**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PROTERRA INC, *et al.*,[1] | ) | Case No. 23-11120 (BLS) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DECLARATION OF GARETH T. JOYCE**
**IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

Pursuant to 28 U.S.C. § 1746, I, Gareth T. Joyce, do hereby declare, under penalty of perjury, the following to the best of my information, knowledge, and belief:

1.      I am the Chief Executive Officer ("CEO") of Proterra Inc, a Delaware corporation (collectively with Proterra Operating Company, Inc., the "Debtors" or the "Company").  I have served in this capacity since January 2022.  I joined the Company in November 2020 as President of Proterra Powered and Proterra Energy (each as defined below). Prior to joining the Company, I served at Delta Air Lines, Inc. ("Delta") as Chief Sustainability Officer beginning in 2020, and prior to that, as Senior Vice President, Airport Customer Service from 2017 to 2020 and President, Delta Cargo from 2016 to 2020.  Prior to Delta, I worked at Daimler AG from 2004 to 2016, including roles at Mercedes-Benz USA (Vice President, Customer Service) and Mercedes-Benz Canada (President and Chief Executive Officer).  Since October 2021, I have served as an independent director of Compass Minerals, a publicly traded producer of minerals, such as salt and magnesium chloride.  I was also appointed by President Biden to

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Proterra Inc (9565); and Proterra Operating Company, Inc. (8459).  The location of the Debtors' service address is: 1815 Rollins Road, Burlingame, California 94010.

serve as a member of the President's Export Council, the principal national advisory committee on international trade.

2.      In my capacity as CEO, I am familiar with the Debtors' operations, day-to-day business affairs, and books and records.  I submit this declaration (this "Declaration") to assist the Court and parties-in-interest in gaining an understanding of the Company, its capital structure, the circumstances that led to the commencement of these chapter 11 cases (collectively, the "Chapter 11 Cases"), the Company's plans to emerge from chapter 11, and in support of the Debtors' petitions and motions requesting various types of "first day" relief (collectively, the "First Day Motions").  I am authorized by the Debtors to submit this Declaration.  If called as a witness, I could and would testify competently to the facts set forth in this Declaration.

3.      Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, my discussions with members of the Debtors' senior management, and information provided to me by the Debtors' professional advisors, including:    (i) Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul, Weiss") and Young Conaway Stargatt & Taylor, LLP ("Young Conaway"), as restructuring co-counsel to the Debtors; (ii) FTI Consulting, Inc. ("FTI"), as financial advisor to the Debtors; and (iii) Moelis & Company LLC ("Moelis"), as investment banker to the Debtors.

4.      On the date hereof (the "Petition Date"), each Debtor filed a voluntary petition for relief with the United States Bankruptcy Court for the District of Delaware (the "Court") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), thereby commencing the Chapter 11 Cases.  The Debtors have filed a motion seeking joint administration of the Chapter 11 Cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure.  The Debtors intend to operate their business and manage their properties

as debtors in possession during the pendency of the Chapter 11 Cases.  No trustee or examiner has been appointed in the Chapter 11 Cases.  As of the date hereof, no statutory committees have been appointed.

5.  **Part I** of this Declaration describes the Debtors' business, including their history, organizational structure, business operations, and prepetition capital structure.  **Part II** describes the events and circumstances leading to the commencement of these Chapter 11 Cases, including the Debtors' prepetition marketing processes.  Finally, **Part III** sets forth the relevant facts in support of the First Day Motions and summarizes the relief requested thereby.

## I.   General Background

### A.   The Debtors' History

6.  The Debtors were founded in 2004 and began building commercial buses in 2008 with their EcoRide bus.  The Debtors sold the first electric transit bus in North America in 2009.  As the Debtors continued to grow, they opened their first factory in Greenville, South Carolina in January 2011.  The Debtors' sales growth expanded substantially in 2011 by signing Proterra Transit customers in Texas, Florida, and South Carolina.  By May 2012, the Debtors signed their first customer contract in the Northeast, with Worcester Regional Transit Authority. The Debtors continued their expansion, and opened their headquarters outside of Silicon Valley in Burlingame, California, in October 2015 with a focus on developing electric powertrain technology.  The Debtors continued to grow over the proceeding years, including through a $155 million investment round co-led by Daimler AG and Tao Capital Partners in September 2018.

7.  As part of the Debtors' growth, the Debtors launched new products to further serve the broader electric commercial vehicle market, expanding beyond electric buses into new vehicle categories with their technology.  In May 2019, the Debtors launched Proterra Energy to provide turnkey energy delivery solutions for heavy-duty vehicle fleets.  Shortly after, in August

2019, the Debtors launched Proterra Powered to leverage Proterra Transit's long history in the electrification space.

8.      The Debtors launched their flagship, fifth generation ZX5 Bus in September 2020 and sold their 1,000th bus in November 2020.  In January 2021, the Debtors announced that they would become a publicly listed company through a merger with ArcLight Clean Transition Corp. ("ArcLight"), a special-purpose acquisition company.  After the shareholders of ArcLight approved the merger on June 11, 2021, the Debtors began trading on the Nasdaq Global Market under the ticker symbol "PTRA" on June 15, 2021.  The Debtors continued to grow their Proterra Powered offerings, announcing plans to open a new EV battery system manufacturing plant in Greer, South Carolina, in December 2021 for production of the Debtors' industry-leading commercial vehicle systems.



**B.      The Debtors' Organizational Structure**

9.      As reflected in the organizational chart set forth below, the Debtors consist of two entities:



10.      Debtor Proterra Inc ("HoldCo"), is a Delaware corporation.  HoldCo became the publicly traded holding company of Debtor Proterra Operating Company, Inc. ("OpCo") on June 15, 2021 pursuant to a "de-SPAC" merger (the "De-SPAC Merger"), as described below.

11.      Prior to the De-SPAC merger, HoldCo was ArcLight, a Cayman special-purpose acquisition company.  As contemplated by the merger agreement governing the De-SPAC Merger (the "Merger Agreement"), HoldCo filed a notice of deregistration with the Cayman Islands Registrar of Companies, together with the necessary accompanying documents, and filed a certificate of incorporation and a certificate of corporate domestication with the Secretary of State of the State of Delaware, under which HoldCo was domesticated and continued as a Delaware corporation.

12.      The De-SPAC Merger was consummated on June 14, 2021 when OpCo—which at the time was named Proterra Inc ("Legacy Proterra")—merged with HoldCo's wholly-owned direct subsidiary, Phoenix Merger Sub, Inc., with OpCo surviving as HoldCo's wholly-owned direct subsidiary.  In connection with the De-SPAC Merger, OpCo's name changed

from Proterra Inc to Proterra Operating Company, Inc. and ArcLight changed its name to Proterra Inc.

13.    The Debtors are managed by their respective boards of directors (each, a "Board" and together, the "Boards"). Each of the Boards is composed of the same nine individuals (each, a "Board Member" and collectively, the "Board Members") as outlined below. In addition, HoldCo has several committees with responsibility to oversee specific areas of the Debtors' management and corporate governance. These committees are:    (a) the nominating, environmental, social, and governance committee (the "Nominating and ESG Committee"), which was formed to ensure the HoldCo Board is properly constituted to meet its fiduciary obligations to stockholders and the Debtors, and to assist the HoldCo Board with corporate governance matters such as nominating members to the HoldCo Board, (b) the audit committee (the "Audit Committee), which was formed to assist the HoldCo Board in fulfilling its oversight responsibilities relating to the Debtors' financial accounting, reporting, and controls, and (c) the compensation committee (the "Compensation Committee"), which was formed to review, evaluate, and make recommendations to the HoldCo Board with respect to the base salary, bonuses, and other compensation of the CEO and the Debtors' other executive officers.

14.    The nine Board Members of each of the Boards are:

    a.    **Gareth Joyce (CEO)**:  As described more fully above, I joined the Debtors in 2020 as President of Proterra Powered and Proterra Energy. I have served as CEO since January 2022.

    b.    **Roger Nielsen (Chairman)**:  Roger Nielsen became the Debtors' Chairman in June 2023. Nielsen joined the Boards in March 2022. He previously served as President and Chief Executive Officer of Daimler Trucks North America ("DTNA") from April 2017 to April 2021. From May 2001 to April 2017, Nielsen served as DTNA's Chief Operating Officer.

    c.    **Jan Hauser**:  Jan Hauser joined the Boards in June 2022. She previously served as Vice President and Chief Accounting Officer of GE from April

2013 to November 2018, where she led a global controllership team of more than 3,000 professionals.  Prior to GE, Hauser was a senior consulting partner in the national office of PricewaterhouseCoopers LLP ("PWC").

d. **ML Krakauer**:  ML Krakauer joined the Boards in January 2022.  She previously served at Dell Corporation (Executive Vice President, Chief Information Officer), where she was responsible for global IT.  Prior to Dell, she served at EMC Corporation (Vice President, Chief Information Officer).

e. **Brook Porter**:  Brook Porter joined the Boards in 2021.  Porter founded G2 Venture Partners in 2016, which invests in transformative technology companies.  He previously served at Kleiner Perkins from 2010 to 2016, where he led investments within their Green Growth Fund.

f. **Jeannine Sargent**:  Jeannine Sargent joined the Boards in October 2018.  Since November 2017, Sargent has served as a Senior Advisor at Generation Investment Management LLP, an investment firm focused on sustainable companies.  Previously, from January 2012 to October 2017, she served at Flex Ltd in multiple leadership roles, including as President of Innovation and New Venture and President of Flex's Energy business.

g. **Constance Skidmore**:  Constance Skidmore joined the Boards in March 2019.  Prior to her retirement in 2009, Skidmore was a partner at PWC, where she worked starting in 1977, including as a member of its governing board.

h. **Michael Smith**:  Michael Smith joined the Boards in July 2014.  Smith currently serves as Chief Executive Officer of CPower Energy.  Previously Smith served as Co-Chief Executive Officer at MyPower Corp. from March 2022 to July 2023.  Prior to MyPower, Smith served as Chief Executive Officer at ForeFront Power.

i. **Jill Frizzley**:  Jill Frizzley was appointed to the Boards shortly before the commencement of the Chapter 11 Cases.  Frizzley currently serves as President of Wildrose Partners, LLC, which offers independent director, fiduciary, governance, restructuring, and other bespoke corporate consulting services.  Frizzley has served on other boards of directors, including, Virgin Orbit Holdings, Inc., iMedia Brands, Inc., and Avaya Holdings Corp. Prior to Wildrose Partners, Frizzley was a counsel at Weil, Gotshal & Manges LLP in its Business Finance & Restructuring group and a counsel at Shearman & Sterling LLP's Bankruptcy & Business Finance group.

15.     In addition, as described below, as the Boards began to evaluate contingency planning to address headwinds facing the Debtors, the Boards created two new committees shortly before the commencement of the Chapter 11 Cases.

16.     *First*, the Boards established a restructuring committee (the "<u>Restructuring Committee</u>"), which was formed to assist the Debtors in their efforts to plan for and assess potential strategic alternatives in connection with a potential restructuring and reorganization of the Debtors and certain of their affiliates in these Chapter 11 Cases, and to explore, assess, and approve all matters in connection with the prosecution of these Chapter 11 Cases.  The Boards granted the Restructuring Committee the authority to assess and approve all matters in connection with the Chapter 11 Cases (other than these Chapter 11 Cases, which were authorized by the full Boards).  The members of the Restructuring Committee are Jill Frizzley, Jan Hauser, Gareth Joyce, ML Krakauer, and Roger Nielsen.

17.     *Second*, the Boards established an Internal Investigation Committee (the "<u>Internal Investigation Committee</u>"), which has the full and exclusive power and authority of the Boards to (a) oversee an independent investigation of any potential claims and causes of action the Debtors may have against any of the Debtors' directors, officers, managers, insiders, equity holders, principals, employees, and other related parties, and (b) determine what actions should be taken, including regarding settlements or releases, on account of such potential causes of action.  The Internal Investigation Committee is composed of Jill Frizzley.

C.     **The Debtors' Business**

18.     As discussed below, today the Debtors operate three distinct business lines (each a "<u>Business Line</u>" and collectively, the "<u>Business Lines</u>") that each address a critical component of commercial and industrial vehicle electrification.  All or substantially all of the three

Business Lines' assets—including the related intellectual property and contracts—and liabilities are held by, or against, OpCo.

### i. Proterra Powered

19.    The Debtors' powered-products Business Line ("<u>Proterra Powered</u>") designs and manufactures proprietary battery systems and electrification solutions for global commercial vehicle original equipment manufacturer ("<u>OEM</u>") customers including Van Hool, Thomas Built Buses (a division of DTNA), and Komatsu.  These OEMs build vehicles in varying sizes spanning the Class 3 to Class 8 vehicle segments, including delivery trucks, school buses, and coach buses, as well as construction and mining equipment, and other applications.  To date, Proterra Powered has partnered with more than a dozen OEMs, spanning several types of on-highway and off-highway categories, and has delivered battery systems and electrification solutions for more than 2,300 vehicles to the Debtors' OEM customers.



*Thomas Built, Proterra Powered battery-electric school bus*



*A Komatsu underground drill with Proterra batteries*

20.    Proterra Powered designs and manufactures its battery packs based upon the core principles of modularity, durability, safety, and scalability.  Its highly modular battery systems come in several sizes and voltages to meet the needs of a variety of commercial vehicle segments and sizes.  Each battery module contains a proprietary battery monitoring board, and

each battery pack contains a proprietary battery management system, which together monitor the performance of the battery pack and communicate with the vehicle.  The battery enclosure aluminum extrusions and casting are designed to be safe and durable even in extreme mechanical and environmental scenarios.  Furthermore, Proterra Powered has worked with LG Chem Ltd., now LG Energy Solution ("LG"), to develop battery cells that are optimized for certain of the Debtors' applications.



*Proterra Powered's purpose-built battery technology is designed to maximize cargo and passenger capacity.*

21.     Proterra Powered also designs and manufactures electric drivetrains, including a single-motor drivetrain—the 275 continuous horsepower ProDrive system—and a dual-motor drivetrain—the 338 continuous horsepower DuoPower system.  Electric drivetrains are a key driver of electric vehicle performance, and the biggest consumer of battery energy.  Both of Proterra Powered's drivetrains provide performance and operability superior to that of a comparably sized commercial diesel vehicle.  The motor in the Debtors' drivetrains weighs 90

kilograms, compared to over 800 kilograms for a typical diesel engine, and may be removed in about four hours, compared to approximately 12 hours for a standard diesel engine.[2]

22.     In addition, Proterra Powered has developed, among other things:  (a) a controls architecture to integrate the battery, drivetrain, charging, and other vehicle hardware for optimal system function, reliability, and safety; and (b) a battery management system ("BMS") and battery monitoring board ("BMB") hardware, software, and patented control algorithms, which are designed to ensure safe and reliable operation in all commercial vehicle applications.

### ii.    Proterra Energy

23.     The Debtors' energy Business Line ("Proterra Energy") provides turnkey fleet-scale, high-power charging solutions and software services.  Historically, Proterra Energy's services and products range from fleet and energy management software-as-a-service, to fleet planning hardware, infrastructure, installation, utility engagement, and charging optimization. Proterra Energy designs these solutions to optimize energy use and costs, and to provide vehicle-to-grid functionality.



*Proterra's charging infrastructure allows charging up to 20 vehicles simultaneously.*

---

[2]     A drivetrain consists of a traction motor, inverter, controller, and gearbox.

24. Proterra Energy currently offers five charger capacities for small-fleet solutions—60 kW, 90 kW, 120 kW, 150 kW, and 180 kW—and a Megawatt class of charger for large-fleet solutions. To date, Proterra Energy has installed more than 110 megawatts of charging infrastructure across North America.

25. Proterra Energy currently operates Proterra Valence (formerly called APEX), a connected vehicle intelligence system. It is a cloud-based data platform that can provide customers performance information about their fleets, and it is designed to provide management of vehicle and charging operations to reduce operating costs. The Debtors' hardware and software connectivity platform is designed for compatibility with each vehicle and charging system that it delivers. Each gateway on a vehicle or charging system automatically connects securely with the Debtors' cloud-based platform. Therefore, the Debtors' data exploration tools offer customers essential data, including current and historical charging metrics, insights, and reports. The Debtors developed and deployed software capabilities to enable customers' vehicles to sell power to the grid at times of high prices.



*Valence's fleet and energy management platform is a cloud-based data platform, offering historical and real-time performance information about customers' battery electric fleet and chargers to reduce costs*

26.     For the first three months ended March 31, 2023, Proterra Powered and Proterra Energy Business Lines realized revenues of approximately $34.7 million, which represented 43.6% of the Debtors' total revenue for the period.  This revenue increased from approximately $23.2 million during the same period in 2022, which represented 39.6% of the Debtors' total revenue.

27.     For the full year 2022, Proterra Powered and Energy Business Lines realized revenues of approximately $118.3 million, which represented approximately 38.2% of the Debtors' total revenue for the year.  Additionally, this revenue increased from approximately $47.3 million in 2021 when Proterra Powered's and Proterra Energy's percentage of total revenue was 19.5%.

### iii.     Proterra Transit

28.     The Debtors are a leader in the U.S. electric transit bus market through their transit Business Line ("Proterra Transit"), which designs, develops, and sells electric transit buses as an OEM for North American public transit agencies, airports, universities, and other commercial transit fleets.  Proterra Transit vehicles showcase and validate the Debtors' electric vehicle technology platform through rigorous daily use by a large number of sophisticated customers focused on meeting the wide-ranging needs of the communities they serve.

29.     As of the Petition Date, Proterra Transit has delivered over 1,000 electric transit buses, including 199 new transit buses and 14 pre-owned buses delivered in 2022.  Proterra Transit's electric transit buses have collectively been driven more than 40 million cumulative service miles spanning a spectrum of climates, conditions, altitudes, and terrains.

30.     Proterra Transit focuses on manufacturing 35-foot and 40-foot buses because these bus sizes represent more than three-quarters of the bus market.  Currently, Proterra

Transit offers buses with battery sizes up to 492 kWh on the 35-foot and up to 738 kWh on its 40-foot ZX5 variant.  Proterra Transit's buses can provide a range of more than 300 miles on a single charge and offer significant total cost of ownership savings compared to an equivalent diesel- and natural gas-powered bus.

31.     Proterra Transit customers are generally transit authorities who depend on federal government funding and programs as well as other state funding programs.  Federal and state funding has accelerated the adoption of electric vehicles in the market.  Proterra Transit's principal customers are eligible for government funding, including programs authorized under the Fixing America's Surface Transportation (FAST) Act, to accelerate investment into electric transit fleets.  The FAST Act, passed in December 2015, allocated over $305 billion for highway, transit, and vehicle safety programs for a five-year period ending September 30, 2020.  The FAST Act has subsequently been extended and reauthorized under the 2021 Infrastructure and Investment Jobs Act, known as the "Bipartisan Infrastructure Law."  The Bipartisan Infrastructure Law also provides approximately $567 billion in funding programs under the U.S. Department of Transportation's ("USDOT") jurisdiction with $39 billion allocated to fund transit.  There are also certain state funding programs, including in California, which provides a point-of-sale discount to organizations that purchase hybrid and electric buses.

32.     Proterra Transit's bus body further distinguishes its product from the market.  While other manufacturers use a modified steel body and frame that was originally designed for an internal combustion engine, the Debtors have partnered with a supplier, TPI Composites, Inc. ("TPI"), to design and manufacture a lighter weight bus body with advanced material specifically designed for an electric powertrain.



*Proterra Transit's 738 kWh ZX5-Max offers the most energy on board a 40-foot transit bus in North America*

33.    Despite its technology and position in the market, Proterra Transit has experienced headwinds to its business that also affect the other players in the commercial electric transit business sector.  Proterra Transit works with some of the largest, most sophisticated transit agencies in North America.  These transit agencies demand highly customized buses that align with the other buses in their respective fleets.  Therefore, the manufacturing process requires much customization, which makes scaling the business difficult and requires an extensive amount of working capital.

34.    The electric transit industry has been further challenged by the inflationary macroeconomic environment.  For example, as reported by the U.S. Bureau of Labor Statistics, the 12-month change in the Consumer Price Index (the "CPI Index") reached over 9% in June 2022.  The CPI Index remained over 5% until March 2023 and remains elevated to this day.  The inflationary environment proved challenging for Proterra Transit as there is limited ability to pass along higher costs to customers once contracts are signed.  Contracts are typically signed 12 to 18 months prior to bus manufacturing.  Therefore, contracts signed in 2021 proved to be priced below where the manufacturing costs were ultimately realized in 2022.

35.     Additionally, the Debtors faced another macro environment challenge as supply chain disruptions slowed and weighed on the Debtors' production efforts.  Given the highly customized nature of the buses, small delays and disruptions can cause significant production inefficiency.  Delays in manufacturing impacted the Debtors' relationship with, amongst others, TPI.  In order to ensure the Debtors had an adequate supply of their composite bus bodies, the Debtors had to make financial commitments to take delivery of a certain number of bus bodies per year.  As the Debtors were unable to reach their agreed-upon deliveries, they faced significant penalties under the TPI contract.  While the Debtors were able to renegotiate the TPI contract to lessen the penalties to some degree, the Debtors still faced liabilities from an inability to accept the agreed-upon bus body minimums.  The Debtors explored, amongst other options, increasing production by instituting a second shift of work; however, given the supply chain difficulties and associated cost inefficiencies, this would have been prohibitively costly.  In addition to the TPI contract, the Debtors faced additional late-delivery penalties from their customers.

36.     For the first three months ended March 31, 2023, Proterra Transit realized revenues of approximately $44.9 million, which represented 56.4% of the Debtors' total revenue for the period.  Additionally, this revenue increased from approximately $35.4 million during the same period in 2022.  Proterra Transit's percentage of revenue decreased from 60.4% of the Debtors' total revenue during the same period in 2022.

37.     For the full year 2022, Proterra Transit realized revenues of approximately $191.1 million, which represented approximately 61.8% of the Debtors' total revenue for the year.  Additionally, this revenue decreased moderately from approximately $195.6 million in 2021.  Proterra Transit's percentage decreased from 80.5% of the Debtors' total revenue during 2021.

### iv.    The Debtors' Employees and Geographical Footprint

38.    As of the Petition Date, the Debtors employ approximately 1,186 employees, independent contractors, and other supplemental workers across their Business Lines, including 567 at Proterra Powered, 405 at Proterra Transit, 50 at Proterra Energy, and 164 in general corporate functions.  The Debtors' headquarters are in Burlingame, California.  Proterra Powered's engineering team is mostly based in Burlingame, California, and the manufacturing team is principally in Greer, South Carolina.  Proterra Transit's vehicle engineering team is based primarily in Greenville, South Carolina, and includes a number of experienced sub-teams organized by vehicle technology.  As announced in January 2023, to improve their operational efficiency, the Debtors are in the process of closing their City of Industry, California, battery manufacturing facility, and moving the manufacturing to existing South Carolina facilities.  The Debtors anticipate that they will have vacated the City of Industry, California, facility by the end of 2023.  Additionally, the Debtors have ceased battery production at their Burlingame, California, headquarters.



39.     Recognizing the risk of employee attrition following the commencement of these Chapter 11 Cases, prior to the Petition Date, the Debtors evaluated their employee programs. The Debtors instituted a Key Employee Retention Plan ("KERP") to provide retentive compensation to certain employees identified by the Debtors' management as critical to business continuity during these Chapter 11 Cases.  The KERP provided prepetition payments to approximately 19 employees in the total amount of approximately $2.25 million.  The KERP supersedes previously granted retention awards to relevant employees and is subject to conditions, including the ability to claw back payments if participants depart the Debtors prior to certain targets.  In addition, the Debtors instituted a leadership stabilization plan that provided for retention payments to five senior employees in a total amount of approximately $2.40 million that is also subject to clawback conditions.  For certain employees and officers not covered by the prepetition KERP or leadership stabilization plan, the Debtors plan to file motions seeking authorization to enter into a postpetition KERP as well as a Key Employee Incentive Program ("KEIP").

D.     **The Debtors' Capital Structure**

40.     As of the Petition Date, the Debtors have approximately $199.1 million of funded debt obligations, consisting of (a) $21.9 million of letters of credit issued under the First Lien Credit Facility (as defined below) and (b) $177.2 million in principal amount of Second Lien Convertible Notes (as defined below).

| Funded Debt | Maturity | Approximate Amounts Outstanding as of the Petition Date |
|---|---|---|
| **First Lien Credit Facility:**<br>*Revolving Loans*<br>*Letters of Credit* | May 9, 2024[3] | $0<br>$21.9 million[4] |
| **Second Lien Convertible Notes** | August 4, 2028[5] | $177.2 million |

### i.    First Lien Credit Facility

41.    As of the Petition Date, the Debtors have no balance outstanding under a First Lien Credit Facility (the "First Lien Credit Facility") documented pursuant to that certain Loan, Guaranty and Security Agreement dated as of May 8, 2019, by and among Legacy Proterra, the lenders from time to time party thereto (collectively, the "Prepetition First Lien Lenders"), the issuing bank party thereto (the "Issuing Bank"), and Bank of America, N.A. ("Bank of America"), as administrative agent (as amended, amended and restated, supplemented or otherwise modified prior to the date hereof, the "Senior Credit Agreement").  The borrowing capacity of the First Lien Credit Facility is up to the lesser of the Borrowing Base (as defined in the Senior Credit Agreement) and $75.0 million.  In the absence of an Event of Default under and as defined in the Senior Credit Agreement, the Prepetition First Lien Lenders' loan commitments under the First Lien Credit Facility were available to the Debtors on a revolving basis through the earlier of May 9, 2024 or 91 days prior to the stated maturity of any subordinated debt in aggregate amount of $7.5

---

[3]    The First Lien Credit Facility has a springing maturity of May 9, 2024 or 91 days prior to the stated maturity of any subordinated debt in aggregate amount of $7.5 million or more.

[4]    This figure represents the total amount committed in Prepetition Letters of Credit that could become drawn upon.

[5]    $3.5 million of the original principal amount has a maturity date of August 4, 2025, as this amount did not have its maturity date extended as part of the March 31, 2023 amendment.

million or more.  The maximum availability under the First Lien Credit Facility is based on certain specified percentage of eligible accounts receivable and inventory, subject to certain reserves.

42.    The First Lien Credit Facility includes a $25.0 million letter of credit sub-line as of March 31, 2023.  As of the Petition Date, approximately $21.9 million of letters of credit have been issued and are outstanding under the Senior Credit Agreement (collectively, the "Prepetition Letters of Credit").

43.    The First Lien Credit Facility is secured by a security interest in substantially all of the Debtors' assets except certain excluded assets.  In accordance with that certain Intercreditor Agreement (the "Intercreditor Agreement"), dated as of August 4, 2020, by and between Bank of America as first lien agent ("the First Lien Agent" together with the Prepetition First Lien Lenders and the Issuing Bank, the "Prepetition First Lien Secured Parties") and CSI GP I LLC as collateral agent for the Second Lien Convertible Notes (as defined below) (the "Second Lien Agent" and collectively with the First Lien Agent, the "Agents"), the security interests securing, and subject to certain conditions set forth in the First Lien Payment Facility, the payment of, the Second Lien Convertible Notes are subordinated to those of the First Lien Credit Facility.

### ii.    Second Lien Convertible Notes

44.    As of the Petition Date, there are approximately $177.2 million of convertible notes (the "Second Lien Convertible Notes") outstanding that were issued by the Debtors pursuant to that certain Note Purchase Agreement, dated as of August 4, 2020, by and among Legacy Proterra, the investors from time to time party thereto (the "Second Lien Convertible Noteholders" and with the Second Lien Agent, the "Prepetition Second Secured Parties"), the guarantors from time to time party thereto, and the Second Lien Agent (as amended, amended and restated, supplemented or otherwise modified prior to the date hereof, the "Note

Purchase Agreement" and with the Senior Credit Agreement, the "Loan Documents").  Since the

March 2023 Amendment (as defined and discussed below), the Note Purchase Agreement

provided that the Second Lien Convertible Notes bear interest of 12.0% per year, consisting of

5.0% in cash and 7.0% PIK.  Prior to the March 2023 Amendment, the Second Lien Convertible

Notes bore cash interest of 5.0% per annum and payment-in-kind interest of 4.5% per annum

payable at each quarter end.  The Cowen Parties (as defined below) own approximately 98% of

the Second Lien Convertible Notes.

45.     Each of the Second Lien Convertible Notes rank equally without preference

or priority of any kind over one another.  Each Second Lien Convertible Note is senior in all rights,

privileges, and preferences to all other shares of the Debtors' capital stock and all other securities

of the Debtors that are convertible into or exercisable for the Debtors' capital stock directly or

indirectly.  The Second Lien Convertible Notes are secured by substantially all of the assets of

OpCo, including its intellectual property.  As discussed above, the security interests securing the

Second Lien Convertible Notes are subordinated to those of the First Lien Credit Facility.

46.     Upon the filing of these Chapter 11 Cases, the amounts under the Second

Lien Convertible Notes accelerated and became automatically and immediately due and payable

without any action taken by the Second Lien Agent, triggering the Maturity Date (as defined in

the Note Purchase Agreement) of the Second Lien Convertible Notes (the "Notes Maturity Date").[6]

47.     The Note Purchase Agreement provides for a premium that is triggered

upon certain liquidation or sale events (as defined in the Note Purchase Agreement, each a

---

[6]     The Note Purchase Agreement (as amended by the March 2023 Amendment) defines "Maturity Date" as (as
applicable):  "the earlier of (a) August 4, 2028, or (b) the time at which the Balance of this Note is due and payable
upon an Event of Default."

"Liquidation Event") that occur prior to the Notes Maturity Date.  Subject to certain terms and conditions, the Note Purchase Agreement provides for a premium of (a) 50% of the principal balance of the Second Lien Convertible Notes, or (b) the consideration that the holders would have received had the holders elected to convert the Second Lien Convertible Notes into common stock of HoldCo immediately prior to such liquidation event (the "Liquidation Premium").  For the reasons to be set forth in the forthcoming *Debtors' Motion for Entry of Interim Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* (the "Cash Collateral Motion"), my understanding is that the Liquidation Premium has not been triggered by the filing of these Chapter 11 Cases.

48.     As to be set forth in the Pugh Declaration in support of the Cash Collateral Motion, based on analysis provided by FTI, the Debtors determined that they could support the use of cash collateral during these Chapter 11 Cases and planned to approach the Cowen Parties to obtain their consent after the Petition Date.  The Debtors chose to approach the Cowen Parties postpetition to avoid any risk, however small, that the Cowen Parties would attempt to argue that their consent to these Chapter 11 Cases triggered the Liquidation Premium.  For reasons to be set forth in the Cash Collateral Motion, the Debtors believe that the risk that the Liquidation Premium would be triggered by such consent is de minimis, but the Debtors nevertheless determined that the most prudent course of action was to approach the Cowen Parties after the filing of these Chapter 11 Cases.  The Debtors hope to work cooperatively with the Cowen Parties during the pendency of these Chapter 11 Cases.

49.     The Note Purchase Agreement also requires the Company to maintain liquidity at quarter end of not less than the greater of (a) $75.0 million and (b) four times of Cash

Burn (as defined therein) for the three-month period then ended (the "Minimum Liquidity Covenant"). The Company was not in compliance with the Minimum Liquidity Covenant as of December 31, 2022. The Company received a waiver of the Liquidity (as defined therein) requirement in February 2023, which provided for retroactive effect, so that no event of default occurred in the year ended December 31, 2022.

50.    The Debtors, with CSI I Prodigy Holdco LP, CSI Prodigy Co-Investment LP, CSI GP I LLC, and CSI PRTA Co-Investment LP (collectively, the "Cowen Parties"), entered into an amendment to the Note Purchase Agreement on March 31, 2023 (the "March 2023 Amendment"). This amendment altered the interest rate, maturity date, mandatory and optional conversion rights, limitations on the issuance of shares of the Debtors' common stock, minimum liquidity requirements, and certain other covenants. The amendment also provided for a (a) waiver of the Minimum Liquidity Covenant through May 31, 2024, and instead required a minimum Liquidity of $125.0 million as of the last day of each quarter from March 31, 2023 through and including May 31, 2024, and (b) waiver of the requirement that the Debtors' financial statements be certified by the Debtors' auditor without a going concern qualification for fiscal years 2022 and 2023.

### iii.    Common Equity

51.    As of the Petition Date, HoldCo's common stock trades on the Nasdaq Global Selection Market ("Nasdaq") under the ticker symbol "PTRA." As of market close on August 7, 2023, the market capitalization of HoldCo's stock was approximately $325 million.[7]

---

[7]    The Debtors have approximately 900 warrants outstanding exercisable at $4.98.

## II.    Events Leading to Chapter 11

52.    The Debtors entered 2023 at a crossroads.  Proterra Transit had helped foster the development and growth of Proterra Powered and Proterra Energy.  However, headwinds facing Proterra Transit started to interfere significantly with the other Business Lines' simultaneous growth.  Recognizing this overhang, the Debtors employed investment banks to explore potential third-party investments involving the Business Lines or a sale of Proterra Transit; however, the Debtors' single OpCo corporate structure, coupled with some burdensome contracts in Proterra Transit and a debt covenant forbidding the raising of additional secured debt, inhibited the Debtors' ability to execute such a transaction.  Ultimately, the Debtors determined that filing these Chapter 11 Cases was the most effective manner to address these challenges for the benefit of all of the Debtors' stakeholders.

### A.    Challenges at Proterra Transit and Their Impact on Proterra Powered and Proterra Energy

53.    Proterra Powered and Proterra Energy require additional capital in order to continue to innovate, grow, and reach their full potential in a highly competitive industry.  The Debtors believe there is substantial incremental value to unlock through the continued growth of Proterra Powered and Proterra Energy and continue to invest in those Business Lines to maximize and preserve value for all stakeholders.  However, the Debtors' ability to do so has come under substantial pressure because of constraints posed by Proterra Transit and the Debtors' existing corporate structure and limitations on additional borrowing.

54.    While Proterra Transit was the Debtors' original flagship Business Line that helped position the Debtors' other Business Lines to start and grow, it demands a large amount of working capital.  For example, in order to build the highly customized buses their customers demand, the Debtors must maintain extensive and often unique inventories, which when combined

with labor-intensive manufacturing, require a large amount of working capital.  Moreover, as more fully described above, Proterra Transit had to contend with long-term contracts that have become economically unfavorable over time, putting significant strain on the Debtors' liquidity.[8]

55.    Despite growing the number of new electric transit buses delivered from 170 in 2020 to 199 in 2022, Proterra Transit was unable to grow sufficiently to cover the costs of its business or satisfy minimum volume and delivery requirements in certain of its contracts with suppliers, contractors, and customers.  For example, Proterra Transit was unable to satisfy its contracted minimum volume commitments to TPI, the supplier of the Debtors' bus bodies, in 2022, resulting in the Debtors' payment of $3.0 million in liquidated penalties.

56.    The capital-intensive business and burdensome contracts of Proterra Transit along with the growth capital needs of Proterra Powered and Proterra Energy have weighed on the Debtors' liquidity.  In March 2023, the Debtors filed their annual report on Form 10-K pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 (the "2022 10-K"), which noted that their independent registered public accounting firm's audit report includes an explanatory paragraph expressing substantial doubt about the Debtors' ability to continue as a going concern.  Prior to the 2022 10-K, the Debtors and the Cowen Parties, as the majority holders of the Second Lien Convertible Notes, were in negotiations to address a potential financial covenant default.  However, the Debtors and the Cowen Parties were unable to reach an agreement with enough time to avoid the going-concern qualifier.  The Debtors decided to file the 2022 10-K with such a qualifier and continued to negotiate with the Cowen Parties.  As previously discussed, shortly after

---

[8]    Recently, the Debtors have focused on signing larger contracts that help facilitate scale and help address the working capital requirements.  However, these contracts are not expected to go into production until 2024.

filing the 2022 10-K, the Debtors entered into the March 2023 Amendment to address their breach of the Note Purchase Agreement's Minimum Liquidity Covenant.

**B.    The Debtors' Cost-Cutting Measures and Prepetition Marketing Process**

57.    The Debtors sought to strengthen their business as the headwinds facing Proterra Transit were realized.  Throughout 2022 and continuing into 2023, the Boards developed and refined their strategic plan.  As part of this process, the Boards carefully reviewed all the options for the Debtors.  The Debtors decided the best long-term path for the Debtors and their stakeholders was to raise additional capital and to focus on Proterra Powered and Proterra Energy.

58.    At the conclusion of this strategic planning, the Debtors engaged Morgan Stanley & Co. LLC ("Morgan Stanley") in February 2023 as a financial advisor to explore raising incremental financing either from new investors or the Company's existing creditors.  The Debtors also engaged Moelis in April 2023 to assist in the raising of additional capital.  Morgan Stanley and Moelis collectively communicated with 25 potential counterparties in the capital raise process, including 13 potential strategic investors and 12 potential financial investors during this time.  In addition, Moelis was engaged to find an acquirer for Proterra Transit.  Moelis communicated with 26 potential investors and the Debtors executed 15 NDAs, of which 11 were with potential strategic investors during this sales process.  None of the potential investors ultimately submitted a bid for Proterra Transit.  While the focus of Morgan Stanley and Moelis' engagement was to explore incremental financing and to divest Proterra Transit, certain potential investors also expressed interest in potentially purchasing Proterra Powered and Proterra Energy.

59.    The Debtors faced two structural impediments to raising new capital.  First, the Debtors received feedback that while investors were interested in investing into or lending against the Proterra Powered Business Line, these potential sources of capital were not inclined to invest given the corporate structure and the lack of ability to isolate these assets from Proterra

Transit's funding need and contractual liabilities.  Second, the Second Lien Convertible Notes essentially precluded the raising of additional secured debt, which largely limited the potential structures to equity investments.

60.     The Debtors examined options to scale back and also to separate Proterra Transit from the other Business Lines.  The Debtors also explored scaling back Proterra Transit. However, running Proterra Transit at a diminished scale without renegotiating contracts would not materially solve the working capital or cost structure issues of the Business Line; additionally, the Business Lines near-term contracts maintained slim or negative gross margins.  Finally, the Debtors explored separating Proterra Transit from the other Business Lines, but out of court such a strategy would not effectively segregate Proterra Transit's liabilities.  Therefore, out of court, despite having potential investors express interest in Proterra Powered and Proterra Energy, the Debtors were unable to raise additional capital or otherwise address the structural impediments posed by Proterra Transit.

61.     The Debtors' prepetition marketing processes for potential out-of-court transactions made two facts clear:  On the one hand, there was interest in the Debtors' Business Lines—particularly Proterra Powered and Proterra Energy—and on the other hand, the commingling of Proterra Transit's liabilities within the same corporate entity as the other Business Lines frustrated the Debtors' ability to execute any out-of-court sale or financing transaction. Moreover, given the limitations on borrowing under the Note Purchase Agreement, the Debtors were foreclosed from raising additional debt.

62.     In addition to the marketing process, the Debtors undertook numerous measures to attempt to cut costs and stabilize the business, while attempting to mitigate any potential impact to the growth trajectory of the Business Lines.  For example, in January 2023, the

Debtors announced that they would be closing their City of Industry, California, facility by December 31, 2023 in order to improve operational efficiency.  The Debtors also stopped battery production at their Burlingame, California, headquarters, and concentrated their battery production in Greer, South Carolina.  In conjunction with focusing their manufacturing in South Carolina, the Debtors made the difficult decision to undertake a reduction of workforce.  The Debtors sought to eliminate approximately 300 jobs through this reduction.

### C.    Commencement of the Chapter 11 Cases

63.    The Debtors' extensive prepetition marketing process and the accompanying feedback from potential investors informed the Debtors' decision to bolster their contingency planning efforts and ultimately commence these Chapter 11 Cases.  Only through these Chapter 11 Cases could the Debtors address their burdensome Proterra Transit contracts, and their associated liabilities, and the related impediments posed by the Debtors' corporate structure and existing limitations on borrowing.

64.    The Debtors engaged FTI and Paul, Weiss in June 2023 to support their contingency planning efforts, including exploring a potential in-court process to address their significant liquidity constraints and liabilities.

65.    Additionally, as the Boards continued contingency planning with assistance of their advisors, the Boards decided to:  (a) appoint a new independent director—Jill Frizzley—to the Boards; (b) create the Restructuring Committee, appoint Jill Frizzley, Jan Hauser, Gareth Joyce, ML Krakauer, and Roger Nielsen as Restructuring Committee's members, and grant the Restructuring Committee the authority to assess and approve all matters in connection with the Chapter 11 Cases (other than these Chapter 11 Cases, which were authorized by the full Boards); and  (c) create the Internal Investigation Committee to oversee an independent internal

investigation of any potential claims and causes of action of the Debtors, and appoint Jill Frizzley as its sole member.

66.    Ultimately, the Debtors decided to commence these Chapter 11 Cases in order to overcome the challenges that hindered an out-of-court solution.  The Debtors intend to use the tools provided by the Bankruptcy Code, including the breathing spell provided by the automatic stay, the ability to reject burdensome contracts, and the ability to sell assets free and clear of liabilities, to preserve and maximize value for the benefit of the Debtors' estates and stakeholders.  The Debtors plan to file shortly their bidding procedures motion (the "Bidding Procedures Motion"), which will request this Court's approval of bidding procedures for bids on one or more potential sales of their assets (including all or any portion of any Business Lines' assets) or other strategic investments, including exit financing in connection with a potential plan of reorganization.  In accordance with the bidding procedures, the Debtors plan to conduct a postpetition marketing process and are optimistic that the process will result in one or more value-maximizing and executable transactions.

## III.    First Day Motions[9]

67.    As a result of my first-hand knowledge, and review of various materials, and information, and discussions with members of the Debtors' management and advisors, I have formed opinions as to (a) the necessity of obtaining the relief sought by the Debtors in the First Day Motions, (b) the need for the Debtors to continue to operate effectively while working to maximize the value of their assets for the benefit of all stakeholders, and (c) the immediate and irreparable harm to which the Debtors will be exposed upon the commencement of these

---

[9]    Capitalized terms used in this section but not otherwise defined herein shall have the meanings ascribed to such terms in the First Day Motions, as applicable.

Chapter 11 Cases unless the limited relief requested in the First Day Motions is granted without delay.

68.     As described more fully below, the relief requested in the First Day Motions was carefully tailored by the Debtors, in consultation with their advisors, to ensure that the Debtors' immediate operational needs are met so that the Debtors can continue their business in the ordinary course, and that the Debtors suffer no immediate and irreparable harm at the outset of these Chapter 11 Cases.  I, or my colleagues at my instruction, participated in the analysis that informed each First Day Motion, and assisted in developing the relief requested therein and reviewed the pleadings related thereto.  At all times, the Debtors' management and professionals remained cognizant of the limitations imposed on a debtor in possession and, in light of those limitations, the Debtors narrowed the relief requested at the outset of these Chapter 11 Cases to those matters that require urgent relief to sustain the Debtors' immediate operations and preserve value during the pendency of these Chapter 11 Cases.  It is my opinion that the Debtors would suffer immediate and irreparable harm if the relief requested in the First Day Motions is not granted.

### A.     Joint Administration Motion

69.     By this motion, (the "Joint Administration Motion"), the Debtors request entry of an order approving the joint administration of these Chapter 11 Cases for procedural purposes only, authorizing the joint administration of these Chapter 11 cases, and the consolidation thereof for procedural purposes only, and approving a case caption as set forth below:

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| PROTERRA INC, *et al.*,[1] | ) Case No. 23-11120 (BLS) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Proterra Inc (9565); and Proterra Operating Company, Inc. (8459).  The location of the Debtors' service address is: 1815 Rollins Road, Burlingame, California 94010.

70.     I understand that many, if not all, of the motions, applications, hearings, and orders that will arise in these Chapter 11 Cases will jointly affect all of the Debtors.  For this reason, the interests of the Debtors, their creditors, and other parties in interest would be best served by the joint administration of these Chapter 11 Cases.  In order to optimally and economically administer these Chapter 11 Cases, the Debtors submit that such cases should be jointly administered, for procedural purposes only, under the case number assigned to Proterra Inc.

71.     In addition, I believe that it would be far more practical and expedient for the administration of the Chapter 11 Cases if the Court were to authorize their joint administration, which will reduce costs and facilitate the administrative process by avoiding the need for duplicative notices, applications, and orders.  It is my understanding that no prejudice will befall any party by the joint administration of the Debtors' cases, as the relief sought therein is solely procedural, and not intended to affect substantive rights.  In light of the foregoing, the Debtors respectfully request that the Joint Administration Motion be granted.

B.      **Claims Agent Retention Application**

72.      By this application, (the "Claims Agent Retention Application"), the Debtors request entry of an order, pursuant to 28 U.S.C. § 156(c), Bankruptcy Rule 2002(f), and Local Rule 2002-1(f), authorizing the retention and appointment of Kurtzman Carson Consultants LLC ("KCC") as claims and noticing agent in these Chapter 11 Cases.  I believe that the relief requested in the KCC retention application will ease the administrative burden on the Clerk of the Court in connection with these Chapter 11 Cases.  In light of the foregoing, and KCC's competitive rates, the Debtors respectfully request that the application to retain KCC as claims and noticing agent be approved.

C.      **Creditor Matrix Motion**

73.      By this motion (the "Creditor Matrix Motion"), the Debtors seek entry of an order (a) authorizing the Debtors to a file a consolidated list of creditors in lieu of submitting separate mailing matrices for each Debtor, (b) authorizing the Debtors to file a consolidated list of the Debtors' 30 largest unsecured creditors in lieu of submitting separate lists for each Debtor, (c) authorizing the Debtors to redact certain personal identification information, including, but not limited to, home addresses and email addresses of the Debtors' former and current employees under seal, (d) authorizing the Debtors to provide the sealed consolidated list of creditors to the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"), any official committee appointed in these Chapter 11 Cases, and any other party upon Court order, and (e) granting related relief.

74.      The Debtors, working together with KCC and FTI, have already prepared a single, consolidated list of all of the Debtors' creditors (the "Consolidated Creditor Matrix") in electronic format.  I believe that permitting the Debtors to maintain the Consolidated Creditor Matrix, in lieu of filing a separate creditor matrix for each Debtor, is warranted in these Chapter

11 Cases to ease the administrative burden of preparing individual creditor matrixes for each Debtor. I believe that the Consolidated Creditor Matrix will be sufficient to allow KCC to provide notice to all creditors, as well as applicable parties in interest during the Chapter 11 Cases, as required by Local Rule 1007-2. Redaction of the home and email addresses of the Debtors' former and current employees will help the Debtors ensure compliance with the California Privacy Protection Act, which applies to entities conducting business in California with more than $25 million in gross revenue, such as the Debtor.

75. To provide the U.S. Trustee with a clearer picture of the Debtors' creditor constituency, the Debtors have prepared the Consolidated Top 30 Creditors List as opposed to a list of the twenty (20) largest unsecured creditors for each Debtor. I understand that one of the primary purposes of filing a list of a debtor's largest unsecured creditors is to facilitate the U.S. Trustee's evaluation of the types and amounts of unsecured claims asserted against a debtor so that the U.S. Trustee can make an informed decision when identifying potential candidates to serve on an official committee of unsecured creditors. Because the Debtors' significant unsecured creditors are captured on the Consolidated Top 30 Creditors List, it will provide the U.S. Trustee with a sufficiently clear picture of the Debtors' unsecured creditor constituency. In addition, the Consolidated Top 30 Creditors List will help alleviate administrative burdens, costs, and the possibility of duplicative service.

76. In light of the foregoing, the Debtors respectfully request that the Creditor Matrix Motion be granted.

**D.    Utilities Motion**

77. By this motion (the "Utilities Motion"), to ensure continued provision of utility services (the "Utility Services") to the Debtors and the Debtors' manufacturing and production operations, the Debtors seek entry of interim and final orders (a) prohibiting the

Debtors' utility service providers (collectively, the "Utility Companies") from altering, refusing, or discontinuing utility service on account of unpaid prepetition invoices, (b) deeming the Utility Companies to have received adequate assurance of future payment, and establishing procedures for resolving requests for additional assurance of payment, and (c) granting related relief. The Debtors propose establishing a segregated account into which the Debtors will deposit a sum equal to approximately 50% of the Debtors' estimated aggregate utility expenses for one month and, additionally, have proposed standard procedures to address any request made by the Utility Companies for additional adequate assurance.

78.     Any disruption of the Debtors' Utility Services would cause irreparable harm to the Debtors' business operations, their estates, and their ability to maximize value through these Chapter 11 Cases. For the foregoing reasons, I believe that the relief requested in the Utilities Motion is in the best interest of the Debtors, their estates, and their creditors, and should therefore be approved.

### E.    Taxes Motion

79.     By this motion (the "Taxes Motion"), the Debtors request entry of interim and final orders (a) authorizing the Debtors to remit or pay (or use tax credits or other attributes to offset or otherwise satisfy) certain taxes and fees (the "Taxes and Fees") that are or will become due and payable to various federal, state, and local taxing, and other governmental authorities and/or certain municipal or governmental subdivisions or agencies of those governmental units (collectively, the "Authorities") determined by audit or otherwise determined to be owed for periods prior to the Petition Date, and (b) granting related relief, all as more fully set forth in the Taxes Motion.

80.     The Taxes and Fees are paid monthly, quarterly, or annually to the respective Authorities, depending on the given Tax or Fee and the relevant Authority to which it

is paid.  The Debtors estimate that no more than $4,170,000 in Taxes and Fees has accrued as of the Petition Date or otherwise relates to the prepetition period and will become due and owing to Authorities after the Petition Date.  Of this amount, the Debtors estimate that approximately no more than $2,075,000 will become due and owing to Authorities on or before the date on which a hearing is scheduled to consider approval of the Taxes Motion on a final basis.

81.     I believe the Debtors' timely payment of the Taxes and Fees is necessary to prevent the adverse consequences that likely would result from a failure to remit the payments, including the failure to maintain good standing, potential audits, the loss of essential permits and licenses necessary to operate their manufacturing and production operations, and/or other enforcement actions or remedies pursued by Authorities.  Significant disruptions to the Debtors' operations of this type threaten to irreparably impair the Debtors' efforts in the Chapter 11 Cases.

82.     Moreover,  I believe that the Court should authorize the payment of Taxes and Fees because (a) certain of the Taxes and Fees do not constitute property of the Debtors' estates, (b) certain of the Taxes and Fees constitute priority claims, and (c) the failure to pay certain of the Taxes and Fees may impact the Debtors' ability to conduct business in certain jurisdictions and their ability to perform under their postpetition agreements.  Absent payment of these amounts, the Debtors may face serious disruptions and distractions during the administration of the Chapter 11 Cases, thus hindering the Debtors' efforts to maximize estate value through these restructuring proceedings.

83.     Specifically, I understand from counsel that the sales & use taxes and excise taxes paid by the Debtors are "trust fund taxes" that, by definition, are held by the Debtors in trust for the benefit of those third parties to whom payment is owed or on behalf of whom such payment is being made.  Because I understand that the Taxes and Fees that are trust fund taxes do not

constitute property of the Debtors' estates, these amounts will not otherwise be available for distribution to the Debtors' creditors.  Thus, I believe that payment of these Taxes and Fees will not adversely affect the Debtors' estates and, accordingly, is warranted.  I also understand from counsel that claims for certain of the Taxes and Fees are or may be priority claims entitled to payment before general unsecured claims pursuant to section 507(a)(8) of the Bankruptcy Code. Therefore, payment of such Taxes and Fees at this time only affects the timing of the payment for the amounts at issue and will not unduly prejudice the rights and recoveries of junior creditors. Furthermore, by paying such Taxes and Fees now, the Debtors will avoid any unnecessary fees, interest, or penalties that might otherwise accrue.

84.    I also believe that some of these Authorities may initiate audits, attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay, and/or pursue other remedies if the Debtors fail to pay the Taxes and Fees promptly.  Such actions would further divert attention and resources from the process of administering these Chapter 11 Cases and harm the Debtors' estates.

85.    For the foregoing reasons, I believe that the relief requested in the Taxes Motion is in the best interests of the Debtors, their estates, and their creditors, and should therefore be approved.

### F.    Cash Management Motion

86.    By this motion (the "Cash Management Motion"), the Debtors seek entry of interim and final orders (a) authorizing the Debtors to (i) continue using their existing Cash Management System, (ii) maintain the Bank Accounts and Business Forms, (iii) continue the Corporate Credit Card Programs, and (iv) honor certain prepetition obligations related to the Cash Management System; (b) waiving strict compliance with section 345(b) of the Bankruptcy Code

and certain operating guidelines related to the Bank Accounts upon entry of the Final Order, to the extent applicable; and (c) granting related relief.

87.     As described in detail in the Cash Management Motion, the Debtors maintain an integrated cash management system in the ordinary course of their operations (the "Cash Management System").  Pursuant to the Senior Credit Agreement, the Debtors maintain their active cash management bank accounts with Bank of America and its affiliate, Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill").   To lessen the disruption caused by the bankruptcy filings and maximize the value of their estates in these Chapter 11 Cases, it is vital that the Debtors be permitted to maintain their Cash Management System and be authorized to, *inter alia*, pay any outstanding bank and processing fees owed in relation to their Cash Management System, continue utilizing their two corporate credit card programs (the "Corporate Credit Card Programs"), and maintain their existing business forms.  As part of the Cash Management Systems, the Debtors maintain a cash investment account (the "WCMA Account"), which has approximately $127 million in U.S. Treasury Holdings and $4 million in the BlackRock BLF FedFund, which invests at least 99.5% of its total assets in cash, and U.S. Treasury bills, notes, and other obligations.

88.     I believe that it is critical for the Cash Management System to remain intact during these Chapter 11 Cases to ensure seamless continuation of transactions and uninterrupted collection of revenues.  The key components of the Cash Management System have been used by the Debtors since 2019 as a customary and essential business practice and comply with the terms of the Senior Credit Agreement.  I believe that any disruption to the Cash Management System would have an immediate adverse impact on the Debtors' business and would impair the Debtors' ability to operate in the ordinary course and successfully administer the Chapter 11 Cases.

Particularly because the Senior Credit Agreement requires the Debtors to maintain the Bank Accounts at Bank of America, I believe it would be time consuming, difficult, and costly for the Debtors to establish an entirely new system of accounts and a new cash management system. I believe that the attendant delays from revising cash management procedures, redirecting receipts, and implementing new payment protocols would create unnecessary pressure on the Debtors while they work to meet the other administrative obligations imposed by chapter 11 of the Bankruptcy Code.

89. The Debtors seek a waiver of strict compliance with section 345(b) of the Bankruptcy Code and the U.S. Trustee Guidelines with respect to the Bank Accounts to the extent applicable. The Debtors' active Bank Accounts are maintained at Bank of America. The Debtors believe that each Bank Account held at Bank of America, except for the WCMA Account, complies with section 345(b) of the Bankruptcy Code because it is maintained at Bank of America, an authorized depository in accordance with the U.S. Trustee Guidelines. However, to the extent that such Bank Accounts are not already in compliance with section 345(b) of the Bankruptcy Code, the Debtors submit that cause exists for the Court to waive strict compliance with the requirements of section 345 of the Bankruptcy Code upon entry of the Final Order. In particular, the BlackRock Fund yields approximately 5% per year while the U.S. Treasury Holdings maintain coupon yields in excess of 5%. In comparison, the Concentration Account (or other similar bank accounts) would yield only a nominal rate, amounting to a significant difference in income per month based on the current balance in the WCMA Account as of the Petition Date. For example, in July 2023, the Debtors received approximately $150,000 in income from the WCMA Account holdings.

90.     If the Debtors are required to alter the way in which they collect and disburse cash throughout the Cash Management System, I believe that their operations would experience severe disruptions, which ultimately would frustrate the Debtors' ability to effectuate a restructuring transaction and maximize the value of their estates for the benefit of all stakeholders.  It is, therefore, critical that the Debtors be able to continue to utilize their existing Cash Management System to consolidate management of cash and centrally coordinate transfers of funds to efficiently and effectively operate their business.

91.     Accordingly, the Debtors request that the relief requested in the Cash Management Motion be approved.

### G.    Insurance and Surety Bond Motion

92.     By this motion (the "Insurance and Surety Bond Motion"), the Debtors request entry of an interim and final order (a) authorizing the Debtors to (i) continue to administer the insurance program and to pay certain prepetition obligations relating thereto, including broker fees arising thereunder or in connection therewith, (ii) make payments pursuant to the Debtors' insurance premium financing agreement, and (iii) revise, extend, supplement, or change insurance coverage as needed, (b) authorizing the Debtors to maintain, renew, and modify their surety bond program and to pay prepetition obligations relating thereto, including broker fees arising thereunder or in connection therewith, and (c) granting related relief.

93.     In the ordinary course of the Debtors' business and as more fully described in the Insurance and Surety Bond Motion, the Debtors maintain insurance, surety bond, and related programs.  These programs provide liability coverage for the Debtors' operations, including workers' compensation, breach of duty by officers or directors, general liabilities, and nonperformance or nonpayment of contractual obligations to certain customers.  In many instances, these insurance and surety bond programs are required by federal, state, or municipal

statute or regulation.  The Debtors estimate that no more than $720,000 in obligations related to the Insurance and Surety Bond Program will become due and owing during the Interim Period. The Debtors estimate that total prepetition obligations under the program do not exceed $1,150,000.

94.     I believe that maintaining the Debtors' insurance and surety bond program, including paying any associated broker fees and premium financing fees, is a crucial ordinary course of business transaction, and essential to the preservation of the value of the Debtors' business, properties, and assets in these Chapter 11 Cases.  Additionally, in many instances the maintenance of these insurance and surety bond programs is required by statute or regulation. Furthermore, it is my understanding that, under the chapter 11 operating guidelines issued by the United States Trustee for the District of Delaware pursuant to 28 U.S.C. § 586, the Debtors are obligated to maintain certain insurance coverage during these Chapter 11 Cases, and such coverage is provided by certain of the policies included in the insurance program.  Consequently, authority to pay any prepetition obligations related to the insurance and surety bond program—to the extent that the Debtors determine that such payment is necessary to avoid cancellation, default, alteration, assignment, attachment, lapse, or any form of impairment of the coverage, benefits or proceeds provided—is imperative.

95.     For the foregoing reasons, I believe that the relief requested in the Insurance and Surety Bond Motion is in the best interests of the Debtors, their estates, and their creditors, and should therefore be approved.

### H.     Wages Motion

96.     By this motion (the "Wages Motion"), the Debtors seek to be permitted to pay and/or perform, as applicable, their employee-related obligations, as detailed in the Wages Motion, including with respect to the following, whether arising pre- or postpetition: (i) employee

wages, salaries, paid time off, and other compensation, including, as applicable, any amounts due in accordance with the terms and conditions of collective bargaining agreements and amounts owed to staffing agencies; (ii) employee business expenses and reimbursements; (iii) contributions to prepetition benefit programs provided to employees; (iv) bonus, severance, and retention programs made in the ordinary course of the Debtors' business to non-insiders; (v) payments for which prepetition payroll deductions were made; and (vi) processing costs and administrative expenses relating to the foregoing payments and contributions.

97. The continued and uninterrupted support of the Debtors' workforce is essential to the Debtors' success. The skills and experience of the Debtors' employees and other workers, their relationships with key parties to the Debtors' business, such as customers and vendors, and their knowledge of the Debtors' business are essential to the preservation and maximization of the value of the Debtors' estates. Interruptions in payment of prepetition employee-related obligations will impose hardship on the employees and is certain to jeopardize their continued performance during this critical time.

98. To minimize the personal hardship that employees will suffer if prepetition employee-related obligations are not paid when due, and to maintain the employees' morale during this critical time, it is important that the Debtors honor these obligations. A chart setting forth the proposed maximum prepetition amounts the Debtors seek to pay with respect to each category of employee wages and benefits is set forth below:

| Prepetition Compensation and Benefits Obligations | Interim Amount | Final Amount |
|---|---|---|
| Unpaid Wages | $5,980,716 | $6,074,316 |
| *Wage Deductions* | $1,236,000 | $1,236,000 |
| Non-Insider Employee Cash Bonus Programs | $4,800 | $4,800 |
| Expenses and Reimbursements | $120,000 | $120,000 |
| Employee Benefits Programs | $718,688 | $4,775,494 |
| *Insurance Benefits* | $533,288 | $533,288 |
| *Other Employee Benefits* | $185,400 | $4,242,205 |
| Employee Compensation Tax Obligations | $55,800 | $55,800 |
| Payroll Processor Fees | $162,000 | $162,000 |
| **Total** | $7,042,004 | $11,192,410 |

99.     Through the Wages Motion, the Debtors seek authority to pay no more than $7,024,004 on account of prepetition employee wages and benefits on an interim basis and no more than $11,192,410 on account of prepetition employee wages and benefits on a final basis.

100.     In particular, by the Wages Motion, the Debtors seek to make certain payments to workers in connection with the Debtors' operations in City of Industry, California, and Burlingame, California, under the Effects Bargaining Agreement and the Reduction-in-Force Agreement.  Honoring the Debtors obligations under these agreements is paramount to the Debtors' ability to maintain their business operations throughout these Chapter 11 Cases.  When the Debtors decided to pursue an orderly wind-down of their operations in Burlingame and City of Industry, to improve the operational efficiencies of their business, the Debtors negotiated extensively with the applicable workers and their representatives, as, without the continued work of these employees at the Debtors' plants, the Debtors would not be able to satisfy outstanding customer orders and demand.  Thus, the Debtors would suffer significant harm to their business.  Further, failing to honor obligations to workers under the Reduction-in-Force-Agreement would severely impact morale and undermine the confidence of the Debtors' other employees in the Debtors' ability to meet their obligations to their workforce.  The Debtors' ability to honor their

payments and obligations to their workers is critical to ensuring that the workers remain at the plants and the Debtors can complete the orderly wind-down of these plants.  I believe that the Debtors' failure to honor their obligations under these agreements would cause significant disruption to the Debtors' business and their ability to operate during these Chapter 11 Cases.

101.    By the Wages Motion, the Debtors also seek approval to maintain their ordinary course, non-insider bonus programs consistent with past practice.  These bonus programs play a critical role in improving the financial and operational performance of the Company, in addition to incentivizing and motivating employees and improving their morale.  Each program is tied to specific sales, financial, or performance metrics, or else designed to improve the quality of the Debtors' workforce.  I believe that continuing these programs is critical to maximizing the value of the Debtors' estates, maintaining employee morale during these Chapter 11 Cases, and allowing the Debtors to continue to operate their businesses.

102.    The relief requested in the Wages Motion is essential to the continued operation of the Debtors' businesses and will enable the Debtors to operate during the Chapter 11 Cases without disruption, thereby maximizing value for the Debtors' estates, creditors, and other stakeholders.  Moreover, I am advised by counsel that the Debtors do not seek to compensate any employees on behalf of prepetition obligations in an amount that exceeds the statutory priority cap of $15,150, unless required by applicable state law, and the Debtors will not make any payments to insiders that would violate the Bankruptcy Code.  For these reasons, I believe that the Wages Motion is in the best interests of the Debtors, their estates, and creditors, and, therefore, should be approved.

## I.    Customer Programs Motion

103.    By this motion (the "Customer Programs Motion"), the Debtors seek entry of interim and final orders (a) authorizing the Debtors to maintain and administer certain customer-

related warranty programs in the ordinary course of business and in a manner consistent with past practice as described herein (collectively, the "Customer Programs"), (b) authorizing the Debtors to continue, replace, implement, modify, and/or terminate one or more of the Customer Programs, in each case as the Debtors deem appropriate in their business judgment, without further Court order, (c) authorizing banks and other financial institutions to honor and process check and electronic transfer requests related to the foregoing, and (d) granting related relief.

104.    In the ordinary course of business, the Debtors provide warranty programs to accompany sold products.  These warranties, as part of the Debtors' general approach toward providing their customers with excellent dependable product support, are a critical component of the promotion, sale, and customer acceptance of the Debtors' products.  The warranty services supporting these programs typically include, among other things, training for operators and technicians, onsite delivery support, field support, engineering escalation support, procurement of spare or replacement parts, and reimbursement of repair costs.  The Debtors' warranty obligations service each of their respective business segments:  the Transit Business; the Powered Business; and the Energy Business.

105.    Through the Customer Programs Motion, the Debtors seek authority, but not direction, to make payments to third parties (excluding third-party staff augmentation that are otherwise considered wages) to satisfy or facilitate the satisfaction of any warranty claims that may require payment or other expenditures (i) of up to $154,000 prior to a final hearing on the Customer Programs Motion, and (ii) of up to $1,200,000 on a final basis.  I believe that satisfaction of the Customer Programs is necessary to the Debtors' continued and uninterrupted operations during these Chapter 11 Cases.  Continuing to administer the Customer Programs without interruption during the pendency of these Chapter 11 Cases, as the Debtors market substantially

all of their assets for sale in connection therewith, will help preserve value and customer good will during these Chapter 11 Cases, and make the Debtors' business more attractive to prospective purchasers.  Indeed, if the Debtors are unable to satisfy certain of the warranty obligations, the Debtors' good will in the marketplace could be significantly diminished.  In addition, I believe that providing the Debtors authority to replace, implement, modify, and/or terminate one or more of the Customer Programs, in each case as the Debtors deem appropriate and in their business judgment, is also appropriate.

106.    For the foregoing reasons, I believe that the relief requested in the Customer Programs Motion is in the best interests of the Debtors, their estates, and their creditors, and, therefore, should be approved.

**J.**    **NOL Procedures Motion**

107.    By this motion (the "NOL Procedures Motion"), the Debtors seek entry of interim and final orders authorizing the Debtors to establish procedures (the "Procedures") to protect the potential value of net operating loss carryforwards ("NOLs") and other tax benefits (collectively, the "Tax Attributes") of the Debtors for U.S. federal income tax purposes in connection with the reorganization of the Debtors.  The Procedures include separate procedures applicable to (a) the beneficial ownership (including direct and indirect ownership) of Proterra Inc's common stock (the "Common Stock") and any options or similar rights to acquire such interests, as well as to any claim of a worthlessness deduction under section 165 of title 26 of the United States Code (the "Tax Code") by a substantial shareholder with respect to any beneficial ownership of Common Stock, and (b) the beneficial ownership (including direct and indirect ownership) of prepetition claims against either of the Debtors.

108.    The Debtors possess certain Tax Attributes, including, as of the end of their 2022 tax year, federal NOL carryovers in the amount of approximately $729.5 million, federal

R&D Credit carryforwards of approximately $7.2 million, state NOL carryovers of approximately $531.1 million, and state R&D Credit carryforwards of approximately $4.3 million.  I understand that the Tax Attributes may be of significant value to the Debtors and their estates because the Debtors can generally carry forward their Tax Attributes to offset their future taxable income, thereby reducing their future aggregate tax obligations.  I further understand that such Tax Attributes may generally be utilized by the Debtors to offset any taxable income generated by transactions consummated during these Chapter 11 Cases.  The value of the Tax Attributes will inure to the benefit of all of the Debtors' stakeholders.

109.    I understand that implementation of the Procedures is necessary and appropriate to enforce the automatic stay and, critically, to preserve the value of the Tax Attributes for the benefit of the Debtors' estates. I am advised that under section 382 of the IRC, certain transfers of Common Stock prior to the consummation of a chapter 11 plan could cause the termination or limit the use of the Tax Attributes.  By establishing the Procedures for monitoring certain transfers of, and the claiming of worthless stock deduction with respect to, beneficial ownership of Proterra Inc's Common Stock, I believe that the Debtors can preserve their ability to seek the necessary relief if it appears that any such action may impair the Debtors' ability to utilize their Tax Attributes.  Moreover, the loss of these valuable estate assets could lead to significant negative consequences for the Debtors, their estates, their stakeholders, and the overall reorganization process.

110.    Furthermore, I believe that the Procedures with respect to prepetition claims (the "Claims Procedures") will preserve the Debtors' ability under appropriate circumstances to determine and, if applicable, preserve the availability of the special relief afforded by section 382(l)(5) of the Tax Code.  I am advised that the Claims Procedures would allow for full trading

of prepetition claims unless and until the Debtors or another chapter 11 plan proponent files a chapter 11 plan contemplating the potential utilization of section 382(l)(5) of the Tax Code.

111.     Importantly, I understand that the Procedures do not bar all transfers of Common Stock and prepetition claims.  The Debtors seek to establish the Procedures only to monitor those types of transactions that would pose a serious risk under the ownership change test pursuant to section 382 of the IRC or corresponding provisions of state law and to preserve the Debtors' ability to seek substantive relief if it appears that a proposed transfer could jeopardize the Debtors' utilization of the Tax Attributes or benefits under section 382(l)(5) of the Tax Code. Because of the potential importance of the Tax Attributes and such benefits to the Debtors' restructuring, and consequently to all parties in interest, the benefits of implementing the Procedures outweigh subjecting a limited number of transfers to the Procedures.  Accordingly, I believe the relief requested in the NOL Procedures Motion is in the best interests of the Debtors, their estates, and all other parties in interest and should be granted in all respects.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: August 8, 2023
      Burlingame, California

              /s/   *Gareth T. Joyce*
              Gareth T. Joyce
              Chief Executive Officer