## EXHIBIT A

**Proposed Order**

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| PROTERRA INC., *et al.*,1 | Case No. 23-11120 (BLS) |
| Debtors. | (Jointly Administered) |
| | Re: Docket No. __ |

### ORDER AUTHORIZING THE DEBTORS TO (I) EMPLOY AND RETAIN FTI CONSULTING, INC. TO PROVIDE THE DEBTORS A CHIEF TRANSFORMATION OFFICER AND CERTAIN ADDITIONAL PERSONNEL AND (II) DESIGNATE JUSTIN D. PUGH AS CHIEF TRANSFORMATION OFFICER FOR THE DEBTORS, EFFECTIVE AS OF THE PETITION DATE

Upon the motion (the "Motion")[2] of the Debtors for entry of an order (this "Order"), authorizing the Debtors, in their sole discretion, to (a) retain and employ FTI Consulting, Inc. ("FTI") to provide them with a Chief Transformation Officer and the Hourly Temporary Staff, effective as of the Petition Date, in accordance with the terms of the Engagement Contract (a copy of which is attached hereto as **Exhibit 1**), as modified by this Order, and (b) designate Justin D. Pugh as Chief Transformation Officer, all as more fully described in the Motion; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* of the United States District Court for the District of Delaware*,* dated February 29, 2012; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b) and that the Court may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of these Chapter 11 Cases and this proceeding is proper pursuant to 28 U.S.C. § 1408; and this Court having found that the relief requested in this

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Proterra Inc (9565); and Proterra Operating Company, Inc. (8459).  The location of the Debtors' service address is: 1815 Rollins Road, Burlingame, California 94010.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and the Pugh Declaration; and this Court having heard the statements in support of the requested relief at a hearing before this Court, if any; and this Court having determined that the legal and factual bases set forth in the Motion and at the hearing establish just cause for the relief granted herein; and any objections to the relief requested in the Motion having been overruled or withdrawn; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is **HEREBY ORDERED THAT**:

1.      The Motion is APPROVED as set forth herein.

2.      All objections to the entry of this Order, to the extent not withdrawn or settled, are overruled.

3.      Pursuant to sections 105(a) and 363 of the Bankruptcy Code, the Debtors are authorized to retain and employ FTI to provide them with a CTO and to employ the Hourly Temporary Staff to provide services under the Engagement Contract, effective as of the Petition Date on the terms set forth in the Motion and the Engagement Contract. The Engagement Contract is adopted, except as modified by this Order.  FTI is authorized to provide the Debtors with the professional services described in the Motion and the Engagement Contract, except as modified by this Order.

4.      FTI and its affiliates shall not act in any other capacity (for example, and without limitation, as a financial advisor, claims agent/claims administrator, or investor/acquirer) in connection with the Chapter 11 Cases.

5.     Notwithstanding the Motion, Engagement Contract, or the Pugh Declaration, in the event the Debtors seek to have FTI personnel assume executive officer positions that are different than the positions disclosed in the Motion, or to materially change the terms of the engagement by either (a) modifying the functions of personnel, (b) adding new personnel, or (c) altering or expanding the scope of the engagement, a motion to modify the retention shall be filed.

6.     No principal, employee, or independent contractor of FTI and its affiliates shall serve as a director of any of the above-captioned Debtors during the pendency of the Chapter 11 Cases.

7.     In the event that during the pendency of these cases, FTI seeks reimbursement for any attorneys' fees or expenses, the invoices and supporting time records from such attorneys shall be included in FTI's fee applications and such invoices and time records shall be in compliance with Local Rule 2016-2(f) and shall be subject to any applicable fee guidelines promulgated by the U.S. Trustee and approval of the Court under the standards of sections 330 and 331 of the Bankruptcy Code, without regard to whether such attorney has been retained under section 327 of the Bankruptcy Code and without regard to whether such attorney's services satisfy section 330 (a)(3)(C) of the Bankruptcy Code; *provided*, *however*, that FTI shall not seek reimbursement of any (a) fees incurred defending any of FTI's fee applications in these cases or (b) fees for services provided by counsel to the Debtors.

8.     FTI shall use its reasonable best efforts to avoid any duplication of services provided by any of the Debtors' other retained professionals in these Chapter 11 Cases.

9.     The Debtors are permitted to indemnify those persons serving as executive officers on the same terms as provided to the Debtors' other officers and directors under the corporate bylaws and applicable state law, along with insurance coverage under the Debtors' directors and

3

officers liability insurance policies and all other relevant active insurance policies carried by the Debtors.

10.     Notwithstanding anything to the contrary in the Motion, the Engagement Contract or the Pugh Declaration, during the course of these Chapter 11 Cases, FTI shall have whatever fiduciary duty is imposed upon it by applicable law, if any.

11.     FTI shall provide ten (10) business days' notice to the Debtors, the U.S. Trustee, and any official committees, if appointed, in connection with any increase in the hourly rates listed in the Motion.  The Debtors and the U.S. Trustee retain all rights to object to any rate increase on all grounds, including, but not limited to, the reasonableness standard provided in section 330 of the Bankruptcy Code, and the Court retains the right to review any rate increase pursuant to section 330 of the Bankruptcy Code.

12.     Notwithstanding anything to the contrary in the Engagement Contract, the Motion, or the Pugh Declaration, the services to be provided by FTI shall not be performed by any entity other than FTI or its affiliates, and if services are to be performed by any FTI affiliate whose connections have not already been disclosed in the Pugh Declaration or any disclosures made subsequent to the entry of this Order, that affiliate shall promptly file the disclosures required by Bankruptcy Rule 2014(a) regarding any connections they may have with parties in interest in these cases, as well as a disclosure regarding its disinterestedness, whether or not they are required.

13.     FTI shall disclose any and all facts that may have a bearing on whether the firm, its affiliates, and/or any individuals working on the engagement hold or represent any interest adverse to the Debtors, their creditors, or other parties in interest.  The obligation to disclose identified herein is a continuing obligation.

14.     FTI is authorized to hold the cash on account as security throughout the Debtors' bankruptcy cases until FTI's final fees and expenses are awarded and payable to FTI pursuant to section 330 of the Bankruptcy Code, at which point FTI shall apply the cash on account to any unpaid allowed fees and expenses and return any unearned portion of the cash on account to the Debtors.

15.     FTI will not be required to submit fee applications pursuant to sections 330 and 331 of the Bankruptcy Code.  Instead, FTI shall file the Compensation and Staffing Reports with the Court and provide notice to the Notice Parties.  Parties in interest in the Chapter 11 Case shall have the right to object to the Compensation and Staffing Reports within twenty-one (21) days of filing. FTI's compensation and expenses for the period covered by each Compensation and Staffing Report shall be subject to Court review in the event that an objection is filed.  Otherwise, should no objection be asserted, subject to limited exception, as of the twenty-second (22nd) day following the filing of a Compensation and Staffing Report, the Debtors are authorized to pay FTI the amounts due for services provided in the preceding month, as identified by such Compensation and Staffing Report.

16.     Notwithstanding the preceding paragraph, the U.S. Trustee and the Court shall retain the right to object to the compensation and fees and expenses to be paid to FTI pursuant to the Motion and the Engagement Contract, based on the reasonableness standard provided for in section 330 of the Bankruptcy Code, and the Court shall consider any such objection by the U.S. Trustee under section 330 of the Bankruptcy Code.

17.     FTI shall include in its Compensation and Staffing Reports, among other things, time records setting forth, in a summary format, a description of the services rendered by each professional and the amount of time spent on each date by each such individual in rendering

services on behalf of the Debtors in half-hour (0.5) increments.  FTI is not required to provide or conform to any schedule of hourly rates.

18.     Notwithstanding anything in the Motion, the Engagement Contract, or the Pugh Declaration to the contrary, FTI shall (a) to the extent that FTI uses the services of independent contractors, subcontractors or employees of foreign affiliates or subsidiaries (collectively, the "Contractors") in these Chapter 11 Cases, FTI shall pass-through the cost of such Contractors to the Debtors at the same rate that FTI pays the Contractors, (b) seek reimbursement for actual costs only, (c) ensure that the Contractors are subject to the same conflict checks as required for FTI, and (d) file with the Court such disclosures required by Bankruptcy Rule 2014.

19.     For a period of three (3) years after the conclusion of the engagement, neither FTI nor its affiliates shall make any investments in the Debtors or the Reorganized Debtors, if applicable.

20.     To the extent that there may be any inconsistency between the terms of the Motion, the Pugh Declaration, the Engagement Contract, and this Order, the terms of this Order shall govern.

21.     Nothing in the Motion or this Order, nor any actions or payments made by the Debtors pursuant to this Order, shall be construed as:  (a) an admission as to the validity of any claim against the Debtors or the existence of any lien against the Debtors' properties; (b) a waiver of the Debtors' rights to dispute any claim or lien on any grounds; (c) a promise to pay any claim; (d) an implication or admission that any particular claim would constitute an allowed claim; (e) an assumption or rejection of any executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code; or (f) a limitation on the Debtors' rights under section 365 of the Bankruptcy Code to assume or reject any executory contract with any party subject to this Order.  Nothing

contained in this Order shall be deemed to increase, reclassify, elevate to an administrative expense status, or otherwise affect any claim to the extent it is not paid.

22.     The Debtors are authorized and empowered to take all actions necessary to implement the relief granted in this Order.

23.     This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

## EXHIBIT 1

**Engagement Contract**



Justin D. Pugh
FTI Consulting, Inc.
999 17th Street
7th Floor
Denver, CO 80202
+1 612 417 1486

<u>PRIVATE & CONFIDENTIAL</u>

August 7, 2023

Jeff Mitchell
General Counsel
1815 Rollins Rd.
Burlingame, CA 94010

Re: <u>Chief Transformation Officer and Support Personnel</u>

Dear Mr. Mitchell:

1.    **Introduction**

This letter confirms that we, FTI Consulting, Inc. ("FTI"), have been retained by you, Proterra Inc. and Proterra Operating Company, Inc. (collectively, the "Company"), to provide the Chief Transformation Officer and related personnel for financial and restructuring advisory (the "Services") set out below.  This letter of engagement (the "Engagement") and the related Standard Terms and Conditions constitute the engagement contract (the "Engagement Contract") pursuant to which the Services will be provided.

2.    **Scope of Services**

FTI will provide Justin D. Pugh to serve as the Client's Transformation Officer (  the "Temporary Officer") reporting to the Company's Chief Executive Officer (the "CEO") in connection with the Engagement. The Temporary Officer, as well as any additional Hourly Temporary Staff (as defined below), shall have such duties as the CEO (or the CEO's designee) may from time to time determine, and shall at all times report to and be subject to supervision by the CEO or its designee. Without limiting the foregoing, the Temporary Officer, as well as any Hourly Temporary Staff, shall work with other senior management of the Client, its designee, and/or other professionals, to provide the Services, which shall include, at your discretion:

- Acting on behalf of the Company or its affiliates in connection with activities related to operational analysis and reporting;
- Negotiating with counterparties; and
- Any other activities related to the Company and any of its affiliates Chapter 11 cases, in each case as may be requested by the Company's Chief Executive Officer

In addition to providing the Temporary Officer, FTI will also provide the Client with additional staff (the "Hourly Temporary Staff" and, together with the Temporary Officer, the "FTI Professionals"), subject to the terms and conditions of this Agreement. The Hourly Temporary Staff may be assisted by or replaced by other FTI professionals reasonably satisfactory to CEO, as required, who shall also become Hourly Temporary Staff for purposes hereof.    FTI will keep the CEO or its designee reasonably informed as to FTI's staffing.

Proterra Inc.
August 7, 2023

FTI is engaged by the Company to provide financial advisory and consulting services only. Accordingly, while we may from time to time suggest options which may be available to you and further give our professional evaluation of these options, the ultimate decision as to which, if any, of these options to implement rests with the Company, its management and board of directors. FTI and its employees will not make any management decisions for the Company and will not be responsible for communicating information concerning the Company to the public, the Company's shareholders or others.

As part of the Services, FTI may be requested to assist the Company (and its legal or other advisors) in negotiating with the Company's creditors and equity holders and with other interested parties. In the event that we participate in such negotiations, the representations made and the positions advanced will be those of the Company and its management, not FTI or its employees.

The services we will provide in connection with the Engagement will encompass all services normally and reasonably associated with this type of engagement that we are requested and are able to provide and that are consistent with our ethical obligations.  With respect to all matters of our Engagement, we will coordinate closely with the Company as to the nature of the services that we will render and the scope of our engagement.

As usual, our Engagement is to represent the Company and not its individual directors, officers, employees or shareholders.  However, we anticipate that in the course of that Engagement, we may provide information or advice to directors, officers or employees in their corporate capacities.

The engagement of FTI to perform the Services shall be subject to the approval of the Bankruptcy Court and shall be substantially as provided in this Agreement as modified by the retention order approved by the Bankruptcy Court. Client agrees, at Client's expense, to file an application (the "Application") to employ FTI as its Chief Transformation Officer effective as of the filing of any petition(s) for relief under the Bankruptcy Code filed by Client or Client's affiliates pursuant to § 363 of the Bankruptcy Code. The Client agrees to file all required applications, including the Application, for the employment or retention of FTI at the earliest practical time, but in no event later than thirty (30) days after the filing of any petitions for relief under the Bankruptcy Code.

The Services do not include (i) audit, legal, tax, environmental, accounting, actuarial, employee benefits, insurance advice or similar specialist and other professional services which are typically outsourced and which shall be obtained directly where required by the Client at Client's expense; or (ii) investment banking, including valuation or securities analysis, including advising any party or representation of the Client on the purchase, sale or exchange of securities or representation of the Client in securities transactions. FTI is not a registered broker-dealer in any jurisdiction and will not offer advice or its opinion or any testimony on valuation or exchanges of securities or on any matter for which FTI is not appropriately licensed or accredited. An affiliate of FTI is a broker-dealer but is not being engaged by the Client to provide any investment banking or broker-dealer services. The Client agrees to supply office space, and office and support services to FTI as reasonably requested by FTI in connection with the performance of its duties hereunder.

Proterra Inc.
August 7, 2023
**3.  Compensation to FTI**

Services renedered by the Temporary Officer will be billed at $1,125 per hour.  Services renedered for any other FTI Professional will be billed at their current hourly rate. The hourly rates for FTI professionals by level are as follows:

| Title | Per Hour ($USD) |
|---|---|
| Senior Managing Director | 1,095 – 1,495 |
| Director/Senior Director/Managing Director | 785 – 1,055 |
| Consultant/Senior Consultant | 435 – 750 |

FTI will invoice consistent with bankrtupcy court protocols for its retention and will be paid accordingly. FTI will work with you to ensure that the team that delivers the Services does so in the most efficient and economic fashion and will work to develop a staffing plan to ensure that you are aware of the estimated hourly run rate cost. Further, it will keep you apprised of the incurred expense on a regular basis. Note that we do not provide any assurance regarding the outcome of our work and our fees will not be contingent on the results of such work.

In addition to the fees outlined above, FTI will bill for reasonable allocated and direct expenses which are incurred on your behalf during this Engagement.  Direct expenses include reasonable and customary out-of-pocket expenses which are billed directly to the engagement such as certain telephone, overnight mail, messenger, travel, meals, accommodations and other expenses specifically related to the engagement.  Further, if FTI and/or any of its employees are required to testify or provide evidence at or in connection with any judicial or administrative proceeding relating to this matter, FTI will be compensated by you at its regular hourly rates and reimbursed for reasonable allocated and direct expenses (including counsel fees) with respect thereto.

<u>**Cash on Account**</u>

In addition to the currently held Initial Cash on Account, the Company will forward to us the amount of $200,000, which funds will be held "on account" to be applied to our professional fees, charges and disbursements for the Engagement (the "Supplemental Cash on Account"). To the extent that this amount exceeds our fees, charges and disbursements upon the completion of the Engagement, we will refund any unused portion.

In a case under the Bankruptcy Code, fees and expenses may not be paid without the express prior approval of the bankruptcy court, which approval may be in the order approving the Application, subject to the filing of any staffing reports ordered by the bankruptcy court.  In most cases of this size and complexity, on request of a party in interest, the bankruptcy court permits the payment of interim fees during the case.  The Company agrees that, if asked to do so by us, the Company will request the bankruptcy court to establish a procedure for the payment of interim fees during the case that would permit payment of interim fees.  If the bankruptcy court approves such a procedure, we will submit invoices on account against our final fee.  These interim invoices will be based on such percentage as the bankruptcy court allows of our internal time charges and costs and expenses for the work performed during the relevant period and will constitute a request for an interim payment against the reasonable fee to be determined at the conclusion of our representation.

If any of the Company's entities become a debtor in one or more cases under the Bankruptcy Code, some fees, charges, and disbursements (whether or not billed) incurred before the filing of bankruptcy petitions (voluntary or involuntary) might remain unpaid as of the date of the

Proterra Inc.
August 7, 2023

filing. The unused portion, if any, of the Initial Cash on Account and the Additional Cash on Account will be applied to any such unpaid pre-petition fees, charges and disbursements. Any requisite court permission will be obtained in advance. We will then hold any portion of the Initial Cash on Account and the Additional Cash on Account not otherwise properly applied for the payment of any such unpaid pre-filing fees, charges and disbursements (whether or not billed) as on account cash to be applied to our final invoice in any case under the Bankruptcy Code.

Post-petition fees, charges and disbursements will be due and payable immediately upon entry of an order containing such court approval or at such time thereafter as instructed by the court. The Company understands that while the arrangement in this paragraph may be altered in whole or in part by the bankruptcy court, the Company shall nevertheless remain liable for payment of court approved post-petition fees and expenses. Such items are afforded administrative priority under 11 U.S.C. § 503(b)(l). The Bankruptcy Code provides in pertinent part, at 11 U.S.C. § 1129(a)(9)(A), that a plan cannot be confirmed unless these priority claims are paid in full in cash on the effective date of any plan (unless the holders of such claims agree to different treatment). It is agreed and understood that the unused portion, if any, of the Initial Cash on Account (as may be supplemented from time to time) and the Additional Cash on Account shall be held by us and applied against the final fee application filed and approved by the court.

Additional Provisions Regarding Fees:

a) FTI may stop work or terminate the Agreement immediately upon the giving of written notice to the Client (i) if payments are not made in accordance with this Agreement, (ii) if the Application is not approved by the Bankruptcy Court, (iii) if the Chapter 11 case is dismissed or converted to a Chapter 7 proceeding, or (iv) if a Chapter 11 Trustee or other responsible person is appointed.

b) If, and only if, local Bankruptcy rules or the order approving the Application so require, FTI shall file with and serve on creditors entitled to notice thereof, a statement of staffing, professional services, compensation or expenses, on a quarterly basis, or as the Bankruptcy Court or rules may direct, and creditors and other parties in interest shall have an opportunity to object thereto and request a hearing thereon. In the event that FTI is employed post-petition as a "professional person" pursuant to § 327 of the Bankruptcy Code, Bankruptcy Court approval will generally be required to pay FTI's fees and expenses for Post-petition Services. In most cases of this size and complexity, on request of a party in interest, the bankruptcy court permits the payment of interim fees during the case. The Client agrees that in this situation it will, at the Client's expense, request the Bankruptcy Court to establish a procedure for the payment of interim fees during the case that would permit payment of interim fees. If the Bankruptcy Court approves such a procedure, we will submit invoices on account against our final fee. These interim invoices will be based on such percentage as the bankruptcy court allows of our internal time charges and costs and expenses for the work performed during the relevant period and will constitute a request for an interim payment against the reasonable fee to be determined at the conclusion of our Engagement.

c) Client agrees that FTI is not an employee of the Client and the FTI employees and independent FTI contractors who perform the Services are not employees of the Client, and they shall not receive a W-2 from the Client for any fees earned under this engagement, and such fees are not subject to any form of withholding by the Client. The Client shall provide FTI a standard form 1099 on request for fees earned under this Engagement.

Proterra Inc.
August 7, 2023

4.    **Terms and Conditions**

The attached Standard Terms and Conditions set forth the duties of each party with respect to the Services. Further, this letter and the Standard Terms and Conditions attached comprise the entire Engagement Contract for the provision of the Services to the exclusion of any other express or implied terms, whether expressed orally or in writing, including any conditions, warranties and representations, and shall supersede all previous proposals, letters of engagement, undertakings, agreements, understandings, correspondence and other communications, whether written or oral, regarding the Services.

5.    **Conflicts of Interest**

Based on the list of interested parties (the "Potentially Interested Parties"), provided by you, we have undertaken a limited review of our records to determine FTI's professional relationships with the Company other key stakeholders.  As you may be aware, FTI is regularly retained by key stakeholders of the Company.  However, such representations are in matters unrelated to this engagement.

From the results of such review, we were not made aware of any conflicts of interest or additional relationships that we believe would preclude us from performing the Services. However, as you know, we are a large consulting firm with numerous offices globally.  We are regularly engaged by new clients, which may include one or more of the Potentially Interested Parties.  The FTI professionals providing services hereunder will not accept an engagement that directly conflicts with this Engagement without your prior written consent.

6.    **Miscellaneous**

This Agreement represents the entire understanding of the parties hereto and supersedes any and all other prior agreements among the parties of any type; shall be binding upon and inure to the benefit of the parties and their respective heirs, representatives, successors and assigns; may be executed by facsimile (followed by originals sent via regular mail), and in two or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument; and may not be waived, modified or amended unless in writing and signed by a representative of the Client and FTI. The provisions of this Agreement shall be severable. No failure to delay in exercising any right, power or privilege related hereto, or any single or partial exercise thereof, shall operate as a waiver thereof.

6.1    **Indemnification –**

Subject to any limitation post-petition required by the Bankruptcy Court, the Client agrees to indemnify and hold harmless FTI and its shareholders, directors, officers, managers, employees, contractors, agents and controlling persons (each, an "Indemnified Party") from and against any losses, claims, damages or expenses, or if same was or is or becomes a party to or witness or other participant in, or is threatened to be made a party to or witness or other participant in, any threatened, pending or completed action, suit, proceeding or alternative dispute resolution mechanism, or any hearing, inquiry or investigation, in each case by reason of (or arising in part out of) any event or occurrence related to this agreement or any predecessor agreement for services or the fact that any Indemnified Party is or was an agent, officer director, employee or fiduciary of the Client, or by reason of any action or inaction on

Proterra Inc.
August 7, 2023

the part of any Indemnified Party while serving in such capacity (an "Indemnifiable Event")
against expenses (including reasonable attorneys' fees and disbursements), judgments, fines,
settlements and other amounts actually and reasonably incurred in connection with any
Indemnifiable Event. The Application shall include the assumption by the Client of FTI's right
to indemnification in respect of its actions under this Agreement prior to the Petition Date.
The Indemnified Party shall promptly forward to the Client all written notifications and other
matter communications regarding any claim that could trigger the Client's indemnification
obligations under this Section 6. If the Client so elects or is requested by an Indemnified Party,
the Client will assume the defense of such action or proceeding, including the employment of
counsel reasonably satisfactory to the Indemnified Party and the payment of the reasonable
fees and disbursements of such counsel. In the event, however, such Indemnified Party is
advised by counsel that having common counsel would present such counsel with a conflict of
interest or if the defendants in, or targets of, any such action or proceeding include both an
Indemnified Party and the Client, and such Indemnified Party is advised by counsel that there
may be legal defenses available to it or other Indemnified Parties that are different from or in
addition to those available to the Client, or if the Client fails to assume the defense of the
action or proceeding or to employ counsel reasonably satisfactory to such Indemnified Party,
in either case in a timely manner, then such Indemnified Party may employ separate counsel to
represent or defend it in any such action or proceeding and the Client will pay the reasonable
fees and disbursements of such counsel; provided, however, that the Client will not be
required to pay the fees and disbursements of more than one separate counsel (in addition to
local counsel) for an Indemnified Party in any jurisdiction in any single action or proceeding.
In any action or proceeding the defense of which the Client assumes, the Indemnified Party
will have the right to participate in such litigation and to retain its own counsel at such
Indemnified Party's own expense. The Client further agrees that the Client will not, without
the prior written consent of the Indemnified Party (which consent shall not be unreasonably
withheld or delayed), settle or compromise or consent to the entry of any judgment in any
pending or threatened claim, action, suit or proceeding in respect of which indemnification or
contribution may be sought hereunder (whether or not the Indemnified Party or any other
Indemnified Party is an actual or potential party to such claim, action, suit or proceeding)
unless (i) to the extent that such settlement, compromise or consent purports directly or
indirectly to cover the Indemnified Party or any other Indemnified Party, such settlement,
compromise or consent includes an unconditional release of the Indemnified Party and each
other Indemnified Party from all liability arising out of such claim, action, suit or proceeding,
or (ii) to the extent that such settlement, compromise or consent does not purport directly or
indirectly to cover the Indemnified Party or any other Indemnified Party, the Client has given
the Indemnified Party reasonable prior written notice thereof and used all reasonable efforts,
after consultation with the Indemnified Party, to obtain an unconditional release of the other
Indemnified Parties hereunder from all liability arising from all liability arising out of such
claim, action, suit or proceeding. The Indemnified Party shall not enter into any closing
agreement or final settlement that could trigger the Client's indemnification obligations under
this Section 6 without the written consent of the Client, which shall not unreasonably be
withheld or delayed or conditioned. The Client will not be liable for any settlement of any
action, claim, suit or proceeding affected without the Client's prior written consent, which
consent shall not be unreasonably withheld or delayed or conditioned, but if settled with the
consent of the Client or if there be a final judgment for the plaintiff, the Client agrees to
indemnify and hold harmless the Indemnified Party from and against any loss or liability by
reason of such settlement or judgment, as the case may be.

6.2    **Insurance –**In addition to the above indemnification and provision regarding advancement of
fees/expenses, FTI employees serving as directors or officers of the Company or its affiliates
will receive the benefit of the most favorable indemnification and advancement provisions

Proterra Inc.
August 7, 2023

provided by the Company to its directors, officers and any equivalently placed employees, whether under the Company's charter or by-laws, by contract or otherwise. The Company shall specifically include and cover employees and agents serving as directors and officers of the Company or affiliates from time to time with direct coverage under the Company's policy for liability insurance covering its directors, officers and any equivalently placed employees. Prior to FTI accepting any director or officer position, the Company shall, at the request of FTI, provide FTI a copy of its current D&O policy, a certificate of insurance evidencing the policy is in full force and effect, and a copy of the signed board resolutions and any other document that FTI may reasonably request evidencing the appointment and coverage of the indemnitees. The Company shall maintain such D&O insurance for the period through which claims can be made against such persons. In the event the Company is unable to include FTI employees and agents under the Company's policy or does not have first dollar coverage acceptable to FTI in effect for at least $10 million, FTI may, subject to the prior written consent of the Company, attempt to purchase a separate D&O insurance  policy that will cover the FTI employees and agents only. The cost of the policy shall be invoiced to the Company as an out-of-pocket expense. Notwithstanding anything to the contrary, the Company's indemnification obligations in this Section 6 shall be primary to (and without allocation against) any similar indemnification and advancement obligations of FTI, its affiliates and insurers to the indemnitees (which shall be secondary), and the Company's D&O insurance coverage for the indemnitees shall be specifically primary to (and without allocation against) any other valid and collectible insurance coverage that may apply to the indemnitees (whether provided by FTI or otherwise).

6.3    **Limitation of liability –**

You and the Company agree that no Indemnified Person shall have any liability as a result of your retention of FTI, the execution and delivery of this Engagement Contract, the provision of Services or other matters relating to or arising from this Engagement Contract, other than liabilities that shall have been determined by final non-appealable order of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of an Indemnified Person or Persons. Without limiting the generality of the foregoing, in no event shall any Indemnified Person be liable for consequential, indirect or punitive damages, damages for lost profits or opportunities or other like damages or claims of any kind.

7.    **Acknowledgement and Acceptance**

Please acknowledge your acceptance of the terms of this Engagement Contract by signing both the confirmation below and the attached Standard Terms and Conditions and returning a copy of each to us at the above address.

If you have any questions regarding this letter or the attached Standard Terms and Conditions, please do not hesitate to contact Justin Pugh at 612-417-1486.

Yours faithfully,


FTI CONSULTING, INC.


By:    *Justin D. Pugh*
       Justin Pugh

Proterra Inc.
August 7, 2023
      Senior Managing Director

Attachment – As stated

Proterra Inc.
August 7, 2023

<u>Confirmation of Terms of Engagement</u>

**We agree to engage FTI Consulting, Inc. upon the terms set forth herein and in the attached Standard Terms and Conditions.**

Proterra Inc.

By: _Jeff Mitchell_____
      Jeff Mitchell
      General Counsel

Date:   August 7, 2023

**FTI CONSULTING, INC.**

**STANDARD TERMS AND CONDITIONS**

The following are the Standard Terms and Conditions on which we will provide the Services to you set forth within the attached letter of engagement with Proterra Inc. dated August 7, 2023.   The Engagement letter and the Standard Terms and Conditions  (collectively the "Engagement Contract") form the entire agreement between us relating to the Services and replace and supersede any previous proposals, letters of engagement, undertakings, agreements, understandings, correspondence and other communications, whether written or oral, regarding the Services.  The headings and titles in the Engagement Contract are included to make it easier to read but do not form part of the Engagement Contract.

**1.**     **Reports and Advice**

1.1     **Use and purpose of advice and reports** – Any advice given or report issued by us is provided solely for your use and benefit and only in connection with the purpose in respect of which the Services are provided. Unless required by law, you shall not provide any advice given or report issued by us to any third party, or refer to us or the Services, without our prior written consent, which shall be conditioned on the execution of a third party release letter in the form provided by FTI and attached hereto as Schedule A. In no event, regardless of whether consent has been provided, shall we assume any responsibility to any third party to which any advice or report is disclosed or otherwise made available.

**2.**     **Information and Assistance**

2.1     **Provision of information and assistance** – Our performance of the Services is dependent upon your providing us with such information and assistance as we may reasonably require from time to time.

2.2     **Punctual and accurate information** – You shall use reasonable skill, care and attention to ensure that all information we may reasonably require is provided on a timely basis and is accurate and complete and relevant for the purpose for which it is required.  You shall also notify us if you subsequently learn that the information provided is incorrect or inaccurate or otherwise should not be relied upon.

2.3     **No assurance on financial data** – While our work may include an analysis of financial and accounting data, the Services will not include an audit, compilation or review of any kind of any financial statements or components thereof.  Company management will be responsible for any and all financial information they provide to us during the course of this Engagement, and we will not examine or compile or verify any such financial information.  Moreover, the circumstances of the Engagement may cause our advice to be limited in certain respects based upon, among other matters, the extent of sufficient and available data and the opportunity for supporting investigations in the time period. Accordingly, as part of this Engagement, we will not express any opinion or other form of assurance on financial statements of the Company.

2.4     **Prospective financial information** - In the event the Services involve prospective financial information, our work will not constitute an examination or compilation, or apply agreed-upon procedures, in accordance with standards established by the American Institute of Certified Public Accountants or otherwise, and we will express no assurance of any kind on such information.  There will usually be differences between estimated and actual results, because events and circumstances frequently do not occur as expected, and those differences may be material.  We will take no responsibility for the achievability of results or events projected or anticipated by the management of the Company.

**3.**    **Additional Services**

3.1    **Responsibility for other parties** – You shall be solely responsible for the work and fees of any other party engaged by you to provide services in connection with the Engagement regardless of whether such party was introduced to you by us.  Except as provided in this Engagement Contract, we shall not be responsible for providing or reviewing the advice or services of any such third party, including advice as to legal, regulatory, accounting or taxation matters.  Further, we acknowledge that we are not authorized under our Engagement Contract to engage any third party to provide services or advice to you, other than our agents or independent contractors engaged to provide Services, without your written authorization.

**4.**    **Confidentiality**

4.1    **Restrictions on confidential information** – Both parties agree that any confidential information received from the other party shall only be used for the purposes of providing or receiving Services under this or any other contract between us. Except as provided below, neither party will disclose the other party's confidential information to any third party without the other party's consent. Confidential information shall not include information that:

4.1.1    is or becomes generally available to the public other than as a result of a breach of an obligation under this Clause 4.1;

4.1.2    is acquired from a third party who, to the recipient party's knowledge, owes no obligation of confidence in respect of the information; or

4.1.3    is or has been independently developed by the recipient.

4.2    **Disclosing confidential information** – Notwithstanding Clause 1.1 or 4.1 above, either party will be entitled to disclose confidential information of the other to a third party to the extent that this is required by valid legal process, provided that (and without breaching any legal or regulatory requirement) where reasonably practicable not less than 2 business days' notice in writing is first given to the other party.

4.3    **Citation of engagement** – Without prejudice to Clause 4.1 and Clause 4.2 above, to the extent our engagement is or becomes known to the public, we may cite the performance of the Services to our clients and prospective clients as an indication of our experience, unless we and you specifically agree otherwise in writing.

4.4    **Internal quality reviews** – Notwithstanding the above, we may disclose any information referred to in this Clause 4 to any other FTI entity or use it for internal quality reviews.

4.5    **Maintenance of workpapers** – Notwithstanding the above, we may keep one archival set of our working papers from the Engagement, including working papers containing or reflecting confidential information, in accordance with our internal policies.

4.6    **Data Protection** - If this Engagement involves the processing of personal data (also referred to herein as personal information) (i) as governed by Regulation (EU) 2016/679 of the European Parliament and of the Council of 27 April 2016, the terms of the EU Data Protection Schedule attached hereto as Schedule A shall apply to this engagement and it shall form an integral part of this Agreement and (ii) as governed by the California Consumer Privacy Act, the terms of the California Data Protection Schedule attached hereto as Schedule B shall apply to this engagement and it shall form an integral part of this Agreement. In the event of a conflict between the terms of this Agreement and the terms of Schedule A or Schedule B, the terms of Schedule A or Schedule B shall prevail in relation to the

processing of such personal data. If such personal data is processed in connection with this engagement, Client shall notify FTI in writing before any personal data is disclosed to FTI.

**5.      Termination**

5.1     **Termination of Engagement with notice** – Either party may terminate the Engagement Contract for whatever reason upon written notice to the other party. Upon receipt of such notice, we will stop all work immediately. You will be responsible for all fees and expenses incurred by us through the date termination notice is received.

5.2     **Continuation of terms** – The terms of the Engagement that by their context are intended to be performed after termination or expiration of this Engagement Contract, including but not limited to, Clauses 3 and 4 of the Engagement letter, and Clauses 1.1, 4, 6 and 7 of the Standard Terms and Conditions, are intended to survive such termination or expiration and shall continue to bind all parties.

**6.      Indemnification, Liability Limitation, and Other Matters**

6.1     **Indemnification** - The Company agrees to indemnify and hold harmless FTI and any of its subsidiaries and affiliates, officers, directors, principals, shareholders, agents, independent contactors and employees (collectively "Indemnified Persons") from and against any and all third party claims, liabilities, damages, obligations, costs and expenses (including reasonable attorneys' fees and expenses and costs of investigation) arising out of or relating to your retention of FTI, the execution and delivery of this Engagement Contract, the provision of Services or other matters relating to or arising from this Engagement Contract , except to the extent that any such claim, liability, obligation, damage, cost or expense shall have been determined by final non-appealable order of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of the Indemnified Person or Persons in respect of whom such liability is asserted  (an "Adverse Determination").  The Company shall pay damages and expenses, including reasonable legal fees and disbursements of counsel as incurred in advance.  FTI agrees that it will reimburse any amounts paid in advance to the extent they relate directly to an Adverse Determination.

6.2     **Limitation of liability –** Except for a party's breach of the Confidentiality obligations set forth in Section 4 and the Company's Indemnification obligations set forth in Section 6.1, neither party shall be liable to the other party, or its successors, affiliates or assigns for damages in excess of the total amount of the fees paid to FTI under this Engagement Contract.  Without limiting the generality of the foregoing, in no event shall either party be liable to the other party for consequential, indirect or punitive damages, damages for lost profits or opportunities or other like damages or claims of any kind.

**7.    Governing Law, Jurisdiction, WAIVER OF JURY TRIAL, and Compliance with Law**

7.1     **Governing Law -** The Engagement Contract shall be governed by and interpreted in accordance with the laws of the State of New York, without giving effect to the choice of law provisions thereof.

7.2     Jurisdiction. - The United States District Court for the Southern District of New York and the appropriate Courts of the State of New York sitting in the Borough of Manhattan, City of New York shall have exclusive jurisdiction in relation to any claim, dispute or difference concerning the Engagement Contract and any matter arising from it. The parties submit to the jurisdiction of such Courts and irrevocably waive any right they may have to object to any action being brought in these Courts, to claim that the action has been brought in an inconvenient forum or to claim that those Courts do not have jurisdiction.

7.3    **WAIVER OF JURY TRIAL** – TO FACILITATE JUDICIAL RESOLUTION AND SAVE TIME AND EXPENSE, THE COMPANY AND FTI IRREVOCABLY AND UNCONDITIONALLY AGREE TO WAIVE A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THE SERVICES OR THIS ENGAGEMENT CONTRACT.

7.4    **Compliance with Laws** - The Company agrees that it will comply with all anti-corruption, anti-money laundering, anti-bribery and other economic sanctions laws and regulations of the United States, United Kingdom, European Union and United Nations (collectively, the "ABC/AML/Sanction Laws") in connection with this Engagement.  The Company further agrees that it shall not, and it shall procure its employees not to, pay or cause other person(s) to pay FTI using any funds that would result in a violation of any of the ABC/AML/Sanction Laws by either Company or FTI, or otherwise take any action that would result in a violation of any of the ABC/AML/Sanction Laws by either Company or FTI. The Company shall promptly notify FTI in the event of any violation or failure to comply with ABC/AML/Sanction Laws in connection with this Engagement, or allegations relating thereto, by the Company or its directors, officers, employees or agents.

FTI CONSULTING, INC

**Confirmation of Standard Terms and Conditions**

We agree to engage FTI Consulting, Inc. upon the terms set forth in these Standard Terms and Conditions as outlined above.


**Proterra Inc.**

By:    *Jeff Mitchell*
       _____
       Jeff Mitchell
       General Counsel

**Proterra Operating Company, Inc.**

By:    *Jeff Mitchell*
       _____
       Jeff Mitchell
       General Counsel

Date:    August 7, 2023

**SCHEDULE A**

## <u>FTI CONSULTING DATA PROTECTION SCHEDULE</u>

This Data Protection Schedule ("**Schedule**") forms part of the contract for services to which it is an attachment (the "**Contract**") between the client party identified in the Contract (the "**Client**") and the relevant FTI Consulting group entity identified in the Contract ("**FTI**").

**1.     Definitions**

1.1     In this Schedule, unless otherwise defined herein, all defined terms shall have the meaning set out in the Contract.

1.2     In this Schedule, the following terms shall have the meanings set out below:

1.2.1     "**Data Protection Laws**" means all legislation protecting the personal data of natural persons that is applicable to the processing of Personal Data under this Schedule, including (without limitation) the GDPR and any national legislation which supplements the GDPR, and the data protection laws of any other country, state or territory which apply to such processing*;*

1.2.2     "**EEA Standard Contractual Clauses**" means the Standard Contractual Clauses set out in the European Implementing Decision (EU) 2021/914 on standard contractual clauses for the transfer of personal data to third countries pursuant to Regulation (EU) 2016/679, as updated, amended, replaced or superseded from time to time by the European Commission;

1.2.3     "**GDPR**" means the General Data Protection Regulation (EU) 2016/679;

1.2.4     "**Restricted Transfer**" means a transfer of Personal Data from Client to FTI in circumstances where such transfer would be prohibited by Data Protection Laws in the absence of the EEA or UK Standard Contractual Clauses;

1.2.5     "**Standard Contractual Clauses**" means either the EEA or UK Standard Contractual Clauses, as applicable to a Restricted Transfer;

1.2.6     "**UK Standard Contractual Clauses**" means the standard contractual clauses for the transfer of personal data to Processors established in third countries which do not ensure an adequate level of protection as set out in Commission Decision 2010/87/EU, as updated, amended, replaced or superseded from time to time by the UK government; "**UK GDPR**" means the GDPR as transposed into United Kingdom national law by operation of section 3 of the European Union (Withdrawal) Act 2018 and as amended by the Data Protection, Privacy and Electronic Communications (Amendments etc.) (EU Exit) Regulations 2019; and

1.2.7     "**Personal Data**", "**Process**", "**Controller**", "**Processor**", "**Data Subject**", "**Supervisory Authority**" and "**Personal Data Breach**" shall have the meanings given to them in the Data Protection Laws.

**2.      Controller Terms**

2.1      FTI and the Client will each act as separate and individual Controllers in relation to any Personal Data (including, without limitation, Personal Data relating to any of the Client's workers, FTI's workers, any litigation or arbitration opponent or customer or vendor or transaction partner) Processed by the Client or FTI to deliver the services set out under the Contract.

2.2      FTI and the Client will each comply with its own respective obligations under the Data Protection Laws in relation to their Processing of Personal Data under the Contract. In particular, the Client will ensure that any disclosures of Personal Data to FTI are lawful, and, in each case where necessary under the Data Protection Laws, the Client has notified and secured the consent of the relevant Data Subjects.

2.3      FTI may appoint Processors as required to deliver the services, who will process the Personal Data on FTI's behalf and at FTI's direction. Further, FTI may disclose Personal Data to other Controllers:

2.3.1      where necessary to deliver the services (including, but without limitation, law firms, accountants, other third party experts and any member of FTI's group of companies); or

2.3.2      pursuant to a legally binding written request, an order or request of a court of competent jurisdiction or any governmental or regulatory authority or where disclosure is required by applicable law or regulation ("**Legal Process**").  In relation to any Legal Process, FTI shall assess the lawfulness of the request before responding, and shall take any steps required by Data Protection Laws to protect Personal Data prior to its disclosure (including, without limitation, with respect to data minimization and data security);

2.4      In respect of any Restricted Transfer subject to the GDPR, the parties hereby enter into Module 1 of the EEA Standard Contractual Clauses (with Client as data exporter and FTI as data importer), which is hereby incorporated by reference into this Schedule and which shall come into effect upon the commencement of a Restricted Transfer.  The parties make the following selections for the purposes of Module 1:

2.4.1      Clause 7 – *Docking clause* shall apply;

2.4.2      Clause 11(a) – *Redress* the optional language shall not apply;

2.4.3      Clause 13(a) – *Supervision*

2.4.3.1      Where Client is established in an EU Member State, the following shall apply: "The supervisory authority with responsibility for ensuring compliance by the data exporter with Regulation (EU) 2016/679 as regards the data transfer shall be the supervisory authority of the Member State in which Client is established or (if different) the lead supervisory authority of the Client in respect of a cross-border processing activity". *OR*

2.4.3.2      Where Client is not established in an EU Member State, but falls within the territorial scope of application of the GDPR in accordance with Article 3(2) and has appointed a representative pursuant to Article 27(1) of the GDPR the following shall apply: "*The supervisory authority of the Member State in which the representative within the meaning of Article 27(1) of Regulation (EU) 2016/679 is established, shall act as competent supervisory authority.*" *OR*

2.4.3.3      Where Client is not established in an EU Member State, but falls within the territorial scope of application of the GDPR in accordance with Article 3(2) without however having to appoint a representative the following shall apply: "*The supervisory authority of one of the Member States in which the data subjects*

*whose personal data is transferred under these Clauses in relation to the offering of goods or services to them, or whose behaviour is monitored, are located, as indicated in Annex I.C, shall act as competent supervisory authority.*"

2.4.4    Clause 17 – *Governing law* "Option 1" shall apply and the "Member State" shall be the Republic of Ireland;

2.4.5    Clause 18 – *Choice of forum and jurisdiction* the Member State shall be the Republic of Ireland;

2.4.6    Annex 1 – the data exporter is Client and the data importer is FTI (in each case as identified, including in relation to their places of establishment, in the Principal Agreement) and the description of transfer is deemed to be as described in Annex 1 to this Schedule;

2.4.7    Annex 2 – the technical and organizational security measures are deemed to be as described in Annex 2 to this Schedule; and

2.4.8    Annex 3 – not applicable.

2.5    In respect of any Restricted Transfer subject to the UK GDPR, the parties hereby enter into the UK Standard Contractual Clauses (with Client as data exporter and FTI as data importer), which are incorporated by reference into this Schedule and which shall come into effect upon the commencement of a Restricted Transfer. For the purposes of clause II h) of the UK Standard Contractual Clauses, the Parties shall be deemed to have selected option (iii).  Annex 2 to the UK Standard Contractual Clauses shall be deemed to be prepopulated with the relevant sections of the Annex to this Schedule.  If at any time the UK government approves the EEA Standard Contractual Clauses for use under the UK GDPR, the provisions of paragraph 2.4 shall apply in place of this paragraph 2.5 in respect of Restricted Transfers subject to the UK GDPR, subject to any modifications to the EEA Standard Contractual Clauses required by the UK GDPR (and subject to the governing law of the EEA Standard Contractual Clauses being English law).

2.6    The Client acknowledges and agrees that certain Processors or Controllers engaged by FTI under paragraph 2.3 may be located in places that may require cross-border transfers of Personal Data. In respect of transfers by FTI to such Controllers or Processors, FTI will take steps in accordance with the Data Protection Laws to ensure an adequate level of protection for the Personal Data Processed by such Processors or Controllers.  Where such a Controller or Processor notifies FTI that it may no longer be able to provide an adequate level of protection in accordance with Data Protection Laws, FTI shall independently assess the level of protection provided and, where necessary, shall take mitigating steps to improve the level of protection or, where this is not possible, terminate the transfer.

2.7    The Client acknowledges that FTI's email records are replicated onto a Microsoft 365 Cloud system in the United States of America and the Client hereby consents that any Personal Data that is provided to FTI by email will be replicated accordingly. To the extent that the Client wishes to transmit certain information or data to FTI and the Client objects to that data being replicated in accordance with this paragraph, the Client will use a communication or transmission method other than e-mail or will use an alternative e-mail system.

**SCHEDULE B**

## <u>FTI CONSULTING CALIFORNIA DATA PROTECTION SCHEDULE</u>

This California Data Protection Schedule ("Schedule") forms part of the contract for services to which it is an attachment (the "Contract") between the client party identified in the Contract (the "Client") and the relevant FTI Consulting group entity identified in the Contract ("FTI"). FTI will be functioning as a service provider.

1.  Processing of Personal Information.
    In connection with FTI's provision of services to Client under the Contract, if FTI receives any personal information (as such term is defined under the California Consumer Privacy Act) from or on behalf of Customer, then FTI:

    (a) will only process such personal information for the purpose of providing the services;

    (b) will not retain, use, or disclose such personal information for any purpose other than to perform the services or outside of the direct business relationship between FTI and Client;

    (c) will not sell, rent, release, disclose, disseminate, make available, transfer or otherwise communicate such personal information to any third party for monetary or other valuable consideration; and

    (d) certifies that it understands the restrictions on its processing of such personal information as set forth in this sentence, and will comply with them.

FTI may disclose personal information to FTI's service providers in connection with such service providers providing services to FTI, and FTI may permit such service providers to process personal information as necessary for FTI to provide the services to Client.

<u>**Annex 1: Description of Personal Data Processing**</u>

<u>This Annex includes certain details of the Processing of Personal Data by FTI under the Principal Agreement.</u>

1.    <u>**Subject matter and duration of the Processing of the Personal Data**</u>
<u>The subject matter and duration of the Processing of the Personal Data are set out in the Principal Agreement and this Schedule.</u>

2.    <u>**The nature and purpose of the Processing of the Personal Data**</u>
<u>FTI is engaged to provide Services to Client which involve the Processing of Personal Data. The scope of the Services are set out in the Principal Agreement, and the Client Personal Data will be Processed by FTI for purposes determined by it, in connection with the delivery of those Services and compliance with the terms of the Principal Agreement, including this Addendum, as well as applicable laws.</u>

3.    <u>**The types of the Personal Data to be Processed**</u>
Client customer or employee information which may be collected in the course of delivering consulting and advisory services to Client, including name, title, gender, personal contact details (address, telephone number, email address), work address, work email, work telephone numbers, job title, and other types of Personal Data supplied by the Client to FTI pursuant to the Principal Agreement.

4.    **The categories of Data Subject to whom the Personal Data relates**

The categories of Data Subjects are determined by the nature of the client engagement, the details of which are covered in the Principal Agreement.

5.    **The obligations and rights of Client**

The obligations and rights of Client are set out in the Principal Agreement and this Schedule.

6.    **Frequency of Restricted Transfers (where applicable):**

As necessary to deliver Services for the duration of the Principal Agreement.

7.    **The period for which Personal Data subject to Restricted Transfers will be retained (where applicable):**

In accordance with FTI's data retention policies, copies of which are available upon request.

**Annex 2: Technical and Organizational Security Measures**

FTI Consulting maintains the following technical and organizational security measures when processing Personal Data for its clients.

- Measures of pseudonymisation and encryption of personal data

When data at rest leaves our direct control (such as backup tapes, removable hard drives, etc.) the data is encrypted using AES 256-bit encryption. All laptops utilize full disk encryption. Data that is in transit over public circuits is encrypted in transit using SSL. FTI Consulting additionally deploys firewalls throughout its networks to allow and deny specific network traffic using key indicators such as source/destination address, source/destination port, etc.

- Measures for ensuring ongoing confidentiality, integrity, availability and resilience of processing systems and services Measures for ensuring the ability to restore the availability and access to personal data in a timely manner in the event of a physical or technical incident

FTI requires new employees/contractors to acknowledge receipt of the following policies including: Code of Ethics and Business Conduct, Anti-Corruption Policy, Acceptable Use of Technology Resources, Confidentiality Agreement, Employee Handbook Policy on Inside Information & Insider Trading, and Time Recording Policy.

FTI Consulting has a documented policy for business continuity and disaster recovery that has been approved by management, communicated properly and is maintained and reviewed. The general details are reflected in the FTI Consulting Information Security Policy.  The recovery point objective exceeds 4 hours and the recovery time objective exceeds 24 hours.  The specific tools used for backups vary by region.

- Processes for regularly testing, assessing and evaluating the effectiveness of technical and organisational measures in order to ensure the security of the processing

FTI has access to all major vendor security bulletins and have controls over identifying, scheduling, testing, and deploying patches. The deployment time is 14 days for high and within 24 hours for critical/emergency patches.

FTI has controls over identification of vulnerabilities, risk ranking, reporting, and remediation.  This includes perimeter vulnerability scans that must be performed at least quarterly and semi-annual internal vulnerability scans that cover workstations, servers, and network devices.

FTI performs internal penetration test to identify flaws in the internal security controls that could allow an attacker to surreptitiously gain access to sensitive data and/or disrupt critical business systems.  The organization must also perform external network penetration test to identify potential vulnerabilities which could be exploited to gain access to systems and data or to establish a foothold into internal network from which to launch further attacks.

FT's cybersecurity team tracks the resolution of vulnerabilities. Vulnerabilities that are not resolved as part of patching cycles must be tracked on a vulnerability log or similar mechanism.

- Measures for user identification and authorization

FTI uses unique IDs and if generic IDs should be disabled unless there is an approved security exception.  FTI users authenticate through Active Directory (AD), SSO used when possible, and remote connection requires two

factor authentication and leverages FTI's Corporate DUO two factor technology. Duo Security generates passcodes (similar to a PIN Code) to mobile devices for login and can receive push notifications for easy updates. Duo Security is integrated with OneLogin (our SSO platform) providing a unified authentication solution.

Privileged and remote access must include multi-factor authentication and secure mechanisms (e.g., TACACs+, RADIUS) must be used on all network devices.

FTI password complexity (i.e. characters, length), lockout settings, expiration settings meets the following requirements:

. Contain both upper and lower case characters (e.g., a-z, A-Z)
· Have digits and punctuation characters as well as letters e.g., 0-9,!@#$%^&*()_+|~-=\`{}[]:";'"<>?,./)
· Contains at least 12 characters for standards accounts and 15 characters in length for admin accounts
· Must be changed at least every 90 days
· Are not words in any language, slang, dialect, jargon, etc.
· Are not based on Confidential Information, names of family, etc.
· User accounts are locked after 10 unsuccessful logins. Account lockout for 30 mins. Reset after 30 mins.
· Password history - 24 passwords remembered

Passwords are stored protected in an encrypted format.

- Measures for the protection of data during transmission and measures for the protection of data during storage

FTI has Data Loss Prevention (DLP) and extrusion prevention tools that restrict sending sensitive data over unsecure mail.  Anomalies that exceed the normal traffic patterns are noted and appropriate action is taken to address them.

FTI protects data in transmission which include the following acceptable methods:

- Email: Transport Layer Security ("TLS") Internet protocol, which provides security for all email transmissions over the public Internet may be setup with using opportunistic or mandatory TLS connections.  Only TLS 1.2 or TLS 1.3 is acceptable.

- "Mailbox to mailbox" encryption that secures email messages and electronic files (using 256-bit AES encryption).

- Secure FTP:  FTP utilizes TLS or SSH to allow us to share data with clients securely over the Internet.  Only TLS 1.2 or TLS 1.3 is acceptable.

- External Encrypted Drive:  Must use FIPS 140-2/AES 256-bit encryption or stronger.

- File Stores:  Matter/Engagement related files stored centrally on the network are secured so that only those explicitly authorized can access the files.

FTI stores data in an environment that is not internet facing and segregated from the demilitarized zone by a firewall. The data must be logically segregated from other client or corporate data. Different tools may be employed depending upon the nature and/or location of the work.

- Measures for ensuring physical security of locations at which personal data are processed

Specific physical security provisions vary depending on office location, however, as per the Information Security policy, access to company premises, including delivery and loading areas, must require badge access.  Badge access is managed by local facilities or ITG, who use a badge kiosk to produce access badges.  All badge issuances and updates require management approval.

- Measures for ensuring events logging

FTI logs activity which is stored for 7 years.  Data is logged at sufficient level (i.e. user ID, activity) and logging is enabled for the entire environment.  The logging must provide relevant information (i.e. authorized & unauthorized attempts, remote access). System event and audit logs should capture the following events as applicable:
- Authentication failures
- Software or service failures
- Logon and use of privileged IDs
- Database changes
- Adding/deleting users
- Password Changes
- Adding/deleting groups and/or users associated with groups
- Changing audit log configuration or disabling audit subsystem

FTI uses SecureWorks which provides a Security Incident and Event Management (SIEM). The foundation of the SIEM includes Red Cloak endpoint event logs analysis, which includes an industry-leading assessment of current and zero-day threats and vulnerabilities.

- Measures for ensuring system configuration, including default configuration Measures for internal IT and IT security governance and management

FTI has processes in place to confirm compliance with configuration standards.  This includes a process for newly created device (i.e., checklist), at least annual reviews and hardening, removal of unnecessary / insecure services, and alarms set for key events (i.e. change in security group, configuration).

- Measures for certification/assurance of processes and products

FTI holds the Certified Enterprise designation from Verizon Cybertrust and participates in their Security Management Program (SMP).  The SMP is a comprehensive security risk reduction and certification program that addresses all aspects of proactive information security, from network and system analysis to physical and policy inspection.  The cornerstone of SMP is the International Standards Organization (ISO) standard 27002.

As part of the Cybertrust Third Party assessment schedule, FTI Consulting's Global Cybersecurity and Privacy function undergoes the following reviews by the Verizon Security Certification organization:

- Policy Review — evaluates the documentation and inspects the contents of key security policies — Annually.
- Process and Procedure Validation — Annually.
- Physical Inspection — evaluates the implementation of security controls in the physical environment surrounding critical network infrastructure, including doors, HVAC, entry logs, power redundancy, etc. — Annually.
- External Risk Assessments (Network and System-level scans) — Quarterly identifies possible risk areas in an organization's external network infrastructure and assesses its consistency with key controls.
- Penetration testing (External and Internal – Network and System-level) is conducted by a separate third-party — Annually.

Individual business units may hold additional certifications or use tools that are supported by additional certifications.

- Measures for ensuring data minimisation

FTI only acquires data for the intended purpose by working with the client or business partner to ensure only the minimum amount of necessary data is obtained.

- Measures for ensuring data quality

FTI Consulting is dedicated to providing its clients with high quality services that meet our standards of excellence and integrity.  The quality of the work for each of our clients is monitored by the Senior Managing Directors responsible for each engagement along with the highly qualified colleagues in their practice teams and business segments.  On a broader level, FTI sets the tone for our global organization in our Code of Conduct (https://www.fticonsulting.com/~/media/Files/us-files/our-firm/guidelines/fti-code-of-conduct.pdf) which discusses our commitment to quality throughout, and in particular in our Statement of Values.

FTI takes into account the principle of purpose limitation, while making sure that the data is adequate, relevant and not excessive for the legitimate purpose. FTI enables data subjects to exercise their rights, including the rights of access and, as appropriate, the rectification, erasure or blocking of Personal data and keep data accurate, and not retain it any longer than necessary.

- Measures for ensuring limited data retention

FTI has a records retention policy that ensures records are retained for required and necessary periods of time; providing that records which are no longer useful are properly destroyed; and providing that records to be retained are stored methodically and economically.  FTI uses their reasonable and best efforts to prevent the premature destruction of Records. The organization must have processes to return data upon end of contract and destroy data using appropriate mechanisms upon Department of Defense (DoD) and National Institute of Standards and Technology (NIST) standards for all data bearing devices.

- Measures for ensuring accountability

FTI has a defined process to resolve complaints about privacy and its collection or use of personal information in compliance with the EU-US Privacy Shield Principles.  FTI has measures in place to ensure complaints are resolved within 1 month.   Unless otherwise dictated by local law, the exact number of days to comply with a request varies, depending on the month in which the request was made and is calculated based on the day the request is received plus one (regardless of whether the day is a working day or not) until the corresponding calendar date in the next month.

- Measures for allowing data portability and ensuring erasure

FTI receives requested Personal Data directly or provide access to a tool which allows the requestor to extract the information themselves using a self-service type model.

The Personal Data requested is required to be provided in a format and structure which is commonly used and machine-readable. The following machine-readable formats:

- CSV: (Comma separated values) a format that stores tabular data (numbers and text) in plain-text form;

- PDF: (Portable Document Format) a file format used mainly to represent documents such that layout will stay the same independent of the system environment;
- XML: (eXtensible Markup Language) a markup language that defines a set of rules for encoding documents in a format that can be both human and machine readable;
- JSON: (JavaScript Object Notation) a machine-readable data format derived from the JavaScript language used for representing simple data structures and associative arrays; or
- HTML: (HyperText Markup Language) the main markup language for displaying web pages and other information in a web browser.

FTI has a data erasure process in place to track and manage responses, and, as necessary, provide updates to the relevant regulatory authority and/or input into management reports. The organization must verify the identity of the data subject before disclosing any personal information. The organization should only refuse to comply with an erasure request if it is "manifestly unfounded or excessive" or, alternatively may elect to charge a "reasonable fee." The response is in written communication together with the documents containing the proper erasure of data.