## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| PROTERRA INC, *et al.*,[1] | ) Case No. 23-11120 (BLS) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) |
| | ) **Ref. Docket Nos.:  228 & 229** |
| | ) |

## NOTICE OF FILING OF REDACTED VERSION OF DEBTORS' MOTION FOR AN ORDER APPROVING THEIR KEY EMPLOYEE INCENTIVE PLAN

**PLEASE TAKE NOTICE** that, on September 13, 2023, the above-captioned debtors and debtors in possession (together, the "Debtors") filed under seal the *Debtors' Motion for an Order Approving Their Key Employee Incentive Plan* [D.I. 228] (the "Motion").[2]

**PLEASE TAKE FURTHER NOTICE** that, the Debtors hereby file a redacted version of the Motion, which is attached hereto as **Exhibit A**, redacting certain confidential information as set forth in the *Debtors' Motion for Entry of an Order Authorizing Debtors to File Under Seal Certain Information Contained in the Debtors' Motion for an Order Approving Their Key Employee Incentive Plan and the Declarations in Connection Therewith* [D.I. 229].

**PLEASE TAKE FURTHER NOTICE** that, any objections or responses to the relief requested in the Motion must be filed on or before **September 27, 2023 at 4:00 p.m. (ET)** (the "Objection Deadline") with the United States Bankruptcy Court for the District of Delaware, 3rd Floor, 824 North Market Street, Wilmington, Delaware 19801.  At the same time, copies of any responses or objections to the Motion must be served upon the undersigned counsel to the Debtors so as to be received on or before the Objection Deadline.

**PLEASE TAKE FURTHER NOTICE** THAT A HEARING ON THE MOTION WILL BE HELD ON **OCTOBER 4, 2023 AT 2:00 P.M. (ET)** BEFORE THE HONORABLE BRENDAN LINEHAN SHANNON, UNITED STATES BANKRUPTCY COURT JUDGE FOR THE DISTRICT OF DELAWARE, 824 N. MARKET STREET, 6TH FLOOR, COURTROOM NO. 1, WILMINGTON, DELAWARE 19801.

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Proterra Inc (1379); and Proterra Operating Company, Inc. (8459).  The location of the Debtors' service address is: 1815 Rollins Road, Burlingame, California 94010.

[2]  Capitalized terms used but not defined herein have the meanings ascribed to such terms in the Motion.

Dated:  September 13, 2023
        Wilmington, Delaware

Respectfully submitted,

**YOUNG CONAWAY STARGATT &
TAYLOR, LLP**

*/s/ Shella Borovinskaya*
Pauline K. Morgan (No. 3650)
Andrew L. Magaziner (No. 5426)
Shella Borovinskaya (No. 6758)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email:  pmorgan@ycst.com
        amagaziner@ycst.com
        sborovinskaya@ycst.com

        - and -

**PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP**
Paul M. Basta (admitted *pro hac vice*)
Robert A. Britton (admitted *pro hac vice*)
Michael J. Colarossi (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Tel:    (212) 373-3000
Fax:    (212) 757-3990
Email:  pbasta@paulweiss.com
        rbritton@paulweiss.com
        mcolarossi@paulweiss.com

*Counsel to the Debtors and
Debtors in Possession*

2

## EXHIBIT A

**Redacted Motion**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| PROTERRA INC, *et al.*,[1] | ) Case No. 23-11120 (BLS) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**Objection Deadline:  September 27, 2023 at 4:00 p.m.**
**Hearing Date:  October 04, 2023 at 11:00 a.m. (ET)**

### DEBTORS' MOTION FOR AN ORDER
### APPROVING THEIR KEY EMPLOYEE INCENTIVE PLAN

The above-captioned debtors and debtors in possession (together, the "Debtors")

submit this motion (this "Motion") for entry of an order, substantially in the form attached

hereto as **Exhibit A** (the "Proposed Order"), pursuant to sections 105(a), 363(b), and

503(c)(3) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532

(the "Bankruptcy Code"), authorizing and approving the Debtors' Key Employee

Incentive Plan (the "KEIP"), which provides for incentive awards for three of the Debtors'

senior executives (the "KEIP Participants").  In support of this Motion, the Debtors will

file declarations (the "Declarations") in advance of the hearing to consider this Motion, to

be incorporated herein by reference, and respectfully state as follows:

### Jurisdiction and Venue

1.    The United States Bankruptcy Court for the District of Delaware

(the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and

the Amended Standing Order of Reference from the United States District Court for the

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Proterra Inc (9565); and Proterra Operating Company, Inc. (8459). The location of the Debtors' service address is: 1815 Rollins Road, Burlingame, California 94010.

District of Delaware, dated February 29, 2012.  Pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtors consent to entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.        Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).

3.        The statutory predicates for the relief requested herein are sections 105(a), 363(b), and 503(c)(3) of the Bankruptcy Code.

### Background

4.        On August 7, 2023 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, thereby commencing the instant cases (the "Chapter 11 Cases").  The Debtors continue to manage and operate their business as debtors in possession under sections 1107 and 1108 of the Bankruptcy Code.

5.        On August 25, 2023, the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed the Official Committee of Unsecured Creditors (the "Committee") in these Chapter 11 Cases [Docket No. 133].  No trustee or examiner has been appointed in these Chapter 11 Cases.  The Debtors' Chapter 11 Cases are jointly administered for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

6.      Information regarding the Debtors' business, their capital and debt structure, and the events leading to the filing of the Chapter 11 Cases is contained in the *Declaration of Gareth T. Joyce in Support of Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration") [Docket No. 16].

**Preliminary Statement**

7.      As set forth in the First Day Declaration, the Debtors commenced these Chapter 11 Cases to, among other things, preserve and maximize the value of their estates for the benefit of all stakeholders.  In furtherance of that objective, the Debtors sought, and this Court granted, authorization to, among other things, implement certain Bidding Procedures[2] to be used during the contemplated postpetition marketing and bidding process (the "Marketing Process").  As of the filing of this Motion, the Debtors, through their advisors, have contacted approximately 232 potential bidders and entered into approximately 78 non-disclosure agreements ("NDAs").

8.      The Debtors have simultaneously sought to stabilize their operations, maintain their pivotal customer relationships, and sustain their workforce, thereby facilitating the success of the Debtors' postpetition Marketing Process and preservation of the value of their estates.  Given this ongoing and critical work, as part of their efforts to motivate a limited number of key senior management personnel who are directly involved

---

[2]      As defined in the *Order (a) Approving Bidding Procedures to Govern the Sale of all or Substantially all of the Debtors' Assets Pursuant to Section 363 of the Bankruptcy Code, (b) Approving Procedures Regarding Entry Into One or More Stalking Horse Agreements, (c) Establishing Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases, (d) Approving the Form and Manner of the Notice of Assumption and Assignment of Executory Contracts and Unexpired Leases, (e) Scheduling Auctions for the Sales of the Company Assets and Hearings to Consider Approval of the Sales and Approving the Form and Manner of the Notice Thereof, and (f) Granting Related Relief* (the "Bidding Procedures Order") [Docket No. 218].

in the administration of these Chapter 11 Cases and the Marketing Process, the Debtors and their advisors have developed a targeted KEIP.

9.     The KEIP is a market-based variable compensation program that will appropriately incentivize the Debtors' senior-most management team to maximize the value of these estates during a time of great uncertainty and challenge.  It is the product of substantial work by the compensation committee (the "Compensation Committee") of the Debtors' board of directors (the "Board"), in consultation with the Debtors' advisors, including FTI Consulting, Inc. ("FTI") and Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul, Weiss").  The KEIP has undergone review and negotiation with the Second Lien Agent[3] and the Committee, and the Debtors have provided substantial information to these key constituencies regarding the program's design and cost, the financial metrics and targets necessary to earn awards under the KEIP, and other relevant matters.  Productive discussions with the Committee and the Second Lien Agent remain ongoing, and the Debtors will endeavor to address any legitimate concerns raised by the Committee, the Second Lien Agent, or other important constituents, including the U.S. Trustee.

10.    The KEIP is critical to achieve a successful Marketing Process and Chapter 11 Cases.  To date, the Debtors and their advisors have run an efficient Marketing Process in accordance with the schedule set forth in the Bidding Procedures, which requires significant attention and effort by the three KEIP Participants.  The KEIP Participants must meet these demands while juggling the demands of the Chapter 11 process itself and the day-to-day administration of the Debtors' business affairs.  The KEIP is critical to

---

[3]     "Second Lien Agent" means CSI GP I LLC as collateral agent under that certain Note Purchase Agreement (as amended, amended and restated, supplemented, or otherwise modified from time to time, the "Note Purchase Agreement").

incentivizing the KEIP Participants to expend the enormous effort, dedication, and focus that will be needed to create value during this challenging period.

11. It is critical to implement the KEIP promptly to ensure that the KEIP Participants remain focused on maximizing value for the Debtors' estates without the stress of uncertainty regarding their personal compensation opportunities. While the KEIP Participants have worked tirelessly to prepare the Debtors for these Chapter 11 Cases, the restrictions placed on the Debtors as a result of that very filing denied the KEIP Participants of the ability to receive their ordinary course equity compensation and awards, as well as prepetition severance protection (at the very time when it may be needed). Over a month into these Chapter 11 Cases, the compensation opportunities available to the Debtors' KEIP Participants is far less than their historical incentive compensation. The Debtors seek to implement the KEIP to provide appropriate incentives to the three KEIP Participants to obtain, for the benefit of the Debtors' estates and stakeholders, significant and measurable value through the Marketing Process and related initiatives. The Debtors believe that the KEIP properly aligns the interests of the KEIP Participants with the Debtors' estates, creditors, and other stakeholders.

12. Therefore, the Debtors submit that implementation of the KEIP reflects a more than reasonable exercise of the Debtors' business judgment. The KEIP was thoroughly developed over several weeks by the Compensation Committee, together with the Debtors' experienced advisors, including their restructuring and compensation advisor, FTI. FTI leveraged its knowledge of bankruptcy and key employee incentive plans to ensure the KEIP was in line with market plans of similarly situated companies and adequately incentivized the KEIP Participants.

13.     The principal terms of the KEIP are set forth below.  The KEIP Participants will earn two categories of payments depending on the results of the Marketing Process. If the total value received as part of the Marketing Process exceeds $███████ in Aggregate Value (as defined below) (the "Threshold"), then the KEIP Participants are eligible for the first payment.  Said differently, if the Marketing Process fails to yield the Threshold, the KEIP pays out nothing.  In the event that the Marketing Process yields more than the Threshold, the KEIP Participants are eligible for additional value that increases linearly as the Marketing Process' proceeds increase in an amount equal to 3% of the incremental proceeds.  The Threshold was set based on target Aggregate Value equal to $███████ (the "Target").

14.     The Threshold and Target will be difficult to achieve because there is no certainty that any transaction will occur, much less at an aggregate value that will trigger the KEIP.  The KEIP Participants must play their respective roles to facilitate the sale process through oversight of the Debtors' strategy, facilitation of due diligence, and preservation of going concern value pending a sale.  The KEIP Participants cannot expect to earn awards under the KEIP merely by engaging in business as usual.

15.     As shown in the tables below, the cost of the KEIP is reasonable under the facts and circumstances of these Chapter 11 Cases as compared to relevant bankruptcy peers.  FTI  created two peer groups.  First, FTI selected a peer group of ten key employee incentive plans that (a) were filed after 2016, (b) had a median funded debt level of approximately $149,900,000 and median total assets of approximately $178,800,000, and (c) involved sales transactions (the "Sale KEIP Peer Group" and the plans thereunder, the "Sale KEIP Peer Group Plans").  The Sale KEIP Peer Group is comprised of companies in

differing industries, including technology, telecommunications, and commercial services. Second, FTI selected a peer group of eight key employee incentive plans that were (a) filed after 2019, (b) had a median funded debt level of approximately $135,600,000 and median total assets of approximately $108,489,000, and (c) arose in bankruptcies with plans of reorganization and sales (the "Diversified KEIP Peer Group," and with the Sale KEIP Peer Group, the "KEIP Peer Groups" and the plans under the Diversified KEIP Peer Group, "Diversified KEIP Peer Group Plans," and with the Sale KEIP Peer Group Plans, the "KEIP Peer Group Plans"). FTI sought to balance industry, business size, and recency when scoping the KEIP Peer Group Plans to best represent the market parameters.

## A. Diversified KEIP Peer Group *($ in 000s)*

| # | Company | Date | Industry | Funded Debt | Total Assets | KEIP Target | KEIP % of Funded Debt | KEIP % of Assets |
|---|---------|------|----------|-------------|--------------|-------------|-----------------------|------------------|
| 1 | Clovis Oncology Inc. | 2022 | Healthcare | $618,300 | $314,980 | $4,350 | *0.70%* | *1.38%* |
| 2 | Agera Energy | 2019 | Electrical Power | $296,700 | $108,489 | $613 | *0.21%* | *0.56%* |
| 3 | Liberty Power Holdings, LLC | 2021 | Electrical Power | $195,000 | $294,889 | $1,100 | *0.56%* | *0.37%* |
| 4 | DCL Holdings | 2022 | Chemicals | $149,800 | n/a | $730 | *0.49%* | *n/a* |
| 5 | EYP Group Holdings Inc. | 2022 | Professional Services | $121,400 | $110,245 | $2,116 | *1.74%* | *1.92%* |
| 6 | Nova Wildcat Shur-Line Holdings | 2023 | Commercial Services | $97,400 | $34,629 | $1,191 | *1.22%* | *3.44%* |
| 7 | MobiTV, Inc. | 2021 | Technology | $30,000 | $19,000 | $795 | *2.65%* | *4.18%* |
| 8 | Wave Computing, Inc. | 2021 | Technology | $15,500 | $42,488 | $1,400 | *9.03%* | *3.30%* |
| | | | *Benchmark Percentiles* | | | | | |
| | 75th Percentile | | | $220,425 | $202,567 | $1,579 | *1.97%* | *3.37%* |
| | Median | | | $135,600 | $108,489 | $1,146 | *0.96%* | *1.92%* |
| | 25th Percentile | | | $80,550 | $35,558 | $779 | *0.54%* | *0.97%* |
| | | | *Proterra KEIP* | | | | | |
| | KEIP @ Target | | | $175,888 | $818,774 | $4,000 | *2.27%* | *0.49%* |

**B. Sale KEIP Peer Group ($ in 000s)**

| # | Company | Date | Industry | Funded Debt | Total Assets | KEIP Target | KEIP % of Funded Debt | KEIP % of Assets |
|---|---------|------|----------|-------------|--------------|-------------|------------------------|-------------------|
| 1 | OneWeb Global Limited | 2020 | Telecomms. | $1,733,000 | $3,300,000 | $1,903 | 0.11% | 0.06% |
| 2 | BPS US Holdings Inc. | 2016 | Manufacturing | $608,000 | $750,000[1] | $3,553 | 0.58% | 0.47% |
| 3 | Gander Mountain Co. | 2017 | Retail | $602,000 | $750,000[1] | $2,700 | 0.45% | 0.36% |
| 4 | Liberty Power Holdings | 2021 | Electrical Power | $195,000 | $57,600 | $1,100 | 0.56% | 1.91% |
| 5 | Rockall Energy Holdings | 2022 | Oil & Gas | $150,000 | $300,000[1] | $1,500 | 1.00% | 0.50% |
| 6 | DCL Holdings | 2022 | Chemicals | $149,800 | $300,000[1] | $730 | 0.49% | 0.24% |
| 7 | Nova Wildcat Shur-Line | 2023 | Commercial Services | $97,400 | $34,629 | $1,191 | 1.22% | 3.44% |
| 8 | Athenex, Inc | 2023 | Healthcare | $41,900 | $16,833 | $803 | 1.92% | 4.77% |
| 9 | MobiTV, Inc. | 2021 | Technology | $30,000 | $19,000 | $795 | 2.65% | 4.18% |
| 10 | Wave Computing, Inc | 2020 | Technology | $15,500 | $42,488 | $1,400 | 9.03% | 3.30% |
| | *Benchmark Percentiles* | | | | | | | |
| | 75th Percentile | | | $500,250 | $637,500 | $1,803 | 1.74% | 3.40% |
| | Median | | | $149,900 | $178,800 | $1,296 | 0.79% | 1.20% |
| | 25th Percentile | | | $55,775 | $36,594 | $877 | 0.51% | 0.39% |
| | *Proterra KEIP* | | | | | | | |
| | KEIP @ Target | | | $175,888 | $818,774 | $4,000 | 2.27% | 0.49% |

1. Total assets provided as a range in court filings. Reflects range midpoint.

16.     If the Threshold is reached, significant value will be delivered to the Debtors' estates, including by satisfying all of the Debtors' funded debt and other selected costs of these Chapter 11 Cases. While at the Target, the KEIP would be above the 75th percentile of the benchmark groups, this allocation is reasonable under the circumstances because it will be difficult to achieve the Target by design. The KEIP's design aligns the interests of the KEIP Participants with those of the Debtors by setting difficult targets and scaling the payments based upon the success of the Marketing Process.

17.     The Debtors accordingly submit that the KEIP constitutes a sound exercise of their business judgment and should be approved.

## Development of the KEIP

18.     In the weeks leading up to and following the Petition Date, the Debtors, including the Compensation Committee, and their advisors evaluated the need to replace

prepetition equity-based incentive compensation and incentivize the KEIP Participants to maximize value created through these Chapter 11 Cases and related Marking Process.  The Debtors have historically incentivized key members of their management team largely through equity compensation and awards, which the Debtors believe no longer provide their intended incentivizing effect.  Therefore, the Debtors and their advisors sought to expeditiously address the acute need to incentivize the KEIP Participants to stabilize the business and chart a successful course through bankruptcy.

19.    The Debtors, FTI, and the Debtors' other advisors, including Paul, Weiss, have had extensive discussions regarding the types of incentive plans utilized in chapter 11 cases, especially in cases of similarly sized and situated companies.  Based on, among other things, information regarding incentive plans in other chapter 11 cases, the Debtors and FTI drafted preliminary proposals, which underwent significant review and revision by the Debtors, FTI, and the Debtors' other advisors.

20.    The Debtors, FTI, and the Debtors' other advisors determined that eligibility to earn the amounts under the KEIP will be critical to maximizing recoveries in these Chapter 11 Cases.  Given the commencement of these Chapter 11 Cases and the ongoing Marketing Process, the three KEIP Participants are irreplaceable to the Debtors at this stage of the Debtors' restructuring.  Moreover, each KEIP Participant has assumed, and will continue to assume, significantly greater responsibilities as a result of these Chapter 11 Cases, including responsibilities related to the Marketing Process.  For example, to date, the KEIP Participants have assisted the Debtors' advisors to (a) contact over 230 parties regarding interest in participating in the Marketing Process, (b) respond to diligence requests and follow-ups from the nearly 80 parties that signed NDAs, including

through the creation of a dataroom, (c) provide strategic guidance on the Marketing Process, (d) set the timing of the Marketing Process, including its relationship with the ongoing Chapter 11 Cases, and (e) meet with potential bidders, including through on-site visits.  These additional workstreams are on top of the KEIP Participants' day-to-day responsibilities and the management of these Chapter 11 Cases.

21.    The Debtors and their advisors also carefully designed the KEIP to motivate the KEIP Participants and align their interests with those of the Debtors and their stakeholders.  The KEIP Participants are rewarded solely if they are able to meet challenging metrics, discussed herein, in connection with the disposition of the Debtors' assets and distributions made on account thereof.  The KEIP Participants' award eligibility is directly tied to the value generated through the ongoing Marketing Process, which the participants are leading.  The KEIP also requires there to be sufficient proceeds or assets to satisfy the claim held by their sole secured lender, the Second Lien Agent, excluding any alleged liquidation premium.

**The KEIP**

A.    **Overview of the KEIP**

22.    The three KEIP Participants are the leaders of the Debtors' business operations and strategy and are critical to the Debtors' ability to effectively and efficiently oversee an orderly Marketing Process.  Prior to the Petition Date, the Debtors maintained various annual cash- and equity-based incentive plans for the purpose of compensating the KEIP Participants in addition to their base salaries.  These ordinary course incentives have been discontinued as part of these Chapter 11 Cases.

23.    In order to restore the alignment of the KEIP Participants' compensation opportunities with the Debtors' strategic goals and stakeholders' interests, the Debtors

worked with FTI, their compensation and restructuring advisor, to formulate a proposal for the KEIP, which was subsequently refined over the course of discussions with stakeholders.   On September 12, 2023, the Compensation Committee unanimously approved the Debtors seeking court approval of the KEIP in order to provide cash-based incentive compensation during the pendency of these Chapter 11 Cases to the KEIP Participants.

24.     The KEIP is structured to tie incentive compensation to the success of the Marketing Process and to pay only to the extent meaningful performance is achieved.  The KEIP provides cash awards to the KEIP Participants based on the success of the Marketing Process as measured by the Aggregate Value[4] obtained by the Debtors.  The terms of the KEIP are further described below.

**B.      The KEIP Participants**

25.     There are three KEIP Participants.  These three KEIP Participants were selected because of their extensive institutional knowledge, industry experience, and direct

---

[4]   "Aggregate Value" is defined as, without duplication, the full transaction value of any Transaction, including, without limitation, the total value of all cash, securities, other property, credit bid, payments made in installments and any contingent, earned or other consideration paid or payable, directly or indirectly, by a Party pursuant to a Transaction.  The value of any such securities (other than indebtedness) or other property or items of value shall be valued at the time of closing without regard to any restrictions on transferability and determined as follows:  (i) if such securities are traded on a stock exchange, the value of securities in an established public market shall be the last closing price of such securities prior to consummation of the sale; (ii) if such securities have no established public market, or if the consideration utilized consists of property other than securities, the value of such securities or other property shall be the fair market value as determined in good faith.  "Aggregate Value" shall include, without duplication, (a) any cure costs paid by a purchaser and (b) the amount of any prepetition trade claims paid by the Debtors after the petition date, whether pursuant to "first day" relief, settlement, or otherwise to the extent the applicable contracts are assumed and assigned to a purchaser where such amounts would have been cure costs had they not been paid by the Debtors..  If any consideration to be paid is computed in a foreign currency, the value of such foreign currency shall, for purposes hereof, be converted into U.S. Dollars at the prevailing exchange rate on the date or dates on which such consideration is paid.

involvement in these Chapter 11 Cases and the postpetition Marketing Process. The KEIP Participants are the following three members of the Debtors' executive leadership team.

| Name | Title |
|------|-------|
| Gareth Joyce | Chief Executive Officer ("CEO") |
| David Black | Chief Financial Officer ("CFO") |
| Jeffrey Mitchell | General Counsel ("GC") |

26.    The KEIP Participants are responsible for executing on the Debtors' strategic direction and ensuring achievement of the Debtors' overall goals. A non-exhaustive list of each KEIP Participant's responsibilities include:

- **Mr. Joyce (CEO)**:  Mr. Joyce is responsible for determining and executing upon the strategic goals of the Debtors under the direction of the Debtors' board of directors (the "Board").  He also oversees all strategic partnerships and key customer relationships.  He will play a pivotal role in the Marketing Process.  With the assistance of the Debtors' proposed investment bank, Moelis & Company ("Moelis") and other advisors, Mr. Joyce will directly negotiate and liaise with potential bidders and is the lead facilitator of the Marketing Process' strategy.  In addition to the Marketing Process, he is responsible for overseeing all other aspects of the Debtors' bankruptcy process, including serving as the declarant in the First Day Declaration.

- **Mr. Black (CFO)**:  Mr. Black is the senior officer responsible for all key areas of the Debtors' finance and accounting functions, including financial planning and analysis.  He also oversees the Debtors' business operating plan, financial forecasts, and compliance with any requirements under the Debtors' cash collateral order

(the "Cash Collateral Order").  He will play an integral and unique role in the Marketing Process by working with Moelis to ensure that financial reporting and underlying diligence is provided to potential bidders.  Additionally, Mr. Black is responsible, and critical, for any Transaction,[5] as he must effectively address potential bidders' diligence requests related to the Debtors' business plan and forecasts to negotiate a value maximizing Transaction.  Mr. Black has also been highly involved in these Chapter 11 Cases, including monitoring the use of cash pursuant the Cash Collateral Order, attending the initial debtor interview, and overseeing financial reporting during the pendency of the Chapter 11 Cases.

- **Mr. Mitchell (GC)**:  Mr. Mitchell is responsible for overseeing the Debtors' global legal matters, including litigation, business development transactions, contracting, securities law, and periodic SEC reporting.  He is responsible for overseeing all legal aspects of the Marketing Process, including the negotiation of NDAs and responses to the due diligence requests of potential bidders.  Additionally, in conjunction with Paul, Weiss, Mr. Mitchell will be involved in negotiating and documenting any definitive documents related to a Transaction.  Like the other KEIP Participants, Mr. Mitchell has been involved in every aspect of these Chapter 11 Cases.  For example, he provided significant input on the first day relief sought by the Debtors, and has assisted the Debtors' preparation of their various pleadings in these Chapter 11 Cases.

---

[5]    "Transaction" means the occurrence of one of the following events:  (i) the sale of a Debtor (including through a merger, recapitalization or sale of substantially all of the assets of the Debtor's entity); or (ii) the sale, disposition or winding down of any business unit or division of a Debtor; or (iii) the effective date of a plan of reorganization of any Debtor.

27.     Each KEIP Participant is integral to the Debtors, including by considering (with the Board) and implementing their business strategies, overseeing the Debtors' finance and reporting operations, and managing the Debtors' legal team and function.  All of these responsibilities directly affect the Debtors' ongoing Marketing Process and ability to maximize value.  Indeed, as described above, each KEIP Participant is heavily involved in the due diligence process, and each will play a leading role in Transaction negotiations.

## C.     The KEIP Awards

28.     The KEIP provides for two categories of payments to the KEIP Participants. The total award opportunities for each KEIP Participant are summarized in the table below:

| KEIP Participant | KEIP Participant Target Variable Compensation ("TVC")[6] | KEIP Award Earned Upon Meeting Sale Threshold (the "Threshold Payment") | Percentage of Transaction Award Pool (the "Excess Threshold Payment")[7] | KEIP Payment at Target |
|---|---|---|---|---|
| Mr. Joyce (CEO) | $3,625,000 | $1,046,250 | 62.50% | $2,500,000 |
| Mr. Black (CFO) | $1,237,500 | $313,875 | 18.75% | $750,000 |
| Mr. Mitchell (GC) | $701,000 | $313,875 | 18.75% | $750,000 |

29.     The Threshold Payments are earned upon the Court's approval of a Transaction or series of Transactions with an Aggregate Value at or above $███████ (the "Threshold" and the "Threshold Transaction").[8]  The Threshold is a defined target and

---

6     "TVC" is defined as the KEIP Participant's annual bonus and target annual long-term incentive compensation based on the long-term incentive targets for the CFO and GC, and assumed value for the CEO, which was the same as the CEO's 2022 long-term incentive award value.

7     The Threshold Payment with the Excess Threshold Payment, if any, the "KEIP Payment."

8     For the avoidance of doubt, in no event will the Threshold be considered met if, after giving effect to all Transactions and any credit bid or debt equitization, there are inadequate assets to pay the remaining

was calculated by the Debtors and their advisors by balancing numerous factors. As designed, the Threshold was originally set at $██████████ but was moved to $██████████ based on negotiations with the Second Lien Agent. The Aggregate Value for the Threshold Payments is measured at the time of the Court's approval of a Threshold Transaction[9] that cumulatively reaches or exceeds the Threshold. The Threshold Payment is paid upon the earlier of (a) the release of a good faith deposit associated with the Threshold Transaction, if any, to the Debtors, and (b) the closing date of the Threshold Transaction.

30.    The Excess Threshold Payments are earned and payable in the following circumstances:  (i) upon the closing of a Threshold Transaction only if such Threshold Transaction results in an Aggregate Value in excess of the Threshold ("Initial Excess Earned Date"), with the total aggregate value of Excess Threshold Payments payable to the KEIP Participants equal to 3% of the portion of the Aggregate Value that exceeds the Threshold (the "Excess Value"); and, (ii) if applicable, each Transaction following the Initial Excess Earned Date (each, an "Additional Excess Earned Date"), with the total Excess Threshold Payments payable to the KEIP Participants upon each Additional Excess Earned Date equal to 3% of the Aggregate Value associated with such Transaction. For purposes of an Excess Threshold Payment, the Aggregate Value of a given Transaction is determined as of the date the applicable Transaction triggering the payment of the Excess Threshold Payment closes, and each KEIP Participant's Excess Threshold Payment will be paid on or as soon as reasonably practicable following such closing date. Transactions with Excess Value may

---

claims of the Second Lien Agent excluding any asserted amounts in relation to a premium on account of the Chapter 11 Cases or otherwise asserted, if any.

[9]    For the avoidance of doubt, the Aggregate Value is calculated, without duplication, from the sum of all Transactions occurring during the Chapter 11 Cases.

result in multiple Excess Threshold Payments being paid, without duplication, upon the closing of the relevant Transactions.

| Name | KEIP Threshold Aggregate Value: $ █████ | | KEIP Scenario 1 Aggregate Value: $ █████ | | KEIP Scenario 2 Aggregate Value: $ █████ | | KEIP Scenario 3 Aggregate Value: $ █████ | |
|---|---|---|---|---|---|---|---|---|
| | Proposed KEIP Payment | % of TVC | Proposed KEIP Payment | % of TVC | Proposed KEIP Payment | % of TVC | Proposed KEIP Payment | % of TVC |
| Mr. Joyce (CEO) | $1,046,250 | 29% | $1,665,000 | 46% | $2,602,500 | 72% | $5,508,750 | 152% |
| Mr. Black (CFO) | $313,875 | 25% | $499,500 | 40% | $780,750 | 63% | $1,652,625 | 134% |
| Mr. Mitchell (GC) | $313,875 | 45% | $499,500 | 71% | $780,750 | 111% | $1,652,625 | 236% |
| Total/Average: | $1,674,000 | 33% | $2,664,000 | 53% | $4,164,000 | 82% | $8,814,000 | 174% |

31.     The KEIP was designed with a Target Aggregate Value of $ █████ and a payout opportunity of $4,000,000 at this level. At the Target, Mr. Joyce would receive $2,500,000, Mr. Black would receive $750,000, and Mr. Mitchell would receive $750,000, respectively.

32.     If a KEIP Participant's employment is terminated for any reason after the date that a KEIP Payment is earned, the KEIP Participant will nevertheless be entitled to receive the KEIP Payment on the regularly scheduled payment date. If a KEIP Participant voluntary resigns or is terminated for cause prior to the date that a KEIP Payment is earned, that KEIP Participant will automatically forfeit any right to a KEIP Payment not yet earned as of the date of such termination. If a KEIP Participant's employment is terminated without cause by the Debtors or due to the KEIP Participant's death or disability (each, a "Qualifying Termination") prior to the applicable KEIP Payment being earned, then the KEIP Participant will receive a prorated payment of each applicable KEIP Payment that may be payable to the KEIP Participant, which shall be payable on the regularly scheduled

payment date.  The proration will be calculated based on the number of days of the KEIP

Participant's service from the Petition Date through the date of the KEIP Participant's

Qualifying Termination, over the number of days from the Petition Date through the

closing of the applicable Transaction (or, in the case of the Threshold Payment, through

the date of the Court's approval of the Threshold Transaction).  Any forfeited awards may

be reallocated by the Debtors, with the consent of the Committee, to the remaining KEIP

Participants or any other individual employed by the Debtors to satisfy the responsibilities

of the KEIP Participant whose employment was terminated.

33.     The Debtors have not sought, and are not seeking the authority to continue

prepetition incentive or retentive programs, or severance, offered to the KEIP

Participants.[10]  Notably, none of the KEIP Participants received a payment as part of the

Debtors' prepetition August 2023 key employee retention program.

### D.     The Reasonableness of the KEIP

34.     To ensure the terms of the KEIP are reasonable and consistent with market

practice, FTI undertook an extensive review of the Debtors' historical compensation

practices and precedent key employee incentive plans in similar cases.  Among other

things, FTI compared the proposed KEIP against the KEIP Participants' variable

compensation targets at the time of the Petition Date because the KEIP will replace any

prepetition incentive bonus eligibility.

35.     If the KEIP Participants only receive the Threshold Payment, their average

compensation as a percentage of their historical TVC would be 33%.  At Target, that same

---

[10]    The GC received a two-part retention payment in April 2023, which totaled $100,000.  The first half
vested in June 2023.  The second half was scheduled to vest in December 2023; however, the GC has
agreed to waive this payment if the Debtors' KEIP is approved.

percentage is 72%. It is only upon the Aggregate Value significantly exceeding the Threshold that the aggregate KEIP Payments approach historical TVC. For example, if the Aggregate Value reaches $██████ then the KEIP Participants' average KEIP Payment would be 82% of their historical TVC.

36.     FTI also compared the KEIP to recent precedents to ensure that the KEIP aligned with the market for similarly situated chapter 11 debtors. FTI benchmarked the KEIP with market data from various databases that specifically focus on key employee incentive programs approved in chapter 11 cases. As described above, FTI created the KEIP Peer Groups. Following the analysis of the KEIP Peer Groups, FTI determined the KEIP would pay above the 75th percentiles of the KEIP Peer Group Plans' targets at Target. FTI believes that this structure is appropriate for several reasons.

37.     *First*, the Debtors operate in an industry in which talent is highly sought after and compensated. Therefore, the KEIP is designed to motivate the KEIP Participants and to make their compensation commensurate with their additional workloads in the face of this industry-wide compensation backdrop. This compensation backdrop is not present in all of the KEIP Peer Group Plans.

38.     *Second*, the Debtors, like many technology companies, historically incentivized the KEIP Participants through equity compensation and awards, which the Debtors believe no longer provide their intended incentive-aligning effect. As such, the KEIP Payments are necessary to reintroduce a portion of prepetition incentive compensation opportunities to appropriately motivate the KEIP Participants during the pendency of the Chapter 11 Cases.

39.    *Third*, the Marketing Process differs from many bankruptcy sales processes, as the Debtors filed these Chapter 11 Cases without a stalking horse in place, and no stalking horse bid has been selected as of the filing of this Motion.  Therefore, the KEIP accounts for the uncertainty surrounding the Marketing Process and the need to incentivize the KEIP Participants to lead the Debtors through such uncertainty and achieve superior results for the Debtors' estates and stakeholders, notwithstanding that the outcome of such process could result in the loss of the KEIP Participants' employment.

40.    *Fourth*, while an Excess Threshold Payment could be above the median target of the KEIP Peer Groups, such a payment would only occur following a Transaction with Aggregate Value exceeding the Threshold, which would achieve substantial value for the benefit of the Debtors' estates and stakeholders.

41.    Based on the foregoing analysis and the critical roles the three KEIP Participants perform, the Debtors and their advisors concluded that the KEIP is reasonable and justified under the facts and circumstances of these Chapter 11 Cases.  The KEIP aligns the KEIP Participants' and Debtors' interests and incentivizes the KEIP Participants to maximize value during these Chapter 11 Cases.

## Basis for Requested Relief

42.    As discussed above, the KEIP Participants are vital to the success of the Marketing Process and these Chapter 11 Cases as a whole.  The KEIP Participants are the three executives with the most impact and responsibilities on the Marketing Process and these Chapter 11 Cases.  While undertaking this significant additional work and continuing to perform their ordinary job functions, the KEIP Participants face the challenge of a loss of historical equity-based incentive compensation and the potential loss of employment upon the achievement of a value-maximizing sale.  For these very reasons, bankruptcy

courts often authorize incentive plans, so long as these plans are tailored to the debtor in an effort to directly incentivize superior job performance that directly compels a value-maximizing result.

43.     In this case, the Debtors and their advisors have designed the KEIP to facilitate a successful Marketing Process and to maximize the value of the Debtors' estates. The Debtors and their advisors identified a limited group—there are only three KEIP Participants—as being vital to the success of the Marketing Process and, ultimately, these Chapter 11 Cases.

44.     The KEIP should be approved pursuant to section 503(c) of the Bankruptcy Code because it is a thoughtfully constructed and difficult to achieve incentive plan, and it is not a retentive or severance plan.  Because the KEIP is performance-based, it should be analyzed under section 503(c)(3) of the Bankruptcy Code.  As this Court stated "[s]ection 503(c) was not intended to foreclose a chapter 11 debtor from *reasonably* compensating employees, including 'insiders,' for their contribution to the debtors' reorganization." *In re Glob. Home Prods. LLC*, 369 B.R. 778, 785 (Bankr. D. Del. 2007) (emphasis in original) (quoting *In re Dana Corp.*, 358 B.R. 567, 575 (Bankr. S.D.N.Y. 2006) ("*Dana II*")). Therefore, "section 503(c)(3) gives the court discretion as to bonus and incentive plans, which are not primarily motivated by retention or in the nature of severance." *Dana II*, 358 B.R. at 576.  If a program primarily addresses incentives, rather than retention or severance, then the court analyzes whether the plan is a proper exercise of the debtor's business judgment. *In re Glob. Home Prods.*, 369 B.R. at 786.  Here, because the KEIP is primarily incentive-based, the Debtors submit that it should be approved as a proper exercise of the Debtors' business judgment.

**A.  The KEIP Is a Difficult to Achieve Performance-Based Incentive Plan**

45.    The KEIP is a performance-based program designed to incentivize the KEIP Participants to achieve superior results during the pendency of these Chapter 11 Cases.  To determine whether an employee bonus plan is incentivizing, courts consider whether the program is "designed to motivate insiders to rise to a challenge or merely report to work." *In re Hawker Beechcraft, Inc.*, 479 B.R. 308, 313 (Bankr. S.D.N.Y. 2012).  Courts also acknowledge "[t]he fact . . . that all compensation has a retention element" but instead they must evaluate whether "the primary goal" is "to create value by motivating performance." *In re Glob. Home Prods.*, 369 B.R. at 786.

46.    The primary goal of the KEIP is to create value by motivating the KEIP Participants to provide superior performance.  As described above, the KEIP Participants are only entitled to receive a KEIP Payment when the Aggregate Value reaches or exceeds the Threshold.  Importantly, the Threshold is set in excess of the funded debt in these Chapter 11 Cases, including any liquidation premium associated with the Second Lien Agent's claim.[11]  Even if a Transaction occurs, if the Aggregate Value only reaches the Threshold, then each of the KEIP Participants' Threshold Payment would be far below their respective historical TVC.  Given that the KEIP Payments scale in accordance with Excess Value, the KEIP is designed to motivate the KEIP Participants to maximize value during the Marketing Process for the benefit of the Debtors' estates and stakeholders.  If the Marketing Process fails to realize sufficient Aggregate Value, the KEIP Participants will fail to receive a KEIP Payment or it will be significantly lower than their historical variable compensation targets.  Specifically, in order for the KEIP Participants to reach

---

[11]    The Debtors dispute that any liquidation premium is owed, or could become owed, by the Debtors.

Target, the KEIP Participants must achieve an Aggregate Value of approximately $█████████

47.    It is challenging to obtain any Aggregate Value through the Marketing Process, let alone the amount required to reach Target because the closing of *any* Transaction is far from guaranteed.[12]  Instead, with the assistance of Moelis, the KEIP Participants must achieve the consummation of a successful Transaction that yields enough Aggregate Value to receive a KEIP Payment all while overseeing the Debtors' day to day operations during these Chapter 11 Cases.  Rewarding and motivating the KEIP Participants as they execute on these responsibilities to realize substantial Aggregate Value of at least $███████ to reach the Threshold and $███████ to reach Target is plainly incentivizing in nature, as it requires far more than "merely reporting to work."  *In re Hawker Beechcraft, Inc.*, 479 B.R. at 313 (analyzing the difference between programs with incentive effects compared to retentive effects).

48.    Moreover, if the KEIP Participants are successful in consummating a value-maximizing Transaction, there will be an enormous benefit for the Debtors' estates and stakeholders.  In addition to any proceeds returned to the Debtors' creditors and estates, a Transaction could provide for contracts to be assumed (and cured) by a buyer, employees to maintain jobs, and vendors and customers to maintain a beneficial relationship going forward.  The Debtors believe that the KEIP properly aligns incentives between the Debtors' estates and the KEIP Participants.

---

[12]    In comparison, courts in this district approve key employee incentive plans when there is a stalking horse bid in place and the threshold levels are around or below the stalking horse bid.  *See, e.g.*, *In re Clovis Oncology, Inc.*, No. 22-11292 (JKS) (Bankr. D. Del. March 16, 2023) [Docket No. 480]; *In re CST Industries Holdings Inc.*, No. 17-11292 (BLS) (Bankr. D. Del. Oct. 13, 2017) [Docket No. 629]; *In re TerraVia Holdings, Inc.*, No. 17-11655 (CSS) (Bankr. D. Del. Aug. 30, 2017) [Docket No. 193].

49.     The fact that the KEIP Participants may be encouraged to remain with the Debtors as a byproduct of the KEIP does not somehow convert the KEIP into a retention-centered plan.  *See In re Glob. Home Prods.*, 369 B.R. at 786 (discussing "all compensation has a retention element" but this did "not reduce the Court's conviction that Debtors' primary goal [is] to create value by motivating performance").  While the KEIP may indirectly cause the KEIP Participants to remain employed with the Debtors, this does not change the KEIP's primary purpose—to incentivize the KEIP Participants to maximize value for the Debtors' creditors and other stakeholders during the Marketing Process.

50.     Accordingly, the Debtors submit the approval of the KEIP should be analyzed under section 503(c)(3) of the Bankruptcy Code.[13]

### B.  The KEIP Is a Valid Exercise of the Debtors' Business Judgment

51.     Because the KEIP is an incentive-based plan, the business judgment rule applies in determining whether the plan should be approved under section 503(c)(3). Section 503(c)(3) of the Bankruptcy Code requires that payments to a debtor's employees outside of the ordinary course of business be "justified by the facts and circumstances of the case."  11 U.S.C. § 503(c)(3).  The "facts and circumstances" standard of section 503(c)(3) of the Bankruptcy Code "creates a standard no different than the business judgment standard under section 363(b)."  *In re Borders Grp.*, 453 B.R. 459, 473 (Bankr. S.D.N.Y. 2011) (citing *Dana II*, 358 B.R. at 576); *see also In re Global Home Prods.*, 369

---

[13]     Additionally, the KEIP does not constitute a severance plan that would be subject to the provisions of section 503(c)(2) of the Bankruptcy Code.  The KEIP does not provide benefits to the KEIP Participants upon termination of their employment with the Debtors.  *See* 11 U.S.C. § 503(c)(2).  The KEIP Participants will only receive their KEIP Payments in relation to a Transaction while they remain employed by the Debtors or in other unique circumstances.  The KEIP is an incentives-based plan that is squarely different than a severance plan.

B.R. at 783 ("If they are plans intended to incentivize management, the analysis utilizes the more liberal business judgment review under § 363.").

52.     To determine whether a compensation plan satisfies the business judgment rule under section 503(c)(3), courts consider multiple factors, including:  (a) whether the proposed plan is calculated to achieve the desired performance; (b) whether the cost is reasonable in the context of the debtor's assets, liabilities, and earning potential; (c) whether the plan discriminates unfairly; (d) whether the plan is consistent with industry standards; (e) what due diligence of the debtor occurred in investigating the need for a plan and analyzing which key employees need to be incentivized; and (f) did the debtor receive independent counsel in performing due diligence and creating and authorizing the incentive compensation.  *Dana II*, 358 B.R. at 576–77; *see also In re Global Home Prods.*, 369 B.R. at 786 (same).  Here, the KEIP satisfies all of the elaborated factors and is a valid exercise of the Debtors' business judgment.

53.     **Maximizing Value**:  The KEIP is designed to maximize the value of the Debtors' assets through the Marketing Process.  As noted throughout this Motion, the KEIP Participants only receive a KEIP Payment upon a Transaction with an Aggregate Value of at least $██████████  This is a significant target that requires extensive work from the KEIP Participants to attain.  Moreover, the KEIP Participants' Excess Threshold Payments directly correlate to the total Excess Value.  Therefore, the KEIP Payments correlate with the success of the Marketing Process and incentivize the KEIP Participants to maximize the value of the Debtors' assets during the pendency of the Marketing Process.

54.     **Reasonable in Context of Debtors' Assets, Liabilities, and Earnings Potential**:  The cost of the KEIP is reasonable in light of the Debtors' assets, liabilities,

and earnings potential.  As previously described, FTI evaluated the KEIP compared to the KEIP Peer Groups, which comprised two robust peer sets of ten and eight comparable key employee incentive plans, respectively.  At Target, the KEIP exceeds the 75th percentiles of the KEIP Peer Groups.  As previously described, this structure is reasonable in the context of the facts and circumstances of these Chapter 11 Cases because the Target sets a challenging goal where significant Aggregate Value would be realized for the Debtors' estates.  The KEIP pays more when more value comes into the estates.  It is self-funding.

55.    **Unfair Discrimination**:  The KEIP does not unfairly discriminate.  The KEIP applies only to the Debtors' senior management whose efforts and performance during these Chapter 11 Cases will have the greatest impact on the Debtors' ability to preserve and maximize the Debtors' value.  The respective KEIP Payment to each KEIP Participant will be determined in accordance with the predetermined award opportunities. Other employees who are not vital to the Marketing Process, but play important roles in the Debtors' business and their Chapter 11 Cases, are eligible for other compensation opportunities.

56.    **Industry Standards**:  The KEIP is consistent with industry standards.  FTI evaluated the KEIP utilizing its experience crafting court-approved key employee incentive plans, and also compared the KEIP to the KEIP Peer Groups.   Through these comprehensive analyses, FTI determined that the KEIP is consistent with industry standards for at least three reasons.  To begin, a key provision of the KEIP is that a KEIP Payment is only made when the Aggregate Value reaches the Threshold.  As with other industry standard key employee incentive plans, the KEIP Participants are only rewarded upon realizing a challenging target.  The KEIP Payment at Target is similarly within the

market range reflected in the KEIP Peer Groups.  Taken together, the KEIP is designed for the unique contours of these Chapter 11 Cases and reflects the industry standards as determined by FTI.  The Debtors and their advisors took other relevant factors into consideration as well, including the tech industry's elevated levels of compensation compared to other industries represented in the KEIP Peer Groups.

57.    **Due Diligence**:  The KEIP underwent significant due diligence by the Debtors.  The Debtors, FTI, and Paul, Weiss worked for weeks to determine the appropriate KEIP that would adequately and fairly incentivize the KEIP Participants to reach superior results in the Marketing Process.  In doing so, FTI undertook significant diligence of the KEIP Peer Groups as compared to the KEIP.

58.    The Compensation Committee played an active role in the KEIP's development.  The Compensation Committee reviewed the drafts of the KEIP to ensure the KEIP encompassed difficult targets and appropriately incentivized the KEIP Participants' interests with those of the Debtors.   The Compensation Committee considered and ultimately approved the KEIP.

59.    **Independent Counsel**:  The Debtors were aided by independent advice and oversight by the Debtors' advisors.  The Debtors sought input from their independent advisors throughout the KEIP development process.  The Debtors received advice and guidance regarding, among other things, (a) the appropriate structure, scale, and scope of the KEIP and the individual KEIP Payments to the KEIP Participants, (b) which of the Debtors' employees and management would have the largest impact on these Chapter 11 Cases and on the Marketing Process, and (c) how to incentivize the KEIP Participants in

order to maximize the value of the Debtors' assets during the pendency of the Marketing Process.

60.     The Debtors respectfully submit that approval of the KEIP is a proper exercise of the Debtors' business judgment, is supported by the facts and circumstances of these Chapter 11 Cases, satisfies the requirements of section 503(c)(3) of the Bankruptcy Code, and should be approved.  The KEIP will incentivize the KEIP Participants to maximize the value of the Debtors' assets through the pendency of the Marketing Process for the benefit of the Debtors' estates.

### Waiver of Stay Under Bankruptcy Rule 6004(h)

61.     Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  As provided herein, and to implement the foregoing successfully, the Debtors request that the Proposed Order include a finding that the Debtors have established cause to exclude such relief from the fourteen (14)-day stay period under Bankruptcy Rule 6004(h), to the extent applicable.

62.     For this reason and those set forth above, the Debtors submit that ample cause exists to justify a waiver of the fourteen (14)-day stay imposed by Bankruptcy Rule 6004(h), to the extent applicable to the Proposed Order.

### Notice

63.     The Debtors will provide notice of this Motion to: (a) the U.S. Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801 Attn: Linda J. Casey (linda.casey@usdoj.gov); (b) proposed counsel to the Committee, Lowenstein Sandler LLP, 1251 Avenue of the Americas New York, NY 10020, Attn: Jeffrey Cohen

(jcohen@lowenstein.com) and Eric S. Chafetz (echafetz@lowenstein.com); (c) the United States Attorney's Office for the District of Delaware; (d) the Internal Revenue Service; (e) the state attorneys general for states in which the Debtors conduct business; (f) the Securities and Exchange Commission; (g) counsel to the First Lien Agent, Holland & Knight, One Arts Plaza, 1722 Routh Street, Suite 1500, Dallas, Texas 75201 Attn: Robert Jones (robert.jones@hklaw.com) and Brent McIlwain (brent.mcilwain@hklaw.com); (h) counsel to the Second Lien Agent, Sidley Austin LLP, 787 Seventh Ave, New York, NY 10019, Attn: Thomas R. Califano (tom.califano@sidley.com) and Dennis M. Twomey (dtwomey@sidley.com); and (i) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

*[Remainder of page intentionally left blank]*

WHEREFORE, the Debtors respectfully request entry of the Proposed Order granting the relief requested herein and such other and further relief as the Court may deem just and proper.

Dated: September 13, 2023
       Wilmington, Delaware

Respectfully submitted,

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ Andrew L. Magaziner*
Pauline K. Morgan (No. 3650)
Andrew L. Magaziner (No. 5426)
Shella Borovinskaya (No. 6758)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email:  pmorgan@ycst.com
      amagaziner@ycst.com
      sborovinskaya@ycst.com

- and -

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Paul M. Basta (admitted *pro hac vice*)
Robert A. Britton (admitted *pro hac vice*)
Michael J. Colarossi (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Tel:  (212) 373-3000
Fax:  (212) 757-3990
    Email: pbasta@paulweiss.com
      rbritton@paulweiss.com
      mcolarossi@paulweiss.com

*Counsel to the Debtors and Debtors in Possession*

## **EXHIBIT A**

**Proposed Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| PROTERRA INC, *et al.*,[1] | ) Case No. 23-11120 (BLS) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) **Re: Docket No. __** |

**ORDER APPROVING DEBTORS'
KEY EXMPLOYEE INCENTIVE PLAN**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possessions (together, the "Debtors"), pursuant to sections 105(a), 363(b), and 503(c) of the Bankruptcy Code, authorizing and approving the Debtors' KEIP, as more fully described in the Motion; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012; and it appearing that this is a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that it may enter a final order consistent with Article III of the United States Constitution; and due and proper notice of the Motion and the hearing thereon having been given as set forth in the Motion; and such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and this Court having reviewed the Motion; and this Court having held a hearing to

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Proterra Inc (9565); and Proterra Operating Company, Inc. (8459). The location of the Debtors' service address is: 1815 Rollins Road, Burlingame, California 94010.

[2]    Capitalized terms used herein but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

consider the relief requested in the Motion (the "Hearing"), if any; and upon the Declarations and the record of the Hearing; and it appearing that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, creditors, and all parties in interest; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is GRANTED as set forth herein.

2.      The KEIP is approved on the terms described in the Motion and **Appendix 1** attached to this Order; *provided* that in the event of a conflict, the terms of this Order shall control.

3.      The Debtors are authorized to take all actions necessary to implement the KEIP on the terms and conditions set forth in the Motion or this Order, including, but not limited to, making payments pursuant to the terms of the KEIP.

4.      The Debtors are authorized to take all actions necessary to implement the KEIP on the terms and conditions set forth in the Motion, including, but not limited to, making payments pursuant to the terms of the KEIP.

5.      All amounts earned and payable under the KEIP shall have administrative expense priority under sections 105(a), 503(b), and 507(a)(2) of the Bankruptcy Code for all purposes in these Chapter 11 Cases and in any other case under the Bankruptcy Code to which these Chapter 11 Cases may be converted.

6.      The Debtors are authorized and empowered to take all actions necessary or appropriate to implement the relief granted in this Order.

7.      Notwithstanding the relief granted in this Order and any actions taken pursuant to such relief, nothing in this Order shall be deemed:  (a) an admission as to the validity of any prepetition claim against a Debtor entity; (b) a waiver of the Debtors' or any other party in interest's right to dispute any prepetition claim on any grounds; (c) a promise or requirement to pay any prepetition claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Order or the Motion or a finding that any particular claim is an administrative expense or other priority claim; or (e) a waiver or limitation of the rights of any party in interest under the Bankruptcy Code or any other applicable law.

8.      Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

9.      This Court shall retain jurisdiction to hear and determine all matters arising or related to the implementation or interpretation of this Order.

# APPENDIX 1

**Key Employee Incentive Plan Term Sheet**

**Proterra Inc**

**Key Employee Incentive Plan Term Sheet**

The following describes the principal terms of the key employee incentive plan (the "<u>KEIP</u>") to be adopted by Proterra Inc (the "<u>Company</u>") in connection with the restructuring of the Company pursuant to Chapter 11 of the Bankruptcy Code (the "<u>Chapter 11</u>").  This term sheet does not contain all of the terms and conditions of the KEIP and has been prepared for discussion purposes only.

| | |
|---|---|
| **Approval Date** | The KEIP will be implemented following approval of material terms contained in this term sheet by (i) the Company's Compensation Committee and (ii) the Bankruptcy Court in the Chapter 11. |
| **Insiders** | The KEIP will include the following three individuals who could be considered "Insiders" under the Bankruptcy Code: |

| Insider | Position |
|---|---|
| Gareth Joyce | Chief Executive Officer |
| David Black | Chief Financial Officer |
| Jeff Mitchell | General Counsel |

| | |
|---|---|
| **Incentive Opportunity** | **Pool**:  The aggregate KEIP pool will be determined as described below in connection with a Transaction, if any, based on the Aggregate Value resulting from such Transaction. |
| | **Individual Awards**:  Each participant will be eligible to receive a KEIP award that represents the potential to earn one or more cash payments (each, a "<u>KEIP Payment</u>"), each amount of which will depend on the achievement of the Aggregate Value in connection with a Transaction and the participant's individual allocation ("<u>KEIP Allocation</u>") of the aggregate amount of KEIP Payments that may become payable upon a Transaction (a "<u>KEIP Pool</u>").  KEIP awards are in lieu of existing incentive and retention opportunities, including the Company's short-term cash bonus, equity incentive and retention programs. |
| | **KEIP Allocations**:  Each participant will be allocated a percentage of the KEIP Pool as follows: |

| Insider | KEIP Allocation (% of KEIP Pool) |
|---|---|
| Gareth Joyce | 62.50% |
| David Black | 18.75% |
| Jeff Mitchell | 18.75% |

| | |
|---|---|
| **KEIP Pool; Payment Schedule** | There are two types of KEIP Pools, the Threshold Pool and the Excess Value Pool, with payments payable pursuant to such KEIP Pools earned as follows (each date in which a KEIP Payment is earned, an "<u>Earned Date</u>"): |
| | • <u>Threshold Pool</u>:  KEIP Payments under the Threshold Pool will be earned upon approval by the Bankruptcy Court of a Transaction which, alone or in combination with a series of prior Transactions, results in an Aggregate Value that equals or exceeds the Threshold ("<u>Threshold Transaction</u>"), an aggregate amount of $1,670,000 will be earned under the Threshold Pool. Following such Earned Date, each KEIP participant will receive a one-time KEIP Payment under the Threshold Pool based on the participant's KEIP Allocation upon the earlier of (i) the release of a good faith deposit associated with the Threshold Transaction or (ii) the closing of the |

Threshold Transaction.  Upon payment of the Threshold Pool, no further payments shall occur under the Threshold Pool.

- Excess Value Pool:  KEIP Payments under the Excess Value Pool will be earned upon the closing of each of the following Transactions, if any:
  - the Threshold Transaction if such Threshold Transaction results in an Aggregate Value in excess of the Threshold, with the aggregate amount earned by the participants pursuant to the Excess Value Pool equal to 3% of the Excess Value associated with such Threshold Transaction ("Initial Excess Earned Date"); and
  - each Transaction following the Initial Excess Earned Date (each, an "Additional Excess Earned Date"), with the aggregate amount earned by the participants pursuant to the Excess Value Pool equal to 3% of the Aggregate Value associated with the Additional Excess Earned Date.

Following an Initial Excess Earned Date and any subsequent Additional Excess Earned Date, each KEIP Participant will receive a one-time KEIP Payment under the Excess Value Pool based on the participant's KEIP Allocation, which will be payable as soon as reasonably practicable following the closing of the applicable Transaction.

For the avoidance of doubt, KEIP Payments under the Threshold Pool and the Excess Value Pool will not be earned unless and until the Aggregate Value in connection with a Transaction or series of Transactions equals or exceeds the Threshold.  Payment of any KEIP Payments pursuant to any KEIP Pool is subject to the estate value satisfying Cowen's secured claim, excluding liquidation premium.

| | |
|---|---|
| **Continued Employment Requirement** | Each KEIP Payment is conditioned upon the participant's continued employment through the Earned Date.  For the avoidance of doubt, in the event a participant experiences a termination of employment for any reason following the Earned Date, but prior to payment of the earned KEIP Payment, the participant will remain entitled to his or her applicable earned KEIP Payment, which shall be payable on the regularly scheduled payment date.

If a participant experiences a Qualifying Termination prior to the date in which KEIP Payments under a KEIP Pool are earned and such KEIP Payments are subsequently earned, the participant will receive a prorated payment of the KEIP Payment the participant would be entitled to under the KEIP Pool based on the number of days of the participant's service from the Petition Date through the date of the participant's Qualifying Termination, over the number of days from the Petition Date through the applicable Earned Date of the KEIP Pool, which shall be payable on the regularly scheduled payment date.

If a participant's employment is terminated for Cause or the participant voluntarily resigns for any reason, the participant shall no longer be eligible to receive any KEIP Payments not already earned following the date of such termination. |
| **Reallocation; Treatment of Forfeited Amounts** | The Compensation Committee of the Company and any officer of the Company (each, an "Authorized Officer") have the authority and discretion to reallocate awards between existing or new participants, subject to the terms of the KEIP or any Bankruptcy Court order. |

| Definitions | "Cause" means (i) an unauthorized use or disclosure by the participant of the Company's confidential information or trade secrets (unless permitted by applicable law) or (ii) a material breach of any agreement between the participant and the Company, in either case, which results in material harm to the Company. |
|---|---|
| | "Company Entities" (each, a "Company Entity") means the Company and Proterra Operating Company, Inc. |
| | "Aggregate Value" shall mean, without duplication, the full transaction value of any Transaction, including, without limitation, the total value of all cash, securities, other property, credit bid, payments made in installments and any contingent, earned or other consideration paid or payable, directly or indirectly, by a party pursuant to a Transaction.  The value of any such securities (other than indebtedness) or other property or items of value shall be valued at the time of closing without regard to any restrictions on transferability and determined as follows:  (i) if such securities are traded on a stock exchange, the value of securities in an established public market shall be the last closing price of such securities prior to consummation of the sale; (ii) if such securities have no established public market, or if the consideration utilized consists of property other than securities, the value of such securities or other property shall be the fair market value as determined in good faith.  "Aggregate Value" shall include, without duplication, (a) any cure costs paid by a purchaser and (b) the amount of any prepetition trade claims paid by the Debtors after the petition date, whether pursuant to "first day" relief, settlement, or otherwise to the extent the applicable contracts are assumed and assigned to a purchaser where such amounts would have been cure costs had they not been paid by the Debtors.  If any consideration to be paid is computed in a foreign currency, the value of such foreign currency shall, for purposes hereof, be converted into U.S. Dollars at the prevailing exchange rate on the date or dates on which such consideration is paid. |
| | "Excess Value" means the amount of Aggregate Value in excess of the Threshold. |
| | "Petition Date" means August 7, 2023. |
| | "Qualifying Termination" means a participant's employment is terminated by the Company without cause or due to the participant's death or disability |
| | "Threshold" means an Aggregate Value of $███████████. |
| | "Transaction" means the occurrence of one of the following events:  (i) the sale of a Company Entity (including through a merger, recapitalization or sale of substantially all of the assets of the Company Entity); (ii) the sale, disposition or winding down of any business unit or division of a Company Entity; or (iii) the effective date of a plan of reorganization of any Company Entity. |

**<u>Exhibit A</u>**
**Illustrations**
*(Intentionally Omitted)*