**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| PROTERRA INC, *et al.*,[1] | ) Case No. 23-11120 (BLS) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) |
| | ) **Ref. Docket Nos.:  229, 230, & 289** |
| | ) |

**NOTICE OF FILING OF REDACTED VERSION OF DECLARATION OF MARY
LOUISE KRAKAUER IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF AN
ORDER APPROVING THEIR KEY EMPLOYEE INCENTIVE PLAN**

       **PLEASE TAKE NOTICE** that, on September 29, 2023, the above-captioned debtors and debtors in possession (together, the "Debtors") filed the *Declaration of Mary Louise Krakauer in Support of Debtors' Motion for Entry of an Order Approving Debtors' Key Employee Incentive Plan* [D.I. 289] (the "Krakauer Declaration") under seal.[2]

       **PLEASE TAKE FURTHER NOTICE** that, the Debtors hereby file a redacted version of the Krakauer Declaration, which is attached hereto as **Exhibit A**, redacting certain confidential information as set forth in the Sealing Motion.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Proterra Inc (1379); and Proterra Operating Company, Inc. (8459).  The location of the Debtors' service address is: 1815 Rollins Road, Burlingame, California 94010.

[2]    On September 13, 2023, the Debtors filed the *Debtors' Motion for Entry of an Order Authorizing the Debtors to File Under Seal Certain Information Contained in the Debtors' Motion for an Order Approving Their Key Employee Incentive Plan and the Declarations in Connection Therewith* [D.I. 229] (the "Sealing Motion").

Dated:  September 29, 2023          Respectfully submitted,
       Wilmington, Delaware

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ Shella Borovinskaya*
Pauline K. Morgan (No. 3650)
Andrew L. Magaziner (No. 5426)
Shella Borovinskaya (No. 6758)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email:  pmorgan@ycst.com
       amagaziner@ycst.com
       sborovinskaya@ycst.com

- and -

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Paul M. Basta (admitted *pro hac vice*)
Robert A. Britton (admitted *pro hac vice*)
Michael J. Colarossi (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Tel:    (212) 373-3000
Fax:   (212) 757-3990
Email:  pbasta@paulweiss.com
      rbritton@paulweiss.com
      mcolarossi@paulweiss.com

*Counsel to the Debtors and Debtors in Possession*

30820146.1

## EXHIBIT A

**Redacted Krakauer Declaration**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| PROTERRA INC, *et al.*,[1] | ) | Case No. 23-11120 (BLS) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) | **Ref. Docket Nos. 230 & 289** |

**DECLARATION OF MARY LOUISE KRAKAUER
IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF
AN ORDER APPROVING THEIR KEY EMPLOYEE INCENTIVE PLAN**

I, Mary Louise Krakauer, under penalty of perjury, declare as follows:

1.      I am a member of the board of directors (the "Board") of Proterra Inc (together with Proterra Operating Company, Inc., the "Debtors"). I joined the Board in January 2022. I am also a member of the Board's (a) Restructuring Committee (the "Restructuring Committee") and (b) Compensation and Leadership Development Committee (the "Compensation Committee"), which I chair. I am also a member of the board of directors of Mercury Systems, a defense and space manufacturing company, and a director on the board of directors of Cadence Design Systems, a software development company. I previously served as Executive Vice President, Chief Information Officer at Dell Corporation, where I was responsible for global IT. Prior to Dell, I served at EMC Corporation as Vice President, Chief Information Officer. I am over the age of 18, and I am authorized to submit this declaration (this "Declaration") on behalf of the Debtors in support of the relief requested by the *Debtors' Motion for Entry of an Order Approving Their Key Employee Incentive Plan* [Docket No. 230] (the "Motion").

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Proterra Inc (9565); and Proterra Operating Company, Inc. (8459). The location of the Debtors' service address is: 1815 Rollins Road, Burlingame, California 94010.

2.     I am generally familiar with the Debtors' operations, business, and financial affairs, and the challenges facing the Debtors during their chapter 11 cases (the "Chapter 11 Cases").  I am familiar with the prepetition structure of the Debtors' compensation programs and the structure of the Debtors' proposed key employee incentive plan (the "KEIP").  As a member of the Compensation Committee, I have been involved in the development of the KEIP since prior to August 7, 2023 (the "Petition Date") and I have attended five Compensation Committee meetings that addressed incentive and retentive programs for the Debtors' key employees, including the KEIP.  These Compensation Committee meetings occurred on July 27, 2023, August 1, 2023, August 24, 2023, September 12, 2023, and September 25, 2023, respectively (collectively, the "Compensation Committee Meetings").  I reviewed the materials provided to me in connection therewith.  I reviewed the Motion and believe that it accurately reflects the development of, and justification for, the KEIP.

3.     Based on my knowledge of the Debtors' prepetition compensation structure, and based on the analyses conducted by the Debtors' advisors, including FTI Consulting, Inc. ("FTI"), as presented to me, I believe that the KEIP is reasonable, necessary, appropriate, and was approved in the reasonable exercise of the Debtors' business judgment.

4.     Except as otherwise indicated herein, all facts set forth in this Declaration are based upon (a) my personal knowledge of the Debtors' industry, operations, and compensation programs, including the development of the KEIP; (b) my review of relevant documents; and/or (c) information provided to me by, or through discussions with, members of the Debtors' management team, employees, or advisors.  If called to testify, I could and would testify competently to each of the facts and opinions set forth herein.

## The Key Employee Incentive Plan

**A.      Overview of the KEIP**

5.      The three participants under the KEIP (collectively, the "KEIP Participants") are the leaders of the Debtors' business operations and strategy and are critical to the Debtors' ability to effectively and efficiently oversee the Debtors' operations, these Chapter 11 Cases, and a value-maximizing postpetition marketing and sale process (the "Marketing Process").  Prior to the Petition Date, the Debtors maintained various annual cash- and equity-based incentive plans for the purpose of compensating members of senior management, including the KEIP Participants in addition to their base salaries.  The KEIP Participants were also entitled to change of control severance protection prior to the Petition Date.  These ordinary course incentives have been discontinued as a consequence of these Chapter 11 Cases.

6.      To restore the alignment of the KEIP Participants' compensation opportunities with the Debtors' strategic goals and stakeholders' interests and to maintain a competitive level of compensation opportunities for the KEIP Participants, the Debtors, including the Compensation Committee, worked with FTI, the Debtors' compensation and restructuring advisor, to formulate a proposal for the KEIP, which was subsequently refined over the course of discussions among the Compensation Committee, the Debtors, and their advisors.

7.      The KEIP is structured to directly tie incentive payments to the successful outcome of the Marketing Process and to reward KEIP Participants only to the extent meaningful and difficult performance levels are achieved.  The KEIP provides cash awards to the KEIP Participants based on the success of the Marketing Process as measured by the Aggregate Value[2]

---

[2]   "Aggregate Value" is defined as, without duplication, the full transaction value of any Transaction, including, without limitation, the total value of all cash, securities, other property, credit bid, payments made in installments and any contingent, earned or other consideration paid or payable, directly or indirectly, by a party pursuant to a Transaction.  The value of any such securities (other than indebtedness) or other property or items of value shall

or Cash, Securities and Credit Bid Value,[3] as applicable, obtained by the Debtors through a sale or reorganization. The KEIP Participants may earn three categories of payments (the "KEIP Payments") depending on the results of the Marketing Process.[4] As originally proposed, the total Aggregate Value required in connection with Transactions approved by the Court as part of the Marketing Process prior to a Threshold Payment (as defined below) being earned was $█████ The Threshold is a defined target and was calculated by the Debtors and their advisors by balancing numerous factors.

---

be valued at the time of closing without regard to any restrictions on transferability and determined as follows: (i) if such securities are traded on a stock exchange, the value of securities in an established public market shall be the last closing price of such securities prior to consummation of the sale; (ii) if such securities have no established public market, or if the consideration utilized consists of property other than securities, the value of such securities or other property shall be the fair market value as determined in good faith. "Aggregate Value" shall include, without duplication, (a) any cure costs paid by a purchaser and (b) the amount of any prepetition trade claims paid by the Debtors after the petition date, whether pursuant to "first day" relief, settlement, or otherwise to the extent the applicable contracts are assumed and assigned to a purchaser where such amounts would have been cure costs had they not been paid by the Debtors. If any consideration to be paid is computed in a foreign currency, the value of such foreign currency shall, for purposes hereof, be converted into U.S. Dollars at the prevailing exchange rate on the date or dates on which such consideration is paid. "Transaction" is defined as the occurrence of one of the following events: (a) the sale of a Company Entity (including through a merger, recapitalization or sale of substantially all of the assets of the Company Entity); (b) the sale, disposition or winding down of any business unit or division or asset of a Company Entity; or (c) the effective date of a plan of reorganization of any Company Entity.

[3]   "Cash, Securities and Credit Bid Value" is defined as the total value of all cash held by the Debtors, the value of a cash or credit bid, whether paid currently or in installments, securities, other property, and any contingent, earned or other consideration paid or payable, directly or indirectly, by a party pursuant to a Transaction. The value of any such securities (other than indebtedness) or other property or items of value shall be valued at the time of closing without regard to any restrictions on transferability and determined as follows: (a) if such securities are traded on a stock exchange, the value of securities in an established public market shall be the last closing price of such securities prior to consummation of the sale; (b) if such securities have no established public market, or if the consideration utilized consists of property other than securities, the value of such securities or other property shall be the fair market value as determined in good faith. "Cash, Securities and Credit Bid Value" shall not include (a) any cure costs paid by a purchaser and (b) the amount of any prepetition trade claims paid by the Debtors after the petition date, whether pursuant to "first day" relief, settlement, or otherwise to the extent the applicable contracts are assumed and assigned to a purchaser where such amounts would have been cure costs had they not been paid by the Debtors. If any consideration to be paid is computed in a foreign currency, the value of such foreign currency shall, for purposes hereof, be converted into U.S. Dollars at the prevailing exchange rate on the date or dates on which such consideration is paid.

[4]   As discussed more fully below, resulting from negotiations with the Committee, Mr. Joyce, the Debtors' CEO, agreed to forego $100,000 of his originally contemplated Threshold Payment. Mr. Joyce is eligible for a third payment to recover up to $200,000 of reconstructed value depending on the results of the Marketing Process.

8.      The Debtors made numerous concessions after engaging in good faith negotiations with the Second Lien Agent[5] and the Official Committee of Unsecured Creditors (the "Committee").  Prior to filing the Motion, the Debtors agreed to an increase in the Aggregate Value needed as part of the Marketing Process to be eligible for the first payment (the "Threshold Payment"); this threshold was raised to $██████ (the "Threshold").  Additionally, the Debtors agreed that for a Threshold Payment or an Excess Threshold Payment[6] to be made there must be sufficient proceeds from the Marketing Process or other assets to satisfy the Second Lien Agent's claim excluding any alleged liquidation premium.[7]

9.      After filing the Motion, the Debtors agreed to five additional changes to the KEIP. First, the Debtors agreed to a 15% holdback of the KEIP Payments until the confirmation of a chapter 11 plan (the "Holdback Requirement").  Second, the Debtors agreed to a $100,000 reduction in Mr. Joyce's Threshold Payment opportunity and the reconstruction of $200,000 of such opportunity to reaching certain threshold amounts of Cash, Securities and Credit Bid Value (the "Cash and Credit Bid Value Payment"), which value does not take into account the value of any cure costs incurred by a buyer or prepetition trade claims paid by the Debtors.  Mr. Joyce would receive $50,000 upon the Cash, Securities and Credit Bid Value reaching $██████. For each additional $██████ of Cash, Securities and Credit Bid Value above $██████, Mr. Joyce would receive an additional $50,000 until he obtains $200,000 upon the Cash, Securities and Credit Bid Value reaching $██████.  The Cash and Credit Bid Value Payment, like the other KEIP Payments, is subject to the Holdback Requirement.  Third, the Debtors amended the

---

[5]     "Second Lien Agent" means CSI GP I LLC as collateral agent under that certain Note Purchase Agreement (as amended, amended and restated, supplemented, or otherwise modified from time to time, the "Note Purchase Agreement").

[6]     Excess Threshold Payments mean the payments made for reaching Aggregate Value that exceeds the Threshold.

[7]     The Debtors dispute that any liquidation premium is owed, or could become owed, by the Debtors.

KEIP so that in the event a KEIP Participant is terminated for Cause,[8] he would no longer be eligible for unpaid KEIP Payments. Fourth, the Debtors further refined the timing mechanics associated with the earning of the KEIP, including that KEIP Participants may earn Threshold Payments, Excess Threshold Payments, or Cash, Securities, and Credit Bid Value Payments, as applicable, for any Transaction for which they are employed when a definitive agreement is signed, so long as the KEIP Participant remains employed through the earlier of (a) the closing of a Powered Sale[9] or (b) the Court's confirmation of a chapter 11 plan. Fifth, the Debtors agreed that KEIP awards may not be reallocated to recipients of the prepetition key employee retention program.

10.    If the Marketing Process fails to achieve the Threshold conditions, no Threshold Payment or Excess Threshold Payment will be made. In the event that the Marketing Process achieves more than the Threshold, the KEIP Participants are eligible for the second category of KEIP Payments, the Excess Threshold Payments, the aggregate amount of which increases linearly with Aggregate Value achieved in excess of the Threshold. Specifically, the aggregate amount of Excess Payments is equal to 3% of Aggregate Value achieved in excess of the Threshold. The KEIP was designed with a target Aggregate Value of $█████████ (the "<u>Target</u>").

---

[8]    "Cause" is defined as (a) a participant's conviction of any felony or other crime involving either fraud or a breach of participant's duty of loyalty with respect to the Debtors, (b) a participant's fraud, misappropriation, embezzlement or material misuse of funds or property belonging to the Debtors, (c) the participant's violation of the material written policies of the Debtors which is reasonably likely to result in demonstrable material harm to the Debtors or other willful misconduct or gross negligence in connection with the performance of his duties, (d) an unauthorized use or disclosure by the participant of the Debtors' confidential information or trade secrets (unless permitted by applicable law) which is reasonably likely to result in demonstrable material harm to the Debtors and (e) the participant's material breach of any agreement between the participant and the Debtors which is reasonably likely to result in demonstrable material harm to the Debtors; <u>provided</u>, that the Debtors shall provide the participant with written notice of the events or occurrences described in clauses (a), (b), (c), (d) and (e) and, to the extent curable and reasonably capable of cure, an opportunity to cure within 15 calendar days.

[9]    "Powered Sale" is defined as (a) the sale of the Debtors' Powered business division, including through a merger, recapitalization, plan of reorganization or sale of substantially all of the assets of the Powered business division or (b) the sale, disposition or winding down of the Debtors' Powered business division.

11.     The Compensation Committee reviewed and advised on the KEIP throughout its formulation and development.   The Compensation Committee unanimously authorized the Debtors to seek Court approval of the KEIP to provide cash-based incentive compensation for three of the most critical members of the Debtors' leadership team during the pendency of these Chapter 11 Cases, and also authorized the Debtors' advisors to continue ongoing negotiations with the Second Lien Agent and the Committee to try to reach consensus in support of the KEIP.   As of the date hereof, the Committee and Second Lien Agent have expressed their support of the KEIP and indicated they will not object to the relief sought in the Motion.   On September 25, 2023, the Compensation Committee met to review the changes to the KEIP and approved the revisions to the KEIP.

**B.      The KEIP Participants**

12.     There are three KEIP Participants, each of whom was selected because of their extensive institutional knowledge, industry experience, seniority in the Debtors' management structure, and direct involvement in these Chapter 11 Cases and the postpetition Marketing Process.   The KEIP Participants are the following three members of the Debtors' executive leadership team:

| Name | Title |
|---|---|
| Gareth Joyce | Chief Executive Officer ("CEO") |
| David Black | Chief Financial Officer ("CFO") |
| Jeffrey Mitchell | General Counsel ("GC") |

13.     The KEIP Participants are responsible for executing on the Debtors' strategic direction and ensuring achievement of the Debtors' overall goals.   A non-exhaustive list of each KEIP Participant's responsibilities include:

- **Mr. Joyce (CEO)**:   Mr. Joyce is responsible for determining and executing upon the strategic goals of the Debtors under the direction of the Board.   He also oversees all strategic partnerships and key customer relationships.   He is playing a pivotal role in the Marketing Process.   With the assistance of the Debtors' investment bank, Moelis & Company ("Moelis") and other advisors, Mr. Joyce will directly negotiate and liaise with potential bidders and is the lead facilitator of the Marketing Process strategy.   In addition to the Marketing Process, he is responsible for overseeing all other aspects of the Debtors' operations and bankruptcy process, including serving as the declarant in the Debtors' first day declaration.

- **Mr. Black (CFO)**:   Mr. Black is the senior officer responsible for all key areas of the Debtors' finance and accounting functions, including financial planning and analysis.   He also oversees the Debtors' business operating plan, financial forecasts, and compliance with any requirements under the Debtors' cash collateral order (the "Cash Collateral Order").   He is playing an integral and unique role in the Marketing Process by working with Moelis to ensure that financial reporting and underlying diligence is provided to potential bidders.   Additionally, Mr. Black is responsible, and critical, for any Transaction, as he must effectively address potential bidders' diligence requests related to the Debtors' business plan and forecasts to negotiate a value maximizing Transaction. In addition to Mr. Black's day-to-day responsibilities as CFO, such as financial reporting and forecasting, Mr. Black has also been highly involved in these Chapter 11 Cases, including monitoring the use of cash pursuant to the Cash Collateral Order, attending the initial debtor interview, and overseeing financial reporting during the pendency of the Chapter 11 Cases.

- **Mr. Mitchell (GC)**:  Mr. Mitchell is responsible for overseeing the Debtors' global legal matters, including litigation, business development transactions, contracting, securities law, and periodic SEC reporting.  He is responsible for overseeing all legal aspects of the Marketing Process, including the negotiation of NDAs and responses to the due diligence requests of potential bidders.  Additionally, in conjunction with Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul, Weiss"), Mr. Mitchell will be involved in negotiating and documenting any definitive documents related to a Transaction.  Like the other KEIP Participants, Mr. Mitchell has been required to take on additional work during these Chapter 11 Cases over and beyond his day-to-day responsibilities overseeing the Debtors' legal department, such as in relation to the Debtors' litigation and contracting.  For example, he provided significant input on the first day relief sought by the Debtors, and has assisted the Debtors' preparation of their various pleadings in these Chapter 11 Cases.

14.     I believe that each KEIP Participant is integral to the Debtors, including by considering (with the Board) and implementing their business strategies, overseeing the Debtors' finance and reporting operations, and managing the Debtors' legal team and function.  All of these responsibilities directly affect the Debtors' ongoing Marketing Process and ability to maximize value.  Indeed, as described above, each KEIP Participant is heavily involved in the due diligence process, and each will play a leading role in Transaction negotiations.

15.     The Threshold and Target will be difficult to achieve because there is no certainty that any transaction will occur, much less at an Aggregate Value that will trigger the KEIP.  The KEIP Participants must play their respective critical roles to facilitate the sale process through oversight of the Debtors' strategy, facilitation of due diligence, and preservation of going concern value pending a sale.  These asks are substantially above and beyond the KEIP Participants'

ordinary course responsibilities.  It is my opinion that the KEIP Participants cannot expect to earn awards under the KEIP merely by engaging in business as usual and the KEIP is structured to incentivize optimal performance from the KEIP Participants.

### C.   The Debtors' Current Environment

16.     The Debtors operate in an industry in which talent is highly sought after and compensated.  I believe that the KEIP is designed to take into account the industry's high level of compensation and competition for talent and motivate the KEIP Participants by making their incentive compensation commensurate with their additional workloads.  I have been informed by the Debtors' advisors that the high level of industry pay and competition for talent is not present in all of the bankruptcy peer plans to which the Debtors' advisors compared the KEIP.  I further believe that if the Debtors' core management team is not awarded incentive compensation opportunities competitive with opportunities available to them in the market, they will not be appropriately incentivized to create value for the Debtors and their overall engagement will diminish, negatively impacting the Debtors' ability to successfully navigate these Chapter 11 Cases and the Marketing Process.

17.     Additionally, the Debtors, like many technology companies, historically incentivized the KEIP Participants through equity compensation and awards, which the Debtors believe no longer provide their intended incentive-aligning effect, and which will not continue to be paid post-petition.  As such, I believe that the KEIP Payments are necessary to reintroduce a portion of prepetition incentive awards to appropriately compensate and motivate the KEIP Participants during the pendency of the Chapter 11 Cases.  The KEIP Participants are especially susceptible to being recruited by nonbankrupt companies that can offer market compensation and severance packages and a stable, long-term work environment.

18.     I also understand that the Debtors' Chapter 11 Cases and Marketing Process differ from many other chapter 11 cases and sales processes.  The Debtors filed these Chapter 11 Cases without a stalking horse in place, and no stalking horse bid has been selected as of the filing of this Declaration.  The Debtors are also simultaneously running sale processes for three different sets of assets in their Power, Energy, and Transit business lines, requiring incrementally greater effort to support each process.  The level of effort required for these three processes is brought into focus by the fact that, to date, the Debtors have signed 90 NDAs with potentially interested counterparties already during these processes.  The KEIP accounts for the uncertainty surrounding the Marketing Process, the tremendous increase in the KEIP Participants' respective responsibilities and the need to incentivize the KEIP Participants to lead the Debtors through such uncertainty and achieve superior results for the Debtors' estates and stakeholders, notwithstanding that the outcome of such process could result in the loss of the KEIP Participants' employment.

### D.     The Debtors' Prepetition Incentive Structure

19.     Prior to the Petition Date, the Debtors maintained incentive plans for the purpose of compensating the KEIP Participants, amongst others.  The Debtors historically have maintained an equity incentive program to encourage and incentivize employees to maximize their performance for the benefit of the Debtors' business  (the "Equity Incentive Program").  Additionally, the Debtors maintained a short-term incentive plan (the "Short-Term Incentive Plan" and with the Equity Incentive Program, the "Prepetition Incentive Plans").  Bonuses under the Short-Term Incentive Plan paid to the KEIP Participants in 2022 ranged from $51,148 to $339,375.[10]

---

[10]     Mr. Black did not have a Short-Term Incentive Plan bonus payment in 2022 because he was not employed by the Debtors.

20.     The Debtors have not sought, and are not seeking, the authority to continue prepetition incentive or retentive programs, or severance, offered to the KEIP Participants.[11] Notably, none of the KEIP Participants received a payment as part of the Debtors' prepetition August 2023 key employee retention program.

21.     I understand that FTI reviewed the Debtors' prepetition compensation structure for the KEIP Participants to identify the impact that discontinuing the Prepetition Incentive Plans would have on the target variable compensation ("Prepetition TVC")[12] of the KEIP Participants. As summarized below, I understand that at Threshold, the KEIP Participants' proposed KEIP Payments are significantly below their respective Prepetition TVCs.  It is only upon the Aggregate Value reaching $███████ that the average KEIP Payment reaches 79% of the KEIP Participants' Prepetition TVC, and at approximately $███████ their average KEIP Payments reach 100% of Prepetition TVC.

---

[11]    Mr. Mitchell received a two-part retention payment in April 2023, which totaled $100,000.  The first half vested in June 2023.  The second half was scheduled to vest in December 2023; however, he has agreed to waive this payment if the Debtors' KEIP is approved.

[12]    As used herein, Prepetition TVC means the KEIP Participant's annual bonus and target annual long-term incentive compensation based on the long-term incentive targets for the CFO and GC, and assumed value for the CEO, which was the same as the CEO's 2022 long-term incentive award value.

| Name | KEIP Threshold Aggregate Value: $ ▮▮▮ | | KEIP Scenario 1 Aggregate Value: $ ▮▮▮ | | KEIP Scenario 2 Aggregate Value: $ ▮▮▮ | | KEIP Scenario 3 Aggregate Value: $ ▮▮▮ | |
|---|---|---|---|---|---|---|---|---|
| | Proposed KEIP Payment | % of Prepetition TVC | Proposed KEIP Payment | % of Prepetition TVC | Proposed KEIP Payment | % of Prepetition TVC | Proposed KEIP Payment | % of Prepetition TVC |
| Mr. Joyce (CEO)[13] | $746,250 | 22% | $1,365,000 | 38% | $2,302,500 | 64% | $5,208,750 | 144% |
| Mr. Black (CFO) | $313,875 | 25% | $499,500 | 40% | $780,750 | 63% | $1,652,625 | 134% |
| Mr. Mitchell (GC) | $313,875 | 45% | $499,500 | 71% | $780,750 | 111% | $1,652,625 | 236% |
| **Total/Average:** | **$1,374,000** | **30%** | **$2,364,000** | **50%** | **$3,864,000** | **79%** | **$8,514,000** | **171%** |

22.     I understand that as originally designed the payout opportunity at Target was $4,000,000.  Under this design, at the Target, Mr. Joyce would have received $2,500,000, Mr. Black would have received $750,000, and Mr. Mitchell would have received $750,000, respectively.  As previously described, as a result of negotiations with the Second Lien Agent and the Committee, Mr. Joyce now will receive $2,400,000[14] at Target and the other two KEIP Participants' KEIP Payments will remain unchanged.

23.     As discussed above, as a result of the negotiations between the Debtors, the Committee, and the Second Lien Agent, the Debtors agreed to lower Mr. Joyce's Threshold Payment by $100,000 and revise the conditions applicable to $200,000 of his potential Threshold Payment into a third category of payment—the Cash and Credit Bid Value Payment.  To receive the Cash and Credit Bid Value Payment, the Cash, Securities and Credit Bid Value of the Transactions must reach $▮▮▮.  The Cash and Credit Bid Value Payment increases by $50,000 with each additional $▮▮▮ in Cash, Securities and Credit Bid Value achieved.  If the Cash, Securities and Credit Bid Value is below $▮▮▮, Mr. Joyce would forego the entire $200,000.

---

[13]     Mr. Joyce's Proposed KEIP Payments are exclusive of any potential Cash and Credit Bid Value Payment.

[14]     This $2,400,000 value includes the full realization of the Cash and Credit Bid Value Payment.



| Name | Title | Total KEIP Target | Cash, Securities and Credit Bid Value | | | |
|------|-------|-------------------|------|------|------|------|
| Gareth Joyce | CEO | **$2,400,000** | $50,000 | $100,000 | $150,000 | $200,000 |

E.    **The Need for the KEIP**

24.    Without the immediate implementation of a KEIP that gives the KEIP Participants an opportunity to earn a portion of the compensation opportunities previously available to them under the Prepetition Incentive Plans, I believe that there is significant risk that the KEIP Participants will not be incentivized to achieve the difficult targets set forth in the KEIP during the Marketing Process, which would deprive the Debtors' estates of substantial potential value.  Based on analysis conducted by FTI, I understand the KEIP Target is below the average Prepetition TVCs for the KEIP Participants.  I further understand the KEIP Payments above the Threshold, if any, would scale linearly with Aggregate Value in excess of the Threshold, thereby aligning the KEIP Participants' interests with those of the Debtors' estates and stakeholders.

25.    It is essential for the KEIP Participants to be adequately incentivized during the pendency of the Marketing Process.  Each of the KEIP Participants is integral to the success of the Marketing Process and their collective efforts are necessary for the Debtors to successfully source and develop bidders for the Debtors' assets.  The KEIP Participants have critical institutional knowledge of the Debtors and their operations and/or relationships with key customers and suppliers, all of which will be integral during future negotiations and structuring of a Transaction.  Given the KEIP Participants' institutional knowledge, it is essential that the Debtors appropriately

incentivize the KEIP Participants as they work to meet the challenging timeline set forth in the Bidding Procedures. [15]

26.     I believe that the KEIP sets forth challenging goals.  It will be challenging to obtain any Aggregate Value through the Marketing Process, let alone the amount required to reach Target because the closing of *any* Transaction is far from guaranteed and will require substantial addition work to achieve.   With the assistance of Moelis, the KEIP Participants must achieve the consummation of a successful Transaction that yields enough Aggregate Value to receive a KEIP Payment all while overseeing the Debtors' day to day operations during these Chapter 11 Cases. Rewarding and motivating the KEIP Participants to realize substantial Aggregate Value of at least $█████████ to reach the Threshold and $█████████ to reach Target is plainly incentivizing in nature.

27.     Moreover, if the KEIP Participants are successful in consummating a qualifying Transaction, there will be an enormous benefit for the Debtors' estates and stakeholders.   In addition to any proceeds returned to the Debtors' creditors and estates, I understand that a Transaction could provide for contracts to be assumed (and cured) by a buyer, employees to maintain jobs, and vendors and customers to maintain a beneficial relationship going forward.  The Debtors believe that the KEIP properly aligns incentives among the Debtors' estates and the KEIP Participants.

---

[15]    As defined in the *Order (a) Approving Bidding Procedures to Govern the Sale of all or Substantially all of the Debtors' Assets Pursuant to Section 363 of the Bankruptcy Code, (b) Approving Procedures Regarding Entry Into One or More Stalking Horse Agreements, (c) Establishing Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases, (d) Approving the Form and Manner of the Notice of Assumption and Assignment of Executory Contracts and Unexpired Leases, (e) Scheduling Auctions for the Sales of the Company Assets and Hearings to Consider Approval of the Sales and Approving the Form and Manner of the Notice Thereof, and (f) Granting Related Relief* (the "Bidding Procedures Order") [Docket No. 218].

**The Compensation Committee's Role in Developing the KEIP**

28.    The Compensation Committee played an important role in the development of the KEIP.  Prior to the Petition Date and continuing through the filing of the Motion, the Compensation Committee reviewed the KEIP's design, purpose, and implementation.  During the Compensation Committee Meetings, the Compensation Committee received analyses from FTI and the Debtors' other advisors and discussed the KEIP at length with these advisors.  As previously noted, at the Compensation Committee's meeting on September 12, 2023, the Compensation Committee unanimously approved the filing of the Motion, seeking Court approval of the KEIP, and permitting the Debtors' advisors to continue ongoing negotiations with the Second Lien Agent and Committee.  On September 25, 2023, the Compensation Committee reviewed and unanimously approved the revised KEIP.

29.    I believe through the actions of the Compensation Committee, the Board appropriately exercised its business judgment in evaluating and ultimately approving the KEIP. The KEIP is the result of extensive analysis and consideration, and the Debtors were advised by advisors, including FTI, an expert on incentive compensation programs in bankruptcy.  The Compensation Committee reviewed multiple drafts of the KEIP to determine that the KEIP established challenging metrics and appropriately incentivized the KEIP Participants' interests with those of the Debtors.  The Compensation Committee's review was informed throughout by the analyses undertaken by the Debtors' advisors regarding the market for incentive compensation programs in similarly situated bankruptcy cases and the Debtors' prepetition executive compensation programs.

**Conclusion**

30.    Based on my knowledge of the Debtors' prepetition compensation structure and the analyses presented to me by the Debtors' advisors, I believe that the KEIP is reasonable,

appropriate, and necessary to properly incentivize the KEIP Participants to perform in order for the Debtors to undertake a successful Marketing Process and ultimately maximize the value of the Debtors' estates during these Chapter 11 Cases.

[*Signature page follows.*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.

Executed on September 29, 2023.

/s/ *Mary Louise Krakauer*
Mary Louise Krakauer
Director of and Chair of the Compensation
Committee of the Board of Directors of Proterra Inc