**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | ) | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PROTERRA INC, *et al.*,[1] | ) | Case No. 23-11120 (BLS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | |
| | ) | **Ref. Docket Nos.:  229, 230, & 291** |
| | ) | |

**NOTICE OF FILING OF REDACTED VERSION OF DECLARATION OF MARTIN KUEHNE IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF AN ORDER APPROVING THEIR KEY EMPLOYEE INCENTIVE PLAN**

**PLEASE TAKE NOTICE** that, on September 29, 2023, the above-captioned debtors and debtors in possession (together, the "Debtors") filed the *Declaration of Martin Kuehne in Support of Debtors' Motion for Entry of an Order Approving Debtors' Key Employee Incentive Plan* [D.I. 291] (the "Kuehne Declaration") under seal.[2]

**PLEASE TAKE FURTHER NOTICE** that, the Debtors hereby file a redacted version of the Kuehne Declaration, which is attached hereto as **Exhibit A**, redacting certain confidential information as set forth in the Sealing Motion.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Proterra Inc (1379); and Proterra Operating Company, Inc. (8459).  The location of the Debtors' service address is: 1815 Rollins Road, Burlingame, California 94010.

[2] On September 13, 2023, the Debtors filed the *Debtors' Motion for Entry of an Order Authorizing the Debtors to File Under Seal Certain Information Contained in the Debtors' Motion for an Order Approving Their Key Employee Incentive Plan and the Declarations in Connection Therewith* [D.I. 229] (the "Sealing Motion").

30820152.1

Dated: September 29, 2023
Wilmington, Delaware

Respectfully submitted,

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ Shella Borovinskaya*
Pauline K. Morgan (No. 3650)
Andrew L. Magaziner (No. 5426)
Shella Borovinskaya (No. 6758)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email:  pmorgan@ycst.com
          amagaziner@ycst.com
          sborovinskaya@ycst.com

- and -

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Paul M. Basta (admitted *pro hac vice*)
Robert A. Britton (admitted *pro hac vice*)
Michael J. Colarossi (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Tel:   (212) 373-3000
Fax:   (212) 757-3990
Email: pbasta@paulweiss.com
         rbritton@paulweiss.com
         mcolarossi@paulweiss.com

*Counsel to the Debtors and Debtors in Possession*

# **EXHIBIT A**

**Redacted Kuehne Declaration**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| PROTERRA INC, *et al.*,[1] | ) ) ) | Case No. 23-11120 (BLS) |
| Debtors. | ) ) ) | (Jointly Administered) |
| | | **Ref. Docket Nos. 230 & 291** |

### DECLARATION OF MARTIN KUEHNE
### IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF
### AN ORDER APPROVING THEIR KEY EMPLOYEE INCENTIVE PLAN

I, Martin Kuehne, under penalty of perjury, declare as follows:

1. I am a Senior Managing Director at FTI Consulting, Inc. ("FTI"). I am over the age of 18, and I am authorized to submit this declaration (this "Declaration") on behalf of the Debtors in support of the relief requested by the *Debtors' Motion for Entry of an Order Approving Their Key Employee Incentive Plan* [Docket No. 230] (the "Motion").[2]

2. Except as otherwise indicated, all facts set forth in this Declaration are based upon (a) my personal knowledge of the Debtors' operations; (b) my review of relevant documents; (c) information provided to me by employees of FTI working under my supervision; (d) information provided to me by, or through discussion with, members of the Debtors' management team, other employees, or the Debtors' other advisors; and/or (e) my expertise in workforce planning and analytics and organizational design based on over thirty years of experience in the field. I am familiar with the structure of the Debtors' proposed key employee

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Proterra Inc (9565); and Proterra Operating Company, Inc. (8459). The location of the Debtors' service address is: 1815 Rollins Road, Burlingame, California 94010.

[2] Capitalized terms used but not defined herein shall have the meanings given to such terms in the Motion.

incentive plan (the "KEIP").  I have reviewed the Motion and believe that it accurately reflects the circumstances leading to the development of the KEIP and the justification and need for the relief requested therein.  If called to testify, I could and would testify competently to each of the facts and opinions set forth herein.

### Professional Background and Qualifications

3. I joined FTI in April 2022 after serving as a Managing Director at Seabury Consulting, where I led Seabury Consulting's human capital consulting efforts globally.  Prior to this, I founded, and served as the Chief Executive Officer of, Organizational Concepts International, a human resources and management consulting firm.  I have held senior positions at American Express, Wells Fargo, and Northwest Airlines with responsibility for compensation, benefits, organizational design, and leadership development.  I received a Bachelor of Arts from the University of Minnesota and a Masters of Arts in Human Resources and Industrial Relations from the University of Minnesota.  I have extensive experience advising organizations on compensation issues during major financial transitions, including bankruptcies and out-of-court restructurings, and designing and managing related incentive programs and employment agreements.

4. I am knowledgeable about and familiar with the Debtors' business and financial affairs and the circumstances leading to the commencement of these cases (the "Chapter 11 Cases").  I am also familiar with the Debtors' management team and historical and current compensation programs.  I have reviewed relevant market data on incentive plans in chapter 11 cases, assisted the Debtors in developing the KEIP, and analyzed whether the KEIP is consistent with typical competitive market practice and designed to incentivize its participants.

**FTI's Involvement with the Debtors**

5. FTI is a global business advisory firm dedicated to helping organizations manage change, mitigate risk, and resolve financial, legal, operational, political & regulatory, reputational and transactional issues or disputes. Among other services, this includes expert analysis of executive and management compensation issues including for stressed, distressed, and bankrupt companies. FTI has access to a broad range of market compensation data, including data related to companies in chapter 11 proceedings.

6. The Debtors engaged FTI on or around June 23, 2023, and amended and restated its engagement terms on August 7, 2023. Pursuant to its engagement letter, FTI has, among other things, provided the Debtors with compensation consulting services. My team and I conducted due diligence on the design, structure, and cost of key employee incentive plans in comparable restructuring situations and applied this knowledge, along with my experience designing key employee incentive plans, to work with the Debtors' Compensation and Leadership Development Committee (the "Compensation Committee") and other advisors on the development of a key employee incentive plan in connection with these cases. Specifically, my team and I provided input and advice on the design, structure, and cost of the KEIP for reasonableness and consistency with market practice while designing the KEIP. The KEIP was approved for submission to the Court by the Compensation Committee on September 12, 2023. I have since updated my analysis to reflect the final design, structure, and cost of the KEIP that resulted from negotiations with the Second Lien Agent[3] and the Official Committee of Unsecured Creditors (the "Committee") for purposes of this Declaration. My primary goal in the course of interactions with the Debtors and

---

[3] "Second Lien Agent" means CSI GP I LLC as collateral agent under that certain Note Purchase Agreement (as amended, amended and restated, supplemented, or otherwise modified from time to time, the "Note Purchase Agreement").

the Debtors' management team was to provide an evaluation of the KEIP that drew directly from relevant market data as well as my experience designing comparable incentive programs for similarly-situated companies.

## The KEIP

### A.    Overview of the KEIP

7.  Pursuant to the Motion, the Debtors seek approval of the KEIP to provide incentive compensation for three key insider employees (collectively, the "KEIP Participants") whom the Debtors have identified as critical to the ongoing postpetition marketing and bidding process (the "Marketing Process") and these Chapter 11 Cases as a whole.

8.  To maximize the value obtained through the restructuring process, companies commonly implement incentive arrangements for key employees. The Debtors determined that the KEIP was critical to incentivize the KEIP Participants to maximize the value of the estates and successfully navigate the Debtors through the restructuring process, while at the same time providing the opportunity to earn compensation commensurate with the market and for strong achievement of challenging performance goals.

### B.    The KEIP Participants

9.  There are three KEIP Participants. These three KEIP Participants were selected because of their extensive institutional knowledge, industry experience, and critical and direct involvement in these Chapter 11 Cases and the postpetition Marketing Process. The KEIP Participants are the following three members of the Debtors' executive leadership team:

| Name | Title |
|---|---|
| Gareth Joyce | Chief Executive Officer ("CEO") |
| David Black | Chief Financial Officer ("CFO") |
| Jeffrey Mitchell | General Counsel ("GC") |

**C.    Terms of the KEIP**

10.    The KEIP provides for three categories of payments to the KEIP Participants (the "KEIP Payments") depending on the results of the Marketing Process. If approved, the award opportunities for each KEIP Participant are summarized in the table below:

| KEIP Participant | KEIP Participant Target Variable Compensation ("Prepetition TVC")[4] | KEIP Award Earned Upon Meeting Sale Threshold (the "Threshold Payment") | Percentage of Transaction Award Pool (the "Excess Threshold Payment") | KEIP Payment at Target |
|---|---|---|---|---|
| Mr. Joyce (CEO) | $3,625,000 | $746,250 | 62.50% | $2,400,000[5] |
| Mr. Black (CFO) | $1,237,500 | $313,875 | 18.75% | $750,000 |
| Mr. Mitchell (GC) | $701,000 | $313,875 | 18.75% | $750,000 |

11.    The Threshold Payments are earned upon the Court's approval of a Transaction or series of Transactions with an Aggregate Value[6] at or above $▓▓▓▓▓▓ (the "Threshold")

---

[4]  As used herein, Prepetition TVC means the KEIP Participant's annual bonus and target annual long-term incentive compensation based on the long-term incentive targets for the CFO and GC, and assumed value for the CEO, which was the same as the CEO's 2022 long-term incentive award value.

[5]  As discussed more fully below, resulting from negotiations with the Committee, Mr. Joyce, the Debtors' CEO, agreed to forego $100,000 of his originally contemplated Threshold Payment. Mr. Joyce is eligible for a third payment to recover up to $200,000 of reconstructed value depending on the results of the Marketing Process.

[6]  "Aggregate Value" is defined as, without duplication, the full transaction value of any Transaction, including, without limitation, the total value of all cash, securities, other property, credit bid, payments made in installments and any contingent, earned or other consideration paid or payable, directly or indirectly, by a Party pursuant to a

5

(the "Threshold Transaction").[7]  The Threshold is a defined target and was calculated by the Debtors and their advisors by balancing numerous factors.  As designed, the Threshold was originally set at $█████ but was moved to $█████ based on negotiations with the Second Lien Agent and the Committee.  The Aggregate Value for the Threshold Payments is measured at the time of the Court's approval of a Threshold Transaction[8] that cumulatively reaches or exceeds the Threshold.  The Threshold Payment is paid upon the earlier of (a) the release of a good faith deposit associated with the Threshold Transaction, if any, to the Debtors, and (b) the closing date of the Threshold Transaction.

12.   The Excess Threshold Payments are earned in the following circumstances: (a) upon the closing of a Threshold Transaction only if such Threshold Transaction results in an Aggregate Value in excess of the Threshold ("Initial Excess Earned Date"), with the total aggregate value of Excess Threshold Payments payable to the KEIP Participants equal to 3% of the portion of the Aggregate Value that exceeds the Threshold (the "Excess Value"); and, (b) if

---

Transaction. The value of any such securities (other than indebtedness) or other property or items of value shall be valued at the time of closing without regard to any restrictions on transferability and determined as follows: (i) if such securities are traded on a stock exchange, the value of securities in an established public market shall be the last closing price of such securities prior to consummation of the sale; (ii) if such securities have no established public market, or if the consideration utilized consists of property other than securities, the value of such securities or other property shall be the fair market value as determined in good faith. "Aggregate Value" shall include, without duplication, (a) any cure costs paid by a purchaser and (b) the amount of any prepetition trade claims paid by the Debtors after the petition date, whether pursuant to "first day" relief, settlement, or otherwise to the extent the applicable contracts are assumed and assigned to a purchaser where such amounts would have been cure costs had they not been paid by the Debtors.  If any consideration to be paid is computed in a foreign currency, the value of such foreign currency shall, for purposes hereof, be converted into U.S. Dollars at the prevailing exchange rate on the date or dates on which such consideration is paid. "Transaction" is defined as the occurrence of one of the following events: (a) the sale of a Company Entity (including through a merger, recapitalization or sale of substantially all of the assets of the Company Entity); (b) the sale, disposition or winding down of any business unit or division or asset of a Company Entity; or (c) the effective date of a plan of reorganization of any Company Entity.

[7]  For the avoidance of doubt, in no event will the Threshold be considered met if, after giving effect to all Transactions and any credit bid or debt equitization, there are inadequate assets to pay the remaining claims of the Second Lien Agent excluding any asserted amounts in relation to a premium on account of the Chapter 11 Cases or otherwise asserted, if any.

[8]  For the avoidance of doubt, the Aggregate Value is calculated, without duplication, from the sum of all Transactions occurring during the Chapter 11 Cases.

6

applicable, each Transaction following the Initial Excess Earned Date (each, an "Additional Excess Earned Date"), with the total Excess Threshold Payments payable to the KEIP Participants upon each Additional Excess Earned Date equal to 3% of the Aggregate Value associated with such Transaction.  For purposes of an Excess Threshold Payment, the Aggregate Value of a given Transaction is determined as of the date the applicable Transaction triggering the payment of the Excess Threshold Payment closes, and each KEIP Participant's Excess Threshold Payment will be paid on or as soon as reasonably practicable following such closing date. Transactions with Excess Value may result in multiple Excess Threshold Payments being paid, without duplication, upon the closing of the relevant Transactions.  During the negotiations with the Committee and the Second Lien Agent following the filing of the Motion, the Debtors agreed to a 15% holdback of the KEIP Payments until the confirmation of a chapter 11 plan (the "Holdback Requirement").  The Debtors further refined the timing mechanics associated with the earning of the KEIP, including that KEIP Participants may earn Threshold Payments, Excess Threshold Payments, or Cash, Securities, and Credit Bid Value Payments (as defined below), as applicable, for any Transaction for which they are employed when a definitive agreement is signed, so long as the KEIP Participant remains employed through the earlier of (a) the closing of a Powered Sale[9] or (b) the Court's confirmation of a chapter 11 plan.  The Debtors also amended the KEIP so that in the event a KEIP Participant is terminated for Cause, he would no longer be eligible for unpaid KEIP Payments[10]

---

[9] "Powered Sale" is defined as (a) the sale of the Debtors' Powered business division, including through a merger, recapitalization, plan of reorganization or sale of substantially all of the assets of the Powered business division or (b) the sale, disposition or winding down of the Debtors' Powered business division.

[10] "Cause" is defined as (a) a participant's conviction of any felony or other crime involving either fraud or a breach of participant's duty of loyalty with respect to the Debtors, (b) a participant's fraud, misappropriation, embezzlement or material misuse of funds or property belonging to the Debtors, (c) the participant's violation of the material written policies of the Debtors which is reasonably likely to result in demonstrable material harm to the Debtors or other willful misconduct or gross negligence in connection with the performance of his duties, (d) an unauthorized use or disclosure by the participant of the Debtors' confidential information or trade secrets

| Name | KEIP Threshold Aggregate Value: $▓ | | KEIP Scenario 1 Aggregate Value: $▓ | | KEIP Scenario 2 Aggregate Value: $▓ | | KEIP Scenario 3 Aggregate Value: $▓ | |
|---|---|---|---|---|---|---|---|---|
| | Proposed KEIP Payment | % of Prepetition TVC | Proposed KEIP Payment | % of Prepetition TVC | Proposed KEIP Payment | % of Prepetition TVC | Proposed KEIP Payment | % of Prepetition TVC |
| Mr. Joyce (CEO)[11] | $746,250 | 22% | $1,365,000 | 38% | $2,302,500 | 64% | $5,208,750 | 144% |
| Mr. Black (CFO) | $313,875 | 25% | $499,500 | 40% | $780,750 | 63% | $1,652,625 | 134% |
| Mr. Mitchell (GC) | $313,875 | 45% | $499,500 | 71% | $780,750 | 111% | $1,652,625 | 236% |
| Total/Average: | $1,374,000 | 30% | $2,364,000 | 50% | $3,864,000 | 79% | $8,514,000 | 171% |

13. The KEIP was originally designed with a target Aggregate Value of $▓ (the "Target") and a payout opportunity of $4,000,000 at this level. At the Target, Mr. Joyce would have received $2,500,000, Mr. Black would have received $750,000, and Mr. Mitchell would have received $750,000, respectively. Following negotiations with the Committee and Second Lien Agent, the Debtors agreed to a $100,000 reduction in Mr. Joyce's Threshold Payment and the reconstruction of $200,000 of such opportunity to reaching certain threshold amounts of Cash, Securities and Credit Bid Value,[12] which value does not take into account the value of any cure

---

(unless permitted by applicable law) which is reasonably likely to result in demonstrable material harm to the Debtors and (e) the participant's material breach of any agreement between the participant and the Debtors which is reasonably likely to result in demonstrable material harm to the Debtors; provided, that the Debtors shall provide the participant with written notice of the events or occurrences described in clauses (a), (b), (c), (d) and (e) and, to the extent curable and reasonably capable of cure, an opportunity to cure within 15 calendar days.

[11] Mr. Joyce's Proposed KEIP Payments are exclusive of any potential Cash and Credit Bid Value Payment.

[12] "Cash, Securities and Credit Bid Value" is defined as the total value of all cash held by the Company, the value of a cash or credit bid, whether paid currently or in installments, securities, other property, and any contingent, earned or other consideration paid or payable, directly or indirectly, by a party pursuant to a Transaction. The value of any such securities (other than indebtedness) or other property or items of value shall be valued at the time of closing without regard to any restrictions on transferability and determined as follows: (a) if such securities are traded on a stock exchange, the value of securities in an established public market shall be the last closing price of such securities prior to consummation of the sale; (b) if such securities have no established public market, or if the consideration utilized consists of property other than securities, the value of such securities or other property shall be the fair market value as determined in good faith. "Cash, Securities and Credit Bid Value" shall not include (a) any cure costs paid by a purchaser and (b) the amount of any prepetition trade claims paid by the Debtors after the petition date, whether pursuant to "first day" relief, settlement, or otherwise to the extent the applicable contracts are assumed and assigned to a purchaser where such amounts would have been cure costs had they not been paid by the Debtors. If any consideration to be paid is computed in a foreign currency, the

costs incurred by a buyer or prepetition trade claims paid by the Debtors. (the "Cash and Credit Bid Value Payment").  Now, at Target, Mr. Joyce would receive $2,400,000, while Mr. Black and Mr. Mitchell will still receive $750,000.

14.     Mr. Joyce is eligible for a $50,000 Cash and Credit Bid Value Payment upon the Cash and Credit Bid Value reaching $■■■■■■■.  Such payment increases by $50,000 with each $■■■■■■■ of Cash and Credit Bid Value attained.  Mr. Joyce would obtain a maximum Cash and Credit Bid Value Payment upon the Cash and Credit Bid Value reaching $■■■■■■■.

15.     Throughout the design, development, and negotiation of the KEIP, my team and I, as well as the Debtors' other advisors, provided updates to the Compensation Committee.  These updates were presented at five Compensation Committee meetings on July 27, 2023, August 1, 2023, August 24, 2023, September 12, 2023, and September 25, 2023, respectively.  During these meetings, FTI and Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul, Weiss") presented on, among other topics, the need for the KEIP and the benchmarking undertaken by my team and me.  The Debtors' advisors provided updates to the Compensation Committee throughout the Debtors' negotiations with the Second Lien Agent and Committee regarding the KEIP.  On September 25, 2023, the Compensation Committee approved the changes to the KEIP.

### D.     Reasonableness of the KEIP

16.     My team and I reviewed the KEIP design, overall cost, and the Debtors' prepetition compensation structure for the KEIP Participants to identify the impact that discontinuing the previous incentive programs would have on the KEIP Participants' Prepetition TVC opportunities.

---

value of such foreign currency shall, for purposes hereof, be converted into U.S. Dollars at the prevailing exchange rate on the date or dates on which such consideration is paid.

9

Key features of the Debtors' prepetition compensation structure are set forth in the declaration of Mary Louise Krakauer (the "Krakauer Declaration").

17. To assess the design, structure, and cost of the KEIP, my team and I analyzed and benchmarked key incentive employee plans in recent chapter 11 cases. *First*, FTI selected a peer group of ten key employee incentive plans that (a) were filed after 2016, (b) had a median funded debt level of approximately $149,900,000 and median total assets of approximately $178,800,000, and (c) involved sales transactions (the "Sale KEIP Peer Group" and the plans thereunder, the "Sale KEIP Peer Group Plans"). The Sale KEIP Peer Group is comprised of companies in differing industries, including technology, telecommunications, and commercial services. *Second*, FTI selected a peer group of eight key employee incentive plans that were (a) filed after 2019, (b) had a median funded debt level of approximately $135,600,000 and median total assets of approximately $108,489,000, and (c) arose in bankruptcies with plans of reorganization and sales (the "Diversified KEIP Peer Group," and with the Sale KEIP Peer Group, the "KEIP Peer Groups" and the plans under the Diversified KEIP Peer Group, "Diversified KEIP Peer Group Plans," and with the Sale KEIP Peer Group Plans, the "KEIP Peer Group Plans"). FTI sought to balance industry, business size, and recency when scoping the KEIP Peer Group Plans to best represent market parameters.

A. **Diversified KEIP Peer Group *($ in 000s)*:**

| # | Company | Date | Industry | Funded Debt | Total Assets | KEIP Target | KEIP % of Funded Debt | KEIP % of Assets |
|---|---|---|---|---|---|---|---|---|
| 1 | Clovis Oncology Inc. | 2022 | Healthcare | $618,300 | $314,980 | $4,350 | *0.70%* | *1.38%* |
| 2 | Agera Energy | 2019 | Electrical Power | $296,700 | $108,489 | $613 | *0.21%* | *0.56%* |
| 3 | Liberty Power Holdings, LLC | 2021 | Electrical Power | $195,000 | $294,889 | $1,100 | *0.56%* | *0.37%* |
| 4 | DCL Holdings | 2022 | Chemicals | $149,800 | n/a | $730 | *0.49%* | *n/a* |
| 5 | EYP Group Holdings Inc. | 2022 | Professional Services | $121,400 | $110,245 | $2,116 | *1.74%* | *1.92%* |
| 6 | Nova Wildcat Shur-Line Holdings | 2023 | Commercial Services | $97,400 | $34,629 | $1,191 | *1.22%* | *3.44%* |
| 7 | MobiTV, Inc. | 2021 | Technology | $30,000 | $19,000 | $795 | *2.65%* | *4.18%* |

| # | Company | Date | Industry | Funded Debt | Total Assets | KEIP Target | KEIP % of Funded Debt | KEIP % of Assets |
|---|---|---|---|---|---|---|---|---|
| 8 | Wave Computing, Inc. | 2021 | Technology | $15,500 | $42,488 | $1,400 | 9.03% | 3.30% |
| | *Benchmark Percentiles* | | | | | | | |
| | 75th Percentile | | | $220,425 | $202,567 | $1,579 | 1.97% | 3.37% |
| | Median | | | $135,600 | $108,489 | $1,146 | 0.96% | 1.92% |
| | 25th Percentile | | | $80,550 | $35,558 | $779 | 0.54% | 0.97% |
| | *Proterra KEIP* | | | | | | | |
| | KEIP @ Target | | | $175,888 | $818,774 | $3,900 | 2.22% | 0.48% |

**B. Sale KEIP Peer Group *($ in 000s)*:**

| # | Company | Date | Industry | Funded Debt | Total Assets | KEIP Target | KEIP % of Funded Debt | KEIP % of Assets |
|---|---|---|---|---|---|---|---|---|
| 1 | OneWeb Global Limited | 2020 | Telecomms. | $1,733,000 | $3,300,000 | $1,903 | 0.11% | 0.06% |
| 2 | BPS US Holdings Inc. | 2016 | Manufacturing | $608,000 | $750,000[1] | $3,553 | 0.58% | 0.47% |
| 3 | Gander Mountain Co. | 2017 | Retail | $602,000 | $750,000[1] | $2,700 | 0.45% | 0.36% |
| 4 | Liberty Power Holdings | 2021 | Electrical Power | $195,000 | $57,600 | $1,100 | 0.56% | 1.91% |
| 5 | Rockall Energy Holdings | 2022 | Oil & Gas | $150,000 | $300,000[1] | $1,500 | 1.00% | 0.50% |
| 6 | DCL Holdings | 2022 | Chemicals | $149,800 | $300,000[1] | $730 | 0.49% | 0.24% |
| 7 | Nova Wildcat Shur-Line | 2023 | Commercial Services | $97,400 | $34,629 | $1,191 | 1.22% | 3.44% |
| 8 | Athenex, Inc | 2023 | Healthcare | $41,900 | $16,833 | $803 | 1.92% | 4.77% |
| 9 | MobiTV, Inc. | 2021 | Technology | $30,000 | $19,000 | $795 | 2.65% | 4.18% |
| 10 | Wave Computing, Inc | 2020 | Technology | $15,500 | $42,488 | $1,400 | 9.03% | 3.30% |
| | *Benchmark Percentiles* | | | | | | | |
| | 75th Percentile | | | $500,250 | $637,500 | $1,803 | 1.74% | 3.40% |
| | Median | | | $149,900 | $178,800 | $1,296 | 0.79% | 1.20% |
| | 25th Percentile | | | $55,775 | $36,594 | $877 | 0.51% | 0.39% |
| | *Proterra KEIP* | | | | | | | |
| | KEIP @ Target | | | $175,888 | $818,774 | $3,900 | 2.22% | 0.48% |

18.     FTI's analysis of the reasonableness of the KEIP considered factors such as (a) the reasonableness of the structure of the proposed KEIP as compared to other plans approved by bankruptcy courts, (b) the reasonableness of the cost of the proposed KEIP relative to plans in other restructurings, and (c) the reasonableness of the KEIP Payments at Target for the KEIP Participants relative to relevant market pay. Based on our review of these factors, I believe that the KEIP is reasonable and appropriate, including the changes made as a result of the negotiations with the Second Lien Agent and Committee.

### i. Design of the KEIP

19. I reviewed the design of the KEIP as compared to the design of the approved key employee incentive plans in the KEIP Peer Groups. The design of the KEIP is generally consistent with observed market practices. Specific design features that are consistent with observed market practices include:

- Range of performance outcomes (i.e., Threshold and Target) and payout levels, which scale linearly once Threshold is reached;

- Using sale-based metrics to measure performance; and

- Requiring sufficient proceeds or assets to pay, after giving effect to all Transactions and any credit bid or debt equitization, the remaining claims of the Second Lien Agent excluding any asserted amounts in relation to a premium on account of the Chapter 11 Cases or otherwise asserted, if any.

20. In my review of the KEIP Peer Groups, I found that sale-based metrics were often utilized for cases undergoing a sale, with threshold amounts typically set in reference to a stalking horse bid amount. Given where the KEIP's Threshold is set and the absence of a stalking horse bid as of the filing of this Declaration, I believe that the KEIP is reflective of typical KEIP metrics approved by bankruptcy courts.

21. Furthermore, while an Excess Threshold Payment could be above the median target of the KEIP Peer Groups, such a payment would only occur following a Transaction with Aggregate Value exceeding the Threshold, which would achieve substantial value for the benefit of the Debtors' estates and stakeholders.

22. As a result of my analyses, I believe that the KEIP's metrics align with common sale chapter 11 key performance indicators and that the KEIP design is reasonable in light of the facts and circumstances of these Chapter 11 Cases.

### ii. Cost of the KEIP and Comparison to Market

23. As also described in the Krakauer Declaration, the Debtors, with the assistance of the Compensation Committee and FTI, compared the KEIP to the KEIP Peer Group Plans. FTI benchmarked the KEIP with market data from various databases that specifically focus on key employee incentive programs approved in chapter 11 cases. As described above, FTI created the KEIP Peer Groups. Following the analysis of the KEIP Peer Groups, FTI determined that the KEIP would pay above the 75th percentiles of the KEIP Peer Group Plans' targets at Target. FTI believes that this structure is appropriate for several reasons.

24. *First*, the Debtors operate in an industry in which talent is highly sought after and compensated. Therefore, the KEIP is designed to motivate the KEIP Participants and to make their compensation commensurate with their additional workloads in the face of this industry wide compensation backdrop. This compensation backdrop is not present in all of the KEIP Peer Group Plans.

25. *Second*, the Debtors, like many technology companies, historically incentivized the KEIP Participants through equity compensation and awards, which the Debtors believe no longer provide their intended incentive-aligning effect. As such, the KEIP Payments are necessary to reintroduce a portion of prepetition incentive compensation opportunities to appropriately motivate the KEIP Participants during the pendency of the Chapter 11 Cases.

26. *Third*, the Marketing Process differs from many bankruptcy sales processes, as the Debtors filed these Chapter 11 Cases without a stalking horse in place, and no stalking horse bid has been selected as of the filing of this Declaration. Therefore, the KEIP accounts for the uncertainty surrounding the Marketing Process and the need to incentivize the KEIP Participants to lead the Debtors through such uncertainty and achieve superior results for the Debtors' estates

13

and stakeholders, notwithstanding that the outcome of such process could result in the loss of the KEIP Participants' employment.

27. *Fourth*, while an Excess Threshold Payment could be above the median target of the KEIP Peer Groups, such a payment would only occur following a Transaction with Aggregate Value exceeding the Threshold, which would achieve substantial value for the benefit of the Debtors' estates and stakeholders.

28. Based on the foregoing analysis and the critical roles the three KEIP Participants perform, I believe that the KEIP is reasonable and justified under the facts and circumstances of these Chapter 11 Cases. The KEIP aligns the KEIP Participants' and Debtors' interests and incentivizes the KEIP Participants to maximize value during these Chapter 11 Cases.

iii. **Comparison of the KEIP to Prepetition Target Compensation**

29. FTI compared the KEIP and the Target to the KEIP Participants' Prepetition TVC. If the KEIP Participants only receive the Threshold Payment, their average compensation as a percentage of their Prepetition TVC would be 31%. At Target, that same percentage is 72%. It is only upon the Aggregate Value significantly exceeding the Threshold that the aggregate KEIP Payments approach Prepetition TVC. For example, if the Aggregate Value reaches $[REDACTED] then the KEIP Participants' average KEIP Payment would be 79% of their Prepetition TVC, and at approximately $[REDACTED] the average KEIP Payment reaches 100% of Prepetition TVC.

30. Based on my experience, employees typically expect, and are incentivized by, pay opportunities that reflect competitive market practice and their historical norms, although the form and structure of incentives is likely to change as a result of a bankruptcy process. Considering the KEIP Participants' Prepetition TVC in sizing the KEIP is very common and critically important to ensure there continues to be a competitive compensation opportunity for the key employees

participating in a KEIP. Based on my analysis, I believe that, with the currently designed KEIP, the KEIP Payments are reasonable and within market norms.

## Conclusion

31. Based on my education, experience, and the work I have done in this case and in similar cases, I believe that the design, structure, and cost of the KEIP is consistent with market practice and fair and reasonable when compared with industry and bankruptcy benchmarks and given the facts and circumstances of these Chapter 11 Cases, and represents award levels that will provide KEIP Participants the opportunity to earn, by achieving challenging performance goals, compensation levels that are within a reasonable range of market practice.

[*Signature page follows.*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.

Executed on September 29, 2023

                                              /s/ *Martin Kuehne*
                                              Martin Kuehne
                                              Senior Managing Director
                                              FTI Consulting, Inc.