# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| PROTERRA INC, *et al.*,[1] | ) Case No. 23-11120 (BLS) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) Ref. Docket No. 163 |

**DECLARATION OF
MARTIN KUEHNE IN SUPPORT OF DEBTORS'
MOTION FOR ENTRY OF AN ORDER APPROVING DEBTORS'
KEY EMPLOYEE RETENTION PLAN AND GRANTING RELATED RELIEF**

I, Martin Kuehne, under penalty of perjury, declare as follows:

1. I am a Senior Managing Director at FTI Consulting, Inc ("FTI"). I am over the age of 18, and I am authorized to submit this declaration (this "Declaration") on behalf of the Debtors in support of the relief requested by the *Debtors' Motion for Entry of an Order Approving Debtors' Key Employee Retention Plan and Granting Related Relief* [Docket No. 163] (the "Motion").[2]

2. Except as otherwise indicated, all facts set forth in this Declaration are based upon (a) my personal knowledge of the Debtors' operations; (b) my review of relevant documents; (c) information provided to me by employees of FTI working under my supervision; (d) information provided to me by, or through discussion with, members of the Debtors' management team, other employees, or the Debtors' other advisors; and/or (e) my expertise in executive compensation, workforce planning and analytics and organizational design based on over thirty years of experience in the field. I am familiar with the structure of the Debtors'

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Proterra Inc (9565); and Proterra Operating Company, Inc. (8459). The location of the Debtors' service address is: 1815 Rollins Road, Burlingame, California 94010.

[2] Capitalized terms used but not defined herein shall have the meanings given to such terms in the Motion.

proposed key employee retention plan (the "KERP").  I have reviewed the Motion and believe that it accurately reflects the circumstances leading to the development of the KERP and the justification and need for the relief requested therein.  If called to testify, I could and would testify competently to each of the facts and opinions set forth herein.

## Professional Background and Qualifications

3. I joined FTI in April 2022 after serving as a Managing Director at Seabury Consulting, where I led Seabury Consulting's human capital consulting efforts globally.  Prior to this, I founded and served as the Chief Executive Officer of Organizational Concepts International, a human resources and management consulting firm.  I have held senior positions at American Express, Wells Fargo, and Northwest Airlines with responsibility for compensation, benefits, organizational design, and leadership development.  I received a Bachelor of Arts from the University of Minnesota and a Masters of Arts in Human Resources and Industrial Relations from the University of Minnesota.  I have extensive experience advising organizations on compensation issues during major financial transitions, including bankruptcies and out-of-court restructurings, and designing and managing related incentive programs and employment agreements.

4. I am knowledgeable about and familiar with the Debtors' business and financial affairs and the circumstances leading to the commencement of these Chapter 11 Cases.  I am also familiar with the Debtors' management team and historical and current compensation programs.  I have reviewed relevant market data on retention payments in chapter 11 cases, assisted the Debtors in developing the KERP, and analyzed whether the KERP is consistent with typical competitive market practice.

5. The Debtors engaged FTI on or around June 23, 2023, and amended and restated its engagement terms on August 7, 2023.  Pursuant to its engagement letter, FTI has, among other things, provided the Debtors with compensation consulting services.

6. FTI is a global business advisory firm dedicated to helping organizations manage change, mitigate risk, and resolve financial, legal, operational, political & regulatory, reputational and transactional issues or disputes. Among other services, this includes expert analysis of executive and management compensation issues including for stressed, distressed, and bankrupt companies. FTI has access to a broad range of market compensation data, including data related to companies in chapter 11 proceedings.

### Development of the KERP

7. The Debtors, with input from FTI and their other advisors, developed the KERP over the course of several weeks after reviewing the Debtors' anticipated needs during these Chapter 11 Cases, the necessary features of a retention program, considerations with respect to the Debtors' use of cash collateral, and the parameters of the Bankruptcy Code. Considering the work remaining to be completed in the Marketing Process and due to the challenges posed by these Chapter 11 Cases, the KERP was designed with the goals of, among other things: (a) preserving, protecting, and maximizing the value of the Debtors' assets for the benefit of the Debtors' estates, and (b) retaining the KERP Participants throughout the Marketing Process. The KERP was also designed with reference to the differing needs of the Debtors' business units.

8. Pursuant to the KERP, the average retention payment that will be made to each KERP Participant is approximately $42,000. Total KERP Payments will not exceed $1.46 million. KERP Payments range from $7,500 to $75,000 per recipient.

9. As approved by the Compensation Committee of the Board, the KERP Payments are a function of the KERP Participants' current compensation within the organization—*i.e.*, 20% of each KERP Participant's base salary—that was adjusted for certain factors, including the KERP Participants' respective (a) critical importance in the Marketing Process and to the Debtors' business; (b) potential risk of attrition; and (c) historical prepetition retention packages.

10.  As described in the Motion, KERP Payments and associated terms will be documented in employee retention letter agreements. KERP Payments will be made upon entry of the order approving the KERP, or as the Debtors determine is reasonably practicable thereafter, provided that the KERP Participant has executed a retention letter agreement, and will be subject to a claw-back provision in the event that the KERP Payments are not fully vested. Full vesting of the KERP Payments will occur upon the six-month or one-year anniversary of the date the KERP Payment is made to the KERP Participant (the "Retention Date") or, if a Corporate Transaction occurs earlier, through the 30-day period following a Corporate Transaction. KERP Payments will also vest immediately upon a KERP Participant's death or disability. The difference with respect to when the Transit KERP Participants' and non-Transit KERP Participants' KERP Payments fully vest is due to the potential expedited Marketing Process for Proterra Transit.[3] Accordingly, average Transit KERP Payments are lower than average Primary KERP Payments.

11.  To the extent that a KERP Participant is involuntarily terminated with cause or voluntarily terminates employment prior to the earlier of (a) the Retention Date or, (b) 30 days following a Corporate Transaction,[4] the KERP Participant will be required to repay to the Debtors the after-tax amount of his or her KERP Payment, and the Debtors have requested the authority to reallocate any such KERP Payment to existing KERP Participants or Additional KERP Participants on the terms set forth in the revised proposed order, filed contemporaneously with this Declaration.

---

[3]  As described in the Motion, one Transit KERP Participant performs payroll services not solely related to Proterra Transit. Motion ¶ 25 n.4.

[4]  "Corporate Transaction" means the first to occur of any of the following events: (a) the sale of the Debtors (including through a merger, recapitalization or sale of substantially all of the assets of the Debtors), or (b) the sale, disposition or winding down of any business unit or division for which the KERP Participant provides substantially all of his or her services.

**Market Analysis of the KERP**

12. To assist the Debtors with the development of a KERP within the range of market terms, FTI reviewed its internal, proprietary database as well as external data sets to identify chapter 11 cases involving approval of key employee retention plans. FTI benchmarked the Debtors' KERP with market data from its proprietary database that specifically focused on key employee retention plans approved in similar chapter 11 cases, as well as external data sets. FTI selected numerous comparison groups, including key employee retention plans approved in recent chapter 11 cases that (a) were filed within the last five years; (b) involved debtors with total funded debt obligations of between approximately $30 million and $650 million; and (c) involved technology, electrical power, or related industries. As a result of this process, FTI identified twelve comparative retention plans (collectively, the "<u>KERP Bankruptcy Peer Group</u>"). The retention plans included in the KERP Bankruptcy Peer Group and relevant information with respect to those plans are detailed in **Appendix 1** attached hereto.

13. The number of KERP Participants is in line with the median number of employees for the retention programs in the KERP Bankruptcy Peer Group. As shown in **Appendix 1**, both the total cost of the KERP and the average KERP Payment are near the 75th percentile of the KERP Bankruptcy Peer Group. Although this represents an upward departure from the median of the plans in the KERP Bankruptcy Peer Group, I believe these higher amounts are reasonable for the reasons set forth below.

14. *First*, the higher KERP Payments, and therefore higher total size of the KERP, are partially due to recent wage inflation which is particularly acute in the electric vehicle market. Such wage inflation is not fully reflected in the average payments under the retention plans in the KERP Bankruptcy Peer Group, as those programs were approved between 2019 and 2023, with the majority being approved in 2021 and 2022.

15. *Second*, the cost to retain talent, particularly for technical expertise in the electric vehicle market, is higher than at any point over the past few years in which the KERP Bankruptcy Peer Group retention plans were approved. The electric vehicle market is experiencing significant growth, and talent with direct industry experience is in high demand and is proactively targeted by recruiters and others businesses in the sector. Because of the significant growth and increased activity in the sector, the labor market in which the Debtors operate is highly competitive, and I believe KERP Participants may receive job offers above standard market compensation in other positions. As such, the cost of retaining the KERP Participants is higher than among the KERP Bankruptcy Peer Group.

16. *Third*, due to the nature of these Chapter 11 Cases, in which the Debtors contemplate selling their assets, there is significant uncertainty regarding the future job prospects of the Debtors' workforce upon a sale. As such, I believe the Debtors must pay an increased premium to retain their key employees throughout the Marketing Process.

17. *Fourth*, as described above, prior to the Petition Date, many of the Debtors' employees received some portion of their overall compensation in equity or received retention awards for which the Debtors have not sought authority to continue granting postpetition, which has led to a perceived loss in overall compensation among the Debtors' employees. As such, I believe higher KERP Payments are necessary to compensate the KERP Participants for this perceived loss in compensation.

18. *Finally*, the total size of the KERP represents a higher amount as a percentage of the Debtors' total funded debt obligations than the median in the KERP Bankruptcy Peer Group. This is in line with the general trend in the KERP Bankruptcy Peer Group that as funded debt obligations decrease, the KERP size as a percentage of funded debt obligations increases, as

the denominator becomes smaller. As there is a minimum threshold value that participants must receive for their retention packages to achieve their intended retentive effect, the numerator does not also decrease proportionally. Therefore, given that they have total lower average funded debt obligations than others within the KERP Bankruptcy Peer Group, I believe it is reasonable that the Debtors' KERP as a percentage of funded debt is elevated.

19. Based on the foregoing, I believe that the KERP is reasonable and in line with industry standards as compared to key employee retention plans implemented and approved in comparable chapter 11 cases.

[*Signature page follows.*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge and belief.

Executed on September 29, 2023

<u>/s/ *Martin Kuehne*</u>
Martin Kuehne
Senior Managing Director
FTI Consulting, Inc.

**Appendix 1**

**KERP Bankruptcy Peer Group[5]**

| Debtor | Year | Jurisdiction | KERP Participants | Funded Debt | Total KERP Size | Average KERP Per Participant |
|---|---|---|---|---|---|---|
| Clovis Oncology Inc. | 2022 | D. Del. | 82 | $618,300 | $1,775 | $22 |
| Voyager Digital Holdings LLC | 2022 | S.D.N.Y. | 38 | $500,000 | $1,900 | $50 |
| Sunguard AS New Holdings | 2022 | S.D. Tx. | 121 | $423,800 | $4,000 | $33 |
| Agera Energy | 2019 | S.D.N.Y, | 30 | $296,700 | $1,150 | $38 |
| Lifesize, Inc | 2023 | S.D. Tx. | 8 | $250,000 | $1,000 | $125 |
| Liberty Power Holdings, LLC | 2021 | S.D. Fla. | 29 | $195,000 | $750 | $26 |
| Packable Holdings LLC | 2022 | D. Del. | 344 | $149,100 | $903 | $3 |
| Teligent, Inc. | 2021 | D. Del. | 11 | $105,000 | $172 | $16 |
| Nova Wildcat Shur-Line Holdings | 2023 | D. Del. | 22 | $97,400 | $816 | $37 |
| MobiTV, Inc. | 2021 | D. Del. | 79 | $30,000 | $1,230 | $16 |
| Genapsys Inc | 2023 | D. Del. | 36 | $30,000 | $700 | $19 |
| Wave Computing Inc | 2021 | N.D. Ca. | 18 | $15,500 | $905 | $50 |
| | | | | | | |
| 75th percentile | | | 80 | $328,475 | $1,366 | $41 |
| Median | | | 33 | $172,050 | $953 | $29 |
| 25th percentile | | | 21 | $80,550 | $800 | $18 |
| | | | | | | |
| **Proterra KERP** | | | **35** | **$175,888** | **$1,456** | **$42** |

---

[5] All dollar amounts are in thousands.