IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>PROTERRA INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 23-11120 (BLS)<br><br>(Jointly Administered)<br><br>Objection Deadline: October 16, 2023 at 4:00 p.m. (ET)<br><br>Re: Docket No. 279 |

**OBJECTION OF THE SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY TO NOTICE OF (I) POTENTIAL ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND (II) PROPOSED CURE AMOUNTS**

The Southeastern Pennsylvania Transportation Authority ("SEPTA"), by and through its undersigned counsel, hereby files this objection (the "Objection") to the *Notice Of (I) Potential Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases And (II) Proposed Cure Amounts* [Docket No. 279] (the "Assumption Notice")[2] filed by the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), and, in support thereof, respectfully states as follows:

**BACKGROUND**

**A.     The Contract**

1.     Prior to the Petition Date (defined herein), in or about August of 2016, SEPTA issued a Request for Proposal (an "RFP") to solicit proposals from contractors to supply SEPTA with a fleet of electric transit buses.

---

[1] Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Proterra Inc. (1379); and Proterra Operating Company, Inc. (8459). The location of the Debtors' service address is: 1815 Rollins Road, Burlingame, California 94010.

[2] Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to such terms in the Assumption Notice.

2.      In accordance with the RFP, Proterra Inc. ("Proterra") submitted a bid proposal to manufacture and deliver the desired electric buses that SEPTA ultimately accepted.

3.      In connection therewith, SEPTA entered into a Contract with Proterra on February 2, 2017 (the "Contract") pursuant to which Proterra agreed to supply SEPTA with 25 heavy duty, forty (40') foot battery-electric transit buses equipped for use by SEPTA's transit passengers.

4.      Per the Contract, the buses were to have a twelve (12) year or 500,000 mile design life and a maintenance-free exterior.

5.      In consideration for this fleet of electric buses, SEPTA agreed to pay Proterra the sum of $23,756,815.54 (the "Purchase Price").

6.      Between the years 2018 and 2019, Proterra delivered the electric buses to SEPTA, and SEPTA paid the Purchase Price to Proterra.

7.      Unfortunately, since receiving the electric buses from Proterra, SEPTA has found them to be plagued with problems that have kept them out of service, thus, rendering them useless to SEPTA and its riders.

8.      These problems include, but are not limited to, Proterra's delivering SEPTA buses with (i) axles insufficient to support the weight of a fully loaded bus; (ii) the cooling system for the electric buses' batteries, mounted to the roof of the buses, being improper and inadequately attached as the brackets holding these cooling systems in place failed and cracked; and (iii) the brackets connecting the bus seats to the floor being inadequate, specifically, the brackets were insufficient to hold the seats to the floor[3].

---

[3] SEPTA hereby incorporates by reference the discussion of the material defects and defaults under the Contract, as well as the numerous steps taken to address and/or remediate the same, set forth in the Addendum to SEPTA's proof of claim, filed on October 16, 2023 against Proterra (the "SEPTA Proof of Claim").

9. Further, in April 2019, before Proterra had completed delivery of the fleet of 25 electric buses ordered by SEPTA, and before the fleet of electric buses was placed into full revenue service, SEPTA discovered, during the course of routine maintenance and inspections, cracks in the bodies of the electric buses that Proterra designed, manufactured, and sold to SEPTA.

10. Following the identification of these cracks, Proterra issued a letter, dated May 31, 2019, to SEPTA claiming that the cracks observed in the bodies of the electric buses were merely "cosmetic" and that they "were either of the gel-coat variety" – referring to the thin gel-coat layer on the exterior of the bus – "or resin rich areas that do not transition to structural piles of the vehicle."[4] In this letter, Proterra "certifie[d] that these cracks will not result in failures that can compromise the performance or safety of passengers." *Id.*

11. However, as of the date hereof, SEPTA has not been provided definitive evidence to support this claim.

12. Because the full extent of these cracks and whether they propagated to and compromised the structural body of the electric buses was unknown to SEPTA, SEPTA promptly and prudently removed the electric buses from revenue service.

13. SEPTA also promptly notified Proterra of the cracks, declaring a fleet-wide defect pursuant to the parties' Contract.[5]

14. Shortly thereafter, representatives from Proterra and TPI Composites, Inc. ("TPI"), an engineering firm selected by Proterra to assist in the evaluation of the cracks, conducted an on-site inspection of the electric-bus fleet.

---

[4] A copy of Proterra's May 31, 2019 letter to SEPTA was attached as Exhibit A to the SEPTA Proof of Claim.

[5] A copy of SEPTA's July 2, 2019 Letter to Proterra was attached as Exhibit B to the SEPTA Proof of Claim.

15. Proterra also represented that "[t]he 'as manufactured' design condition and the repair condition have been analyzed to ensure that the repair is as good or better than the original design." *Id.* Indeed, Proterra's structural designer represented that Proterra's repairs were designed to be permanent.

16. Despite these representations by Proterra and its structural designer, by February of 2020, cracks again began to reform and appear near the window and door openings in the body of the electric buses.

17. As a result of these newly formed cracks, SEPTA was again required to promptly and prudently remove the Proterra fleet of electric buses from revenue service, and to again promptly notify Proterra of this serious and recurring defect, and to again declare that "the Fleet Defect issued in July 2, 2019 is still in effect."[6]

18. Following the re-development of cracks in the bodies of the electric buses, Proterra continued to maintain that the cracks were merely cosmetic.

19. However, Proterra reversed course on its previous representations that its repair, performed in 2019, would be permanent, stating that it was not possible to permanently repair the cracks and that SEPTA would have to engage in an ongoing, time-consuming, and costly practice of maintenance campaigns to identify and repair the cracking. Not only was this an about face from Proterra's prior representations, it was in direct contrast to the Contract's requirement that the buses have a maintenance-free exterior (and 12-year design life).

20. On August 19, 2020, SEPTA, Proterra, and LTK Engineering Services ("LTK"), an engineering firm selected by SEPTA to help evaluate the cracks, conducted a further review of SEPTA's electric-bus fleet to determine the scope and cause of the cracks.

---

[6] A copy of the June 8, 2020 Letter from SEPTA to Proterra was attached as Exhibit C to the SEPTA Proof of Claim.

21. Due to the high number of observable cracks, SEPTA and LTK selected a subset of cracks for the parties to analyze during the inspection. To conduct the analysis, LTK first used ultrasonic scanning to acquire measurement data for the pre-selected areas, and then Proterra conducted destructive crack excavations[7].

22. The parties' inspection identified numerous design and/or manufacturing irregularities and defects affecting the thickness and uniformity of the electric buses' body composition and construction, raising serious questions and concerns regarding Proterra's manufacturing process and the adequacy and reliability of the electric buses it produced, and whether they could meet the contracted for 12-year design life.

23. The parties also identified a crack on Bus 923 that Proterra previously repaired. Although the area was originally repaired for skincoat and resin-rich cracks, the same area presented gelcoat cracks on the subsequent inspection. Additionally, while the parties' August 2020 review identified a large number of defects, their inspection and corresponding analysis was constrained by the fact that they were only able to inspect a subset of the cracks.

24. Proterra also hired LPI, Inc. ("LPI"), an engineering and consulting firm, to produce an independent analysis of the cracking issue experienced by SEPTA. Amazingly, LPI not only predicted that the cracking would continue, it predicted that *structural cracks would appear within six to eight years* – far sooner than the 12-year design life SEPTA contracted for – and recommended performing destructive grinding of all cracks to determine if the cracks were structural. Of note, the areas in which LPI anticipates structural failure correspond to locations at which SEPTA has identified cracks in the bodies of the electric buses.

---

[7] The destructive crack excavations involved the use of a series of tools, including rotary tools, cylindrical files, and belt sanders to peel away layers of the bus one at a time in an attempt to determine the depth of the identified cracks.

25. Furthermore, the foregoing issues, all relating to poorly implemented design choices and poor craftsmanship and workmanship, were in direct breach of the Proterra's duties and obligations under the Contract[8].

26. In addition to the foregoing, SEPTA believes that Proterra was also primarily responsible for causing a fire to one of the buses purchased by SEPTA (*e.g.*, Bus No. 912).

27. Specifically, Proterra provided SEPTA with instructions on how to start that bus in connection with Proterra's efforts to address the cracks identified in the buses purchased by SEPTA. While that bus was charging, the battery in Bus No. 912 erupted and burned uncontrollably, resulting in the total loss of this bus.

28. SEPTA believes that this fire was caused by a manufacturer defect that permitted liquid/moisture to enter and accumulate inside the battery packs. Notably, Proterra did not dispute this and, in fact, issued a safety recall for 19 buses, stating "[v]ehicles within the recall population have reported a fault code and other data that signals there may be liquid inside one or more 400V battery packs (the "Battery Pack") onboard these vehicles. Over time, the accumulation of liquid inside the Battery Pack enclosure may reach a level that could result in the occurrence of a thermal event."

29. Eight of SEPTA's buses that were purchased from Proterra are affected by (or are the subject of) the recall. Proterra's recall letter acknowledges that this defect renders those buses inoperable, stating: "[u]ntil a remedy has been provided by Proterra, please park the vehicle outside

---

[8] As a result of the foregoing breaches of the Contract, prior to the Petition Date, SEPTA and Proterra commenced a mediation to mediate these issues. The mediation has been stayed by Proterra's commencement of the instant proceedings.

in a safe location and refrain from further use of the vehicle, including but not limited to driving the vehicle or charging the vehicle's batteries." [9]

30. As admitted by Proterra, the batteries are irreparable.

31. However, although Proterra has represented it would do so, Proterra has not replaced the batteries; it also has not replaced or compensated SEPTA for the complete loss of Bus No. 912.

32. In short, SEPTA paid Proterra approximately $24 million for twenty five buses that are a total loss. Proterra's failure to deliver such a fleet of buses to SEPTA deprived SEPTA of the benefit of the bargain it struck and SEPTA should be reimbursed for the entire Purchase Price together with all other expenses and losses incurred by SEPTA in connection therewith, including the cost to investigate and address the cracks in its newly purchased fleet of electric buses.

**B.     The Bankruptcy Case**

33. On August 7, 2023, the above-captioned debtors (collectively, the "Debtors") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court").

34. On September 7, 2023, the Court entered the *Order (A) Approving Bidding Procedures to Govern the Sale of All or Substantially All of the Debtors' Assets Pursuant to Section 363 of the Bankruptcy Code, (B) Approving Procedures Regarding Entry Into One or More Stalking Horse Agreements, (C) Establishing Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases, (D) Approving the Form and Manner of the Notice of Assumption and Assignment of Executory Contracts and Unexpired Leases, (E) Scheduling*

---

[9] A copy of copy of Proterra's recall letter is was attached as Exhibit D to the SEPTA Proof of Claim.

*Auctions for the Sales of the Company Assets and Hearings to Consider Approval of the Sales and Approving the Form and Manner of the Notice Thereof, and (F) Granting Related Relief* [Docket No. 218] (the "<u>Bidding Procedures Order</u>"), approving, among other things, procedures in connection with the assumption and assignment of any executory contracts or unexpired leases the Debtors seek to have assumed and assigned in connection with a Potential Transaction.

35. Pursuant to the Bidding Procedures Order, on September 25, 2023, the Debtors filed the Assumption Notice.

36. The Debtors listed the following agreements with SEPTA on the Assumption Notice (collectively, the "<u>Identified Contracts</u>") and assert that the associated Cure Amounts for each Identified Contract is $0.00.

| # | Counterparty | Contract Description | Contract Agreement Date | Debtor(s) | Cure Amount |
|---|---|---|---|---|---|
| 2255 | Southeastern Pennsylvania Transportation Authority | Section 3: Contract and General Conditions (16-00167-AJAC) | 2/2/2017 | Proterra Operating Company, Inc. | $ - |
| 2256 | Southeastern Pennsylvania Transportation Authority | Letter re: Purchase Order No. S887603 | 2/24/2017 | Proterra Operating Company, Inc. | $ - |
| 2257 | Southeastern Pennsylvania Transportation Authority | Purchase Order (S 887603) | 2/24/2017 | Proterra Operating Company, Inc. | $ - |

37. As evident above, the Assumption Notice fails to identify with specificity the contract(s) that may be subject to a potential assumption and assignment to the Successful Bidder, but asserts that, nevertheless, the Cure Amount is $0.00. Upon information and belief, however, SEPTA believes the Debtors intend that the Contract is, in fact, the actual contract that the Debtors added to the Assumption Notice, especially since this is the only contract between the parties.

**OBJECTION**

38. SEPTA hereby objects to the Assumption Notice on the basis that (i) the material defaults under the Contract that Proterra concedes cannot be cured and as such, the Contract may not be assumed and assigned; (ii) the nature and terms of the Contract preclude assignment without SEPTA's consent, which has not been sought or given; (iii) the proposed Cure Amount is incorrect; and (iv) the Successful Bidder must provide SEPTA adequate assurance of future performance, which SEPTA has not yet received.

**I.  The Contract Cannot Be Assumed And Assigned Because The Material Defaults Thereunder Cannot Be Cured.**

39. A debtor generally may not assume and assign a contract unless the debtor cures all defaults thereunder, compensates any party to the contract who incurred a pecuniary loss resulting from such default, and provides adequate assurance of future performance thereunder. *See* 11 U.S.C. § 365(b)(1)(A)-(C).

40. Courts have considered whether a debtor is precluded from assuming an executory contract under Bankruptcy Code Section 365(b) after committing a non-monetary default that cannot be cured. *See In re Claremont Acquisition Corp., Inc.*, 113 F.3d 1029, 1033 (9th Cir. 1997) (debtor's failure to operate a car dealership for seven consecutive business days constituted a non-monetary default which was a historical fact that could not be cured); *In re New Breed Realty Enters., Inc.,* 278 B.R. 314, 320 (Bankr. E.D.N.Y. 2002) (debtor failed to close a sale pursuant to a time of the essence closing date, resulting in a non-monetary default which was a historical fact unable to be cured).

41. Certain courts have required that the default must be material or cause substantial economic detriment before a debtor is precluded from assuming an executory contract. *See In re Joshua Slocum Ltd.,* 922 F.2d 1081, 1092 (3d Cir. 1990); *In re New Breed Realty Enters.*, Inc., 278

B.R. at 321 ("the failure to close by the specified closing date in a sales contract that declared time to be of the essence is a material breach which terminates the defaulting party's right to enforce the contract.").

42. Here, Proterra has breached virtually every term and every obligation owing under the Contract, entitling SEPTA to a complete and total refund of the Purchase Price plus other costs and fees.

43. Proterra delivered to SEPTA twenty five buses that were riddled with rampant and repeated serious defects, rendering them a hazard to utilize in transporting the general public. These buses, in other words, are a total loss.

44. Proterra's failure to deliver such a fleet of buses and to otherwise perform its obligations under the Contracts deprived SEPTA of the benefit of the bargain and caused SEPTA to incur substantial fees and other losses.

45. At every turn, Proterra has failed to perform its obligations and provide safe, reliable products to SEPTA for use by its public riders. These material defaults persisted even after Proterra allegedly attempted to remediate and cure such deficiencies.

46. These are not defaults of a type that can be cured solely by economic remuneration and, at this point, have grown to such an extent that, even Proterra admits, their cure is impossible. Consequently, the Contract cannot be assumed and assigned.

**II.    The Nature and Terms of the Contract Preclude Assignment.**

47. To the extent a cure of the above-referenced material defaults is not determined to be impossible, the Contract cannot be assumed and assigned without the consent of SEPTA, which consent has not be sought or given.

48. If non-bankruptcy law provides that SEPTA would have to consent to an assignment of the Contract to a third party, *i.e.*, someone other than the debtor or the debtor in possession, then the Debtor, cannot assume that contract. 11 U.S.C. § 365(c)(1); *see also*, *In re W. Elecs., Inc.*, 852 F.2d 79, 83 (3d Cir. 1988) (contract for the manufacture of military equipment was personal services contract which was non-assignable under government anti-assignment statute and § 365(c)(1)).

49. Pennsylvania law precludes the assignment of personal service contracts. *See, e.g, Saxe v. Feinstein*, 366 Pa. 473, 476 (1951) ("[w]hile a party to a contract may assign his rights and benefits thereunder, he may not, unless the contract so provides, assign his liability under the contract to perform duties involving his personal ability, integrity, credit or responsibility.").

50. "A personal services contract has been defined as '[a] contract which contemplates the performance of personal services involving the exercise of special knowledge, judgment, taste, skill, or ability.'" *Holber v. Segal (In re Segal)*, 579 B.R. 734, 747 (E.D. Pa. 2016) (citation omitted).

51. Whether a contract is for personal services depends upon the *sui generis* attributes of the intended performance and whether such services are considered delegable. *In re Rooster, Inc.*, 100 B.R. 228, 233 (Bankr. E.D. Pa. 1989). Corporations can enter into such contracts. *Id.* (citing *Ford, Bacon & Davis, Inc. v. Holahan,* 311 F.2d 901, 904 (5th Cir. 1962), *cert. denied,* 373 U.S. 913, 83 S. Ct. 1303, 10 L. Ed. 2d 414 (1963)).

52. Generally, non-delegable duties have been determined to be of a personal nature whenever the performance depends upon a special relationship, special knowledge, or a unique skill, upon which the other party is entitled to rely. *Id.*

53. Here, the identity, reputation and skillset of Proterra was a material component to SEPTA when accepting the RFP and entering into the Contract. The Contract required its counterparty to provide and perform specialized services directed at ultimately delivering highly specialized products for the use and enjoyment of the general public.

54. The buses and various components thereof that Proterra is delivering under the Contact are products that not just any party can simply begin delivering and maintaining, especially when the safety and welfare of the general public, which will be utilizing such products, is taken into consideration.

55. Accordingly, SEPTA intended the special relationship with Proterra, and the services and other duties contemplated under the Contract, to be personal in nature. SEPTA should not be forced to accept services from a currently-unknown third party and utilize those services in serving the people of Pennsylvania.

56. Furthermore, Section 3.3.1 of the Contract, by its terms, specifically provides that Proterra "shall not sell, assign, transfer or dispose of any interest in the Contact without the prior written consent of SEPTA thereto. SEPTA shall not be obligated to give such consent."

57. As a result, § 365(c)(1) of the Bankruptcy Code precludes the Debtor from assigning personal services owing SEPTA under the Contract to an assignee unknown and unfamiliar to SEPTA without SEPTA's consent, which has not been sought or given.

### III.   The Cure Amount Is Incorrect.

58. SEPTA further objects to the proposed Cure Amount for the Contract listed in the Assumption Notice.

59. According to SEPTA's books and records, the Cure Amount for the Contract as of October 11, 2023 is **$23,145,884.62** (the "Actual Cure Amount").

60. Section 365(b)(1) of the Bankruptcy Code provides that a debtor may not assume an unexpired lease or executory contract on which there has been a default unless it: (a) cures the default or provides adequate assurance that the default will be promptly cured; (b) compensates or provides adequate assurance that any pecuniary loss of the counterparty resulting from the default will be promptly compensated; and (c) provides adequate assurance of future performance under the contract. 11 U.S.C. § 365(b)(1); *see also Kimmelman v. Port Auth. of N.Y. & N.J. (In re Kiwi Int'l Air Lines, Inc.),* 344 F.3d 311, 317-18 (3d Cir. 2003) ("In order to assume [an executory contract or unexpired lease], the debtor in possession must cure defaults and provide assurance of future performance.").

61. SEPTA therefore objects to the stated Cure Amount of the Contract and asserts that, in order for Proterra to assume and assign the Contract, the Debtors must, *inter alia*, pay the Actual Cure Amount plus any obligations incurred thereunder through the date of assumption.

**IV.   The Successful Bidder Must Provide Adequate Assurance of Future Performance.**

62. In addition to each of the foregoing arguments, the Contract may not be assumed and assigned unless SEPTA is provided adequate assurance of future performance. *See* 11 U.S.C. §§ 365(b)(1)(C) & 365(f)(2).

63. As outlined above, the Contract imposes significant performance obligations in connection with the production, delivery and maintenance of buses and related components thereof that Proterra must comply with, all of which necessarily will be assumed by the Successful Bidder should the Contract be assumed and assigned under any Potential Transaction.

64. SEPTA however, has not yet been definitively advised as to whether any Successful Bidder intends to seek assignment of the Contract. SEPTA accordingly does not have, and the Debtors have not supplied, any information, much less sufficient information or a reasonable

amount of time, to determine if a Successful Bidder would be capable of providing adequate assurance of future performance.

65. Therefore, SEPTA objects to the Assumption Notice and any Potential Transaction on the basis that SEPTA does not have adequate assurance of future performance as required by § 365(f)(2) of the Bankruptcy Code.

### RESERVATION OF RIGHTS

66. SEPTA expressly reserves the right to make such other and further objections as may be appropriate or necessary with respect to the Potential Transaction and the Assumption Notice, including but not limited to, any additional objections regarding the prospective assumption and assignment of the Contract.

**WHEREFORE**, to the extent the Debtors seek to assume and assign the Contract, SEPTA respectfully requests that the Court order that (i) any assumption and assignment of the Contract be conditioned upon SEPTA's express consent and (ii) the Cure Amount for the Contract be established as **$23,145,884.62**.

Dated: October 16, 2023            **DUANE MORRIS LLP**

*/s/ Lawrence J. Kotler*
Lawrence J. Kotler (DE 4181)
Drew S. McGehrin (DE 6508)
1201 N. Market Street, Suite 501
Wilmington, Delaware  19801
Tel: 302-657-4900
Fax: 302-657-4901
Email: ljkotler@duanemorris.com
         dsmcgehrin@duanemorris.com

*Counsel to SEPTA*