## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| PROTERRA INC, *et al.*,[1] | Case No. 23-11120 (BLS) |
| Debtors. | (Jointly Administered) |
| | **Sale Hearing: Nov. 28, 2023 at 10:00 a.m. (ET)** |

## NOTICE OF SUCCESSFUL BIDDER
## REGARDING DEBTORS' POWERED ASSETS

**PLEASE TAKE NOTICE** that, on September 7, 2023, the United States Bankruptcy Court for the District of Delaware (the "Court") entered that certain *Order (A) Approving Bidding Procedures to Govern the Sale of All or Substantially All of the Debtors' Assets Pursuant to Section 363 of the Bankruptcy Code, (B) Approving Procedures Regarding Entry Into One or More Stalking Horse Agreements, (C) Establishing Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases, (D) Approving the Form and Manner of the Notice of Assumption and Assignment of Executory Contracts and Unexpired Leases, (E) Scheduling Auctions for the Sales of the Company Assets and Hearings to Consider Approval of the Sales and Approving the Form and Manner of the Notice Thereof, and (F) Granting Related Relief* [Docket No. 218] (the "Bidding Procedures Order"),[2] approving certain dates, deadlines, and procedures for the potential sale of all or substantially all of the Debtors' assets (the "Bidding Procedures").

**PLEASE TAKE FURTHER NOTICE** that, in accordance with paragraph 31 of the Bidding Procedures Order, on October 13, 2023, the Debtors filed the *Notice of Revised Dates Relating to the Bidding Procedures Deadline for (I) Proterra Energy; and (II) Proterra Transit* [Docket No. 368], and on November 7, 2023, the Debtors filed the *Second Notice of Revised Dates Relating to Bidding Procedures Deadlines for Proterra Energy* [Docket No. 514] (collectively, the "Notices of Revised Dates").

**PLEASE TAKE FURTHER NOTICE** that, pursuant to paragraph 14 of the Bidding Procedures Order, on November 9, 2023, the Debtors, in consultation with the Consultation Parties, commenced an Auction for the Company Assets related to Proterra Powered. The Auction concluded at approximately 6:28 p.m. (prevailing Eastern Time) on the same day, November 9, 2023. The proceedings were conducted in accordance with the Bidding Procedures.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to paragraph 9 of the Bidding Procedures Order, the Debtors, in consultation with the Consultation Parties, selected Volvo

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Proterra Inc (9565); and Proterra Operating Company, Inc. (8459). The location of the Debtors' service address is: 1815 Rollins Road, Burlingame, California 94010.

[2]   All capitalized terms used but not otherwise defined herein shall be given the meanings ascribed to them in the Bidding Procedures Order or the Bidding Procedures, as applicable.

Battery Solutions LLC as the Successful Bidder at the conclusion of the Auction. The Debtors and the Successful Bidder agreed to an asset purchase agreement, attached hereto as **Exhibit A** (the "APA").

**PLEASE TAKE FURTHER NOTICE** that on **November 28, 2023 at 10:00 a.m. (prevailing Eastern Time)**, a hearing (the "Sale Hearing") will be held before the Honorable Brendan Linehan Shannon, United States Bankruptcy Judge, to consider the entry of the Sale Order authorizing the Debtors and the Successful Bidder to consummate the transactions provided for by the APA. Pursuant to the Bidding Procedures Order, and as reflected in the subsequent Notices of Revised Dates, objections, if any, (i) to the conduct at the Auction or (ii) solely with respect to the Non-Debtor Counterparties to the Contracts, to the specific identity of and adequate assurance of future performance provided by the Successful Bidder, must be filed by **Friday, November 17, 2023 at 4:00 p.m. (prevailing Eastern Time)**.

**PLEASE TAKE FURTHER NOTICE** that the Sale Hearings (or any portion thereof) may be adjourned by the Debtors, in consultation with the Consultation Parties, from time to time without further notice other than by announcement in open court or through the filing of a notice or other document on the Court's docket.

**PLEASE TAKE FURTHER NOTICE** that copies of the Bidding Procedures, Bidding Procedures Order, and other pleadings filed in these chapter 11 cases may be obtained free of charge by visiting the website of the solicitation agent, Kurtzman Carson Consultants, LLC, at https://kccllc.net/proterra. You may also obtain pleadings filed in these chapter 11 cases by visiting the Court's website via PACER at http://deb.uscourts.gov.

*[Remainder of page intentionally left blank]*

Dated: November 10, 2023  
Wilmington, Delaware

Respectfully submitted,

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*Andrew L. Magaziner*
Pauline K. Morgan (No. 3650)
Andrew L. Magaziner (No. 5426)
Shella Borovinskaya (No. 6758)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email:  pmorgan@ycst.com
        amagaziner@ycst.com
        sborovinskaya@ycst.com

- and -

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Paul M. Basta (admitted *pro hac vice*)
Robert A. Britton (admitted *pro hac vice*)
Michael J. Colarossi (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Tel:    (212) 373-3000
Fax:    (212) 757-3990
Email:  pbasta@paulweiss.com
        rbritton@paulweiss.com
        mcolarossi@paulweiss.com

*Counsel to the Debtors and Debtors in Possession*

30963171.1

## Exhibit A

## Asset Purchase Agreement

ASSET PURCHASE AGREEMENT

by and among

PROTERRA INC,

PROTERRA OPERATING COMPANY, INC.

("**Sellers**")

and

VOLVO BATTERY SOLUTIONS LLC

("**Purchaser**")

and

MACK TRUCKS, INC.

("**Purchaser Parent**"),

for the limited purposes set forth herein


DATED AS OF NOVEMBER 9, 2023

# TABLE OF CONTENTS

Page

ARTICLE I Definitions ......................................................................................... 1

    Section 1.1    Certain Definitions ............................................................ 1

    Section 1.2    Construction of Certain Terms and Phrases .................................... 24

ARTICLE II Purchase and Sale and Assumption.......................................... 25

    Section 2.1    Purchase and Sale of Acquired Assets ........................................... 25

    Section 2.2    Excluded Assets.............................................................................. 26

    Section 2.3    Assumed Liabilities ........................................................................ 26

    Section 2.4    Excluded Liabilities ........................................................................ 26

    Section 2.5    Assignment and Cure Amounts....................................................... 26

    Section 2.6    Bulk Sales Laws ............................................................................. 28

ARTICLE III Purchase Price .............................................................................. 28

    Section 3.1    Purchase Price; Earnest Deposit ..................................................... 28

    Section 3.2    Withholding of Tax ......................................................................... 29

    Section 3.3    Allocation of Consideration............................................................ 29

    Section 3.4    Determination of Closing Inventory................................................ 30

    Section 3.5    Disputes Regarding Closing Statement ........................................... 30

    Section 3.6    Manner of Payment of Purchase Price ........................................... 31

    Section 3.7    Time and Manner of Payment of Purchase Price Adjustment........................ 31

ARTICLE IV Closing Matters.............................................................................. 32

    Section 4.1    Closing ........................................................................................... 32

    Section 4.2    Deliveries at Closing ...................................................................... 33

    Section 4.3    Further Assurances and Cooperation............................................... 35

ARTICLE V Representations and Warranties .................................................. 37

    Section 5.1    Representations and Warranties of Seller........................................ 37

    Section 5.2    Representations and Warranties of Purchaser ................................. 54

ARTICLE VI Regulatory Matters ....................................................................... 57

    Section 6.1    Regulatory Filings .......................................................................... 57

    Section 6.2    Cooperation: Confidentiality .......................................................... 58

    Section 6.3    Objections or Other Challenges...................................................... 58

ARTICLE VII Certain Covenants ....................................................................... 59

    Section 7.1    Conduct of Business Pending Closing............................................. 59

Section 7.2    Efforts to Satisfy Closing Conditions................................................................ 62

Section 7.3    Assets Incapable of Transfer ......................................................................... 62

Section 7.4    Discovery of Breach; Notification.................................................................. 63

Section 7.5    Ability to Supplement Disclosure Schedules ................................................. 63

Section 7.6    Restricted Use of Confidential Information ................................................... 64

Section 7.7    Review and Inspections.................................................................................. 64

Section 7.8    No Use of Sellers Brand ................................................................................ 65

Section 7.9    Support Obligations ....................................................................................... 65

Section 7.10   Casualty ......................................................................................................... 65

Section 7.11   Intellectual Property ...................................................................................... 65

Section 7.12   Background License ....................................................................................... 66

Section 7.13   License to Sellers Brand ................................................................................ 67

Section 7.14   Successor Liability ......................................................................................... 67

Section 7.15   Receipt of Misdirected Assets ....................................................................... 67

Section 7.16   No Other Representations .............................................................................. 68

Section 7.17   Purchaser Parent Guarantee.......................................................................... 68

Section 7.18   Transition Services Agreement ..................................................................... 69

ARTICLE VIII Employee Matters ........................................................................................ 69

Section 8.1    Transferred Employees................................................................................... 69

Section 8.2    Benefits Matters ............................................................................................. 70

Section 8.3    Labor Matters ................................................................................................. 70

Section 8.4    Benefits Eligibility......................................................................................... 70

Section 8.5    WARN Act ..................................................................................................... 71

Section 8.6    Bonuses .......................................................................................................... 71

Section 8.7    Benefit Plans.................................................................................................. 71

ARTICLE IX Conditions to Closing ..................................................................................... 71

Section 9.1    Conditions to the Obligations of Purchaser.................................................. 71

Section 9.2    Conditions to the Obligations of Sellers....................................................... 72

Section 9.3    Conditions Precedent to Obligations of Purchaser and Sellers ..................... 73

Section 9.4    Frustration of Closing Conditions ................................................................. 74

ARTICLE X Termination ....................................................................................................... 74

Section 10.1   Termination .................................................................................................... 74

Section 10.2   Effect of Termination ..................................................................................... 75

Section 10.3   Exclusive Remedies........................................................................................ 76

ARTICLE XI Bankruptcy Matters.................................................................................. 77

    Section 11.1    Bankruptcy Cases ................................................................... 77

    Section 11.2    Bankruptcy Court Approvals.................................................. 77

    Section 11.3    Further Filings and Assurances .............................................. 78

    Section 11.4    Notice of Sale ........................................................................ 78

    Section 11.5    Avoidance Actions ................................................................. 78

    Section 11.6    Free and Clear ....................................................................... 78

    Section 11.7    Transfer Taxes ....................................................................... 78

ARTICLE XII Miscellaneous ..................................................................................... 79

    Section 12.1    Survival.................................................................................. 79

    Section 12.2    Governing Law and Jurisdiction............................................ 79

    Section 12.3    Notices .................................................................................. 80

    Section 12.4    Amendments and Waivers ..................................................... 81

    Section 12.5    Entire Agreement................................................................... 82

    Section 12.6    Headings: Interpretation ........................................................ 82

    Section 12.7    No Assignment: Binding Effect ............................................ 82

    Section 12.8    Counterparts........................................................................... 82

    Section 12.9    Incorporation by Reference ................................................... 82

    Section 12.10   Time of the Essence............................................................... 82

    Section 12.11   Specific Performance............................................................. 82

    Section 12.12   No Third Party Beneficiaries................................................. 83

    Section 12.13   Expenses ................................................................................ 84

    Section 12.14   Severability............................................................................ 84

    Section 12.15   Public Announcements .......................................................... 84

    Section 12.16   No Liability; Release. ............................................................ 84

<u>EXHIBITS</u>

Exhibit A           Assumption Agreement

Exhibit B           General Assignment

Exhibit C           Intellectual Property Assignment Agreement

Exhibit D           Inventory Adjustment Escrow Agreement

Exhibit E           Trademark License Agreement

SCHEDULES

Schedule 1-A          Excluded Claims

Schedule 1-B          Transferred Permits

Schedule 1-C          Transferred Intellectual Property

Schedule 1-D          Additional Acquired Assets

Schedule 1-E          Tangible Personal Property

Schedule 1-F          Transferred Real Property

Schedule 1-G          Acquired Business Employees

Schedule 1-H          Transferred Contracts

Schedule 1-I          Certain Excluded Assets

Schedule 1-J          Excluded Tangible Personal Property

Schedule 1-K          Retained Avoidance Actions

Schedule 1-L          Assumed Benefit Plans

Schedule 1-M          Equity Interests in Other Persons

Schedule 1-N          Employee Severance Liabilities

Schedule 3.3          Allocation Principles

Schedule 3.4          Accounting Principles and Procedures

Schedule 7.9          Support Obligations

Seller Disclosure Schedules

Purchaser Disclosure Schedules

# ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (collectively with the Exhibits and Schedules referred to herein, this "**Agreement**") is made as of the 9th day of November, 2023 (the "**Execution Date**"), by and among PROTERRA INC, a Delaware corporation ("**Holdco**"), PROTERRA OPERATING COMPANY, INC., a Delaware corporation ("**Opco**" and together with Holdco, "**Sellers**" and each a "**Seller**"), Volvo Battery Solutions LLC, a Delaware limited liability company ("**Purchaser**"), and Mack Trucks, Inc., a Pennsylvania corporation ("**Purchaser Parent**"), solely for purposes of <u>Section 7.17</u>.

WHEREAS, Sellers are engaged in the Business (as defined below);

WHEREAS, on August 7, 2023 (the "**Petition Date**"), Sellers commenced the Bankruptcy Cases (as defined below) and Sellers intend to seek approval of and authorization for a sale and transfer of Sellers' assets used in the conduct of the Business to the individual or entity submitting the highest or otherwise best bid for those assets in a process approved by the Bankruptcy Court (as defined below) (the "**Sale Process**") and to be consummated in accordance with the Bidding Procedures Order (as defined below) and pursuant to the Sale Order (as defined below);

WHEREAS, Purchaser desires to purchase from Sellers the Acquired Assets (as defined below) through the Sale Process (the "**Sale**"), in exchange for the Purchase Price (as defined below) and Purchaser's assumption of the Assumed Liabilities (as defined below), on the terms and subject to the conditions set forth in this Agreement;

WHEREAS, Sellers have determined, in the exercise of their business judgment, that the sale to Purchaser as contemplated herein is the highest or otherwise best bid for the Acquired Assets and therefore it is advisable and in the best interest of their estates and the beneficiaries of the estates to enter into this Agreement, which has been approved by Sellers' applicable governing bodies; and

WHEREAS, Sellers and Purchaser each acknowledge and agree that the transactions contemplated by this Agreement are subject to the Bankruptcy Court's approval of this Agreement.

NOW, THEREFORE, in consideration of the premises and of the respective representations, warranties, covenants, agreements, and conditions contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, Sellers and Purchaser each agree as follows:

## ARTICLE I

### Definitions

Section 1.1    <u>Certain Definitions</u>. Capitalized terms used in this Agreement but not otherwise defined in this Agreement shall have the meanings ascribed to such terms in the Bidding Procedures Order (as defined below) as in effect at the date hereof or as such terms may be modified with the approval of the Sellers. In this Agreement and any Exhibit or Schedule hereto, the following capitalized terms have the following respective meanings:

"**Accounts Receivable**" means, with respect to each Seller, all accounts receivable, notes receivable, purchase orders, negotiable instruments, completed work or services that have not been billed, chattel paper, notes and other rights to payment, including those consisting of all accounts receivable in respect of services rendered or products sold to customers by such Seller, any other miscellaneous accounts receivable of such Seller, and any claim, remedy or other right of such Seller related to any of the foregoing, together with all unpaid financing charges accrued thereon and any payments with respect thereto.

"**Acquired Assets**" means:

(a)　　all of the properties, rights, title, interests and other tangible and intangible assets that each Seller owns or possesses (other than the Excluded Assets) (wherever located and whether or not required to be reflected on a balance sheet) and that are primarily used or held for use by such Seller in connection with the conduct of the Acquired Business, including:

(i)　　all intangible assets of such Seller that are not Intellectual Property, including goodwill and going-concern value;

(ii)　　all Accounts Receivable and all other rights of any Seller to receive or recoup, whether by offset or netting against production from the Acquired Assets and the proceeds thereof or otherwise, amounts owed by Persons other than Sellers and their Affiliates with respect to the Acquired Assets, in each case to the extent accruing from and after the Effective Time;

(iii)　　all books and records relating to Assumed Benefit Plans and all rights of such Seller in any documents, drawings, diagrams, data, logs and records, operating, maintenance and safety manuals, plans, sales order files, purchase order files, test specifications and validation procedures, information, blueprints, property reports, surveys, maintenance and asset history records, Occupational Safety and Health Administration and Environmental Protection Agency files, present vendor, client, customer and supplier lists, pricing information, sales and promotional literature and paper work and business files of such Seller and other books and records, in each case, primarily used or held for use in connection with the conduct of the Acquired Business, including all of the foregoing data and electronic information related to the Acquired Assets or the Acquired Business stored or archived in any server, computer, laptop, network, system or other electronic data base, but excluding the Excluded Books and Records (collectively, to the extent in the possession or control of such Seller or its Affiliates, the "**Acquired Business Books and Records**"), provided that such Seller may, at its election, provide to Purchaser either originals or copies (whether in hard or electronic form) of such Acquired Business Books and Records and shall be entitled to retain, as applicable, copies or such originals; provided, further, that the foregoing shall exclude all Intellectual Property rights therein, which are the subject of clause (h);

(iv)     all claims and counterclaims of such Seller against any other Person, except for such claims and counterclaims set forth on <u>Schedule 1-A</u>;

(v)     all unexpired warranties, indemnitees and guarantees in favor of such Seller made or given by manufacturers, contractors, consultants, vendors, suppliers and other third parties to the extent arising from any Acquired Asset or Assumed Liability;

(vi)     all claims, deposits, refunds, rebates and prepaid items and expenses of such Seller paid prior to the Closing except those designated as Excluded Assets;

(vii)     the Avoidance Actions (other than the Retained Avoidance Actions);

(viii)     all rights of such Seller to collect damages from any Person (other than such Seller or an Affiliate of such Seller) for past, present or future misappropriation, infringement, or other violation of Purchased Intellectual Property;

(ix)     all leasehold interests and leasehold improvements created by all leases (including capitalized leases) for personal property, in each case, under which any Seller is a lessee or lessor;

(b)     the Transferred Real Property and Transferred Real Property Leases;

(c)     the Acquired Tangible Personal Property;

(d)     subject to <u>Section 7.3</u>, the Transferred Contracts and such Seller's rights thereunder;

(e)     to the extent their transfer is permitted under applicable Laws and/or by the applicable Governmental or Regulatory Authority and subject to <u>Section 7.3</u>, all Permits held by such Seller relating to or necessary for the operation of the Acquired Assets or the Acquired Business listed on <u>Schedule 1-B</u> (the "**Transferred Permits**");

(f)     all supplies or construction materials owned by such Seller to the extent (A) primarily related to the Acquired Business or (B) located at the Transferred Real Property;

(g)     all shares of capital stock or other equity interests in or issued by a Person other than a Seller, as set forth on <u>Schedule 1-M</u> (the "**Transferred Equity**");

(h)     the Purchased Intellectual Property, including the Intellectual Property set forth in <u>Schedule 1-C</u>;

(i)     the assets set forth in <u>Schedule 1-D</u>;

(j)     the Assumed Benefit Plans and any related trusts, insurance policies or other funding arrangements for the Assumed Benefit Plans; and

(k)     data relating to usage, performance, longevity or value of any product of the Acquired Business (whether used or held for use in the Acquired Business or in connection with the conduct of a Proterra Other Business Unit), including test results and reports, drawings, component specifications, product development plans, risk assessment and failure mode and effects analysis data (FMEA), audit reports, data in product data management systems (PDM), data used in research and development, product test data, battery cell cycling and performance test data, data from field use of traction batteries in Proterra transit buses, data from field use of traction batteries in vehicles and other applications of Proterra customers, data from testing and validation of batteries (cells, modules, and/or packs), prototypes, production samples, and market returned battery samples, all of the foregoing solely to the extent owned or transferrable by a Seller, whether stored or archived in any server (whether located in the facilities of the Acquired Business or at external data centers), cloud server, cloud service, external data storage service or other electronic data storage, <u>provided</u> that such Seller may, at its election, provide to Purchaser either originals or copies (whether in hard or electronic form) of such data and shall be entitled to retain, as applicable, copies or such originals.

"**Acquired Business**" means the Proterra Powered Business Unit, which is operated and conducted at the offices and plants located at (a) 1815 and 1835 Rollins Rd, Burlingame, California 94010 and 23 Broderick Road, Burlingame, California 94010 and (b) 1605 Poplar Dr. Extension, Suite 100, Greer, South Carolina 29651.

"**Acquired Business Books and Records**" has the meaning set forth in the definition of Acquired Assets.

"**Acquired Business Employees**" means those Employees set forth in <u>Schedule 1-G</u>.

"**Acquired Business Material Adverse Effect**" means any event, change, development, condition, fact, circumstance or effect that, individually or in the aggregate, has had or would reasonably be expected to have a material adverse effect on (v) the validity or enforceability of this Agreement and the Related Agreements, (w) the Transferred Real Property, taken as a whole, (x) the Acquired Business, taken as a whole, (y) the Acquired Assets, taken as a whole or (z) the Condition of the Acquired Business, taken as a whole; <u>provided</u>, <u>however</u>, that, in the case of clauses (w) through (z) above, none of the following shall be deemed to constitute, and none of the following shall be taken into account in determining whether there has been, an Acquired Business Material Adverse Effect: (a) any change, event, development, condition, fact, circumstance or effect (whether short-term or long-term) arising from (1) any general industry change in the industries in which the Acquired Business operates, (2) national or international political or social conditions, including the engagement in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the United States or foreign country, or any of their respective territories, possessions or diplomatic or consular offices or upon any military installation, equipment or personnel of the United States, (3) any epidemic, pandemic, or disease outbreak (including COVID-19) or any law, regulation, statute, directive, pronouncement or guideline issued by a Governmental or Regulatory Authority, the Centers for Disease Control and Prevention, the World Health Organization or industry group providing for business closures, "sheltering-in-place", curfews or other restrictions that arise out of an epidemic, pandemic or disease outbreak or any change in such law, regulation,

statute, directive, pronouncement or guideline or interpretation thereof, or any worsening of such conditions, (4) any general change in financial, banking or securities markets (including any disruption thereof and any decline in the price of any security or any market index), (5) any change in GAAP, regulatory accounting principles or industry standards, or (6) changes in Laws (except in the case of clauses (1), (2), (3), (4), (5) and (6) to the extent such change, event, development, condition, fact, circumstance or effect has a disproportionate effect on the Acquired Assets, Assumed Liabilities and Acquired Business, taken as a whole, compared to other participants engaged in the industries and geographies in which the Acquired Business operates), (b) the taking of (or omitting to take) any action by any Seller at the written request of Purchaser or that is expressly required by this Agreement, (c) any matters that arise from any actions or omissions of Purchaser or its Affiliates (including any breach by Purchaser of this Agreement), (d) any change resulting or arising from the identity of, or any facts or circumstances relating to, Purchaser or its Affiliates, (e) any failure to meet a forecast (whether internal or published) of revenue, earnings, cash flow or other data for any period on or after the Execution Date or any change in such a forecast (it being understood that this clause (e) shall not prevent a determination that any event, change, development, condition, fact, circumstance or effect underlying such failure to meet a forecast has resulted in an Acquired Business Material Adverse Effect), (f) any change in the financial condition or results of operation of Purchaser or its Affiliates, including its ability to access capital and equity markets and changes due to a change in the credit rating of Purchaser or its Affiliates, (g) the announcement, commencement, pendency or consummation of the Bankruptcy Cases, this Agreement or the transactions contemplated hereby, or (h) any change in the market price or trading volume of any securities or Indebtedness of a Seller (it being understood that this clause (h) shall not prevent a determination that any event, change, development, condition, fact, circumstance or effect underlying such change has resulted in an Acquired Business Material Adverse Effect); provided, further, that, for the avoidance of doubt, an Acquired Business Material Adverse Effect shall be measured only against past performance of the Acquired Business and not against any forward-looking statements, financial projections or forecasts of the Acquired Business.

"**Acquired Tangible Personal Property**" means all Tangible Personal Property other than the Excluded Tangible Personal Property.

"**Action**" means any claim, demand, action, cause of action, suit, arbitration, audit, investigation or proceeding.

"**Affiliate**" means, as to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with that Person. For purposes of this definition, "**control**" (including, with correlative meanings, the terms "**controlled by**" and "**under common control with**"), as used with respect to any Person or group of Persons, means possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of the Person, whether through the ownership of voting securities or by contract.

"**Agreement**" has the meaning set forth in the preamble.

"**Allocation Principles**" has the meaning set forth in Section 3.3.

"**Alternative Transaction**" means a sale, assignment, transfer or other disposition of all or substantially all of the Acquired Assets to any Person (or group of Persons), other than to Purchaser or an Affiliate of Purchaser.

"**Antitrust Law**" means the Sherman Act, the Clayton Act, the HSR Act, the Federal Trade Commission Act, and all other Laws or Orders that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or lessening of competition through merger or acquisition.

"**Assumed Benefit Plans**" means any Benefit Plan or portion of a Benefit Plan related to the Transferred Employees to be assumed by Purchaser and set forth on Schedule 1-L.

"**Assumed Liabilities**" means all of the following (and only the following) liabilities and obligations of each Seller:

(i) for payment and performance under any Transferred Contract, Transferred Real Property Lease and Transferred Permit that is an Acquired Asset by which any Seller is bound as of the Closing, but, except with respect to any Cure Amounts expressly assumed by Purchaser pursuant to clause (ii) below, only to the extent such liabilities and obligations (A) relate to payment or performance from the period beginning from and after the Closing Date and (B) do not arise from or relate to any breach prior to the Closing by a Seller or an Affiliate thereof of such Transferred Contract, Transferred Real Property Lease or Transferred Permit, provided that liabilities and obligations of each Seller with respect to any Product Liability Claim, recall, design defect or similar claim or Warranty Liability Claim in connection with any Transferred Contract or ordinary course trade payables that remain unpaid on or after the Closing Date (regardless of when accrued) shall not constitute Assumed Liabilities, except, only with respect to Warranty Liability Claims, to the extent expressly provided for in any such Transferred Contract.

(ii) for payment of the Cure Amounts, subject to the Cure Amounts Cap set forth in Section 2.5(c),

(iii) the obligation to provide COBRA continuation coverage for Transferred Employees and their applicable dependents for COBRA qualifying events occurring after the applicable Transferred Employee's first day of employment with Purchaser,

(iv) any claims arising after the Closing Date under any Assumed Benefit Plan (which for the avoidance of doubt shall not include (i) contributions relating to any period on or prior to the Closing Date or (ii) claims for benefits for services or, in the case of disability benefits, injuries, incurred on or prior to the Closing Date but not submitted for payment or reimbursement until after the Closing Date) ("**Post-Closing Benefits Claims**"),

(v) the Employee Severance Liabilities, and

(vi) any Taxes that Purchaser bears under Section 11.7.

"**Assumption Agreement**" means the Assumption Agreement in the form attached hereto as Exhibit A.

"**Auction**" has the meaning set forth in the Bidding Procedures.

"**Avoidance Action**" means any claim, right or cause of action of a Seller arising under chapter 5 of the Bankruptcy Code and any analogous state or federal statutes and common Law relating to the Sellers, the Acquired Assets, the Acquired Business, the Transferred Contracts, the Transferred Real Property, the Transferred Real Property Leases, the Acquired Tangible Personal Property, or the Assumed Liabilities.

"**Backup Bidder**" has the meaning set forth in the Bidding Procedures.

"**Bankruptcy Cases**" has the meaning set forth in Section 11.1.

"**Bankruptcy Code**" means Title 11 of the United States Code.

"**Bankruptcy Court**" has the meaning set forth in Section 11.1.

"**Benefit Plan**" means (i) any "employee benefit plan" as defined in Section 3(3) of the ERISA (whether or not subject to ERISA) and (ii) any other pension, retirement, profit-sharing, savings, bonus, incentive, commission, stock option or other equity or equity-based, deferred compensation, severance, retention, employment, benefit, excess benefit, incentive, equity interest, equity bonus, equity purchase, restricted equity, equity ownership, equity appreciation, phantom equity, savings and thrift, cafeteria, reimbursement, health savings, flexible spending, compensation, welfare, sick leave, vacation, medical, dental, hospitalization, vision, disability, accidental death and dismemberment, life insurance, death benefit, post-retirement, transaction bonus, periodic bonus, termination, fringe benefit, perquisite or change of control plan, program, policy, agreement, contract or arrangement that (x) is sponsored, maintained or contributed to by Sellers, or for which Sellers have any obligation to sponsor, maintain or contribute to, or for which Sellers have any direct or indirect liability, whether contingent or otherwise and (y) under which any current or former officer, director, employee, consultant or independent contractor (or their respective beneficiaries) of Sellers has any present or future right to benefits, except for any Multiemployer Plan.

"**Bidding Procedures**" means the procedures governing the Auction and the Sale Process, as approved by the Bankruptcy Court pursuant to the Bidding Procedures Order and attached as Exhibit 1 to the Bidding Procedures Order, and as may be amended from time to time in accordance with their terms.

"**Bidding Procedures Order**" means the order entered by the Bankruptcy Court on September 7, 2023 [ECF No. 218], approving the Bidding Procedures.

"**Business**" means the business of the Proterra Powered Business Unit.

"**Business Day**" means a day (other than a Saturday, Sunday or national holiday) on which commercial banks in the State of New York and the State of California are open for the transaction of commercial banking business.

"**Cash Payment**" has the meaning set forth in Section 3.1.

"**Casualty**" has the meaning set forth in Section 7.10.

"**Clayton Act**" means Title 15 of the United States Code §§ 12-27 and Title 29 of the United States Code §§ 52-53, as amended.

"**Closing**" means the consummation of the transactions contemplated in this Agreement.

"**Closing Date**" has the meaning set forth in Section 4.1.

"**Closing Inventory**" means all inventory (including raw materials, work in process, finished goods and packaging) of the Acquired Business, to the extent included in Acquired Assets, all as of the Effective Time and determined in the manner set forth in Section 3.4 and Schedule 3.4.

"**Closing Inventory Adjustment**" means (a) a positive amount equal to the amount by which the Closing Inventory set forth in the Closing Statement is greater than the Closing Inventory Target (or for purposes of Section 3.6, a positive amount equal to the amount by which the estimated Closing Inventory set forth in the Estimated Closing Statement is greater than the Closing Inventory Target), or (b) a negative amount equal to the amount by which the Closing Inventory set forth in the Closing Statement is less than the Closing Inventory Target (or for purposes of Section 3.6, a negative amount equal to the amount by which the estimated Closing Inventory set forth in the Estimated Closing Statement is less than the Closing Inventory Target).

"**Closing Inventory Target**" means One Hundred Twenty Million Dollars ($120,000,000).

"**Closing Payment**" has the meaning set forth in Section 3.1.

"**Closing Statement**" has the meaning set forth in Section 3.4.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Condition of the Acquired Business**" means the condition of the business, operations, properties, Acquired Assets, financial condition and results of operations of the Acquired Business.

"**Confidential Information**" has the meaning set forth in the Confidentiality Agreement.

"**Confidentiality Agreement**" means that certain Confidentiality Agreement dated as of September 4, 2023 by and between Volvo Technology AB and Holdco.

"**Contract**" means any written or oral contract, agreement or instrument, including supply contracts, purchase orders, sale orders, bids, understandings or commitments, customer agreements, licenses, mortgages, subcontracts, indentures, leases or subleases of personal or real property, deeds of trust, notes or guarantees, pledges, liens, or conditional sales agreements to which the Person referred to is a party or by which any of its assets may be bound.

"**Cure Amounts**" means all amounts necessary to cure all defaults, if any, and to pay all actual or pecuniary losses, if any, that have resulted from any defaults on the part of a Seller under the Transferred Contracts and Transferred Real Property Leases. For the avoidance of doubt, Cure Amounts are subject to the Cure Amounts Cap.

"**Cure Amounts Cap**" has the meaning set forth in Section 2.5(c).

"**Delivery Date**" means the date on which the Closing Statement has been delivered.

"**Deposit Escrow Account**" means the escrow account established pursuant to the Deposit Escrow Agreement.

"**Deposit Escrow Agreement**" means that certain escrow agreement, dated as of the date hereof, executed by and among Purchaser, Holdco and the Escrow Agent.

"**Deposit Escrow Funds**" mean, at any time of determination, the Earnest Deposit deposited in the Deposit Escrow Account, together with any interest earned thereon.

"**Disclosure Update**" has the meaning set forth in Section 7.5.

"**Dispute**" means any dispute regarding the items or amounts reflected on the Closing Statement and affecting the calculation of the Closing Inventory and the Closing Payment.

"**Disputed Items**" has the meaning set forth in Section 3.5(a).

"**Dispute Notice**" means a written notice of a Dispute delivered to Purchaser within the Dispute Period.

"**Dispute Period**" means the period beginning on the Delivery Date and ending at 5:00 p.m. (Eastern time) on the date that is thirty (30) days after the Delivery Date.

"**Downward Adjustment**" has the meaning set forth in Section 3.7(b).

"**Earnest Deposit**" has the meaning set forth in Section 3.1(b).

"**Effective Time**" means 12:01 a.m. Eastern Time, on the Closing Date.

"**Employee Severance Liabilities**" means the severance amount calculated in accordance with Schedule 1-N for any Acquired Business Employee who does not receive an offer from Purchaser pursuant to Section 8.1.

"**Employees**" means the employees of Sellers on the Execution Date, as well as any additional persons who become employees of Sellers during the period from the Execution Date through and including the Closing Date.

"**Environmental Laws**" means all foreign, federal, state and local Laws, code, binding and enforceable guidelines, policy or rule of common law or judicial or administrative interpretation thereof relating to pollution, Hazardous Materials, public health and safety (as it relates to exposure to Hazardous Materials), recycling, e-waste or protection of the environment,

including the Comprehensive Environmental Response, Compensation and Liability Act, the Resource Conservation and Recovery Act, the Clean Air Act, the Clean Water Act, and any state or local counterparts or equivalents, as such requirements have been enacted and are in effect on or prior to the Closing Date.

"**Environmental Liabilities**" means all Liabilities relating to Seller's ownership and/or operation of the Acquired Business and/or the Acquired Assets and consisting of or relating to:

(i)     any Hazardous Materials, environmental matters or conditions (including on-site or off-site contamination and regulation of chemical substances or products), battery or battery component recycling or disposal, or any violations of or liabilities under Environmental Laws;

(ii)     fines, penalties, judgments, awards, settlements, legal or administrative proceedings, damages, losses, claims, demands and investigative, remedial, or inspection costs and expenses arising under Environmental Laws or relating to Hazardous Materials;

(iii)     financial responsibility under Environmental Laws for cleanup costs or corrective action, including any investigation, cleanup, removal, containment, or other remediation or response actions required by applicable Environmental Laws and for any natural resource damages; or

(iv)     any other compliance, corrective, investigative or remedial measures required under Environmental Laws.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

"**ERISA Affiliate**" means any Person that at any relevant time would be considered a single employer with any of the Sellers under Sections 414(b), (c), (m) or (o) of the Code or Section 4001 of ERISA.

"**Escrow Agent**" means Citibank, National Association.

"**Estimated Closing Payment**" has the meaning set forth in <u>Section 3.6</u>.

"**Estimated Closing Statement**" has the meaning set forth in <u>Section 3.6</u>.

"**Excluded Assets**" means all assets, rights, claims or properties owned by either Seller that are not Acquired Assets, including:

(i)     all cash, rights in bank accounts, certificates of deposit, bank deposits, cash equivalents, professional fee retainers, the cash surrender value of any life insurance policies, investment securities and checks or other payments received by such Seller (including received in lock boxes) prior to the Effective Time;

(ii)     the Purchase Price and the Deposit Escrow Funds;

(iii)     any Benefit Plan (other than any Assumed Benefit Plan) and any assets, trust agreements, insurance policies, administrative service agreements and other contracts, files and records in respect thereof;

(iv)     any prepayments and good faith and other bid deposits submitted by any third party under the terms of the Bidding Procedures Order;

(v)     all Accounts Receivable and all other rights of any Seller to receive or recoup, whether by offset or netting against production from the Acquired Assets and the proceeds thereof or otherwise, amounts owed by Persons other than Sellers and their Affiliates with respect to the Acquired Assets, in each case to the extent accruing prior to the Effective Time;

(vi)     any deposits, escrows, surety bonds or other financial assurances and any cash or cash equivalents securing any surety bonds or financial assurances, in each case, to the extent arising under the Excluded Assets or Excluded Liabilities;

(vii)     all trade credits or refunds of costs or expenses borne by any Seller, in each case, attributable to the Acquired Assets and attributable to any period of time prior to the Effective Time;

(viii)     all Excluded Tangible Personal Property;

(ix)     any rights to Tax refunds, rebates, abatements, deposits, prepayments or credits (other than with respect to (A) Taxes allocated to Purchaser in Section 11.7 and (B) the Transferred Incentives);

(x)     all claims and counterclaims of such Seller against any other Person that are set forth on Schedule 1-A;

(xi)     such Seller's rights under this Agreement and the Related Agreements;

(xii)     all Intellectual Property that is not Purchased Intellectual Property;

(xiii)     all Contracts that are not Transferred Contracts;

(xiv)     all Real Property Leases that are not Transferred Real Property Leases;

(xv)     all Permits that are not Transferred Permits;

(xvi)     the Excluded Books and Records;

(xvii)   the Retained Avoidance Actions and any other claims, interests, rights, rebates, abatements, remedies, recoveries, goodwill, customer and referral relationships, other intangible property and all privileges, set-offs and benefits of Sellers, and all claims, demands, indemnification rights or causes of action, available to any of the Sellers or their estates against third parties to the extent exclusively related to the Excluded Assets or the Excluded Liabilities (including any claim to collect any Accounts Receivable accruing prior to the Effective Time);

(xviii)   all of such Seller's insurance policies, including director and officer insurance policies, and related contracts and all rights thereunder (including, the right to make claims thereunder and to the proceeds thereof);

(xix)   all debts, demands, causes of action or other rights or claims of such Seller against any Affiliates of such Seller including any intercompany receivables due from any such Affiliate of such Seller;

(xx)   all shares of capital stock or other equity interest in or issued by any Seller or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interest in or issued by any Seller, and, except as set forth on Schedule 1-M, any shares of capital stock or other equity interest in or issued by any other entity in which any Seller holds an equity interest, or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interest in or issued by any other entity in which any Seller holds an equity interest; and

(xxi)   those assets of the type identified on Schedule 1-I hereto.

"**Excluded Books and Records**" means (i) all books and records relating to employees who are not Transferred Employees, (ii) all minute books of a Seller, (iii) all income Tax Returns and income Tax records, (iv) all books and records prepared in anticipation of or in connection with or otherwise related to the negotiation, execution or performance by Sellers under this Agreement or any Related Agreement; (v) all books and records that are subject to attorney-client privilege or other work product privilege that do not relate primarily to the Acquired Business and (vi) any other books and records to the extent exclusively relating to the Excluded Assets or Excluded Liabilities.

"**Excluded Liabilities**" means all Liabilities of each Seller that are not Assumed Liabilities, including:

(i)   all Liabilities of such Seller or any Affiliate of such Seller in respect of any Indebtedness, other than the Support Obligations addressed in Section 7.9;

(ii)   all Liabilities of such Seller or any Affiliate of such Seller for (a) Taxes (whether or not then due) for any taxable period (except for Taxes allocated to Purchaser pursuant to Section 11.7) and (b) Taxes of any other Person under section 1.1502-6 of the Treasury Regulations (or any similar provision of state, local or foreign law) or as a transferee, successor, by Contract, by Law or otherwise;

(iii)     all Liabilities for (a) Taxes with respect to the Acquired Assets, the Acquired Business or any of its facilities (except for Taxes allocated to Purchaser pursuant to <u>Section 11.7</u>) for all taxable periods, or portions thereof, ending at or prior to the Effective Time or that are otherwise allocated to Seller in <u>Section 11.7</u> and (b) Taxes imposed upon Purchaser or any of its Affiliates as a transferee or successor of any Seller;

(iv)     all Liabilities arising from any litigation, arbitration, Action or any proceeding involving such Seller, the Acquired Business, any Affiliate of such Seller or any of the Acquired Assets, including with any Governmental or Regulatory Authority or any other Person, in each case, with respect to matters that occurred prior to the Effective Time;

(v)     all Liabilities of such Seller to any Affiliate of such Seller or any current or former shareholder, director or officer of such Seller or any Affiliate of such Seller, including, any Liability arising out of or related to any loan, or any accrued interest related thereto, from any Affiliate of such Seller or any member, director or officer of such Seller or any Affiliate to such Seller and all Liabilities to indemnify, reimburse, or advance amounts to any present or former officer, director, employee, agent or other Person of such Seller (including with respect to any breach of fiduciary obligations);

(vi)     all Liabilities to the extent arising out of or relating to any Excluded Asset, including any Liabilities arising under any contract that is not a Transferred Contract;

(vii)     all Liabilities of such Seller or any of its Affiliates or ERISA Affiliates arising out of any Benefit Plan or Multiemployer Plan, other than Post-Closing Benefits Claims;

(viii)     such Seller's costs and expenses incurred in connection with the process of selling the Acquired Assets, Acquired Business or any Proterra Other Business Unit, this Agreement and the transactions contemplated by this Agreement and all Liabilities of such Seller arising or incurred in connection with the negotiation, preparation, investigation and performance of this Agreement, the Related Agreements and the transactions contemplated hereby and thereby;

(ix)     all Environmental Liabilities;

(x)     ordinary course trade payables of the Acquired Business or any Seller that remain unpaid on or after the Closing Date (regardless of when accrued) and all other current Liabilities existing on the Closing Date (regardless of when accrued) of such Seller;

(xi)     any Product Liability Claim arising from the sale (whether prior to or after the Closing Date) of products manufactured by the Acquired Business or such Seller and all product Liability or similar claims for injury to a Person or property that arises out of or is based upon any express or implied representation,

warranty, agreement, or guaranty made by such Seller, or by reason of the improper performance or malfunctioning of a product, improper design or manufacture, failure to adequately package, label, or warn of hazards or other related product defects of any products at any time manufactured or sold or any service performed by such Seller;

(xii)    all recall, design defect or similar claims of any products manufactured or sold or any service performed by such Seller;

(xiii)    any Warranty Liability Claim arising from the sale (whether prior to, on or after the Closing Date) of products manufactured by the Acquired Business or such Seller;

(xiv)    all Liabilities for any Cure Amounts that are not Assumed Liabilities;

(xv)    other than with respect to Cure Amounts expressly assumed by Purchaser, all Liabilities owed to vendors that provided goods or services to, or customers that purchased products or services from, such Seller prior to the Closing;

(xvi)    other than with respect to Cure Amounts expressly assumed by Purchaser, all Liabilities arising under Section 503(b)(9) of the Bankruptcy Code;

(xvii)    all Liabilities in respect of any pending or threatened Action arising out of, relating to, or otherwise in respect of the operation of the Acquired Business or the Acquired Assets to the extent such Action relates to such operation on or prior to the Closing Date, including any Action related to infringement with respect to Purchased Intellectual Property;

(xviii)    all Liabilities of any Seller arising under or in connection with any employee benefit plan providing benefits to any present or former employee of any Seller and all Liabilities of any Seller for any present or former employees, officers, directors, retirees, independent contractors, or consultants of any Seller, including any Liabilities associated with any claims for wages or other benefits, bonuses, accrued vacation, workers' compensation, or employee deferred compensation, including stock option plans, grants, and agreements, severance, retention, termination, or other payments;

(xix)    all Liabilities for injury to a Person that arises out of or relates to the Acquired Business prior to the Closing, including any loss, damage, or injury sustained by any present or former employee or independent contractor of such Seller or any other Person while engaging in manufacturing, engineering or similar activities in connection with any Acquired Asset prior to the Closing;

(xx)    all Liabilities under any Contracts, Real Property Leases and Permits (a) that are not validly and effectively assigned to Purchaser pursuant to this Agreement, or (b) to the extent such Liabilities arise out of or relate to a breach

(excluding Cure Amounts assumed by Purchaser pursuant to, and subject to the limitations set forth in, this Agreement) prior to the Closing by such Seller or an Affiliate thereof of such Contracts, Real Property Leases or Permits; or

(xxi) all Liabilities arising out of, in respect of, or in connection with the failure by such Seller or any of its Affiliates to comply with any Law or Order.

"**Excluded Tangible Personal Property**" means all Tangible Personal Property listed on Schedule 1-J.

"**Execution Date**" has the meaning set forth in the preamble.

"**Federal Trade Commission Act**" means the Federal Trade Commission Act (15 U.S.C. § 41 *et seq.*), as amended, and the rules and regulations promulgated thereunder.

"**GAAP**" means United States generally accepted accounting principles, consistently applied.

"**General Assignment**" means the General Assignment substantially in the form attached hereto as Exhibit B.

"**Governmental or Regulatory Authority**" means any court, tribunal, public or private arbitrator, authority, agency, commission, official or other instrumentality of the United States, or any country, state, county, city or other political subdivision, including any self-regulatory organization or similar governmental or quasi-governmental entity or body having jurisdiction.

"**Guaranteed Obligations**" has the meaning set forth in Section 7.17.

"**Hazardous Materials**" means any substance or material that has been listed, defined or regulated or otherwise classified by any Environmental Law as a "hazardous substance," "hazardous material," "hazardous waste," "toxic substance," "pollutant," "contaminant," "e-waste or electronic waste," "waste batteries or battery components", or any other similar term, including any other term intended to define, list, or classify a substance by reason of such substance's ignitability, corrosivity, reactivity, carcinogenicity, reproductive toxicity, "EP toxicity" or adverse effect on human health or the environment, including, substances that are radioactive, toxic, hazardous or otherwise a pollutant, contaminant or waste, including PCBs, asbestos, petroleum products, petroleum derived substances or any fraction thereof, and urea-formaldehyde.

"**HSR Act**" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (15 U.S.C. §§ 15c-15h, 18a), as amended.

"**Improvements**" means the buildings, improvements and structures now existing on the Transferred Real Property.

"**Indebtedness**" means, as to any Person, without duplication, (a) all Liabilities of such Person (i) with respect to indebtedness for borrowed money or (ii) in respect of loans or advances (including, reimbursement and all other obligations with respect to surety bonds, guarantees, letters of credit, banker's acceptances, corporate credit card or business credit lines, indemnities,

performance letters, comfort letters and other arrangements similar to the foregoing, in each case of this clause (ii) only to the extent drawn); (b) all Liabilities of such Person under or pursuant to any arrangement to pay the deferred purchase price of assets, property or services or the acquisition of any business or with respect to earn out obligations with respect to any business acquisition; (c) all Liabilities of such Person under or pursuant to any interest rate and currency swaps, caps, collars, interest rate cap agreements, interest rate swap agreements, foreign currency exchange agreements and similar financial hedging devices and agreements; (d) all Liabilities created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of such Person or lender under such agreement in the event of default are limited to repossession or sale of such property), other than inventory or other property purchased by such Person in the Ordinary Course of Business; (e) all obligations or liabilities of such Person under or pursuant to leases which are required to be, in accordance with GAAP, recorded as capital leases; (f) all Liabilities secured by any Lien (excluding Permitted Encumbrances) on any property or asset owned by that Person, regardless of whether the indebtedness secured thereby shall have been assumed by that Person or is non-recourse to the credit of that Person; (g) all Liabilities of such Person for off balance sheet financing of such Person (other than operating leases); (h) all Liabilities of such Person evidenced by bonds, debentures, notes or other similar securities or instruments (other than performance, surety and appeal bonds arising in the Ordinary Course of Business in respect of which such Person's liability remains contingent); (i) all Liabilities of such Person for any direct or indirect guarantees made by such Person of any Indebtedness of any other Person described in clauses (a) through (h); and (j) any accrued but unpaid interest, unpaid prepayment or redemption penalties, premiums or payments and unpaid fees and expenses, in each case, that are actually payable in connection with retirement, payment or prepayment of any of the foregoing Liabilities.

"**Independent Accountant**" means an impartial nationally recognized firm of independent certified public accountants to be mutually agreed to by Purchaser and Sellers and not engaged by either Sellers, on the one hand, or Purchaser, on the other hand, or any of their respective Affiliates in the last twelve (12) months, provided that in the event Purchaser and Sellers are unable to mutually agree on such firm within two (2) days after any dispute is required to be referred to such firm pursuant to the terms of this Agreement, Sellers or Purchaser may petition the Bankruptcy Court to appoint a nationally recognized firm of independent certified public accountants that has not been engaged by either Sellers, on the one hand, or Purchaser, on the other hand, or any of their respective Affiliates in the last twelve (12) months.

"**Intellectual Property**" means all intellectual property rights, whether registered or unregistered, as they exist anywhere in the world, including all patents, trademarks and service marks, trade names, logos, URLs and Internet domain names, copyrights, Software, industrial designs, inventions, proprietary know-how, confidential business information and trade secrets.

"**Intellectual Property Assignment Agreement**" means the Intellectual Property Assignment Agreement substantially in the form attached hereto as Exhibit C.

"**Interest**" means Liens, encumbrances, pledges, mortgages, deeds of trust, security interests, leases, charges, fines or penalties related to governmental violations, options, rights of first refusal, easements, servitudes, proxies, voting trusts or agreements, transfer restrictions under any agreement, and any other rights, claims or demands of any kind whatsoever of other Persons,

in each case, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, mature or unmatured, material or non-material, disputed or undisputed.

"**Inventory Adjustment Escrow Agreement**" means an escrow agreement, in the form attached hereto as <u>Exhibit D</u>, dated as of the Closing Date, executed by and among Purchaser, Holdco and the Escrow Agent.

"**Inventory Adjustment Escrow Amount**" has the meaning set forth in <u>Section 4.2(c)</u>.

"**Knowledge**" means, with respect to Sellers, the actual knowledge of Gareth T. Joyce, David Black, Dustin Grace, Chris Bailey, Julian Soell, Sara Dadyar and Jeffrey Mitchell after due inquiry.

"**Laws**" means all laws, statutes, rules, regulations and ordinances in any jurisdiction or any state, county, country, city or other political subdivision or of any Governmental or Regulatory Authority, including, the Bankruptcy Code, ERISA, Environmental Laws, public health and OSHA and anti-kickback statutes.

"**Liability**" or "**Liabilities**" means any or all obligations (whether to make payments, to give notices or to perform or not perform any action), commitments, contingencies and other liabilities of a Person (whether known or unknown, asserted or not asserted, whether absolute, accrued, contingent, fixed or otherwise, determined or determinable, liquidated or unliquidated, and whether due or to become due).

"**Licensable**" means, with respect to any Intellectual Property right, that a Person has the power and authority to grant a license (or sublicense, as the case may be) to such Intellectual Property right without any of the following: (a) the consent of any third party; (b) impairing such Person's existing rights in respect of such Intellectual Property right (it being understood that the grant of any license hereunder, in and of itself, shall not be construed as an impairment of any of such Person's rights); (c) imposing any additional obligations on such Person or impairing any of such Person's other existing rights under any preexisting agreement relating to such Intellectual Property right; and/or (d) the payment of royalties or other consideration by such Person to any third party under any preexisting agreement relating to such Intellectual Property right. For the avoidance of doubt, in no event shall any Intellectual Property right be "Licensable" if any of the foregoing conditions in clauses (a)-(d) apply.

"**Lien**" means any mortgage, pledge, security interest, hypothecation, assignment, encumbrance, lease, lien (including consensual liens, judicial liens or statutory liens), option, right of use and other rights and claims of other Persons, any conditional sale contract, title retention contract, or other encumbrance of any kind, including easements, conditions, reservations and restrictions.

"**Material Contracts**" has the meaning set forth in <u>Section 5.1(j)(i)</u>.

"**Multiemployer Plan**" means a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA covering any of the Employees or pursuant to which any of Sellers or their ERISA Affiliates have or could reasonably be expected to have any Liability.

"**New Matter**" has the meaning set forth in <u>Section 7.5</u>.

"**Order**" means and includes any writ, judgment, decree, injunction, award or other order of any Governmental or Regulatory Authority, including the Bankruptcy Court.

"**Ordinary Course of Business**" means an action taken by a Person if: such action is in the ordinary course of business and consistent with the past practices of such Person including with respect to quantity and frequency; subject, however, to those actions necessary and incident, or otherwise relating, to the Bankruptcy Cases.

"**Organizational Document**" means (a) the articles or certificate of incorporation and the bylaws of a corporation; (b) operating agreement, limited liability company agreement, or similar document governing a limited liability company; (c) any charter or similar document adopted or filed in connection with the creation, formation, or organization of a Person; and (d) any amendment to any of the foregoing.

"**OSHA**" means the Occupational Safety and Health Act of 1970, 29 U.S.C. §651, et seq.

"**Outside Closing Date**" means February 15, 2024 plus ten (10) days solely to the extent needed for regulatory approval unless otherwise mutually agreed by Purchaser and Sellers.

"**Permits**" means all licenses, permits, certificates, orders, authorizations, approvals, registrations, franchises and similar consents granted or issued by any Governmental or Regulatory Authority.

"**Permitted Encumbrances**" means (a) recorded easements, rights-of-way (including utility rights-of-way), servitudes, covenants, agreements, licenses, conditions and restrictions and other encumbrances, burdens and defects, imperfections or irregularities of title of record and items that would be shown on a true and accurate survey as of the Execution Date, affecting all or any portion of the Transferred Real Property which do not materially interfere with Purchaser's proposed use of the Transferred Real Property or the operation of the Acquired Business or that are reflected in any title report, title commitment, title policy, or survey made available to Purchaser; (b) Liens existing as a result of or expressly permitted pursuant to any leases, easements, licenses, rights of way, or other instruments granting a Seller's interest in and to the Transferred Real Property, other than, in each case, Liens created due to a breach of such instrument; (c) building and zoning laws, rules and decisions affecting any of the Transferred Real Property that do not, individually or in the aggregate, materially interfere with the use or occupancy of the Transferred Real Property or the operation of the Acquired Business and (d) non-exclusive licenses of Intellectual Property.

"**Person**" means any natural person, corporation, general partnership, limited partnership, limited liability partnership, limited liability company, proprietorship, other business organization, trust, government, Governmental or Regulatory Authority, or any other entity whatsoever.

"**Personal Information**" means any information which allows the identification of, is reasonably capable of being associated with, or could reasonably be linked, directly or indirectly with, a natural person or household, including any data that constitutes personal information, personally identifiable information, or personal data under any Privacy Law and Security Requirements.

"**Privacy Laws and Security Requirements**" means, with respect to the collection, use, handling, sharing, security, and availability of Personal Information: (a) all applicable Laws; (b) Sellers' own rules, policies, and procedures (including all website privacy policies and internal information security procedures); (c) any similar requirements imposed by any Contract to which any Seller is bound; and (d) industry standards applicable to the industry in which a Seller's business operates (including, if applicable, the PCI DSS), including any anti-spam Laws.

"**Petition Date**" has the meaning set forth in the recitals.

"**Prior Events**" has the meaning set forth in Section 12.16(b).

"**Product Liability Claim**" means any Action or Liability arising out of or otherwise relating to in any way or in respect of any claim for personal injury, wrongful death or property damage resulting from exposure to, or any product recall, defective material claim or any other similar claim or cause of action (including with respect to improper performance, malfunctioning, improper design or manufacture or other defect), whether such claim or cause of action is known or unknown or asserted or unasserted, with respect to, any product sold, supplied, marketed, stored, delivered, distributed or transported by the Acquired Business.

"**Prorations**" means the Liabilities payable under or in connection with the Transferred Real Property Leases that are prorated as of the Closing Date and any ad valorem Taxes on the Acquired Assets, with Sellers responsible for all such amounts accruing prior to and on the Closing Date, and Purchaser bearing responsibility for all such amounts to the extent accruing after the Closing Date.

"**Proterra Energy Business Unit**" means the business unit of Sellers that provides, installs, and services turnkey fleet-scale, high-power charging solutions and software services, *provided* that the Proterra Valence Business Unit shall be excluded from the definition of Proterra Energy Business Unit.

"**Proterra Other Business Units**" means the Proterra Energy Business Unit, the Proterra Transit Business Unit and the Proterra Valence Business Unit.

"**Proterra Powered Business Unit**" means the business unit of Sellers that designs and manufactures proprietary battery systems and electrification solutions for global commercial vehicle original equipment manufacturer customers.

"**Proterra Transit Business Unit**" means the business unit of Sellers that designs, develops and sells electric transit buses as an original equipment manufacturer for North American public transit agencies, airports, universities and other commercial transit fleets.

"**Proterra Valence Business Unit**" means the business sub-unit of Sellers, currently situated within the Proterra Energy Business Unit, that is a cloud-based data platform that can provide customers performance information about their commercial transit fleets.

"**Purchase Price**" has the meaning set forth in Section 3.1(a).

"**Purchased Intellectual Property**" means (a) Sellers Brand, (b) all Intellectual Property owned and used by Sellers exclusively in the conduct of the Acquired Business (including, for the avoidance of doubt, such exclusively used Intellectual Property rights in Purchased Data and Acquired Business Books and Records) and (c) to the extent not included in (b), all patents and patent applications set forth in Schedule 1-C.

"**Purchaser**" has the meaning set forth in the preamble.

"**Purchaser Disclosure Schedules**" means the disclosure schedules of Purchaser as attached hereto, and as they may be updated or otherwise modified hereafter in compliance with this Agreement.

"**Purchaser Group**" has the meaning set forth in Section 12.16(c).

"**Purchaser Plan**" has the meaning set forth in Section 8.4.

"**Purchaser Released Claims**" has the meaning set forth in Section 12.16(b).

"**Purchaser Required Approvals**" means the consents and approvals set forth on Section 5.2(d) of the Purchaser Disclosure Schedules.

"**Real Property Leases**" means all of Sellers' right, title and interest in all leases, subleases, licenses or other occupancy agreements, including all amendments, renewals and other agreements with respect thereto, pursuant to which a Seller holds a leasehold or subleasehold interest in, or is granted a license or other right to use, any real property or is a landlord, sublandlord, sublicensor or similar.

"**Reasonable Efforts**" means the commercially reasonable efforts that a reasonable Person wanting to achieve the result in question would take under similar circumstances to achieve that result as expeditiously as possible.

"**Related Agreements**" means all agreements, certificates, instruments or other documents required to be executed and/or delivered pursuant to or in connection with, this Agreement by any Person, including, the Assumption Agreement, the General Assignment, the Intellectual Property Assignment Agreement, the Trademark License Agreement, the Deposit Escrow Agreement and the Inventory Adjustment Escrow Agreement.

"**Remaining Disputed Items**" has the meaning set forth in Section 3.5(b).

"**Representative**" means, with respect to any Person, its directors, officers, employees, agents, advisors or other representatives.

"**Reserved Contracts and Leases**" has the meaning set forth in <u>Section 2.5(b)</u>.

"**Retained Avoidance Actions**" means the Avoidance Actions set forth on <u>Schedule 1-K</u>.

"**Sale**" has the meaning set forth in the recitals.

"**Sale Hearing**" means the hearing before the Bankruptcy Court to consider entry of the Sale Order.

"**Sale Order**" means an Order of the Bankruptcy Court entered in the Bankruptcy Cases pursuant to Sections 105, 363, and 365 of the Bankruptcy Code, approving this Agreement and the transactions contemplated hereby, in all respects as shall be satisfactory to Sellers and Purchaser (a) approving the sale and transfer of the Acquired Assets to Purchaser free and clear of all liens, claims and interests other than Permitted Encumbrances, if any, pursuant to Section 363(f) of the Bankruptcy Code; (b) approving the assumption and assignment to Purchaser of the Transferred Contracts and Transferred Real Property Leases; (c) authorizing consummation of the transactions contemplated hereby; (d) containing a finding that the transactions contemplated by this Agreement are undertaken by Sellers and Purchaser at arm's length, without collusion, and finding that Purchaser is a good-faith Purchaser entitled to the protections of Section 363(m) of the Bankruptcy Code; (e) finding that due and adequate notice of the approval of the sale hearing and proposed Sale Order and an opportunity to be heard were provided to all Persons entitled thereto, including federal, state and local taxing and regulatory authorities; (f) confirming that Purchaser is acquiring the Acquired Assets free and clear of all Liabilities, other than the Assumed Liabilities; (g) assuring that Purchaser will not be subject to successor liability for any claims or causes of action of any kind or character against any Seller, whether known or unknown, unless expressly assumed as an Assumed Liability pursuant to this Agreement; (h) authorizing Purchaser to freely own and operate the Acquired Assets; (i) providing that the Bankruptcy Court shall retain jurisdiction to hear any disputes arising in connection with the transactions contemplated by this Agreement; (j) providing that the provisions of Federal Rules of Bankruptcy Procedure 6004(h) and 6006(d) are waived and there will be no stay of execution of the Sale Order under Rule 62(a) of the Federal Rules of Civil Procedure; (k) permitting Purchaser to waive, in its sole discretion, the 14-day stay period under Rule 6004(h) of the Federal Rules of Bankruptcy Procedure; and (l) granting related relief.

"**Sale Process**" has the meaning set forth in the recitals.

"**Security Breach**" means any actual or alleged (a) security breach or unauthorized access or use of any of the information technology systems of the Acquired Business, (b) unauthorized access, acquisition, destruction, damage, disclosure, loss, corruption, alteration, or use of any Personal Information or the Acquired Business's own confidential or proprietary information, or (c) unauthorized interference with system operations or security safeguards of the information technology systems of the Acquired Business, including any successful phishing incident or ransomware attack.

"**Seller**" has the meaning set forth in the preamble.

"**Sellers**" has the meaning set forth in the preamble.

"**Seller Disclosure Schedules**" means the disclosure schedules of Sellers attached hereto, and as they may be updated or otherwise modified hereafter in compliance with Section 7.5 of this Agreement, and which, for the avoidance of doubt, exclude Schedule 1-A through 1-N, Schedule 3.3, Schedule 3.4, and Schedule 7.9.

"**Seller ERISA Plans**" has the meaning set forth in Section 8.7.

"**Seller Fundamental Representations**" means, collectively, the representations and warranties in the first sentence of Section 5.1(a) (Organization and Existence), Section 5.1(b) (Authority and Approval), Section 5.1(c)(i) (No Conflict — Seller's Organizational Documents) and Section 5.1(o) (Brokers).

"**Seller Group**" has the meaning set forth in Section 12.16(b).

"**Seller Released Claims**" has the meaning set forth in Section 12.16(c).

"**Sellers Brand**" means the trademarks "PROTERRA," "PROTERRA POWERED," and any trademark confusingly similar thereto and derivatives thereof.

"**Sherman Act**" means title 15 of the United States Code §§ 1-7, as amended.

"**Software**" means computer software, including, source code, object code, disks, documentation, operating manuals, related systems data, source programs, record layouts, program libraries, and any other documentation in those application areas that may pertain to any data processing system or operation.

"**Successful Bidder**" has the meaning set forth in the Bidding Procedures.

"**Support Obligations**" has the meaning set forth in Section 7.9.

"**Tangible Personal Property**" means the fixed assets, equipment, equipment spare parts, machinery, fixtures, tools, furniture and furnishings, consumables, inventory (including raw materials, works in progress, finished goods and packaging), parts, computers, hardware, information technology infrastructure, telephones, tablets, dies, jigs, molds, supplies, motor vehicles, cranes, forklifts, other rolling stock, supplies and other tangible personal property owned or possessed by a Seller and (a) used or held for use primarily in connection with, or necessary for the operation of, the Acquired Business and the Acquired Assets regardless of where located (including inventory (including raw materials, works in progress, finished goods and packaging) in transit to or from any Transferred Real Property), (b) listed on Schedule 1-E or (c) located at or appurtenant to the Transferred Real Property, notwithstanding that such Tangible Personal Property may not be primarily used or held for use in connection with the conduct of the Acquired Business and notwithstanding that such Tangible Personal Property may be used in the conduct of the Proterra Other Business Units.

"**Tax Returns**" means all returns, declarations, reports, statements, schedules, notices, forms or other documents or information filed or required to be filed in respect of the determination, assessment, collection or payment of any Tax or in connection with the

administration, implementation or enforcement of any legal requirement relating to any Tax, and the term "**Tax Return**" means any one of the foregoing Tax Returns.

"**Taxes**" means all taxes, charges, fees, levies or other like assessments, including U.S. federal, state, local, foreign, and other net income, gross income, gross receipts, social security, estimated, sales, use, ad valorem, franchise, profits, net worth, alternative or add-on minimum, capital gains, license, withholding, payroll, employment, unemployment, social security, excise, property, unclaimed property, escheat, transfer, and any and all other taxes, assessments, fees or other governmental charges, whether computed on a separate, consolidated unitary, combined or any other basis together with any interest and any penalties, additions to tax, estimated taxes or additional amounts with respect thereto, and including any liability for Taxes as a result of being a member of a consolidated, combined, unitary or affiliated group, and the term "Tax" means any one of the foregoing Taxes.

"**Trademark License Agreement**" means the Trademark License Agreement substantially in the form attached hereto as Exhibit E.

"**Transfer Taxes**" means all stamp, documentary, registration, value-added, transfer, sales, use, reporting, recording, filing and other similar fees, Taxes and charges resulting from the transfer of the Acquired Assets effected pursuant to this Agreement.

"**Transferred Contracts**" means each of the Contracts or Real Property Leases identified and/or described in the Schedule of Transferred Contracts set forth in Schedule 1-H, which schedule shall be in form and substance reasonably acceptable to Purchaser.

"**Transferred Employees**" has the meaning set forth in Section 8.1.

"**Transferred Incentives**" means all of Seller's right, title and interest in and to those certain (a) Fee in Lieu of Tax Agreement dated December 13, 2021 by and between Spartanburg County, South Carolina and Proterra Operating Company, Inc., (b) Revitalization Agreement dated December 2, 2021 by and between Coordinating Council for Economic Development for the State of South Carolina and Proterra Operating Company, Inc. (Spartanburg County EZ21423454A), and (c) Revitalization Agreement dated December 2, 2021 by and between Coordinating Council for Economic Development for the State of South Carolina and Proterra Operating Company, Inc. (Spartanburg County EZ21423454B).

"**Transferred Permits**" has the meaning set forth in the definition of Acquired Assets.

"**Transferred Real Property**" means all of Sellers' right, title and interest in any real property leased, subleased or licensed by Sellers as lessees, sublessees or licensees, pursuant to the Transferred Real Property Leases and, in each case, including all of Sellers' right, title and interest in any Improvements located on such real property or any ancillary rights and ancillary agreements related thereto (including the Transferred Incentives).

"**Transferred Real Property Leases**" means the Real Property Leases pursuant to which Sellers lease, sublease, license or otherwise occupy any real property that is primarily used in the conduct of the Acquired Business and, for the avoidance of doubt, shall include those Real Property Leases set forth on Schedule 1-H.

"**Transition Services Agreement**" means the transition services agreement(s) between Purchaser or an Affiliate of Purchaser and the Sellers or the respective purchasers of any Proterra Other Business Unit, as applicable, pursuant to which Purchaser or an Affiliate of Purchaser shall use commercially reasonable efforts to provide (or Sellers or the respective purchaser of any Proterra Other Business Unit shall use commercially reasonable efforts to provide) certain transition services related to the operation of the Acquired Business or the Proterra Other Business Units, as applicable, each of which shall be in form and substance reasonably satisfactory to Purchaser.

"**Treasury Regulations**" means the regulations (including all proposed and temporary regulations) promulgated by the U.S. Department of the Treasury under the Code, as such regulations may be amended from time to time.

"**Upward Adjustment**" has the meaning set forth in <u>Section 3.7(a)</u>.

"**WARN Act**" means the Worker Adjustment and Retraining Notification Act and any similar applicable Law.

"**Warranty Liability Claim**" means any Action or Liability arising out of or otherwise relating to in any way or in respect of any product recall or representation, warranty, agreement or guaranty made by a Seller, including any warranty claim, guaranty claim, refund, return, rebate, property damage, defective material claim and/or any other similar claim (including with respect to improper performance, malfunctioning, improper design or manufacture or other defect), or any other similar claim or cause of action, whether such claim or cause of action is known or unknown or asserted or unasserted, with respect to, any product sold, supplied, marketed, stored, delivered, distributed or transported by the Acquired Business.

Section 1.2    <u>Construction of Certain Terms and Phrases</u>.

(a)    Unless the context of this Agreement otherwise requires, (i) words of any gender include each other gender; (ii) words using the singular or plural number also include the plural or singular number, respectively; (iii) the terms "hereof," "herein," "hereby" and derivative or similar words refer to this entire Agreement; (iv) the terms "Article," "Section," or "clause" refer to the specified Article, Section, or clause of this Agreement; (v) the word "including" (and, with correlative meaning, the word "include") means including, without limiting the generality of any description preceding that word; (vi) the words "shall" and "will" are used interchangeably and have the same meaning; (vii) all references to Articles, Sections, Schedules or Exhibits shall mean and refer to Articles, Sections, Schedules or Exhibits in this Agreement; and (viii) "or" is used in the inclusive sense of "and/or". Any reference to a Law shall include any amendment thereof or any successor thereto and any rules and regulations promulgated thereunder, unless the context otherwise requires. Any reference in this Agreement to any contract, license, agreement or order means such contract, license, agreement or order as amended, supplemented or modified from time to time in accordance with the terms thereof. Currency amounts referenced in this Agreement are in U.S. Dollars.

(b)     Any representation or warranty contained herein as to the enforceability of a Contract (including this Agreement and any Related Agreement) will be subject to the effect of any bankruptcy, insolvency, reorganization, moratorium or other similar law affecting the enforcement of creditors' rights generally and to general equitable principles (regardless of whether such enforceability is considered in a proceeding in equity or at law).

(c)     This Agreement is being entered into by and among competent and sophisticated parties who are experienced in business matters and represented by counsel and other advisors, and have been reviewed by the parties and their counsel and other advisors. Therefore, any ambiguous language in this Agreement will not be construed against any particular party as the drafter of the language. The Recitals are part of this Agreement.

(d)     Whenever this Agreement refers to a number of days, such number shall refer to calendar days unless Business Days are specified. Whenever any action must be taken hereunder on or by a day that is not a Business Day, then such action may be validly taken on or by the next day that is a Business Day.

(e)     The phrases "provided", "delivered", or "made available", when used herein, mean that the information or materials referred to have been posted to the on-line "virtual data room" established under project name "Project Wren" on Intralinks to which Purchaser and its counsel have continuous access at least two (2) days prior to the Execution Date.

(f)     The Parties agree that any drafts of this Agreement or any Related Agreement prior to the final fully executed drafts shall not be used for purposes of interpreting any provision of this Agreement or any Related Agreement, and each of the Parties agrees that no Party shall make any claim, assert any defense or otherwise take any position inconsistent with the foregoing in connection with any dispute or Action among any of the foregoing or for any other purpose.

<u>ARTICLE II</u>

<u>Purchase and Sale and Assumption</u>

Section 2.1     <u>Purchase and Sale of Acquired Assets</u>. Upon the terms and subject to the conditions of this Agreement and the Sale Order, at the Closing, each Seller will sell, transfer, convey, assign, deliver and set over to Purchaser, and Purchaser will purchase and accept, all of the right, title, benefit and interest of such Seller in, to and under the Acquired Assets, free and clear of all Liens and Interests (other than Permitted Encumbrances and Assumed Liabilities), pursuant to Sections 105, 363, 365 and 1123(b)(4) of the Bankruptcy Code, as applicable. Other than the Permitted Encumbrances and Assumed Liabilities, all mortgages or other Liens on the Acquired Assets securing Indebtedness shall attach to the net proceeds of the Sale pursuant to Sections 105, 363, 365 and 1123(b)(4) of the Bankruptcy Code, as applicable, so that the Acquired Assets will be sold free and clear of such Liens and other Interests. At the Closing, the sale, transfer, conveyance, assignment and delivery of the Acquired Assets will be effected pursuant to

the General Assignment, the Intellectual Property Assignment Agreement, the Sale Order and other instruments of transfer described in <u>Section 4.2(a)</u>.

Section 2.2    <u>Excluded Assets</u>. Notwithstanding anything to the contrary contained herein, the Acquired Assets do not include, and in no event will Purchaser acquire any right, title, benefit or interest in, to or under, any of the Excluded Assets.

Section 2.3    <u>Assumed Liabilities</u>. Upon the terms and subject to the conditions of this Agreement and the Sale Order, at the Closing, Purchaser will assume all of the Assumed Liabilities. The assumption of the Assumed Liabilities by Purchaser will be effected pursuant to the Assumption Agreement and the Sale Order.

Section 2.4    <u>Excluded Liabilities</u>. Notwithstanding anything to the contrary contained herein, the Assumed Liabilities will not include, and in no event will Purchaser assume, be required to pay, perform, discharge or hold Sellers harmless from any Excluded Liabilities and such Excluded Liabilities shall be retained by and remain the Liabilities of Sellers.

Section 2.5    <u>Assignment and Cure Amounts</u>.

(a)    Subject to the terms and conditions of this Agreement and the entry of the Sale Order, at the Closing and pursuant to Section 365 of the Bankruptcy Code, each Seller shall assume and assign to Purchaser, and Purchaser shall take assignment from such Seller of, the Transferred Contracts and Transferred Real Property Leases. Purchaser shall be responsible for Cure Amounts, subject to <u>Section 2.5(c)</u>, and for satisfying the requirements of "adequate assurance of future performance" as required by section 365 of the Bankruptcy Code and shall cooperate fully with each Seller in seeking such approval from the Bankruptcy Court, including Purchaser providing the necessary evidence required in connection with the Sale Hearing, as applicable, to approve this Agreement and the transactions contemplated herein.

(b)    From and after the date hereof until the Closing, Purchaser may, in its sole discretion, elect to (a) designate a Contract or Real Property Lease that is not a Transferred Contract or Transferred Real Property Lease, respectively, and is primarily related to the Acquired Business or as otherwise agreed with Sellers, for assumption and assignment to Purchaser, effective on and as of the Closing, which assumption and assignment is subject to approval by Order of the Bankruptcy Court or (b) remove any Transferred Contract or Transferred Real Property Lease from their respective schedules. In the event Purchaser designates additional Contract(s) or Real Property Lease(s), Purchaser shall be responsible for paying any corresponding Cure Amount(s), irrespective of the Cure Amounts Cap and such additional Cure Amount(s) shall increase the Cure Amounts Cap. In the event Purchaser elects to remove any Transferred Contract or Transferred Real Property Lease, Sellers shall provide Purchaser with the amount that the Cash Payment would be adjusted in the event of removal based on the amount, if any, of the corresponding change to recovery of unsecured creditors (as measured against the projected rate of recoveries for unsecured creditors at the time of the conclusion of the auctions), as determined in Seller's good faith after consultation with Purchaser, and following this, if Purchaser so elects, the amount of the Cash Payment shall be so adjusted and paid by Purchaser and the Transferred

Contract or Transferred Real Property Lease shall be removed from the respective schedule. Notwithstanding anything to the contrary in this Section 2.5(b), any Contracts and Real Property Leases set forth in Schedule 2.5(b) (collectively, the "**Reserved Contracts and Leases**") may be designated by Purchaser for assumption or rejection until the Closing without such additional Cure Amount(s) increasing the Cure Amounts Cap (in the case of assumption) or any adjustment to the Cash Payment (in the case of rejection). The Schedule of Transferred Contracts will be supplemented as additional Contracts and Real Property Leases are designated for assumption and assignment or rejection as set forth in this Section 2.5(b).

(c)     Subject to Section 2.5(b), an amount not to exceed Thirty-Five Million Dollars ($35,000,000) in the aggregate of Cure Amounts (collectively, the "**Cure Amounts Cap**") shall be paid by Purchaser at the Closing or as soon as reasonably practicable thereafter (except as may otherwise be agreed to by the non-debtor party to the Transferred Contracts and Transferred Real Property Leases, including with respect to any negotiated Cure Amounts and timing of payment of any Cure Amounts) and such Seller shall have no Liability for any such Cure Amounts, subject to the cap set forth above, as adjusted pursuant to Section 2.5(b). Consistent with Paragraph 5(g) of the Bidding Procedures Order, for any Transferred Contracts and Transferred Real Property Leases that is the subject of a pending Cure/Assignment Objection (as defined in the Bidding Procedures Order) with respect solely to the amount of the Cure Amount owing under such Transferred Contracts and Transferred Real Property Leases at the time of Closing, Purchaser shall, subject to the Cure Amounts Cap (as adjusted pursuant to Section 2.5(b), (i) pay any undisputed Cure Amount at the Closing or as soon as reasonably practicable thereafter and (ii) appropriately reserve funding for the disputed portion of the Cure Amount pending resolution of the dispute; provided, however, that for the avoidance of any doubt, in no event shall Purchaser be required to reserve for or pay any portion of the disputed Cure Amounts that would exceed the Cure Amounts Cap, with such amounts exceeding the Cure Amounts Cap (as adjusted pursuant to Section 2.5(b)) being reserved for and paid by Sellers.

(d)     Sellers shall take all actions reasonably required for Bankruptcy Court approval to assume and assign their right, title and interest in and to the Transferred Contracts and Transferred Real Property Leases to Purchaser, including taking all actions reasonably necessary to facilitate any negotiations with the counterparties to such contracts and leases and, if necessary, to obtain an order of the Bankruptcy Court containing a finding that the proposed assumption and assignment of such contract or lease to Purchaser satisfies all applicable requirements of Section 365 of the Bankruptcy Code.

(e)     Prior to the Closing, Sellers shall not terminate, amend, supplement, modify, waive any rights under, or create any adverse interest with respect to any Contract or Real Property Lease to be assumed and assigned to Purchaser, without the prior written consent of Purchaser (not to be unreasonably withheld, conditioned or delayed) or unless Purchaser has provided written notice to Sellers designating such Contract or Real Property Lease for rejection pursuant to this Section 2.5.

Section 2.6    Bulk Sales Laws. Promptly following the date hereof, (a) Sellers shall prepare and file any documentation required to comply with applicable Laws regarding bulk sales in the state of South Carolina to obtain a certificate of compliance as described in South Carolina Code of Laws, Section 12-54-124, (b) Sellers shall cooperate with Purchaser in preparing and filing any documentation required to obtain the certificates described in California Revenue and Taxation Code Section 18669, California Unemployment Insurance Code Section 1732 and in the California Code of Regulations, Title 18, Section 1702(c) and (c) Sellers shall use their reasonable best efforts to obtain the certificates described in clause (a) and (b) prior to the Closing and to the extent that any such certificate reflects any amounts due and owing to any taxing authority, Sellers shall promptly pay the amounts reflected as due and owing to the applicable taxing authority and provide Purchaser with a certified receipt thereof or other evidence thereof in a form reasonably acceptable to Purchaser. Except as described in the preceding sentence, the parties hereto waive compliance by Sellers with any "bulk transfer" or similar Laws of any jurisdiction that may otherwise be applicable with respect to the sale and transfer of any or all of the Acquired Assets to Purchaser. Each party hereto shall take such steps as may be necessary or appropriate to provide in the Sale Order that the transfer of the Acquired Assets shall be free and clear of any security interests in the Acquired Assets, including any Liens or claims arising out of any "bulk transfer" or similar Laws.

## ARTICLE III

## Purchase Price

Section 3.1    Purchase Price; Earnest Deposit.

(a)    The purchase price for the Acquired Assets (the "**Purchase Price**") will be, in addition to the Assumed Liabilities and, subject to Section 2.5(c), the Cure Amounts (which shall be paid by Purchaser to the applicable counterparty on or about the Closing Date), an amount (the "**Closing Payment**") equal to (i) Two Hundred Ten Million Dollars ($210,000,000) (the "**Cash Payment**") plus or minus (ii) the amount of the Closing Inventory Adjustment (as set forth in Section 3.1(c)).

(b)    Purchaser or one of its Affiliates shall make an earnest deposit by wire transfer of immediately available funds into the Deposit Escrow Account equal to ten percent (10%) of the Cash Payment (the "**Earnest Deposit**") in accordance with the Bidding Procedures Order. The Deposit Escrow Funds while remaining in the Deposit Escrow Account, shall not be subject to any lien, attachment, trustee process, or any other judicial process of any creditor of any Seller, Purchaser or their respective Affiliates, and the Deposit Escrow Agreement shall provide that the Deposit Escrow Funds shall be released in accordance with the provisions of this Agreement and Bidding Procedures Order. All interest earned on the Earnest Deposit in the Deposit Escrow Account shall be distributed by the Escrow Agent (i) following the Closing, to Purchaser, or (ii) if the Agreement is terminated prior to the Closing, to Sellers or Purchaser, as applicable, in accordance with Section 10.2. Any portion of the Deposit Escrow Funds released to Purchaser in accordance with the terms of this Agreement and the Bidding Procedures Order shall not be subject to any lien, attachment, trustee process or any other judicial process of any creditor of any Seller. At the Closing, (i) the Earnest Deposit shall be

credited against the Estimated Closing Payment and distributed by the Escrow Agent to Sellers; and (ii) Purchaser will pay to Sellers by wire transfer of immediately available funds to an account specified in writing by Sellers an amount equal to the Estimated Closing Payment minus the Earnest Deposit minus the Prorations minus the Inventory Adjustment Escrow Amount.

(c)     Pursuant to Section 3.1(a), the Purchase Price will be increased or decreased on a dollar-for-dollar basis by the amount of the Closing Inventory Adjustment. For clarification purposes, in the event the Closing Inventory Adjustment is a positive number, such amount shall be added to the Purchase Price pursuant to Section 3.1(a)(ii). In the event the Closing Inventory Adjustment is a negative number, the absolute value of such amount shall be subtracted from the Purchase Price pursuant to Section 3.1(a)(ii).

Section 3.2     Withholding of Tax. Purchaser shall be entitled to deduct and withhold any amounts Purchaser is required to deduct and withhold under any applicable Tax Law in connection with payments to be made by Purchaser pursuant to the terms of this Agreement; provided, that, if Purchaser believes that any such deduction or withholding of Tax (other than any deduction or withholding as a result of the failure to provide a W-9 for Sellers in compliance with Section 4.2(a)(v)) is required with respect to any payment under this Agreement, then Purchaser shall use its commercially reasonable efforts to give written notice to Sellers describing the basis for such withholding in reasonable detail at least five (5) Business Days prior to making such payment and Purchaser shall provide Sellers with a reasonable opportunity to provide any applicable certificate, form or documentation that would reduce or eliminate the requirement to deduct and withhold Tax with respect to such payment, and Purchaser shall otherwise reasonably cooperate with Sellers and take such steps as Sellers may reasonably request to reduce or eliminate such withholding obligation to the extent permitted by applicable Law. Such withheld amounts will be treated for all purposes of this Agreement as having been paid to Sellers by Purchaser and shall be timely paid to the appropriate Tax authority.

Section 3.3     Allocation of Consideration. The Purchase Price, the Assumed Liabilities, and any other items required to be treated as consideration for U.S. federal income Tax purposes will be allocated among the Acquired Assets for all Tax purposes in accordance with section 1060 of the Code and the Treasury Regulations promulgated thereunder in a manner consistent with the principles set forth on Schedule 3.3 and the allocation used for applicable Transfer Tax purposes (the "**Allocation Principles**"). Within thirty (30) days following the final determination of Closing Inventory pursuant to Section 3.4 and Section 3.5, Purchaser shall provide to Sellers a draft allocation in a manner consistent with the Allocation Principles for Sellers' review and comment. If Sellers do not provide Purchaser written objections to the draft allocation within five (5) days of receipt, the draft allocation shall be deemed to be agreed upon by the parties. If Sellers propose changes to the draft allocation within such five (5)-day period, Sellers and Purchaser shall negotiate in good faith to amend any aspects of the allocation in dispute; provided, however, that if Sellers and Purchaser are unable to resolve any dispute with respect to the allocation within five (5) days after the date Purchaser received notice of Sellers' objection, such dispute shall be resolved by the Independent Accountant. The findings of the Independent Accountant shall be final, binding and conclusive on Sellers and Purchaser. The fees and expenses of the Independent Accountant shall be borne equally by Sellers and Purchaser. Purchaser and Sellers shall (a) complete and file IRS Form 8594 with their respective U.S. Federal income Tax Returns consistent

with such allocation for the taxable year in which the Closing occurs, and (b) not take any position (and cause their respective Affiliates to not take any position) on any Tax Return, before any Governmental or Regulatory Authority charged with the imposition, assessment or collection of Taxes, or in any judicial proceeding, that is in any manner inconsistent with the terms of such allocation, as finally determined; provided, however, that (i) no party hereto shall be unreasonably impeded in its ability and discretion to negotiate, compromise and/or settle any Tax audit, claim or similar proceedings in connection with such allocation and (ii) the allocation shall not be binding upon Sellers for purposes of any plan filed in connection with the Bankruptcy Cases and shall not, and shall not be interpreted to, have any effect on any distributions to Sellers' creditors or equityholders. The parties agree that for purposes of filing any Tax Return related to the transactions contemplated by this Agreement the parties shall not apply the principles of *Pierce v. Commissioner*, 326 F. 2d 67 (8th Cir. 1964) with respect to any prepaid amount received or deferred revenue accrued prior to the Closing in connection with the Acquired Assets or the Acquired Business. Notwithstanding any other provision of this Agreement, the terms and provisions of this Section 3.3 shall survive the Closing without limitation.

Section 3.4    Determination of Closing Inventory. Within sixty (60) days after the Closing Date, Purchaser shall prepare and deliver to Sellers a statement setting forth (a) Purchaser's calculation of Closing Inventory and (b) Purchaser's recalculation of the Closing Payment based thereon (the "**Closing Statement**"). The Closing Statement shall be prepared in accordance with this Agreement, including the principles set forth in Schedule 3.4, the definition of Closing Inventory and the other applicable definitions herein. During the thirty (30) day-period immediately following delivery of the Closing Statement, Sellers and their Representatives shall have reasonable access during normal business hours (or, in respect of books and records, Purchaser shall make copies available to Sellers and their Representatives) of the relevant books and records used in the preparation of the Closing Statement and the accountants and senior finance employees who were involved in the preparation of the Closing Statement as reasonably requested by Sellers for the purpose of enabling Sellers to review the Closing Statement and the amounts set forth thereon; provided, however, that the provision of any information or access pursuant to this Section 3.4 will be subject to appropriate confidentiality undertakings and, if applicable, execution of customary release letters in favor of the auditors as requested by the auditors in connection with the sharing of work papers.

Section 3.5    Disputes Regarding Closing Statement. Disputes with respect to the Closing Statement shall be resolved as follows:

(a)    Sellers shall have the Dispute Period to bring a Dispute, but only on the basis that the amounts reflected on the Closing Statement were not prepared in accordance with Section 3.4 (including Schedule 3.4) or were inaccurate or incomplete, in each case, in accordance with the terms of this Agreement (including such Section and such Schedule). If Sellers do not deliver a Dispute Notice during the Dispute Period, the Closing Statement shall be deemed to have been accepted and agreed to by Sellers in the form in which it was delivered to Sellers, and shall be final and binding upon the parties hereto. If Sellers have a Dispute, Sellers shall deliver to Purchaser a Dispute Notice within the Dispute Period, setting forth the items and amounts in dispute (collectively, the "**Disputed Items**") (it being understood that all other items and amounts reflected in the Closing Statement not so disputed shall be deemed final). For thirty (30) days after delivery of such

Dispute Notice, the parties hereto shall attempt to resolve the Disputed Items and agree in writing upon the final content of the disputed Closing Statement.

(b)　　If Purchaser and Sellers are unable to resolve all Disputed Items within the thirty (30) day period after Purchaser's receipt of a Dispute Notice (any such items and/or amounts remaining in dispute, collectively, the "**Remaining Disputed Items**"), Sellers and Purchaser shall jointly engage the Independent Accountant. The Independent Accountant's function shall be to act as an accounting expert only (and not as an arbitrator) to determine and resolve the Remaining Disputed Items (and only the Remaining Disputed Items) in accordance with this Agreement, including the requirements of <u>Section 3.4</u>, the principles set forth in <u>Schedule 3.4</u>, the definitions of Closing Inventory, Closing Inventory Adjustment and the other applicable definitions herein. The Independent Accountant's determination shall be based solely on one written submission by each of Purchaser and Sellers setting forth their respective positions regarding the Remaining Disputed Items (and not by independent determination of the amounts set forth on the Closing Statement). In connection with such process, there shall be no hearings or any oral examinations, testimony, depositions, discovery or other similar proceedings. In resolving any Remaining Disputed Item, the Independent Accountant may not assign a value to any item greater than the greatest value for such item claimed by either party or less than the smallest value for such item claimed by either party. Purchaser and Sellers shall direct the Independent Accountant to promptly, and in any event within thirty (30) days after the date of its appointment, render its decision on the Remaining Disputed Items in writing. Such written determination shall be final and binding upon the parties hereto and the parties shall be entitled to specifically enforce such determination. Upon the final resolution of all Disputes pursuant to this <u>Section 3.5</u>, the Closing Statement shall be revised to reflect such resolution. The Independent Accountant shall determine the portion of its fees and expenses to be paid by each of Sellers and Purchaser, which shall be in proportion to the degree to which the Independent Accountant has accepted the positions of the respective parties (e.g., if Sellers challenge the calculation of the Estimated Closing Statement by an amount of $100,000, but the Independent Accountant adjusts the Closing Statement in favor of Sellers by only $60,000, then Purchaser will pay 60% of the Independent Accountant's fees, costs and expenses and Sellers will pay 40% of the Independent Accountant's fees, costs and expenses).

Section 3.6　　<u>Manner of Payment of Purchase Price</u>. At least three (3) Business Days prior to the Closing Date, Sellers shall deliver to Purchaser a statement (the "**Estimated Closing Statement**") setting forth (a) Sellers' good faith estimate of Closing Inventory (and the corresponding Closing Inventory Adjustment) and (b) Sellers' calculation of the estimated Closing Payment (the "**Estimated Closing Payment**") based upon the estimate described in clause (a) immediately above. At least three (3) Business Days but not more than five (5) Business Days prior to the Closing Date, Sellers shall conduct a physical count of the Closing Inventory with Representatives of Purchaser present during such count. Sellers shall consider in good faith any comments made by Purchaser to the Estimated Closing Statement.

Section 3.7　　<u>Time and Manner of Payment of Purchase Price Adjustment</u>. Following the final determination of Closing Inventory pursuant to <u>Section 3.4</u> and <u>Section 3.5</u>, the Closing

Payment shall be recalculated based thereon, and any difference between such recalculated Closing Payment and the Estimated Closing Payment shall be paid as follows:

(a)       if the recalculated Closing Payment exceeds the Estimated Closing Payment (such amount, if any, an "**Upward Adjustment**"), then (i) Purchaser and Holdco shall cause the Inventory Adjustment Escrow Amount in the escrow account to be paid to Sellers, by wire transfer of immediately available funds to an account designated by Sellers and (ii) the amount of the Upward Adjustment shall be paid to Sellers by Purchaser, within three (3) Business Days of the final determination of the Closing Payment, by wire transfer of immediately available funds to an account designated in writing by Sellers; and

(b)       if the Estimated Closing Payment exceeds the recalculated Closing Payment (such amount, a "**Downward Adjustment**"), then an amount equal to such Downward Adjustment shall (i) first, be deducted from the Inventory Adjustment Escrow Amount in the escrow account and paid to Purchaser, by wire transfer of immediately available funds to an account designated in writing by Purchaser and Purchaser and Holdco shall cause the remaining Inventory Adjustment Escrow Amount in the escrow account (if any) to be paid to Sellers, by wire transfer of immediately available funds to an account designated by Sellers, and (ii) if the Inventory Adjustment Escrow Amount in the escrow account is not enough to cover such Downward Adjustment in full, any amounts not fully covered by the funds in the Inventory Adjustment Escrow Amount in the escrow account shall be paid by Sellers to Purchaser, within three (3) Business Days of the final determination of the Closing Payment, by wire transfer of immediately available funds to an account designated in writing by Purchaser.

Within three (3) Business Days after the determination of the Closing Inventory, Purchaser and Holdco shall deliver a joint written instruction to the Escrow Agent instructing it to disburse all of the Inventory Adjustment Escrow Amount in the Escrow Account pursuant to this <u>Section 3.7</u>.

ARTICLE IV

Closing Matters

Section 4.1     <u>Closing</u>. Upon the terms and subject to the conditions of this Agreement, the Closing will take place beginning at 10:00 a.m. (local time) remotely by electronic transmissions or, in the event that the parties deem an in-person Closing necessary, at the offices of Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019-6064, on the second Business Day after the satisfaction (or waiver by the party for whose benefit such conditions exist) of all conditions described in <u>Article IX</u> that are required to be satisfied prior to the Closing (other than actions to be taken or items to be delivered at Closing as set forth herein, but subject to the satisfaction or waiver of such conditions), or at such other time, date, and place as the parties may mutually agree in writing; <u>provided</u> that in no event shall the Closing Date be prior to January 15, 2023. The date and time of Closing are referred to herein as the "**Closing Date**". All documents delivered and all transactions consummated at the Closing

will be deemed for all purposes to have been delivered and consummated effective as of the Effective Time.

Section 4.2    Deliveries at Closing.

(a)    Deliveries of Seller. At the Closing, each Seller will deliver or cause to be delivered to Purchaser the following, as applicable:

(i)    duly executed counterparts of the General Assignment, Assumption Agreement, Intellectual Property Assignment Agreement, Trademark License Agreement, Inventory Adjustment Escrow Agreement and other Related Agreements;

(ii)    the Acquired Business Books and Records;

(iii)    any physical Acquired Assets (which will be either delivered to the Transferred Real Property or otherwise made available to Purchaser, in either case, as reasonably specified by Purchaser);

(iv)    all certificates of title or origin (or similar documents), duly endorsed with respect to any material vehicles or other equipment included in the Acquired Assets for which a certificate of title or origin is required to transfer title;

(v)    a W-9 for such Seller duly executed by such Seller;

(vi)    a joint written instruction to the Escrow Agent instructing the release of the Earnest Deposit to Sellers;

(vii)    all other instruments of conveyance and transfer executed by the applicable Seller, in form and substance reasonably acceptable to Purchaser, as may be necessary to convey the Acquired Assets to Purchaser free and clear of all Liens, Liabilities (other than Assumed Liabilities) and other Interests (except Permitted Encumbrances), provided, however, that the Sale Order shall be the only required document to evidence the conveyance and transfer free and clear of such Liens, Liabilities and other Interests;

(viii)    (A) original certificates (if any) representing all shares of capital stock or other equity interests set forth on Schedule 1-M to the extent they are certificated, (B) stock powers or assignments evidencing the conveyance of such capital stock or other equity interests duly executed in blank, and (C) written notice prior to the Closing Date from Sellers to the issuer of such capital stock or other equity interests to the transfer to Purchaser of such capital stock or other equity interests;

(ix)    a certificate of good standing of each Seller from the Delaware Secretary of State as to such Seller, that will be dated not more than ten (10) days prior to the Closing Date;

(x)     a certificate of an officer of each Seller certifying that its Organizational Documents, as certified and as delivered at the Closing, have not been amended or rescinded since the date of such certification and remain in full force and effect at the Closing Date;

(xi)    copies of resolutions of the governing body of each Seller authorizing the execution, delivery and performance of this Agreement and the Related Agreements; and

(xii)   such other duly executed documents, instruments and certificates as may be required to be delivered by Sellers pursuant to the terms of this Agreement, all in form reasonably satisfactory to Purchaser.

(b)     <u>Deliveries by Purchaser</u>. At the Closing, Purchaser will deliver or cause to be delivered to Sellers the following:

(i)     An amount equal to (i) the Estimated Closing Payment <u>minus</u> (ii) the Earnest Deposit, as provided in <u>Section 3.1(b)</u> <u>minus</u> (iii) the Prorations <u>minus</u> (iv) the Inventory Adjustment Escrow Amount;

(ii)    a joint written instruction to the Escrow Agent instructing the release of the Earnest Deposit to Sellers;

(iii)   duly executed counterparts of the Assumption Agreement, Intellectual Property Assignment Agreement, Trademark License Agreement, Inventory Adjustment Escrow Agreement and other Related Agreements;

(iv)    a certificate of good standing of Purchaser from the Delaware Secretary of State as to Purchaser, that will be dated not more than ten (10) days prior to the Closing Date;

(v)     a certificate of an officer of Purchaser certifying that its Organizational Documents, as certified and as delivered at the Closing, have not been amended or rescinded since the date of such certification and remain in full force and effect at the Closing Date;

(vi)    copies of resolutions of the governing body of Purchaser authorizing the execution, delivery and performance of this Agreement and the Related Agreements; and

(vii)   such other duly executed documents, instruments and certificates as may be required to be delivered by Purchaser pursuant to the terms of this Agreement, all in form reasonably satisfactory to Sellers.

(c)     <u>Inventory Adjustment Escrow</u>. At the Closing, Purchaser shall deposit or cause to be deposited in escrow with the Escrow Agent a portion of the Purchase Price equal to Seven Million Dollars ($7,000,000) (the "**Inventory Adjustment Escrow Amount**") in immediately available funds. The Inventory Adjustment Escrow Amount

shall be held in an account and disbursed by the Escrow Agent in accordance with the terms and provisions of the Inventory Adjustment Escrow Agreement.

Section 4.3    Further Assurances and Cooperation.

(a)    Further Assurances. Subject to the terms and conditions of this Agreement, from time to time after the Closing through the date on which the Bankruptcy Cases are closed, at a party's reasonable request and without further consideration or cost to any party, the other party will execute and deliver such other instruments of sale, transfer, conveyance, assignment and confirmation, and assumption, and provide such materials and information and take such other actions as the other party may reasonably deem necessary or desirable in order to more effectively transfer, convey and assign to Purchaser all of the Acquired Assets and/or in order to more effectively effect the assumption by Purchaser of the Assumed Liabilities and Purchaser's operation of the Acquired Business and/or in order to carry out the intent of this Agreement and the documents referred to in this Agreement and to more effectively comply with the terms of this Agreement and the Related Agreements and consummate the transactions contemplated hereby and thereby. In addition, from time to time following the Closing Date, each party shall (and shall cause its respective Affiliates to) promptly execute, acknowledge and deliver such further documents and perform such further acts as are reasonably requested by Purchaser and as may be necessary to transfer and convey to Purchaser, or make available to Purchaser the benefits of any assets, properties or rights held by Sellers or any of their Affiliates (or their respective assignees) that have been used in, and are necessary for the operation of, the Acquired Business. The parties acknowledge and agree that (i) each Seller and its Affiliates shall be obligated to transfer and convey ownership of an asset, property or right under this Section 4.3(a) only if the asset is used primarily in the Acquired Business, and (ii) with respect to any asset that is used by Sellers or any of their Affiliates primarily in a Proterra Other Business Unit, then, Sellers and their Affiliates (and their respective assignees) shall be obligated to enter into an arrangement on terms reasonably acceptable to Purchaser pursuant to which Purchaser receives the benefit of such asset, property or right, in each case without cost to Purchaser.

(b)    Access to Information and Books and Records. During the period from the Execution Date to the Closing Date, Sellers shall provide Purchaser and its authorized Representatives with (x) reasonable access, during normal business hours and upon reasonable prior written notice, to the Acquired Business, the Acquired Assets, the Assumed Liabilities, the Transferred Real Property and Acquired Business Employees and any offices, facilities or warehouses relating the Acquired Business and (y) information and books and records of Sellers related to the Acquired Business, any Acquired Asset, any Assumed Liability or any transition service contemplated to be provided or received by Purchaser, including employee records and Benefit Plan data, reasonably requested by Purchaser, except as otherwise prohibited by applicable Laws. For a period of twelve (12) months following the Closing (or until the earlier liquidation or dissolution of Sellers), Purchaser and Sellers will afford each other, and their respective Representatives, during normal business hours and upon reasonable prior notice, reasonable access to, in the case of Sellers, the Excluded Books and Records and, in the case of Purchaser, the Acquired Business Books and Records in its possession with respect to periods through the Closing

and the right to make copies and extracts therefrom to the extent that such access may be reasonably required by the requesting party in connection with (i) the preparation of Tax Returns, (ii) any Tax audit, Tax protest, or other proceeding relating to Taxes, (iii) the making of any election related to Taxes, (iv) compliance with the requirements of any Governmental or Regulatory Authority, (v) Sellers' conduct or administration of the Bankruptcy Cases including, their participation in any contested matter or adversary proceeding in or relating to the Bankruptcy Cases, (vi) monitoring or enforcing rights or obligations of each Seller under this Agreement, (vii) the preparation of financial or accounting statements, financial or accounting reports or in connection with other financial or accounting matters or (viii) any actual or threatened third party action or proceeding. Neither Purchaser nor Sellers may, for a period of the shorter of seven (7) years after the Effective Time and the motion of any Seller to close or dismiss the Bankruptcy Cases, destroy or otherwise dispose of any such books, records and other data unless such party will first offer in writing to surrender copies of such books, records and other such data to the other party and such other party has not agreed in writing to take possession thereof during the ten (10) day period after such offer is made.

(c)     Tax Cooperation. If, in order to properly prepare its Tax Returns or other documents or reports required to be filed with any Governmental or Regulatory Authority, it is necessary that either Purchaser or Sellers be furnished with additional information, documents or records relating to the Acquired Business, the Acquired Assets or the Assumed Liabilities not referred to in Section 4.3(b), and such information, documents or records are in the possession or control of the other party, such other party will use its Reasonable Efforts to furnish or make available such information, documents or records (or copies thereof) at the recipient's reasonable request and at recipient's cost and expense. Notwithstanding the foregoing, this Section 4.3 shall not require any Seller or Purchaser, as applicable, to permit any access to, or to disclose (i) any information that, in the reasonable, good faith judgment (after consultation with counsel, which may be in-house counsel) of Sellers or Purchaser, as applicable, is reasonably likely to result in any violation of any legal requirement or any Contract to which a Seller or Purchaser, as applicable, is a party or cause any privilege (including attorney-client privilege) or work product protection that a Seller or Purchaser, as applicable, would be entitled to assert to be waived or (ii) if any Seller, on the one hand, and Purchaser, on the other hand, are adverse parties in a litigation, any information that is reasonably pertinent thereto.

(d)     Prorations. Prorations that accrue ratably with the lapse of time during the applicable period that includes the Closing Date shall be prorated on a per diem basis based upon the number of days during the applicable period in which Closing occurs that fall on or before the Closing (which shall be allocated to Sellers) and the number of days in such period following the Closing (which shall be allocated to Purchaser). All such prorations shall be made on the Closing Date; provided, that if the actual bills for such period are not then available, then the rates and assessed valuation of the previous year, with any known changes, shall be used, and when the actual amounts for such period are determinable, then such amounts shall be re-prorated between Sellers and Purchaser to reflect the actual amounts for the applicable taxable period in which Closing occurs. On the Closing Date, each Seller and Purchaser shall sign a statement showing the amount of all such prorations being made on such date. Within a reasonable period of time following receipt by Purchaser

or a Seller of a bill for any item subject to a proration pursuant to this Section 4.3(d), such party shall provide a copy of such bill to the other party and shall advise the other party as to the amount, if any, that each party is responsible to pay pursuant to this Section 4.3(d). Purchaser and Sellers shall thereafter promptly (no later than ten (10) Business Days following receipt of such bill) pay its portion of such expense.

ARTICLE V

Representations and Warranties

Section 5.1    Representations and Warranties of Seller. Except as set forth in the Seller Disclosure Schedules, each Seller makes the following representations and warranties to Purchaser as set forth in this Section 5.1 and represents and warrants to Purchaser that the statements contained in this Section 5.1 are true and correct as of the date hereof and as of the Closing Date. The Seller Disclosure Schedules will be arranged in paragraphs corresponding to the lettered and numbered Paragraphs contained in this Section 5.1 that are qualified or modified by such disclosure (as to which Purchaser acknowledges and agrees that any matter disclosed pursuant to a section, subsection, paragraph or subparagraph of the Seller Disclosure Schedules shall be deemed to relate to and qualify the particular representation or warranty set forth in the corresponding section, subsection, paragraph or subparagraph in this Agreement and any other representation or warranty only if and to the extent the content or context of such disclosure makes it reasonably apparent on its face, if read in the context of such other section, subsection, paragraph or subparagraph of the Seller Disclosure Schedules, that such disclosure is applicable to such other representation or warranty):

(a)    Organization and Existence. Such Seller is a corporation duly incorporated, validly existing, and in good standing under the laws of the State of Delaware, with full power and authority to own, lease, and operate the properties and assets now owned, leased or operated by such Seller, including the Acquired Business and the applicable Acquired Assets and to carry on the Acquired Business as and where such assets are now owned or leased and the Acquired Business is now conducted, subject to the Bankruptcy Cases. The states in which such Seller is required by law to be qualified to do business as a foreign company are set forth on Section 5.1(a) of the Seller Disclosure Schedules, and such Seller is qualified to do business as a foreign company in each such state and is in good standing (or its equivalent) in every jurisdiction in which its ownership of property or the conduct of its business as now conducted requires it to qualify.

(b)    Authority and Approval. Such Seller has the power to enter into this Agreement and each of the Related Agreements to which it is a party, subject to entry of the Sale Order by the Bankruptcy Court, and to perform its obligations hereunder and thereunder. The execution, delivery and performance by such Seller of this Agreement and the Related Agreements to which it is to be a party, and the consummation by such Seller of the transactions contemplated herein and therein, have been duly authorized by all required corporate action on the part of such Seller, and no other corporate or similar organizational action on the part of such Seller is necessary to authorize the execution, delivery or performance by such Seller of this Agreement and the Related Agreements to which it is to be a party, the performance of the obligations of such Seller contemplated

herein and therein and the consummation of the transactions contemplated herein and therein. This Agreement has been duly executed and delivered by such Seller, and when executed and delivered by such Seller, the Related Agreements to which it is a party will have been duly executed and delivered by such Seller, subject to the Bankruptcy Cases. This Agreement is, and each of the Related Agreements to which such Seller is a party when executed and delivered by such Seller, subject to entry of the Sale Order by the Bankruptcy Court, will be, the valid and binding obligations of such Seller, enforceable against such Seller, in accordance with their respective terms, except as may be limited by the Bankruptcy Cases.

(c)     No Conflict. The execution, delivery and performance by such Seller of this Agreement and each of the Related Agreements to which it is to be a party, and such Seller's compliance with the terms and conditions hereof and thereof, and the consummation by such Seller of the transactions contemplated hereby and thereby, do not and will not (i) violate, conflict with, or require the consent of any Person under such Seller's Organizational Documents, (ii) subject to entry of the Sale Order, obtaining the authorizations referred to in Section 5.1(d) of the Seller Disclosure Schedules and excluding any Antitrust Law, violate or breach any provision of, or require any consent, authorization, or approval under, any Law or Order applicable to such Seller, the Acquired Business, the Acquired Assets or the Assumed Liabilities, (iii) result in a violation or breach of any provision of any Law or Order applicable to such Seller, the Acquired Business, the Acquired Assets, the Transferred Real Property or the Assumed Liabilities, (iv) subject to entry of the Sale Order, and except as set forth in Section 5.1(c) of the Seller Disclosure Schedules, violate, conflict with, result in a breach of, constitute a default under (whether with or without notice or the lapse of time or both), accelerate or permit the acceleration of the performance required by, or require any consent, authorization, or approval under, any Transferred Contract or other Material Contract, or Transferred Permit material to the Acquired Business to which such Seller is a party or by which such Seller is bound or to which any of its assets or properties are subject, except to the extent excused or stayed by the Bankruptcy Cases or (v) result in the creation of any Lien upon the Acquired Assets other than Permitted Encumbrances; provided, however, that no representation or warranty is made in the foregoing clauses (ii) through (v) with respect to matters that would not reasonably be expected, individually or in the aggregate, to be material to the Acquired Assets taken as a whole.

(d)     Governmental Approvals and Filing. Except (i) as set forth in Section 9.3(b) or as disclosed in Section 5.1(d) of the Seller Disclosure Schedules, (ii) with respect to any Antitrust Law, and (iii) the entry of the Sale Order, no consent, authorization, approval or action of, filing with, notice to, or exemption from any Governmental or Regulatory Authority on the part of such Seller is required in connection with the execution, delivery and performance of this Agreement or any Related Agreements to which such Seller is to be a party or the consummation of the transactions contemplated hereby or thereby, except where the failure to obtain any such consent, approval or action, to make any such filing, to give any such notice or obtain any such exemption would not be reasonably expected to (x) have a material adverse effect on such Seller, the Acquired Assets or the Acquired Business or (y) materially adversely affect the validity or enforceability against such Seller

of this Agreement or such Related Agreements or materially adversely affect the ability of such Seller to consummate the transactions contemplated by this Agreement.

(e) <u>Legal Proceedings</u>. <u>Section 5.1(e)</u> of the Seller Disclosure Schedules contains a complete and accurate description (including the case caption and case number where available) of each material Action to which such Seller is currently or in the last year had been a party. Except as disclosed in <u>Section 5.1(e)</u> of the Seller Disclosure Schedules or on the Bankruptcy Cases docket, there is no: (i) pending or, to Seller's Knowledge, written threatened Action or Order of any Governmental or Regulatory Authority, in each case relating to such Seller, the Acquired Business, the Transferred Real Property or any of the Acquired Assets, in each case that would reasonably be expected to adversely affect the validity or enforceability of this Agreement or any of the Related Agreements against such Seller or adversely affect the ability of such Seller to consummate the transactions contemplated by this Agreement; or (ii) Orders outstanding against such Seller that would adversely affect the ability of such Seller to consummate the transactions contemplated by this Agreement or that are otherwise related to such Seller, the Acquired Business, the Transferred Real Property, or the Acquired Assets.

(f) <u>Compliance with Laws and Orders</u>. Except as set forth in <u>Section 5.1(f)</u> of the Seller Disclosure Schedules, there is no unresolved material violation of or default under any Law or Order applicable to such Seller, the Acquired Business, the Acquired Assets, or the Transferred Real Property, or the Assumed Liabilities, in each case, other than as a result of the Bankruptcy Cases or stayed by the Bankruptcy Court. Such Seller is in compliance in all material respects with all applicable Laws regulating such Seller, the Acquired Business, the Acquired Assets, or the Transferred Real Property.

(g) <u>Employee Matters and Employee Benefit Plans</u>.

(i) Each Benefit Plan has been maintained, administered and funded in all material respects, in accordance with its terms and all provisions of applicable Laws (including ERISA and the Code). Except as set forth on <u>Section 5.1(g)(i)</u> of the Seller Disclosure Schedules, none of Sellers or their ERISA Affiliates have, within the past six (6) years, incurred, and no event has occurred and no condition or circumstance exists that could result, directly or indirectly, in, any unsatisfied Liability (including, any indirect, contingent or secondary Liability) of any Seller or any ERISA Affiliate under Title IV of ERISA or Section 412 or 430 of the Code or Section 302 or 303 of ERISA. Sellers have provided Purchaser with true and complete copies of the following (as applicable) for each Assumed Benefit Plan: (i) the written document evidencing each Assumed Benefit Plan, including any amendments thereto; (ii) the most recent annual report (Form 5500); (iii) the most recent summary plan description and summary of material modifications; (iv) the most recently received Internal Revenue Service opinion or determination letter relating to an Assumed Benefit Plan; and (v) the most recently prepared actuarial report or financial statement relating to an Assumed Benefit Plan.

(ii) Each of the Benefit Plans that is intended to qualify under Section 401 of the Code has received a favorable opinion or determination letter

from the Internal Revenue Service that such Benefit Plan is so qualified, and, to the Knowledge of Sellers, nothing has occurred with respect to the operation of any such Benefit Plan which could reasonably be expected to result in the revocation of such favorable opinion or determination.

(iii)    Sellers have timely paid all payments, reimbursements or contributions due to date that are required under Benefit Plans, and there are no pending or unresolved claims under any Benefit Plans for outstanding or owed contributions, arrears, delinquencies, or for compliance with any payroll audit or investigation concerning the Acquired Business Employees.

(iv)    Section 5.1(g)(iv) of the Seller Disclosure Schedules is a complete and accurate anonymized list of all Acquired Business Employees, including base salary/base wage, commissions, bonus or incentive opportunities, title or position, date of hire, work location, exempt or non-exempt status, and full-time or part-time status.

(v)    (A) With respect to the Acquired Business Employees, Sellers are in compliance in all material respects with all applicable Laws relating to labor and employment, including all legal requirements relating to discrimination, equal employment opportunities, disability, labor relations, wages and hours, Fair Labor Standards Act, payment of wages, occupational safety, and family and medical leave and (B) there are no pending, or to the Knowledge of Sellers, threatened, lawsuits, grievances, unfair labor practice charges, arbitrations, charges, investigations, hearings, actions, claims, or proceedings (including any administrative investigations, charges, claims, actions, or proceedings), against Sellers brought by or on behalf of any Acquired Business Employee alleging violation of any labor or employment legal requirements, breach of any express or implied contract of employment, wrongful termination of employment, or any other discriminatory, wrongful, or tortious conduct in connection with the employment relationship.

(vi)    Except as set forth in Section 5.1(g)(vi) of the Seller Disclosure Schedules, such Seller is not a party to or bound by a collective bargaining agreement or similar agreement with a union or other labor organization covering any of the Acquired Business Employees, and none of the Acquired Business Employees is represented by a union or other certified bargaining agent with respect to their services to Sellers or the Acquired Business nor has there been a pending demand for recognition or certification by a union or other certified bargaining agent, and there are no representation or certification proceedings or petitions seeking a representation proceeding pending or, to the Knowledge of Sellers, threatened to be brought or filed with the National Labor Relations Board or similar Governmental or Regulatory Authority. To the Knowledge of Sellers, there are no union organizing activities with respect to any of the Acquired Business Employees. With respect to the Acquired Business, there is not any, and in the last three (3) years has been no, strike, slowdown, picketing or work stoppage.

(vii)     Except as set forth in Section 5.1(g)(vii) of the Seller Disclosure Schedules, neither the execution of this Agreement nor the consummation of any of the transactions contemplated hereby will, alone or in combination with any other event, result in any payment or benefit becoming due to any Acquired Business Employee, increase the amount of any payment or benefit due to any Acquired Business Employee or accelerate the vesting or time of payment of any compensation or benefit for any Acquired Business Employee.

(h)     Title.

(i)     Except as set forth in Section 5.1(h)(i) of the Seller Disclosure Schedules, Sellers have good, valid and marketable title to, or a valid leasehold interest in and right to use, all Acquired Assets, in each case, free and clear of all Liens other than Permitted Encumbrances or Liens that will be released at the Closing Date, and as of the Closing Date and subject to the entry of the Sale Order, Purchaser will acquire good, valid, marketable and undivided title in and to the Acquired Assets, free and clear of all Liens other than Permitted Encumbrances.

(ii)     The Acquired Assets and the Exclusions constitute all of the assets, properties and rights that are used or held for use in, or are otherwise necessary for the operation of, the Acquired Business. Except as set forth in Section 5.1(h)(ii)(A) of the Seller Disclosure Schedules, all of tangible personal property located at the Transferred Real Property constitutes Acquired Assets. Section 5.1(h)(ii)(B) of the Seller Disclosure Schedules sets forth the location of each item of tangible personal property included in the Acquired Assets that is not located at the Transferred Real Property. All leased tangible personal property included in the Acquired Assets is set forth in Section 5.1(h)(ii)(C) of the Seller Disclosure Schedules.

(iii)     Assuming the receipt of all required consents, the employment or replacement by Purchaser of substantially all of the Acquired Business Employees, and the assignment of all Transferred Contracts material, individually or in the aggregate, to the Acquired Business, and provided Purchaser replaces the assets specified in the definition of "Excluded Assets" on the Closing Date (the "**Exclusions**"), the Acquired Assets and the Transferred Contracts, taking into account all provisions of this Agreement and the Related Agreements, will enable Purchaser to conduct, in all material respects, the manufacturing, research and development and sales functions of the Acquired Business immediately following the Closing as conducted by the Sellers as of the date of this Agreement.

(iv)     Subject to reserves maintained in accordance with GAAP for (A) slow-moving, obsolete, outmoded or scrap inventory and (B) quality or safety retention holds, the inventory of Sellers that is held for resale, sale, lease or consumption, including raw material, work in process, finished goods and packaging, consists of items of a quantity and quality historically useable and/or saleable in the Ordinary Course of Business, free from any material defect or deficiency.

(i)     Intellectual Property. Section 5.1(i)(a) of the Seller Disclosure Schedules contains a complete and accurate list of all patents, registered trademarks and trademark applications, material unregistered trademarks, registered copyrights and applications for copyright registrations and domain names included in the Purchased Intellectual Property. Except as set forth in Section 5.1(i) of the Seller Disclosure Schedules:

(i)     No Action is pending and, to Sellers' Knowledge, no claims are threatened in writing by any Person against Sellers (1) alleging the use by Sellers of any of the Purchased Intellectual Property infringes or misappropriates the Intellectual Property of any third party; (2) claiming infringement upon or misappropriation of any Intellectual Property rights of third parties as a result of the operation by Sellers of the Acquired Business as presently conducted; or (3) challenging the ownership or validity of any of the Purchased Intellectual Property (other than non-final office actions and similar correspondence involving the United States Patent and Trademark Office or any equivalent foreign Governmental or Regulatory Authority);

(ii)     There are no orders, judgments, holdings, consents, decrees, settlements or rulings with respect to Intellectual Property to which any Seller, or any of the Purchased Intellectual Property, is bound (excluding, for the avoidance of doubt, ordinary course determinations by the United States Patent and Trademark Office or any equivalent foreign Governmental or Regulatory Authority).

(iii)     Such Seller is the owner of the Purchased Intellectual Property, and has the right to use, free and clear of all Liens, other than Permitted Encumbrances, the Purchased Intellectual Property;

(iv)     To Sellers' Knowledge, the operation of the Acquired Business as currently conducted by Sellers, and the possession or use of the Purchased Intellectual Property by Sellers, do not infringe, misappropriate or otherwise violate any Intellectual Property right of any other Person. To Sellers' Knowledge, none of the Purchased Intellectual Property is being infringed, misappropriated or otherwise violated by any Person; and

(v)     Sellers have used Reasonable Efforts to maintain the secrecy and protect the confidentiality of any trade secret included in the Purchased Intellectual Property.

(vi)     The execution of this Agreement by Sellers will not contravene any Privacy Laws and Security Requirements applicable to Sellers. Each Seller, with respect to the Acquired Business, is in compliance in all material respects with applicable Privacy Laws and Security Requirements. Sellers maintain commercially reasonable safeguards designed to protect Personal Information in their possession or control against loss and against unauthorized access, use, modification or disclosure. Sellers do not engage in the sale of Personal Information as defined by Privacy Laws and Security requirements.

(vii)    With respect to the Acquired Business, during the two (2) year period preceding the date of this Agreement, (1) there have been no Security Breaches, and (2) neither Seller has received any written notice of any claims of, or, to the Knowledge of Sellers, been charged with, a violation of any applicable Privacy Laws and Security Requirements.

(j)    Material Contracts.

(i)    Except for (x) Contracts subject to ordinary course confidentiality restrictions that have not been waived despite such Seller's commercially reasonable efforts to have such restrictions waived to permit disclosure to Purchaser, (y) Contracts with legal, financial, or other advisors, independent contractors and consultants in connection with the Bankruptcy Case or any other transactions contemplated hereby, and (z) any agreement entered into with any of such Seller's secured lenders, Section 5.1(j)(i) of the Seller Disclosure Schedules contains a complete and accurate list as of the date hereof of all of the following Transferred Contracts to which such Seller is a party ("**Material Contracts**"):

(A)    all Contracts involving commitments to others to make capital expenditures or purchases or sales in excess of Five Hundred Thousand Dollars ($500,000);

(B)    any Contract creating a shareholders' agreement, strategic alliance, partnership, joint venture agreement, development, joint development or similar arrangement that is material to the Acquired Business;

(C)    any Contract that relates to the settlement of any legal proceeding in the last two (2) years or under which any Seller has outstanding obligations or imposes continuing restrictions on the operation of the Acquired Assets or Acquired Business other than any confidentiality, release or non-disparagement provisions;

(D)    any written employment, consulting, contractor, confidentiality, non-competition, severance or termination agreements as to employees, individual consultants or other individual service providers, in each case, material to the Acquired Business;

(E)    any collective bargaining agreements;

(F)    any Contract that is an operations, maintenance or staffing services or other agreement with a provider of contract labor, including any professional employer organization, consulting firm or temporary employee agency;

(G)    all Contracts (1) relating to any direct or indirect Indebtedness (other than any agreement with such Seller's secured lenders) (including, without limitation, loan agreements, lease purchase arrangements, guarantees, agreements to purchase goods or services or to supply funds or other undertakings on which others rely in extending credit), or any conditional sales contracts, chattel mortgages, equipment lease agreements and other security arrangements with

respect to personal property, in each case, with a principal or secured amount in excess of Two Hundred Fifty Thousand Dollars ($250,000), or (2) granting any Person a Lien on all or any part of the Acquired Assets, other than Liens that will be released at the Closing Date;

(H)    all Contracts between Holdco and Opco;

(I)    all swap agreements, securities contracts, commodities contracts, option agreements, repurchase agreements, futures contracts, forward contracts, master netting agreements, in each instance, as such term is defined or otherwise referenced in the Bankruptcy Code, or other hedging agreement or derivative agreement used in the conduct of the Acquired Business;

(J)    all Contracts that in any way could limit the freedom of Purchaser to engage in any line of business or to compete with any Person or to operate in any area or territory;

(K)    all (1) Contracts pursuant to which Sellers grant to a third party a license or right to use any Purchased Intellectual Property and (2) Contracts pursuant to which Sellers obtain a license or right to use any material Intellectual Property (other than licenses for "off-the-shelf" Software or other Software generally commercially available on standard terms and conditions, or non-exclusive licenses of Intellectual Property);

(L)    all Contracts (whether exclusive or otherwise) with any sales agent, representative, franchisee, dealer, distributor;

(M)    all Contracts that require the payment of royalties;

(N)    all Contracts with any Governmental or Regulatory Authority;

(O)    all Contracts involving a sharing of profits, losses, costs or liabilities or that creates a partnership or joint venture or similar arrangement;

(P)    all customer Contracts of the Acquired Business;

(Q)    all supplier Contracts of the Acquired Business, including material purchase orders and sales orders for which, as of the date hereof, a supplier remains obligated to provide goods or services or such Seller remains obligated to pay for goods or services, and excluding all other purchase orders and sales orders;

(R)    any customer or supplier Contract in which any Seller grants most favored nation pricing to any Person;

(S)    all Contracts containing written warranties or guaranties extended by such Seller, other than warranties or guaranties extended by such Seller to a customer pursuant to a Contract disclosed pursuant to any of the other items of this Section 5.1(j)(i);

(T)     all other Contracts not of the type covered by any of the other items of this Section 5.1(j)(i) involving money or property having an obligation, or relating to payments by or to such Seller, in excess of Fifty Thousand Dollars ($50,000) per month or Two Hundred Fifty Thousand Dollars ($250,000) in the aggregate in the last twelve (12) consecutive months, except those that are terminable by such Seller on sixty (60) days' notice or less without penalty;

(U)     all Contracts under which any Seller is (1) a lessee or sublessee of any machinery, equipment, vehicle or other tangible personal property involving payments of more than Two Hundred Fifty Thousand Dollars ($250,000) in the aggregate in any twelve (12)-month period, (2) a lessee or sublessee of any real property or (3) a lessor of any tangible personal property owned by any Seller;

(V)     all Contracts between any Seller and any Affiliate (other than Holdco or Opco) of any Seller that is not already covered by any of the other items of this Section 5.1(j)(i);

(W)     all Contracts entered into outside of the Ordinary Course of Business involving payment or obligations in excess of One Million Dollars ($1,000,000) that is not already covered by any of the other items of this Section 5.1(j)(i).

(ii)     True, correct and complete copies of the Material Contracts (including any amendments, supplements, restatements or modifications thereto) listed in Section 5.1(j)(i) of the Seller Disclosure Schedules have been made available to Purchaser. Subject to entry of the Sale Order and payment of all Cure Amounts, each Material Contract that is a Transferred Contract is in full force and effect, is fully assignable without the consent of any Person, except as set forth on Section 5.1(j)(ii) of the Seller Disclosure Schedules, and is valid, binding and enforceable in accordance with its terms as to such Seller and, to Seller's Knowledge, the other parties to the Material Contract. Other than the payment of Cure Amounts, such Seller has performed and is performing all obligations required to be performed by it under the Material Contracts that are Transferred Contracts. Except as set forth in Section 5.1(j)(ii) of the Seller Disclosure Schedules, no material default or material breach of a Material Contract that is a Transferred Contract exists (or, solely as a result of the Bankruptcy Cases or the consummation of the transactions contemplated hereby, will exist) on the part of such Seller or, to Seller's Knowledge, on the part of any other Person under any such Material Contracts, and no condition or event has occurred that, after notice or lapse of time, or both, would constitute a material default or material breach of such Material Contracts that are Transferred Contracts. No party to a Material Contract that is a Transferred Contract has notified such Seller in writing, and neither Seller has received any written notice, or to Seller's Knowledge, oral notice that such party intends to (i) cancel or otherwise terminate or otherwise not renew such Material Contract, (ii) materially reduce its obligations under any such Material Contract, (iii) make an indemnification or other material claim under any such Material Contract or to Seller's Knowledge, taken any action or threatened to take any of the foregoing actions in clauses (i) through (iii) or taken any action or threatened to

take any action with respect of an amount paid to such Seller pursuant to such Material Contract or a reduction in fees due to such Seller pursuant to such Material Contract.

(k)     Permits. Sellers own or possess all Permits necessary and material to the Condition of the Acquired Business or the ownership, operation and use of the Acquired Assets and the Acquired Business. Section 5.1(k) of the Seller Disclosure Schedules identifies a complete and correct list of all Permits possessed by Sellers that are necessary to the conduct of the Acquired Business by the Sellers or the ownership or operation of the Acquired Assets by the Sellers as conducted prior to the Petition Date. Except as disclosed in Section 5.1(k) of the Seller Disclosure Schedules or as a result of the Bankruptcy Cases, (i) all such Permits possessed by Sellers are in full force and effect; (ii) Sellers are, and during the past (2) years, have been in compliance in all material respects with the terms and conditions of such Permits, and no event has occurred during such time period which, with notice or lapse of time, or both, would constitute a breach or default or violation of any term, condition, provision or requirement of any Permit; and (iii) Sellers have not received written notice of violation or proposed revocation or termination or limitation or non-renewal of any such Permit from any issuing Person or Governmental or Regulatory Authority, which remains unresolved, and no investigation or Action by any Person or Governmental or Regulatory Authority with respect to the Acquired Business, Acquired Assets, Assumed Liabilities or Permits is pending or, to Seller's Knowledge, threatened, and during the prior two (2) years, no Seller has received any written notice of any such investigation or Action or any notice of violation of any Permit, except in each case, for any such investigation or Action that would not reasonably be expected to be material to the Acquired Assets.

(l)     Insurance. Sellers maintain material insurance covering the Acquired Business and the Acquired Assets in amounts (and subject to deductibles and self-insurance amounts) that, to Seller's Knowledge, are consistent with local industry practice and which Sellers have reasonably determined to be adequate for the Acquired Business. Each insurance policy of any Seller (including the name of the carrier thereunder, the amounts, limits or deductibles thereunder, and the expiration date thereof) is listed on Section 5.1(l) of the Seller Disclosure Schedules.

(m)     Certain Environmental Matters. Except as (i) related solely to the Excluded Assets, or (ii) disclosed in Section 5.1(m) of the Seller Disclosure Schedules:

(i)     Sellers hold, and are in compliance in all material respects with, all Permits required to conduct the Acquired Business as currently being conducted under any Environmental Laws.

(ii)     Sellers, the Acquired Business and the Transferred Real Property have been and are in compliance with all Environmental Laws and, during the two (2) years preceding the Execution Date (or earlier, if not fully resolved), such Seller has not received written notice from any Person alleging that such Seller, the Acquired Business or the Transferred Real Property, is in material violation of or

is liable under any applicable Environmental Law, which violation or liability is unresolved.

(iii)    During the two (2) years preceding the date of this Agreement (or earlier, if not fully resolved), such Seller has not received any written request for information or any written notice that it is a potentially responsible party under any Environmental Laws with regard to the Acquired Business or the operation of the Transferred Real Property or any off-site location, and to Sellers' Knowledge it is not such a potentially responsible party under any Environmental Law.

(iv)    Such Seller is not subject to any outstanding Order or demand relating to compliance with any Environmental Law or to investigation or cleanup of Hazardous Materials.

(v)    No Hazardous Materials are present in, on or under the Transferred Real Property, except those used by such Seller in the ordinary operation of the Acquired Business and in strict compliance with Environmental Laws.

(vi)    Such Seller has not transported, stored, used, manufactured, disposed of or released Hazardous Materials in violation of or which could be the basis of liability under Environmental Laws.

(vii)    There are no Actions pending or, to the Knowledge of Sellers, threatened against or affecting any Seller related to Environmental Laws.

(viii)    No capital improvements are necessary for the Acquired Business to continue to operate in compliance with Environmental Law and the Acquired Business does not maintain or reasonably should not maintain reserves under GAAP for environmental matters, liabilities or potential liabilities.

(ix)    Sellers have delivered to Purchaser true and complete copies of all environmental Phase I reports and other investigations, studies, audits, tests, reviews or other analyses commenced or conducted by or on behalf of the Sellers or the Acquired Business (or by a third party of which it or they have knowledge) in relation to the current or prior business of the Acquired Business or any real property presently or formerly owned, leased, or operated by the Acquired Business (or its predecessors) that are in the possession, custody or control of Sellers or the Acquired Business.

(n)    Transferred Real Property. Except as set forth in Section 5.1(n) of the Seller Disclosure Schedules:

(i)    Schedule 1-F contains a true, correct and complete list of such Seller's Transferred Real Property. Such Seller has made available to Purchaser true correct and complete copies of the Transferred Real Property Leases with respect thereto.

(ii)     Such Seller has a good and valid leasehold right in and to such Seller's Transferred Real Property, free and clear, as of the Closing Date, of Liens and other Interests, except for Permitted Encumbrances and the sublease set forth in Section 5.1(n) of the Seller Disclosure Schedules. Subject to entry of the Sale Order and payment of all Cure Amounts, each of the Transferred Real Property Leases with respect thereto is in full force and effect, and neither such Seller, nor to the Knowledge of Sellers, any other party thereto, is in material default thereunder, nor has any condition or event occurred that, after notice or lapse of time, or both, would constitute a material default thereunder by such Seller or, to the Knowledge of Sellers, any other party thereto, other than as a result of the Bankruptcy Cases. Such Seller has not, and will not fail to renew any Transferred Real Property Lease that by its terms would otherwise expire, except in the Ordinary Course of Business. Subject to entry of the Sale Order and payment of all Cure Amounts and except as set forth in Section 5.1(n) of the Seller Disclosure Schedules, the consummation of the transactions contemplated by this Agreement does not require the consent of any party to any Transferred Real Property Lease, will not result in a breach of or default under any Transferred Real Property Lease, or otherwise cause any Transferred Real Property Lease to cease to be legal, valid, binding, enforceable and in full force and effect on identical terms following the Closing Date.

(iii)     Other than the rights of fee (or other superior interest) owners and as set forth in Section 5.1(n) of the Seller Disclosure Schedules, there are no subtenants or other parties in possession of any of such Seller's Transferred Real Property.

(iv)     To the Knowledge of Sellers, there are no pending or threatened proceedings or actions to condemn or take by power of eminent domain, all or any of such Seller's Transferred Real Property.

(v)     Except as set forth in Section 5.1(n) of the Seller Disclosure Schedules, as of the Closing Date, (i) all rents, required deposits and additional rents due to date pursuant to the Transferred Real Property Leases have been paid in full, and (ii) no Seller has collaterally assigned or granted any security interest in any Transferred Real Property Lease or any interest therein.

(vi)     The Transferred Real Property listed on Schedule 1-F of the Seller Disclosure Schedules constitutes all of the real property and improvements used and occupied by the Sellers necessary to conduct the Acquired Business as conducted prior to the Petition Date. To the Knowledge of the Sellers, as of the Closing Date no fact or condition exists which is reasonably likely to result in the material impairment of the use or occupancy of such real property and Improvements in the Ordinary Course of Business following the Closing Date.

(o)     Brokers. Except as set forth in Section 5.1(o) of the Seller Disclosure Schedules, no broker, finder or investment banker is entitled to any brokerage commission,

finder's fee or similar payment in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of Sellers.

(p)    Taxes. Except as otherwise set forth in Section 5.1(p) of the Seller Disclosure Schedules:

(i)    All material Tax Returns required to be filed with respect to the Acquired Assets and the Acquired Business have been timely filed and all such Tax Returns are true, accurate and complete in all material respects.

(ii)    All material Taxes with respect to the Acquired Assets and the Acquired Business that are due and payable have been duly and timely paid.

(iii)    There is no claim, audit, action, suit, investigation or other proceeding pending or threatened in writing against, or with respect to, a material amount of Taxes relating to the Acquired Assets or the Acquired Business.

(iv)    No written claim has ever been made in a jurisdiction where any Seller does not file Tax Returns with respect to the Acquired Assets and the Acquired Business that such Seller is subject to taxation in that jurisdiction with respect to the Acquired Assets and the Acquired Business.

(v)    All Taxes that any Seller is required to withhold or to collect with respect to the Acquired Assets or the Acquired Business have been duly withheld and collected and have been timely paid over to the proper governmental authorities and agencies to the extent due and payable.

(vi)    Except for any shares of capital stock or other equity interests in or issued by a Person other than a Seller as set forth on Schedule 1-M, none of the Acquired Assets is an equity interest in any Person for Tax purposes.

(vii)    No Seller has given or been requested to give waivers or extensions (or is or would be subject to a waiver or extension given by any other Person) of any statute of limitations relating to the assessment or payment of Taxes with respect to the Acquired Assets or the Acquired Business.

(viii)    There is no Lien (other than with respect to any ad valorem Taxes not yet due and payable) on any of the Acquired Assets that arose in connection with any failure (or alleged failure) to pay any Tax.

(ix)    None of the Assumed Liabilities is an obligation under any Tax allocation, Tax sharing, Tax indemnification or similar agreement or arrangement with respect to Taxes.

(x)    No Seller has claimed or will claim the credit allowed under Section 48C of the Code after August 16, 2022 with respect to any assets (including the Acquired Assets) that are or have been located at the Transferred Real Property or the property subject to the Transferred Real Property Leases.

(q) <u>Credit Support Obligations</u>. <u>Section 5.1(q)</u> of the Seller Disclosure Schedules sets forth a true and complete list of each guaranty, letter of credit, performance or surety bond or similar credit support arrangement (including the name of the counterparty, the amounts and the term thereunder) provided by such Seller or any of its Affiliates to any other Person with respect to related to the Acquired Business, any Acquired Asset or any Transferred Contract.

(r) <u>No Material Adverse Change</u>. Except as described in <u>Section 5.1(r)</u> of the Seller Disclosure Schedules, except as a result of the Bankruptcy Cases, since the Petition Date:

(i) There has not occurred any event or condition that, individually or in the aggregate, has had or is reasonably expected to have an Acquired Business Material Adverse Effect;

(ii) Such Seller has not, except in the Ordinary Course of Business, sold, leased, transferred, or assigned any of the material properties, rights or other assets of such Seller that would, but for such transaction, be an Acquired Asset;

(iii) Such Seller has not cancelled, compromised, waived or released any right or claim (or series of related rights and claims) related to the Acquired Assets except in the Ordinary Course of Business or pursuant to an Order of the Bankruptcy Court;

(iv) Such Seller has not (i) made any change to any accounting method or any change to any material methods of reporting income, deductions or other items for Tax purposes, (ii) made or changed any election with respect to Taxes, (iii) amended any Tax Return, (iv) entered into any closing agreement related to Taxes, (v) settled any Tax claim or assessment, (vi) consented to any extension or waiver of the limitation period applicable to any Tax claim or assessment, (vii) failed to file any Tax Return, or (viii) failed to pay any Tax that became due and payable;

(v) There has not occurred any material damage, destruction, contamination or loss (whether or not covered by insurance) to any Acquired Asset that is has failed to repair or take steps to repair; or

(vi) Such Seller has not made any agreement to do any of the foregoing.

(s) <u>Inter-Company Transactions</u>. A true, correct and complete list and description of all Contracts (including any amendments, supplements, restatements or modifications thereto) between Sellers relating to the Acquired Assets, Assumed Liabilities or the Acquired Business, is set forth in <u>Section 5.1(s)</u> of the Seller Disclosure Schedules, and true, correct and complete copies of such Contracts have been made available to Purchaser. There are no Contracts between any Seller, on the one hand, and any Affiliate (other than Holdco or Opco) of any Seller, on the other hand, relating to the Acquired Assets, Assumed Liabilities or the Acquired Business. No member of the Seller Group other than a Seller (i) owns any asset, property or right, whether tangible or intangible,

which is or has been used in, or is otherwise necessary for the operation of, the Acquired Business, (ii) is a party to any Transferred Contract, or (iii) provides services or resources to any Seller or is dependent on services or resources provided by any Seller. No Acquired Asset is or has been used by any member of the Seller Group in the conduct of any of its businesses or operations, other than the Acquired Business and the Proterra Other Business Units.

(t)　　Relations With Competitors; Amounts Owed Related Parties. Except as set forth on Section 5.1(t) of the Seller Disclosure Schedules, such Seller does not own, directly or indirectly, any interest in (excepting not more than five percent (5%) stock holdings for investment purposes in securities of publicly held and traded companies) nor is it an officer, director, employee or consultant of, any Person that is a competitor, lessor, lessee, customer or supplier of the Acquired Business or in any other Person with whom the Acquired Business has any business relationship.

(u)　　Equity Interests in Other Persons. Sellers purchased in cash and have no further payment obligations with respect to the shares of capital stock or other equity interests in or issued by a Person other than a Seller set forth on Schedule 1-M and Sellers have held and owned such shares of capital stock or other equity interests for a period of time greater than one (1) year. With respect to any such shares of capital stock or other equity interests set forth on Schedule 1-M, except as set forth on Section 5.1(u) of the Seller Disclosure Schedules, (i) there are no voting agreements or voting trusts or proxies or other agreements with respect to voting, stockholder agreements, rights agreements, agreements containing restrictions on transfer, preemptive rights or the like, (ii) there are no outstanding powers of attorney with respect thereto, (iii) no Seller is subject to any obligation (contingent or otherwise) to provide additional capital with respect thereto or to the issuer of any such capital stock or other equity interests, and (iv) all issuances, sales and purchases thereof have been effected in compliance with all applicable federal, state and provincial securities laws.

(v)　　Anti-Corruption Compliance; Certain Business Practices. The Acquired Business, Sellers, their respective Affiliates and each of their respective officers, directors, and employees, and to the Knowledge of Sellers, their respective agents, and representatives have at all times during the past two (2) years complied in all respects with the provisions of Anti-Corruption Laws. Neither any Seller, nor the Acquired Business, nor any Affiliate of any Seller, nor any of their respective directors, officers, or employees, nor, to the Knowledge of the Sellers, any of their respective agents, or representatives have: (i) used any funds for unlawful contributions, gifts, entertainment or other unlawful expenses related to political activity; (ii) made any unlawful payment to foreign or domestic government officers or employees or to foreign or domestic political parties or campaigns or violated any provision of the Anti-Corruption Laws; or (iii) made any payment that would constitute a bribe, kickback or illegal or improper payment to assist Sellers, any of their respective Affiliates or the Acquired Business in obtaining or retaining business for, or with, or directing business to, any person, or in securing any improper advantage. There have been no false or fictitious entries made in the books or records of Sellers, any of their Affiliates or the Acquired Business relating to any illegal payment or secret or unrecorded fund and Sellers have not established or maintained a secret or

unrecorded fund. Sellers, their respective Affiliates and the Acquired Business have implemented and maintain in effect policies and procedures designed to ensure compliance by Sellers, their Affiliates and the Acquired Business, and their respective directors, officers, employees, agents, and representatives with Anti-Corruption Laws. "**Anti-Corruption Laws**" means the U.S. Foreign Corrupt Practices Act of 1977, as amended, and the provisions of any other applicable domestic or foreign anti-corruption laws.

    (w)    <u>CFIUS; Sanctions and Export and Import Compliance</u>.

    (i)    Neither the Acquired Business nor any Seller, nor any Affiliate of any Seller: (A) is a "TID U.S. Business" as defined in the Department of the Treasury's Office of Investment Security regulations at 31 C.F.R. § 800.248; (B) produces, designs, tests, manufactures, fabricates or develops any "critical technologies" as defined at 31 C.F.R. § 800.215; or (C) operates in, or designs, any critical technology for use in any of the industries set forth in 31 C.F.R. Part 800, Appendix B, and therefore no filing before the Committee on Foreign Investment in the United States is required pursuant to §800.401 in connection with the transactions contemplated by this Agreement and any Related Agreement.

    (ii)    The Acquired Business, Sellers, their respective Affiliates and their respective officers, directors, and employees, and to the Knowledge of Sellers, their respective agents, and representatives have at all times during the past two (2) years complied with all applicable Sanctions. During the past two (2) years, neither the Acquired Business nor any Seller, nor any Affiliate of any Seller, nor any of their respective directors, officers, or employees, nor, to the Knowledge of Sellers, any of their respective agents or representatives has: (A) been or is a Sanctioned Person; (B) been or is owned or controlled by a Sanctioned Person; (C) maintained or maintains any offices, branches, operations, assets, investments, Employees, or agents in any Sanctioned Country; (D) participated in any transaction or business dealing with any Sanctioned Person or in any Sanctioned Country; (E) received from any Governmental or Regulatory Authority or any other person any notice, inquiry, or internal or external allegation regarding an actual or alleged violation of Sanctions; or (F) made any voluntary or involuntary disclosure to a Governmental or Regulatory Authority regarding an actual or alleged violation of Sanctions. "**Sanctioned Country**" means any country, jurisdiction or territory that is the subject or target of comprehensive Sanctions (at the time of this agreement, the Crimea Region, the occupied Ukrainian regions of Kherson, Zaporizhzhia, Luhansk, and Donetsk, Cuba, Iran, North Korea, and Syria). "**Sanctioned Person**" means any Person that is or was the subject or target of Sanctions or restrictions under Sanctions Laws, including: (a) any Person listed on any applicable U.S. or non-U.S. sanctions- or export-related restricted party list, including but not limited to the U.S. Department of the Treasury's Office of Foreign Assets Control's ("**OFAC**") Specially Designated Nationals and Blocked Persons List, List of Persons Identified as Blocked Solely Pursuant to Executive Order 13599, and Sectoral Sanctions Identifications List; the Denied Persons, Unverified, and Entity Lists, maintained by the U.S. Department of Commerce; and the Debarred List or non-proliferation sanctions lists maintained by the U.S. State Department; and

similar lists maintained by the United Nations Security Council; (b) any person that is, in the aggregate, fifty percent (50%) or greater owned, directly or indirectly, or otherwise controlled by a Person or Persons described in clause (a); or (c) any person located, organized or resident in a Sanctioned Country. "**Sanctions**" means economic sanctions laws, regulations, and executive orders of the United States (including those administered by OFAC, the U.S. Department of State, and the U.S. Department of Commerce), the United Nations Security Council, the European Union, any European Union member state, the United Kingdom and any other relevant sanctions authority.

(iii)    The Acquired Business, Sellers, their respective Affiliates and their respective officers, directors, and employees, and to the Knowledge of Sellers, their respective agents, and representatives have at all times during the past two (2) years complied with Export Control Laws. During the past two (2) years, neither the Acquired Business nor any Seller nor any of their respective Affiliates, nor any of their respective directors, officers or employees, nor, to the Knowledge of Sellers, any of their respective agents or representatives has: (A) received from any Governmental or Regulatory Authority or any other person any notice, inquiry, or internal or external allegation regarding an actual or alleged violation of Export Control Laws; or (B) made any voluntary or involuntary disclosure to a Governmental or Regulatory Authority regarding an actual or alleged violation of Export Control Laws. "**Export Control Laws**" means the U.S. Export Controls Reform Act, U.S. International Emergency Economic Powers Act, U.S. Export Administration Regulations, U.S. Arms Export Control Act, U.S. International Traffic in Arms Regulations and their respective implementing rules and regulations administered by the U.S. State Department and the U.S. Commerce Department, and other similar export control Laws or restrictions applicable to Sellers, their respective Affiliates, the Acquired Business and their operations from time to time.

(iv)    The Acquired Business, Sellers, their respective Affiliates and their respective officers, directors, and employees, and to the Knowledge of Sellers, their respective agents, and representatives have at all times during the past two (2) years complied in all material respects with all rules and regulations relating to imports, including those enforced by CBP. The Acquired Business, Sellers, their respective Affiliates and their respective officers, directors, and employees, and to the Knowledge of Sellers, their respective agents, and representatives have, during the past two (2) years, had no material issues with CBP relating to the tariff classification or valuation of the goods it imports. No goods imported by Sellers have been subject to CBP detention or seizure, nor subject to notices of redelivery. All duties owed, including any anti-dumping or countervailing duties, or additional duties owed under sections 232 of the Trade Expansion Act of 1962, as amended, or under section 301 of the Trade Act of 1974, have been paid, or are in the process of being paid, in the ordinary course of business. To the Knowledge of Sellers, based on due diligence performed on its supply chains in China and in other countries, its supply chains are free of forced labor. "**CBP**" means U.S. Custom and Border Protection.

(x)  Warranties Exclusive. EXCEPT AS EXPRESSLY SET FORTH IN THIS SECTION 5.1 (AS MODIFIED BY THE SELLER DISCLOSURE SCHEDULES), SUCH SELLER MAKES NO REPRESENTATION OR WARRANTY, STATUTORY, EXPRESS OR IMPLIED, WRITTEN OR ORAL, AT LAW OR IN EQUITY, IN RESPECT OF ANY OF ITS ASSETS (INCLUDING THE ACQUIRED ASSETS), LIABILITIES (INCLUDING THE ASSUMED LIABILITIES), THE BUSINESS OR THE ACQUIRED BUSINESS, INCLUDING, WITH RESPECT TO MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, OR NON-INFRINGEMENT, AND ANY SUCH OTHER REPRESENTATIONS OR WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED AND NONE SHALL BE IMPLIED AT LAW OR IN EQUITY. NEITHER SUCH SELLER NOR ANY OTHER PERSON, DIRECTLY OR INDIRECTLY, HAS MADE OR IS MAKING, ANY REPRESENTATION OR WARRANTY, WHETHER WRITTEN OR ORAL, REGARDING THE PRO-FORMA FINANCIAL INFORMATION, FINANCIAL PROJECTIONS OR OTHER FORWARD-LOOKING STATEMENTS OF SUCH SELLER, THE BUSINESS OR THE ACQUIRED BUSINESS.

Section 5.2  Representations and Warranties of Purchaser. Except as set forth in the Purchaser Disclosure Schedules, Purchaser makes the following representations and warranties to Sellers as set forth in this Section 5.2 and represents and warrants to Sellers that the statements contained in this Section 5.2 are true and correct as of the date hereof and as of the Closing Date. The Purchaser Disclosure Schedules will be arranged in paragraphs corresponding to the lettered and numbered paragraphs contained in this Section 5.2 that are qualified or modified by such disclosure (as to which each Seller acknowledges and agrees that any matter disclosed pursuant to a section, subsection, paragraph or subparagraph of the Purchaser Disclosure Schedules shall be deemed to relate to and qualify the particular representation or warranty set forth in the corresponding section, subsection, paragraph or subparagraph in this Agreement and any other representation or warranty only if and to the extent the content or context of such disclosure makes it reasonably apparent on its face, if read in the context of such other section, subsection, paragraph or subparagraph of the Purchaser Disclosure Schedules, that such disclosure is applicable to such other representation or warranty):

(a)  Organization and Existence. Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, with full power and authority to own, lease and operate its business and properties and to carry on its business as and where such properties and assets are now owned or leased and such business is now conducted.

(b)  Authority and Approval. Purchaser has the power to enter into this Agreement and each of the Related Agreements to which it is to be a party and to perform its obligations hereunder and thereunder. The execution, delivery and performance by Purchaser of this Agreement and the Related Agreements to which it is to be a party, and the consummation by Purchaser of the transactions contemplated herein and therein, have been duly authorized by all required action on the part of Purchaser. This Agreement has been duly executed and delivered by Purchaser and, when executed and delivered by Purchaser, the Related Agreements to which Purchaser is to be a party will have been duly executed and delivered by Purchaser. This Agreement is, and each of the Related

Agreements to which Purchaser is to be a party when executed and delivered by Purchaser, will be, the valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with their respective terms, except as may be limited by the Bankruptcy Cases.

(c)     <u>No Conflict</u>. The execution and delivery by Purchaser of this Agreement and each of the Related Agreements to which it is to be a party, and Purchaser's compliance with the terms and conditions hereof and thereof, and the consummation by Purchaser of the transactions contemplated hereby and thereby, do not and will not (i) conflict with any of Purchaser's Organizational Documents, (ii) subject to entry of the Sale Order and obtaining the authorizations referred to in <u>Section 5.2(d)</u> of the Purchaser Disclosure Schedules, violate or breach in any material respect any provision of, or require any consent, authorization, or approval under, any Law or any Order applicable to Purchaser, (iii) result in a violation or breach of any provision of any Law or Order applicable to Purchaser, (iv) subject to entry of the Sale Order, violate, conflict with, result in a breach of, constitute a default under (whether with or without notice or the lapse of time or both), accelerate or permit the acceleration of the performance required by, or require any consent, authorization, or approval under, any material Contract to which Purchaser is a party or by which it is bound or to which any of its assets or property is subject or (v) result in the creation of any Lien upon the assets or property of Purchaser, except in each case as would not reasonably be expected to have a material adverse effect on Purchaser or materially adversely affect the validity or enforceability of this Agreement against Purchaser or materially adversely affect the ability of Purchaser to consummate the transactions contemplated by this Agreement.

(d)     <u>Governmental Approvals and Filing</u>. Except (i) as set forth in <u>Section 9.3(b)</u> or as disclosed in <u>Section 5.2(d)</u> of the Purchaser Disclosure Schedules, and (ii) the entry of the Sale Order, no consent, authorization, approval or action of, filing with, notice to, or exemption from any Governmental or Regulatory Authority on the part of Purchaser is required in connection with the execution, delivery and performance of this Agreement or any Related Agreements to which Purchaser is to be a party or the consummation of the transactions contemplated hereby or thereby, except where the failure to obtain any such consent, approval or action, to make any such filing, to give any such notice or obtain any such exemption would not be reasonably expected to (i) have a material adverse effect on Purchaser or (ii) materially adversely affect the validity or enforceability against Purchaser of this Agreement or such Related Agreements or materially adversely affect the ability of Purchaser to consummate the transactions contemplated by this Agreement.

(e)     <u>Legal Proceedings</u>.

(i)     Purchaser has received no written notice that there are any lawsuits or arbitrations pending or threatened against Purchaser as would reasonably be expected (x) to have a material adverse effect on Purchaser, (y) to materially adversely affect the validity or enforceability of this Agreement or any of the Related Agreements against Purchaser or materially adversely affect the ability of Purchaser to consummate the transactions contemplated by this Agreement, or (z) result in the issuance of an Order restraining, enjoining or otherwise prohibiting

or making illegal the consummation of the transactions contemplated by this Agreement; and

        (ii)     Purchaser has received no written notice that there are any Orders outstanding against Purchaser that would be reasonably expected to have a material adverse effect on Purchaser or materially adversely affect the ability of Purchaser to consummate the transactions contemplated by this Agreement.

        (f)     <u>Brokers</u>. Other than PJT Partners (UK) Ltd., no broker, finder or investment banker is entitled to any brokerage commission, finder's fee or similar payment in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of Purchaser.

        (g)     <u>Financial Resources</u>. Purchaser has, and will have available at the Closing, funds sufficient to pay in full the Purchase Price, the Cure Amounts and the fees and expenses related to the transactions contemplated by this Agreement in cash. Purchaser knows of no circumstance or condition that could be reasonably expected to prevent the availability at Closing of such funds. Purchaser acknowledges and agrees that notwithstanding anything to the contrary contained herein, its obligation to consummate the transactions contemplated hereby is not subject to Purchaser or any of its Affiliates obtaining any financing.

        (h)     <u>Sophistication</u>. Purchaser is as of the Execution Date, and shall be as of the Closing Date, an "accredited investor" within the meaning of Rule 501(a) under the Securities Act of 1933 (as amended). Purchaser understands and is able to bear any economic risks associated with the transactions contemplated by this Agreement.

        (i)     <u>Investment Entirely for Own Account</u>. Purchaser is acquiring the Acquired Assets for investment for Purchaser's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and Purchaser has no present intention of selling, granting any participation in, or otherwise distributing the same. Purchaser does not presently have any Contract with any Person to sell, transfer or grant participations to such Person or to any third Person, with respect to any of the Acquired Assets or any debt or equity security or interest in any Seller.

        (j)     <u>Opportunity for Independent Investigation; No Other Representations</u>. Prior to its execution of this Agreement, Purchaser has conducted to its satisfaction an independent investigation and verification of the current condition and affairs of the Acquired Business and the Acquired Assets, including the condition, the cash flow and the prospects of the Acquired Assets and Assumed Liabilities. In making its decision to execute this Agreement and to purchase the Acquired Assets and assume the Assumed Liabilities, Purchaser has relied and will rely solely upon the results of such independent investigation and verification and the terms and conditions of this Agreement. Purchaser acknowledges and agrees that: (a) it has had the opportunity to visit the Acquired Business and to visit with Sellers and meet with its Representatives to discuss the Acquired Assets and Assumed Liabilities, and their condition, cash flows and prospects, and (b) except as expressly set forth in <u>Section 5.1</u>, neither Sellers nor any Affiliate thereof makes any

representation or warranty, express or implied, written or oral, as to the Acquired Business, the Acquired Assets or the Assumed Liabilities or any other matter. Except as expressly set forth in Section 5.1, Purchaser acknowledges that the Acquired Assets are being transferred on an "AS IS, WHERE IS" basis.

(k)     Disclaimer Regarding Projections. Purchaser may be in possession of certain projections and other forecasts regarding the Acquired Business, Acquired Assets and the Assumed Liabilities and any expansions or other development opportunities relating thereto or otherwise, including projected financial statements, cash flow items and other data, and certain business plan information of the Acquired Business, Acquired Assets and the Assumed Liabilities and any expansions or other development opportunities relating thereto or otherwise. Purchaser acknowledges that there are substantial uncertainties inherent in attempting to make such projections and other forecasts and plans, and that Purchaser is familiar with such uncertainties. Accordingly, Purchaser acknowledges that neither Sellers nor any of their Affiliates, Representatives, agents or advisors has made any representation or warranty, express or implied, written or oral, with respect to such projections and other forecasts and plans.

(l)     Warranties Exclusive. EXCEPT AS EXPRESSLY SET FORTH IN THIS Section 5.2 (AS MODIFIED BY THE PURCHASER DISCLOSURE SCHEDULES), NEITHER PURCHASER NOR ANY OTHER PERSON MAKES, AND ANY NEITHER SELLER NOR ANY MEMBER OF THE SELLER GROUP HAS RELIED ON, ANY REPRESENTATION OR WARRANTY, STATUTORY, EXPRESS OR IMPLIED, WRITTEN OR ORAL, AT LAW OR IN EQUITY, ON BEHALF OF PURCHASER OR ANY OTHER PERSON, INCLUDING ANY REPRESENTATION OR WARRANTY AS TO THE ACCURACY OR COMPLETENESS OF ANY INFORMATION REGARDING PURCHASED OR ANY OF ITS AFFILIATES FURNISHED, PROVIDED OR MADE AVAILABLE TO ANY SELLER AND ITS REPRESENTATIVES.

ARTICLE VI

Regulatory Matters

Purchaser hereby covenants and agrees with Sellers, and each Seller hereby covenants and agrees with Purchaser, in each case, as follows:

Section 6.1     Regulatory Filings. Subject to the terms and conditions of this Agreement, each party shall use Reasonable Efforts to (a) take, or cause to be taken, all actions and to do, or cause to be done, all things necessary under applicable Laws to consummate the transactions contemplated by this Agreement; (b) if required, file such applications and documents as may be required with any Governmental or Regulatory Authority, if any, with consent or approval rights as to or over the transfer of the Acquired Assets to Purchaser; (c) if required, file a Notification and Report Form pursuant to the HSR Act with respect to the transactions contemplated hereby within five (5) Business Days after Purchaser is selected as the Successful Bidder, if applicable, pursuant to the Bidding Procedures Order; (d) supply as promptly as practicable any additional information and documentary material that may be requested or required by any Governmental or Regulatory Authority having rights of consent or approval over or regarding the transfer of the

Acquired Assets to Purchaser, including pursuant to any Antitrust Law, including the HSR Act, and (e) if applicable, cause the expiration or termination of the applicable waiting periods under the HSR Act, any other Antitrust Law or any other state, federal or local law, regulation or designation as soon as practicable. In furtherance of and without limiting the generality of the foregoing, the parties hereto will use their respective Reasonable Efforts to (i) prepare, as soon as is practicable following the execution of this Agreement, all necessary filings in connection with the transactions contemplated by this Agreement that may be required to be filed by such party with any other relevant Governmental or Regulatory Authority, (ii) submit such filings as soon as practicable after Purchaser is selected as the Successful Bidder, if applicable, pursuant to the Bidding Procedures Order, (iii) assure that all such filings are in material compliance with the requirements of applicable regulatory Laws, (iv) make available to the other parties such information as the other parties may reasonably request in order to complete the filings or to respond to information requests by any relevant Governmental or Regulatory Authority, (v) take all actions necessary to cause all conditions set forth in <u>Article IX</u> to be satisfied as soon as practicable and (vi) execute and deliver any additional instruments reasonably requested and necessary to fully carry out the purposes of this Agreement. Except as set forth in <u>Section 12.13</u>, each party hereto shall bear its own fees, costs and all other expenses associated with any filings or consents with or from any third party in connection with or otherwise related to the transactions contemplated hereby.

Section 6.2    <u>Cooperation: Confidentiality</u>. In connection with the efforts referenced in <u>Section 6.1</u> to obtain all requisite approvals and authorizations for the transactions contemplated by this Agreement, including, if applicable, under the HSR Act, any other Antitrust Law or any state or local law or regulation, or of any other relevant Governmental or Regulatory Authority, each party hereto shall use Reasonable Efforts to (a) cooperate with the other parties in connection with any filing or submission and in connection with any investigation or other inquiry, including any proceeding initiated by a private party; (b) keep the other parties informed in all material respects of any material communication received by such party from, or given by such party to, any Governmental or Regulatory Authority and of any material communication received or given in connection with any proceeding by a private party, in each case, regarding any of the transactions contemplated hereby and (c) permit the other parties to review any material communication given to it by, and, to the extent reasonably practicable, consult with the other parties in advance of any meeting or conference with, any Governmental or Regulatory Authority, including in connection with any proceeding by a private party. The foregoing obligations in this <u>Section 6.2</u> shall be subject to the Confidentiality Agreement and any attorney-client, work product or other privilege, and each party hereto shall coordinate and cooperate fully with the other parties hereto in exchanging such information and providing such assistance as such other parties may reasonably request in connection with the foregoing and in seeking early termination of any applicable waiting periods under Antitrust Law. No party hereto will take any action with the intent of delaying, impairing or impeding the receipt of any required authorizations, consents, Orders or approvals.

Section 6.3    <u>Objections or Other Challenges</u>. If (a) any objections are asserted with respect to the transactions contemplated hereby under any Antitrust Law or if any suit is instituted by any Governmental or Regulatory Authority or any private party challenging any of the transactions contemplated hereby as violating any Law, including any Antitrust Law, or (b) the filing made pursuant to <u>Section 6.1</u> is reasonably likely to be rejected or conditioned by any

Governmental or Regulatory Authority, each party hereto shall use Reasonable Efforts to resolve such objections or challenge such Governmental or Regulatory Authority or private party may have to such transactions, including to vacate, lift, reverse or overturn any Order, whether temporary, preliminary or permanent, so as to permit consummation of the transactions contemplated by this Agreement. In furtherance of the foregoing, Purchaser shall undertake promptly any and all actions required to complete lawfully the transactions contemplated by this Agreement prior to the Outside Closing Date, including by (i) responding to and complying with, as promptly as reasonably practicable, any request for information or documentary material regarding the transactions from any relevant Governmental or Regulatory Authority (including responding to any "second request" for additional information or documentary material under the HSR Act as promptly as reasonably practicable), and (ii) causing the prompt expiration or termination (including requesting early termination and/or approvals thereof) of any applicable waiting period and clearance or approval by any relevant Governmental or Regulatory Authority, including defense against, and the resolution of, any objections or challenges, in court or otherwise, by any relevant Governmental or Regulatory Authority preventing consummation of the transactions. Notwithstanding the foregoing, Reasonable Efforts of the parties in connection with fulfillment of their respective obligations in this <u>Section 6.3</u> shall not include proffering or consenting to any Order providing for the sale or other disposition, or the holding separate, of particular Acquired Assets, categories of Acquired Assets or lines of business, of either Acquired Assets or lines of business of the Acquired Business or of any other assets or lines of business of Purchaser or any of its Affiliates, or proffering or consenting to any other restriction, prohibition or limitation on any of its assets, the Acquired Business, Purchaser or any of Purchaser's Affiliates, including offering, agreeing or consenting to any requirement to notify any Governmental or Regulatory Authority regarding any future transaction, or offering, agreeing, or consenting to any requirement to provide any Governmental or Regulatory Authority with pre-approval or other affirmative approval rights for any future transaction. Purchaser further agrees that neither it nor any of its Affiliates shall, prior to Closing, acquire, market, operate or control, nor enter into any other Contract to acquire, market, operate or control, any business similar to any portion of the Acquired Business if the proposed acquisition or ability to market, operate or control such business could reasonably be expected to materially delay the consummation of the transactions contemplated by this Agreement.

ARTICLE VII

Certain Covenants

Section 7.1    <u>Conduct of Business Pending Closing</u>. Except (1) those matters set forth in <u>Section 7.1</u> of the Seller Disclosure Schedules, (2) as otherwise expressly contemplated by this Agreement, (3) as required by applicable Law or any Governmental or Regulatory Authority, (4) with the written consent of Purchaser (which consent will not be unreasonably withheld, conditioned or delayed) or (5) for any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code, during the period from the Execution Date to the Closing, each Seller will:

(a)    consistent with past practice prior to the Petition Date, (i) preserve its business organization, (ii) maintain the Tangible Personal Property and other Acquired Assets in good working condition and repair and preserve intact the Acquired Assets (and

all goodwill relating thereto), (iii) conduct the Acquired Business (including the payment of payables) and billing, marketing, sales and discount practices only in the Ordinary Course of Business, and (iv) use its Reasonable Efforts to comply with all Laws applicable to the conduct of the Acquired Business or the ownership and use of the Acquired Assets;

(b)     not sell, assign, transfer, convey, license or dispose of (including by waiver or release) any Acquired Assets other than in the Ordinary Course of Business;

(c)     not cancel, terminate, fail to renew or amend, modify or change, in any material respect, any Transferred Permit, in each case, other than in the Ordinary Course of Business;

(d)     not amend, supplement or modify in any material respect, terminate (other than with cause), reject or waive any material term under, exercise any material option under or give any material consent with respect to any Transferred Contract, in each case, other than in the Ordinary Course of Business;

(e)     not institute, settle or consent to any material litigation, arbitration or other proceeding (whether at law or in equity) or Order that would (i) become an Assumed Liability or (ii) have an adverse effect on Purchaser's ownership, use or operation of, or the value of, the Acquired Assets, or Purchaser's conduct of the Acquired Business, after the Closing;

(f)     not (i) increase the base salary, base wage rate or cash incentive opportunities of any of the Acquired Business Employees or independent contractors or consultants of the Acquired Business, (ii) amend or terminate any Assumed Benefit Plan, (iii) amend, establish or adopt any other Benefit Plan in respect of any Acquired Business Employee or independent contractor or consultant of the Acquired Business, (iv) enter into any collective bargaining agreement or other Contract, agreement or understanding with any labor union or similar representative of any of the Acquired Business Employees or (v) hire or fire any Acquired Business Employee or independent contractor or consultant who is listed on Schedule 1-G or whose annual base compensation is in excess of One Hundred Twenty-Five Thousand Dollars ($125,000);

(g)     not take any of the actions described in Section 5.1(r)(ii) through 5.1(r)(vi);

(h)     not move or remove, or permit to be moved or removed, any Acquired Asset from or at the Transferred Real Property or move, place or locate, or permit to be moved, placed or located, any Excluded Asset from or at the Transferred Real Property (other than inventory in the Ordinary Course of Business);

(i)     not increase the total number of employees, independent contractors or consultants working as part of the Proterra Powered Business Unit by more than 5%;

(j)     not permit, offer, agree or commit to subject any portion of the Acquired Assets to any Lien or Interest, directly or indirectly, except for Permitted Encumbrances already existing prior to the date of this Agreement;

(k)      not authorize or enter into any Contract, arrangement, or commitment other than in the Ordinary Course of Business;

(l)      not abandon, cancel, permit to lapse or otherwise dispose of or forfeit to the public any rights in, to or for the use of any Purchased Intellectual Property or any Intellectual Property licensed to it that are part of the Acquired Assets;

(m)      not (i) sell, license exclusively or on a preferential basis or assign to any Person or enter into any Contract to sell, license exclusively or on a preferential basis or assign to any Person any rights to any Purchased Intellectual Property; (ii) license or otherwise grant any rights in, to or under any Purchased Intellectual Property; or (iii) grant a release, immunity or covenant not to sue in connection with any Purchased Intellectual Property;

(n)      not undertake or approve any renovation or rehabilitation of the Transferred Real Property;

(o)      not acquire any material properties or assets that would be Acquired Assets other than in the Ordinary Course of Business;

(p)      not cancel or compromise any debt or claim or waive or release any right of any Seller that constitutes an Acquired Asset other than in the Ordinary Course of Business or in connection with the Bankruptcy Cases;

(q)      not resolve any Liability that would be an Assumed Liability other than in the Ordinary Course of Business;

(r)      not transfer, to the extent that following such transfer such amounts would be treated as Excluded Assets, any security deposits, prepaid rentals, unbilled charges, fees, deposits, cash, cash equivalents or negotiable instruments, in each case constituting Acquired Assets;

(s)      not satisfy any Excluded Liability with an Acquired Asset;

(t)      not (i) introduce any change in product specifications or prices or terms of distribution of the products of the Acquired Business, (ii) introduce any change in pricing, discount, allowance, warranty, refund or return policies or practices with respect to products of the Acquired Business, (iii) modify any pricing, discount, allowance, warranty, refund or return terms for any customer, supplier or vendor not in accordance with such policies and prior terms for such customer, supplier or vendor, (iv) introduce any change to the manner in which the Acquired Business distributes or sells its products or services or (v) modify standard billing or collection procedures or practices with respect to the Acquired Business except, with respect to each of the foregoing clauses (i) through (v), in the Ordinary Course of Business;

(u)      use commercially reasonable efforts to maintain material relationships with customers, vendors, creditors, employees, landlords, agents, and any other Person having

material business relationships with the Acquired Business, the Acquired Assets or the Assumed Liabilities;

(v)     pay all undisputed post-petition bills and invoices for post-petition goods or services promptly when due (including any post-petition lease payments and additional rent payments with respect to the Transferred Real Property Leases) through the Closing Date;

(w)     protect, defend and maintain the validity and enforceability of all Purchased Intellectual Property and timely submit all payments and filings with respect to all Purchased Intellectual Property due before the Closing Date;

(x)     maintain insurance coverage with financially responsible insurance companies substantially similar in all material respects to the insurance coverage maintained by Sellers prior to the Petition Date; and

(y)     not agree in writing to take any of the actions described above in clauses (a) through (t) of this Section 7.1.

Section 7.2     Efforts to Satisfy Closing Conditions. Each party to this Agreement will use their reasonable best efforts to take, or cause to be taken, all actions necessary, proper or advisable to (a) satisfy all of the conditions set forth in Article IX and cause the transactions contemplated herein to be effected as soon as practicable; (b) comply promptly with all legal requirements that may be imposed on such party with respect to the transactions contemplated by this Agreement and, subject to the conditions set forth in Article IX, to consummate the transactions contemplated by this Agreement; and (c) make any required filing with or notification to, and obtain (and to cooperate with the other party to obtain) any consent, authorization, order or approval of, or any exemption by, any Governmental or Regulatory Authority and any other third party that is required to be made or obtained by it in connection with the transactions contemplated by this Agreement, including the Purchaser Required Approvals.

Section 7.3     Assets Incapable of Transfer. To the extent that any Transferred Contract, Transferred Equity or Transferred Permit is not assignable or transferable without the consent of another Person and such consent requirement is not made unenforceable by the Bankruptcy Code, this Agreement will not constitute an assignment or transfer thereof, an attempted assignment or transfer thereof, or an agreement to effect such an assignment or transfer, if such assignment or transfer, attempted assignment or transfer, or agreement would constitute a breach thereof. Sellers, upon the reasonable request by Purchaser, will use their Reasonable Efforts to obtain the consent of such other Person to the assignment or transfer of any such Transferred Contract, Transferred Equity and/or Transferred Permit to Purchaser in all cases in which (a) such consent is or may be required for such assignment or transfer and (b) such consent requirement is not made unenforceable by the Bankruptcy Code. Purchaser will, without additional cost or expense to Purchaser, cooperate with Sellers in their efforts to obtain such consents. For purposes of clarification, Reasonable Efforts by Sellers will in no event require the payment of any money or permit, without the prior written consent of Purchaser, the amendment or modification of any material term or provision of any Transferred Contract, Transferred Equity or Transferred Permit, but Reasonable Efforts shall include appropriate filings by Sellers in the Bankruptcy Court seeking

a determination that the Bankruptcy Code renders unenforceable the consent requirement in question. Notwithstanding the foregoing, failure to obtain any such consent will not give rise to Purchaser's ability not to consummate the transactions contemplated by this Agreement. Without limiting the generality of the foregoing, the beneficial interest in and to the Transferred Contracts, Transferred Equity or Transferred Permits, to the fullest extent permitted by the relevant Transferred Contract, Transferred Equity or Transferred Permit and applicable Law, will pass to Purchaser.

Section 7.4     Discovery of Breach; Notification. Sellers shall promptly notify Purchaser if, prior to the Closing, Sellers conclude or discover that (i) any of Sellers' representations and warranties contained in this Agreement is not accurate in any material respect such that the conditions set forth in Article IX would reasonably be expected or likely to be incapable of being satisfied, (ii) any other conditions to Purchaser's obligations to consummate the transactions contemplated by this Agreement would reasonably be expected or likely to be incapable of being satisfied or (iii) any Acquired Business Material Adverse Effect has occurred or would reasonably be expected or likely to occur, which notice will summarize the reason for such conclusion, and Sellers shall furnish Purchaser any information it may reasonably request with respect thereto. Purchaser shall immediately notify Sellers if, prior to the Closing, Purchaser concludes or discovers that (i) any of Purchaser's representations and warranties contained in this Agreement is not accurate in any material respect such that the conditions set forth in Article IX would reasonably be expected or likely to be incapable of being satisfied or (ii) any other conditions to Sellers' obligations to consummate the transactions contemplated by this Agreement would reasonably be expected or likely to be incapable of being satisfied, which notice will summarize the reason for such conclusion, and Purchaser shall furnish Sellers any information they may reasonably request with respect thereto. From the date hereof until Closing (or the earlier termination of this Agreement pursuant to Article X), Sellers shall promptly notify Purchaser of, and furnish Purchaser any information it may reasonably request with respect to: (i) any written notice or other written communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement; (ii) any notice or other communication from any Governmental or Regulatory Authority related to or in connection with the transactions contemplated by this Agreement; (iii) the receipt or notice of any proposal for an Alternative Transaction and shall deliver all written proposals for any Alternative Transaction to Purchaser; and (iv) any Actions relating to or involving or otherwise affecting Sellers or its Affiliates that relate to the transactions contemplated by this Agreement.

Section 7.5     Ability to Supplement Disclosure Schedules. Sellers and Purchaser may, prior to Closing, from time to time, but in no event later than five (5) Business Days prior to the Closing, supplement or amend the Seller Disclosure Schedules or Purchaser Disclosure Schedules with respect to any event, circumstance or matter (each a "**New Matter**"), that is required to be set forth or described in such Seller Disclosure Schedules or Purchaser Disclosure Schedules (a "**Disclosure Update**"). Any such Disclosure Update will not (i) cure any breach or inaccuracy of any representation or warranty made in this Agreement for any purpose, (ii) serve to amend, modify or supplement the Seller Disclosure Schedules or Purchaser Disclosure Schedules for purposes of Article IX or Article X, (iii) be deemed to satisfy any condition set forth in this Agreement or (iv) diminish the rights or remedies of Purchaser with respect thereto, nor shall any such notification affect any conditions to the obligations of the parties hereunder.

Section 7.6    Restricted Use of Confidential Information. Purchaser acknowledges and agrees that all information furnished to it in connection with this Agreement, the Related Agreements or the transactions contemplated hereby or thereby (i) is subject to the Confidentiality Agreement, the terms of which are incorporated herein by reference, and (ii) subject to Section 2 of the Confidentiality Agreement, constitutes Confidential Information. Notwithstanding anything to the contrary contained in the Confidentiality Agreement (including any expiration or termination thereof in accordance with its terms), the parties hereto agree that (A) during the period from the Execution Date to the Closing Date, Purchaser shall hold all Confidential Information in accordance with the obligations set forth in the Confidentiality Agreement (as if Purchaser were the Receiving Party thereunder) and (B) from and after the Closing Date, for a period of two (2) years, (x) Purchaser shall hold all Confidential Information, to the extent relating to any Excluded Assets, Excluded Liabilities or Employees (other than Transferred Employees), in accordance with the confidentiality and non-use obligations set forth in the Confidentiality Agreement (as if Purchaser were the Receiving Party thereunder) and (y) Sellers shall hold all Confidential Information, to the extent relating to any Acquired Assets, Assumed Liabilities, Transferred Employees or the Acquired Business, in accordance with the confidentiality and non-use obligations set forth in the Confidentiality Agreement (as if Sellers were the Receiving Party thereunder). If this Agreement is terminated for any reason prior to the Closing, the Confidentiality Agreement shall continue in full force and effect in accordance with its terms. As of the Closing, Purchaser's obligations under the Confidentiality Agreement related to non-use, non-disclosure and return or destruction of Confidential Information (as defined in the Confidentiality Agreement) related to the Acquired Assets and the Assumed Liabilities shall terminate.

Section 7.7    Review and Inspections. Subject to Section 4.3, during the period from the Execution Date to the Closing Date, upon reasonable advance written notice, Sellers will provide Purchaser and its Representatives and designees with reasonable access to each Seller's books, records, systems, system master data and transactional data and facilities and reasonably make appropriate accountants, attorneys and advisors available during normal business hours in order to permit Purchaser to complete its review of Sellers for purposes of facilitating the transfer to Purchaser of the Acquired Assets, the Assumed Liabilities, the Transferred Real Property and the Acquired Business and the hiring of the Transferred Employees, and will reasonably promptly comply with any reasonable requests relating thereto made by or on behalf of Purchaser. The parties will use Reasonable Efforts to share information protected from disclosure under the attorney-client privilege, work product doctrine, joint defense privilege or any other privilege pursuant to this Section 7.7 in a manner so as to preserve the applicable privilege. Any party may share information with any other party on an "outside counsel only" basis. Nothing in this Agreement shall obligate the parties to share any information covered by the attorney client privilege, work product doctrine or other similar privilege. Sellers acknowledge that Purchaser's review includes an assessment of and preparation for the efficient and orderly transition of the Acquired Business, Acquired Assets and Assumed Liabilities to Purchaser, at and after and subject to the Closing. Without limiting the generality of the foregoing, at any time on or before the Closing Date, upon reasonable advance written notice, Purchaser, its Representatives and designees, shall be granted reasonable access during normal business hours by Sellers to inspect the Transferred Real Property and Seller's records relating thereto (including interviews with Sellers and any Representatives of Sellers) to evaluate the Transferred Real Property for Hazardous Materials and compliance with Environmental Laws and in connection with Purchaser's plans and intentions following the Closing. Purchaser shall be entitled to obtain and evaluate all

environmental reports and studies related to the Transferred Real Property that are in Sellers' possession, necessary or advisable in Purchaser's sole discretion. Notwithstanding any of the foregoing provisions of this Section 7.7, Purchaser shall not have the right to conduct invasive environmental investigation of any kind on the Acquired Assets, or conduct any structural evaluation or invasive environmental investigation of any kind, including in the form of soil and groundwater sampling without a Seller's written approval, nor be entitled to any environmental reports or other similar information related to Excluded Assets.

Section 7.8    No Use of Sellers Brand. Except as permitted pursuant to the Trademark License Agreement, each Seller shall within sixty (60) days after the Closing Date, (a) cease use of the Sellers Brand and (b) change signage and stationery and otherwise discontinue public use of the Sellers Brand. As promptly as reasonably practicable after the Closing Date, each Seller and its Affiliates shall file applications to amend or terminate any certificate of incorporation, certificate of assumed name or d/b/a filings so as to eliminate its right to use the Sellers Brand.

Section 7.9    Support Obligations. Purchaser shall replace, effective as of Closing, the credit support obligations (including the letters of credit) provided by Sellers or any of their Affiliates with respect to the Acquired Business, the Acquired Assets or the operation thereof, as listed on Schedule 7.9 (collectively, the "**Support Obligations**"). In furtherance of the foregoing, Purchaser shall obtain, prior to the Closing, substitute credit support arrangements in replacement for the Support Obligations, which substitute credit support arrangements shall be in form and substance reasonably satisfactory to Sellers and Purchaser.

Section 7.10    Casualty. If, during the period from the Execution Date to the Closing, any of the Acquired Assets shall be destroyed or damaged in whole or in part by fire, earthquake, hurricane, flood, other casualty or any other cause or act of god (each a "**Casualty**"), then Purchaser shall have the option to: (a) acquire such Acquired Assets on an "as is" basis and take an assignment from Sellers of all insurance proceeds payable to Sellers in respect of the applicable Casualty or (b) in the event that the applicable Casualty would have an Acquired Business Material Adverse Effect, terminate this Agreement and the transactions contemplated hereby.

Section 7.11    Intellectual Property.

(a)    Without limiting any other provision of this Agreement, prior to, on and after the Closing Date, Sellers shall cooperate with Purchaser, without any further consideration to (i) execute and deliver, or use commercially reasonable efforts to execute and deliver to Purchaser, or cause to be executed and delivered, all instruments, including any instruments of conveyance, assignment and transfer as Purchaser may provide to Sellers for execution and delivery, and (ii) use commercially reasonable efforts to take, or cause to be taken, all such other actions Purchaser may reasonably request from time to time in order to effectuate all transfers of Purchased Intellectual Property pursuant to this Agreement. In the event the Purchaser (or its designee) is unable for any reason, after reasonable effort, to secure any Seller's signature on any document needed in connection with the actions specified in this paragraph, each such Seller hereby irrevocably designates and appoints Purchaser and its duly authorized officers and agents as each such Seller's agent and attorney in fact, which appointment is coupled with an interest, to act for and in each such Seller's behalf to execute, verify and file any such documents and to do all other

lawfully permitted acts to further the purposes of the preceding paragraph with the same legal force and effect as if executed by each such Seller.

(b)    Sellers shall cease to make use of any Purchased Intellectual Property after the Closing except as expressly permitted in Section 7.12 and Section 7.13 and the Related Agreements.

Section 7.12    Background License.

(a)    Effective as of the Closing, each Seller hereby grants to Purchaser and its Affiliates, or alternatively shall procure for Purchaser and its Affiliates from purchasers of the Proterra Other Business Units or assets of any Seller, a worldwide, fully paid-up, royalty-free, irrevocable, non-terminable, perpetual, sublicensable (including through multiple tiers), non-exclusive license under and to all Intellectual Property (excluding trademarks, websites and domain names) Licensable by a Seller or any of its Affiliates or that is not an Acquired Asset and that is used or held for use in or necessary for the operation and maintenance of the Acquired Business and/or the Acquired Assets as conducted at any time prior to the Closing (including to make, have made, use, sell, offer to sell, and import any product or service, to reproduce, make derivative works of, distribute, display and perform any work, and to use such Intellectual Property) solely in connection with the Acquired Business as conducted at any time prior to Closing and the design, manufacture, marketing, promotion, sale, distribution, maintenance, repair or servicing of battery systems, electric drivetrains or electrification solutions for commercial vehicles, marine applications (boats/vessels), construction equipment, stationary battery energy storage systems, and any natural extensions thereof. Purchaser or its Affiliates may assign and otherwise transfer such license, in whole or in part, (a) to any lender or other financing source as collateral security following the Closing, (b) to an Affiliate or (c) in connection with any assignment, sale, merger, or other transfer of all or any part of the Acquired Business or a product or service line of the Acquired Business or any of its Affiliates (regardless of the form of transaction or series of transactions). All use of such licensed Intellectual Property by or under authority of Purchaser or its Affiliates (or their successors and assigns) from and after the Closing shall be on an "AS IS, WHERE IS" basis, with all faults and all express and implied representations and warranties disclaimed, and at their sole risk.

(b)    Effective as of the Closing, Purchaser hereby grants to the Sellers and purchasers of the Proterra Other Business Units or assets of any Seller and their Affiliates (or on request shall provide a standalone license agreement directly to purchasers of the Proterra Other Business Units or assets of any Seller and their Affiliates granting) a worldwide, fully paid-up, royalty-free, irrevocable, non-terminable, perpetual, sublicensable (including through multiple tiers), non-exclusive license under and to all patents and patent applications in the Purchased Intellectual Property (excluding trademarks, websites and domain names) that is used or held for use in or necessary for the operation and maintenance of the Proterra Other Business Units as conducted at any time prior to the Closing (including to make, have made, use, sell, offer to sell, and import any product or service, to reproduce, make derivative works of, distribute, display and perform any work, and to use such Intellectual Property) solely in connection with the Proterra

Other Business Units as conducted as of Closing or the provision of transition services thereto; provided, for the avoidance of doubt, in no event shall any licensee, sublicensee, transferee or assignee of the license granted pursuant to this Section 7.12(b) be used to compete with the Acquired Business as conducted prior to Closing. Sellers and purchasers of the Proterra Other Business Units or their Affiliates may assign and otherwise transfer such license, in whole or in part, following written notice to Purchaser or its assignee, (a) to any lender or other financing source as collateral security following the Closing, (b) to an Affiliate or (c) in connection with any assignment, sale, merger, or other transfer of all or any part of a Proterra Other Business Unit or a product or service line of a Proterra Other Business Unit or any of its Affiliates (regardless of the form of transaction or series of transactions). All use of such licensed Intellectual Property by or under authority of Sellers and purchasers of the Proterra Other Business Units or their Affiliates (or their successors and assigns) from and after the Closing shall be on an "AS IS, WHERE IS" basis, with all faults and all express and implied representations and warranties disclaimed, and at their sole risk.

Section 7.13   License to Sellers Brand. Purchaser hereby grants to Sellers a worldwide, fully paid-up, royalty-free, irrevocable, non-terminable, perpetual, limited-exclusive license to use the PROTERRA trademark solely in connection with the marketing, promotion, provision and sale of products and provision of services in connection with the Proterra Other Business Units as conducted by Sellers prior to the Closing as further set forth in the Trademark License Agreement. Each Seller agrees and acknowledges that it has no rights to the PROTERRA POWERED trademark and shall not grant others any right to use any Seller Brands in connection with the design, manufacture, marketing, promotion, sale, distribution, maintenance, repair or servicing of battery or battery pack systems, electric drivetrains or electrification solutions for vehicles.

Section 7.14   Successor Liability. Purchaser shall have no liability or responsibility for any Liability or other obligation of Sellers arising under, related to or in connection with the Acquired Assets and the Acquired Business other than as expressly set forth in this Agreement. Without limiting the effect of the foregoing, the transfer of the Acquired Assets will not subject Purchaser to any Liability or other obligation in connection with claims against Sellers or the Acquired Assets, including, claims for successor or vicarious liability, by reason of such transfer under the laws of the United States, any state, territory or possession thereof applicable to such transactions. Purchaser shall not be deemed, as a result of the consummation of the transactions contemplated by this Agreement and the Related Agreements, to be a successor of any Seller, have, de facto or otherwise, merged with or into Sellers, be a mere continuation or substantial continuation of Sellers or the enterprise of Sellers or be responsible for any Liability or other obligation of Sellers or for payment of any benefit accruing to Sellers, except as expressly set forth in this Agreement.

Section 7.15   Receipt of Misdirected Assets. From and after the Closing, if any Seller or any respective Affiliates of any Seller receives any right, property or asset that is an Acquired Asset, such Seller shall promptly transfer or cause such of its Affiliates to transfer such right, property or asset (and shall promptly endorse and deliver any such asset that is received in the form of cash, checks or other documents) to Purchaser, and such asset will be deemed the property of Purchaser held in trust by such Seller for Purchaser until so transferred. From and after the Closing, if Purchaser or any of its Affiliates receives any right, property or asset that is an Excluded

Asset, Purchaser shall promptly transfer or cause such of its Affiliates to transfer such asset (and shall promptly endorse and deliver any such right, property or asset that is received in the form of cash, checks, or other documents) to such Seller, and such asset will be deemed the property of such Seller held in trust by Purchaser for such Seller until so transferred. From and after the Closing, if Purchaser or either Seller discover that any asset previously deemed an Excluded Asset should have been included as an Acquired Asset, and each of Purchaser and the applicable Seller agree as to this classification, the applicable Seller shall promptly transfer such asset to Purchaser.

Section 7.16    No Other Representations. Each Seller acknowledges and agrees, on its own behalf and on behalf of the Seller Group, except as expressly set forth in Section 5.2 (as qualified by the Purchaser Disclosure Schedules) (it being understood and agreed that each Seller and the Seller Group have relied only on such express representations and warranties), neither Purchaser nor any Affiliate thereof nor any other Person on behalf of Purchaser makes, and neither any Seller nor any member of the Seller Group has relied on, any representation or warranty, express or implied, written or oral, on behalf of Purchaser or any other Person, including any representation or warranty as to the accuracy or completeness of any information regarding Purchaser or any of its Affiliates furnished, provided or made available to any Seller and its Representatives.

Section 7.17    Purchaser Parent Guarantee.

(a)    Purchaser Parent guarantees to Sellers the payment, if and when due, of the obligations of Purchaser to pay (or cause to be paid) at the Closing the Estimated Closing Payment and the Closing Payment pursuant to Section 3.1(b) and Section 3.7, respectively (the "Guaranteed Obligations"). If Purchaser as primary obligor fails to pay any of the Guaranteed Obligations when due pursuant to the terms of this Agreement, Purchaser Parent shall, upon the written request of Sellers, immediately pay such amount.

(b)    Purchaser Parent shall make all payments in respect of the Guaranteed Obligations in U.S. Dollars without setoff or counterclaim. If any payment to Sellers in respect of any Guaranteed Obligation is rescinded or must otherwise be returned for any reason, including by reason of becoming unenforceable or an allowed or disallowed claim under any proceeding or case commenced by or against Purchaser Parent or Purchaser under any applicable debtor relief laws, Purchaser Parent shall remain liable under this Section 7.17 with respect to such Guaranteed Obligation in accordance with the terms hereof as if such payment had not been made. Purchaser Parent shall not exercise any right of subrogation, contribution, indemnity, reimbursement or similar rights with respect to any payments in respect of the Guaranteed Obligations until the Guaranteed Obligations have been indefeasibly paid in full.

(c)    The guaranty under this Section 7.17 is one of payment, not collection, and a separate action or actions may be brought and prosecuted against Purchaser Parent to enforce the obligations of Purchaser Parent under this Section 7.17, irrespective of whether any action is brought against Purchaser or any other Person, or whether Purchaser or any other Person is joined in any such action or actions. Purchaser Parent waives any and all rights or defenses arising by reason of any law that would otherwise require any election of remedies by Sellers. Purchaser Parent waives, to the fullest extent permitted by Law, (i) any defense arising by reason of any disability or other defense of Purchaser, or the

cessation from any cause whatsoever (including any act or omission of Sellers) of the liability of Purchaser, (ii) any defense based on any claim that Purchaser Parent's obligations exceed or are more burdensome than those of Purchaser, (iii) the benefit of any statute of limitations affecting Purchaser Parent's liability hereunder, (iv) any benefit of and any right to participate in any security now or hereafter held by Sellers, (v) any fact or circumstance related to the Guaranteed Obligations that might otherwise constitute a defense to the obligations of Purchaser Parent under its guaranty of the Guaranteed Obligation, (vi) any defense based upon the genuineness, validity or enforceability of the Guaranteed Obligations and (vii) any and all other defenses or benefits that may be derived from or afforded by applicable law limiting the liability of or exonerating guarantors or sureties; provided, however, that notwithstanding anything to the contrary herein or otherwise, Purchaser Parent may assert, as a defense to, or release or discharge of, any payment by Purchaser Parent of the Guaranteed Obligations, any claim, set-off, deduction, defense or release that Purchaser would validly be entitled to assert against Sellers under the terms of this Agreement. Purchaser Parent irrevocably waives promptness, diligence, notice of the acceptance of the Guaranteed Obligations, presentment, demand for payment, notice of non-performance, default, dishonor and protest, notice of the incurrence of the Guaranteed Obligations and all other notices of any kind (other than notices expressly required to be provided to Purchaser under this Agreement), all defenses which may be available by virtue of any valuation, stay, moratorium law or other similar law now or hereafter in effect, and any right to require the marshaling of assets of Purchaser or any other Person interested in the transactions contemplated by this Agreement.

Section 7.18    Transition Services Agreement. From the date hereof until Closing (or the earlier termination of this Agreement pursuant to Article X), Purchaser shall use commercially reasonable efforts to enter into a Transition Services Agreement. Sellers shall use commercially reasonable efforts, and shall cause the purchaser of any Proterra Other Business Unit(s) to use commercially reasonable, to enter into a Transition Services Agreement.


## ARTICLE VIII

## Employee Matters

Section 8.1    Transferred Employees. Following the Execution Date, Purchaser shall be permitted to communicate with and interview Acquired Business Employees. To the extent that Purchaser may reasonably request, Sellers shall reasonably cooperate with, and not hinder, Purchaser in facilitating the interviews and provide Purchaser with such information as Purchaser may reasonably request regarding the employees to evaluate such Acquired Business Employees. At least five (5) Business Days prior to the Closing Date, and contingent on the occurrence of the Closing, Purchaser shall extend an offer of employment to those Acquired Business Employees to whom Purchaser has determined to offer employment, with such employment to take effect under the terms stated herein as of the Closing Date. Each such Acquired Business Employee who accepts an offer of employment from Purchaser and commences employment with Purchaser or an applicable Affiliate of Purchaser shall be referred to herein as a "**Transferred Employee**". If Purchaser does not make an offer to any Acquired Business Employee, Purchaser shall pay such individual severance in accordance with Schedule 1-N subject to, and conditioned upon, such

individual's execution of a general release of claims and covenant not to sue that shall include a release of claims against Purchaser and its Affiliates. Sellers shall, and shall cause each of their Representatives, not to (A) interfere with Purchaser's or its Representatives' rights under this <u>Section 8.1</u> to make offers of employment to any Acquired Business Employee to whom Purchaser has determined to offer employment, or (B) solicit or encourage any such Acquired Business Employee not to accept, or to reject, any such offer of employment.

Section 8.2    <u>Benefits Matters</u>. With respect to each Transferred Employee who is not covered by a collective bargaining agreement, for a period of at least twelve (12) months following the Closing Date (or until the Transferred Employee's earlier termination of employment with Purchaser and its Affiliates), Purchaser shall, or shall cause an Affiliate of Purchaser to, provide each Transferred Employee with a position that is comparable to such Transferred Employee's position immediately prior to the Closing and shall maintain: (a) base salary or base wage rate at least equal to such Transferred Employee's base salary and base wage rate as in effect immediately prior to the Closing, (b) cash short-term incentive opportunities for such Transferred Employee that are no less favorable than those in effect for such Transferred Employee immediately prior to the Closing (excluding, for purposes of the comparison, cash retention incentives including under any key employee incentive plan, key employee retention plan or similar plan) and (c) retirement, health and welfare benefits that are substantially comparable in the aggregate to those provided to similarly situated employees of Purchaser or an applicable Affiliate or those provided by any Seller to such Transferred Employee immediately prior to the Closing.

Section 8.3    <u>Labor Matters</u>. Reserved.

Section 8.4    <u>Benefits Eligibility</u>. As of and after the Closing, Purchaser shall provide each Transferred Employee with service credit for purposes of eligibility, vesting (other than for equity incentive purposes) and level of benefits (but not for purposes of benefit accrual under any defined benefit pension plan, equity incentive plan or retiree welfare benefit plan) under any employee benefit plan, policy or arrangement sponsored by Purchaser or any of its Affiliates in which such Transferred Employee is eligible to participate following the Closing (each, a "**Purchaser Plan**") for such Transferred Employee's service prior to the Closing with Sellers or any of their respective Affiliates (and their respective predecessors), to the same extent that such service was recognized immediately prior to the Closing under a comparable Benefit Plan; <u>provided</u>, that such service shall not be credited to the extent such credit would result in any duplication of compensation or benefits. Without limiting the foregoing, (i) each Transferred Employee (and spouse and dependents thereof) will not be subject to any limitations as to pre-existing conditions, actively-at-work requirements, exclusions or waiting periods under any Purchaser Plan that is a health or welfare plan for any limitations for which such employee would have been entitled to coverage under a comparable Benefit Plan in which such Transferred Employee (or spouse or dependent thereof) was eligible to participate immediately prior to the Closing Date and (ii) Purchaser shall use commercially reasonable efforts to procure that each Transferred Employee (and spouse and dependents thereof) be given full credit under each such Purchaser Plan for the plan year that includes the Closing Date under the Purchaser Plan for any co-payments, deductibles, out-of-pocket expenses and lifetime maximums paid or satisfied, as applicable, during the relevant plan year up to and including the Closing Date under a Benefit Plan.

Section 8.5     WARN Act. With respect to Transferred Employees, Purchaser will have responsibility under the WARN Act relating to any act or omission of Purchaser after the Closing Date. With respect to the Employees, Sellers will have full responsibility under the WARN Act relating to any act or omission of Sellers prior to and on the Closing Date. Sellers shall be responsible for, and shall indemnify Purchaser against, all other WARN Act Liabilities relating to the periods prior to and on the Closing Date, including any such Liabilities that result from any Acquired Business Employees' separation of employment from Sellers and/or Acquired Business Employees not becoming Transferred Employees pursuant to this Article VIII. Unless otherwise agreed to by Sellers and Purchaser, Sellers agree to issue, at least than sixty (60) days prior to the Closing Date, all applicable WARN Act notices, in a form reasonably acceptable to Purchaser, to the Acquired Business Employees and all other parties required to receive notice under the WARN Acts.

Section 8.6     Bonuses. Sellers shall pay the Acquired Business Employees annual bonuses, if any, in accordance with applicable plan terms and communications to the Acquired Business Employees for 2023 (which amounts shall be pro-rated if the Closing occurs prior to December 31, 2023) and on a pro-rated basis for 2024 if the Closing occurs in 2024.

Section 8.7     Benefit Plans. Between the Execution Date and the Closing, Sellers shall cooperate in good faith with Purchaser and the relevant insurance carriers and service providers to enable Purchaser to establish, as of the Closing Date, a 401(k) plan and ERISA welfare benefit plans that "mirror", to the extent commercially practicable, the terms of the 401(k) plan and ERISA welfare benefit plans sponsored by Sellers ("**Seller ERISA Plans**"), and shall promptly furnish all plan documents, contracts, records and information requested by Purchaser or any of its Affiliates or their respective Representatives in order to accomplish the adoption of such mirror plans on the Closing Date. To the extent Purchaser is not able to adopt any "mirror" plans on the Closing Date, Purchaser may in its sole discretion determine, by written notice to Sellers at least five (5) Business Days prior to the Closing Date, to (a) treat any corresponding Seller ERISA Plans as Assumed Benefit Plans, and related insurance policies and third-party Contracts as Transferred Contracts, notwithstanding that such plans are not identified on Schedule 1-L as of the date hereof and that such Contracts are not identified on Schedule 1-H as of the date hereof, but only if such Seller does not need such Seller ERISA Plans for active participating employees following the Closing Date or (b) require Sellers to permit the Acquired Business Employees to continue participating in such Seller ERISA Plans, at the expense of Purchaser, pursuant to a transition services agreement until "mirror" plans can be established.

ARTICLE IX

Conditions to Closing

Section 9.1     Conditions to the Obligations of Purchaser. The obligation of Purchaser to effect the Closing is subject to the satisfaction (or waiver by Purchaser in its sole discretion) on or prior to the Closing of the following conditions:

(a)     Representations and Warranties. (i) Each of the Seller Fundamental Representations shall be true and correct in all respects, in each case as of the Execution Date and as of the Closing as if made as of the Closing, except for such representations and

warranties which are as of a specific date, which shall be true and correct in all material respects as of such date, and (ii) each of the representations and warranties of Sellers contained herein (other than the Seller Fundamental Representations) shall be true and correct in all respects (without giving effect to any limitation as to materiality or Acquired Business Material Adverse Effect), in each case as of the Execution Date and as of the Closing as if made as of the Closing, except for (y) representations and warranties which are as of a specific date, which shall be true and correct as of such date, subject to the immediately following clause (z); or (z) where the failure to be so true and correct would not in the aggregate have an Acquired Business Material Adverse Effect or have a material adverse effect on the ability of Sellers to consummate the transactions contemplated hereby. Purchaser will have received a certificate from Sellers signed on behalf of each Seller by a duly authorized officer thereof with respect to the foregoing.

(b)     Covenants. The covenants and agreements of Sellers to be performed on or prior to the Closing under this Agreement and each Related Agreement will have been duly performed in all material respects on or prior to the Closing. Purchaser will have received a certificate from Sellers signed on behalf of each Seller by a duly authorized officer thereof with respect to the foregoing.

(c)     Related Agreements. Each Seller will have duly executed and delivered to Purchaser the Related Agreements to which such Seller is to be a party.

(d)     Seller's Deliveries. Sellers will have delivered or caused to be delivered to Purchaser the items listed in Section 4.2(a) in form and substance as required herein.

(e)     Acquired Business Material Adverse Effect. Since the Execution Date, there shall not have occurred or been discovered any developments, circumstances or occurrences with regard to any of the Acquired Assets or the Acquired Business, that, individually or in the aggregate, has had or would be reasonably expected to have an Acquired Business Material Adverse Effect. Purchaser will have received a certificate from Sellers signed on behalf of each Seller by a duly authorized officer thereof with respect to the foregoing.

Section 9.2     Conditions to the Obligations of Sellers. The obligation of Sellers to effect the Closing is subject to the satisfaction (or waiver by Sellers in their sole discretion) on or prior to the Closing of the following conditions:

(a)     Representations and Warranties. Each of the other representations and warranties of Purchaser contained herein shall be true and correct in all material respects, in each case as of the Execution Date and as of the Closing as if made as of the Closing, except for such representations and warranties which are as of a specific date, which shall be true and correct in all material respects as of such date. Sellers will have received a certificate from Purchaser signed on behalf of Purchaser by a duly authorized officer thereof with respect to the foregoing.

(b)     Covenants. The covenants and agreements of Purchaser to be performed on or prior to the Closing will have been duly performed in all material respects. Sellers will

have received a certificate from Purchaser signed on behalf of Purchaser by a duly authorized officer thereof with respect to the foregoing.

(c)     Receipt of Purchase Price. Sellers will have received from Purchaser an amount equal to (i) the Estimated Closing Payment minus (ii) the Earnest Deposit, as provided and in accordance with Section 3.1(b) of the Agreement minus (iii) the Prorations minus (iv) the Inventory Adjustment Escrow Amount. Sellers will have also received the Earnest Deposit from the Escrow Agent.

(d)     Related Agreements. Purchaser will have duly executed and delivered to Sellers each of the Related Agreements to which Purchaser is a party.

(e)     Purchaser's Deliveries. Purchaser will have delivered or caused to be delivered to Sellers the items listed in Section 4.2(b).

Section 9.3     Conditions Precedent to Obligations of Purchaser and Sellers. The respective obligations of the parties to effect the Closing are subject to the fulfillment, on or prior to the Closing, of each of the following conditions (any or all of which may be waived by Purchaser and Sellers in whole or in part to the extent permitted by applicable Law):

(a)     there shall not be in effect any Order by a Governmental or Regulatory Authority (i) declaring this Agreement or any Related Agreement invalid or unenforceable in any respect or (ii) restraining, enjoining or otherwise prohibiting or making illegal the Closing, in each case, that is not stayed by the commencement of the Bankruptcy Cases or any Order of the Bankruptcy Court;

(b)     the Sale Order, together with any other Order of the Bankruptcy Court required to consummate the transactions contemplated hereby, shall have been entered by the Bankruptcy Court and each such Order (i) is not subject to any stay, and (ii) has not been vacated, reversed, or modified in any material respect with respect to Purchaser's rights or protections thereunder without Purchaser's prior written consent, and there shall be no appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial, and if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the Sale Order in all respects;

(c)     subject to the provisions of Section 7.3, the Sale Order shall approve and authorize the assumption and assignment of the Transferred Contracts and the Transferred Real Property Leases and the Transferred Contracts and the Transferred Real Property Leases shall have been actually assumed and assigned to Purchaser, subject to the payment of applicable Cure Amounts by Purchaser as set forth in Section 2.5;

(d)     any applicable waiting period (and any extensions thereof) under the HSR Act shall have expired or been terminated;

(e)     all Purchaser Required Approvals shall have been obtained and shall be in full force and effect; and

(f)    all conditions to the closing of the Sale under the Sale Order other than the Closing, shall have occurred or been waived pursuant to the terms of the Sale Order.

Section 9.4    Frustration of Closing Conditions. Purchaser may not rely on the failure of any condition set forth in this Article IX to be satisfied if such failure was caused by Purchaser's failure to use reasonable best efforts (or Reasonable Efforts with respect to those matters contemplated in Article VI), as required by and subject to Section 7.2 and Article VI, as applicable. Sellers may not rely on the failure of any condition set forth in this Article IX to be satisfied if such failure was caused by any Seller's failure to use reasonable best efforts (or Reasonable Efforts with respect to those matters contemplated in Article VI), as required by and subject to Section 7.2 and Article VI, as applicable.

ARTICLE X

Termination

Section 10.1    Termination. Subject to Section 10.2, this Agreement may be terminated at any time prior to the Closing Date:

(a)    by written agreement of Sellers and Purchaser;

(b)    by the Sellers, on the one hand, or Purchaser, on the other hand, by written notice to the other if the Closing has not occurred on or prior to the Outside Closing Date (unless, in each case, the failure to consummate the Closing by such date is due to the failure of any Seller, on the one hand, or Purchaser, on the other hand, to have fulfilled any of its obligations under this Agreement or caused by the breach or action or inaction of such party);

(c)    by either Purchaser, on the one hand, or Sellers, on the other hand, by written notice to the other, in the event that any Governmental or Regulatory Authority has issued a final, non-appealable Order or ruling or taken any other final, non-appealable action, or any applicable Law has been entered, adopted, enacted or promulgated, in each case permanently restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement that is not stayed by the commencement of the Bankruptcy Cases or any order of the Bankruptcy Court; provided, however, that a party hereto shall not be permitted to terminate this Agreement pursuant to this Section 10.1(c) if such party did not use reasonable best efforts to have such Order vacated prior to it becoming final and non-appealable or if such party's failure to fulfill any obligation under this Agreement shall have been a material cause of, or resulted in the occurrence of, such restraint;

(d)    by Sellers, by written notice to Purchaser, (i) in the event that, other than through the failure of a Seller to comply with its obligations under this Agreement, one or more of the conditions to Sellers' obligation to effect the Closing is or becomes impossible to satisfy at any time after the Execution Date and Sellers have not waived such condition(s) or (ii) if neither Seller is in material breach of any terms of this Agreement, upon a material breach of a representation, warranty, or covenant on the part of Purchaser set forth in this Agreement such that a condition set forth in Section 9.2 or Section 9.3

would not reasonably be expected to be satisfied as of the time of such termination, and such breach is not capable of being cured or has not been cured within 30 days after Purchaser receives written notice thereof from Sellers;

(e)     by Purchaser, by written notice to Sellers, (i) in the event that, other than through the failure of Purchaser to comply with its obligations under this Agreement, one or more of the conditions to Purchaser's obligation to effect the Closing is or becomes impossible to satisfy at any time after the Execution Date and Purchaser has not waived such condition(s) or (ii) if Purchaser is not in material breach of any terms of this Agreement, upon a material breach of a representation, warranty, or covenant on the part of a Seller set forth in this Agreement such that a condition set forth in <u>Section 9.1</u> or <u>Section 9.3</u> would not reasonably be expected to be satisfied as of the time of such termination, and such breach is not capable of being cured or has not been cured within 30 days after Seller receives written notice thereof from Purchaser;

(f)     by Purchaser, by written notice to Sellers, if the Sale Order entered by the Bankruptcy Court has been (A) subject to a stay, vacated or reversed or (B) modified in a manner that is adverse to Purchaser in any material respect without Purchaser's prior written consent;

(g)     by either Purchaser, on the one hand, or Sellers, on the other hand only following compliance by Sellers in all material respects with this Agreement and the Bidding Procedures Order, by written notice to the other, if (i) Purchaser is not the Successful Bidder or Backup Bidder at the Auction, (ii) prior to Closing, the Bankruptcy Court enters an order dismissing or converting the Bankruptcy Cases to a case under Chapter 7 of the Bankruptcy Code or (iii) the Bankruptcy Court enters an Order denying approval of the Sale Order or represents at a Sale Hearing (as defined in the Bidding Procedures Order) or other hearing that the Bankruptcy Court will not approve entry of the Sale Order;

(h)     by Purchaser, by written notice to Sellers, if, Sellers withdraw the request for authority to sell the Acquired Assets and assume and assign the Transferred Contracts; or

(i)     by Purchaser, by written notice to Sellers, if Sellers (i) move to voluntarily dismiss the Bankruptcy Cases or (ii) move for conversion of the Bankruptcy Cases to a case under chapter 7 of the Bankruptcy Code, in each case, unless the effectiveness thereof is to occur after the Closing.

Section 10.2     <u>Effect of Termination.</u> In the event of the termination of this Agreement in accordance with <u>Section 10.1</u>, this Agreement will thereafter become void and have no effect, and no party hereto will have any liability to the other party hereto or their respective Affiliates, directors, officers or employees, except for the obligations of the parties hereto contained in this <u>Section 10.2</u>, in <u>Article XII</u> and in <u>Section 7.6</u>; <u>provided</u>, <u>however</u>, that (a) if this Agreement is validly terminated by Sellers prior to Closing pursuant to <u>Section 10.1(d)(ii)</u>, and at the time of such termination pursuant to <u>Section 10.1(d)(ii)</u>, Purchaser is not entitled to terminate this Agreement pursuant to <u>Section 10.1(e)</u>, Escrow Agent shall, within two (2) Business Days

following such termination of this Agreement and without the requirement of any approval by the Bankruptcy Court, distribute the Deposit Escrow Funds to Sellers and such distribution to Sellers shall be each Seller's sole and exclusive remedy as a result of such termination, and (b) if this Agreement is validly terminated by Sellers or Purchaser prior to Closing for any reason other than by Sellers pursuant to Section 10.1(d)(ii), Escrow Agent shall, within two (2) Business Days following the termination of this Agreement and without the requirement of any approval by the Bankruptcy Court, distribute the Deposit Escrow Funds to Purchaser and Purchaser shall be entitled to retain the Deposit Escrow Funds; provided further that no termination will relieve any Seller from any liability for breach of this Agreement prior to any such termination or intentional common law fraud by, on behalf of or with respect to any Seller.

Section 10.3    Exclusive Remedies. Each Seller, on behalf of itself and each member of the Seller Group, acknowledges and agrees that any disbursement of the Deposit Escrow Funds to Sellers pursuant to Section 10.2 shall be deemed liquidated damages and shall be the sole and exclusive recourse of each Seller and the Seller Group against Purchaser and the Purchaser Group for any loss or damage suffered as a result of any breach of this Agreement or any representation, warranty, covenant or agreement contained herein by Purchaser or the failure of the transactions contemplated by this Agreement to be consummated, except in the event Sellers are entitled to and elect specific performance of Purchaser's obligations to consummate the transactions contemplated herein pursuant to Section 12.11. In the event of valid termination of this Agreement pursuant to Section 10.1, in the event that Sellers have elected not to require specific performance of Purchaser's obligations to consummate the transactions contemplated herein pursuant to Section 12.11 and have opted instead to receive the Deposit Escrow Funds, then upon release of the Deposit Escrow Funds to Sellers in accordance with Section 10.2, (i) Purchaser and the Purchaser Group shall not have any further liability or obligation relating to or arising out of this Agreement or the transactions contemplated hereby and (ii) neither any Seller nor any member of the Seller Group will have any right of recovery, whether arising under contract Law, tort Law or any other theory of Law, against, and no personal liability shall attach to any Purchaser and the Purchaser Group, whether by or through attempted piercing of the corporate, limited partnership or limited liability company veil, by the enforcement of any assessment or by any legal or equitable Action, by virtue of any statute, regulation or applicable Law, or otherwise. For the avoidance of doubt, the maximum aggregate liability of Purchaser and the Purchaser Group for losses in connection with this Agreement shall be limited to the Deposit Escrow Funds, and under no circumstances will any Seller or member of the Seller Group be entitled to, nor will any Seller or any member of the Seller Group seek, obtain or accept, monetary damages or losses of any kind (including damages for the loss of the benefit of the bargain, opportunity cost, loss of premium, time value of money or otherwise, or any consequential, special, expectancy, indirect or punitive damages) in connection with the termination of this Agreement in excess of the amount of the Deposit Escrow Funds; provided, however, that the foregoing shall not been interpreted to limit in any way Sellers' right to require specific performance of Purchaser's obligations to consummate the transactions contemplated herein pursuant to Section 12.11 in the event this Agreement has not been terminated.

## ARTICLE XI

### Bankruptcy Matters

Section 11.1 <u>Bankruptcy Cases</u>. On the Petition Date, Sellers filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code, which cases are jointly administered under Case No. 23-11120 (BLS) (the "**Bankruptcy Cases**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") as of the Execution Date.

Section 11.2 <u>Bankruptcy Court Approvals</u>.

(a)     Sellers and Purchaser acknowledge that this Agreement is subject to approval by the Bankruptcy Court by entry of the Sale Order.

(b)     If Purchaser is selected as the Successful Bidder or Backup Bidder pursuant to the Bidding Procedures Order, a list of the Transferred Contracts and Transferred Real Property Leases shall be attached to the Sale Order.

(c)     If the Sale Order or any other Orders of the Bankruptcy Court relating to the transactions contemplated by this Agreement shall be appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or re-argument shall be filed with respect to the Sale Order or other such Order), subject to rights otherwise arising from this Agreement, including each party's respective right to terminate this Agreement pursuant to <u>Section 10.1</u>, Sellers will promptly notify Purchaser of such appeal, petition, motion or stay request, and Sellers, with input from the Purchaser, will take all necessary and reasonable steps to defend against such appeal, petition, motion or stay request.

(d)     Purchaser and Sellers agree that from and after the date that the Auction is declared closed by Sellers, Sellers will not, directly or indirectly, and will not permit any of their respective Affiliates or Representatives (or Representatives of any of their respective Affiliates) to initiate contact with, or solicit or knowingly encourage submission of any inquiries, proposals or offers by, any Person with respect to an Alternative Transaction or otherwise facilitate any effort or attempt to make a proposal or offer to Sellers or any of their respective Affiliates or Representatives (or Representatives of any of their respective Affiliates) with respect to an Alternative Transaction. For the avoidance of doubt, Sellers will not, and will not permit any of their respective Affiliates or Representatives (or Representatives of any of their respective Affiliates) to, pursue or agree to any Alternative Transaction or continue discussions or participate in negotiations with any Person with respect to an Alternative Transactions; <u>provided</u>, that if Sellers, in consultation with Purchaser, shall have the obligation to respond to any inquiries or offers to purchase all or any part of the Acquired Assets and perform any and all other acts related thereto that are required under the Bankruptcy Code or Sellers' fiduciary obligations in the Bankruptcy Cases, then Sellers (i) may respond to such inquiries or offers only to the extent required under the Bankruptcy Code or Sellers' fiduciary obligations in the Bankruptcy Cases and (ii) shall keep Purchaser fully informed at all times as to the status any

discussions that take place, notwithstanding any provisions of <u>Section 7.6</u> hereof to the contrary.

Section 11.3    <u>Further Filings and Assurances</u>. Reserved.

Section 11.4    <u>Notice of Sale.</u> Notice of the sale of Acquired Assets contemplated in this Agreement shall be served in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Local Rules of the Bankruptcy Court and the Bidding Procedures Order.

Section 11.5    <u>Avoidance Actions</u>. Purchaser agrees that it will not pursue, participate in the pursuit of, sell, transfer, or enter into any agreement with a third party to facilitate pursuit of, any Avoidance Action acquired under this Agreement, each of which shall be waived effective as of the Closing Date and released by the Purchaser.

Section 11.6    <u>Free and Clear</u>. The transfer of the Acquired Assets shall vest Purchaser with all right, title, and interest of Sellers in the Acquired Assets free and clear of any and all Liens, Liabilities and other Interests (other than Permitted Encumbrances and Assumed Liabilities) pursuant to Sections 105, 363, 365 and 1123(b)(4) of the Bankruptcy Code, as applicable, whether arising by statute or otherwise and whether arising before or after the commencement of the Bankruptcy Cases, whether known or unknown, including Interests of or asserted by any of the creditors, vendors, employees, suppliers, or lessors of Sellers or any other third party; <u>provided</u>, that any and all such Liens, Liabilities and other Interests shall attach to the net proceeds of the Purchase Price, with the same priority, validity, force, and effect as they now have against the Acquired Assets. Purchaser shall not be liable for any liability for any Lien, Liability or other Interest, other than the Assumed Liabilities and Permitted Encumbrances.

Section 11.7    <u>Transfer Taxes</u>. The transactions contemplated herein shall be exempt from Transfer Tax to the fullest extent available in accordance with Section 1146 of the Bankruptcy Code. Purchaser will pay any Transfer Taxes that are not so exempt. Notwithstanding the foregoing, if any sales Taxes are imposed upon the sale of the Acquired Assets pursuant to this Agreement, (a) Purchaser will cooperate with Sellers in advance of Closing to determine the scope of Acquired Assets subject to Transfer Taxes, and shall, prior to or promptly following the Closing Date, deliver to Sellers a schedule showing the consideration allocable to each such Acquired Asset, (b) Sellers will deliver to Purchaser an invoice (or other valid and customary documentation) reflecting such sales Taxes in accordance with applicable Law (and Purchaser's stated allocation) and provide Purchaser with a reasonable opportunity to deliver any Tax exemption certificates or other documentation to reduce or eliminate the amount of any such sales Taxes and shall revise any such invoice to reflect any such reduction or elimination of the sales Taxes, (c) Purchaser shall pay to Sellers the amount of sales Taxes shown as due on such invoice as revised to reflect any such reduction or elimination of the sales Taxes no later than ten (10) Business Days following Purchaser's receipt of such revised invoice (but in no event prior to the Closing Date or later than three (3) Business Days prior to the applicable due date for the applicable Transfer Tax), and (d) Sellers shall remit any such sales Taxes to the applicable taxing authority in accordance with applicable Law. Sellers shall be responsible for any interest and penalties imposed as a result of a failure to timely remit any sales Taxes to the applicable taxing authority to the extent Purchaser timely remits such sales Taxes to Sellers or Purchaser's failure to do so

results from Seller's failure to timely charge or provide notice of such sales Taxes to Purchaser. The party required under applicable Law shall be responsible for the filing of any applicable Tax Returns with respect to Transfer Taxes and the other parties hereto shall reasonably cooperate in connection with any such filing.

ARTICLE XII

Miscellaneous

Section 12.1    Survival. All covenants and agreements contained herein which by their terms are to be performed in whole or in part, or which prohibit actions, subsequent to the Closing shall, solely to the extent such covenants and agreements are to be performed, or prohibit actions, subsequent to the Closing, survive the Closing in accordance with their terms until fully performed or satisfied. All other covenants and agreements contained herein, and all representations and warranties contained herein or in any certificated deliveries hereunder, in each case shall not survive the Closing and shall thereupon terminate and be of no further force or effect, including any actions for damages in respect of any breach or inaccuracy thereof. Notwithstanding the foregoing, nothing contained in this Section 12.1 shall prevent, limit or otherwise restrict any cause of action under Section 12.11 to seek or obtain an injunction to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof. Furthermore, notwithstanding anything to the contrary contained in this Agreement, the provisions of this Section 12.1 will not prevent or limit in any way a cause of action on account of intentional common law fraud.

Section 12.2    Governing Law and Jurisdiction. Except to the extent governed by the Bankruptcy Code, this Agreement will be governed by and be construed and enforced in accordance with the Laws of the State of Delaware, without giving effect to any Law that would cause the Laws of any jurisdiction, other than the State of Delaware, to be applied. Without limiting any party's right to appeal any Order of the Bankruptcy Court, (a) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes that may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, including, but not limited to, the assumption and assignment of the Transferred Contracts and Transferred Real Property Leases and (b) any and all legal proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereto hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations pursuant to Section 12.3 hereto. To the extent not prohibited by applicable Law or Bankruptcy Court rule, each party hereby waives and agrees not to assert, by way of motion, as a defense or otherwise in any such proceeding, any claim (i) that it is not subject to the jurisdiction of the Bankruptcy Court, (ii) that the proceeding is brought in an inconvenient forum, (iii) that it is immune from any legal process with respect to itself or its property, (iv) that the venue of the proceeding is improper or (v) that this Agreement or the subject matter hereof or thereof may not be enforced in or by such court. Each of the parties hereto hereby (a) irrevocably submits with regard to any such legal proceeding to the exclusive personal jurisdiction of the Bankruptcy Court in the event any dispute arises out of this Agreement or any transaction contemplated hereby, including, but not limited to, the assumption and assignment of the Transferred Contracts and Transferred Real Property Leases, (b) agrees that it shall not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from the Bankruptcy Court or that such action is brought in an inconvenient forum and (c) agrees

that it shall not bring any action relating to this Agreement or any transaction contemplated hereby in any court other than the Bankruptcy Court; provided, that, a party may commence any action or proceeding in a court other than the Bankruptcy Court solely for the purpose of enforcing an order or judgment issued by the Bankruptcy Court. The parties waive personal service of any and all process on each of them and consent that all such service of process shall be made in the manner, to the party and at the address set forth in Section 12.3 of this Agreement, and service so made shall be complete as stated in such Section 12.3. EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY.

Section 12.3    Notices. All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by e-mail (so long as no "bounceback" or similar "undeliverable" message is received by the sender thereof) if successfully transmitted prior to 5:00 pm (Eastern Time) on any Business Day, and on the next Business Day if successfully transmitted after such time or on a non-Business Day or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 12.3):

(1)    If to Sellers, to:

Proterra Inc
1815 Rollins Road
Burlingame, California 94010
Attention:    Jeff Mitchell
Email:         jmitchell@proterra.com

and an additional copy (which will not constitute notice to Sellers) to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064
Attention:    Paul M. Basta
                   Robert A. Britton
                   Austin S. Pollet
                   Michael J. Colarossi
Email:         pbasta@paulweiss.com
                   rbritton@paulweiss.com
                   apollet@paulweiss.com
                   mcolarossi@paulweiss.com

(2)    If to Purchaser or Purchaser Parent, to:

Volvo Battery Solutions LLC

Mack Trucks, Inc.
8003 Piedmont Triad Parkway
Greensboro, North Carolina 27409
Attention:     Gregory Higgins
             Rikard Bentelius
             Fredrik Brunell
Email:         gregory.higgins@volvo.com
             rikard.bentelius@volvo.com
             fredrik.brunell@volvo.com

and an additional copy (which will not constitute notice to Purchaser) to:

Greenberg Traurig, LLP
1000 Louisiana Street, Suite 1700
Houston, Texas 77002
Attention:     Shari L. Heyen
             David R. Eastlake
Email:         shari.heyen@gtlaw.com
             david.eastlake@gtlaw.com

Greenberg Traurig, LLP
77 West Wacker Drive, Suite 3100
Chicago, Illinois 60601
Attention:     Hans E. Biebl
Email:        hans.biebl@gtlaw.com

Section 12.4   <u>Amendments and Waivers</u>.

(a)     This Agreement may be amended, superseded, canceled, renewed, or extended, and the terms hereof may be waived, only by a written instrument signed by the parties hereto or, in the case of a waiver, by the party against whom the waiver is to be effective. Neither the failure nor any delay by any party in exercising any right, power or privilege under this Agreement will operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power or privilege will preclude any other or further exercise of such right, power or privilege or the exercise of any other right, power or privilege. To the maximum extent permitted by applicable Law (i) no claim or right arising out of this Agreement can be discharged by one party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other party, (ii) no waiver that may be given by a party will be applicable except in the specific instance for which it is given, and (iii) no notice to or demand on one party will be deemed to be a waiver of any obligation of such party or of the right of the party giving such notice or demand to take further action without notice or demand as provided in this Agreement.

(b)     A failure or omission of any party to insist, in any instance, upon strict performance by another party of any term or provision of this Agreement or to exercise any of its rights hereunder will not be deemed a modification of any term or provision hereof or a waiver or relinquishment of the future performance of any such term or

provision by such party, nor will such failure or omission constitute a waiver of the right of such party to insist upon future performance by another party of any such term or provision or any other term or provision of this Agreement.

Section 12.5    Entire Agreement. This Agreement, together with the Seller Disclosure Schedules, the Purchaser Disclosure Schedules, all Exhibits and Schedules hereto and the documents, agreements, certificates and instruments referred to herein and therein, including the Related Agreements, Confidentiality Agreement and related Orders, including the Sale Order, constitutes the entire agreement between the parties hereto and with respect to the subject matter hereof and supersedes all prior representations, warranties, agreements, and understandings, oral or written, with respect to such matters and other than any written agreement of the parties that expressly provides that it is not superseded by this Agreement.

Section 12.6    Headings: Interpretation. The headings in this Agreement are intended solely for convenience of reference and will be given no effect in the construction or interpretation of this Agreement. Unless the context otherwise requires, the singular includes the plural, and the plural includes the singular.

Section 12.7    No Assignment: Binding Effect. This Agreement is not assignable by any party without the prior written consent of the other party. Notwithstanding the foregoing, Purchaser may, without the prior written consent of Sellers, (a) assign this Agreement or all or any portion of Purchaser's rights, interests and obligations hereunder to any of its Affiliates or (b) designate any Person who is an Affiliate of Purchaser to perform any of Purchaser's obligations, in whole or in part (including the obligation to acquire any of the Acquired Assets or the obligation to assume any Assumed Liabilities), under this Agreement, provided however, that in no event will such an assignment release Purchaser from its obligations hereunder. This Agreement will be binding upon and will inure to the benefit of the parties hereto and their respective successors and permitted assigns.

Section 12.8    Counterparts. This Agreement may be executed in any number of counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument. Any electronic signature, including via portable document format (pdf) or DocuSign, attached hereto will be deemed to be an original and will have the same force and effect as an original signature.

Section 12.9    Incorporation by Reference. The Seller Disclosure Schedules, the Purchaser Disclosure Schedules and other Schedules and Exhibits and the documents referenced therein constitute integral parts of this Agreement and are hereby incorporated by reference herein.

Section 12.10    Time of the Essence. With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

Section 12.11    Specific Performance. Each party hereby acknowledges and agrees that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed by a party in accordance with their specific terms or were otherwise breached by a party. Notwithstanding anything to the contrary herein, if any party violates or refuses to perform any covenant or agreement made by such party herein, without limiting or waiving in any respect

any rights or remedies of a party under this Agreement now or hereafter existing at law, in equity or by statute, the non-breaching party or parties shall, in addition to any other remedy to which a party is entitled at law or in equity, be entitled to specific performance of such covenant or agreement or seek any other equitable relief, in each case without the proof of actual damages. Each party agrees to waive any requirement for the security or posting of any bond in connection with any such equitable remedy, and agrees that it will not oppose the granting of an injunction, specific performance or other equitable relief on the basis that (a) the other party has an adequate remedy at law, or (b) an award of specific performance is not an appropriate remedy for any reason at law or equity. Notwithstanding anything contained herein to the contrary, it is acknowledged and agreed that Sellers shall be entitled to specific performance of Purchaser's obligations to consummate the transaction contemplated herein only in the event that (i) all of the conditions set forth in Section 9.1 and Section 9.3 (other than those conditions that by their terms are to be satisfied at the Closing, each of which shall be capable of being satisfied if the Closing were to occur) have been and remain satisfied as of the time when Closing is required to have occurred pursuant to Section 4.1, (ii) Purchaser has failed to consummate the Closing on the date that the Closing is required to occur pursuant to Section 4.1, and (iii) Sellers have delivered to Purchaser an irrevocable notice on or after the date that the Closing is required to occur pursuant to Section 4.1 that all conditions set forth in Section 9.1 and Section 9.3 have been satisfied or waived (other than those conditions that by their terms are to be satisfied at the Closing, each of which shall be capable of being satisfied if the Closing were to occur) and the Closing shall occur in accordance with Section 4.1 if specific performance is granted. The disbursement of the Deposit Escrow Funds to Sellers pursuant to Section 10.2 shall be the sole and exclusive recourse of each Seller and the Seller Group against Purchaser and the Purchaser Group for any loss or damage suffered as a result of any breach of this Agreement or any representation, warranty, covenant or agreement contained herein by Purchaser or the failure of the transactions contemplated by this Agreement to be consummated, except in the event Sellers are entitled to and elect specific performance of Purchaser's obligations to consummate the transactions contemplated herein pursuant to this Section 12.11.

Section 12.12    No Third Party Beneficiaries.

(a)    Except as provided in Section 12.16, the terms and provisions of this Agreement are intended solely for the benefit of the parties hereto and their respective successors and permitted assigns, and it is not the intention of the parties hereto to confer third party beneficiary rights upon any other Person.

(b)    For the avoidance of doubt, all provisions contained in this Agreement, including those contained in Article VIII, are included for the sole benefit of the respective parties hereto, and nothing contained herein, including in Article VIII, (i) shall confer upon any former, current or future employee of Sellers or Purchaser or any legal representative or beneficiary thereof any rights or remedies, including any right to employment or continued employment, of any nature, for any specified period, (ii) shall cause the employment status of any former, present or future employee to be other than terminable at will, (iii) shall confer any third party beneficiary rights upon any Employee or any dependent or beneficiary thereof or any heirs or assigns thereof or (iv) shall constitute an amendment of, or prohibition on the amendment or termination of, any Benefit Plan or

other employee compensation or benefit plan, program, policy or arrangement of Sellers, Purchaser or any of their respective Affiliates.

Section 12.13 <u>Expenses</u>. Whether or not the transactions contemplated hereby are consummated, each party hereto will pay its own costs and expenses incurred in connection with the negotiation, execution and closing of this Agreement and the Related Agreements and the transactions contemplated hereby and thereby provided. In the event of termination of this Agreement, the obligation of each party to pay its own expenses will be subject to any rights of such party arising from a breach of this Agreement by another party. Notwithstanding the foregoing, (a) Sellers agree to pay all costs of releasing existing Liens and other Interests and recording the releases, and (b) Purchaser agrees to pay any filing fees in connection with the filings made pursuant to the HSR Act and any other federal, state or local Governmental or Regulatory Authority in accordance with <u>Section 6.1</u>.

Section 12.14 <u>Severability</u>. If any term or other provision of this Agreement is illegal, invalid or unenforceable under any Law or as a matter of public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated by this Agreement is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision contained herein is, to any extent, invalid or unenforceable in any respect under the Laws governing this Agreement, the parties to this Agreement shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated by this Agreement be consummated as originally contemplated to the greatest extent possible.

Section 12.15 <u>Public Announcements</u>. Prior to the Closing, unless otherwise required by applicable Law, the Bankruptcy Court, the Bidding Procedures or Bidding Procedures Order or by obligations of Purchaser or Sellers or their respective Affiliates pursuant to any listing agreement with or rules of any securities exchange, Purchaser, on the one hand, and Sellers, on the other hand, shall consult with each other before issuing any press release or otherwise making any public statement with respect to this Agreement or the transactions contemplated hereby and shall not issue any such release or make any such statement without the prior written consent of the other (such consent not to be unreasonably withheld, conditioned or delayed). From and after the Closing, the parties hereto may make public statements with respect to this Agreement or the transactions contemplated hereby so long as such announcements do not disclose the specific terms or conditions of this Agreement, except where such terms and conditions have already been disclosed as required by Law or by obligations of Purchaser or Sellers or their respective Affiliates pursuant to any listing agreement with or rules of any securities exchange or the Bankruptcy Court; <u>provided</u>, that the issuing party shall use its Reasonable Efforts to consult with the other party with respect to the text thereof to the extent practicable.

Section 12.16 <u>No Liability; Release.</u>

(a)     (i) No past, present or future director, officer, manager, employee, incorporator, member, partner or equityholder or other Affiliates of (A) any Seller (other than such Seller in its capacity as such), or (B) Purchaser (other than (x) Purchaser in its capacity as such and (y) Purchaser Parent in its capacity as such pursuant to <u>Section 7.17</u>),

and (ii) none of the lenders or agents under any Indebtedness of a Seller or Purchaser, as applicable, in any case, shall have any Liability for any obligations or liabilities of Sellers or Purchaser or Purchaser Parent, as applicable, under this Agreement or any agreement, document or instrument entered into in connection herewith of or for any claim based on, in respect of, or by reason of, the transactions contemplated hereby and thereby. Any claim or cause of action based upon, arising out of, or related to this Agreement or any agreement, document or instrument contemplated hereby may only be brought against Persons that are expressly named as parties hereto or thereto, and then only with respect to the specific obligations set forth herein or therein. Other than the parties hereto, no other party shall have any Liability or obligation for any of the representations, warranties, covenants, agreements, obligations or liabilities of any party under this Agreement or the agreements, documents or instruments contemplated hereby or of or for any legal proceeding based on, in respect of, or by reason of, the transactions contemplated hereby or thereby (including the breach, termination or failure to consummate such transactions), in each case whether based on contract, tort, fraud, strict liability, other Law or otherwise and whether by piercing the corporate veil, by a claim by or on behalf of a party hereto or another Person or otherwise.

(b)     Effective upon the Closing, Purchaser acknowledges that it has no claim, counterclaim, setoff, recoupment, action or cause of action of any kind or nature whatsoever against any of the individuals or entities within the Seller Group, that directly or indirectly arises out of, is based upon, or is in any manner connected with any Prior Event (including, for the avoidance of doubt, any Avoidance Actions) (collectively, the "**Purchaser Released Claims**"); and, should any Purchaser Released Claims nonetheless exist, Purchaser hereby (i) releases and discharges each member of the Seller Group from any liability whatsoever on such Purchaser Released Claims that directly or indirectly arises out of, is based upon, or is in any manner connected with a Prior Event, and (ii) releases, remises, waives and discharges all such Purchaser Released Claims against the Seller Group. For purposes of this Agreement, "**Seller Group**" means (1) each Seller, (2) the lenders and agents under the Indebtedness of any Seller, (3) the Statutory Committee of Unsecured Creditors of the Sellers in their Bankruptcy Cases, and any members thereof at any time, in each case, solely in their capacity as such, and (4) with respect to those parties in the foregoing (1)–(3) of this sentence, any of their respective agents, attorneys, financial advisors, legal representatives, consultants, legal advisors, Affiliates, directors, managers, officers, control persons (as defined in Section 15 of the Securities Act of 1933 (as amended) or Section 20 of the Securities Exchange Act of 1934 (as amended)), shareholders, partners, estates, members, employees and successors and assigns, in each case, solely in their capacity as such, and "**Prior Event**" means any transaction, event, circumstances, action, failure to act or occurrence of any sort or type, including any approval or acceptance given or denied, whether known or unknown, which occurred, existed, was taken or begun prior to the consummation of the transactions contemplated hereunder; provided, that for the avoidance of doubt, "Prior Event" shall include any transaction, event, circumstances, action, failure to act or occurrence of any sort or type which occurred, existed, was taken or begun prior to the consummation of the transactions contemplated hereunder including: any terms of this Agreement (other than any rights, interests or obligations of the parties under this Agreement and any Related Agreement), the Bankruptcy Cases or the events leading to the commencement thereof,

or any oral or written agreement relating to the foregoing (other than any rights, interests or obligations of the parties under this Agreement and any Related Agreement). Notwithstanding anything set forth herein to the contrary, Purchaser is not in any manner releasing any officer or employee of any Seller in their capacity as such.

(c)     Effective upon the Closing, each Seller acknowledges that it has no claim, counterclaim, setoff, recoupment, action or cause of action of any kind or nature whatsoever against any of the individuals or entities within the Purchaser Group, that directly or indirectly arises out of, is based upon, or is in any manner connected with any Prior Event (including, for the avoidance of doubt, any Retained Avoidance Actions) (collectively, the "**Seller Released Claims**"); and, should any Seller Released Claims nonetheless exist, each Seller hereby (i) releases and discharges each member of the Purchaser Group from any liability whatsoever on such Seller Released Claims that directly or indirectly arises out of, is based upon, or is in any manner connected with a Prior Event, and (ii) releases, remises, waives and discharges all such Seller Released Claims against the Purchaser Group. For purposes of this Agreement, "**Purchaser Group**" means (1) each of Purchaser and Purchaser Parent, (2) the lenders and agents under any Indebtedness of Purchaser or Purchaser Parent, and (3) with respect to those parties in the foregoing (1)–(2) of this sentence, any of their respective agents, attorneys, financial advisors, legal representatives, consultants, legal advisors, Affiliates, directors, managers, officers, control persons (as defined in Section 15 of the Securities Act of 1933 (as amended) or Section 20 of the Securities Exchange Act of 1934 (as amended)), shareholders, equityholders, partners, estates, members, employees and successors and assigns, in each case, solely in their capacity as such.

(d)     Without limiting in any way the scope of the release contained in subparagraph (a), (b) or (c) of this Section 12.16 and effective upon the Closing, Purchaser and each Seller, to the fullest extent allowed under applicable Law, hereby waives and relinquishes all statutory and common law protections purporting to limit the scope or effect of a general release, whether due to lack of knowledge of any claim or otherwise, including, waiving and relinquishing the terms of any Law which provides that a release may not apply to material unknown claims. Purchaser and each Seller hereby further affirms its intent to waive and relinquish such unknown claims and to waive and relinquish any statutory or common law protection available in any applicable jurisdiction with respect thereto including, without limitation, California Civil Code § 1542, which provides:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

(e)     Notwithstanding anything set forth herein to the contrary, the releases set forth in this Section 12.16 do not extend to (i) the willful misconduct, intentional common

law fraud or gross negligence of such Person or (ii) any rights, interests or obligations of the parties under this Agreement and any Related Agreement.

*[Signature Page to Follow]*

IN WITNESS WHEREOF, the parties, intending legally to be bound, have caused this Agreement to be duly executed as of the day and year first herein above written.

**SELLERS:**

PROTERRA INC

By:_____
    Name: GARETH JOYCE
    Title: CEO & PRESIDENT

PROTERRA OPERATING COMPANY, INC.

By:_____
    Name: GARETH JOYCE
    Title: CEO & PRESIDENT

DocuSign Envelope ID: 39704D9C-67C4-450D-A245-CD4D2735010A

**PURCHASER:**

VOLVO BATTERY SOLUTIONS LLC

By: _____
            Name: Charles A. Albrecht
            Title: President

**PURCHASER PARENT, solely for purposes of <u>Section 7.17</u>:**

MACK TRUCKS, INC.

By: _____
            Name: Stephen Roy
            Title:  President

DocuSign Envelope ID: 1766A6E1-AE7A-4334-BF8A-CB3474A58173

**PURCHASER:**

VOLVO BATTERY SOLUTIONS LLC

By: _____
     Name: Charles A. Albrecht
     Title: President

**PURCHASER PARENT, solely for purposes of
<u>Section 7.17</u>:**

MACK TRUCKS, INC.

By: _____
     Name: Stephen Roy
     Title: President