## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| PROTERRA INC, *et al.*,[1] | Case No. 23-11120 (BLS) |
| Debtors. | (Jointly Administered) |
| | **Sale Hearing: Nov. 28, 2023 at 10:00 a.m. (ET)** |

## NOTICE OF (A) SUCCESSFUL BIDDER
## REGARDING DEBTORS' (I) TRANSIT ASSETS AND (II) ENERGY ASSETS AND
## (B) CANCELLATION OF THE SALE HEARING SOLELY WITH RESPECT TO
## PROTERRA ENERGY

**PLEASE TAKE NOTICE** that, on September 7, 2023, the United States Bankruptcy Court for the District of Delaware (the "Court") entered that certain *Order (A) Approving Bidding Procedures to Govern the Sale of All or Substantially All of the Debtors' Assets Pursuant to Section 363 of the Bankruptcy Code, (B) Approving Procedures Regarding Entry Into One or More Stalking Horse Agreements, (C) Establishing Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases, (D) Approving the Form and Manner of the Notice of Assumption and Assignment of Executory Contracts and Unexpired Leases, (E) Scheduling Auctions for the Sales of the Company Assets and Hearings to Consider Approval of the Sales and Approving the Form and Manner of the Notice Thereof, and (F) Granting Related Relief* [Docket No. 218] (the "Bidding Procedures Order"),[2] approving certain dates, deadlines, and procedures for the potential sale of all or substantially all of the Debtors' assets (the "Bidding Procedures").

**PLEASE TAKE FURTHER NOTICE** that, in accordance with paragraph 31 of the Bidding Procedures Order, on October 13, 2023, the Debtors filed the *Notice of Revised Dates Relating to the Bidding Procedures Deadline for (I) Proterra Energy; and (II) Proterra Transit* [Docket No. 368], and on November 7, 2023, the Debtors filed the *Second Notice of Revised Dates Relating to Bidding Procedures Deadlines for Proterra Energy* [Docket No. 514] (collectively, the "Notices of Revised Dates").

**PLEASE TAKE FURTHER NOTICE** that, pursuant to paragraph 14 of the Bidding Procedures Order, on November 13, 2023, the Debtors, in consultation with the Consultation Parties, commenced an Auction for the Company Assets related to Proterra Transit and Proterra Energy. The proceedings were conducted in accordance with the Bidding Procedures.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Proterra Inc (9565); and Proterra Operating Company, Inc. (8459). The location of the Debtors' service address is: 1815 Rollins Road, Burlingame, California 94010.

[2]    All capitalized terms used but not otherwise defined herein shall be given the meanings ascribed to them in the Bidding Procedures Order or the Bidding Procedures, as applicable.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to paragraph 9 of the Bidding Procedures Order, the Debtors, in consultation with the Consultation Parties and subject to the representations made on the record at the Auction, selected Phoenix Motor, Inc. as the Successful Bidder at the conclusion of the (i) Auction for certain battery lease assets of the Debtors (the "Battery Lease Assets") and (ii) Auction for Proterra Transit, excluding the Battery Lease Assets. The Debtors and the Successful Bidder agreed to an asset purchase agreement for each respective Auction, attached hereto as **Exhibit A** (the "Battery Lease APA") and **Exhibit B** (the "Transit APA" and, together with the Battery Lease APA, the "APAs").

**PLEASE TAKE FURTHER NOTICE** that, pursuant to paragraph 9 of the Bidding Procedures Order, the Debtors have reserved the right to select Zenobē Americas, Inc. as the Backup Bidder for the Battery Lease Assets in consultation with the Consultation Parties, and subject to representations made on the record at the Auction and final documentation, which the Debtors will file on the docket if finalized.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to paragraph 9 of the Bidding Procedures Order and subject to the representations made on the record at the Auction, the Debtors, in consultation with the Consultation Parties, selected CSI GP I LLC, CSI Prodigy Holdco LP, CSI Prodigy CoInvestment LP, and CSI PRTA Co-Investment LP (collectively, the "Plan Sponsor") as the Successful Bidder at the conclusion of the Auction for Proterra Energy.  The Debtors and the Plan Sponsor agreed to a *Chapter 11 Plan Support Agreement*, attached hereto as **Exhibit C**.

**PLEASE TAKE FURTHER NOTICE** that on **November 28, 2023 at 10:00 a.m. (prevailing Eastern Time)**, a hearing (the "Sale Hearing") will be held before the Honorable Brendan Linehan Shannon, United States Bankruptcy Judge, to consider the entry of the Sale Order authorizing the Debtors and the Successful Bidder for Proterra Transit to consummate the transactions provided for by the APAs.  Pursuant to the Bidding Procedures Order, and as reflected in the subsequent Notices of Revised Dates, objections, if any, (i) to the conduct at the Auctions or (ii) solely with respect to the Non-Debtor Counterparties to the Contracts, to the specific identity of and adequate assurance of future performance provided by the Successful Bidder, must be filed by **Tuesday, November 21, 2023 at 4:00 p.m. (prevailing Eastern Time)**.

**PLEASE TAKE FURTHER NOTICE** that the **Sale Hearing scheduled to approve the Sale of Proterra Energy on November 28, 2023 at 10:00 a.m. (prevailing Eastern Time) has been cancelled**.  For the avoidance of doubt, the Sale Hearings to approve the Sales of Proterra Powered and Proterra Transit remain scheduled for Tuesday, November 28, 2023 at 10:00 a.m. (prevailing Eastern Time).

**PLEASE TAKE FURTHER NOTICE** that the Sale Hearings (or any portion thereof) may be adjourned by the Debtors, in consultation with the Consultation Parties, from time to time without further notice other than by announcement in open court or through the filing of a notice or other document on the Court's docket.

**PLEASE TAKE FURTHER NOTICE** that copies of the Bidding Procedures, Bidding Procedures Order, and other pleadings filed in these chapter 11 cases may be obtained free of charge by visiting the website of the solicitation agent, Kurtzman Carson Consultants, LLC, at

https://kccllc.net/proterra.  You may also obtain pleadings filed in these chapter 11 cases by visiting the Court's website via PACER at http://deb.uscourts.gov.

[*Remainder of page intentionally left blank*]

Dated:  November 13, 2023
        Wilmington, Delaware

Respectfully submitted,

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*Andrew L. Magaziner*
Pauline K. Morgan (No. 3650)
Andrew L. Magaziner (No. 5426)
Shella Borovinskaya (No. 6758)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email:  pmorgan@ycst.com
        amagaziner@ycst.com
        sborovinskaya@ycst.com

- and -

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Paul M. Basta (admitted *pro hac vice*)
Robert A. Britton (admitted *pro hac vice*)
Michael J. Colarossi (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Tel:    (212) 373-3000
Fax:    (212) 757-3990
Email:  pbasta@paulweiss.com
        rbritton@paulweiss.com
        mcolarossi@paulweiss.com

*Counsel to the Debtors and Debtors in Possession*

30971633.1

4

## Exhibit A

**Battery Lease Asset Purchase Agreement**

EXECUTION VERSION

ASSET PURCHASE AGREEMENT

by and among

PROTERRA INC,

PROTERRA OPERATING COMPANY, INC.

(**"Sellers"**)

and

PHOENIX MOTOR, INC.

(**"Purchaser"**)

DATED AS OF NOVEMBER 13, 2023

## TABLE OF CONTENTS

Page

ARTICLE I Definitions ...................................................................................... 1
  Section 1.1   Certain Definitions ......................................................... 1
  Section 1.2   Construction of Certain Terms and Phrases ................. 14
ARTICLE II Purchase and Sale and Assumption ........................................... 15
  Section 2.1   Purchase and Sale of Acquired Assets ........................ 15
  Section 2.2   Excluded Assets ........................................................... 16
  Section 2.3   Assumed Liabilities ..................................................... 16
  Section 2.4   Excluded Liabilities ..................................................... 16
  Section 2.5   Assignment and Cure Amounts .................................... 16
  Section 2.6   Bulk Sales Laws .......................................................... 17
ARTICLE III Purchase Price ......................................................................... 17
  Section 3.1   Purchase Price; Earnest Deposit .................................. 17
  Section 3.2   Withholding of Tax ...................................................... 18
  Section 3.3   Allocation of Consideration ........................................ 18
ARTICLE IV Closing Matters ....................................................................... 19
  Section 4.1   Closing ......................................................................... 19
  Section 4.2   Deliveries at Closing ................................................... 19
  Section 4.3   Further Assurances and Cooperation ........................... 20
ARTICLE V Representations and Warranties ................................................ 21
  Section 5.1   Representations and Warranties of Seller ..................... 21
  Section 5.2   Representations and Warranties of Purchaser ............... 25
ARTICLE VI Regulatory Matters .................................................................. 29
  Section 6.1   Regulatory Filings ........................................................ 29
  Section 6.2   Objections or Other Challenges ................................... 29
ARTICLE VII Certain Covenants .................................................................. 30
  Section 7.1   Conduct of Business Pending Closing .......................... 30
  Section 7.2   Efforts to Satisfy Closing Conditions ........................... 30
  Section 7.3   Assets Incapable of Transfer ....................................... 31
  Section 7.4   Discovery of Breach ..................................................... 31
  Section 7.5   Restricted Use of Confidential Information .................. 32
  Section 7.6   Review and Inspections ............................................... 32

Section 7.7     No Use of Sellers Brand ................................................................ 32

Section 7.8     Background License ...................................................................... 32

ARTICLE VIII Intentionally Omitted. ........................................................................ 33

ARTICLE IX Conditions to Closing ........................................................................... 33

Section 9.1     Conditions to the Obligations of Purchaser ................................... 33

Section 9.2     Conditions to the Obligations of Sellers ........................................ 34

Section 9.3     Conditions Precedent to Obligations of Purchaser and Sellers ...... 35

Section 9.4     Frustration of Closing Conditions ................................................. 35

ARTICLE X Termination ............................................................................................ 35

Section 10.1    Termination .................................................................................. 35

Section 10.2    Effect of Termination .................................................................. 37

ARTICLE XI Bankruptcy Matters .............................................................................. 37

Section 11.1    Bankruptcy Cases ........................................................................ 37

Section 11.2    Bankruptcy Court Approvals ....................................................... 37

Section 11.3    Further Filings and Assurances .................................................... 38

Section 11.4    Notice of Sale .............................................................................. 38

Section 11.5    Free and Clear ............................................................................. 38

Section 11.6    Transfer Tax Exemption ............................................................... 39

ARTICLE XII Miscellaneous ...................................................................................... 39

Section 12.1    Survival ........................................................................................ 39

Section 12.2    Governing Law and Jurisdiction ................................................... 39

Section 12.3    Notices ......................................................................................... 40

Section 12.4    Amendments and Waivers ............................................................ 41

Section 12.5    Entire Agreement ......................................................................... 41

Section 12.6    Headings: Interpretation ............................................................... 42

Section 12.7    No Assignment: Binding Effect .................................................... 42

Section 12.8    Counterparts ................................................................................. 42

Section 12.9    Incorporation by Reference .......................................................... 42

Section 12.10   Time of the Essence ..................................................................... 42

Section 12.11   Specific Performance .................................................................... 42

Section 12.12   No Third Party Beneficiaries ........................................................ 42

Section 12.13   Expenses ...................................................................................... 43

Section 12.14   Severability .................................................................................. 43

Section 12.15   Public Announcements .................................................................. 43

Section 12.16   No Liability; Release. ...................................................................... 44

## EXHIBITS

Exhibit A                Assumption Agreement

Exhibit B                General Assignment

## SCHEDULES

Schedule 3.3             Allocation Principles

Seller Disclosure Schedules

Purchaser Disclosure Schedules

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (collectively with the Exhibits and Schedules referred to herein, this "**Agreement**") is made as of the 13th day of November, 2023 (the "**Execution Date**"), by and among PROTERRA INC, a Delaware corporation ("**Holdco**"), PROTERRA OPERATING COMPANY, INC., a Delaware corporation ("**Opco**" and together with Holdco, "**Sellers**" and each a "**Seller**"), and PHOENIX MOTOR, INC., a Delaware corporation ("**Purchaser**").

WHEREAS, Sellers are engaged in the Business (as defined below);

WHEREAS, on August 7, 2023 (the "**Petition Date**"), Sellers commenced the Bankruptcy Cases (as defined below) and Sellers intend to seek approval of and authorization for a sale and transfer of Sellers' assets used in the conduct of the Business to the individual or entity submitting the highest or otherwise best bid for those assets in a process approved by the Bankruptcy Court (as defined below) (the "**Sale Process**") and to be consummated in accordance with the Bidding Procedures Order (as defined below) and pursuant to the Sale Order (as defined below);

WHEREAS, Purchaser desires to purchase from Sellers the Acquired Assets (as defined below) through the Sale Process (the "**Sale**"), in exchange for the Purchase Price (as defined below) and Purchaser's assumption of the Assumed Liabilities (as defined below), on the terms and subject to the conditions set forth in this Agreement;

WHEREAS, Sellers have determined, in the exercise of their business judgment, that the sale to Purchaser as contemplated herein is, in light of the facts and circumstances, the highest or otherwise best bid for the Acquired Assets and therefore it is advisable and in the best interest of their estates and the beneficiaries of the estates to enter into this Agreement, which has been approved by Sellers' applicable governing bodies; and

WHEREAS, Sellers and Purchaser each acknowledge and agree that the transactions contemplated by this Agreement are subject to the Bankruptcy Court's approval of this Agreement.

NOW, THEREFORE, in consideration of the premises and of the respective representations, warranties, covenants, agreements, and conditions contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, Sellers and Purchaser each agree as follows:

## ARTICLE I

## Definitions

Section 1.1    Certain Definitions. Capitalized terms used in this Agreement but not otherwise defined in this Agreement shall have the meanings ascribed to such terms in the Bidding Procedures Order (as defined below) as in effect at the date hereof or as such terms may

be modified with the approval of the Sellers. In this Agreement and any Exhibit or Schedule hereto, the following capitalized terms have the following respective meanings:

"**Accounts Receivable**" means all accounts receivable, notes receivable, purchase orders, negotiable instruments, completed work or services that have not been billed, chattel paper, notes and other rights to payment with respect to the Transferred Contracts.

"**Acquired Assets**" means:

(a)     subject to Section 7.3, the Transferred Contracts and each Seller's rights thereunder (in the case of the Battery Lease Agreements, in its capacity as "Lessor" thereunder);

(b)     all of the battery packs that each Seller owns that are leased by such Seller, in its capacity as "Lessor", pursuant to the Transferred Contracts that are Battery Lease Agreements (the "**Tangible Assets**");

(c)     all Accounts Receivable and all other rights of any Seller to receive or recoup, whether by offset or netting against production from the Acquired Assets and the proceeds thereof or otherwise, amounts owed by Persons other than Sellers and their Affiliates with respect to the Transferred Contracts, in each case to the extent arising from and after the Closing Date;

(d)     all claims and counterclaims, known or unknown, of such Seller (in the case of the Battery Lease Agreements, in its capacity as "Lessor") under the Transferred Contracts, against any other Person arising under the Transferred Contracts; and

(e)     all unexpired warranties, indemnitees and guarantees in favor of such Seller made or given by manufacturers, contractors, subcontractors, consultants, vendors, suppliers and other third parties to the extent arising from or related to any Acquired Asset or Assumed Liability.

"**Action**" means any claim, demand, action, cause of action, suit, arbitration, audit, investigation or proceeding.

"**Affiliate**" means, as to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with that Person. For purposes of this definition, "**control**" (including, with correlative meanings, the terms "**controlled by**" and "**under common control with**"), as used with respect to any Person or group of Persons, means possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of the Person, whether through the ownership of voting securities or by contract.

"**Agreement**" has the meaning set forth in the preamble.

"**Allocation Principles**" has the meaning set forth in Section 3.3.

"**Alternative Transaction**" means a sale, assignment, transfer or other disposition of all or substantially all of the Acquired Assets to any Person (or group of Persons), other than to Purchaser or an Affiliate of Purchaser.

"**Antitrust Law**" means the Sherman Act, the Clayton Act, the HSR Act, the Federal Trade Commission Act, and all other Laws or Orders that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or lessening of competition through merger or acquisition.

"**Assumed Liabilities**" means those liabilities and obligations to the extent arising out of or relating to the Transferred Contracts, including Cure Amounts, or any of the other Acquired Assets.

"**Assumption Agreement**" means the Assumption Agreement in the form attached hereto as Exhibit A.

"**Auction**" has the meaning set forth in the Bidding Procedures.

"**Avoidance Action**" means any claim, right or cause of action of a Seller arising under chapter 5 of the Bankruptcy Code and any analogous state or federal statutes and common Law relating to the Sellers, the Acquired Assets, the Transferred Contracts or the Assumed Liabilities.

"**Backup Bidder**" has the meaning set forth in the Bidding Procedures.

"**Bankruptcy Cases**" has the meaning set forth in Section 11.1.

"**Bankruptcy Code**" means Title 11 of the United States Code.

"**Bankruptcy Court**" has the meaning set forth in Section 11.1.

"**Battery Lease Agreements**" means all of the battery lease Transferred Contracts to which the Sellers are party, as the case may be, as "Lessor" thereunder, set forth under the heading "Battery Lease Agreements" on Section 5.1(h)(i) of the Seller Disclosure Schedules.

"**Benefit Plan**" means (i) any "employee benefit plan" as defined in Section 3(3) of the ERISA (whether or not subject to ERISA) and (ii) any other pension, retirement, profit-sharing, savings, bonus, incentive, commission, stock option or other equity or equity-based, deferred compensation, severance, retention, employment, benefit, excess benefit, incentive, equity interest, equity bonus, equity purchase, restricted equity, equity ownership, equity appreciation, phantom equity, savings and thrift, cafeteria, reimbursement, health savings, flexible spending, compensation, welfare, sick leave, vacation, medical, dental, hospitalization, vision, disability, accidental death and dismemberment, life insurance, death benefit, post-retirement, transaction bonus, periodic bonus, termination, fringe benefit, perquisite or change of control plan, program, policy, agreement, contract or arrangement that (x) is sponsored, maintained or contributed to by Sellers, or for which Sellers have any obligation to sponsor, maintain or contribute to, or for which Sellers have any direct or indirect liability, whether contingent or otherwise and (y) under which any current or former officer, director, employee, consultant (or their respective beneficiaries) of Sellers has any present or future right to benefits.

"**Bidding Procedures**" means the procedures governing the Auction and the Sale Process, as approved by the Bankruptcy Court pursuant to the Bidding Procedures Order and attached as Exhibit 1 to the Bidding Procedures Order, and as may be amended from time to time in accordance with their terms.

"**Bidding Procedures Order**" means the order entered by the Bankruptcy Court on September 7, 2023 (Docket No. 218), approving the Bidding Procedures.

"**Business**" means the business of the Proterra Energy Business Unit, the Proterra Powered Business Unit, the Proterra Transit Business Unit and the Proterra Valence Business Unit.

"**Business Units**" means the Proterra Transit Business Unit, Proterra Energy Business Unit, the Proterra Powered Business Unit and the Proterra Valence Business Unit.

"**Business Day**" means a day (other than a Saturday, Sunday or national holiday) on which commercial banks in the State of New York and the State of California are open for the transaction of commercial banking business.

"**Cash Component Price**" has the meaning set forth in Section 3.1(a).

"**Clayton Act**" means Title 15 of the United States Code §§ 12-27 and Title 29 of the United States Code §§ 52-53, as amended.

"**Closing**" means the consummation of the transactions contemplated in this Agreement.

"**Closing Date**" has the meaning set forth in Section 4.1.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Confidential Information**" has the meaning set forth in the Confidentiality Agreement.

"**Confidentiality Agreement**" means that certain Confidentiality Agreement dated as of August 10, 2023 by and between Purchaser and Holdco.

"**Contract**" means any written or oral contract, agreement or instrument, including, supply contracts, purchase orders, sale orders, bids, understandings or commitments, customer agreements, licenses, mortgages, subcontracts, indentures, leases of personal property, deeds of trust, notes or guarantees, pledges, liens, or conditional sales agreements to which the Person referred to is a party or by which any of its assets may be bound.

"**Cure Amounts**" has the meaning set forth in Section 2.5(b).

"**Deposit Escrow Account**" means the escrow account established pursuant to the Deposit Escrow Agreement.

"**Deposit Escrow Agreement**" means that certain escrow agreement, dated as of the date hereof, executed by and among Purchaser, Holdco and the Escrow Agent.

"**Deposit Escrow Funds**" mean, at any time of determination, the Earnest Deposit deposited in the Deposit Escrow Account, together with any interest earned thereon.

"**Effective Time**" means 12:01 a.m. Eastern Time, on the Closing Date.

"**Environmental Laws**" means all federal, state and local Laws, code, binding and enforceable guidelines, policy or rule of common law or judicial or administrative interpretation thereof relating to pollution, public health and safety (as it relates to exposure to Hazardous Materials) or protection of the environment, including the Comprehensive Environmental Response, Compensation and Liability Act, the Resource Conservation and Recovery Act, the Clean Air Act, the Clean Water Act, and any state or local counterparts or equivalents, as such requirements have been enacted and are in effect on or prior to the Closing Date.

"**Environmental Liabilities**" means all Liabilities relating to Seller's ownership and/or operation of the Business and/or the Acquired Assets and consisting of or relating to:

> (i)     any Hazardous Materials, environmental matters or conditions (including on-site or off-site contamination and regulation of chemical substances or products);

> (ii)     fines, penalties, judgments, awards, settlements, legal or administrative proceedings, damages, losses, claims, demands and investigative, remedial, or inspection costs and expenses arising under Environmental Laws or relating to Hazardous Materials;

> (iii)     financial responsibility under Environmental Laws for cleanup costs or corrective action, including any investigation, cleanup, removal, containment, or other remediation or response actions required by applicable Environmental Laws and for any natural resource damages; or

> (iv)     any other compliance, corrective, investigative or remedial measures required under Environmental Laws.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

"**Escrow Agent**" means Citibank, N.A.

"**Excluded Assets**" means all assets, rights, claims or properties owned by either Seller that are not Acquired Assets, including:

> (i)     all cash, rights in bank accounts, certificates of deposit, bank deposits, cash equivalents, professional fee retainers, the cash surrender value of any life insurance policies, investment securities and checks or other payments received by such Seller (including received in lock boxes) prior to the Effective Time;

> (ii)     the Purchase Price and the Deposit Escrow Funds;

(iii)    any Benefit Plan and any assets, trust agreements, insurance policies, administrative service agreements and other contracts, files and records in respect thereof;

(iv)    any prepayments and good faith and other bid deposits submitted by any third party under the terms of the Bidding Procedures Order;

(v)    all Accounts Receivable and all other rights of any Seller to receive or recoup, whether by offset or netting against production from the Acquired Assets and the proceeds thereof or otherwise, amounts owed by Persons other than Sellers and their Affiliates with respect to the Acquired Assets, in each case to the extent accruing prior to the Effective Time;

(vi)    any deposits, escrows, surety bonds or other financial assurances and any cash or cash equivalents securing any surety bonds or financial assurances, in each case, to the extent arising under the Excluded Assets or Excluded Liabilities;

(vii)    all trade credits or refunds of costs or expenses borne by any Seller, in each case, attributable to the Acquired Assets and attributable to any period of time prior to the Effective Time;

(viii)    any rights to Tax refunds, rebates, abatements, deposits, prepayments, attributes or credits and current and deferred Tax assets (other than with respect to Taxes allocated to Purchaser in Section 12.13);

(ix)    such Seller's rights under this Agreement and the Related Agreements;

(x)    the Sellers Brand;

(xi)    all Intellectual Property;

(xii)    all Contracts that are not Transferred Contracts;

(xiii)    all Real Property Leases;

(xiv)    all Permits;

(xv)    the Excluded Books and Records;

(xvi)    the Avoidance Actions and any other claims, interests, rights, rebates, abatements, remedies, recoveries, goodwill, customer and referral relationships, other intangible property and all privileges, set-offs and benefits of Sellers, and all claims, demands, indemnification rights or causes of action, available to any of the Sellers or their estates against third parties to the extent related to the Excluded Assets or the Excluded Liabilities (including any claim to collect any Accounts Receivable accruing prior to the Effective Time);

(xvii) all of such Seller's insurance policies, including director and officer insurance policies, and related contracts and all rights thereunder (including, the right to make claims thereunder and to the proceeds thereof);

(xviii) all debts, demands, causes of action or other rights or claims of such Seller against any Affiliates of such Seller including any intercompany receivables due from any such Affiliate of such Seller; and

(xix) all shares of capital stock or other equity interest in or issued by any Seller or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interest in or issued by any Seller, and any shares of capital stock or other equity interest in or issued by any other entity in which any Seller holds an equity interest, or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interest in or issued by any other entity in which any Seller holds an equity interest.

"**Excluded Books and Records**" means (i) all books and records relating to employee benefit matters, (ii) all books and records relating to employees, (iii) all minute books of a Seller, (iv) all income Tax Returns and income Tax records, (v) all books and records prepared in anticipation of or in connection with or otherwise related to the negotiation, execution or performance by Sellers under this Agreement or any Related Agreement; (vi) all books and records that Sellers are required by Law to retain, (vii) all books and records that are subject to attorney-client privilege or other work product privilege and (viii) any other books and records to the extent relating to the Excluded Assets or Excluded Liabilities.

"**Excluded Liabilities**" means all Liabilities of each Seller that are not Assumed Liabilities, including:

(i) all Liabilities of such Seller or any Affiliate of such Seller in respect of any Indebtedness;

(ii) all Liabilities of such Seller or any Affiliate of such Seller for (a) income Taxes (whether or not then due), arising in connection with the consummation of the transactions contemplated by this Agreement or (b) the unpaid pre-Closing Taxes of any other Person under section 1.1502-6 of the Treasury Regulations (or any similar provision of state, local or foreign law) or as a transferee, successor, by Contract, by Law or otherwise;

(iii) all Liabilities for Taxes with respect to the Acquired Assets, the Business or any of its facilities (except for Taxes allocated to Purchaser pursuant to Section 12.13) for all taxable periods, or portions thereof, ending at or prior to the Effective Time or that are otherwise allocated to Seller in Section 12.13;

(iv) all Liabilities arising from any litigation, arbitration or any proceeding with any Governmental or Regulatory Authority involving such Seller, the Business, any Affiliate of such Seller or any of the Acquired Assets, in each case, with respect to matters that occurred prior to the Effective Time;

(v)    all Liabilities of such Seller to any Affiliate of such Seller or any current or former shareholder, director or officer of such Seller or any Affiliate of such Seller, including, any Liability arising out of or related to any loan, or any accrued interest related thereto, from any Affiliate of such Seller or any member, director or officer of such Seller or any Affiliate to such Seller;

(vi)    all Liabilities to the extent arising out of any Excluded Asset, including any Liabilities arising under any contract that is not a Transferred Contract;

(vii)    all Liabilities of such Seller or any of its Affiliates arising out of any Benefit Plan or any assets attributable to or related to any such Benefit Plan;

(viii)    such Seller's costs and expenses incurred in connection with this Agreement and the transactions contemplated by this Agreement; and

(ix)    all Environmental Liabilities arising out of Excluded Assets.

"**Execution Date**" has the meaning set forth in the preamble.

"**Federal Trade Commission Act**" means the Federal Trade Commission Act (15 U.S.C. § 41 *et seq.*), as amended, and the rules and regulations promulgated thereunder.

"**GAAP**" means United States generally accepted accounting principles, consistently applied.

"**General Assignment**" means the General Assignment substantially in the form attached hereto as Exhibit B.

"**Governmental or Regulatory Authority**" means any court, tribunal, public or private arbitrator, authority, agency, commission, official or other instrumentality of the United States, or any country, state, county, city or other political subdivision, including any self-regulatory organization or similar governmental or quasi-governmental entity or body having jurisdiction.

"**Hazardous Materials**" means any substance or material that has been listed, defined or regulated or otherwise classified by any Environmental Law as a "hazardous substance," "hazardous material," "hazardous waste," "toxic substance," "pollutant," "contaminant," or any other similar term intended to define, list, or classify a substance by reason of such substance's ignitability, corrosivity, reactivity, carcinogenicity, reproductive toxicity, "EP toxicity" or adverse effect on human health or the environment, including, substances that are radioactive, toxic, hazardous or otherwise a pollutant, contaminant or waste, including PCBs, asbestos, petroleum products, petroleum derived substances or any fraction thereof, and urea-formaldehyde.

"**HSR Act**" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (15 U.S.C. §§ 15c-15h, 18a), as amended.

"**Indebtedness**" means, as to any Person, without duplication, (a) all Liabilities of such Person for borrowed money or in respect of loans or advances (including, reimbursement and all other obligations with respect to surety bonds, guarantees, letters of credit, banker's acceptances, corporate credit card or business credit lines, indemnities, performance letters, comfort letters and other arrangements similar to the foregoing, in each case only to the extent drawn); (b) all Liabilities of such Person under or pursuant to any arrangement to pay the deferred purchase price of property or services or the acquisition of any business; (c) all Liabilities of such Person under or pursuant to any interest rate and currency swaps, caps, collars, interest rate cap agreements, interest rate swap agreements, foreign currency exchange agreements and similar financial hedging devices and agreements, in each case, to the extent out of the money; (d) all Liabilities created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of such Person or lender under such agreement in the event of default are limited to repossession or sale of such property), other than inventory or other property purchased by such Person in the Ordinary Course of Business; (e) all obligations or liabilities of such Person under or pursuant to leases which are required to be, in accordance with GAAP, recorded as capital leases; (f) all Liabilities secured by any Lien (excluding Permitted Encumbrances) on any property or asset owned by that Person, regardless of whether the indebtedness secured thereby shall have been assumed by that Person or is non-recourse to the credit of that Person; (g) all Liabilities of such Person for off balance sheet financing of such Person (other than operating leases); (h) all Liabilities of such Person evidenced by bonds, debentures, notes or other similar securities or instruments (other than performance, surety and appeal bonds arising in the Ordinary Course of Business in respect of which such Person's liability remains contingent); (i) all Liabilities of such Person for any direct or indirect guarantees made by such Person of any Indebtedness of any other Person described in clauses (a) through (h); and (j) any accrued but unpaid interest, unpaid prepayment or redemption penalties, premiums or payments and unpaid fees and expenses, in each case, that are actually payable in connection with retirement, payment or prepayment of any of the foregoing Liabilities.

"**Independent Accountant**" means an impartial nationally recognized firm of independent certified public accountants to be mutually agreed to in good faith by Purchaser and Sellers and not engaged by either Sellers, on the one hand, or Purchaser, on the other hand, or any of their respective Affiliates in the last twelve (12) months.

"**Intellectual Property**" means all intellectual property rights, whether registered or unregistered, as they exist anywhere in the world, including all patents, trademarks and service marks, trade names, logos, URLs and Internet domain names, copyrights, Software, industrial designs, inventions, proprietary know-how, confidential business information and trade secrets.

"**Interest**" means Liens, encumbrances, pledges, mortgages, deeds of trust, security interests, leases, charges, fines or penalties related to governmental violations, options, rights of first refusal, easements, servitudes, proxies, voting trusts or agreements, transfer restrictions under any agreement, and any other rights, claims or demands of any kind whatsoever of other Persons, in each case, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, mature or unmatured, material or non-material, disputed or undisputed.

"**Knowledge**" means, with respect to Sellers, the actual knowledge of Gareth T. Joyce.

"**Laws**" means all laws, statutes, rules, regulations and ordinances in any jurisdiction or any state, county, country, city or other political subdivision or of any Governmental or Regulatory Authority, including, the Bankruptcy Code, ERISA, Environmental Laws, public health and OSHA and anti-kickback statutes.

"**Liability**" or "**Liabilities**" means any or all obligations (whether to make payments, to give notices or to perform or not perform any action), commitments, contingencies and other liabilities of a Person (whether known or unknown, asserted or not asserted, whether absolute, accrued, contingent, fixed or otherwise, determined or determinable, liquidated or unliquidated, and whether due or to become due).

"**Licensable**" means, with respect to any Intellectual Property right, that a Person has the power and authority to grant a license (or sublicense, as the case may be) to such Intellectual Property right without any of the following: (a) the consent of any third party; (b) impairing such Person's existing rights in respect of such Intellectual Property right (it being understood that the grant of any license hereunder, in and of itself, shall not be construed as an impairment of any of such Person's rights); (c) imposing any additional obligations on such Person or impairing any of such Person's other existing rights under any preexisting agreement relating to such Intellectual Property right; and/or (d) the payment of royalties or other consideration by such Person to any third party under any preexisting agreement relating to such Intellectual Property right. For the avoidance of doubt, in no event shall any Intellectual Property right be "Licensable" if any of the foregoing conditions in clauses (a)-(d) apply.

"**Lien**" means any mortgage, pledge, security interest, hypothecation, assignment, encumbrance, lease, lien (including consensual liens, judicial liens or statutory liens), option, right of use and other rights and claims of other Persons, any conditional sale contract, title retention contract, or other encumbrance of any kind, including easements, conditions, reservations and restrictions.

"**Material Adverse Effect**" means any event, change, development or effect that, individually or in the aggregate, has had or would reasonably be expected to have a material adverse effect on the Acquired Assets, taken as a whole; provided, however, that none of the following shall be deemed to constitute, and none of the following shall be taken into account in determining whether there has been, a Material Adverse Effect: (a) any change, event, development or effect (whether short-term or long-term) arising from or relating to (1) any general industry change in the industries in which Sellers and the Proterra Transit Business Unit operate, (2) national or international political or social conditions, including the engagement in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the United States or foreign country, or any of their respective territories, possessions or diplomatic or consular offices or upon any military installation, equipment or personnel of the United States, (3) any epidemic, pandemic, or disease outbreak (including COVID-19) or any law, regulation, statute, directive, pronouncement or guideline issued by a Governmental or Regulatory Authority, the Centers for Disease Control and Prevention, the World Health Organization or industry group providing for business closures, "sheltering-in-place", curfews or other restrictions that relate to, or arise out of, an

epidemic, pandemic or disease outbreak or any change in such law, regulation, statute, directive, pronouncement or guideline or interpretation thereof, or any worsening of such conditions, (4) any general change in financial, banking or securities markets (including any disruption thereof and any decline in the price of any security or any market index), (5) any change in GAAP, regulatory accounting principles or industry standards, or (6) changes in laws, rules, regulations, orders or other binding directives issued by any Governmental or Regulatory Authority, (b) the taking of (or omitting to take) any action by any Seller at the written request of Purchaser or that is expressly required by this Agreement, (c) any matters that arise from any actions or omissions of Purchaser or its Affiliates (including any breach by Purchaser of this Agreement), (d) any change resulting or arising from the identity of, or any facts or circumstances relating to, Purchaser or its Affiliates, (e) any failure to meet a forecast (whether internal or published) of revenue, earnings, cash flow or other data for any period or any change in such a forecast, (f) any change in or effect on the Acquired Assets that, if curable, is cured by Sellers before the earlier of (1) the Closing Date and (2) the date on which this Agreement is terminated pursuant to Article X below, (g) any change in the financial condition or results of operation of Purchaser or its Affiliates, including its ability to access capital and equity markets and changes due to a change in the credit rating of Purchaser or its Affiliates, (h) the announcement, commencement, pendency or consummation of the Bankruptcy Cases, this Agreement or the transactions contemplated hereby, (i) any new or announced renewable fuel or oil provider entrants, including their effect on pricing, (j) any earthquakes, fires, hurricanes, tornados or other natural disasters or effects of weather and other acts of God, (k) any casualty loss or event of condemnation; (l) any seasonality of the Acquired Assets or the Proterra Transit Business Unit as anticipated to be conducted, (m) any change resulting or arising from product recalls announced or commenced prior to the Execution Date or (n) any change in the market price or trading volume of any securities or Indebtedness of a Seller; provided, further, that, for the avoidance of doubt, a Material Adverse Effect shall be measured only against past performance of the Proterra Transit Business Unit and not against any forward-looking statements, financial projections or forecasts of Sellers with respect to the Proterra Transit Business Unit.

"**Order**" means and includes any writ, judgment, decree, injunction, award or other order of any Governmental or Regulatory Authority, including the Bankruptcy Court.

"**Ordinary Course of Business**" means an action taken by a Person if: (a) such action is in the ordinary course of business and consistent with the past practices of such Person including with respect to quantity and frequency; or (b) such action is similar in nature and magnitude to actions customarily taken in the ordinary course of normal day-to-day operations of other Persons that are in the same line of business as such Person; subject, however, to those actions necessary and incident, or otherwise relating, to the Bankruptcy Cases.

"**Organizational Document**" means (a) the articles or certificate of incorporation and the bylaws of a corporation; (b) operating agreement, limited liability company agreement, or similar document governing a limited liability company; (c) any charter or similar document adopted or filed in connection with the creation, formation, or organization of a Person; and (d) any amendment to any of the foregoing.

"**OSHA**" means the Occupational Safety and Health Act of 1970, 29 U.S.C. §651, et seq.

"**Outside Closing Date**" means the date that is five (5) Business Days following the entry of the Sale Order by the Bankruptcy Court.

"**Permits**" means all licenses, permits, certificates, orders, authorizations, approvals, registrations, franchises and similar consents granted or issued by any Governmental or Regulatory Authority.

"**Permitted Encumbrances**" means (a) Liens for current Taxes not yet delinquent as of the Closing Date or being contested in good faith by appropriate proceedings; (b) Liens for impositions, assessments, fees, rents or other charges levied or assessed or imposed by a Governmental or Regulatory Authority not yet delinquent as of the Closing Date or being contested in good faith by appropriate proceedings; (c) statutory Liens (including materialmen's, warehousemen's, mechanic's, repairmen's, landlord's and other similar Liens) arising in the Ordinary Course of Business securing payments that are inchoate, unrecorded and not yet delinquent as of the Closing Date or being contested in good faith by appropriate proceedings; (d) Liens created by, through or under Purchaser or its successors or assigns and (e) non-exclusive licenses of Intellectual Property rights.

"**Person**" means any natural person, corporation, general partnership, limited partnership, limited liability partnership, limited liability company, proprietorship, other business organization, trust, government, Governmental or Regulatory Authority, or any other entity whatsoever.

"**Petition Date**" has the meaning set forth in the recitals.

"**Proterra Energy Business Unit**" means the business unit of Sellers that provides, installs, and services turnkey fleet-scale, high-power charging solutions and software services, *provided* that the Proterra Valence Business Unit shall be excluded from the definition of Proterra Energy Business Unit.

"**Proterra Powered Business Unit**" means the business unit of Sellers that designs and manufactures proprietary battery systems and electrification solutions for global commercial vehicle original equipment manufacturer customers.

"**Proterra Transit Business Unit**" means the business unit of Sellers that designs, develops and sells electric transit buses as an original equipment manufacturer for North American public transit agencies, airports, universities and other commercial transit fleets.

"**Proterra Valence Business Unit**" means the business sub-unit of Sellers, currently situated within the Proterra Energy Business Unit, that is a cloud-based data platform that can provide customers performance information about their commercial transit fleets.

"**Purchase Price**" has the meaning set forth in Section 3.1(a).

"**Purchaser**" has the meaning set forth in the preamble.

"**Purchaser Disclosure Schedules**" means the disclosure schedules of Purchaser as attached hereto, and as they may be updated or otherwise modified hereafter in compliance with this Agreement.

"**Purchaser Released Claims**" has the meaning set forth in Section 12.16(b).

"**Purchaser Required Approvals**" means the consents and approvals set forth on Section 5.2(d) of the Purchaser Disclosure Schedules.

"**Real Property Leases**" means all of Sellers' right, title and interest in all leases, subleases, licenses or other occupancy agreements, including all amendments, renewals and other agreements with respect thereto, pursuant to which a Seller holds a leasehold or subleasehold interest in, or is granted a license or other right to use, any real property.

"**Reasonable Efforts**" means the commercially reasonable efforts that a reasonable Person wanting to achieve the result in question would take under similar circumstances to achieve that result as expeditiously as possible.

"**Related Agreements**" means all agreements, certificates, instruments or other documents required to be executed and/or delivered pursuant to or in connection with, this Agreement by any Person, including, the Assumption Agreement and the General Assignment.

"**Representative**" means, with respect to any Person, its directors, officers, employees, agents, advisors or other representatives.

"**Sale**" has the meaning set forth in the recitals.

"**Sale Hearing**" means the hearing before the Bankruptcy Court to consider entry of the Sale Order.

"**Sale Order**" means an Order of the Bankruptcy Court (i) approving the Agreement, (ii) approving the consummation of the Sale and the other transactions contemplated hereby, (iii) finding that Purchaser is purchasing the Acquired Assets in good faith within the meaning of Section 363(m) of the Bankruptcy Code, and (iv) approving the sale of the Acquired Assets free and clear of all Liens, Liabilities and other Interests (other than Permitted Encumbrances and Assumed Liabilities).

"**Sale Process**" has the meaning set forth in the recitals.

"**Seller Disclosure Schedules**" means the disclosure schedules of Sellers attached hereto which, for the avoidance of doubt, excludes Schedule 3.3.

"**Seller Fundamental Representations**" means, collectively, the representations and warranties in the first sentence of Section 5.1(a) (Organization and Existence), Section 5.1(b) (Authority and Approval), Section 5.1(c)(i) (No Conflict — Seller's Organizational Documents) and Section 5.1(i) (Brokers).

"**Seller Group**" has the meaning set forth in Section 12.16(b).

"**Sellers**" has the meaning set forth in the preamble.

"**Sellers Brand**" means the trademarks "PROTERRA," "PROTERRA POWERED," "PROTERRA TRANSIT," "PROTERRA ENERGY" and any trademark confusingly similar thereto and derivatives thereof.

"**Sherman Act**" means title 15 of the United States Code §§ 1-7, as amended.

"**Software**" means computer software, including, source code, object code, disks, documentation, operating manuals, related systems data, source programs, record layouts, program libraries, and any other documentation in those application areas that may pertain to any data processing system or operation.

"**Successful Bidder**" has the meaning set forth in the Bidding Procedures.

"**Tax Returns**" means all returns, declarations, reports, statements, schedules, notices, forms or other documents or information filed or required to be filed in respect of the determination, assessment, collection or payment of any Tax or in connection with the administration, implementation or enforcement of any legal requirement relating to any Tax, and the term "**Tax Return**" means any one of the foregoing Tax Returns.

"**Taxes**" means all taxes, charges, fees, levies or other like assessments, including U.S. federal, state, local, foreign, and other net income, gross income, gross receipts, social security, estimated, sales, use, ad valorem, franchise, profits, net worth, alternative or add-on minimum, capital gains, license, withholding, payroll, employment, unemployment, social security, excise, property, transfer, and any and all other taxes, assessments, fees or other governmental charges, whether computed on a separate, consolidated unitary, combined or any other basis together with any interest and any penalties, additions to tax, estimated taxes or additional amounts with respect thereto, and including any liability for Taxes as a result of being a member of a consolidated, combined, unitary or affiliated group, and the term "Tax" means any one of the foregoing Taxes.

"**Transfer Taxes**" means all stamp, documentary, registration, value-added, transfer, sales, use, bulk sales, reporting, recording, filing and other similar fees, Taxes and charges arising out of or in connection with the transfer of the Acquired Assets effected pursuant to this Agreement.

"**Transferred Contracts**" means all of the Contracts to which the Sellers are party set forth on Section 5.1(h)(i) of the Seller Disclosure Schedules.

"**Treasury Regulations**" means the regulations (including all proposed and temporary regulations) promulgated by the U.S. Department of the Treasury under the Code, as such regulations may be amended from time to time.

Section 1.2     Construction of Certain Terms and Phrases.

(a)     Unless the context of this Agreement otherwise requires, (i) words of any gender include each other gender; (ii) words using the singular or plural number also

include the plural or singular number, respectively; (iii) the terms "hereof," "herein," "hereby" and derivative or similar words refer to this entire Agreement; (iv) the terms "Article," "Section," or "clause" refer to the specified Article, Section, or clause of this Agreement; (v) the word "including" (and, with correlative meaning, the word "include") means including, without limiting the generality of any description preceding that word; and (vi) the words "shall" and "will" are used interchangeably and have the same meaning. Any reference to a Law shall include any amendment thereof or any successor thereto and any rules and regulations promulgated thereunder, unless the context otherwise requires. Any reference in this Agreement to any contract, license, agreement or order means such contract, license, agreement or order as amended, supplemented or modified from time to time in accordance with the terms thereof. Currency amounts referenced in this Agreement are in U.S. Dollars.

(b)      Any representation or warranty contained herein as to the enforceability of a Contract (including this Agreement and any Related Agreement) will be subject to the effect of any bankruptcy, insolvency, reorganization, moratorium or other similar law affecting the enforcement of creditors' rights generally and to general equitable principles (regardless of whether such enforceability is considered in a proceeding in equity or at law).

(c)      This Agreement is being entered into by and among competent and sophisticated parties who are experienced in business matters and represented by counsel and other advisors, and have been reviewed by the parties and their counsel and other advisors. Therefore, any ambiguous language in this Agreement will not be construed against any particular party as the drafter of the language.

(d)      Whenever this Agreement refers to a number of days, such number shall refer to calendar days unless Business Days are specified. Whenever any action must be taken hereunder on or by a day that is not a Business Day, then such action may be validly taken on or by the next day that is a Business Day.

(e)      The phrases "provided", "delivered", or "made available", when used herein, mean that the information or materials referred to have been (i) posted to the on-line "virtual data room" established under project name "Project Wren" on Intralinks to which Purchaser and its counsel have continuous access at least two (2) days prior to the Execution Date or (ii) delivered directly to Purchaser or its Representatives by or on behalf of Sellers at least two (2) days prior to the Execution Date.

ARTICLE II

Purchase and Sale and Assumption

Section 2.1    Purchase and Sale of Acquired Assets. Upon the terms and subject to the conditions of this Agreement and the Sale Order, at the Closing, each Seller will sell, transfer, convey, assign, deliver and set over to Purchaser, and Purchaser will purchase and accept, all of the right, title, benefit and interest of such Seller in, to and under the Acquired Assets, free and clear of all Liens and Interests (other than Permitted Encumbrances and Assumed Liabilities),

pursuant to Sections 363(f) and 1123(b)(4) of the Bankruptcy Code. Other than the Permitted Encumbrances and Assumed Liabilities, all mortgages or other Liens on the Acquired Assets securing Indebtedness shall attach to the net proceeds of the Sale pursuant to Sections 363(f) and 1123(b)(4) of the Bankruptcy Code so that the Acquired Assets will be sold free and clear of such Liens and other Interests. At the Closing, the sale, transfer, conveyance, assignment and delivery of the Acquired Assets will be effected pursuant to the General Assignment, the Sale Order and other instruments of transfer described in Section 4.2(a).

Section 2.2    Excluded Assets. Notwithstanding anything to the contrary contained herein, the Acquired Assets do not include, and in no event will Purchaser acquire any right, title, benefit or interest in, to or under, any of the Excluded Assets.

Section 2.3    Assumed Liabilities. Upon the terms and subject to the conditions of this Agreement, at the Closing, Purchaser will assume and agree to pay, perform and discharge or hold Sellers harmless from all of the Assumed Liabilities. The assumption of the Assumed Liabilities by Purchaser will be effected pursuant to the Assumption Agreement and the Sale Order.

Section 2.4    Excluded Liabilities. Notwithstanding anything to the contrary contained herein, the Assumed Liabilities will not include, and in no event will Purchaser assume, be required to pay, perform, discharge and hold Sellers harmless from any Excluded Liabilities.

Section 2.5    Assignment and Cure Amounts.

(a)    Subject to the terms and conditions of this Agreement and the entry of the Sale Order, at the Closing and pursuant to Section 365 of the Bankruptcy Code, each Seller shall assume and assign to Purchaser, and Purchaser shall take assignment from such Seller of, the Transferred Contracts. Purchaser shall be responsible for Cure Amounts and for satisfying the requirements of "adequate assurance of future performance" as required by section 365 of the Bankruptcy Code and shall cooperate fully with each Seller in seeking such approval from the Bankruptcy Court, including Purchaser providing the necessary evidence required in connection with the Sale Hearing, as applicable, to approve this Agreement and the transactions contemplated herein.

(b)    The cure amounts (collectively, the "**Cure Amounts**"), if any, necessary to cure all defaults, if any, and to pay all actual or pecuniary losses, if any, that have resulted from any defaults on the part of a Seller under the Transferred Contracts shall be paid by Purchaser at the Closing or as soon as reasonably practicable thereafter (except as otherwise agreed to by the other party to the Transferred Contracts) and such Seller shall have no Liability for any such Cure Amounts. As part of the Sale Process, Sellers shall file with the Bankruptcy Court the Schedule of Transferred Contracts, which shall be in form and substance reasonably acceptable to Purchaser, setting forth the Transferred Contracts and the respective Cure Amounts as to each Transferred Contract. Purchaser shall have the right to request that Sellers add or remove any Contract identified in the Schedule of Transferred Contracts at any time on or prior to the Sale Hearing (or such later date as may be permitted under the Bidding Procedures Order or the Sale Order, as applicable). Upon such request, Sellers shall provide Purchaser with the amount, in

Sellers' sole discretion, by which the Purchase Price shall be adjusted based on such addition or removal and Purchaser shall have the election to have such Contract added or removed. If Purchaser so elects, Sellers shall cause an applicable modified Schedule of Transferred Contracts to be filed with the Bankruptcy Court consistent with the Bidding Procedures Order or the Sale Order, as applicable (which, for the avoidance of doubt, shall be subject to, in the case of the addition of a Contract to the Schedule of Transferred Contracts, the ability of the other party to such Contract to object to such addition), and the Purchase Price shall be updated to reflect such adjustment.

Section 2.6    Bulk Sales Laws. The parties hereto hereby waive compliance by Sellers with the requirements and provisions of any "bulk-transfer" or similar Laws of any jurisdiction that may otherwise be applicable with respect to the sale and transfer of any or all of the Acquired Assets to Purchaser, and Purchaser hereby waives all claims against Sellers to the extent related to non-compliance therewith.

ARTICLE III

Purchase Price

Section 3.1    Purchase Price; Earnest Deposit.

(a)    The purchase price for the Acquired Assets will be, in addition to the Assumed Liabilities and the Cure Amounts (which shall be paid by Purchaser to the applicable counterparty on or about the Closing Date), a cash amount equal to $6,500,000.00 (such cash amount, the "**Cash Component Price**" and, together with the Assumed Liabilities and the Cure Amounts, the "**Purchase Price**").

(b)    Purchaser or one of its Affiliates has made an earnest deposit by wire transfer of immediately available funds into the Deposit Escrow Account equal to ten percent (10%) of the cash amount of the Purchase Price (the "**Earnest Deposit**") in accordance with the Bidding Procedures Order. The Deposit Escrow Funds while remaining in the Deposit Escrow Account, shall not be subject to any lien, attachment, trustee process, or any other judicial process of any creditor of any Seller, Purchaser or their respective Affiliates, and the Deposit Escrow Agreement shall provide that the Deposit Escrow Funds shall be released in accordance with the provisions of this Agreement and Bidding Procedures Order. All interest earned on the Earnest Deposit in the Deposit Escrow Account shall be distributed by the Escrow Agent (i) following the Closing, to Purchaser, or (ii) if the Agreement is terminated prior to the Closing, to Sellers or Purchaser, as applicable, in accordance with Section 10.2. Any portion of the Deposit Escrow Funds released to Purchaser in accordance with the terms of this Agreement and the Bidding Procedures Order shall not be subject to any lien, attachment, trustee process or any other judicial process of any creditor of any Seller. At the Closing, (i) the Earnest Deposit shall be credited against the Purchase Price and distributed by the Escrow Agent to Sellers; and (ii) Purchaser will pay to Sellers by wire transfer of immediately available funds to an account specified in writing by Sellers an amount equal to the Purchase Price minus the Earnest Deposit.

Section 3.2    Withholding of Tax. Purchaser shall be entitled to deduct and withhold any amounts Purchaser reasonably believes that it is required to deduct and withhold under any applicable Tax Law in connection with payments to be made by Purchaser pursuant to the terms of this Agreement; provided, that, if Purchaser believes that any such deduction or withholding of Tax (other than any deduction or withholding as a result of the failure to provide a W-9 for Sellers in compliance with Section 4.2(a)(v)) is required with respect to any payment under this Agreement, then Purchaser shall give written notice to Sellers describing the basis for such withholding in reasonable detail at least five (5) Business Days prior to making such payment and Purchaser shall provide Sellers with a reasonable opportunity to provide any applicable certificate, form or documentation that would reduce or eliminate the requirement to deduct and withhold Tax with respect to such payment, and Purchaser shall otherwise cooperate with Sellers and take such steps as Sellers may reasonably request to reduce or eliminate such withholding obligation to the extent permitted by applicable Law. Such withheld amounts will be treated for all purposes of this Agreement as having been paid to Sellers by Purchaser to the extent such amounts have been timely paid to the appropriate Tax authority.

Section 3.3    Allocation of Consideration. The Purchase Price, the Assumed Liabilities, and any other items required to be treated as consideration for U.S. federal income Tax purposes will be allocated among the Acquired Assets for all Tax purposes in accordance with section 1060 of the Code and the Treasury Regulations promulgated thereunder in a manner consistent with the principles set forth on Schedule 3.3 (the "**Allocation Principles**"). Within five (5) days of the Closing Date, Purchaser shall provide to Sellers a draft allocation in a manner consistent with the Allocation Principles for Sellers' review and comment. If Sellers do not provide Purchaser a written objection to the draft allocation within five (5) days of receipt, the draft allocation shall be deemed to be agreed upon by the parties. If Sellers propose changes to the draft allocation within such five (5)-day period, Sellers and Purchaser shall negotiate in good faith to amend any aspects of the allocation in dispute; provided, however, that if Sellers and Purchaser are unable to resolve any dispute with respect to the allocation within five (5) days after the date Purchaser received notice of Sellers' objection, such dispute shall be resolved by the Independent Accountant. The findings of the Independent Accountant shall be final, binding and conclusive on Sellers and Purchaser. The fees and expenses of the Independent Accountant shall be borne by Purchaser, on the one hand, and Sellers, on the other hand, in inverse proportion as they may prevail on the matters resolved by the Independent Accountant, which proportionate allocation shall be calculated on an aggregate basis based on the relative dollar values of the amounts in dispute and which proportionate allocation shall be conclusively determined by the Independent Accountant. Purchaser and Sellers shall (a) complete and file IRS Form 8594 with their respective U.S. Federal income Tax Returns consistent with such allocation for the taxable year in which the Closing occurs, and (b) not take any position (and cause their respective Affiliates to not take any position) on any Tax Return, before any Governmental or Regulatory Authority charged with the imposition, assessment or collection of Taxes, or in any judicial proceeding, that is in any manner inconsistent with the terms of such allocation, as finally determined; provided, however, that (i) no party hereto shall be unreasonably impeded in its ability and discretion to negotiate, compromise and/or settle any Tax audit, claim or similar proceedings in connection with such allocation and (ii) the allocation shall not be binding upon Sellers for purposes of any plan filed in connection with the Bankruptcy Cases and shall not, and shall not be interpreted to, have any effect on any distributions to

Sellers' creditors or equityholders. Notwithstanding any other provision of this Agreement, the terms and provisions of this Section 3.3 shall survive the Closing without limitation.

ARTICLE IV

Closing Matters

Section 4.1    Closing. Upon the terms and subject to the conditions of this Agreement, the Closing will take place beginning at 10:00 a.m. (local time) remotely by electronic transmissions or, in the event that the parties deem an in-person Closing necessary, at the offices of Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019-6064, on the second Business Day after the satisfaction (or waiver by the party for whose benefit such conditions exist) of all conditions described in Article IX that are required to be satisfied prior to the Closing (other than actions to be taken or items to be delivered at Closing as set forth herein, but subject to the satisfaction or waiver of such conditions), or at such other time, date, and place as the parties may mutually agree in writing (the "**Closing Date**"). All documents delivered and all transactions consummated at the Closing will be deemed for all purposes to have been delivered and consummated effective as of the Effective Time.

Section 4.2    Deliveries at Closing.

(a)    Deliveries of Seller. At the Closing, each Seller will deliver or cause to be delivered to Purchaser the following, as applicable:

(i)    the General Assignment, substantially in the form attached hereto as Exhibit B, duly executed by each Seller;

(ii)    the Assumption Agreement, substantially in the form attached hereto as Exhibit A, duly executed by each Seller;

(iii)    any physical Acquired Assets within the control or possession of Seller or its Affiliates (which will be made available to Purchaser and delivered to a location as reasonably specified by Purchaser);

(iv)    all certificates of title or origin (or similar documents), duly endorsed with respect to any material vehicles or other equipment included in the Acquired Assets for which a certificate of title or origin is required to transfer title;

(v)    a W-9 for such Seller;

(vi)    a joint written instruction to the Escrow Agent instructing the release of the Earnest Deposit to Sellers; and

(vii)    all other instruments of conveyance and transfer executed by the applicable Seller, in form and substance reasonably acceptable to Purchaser, as may be necessary to convey the Acquired Assets to Purchaser free and clear of all

Liens, Liabilities (other than Assumed Liabilities) and other Interests (except Permitted Encumbrances), provided, however, that the Sale Order shall be the only required document to evidence the conveyance and transfer free and clear of such Liens, Liabilities and other Interests.

(b)     Deliveries by Purchaser. At the Closing, Purchaser shall pay all Cure Amounts to the applicable counterparties and will deliver or cause to be delivered to Sellers the following:

(i)     an amount equal to (i) the Cash Component Price minus (ii) the Earnest Deposit, as provided in Section 3.1(b), by wire transfer of immediately available funds to the accounts specified by the Sellers;

(ii)     a joint written instruction to the Escrow Agent instructing the release of the Earnest Deposit to Sellers;

(iii)     the Assumption Agreement, substantially in the form attached hereto as Exhibit A, duly executed by Purchaser;

(iv)     a certificate of good standing of Purchaser from the Delaware Secretary of State as to Purchaser, that will be dated not more than ten (10) days prior to the Closing Date;

(v)     copies of resolutions of the governing body of Purchaser authorizing the execution, delivery and performance of this Agreement and the Related Agreements; and

(vi)     all required Transfer Tax stamps and transfer forms (if any), unless under applicable Law such Transfer Tax stamps or duly stamped transfer forms are only available post-Closing (in which case such Transfer Tax stamps or duly stamped transfer forms shall be delivered to Sellers promptly and in any event no later than five (5) Business Days after receipt thereof by Purchaser).

Section 4.3     Further Assurances and Cooperation.

(a)     Further Assurances. Subject to the terms and conditions of this Agreement, from time to time after the Closing through the date on which the Bankruptcy Cases are closed, at a party's reasonable request and without further consideration, and solely at the cost and expense of the requesting party, the other party will execute and deliver such other instruments of sale, transfer, conveyance, assignment and confirmation, and assumption, and provide such materials and information and take such other actions as the other party may reasonably deem necessary or desirable in order to more effectively transfer, convey and assign to Purchaser all of the Acquired Assets and/or in order to more effectively effect the assumption by Purchaser of the Assumed Liabilities.

(b)     Access to Information and Books and Records. During the period from the Execution Date to the Closing Date, Sellers shall provide Purchaser with reasonable

access, during normal business hours and upon reasonable notice, to information reasonably requested by Purchaser and solely to the extent related to the Acquired Assets and Assumed Liabilities, except as otherwise prohibited by applicable Laws. For a period of twelve (12) months following the Closing (or until the earlier liquidation or dissolution of Sellers), Sellers will afford Purchaser, and its Representatives, during normal business hours and upon reasonable prior notice, reasonable access to the Excluded Books and Records and the right to make copies and extracts therefrom to the extent that such access may be reasonably required by Purchaser in connection with (i) the preparation of Tax Returns, (ii) any Tax audit, Tax protest, or other proceeding relating to Taxes, (iii) the making of any election related to Taxes, (iv) compliance with the requirements of any Governmental or Regulatory Authority, or (v) any actual or threatened third party action or proceeding. Neither Seller may, for a period of seven (7) years after the Effective Time, destroy or otherwise dispose of any such books, records and other data unless such party will first offer in writing to surrender copies of such books, records and other such data to Purchaser and Purchaser has not agreed in writing to take possession thereof during the ten (10) day period after such offer is made, provided Sellers' motion to close or dismiss the Bankruptcy Cases shall be deemed to constitute notice to Purchaser of Sellers' intention to destroy all books, records and data in connection with the Acquired Assets and its offer to surrender such books, records and data to Purchaser.

(c)     If, in order to properly prepare its Tax Returns or other documents or reports required to be filed with any Governmental or Regulatory Authority, it is necessary that either Purchaser or Sellers be furnished with additional information, documents or records relating to the Acquired Assets or the Assumed Liabilities not referred to in Section 4.3(b), and such information, documents or records are in the possession or control of the other party, such other party will use its Reasonable Efforts to furnish or make available such information, documents or records (or copies thereof) at the recipient's reasonable request and at recipient's cost and expense. Notwithstanding the foregoing, this Section 4.3 shall not require any Seller to permit any access to, or to disclose (i) any information that, in the reasonable, good faith judgment (after consultation with counsel, which may be in-house counsel) of Sellers, is reasonably likely to result in any violation of any legal requirement or any Contract to which a Seller is a party or cause any privilege (including attorney-client privilege) or work product protection that a Seller would be entitled to assert to be waived or (ii) if any Seller, on the one hand, and Purchaser, on the other hand, are adverse parties in a litigation, any information that is reasonably pertinent thereto.

<u>ARTICLE V</u>

<u>Representations and Warranties</u>

Section 5.1     <u>Representations and Warranties of Seller</u>. Except as set forth in (a) the Seller Disclosure Schedules or (b) any forms, reports, schedules, statements or other documents filed by a Seller and available on the Securities and Exchange Commission's Electronic Data Gathering Analysis and Retrieval System (excluding statements in any "Risk Factors" sections and any disclosure of risks included in any "forward-looking statements" disclaimer to the extent that such statement or disclosure is cautionary, predictive or forward-looking in nature), each

Seller represents and warrants to Purchaser as set forth in this <u>Section 5.1</u>. The Seller Disclosure Schedules will be arranged in paragraphs corresponding to the lettered and numbered Paragraphs contained in this Agreement (as to which Purchaser acknowledges and agrees that any matter disclosed pursuant to a section, subsection, paragraph or subparagraph of the Seller Disclosure Schedules shall be deemed to modify the respective representations and warranties in this <u>Section 5.1</u>, in each case, solely to the extent that it is reasonably apparent on the face of the disclosure that the disclosure in one section of the Seller Disclosure Schedules is applicable to such other section of the Seller Disclosure Schedules):

(a)     <u>Organization and Existence</u>. Such Seller is a corporation duly incorporated, validly existing, and in good standing under the laws of the State of Delaware, with full power and authority to own, lease, and operate the Acquired Assets, as applicable, and to carry on its business as and where such assets are now owned or leased and its business is now conducted, subject to the Bankruptcy Cases. The states in which such Seller is required by law to be qualified to do business as a foreign company are set forth on <u>Section 5.1(a)</u> of the Seller Disclosure Schedules, and such Seller is qualified to do business as a foreign company in each such state.

(b)     <u>Authority and Approval</u>. Such Seller has the power to enter into this Agreement and each of the Related Agreements to which it is a party, subject to entry of the Sale Order by the Bankruptcy Court, and to perform its obligations hereunder and thereunder. The execution, delivery and performance by such Seller of this Agreement and the Related Agreements to which it is to be a party, and the consummation by such Seller of the transactions contemplated herein and therein, have been duly authorized by all required corporate action on the part of such Seller. This Agreement has been duly executed and delivered by such Seller, and when executed and delivered by such Seller, the Related Agreements to which it is a party will have been duly executed and delivered by such Seller, subject to the Bankruptcy Cases. This Agreement is, and each of the Related Agreements to which such Seller is a party when executed and delivered by such Seller, subject to entry of the Sale Order by the Bankruptcy Court, will be, the valid and binding obligations of such Seller, enforceable against such Seller, in accordance with their respective terms, except as may be limited by the Bankruptcy Cases.

(c)     <u>No Conflict</u>. The execution and delivery by such Seller of this Agreement and each of the Related Agreements to which it is to be a party, and such Seller's compliance with the terms and conditions hereof and thereof, and the consummation by such Seller of the transactions contemplated hereby and thereby, do not and will not (i) conflict with, or require the consent of any Person that has not been obtained under such Seller's Organizational Documents, (ii) subject to entry of the Sale Order, obtaining the authorizations referred to in <u>Section 5.1(d)</u> of the Seller Disclosure Schedules and excluding any Antitrust Law, violate or breach in any material respect any provision of, or require any consent, authorization, or approval under, any Law or Order applicable to such Seller, the Acquired Assets or the Assumed Liabilities, (iii) subject to entry of the Sale Order, and except as set forth in <u>Section 5.1(c)</u> of the Seller Disclosure Schedules, violate, conflict with, result in a breach of, constitute a default under (whether with or without notice or the lapse of time or both), accelerate or permit the acceleration of the performance required by, or require any consent, authorization, or approval under, any

Transferred Contract to which such Seller is a party or by which such Seller is bound or to which any of its assets or properties are subject, except to the extent excused or stayed by the Bankruptcy Cases or (iv) result in the creation of any Lien upon the Acquired Assets other than Permitted Encumbrances and Liens created by Purchaser; provided, however, that no representation or warranty is made in the foregoing clauses (ii) through (iv) with respect to matters that would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect.

(d)    Governmental Approvals and Filing. Except (i) as set forth in Section 9.3(b) or as disclosed in Section 5.1(d) of the Seller Disclosure Schedules, (ii) with respect to any Antitrust Law, and (iii) the entry of the Sale Order, no consent, authorization, approval or action of, filing with, notice to, or exemption from any Governmental or Regulatory Authority on the part of such Seller is required in connection with the execution, delivery and performance of this Agreement or any Related Agreements to which such Seller is to be a party or the consummation of the transactions contemplated hereby or thereby, except where the failure to obtain any such consent, approval or action, to make any such filing, to give any such notice or obtain any such exemption would not be reasonably expected to (x) have a material adverse effect on such Seller or (y) materially adversely affect the validity or enforceability against such Seller of this Agreement or such Related Agreements or materially adversely affect the ability of such Seller to consummate the transactions contemplated by this Agreement.

(e)    Legal Proceedings. Section 5.1(e) of the Seller Disclosure Schedules contains a complete and accurate description (including the case caption and case number where available) of each material Action to which such Seller is currently or in the last year had been a party arising out of or in relation to the Acquired Assets. Except as disclosed in Section 5.1(e) of the Seller Disclosure Schedules or on the Bankruptcy Case docket, there is no: (i) pending or, to Seller's Knowledge, written threatened Action or Order of any Governmental or Regulatory Authority, in each case relating to such Seller or any of the Acquired Assets, in each case that would reasonably be expected (x) to have a Material Adverse Effect or (y) to adversely affect the validity or enforceability of this Agreement or any of the Related Agreements against such Seller or adversely affect the ability of such Seller to consummate the transactions contemplated by this Agreement; or (ii) Orders outstanding against such Seller that would adversely affect the ability of such Seller to consummate the transactions contemplated by this Agreement or that are otherwise related to such Seller or the Acquired Assets.

(f)    Compliance with Laws and Orders. Except as set forth in Section 5.1(f) of the Seller Disclosure Schedules, there is no unresolved material violation of or default under any Law or Order applicable to the Acquired Assets or the Assumed Liabilities, in each case, other than as a result of the Bankruptcy Cases or stayed by the Bankruptcy Court. Such Seller is in compliance in all material respects with all applicable Laws related to the Acquired Assets or the Assumed Liabilities.

(g)    Title. Except as set forth in Section 5.1(g) of the Seller Disclosure Schedules, Sellers have good and marketable title to, or a valid leasehold interest in and right to use, all Acquired Assets, in each case, free and clear of all Liens other than

Permitted Encumbrances, Liens relating to any Assumed Liabilities, or Liens that will be released at the Closing Date.

(h) <u>Contracts</u>.

(i) <u>Section 5.1(h)(i)</u> of the Seller Disclosure Schedules sets forth a true, correct and complete list of the Transferred Contracts.

(ii) True, correct and complete copies of Transferred Contracts (including any amendments, supplements, restatements or modifications thereto) have been made available to Purchaser. Pursuant to entry of the Sale Order and payment of all Cure Amounts, each Transferred Contract is in full force and effect, is fully assignable without the consent of any Person, except as set forth on <u>Section 5.1(h)(ii)</u> of the Seller Disclosure Schedules, and is valid, binding and enforceable in accordance with its terms as to such Seller and, to Seller's Knowledge, the other parties thereto. Other than the payment of Cure Amounts, such Seller has performed and is performing all obligations required to be performed by it under the Transferred Contracts. Except as set forth in <u>Section 5.1(h)(ii)</u> of the Seller Disclosure Schedules, no material default or material breach of a Transferred Contract exists on the part of such Seller or, to Seller's Knowledge, on the part of any other Person under any such Transferred Contract, and no condition or event has occurred that, after notice or lapse of time, or both, would constitute a material default or material breach of such Transferred Contracts. No party to a Transferred Contract has notified such Seller in writing that such party intends to cancel or otherwise terminate such Transferred Contract, or, to Seller's Knowledge, has taken any action or threatened to take any action with respect of an amount paid or payable to such Seller pursuant to such Transferred Contract.

(i) <u>Brokers</u>. Except as set forth in <u>Section 5.1(i)</u> of the Seller Disclosure Schedules, no broker, finder or investment banker is entitled to any brokerage commission, finder's fee or similar payment in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of Sellers.

(j) <u>Taxes</u>. Except as otherwise set forth in <u>Section 5.1(j)</u> of the Seller Disclosure Schedules:

(i) All material Tax Returns required to be filed with respect to the Acquired Assets have been timely filed and all such Tax Returns are true, accurate and complete in all material respects to the extent that failure to file such a Tax Return, or the failure of any such Tax Return to be true, accurate and complete, could reasonably be expected to give rise to a Lien on any Acquired Asset following the Closing.

(ii) All material Taxes with respect to the Acquired Assets that are due and payable have been duly and timely paid to the extent that failure to pay such

Taxes could reasonably be expected to give rise to a Lien on any Acquired Asset following the Closing.

(iii)    There is no claim, audit, action, suit, investigation or other proceeding pending or threatened in writing against, or with respect to, a material amount of Taxes relating to the Acquired Assets to the extent that the outcome of such proceeding could reasonably be expected to give rise to a Lien on any Acquired Asset following the Closing.

(k)    No Material Adverse Change. Except as described in Section 5.1(k) of the Seller Disclosure Schedules, except as a result of the Bankruptcy Cases, since the Petition Date until the Execution Date:

(i)    There has not occurred any event or condition that, individually or in the aggregate, has had or is reasonably expected to have a Material Adverse Effect;

(ii)    Such Seller has not cancelled, compromised, waived or released any right or claim (or series of related rights and claims) related to the Acquired Assets except in the Ordinary Course of Business or pursuant to an Order of the Bankruptcy Court; and

(iii)    Such Seller has not made any agreement to do any of the foregoing.

(l)    Warranties Exclusive. EXCEPT AS EXPRESSLY SET FORTH IN THIS SECTION 5.1, SUCH SELLER MAKES NO REPRESENTATION OR WARRANTY, STATUTORY, EXPRESS OR IMPLIED, WRITTEN OR ORAL, AT LAW OR IN EQUITY, IN RESPECT OF ANY OF ITS ASSETS (INCLUDING THE ACQUIRED ASSETS), LIABILITIES (INCLUDING THE ASSUMED LIABILITIES), OR THE BUSINESS, INCLUDING, WITH RESPECT TO MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, OR NON-INFRINGEMENT, AND ANY SUCH OTHER REPRESENTATIONS OR WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED AND NONE SHALL BE IMPLIED AT LAW OR IN EQUITY. NEITHER SUCH SELLER NOR ANY OTHER PERSON, DIRECTLY OR INDIRECTLY, HAS MADE OR IS MAKING, ANY REPRESENTATION OR WARRANTY, WHETHER WRITTEN OR ORAL, REGARDING THE PRO-FORMA FINANCIAL INFORMATION, FINANCIAL PROJECTIONS OR OTHER FORWARD-LOOKING STATEMENTS OF SUCH SELLER OR THE BUSINESS.

Section 5.2    Representations and Warranties of Purchaser. Except as set forth in the Purchaser Disclosure Schedules, Purchaser makes the following representations and warranties to Sellers as set forth in this Section 5.2. The Purchaser Disclosure Schedules will be arranged in paragraphs corresponding to the lettered and numbered paragraphs contained in this Section 5.2 (as to which each Seller acknowledges and agrees that any matter disclosed pursuant to a section, subsection, paragraph or subparagraph of the Purchaser Disclosure Schedules shall be deemed disclosed for all other purposes of the Purchaser Disclosure Schedules as and to the extent the

content or context of such disclosure makes it reasonably apparent, if read in the context of such other section, subsection, paragraph or subparagraph of the Purchaser Disclosure Schedules, that such disclosure is applicable to such other section, subsection, paragraph or subparagraph of the Purchaser Disclosure Schedules):

(a)    Organization and Existence. Purchaser is a corporation duly incorporated, validly existing, and in good standing under the laws of the State of Delaware, with full power and authority to own, lease and operate its business and properties and to carry on its business as and where such properties and assets are now owned or leased and such business is now conducted.

(b)    Authority and Approval. Purchaser has the power to enter into this Agreement and each of the Related Agreements to which it is to be a party and to perform its obligations hereunder and thereunder. The execution, delivery and performance by Purchaser of this Agreement and the Related Agreements to which it is to be a party, and the consummation by Purchaser of the transactions contemplated herein and therein, have been duly authorized by all required action on the part of Purchaser. This Agreement has been duly executed and delivered by Purchaser and, when executed and delivered by Purchaser, the Related Agreements to which Purchaser is to be a party will have been duly executed and delivered by Purchaser. This Agreement is, and each of the Related Agreements to which Purchaser is to be a party when executed and delivered by Purchaser, will be, the valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with their respective terms, except as may be limited by the Bankruptcy Cases.

(c)    No Conflict. The execution and delivery by Purchaser of this Agreement and each of the Related Agreements to which it is to be a party, and Purchaser's compliance with the terms and conditions hereof and thereof, and the consummation by Purchaser of the transactions contemplated hereby and thereby, do not and will not (i) conflict with any of, or require any consent of any Person that has not been obtained under, Purchaser's Organizational Documents, (ii) subject to entry of the Sale Order and obtaining the authorizations referred to in Section 5.2(d) of the Purchaser Disclosure Schedules, violate or breach in any material respect any provision of, or require any consent, authorization, or approval under, any Law or any Order applicable to Purchaser, (iii) result in a violation or breach of any provision of any Law or Order applicable to Purchaser, (iv) violate, conflict with, result in a breach of, constitute a default under (whether with or without notice or the lapse of time or both), accelerate or permit the acceleration of the performance required by, or require any consent, authorization, or approval under, any Transferred Contract or any other Contract to which Purchaser is a party or by which it is bound or to which any of its assets or property is subject or (v) result in the creation of any Lien upon the assets or property of Purchaser, except in each case as would not reasonably be expected to have a material adverse effect on Purchaser or materially adversely affect the validity or enforceability of this Agreement against Purchaser or materially adversely affect the ability of Purchaser to consummate the transactions contemplated by this Agreement.

(d)     Governmental Approvals and Filing. Except as disclosed in Section 5.2(d) of the Purchaser Disclosure Schedules, no consent, authorization, approval or action of, filing with, notice to, or exemption from any Governmental or Regulatory Authority on the part of Purchaser is required in connection with the execution, delivery and performance of this Agreement or any Related Agreements to which Purchaser is to be a party or the consummation of the transactions contemplated hereby or thereby, except where the failure to obtain any such consent, approval or action, to make any such filing, to give any such notice or obtain any such exemption would not be reasonably expected to (i) have a material adverse effect on Purchaser or (ii) materially adversely affect the validity or enforceability against Purchaser of this Agreement or such Related Agreements or materially adversely affect the ability of Purchaser to consummate the transactions contemplated by this Agreement.

(e)     Legal Proceedings.

(i)     Purchaser has received no written notice that there are any lawsuits or arbitrations pending or threatened against Purchaser as would reasonably be expected (x) to have a material adverse effect on Purchaser, (y) to materially adversely affect the validity or enforceability of this Agreement or any of the Related Agreements against Purchaser or materially adversely affect the ability of Purchaser to consummate the transactions contemplated by this Agreement, or (z) result in the issuance of an Order restraining, enjoining or otherwise prohibiting or making illegal the consummation of the transactions contemplated by this Agreement; and

(ii)     Purchaser has received no written notice that there are any Orders outstanding against Purchaser that would be reasonably expected to have a material adverse effect on Purchaser or materially adversely affect the ability of Purchaser to consummate the transactions contemplated by this Agreement.

(f)     Brokers. No broker, finder or investment banker is entitled to any brokerage commission, finder's fee or similar payment in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of Purchaser.

(g)     Financial Resources. Purchaser has, and will have available at the Closing, funds sufficient to pay in full the Purchase Price, the Cure Amounts and the fees and expenses related to the transactions contemplated by this Agreement in cash. Purchaser knows of no circumstance or condition that could be reasonably expected to prevent the availability at Closing of such funds. Purchaser acknowledges and agrees that notwithstanding anything to the contrary contained herein, its obligation to consummate the transactions contemplated hereby is not subject to Purchaser or any of its Affiliates obtaining any financing.

(h)     No Conflicting Contracts. Except as set forth in Section 5.2(h) of the Purchaser Disclosure Schedules, neither Purchaser nor any of its Affiliates is a party to any Contract involving the operation, management or ownership of a business similar to

any portion of the Proterra Transit Business Unit that would reasonably be expected to cause a delay in any Governmental or Regulatory Authority's granting of any required or necessary approval or authorization in connection with the transactions contemplated hereby, and neither Purchaser nor any of its Affiliates has any plans, or engaged in any discussions, to enter into any such Contract prior to the Closing Date.

(i)     Qualification. There exist no facts or circumstances that would cause, or be reasonably expected to cause, Purchaser and/or its Affiliates not to qualify as "good faith" purchasers under Section 363(m) of the Bankruptcy Code.

(j)     Opportunity for Independent Investigation; No Other Representations. Prior to its execution of this Agreement, Purchaser has conducted to its satisfaction an independent investigation and verification of the current condition and affairs of the Acquired Assets, including the condition, the cash flow and the prospects of the Acquired Assets and Assumed Liabilities. In making its decision to execute this Agreement and to purchase the Acquired Assets and assume the Assumed Liabilities, Purchaser has relied and will rely solely upon the results of such independent investigation and verification and the terms and conditions of this Agreement. Purchaser acknowledges and agrees that: (a) it has had the opportunity to visit with Sellers and meet with its Representatives to discuss the Acquired Assets and Assumed Liabilities, and their condition, cash flows and prospects, (b) all materials and information requested by Purchaser have been provided to Purchaser to Purchaser's satisfaction and Purchaser is fully familiar with all such materials (including such documents and information found in the electronic data room and the Confidential Information) and information, including all terms and conditions, obligations and liabilities pursuant to, and arising under, all Transferred Contracts and (c) except as expressly set forth in Section 5.1, neither Sellers nor any Affiliate thereof makes any representation or warranty, express or implied, written or oral, as to the Acquired Assets or the Assumed Liabilities or any other matter. Purchaser acknowledges that the Acquired Assets are being transferred on an "AS IS, WHERE IS" basis.

(k)     Disclaimer Regarding Projections. Purchaser may be in possession of certain projections and other forecasts regarding the Acquired Assets and the Assumed Liabilities and any expansions or other development opportunities relating thereto or otherwise, including projected financial statements, cash flow items and other data, and certain business plan information of the Acquired Assets and the Assumed Liabilities and any expansions or other development opportunities relating thereto or otherwise. Purchaser acknowledges that there are substantial uncertainties inherent in attempting to make such projections and other forecasts and plans, and that Purchaser is familiar with such uncertainties. Accordingly, Purchaser acknowledges that neither Sellers nor any of their Affiliates, Representatives, agents or advisors has made any representation or warranty, express or implied, written or oral, with respect to such projections and other forecasts and plans.

ARTICLE VI

Regulatory Matters

Purchaser hereby covenants and agrees with Sellers, and each Seller hereby covenants and agrees with Purchaser, in each case, as follows:

Section 6.1   Regulatory Filings. Subject to the terms and conditions of this Agreement, each party shall use Reasonable Efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary under applicable Laws to consummate the transactions contemplated by this Agreement.

Section 6.2   Objections or Other Challenges. If (a) any objections are asserted with respect to the transactions contemplated hereby under any Law or if any suit is instituted by any Governmental or Regulatory Authority or any private party challenging any of the transactions contemplated hereby as violating any Law, or (b) any filing made pursuant to Section 6.1 is reasonably likely to be rejected or conditioned by any Governmental or Regulatory Authority, each party hereto shall use Reasonable Efforts to resolve such objections or challenge such Governmental or Regulatory Authority or private party may have to such transactions, including to vacate, lift, reverse or overturn any Order, whether temporary, preliminary or permanent, so as to permit consummation of the transactions contemplated by this Agreement. In furtherance of the foregoing, Purchaser shall undertake promptly any and all actions required to complete lawfully the transactions contemplated by this Agreement prior to the Outside Closing Date, including by (i) responding to and complying with, as promptly as reasonably practicable, any request for information or documentary material regarding the transactions from any relevant Governmental or Regulatory Authority (including responding to any "second request" for additional information or documentary material under applicable Law as promptly as reasonably practicable), (ii) causing the prompt expiration or termination (including requesting early termination and/or approvals thereof) of any applicable waiting period and clearance or approval by any relevant Governmental or Regulatory Authority, including defense against, and the resolution of, any objections or challenges, in court or otherwise, by any relevant Governmental or Regulatory Authority preventing consummation of the transactions and (iii) making any necessary post-Closing filings or proffering and consenting to a governmental order providing for the sale or other disposition, or the holding separate, of particular Acquired Assets, categories of Acquired Assets or lines of business, of the Acquired Assets or of any other assets or lines of business of Purchaser or any of its Affiliates in order to mitigate or otherwise remedy any requirements of, or concerns of, any Governmental or Regulatory Authority, or proffering and consenting to any other restriction, prohibition or limitation on any of its assets, the Acquired Assets, Purchaser or any of Purchaser's Affiliates, in order to mitigate or remedy such requirements or concerns, in each case conditioned on consummation of the transactions contemplated hereby. The entry by any Governmental or Regulatory Authority in any legal proceeding of a governmental order permitting the consummation of the transactions contemplated hereby but which is subject to certain conditions or requires Purchaser or any of its Affiliates to take any action, including any restructuring of the Acquired Assets or lines of business of Purchaser or any of its Affiliates or any changes to the existing business of Purchaser or any of its Affiliates, shall not be deemed a failure to satisfy the conditions specified in Article IX. Purchaser further agrees that neither it nor any of its Affiliates shall, prior to Closing,

acquire, market, operate or control, nor enter into any other Contract to acquire, market, operate or control, any business similar to any portion of the Proterra Transit Business Unit if the proposed acquisition or ability to market, operate or control such business could reasonably be expected to increase the market power attributable to Purchaser and/or its Affiliates in a manner materially adverse to approval of the transactions contemplated by this Agreement or that would reasonably be expected to prevent or otherwise materially interfere with, or materially delay the consummation of the transactions contemplated by, this Agreement.

ARTICLE VII

Certain Covenants

Section 7.1    Conduct of Business Pending Closing. Except (1) those matters set forth in Section 7.1 of the Seller Disclosure Schedules, (2) as otherwise expressly contemplated by this Agreement, (3) as required by applicable Law or any Governmental or Regulatory Authority, or (4) with the written consent of Purchaser (which consent will not be unreasonably withheld, conditioned or delayed), during the period from the Execution Date to the Closing Date, each Seller will:

(a)    use its Reasonable Efforts to comply with all Laws applicable to the conduct of the Proterra Transit Business Unit to the extent relating to the Acquired Assets or the ownership and use of the Acquired Assets, in each case, except as would not reasonably be expected to have a Material Adverse Effect;

(b)    not sell, assign, transfer, convey, license or dispose of (including by waiver or release) any of the Transferred Contracts or, other than in the Ordinary Course of Business, other material Acquired Assets;

(c)    not cancel, terminate, fail to renew or amend, modify or change, in any material respect, any material Permit, in each case, to the extent required to perform its material obligations under the Transferred Contracts;

(d)    not amend, supplement or modify in any material respect, terminate (other than with cause) or waive any material term under, exercise any material option under or give any material consent with respect to any material Transferred Contract, in each case, other than in the Ordinary Course of Business;

(e)    not institute, settle or consent to any material litigation, arbitration or other proceeding (whether at law or in equity) or Order arising out of or related to the Acquired Assets that would (i) become an Assumed Liability or (ii) have a material and adverse effect on Purchaser's ownership, use or operation of, or the value of, the Acquired Assets after the Closing; and

(f)    not agree in writing to take any of the actions described above in clauses (a) through (e) of this Section 7.1.

Section 7.2    Efforts to Satisfy Closing Conditions. Each party to this Agreement will use their good-faith, reasonable best efforts to take, or cause to be taken, all actions necessary,

30

proper or advisable to (a) satisfy all of the conditions set forth in Article IX; (b) comply promptly with all legal requirements that may be imposed on such party with respect to the transactions contemplated by this Agreement and, subject to the conditions set forth in Article IX, to consummate the transactions contemplated by this Agreement; and (c) make any required filing with or notification to, and obtain (and to cooperate with the other party to obtain) any consent, authorization, order or approval of, or any exemption by, any Governmental or Regulatory Authority and any other third party that is required to be made or obtained by it in connection with the transactions contemplated by this Agreement, including the Purchaser Required Approvals.

Section 7.3    Assets Incapable of Transfer. To the extent that any Transferred Contract is not assignable or transferable without the consent of another Person and such consent requirement is not made unenforceable by the Bankruptcy Code, this Agreement will not constitute an assignment or transfer thereof, an attempted assignment or transfer thereof, or an agreement to effect such an assignment or transfer, if such assignment or transfer, attempted assignment or transfer, or agreement would constitute a breach thereof. Sellers will, prior to the Closing, use their Reasonable Efforts to obtain the consent of such other Person to the assignment or transfer of any such Transferred Contract to Purchaser in all cases in which (a) such consent is or may be required for such assignment or transfer and (b) such consent requirement is not made unenforceable by the Bankruptcy Code. Purchaser will, without additional cost or expense to Purchaser, cooperate with Sellers in their efforts to obtain such consents. If any such consent is not obtained prior to the Closing, Sellers shall use their Reasonable Efforts to cooperate with Purchaser in reasonable and lawful arrangements, to the extent reasonably practicable, designed to provide for Purchaser the benefits thereunder, including (a) adherence to reasonable procedures established by Purchaser for the immediate transfer to Purchaser of any payments or other funds received by Purchaser thereunder from the other party to the Transferred Contract for services performed by Purchaser after the Closing and (b) enforcement for the benefit of Purchaser of any and all rights of Sellers thereunder against the other party or parties thereto arising out of the breach or cancellation thereof by such other party or parties or otherwise. For purposes of clarification, Reasonable Efforts by Sellers will in no event require the payment of any money or permit, without the prior written consent of Purchaser, the amendment or modification of any material term or provision of any Transferred Contract, but Reasonable Efforts shall include appropriate filings by Sellers in the Bankruptcy Court seeking a determination that the Bankruptcy Code renders unenforceable the consent requirement in question. Notwithstanding the foregoing, failure to obtain any such consent will not give rise to Purchaser's ability not to consummate the transactions contemplated by this Agreement. Without limiting the generality of the foregoing, the beneficial interest in and to the Transferred Contracts, to the fullest extent permitted by the relevant Transferred Contract and applicable Law, will pass to Purchaser.

Section 7.4    Discovery of Breach. Sellers shall promptly notify Purchaser if, prior to the Closing, Sellers conclude or discover that any of Sellers' representations and warranties contained in this Agreement is not accurate in any material respect such that the conditions set forth in Article IX are incapable of being satisfied, which notice will summarize the reason for such conclusion. Purchaser shall promptly notify Sellers if, prior to the Closing, Purchaser concludes or discovers that any of Purchaser's representations and warranties contained in this

Agreement is not accurate in any material respect such that the conditions set forth in <u>Article IX</u> are incapable of being satisfied, which notice will summarize the reason for such conclusion.

Section 7.5    <u>Restricted Use of Confidential Information</u>. Purchaser acknowledges and agrees that all information furnished to it in connection with this Agreement, the Related Agreements or the transactions contemplated hereby or thereby (i) is subject to the Confidentiality Agreement, the terms of which are incorporated herein by reference, and (ii) subject to Section 2 of the Confidentiality Agreement, constitutes Confidential Information. Notwithstanding anything to the contrary contained in the Confidentiality Agreement (including any expiration or termination thereof in accordance with its terms), the parties hereto agree that (A) during the period from the Execution Date to the Closing Date, Purchaser shall hold all Confidential Information in accordance with the obligations set forth in the Confidentiality Agreement (as if Purchaser were the Receiving Party thereunder) and (B) from and after the Closing Date, for a period of five (5) years, (x) Purchaser shall hold all Confidential Information, to the extent relating to any Excluded Assets or Excluded Liabilities in accordance with the confidentiality and non-use obligations set forth in the Confidentiality Agreement (as if Purchaser were the Receiving Party thereunder) and (y) Sellers shall hold all Confidential Information, to the extent relating to any Acquired Assets or Assumed Liabilities in accordance with the confidentiality and non-use obligations set forth in the Confidentiality Agreement (as if Sellers were the Receiving Party thereunder). If this Agreement is terminated for any reason prior to the Closing, the Confidentiality Agreement shall continue in full force and effect in accordance with its terms.

Section 7.6    <u>Review and Inspections</u>. Subject to <u>Section 4.3</u>, during the period from the Execution Date to the Closing Date, upon reasonable advance written notice, Sellers will provide Purchaser and its Representatives and designees with reasonable access to Seller's books, records, systems, system master data and transactional data and facilities and reasonably make appropriate accountants, attorneys and advisors available during normal business hours in order to permit Purchaser to complete its review of Sellers for purposes of facilitating the transfer to Purchaser of the Acquired Assets, and will reasonably promptly comply with any reasonable requests relating thereto made by or on behalf of Purchaser. The parties will use Reasonable Efforts to share information protected from disclosure under the attorney-client privilege, work product doctrine, joint defense privilege or any other privilege pursuant to this <u>Section 7.6</u> in a manner so as to preserve the applicable privilege. Any party may share information with any other party on an "outside counsel only" basis. Nothing in this Agreement shall obligate the parties to share any information covered by the attorney client privilege, work product doctrine or other similar privilege. Sellers acknowledge that Purchaser's review includes an assessment of and preparation for the efficient and orderly transition of the Acquired Assets to Purchaser, at and after and subject to the Closing.

Section 7.7    <u>No Use of Sellers Brand</u>. Purchaser shall, within sixty (60) days after the Closing Date, (a) cease use of the Sellers Brand and (b) change signage and stationery and otherwise discontinue public use of the Sellers Brand.

Section 7.8    <u>Background License</u>. Effective as of the Closing, each Seller hereby grants to Purchaser and its Affiliates, or alternatively shall procure for Purchaser and its Affiliates from purchasers of the Business Units or assets of any Seller, a worldwide, fully paid-up, royalty-free,

irrevocable, non-terminable, perpetual, sublicensable (including through multiple tiers), non-exclusive license under and to all Intellectual Property (excluding trademarks, websites and domain names) Licensable by a Seller or any of its Affiliates that is not an Acquired Asset and that is necessary for Purchaser and its Affiliates to perform their obligations under the Transferred Contracts as such contracts exist as of Closing, in each case solely in connection with the performance of Purchaser's and its Affiliates' obligations under the Transferred Contracts; provided, for the avoidance of doubt, in no event shall Purchaser or any sublicensee, transferee or assignee of the license granted pursuant to this Section 7.8 be used to compete with the Proterra Powered Business Unit as conducted prior to Closing. Purchaser or its Affiliates may assign and otherwise transfer such license, in whole or in part, following written notice to Volvo Battery Solutions LLC (8003 Piedmont Triad Parkway, Greensboro, North Carolina 27409, Attention: Gregory Higgins, Rikard Bentelius and Fredrik Brunell and an additional copy to Greenberg Traurig, LLP, 1000 Louisiana Street, Suite 1700 Houston, Texas 77002 Attention: Shari L. Heyen and David R. Eastlake) or its assignee, (a) to any lender or other financing source as collateral security following the Closing, (b) to an Affiliate or (c) in connection with any assignment, sale, merger, or other transfer of all or any part of the Acquired Business or a product or service line of the Acquired Business or any of its Affiliates (regardless of the form of transaction or series of transactions). All use of such licensed Intellectual Property by or under authority of Purchaser or its Affiliates (or their successors and assigns) from and after the Closing shall be on an "AS IS, WHERE IS" basis, with all faults and all express and implied representations and warranties disclaimed, and at their sole risk.

ARTICLE VIII

Intentionally Omitted.

ARTICLE IX

Conditions to Closing

Section 9.1    Conditions to the Obligations of Purchaser. The obligation of Purchaser to effect the Closing is subject to the satisfaction (or waiver by Purchaser) on the Closing Date of the following conditions:

(a)    Representations and Warranties. (i) Each of the Seller Fundamental Representations shall be true and correct in all material respects, in each case as of the Execution Date and as of the Closing as if made as of the Closing, except for such representations and warranties which are as of a specific date, which shall be true and correct in all material respects as of such date, and (ii) each of the representations and warranties of Sellers contained herein (other than the Seller Fundamental Representations) shall be true and correct in all respects (without giving effect to any limitation as to materiality or Material Adverse Effect), in each case as of the Execution Date and as of the Closing as if made as of the Closing, except for (x) changes permitted or contemplated hereby; (y) representations and warranties which are as of a specific date, which shall be true and correct as of such date, subject to the immediately following clause (z); or (z) where the failure to be so true and correct would not in the aggregate have a Material Adverse Effect or have a material adverse effect on the ability of Sellers

to consummate the transactions contemplated hereby. Purchaser will have received a certificate from Sellers signed on behalf of each Seller by a duly authorized officer thereof with respect to the foregoing.

(b)     Covenants. The covenants and agreements of Sellers to be performed on or prior to the Closing will have been duly performed in all material respects. Purchaser will have received a certificate from Sellers signed on behalf of each Seller by a duly authorized officer thereof with respect to the foregoing.

(c)     Related Agreements. Each Seller will have duly executed and delivered to Purchaser the Related Agreements to which such Seller is to be a party.

(d)     Seller's Deliveries. Sellers will have delivered or caused to be delivered to Purchaser the items listed in Section 4.2(a) in form and substance as required herein.

(e)     Material Adverse Effect. Since the Execution Date, there shall not have occurred or been discovered any developments, circumstances or occurrences with regard to any of the Acquired Assets or the Assumed Liabilities, that, individually or in the aggregate, has had a Material Adverse Effect.

Section 9.2     Conditions to the Obligations of Sellers. The obligation of Sellers to effect the Closing is subject to the satisfaction (or waiver by Sellers) on the Closing Date of the following conditions:

(a)     Representations and Warranties. Each of the representations and warranties of Purchaser contained herein shall be true and correct in all material respects, in each case as of the Execution Date and as of the Closing as if made as of the Closing, except for such representations and warranties which are as of a specific date, which shall be true and correct in all material respects as of such date. Sellers will have received a certificate from Purchaser signed on behalf of Purchaser by a duly authorized officer thereof with respect to the foregoing.

(b)     Covenants. The covenants and agreements of Purchaser to be performed on or prior to the Closing will have been duly performed in all material respects. Sellers will have received a certificate from Purchaser signed on behalf of Purchaser by a duly authorized officer thereof with respect to the foregoing.

(c)     Receipt of Purchase Price. Sellers will have received from Purchaser an amount equal to (i) the Purchase Price minus (ii) the Earnest Deposit, as provided and in accordance with Section 3.1(b) of the Agreement. Sellers will have also received the Earnest Deposit from the Escrow Agent. Sellers shall have received evidence of the payment of the Cure Amounts.

(d)     Related Agreements. Purchaser will have duly executed and delivered to Sellers each of the Related Agreements to which Purchaser is a party.

(e)     Purchaser's Deliveries. Purchaser will have delivered or caused to be delivered to Sellers, to the extent not already set forth in Section 9.3(d), the items listed in Section 4.2(b).

Section 9.3     Conditions Precedent to Obligations of Purchaser and Sellers. The respective obligations of the parties to effect the Closing are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser and Sellers in whole or in part to the extent permitted by applicable Law):

(a)     there shall not be in effect any Order by a Governmental or Regulatory Authority (i) declaring this Agreement or any Related Agreement invalid or unenforceable in any respect or (ii) restraining, enjoining or otherwise prohibiting or making illegal the Closing, in each case, that is not stayed by the commencement of the Bankruptcy Cases or any Order of the Bankruptcy Court;

(b)     the Sale Order, together with any other Order of the Bankruptcy Court required to consummate the transactions contemplated hereby, shall have been entered by the Bankruptcy Court and each such Order (i) is not subject to any stay, and (ii) has not been vacated, reversed, or modified in a material matter with respect to Purchaser's rights or protections thereunder without Purchaser's prior written consent;

(c)     subject to the provisions of Section 7.3, the Sale Order shall approve and authorize the assumption and assignment of the Transferred Contracts and the Transferred Contracts shall have been actually assumed and assigned to Purchaser, subject to the payment of applicable Cure Amounts by Purchaser;

(d)     all Purchaser Required Approvals shall have been obtained and shall be in full force and effect; and

(e)     all conditions to the closing of the Sale under the Sale Order other than the Closing, shall have occurred or been waived pursuant to the terms of the Sale Order.

Section 9.4     Frustration of Closing Conditions. Purchaser may not rely on the failure of any condition set forth in this Article IX to be satisfied if such failure was caused by Purchaser's failure to comply with the terms of this Agreement. Sellers may not rely on the failure of any condition set forth in this Article IX to be satisfied if such failure was caused by any Seller's failure to comply with the terms of this Agreement.

ARTICLE X

Termination

Section 10.1     Termination. Subject to Section 10.2, this Agreement may be terminated at any time prior to the Closing Date:

(a)     by written agreement executed by each of Sellers and Purchaser;

(b)     by Sellers by written notice to Purchaser, if the Closing has not occurred on or prior to the Outside Closing Date (unless, in each case, the failure to consummate the Closing by such date is due to the failure of a Seller to have fulfilled any of its obligations under this Agreement);

(c)     by either Purchaser, on the one hand, or Sellers, on the other hand, by written notice to the other, in the event that any Governmental or Regulatory Authority has issued a final, non-appealable Order or ruling or taken any other final, non-appealable action, or any applicable Law has been entered, adopted, enacted or promulgated, in each case permanently restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement that is not stayed by the commencement of the Bankruptcy Cases or any order of the Bankruptcy Court;

(d)     by Sellers, by written notice to Purchaser, (i) in the event that, other than through the failure of a Seller to comply with its obligations under this Agreement, one or more of the conditions to Sellers' obligation to effect the Closing is or becomes impossible to satisfy at any time after the Execution Date and Sellers have not waived such condition(s) or (ii) if neither Seller is in material breach of any terms of this Agreement, upon a material breach of a representation, warranty, or covenant on the part of Purchaser set forth in this Agreement such that a condition set forth in Section 9.2 or Section 9.3 would not reasonably be expected to be satisfied as of the time of such termination, and such breach is not capable of being cured or has not been cured within 30 days after Purchaser receives written notice thereof from Sellers;

(e)     by Purchaser, by written notice to Sellers, (i) in the event that, other than through the failure of Purchaser to comply with its obligations under this Agreement, one or more of the conditions to Purchaser's obligation to effect the Closing is or becomes impossible to satisfy at any time after the Execution Date and Purchaser has not waived such condition(s) or (ii) if Purchaser is not in material breach of any terms of this Agreement, upon a material breach of a representation, warranty, or covenant on the part of a Seller set forth in this Agreement such that a condition set forth in Section 9.1 or Section 9.3 would not reasonably be expected to be satisfied as of the time of such termination, and such breach is not capable of being cured or has not been cured within 30 days after Seller receives written notice thereof from Purchaser;

(f)     by Purchaser, by written notice to Sellers, if the Sale Order entered by the Bankruptcy Court has been (A) vacated or reversed or (B) modified in a manner that is adverse to Purchaser in any material respect without Purchaser's prior written consent;

(g)     by either Purchaser, on the one hand, or Sellers, on the other hand, by written notice to the other, if (i) Purchaser is not the Successful Bidder or Backup Bidder at the Auction, (ii) prior to Closing, the Bankruptcy Court enters an order dismissing or converting the Bankruptcy Cases to a case under Chapter 7 of the Bankruptcy Code or (iii) the Bankruptcy Court enters an Order denying approval of the Sale Order or represents at a Sale Hearing (as defined in the Bidding Procedures Order) or other hearing that the Bankruptcy Court will not approve entry of the Sale Order;

(h)     by Purchaser, by written notice to Sellers, if, Sellers withdraw the request for authority to sell the Acquired Assets and assume and assign the Transferred Contracts; or

(i)     by Purchaser, by written notice to Sellers, if Sellers (i) move to voluntarily dismiss the Bankruptcy Cases or (ii) move for conversion of the Bankruptcy Cases to a case under chapter 7 of the Bankruptcy Code, in each case, unless the effectiveness thereof is to occur after the Closing.

Section 10.2     Effect of Termination. In the event of the termination of this Agreement in accordance with Section 10.1, this Agreement will thereafter become void and have no effect, and no party hereto will have any liability to the other party hereto or their respective Affiliates, directors, officers or employees, except for the obligations of the parties hereto contained in this Section 10.2, in Article XII and in Section 7.5; provided, however, that (a) if this Agreement is validly terminated by Purchaser prior to Closing pursuant to Section 10.1(e)(ii), Escrow Agent shall, within two (2) Business Days following the termination of this Agreement and without the requirement of any approval by the Bankruptcy Court, distribute the Deposit Escrow Funds to Purchaser and such distribution to Purchaser shall be Purchaser's sole and exclusive remedy as a result of such termination, and (b) if this Agreement is validly terminated by Sellers or Purchaser prior to Closing for any reason other than by Purchaser pursuant to Section 10.1(e)(ii), Escrow Agent shall, within two (2) Business Days following the termination of this Agreement and without the requirement of any approval by the Bankruptcy Court, distribute the Deposit Escrow Funds to Sellers and Sellers shall be entitled to retain the Deposit Escrow Funds.

ARTICLE XI

Bankruptcy Matters

Section 11.1     Bankruptcy Cases. On the Petition Date, Sellers filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code, which cases are jointly administered under Case No. 23-11120 (BLS) (the "**Bankruptcy Cases**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") as of the Execution Date.

Section 11.2     Bankruptcy Court Approvals.

(a)     Sellers and Purchaser acknowledge that this Agreement is subject to approval by the Bankruptcy Court by entry of the Sale Order.

(b)     If Purchaser is selected as the Successful Bidder or Backup Bidder pursuant to the Bidding Procedures Order, a list of the Transferred Contracts shall be attached to the Sale Order.

(c)     If the Sale Order or any other Orders of the Bankruptcy Court relating to the transactions contemplated by this Agreement shall be appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or re-argument shall be filed with respect to the Sale Order or other such Order), subject to rights otherwise arising from this Agreement, including each party's respective right to terminate this Agreement pursuant to

Section 10.1, Sellers and Purchaser shall use their Reasonable Efforts to oppose such appeal, petition or motion and obtain an expedited resolution of any such appeal, petition or motion.

(d)     Purchaser and Sellers agree that from and after the date that the Auction is declared closed by Sellers, Sellers will not, directly or indirectly, and will not permit any of their respective Affiliates or Representatives (or Representatives of any of their respective Affiliates) to initiate contact with, or solicit or knowingly encourage submission of any inquiries, proposals or offers by, any Person with respect to an Alternative Transaction or otherwise facilitate any effort or attempt to make a proposal or offer to Sellers or any of their respective Affiliates or Representatives (or Representatives of any of their respective Affiliates) with respect to an Alternative Transaction. For the avoidance of doubt, Sellers will not, and will not permit any of their respective Affiliates or Representatives (or Representatives of any of their respective Affiliates) to, pursue or agree to any Alternative Transaction other than as expressly permitted by and in accordance with the Bidding Procedures Order; provided, that Sellers shall have the responsibility and obligation to respond to any inquiries or offers to purchase all or any part of the Acquired Assets and perform any and all other acts related thereto that are required under the Bankruptcy Code, fiduciary obligations, or other applicable law, including, supplying information relating to the Acquired Assets to prospective purchasers, notwithstanding any provisions of Section 7.5 hereof to the contrary.

Section 11.3    Further Filings and Assurances.

(a)     Purchaser agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Purchaser, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under the Transferred Contracts and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code. Without limiting the foregoing, Sellers and Purchaser shall each use Reasonable Efforts to cooperate to obtain a Sale Order finding that Purchaser is purchasing the Acquired Assets in good faith within the meaning of Section 363(m) of the Bankruptcy Code.

(b)     In the event the entry of the Sale Order shall be appealed, each party shall use its respective Reasonable Efforts to defend against such appeal, provided however, that nothing herein shall alter, amend or modify the conditions to Closing set forth in Section 9.3(b) hereof.

Section 11.4    Notice of Sale. Notice of the sale of Acquired Assets contemplated in this Agreement shall be served in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Local Rules of the Bankruptcy Court and the Bidding Procedures Order.

Section 11.5    Free and Clear. The transfer of the Acquired Assets shall vest Purchaser with all right, title, and interest of Sellers in the Acquired Assets free and clear of any and all

Liens, Liabilities and other Interests (other than Permitted Encumbrances and Assumed Liabilities) pursuant to Sections 363(f) and/or 1123(b)(4) of the Bankruptcy Code, whether arising by statute or otherwise and whether arising before or after the commencement of the Bankruptcy Cases, whether known or unknown, including Interests of or asserted by any of the creditors, vendors, employees, suppliers, or lessors of Sellers or any other third party; provided, that any and all such Liens, Liabilities and other Interests shall attach to the net proceeds of the Purchase Price, with the same priority, validity, force, and effect as they now have against the Acquired Assets. Purchaser shall not be liable for any liability for any Lien, Liability or other Interest, other than the Assumed Liabilities and Permitted Encumbrances.

Section 11.6   Transfer Tax Exemption. The transactions contemplated herein shall be exempt from Transfer Tax to the fullest extent available in accordance with Section 1146 of the Bankruptcy Code.

ARTICLE XII

Miscellaneous

Section 12.1   Survival. All covenants and agreements contained herein which by their terms are to be performed in whole or in part, or which prohibit actions, subsequent to the Closing shall, solely to the extent such covenants and agreements are to be performed, or prohibit actions, subsequent to the Closing, survive the Closing in accordance with their terms until fully performed or satisfied. All other covenants and agreements contained herein, and all representations and warranties contained herein or in any certificated deliveries hereunder, in each case shall not survive the Closing and shall thereupon terminate and be of no further force or effect, including any actions for damages in respect of any breach or inaccuracy thereof.

Section 12.2   Governing Law and Jurisdiction. Except to the extent governed by the Bankruptcy Code, this Agreement will be governed by and be construed in accordance with the Laws of the State of Delaware, without regard however to the conflicts of laws principles thereof. Without limiting any party's right to appeal any Order of the Bankruptcy Court, (a) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes that may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, including, but not limited to, the assumption and assignment of the Transferred Contracts and (b) any and all legal proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereto consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations pursuant to Section 12.3 hereto. To the extent not prohibited by applicable Law or Bankruptcy Court rule, each party hereby waives and agrees not to assert, by way of motion, as a defense or otherwise in any such proceeding, any claim (i) that it is not subject to the jurisdiction of the Bankruptcy Court, (ii) that the proceeding is brought in an inconvenient forum, (iii) that it is immune from any legal process with respect to itself or its property, (iv) that the venue of the proceeding is improper or (v) that this Agreement or the subject matter hereof or thereof may not be enforced in or by such court. Each of the parties hereto hereby (a) irrevocably submits with regard to any such legal proceeding to the exclusive personal jurisdiction of the Bankruptcy Court in the event any dispute arises out of this Agreement or any transaction contemplated hereby, including, but

not limited to, the assumption and assignment of the Transferred Contracts, (b) agrees that it shall not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from the Bankruptcy Court or that such action is brought in an inconvenient forum and (c) agrees that it shall not bring any action relating to this Agreement or any transaction contemplated hereby in any court other than the Bankruptcy Court; provided, that, a party may commence any action or proceeding in a court other than the Bankruptcy Court solely for the purpose of enforcing an order or judgment issued by the Bankruptcy Court. The parties waive personal service of any and all process on each of them and consent that all such service of process shall be made in the manner, to the party and at the address set forth in Section 12.3 of this Agreement, and service so made shall be complete as stated in such Section 12.3. EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY.

Section 12.3    Notices. All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by e-mail (so long as no "bounceback" or similar "undeliverable" message is received by the sender thereof) if successfully transmitted prior to 5:00 pm (Eastern Time) on any Business Day, and on the next Business Day if successfully transmitted after such time or on a non-Business Day or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 12.3):

    (1)    If to Sellers, to:

> Proterra Inc
> 1815 Rollins Road
> Burlingame, California 94010
> Attention:    Jeff Mitchell
>                 Proterra Legal Department
> Email:    jmitchell@proterra.com
>                 legal@proterra.com

> and an additional copy (which will not constitute notice to Sellers) to:

> Paul, Weiss, Rifkind, Wharton & Garrison LLP
> 1285 Avenue of the Americas
> New York, New York 10019-6064
> Attention:    Paul M. Basta
>                 Robert A. Britton
>                 Austin S. Pollet
>                 Michael J. Colarossi
> Email:    pbasta@paulweiss.com
>                 rbritton@paulweiss.com
>                 apollet@paulweiss.com

mcolarossi@paulweiss.com

(2)    If to Purchaser to:

Phoenix Motor, Inc.
1500 LAKEVIEW LOOP
ANAHEIM, CA 92807
Attn: Mark Hastings
Telephone: 916-622-5531
Email: MarkH@phoenixmotorcars.com

Section 12.4    Amendments and Waivers.

(a)    This Agreement may be amended, superseded, canceled, renewed, or extended, and the terms hereof may be waived, only by a written instrument signed by the parties hereto or, in the case of a waiver, by the party against whom the waiver is to be effective. Neither the failure nor any delay by any party in exercising any right, power or privilege under this Agreement will operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power or privilege will preclude any other or further exercise of such right, power or privilege or the exercise of any other right, power or privilege. To the maximum extent permitted by applicable Law (i) no claim or right arising out of this Agreement can be discharged by one party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other party, (ii) no waiver that may be given by a party will be applicable except in the specific instance for which it is given, and (iii) no notice to or demand on one party will be deemed to be a waiver of any obligation of such party or of the right of the party giving such notice or demand to take further action without notice or demand as provided in this Agreement.

(b)    A failure or omission of any party to insist, in any instance, upon strict performance by another party of any term or provision of this Agreement or to exercise any of its rights hereunder will not be deemed a modification of any term or provision hereof or a waiver or relinquishment of the future performance of any such term or provision by such party, nor will such failure or omission constitute a waiver of the right of such party to insist upon future performance by another party of any such term or provision or any other term or provision of this Agreement.

Section 12.5    Entire Agreement. This Agreement, together with the Seller Disclosure Schedules, the Purchaser Disclosure Schedules, all Exhibits and Schedules hereto and the documents, agreements, certificates and instruments referred to herein and therein, including the Related Agreements, Confidentiality Agreement and related Orders, including the Sale Order, constitutes the entire agreement between the parties hereto and with respect to the subject matter hereof and supersedes all prior representations, warranties, agreements, and understandings, oral or written, with respect to such matters and other than any written agreement of the parties that expressly provides that it is not superseded by this Agreement.

Section 12.6  Headings: Interpretation. The headings in this Agreement are intended solely for convenience of reference and will be given no effect in the construction or interpretation of this Agreement. Unless the context otherwise requires, the singular includes the plural, and the plural includes the singular.

Section 12.7  No Assignment: Binding Effect. This Agreement is not assignable by any party without the prior written consent of the other party. Notwithstanding the foregoing, Purchaser may, without the prior written consent of Sellers, assign this Agreement or all or any portion of Purchaser's rights, interests and obligations hereunder to any of its Affiliates upon notice given to Sellers at least three (3) Business Days prior to the Closing, provided however, that in no event will such an assignment release Purchaser from its obligations hereunder. This Agreement will be binding upon and will inure to the benefit of the parties hereto and their respective successors and permitted assigns.

Section 12.8  Counterparts. This Agreement may be executed in any number of counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument. Any electronic signature, including via portable document format (pdf) or DocuSign, attached hereto will be deemed to be an original and will have the same force and effect as an original signature.

Section 12.9  Incorporation by Reference. The Seller Disclosure Schedules, the Purchaser Disclosure Schedules and other Schedules and Exhibits and the documents referenced therein constitute integral parts of this Agreement and are hereby incorporated by reference herein.

Section 12.10  Time of the Essence. With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

Section 12.11  Specific Performance. Each party hereby acknowledges and agrees that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed by a party in accordance with their specific terms or were otherwise breached by a party. Notwithstanding anything to the contrary herein, if any party violates or refuses to perform any covenant or agreement made by such party herein, without limiting or waiving in any respect any rights or remedies of a party under this Agreement now or hereafter existing at law, in equity or by statute, the non-breaching party or parties shall, in addition to any other remedy to which a party is entitled at law or in equity, be entitled to specific performance of such covenant or agreement or seek any other equitable relief, in each case without the proof of actual damages. Each party agrees to waive any requirement for the security or posting of any bond in connection with any such equitable remedy, and agrees that it will not oppose the granting of an injunction, specific performance or other equitable relief on the basis that (a) the other party has an adequate remedy at law, or (b) an award of specific performance is not an appropriate remedy for any reason at law or equity.

Section 12.12  No Third Party Beneficiaries.

(a)     Except as provided in Section 12.16, the terms and provisions of this Agreement are intended solely for the benefit of the parties hereto and their respective

successors and permitted assigns, and it is not the intention of the parties hereto to confer third party beneficiary rights upon any other Person.

(b)     For the avoidance of doubt, all provisions contained in this Agreement with respect to employee benefit plans or compensation of any employees of a Seller are included for the sole benefit of the respective parties hereto, and nothing contained herein (i) shall confer upon any former, current or future employee of Sellers or Purchaser or any legal representative or beneficiary thereof any rights or remedies, including any right to employment or continued employment, of any nature, for any specified period, (ii) shall cause the employment status of any former, present or future employee to be other than terminable at will, (iii) shall confer any third party beneficiary rights upon any such employee or any dependent or beneficiary thereof or any heirs or assigns thereof or (iv) shall constitute an amendment of any Benefit Plan or other employee compensation or benefit plan, program, policy or arrangement of Sellers, Purchaser or any of their respective Affiliates.

Section 12.13 <u>Expenses</u>. Whether or not the transactions contemplated hereby are consummated, each party hereto will pay its own costs and expenses incurred in connection with the negotiation, execution and closing of this Agreement and the Related Agreements and the transactions contemplated hereby and thereby provided. In the event of termination of this Agreement, the obligation of each party to pay its own expenses will be subject to any rights of such party arising from a breach of this Agreement by another party. Notwithstanding the foregoing, (a) Sellers agree to pay all costs of releasing existing Liens and other Interests and recording the releases, (b) Purchaser agrees to pay any filing fees in connection with the filings made pursuant to the HSR Act and any other federal, state or local Governmental or Regulatory Authority in accordance with <u>Section 6.1</u> and (c) Purchaser will pay the cost of all document recordation costs and all Transfer Taxes not determined to be exempt in accordance with Section 1146 of the Bankruptcy Code arising by reason of the transactions contemplated by this Agreement to the extent the transactions contemplated herein are determined not to be exempt from such costs.

Section 12.14 <u>Severability</u>. If any term or other provision of this Agreement is illegal, invalid or unenforceable under any Law or as a matter of public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated by this Agreement is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision contained herein is, to any extent, invalid or unenforceable in any respect under the Laws governing this Agreement, the parties to this Agreement shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated by this Agreement be consummated as originally contemplated to the greatest extent possible.

Section 12.15 <u>Public Announcements</u>. Prior to the Closing, unless otherwise required by applicable Law, the Bankruptcy Court, the Bidding Procedures or Bidding Procedures Order or by obligations of Purchaser or Sellers or their respective Affiliates pursuant to any listing agreement with or rules of any securities exchange, Purchaser, on the one hand, and Sellers, on the other hand, shall consult with each other before issuing any press release or otherwise

making any public statement with respect to this Agreement or the transactions contemplated hereby and shall not issue any such release or make any such statement without the prior written consent of the other (such consent not to be unreasonably withheld, conditioned or delayed). From and after the Closing, the parties hereto may make public statements with respect to this Agreement or the transactions contemplated hereby so long as such announcements do not disclose the specific terms or conditions of this Agreement, except where such terms and conditions have already been disclosed as required by Law or by obligations of Purchaser or Sellers or their respective Affiliates pursuant to any listing agreement with or rules of any securities exchange or the Bankruptcy Court; provided, that the issuing party shall use its Reasonable Efforts to consult with the other party with respect to the text thereof to the extent practicable.

Section 12.16  No Liability; Release.

(a)      (i) No past, present or future director, officer, manager, employee, incorporator, member, partner or equityholder or other Affiliates of (A) any Seller (other than such Seller in its capacity as such), or (B) Purchaser (other than any obligations hereunder or assumed herein), and (ii) none of the lenders or agents under any Indebtedness of a Seller, in any case, shall have any Liability for any obligations or liabilities of Sellers or Purchaser, as applicable, under this Agreement or any agreement, document or instrument entered into in connection herewith of or for any claim based on, in respect of, or by reason of, the transactions contemplated hereby and thereby. Any claim or cause of action based upon, arising out of, or related to this Agreement or any agreement, document or instrument contemplated hereby may only be brought against Persons that are expressly named as parties hereto or thereto, and then only with respect to the specific obligations set forth herein or therein. Other than the parties hereto, no other party shall have any Liability or obligation for any of the representations, warranties, covenants, agreements, obligations or liabilities of any party under this Agreement or the agreements, documents or instruments contemplated hereby or of or for any legal proceeding based on, in respect of, or by reason of, the transactions contemplated hereby or thereby (including the breach, termination or failure to consummate such transactions), in each case whether based on contract, tort, fraud, strict liability, other Law or otherwise and whether by piercing the corporate veil, by a claim by or on behalf of a party hereto or another Person or otherwise.

(b)      Effective upon the Closing Date, Purchaser acknowledges that it has no claim, counterclaim, setoff, recoupment, action or cause of action of any kind or nature whatsoever against any of the individuals or entities within the Seller Group, that directly or indirectly arises out of, is based upon, or is in any manner connected with any Prior Event (including, for the avoidance of doubt, any Avoidance Actions) (collectively, the "**Purchaser Released Claims**"); and, should any Purchaser Released Claims nonetheless exist, Purchaser hereby (i) releases and discharges each member of the Seller Group from any liability whatsoever on such Purchaser Released Claims that directly or indirectly arises out of, is based upon, or is in any manner connected with a Prior Event, and (ii) releases, remises, waives and discharges all such Purchaser Released Claims against the Seller Group. For purposes of this Section 12.16(b), "**Seller Group**" means (1) each Seller, (2) the lenders and agents under the Indebtedness of any Seller, (3) the Statutory

Committee of Unsecured Creditors of the Sellers in their Bankruptcy Cases, and any members thereof at any time, in each case, solely in their capacity as such, and (4) with respect to those parties in the foregoing (1)–(3) of this sentence, any of their respective agents, attorneys, financial advisors, legal representatives, consultants, legal advisors, Affiliates, directors, managers, officers, control persons (as defined in Section 15 of the Securities Act of 1933 (as amended) or Section 20 of the Securities Exchange Act of 1934 (as amended)), shareholders, partners, estates, members, employees and successors and assigns, in each case, solely in their capacity as such, and "**Prior Event**" means any transaction, event, circumstances, action, failure to act or occurrence of any sort or type, including any approval or acceptance given or denied, whether known or unknown, which occurred, existed, was taken or begun prior to the consummation of the transactions contemplated hereunder; provided, that for the avoidance of doubt, "Prior Event" shall include any transaction, event, circumstances, action, failure to act or occurrence of any sort or type which occurred, existed, was taken or begun in accordance with, pursuant to or by virtue of: (A) any terms of this Agreement, (B) the transactions referred to herein, (C) the Bankruptcy Cases or the events leading to the commencement thereof, or (D) any oral or written agreement relating to the foregoing (A) to (C) of this sentence.

(c)     Without limiting in any way the scope of the release contained in subparagraph (a) or (b) of this Section 12.16 and effective upon the Closing Date, Purchaser, to the fullest extent allowed under applicable Law, hereby waives and relinquishes all statutory and common law protections purporting to limit the scope or effect of a general release, whether due to lack of knowledge of any claim or otherwise, including, waiving and relinquishing the terms of any Law which provides that a release may not apply to material unknown claims. Purchaser hereby further affirms its intent to waive and relinquish such unknown claims and to waive and relinquish any statutory or common law protection available in any applicable jurisdiction with respect thereto including, without limitation, California Civil Code § 1542, which provides:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

(d)     Notwithstanding anything set forth herein to the contrary, the releases set forth in this Section 12.16 do not extend to (i) any obligations that are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the willful misconduct, actual and intentional fraud or gross negligence of such Person or (ii) any obligations of the parties under this Agreement.

*[Signature Pages to Follow]*

IN WITNESS WHEREOF, the parties, intending legally to be bound, have caused this Agreement to be duly executed as of the day and year first herein above written.

**SELLERS:**

PROTERRA INC

By: _____

Name: Gareth Joyce

Title: CEO & President

PROTERRA OPERATING COMPANY, INC.

By: _____

Name: Gareth Joyce

Title: CEO & President.

[Signature Page to Asset Purchase Agreement]

**PURCHASER:**

PHOENIX MOTOR, INC.

By: _____

Name: JAMES MARK HASTINGS

Title: SENIOR VICE PRESIDENT

## **Exhibit B**

**Transit Asset Purchase Agreement**

EXECUTION VERSION

ASSET PURCHASE AGREEMENT

by and among

PROTERRA INC.,

PROTERRA OPERATING COMPANY, INC.

(“**Sellers**”)

and

PHOENIX MOTOR, INC.

(“**Purchaser**”)

DATED AS OF:

November 13, 2023

## TABLE OF CONTENTS

Page

ARTICLE I Definitions ...........................................................................................................1
    Section 1.1    Certain Definitions ......................................................................1
    Section 1.2    Construction of Certain Terms and Phrases ..........................18
ARTICLE II Purchase and Sale and Assumption...............................................................19
    Section 2.1    Purchase and Sale of Acquired Assets ..................................19
    Section 2.2    Excluded Assets .....................................................................19
    Section 2.3    Assumed Liabilities................................................................20
    Section 2.4    Excluded Liabilities...............................................................20
    Section 2.5    Assignment and Cure Amounts..............................................20
    Section 2.6    Bulk Sales Laws .....................................................................20
ARTICLE III Purchase Price...............................................................................................21
    Section 3.1    Purchase Price; Earnest Deposit.............................................21
    Section 3.2    Withholding of Tax .................................................................21
    Section 3.3    Allocation of Consideration ...................................................22
ARTICLE IV Closing Matters.............................................................................................22
    Section 4.1    Closing....................................................................................22
    Section 4.2    Deliveries at Closing ..............................................................23
    Section 4.3    Further Assurances and Cooperation .....................................24
ARTICLE V Representations and Warranties......................................................................25
    Section 5.1    Representations and Warranties of Seller ..............................25
    Section 5.2    Representations and Warranties of Purchaser ........................36
ARTICLE VI Regulatory Matters .......................................................................................39
    Section 6.1    Regulatory Filings ..................................................................39
    Section 6.2    Cooperation: Confidentiality ..................................................40
    Section 6.3    Objections or Other Challenges .............................................40
ARTICLE VII Certain Covenants .......................................................................................41
    Section 7.1    Conduct of Business Pending Closing ...................................41
    Section 7.2    Efforts to Satisfy Closing Conditions.....................................42
    Section 7.3    Assets Incapable of Transfer .................................................42
    Section 7.4    Discovery of Breach ...............................................................43
    Section 7.5    Ability to Supplement Disclosure Schedules .........................43

Section 7.6    Restricted Use of Confidential Information .................................................. 43

Section 7.7    Review and Inspections .......................................................................................... 44

Section 7.8    No Use of Sellers Brand ......................................................................................... 44

Section 7.9    Background License. ................................................................................................. 44

Section 7.10   Support Obligations ................................................................................................. 46

Section 7.11   Transition Services Agreement ........................................................................... 46

ARTICLE VIII Employee Matters ............................................................................................................ 46

Section 8.1    Transferred Employees ........................................................................................... 46

Section 8.2    Benefits Matters ........................................................................................................ 46

Section 8.3    Labor Matters ............................................................................................................. 47

Section 8.4    Benefits Eligibility ..................................................................................................... 47

Section 8.5    WARN Act ................................................................................................................... 47

ARTICLE IX Conditions to Closing ....................................................................................................... 48

Section 9.1    Conditions to the Obligations of Purchaser ...................................................... 48

Section 9.2    Conditions to the Obligations of Sellers ............................................................ 48

Section 9.3    Conditions Precedent to Obligations of Purchaser and Sellers ................... 49

Section 9.4    Frustration of Closing Conditions ........................................................................ 50

ARTICLE X Termination ............................................................................................................................ 50

Section 10.1   Termination ................................................................................................................. 50

Section 10.2   Effect of Termination ............................................................................................... 51

ARTICLE XI Bankruptcy Matters ........................................................................................................... 52

Section 11.1   Bankruptcy Cases ..................................................................................................... 52

Section 11.2   Bankruptcy Court Approvals ................................................................................. 52

Section 11.3   Further Filings and Assurances ............................................................................ 53

Section 11.4   Notice of Sale ............................................................................................................. 53

Section 11.5   Free and Clear ........................................................................................................... 53

Section 11.6   Transfer Tax Exemption ......................................................................................... 53

ARTICLE XII Miscellaneous ..................................................................................................................... 53

Section 12.1   Survival ........................................................................................................................ 53

Section 12.2   Governing Law and Jurisdiction .......................................................................... 54

Section 12.3   Notices .......................................................................................................................... 54

Section 12.4   Amendments and Waivers ..................................................................................... 55

Section 12.5   Entire Agreement ...................................................................................................... 56

Section 12.6   Headings: Interpretation ......................................................................................... 56

2

Section 12.7    No Assignment: Binding Effect ........................................................56

Section 12.8    Counterparts ....................................................................................56

Section 12.9    Incorporation by Reference ............................................................56

Section 12.10   Time of the Essence ........................................................................56

Section 12.11   Specific Performance ......................................................................57

Section 12.12   No Third Party Beneficiaries ..........................................................57

Section 12.13   Expenses ..........................................................................................57

Section 12.14   Severability ......................................................................................58

Section 12.15   Public Announcements ....................................................................58

Section 12.16   No Liability; Release ........................................................................58

## EXHIBITS

| | |
|---|---|
| Exhibit A | Assumption Agreement |
| Exhibit B | General Assignment |
| Exhibit C | Intellectual Property Assignment Agreement |

## SCHEDULES

| | |
|---|---|
| Schedule 1-A | Excluded Claims |
| Schedule 1-B | Transferred Permits |
| Schedule 1-C | Transferred Intellectual Property |
| Schedule 1-E | Tangible Personal Property |
| Schedule 1-F | Transferred Real Property |
| Schedule 1-G | Additional Employees |
| Schedule 1-H | Transferred Contracts |
| Schedule 1-I | Certain Excluded Assets |
| Schedule 1-J | Excluded Tangible Personal Property |
| Schedule 3.3 | Allocation Principles |
| Schedule 7.10 | Support Obligations |

3

Seller Disclosure Schedules

Purchaser Disclosure Schedules

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (collectively with the Exhibits and Schedules referred to herein, this "**Agreement**") is made as of the 11th day of November, 2023 (the "**Execution Date**"), by and among PROTERRA INC, a Delaware corporation ("**Holdco**"), PROTERRA OPERATING COMPANY, INC., a Delaware corporation ("**Opco**" and together with Holdco, "**Sellers**" and each a "**Seller**"), and PHOENIX MOTOR, INC., a Delaware corporation ("**Purchaser**").

WHEREAS, Sellers are engaged in the Business (as defined below);

WHEREAS, on August 7, 2023 (the "**Petition Date**"), Sellers commenced the Bankruptcy Cases (as defined below) and Sellers intend to seek approval of and authorization for a sale and transfer of Sellers' assets used in the conduct of the Business to the individual or entity submitting the highest or otherwise best bid for those assets in a process approved by the Bankruptcy Court (as defined below) (the "**Sale Process**") and to be consummated in accordance with the Bidding Procedures Order (as defined below) and pursuant to the Sale Order (as defined below);

WHEREAS, Purchaser desires to purchase from Sellers the Acquired Assets (as defined below) through the Sale Process (the "**Sale**"), in exchange for the Purchase Price (as defined below) and Purchaser's assumption of the Assumed Liabilities (as defined below), on the terms and subject to the conditions set forth in this Agreement;

WHEREAS, Sellers have determined, in the exercise of their business judgment, that the sale to Purchaser as contemplated herein is the highest or otherwise best bid for the Acquired Assets and therefore it is advisable and in the best interest of their estates and the beneficiaries of the estates to enter into this Agreement, which has been approved by Sellers' applicable governing bodies; and

WHEREAS, Sellers and Purchaser each acknowledge and agree that the transactions contemplated by this Agreement are subject to the Bankruptcy Court's approval of this Agreement.

NOW, THEREFORE, in consideration of the premises and of the respective representations, warranties, covenants, agreements, and conditions contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, Sellers and Purchaser each agree as follows:

## ARTICLE I

### Definitions

Section 1.1   Certain Definitions. Capitalized terms used in this Agreement but not otherwise defined in this Agreement shall have the meanings ascribed to such terms in the Bidding Procedures Order (as defined below)  as in effect at the date hereof or as such terms may be modified with the approval of the Sellers. In this Agreement and any Exhibit or Schedule hereto, the following capitalized terms have the following respective meanings:

"**Accounts Receivable**" means, with respect to each Seller, all accounts receivable, notes receivable, purchase orders, negotiable instruments, completed work or services that have not been billed, chattel paper, notes and other rights to payment, including those consisting of all accounts receivable in respect of services rendered or products sold to customers by such Seller, any other miscellaneous accounts receivable of such Seller, and any claim, remedy or other right of such Seller related to any of the foregoing, together with all unpaid financing charges accrued thereon and any payments with respect thereto.

"**Acquired Assets**" means:

(a)     all of the properties, rights, title, interests and other tangible and intangible assets that each Seller owns or possesses (other than the Excluded Assets) (wherever located and whether or not required to be reflected on a balance sheet) and that are primarily used or held for use by such Seller in connection with the conduct of the Acquired Business as the same shall exist on the Closing Date, including:

(i)     the Transferred Real Property;

(ii)     the Acquired Tangible Personal Property;

(iii)     all intangible assets of such Seller that are not Intellectual Property, including goodwill and going-concern value;

(iv)     subject to <u>Section 7.3</u>, the Transferred Contracts and such Seller's rights thereunder;

(v)     all Accounts Receivable and all other rights of any Seller to receive or recoup, whether by offset or netting against production from the Acquired Assets and the proceeds thereof or otherwise, amounts owed by Persons other than Sellers and their Affiliates with respect to the Acquired Assets, in each case to the extent accruing from and after the Effective Time;

(vi)     all rights of such Seller in any documents, drawings, diagrams, data, logs and records, operating, maintenance and safety manuals, plans, sales order files, purchase order files, test specifications and validation procedures, present vendor, client, customer and supplier lists, pricing information, sales and promotional literature and paper work and business files of such Seller and other books and records, in each case, primarily used or held for use in connection with the conduct of the Acquired Business, including all of the foregoing data and electronic information related to the Acquired Assets or the Acquired Business stored or archived in any server, computer, laptop, network, system or other electronic data base, but excluding the Excluded Books and Records (collectively, to the extent in the possession or control of such Seller or its Affiliates, the "**Acquired Business Books and Records**"), provided that such Seller may, at its election, provide to Purchaser either originals or copies (whether in hard or electronic form) of such Acquired Business Books and Records and shall be entitled to retain, as applicable, copies or such originals, provided, further, that the

2

foregoing shall exclude all Intellectual Property rights therein, which are the subject of clause (b);

(vii)    all claims and counterclaims of such Seller against any other Person, except for such claims and counterclaims set forth on <u>Schedule 1-A</u> and except for Avoidance Actions;

(viii)    to the extent their transfer is permitted under applicable Laws and/or by the applicable Governmental or Regulatory Authority and subject to <u>Section 7.3</u>, all Permits held by such Seller relating to the Acquired Assets or the Acquired Business listed on <u>Schedule 1-B</u> (the "**Transferred Permits**");

(ix)    all unexpired warranties, indemnitees and guarantees in favor of such Seller made or given by manufacturers, contractors, consultants, vendors, suppliers and other third parties to the extent arising from any Acquired Asset or Assumed Liability;

(x)    all claims, deposits, refunds, rebates and prepaid items of such Seller paid prior to the Closing except (i) those primarily related to or arising from the Excluded Assets or Excluded Liabilities and (ii) those designated as Excluded Assets;

(xi)    all supplies or construction materials owned by such Seller to the extent primarily related to the Acquired Business;

(xii)    all rights of such Seller to collect damages from any Person (other than such Seller or an Affiliate of such Seller) for past, present or future misappropriation, infringement, or other violation of Purchased Intellectual Property; and

(b)    the Purchased Intellectual Property, including the Intellectual Property set forth in <u>Schedule 1-C</u>;

"**Acquired Business**" means the Proterra Transit Business Unit.

"**Acquired Business Books and Records**" has the meaning set forth in the definition of Acquired Assets.

"**Acquired Business Employees**" means Employees who are primarily engaged in the Acquired Business.

"**Acquired Business Material Adverse Effect**" means any event, change, development or effect that, individually or in the aggregate, has had or would reasonably be expected to have a material adverse effect on the Acquired Business, the Acquired Assets or the Condition of the Acquired Business, taken as a whole; <u>provided</u>, <u>however</u>, that none of the following shall be deemed to constitute, and none of the following shall be taken into account in determining whether there has been, an Acquired Business Material Adverse Effect: (a) any change, event, development or effect (whether short-term or long-term) arising from or relating to (1) any general industry

3

change in the industries in which Sellers and the Acquired Business operate, (2) national or international political or social conditions, including the engagement in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the United States or foreign country, or any of their respective territories, possessions or diplomatic or consular offices or upon any military installation, equipment or personnel of the United States, (3) any epidemic, pandemic, or disease outbreak (including COVID-19) or any law, regulation, statute, directive, pronouncement or guideline issued by a Governmental or Regulatory Authority, the Centers for Disease Control and Prevention, the World Health Organization or industry group providing for business closures, "sheltering-in-place", curfews or other restrictions that relate to, or arise out of, an epidemic, pandemic or disease outbreak or any change in such law, regulation, statute, directive, pronouncement or guideline or interpretation thereof, or any worsening of such conditions, (4) any general change in financial, banking or securities markets (including any disruption thereof and any decline in the price of any security or any market index), (5) any change in GAAP, regulatory accounting principles or industry standards, or (6) changes in laws, rules, regulations, orders or other binding directives issued by any Governmental or Regulatory Authority, (b) the taking of (or omitting to take) any action by any Seller at the written request of Purchaser or that is expressly required by this Agreement, (c) any matters that arise from any actions or omissions of Purchaser or its Affiliates (including any breach by Purchaser of this Agreement), (d) any change resulting or arising from the identity of, or any facts or circumstances relating to, Purchaser or its Affiliates, (e) any failure to meet a forecast (whether internal or published) of revenue, earnings, cash flow or other data for any period or any change in such a forecast, (f) any change in or effect on the Acquired Business that, if curable, is cured by Sellers before the earlier of (1) the Closing Date and (2) the date on which this Agreement is terminated pursuant to Article X below, (g) any change in the financial condition or results of operation of Purchaser or its Affiliates, including its ability to access capital and equity markets and changes due to a change in the credit rating of Purchaser or its Affiliates, (h) the announcement, commencement, pendency or consummation of the Bankruptcy Cases, this Agreement or the transactions contemplated hereby, (i) any new or announced renewable fuel or oil provider entrants, including their effect on pricing, (j) any earthquakes, fires, hurricanes, tornados or other natural disasters or effects of weather and other acts of God, (k) any casualty loss or event of condemnation; (l) any seasonality of the Acquired Business as anticipated to be conducted, (m) any change resulting or arising from product recalls announced or commenced prior to the Execution Date or (n) any change in the market price or trading volume of any securities or Indebtedness of a Seller; provided, further, that, for the avoidance of doubt, an Acquired Business Material Adverse Effect shall be measured only against past performance of the Acquired Business and not against any forward-looking statements, financial projections or forecasts of the Acquired Business.

"**Acquired Tangible Personal Property**" means all Tangible Personal Property other than the Excluded Tangible Personal Property.

"**Action**" means any claim, demand, action, cause of action, suit, arbitration, audit, investigation or proceeding.

"**Affiliate**" means, as to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with that Person. For purposes of this definition, "**control**" (including, with correlative meanings, the terms

4

"**controlled by**" and "**under common control with**"), as used with respect to any Person or group of Persons, means possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of the Person, whether through the ownership of voting securities or by contract.

"**Agreement**" has the meaning set forth in the preamble.

"**Allocation Principles**" has the meaning set forth in Section 3.3.

"**Alternative Transaction**" means a sale, assignment, transfer or other disposition of all or substantially all of the Acquired Assets to any Person (or group of Persons), other than to Purchaser or an Affiliate of Purchaser.

"**Antitrust Law**" means the Sherman Act, the Clayton Act, the HSR Act, the Federal Trade Commission Act, and all other Laws or Orders that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or lessening of competition through merger or acquisition.

"**Assumed Liabilities**" means all liabilities and obligations of each Seller relating to, arising under or in connection with (i) the Transferred Contracts, including Cure Amounts, (ii) the Acquired Assets and the Acquired Business, with respect to all Liabilities other than Environmental Liabilities, for periods on and after the Closing Date, (iii) the Acquired Assets and the Acquired Business, with respect to Environmental Liabilities, at any time, except to the extent that such Environmental Liability is a claim subject to discharge in the Bankruptcy Cases, (iv) any Product Liability Claim arising from the sale after the Petition Date of products manufactured by the Acquired Business, (v) any Warranty Liability Claim, (vi) ordinary course trade payables of the Acquired Business that remain unpaid on or after the Closing Date (regardless of when accrued), (vii) all Liabilities of Sellers related to (x) COBRA continuation coverage for Transferred Employees and their applicable dependents arising after the Closing Date, and (y) the Employee Severance Liabilities, and (viii) any Taxes that Purchaser bears under Section 3.3 and Section 12.13.

"**Assumption Agreement**" means the Assumption Agreement in the form attached hereto as Exhibit A.

"**Auction**" has the meaning set forth in the Bidding Procedures.

"**Avoidance Action**" means any claim, right or cause of action of a Seller arising under chapter 5 of the Bankruptcy Code and any analogous state or federal statutes and common Law relating to the Sellers, the Acquired Assets, the Transferred Contracts or the Assumed Liabilities.

"**Backup Bidder**" has the meaning set forth in the Bidding Procedures.

"**Bankruptcy Cases**" has the meaning set forth in Section 11.1.

"**Bankruptcy Code**" means Title 11 of the United States Code.

"**Bankruptcy Court**" has the meaning set forth in Section 11.1.

"**Benefit Plan**" means (i) any "employee benefit plan" as defined in Section 3(3) of the ERISA (whether or not subject to ERISA) and (ii) any other pension, retirement, profit-sharing, savings, bonus, incentive, commission, stock option or other equity or equity-based, deferred compensation, severance, retention, employment, benefit, excess benefit, incentive, equity interest, equity bonus, equity purchase, restricted equity, equity ownership, equity appreciation, phantom equity, savings and thrift, cafeteria, reimbursement, health savings, flexible spending, compensation, welfare, sick leave, vacation, medical, dental, hospitalization, vision, disability, accidental death and dismemberment, life insurance, death benefit, post-retirement, transaction bonus, periodic bonus, termination, fringe benefit, perquisite or change of control plan, program, policy, agreement, contract or arrangement that (x) is sponsored, maintained or contributed to by Sellers, or for which Sellers have any obligation to sponsor, maintain or contribute to, or for which Sellers have any direct or indirect liability, whether contingent or otherwise and (y) under which any current or former officer, director, employee, consultant (or their respective beneficiaries) of Sellers has any present or future right to benefits, except for any Multiemployer Plan.

"**Bidding Procedures**" means the procedures governing the Auction and the Sale Process, as approved by the Bankruptcy Court pursuant to the Bidding Procedures Order and attached as Exhibit 1 to the Bidding Procedures Order, and as may be amended from time to time in accordance with their terms.

"**Bidding Procedures Order**" means the order entered by the Bankruptcy Court on September 7, 2023 [ECF No. 218], approving the Bidding Procedures.

"**Business**" means the business of the Proterra Energy Business Unit, the Proterra Powered Business Unit, the Proterra Transit Business Unit and the Proterra Valence Business Unit.

"**Business Day**" means a day (other than a Saturday, Sunday or national holiday) on which commercial banks in the State of New York and the State of California are open for the transaction of commercial banking business.

"**Clayton Act**" means Title 15 of the United States Code §§ 12-27 and Title 29 of the United States Code §§ 52-53, as amended.

"**Closing**" means the consummation of the transactions contemplated in this Agreement.

"**Closing Date**" has the meaning set forth in Section 4.1.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Condition of the Acquired Business**" means the condition of the business, operations, properties, Acquired Assets, financial condition and results of operations of the Acquired Business.

"**Confidential Information**" has the meaning set forth in the Confidentiality Agreement.

"**Confidentiality Agreement**" means that certain Confidentiality Agreement dated as of August 10, 2023 by and between Purchaser and Holdco.

"**Contract**" means any written or oral contract, agreement or instrument, including, supply contracts, purchase orders, sale orders, bids, understandings or commitments, customer agreements, licenses, mortgages, subcontracts, indentures, leases of personal property, deeds of trust, notes or guarantees, pledges, liens, or conditional sales agreements to which the Person referred to is a party or by which any of its assets may be bound.

"**Cure Amounts**" has the meaning set forth in <u>Section 2.5(b)</u>.

"**Deposit Escrow Account**" means the escrow account established pursuant to the Deposit Escrow Agreement.

"**Deposit Escrow Agreement**" means that certain escrow agreement, dated as of the date hereof, executed by and among Purchaser, Holdco and the Escrow Agent.

"**Deposit Escrow Funds**" mean, at any time of determination, the Earnest Deposit deposited in the Deposit Escrow Account, together with any interest earned thereon.

"**Disclosure Update**" has the meaning set forth in <u>Section 7.5</u>.

"**Earnest Deposit**" has the meaning set forth in <u>Section 3.1(b)</u>.

"**Effective Time**" means 12:01 a.m. Eastern Time, on the Closing Date.

"**Employee Severance Liabilities**" means any and all severance, termination indemnity or similar benefits and Liabilities incurred by Sellers or any of their Affiliates with respect to any Acquired Business Employee who does not become a Transferred Employee.

"**Employees**" means the employees of Sellers on the Execution Date, as well as any additional persons who become employees of Sellers during the period from the Execution Date through and including the Closing Date.

"**Environmental Laws**" means all federal, state and local Laws, code, binding and enforceable guidelines, policy or rule of common law or judicial or administrative interpretation thereof relating to pollution, public health and safety (as it relates to exposure to Hazardous Materials) or protection of the environment, including the Comprehensive Environmental Response, Compensation and Liability Act, the Resource Conservation and Recovery Act, the Clean Air Act, the Clean Water Act, and any state or local counterparts or equivalents, as such requirements have been enacted and are in effect on or prior to the Closing Date.

"**Environmental Liabilities**" means all Liabilities relating to Seller's ownership and/or operation of the Acquired Business and/or the Acquired Assets and consisting of or relating to:

> (i)     any Hazardous Materials, environmental matters or conditions (including on-site or off-site contamination and regulation of chemical substances or products);

> (ii)    fines, penalties, judgments, awards, settlements, legal or administrative proceedings, damages, losses, claims, demands and investigative,

remedial, or inspection costs and expenses arising under Environmental Laws or relating to Hazardous Materials;

        (iii)    financial responsibility under Environmental Laws for cleanup costs or corrective action, including any investigation, cleanup, removal, containment, or other remediation or response actions required by applicable Environmental Laws and for any natural resource damages; or

        (iv)    any other compliance, corrective, investigative or remedial measures required under Environmental Laws.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

"**ERISA Affiliate**" means any Person that would be considered a single employer with Sellers under Sections 414(b), (c), (m) or (o) of the Code.

"**Escrow Agent**" means Citibank, N.A.

"**Excluded Assets**" means all assets, rights, claims or properties owned by either Seller that are not Acquired Assets, including:

        (i)    all cash, rights in bank accounts, certificates of deposit, bank deposits, cash equivalents, professional fee retainers, the cash surrender value of any life insurance policies, investment securities and checks or other payments received by such Seller (including received in lock boxes) prior to the Effective Time;

        (ii)    the Purchase Price and the Deposit Escrow Funds;

        (iii)    any Benefit Plan and any assets, trust agreements, insurance policies, administrative service agreements and other contracts, files and records in respect thereof;

        (iv)    any prepayments and good faith and other bid deposits submitted by any third party under the terms of the Bidding Procedures Order;

        (v)    all Accounts Receivable and all other rights of any Seller to receive or recoup, whether by offset or netting against production from the Acquired Assets and the proceeds thereof or otherwise, amounts owed by Persons other than Sellers and their Affiliates with respect to the Acquired Assets, in each case to the extent accruing prior to the Effective Time;

        (vi)    any deposits, escrows, surety bonds or other financial assurances and any cash or cash equivalents securing any surety bonds or financial assurances, in each case, to the extent arising under the Excluded Assets or Excluded Liabilities;

(vii)   all trade credits or refunds of costs or expenses borne by any Seller, in each case, attributable to the Acquired Assets and attributable to any period of time prior to the Effective Time;

(viii)   all Excluded Tangible Personal Property;

(ix)   any rights to Tax refunds, rebates, abatements, deposits, prepayments, attributes or credits and current and deferred Tax assets (other than with respect to Taxes allocated to Purchaser in Section 12.13);

(x)   all claims and counterclaims of such Seller against any other Person that are set forth on Schedule 1-A;

(xi)   such Seller's rights under this Agreement and the Related Agreements;

(xii)   the Sellers Brand;

(xiii)   all Intellectual Property that is not Purchased Intellectual Property;

(xiv)   all Contracts that are not Transferred Contracts;

(xv)   all Real Property Leases that are not Transferred Real Property Leases;

(xvi)   all Permits that are not Transferred Permits;

(xvii)   the Excluded Books and Records;

(xviii)   the Avoidance Actions and any other claims, interests, rights, rebates, abatements, remedies, recoveries, goodwill, customer and referral relationships, other intangible property and all privileges, set-offs and benefits of Sellers, and all claims, demands, indemnification rights or causes of action, available to any of the Sellers or their estates against third parties to the extent related to the Excluded Assets or the Excluded Liabilities (including any claim to collect any Accounts Receivable accruing prior to the Effective Time);

(xix)   all of such Seller's insurance policies, including director and officer insurance policies, and related contracts and all rights thereunder (including, the right to make claims thereunder and to the proceeds thereof);

(xx)   all debts, demands, causes of action or other rights or claims of such Seller against any Affiliates of such Seller including any intercompany receivables due from any such Affiliate of such Seller;

(xxi)   any "Acquired Assets" pursuant to that certain Asset Purchase Agreement, dated as of November 9, 2023, by and among the Sellers and Volvo Battery Solutions LLC and Mack Trucks, Inc.;

(xxii)   all shares of capital stock or other equity interest in or issued by any Seller or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interest in or issued by any Seller, and any shares of capital stock or other equity interest in or issued by any other entity in which any Seller holds an equity interest, or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interest in or issued by any other entity in which any Seller holds an equity interest; and

(xxiii)   those assets of the type identified on Schedule 1-I hereto.

"**Excluded Books and Records**" means (i) all books and records relating to employee benefit matters, (ii) all books and records relating to employees, (iii) all minute books of a Seller, (iv) all income Tax Returns and income Tax records, (v) all books and records prepared in anticipation of or in connection with or otherwise related to the negotiation, execution and performance by Sellers under this Agreement or any Related Agreement; (vi) all books and records that Sellers are required by Law to retain, (vii) all books and records that are subject to attorney-client privilege or other work product privilege and (viii) any other books and records to the extent relating to the Excluded Assets or Excluded Liabilities.

"**Excluded Liabilities**" means all Liabilities of each Seller that are not Assumed Liabilities, including:

(i)   all Liabilities of such Seller or any Affiliate of such Seller in respect of any Indebtedness, other than the Support Obligations addressed in Section 7.10 or as set forth in any Transferred Contract;

(ii)   all Liabilities of such Seller or any Affiliate of such Seller for (a) income Taxes (whether or not then due), arising in connection with the consummation of the transactions contemplated by this Agreement or (b) the unpaid pre-Closing Taxes of any other Person under section 1.1502-6 of the Treasury Regulations (or any similar provision of state, local or foreign law) or as a transferee, successor, by Contract, by Law or otherwise;

(iii)   all Liabilities for Taxes with respect to the Acquired Assets, the Acquired Business or any of its facilities (except for Taxes allocated to Purchaser pursuant to Section 12.13) for all taxable periods, or portions thereof, ending at or prior to the Effective Time or that are otherwise allocated to Seller in Section 12.13;

(iv)   all Liabilities arising from any litigation, arbitration or any proceeding with any Governmental or Regulatory Authority involving such Seller, the Acquired Business, any Affiliate of such Seller or any of the Acquired Assets, in each case, with respect to matters that occurred prior to the Effective Time;

(v)   all Liabilities of such Seller to any Affiliate of such Seller or any current or former shareholder, director or officer of such Seller or any Affiliate of such Seller, including, any Liability arising out of or related to any loan, or any accrued interest related thereto, from any Affiliate of such Seller or any member, director or officer of such Seller or any Affiliate to such Seller;

(vi)     all Liabilities to the extent arising out of any Excluded Asset, including any Liabilities arising under any contract that is not a Transferred Contract;

(vii)    all Liabilities of such Seller or any of its Affiliates arising out of any Benefit Plan or any assets attributable to or related to any such Benefit Plan;

(viii)   such Seller's costs and expenses incurred in connection with this Agreement and the transactions contemplated by this Agreement; and

(ix)     all Environmental Liabilities arising out of Excluded Assets.

"**Excluded Tangible Personal Property**" means all Tangible Personal Property listed on Schedule 1-J.

"**Execution Date**" has the meaning set forth in the preamble.

"**Federal Trade Commission Act**" means the Federal Trade Commission Act (15 U.S.C. § 41 *et seq.*), as amended, and the rules and regulations promulgated thereunder.

"**GAAP**" means United States generally accepted accounting principles, consistently applied.

"**General Assignment**" means the General Assignment substantially in the form attached hereto as Exhibit B.

"**Governmental or Regulatory Authority**" means any court, tribunal, public or private arbitrator, authority, agency, commission, official or other instrumentality of the United States, or any country, state, county, city or other political subdivision, including any self-regulatory organization or similar governmental or quasi-governmental entity or body having jurisdiction.

"**Hazardous Materials**" means any substance or material that has been listed, defined or regulated or otherwise classified by any Environmental Law as a "hazardous substance," "hazardous material," "hazardous waste," "toxic substance," "pollutant," "contaminant," or any other similar term intended to define, list, or classify a substance by reason of such substance's ignitability, corrosivity, reactivity, carcinogenicity, reproductive toxicity, "EP toxicity" or adverse effect on human health or the environment, including, substances that are radioactive, toxic, hazardous or otherwise a pollutant, contaminant or waste, including PCBs, asbestos, petroleum products, petroleum derived substances or any fraction thereof, and urea-formaldehyde.

"**HSR Act**" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (15 U.S.C. §§ 15c-15h, 18a), as amended.

"**Improvements**" means the buildings, improvements and structures now existing on the Transferred Real Property.

"**Indebtedness**" means, as to any Person, without duplication, (a) all Liabilities of such Person for borrowed money or in respect of loans or advances (including, reimbursement and all

11

other obligations with respect to surety bonds, guarantees, letters of credit, banker's acceptances, corporate credit card or business credit lines, indemnities, performance letters, comfort letters and other arrangements similar to the foregoing, in each case only to the extent drawn); (b) all Liabilities of such Person under or pursuant to any arrangement to pay the deferred purchase price of property or services or the acquisition of any business; (c) all Liabilities of such Person under or pursuant to any interest rate and currency swaps, caps, collars, interest rate cap agreements, interest rate swap agreements, foreign currency exchange agreements and similar financial hedging devices and agreements, in each case, to the extent out of the money; (d) all Liabilities created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of such Person or lender under such agreement in the event of default are limited to repossession or sale of such property), other than inventory or other property purchased by such Person in the Ordinary Course of Business; (e) all obligations or liabilities of such Person under or pursuant to leases which are required to be, in accordance with GAAP, recorded as capital leases; (f) all Liabilities secured by any Lien (excluding Permitted Encumbrances) on any property or asset owned by that Person, regardless of whether the indebtedness secured thereby shall have been assumed by that Person or is non-recourse to the credit of that Person; (g) all Liabilities of such Person for off balance sheet financing of such Person (other than operating leases); (h) all Liabilities of such Person evidenced by bonds, debentures, notes or other similar securities or instruments (other than performance, surety and appeal bonds arising in the Ordinary Course of Business in respect of which such Person's liability remains contingent); (i) all Liabilities of such Person for any direct or indirect guarantees made by such Person of any Indebtedness of any other Person described in clauses (a) through (h); and (j) any accrued but unpaid interest, unpaid prepayment or redemption penalties, premiums or payments and unpaid fees and expenses, in each case, that are actually payable in connection with retirement, payment or prepayment of any of the foregoing Liabilities.

"**Independent Accountant**" means an impartial nationally recognized firm of independent certified public accountants to be mutually agreed to by Purchaser and Sellers and not engaged by either Sellers, on the one hand, or Purchaser, on the other hand, or any of their respective Affiliates in the last twelve (12) months.

"**Intellectual Property**" means all intellectual property rights, whether registered or unregistered, as they exist anywhere in the world, including all patents, trademarks and service marks, trade names, logos, URLs and Internet domain names, copyrights, Software, industrial designs, inventions, proprietary know-how, confidential business information and trade secrets.

"**Intellectual Property Assignment Agreement**" means the Intellectual Property Assignment Agreement substantially in the form attached hereto as Exhibit C.

"**Interest**" means Liens, encumbrances, pledges, mortgages, deeds of trust, security interests, leases, charges, fines or penalties related to governmental violations, options, rights of first refusal, easements, servitudes, proxies, voting trusts or agreements, transfer restrictions under any agreement, and any other rights, claims or demands of any kind whatsoever of other Persons, in each case, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, mature or unmatured, material or non-material, disputed or undisputed.

"**Knowledge**" means, with respect to Sellers, the actual knowledge of Gareth T. Joyce, David Black and Jeffrey Mitchell.

"**Laws**" means all laws, statutes, rules, regulations and ordinances in any jurisdiction or any state, county, country, city or other political subdivision or of any Governmental or Regulatory Authority, including, the Bankruptcy Code, ERISA, Environmental Laws, public health and OSHA and anti-kickback statutes.

"**Liability**" or "**Liabilities**" means any or all obligations (whether to make payments, to give notices or to perform or not perform any action), commitments, contingencies and other liabilities of a Person (whether known or unknown, asserted or not asserted, whether absolute, accrued, contingent, fixed or otherwise, determined or determinable, liquidated or unliquidated, and whether due or to become due).

"**Licensable**" means, with respect to any Intellectual Property right, that a Person has the power and authority to grant a license (or sublicense, as the case may be) to such Intellectual Property right without any of the following: (a) the consent of any third party; (b) impairing such Person's existing rights in respect of such Intellectual Property right (it being understood that the grant of any license hereunder, in and of itself, shall not be construed as an impairment of any of such Person's rights); (c) imposing any additional obligations on such Person or impairing any of such Person's other existing rights under any preexisting agreement relating to such Intellectual Property right; and/or (d) the payment of royalties or other consideration by such Person to any third party under any preexisting agreement relating to such Intellectual Property right. For the avoidance of doubt, in no event shall any Intellectual Property right be "Licensable" if any of the foregoing conditions in clauses (a)-(d) apply.

"**Lien**" means any mortgage, pledge, security interest, hypothecation, assignment, encumbrance, lease, lien (including consensual liens, judicial liens or statutory liens), option, right of use and other rights and claims of other Persons, any conditional sale contract, title retention contract, or other encumbrance of any kind, including easements, conditions, reservations and restrictions.

"**Material Contracts**" has the meaning set forth in Section 5.1(j)(i).

"**Multiemployer Plan**" means a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA covering any of the Employees or pursuant to which any of Sellers or their ERISA Affiliates have or could reasonably be expected to have any Liability.

"**New Matter**" has the meaning set forth in Section 7.5.

"**Order**" means and includes any writ, judgment, decree, injunction, award or other order of any Governmental or Regulatory Authority, including the Bankruptcy Court.

"**Ordinary Course of Business**" means an action taken by a Person if: (a) such action is in the ordinary course of business and consistent with the past practices of such Person including with respect to quantity and frequency; or (b) such action is similar in nature and magnitude to actions customarily taken in the ordinary course of normal day-to-day operations of other Persons

that are in the same line of business as such Person; subject, however, to those actions necessary and incident, or otherwise relating, to the Bankruptcy Cases.

"**Organizational Document**" means (a) the articles or certificate of incorporation and the bylaws of a corporation; (b) operating agreement, limited liability company agreement, or similar document governing a limited liability company; (c) any charter or similar document adopted or filed in connection with the creation, formation, or organization of a Person; and (d) any amendment to any of the foregoing.

"**OSHA**" means the Occupational Safety and Health Act of 1970, 29 U.S.C. §651, et seq.

"**Outside Closing Date**" means the date that is five (5) Business Days following the entry of the Sale Order by the Bankruptcy Court.

"**Permits**" means all licenses, permits, certificates, orders, authorizations, approvals, registrations, franchises and similar consents granted or issued by any Governmental or Regulatory Authority.

"**Permitted Encumbrances**" means (a) Liens for current Taxes not yet delinquent as of the Closing Date or being contested in good faith by appropriate proceedings; (b) Liens for impositions, assessments, fees, rents or other charges levied or assessed or imposed by a Governmental or Regulatory Authority not yet delinquent as of the Closing Date or being contested in good faith by appropriate proceedings; (c) statutory Liens (including materialmen's, warehousemen's, mechanic's, repairmen's, landlord's and other similar Liens) arising in the Ordinary Course of Business securing payments that are inchoate, unrecorded and not yet delinquent as of the Closing Date or being contested in good faith by appropriate proceedings; (d) easements, rights-of-way (including utility rights-of-way), servitudes, covenants, agreements, licenses, conditions and restrictions and other encumbrances, burdens and defects, imperfections or irregularities of title, and other matters of record as of the Execution Date, affecting all or any portion of the Transferred Real Property which do not materially interfere with Purchaser's proposed use of the Transferred Real Property or the operation of the Acquired Business or that are reflected in any title report, title commitment, title policy, or survey made available to Purchaser; (e) Liens existing as a result of or expressly permitted pursuant to any leases, easements, licenses, rights of way, or other instruments granting a Seller's interest in and to the Transferred Real Property, other than, in each case, Liens created due to a breach of such instrument; (f) Liens created by, through or under Purchaser or its successors or assigns; (g) building and zoning laws, rules and decisions affecting any of the Transferred Real Property; (h) with respect to any Transferred Real Property, any Lien to which the fee or any superior interest is subject; and (i) non-exclusive licenses of Intellectual Property rights.

"**Person**" means any natural person, corporation, general partnership, limited partnership, limited liability partnership, limited liability company, proprietorship, other business organization, trust, government, Governmental or Regulatory Authority, or any other entity whatsoever.

"**Petition Date**" has the meaning set forth in the recitals.

"**Prior Events**" has the meaning set forth in Section 12.16(b).

14

"**Product Liability Claim**" means any Action or Liability arising out of or otherwise relating to in any way or in respect of any claim for personal injury, wrongful death or property damage resulting from exposure to, or any product recall, defective material claim or any other similar claim or cause of action (including with respect to improper performance, malfunctioning, improper design or manufacture or other defect), whether such claim or cause of action is known or unknown or asserted or unasserted, with respect to, any product sold, supplied, marketed, stored, delivered, distributed or transported by the Acquired Business.

"**Proterra Energy Business Unit**" means the business unit of Sellers that provides, installs, and services turnkey fleet-scale, high-power charging solutions and software services, *provided* that the Proterra Valence Business Unit shall be excluded from the definition of Proterra Energy Business Unit.

"**Proterra Other Business Units**" means the Proterra Energy Business Unit, the Proterra Powered Business Unit and the Proterra Valence Business Unit.

"**Proterra Powered Business Unit**" means the business unit of Sellers that designs and manufactures proprietary battery systems and electrification solutions for global commercial vehicle original equipment manufacturer customers.

"**Proterra Transit Business Unit**" means the business unit of Sellers that designs, develops and sells electric transit buses as an original equipment manufacturer for North American public transit agencies, airports, universities and other commercial transit fleets.

"**Proterra Valence Business Unit**" means the business sub-unit of Sellers, currently situated within the Proterra Energy Business Unit, that is a cloud-based data platform that can provide customers performance information about their commercial transit fleets.

"**Purchase Price**" has the meaning set forth in Section 3.1(a).

"**Purchased Intellectual Property**" means (a) all Intellectual Property owned and used by Sellers primarily in the conduct of the Acquired Business (including, for the avoidance of doubt, such primarily used Intellectual Property Rights in Acquired Business Books and Records) and (b) to the extent not included in (a), all patents, patent applications and software set forth in Schedule 1-C.

"**Purchaser**" has the meaning set forth in the preamble.

"**Purchaser Disclosure Schedules**" means the disclosure schedules of Purchaser as attached hereto, and as they may be updated or otherwise modified hereafter in compliance with this Agreement.

"**Purchaser Plan**" has the meaning set forth in Section 8.4.

"**Purchaser Released Claims**" has the meaning set forth in Section 12.16(b).

"**Purchaser Required Approvals**" means the consents and approvals set forth on Section 5.2(d) of the Purchaser Disclosure Schedules.

"**Real Property Leases**" means all of Sellers' right, title and interest in all leases, subleases, licenses or other occupancy agreements, including all amendments, renewals and other agreements with respect thereto, pursuant to which a Seller holds a leasehold or subleasehold interest in, or is granted a license or other right to use, any real property.

"**Reasonable Efforts**" means the commercially reasonable efforts that a reasonable Person wanting to achieve the result in question would take under similar circumstances to achieve that result as expeditiously as possible.

"**Related Agreements**" means all agreements, certificates, instruments or other documents required to be executed and/or delivered pursuant to or in connection with, this Agreement by any Person, including, the Assumption Agreement, the General Assignment and the Intellectual Property Assignment Agreement.

"**Representative**" means, with respect to any Person, its directors, officers, employees, agents, advisors or other representatives.

"**Sale**" has the meaning set forth in the recitals.

"**Sale Hearing**" means the hearing before the Bankruptcy Court to consider entry of the Sale Order.

"**Sale Order**" means an Order of the Bankruptcy Court approving consummation of the Sale and the other transactions contemplated hereby, as may be altered, amended, modified, or supplemented from time to time.

"**Sale Process**" has the meaning set forth in the recitals.

"**Seller**" has the meaning set forth in the preamble.

"**Sellers**" has the meaning set forth in the preamble.

"**Seller Disclosure Schedules**" means the disclosure schedules of Sellers attached hereto, and as they may be updated or otherwise modified hereafter in compliance with Section 7.5 of this Agreement, and which, for the avoidance of doubt, exclude Schedule 1-A through 1-J, Schedule 3.3 and Schedule 7.10.

"**Seller Fundamental Representations**" means, collectively, the representations and warranties in the first sentence of Section 5.1(a) (Organization and Existence), Section 5.1(b) (Authority and Approval), Section 5.1(c)(i) (No Conflict — Seller's Organizational Documents) and Section 5.1(o) (Brokers).

"**Seller Group**" has the meaning set forth in Section 12.16(b).

"**Sellers Brand**" means the trademarks "PROTERRA," "PROTERRA POWERED," "PROTERRA TRANSIT," "PROTERRA ENERGY" and any trademark confusingly similar thereto and derivatives thereof.

"**Sherman Act**" means title 15 of the United States Code §§ 1-7, as amended.

"**Software**" means computer software, including, source code, object code, disks, documentation, operating manuals, related systems data, source programs, record layouts, program libraries, and any other documentation in those application areas that may pertain to any data processing system or operation.

"**Successful Bidder**" has the meaning set forth in the Bidding Procedures.

"**Support Obligations**" has the meaning set forth in Section 7.10.

"**Tangible Personal Property**" means the fixed assets, equipment, equipment spare parts, machinery, fixtures, tools, furniture and furnishings, consumables, inventory (including works in progress and finished goods), parts, computers, supplies, motor vehicles, cranes, forklifts, supplies and other tangible personal property owned by a Seller and used or held for use primarily in connection with the Acquired Business and the Acquired Assets, including the tangible personal property listed on Schedule 1-E.

"**Tax Returns**" means all returns, declarations, reports, statements, schedules, notices, forms or other documents or information filed or required to be filed in respect of the determination, assessment, collection or payment of any Tax or in connection with the administration, implementation or enforcement of any legal requirement relating to any Tax, and the term "**Tax Return**" means any one of the foregoing Tax Returns.

"**Taxes**" means all taxes, charges, fees, levies or other like assessments, including U.S. federal, state, local, foreign, and other net income, gross income, gross receipts, social security, estimated, sales, use, ad valorem, franchise, profits, net worth, alternative or add-on minimum, capital gains, license, withholding, payroll, employment, unemployment, social security, excise, property, transfer, and any and all other taxes, assessments, fees or other governmental charges, whether computed on a separate, consolidated unitary, combined or any other basis together with any interest and any penalties, additions to tax, estimated taxes or additional amounts with respect thereto, and including any liability for Taxes as a result of being a member of a consolidated, combined, unitary or affiliated group, and the term "Tax" means any one of the foregoing Taxes.

"**Transfer Taxes**" means all stamp, documentary, registration, value-added, transfer, sales, use, bulk sales, reporting, recording, filing and other similar fees, Taxes and charges arising out of or in connection with the transfer of the Acquired Assets effected pursuant to this Agreement.

"**Transferred Contracts**" means each of the Contracts identified and/or described in the Schedule of Transferred Contracts set forth in Schedule 1-H, which schedule shall be in form and substance reasonably acceptable to Purchaser.

"**Transferred Employees**" has the meaning set forth in Section 8.1.

"**Transferred Permits**" has the meaning set forth in the definition of Acquired Assets.

"**Transferred Real Property**" means all of Sellers' right, title and interest in any real property leased, subleased or licensed by Sellers as lessees, sublessees or licensees, pursuant to

17

the Transferred Real Property Leases, and including all of Sellers' right, title and interest in any Improvements located on such real property.

"**Transferred Real Property Leases**" means the Real Property Leases pursuant to which Sellers lease, sublease, license or otherwise occupy any real property that is primarily used in the conduct of the Acquired Business, and, for the avoidance of doubt, shall include those Real Property Leases set forth on Schedule 1-H.

"**Transition Services Agreement**" means the transition services agreement(s) between Purchaser or an Affiliate of Purchaser and the Sellers or the respective purchasers of any Proterra Other Business Unit, as applicable, pursuant to which Sellers or the respective purchaser of any Proterra Other Business Unit shall use commercially reasonable efforts to provide certain transition services related to the operation of the Acquired Business, each of which shall be in form and substance reasonably satisfactory to Purchaser and Sellers and/or the respective purchasers of any Proterra Other Business Unit, as applicable..

"**Treasury Regulations**" means the regulations (including all proposed and temporary regulations) promulgated by the U.S. Department of the Treasury under the Code, as such regulations may be amended from time to time.

"**WARN Act**" means the Worker Adjustment and Retraining Notification Act.

"**Warranty Liability Claim**" means any Action or Liability arising out of or otherwise relating to in any way or in respect of any product recall or representation, warranty, agreement or guaranty made by a Seller, including any warranty claim, guaranty claim, refund, return, rebate, property damage, defective material claim and/or any other similar claim (including with respect to improper performance, malfunctioning, improper design or manufacture or other defect), or any other similar claim or cause of action, whether such claim or cause of action is known or unknown or asserted or unasserted, with respect to, any product sold, supplied, marketed, stored, delivered, distributed or transported by the Acquired Business.

Section 1.2    Construction of Certain Terms and Phrases.

(a)    Unless the context of this Agreement otherwise requires, (i) words of any gender include each other gender; (ii) words using the singular or plural number also include the plural or singular number, respectively; (iii) the terms "hereof," "herein," "hereby" and derivative or similar words refer to this entire Agreement; (iv) the terms "Article," "Section," or "clause" refer to the specified Article, Section, or clause of this Agreement; (v) the word "including" (and, with correlative meaning, the word "include") means including, without limiting the generality of any description preceding that word; and (vi) the words "shall" and "will" are used interchangeably and have the same meaning. Any reference to a Law shall include any amendment thereof or any successor thereto and any rules and regulations promulgated thereunder, unless the context otherwise requires. Any reference in this Agreement to any contract, license, agreement or order means such contract, license, agreement or order as amended, supplemented or modified from time to time in accordance with the terms thereof. Currency amounts referenced in this Agreement are in U.S. Dollars.

18

(b)        Any representation or warranty contained herein as to the enforceability of a Contract (including this Agreement and any Related Agreement) will be subject to the effect of any bankruptcy, insolvency, reorganization, moratorium or other similar law affecting the enforcement of creditors' rights generally and to general equitable principles (regardless of whether such enforceability is considered in a proceeding in equity or at law).

(c)        This Agreement is being entered into by and among competent and sophisticated parties who are experienced in business matters and represented by counsel and other advisors, and have been reviewed by the parties and their counsel and other advisors. Therefore, any ambiguous language in this Agreement will not be construed against any particular party as the drafter of the language.

(d)        Whenever this Agreement refers to a number of days, such number shall refer to calendar days unless Business Days are specified. Whenever any action must be taken hereunder on or by a day that is not a Business Day, then such action may be validly taken on or by the next day that is a Business Day.

(e)        The phrases "provided", "delivered", or "made available", when used herein, mean that the information or materials referred to have been (i) posted to the on-line "virtual data room" established under project name "Project Wren" on Intralinks to which Purchaser and its counsel have continuous access at least two (2) days prior to the Execution Date or (ii) delivered directly to Purchaser or its Representatives by or on behalf of Sellers at least two (2) days prior to the Execution Date.

ARTICLE II

Purchase and Sale and Assumption

Section 2.1    Purchase and Sale of Acquired Assets. Upon the terms and subject to the conditions of this Agreement and the Sale Order, at the Closing, each Seller will sell, transfer, convey, assign, deliver and set over to Purchaser, and Purchaser will purchase and accept, all of the right, title, benefit and interest of such Seller in, to and under the Acquired Assets, free and clear of all Liens and Interests (other than Permitted Encumbrances and Assumed Liabilities), pursuant to Sections 363(f) and 1123(b)(4) of the Bankruptcy Code. Other than the Permitted Encumbrances and Assumed Liabilities, all mortgages or other Liens on the Acquired Assets securing Indebtedness shall attach to the net proceeds of the Sale pursuant to Sections 363(f) and 1123(b)(4) of the Bankruptcy Code so that the Acquired Assets will be sold free and clear of such Liens and other Interests. At the Closing, the sale, transfer, conveyance, assignment and delivery of the Acquired Assets will be effected pursuant to the General Assignment, the Intellectual Property Assignment Agreement, the Sale Order and other instruments of transfer described in Section 4.2(a).

Section 2.2    Excluded Assets. Notwithstanding anything to the contrary contained herein, the Acquired Assets do not include, and in no event will Purchaser acquire any right, title, benefit or interest in, to or under, any of the Excluded Assets.

19

Section 2.3    <u>Assumed Liabilities</u>. Upon the terms and subject to the conditions of this Agreement, at the Closing, Purchaser will assume and agree to pay, perform and discharge or hold Sellers harmless from all of the Assumed Liabilities. The assumption of the Assumed Liabilities by Purchaser will be effected pursuant to the Assumption Agreement and the Sale Order.

Section 2.4    <u>Excluded Liabilities</u>. Notwithstanding anything to the contrary contained herein, the Assumed Liabilities will not include, and in no event will Purchaser assume, be required to pay, perform, discharge or hold Sellers harmless from any Excluded Liabilities.

Section 2.5    <u>Assignment and Cure Amounts</u>.

(a)    Subject to the terms and conditions of this Agreement and the entry of the Sale Order, at the Closing and pursuant to Section 365 of the Bankruptcy Code, each Seller shall assume and assign to Purchaser, and Purchaser shall take assignment from such Seller of, the Transferred Contracts. Purchaser shall be responsible for Cure Amounts and for satisfying the requirements of "adequate assurance of future performance" as required by section 365 of the Bankruptcy Code and shall cooperate fully with each Seller in seeking such approval from the Bankruptcy Court, including Purchaser providing the necessary evidence required in connection with the Sale Hearing, as applicable, to approve this Agreement and the transactions contemplated herein.

(b)    The cure amounts (collectively, the "**Cure Amounts**"), if any, necessary to cure all defaults as required by section 365 of the Bankruptcy Code, if any, and to pay all actual or pecuniary losses, if any, that have resulted from any defaults on the part of a Seller under the Transferred Contracts as required by section 365 of the Bankruptcy Code shall be paid by Purchaser at the Closing or as soon as reasonably practicable thereafter (except as otherwise agreed to by the other party to the Transferred Contracts) and such Seller shall have no Liability for any such Cure Amounts. As part of the Sale Process, Sellers may file with the Bankruptcy Court the Schedule of Transferred Contracts, which shall be in form and substance reasonably acceptable to Purchaser, setting forth the Transferred Contracts and the respective Cure Amounts as to each Transferred Contract. Purchaser shall have the right to request that Sellers add or remove any Contract identified in the Schedule of Transferred Contracts at any time on or prior to the Sale Hearing (or such later date as may be permitted under the Bidding Procedures Order or the Sale Order, as applicable). Upon such request, Sellers shall provide Purchaser with the amount, in Sellers' sole discretion, by which the Purchase Price shall be adjusted based on such addition or removal and Purchaser shall have the election to have such Contract added or removed. If Purchaser so elects, Sellers may cause an applicable modified Schedule of Transferred Contracts to be filed with the Bankruptcy Court consistent with the Bidding Procedures Order or the Sale Order, as applicable, and the Purchase Price shall be updated to reflect such adjustment.

Section 2.6    <u>Bulk Sales Laws</u>. The parties hereto hereby waive compliance by Sellers with the requirements and provisions of any "bulk-transfer" or similar Laws of any jurisdiction that may otherwise be applicable with respect to the sale and transfer of any or all of the Acquired Assets to Purchaser, and Purchaser hereby waives all claims against Sellers to the extent related to non-compliance therewith.

ARTICLE III

Purchase Price

Section 3.1    Purchase Price; Earnest Deposit

(a)    Subject to entry of the Sale Order, the purchase price for the Acquired Assets will be, in addition to the Assumed Liabilities and the Cure Amounts (which shall be paid by Purchaser to the applicable counterparty on or about the Closing Date), a cash amount equal to THREE MILLION FIVE HUNDRED THOUSAND DOLLARS ($3,500,000.00) (such cash amount, the "**Cash Component Price**" and together with the Assumed Liabilities and the Cure Amounts, the "**Purchase Price**").

(b)    Purchaser or one of its Affiliates has made an earnest deposit by wire transfer of immediately available funds into the Deposit Escrow Account equal to ten percent (10%) of the  Cash Component Price  of the Purchase Price (the "**Earnest Deposit**") in accordance with the Bidding Procedures Order. The Deposit Escrow Funds while remaining in the Deposit Escrow Account, shall not be subject to any lien, attachment, trustee process, or any other judicial process of any creditor of any Seller, Purchaser or their respective Affiliates, and the Deposit Escrow Agreement shall provide that the Deposit Escrow Funds shall be released in accordance with the provisions of this Agreement and Bidding Procedures Order. All interest earned on the Earnest Deposit in the Deposit Escrow Account shall be distributed by the Escrow Agent (i) following the Closing, to Purchaser, or (ii) if the Agreement is terminated prior to the Closing, to Sellers or Purchaser, as applicable, in accordance with Section 10.2. Any portion of the Deposit Escrow Funds released to Purchaser in accordance with the terms of this Agreement and the Bidding Procedures Order shall not be subject to any lien, attachment, trustee process or any other judicial process of any creditor of any Seller. At the Closing, (i) the Earnest Deposit shall be credited against the Purchase Price and distributed by the Escrow Agent to Sellers; and (ii) Purchaser will pay to Sellers by wire transfer of immediately available funds to an account specified in writing by Sellers an amount equal to the Purchase Price minus the Earnest Deposit.

Section 3.2    Withholding of Tax. Purchaser shall be entitled to deduct and withhold any amounts Purchaser is required to deduct and withhold under any applicable Tax Law in connection with payments to be made by Purchaser pursuant to the terms of this Agreement; provided, that, if Purchaser believes that any such deduction or withholding of Tax (other than any deduction or withholding as a result of the failure to provide a W-9 for Sellers in compliance with Section 4.2(a)(v)) is required with respect to any payment under this Agreement, then Purchaser shall give written notice to Sellers describing the basis for such withholding in reasonable detail at least five (5) Business Days prior to making such payment and Purchaser shall provide Sellers with a reasonable opportunity to provide any applicable certificate, form or documentation that would reduce or eliminate the requirement to deduct and withhold Tax with respect to such payment, and Purchaser shall otherwise cooperate with Sellers and take such steps as Sellers may reasonably request to reduce or eliminate such withholding obligation to the extent permitted by

21

applicable Law. Such withheld amounts will be treated for all purposes of this Agreement as having been paid to Sellers by Purchaser to the extent such amounts have been timely paid to the appropriate Tax authority.

Section 3.3    Allocation of Consideration. The Purchase Price, the Assumed Liabilities, and any other items required to be treated as consideration for U.S. federal income Tax purposes will be allocated among the Acquired Assets for all Tax purposes in accordance with section 1060 of the Code and the Treasury Regulations promulgated thereunder in a manner consistent with the principles set forth on Schedule 3.3 (the "**Allocation Principles**"). Within five (5) days of the Closing Date, Purchaser shall provide to Sellers a draft allocation in a manner consistent with the Allocation Principles for Sellers' review and comment. If Sellers do not provide Purchaser written objections to the draft allocation within five (5) days of receipt, the draft allocation shall be deemed to be agreed upon by the parties. If Sellers propose changes to the draft allocation within such five (5)-day period, Sellers and Purchaser shall negotiate in good faith to amend any aspects of the allocation in dispute; provided, however, that if Sellers and Purchaser are unable to resolve any dispute with respect to the allocation within five (5) days after the date Purchaser received notice of Sellers' objection, such dispute shall be resolved by the Independent Accountant. The findings of the Independent Accountant shall be final, binding and conclusive on Sellers and Purchaser. The fees and expenses of the Independent Accountant shall be borne equally by Sellers and Purchaser. Purchaser and Sellers shall (a) complete and file IRS Form 8594 with their respective U.S. Federal income Tax Returns consistent with such allocation for the taxable year in which the Closing occurs, and (b) not take any position (and cause their respective Affiliates to not take any position) on any Tax Return, before any Governmental or Regulatory Authority charged with the imposition, assessment or collection of Taxes, or in any judicial proceeding, that is in any manner inconsistent with the terms of such allocation, as finally determined; provided, however, that (i) no party hereto shall be unreasonably impeded in its ability and discretion to negotiate, compromise and/or settle any Tax audit, claim or similar proceedings in connection with such allocation and (ii) the allocation shall not be binding upon Sellers for purposes of any plan filed in connection with the Bankruptcy Cases and shall not, and shall not be interpreted to, have any effect on any distributions to Sellers' creditors or equityholders. Notwithstanding any other provision of this Agreement, the terms and provisions of this Section 3.3 shall survive the Closing without limitation.

<u>ARTICLE IV</u>

Closing Matters

Section 4.1    Closing. Upon the terms and subject to the conditions of this Agreement, the Closing will take place beginning at 10:00 a.m. (local time) remotely by electronic transmissions or, in the event that the parties deem an in-person Closing necessary, at the offices of Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019-6064, on the second Business Day after the satisfaction (or waiver by the party for whose benefit such conditions exist) of all conditions described in Article IX that are required to be satisfied prior to the Closing (other than actions to be taken or items to be delivered at Closing as set forth herein, but subject to the satisfaction or waiver of such conditions), or at such other time, date, and place as the parties may mutually agree in writing (the "**Closing Date**"). All

documents delivered and all transactions consummated at the Closing will be deemed for all purposes to have been delivered and consummated effective as of the Effective Time.

Section 4.2    Deliveries at Closing.

(a)    Deliveries of Seller. At the Closing, each Seller will deliver or cause to be delivered to Purchaser the following, as applicable:

(i)    duly executed counterparts by the applicable Seller of the General Assignment, Assumption Agreement, Intellectual Property Assignment Agreement and other Related Agreements to which a Seller is a party;

(ii)    the Acquired Business Books and Records;

(iii)    any physical Acquired Assets within the control or possession of Seller or its Affiliates (which will be either delivered to the Transferred Real Property or otherwise made available to Purchaser, in either case, as reasonably specified by Purchaser);

(iv)    all certificates of title or origin (or similar documents), duly endorsed with respect to any material vehicles or other equipment included in the Acquired Assets for which a certificate of title or origin is required to transfer title;

(v)    a W-9 for such Seller;

(vi)    a joint written instruction to the Escrow Agent instructing the release of the Earnest Deposit to Sellers; and

(vii)    all other instruments of conveyance and transfer executed by the applicable Seller, in form and substance reasonably acceptable to Purchaser, as may be necessary to convey the Acquired Assets to Purchaser free and clear of all Liens, Liabilities (other than Assumed Liabilities) and other Interests (except Permitted Encumbrances), provided, however, that the Sale Order shall be the only required document to evidence the conveyance and transfer free and clear of such Liens, Liabilities and other Interests.

(b)    Deliveries by Purchaser. At the Closing, Purchaser shall pay all Cure Amounts to the applicable counterparties and will deliver or cause to be delivered to Sellers the following:

(i)    an amount equal to (i) the Cash Component Price minus (ii) the Earnest Deposit, as provided in Section 3.1(b);

(ii)    a joint written instruction to the Escrow Agent instructing the release of the Earnest Deposit to Sellers;

(iii)    duly executed counterparts of the Assumption Agreement and other Related Agreements;

(iv)     a certificate of good standing of Purchaser from the Delaware Secretary of State as to Purchaser, that will be dated not more than ten (10) days prior to the Closing Date;

(v)     a certificate of an officer of Purchaser certifying that its Organizational Documents, as certified and as delivered at the Closing, have not been amended or rescinded since the date of such certification and remain in full force and effect at the Closing Date;

(vi)     copies of resolutions of the governing body of Purchaser authorizing the execution, delivery and performance of this Agreement and the Related Agreements;

(vii)     all required Transfer Tax stamps and transfer forms (if any), unless under applicable Law such Transfer Tax stamps or duly stamped transfer forms are only available post-Closing (in which case such Transfer Tax stamps or duly stamped transfer forms shall be delivered to Sellers promptly and in any event no later than five (5) Business Days after receipt thereof by Purchaser); and

(viii)     such other duly executed documents, instruments and certificates as may be required to be delivered by Purchaser pursuant to the terms of this Agreement, all in form reasonably satisfactory to Sellers.

Section 4.3     Further Assurances and Cooperation.

(a)     Further Assurances. Subject to the terms and conditions of this Agreement, from time to time after the Closing through the date on which the Bankruptcy Cases are closed, at a party's reasonable request and without further consideration, and solely at Purchaser's cost and expense, the other party will execute and deliver such other instruments of sale, transfer, conveyance, assignment and confirmation, and assumption, and provide such materials and information and take such other actions as the other party may reasonably deem necessary or desirable in order to more effectively transfer, convey and assign to Purchaser all of the Acquired Assets and/or in order to more effectively effect the assumption by Purchaser of the Assumed Liabilities and Purchaser's operation of the Acquired Business.

(b)     Access to Information and Books and Records. During the period from the Execution Date to the Closing Date, Sellers shall provide Purchaser with (x) reasonable access, during normal business hours and upon reasonable prior written notice, to the Acquired Business Employees and (y) information, including employee records and Benefit Plan data, reasonably requested by Purchaser, except as otherwise prohibited by applicable Laws. For a period of twelve (12) months following the Closing (or until the earlier liquidation or dissolution of Sellers), Purchaser and Sellers will afford each other, and their respective Representatives, during normal business hours and upon reasonable prior notice, reasonable access to, in the case of Sellers, the Excluded Books and Records and, in the case of Purchaser, the Acquired Business Books and Records in its possession with respect to periods through the Closing and the right to make copies and extracts

therefrom to the extent that such access may be reasonably required by the requesting party in connection with (i) the preparation of Tax Returns, (ii) any Tax audit, Tax protest, or other proceeding relating to Taxes, (iii) the making of any election related to Taxes, (iv) compliance with the requirements of any Governmental or Regulatory Authority, (v) Sellers' conduct or administration of the Bankruptcy Cases including, their participation in any contested matter or adversary proceeding in or relating to the Bankruptcy Cases, (vi) monitoring or enforcing rights or obligations of each Seller under this Agreement or (vii) any actual or threatened third party action or proceeding. Neither Purchaser nor Sellers may, for a period of seven (7) years after the Effective Time, destroy or otherwise dispose of any such books, records and other data unless such party will first offer in writing to surrender copies of such books, records and other such data to the other party and such other party has not agreed in writing to take possession thereof during the ten (10) day period after such offer is made, provided Sellers' motion to close or dismiss the Bankruptcy Cases shall be deemed to constitute notice to Purchaser of Sellers' intention to destroy all books, records and data in connection with the Acquired Business and its offer to surrender such books, records and data to Purchaser.

(c)     If, in order to properly prepare its Tax Returns or other documents or reports required to be filed with any Governmental or Regulatory Authority, it is necessary that either Purchaser or Sellers be furnished with additional information, documents or records relating to the Acquired Business, the Acquired Assets or the Assumed Liabilities not referred to in Section 4.3(b), and such information, documents or records are in the possession or control of the other party, such other party will use its Reasonable Efforts to furnish or make available such information, documents or records (or copies thereof) at the recipient's reasonable request and at recipient's cost and expense. Notwithstanding the foregoing, this Section 4.3 shall not require any Seller to permit any access to, or to disclose (i) any information that, in the reasonable, good faith judgment (after consultation with counsel, which may be in-house counsel) of Sellers, is reasonably likely to result in any violation of any legal requirement or any Contract to which a Seller is a party or cause any privilege (including attorney-client privilege) or work product protection that a Seller would be entitled to assert to be waived or (ii) if any Seller, on the one hand, and Purchaser, on the other hand, are adverse parties in a litigation, any information that is reasonably pertinent thereto.

ARTICLE V

Representations and Warranties

Section 5.1     Representations and Warranties of Seller. Except as set forth in (a) the Seller Disclosure Schedules or (b) any forms, reports, schedules, statements or other documents filed by a Seller and available on the Securities and Exchange Commission's Electronic Data Gathering Analysis and Retrieval System (excluding statements in any "Risk Factors" sections and any disclosure of risks included in any "forward-looking statements" disclaimer to the extent that such statement or disclosure is cautionary, predictive or forward-looking in nature), each Seller makes the following representations and warranties to Purchaser as set forth in this Section 5.1. The Seller Disclosure Schedules will be arranged in paragraphs corresponding to the lettered and numbered Paragraphs contained in this Agreement (as to which Purchaser acknowledges and agrees that any

matter disclosed pursuant to a section, subsection, paragraph or subparagraph of the Seller Disclosure Schedules shall be deemed disclosed for all other purposes of the Seller Disclosure Schedules as and to the extent the content or context of such disclosure makes it reasonably apparent, if read in the context of such other section, subsection, paragraph or subparagraph of the Seller Disclosure Schedules, that such disclosure is applicable to such other section, subsection, paragraph or subparagraph of the Seller Disclosure Schedules):

(a)     Organization and Existence. Such Seller is a corporation duly incorporated, validly existing, and in good standing under the laws of the State of Delaware, with full power and authority to own, lease, and operate the Acquired Business and the applicable Acquired Assets and to carry on the Acquired Business as and where such assets are now owned or leased and the Acquired Business is now conducted, subject to the Bankruptcy Cases. The states in which such Seller is required by law to be qualified to do business as a foreign company are set forth on Section 5.1(a) of the Seller Disclosure Schedules, and such Seller is qualified to do business as a foreign company in each such state.

(b)     Authority and Approval. Such Seller has the power to enter into this Agreement and each of the Related Agreements to which it is a party, subject to entry of the Sale Order by the Bankruptcy Court, and to perform its obligations hereunder and thereunder. The execution, delivery and performance by such Seller of this Agreement and the Related Agreements to which it is to be a party, and the consummation by such Seller of the transactions contemplated herein and therein, have been duly authorized by all required corporate action on the part of such Seller. This Agreement has been duly executed and delivered by such Seller, and when executed and delivered by such Seller, the Related Agreements to which it is a party will have been duly executed and delivered by such Seller, subject to the Bankruptcy Cases. This Agreement is, and each of the Related Agreements to which such Seller is a party when executed and delivered by such Seller, subject to entry of the Sale Order by the Bankruptcy Court, will be, the valid and binding obligations of such Seller, enforceable against such Seller, in accordance with their respective terms, except as may be limited by the Bankruptcy Cases.

(c)     No Conflict. The execution and delivery by such Seller of this Agreement and each of the Related Agreements to which it is to be a party, and such Seller's compliance with the terms and conditions hereof and thereof, and the consummation by such Seller of the transactions contemplated hereby and thereby, do not and will not (i) conflict with, or require the consent of any Person that has not been obtained under such Seller's Organizational Documents, (ii) subject to entry of the Sale Order and obtaining the authorizations referred to in Section 5.1(d) of the Seller Disclosure Schedules and excluding any Antitrust Law, violate or breach in any material respect any provision of, or require any consent, authorization, or approval under, any Law or Order applicable to such Seller, the Acquired Business, the Acquired Assets or the Assumed Liabilities, (iii) subject to entry of the Sale Order, and except as set forth in Section 5.1(c) of the Seller Disclosure Schedules, violate, conflict with, result in a breach of, constitute a default under (whether with or without notice or the lapse of time or both), accelerate or permit the acceleration of the performance required by, or require any consent, authorization, or approval under, any Transferred Contract or other Material Contract, or Transferred Permit material to the Acquired Business to which such Seller is a party or by which such Seller is bound or to

which any of its assets or properties are subject, except to the extent excused or stayed by the Bankruptcy Cases or (iv) result in the creation of any Lien upon the Acquired Assets other than Permitted Encumbrances and Liens created by Purchaser; provided, however, that no representation or warranty is made in the foregoing clauses (ii) through (iv) with respect to matters that would not reasonably be expected, individually or in the aggregate, to have an Acquired Business Material Adverse Effect.

(d)     Governmental Approvals and Filing. Except (i) as set forth in Section 9.3(b) or as disclosed in Section 5.1(d) of the Seller Disclosure Schedules, (ii) with respect to any Antitrust Law, and (iii) the entry of the Sale Order, no consent, authorization, approval or action of, filing with, notice to, or exemption from any Governmental or Regulatory Authority on the part of such Seller is required in connection with the execution, delivery and performance of this Agreement or any Related Agreements to which such Seller is to be a party or the consummation of the transactions contemplated hereby or thereby, except where the failure to obtain any such consent, approval or action, to make any such filing, to give any such notice or obtain any such exemption would not be reasonably expected to (x) have a material adverse effect on such Seller or (y) materially adversely affect the validity or enforceability against such Seller of this Agreement or such Related Agreements or materially adversely affect the ability of such Seller to consummate the transactions contemplated by this Agreement.

(e)     Legal Proceedings. Section 5.1(e) of the Seller Disclosure Schedules contains a complete and accurate description (including the case caption and case number where available) of each material Action to which such Seller is currently or in the last year had been a party. Except as disclosed in Section 5.1(e) of the Seller Disclosure Schedules or on the Bankruptcy Cases docket, there is no: (i) pending or, to Seller's Knowledge, written threatened Action or Order of any Governmental or Regulatory Authority, in each case relating to such Seller, the Acquired Business, the Transferred Real Property or any of the Acquired Assets, in each case that would reasonably be expected (x) to have an Acquired Business Material Adverse Effect or (y) to adversely affect the validity or enforceability of this Agreement or any of the Related Agreements against such Seller or adversely affect the ability of such Seller to consummate the transactions contemplated by this Agreement; or (ii) Orders outstanding against such Seller that would adversely affect the ability of such Seller to consummate the transactions contemplated by this Agreement or that are otherwise related to such Seller, the Acquired Business, the Transferred Real Property, or the Acquired Assets.

(f)     Compliance with Laws and Orders. Except as set forth in Section 5.1(f) of the Seller Disclosure Schedules, there is no unresolved material violation of or default under any Law or Order applicable to such Seller, the Acquired Business, the Acquired Assets, or the Transferred Real Property, or the Assumed Liabilities, in each case, other than as a result of the Bankruptcy Cases or stayed by the Bankruptcy Court. Such Seller is in compliance in all material respects with all applicable Laws regulating such Seller, the Acquired Business, the Acquired Assets, or the Transferred Real Property.

27

(g)    Employee Matters and Employee Benefit Plans.

(i)    Each Benefit Plan has been maintained, administered and funded in all material respects, in accordance with its terms and all provisions of applicable Laws (including ERISA and the Code). Except as set forth on Section 5.1(g)(i) of the Seller Disclosure Schedules, none of Sellers or their ERISA Affiliates have, within the past six (6) years, incurred, and no event has occurred and no condition or circumstance exists that could result, directly or indirectly, in, any unsatisfied Liability (including, any indirect, contingent or secondary Liability) of any Seller under Title IV of ERISA or Section 412 or 430 of the Code or Section 302 or 303 of ERISA.

(ii)    Each of the Benefit Plans that is intended to qualify under Section 401 of the Code has received a favorable opinion or determination letter from the Internal Revenue Service that such Benefit Plan is so qualified, and, to the Knowledge of Sellers, nothing has occurred with respect to the operation of any such Benefit Plan which could reasonably be expected to result in the revocation of such favorable opinion or determination.

(iii)    Sellers have timely paid all contributions due to date that are required under Benefit Plans, and there are no pending or unresolved claims under any Benefit Plans for outstanding or owed contributions, arrears, delinquencies, or for compliance with any payroll audit or investigation concerning the Acquired Business Employees.

(iv)    Section 5.1(g)(iv) of the Seller Disclosure Schedules is a complete and accurate anonymized list of all Acquired Business Employees, including base salary/base wage, commissions, bonus or incentive opportunities, title or position, date of hire, work location, exempt or non-exempt status, and full-time or part-time status (except where the provision of such information has been excluded due to appliable privacy Laws).

(v)    (A) With respect to the Acquired Business Employees, Sellers are in compliance in all material respects with all applicable Laws relating to labor and employment, including all legal requirements relating to discrimination, equal employment opportunities, disability, labor relations, wages and hours, Fair Labor Standards Act, payment of wages, occupational safety, and family and medical leave and (B) there are no pending, or to the Knowledge of Sellers, threatened, lawsuits, grievances, unfair labor practice charges, arbitrations, charges, investigations, hearings, actions, claims, or proceedings (including any administrative investigations, charges, claims, actions, or proceedings), against Sellers brought by or on behalf of any Acquired Business Employee alleging violation of any labor or employment legal requirements, breach of any express or implied contract of employment, wrongful termination of employment, or any other discriminatory, wrongful, or tortious conduct in connection with the employment relationship.

(vi)     Except as set forth in Section 5.1(g)(vi) of the Seller Disclosure Schedules, such Seller is not a party to or bound by a collective bargaining agreement or similar agreement with a union or other labor organization covering any of the Acquired Business Employees, and none of the Acquired Business Employees is represented by a union or other certified bargaining agent with respect to their services to Sellers or the Acquired Business. With respect to the Acquired Business, there is not any, and in the last three (3) years has been no, strike, slowdown, picketing or work stoppage.

(h)     Title. Except as set forth in Section 5.1(h) of the Seller Disclosure Schedules, Sellers have good and marketable title to, or a valid leasehold interest in and right to use, all Acquired Assets, in each case, free and clear of all Liens other than Permitted Encumbrances, Liens relating to any Assumed Liabilities or Liens that will be released at the Closing Date.

(i)     Intellectual Property. Section 5.1(i) of the Seller Disclosure Schedules contains a complete and accurate list of all material patents, registered trademarks and trademark applications, registered copyrights and applications for copyright registrations and domain names included in the Purchased Intellectual Property. Except as would not have an Acquired Business Material Adverse Effect or as set forth in Section 5.1(i) of the Seller Disclosure Schedules:

(i)     No Action is pending and, to Sellers' Knowledge, no claims are threatened in writing by any Person against Sellers (1) alleging the use by Sellers of any of the Purchased Intellectual Property infringes or misappropriates the Intellectual Property of any third party; (2) claiming infringement upon or misappropriation of any Intellectual Property rights of third parties as a result of the operation by Sellers of the Acquired Business as presently conducted; or (3) challenging the ownership or validity of any of the Purchased Intellectual Property (other than non-final office actions and similar correspondence involving the United States Patent and Trademark Office or any equivalent foreign Governmental or Regulatory Authority);

(ii)     There are no orders, judgments, holdings, consents, decrees, settlements or rulings with respect to Intellectual Property to which Sellers, or any of the Purchased Intellectual Property, is bound (excluding, for the avoidance of doubt, ordinary course determinations by the United States Patent and Trademark Office or any equivalent foreign Governmental or Regulatory Authority).

(iii)     Such Seller is the owner of the Purchased Intellectual Property, and has the right to use, free and clear of all Liens, other than Permitted Encumbrances, the Purchased Intellectual Property;

(iv)     To Sellers' Knowledge, the operation of the Acquired Business as currently conducted by Sellers, and the possession or use of the Purchased Intellectual Property by Sellers, do not infringe, misappropriate or otherwise violate any Intellectual Property right of any other Person. To Sellers' Knowledge, none of

the Purchased Intellectual Property is being infringed, misappropriated or otherwise violated by any Person; and

(v)     Sellers have used Reasonable Efforts to protect the confidentiality of any trade secret included in the Purchased Intellectual Property.

(j)     Material Contracts.

(i)     Except for (x) Contracts subject to ordinary course confidentiality restrictions that have not been waived despite such Seller's commercially reasonable efforts to have such restrictions waived to permit disclosure to Purchaser, (y) Contracts with legal, financial, or other advisors and consultants in connection with the Bankruptcy Case or any other transactions contemplated hereby, and (z) any agreement entered into with any of such Seller's secured lenders, Section 5.1(j)(i) of the Seller Disclosure Schedules contains a complete and accurate list as of the date hereof of all of the following Transferred Contracts to which such Seller is a party ("**Material Contracts**"):

(A)     all Contracts involving commitments to others to make capital expenditures or purchases or sales in excess of $5,000,000;

(B)     any Contract creating a shareholders' agreement, strategic alliance, partnership, joint venture agreement, development, joint development or similar arrangement that is material to the Acquired Business;

(C)     any Contract that relates to the settlement of any legal proceeding in the last two (2) years;

(D)     any written employment, consulting, contractor, confidentiality, non-competition, severance or termination agreements as to employees, individual consultants or other individual service providers, in each case, material to the Acquired Business;

(E)     any collective bargaining agreements;

(F)     any Contract that is an operations, maintenance or staffing services or other agreement with a provider of contract labor;

(G)     all Contracts relating to any direct or indirect Indebtedness (other than any agreement with such Seller's secured lenders) (including, without limitation, loan agreements, lease purchase arrangements, guarantees, agreements to purchase goods or services or to supply funds or other undertakings on which others rely in extending credit), or any conditional sales contracts, chattel mortgages, equipment lease agreements and other security arrangements with respect to personal property, in each case, with a principal or secured amount in excess of $5,000,000;

(H)     all Contracts between Holdco and Opco;

30

(I)      all swap agreements, securities contracts, commodities contracts, option agreements, repurchase agreements, futures contracts, forward contracts, master netting agreements, in each instance, as such term is defined or otherwise referenced in the Bankruptcy Code, or other hedging agreement or derivative agreement used in the conduct of the Acquired Business;

(J)      all Contracts that in any way could limit the freedom of Purchaser to engage in any line of business or to compete with any Person in any area or territory;

(K)      all (1) Contracts pursuant to which Sellers grant to a third party a license or right to use any material Purchased Intellectual Property (other than non-exclusive licenses of Intellectual Property) and (2) Contracts pursuant to which Sellers obtain a license or right to use any material Intellectual Property (other than licenses for "off-the-shelf" Software or other Software generally commercially available on standard terms and conditions, or non-exclusive licenses of Intellectual Property);

(L)      all Contracts (whether exclusive or otherwise) with any sales agent, representative, franchisee, dealer, distributor;

(M)      all Contracts that require the payment of royalties;

(N)      all Contracts with any Governmental or Regulatory Authority;

(O)      all Contracts involving a sharing of profits, losses, costs or liabilities;

(P)      all customer Contracts of the Acquired Business;

(Q)      all supplier Contracts of the Acquired Business, including material purchase orders and sales orders for which, as of the date hereof, a supplier remains obligated to provide goods or services or such Seller remains obligated to pay for goods or services, and excluding all other purchase orders and sales orders;

(R)      all Contracts containing written warranties or guaranties extended by such Seller, other than warranties or guaranties extended by such Seller to a customer pursuant to a Contract disclosed pursuant to any of the other items of this Section 5.1(j)(i); and

(S)      all other Contracts not of the type covered by any of the other items of this Section 5.1(j)(i) involving money or property having an obligation, or relating to payments by or to such Seller, in excess of $1,000,000 per month or $5,000,000 in the aggregate in the last twelve (12) consecutive months.

(ii)      True, correct and complete copies of the Material Contracts (including any amendments, supplements, restatements or modifications thereto) listed in Section 5.1(j)(i) of the Seller Disclosure Schedules have been made

available to Purchaser. Subject to entry of the Sale Order and payment of all Cure Amounts, each Material Contract that is a Transferred Contract is in full force and effect, is fully assignable without the consent of any Person, except as set forth on Section 5.1(j)(ii) of the Seller Disclosure Schedules, and is valid, binding and enforceable in accordance with its terms as to such Seller and, to Seller's Knowledge, the other parties to the Material Contract. Other than the payment of Cure Amounts, such Seller has performed and is performing all obligations required to be performed by it under the Material Contracts that are Transferred Contracts. Except as set forth in Section 5.1(j)(ii) of the Seller Disclosure Schedules, no material default or material breach of a Material Contract that is a Transferred Contract exists (or, solely as a result of the Bankruptcy Cases or the consummation of the transactions contemplated hereby, will exist) on the part of such Seller or, to Seller's Knowledge, on the part of any other Person under any such Material Contracts, and no condition or event has occurred that, after notice or lapse of time, or both, would constitute a material default or material breach of such Material Contracts that are Transferred Contracts. No party to a Material Contract that is a Transferred Contract has notified such Seller in writing that such party intends to cancel or otherwise terminate such Material Contract, or to Seller's Knowledge, taken any action or threatened to take any action with respect of an amount paid to such Seller pursuant to such Material Contract or a reduction in fees due to such Seller pursuant to such Material Contract.

(k)     Permits. To Sellers' Knowledge, Sellers own or possess all Permits necessary and material to the Condition of the Acquired Business or the ownership, operation and use of the Acquired Assets. Section 5.1(k) of the Seller Disclosure Schedules identifies all material Permits possessed by Sellers that are necessary to the conduct of the Acquired Business by the Sellers or the ownership or operation of the Acquired Assets by the Sellers as conducted on the Execution Date. Except as disclosed in Section 5.1(k) of the Seller Disclosure Schedules or as a result of the Bankruptcy Cases, (i) all such Permits possessed by Sellers are in full force and effect; (ii) Sellers are in compliance in all material respects with the terms and conditions of such Permits; and (iii) Sellers have not received written notice of violation or proposed revocation or termination of any such Permit from any issuing Person or Governmental or Regulatory Authority, which remains unresolved.

(l)     Insurance. Sellers maintain material insurance covering the Acquired Business and the Acquired Assets in amounts (and subject to deductibles and self-insurance amounts) that, to Seller's Knowledge, are consistent with local industry practice and which Sellers have reasonably determined to be adequate for the Acquired Business, and which (including the name of the carrier thereunder, the amounts, limits or deductibles thereunder, and the expiration date thereof) is listed on Section 5.1(l) of the Seller Disclosure Schedules.

(m)     Certain Environmental Matters. Except as (i) related solely to the Excluded Assets, (ii) would not reasonably be expected to have an Acquired Business Material Adverse Effect or (iii) disclosed in Section 5.1(m) of the Seller Disclosure Schedules:

(i)    To Sellers' Knowledge, Sellers hold, and are in compliance in all material respects with, all Permits required to conduct the Acquired Business as currently being conducted under any Environmental Laws.

(ii)    To Sellers' Knowledge, such Seller, the Acquired Business and the Transferred Real Property are in compliance, in all material respects, with all Environmental Laws and, during the one (1) year preceding the Execution Date, such Seller has not received written notice from any Person alleging that such Seller, the Acquired Business or the Transferred Real Property, is in material violation of any applicable Environmental Law, which violation or liability is unresolved.

(iii)    During the one (1) year preceding the date of this Agreement, such Seller has not received any written request for information or any written notice that it is a potentially responsible party under any Environmental Laws with regard to the Acquired Business and the operation of the Transferred Real Property or any off-site location for which any liability is currently being asserted, and to Sellers' Knowledge it is not such a potentially responsible party under any Environmental Law.

(iv)    Such Seller is not subject to any outstanding Order relating to compliance with any Environmental Law or to investigation or cleanup of Hazardous Materials.

(v)    To Sellers' Knowledge, no Hazardous Materials are present in, on or under the Transferred Real Property, except those used by such Seller in the ordinary operation of the Acquired Business and in strict compliance with Environmental Laws.

(vi)    During the one (1) year preceding the Execution Date, such Seller has not transported, stored, used, manufactured, disposed of or released Hazardous Materials in material violation of Environmental Laws.

(n)    <u>Transferred Real Property</u>. Except as set forth in <u>Section 5.1(n)</u> of the Seller Disclosure Schedules:

(i)    <u>Schedule 1-F</u> contains a true, correct and complete list of such Seller's Transferred Real Property. Such Seller has made available to Purchaser true correct and complete copies of the Transferred Real Property Leases with respect thereto.

(ii)    Such Seller has a good and valid leasehold, subleasehold, license, or other right in and to such Seller's Transferred Real Property, free and clear, as of the Closing Date, of Liens and other Interests, except for Permitted Encumbrances. Subject to entry of the Sale Order and payment of all Cure Amounts, each of the Transferred Real Property Leases with respect thereto is in full force and effect, and neither such Seller, nor to the Knowledge of Sellers, any other party thereto, is in material default thereunder, nor has any condition or event occurred that, after

notice or lapse of time, or both, would constitute a material default thereunder by such Seller or, to the Knowledge of Sellers, any other party thereto, other than as a result of the Bankruptcy Cases.

(iii)     Other than the rights of fee (or other superior interest) owners, there are no subtenants or other parties in possession of any of such Seller's Transferred Real Property.

(iv)     To the Knowledge of Sellers, there are no pending or threatened proceedings or actions to condemn or take by power of eminent domain, all or any of such Seller's Transferred Real Property.

(o)     Brokers. Except as set forth in Section 5.1(o) of the Seller Disclosure Schedules, no broker, finder or investment banker is entitled to any brokerage commission, finder's fee or similar payment in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of Sellers.

(p)     Taxes. Except as otherwise set forth in Section 5.1(p) of the Seller Disclosure Schedules:

(i)     All material Tax Returns required to be filed with respect to the Acquired Assets have been timely filed and all such Tax Returns are true, accurate and complete in all material respects to the extent that failure to file such a Tax Return, or the failure of any such Tax Return to be true, accurate and complete, could reasonably be expected to give rise to a Lien on any Acquired Asset following the Closing.

(ii)     All material Taxes with respect to the Acquired Assets that are due and payable have been duly and timely paid to the extent that failure to pay such Taxes could reasonably be expected to give rise to a Lien on any Acquired Asset following the Closing.

(iii)     There is no claim, audit, action, suit, investigation or other proceeding pending or threatened in writing against, or with respect to, a material amount of Taxes relating to the Acquired Assets to the extent that the outcome of such proceeding could reasonably be expected to give rise to a Lien on any Acquired Asset following the Closing.

(q)     Credit Support Obligations. Section 5.1(q) of the Seller Disclosure Schedules sets forth a true and complete list of each guaranty, letter of credit, performance or surety bond or similar credit support arrangement provided by such Seller or any of its Affiliates to any other Person with respect to related to the Acquired Business or any Transferred Contract.

(r)     No Material Adverse Change. Except as described in Section 5.1(r) of the Seller Disclosure Schedules, except as a result of the Bankruptcy Cases, since the Petition Date until the Execution Date:

34

(i)      There has not occurred any event or condition that, individually or in the aggregate, has had or is reasonably expected to have an Acquired Business Material Adverse Effect;

(ii)      Such Seller has not, except in the Ordinary Course of Business, sold, leased, transferred, or assigned any of the material properties, rights or other assets of such Seller that would, but for such transaction, be an Acquired Asset;

(iii)      Such Seller has not cancelled, compromised, waived or released any right or claim (or series of related rights and claims) related to the Acquired Assets except in the Ordinary Course of Business or pursuant to an Order of the Bankruptcy Court;

(iv)      Such Seller has not made any change to any accounting method or any change to any material methods of reporting income, deductions or other items for Tax purposes; and

(v)      Such Seller has not made any agreement to do any of the foregoing.

(s)      <u>Inter-Company Transactions</u>. A true, correct and complete list and description of all Contracts (including any amendments, supplements, restatements or modifications thereto) between Sellers relating to the Acquired Assets, Assumed Liabilities or the Acquired Business, is set forth in <u>Section 5.1(s)</u> of the Seller Disclosure Schedules, and true, correct and complete copies of such Contracts have been made available to Purchaser.

(t)      <u>Relations With Competitors; Amounts Owed Related Parties</u>. Except as set forth on <u>Section 5.1(t)</u> of the Seller Disclosure Schedules, to Seller's Knowledge, such Seller does not own, directly or indirectly, any interest in (excepting not more than five percent (5%) stock holdings for investment purposes in securities of publicly held and traded companies) nor is it an officer, director, employee or consultant of, any Person that is a competitor, lessor, lessee, customer or supplier of the Acquired Business, other than Affiliates of such Seller.

(u)      <u>Warranties Exclusive</u>. EXCEPT AS EXPRESSLY SET FORTH IN THIS SECTION 5.1 (AS MODIFIED BY THE SELLER DISCLOSURE SCHEDULES), SUCH SELLER MAKES NO REPRESENTATION OR WARRANTY, STATUTORY, EXPRESS OR IMPLIED, WRITTEN OR ORAL, AT LAW OR IN EQUITY, IN RESPECT OF ANY OF ITS ASSETS (INCLUDING THE ACQUIRED ASSETS), LIABILITIES (INCLUDING THE ASSUMED LIABILITIES), THE BUSINESS OR THE ACQUIRED BUSINESS, INCLUDING, WITH RESPECT TO MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, OR NON-INFRINGEMENT, AND ANY SUCH OTHER REPRESENTATIONS OR WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED AND NONE SHALL BE IMPLIED AT LAW OR IN EQUITY. NEITHER SUCH SELLER NOR ANY OTHER PERSON, DIRECTLY OR INDIRECTLY, HAS MADE OR IS MAKING, ANY REPRESENTATION OR WARRANTY, WHETHER WRITTEN OR ORAL,

REGARDING THE PRO-FORMA FINANCIAL INFORMATION, FINANCIAL PROJECTIONS OR OTHER FORWARD-LOOKING STATEMENTS OF SUCH SELLER, THE BUSINESS OR THE ACQUIRED BUSINESS.

Section 5.2    Representations and Warranties of Purchaser. Except as set forth in the Purchaser Disclosure Schedules, Purchaser makes the following representations and warranties to Sellers as set forth in this Section 5.2. The Purchaser Disclosure Schedules will be arranged in paragraphs corresponding to the lettered and numbered paragraphs contained in this Section 5.2 (as to which each Seller acknowledges and agrees that any matter disclosed pursuant to a section, subsection, paragraph or subparagraph of the Purchaser Disclosure Schedules shall be deemed disclosed for all other purposes of the Purchaser Disclosure Schedules as and to the extent the content or context of such disclosure makes it reasonably apparent, if read in the context of such other section, subsection, paragraph or subparagraph of the Purchaser Disclosure Schedules, that such disclosure is applicable to such other section, subsection, paragraph or subparagraph of the Purchaser Disclosure Schedules):

(a)    Organization and Existence. Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, with full power and authority to own, lease and operate its business and properties and to carry on its business as and where such properties and assets are now owned or leased and such business is now conducted.

(b)    Authority and Approval. Purchaser has the power to enter into this Agreement and each of the Related Agreements to which it is to be a party and to perform its obligations hereunder and thereunder. The execution, delivery and performance by Purchaser of this Agreement and the Related Agreements to which it is to be a party, and the consummation by Purchaser of the transactions contemplated herein and therein, have been duly authorized by all required action on the part of Purchaser. This Agreement has been duly executed and delivered by Purchaser and, when executed and delivered by Purchaser, the Related Agreements to which Purchaser is to be a party will have been duly executed and delivered by Purchaser. This Agreement is, and each of the Related Agreements to which Purchaser is to be a party when executed and delivered by Purchaser, will be, the valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with their respective terms, except as may be limited by the Bankruptcy Cases.

(c)    No Conflict. The execution and delivery by Purchaser of this Agreement and each of the Related Agreements to which it is to be a party, and Purchaser's compliance with the terms and conditions hereof and thereof, and the consummation by Purchaser of the transactions contemplated hereby and thereby, do not and will not (i) conflict with any of, or require any consent of any Person that has not been obtained under, Purchaser's Organizational Documents, (ii) subject to entry of the Sale Order and obtaining the authorizations referred to in Section 5.2(d) of the Purchaser Disclosure Schedules, violate or breach in any material respect any provision of, or require any consent, authorization, or approval under, any Law or any Order applicable to Purchaser, (iii) result in a violation or breach of any provision of any Law or Order applicable to Purchaser, (iv) violate, conflict with, result in a breach of, constitute a default under (whether with or without notice or the lapse of time or both), accelerate or permit the acceleration of the performance

36

required by, or require any consent, authorization, or approval under, any material Contract to which Purchaser is a party or by which it is bound or to which any of its assets or property is subject or (v) result in the creation of any Lien upon the assets or property of Purchaser, except in each case as would not reasonably be expected to have a material adverse effect on Purchaser or materially adversely affect the validity or enforceability of this Agreement against Purchaser or materially adversely affect the ability of Purchaser to consummate the transactions contemplated by this Agreement.

(d)     Governmental Approvals and Filing. Except as disclosed in Section 5.2(d) of the Purchaser Disclosure Schedules, no consent, authorization, approval or action of, filing with, notice to, or exemption from any Governmental or Regulatory Authority on the part of Purchaser is required in connection with the execution, delivery and performance of this Agreement or any Related Agreements to which Purchaser is to be a party or the consummation of the transactions contemplated hereby or thereby, except where the failure to obtain any such consent, approval or action, to make any such filing, to give any such notice or obtain any such exemption would not be reasonably expected to (i) have a material adverse effect on Purchaser or (ii) materially adversely affect the validity or enforceability against Purchaser of this Agreement or such Related Agreements or materially adversely affect the ability of Purchaser to consummate the transactions contemplated by this Agreement.

(e)     Legal Proceedings.

(i)     Purchaser has received no written notice that there are any lawsuits or arbitrations pending or threatened against Purchaser as would reasonably be expected (x) to have a material adverse effect on Purchaser, (y) to materially adversely affect the validity or enforceability of this Agreement or any of the Related Agreements against Purchaser or materially adversely affect the ability of Purchaser to consummate the transactions contemplated by this Agreement, or (z) result in the issuance of an Order restraining, enjoining or otherwise prohibiting or making illegal the consummation of the transactions contemplated by this Agreement; and

(ii)     Purchaser has received no written notice that there are any Orders outstanding against Purchaser that would be reasonably expected to have a material adverse effect on Purchaser or materially adversely affect the ability of Purchaser to consummate the transactions contemplated by this Agreement.

(f)     Brokers. No broker, finder or investment banker is entitled to any brokerage commission, finder's fee or similar payment in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of Purchaser.

(g)     Financial Resources. Purchaser has, and will have available at the Closing, funds sufficient to pay in full the Purchase Price, the Cure Amounts and the fees and expenses related to the transactions contemplated by this Agreement in cash. Purchaser knows of no circumstance or condition that could be reasonably expected to prevent the availability at Closing of such funds. Purchaser acknowledges and agrees that

notwithstanding anything to the contrary contained herein, its obligation to consummate the transactions contemplated hereby is not subject to Purchaser or any of its Affiliates obtaining any financing.

(h)  Sophistication. Purchaser is as of the Execution Date, and shall be as of the Closing Date, an "accredited investor" within the meaning of Rule 501(a) under the Securities Act of 1933 (as amended). Purchaser understands and is able to bear any economic risks associated with the transactions contemplated by this Agreement.

(i)  Investment Entirely for Own Account. Purchaser is acquiring the Acquired Assets for investment for Purchaser's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and Purchaser has no present intention of selling, granting any participation in, or otherwise distributing the same. Purchaser does not presently have any Contract with any Person to sell, transfer or grant participations to such Person or to any third Person, with respect to any of the Acquired Assets or any debt or equity security or interest in any Seller.

(j)  No Conflicting Contracts. Except as set forth in Section 5.2(j) of the Purchaser Disclosure Schedules, neither Purchaser nor any of its Affiliates is a party to any Contract involving the operation, management or ownership of a business similar to any portion of the Acquired Business that would reasonably be expected to cause a delay in any Governmental or Regulatory Authority's granting of any required or necessary approval or authorization in connection with the transactions contemplated hereby, and neither Purchaser nor any of its Affiliates has any plans, or engaged in any discussions, to enter into any such Contract prior to the Closing Date.

(k)  Opportunity for Independent Investigation; No Other Representations. Prior to its execution of this Agreement, Purchaser has conducted to its satisfaction an independent investigation and verification of the current condition and affairs of the Acquired Business and the Acquired Assets, including the condition, the cash flow and the prospects of the Acquired Assets and Assumed Liabilities. In making its decision to execute this Agreement and to purchase the Acquired Assets and assume the Assumed Liabilities, Purchaser has relied and will rely solely upon the results of such independent investigation and verification and the terms and conditions of this Agreement. Purchaser acknowledges and agrees that: (a) it has had the opportunity to visit the Acquired Business and to visit with Sellers and meet with its Representatives to discuss the Acquired Assets and Assumed Liabilities, and their condition, cash flows and prospects, (b) all materials and information requested by Purchaser have been provided to Purchaser to Purchaser's satisfaction and Purchaser is fully familiar with all such materials (including such documents and information found in the electronic data room and the Confidential Information) and information, including all terms and conditions, obligations and liabilities pursuant to, and arising under, all Material Contracts and (c) except as expressly set forth in Section 5.1, neither Sellers nor any Affiliate thereof makes any representation or warranty, express or implied, written or oral, as to the Acquired Business, the Acquired Assets or the Assumed Liabilities or any other matter. Purchaser acknowledges that the Acquired Assets are being transferred on an "AS IS, WHERE IS" basis.

(l)    Disclaimer Regarding Projections. Purchaser may be in possession of certain projections and other forecasts regarding the Acquired Business, Acquired Assets and the Assumed Liabilities and any expansions or other development opportunities relating thereto or otherwise, including projected financial statements, cash flow items and other data, and certain business plan information of the Acquired Business, Acquired Assets and the Assumed Liabilities and any expansions or other development opportunities relating thereto or otherwise. Purchaser acknowledges that there are substantial uncertainties inherent in attempting to make such projections and other forecasts and plans, and that Purchaser is familiar with such uncertainties. Accordingly, Purchaser acknowledges that neither Sellers nor any of their Affiliates, Representatives, agents or advisors has made any representation or warranty, express or implied, written or oral, with respect to such projections and other forecasts and plans.

## ARTICLE VI

### Regulatory Matters

Purchaser hereby covenants and agrees with Sellers, and each Seller hereby covenants and agrees with Purchaser, in each case, as follows:

Section 6.1    Regulatory Filings. Subject to the terms and conditions of this Agreement, each party shall use Reasonable Efforts to (a) take, or cause to be taken, all actions and to do, or cause to be done, all things necessary under applicable Laws to consummate the transactions contemplated by this Agreement; (b) if required or requested, file such applications and documents as may be required with any Governmental or Regulatory Authority, if any, with consent or approval rights as to or over the transfer of the Acquired Assets to Purchaser; (c) if required, file a Notification and Report Form pursuant to the HSR Act with respect to the transactions contemplated hereby within five (5) Business Days after Purchaser is selected as the Successful Bidder, if applicable, pursuant to the Bidding Procedures Order; (d) supply as promptly as practicable any additional information and documentary material that may be requested or required by any Governmental or Regulatory Authority having rights of consent or approval over or regarding the transfer of the Acquired Assets to Purchaser, including pursuant to any Antitrust Law, including the HSR Act, and (e) if applicable, cause the expiration or termination of the applicable waiting periods under the HSR Act, any other Antitrust Law or any other state, federal or local law, regulation or designation as soon as practicable. In furtherance of and without limiting the generality of the foregoing, the parties hereto will use their respective Reasonable Efforts to (i) prepare, as soon as is practicable following the execution of this Agreement, all necessary filings in connection with the transactions contemplated by this Agreement that may be required to be filed by such party with any other relevant Governmental or Regulatory Authority, (ii) submit such filings as soon as practicable, but in no event later than five (5) Business Days after Purchaser is selected as the Successful Bidder, if applicable, pursuant to the Bidding Procedures Order, (iii) assure that all such filings are in material compliance with the requirements of applicable regulatory Laws, (iv) make available to the other parties such information as the other parties may reasonably request in order to complete the filings or to respond to information requests by any relevant Governmental or Regulatory Authority, (v) take all actions necessary to cause all conditions set forth in Article IX to be satisfied as soon as practicable and (vi) execute and deliver any additional instruments reasonably requested and necessary to fully carry out the purposes of

this Agreement. Except as set forth in Section 12.13, each party hereto shall bear its own fees, costs and all other expenses associated with any filings or consents with or from any third party in connection with or otherwise related to the transactions contemplated hereby.

Section 6.2    Cooperation: Confidentiality. In connection with the efforts referenced in Section 6.1 to obtain all requisite approvals and authorizations for the transactions contemplated by this Agreement, including, if applicable, under the HSR Act, any other Antitrust Law or any state or local law or regulation, or of any other relevant Governmental or Regulatory Authority, each party hereto shall use Reasonable Efforts to (a) cooperate with the other parties in connection with any filing or submission and in connection with any investigation or other inquiry, including any proceeding initiated by a private party; (b) keep the other parties informed in all material respects of any material communication received by such party from, or given by such party to, any Governmental or Regulatory Authority and of any material communication received or given in connection with any proceeding by a private party, in each case, regarding any of the transactions contemplated hereby and (c) permit the other parties to review any material communication given to it by, and, to the extent reasonably practicable, consult with the other parties in advance of any meeting or conference with, any Governmental or Regulatory Authority, including in connection with any proceeding by a private party. The foregoing obligations in this Section 6.2 shall be subject to the Confidentiality Agreement and any attorney-client, work product or other privilege, and each party hereto shall coordinate and cooperate fully with the other parties hereto in exchanging such information and providing such assistance as such other parties may reasonably request in connection with the foregoing and in seeking early termination of any applicable waiting periods under Antitrust Law. No party hereto will take any action with the intent of delaying, impairing or impeding the receipt of any required authorizations, consents, Orders or approvals.

Section 6.3    Objections or Other Challenges. If (a) any objections are asserted with respect to the transactions contemplated hereby under any Antitrust Law or if any suit is instituted by any Governmental or Regulatory Authority or any private party challenging any of the transactions contemplated hereby as violating any Law, including any Antitrust Law, or (b) the filing made pursuant to Section 6.1 is reasonably likely to be rejected or conditioned by any Governmental or Regulatory Authority, each party hereto shall use Reasonable Efforts to resolve such objections or challenge such Governmental or Regulatory Authority or private party may have to such transactions, including to vacate, lift, reverse or overturn any Order, whether temporary, preliminary or permanent, so as to permit consummation of the transactions contemplated by this Agreement. In furtherance of the foregoing, Purchaser shall undertake promptly any and all actions required to complete lawfully the transactions contemplated by this Agreement prior to the Outside Closing Date, including by (i) responding to and complying with, as promptly as reasonably practicable, any request for information or documentary material regarding the transactions from any relevant Governmental or Regulatory Authority (including responding to any "second request" for additional information or documentary material under the HSR Act as promptly as reasonably practicable), (ii) causing the prompt expiration or termination (including requesting early termination and/or approvals thereof) of any applicable waiting period and clearance or approval by any relevant Governmental or Regulatory Authority, including defense against, and the resolution of, any objections or challenges, in court or otherwise, by any relevant Governmental or Regulatory Authority preventing consummation of the transactions and (iii) making any necessary post-Closing filings or proffering and consenting to a governmental

order providing for the sale or other disposition, or the holding separate, of particular Acquired Assets, categories of Acquired Assets or lines of business, of either Acquired Assets or lines of business of the Acquired Business or of any other assets or lines of business of Purchaser or any of its Affiliates in order to mitigate or otherwise remedy any requirements of, or concerns of, any Governmental or Regulatory Authority, or proffering and consenting to any other restriction, prohibition or limitation on any of its assets, the Acquired Business, Purchaser or any of Purchaser's Affiliates, in order to mitigate or remedy such requirements or concerns, in each case conditioned on consummation of the transactions contemplated hereby. The entry by any Governmental or Regulatory Authority in any legal proceeding of a governmental order permitting the consummation of the transactions contemplated hereby but which is subject to certain conditions or requires Purchaser or any of its Affiliates to take any action, including any restructuring of the Acquired Assets, the Acquired Business or lines of business of Purchaser or any of its Affiliates or any changes to the existing business of Purchaser or any of its Affiliates, shall not be deemed a failure to satisfy the conditions specified in <u>Article IX</u>. Purchaser further agrees that neither it nor any of its Affiliates shall, prior to Closing, acquire, market, operate or control, nor enter into any other Contract to acquire, market, operate or control, any business similar to any portion of the Acquired Business if the proposed acquisition or ability to market, operate or control such business could reasonably be expected to increase the market power attributable to Purchaser and/or its Affiliates in a manner materially adverse to approval of the transactions contemplated by this Agreement or that would reasonably be expected to prevent or otherwise materially interfere with, or materially delay the consummation of the transactions contemplated by, this Agreement.

ARTICLE VII

Certain Covenants

Section 7.1    <u>Conduct of Business Pending Closing</u>. Except (1) those matters set forth in <u>Section 7.1</u> of the Seller Disclosure Schedules, (2) as otherwise expressly contemplated by this Agreement, (3) as required by applicable Law or any Governmental or Regulatory Authority, (4) with the written consent of Purchaser (which consent will not be unreasonably withheld, conditioned or delayed) or (5) for any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code, during the period from the Execution Date to the Closing Date, each Seller will:

(a)    (i) use its Reasonable Efforts, consistent with current practice, to preserve its business organization, (ii) use its Reasonable Efforts to maintain the Tangible Personal Property in good working condition and repair and (iii) use its Reasonable Efforts to comply with all Laws applicable to the conduct of the Acquired Business or the ownership and use of the Acquired Assets, in each case, except as would not reasonably be expected to have an Acquired Business Material Adverse Effect;

(b)    not sell, assign, transfer, convey, license or dispose of (including by waiver or release) any of the material Acquired Assets other than in the Ordinary Course of Business;

41

(c)      not cancel, terminate, fail to renew or amend, modify or change, in any material respect, any material Transferred Permit, in each case, other than in the Ordinary Course of Business;

(d)      not amend, supplement or modify in any material respect, terminate (other than with cause) or waive any material term under, exercise any material option under or give any material consent with respect to any material Transferred Contract, in each case, other than in the Ordinary Course of Business;

(e)      not institute, settle or consent to any material litigation, arbitration or other proceeding (whether at law or in equity) or Order that would (i) become an Assumed Liability or (ii) have a material and adverse effect on Purchaser's ownership, use or operation of, or the value of, the Acquired Assets, or Purchaser's conduct of the Acquired Business, after the Closing;

(f)      not (i) increase the base salary, base wage rate or cash incentive opportunities of any of the Acquired Business Employees, or (ii) enter into any collective bargaining agreement or other Contract, agreement or understanding with any labor union or similar representative of any of the Acquired Business Employees, in each case, except to the extent determined to be reasonably necessary by any Seller to prevent an Acquired Business Material Adverse Effect;

(g)      not take any of the actions described in Section 5.1(r)(ii) through 5.1(r)(v); and

(h)      not agree in writing to take any of the actions described above in clauses (a) through (g) of this Section 7.1.

Section 7.2      Efforts to Satisfy Closing Conditions.  Each party to this Agreement will use their good-faith, reasonable best efforts to take, or cause to be taken, all actions necessary, proper or advisable to (a) satisfy all of the conditions set forth in Article IX; (b) comply promptly with all legal requirements that may be imposed on such party with respect to the transactions contemplated by this Agreement and, subject to the conditions set forth in Article IX, to consummate the transactions contemplated by this Agreement; and (c) make any required filing with or notification to, and obtain (and to cooperate with the other party to obtain) any consent, authorization, order or approval of, or any exemption by, any Governmental or Regulatory Authority and any other third party that is required to be made or obtained by it in connection with the transactions contemplated by this Agreement, including the Purchaser Required Approvals.

Section 7.3      Assets Incapable of Transfer. To the extent that any Transferred Contract or Transferred Permit is not assignable or transferable without the consent of another Person and such consent requirement is not made unenforceable by the Bankruptcy Code, this Agreement will not constitute an assignment or transfer thereof, an attempted assignment or transfer thereof, or an agreement to effect such an assignment or transfer, if such assignment or transfer, attempted assignment or transfer, or agreement would constitute a breach thereof. Sellers, upon the reasonable request by Purchaser, will use their Reasonable Efforts to obtain the consent of such other Person to the assignment or transfer of any such Transferred Contract and/or Transferred

42

Permit to Purchaser in all cases in which (a) such consent is or may be required for such assignment or transfer and (b) such consent requirement is not made unenforceable by the Bankruptcy Code. Purchaser will, without additional cost or expense to Purchaser, cooperate with Sellers in their efforts to obtain such consents. For purposes of clarification, Reasonable Efforts by Sellers will in no event require the payment of any money or permit, without the prior written consent of Purchaser, the amendment or modification of any material term or provision of any Transferred Contract or Transferred Permit, but Reasonable Efforts shall include appropriate filings by Sellers in the Bankruptcy Court seeking a determination that the Bankruptcy Code renders unenforceable the consent requirement in question. Notwithstanding the foregoing, failure to obtain any such consent will not give rise to Purchaser's ability not to consummate the transactions contemplated by this Agreement. Without limiting the generality of the foregoing, the beneficial interest in and to the Transferred Contracts or Transferred Permits, to the fullest extent permitted by the relevant Transferred Contract or Transferred Permit and applicable Law, will pass to Purchaser.

Section 7.4    Discovery of Breach. Sellers shall promptly notify Purchaser if, prior to the Closing, Sellers conclude or discover that any of Sellers' representations and warranties contained in this Agreement is not accurate in any material respect such that the conditions set forth in Article IX are incapable of being satisfied, which notice will summarize the reason for such conclusion. Purchaser shall immediately notify Sellers if, prior to the Closing, Purchaser concludes or discovers that any of Purchaser's representations and warranties contained in this Agreement is not accurate in any material respect such that the conditions set forth in Article IX are incapable of being satisfied, which notice will summarize the reason for such conclusion.

Section 7.5    Ability to Supplement Disclosure Schedules. Sellers may, prior to Closing, from time to time, but in no event later than five (5) Business Days prior to the Closing, supplement or amend the Seller Disclosure Schedules with respect to any event, circumstance or matter (each a "**New Matter**"), that is required to be set forth or described in such Seller Disclosure Schedules (a "**Disclosure Update**") to make such Seller Disclosure Schedules true and correct as of the Closing Date. Any such Disclosure Update will not cure any breach or inaccuracy of any representation or warranty made in this Agreement for any purpose or diminish the rights or remedies of Purchaser with respect thereto, nor shall any such notification affect any conditions to the obligations of the parties hereunder.

Section 7.6    Restricted Use of Confidential Information. Purchaser acknowledges and agrees that all information furnished to it in connection with this Agreement, the Related Agreements or the transactions contemplated hereby or thereby (i) is subject to the Confidentiality Agreement, the terms of which are incorporated herein by reference, and (ii) subject to Section 2 of the Confidentiality Agreement, constitutes Confidential Information. Notwithstanding anything to the contrary contained in the Confidentiality Agreement (including any expiration or termination thereof in accordance with its terms), the parties hereto agree that (A) during the period from the Execution Date to the Closing Date, Purchaser shall hold all Confidential Information in accordance with the obligations set forth in the Confidentiality Agreement (as if Purchaser were the Receiving Party thereunder) and (B) from and after the Closing Date, for a period of five (5) years, (x) Purchaser shall hold all Confidential Information, to the extent relating to any Excluded Assets, Excluded Liabilities or Employees (other than Transferred Employees), in accordance with the confidentiality and non-use obligations set forth in the Confidentiality Agreement (as if Purchaser were the Receiving Party thereunder) and (y) Sellers shall hold all Confidential

Information, to the extent relating to any Acquired Assets, Assumed Liabilities or Transferred Employees, in accordance with the confidentiality and non-use obligations set forth in the Confidentiality Agreement (as if Sellers were the Receiving Party thereunder). If this Agreement is terminated for any reason prior to the Closing, the Confidentiality Agreement shall continue in full force and effect in accordance with its terms.

Section 7.7    Review and Inspections. Subject to Section 4.3, during the period from the Execution Date to the Closing Date, upon reasonable advance written notice, Sellers will provide Purchaser and its Representatives and designees with reasonable access to Seller's books, records, systems, system master data and transactional data and facilities and reasonably make appropriate accountants, attorneys and advisors available during normal business hours in order to permit Purchaser to complete its review of Sellers for purposes of facilitating the transfer to Purchaser of the Acquired Assets, and will reasonably promptly comply with any reasonable requests relating thereto made by or on behalf of Purchaser. The parties will use Reasonable Efforts to share information protected from disclosure under the attorney-client privilege, work product doctrine, joint defense privilege or any other privilege pursuant to this Section 7.7 in a manner so as to preserve the applicable privilege. Any party may share information with any other party on an "outside counsel only" basis. Nothing in this Agreement shall obligate the parties to share any information covered by the attorney client privilege, work product doctrine or other similar privilege. Sellers acknowledge that Purchaser's review includes an assessment of and preparation for the efficient and orderly transition of the Acquired Business to Purchaser, at and after and subject to the Closing. Without limiting the generality of the foregoing, at any time on or before the Closing Date, upon reasonable advance written notice, Purchaser, its Representatives and designees, shall be granted reasonable access during normal business hours by Sellers to inspect the Transferred Real Property and Seller's records relating thereto (including interviews with Sellers and any Representatives of Sellers) to evaluate the Transferred Real Property for Hazardous Materials and compliance with Environmental Laws. Purchaser shall be entitled to obtain and evaluate all environmental reports and studies related to the Transferred Real Property that are in Sellers' possession, necessary or advisable in Purchaser's sole discretion. Notwithstanding any of the foregoing provisions of this Section 7.7, Purchaser shall not have the right to conduct invasive environmental investigation of any kind on the Acquired Assets, or conduct any structural evaluation or invasive environmental investigation of any kind, including in the form of soil and groundwater sampling, nor be entitled to any environmental reports or other similar information related to Excluded Assets.

Section 7.8    No Use of Sellers Brand. Purchaser shall, within sixty (60) days after the Closing Date, (a) cease use of the Sellers Brand and (b) change signage and stationery and otherwise discontinue public use of the Sellers Brand. As promptly as reasonably practicable after the Closing Date, Purchaser and its Affiliates shall file applications to amend or terminate any certificate of incorporation, certificate of assumed name or d/b/a filings so as to eliminate its right to use the Sellers Brand.

Section 7.9    Background License.

(a)    Effective as of the Closing, each Seller hereby grants to Purchaser and its Affiliates, or alternatively shall procure for Purchaser and its Affiliates from purchasers of the Proterra Other Business Units or assets of any Seller, a worldwide, fully paid-up,

royalty-free, irrevocable, non-terminable, perpetual, sublicensable (including through multiple tiers), non-exclusive license under and to all patents and patent applications (excluding trademarks, websites and domain names) Licensable by a Seller or any of its Affiliates that is not an Acquired Asset and that is used or held for use in or necessary for the operation and maintenance of the Acquired Business as conducted at any time prior to the Closing (including to make, have made, use, sell, offer to sell, and import any product or service, to reproduce, make derivative works of, distribute, display and perform any work, and to use such Intellectual Property) solely in connection with the Acquired Business as conducted as of Closing; provided, for the avoidance of doubt, in no event shall Purchaser or any sublicensee, transferee or assignee of the license granted pursuant to this Section 7.9(a) be used to compete with the Proterra Powered Business Unit as conducted prior to Closing. Purchaser or its Affiliates may assign and otherwise transfer such license, in whole or in part, following written notice to Volvo Battery Solutions LLC (8003 Piedmont Triad Parkway, Greensboro, North Carolina 27409, Attention: Gregory Higgins, Rikard Bentelius and Fredrik Brunell and an additional copy to Greenberg Traurig, LLP, 1000 Louisiana Street, Suite 1700 Houston, Texas 77002 Attention: Shari L. Heyen and David R. Eastlake)or its assignee, (a) to any lender or other financing source as collateral security following the Closing, (b) to an Affiliate or (c) in connection with any assignment, sale, merger, or other transfer of all or any part of the Acquired Business or a product or service line of the Acquired Business or any of its Affiliates (regardless of the form of transaction or series of transactions). All use of such licensed Intellectual Property by or under authority of Purchaser or its Affiliates (or their successors and assigns) from and after the Closing shall be on an "AS IS, WHERE IS" basis, with all faults and all express and implied representations and warranties disclaimed, and at their sole risk.

(b)    Effective as of the Closing, Purchaser hereby grants to the Sellers and purchasers of the Proterra Other Business Units or assets of any Seller and their Affiliates (or on request shall provide a standalone license agreement directly to purchasers of the Proterra Other Business Units or assets of any Seller and their Affiliates granting) a worldwide, fully paid-up, royalty-free, irrevocable, non-terminable, perpetual, sublicensable (including through multiple tiers), non-exclusive license under and to all Purchased Intellectual Property (excluding trademarks, websites and domain names) that is used or held for use in or necessary for the operation and maintenance of the Proterra Other Business Units (and/or any assets acquired in connection therewith) as conducted at any time prior to the Closing (including to make, have made, use, sell, offer to sell, and import any product or service, to reproduce, make derivative works of, distribute, display and perform any work, and to use such Intellectual Property) solely in connection with (x) (i) the Proterra Other Business Units as conducted at any time prior to Closing and (ii) the design, manufacture, marketing, promotion, sale, distribution, maintenance, repair or servicing of battery systems, electric drivetrains or electrification solutions for commercial vehicles, marine applications (boats/vessels), construction equipment, stationary battery energy storage systems, and, in the case of each of clauses (i) and (ii), any natural extensions thereof, and (y) the provision of transition services to the Proterra Other Business Units. Sellers and purchasers of the Proterra Other Business Units or their Affiliates may assign and otherwise transfer such license, in whole or in part, (a) to any lender or other financing source as collateral security following the Closing, (b) to an Affiliate or (c) in connection with any assignment, sale, merger, or other transfer of all or

any part of a Proterra Other Business Unit or a product or service line of a Proterra Other Business Unit or any of its Affiliates (regardless of the form of transaction or series of transactions). All use of such licensed Intellectual Property by or under authority of Sellers and purchasers of the Proterra Other Business Units or their Affiliates (or their successors and assigns) from and after the Closing shall be on an "AS IS, WHERE IS" basis, with all faults and all express and implied representations and warranties disclaimed, and at their sole risk.

Section 7.10   Support Obligations. Purchaser shall replace, effective as of Closing, the credit support obligations (including the letters of credit) provided by Sellers or any of their Affiliates with respect to the Acquired Business, the Acquired Assets or the operation thereof, as listed on Schedule 7.10, as the same may be updated from time to time to include additional credit support provided by Sellers or any of their Affiliates with respect to the Acquired Business, the Acquired Assets or the operation thereof at any time on or after the date hereof and prior to Closing in accordance with the terms and conditions set forth herein (collectively, the "**Support Obligations**"). In furtherance of the foregoing, Purchaser shall obtain, prior to the Closing, substitute credit support arrangements in replacement for the Support Obligations, which substitute credit support arrangements shall be in form and substance reasonably satisfactory to Sellers.

Section 7.11   Transition Services Agreement. From the date hereof until Closing (or the earlier termination of this Agreement pursuant to Article X), Purchaser shall use commercially reasonable efforts to enter into a Transition Services Agreement.

ARTICLE VIII

Employee Matters

Section 8.1   Transferred Employees. At least ten (10) Business Days prior to, and contingent on the occurrence of the Closing, Purchaser shall extend an offer of employment to those Acquired Business Employees to whom Purchaser has determined to offer employment, with such employment to take effect under the terms stated herein as of the Closing Date. Each such Acquired Business Employee who accepts an offer of employment from Purchaser and commences employment with Purchaser or an applicable Affiliate of Purchaser shall be referred to herein as a "**Transferred Employee**". Purchaser shall provide Sellers with information that Sellers reasonably request to verify that such offers of employment are in compliance with this Article VIII.

Section 8.2   Benefits Matters. With respect to each Transferred Employee who is not covered by a collective bargaining agreement, for a period of at least twelve (12) months following the Closing Date, Purchaser shall provide each Transferred Employee with a position that is comparable to such Transferred Employee's position immediately prior to the Closing and shall maintain: (a) base salary or base wage rate at least equal to such Transferred Employee's base salary and base wage rate as in effect immediately prior to the Closing, (b) cash incentive opportunities for such Transferred Employee that are no less favorable than those in effect for such Transferred Employee immediately prior to the Closing and (c) retirement, health and welfare

benefits that are no less favorable than those provided to similarly situated employees of Purchaser or an applicable Affiliate.

Section 8.3    Labor Matters. Purchaser agrees that, as of and following the Closing Date, Purchaser shall recognize any union or other labor representatives of the Transferred Employees. Without limiting the generality of this Section 8.3 or Purchaser's obligations under this Agreement, (a) with respect to each Transferred Employee covered by a collective bargaining agreement, Purchaser shall comply with the terms of the applicable collective bargaining agreement and (b) Purchaser and Sellers shall, and shall cause their respective Affiliates to, cooperate to take all steps, on a timely basis, as are required under applicable Laws or any collective bargaining agreement to notify, consult with, or negotiate the effect, impact, terms or timing of the transactions contemplated by this Agreement with the unions, works councils or other labor representatives of the Transferred Employees or a Governmental or Regulatory Authority to the extent required by applicable Law or any collective bargaining agreement.

Section 8.4    Benefits Eligibility. As of and after the Closing, Purchaser shall provide each Transferred Employee with service credit for purposes of eligibility, vesting and level of benefits (but not for purposes of benefit accrual under any defined benefit pension plan) under any employee benefit plan, policy or arrangement sponsored by Purchaser or any of its Affiliates (each, a "**Purchaser Plan**") for such Transferred Employee's service prior to the Closing with Sellers or any of their respective Affiliates (and their respective predecessors), to the same extent that such service was recognized immediately prior to the Closing under a comparable Benefit Plan; provided, that such service shall not be credited to the extent such credit would result in any duplication of compensation or benefits.  Without limiting the foregoing, (i) each Transferred Employee (and spouse and dependents thereof) will not be subject to any limitations as to pre-existing conditions, actively-at-work requirements, exclusions or waiting periods under any Purchaser Plan that is a health or welfare plan for any limitations for which such employee would have been entitled to coverage under a comparable Benefit Plan in which such Transferred Employee (or spouse or dependent thereof) was eligible to participate immediately prior to the Closing Date and (ii) Purchaser shall cause each Transferred Employee (and spouse and dependents thereof) to be given full credit under each such Purchaser Plan for any co-payments, deductibles, out-of-pocket expenses and lifetime maximums paid or satisfied, as applicable, during the relevant plan year up to and including the Closing Date.

Section 8.5    WARN Act. With respect to Transferred Employees, Purchaser will have responsibility under the WARN Act relating to any act or omission of Purchaser after the Closing Date. With respect to the Employees, Sellers will have full responsibility under the WARN Act relating to any act or omission of Sellers prior to and on the Closing Date. Sellers shall be responsible for all other WARN Act Liabilities relating to the periods prior to and on the Closing Date, including any such Liabilities that result from any Acquired Business Employees' separation of employment from Sellers and/or Acquired Business Employees not becoming Transferred Employees pursuant to this Article VIII. Unless otherwise agreed to by Sellers and Purchaser, Sellers agree to issue, no later than sixty (60) days prior to the Closing Date, all applicable WARN Act notices, in a form acceptable to Purchaser, to the Acquired Business Employees and all other parties required to receive notice under the WARN Acts.

## ARTICLE IX

### Conditions to Closing

Section 9.1    Conditions to the Obligations of Purchaser. The obligation of Purchaser to effect the Closing is subject to the satisfaction (or waiver by Purchaser) on the Closing Date of the following conditions:

(a)    Representations and Warranties. (i) Each of the Seller Fundamental Representations shall be true and correct in all material respects, in each case as of the Execution Date and as of the Closing as if made as of the Closing, except for such representations and warranties which are as of a specific date, which shall be true and correct in all material respects as of such date, and (ii) each of the representations and warranties of Sellers contained herein (other than the Seller Fundamental Representations) shall be true and correct in all respects (without giving effect to any limitation as to materiality or Acquired Business Material Adverse Effect), in each case as of the Execution Date and as of the Closing as if made as of the Closing, except for (x) changes permitted or contemplated hereby; (y) representations and warranties which are as of a specific date, which shall be true and correct as of such date, subject to the immediately following clause (z); or (z) where the failure to be so true and correct would not in the aggregate have an Acquired Business Material Adverse Effect or have a material adverse effect on the ability of Sellers to consummate the transactions contemplated hereby. Purchaser will have received a certificate from Sellers signed on behalf of each Seller by a duly authorized officer thereof with respect to the foregoing.

(b)    Covenants. The covenants and agreements of Sellers to be performed on or prior to the Closing will have been duly performed in all material respects. Purchaser will have received a certificate from Sellers signed on behalf of each Seller by a duly authorized officer thereof with respect to the foregoing.

(c)    Related Agreements. Each Seller will have duly executed and delivered to Purchaser the Related Agreements  to which such Seller is to be a party.

(d)    Seller's Deliveries. Sellers will have delivered or caused to be delivered to Purchaser the items listed in Section 4.2(a) in form and substance as required herein.

(e)    Acquired Business Material Adverse Effect. Since the Execution Date, there shall not have occurred or been discovered any developments, circumstances or occurrences with regard to any of the Acquired Assets or the Acquired Business, that, individually or in the aggregate, has had an Acquired Business Material Adverse Effect.

Section 9.2    Conditions to the Obligations of Sellers. The obligation of Sellers to effect the Closing is subject to the satisfaction (or waiver by Sellers) on the Closing Date of the following conditions:

(a)    Representations and Warranties. Each of the representations and warranties of Purchaser contained herein shall be true and correct in all material respects, in each case as of the Execution Date and as of the Closing as if made as of the Closing, except for such

48

representations and warranties which are as of a specific date, which shall be true and correct in all material respects as of such date. Sellers will have received a certificate from Purchaser signed on behalf of Purchaser by a duly authorized officer thereof with respect to the foregoing.

(b)     Covenants. The covenants and agreements of Purchaser to be performed on or prior to the Closing will have been duly performed in all material respects. Sellers will have received a certificate from Purchaser signed on behalf of Purchaser by a duly authorized officer thereof with respect to the foregoing.

(c)     Receipt of Purchase Price. Sellers will have received from Purchaser an amount equal to (i) the Purchase Price minus (ii) the Earnest Deposit, as provided and in accordance with Section 3.1(b) of the Agreement. Sellers will have also received the Earnest Deposit from the Escrow Agent. Sellers shall have received evidence of the payment of the Cure Amounts.

(d)     Related Agreements. Purchaser will have duly executed and delivered to Sellers each of the Related Agreements to which Purchaser is a party.

(e)     Purchaser's Deliveries. Purchaser will have delivered or caused to be delivered to Sellers the items listed in Section 4.2(b).

Section 9.3     Conditions Precedent to Obligations of Purchaser and Sellers. The respective obligations of the parties to effect the Closing are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser and Sellers in whole or in part to the extent permitted by applicable Law):

(a)     there shall not be in effect any Order by a Governmental or Regulatory Authority (i) declaring this Agreement or any Related Agreement invalid or unenforceable in any respect or (ii) restraining, enjoining or otherwise prohibiting or making illegal the Closing, in each case, that is not stayed by the commencement of the Bankruptcy Cases or any Order of the Bankruptcy Court;

(b)     the Sale Order, together with any other Order of the Bankruptcy Court required to consummate the transactions contemplated hereby, shall have been entered by the Bankruptcy Court and each such Order (i) is not subject to any stay, and (ii) has not been vacated, reversed, or modified in a material matter with respect to Purchaser's rights or protections thereunder without Purchaser's prior written consent;

(c)     subject to the provisions of Section 7.3, the Sale Order shall approve and authorize the assumption and assignment of the Transferred Contracts and the Transferred Contracts shall have been actually assumed and assigned to Purchaser, subject to the payment of applicable Cure Amounts by Purchaser;

(d)     any applicable waiting period (and any extensions thereof) under the HSR Act shall have expired or been terminated;

(e)     all Purchaser Required Approvals shall have been obtained and shall be in full force and effect; and

(f)     all conditions to the closing of the Sale under the Sale Order other than the Closing, shall have occurred or been waived pursuant to the terms of the Sale Order.

Section 9.4     Frustration of Closing Conditions. Purchaser may not rely on the failure of any condition set forth in this Article IX to be satisfied if such failure was caused by Purchaser's failure to comply with the terms of this Agreement. Sellers may not rely on the failure of any condition set forth in this Article IX to be satisfied if such failure was caused by any Seller's failure to comply with the terms of this Agreement.

ARTICLE X

Termination

Section 10.1     Termination. Subject to Section 10.2, this Agreement may be terminated at any time prior to the Closing Date:

(a)     by written agreement of Sellers and Purchaser;

(b)     by the Sellers by written notice to the Purchaser, if the Closing has not occurred on or prior to the Outside Closing Date (unless, in each case, the failure to consummate the Closing by such date is due to the failure of a Seller to have fulfilled any of its obligations under this Agreement);

(c)     by either Purchaser, on the one hand, or Sellers, on the other hand, by written notice to the other, in the event that any Governmental or Regulatory Authority has issued a final, non-appealable Order or ruling or taken any other final, non-appealable action, or any applicable Law has been entered, adopted, enacted or promulgated, in each case permanently restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement that is not stayed by the commencement of the Bankruptcy Cases or any order of the Bankruptcy Court;

(d)     by Sellers, by written notice to Purchaser, (i) in the event that, other than through the failure of a Seller to comply with its obligations under this Agreement, one or more of the conditions to Sellers' obligation to effect the Closing is or becomes impossible to satisfy at any time after the Execution Date and Sellers have not waived such condition(s) or (ii) if neither Seller is in material breach of any terms of this Agreement, upon a material breach of a representation, warranty, or covenant on the part of Purchaser set forth in this Agreement such that a condition set forth in Section 9.2 or Section 9.3 would not reasonably be expected to be satisfied as of the time of such termination, and such breach is not capable of being cured or has not been cured within 30 days after Purchaser receives written notice thereof from Sellers;

(e)     by Purchaser, by written notice to Sellers, (i) in the event that, other than through the failure of Purchaser to comply with its obligations under this Agreement, one or more of the conditions to Purchaser's obligation to effect the Closing is or becomes

50

impossible to satisfy at any time after the Execution Date and Purchaser has not waived such condition(s) or (ii) if Purchaser is not in material breach of any terms of this Agreement, upon a material breach of a representation, warranty, or covenant on the part of a Seller set forth in this Agreement such that a condition set forth in Section 9.1 or Section 9.3 would not reasonably be expected to be satisfied as of the time of such termination, and such breach is not capable of being cured or has not been cured within 30 days after Seller receives written notice thereof from Purchaser;

(f)   by Purchaser, by written notice to Sellers, if the Sale Order entered by the Bankruptcy Court has been (A) vacated or reversed or (B) modified in a manner that is adverse to Purchaser in any material respect without Purchaser's prior written consent;

(g)   by either Purchaser, on the one hand, or Sellers, on the other hand, by written notice to the other, if (i) Purchaser is not the Successful Bidder or Backup Bidder at the Auction, (ii) prior to Closing, the Bankruptcy Court enters an order dismissing or converting the Bankruptcy Cases to a case under Chapter 7 of the Bankruptcy Code or (iii) the Bankruptcy Court enters an Order denying approval of the Sale Order or represents at a Sale Hearing (as defined in the Bidding Procedures Order) or other hearing that the Bankruptcy Court will not approve entry of the Sale Order;

(h)   by Purchaser, by written notice to Sellers, if, Sellers withdraw the request for authority to sell the Acquired Assets and assume and assign the Transferred Contracts; or

(i)   by Purchaser, by written notice to Sellers, if Sellers (i) move to voluntarily dismiss the Bankruptcy Cases or (ii) move for conversion of the Bankruptcy Cases to a case under chapter 7 of the Bankruptcy Code, in each case, unless the effectiveness thereof is to occur after the Closing.

Section 10.2   Effect of Termination. In the event of the termination of this Agreement in accordance with Section 10.1, this Agreement will thereafter become void and have no effect, and no party hereto will have any liability to the other party hereto or their respective Affiliates, directors, officers or employees, except for the obligations of the parties hereto contained in this Section 10.2, in Article XII and in Section 7.6; provided, however, that (a) if this Agreement is validly terminated by Purchaser prior to Closing pursuant to Section 10.1(e)(ii), Escrow Agent shall, within two (2) Business Days following the termination of this Agreement and without the requirement of any approval by the Bankruptcy Court, distribute the Deposit Escrow Funds to Purchaser and such distribution to Purchaser shall be Purchaser's sole and exclusive remedy as a result of such termination, and (b) if this Agreement is validly terminated by Sellers or Purchaser prior to Closing for any reason other than by Purchaser pursuant to Section 10.1(e)(ii), Escrow Agent shall, within two (2) Business Days following the termination of this Agreement and without the requirement of any approval by the Bankruptcy Court, distribute the Deposit Escrow Funds to Sellers and Sellers shall be entitled to retain the Deposit Escrow Funds.

ARTICLE XI

Bankruptcy Matters

Section 11.1    Bankruptcy Cases. On the Petition Date, Sellers filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code, which cases are jointly administered under Case No. 23-11120 (BLS) (the "**Bankruptcy Cases**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") as of the Execution Date.

Section 11.2    Bankruptcy Court Approvals

(a)    Sellers and Purchaser acknowledge that this Agreement is subject to approval by the Bankruptcy Court by entry of the Sale Order.

(b)    If Purchaser is selected as the Successful Bidder or Backup Bidder pursuant to the Bidding Procedures Order, a list of the Transferred Contracts shall be attached to the Sale Order.

(c)    If the Sale Order or any other Orders of the Bankruptcy Court relating to the transactions contemplated by this Agreement shall be appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or re-argument shall be filed with respect to the Sale Order or other such Order), subject to rights otherwise arising from this Agreement, including each party's respective right to terminate this Agreement pursuant to Section 10.1, Sellers and Purchaser shall use their Reasonable Efforts to oppose such appeal, petition or motion and obtain an expedited resolution of any such appeal, petition or motion.

(d)    Purchaser and Sellers agree that from and after the date that the Auction is declared closed by Sellers, Sellers will not, directly or indirectly, and will not permit any of their respective Affiliates or Representatives (or Representatives of any of their respective Affiliates) to initiate contact with, or solicit or knowingly encourage submission of any inquiries, proposals or offers by, any Person with respect to an Alternative Transaction or otherwise facilitate any effort or attempt to make a proposal or offer to Sellers or any of their respective Affiliates or Representatives (or Representatives of any of their respective Affiliates) with respect to an Alternative Transaction. For the avoidance of doubt, Sellers will not, and will not permit any of their respective Affiliates or Representatives (or Representatives of any of their respective Affiliates) to, pursue or agree to any Alternative Transaction other than as expressly permitted by and in accordance with the Bidding Procedures Order; provided, that Sellers shall have the responsibility and obligation to respond to any inquiries or offers to purchase all or any part of the Acquired Assets and perform any and all other acts related thereto that are required under the Bankruptcy Code, fiduciary obligations, or other applicable law, including, supplying information relating to the Acquired Assets to prospective purchasers, notwithstanding any provisions of Section 7.6 hereof to the contrary.

Section 11.3   <u>Further Filings and Assurances</u>.

(a)     Purchaser agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Purchaser, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under the Transferred Contracts and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code.

(b)     In the event the entry of the Sale Order shall be appealed, each party shall use its respective Reasonable Efforts to defend against such appeal, provided however, that nothing herein shall alter, amend or modify the conditions to Closing set forth in <u>Section 9.3(b)</u> hereof.

Section 11.4   <u>Notice of Sale.</u> Notice of the sale of Acquired Assets contemplated in this Agreement shall be served in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Local Rules of the Bankruptcy Court and the Bidding Procedures Order.

Section 11.5   <u>Free and Clear</u>. The transfer of the Acquired Assets shall vest Purchaser with all right, title, and interest of Sellers in the Acquired Assets free and clear of any and all Liens, Liabilities and other Interests (other than Permitted Encumbrances and Assumed Liabilities) pursuant to Sections 363(f) and/or 1123(b)(4) of the Bankruptcy Code, whether arising by statute or otherwise and whether arising before or after the commencement of the Bankruptcy Cases, whether known or unknown, including Interests of or asserted by any of the creditors, vendors, employees, suppliers, or lessors of Sellers or any other third party; <u>provided</u>, that any and all such Liens, Liabilities and other Interests shall attach to the net proceeds of the Purchase Price, with the same priority, validity, force, and effect as they now have against the Acquired Assets. Purchaser shall not be liable for any liability for any Lien, Liability or other Interest, other than the Assumed Liabilities and Permitted Encumbrances.

Section 11.6   <u>Transfer Tax Exemption</u>. The transactions contemplated herein shall be exempt from Transfer Tax to the fullest extent available in accordance with Section 1146 of the Bankruptcy Code.

ARTICLE XII

Miscellaneous

Section 12.1   <u>Survival</u>. All covenants and agreements contained herein which by their terms are to be performed in whole or in part, or which prohibit actions, subsequent to the Closing shall, solely to the extent such covenants and agreements are to be performed, or prohibit actions, subsequent to the Closing, survive the Closing in accordance with their terms until fully performed or satisfied. All other covenants and agreements contained herein, and all representations and warranties contained herein or in any certificated deliveries hereunder, in each case shall not

53

survive the Closing and shall thereupon terminate and be of no further force or effect, including any actions for damages in respect of any breach or inaccuracy thereof.

Section 12.2    Governing Law and Jurisdiction. Except to the extent governed by the Bankruptcy Code, this Agreement will be governed by and be construed in accordance with the Laws of the State of Delaware, without regard however to the conflicts of laws principles thereof. Without limiting any party's right to appeal any Order of the Bankruptcy Court, (a) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes that may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, including, but not limited to, the assumption and assignment of the Transferred Contracts and (b) any and all legal proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereto hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations pursuant to Section 12.3 hereto. To the extent not prohibited by applicable Law or Bankruptcy Court rule, each party hereby waives and agrees not to assert, by way of motion, as a defense or otherwise in any such proceeding, any claim (i) that it is not subject to the jurisdiction of the Bankruptcy Court, (ii) that the proceeding is brought in an inconvenient forum, (iii) that it is immune from any legal process with respect to itself or its property, (iv) that the venue of the proceeding is improper or (v) that this Agreement or the subject matter hereof or thereof may not be enforced in or by such court. Each of the parties hereto hereby (a) irrevocably submits with regard to any such legal proceeding to the exclusive personal jurisdiction of the Bankruptcy Court in the event any dispute arises out of this Agreement or any transaction contemplated hereby, including, but not limited to, the assumption and assignment of the Transferred Contracts, (b) agrees that it shall not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from the Bankruptcy Court or that such action is brought in an inconvenient forum and (c) agrees that it shall not bring any action relating to this Agreement or any transaction contemplated hereby in any court other than the Bankruptcy Court; provided, that, a party may commence any action or proceeding in a court other than the Bankruptcy Court solely for the purpose of enforcing an order or judgment issued by the Bankruptcy Court. The parties waive personal service of any and all process on each of them and consent that all such service of process shall be made in the manner, to the party and at the address set forth in Section 12.3 of this Agreement, and service so made shall be complete as stated in such Section 12.3. EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY.

Section 12.3    Notices. All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by e-mail (so long as no "bounceback" or similar "undeliverable" message is received by the sender thereof) if successfully transmitted prior to 5:00 pm (Eastern Time) on any Business Day, and on the next Business Day if successfully transmitted after such time or on a non-Business Day or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 12.3):

(1)     If to Sellers, to:

> Proterra Inc
> 1815 Rollins Road
> Burlingame, California 94010
> Attention:     Jeff Mitchell
>                Proterra Legal Department
> Email:         jmitchell@proterra.com; Legal@proterra.com

and an additional copy (which will not constitute notice to Sellers) to:

> Paul, Weiss, Rifkind, Wharton & Garrison LLP
> 1285 Avenue of the Americas
> New York, New York 10019-6064
> Attention:     Paul M. Basta
>                Robert A. Britton
>                Austin S. Pollet
>                Michael J. Colarossi
> Email:         pbasta@paulweiss.com
>                rbritton@paulweiss.com
>                apollet@paulweiss.com
>                mcolarossi@paulweiss.com

(2)     If to Purchaser to:

> Phoenix Motor, Inc.
> 1500 LAKEVIEW LOOP
> ANAHEIM, CA 92807
> Attn: Mark Hastings
> Telephone: 916-622-5531
> Email: MarkH@phoenixmotorcars.com

Section 12.4    <u>Amendments and Waivers</u>.

(a)     This Agreement may be amended, superseded, canceled, renewed, or extended, and the terms hereof may be waived, only by a written instrument signed by the parties hereto or, in the case of a waiver, by the party against whom the waiver is to be effective. Neither the failure nor any delay by any party in exercising any right, power or privilege under this Agreement will operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power or privilege will preclude any other or further exercise of such right, power or privilege or the exercise of any other right, power or privilege. To the maximum extent permitted by applicable Law (i) no claim or right arising out of this Agreement can be discharged by one party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other party, (ii) no waiver that may be given by a party will be applicable except in the specific instance

for which it is given, and (iii) no notice to or demand on one party will be deemed to be a waiver of any obligation of such party or of the right of the party giving such notice or demand to take further action without notice or demand as provided in this Agreement.

(b)    A failure or omission of any party to insist, in any instance, upon strict performance by another party of any term or provision of this Agreement or to exercise any of its rights hereunder will not be deemed a modification of any term or provision hereof or a waiver or relinquishment of the future performance of any such term or provision by such party, nor will such failure or omission constitute a waiver of the right of such party to insist upon future performance by another party of any such term or provision or any other term or provision of this Agreement.

Section 12.5    Entire Agreement. This Agreement, together with the Seller Disclosure Schedules, the Purchaser Disclosure Schedules, all Exhibits and Schedules hereto and the documents, agreements, certificates and instruments referred to herein and therein, including the Related Agreements, Confidentiality Agreement and related Orders, including the Sale Order, constitutes the entire agreement between the parties hereto and with respect to the subject matter hereof and supersedes all prior representations, warranties, agreements, and understandings, oral or written, with respect to such matters and other than any written agreement of the parties that expressly provides that it is not superseded by this Agreement.

Section 12.6    Headings: Interpretation. The headings in this Agreement are intended solely for convenience of reference and will be given no effect in the construction or interpretation of this Agreement. Unless the context otherwise requires, the singular includes the plural, and the plural includes the singular.

Section 12.7    No Assignment: Binding Effect. This Agreement is not assignable by any party without the prior written consent of the other party. Notwithstanding the foregoing, Purchaser may, without the prior written consent of Sellers, assign this Agreement or all or any portion of Purchaser's rights, interests and obligations hereunder to any of its Affiliates upon notice given to Sellers at least three (3) Business Days prior to the Closing, provided however, that in no event will such an assignment release Purchaser from its obligations hereunder. This Agreement will be binding upon and will inure to the benefit of the parties hereto and their respective successors and permitted assigns.

Section 12.8    Counterparts. This Agreement may be executed in any number of counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument. Any electronic signature, including via portable document format (pdf) or DocuSign, attached hereto will be deemed to be an original and will have the same force and effect as an original signature.

Section 12.9    Incorporation by Reference. The Seller Disclosure Schedules, the Purchaser Disclosure Schedules and other Schedules and Exhibits and the documents referenced therein constitute integral parts of this Agreement and are hereby incorporated by reference herein.

Section 12.10    Time of the Essence. With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

56

Section 12.11 <u>Specific Performance</u>. Each party hereby acknowledges and agrees that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed by a party in accordance with their specific terms or were otherwise breached by a party. Notwithstanding anything to the contrary herein, if any party violates or refuses to perform any covenant or agreement made by such party herein, without limiting or waiving in any respect any rights or remedies of a party under this Agreement now or hereafter existing at law, in equity or by statute, the non-breaching party or parties shall, in addition to any other remedy to which a party is entitled at law or in equity, be entitled to specific performance of such covenant or agreement or seek any other equitable relief, in each case without the proof of actual damages. Each party agrees to waive any requirement for the security or posting of any bond in connection with any such equitable remedy, and agrees that it will not oppose the granting of an injunction, specific performance or other equitable relief on the basis that (a) the other party has an adequate remedy at law, or (b) an award of specific performance is not an appropriate remedy for any reason at law or equity.

Section 12.12 <u>No Third Party Beneficiaries</u>.

(a)     Except as provided in <u>Section 12.16</u>, the terms and provisions of this Agreement are intended solely for the benefit of the parties hereto and their respective successors and permitted assigns, and it is not the intention of the parties hereto to confer third party beneficiary rights upon any other Person.

(b)     For the avoidance of doubt, all provisions contained in this Agreement with respect to employee benefit plans or compensation of any Employees are included for the sole benefit of the respective parties hereto, and nothing contained herein (i) shall confer upon any former, current or future employee of Sellers or Purchaser or any legal representative or beneficiary thereof any rights or remedies, including any right to employment or continued employment, of any nature, for any specified period, (ii) shall cause the employment status of any former, present or future employee to be other than terminable at will, (iii) shall confer any third party beneficiary rights upon any Employee or any dependent or beneficiary thereof or any heirs or assigns thereof or (iv) shall constitute an amendment of any Benefit Plan or other employee compensation or benefit plan, program, policy or arrangement of Sellers, Purchaser or any of their respective Affiliates.

Section 12.13 <u>Expenses</u>. Whether or not the transactions contemplated hereby are consummated, each party hereto will pay its own costs and expenses incurred in connection with the negotiation, execution and closing of this Agreement and the Related Agreements and the transactions contemplated hereby and thereby provided. In the event of termination of this Agreement, the obligation of each party to pay its own expenses will be subject to any rights of such party arising from a breach of this Agreement by another party. Notwithstanding the foregoing, (a) Sellers agree to pay all costs of releasing existing Liens and other Interests and recording the releases, (b) Purchaser agrees to pay any filing fees in connection with the filings made pursuant to the HSR Act and any other federal, state or local Governmental or Regulatory Authority in accordance with <u>Section 6.1</u> and (c) Purchaser will pay the cost of all document recordation costs and all Transfer Taxes not determined to be exempt in accordance with Section 1146 of the Bankruptcy Code arising by reason of the transactions contemplated by this

Agreement to the extent the transactions contemplated herein are determined not to be exempt from such costs.

Section 12.14 <u>Severability</u>. If any term or other provision of this Agreement is illegal, invalid or unenforceable under any Law or as a matter of public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated by this Agreement is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision contained herein is, to any extent, invalid or unenforceable in any respect under the Laws governing this Agreement, the parties to this Agreement shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated by this Agreement be consummated as originally contemplated to the greatest extent possible.

Section 12.15 <u>Public Announcements</u>. Prior to the Closing, unless otherwise required by applicable Law, the Bankruptcy Court, the Bidding Procedures or Bidding Procedures Order or by obligations of Purchaser or Sellers or their respective Affiliates pursuant to any listing agreement with or rules of any securities exchange, Purchaser, on the one hand, and Sellers, on the other hand, shall consult with each other before issuing any press release or otherwise making any public statement with respect to this Agreement or the transactions contemplated hereby and shall not issue any such release or make any such statement without the prior written consent of the other (such consent not to be unreasonably withheld, conditioned or delayed). From and after the Closing, the parties hereto may make public statements with respect to this Agreement or the transactions contemplated hereby so long as such announcements do not disclose the specific terms or conditions of this Agreement, except where such terms and conditions have already been disclosed as required by Law or by obligations of Purchaser or Sellers or their respective Affiliates pursuant to any listing agreement with or rules of any securities exchange or the Bankruptcy Court; <u>provided</u>, that the issuing party shall use its Reasonable Efforts to consult with the other party with respect to the text thereof to the extent practicable.

Section 12.16 <u>No Liability; Release</u>.

(a)     (i) No past, present or future director, officer, manager, employee, incorporator, member, partner or equityholder or other Affiliates of (A) any Seller (other than such Seller in its capacity as such), or (B) Purchaser (other than any obligations hereunder or assumed herein), and (ii) none of the lenders or agents under any Indebtedness of a Seller , in any case, shall have any Liability for any obligations or liabilities of Sellers or Purchaser, as applicable, under this Agreement or any agreement, document or instrument entered into in connection herewith of or for any claim based on, in respect of, or by reason of, the transactions contemplated hereby and thereby. Any claim or cause of action based upon, arising out of, or related to this Agreement or any agreement, document or instrument contemplated hereby may only be brought against Persons that are expressly named as parties hereto or thereto, and then only with respect to the specific obligations set forth herein or therein. Other than the parties hereto, no other party shall have any Liability or obligation for any of the representations, warranties, covenants, agreements, obligations or liabilities of any party under this Agreement or the agreements, documents or instruments contemplated hereby or of or for any legal proceeding based on, in respect

of, or by reason of, the transactions contemplated hereby or thereby (including the breach, termination or failure to consummate such transactions), in each case whether based on contract, tort, fraud, strict liability, other Law or otherwise and whether by piercing the corporate veil, by a claim by or on behalf of a party hereto or another Person or otherwise.

(b)     Effective upon the Closing Date, Purchaser acknowledges that it has no claim, counterclaim, setoff, recoupment, action or cause of action of any kind or nature whatsoever against any of the individuals or entities within the Seller Group, that directly or indirectly arises out of, is based upon, or is in any manner connected with any Prior Event (including, for the avoidance of doubt, any Avoidance Actions) (collectively, the "**Purchaser Released Claims**"); and, should any Purchaser Released Claims nonetheless exist, Purchaser hereby (i) releases and discharges each member of the Seller Group from any liability whatsoever on such Purchaser Released Claims that directly or indirectly arises out of, is based upon, or is in any manner connected with a Prior Event, and (ii) releases, remises, waives and discharges all such Purchaser Released Claims against the Seller Group. For purposes of this Section 12.16(b), "**Seller Group**" means (1) each Seller, (2) the lenders and agents under the Indebtedness of any Seller, (3) the Statutory Committee of Unsecured Creditors of the Sellers in their Bankruptcy Cases, and any members thereof at any time, in each case, solely in their capacity as such, and (4) with respect to those parties in the foregoing (1)–(3) of this sentence, any of their respective agents, attorneys, financial advisors, legal representatives, consultants, legal advisors, Affiliates, directors, managers, officers, control persons (as defined in Section 15 of the Securities Act of 1933 (as amended) or Section 20 of the Securities Exchange Act of 1934 (as amended), shareholders, partners, estates, members, employees and successors and assigns, in each case, solely in their capacity as such, and "**Prior Event**" means any transaction, event, circumstances, action, failure to act or occurrence of any sort or type, including any approval or acceptance given or denied, whether known or unknown, which occurred, existed, was taken or begun prior to the consummation of the transactions contemplated hereunder; provided, that for the avoidance of doubt, "Prior Event" shall include any transaction, event, circumstances, action, failure to act or occurrence of any sort or type which occurred, existed, was taken or begun in accordance with, pursuant to or by virtue of: (A) any terms of this Agreement, (B) the transactions referred to herein, (C) the Bankruptcy Cases or the events leading to the commencement thereof, or (D) any oral or written agreement relating to the foregoing (A) to (C) of this sentence.

(c)     Without limiting in any way the scope of the release contained in subparagraph (a) or (b) of this Section 12.16 and effective upon the Closing Date, Purchaser, to the fullest extent allowed under applicable Law, hereby waives and relinquishes all statutory and common law protections purporting to limit the scope or effect of a general release, whether due to lack of knowledge of any claim or otherwise, including, waiving and relinquishing the terms of any Law which provides that a release may not apply to material unknown claims. Purchaser hereby further affirms its intent to waive and relinquish such unknown claims and to waive and relinquish any statutory or common law protection available in any applicable jurisdiction with respect thereto including, without limitation, California Civil Code § 1542, which provides:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

(d)     Notwithstanding anything set forth herein to the contrary, the releases set forth in this Section 12.16 do not extend to (i) any obligations that are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the willful misconduct, actual and intentional fraud or gross negligence of such Person or (ii) any obligations of the parties under this Agreement.

*[Signature Page to Follow]*

IN WITNESS WHEREOF, the parties, intending legally to be bound, have caused this Agreement to be duly executed as of the day and year first herein above written.

**SELLERS:**

PROTERRA INC

By: _____
Name: GARETH JOYCE
Title: CEO & PRESIDENT

PROTERRA OPERATING COMPANY, INC.

By: _____
Name: GARETH JOYCE
Title: CEO & PRESIDENT.

**PURCHASER:**

PHOENIX MOTOR INC.

By: _____
Name: JAMES MARK HASTINGS
Title: SENIOR VICE PRESIDENT

**Exhibit C**

**Chapter 11 Plan Support Agreement**

**THIS CHAPTER 11 PLAN SUPPORT AGREEMENT DOES NOT CONSTITUTE, AND SHALL NOT BE DEEMED TO BE, AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OR 1126 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS CHAPTER 11 PLAN SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.**

**THIS CHAPTER 11 PLAN SUPPORT AGREEMENT DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE TRANSACTIONS DESCRIBED HEREIN, WHICH TRANSACTIONS WILL BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN AND THE CLOSING OF ANY TRANSACTION SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS AND THE APPROVAL RIGHTS OF THE PARTIES SET FORTH HEREIN AND IN SUCH DEFINITIVE DOCUMENTS.**

### *CHAPTER 11 PLAN SUPPORT AGREEMENT*

This CHAPTER 11 PLAN SUPPORT AGREEMENT (including all exhibits, annexes, and schedules hereto in accordance with **Section 13.02**, in each case, as may be amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof, this "Agreement") is made and entered into as of November 6, 2023 (the "Execution Date"), by and among the following parties (each of the following described in clauses (a) through (b) of this preamble, collectively, the "Parties"):

    (a)    Proterra Inc ("Proterra"), a company incorporated under the Laws of Delaware, and Proterra Operating Company, Inc., its direct subsidiary (together, the "Debtors" or "Company"), each of which is a debtor and debtor in possession in the Chapter 11 Cases, to the extent each has executed and delivered a counterpart signature page to this Agreement to counsel to the Plan Sponsor; and

    (b)    CSI GP I LLC, CSI Prodigy Holdco LP, CSI Prodigy CoInvestment LP, and CSI PRTA Co-Investment LP (each, a "Plan Sponsor Party" and collectively, the "Plan Sponsor").

### *RECITALS*

**WHEREAS**, on August 7, 2023 (the "Petition Date"), each of the Debtors commenced a case (collectively, the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

**WHEREAS**, the Debtors and the Plan Sponsor have in good faith and at arm's length negotiated certain restructuring transactions with respect to the Debtors on the terms set forth in this Agreement and as specified in the term sheet attached as **Exhibit A** hereto (as may be amended, supplemented, or otherwise modified from time to time pursuant to this Agreement, including all exhibits, schedules, supplements, appendices, annexes, and attachments thereto, the "Plan Term Sheet"), subject to agreement on definitive documentation and approval by the Bankruptcy Court; and

**WHEREAS**, the Parties have agreed to take certain actions to implement the Restructuring Transactions on the terms and conditions set forth in this Agreement.

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound, hereby agrees as follows:

*AGREEMENT*

**Section 1.**    *Definitions and Interpretation.*

**1.01**    Definitions.  The following terms shall have the following definitions:

"Agreement" has the meaning set forth in the preamble hereof and includes all the exhibits, annexes, and schedules hereto in accordance with **Section 13.02** (including the Plan Term Sheet).

"Agreement Effective Date" means the date on which each of the conditions set forth in **Section 2** has been satisfied or waived by the appropriate Party or Parties in accordance with this Agreement.

"Agreement Effective Period" means, with respect to a Party, the period from the Agreement Effective Date to the Termination Date applicable to that Party.

"Alternative Restructuring Proposal" means any inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to a sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, liquidation, tender offer, recapitalization, plan of reorganization, share exchange, business combination, or similar transaction involving any one or more Debtors, or any material portion of any of their assets, debt, equity, or other interests, in each case, that is inconsistent with the Plan Term Sheet.

"Bankruptcy Code" has the meaning set forth in the recitals to this Agreement.

"Bankruptcy Court" has the meaning set forth in the recitals to this Agreement.

"Bidding Procedures" means the Bidding Procedures attached to the Bidding Procedures Order as Exhibit 1 (as amended, supplemented or otherwise modified from time to time in accordance with the Bidding Procedures).

"<u>Bidding Procedures Order</u>" means the *Order (A) Approving Bidding Procedures to Govern the Sale of All or Substantially All of the Debtors' Assets Pursuant to Section 363 of the Bankruptcy Code, (B) Approving Procedures Regarding Entry Into One or More Stalking Horse Agreements, (C) Establishing Procedures for the Assumption or Rejection of Executory Contracts and Unexpired Leases, (D) Approving the Form and Manner of the Notice of Assumption and Assignment of Executory Contracts and Unexpired Leases, (E) Scheduling Auctions for the Sales of the Company Assets and Hearings to Consider Approval of the Sales and Approving the Form and Manner of the Notice Thereof, and (F) Granting Related Relief* [Docket No. 218].

"<u>Breach Notice</u>" means a written notice which shall (a) be delivered in connection with a purported breach of this Agreement in accordance with this Agreement and (b) set forth the provision(s) under this Agreement pursuant to which the purported breach has occurred and the purported grounds for the delivery of such notice.

"<u>Business Day</u>" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

"<u>Chapter 11 Cases</u>" has the meaning set forth in the recitals to this Agreement.

"<u>Claim</u>" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

"<u>Company Claims/Interests</u>" means Claims against, and Interests in, any Debtor.

"<u>Confidentiality Agreement</u>" means an executed confidentiality agreement, including with respect to the issuance of a "cleansing letter" or other public disclosure of material non-public information, in connection with any proposed Restructuring Transactions.

"<u>Debtor Termination Events</u>" has the meaning set forth in **Section 11.02**.

"<u>Debtors</u>" has the meaning set forth in the preamble to this Agreement.

"<u>Definitive Documents</u>" shall mean the documents set forth in **Section 3.01**, including all exhibits, annexes, schedules, amendments, and supplements relating to such documents.

"<u>Disclosure Statement</u>" means the disclosure statement to be filed with the Bankruptcy Court with respect to the Plan.

"<u>Disclosure Statement Order</u>" means the order entered by the Bankruptcy Court approving the Disclosure Statement.

"<u>Distribution Trust</u>" means a trust established for effecting certain distributions in accordance with the terms of the Plan and the Plan Term Sheet.

"<u>Distribution Trust Documents</u>" means the trust agreement and related documents, as may be amended, effective as of the Effective Date, establishing and setting forth the terms and

conditions which shall, in conjunction with the Plan, govern the administration of the Distribution Trust.

"Entity" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

"Execution Date" has the meaning set forth in the preamble to this Agreement.

"Fiduciary Out Notice" has the meaning set forth in **Section 7.01** of this Agreement.

"Final Order" means an order or judgment of the Bankruptcy Court, or court of competent jurisdiction with respect to the subject matter that has not been reversed, stayed, modified, or amended, as entered on the docket in any Chapter 11 Case or the docket of any court of competent jurisdiction, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument, or rehearing has expired and no appeal or petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing will have been denied, resulted in no stay pending appeal of such order, or has otherwise been dismissed with prejudice; *provided* that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order will not preclude such order from being a Final Order.

"Final Cash Collateral Order" means that certain *Final Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* [Docket No. 422] entered in the Chapter 11 Cases.

"Holder" means any entity that holds a Claim or Interest, as applicable.

"Independent Investigation" means the internal investigation of potential claims, if any, that certain Debtors may hold against insiders and affiliates being conducted by the investigation committees of the boards of directors of the Debtors.

"Interest" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor.

"Law" means any federal, state, provincial, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

"Lien" has the meaning set forth in section 101(37) of the Bankruptcy Code.

4

"<u>New Organizational Documents</u>" means the organizational and governance documents for the Reorganized Debtors, including, as applicable, the certificates or articles of incorporation, certificates of formation, certificates of organization, certificates of limited partnership, certificates of conversion, limited liability company agreements, operating agreements, limited partnership agreements, stockholder or shareholder agreements, bylaws, indemnification agreements, and any registration rights agreements (or equivalent governing documents of any of the foregoing).

"<u>Parties</u>" has the meaning set forth in the preamble to this Agreement.

"<u>Petition Date</u>" has the meaning set forth in the recitals to this Agreement.

"<u>Plan</u>" means the plan of reorganization to be proposed by the Debtors under chapter 11 of the Bankruptcy Code in accordance with the terms and conditions of this Agreement, including any and all exhibits, supplements, appendices, and schedules hereto, as may be altered, amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof, including the Plan Supplement (as altered, amended, supplemented, or otherwise modified from time to time), which are incorporated into the Plan by reference and shall be made part of the Plan as if set forth therein.

"<u>Plan Effective Date</u>" means the date that is the first Business Day after the Confirmation Date on which all Conditions Precedent to the Plan Effective Date have been satisfied or waived in accordance with the Plan.

"<u>Plan Sponsor</u>" has the meaning set forth in the recitals to this Agreement.

"<u>Plan Sponsor Termination Events</u>" has the meaning set forth in **Section 11.01**.

"<u>Plan Supplement</u>" means any compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan, which shall be Filed by the Debtors prior to the Confirmation Hearing, and additional documents Filed with the Bankruptcy Court prior to the Plan Effective Date as amendments to the Plan Supplement, each of which shall be consistent in all respects with, and shall otherwise contain, the terms and conditions and be subject to the consent rights set forth in the Plan Term Sheet, where applicable.

"<u>Plan Term Sheet</u>" has the meaning set forth in the recitals to this Agreement.

"<u>Restructuring Transactions</u>" means those mergers, amalgamations, consolidations, arrangements, continuances, restructurings, transfers, conversions, dispositions, liquidations, dissolutions, settlements, releases, or other transactions that the Debtors reasonably determine to be necessary to implement the Plan in a manner consistent with this Agreement and the Plan Term Sheet.

"<u>Rules</u>" means Rule 501(a)(1), (2), (3), and (7) of Regulation D under the Securities Act.

"<u>Sale</u>" has the meaning ascribed to such term in the Bidding Procedures.

"Secured" means, when referring to a Claim: (a) secured by a Lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

"Securities Act" means the Securities Act of 1933, as amended, 15 U.S.C. §§ 77a–77aa, or any similar federal, state, or local law, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

"Solicitation Materials" means all documents, forms, and other materials distributed in connection with the solicitation of votes on the Plan pursuant to sections 1125 and 1126 of the Bankruptcy Code, including, without limitation, the Disclosure Statement, the forms of ballots with respect to votes on the Plan, and the opt-out forms with respect to the Third-Party Releases.

"Termination Date" means, with respect to a Party, the date on which termination of this Agreement as to such Party is effective in accordance with **Sections 11.01**, **11.02**, **11.03**, or **11.04**, as applicable.

"Termination Events" has the meaning set forth in **Section 11.02**.

"Termination Notice" means a written notice which shall (a) be delivered in connection with a Termination Event in accordance with this Agreement and (b) set forth the provision(s) under this Agreement pursuant to which the Termination Event has occurred and the purported grounds for such termination.

"Transfer" means, as the context requires, (a) to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate, or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales, or other transactions), or (b) a transaction effectuating any of the foregoing.

"U.S. Trustee" means the United States Trustee for the Southern District of New York.

**1.02**    Interpretation.  For purposes of this Agreement:

(a)    in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and neuter gender;

(b)    capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c)    unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, supplemented, or otherwise modified from time to time; *provided* that any capitalized terms herein which are defined with reference to another agreement, are, unless otherwise specified, defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

(d)    unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(e)    the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety, including all exhibits, annexes, and schedules attached hereto in accordance with **Section 13.02**, rather than to any particular portion of this Agreement;

(f)    captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(g)    references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws;

(h)    the use of "include" or "including" is without limitation, whether stated or not;

(i)    unless otherwise specified, any action to be taken on the Plan Effective Date may be taken on or as soon as reasonably practicable thereafter; and

(j)    the phrase "counsel to the Plan Sponsor" refers in this Agreement to Sidley Austin LLP.

**Section 2.**    *Effectiveness of this Agreement*.    This Agreement shall become effective and binding upon each of the Parties at 12:00 a.m., prevailing Eastern Time, on the Agreement Effective Date, which is the date on which all of the following conditions have been satisfied or waived in accordance with this Agreement:

(a)    each of the Debtors shall have executed and delivered counterpart signature pages of this Agreement to counsel to the Plan Sponsor;

(b)    each Plan Sponsor Party shall have executed and delivered a counterpart signature page to this Agreement to counsel to the Debtors; and

(c)    the Debtors shall have (A) secured one or more orders of the Bankruptcy Court approving this Agreement and the Debtors' entry into this Agreement as the Successful Bid (as defined in the Bidding Procedures) or (B) (i) secured one or more orders of the Bankruptcy Court approving this Agreement and the Debtors' entry into this Agreement as the Backup Bid (as defined in the Bidding Procedures) and (ii) filed a notice with the Bankruptcy Court designating such Backup Bid as the Successful Bid pursuant to the Bidding Procedures.

Notwithstanding the foregoing, the delivery of an executed counterpart signature page hereto shall constitute an irrevocable offer from the Plan Sponsor to enter into this Agreement, which offer shall, in accordance with the Bidding Procedures, be irrevocable unless and until the Debtors notify the Plan Sponsor that the Restructuring Transactions contemplated hereby and in the Plan Term Sheet have not been selected as the Successful Bid or Backup Bid.

The Debtors shall give notice to counsel to the Plan Sponsor in the manner set forth in **Section 13.10** hereof (by email or otherwise) that the conditions to the Agreement Effective Date set forth in this **Section 2** have occurred promptly after the occurrence thereof.

**Section 3.**      *Definitive Documents*.

**3.01**      The Definitive Documents governing the Restructuring Transactions shall include the following, which shall, in each case, be in form and substance consistent with this Agreement, including **Section 3.02**:

(a)      the Plan (including all exhibits, annexes, schedules, and supplements related thereto, including the Plan Supplement);

(b)      the Confirmation Order;

(c)      the Disclosure Statement Order (including all exhibits, annexes, schedules, and supplements related thereto);

(d)      the Solicitation Materials, including the Disclosure Statement;

(e)      the Distribution Trust Documents; and

(f)      the New Organizational Documents.

**3.02**      The Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date remain subject to negotiation and completion.   The Definitive Documents, including all amendments and modifications thereto and including all forms thereof filed with the Bankruptcy Court, shall contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement, as they may be modified, amended, or supplemented in accordance with **Section 12** and be in form and substance acceptable to the Debtors and reasonably acceptable to the Plan Sponsor.   The terms of this Agreement (including the exhibits attached hereto) have been agreed by all the Parties.

**Section 4.**      *Commitments of the Plan Sponsor*.

**4.01**      Affirmative Commitments.

(a)      During the Agreement Effective Period, and subject to and consistent with the terms and conditions of this Agreement, the Plan Sponsor agrees to:

(i)      support the consummation and implementation of the Restructuring Transactions, including giving any notice, order, instruction, or direction necessary to give effect to the Restructuring Transactions;

(ii)      use commercially reasonable efforts to cooperate with and assist the Company in obtaining additional support for the Restructuring Transactions from the Company's other stakeholders;

(iii)    negotiate in good faith and use commercially reasonable efforts to execute and implement the Definitive Documents to which it is required to be a party;

(iv)    to the extent it is permitted to elect whether to opt out of the releases set forth in the Plan, elect not to opt out of the releases set forth in the Plan by timely delivering any duly executed and completed forms required to indicate such election;

(v)    support, and not directly or indirectly object to, delay, impede, or take any other action to interfere with, Confirmation or consummation of the Plan in a form consistent with this Agreement, including using commercially reasonable efforts to support and take all actions reasonably requested by the Company to facilitate approval of the Disclosure Statement and solicitation, confirmation, and consummation of the Plan;

(vi)    support, and not directly or indirectly object to, delay, impede, or take any other action to interfere with, any motion or other pleading or document filed by a Debtor in the Bankruptcy Court or any other court that is consistent in all respects with this Agreement and the Restructuring Transactions;

(vii)    support, and not directly or indirectly object to, delay, impede, or take any other action to interfere with, any motion or other pleading or document filed by a Debtor in the Bankruptcy Court or any other court related to the consummation of the Sales;

(viii)    negotiate in good faith upon reasonable request of the Debtors in connection with any modifications to the Restructuring Transactions that improve the tax efficiency of the Restructuring Transactions;

(ix)    to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions contemplated in the Plan Term Sheet, the Plan, or this Agreement, negotiate in good faith appropriate additional or alternative provisions to address any such impediment; and

(x)    grant up to one waiver of the Debtors' breach of the requirements contained in Paragraph 5(b) of the Final Cash Collateral Order, subject to the limitations separately addressed by the Parties.

**4.02**    Negative Commitments.

(a)    During the Agreement Effective Period, and subject to and consistent with the terms and conditions of this Agreement, the Plan Sponsor agrees that it shall not directly or indirectly, and it shall not direct any other Entity to:

(i)    object to, delay, impede, or take any other action to interfere with, delay, or impede the acceptance, consummation, or implementation of the Plan or the Restructuring Transactions to the extent consistent with this Agreement in all respects;

(ii)    seek, solicit, propose, file, support, vote in favor of, assist, engage in negotiations in connection with, or participate in the formulation, preparation, filing, or prosecution of any Alternative Restructuring Proposal;

(iii)    change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any election referred to in **Section 4.01(a)(iv)** above;

(iv)    file any motion, pleading, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is materially inconsistent with this Agreement or the Restructuring Transactions;

(v)    initiate, or have initiated on its behalf, any litigation or proceeding of any kind that is inconsistent with this Agreement or the Restructuring Transactions against the Debtors or the other Parties (it being understood that any litigation or proceeding to enforce this Agreement or any Definitive Document or that is otherwise permitted under this Agreement shall not be construed to be inconsistent with this Agreement or the Restructuring Transactions);

(vi)    exercise, or direct any other person to exercise, any right or remedy for the enforcement, collection, or recovery of any Company Claims/Interests in a manner that is inconsistent with this Agreement; or

(vii)    object to, delay, impede, or take any other action to interfere with the Debtors' ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code, other than as permitted by this Agreement.

**4.03**    Additional Provisions Regarding the Plan Sponsors' Commitments.

Notwithstanding anything contained in this Agreement, nothing in this Agreement shall:

(a)    prevent the Plan Sponsor from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement; or

(b)    prohibit the Plan Sponsor from taking any other action that is not inconsistent with this Agreement, the Restructuring Transactions, or any Definitive Document.

**Section 5.    *Commitments of the Debtors*.**

**5.01**    Affirmative Commitments.  Except as expressly permitted in **Section 7**, during the Agreement Effective Period, each of the Debtors agrees to, and agrees to cause each of its direct and indirect subsidiaries to:

(a)    support and take all steps reasonably necessary and desirable to consummate the Restructuring Transactions in accordance with this Agreement;

(b)    to the extent any legal or structural impediment arises that would prevent, hinder, impede, or delay the consummation of the Restructuring Transactions, take all steps reasonably necessary and desirable to address any such impediment, and negotiate in good faith any appropriate additional or alternative provisions or agreements to address any such impediment;

(c)    use commercially reasonable efforts to obtain any and all required governmental, regulatory, and/or third-party approvals for the Restructuring Transactions;

(d)        negotiate in good faith and use commercially reasonable efforts to take all steps reasonably necessary to (i) consummate the Restructuring Transactions and (ii) negotiate, execute and implement the Definitive Documents;

(e)        negotiate in good faith upon reasonable request of the Plan Sponsor in connection with any modifications to the Restructuring Transactions that improve the tax efficiency of the Restructuring Transactions;

(f)        actively oppose and object to any motion, application, adversary proceeding, or cause of action (i) seeking to impose liability upon or enjoin the Plan Sponsors, (ii) seeking the entry of an order directing the appointment of a trustee or examiner (with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code), (iii) seeking the entry of an order converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (iv) seeking the entry of an order dismissing the Chapter 11 Cases, or (v) seeking the entry of an order modifying or terminating the Debtors' exclusive right to file and/or solicit acceptances of a plan of reorganization, as applicable; and

(g)        inform counsel to the Plan Sponsor as soon as reasonably practicable after becoming aware of: (i) any matter or circumstance which they know, or believe is likely, to be a material impediment to the implementation or consummation of the Restructuring Transactions; (ii) a breach of this Agreement (including a breach by any Debtor); and (iii) any representation or statement made or deemed to be made by them under this Agreement which is or proves to have been incorrect or misleading in any material respect when made or deemed to be made.

**5.02**    Negative Commitments.  Except as expressly permitted in **Section 7**, during the Agreement Effective Period, each of the Debtors shall not, and shall cause each of its direct and indirect subsidiaries to not, directly or indirectly:

(a)        take any action or inaction that is inconsistent in any material respect with, or is intended or could reasonably be expected to frustrate or impede approval, implementation, and consummation of the Restructuring Transactions or this Agreement;

(b)        file any motion or pleading, with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is materially inconsistent with this Agreement, including the consent rights set forth in **Section 3**, or the Restructuring Transactions;

(c)        execute or file any Definitive Document with the Bankruptcy Court (including any modifications or amendments thereto) that, in whole or in part, is materially inconsistent with this Agreement, including the consent rights set forth in **Section 3**, or the Restructuring Transactions.

**Section 6.      *Additional Commitments*.**

**6.01**    Cooperation and Support.  The Debtors shall provide draft copies of any Definitive Document that any Debtor intends to file with or submit to the Bankruptcy Court, and draft copies of all press releases that any Debtor intends to issue regarding this Agreement or the Restructuring Transactions, to Thomas R. Califano (tom.califano@sidley.com); Dennis M.

Twomey (dtwomey@sidley.com); Jackson T. Garvey (jgarvey@sidley.com), and Juliana Hoffman (jhoffman@sidley.com) of Sidley Austin LLP, as counsel to the Plan Sponsor, at least three (3) Business Days prior to the date when such Debtor intends to file, submit or issue such document to the extent reasonably practicable; *provided* that all rights provided for in this **Section 6.01** shall be subject to the terms of any agreements between the Debtors and third parties that may be affected by the exercise of the foregoing rights.

**Section 7.**    *Additional Provisions Regarding Fiduciary Obligations*.

**7.01**    Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require any Debtor or the board of directors, board of managers, or similar governing body of any Debtor (the aforementioned parties, collectively, "Fiduciaries"), in each case, acting in their capacity as such, to take any action or to refrain from taking any action to the extent such Fiduciary determines that taking or failing to take such action would be inconsistent with applicable Law or its fiduciary obligations under applicable Law, including based on the results of the Independent Investigation; *provided* that counsel to the Debtors shall promptly give notice to counsel to the Plan Sponsor of any decision by any Fiduciary in accordance with this **Section 7.01** to take or refrain from taking any action, but in any case not later than two (2) Business Days thereafter (with email being sufficient) (a "Fiduciary Out Notice"). This **Section 7.01** shall not be deemed to amend, supplement or otherwise modify, or constitute a waiver of any Party's rights to terminate this Agreement pursuant to **Section 11** or **Section 7.02** of this Agreement that may arise as a result of any such action or inaction. Notwithstanding anything to the contrary herein, each Plan Sponsor Party reserves its rights to challenge whether any purported exercise of the Debtors' rights under this **Section 7.01** is in fact a valid exercise of the Debtors' business judgment and rights under this **Section 7.01**; *provided* that the sole remedies of the Plan Sponsor Parties for any invalid purported exercise of the Debtors' rights under this **Section 7.01** shall be specific performance or termination of this Agreement.

**7.02**    Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall: (a) impair or waive the rights of any Debtor to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions, or (b) prevent any Debtor from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement. Notwithstanding anything to the contrary in this Agreement, the sole remedy available to any Party upon termination of this Agreement resulting from the Debtors' exercise of their rights under this **Section 7** shall be to terminate this Agreement and no other remedy in equity or in Law, including specific performance or actual or expectation damages, shall be available against the Debtors.

**7.03**    Notwithstanding anything to the contrary in this Agreement (but subject to **Section 7.01**), each Debtor and its respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the right to consider, respond to, and facilitate Alternative Restructuring Proposals, but may not solicit an Alternative Restructuring Proposal, offer, indication of interest or inquiry for one or more Alternative Restructuring Proposals. If any Debtor receives an Alternative Restructuring Proposal, or any update to an Alternative Restructuring Proposal from the counterparty thereto, then such Debtor shall (A) within two (2) Business Days of receiving such proposal, provide counsel to the Plan Sponsor with all documentation received in connection with such Alternative

Restructuring Proposal; (B) provide counsel to the Plan Sponsor with regular updates as to the status and progress of such Alternative Restructuring Proposal; and (C) respond promptly to reasonable information requests and questions from counsel to the Plan Sponsor relating to such Alternative Restructuring Proposal.

**Section 8.**     *Transfer of Company Claims/Interests*

**8.01**     During the Agreement Effective Period, no Plan Sponsor Party shall Transfer any ownership (including any beneficial ownership as defined in Rule 13d-3 under the Securities Exchange Act of 1934, as amended) in any Company Claims/Interests to any party, including any party in which it may hold a direct or indirect beneficial interest, unless such transferee agrees to be bound by this Agreement.

**8.02**     Upon compliance with the requirements of **Section 8.01**, the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of the rights and obligations in respect of such Transferred Company Claims/Interests, and the transferee shall be deemed a "Plan Sponsor Party" and a "Party" under this Agreement.  Any Transfer in violation of **Section 8.01** shall be void *ab initio*.

**8.03**     This Agreement shall in no way be construed to preclude any Plan Sponsor Party from acquiring additional Company Claims/Interests; *provided, however*, that (a) such additional Company Claims/Interests shall automatically and immediately upon acquisition by a Plan Sponsor Party be deemed to be subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to counsel to the Company or counsel to the Plan Sponsor) and (b) such Plan Sponsor Party must provide notice of such acquisition (including the amount and type of Company Claim/Interest acquired) to counsel to the Company within five (5) Business Days of such acquisition.

**8.04**     This **Section 8** shall not impose any obligation on the Company to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Plan Sponsor  Party to Transfer any of its Company Claims/Interests.  Notwithstanding anything to the contrary herein, to the extent the Company and another Party have entered into a Confidentiality Agreement, the terms of such Confidentiality Agreement shall remain in full force and effect according to its terms, and this Agreement does not supersede any rights or obligations otherwise arising under such Confidentiality Agreements.

**Section 9.**     *Representations and Warranties of the Plan Sponsor Parties.*

(a)     Each Plan Sponsor Party represents and warrants that, as of the date it executes and delivers this Agreement:

(i)     it is the beneficial or record owner of the face amount of the Company Claims/Interests or is the nominee, investment manager, or advisor for beneficial holders of the Company Claims/Interests reflected in, and having made reasonably inquiry, is not the beneficial owner or record owner of any Company Claims/Interest other than those reflected in, such Plan Sponsor Party's signature page to this Agreement;

(ii)    it is either (A) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (B) not a U.S. person (as defined in Regulation S of the Securities Act), or (C) an institutional accredited investor (as defined in the Rules); and

(iii)    any securities acquired by it in connection with the Restructuring Transactions will have been acquired for investment and not with a view to distribution or resale in violation of the Securities Act.

**Section 10.    *Mutual Representations, Warranties, and Covenants*.**    Each of the Parties represents, warrants, and covenants to each other Party, as of the date such Party executes and delivers this Agreement and as of the Plan Effective Date:

(a)    such Party is validly existing and in good standing under the Laws of the state of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b)    subject to Bankruptcy Court approval of the Debtors' entry into this Agreement, the entry into and performance by it of, and the transactions contemplated by, this Agreement do not, and will not, conflict in any material respect with any Law or regulation applicable to it or with any of its articles of association, memorandum of association, or other constitutional documents;

(c)    except as expressly provided in this Agreement, it has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(d)    except as expressly provided by this Agreement, it is not party to any restructuring or similar agreements or arrangements with the other Parties to this Agreement that have not been disclosed to all Parties to this Agreement; and

(e)    it has been represented by legal counsel of its choosing in connection with this Agreement and the transactions contemplated by this Agreement, has had the opportunity to review this Agreement with its legal counsel, and has not relied on any statements made by any other Party or its legal counsel as to the meaning of any term or condition contained herein or in deciding whether to enter into this Agreement or the transactions contemplated hereby.

**Section 11.    *Termination Events*.**

**11.01**    Plan Sponsor Termination Events. The Plan Sponsor may terminate this Agreement as to all Parties (except as otherwise provided below), by delivering a Termination Notice to counsel to the Debtors in accordance with **Section 13.10** hereof upon the occurrence of any of the following events, unless waived in writing by the Plan Sponsor (such events, the "Plan Sponsor Termination Events"):

(a)     the material breach by any Debtor of any of the representations, warranties, or covenants of the Debtors set forth in this Agreement or the Plan Term Sheet that remains uncured (to the extent curable) for ten (10) Business Days after the Plan Sponsor transmits a Breach Notice in accordance with **Section 13.10** hereof detailing any such breach;

(b)     the issuance by any governmental authority, including the Bankruptcy Court, any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions, or (ii) (A) would prevent the consummation of a material portion of the Restructuring Transactions, and (B) remains in effect for ten (10) Business Days after the Plan Sponsor transmits a written notice in accordance with **Section 13.10** detailing any such issuance; notwithstanding the foregoing, this termination right may not be exercised by any Party that sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(c)     any Debtor (i) provides a Fiduciary Out Notice to counsel to the Plan Sponsor or (ii) publicly announces or executes a definitive agreement with respect to an Alternative Restructuring Proposal;

(d)     the entry of a Final Order by the Bankruptcy Court or other court of competent jurisdiction, or the filing of a motion or application by any Debtor seeking an order (without the prior written consent of the Plan Sponsor):

(i)     (A) converting one or more of the Chapter 11 Cases of a Debtor to a case under chapter 7 of the Bankruptcy Code; (B) appointing a trustee, receiver, or an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code in one or more of the Chapter 11 Cases of a Debtor; (C) dismissing the Chapter 11 Cases; or (D) terminating any of the Debtors' exclusive right to file a plan pursuant to section 1121 of the Bankruptcy Code;

(ii)     (A) denying confirmation of the Plan, or confirming the Plan pursuant to an order that is not in form and substance reasonably consistent with this Agreement, to the extent such approval is in contravention of the consent rights set forth in **Section 3**; (B) reversing or vacating the Confirmation Order; or (C) approving any Definitive Document that is not in form or substance consistent with this Agreement, including the consent rights set forth in **Section 3**;

(e)     the board of directors, board of managers, or such similar governing body of a Debtor enters a resolution approving the Debtors' consummation of an Alternative Restructuring Proposal;

(f)     the Debtors' use of cash collateral is terminated in accordance with the terms of the Final Cash Collateral Order; or

(g)     the failure of the Debtors to comply with or achieve any one of the milestones set forth in the Plan Term Sheet, unless such milestone is extended with the express prior written consent of the Plan Sponsor or in accordance with such milestone, which consent may be provided via email from counsel to the Plan Sponsor.

**11.02**  <u>Debtor Termination Events</u>. Any Debtor may terminate this Agreement as to all Parties (except as otherwise provided below) by delivering written notice to all Parties in accordance with **Section 13.10** hereof upon the occurrence of any of the following events (such events, the "Debtor Termination Events" and, together with the Plan Sponsor Termination Events, the "Termination Events"):

(a)  the breach by the Plan Sponsor of any of the representations, warranties, or covenants made thereby set forth in this Agreement or the Plan Term Sheet that remains uncured for a period of ten (10) Business Days after the receipt by counsel to the Plan Sponsor of a Breach Notice;

(b)  the board of directors, board of managers, restructuring officer, or such similar governing body of any Debtor determines (i) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or its compliance with applicable Law, or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal;

(c)  the issuance by any governmental authority, including the Bankruptcy Court, any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that enjoins the consummation of a material portion of the Restructuring Transactions; *provided* that this termination right shall not apply to or be exercised by any Debtor that sought or requested such ruling or order in contravention of any obligation or restriction set out in this Agreement; or

(d)  the entry of an order by the Bankruptcy Court or other court of competent jurisdiction, or the filing of a motion or application by the Plan Sponsor seeking an order (without the prior written consent of the Debtors):

(i)  (A) converting one or more of the Chapter 11 Cases of a Debtor to a case under chapter 7 of the Bankruptcy Code; (B) appointing a trustee, receiver, or an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code in one or more of the Chapter 11 Cases of a Debtor; (C) dismissing the Chapter 11 Cases; or (D) terminating any of the Debtors' exclusive right to file a plan pursuant to section 1121 of the Bankruptcy Code; or

(ii)  (A) denying confirmation of the Plan, or confirming the Plan pursuant to an order that is not in form and substance consistent with this Agreement, to the extent such approval is in contravention of the consent rights set forth in **Section 3**; (B) reversing or vacating the Confirmation Order; or (C) approving Definitive Document that is not in form or substance consistent with this Agreement, including the consent rights set forth in **Section 3**.

**11.03**  <u>Mutual Termination</u>. This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among the Parties.

**11.04**  <u>Automatic Termination</u>. This Agreement shall terminate automatically without any further required action or notice immediately after the occurrence of the Plan Effective Date.

16

**11.05**  Effect of Termination. Upon the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force or effect as to such Party and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims or causes of action. Nothing in this Agreement shall be construed as prohibiting any Party from contesting whether any such termination is in accordance with the terms of this Agreement or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict any right of any Party or the ability of any Party to protect and reserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any other Party.  No purported termination of this Agreement shall be effective under this **Section 11.05** or otherwise if the Party seeking to terminate this Agreement is in material breach of this Agreement, with such material breach causing, or resulting in, the occurrence of one or more Termination Events.  Nothing in this **Section 11.05** (including the foregoing sentence) shall restrict any Debtor's right to terminate this Agreement in accordance with **Section 11.02(a)** or **Section 11.02(d)** or the Plan Sponsor's right to terminate this Agreement in accordance with **Section 11.01(a)** or **Section 11.01(d)**.  Following the occurrence of a Termination Date, the following shall survive any such termination: (a) any claim for breach of this Agreement that occurs prior to such Termination Date, and all rights and remedies with respect to such claims shall not be prejudiced in any way; and (b) **Sections 1.02**, **11.05**, **13.01**, **13.02**, **13.04**, **13.05**, **13.06**, **13.07**, **13.08**, **13.09**, **13.10**, **13.11**, **13.13**, **13.14**, **13.15**, **13.16**, and **13.17** hereof.  The automatic stay applicable under section 362 of the Bankruptcy Code shall not prohibit a Party from taking any action or delivering any notice necessary to effectuate the termination of this Agreement pursuant to and in accordance with the terms hereof.

**Section 12.**    *Amendments and Waivers*.

(a)    Except as otherwise set forth in this **Section 12**, this Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner without the prior written consent of each of the Debtors and the Plan Sponsor.

(b)    Any proposed modification, amendment, waiver, or supplement that does not comply with this **Section 12** shall be ineffective and void *ab initio*.

(c)    The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power, or remedy under this Agreement shall operate as a waiver of any such right, power, or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power, or remedy by such Party preclude any other or further exercise of such right, power, or remedy or the exercise of any other right, power, or remedy.  All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

(d)     Any consent or waiver contemplated in this **Section 12** may be provided by email to counsel to the relevant Party.

**Section 13.    *Miscellaneous*.**

**13.01**   Acknowledgement.   Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.  Any such offer or solicitation will be made only in compliance with all applicable securities Laws, provisions of the Bankruptcy Code, and/or other applicable Law.

**13.02**   Exhibits Incorporated by Reference; Conflicts.  Each of the exhibits, annexes, signature pages, and schedules attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules.  In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules hereto) and the exhibits, annexes, and schedules hereto, this Agreement (without reference to the exhibits, annexes, and schedules thereto) shall govern.

**13.03**   Further Assurances.  Subject to the other terms of this Agreement during the Agreement Effective Period, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring Transactions, as applicable.

**13.04**   Complete Agreement.  Except as otherwise explicitly provided herein, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto, other than any Confidentiality Agreement.

**13.05**   GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.  Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Bankruptcy Court, and solely in connection with claims arising under this Agreement: (a) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (b) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (c) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party hereto.

**13.06**   TRIAL BY JURY WAIVER.  EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

**13.07**  Execution of Agreement. This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.  Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

**13.08**  Rules of Construction. This Agreement is the product of negotiations among the Debtors and the Plan Sponsor, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.  The Debtors and the Plan Sponsor were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

**13.09**  Successors and Assigns; Third Parties. This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable.  There are no third-party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other person or entity.

**13.10**  Notices. All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

(a)    if to a Debtor, to:

Proterra Inc
1815 Rollins Road
Burlingame, California 94010
Attention:    Jeff Mitchell, General Counsel
Email:        JMitchell@proterra.com

with copies to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064
Facsimile: (212) 757-3990
Attention:    Paul M. Basta
              Robert A. Britton
              Michael J. Colarossi
Email:        pbasta@paulweiss.com
              rbritton@paulweiss.com
              mcolarossi@paulweiss.com

(b)      if to the Plan Sponsor:

CSI GP I LLC, CSI Prodigy Holdco LP, CSI Prodigy Co-Investment LP,
and CSI PRTA Co-Investment LP
599 Lexington Ave., 19th Floor,
New York, NY 10022
Attn:   Legal Department
Email: CSILegal@cowen.com

with copies to:

Sidley Austin LLP
787 7th Avenue
New York, New York 10019
Attention:      Thomas R. Califano
                Dennis M. Twomey
                Jackson T. Garvey
                Juliana Hoffman
Email:          tom.califano@sidley.com
                dtwomey@sidley.com
                jgarvey@sidley.com
                jhoffman@sidley.com

Any notice given by delivery, mail, or courier shall be effective when received.

**13.11**  <u>Reservation of Rights; Waiver</u>. If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason pursuant to **Section 11** (other than pursuant to **Section 11.04**), the Parties each fully reserve any and all of their respective rights, remedies, claims, and interests, subject to **Section 12** hereof, in the case of any claim for breach of this Agreement. Further, nothing herein shall be construed to prohibit any Party from appearing as a party in interest in any matter to be adjudicated in the Chapter 11 Cases, so long as, during the Agreement Effective Period, such appearance and the positions advocated in connection therewith are consistent with this Agreement and any Definitive Document and are not for the purpose of, and could not reasonably be expected to have the effect of, hindering, delaying, or preventing the consummation of the Restructuring Transactions.

**13.12**  <u>Independent Due Diligence and Decision-Making</u>. The Plan Sponsor hereby confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial, and other conditions, and prospects of the Debtors.

**13.13**  <u>Settlement or Compromise</u>. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms, pursue the consummation of the Restructuring Transactions, or the payment of damages to which a Party may be entitled under this Agreement.

**13.14**  Specific Performance. It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and, except as otherwise provided herein, each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.  Notwithstanding anything to the contrary in this Agreement, none of the Parties will be liable for, and none of the Parties shall claim or seek to recover, any punitive, special, indirect, or consequential damages or damages for lost profits.

**13.15**  Severability and Construction. If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

**13.16**  Remedies Cumulative. Except as otherwise provided herein, all rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

**13.17**  Email Consents. Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, pursuant to **Section 3**, **Section 12**, or otherwise, including a written approval by the Debtors or the Plan Sponsor, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including email) between each such counsel without representations or warranties of any kind on behalf of such counsel.

**13.18**  Enforceability of Agreement. Each of the Parties waives any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required.

*[Remainder of Page Intentionally Left Blank]*

[*Signature Pages on File*]

## **Exhibit A**

**Plan Term Sheet**

**THIS PLAN TERM SHEET IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS PLAN TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE PLAN EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.**

# *PLAN TERM SHEET*

## INTRODUCTION

This Plan Term Sheet[1] describes the principal terms of the proposed chapter 11 plan of reorganization and the Restructuring Transactions of Proterra Inc ("**TopCo**") and Proterra Operating Company, Inc. (f/k/a Proterra Inc.) ("**OpCo**" and together with TopCo, the "**Debtors**"), its direct subsidiary, which the CSI Parties (as defined below) will support. The regulatory, corporate, tax, accounting, and other legal and financial matters related to the Restructuring have not been fully evaluated, and any such evaluation may affect the terms and structure of any Restructuring. This Plan Term Sheet is proffered in the nature of a settlement proposal in furtherance of settlement discussions. Accordingly, this Plan Term Sheet and the information contained herein are entitled to protection from any use or disclosure to any party or person pursuant to Rule 408 of the Federal Rules of Evidence and any other applicable rule, statute, or doctrine of similar import protecting the use or disclosure of confidential settlement discussions.

This Plan Term Sheet does not include a description of all of the terms, conditions, and other provisions that will be contained in the definitive documents governing the Restructuring, which remain subject to negotiation and completion. The Plan will not contain any material terms or conditions that are inconsistent in any material respect with this Plan Term Sheet. This Plan Term Sheet incorporates the rules of construction as set forth in section 102 of the Bankruptcy Code.

| GENERAL PROVISIONS REGARDING THE RESTRUCTURING | |
|---|---|
| **Restructuring Summary** | The Restructuring will be consummated through the completion of: |
| | (a) the sale of all or substantially all of the Proterra Powered business line to Volvo Battery Solutions LLC pursuant to section 363 of the Bankruptcy Code, as contemplated by the Bidding Procedures Order; |
| | (b) (i) the sale of all or substantially all of the Proterra Transit business line pursuant to section 363 of the Bankruptcy Code, as contemplated by the Bidding Procedures Order, and/or (ii) the wind down of Proterra Transit which, if such wind down is not complete prior to the Effective Date, shall be conducted in accordance with the terms set forth in the Plan (as defined below); and |
| | (c) the Debtors' joint chapter 11 plan of reorganization in the Chapter 11 Cases, which shall have terms consistent with this Plan Term Sheet (the "**Plan**"). |

---

[1]  Capitalized terms used but not defined in this Plan Term Sheet have the meanings given to such terms in **Exhibit 1** to this Plan Term Sheet.

| **GENERAL PROVISIONS REGARDING THE RESTRUCTURING** | |
|---|---|
| | The Plan and Plan Support Agreement (as defined below) shall provide that, notwithstanding anything to the contrary herein or therein, the Debtors shall be entitled to (a) designate a back-up bidder for Proterra Energy (the "**Energy Back-Up Bidder**"), (b) close a sale with the Energy Back-Up Bidder (the "**Energy Back-Up Bid Transaction**") or wind down Proterra Energy in the event that the Plan Support Agreement is terminated in accordance with its terms prior to the Plan Effective Date (a "**PSA Termination**"), and (c) consummate the Plan on the terms contained in this Term Sheet, including the distribution of proceeds from the sale of Proterra Energy, if any, notwithstanding the termination of the Plan Support Agreement. |
| | The assets comprising the Proterra Energy line of business, including Proterra Valence and any executory contracts and unexpired leases that are assumed by the Debtors in accordance with the Plan and not assigned to a non-Debtor, will remain with the Reorganized Debtors and will not be sold pursuant to the Bidding Procedures Order. |
| **Plan Proponents; Plan Modifications** | The Plan will be proposed by the Debtors.  The Debtors shall not modify the Plan without the prior written consent of the Second Lien Agent (not to be unreasonably withheld or delayed). |
| **Chapter 11 Plan** | On the Plan Effective Date, or as soon as is reasonably practicable thereafter, each Holder of an Allowed Claim or Interest, as applicable, shall receive the treatment provided for under the Plan, which shall be consistent with the terms of this Plan Term Sheet, in full and final satisfaction, settlement, release, and discharge of and in exchange for such holder's Allowed Claim or Interest, except to the extent different treatment is agreed to by the Debtors, with the prior written consent of the Second Lien Agent (not to be unreasonably withheld or delayed) and, to the extent required under the Bankruptcy Code, the holders of such Allowed Claims. |
| **New Common Stock** | If an Energy Back-Up Bid Transaction does not occur, on the Plan Effective Date, Reorganized Proterra shall issue a single class of common equity interests (the "**New Common Stock**").  The New Common Stock will be distributed in accordance with the Plan, which shall be consistent with the terms of this Plan Term Sheet. |
| **Cash on Hand** | Cash distributions, in accordance with this Plan Term Sheet and the Plan, shall be made from Distributable Cash as of the Plan Effective Date, including proceeds from the Sales. |
| | If no PSA Termination has occurred prior to the Plan Effective Date, the Reorganized Proterra Retained Cash shall be retained by Reorganized Proterra and shall not constitute Distributable Cash. |
| | If a PSA Termination has occurred prior to the Plan Effective Date, the Reorganized Proterra Retained Cash shall not be retained by Reorganized Proterra and shall instead constitute Distributable Cash. |
| **Professional Compensation** | On the Plan Effective Date, the Debtors shall establish and fund, in Cash |

| GENERAL PROVISIONS REGARDING THE RESTRUCTURING | |
|---|---|
| **Escrow Account** | in an amount equal to (a) the amount of accrued and unpaid Professional Compensation Claims that are known as of the Plan Effective Date, plus (b) a reasonable estimate of any unknown accrued and unpaid Professional Compensation Claims as of the Plan Effective Date, which estimate shall be determined by the Debtors, in consultation with the Second Lien Agent and based upon the Professionals' respective estimates submitted to the Debtors (and otherwise based upon the Debtors' reasonable estimate), an interest-bearing account to provide for the payment of Professional Compensation Claims. |
| | Funds held in the Professional Compensation Escrow Account shall not be considered property of the Estates.  The Professionals shall estimate their Professional Compensation Claims before and as of the Plan Effective Date, taking into account any prior payments, and shall deliver such estimates to the Debtors no later than five (5) Business Days prior to the anticipated Plan Effective Date; *provided*, *however*, that such estimates shall not be considered an admission or representation with respect to the fees and expenses of such Professional that are the subject of a Professional's final request for payment of Professional Compensation Claims Filed with the Bankruptcy Court and such Professionals are not bound to any extent by such estimates. |
| | Professional Compensation Claims shall be paid in full, in Cash, from the Professional Compensation Escrow Account, in such amounts as are Allowed by the Bankruptcy Court (a) on the date upon which a Final Order relating to any such Allowed Professional Compensation Claim is entered or (b) on such other terms as may be mutually agreed upon between the holder of such an Allowed Professional Compensation Claim and the Distribution Trustee.  The obligations of the Estates with respect to Professional Compensation Claims shall not be limited by nor deemed limited to the balance of funds held in the Professional Compensation Escrow Account.   To the extent that funds held in the Professional Compensation Escrow Account are insufficient to satisfy the amount of accrued Professional Compensation Claims owing to the Professionals, such Professionals shall have an Allowed Administrative Claim for any such deficiency.   No Liens, claims, or interests shall encumber the Professional Compensation Escrow Account in any way, other than customary liens in favor of the depository bank at which the Professional Compensation Escrow Account is maintained. |
| | Amounts held in the Professional Compensation Escrow Account shall not be Distribution Trust Assets; *provided*, *however*, to the extent any Cash is remaining in the Professional Compensation Escrow Account following irrevocable payment in full of all Allowed Professional Compensation Claims (including Allowed Professional Compensation Claims arising after the Confirmation Date), the Distribution Trustee shall transfer such Cash to the Distribution Trust, with such excess amounts constituting Distribution Trust Assets to be distributed pursuant to the terms of the Plan, the Distribution Trust Agreement, and the Confirmation Order. |
| **Tax Matters** | Subject to the terms of this Plan Term Sheet, the Debtors and the CSI |

| GENERAL PROVISIONS REGARDING THE RESTRUCTURING | |
|---|---|
| | Parties will work together in good faith and will use commercially reasonable efforts to structure and implement the Restructuring in a tax efficient and cost-effective manner for the Debtors and Holders of Second Lien Convertible Notes Claims and in a manner reasonably acceptable to the Debtors and the Second Lien Agent. |

## TREATMENT OF CLAIMS AND INTERESTS OF THE DEBTORS UNDER THE PLAN

| Class No. | Type of Claim | Treatment | Impairment / Voting |
|---|---|---|---|
| **Unclassified Non-Voting Claims** | | | |
| N/A | Administrative Claims | On the Plan Effective Date, each holder of an Allowed Administrative Claim shall receive treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code. | N/A |
| N/A | Priority Tax Claims | On the Plan Effective Date, each holder of an Allowed Priority Tax Claim shall receive treatment in a manner consistent with section 1129(a)(9)(C) of the Bankruptcy Code. | N/A |
| **Classified Claims and Interests of the Debtors** | | | |
| Class 1 | Other Secured Claims | Except to the extent the holder of an Allowed Other Secured Claim agrees to less favorable treatment, on the Plan Effective Date, each holder of an Allowed Other Secured Claim shall receive, at the Debtors' option and in consultation with the Second Lien Agent: (a) payment in full in cash; (b) the collateral securing its Allowed Other Secured Claim; (c) Reinstatement of its Allowed Other Secured Claim; or (d) such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | Unimpaired / Presumed to Accept |
| Class 2 | Other Priority Claims | Except to the extent the holder of an Allowed Other Priority Claim agrees to less favorable treatment, on the Plan Effective Date, each holder of an Allowed Other Priority Claim shall receive treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code. | Unimpaired / Presumed to Accept |
| Class 3 | First Lien Claims | On the Plan Effective Date, the First Lien Claims shall be Allowed and deemed to be Allowed Claims in the full amount outstanding under the First Lien Credit Facility, including all principal, any accrued and unpaid interest at the contract rate, and all accrued and unpaid fees, expenses, and non-contingent indemnity payable under the First Lien Credit Facility. | Unimpaired / Presumed to Accept |

4

| | | TREATMENT OF CLAIMS AND INTERESTS OF THE DEBTORS UNDER THE PLAN | |
|---|---|---|---|
| **Class No.** | **Type of Claim** | **Treatment** | **Impairment / Voting** |
| | | Except to the extent the holder of an Allowed First Lien Claim agrees to less favorable treatment, on the Plan Effective Date, each holder of an Allowed First Lien Claim shall receive cash in an amount equal to such Allowed First Lien Claim.[2] | |
| **Class 4** | **Second Lien Convertible Notes Claims** | On the Plan Effective Date, the Second Lien Convertible Notes Claims, including the Agreed Second Lien Obligations, shall be Allowed and deemed to be Allowed Claims. The amount and validity of any Liquidation Payment Amount Claims shall be determined (whether pursuant to a Final Order of the Bankruptcy Court or a settlement agreement between the Debtors and CSI Parties) in accordance with the Liquidation Payment Amount Determination Protocol (as defined in the Final Cash Collateral Order) at or prior to the Confirmation Hearing, and the Parties shall agree to a litigation schedule that results in trial no later than February 15, 2024. Except to the extent the holder of an Allowed Second Lien Convertible Notes Claim agrees to less favorable treatment, on the Plan Effective Date, or as soon as reasonably practicable thereafter, each Holder of an Allowed Second Lien Convertible Notes Claim shall receive: <br><br>a. **If a PSA Termination does not occur prior to the Plan Effective Date:** <br><br>  i.  on account, and in satisfaction, of such Holder's *pro rata* portion of $10 million of the Allowed Second Lien Convertible Notes Claims, its *pro rata* allocation of all of the equity of Reorganized Proterra (the "**Equity Distribution**"); <br><br>  ii.  such Holder's Allowed Second Lien Convertible Notes Claims shall be reduced *pro rata* by the Reorganized Proterra Retained Cash (the "**Retained Cash Reduction**") and the Reorganized Proterra Retained Cash shall be retained by Reorganized Proterra on the Plan Effective Date; <br><br>  iii.  such Holder's Allowed Second Lien Convertible | Impaired / Entitled to Vote |

---

[2] To the extent there are any undrawn letters of credit issued under the First Lien Credit Facility as of the Plan Effective Date, such letters of credit shall remain cash collateralized in accordance with the Final Cash Collateral Order, subject to transferring ownership of the segregated account used to cash collateralize such letters of credit in accordance with the Final Cash Collateral Order to the Distribution Trust.

| | | TREATMENT OF CLAIMS AND INTERESTS OF THE DEBTORS UNDER THE PLAN | |
|---|---|---|---|
| **Class No.** | **Type of Claim** | **Treatment** | **Impairment / Voting** |
| | | Notes Claims shall be reduced *pro rata* by the amount (if any) that the aggregate Cure Claims payable on account of the Debtors' assumption of contracts and leases attributable to Proterra Energy exceeds $6,500,000 (the "**Cure Cost Reduction**"); and<br><br>iv.  after giving effect to the Retained Cash Reduction, the Equity Distribution and the Cure Cost Reduction, if any, cash in an amount equal to its *pro rata* share of the remaining Allowed Second Lien Convertible Notes Claims.<br><br>**b.  If a PSA Termination occurs prior to the Plan Effective Date:**<br><br>i.  Cash in an amount equal to the Allowed Second Lien Convertible Notes Claims. | |
| **Class 5** | **General Unsecured Claims** | Except to the extent the holder of an Allowed General Unsecured Claim agrees to less favorable treatment, on the Plan Effective Date, each holder of an Allowed General Unsecured Claim shall receive its *pro rata* share of the Second Priority Distribution Trust Beneficiaries' (as defined below) interests in the Distribution Trust. | Impaired / Entitled to Vote |
| **Class 6** | **Intercompany Claims** | On the Plan Effective Date, each holder of an Allowed Intercompany Claim shall have its Claim Reinstated or cancelled, released, and extinguished and without any distribution at the election of the Debtors with the prior written consent of the Second Lien Agent (not to be unreasonably withheld or delayed). | Impaired / Deemed to Reject or Unimpaired / Presumed to Accept |
| **Class 7** | **Existing Equity Interests in OpCo** | On the Plan Effective Date, each holder of an Existing Equity Interest in OpCo shall have such Interest Reinstated or cancelled, released, and extinguished and without any distribution at the Debtors' election with the prior written consent of the Second Lien Agent (not to be unreasonably withheld or delayed). | Impaired / Deemed to Reject or Unimpaired / Presumed to Accept |
| **Class 8** | **Existing Equity Interests in TopCo** | Each Holder of an Existing Equity Interest in TopCo shall have such interest cancelled without distribution or compensation. | Impaired / Deemed to Reject |

| | |
|---|---|
| COMPLETION OF SECTION 363 SALES | |
| **Completion of Section 363** | The Debtors shall complete the contemplated sales or wind-down (which, if such wind down is not complete prior to the Effective Date, shall be |

| **COMPLETION OF SECTION 363 SALES** | |
|---|---|
| **Sales** | conducted in accordance with the terms set forth in the Plan, as applicable), of Proterra Transit and Proterra Powered on the terms contemplated by the Bidding Procedures Order and this Plan Term Sheet (such sales, if consummated, collectively, the "**Transit and Powered 363 Sales**" and, together with the Energy Back-Up Bid Transaction if consummated, the "**Sales**"). If a PSA Termination does not occur prior to the Plan Effective Date, to the extent requested by any purchaser party to the Transit and Powered 363 Sales (a "**Purchaser**"), Proterra will use commercially reasonable efforts to negotiate and execute an agreement providing for the Reorganized Debtors to supply the purchasers of Proterra Transit and Proterra Powered (if any) with goods and services on commercial terms acceptable to the Second Lien Agent. |
| | The Plan and Plan Support Agreement shall provide that, notwithstanding anything to the contrary herein or therein, the Debtors shall be entitled to (a) designate an Energy Back-Up Bidder, (b) close an Energy Back-Up Bid Transaction or, to the extent an Energy Back-Up Bid Transaction is not consummated, wind down the Proterra Energy business, in the event that the Plan Support Agreement is terminated in accordance with its terms prior to the Plan Effective Date, and (c) consummate the Plan, including the distribution of proceeds from the Sales, notwithstanding the termination of the Plan Support Agreement. |
| **Wind-Down of Proterra Transit** | In the event Proterra Transit or Proterra Energy are wound down, the Debtors shall conduct the wind down in an orderly and efficient manner, including through the creation of a liquidating trust (the "**Liquidating Trust**") created pursuant to the Plan to manage the wind-down of Proterra Transit and distribute the proceeds thereof for the benefit of the Distribution Trust (as defined below). In the event that the Plan provides for the creation of the Liquidating Trust: (a) the Debtors shall establish and fund a reserve account (the "**Liquidating Trust Expense Reserve**") in an amount, as determined by the Debtors in consultation with the Second Lien Agent, sufficient to satisfy the costs of administering the Liquidating Trust; (b) the Debtors shall conduct the wind-down of Proterra Transit in a manner as to maximize the value of Proterra Transit; (c) the Debtors shall consult with the Second Lien Agent and the trustee of the Distribution Trust on the manner of the wind-down; and (d) the net proceeds of the Liquidating Trust shall be distributed to the Distribution Trust. |

| **MILESTONES** |
|---|
| (a) By no later than November 30, 2023, the Debtors shall have secured one or more orders of the Bankruptcy Court (i) approving the sale of Proterra Transit or commenced the wind-down of Proterra Transit, and (ii) approving the sale of Proterra Powered under the Bidding Procedures Order. |
| (b) By no later than December 15, 2023, the Debtors shall have Filed the Disclosure Statement and a motion seeking approval of the Disclosure Statement, in each case in a form reasonably acceptable |

| **MILESTONES** |
|---|

to the Second Lien Agent.

(c) By no later than January 26, 2024, the Debtors shall have secured an order of the Bankruptcy Court approving the Disclosure Statement.

(d) By no later than March 11, 2024 the Debtors shall have secured entry of the Confirmation Order.

(e) By no later than April 1, 2024, the Plan Effective Date shall have occurred.

The parties to the Plan Support Agreement shall cooperate in good faith to ensure that the events described in clauses (a) through (e) occur as soon as is reasonably practicable, but in any event, on or before the dates required by such foregoing clauses; *provided*, *however*, notwithstanding anything herein to the contrary, with respect to the event described in clause (e), the Parties acknowledge and agree that any delay of the event described in such clause arising out of the need to obtain regulatory approvals of the Sales shall not be a breach of this Plan Term Sheet so long as such event described in clause (e) occurs by no later than May 1, 2024 or such later date as determined by the Second Lien Agent in its sole discretion.

| **OTHER MATERIAL PROVISIONS REGARDING THE RESTRUCTURING** | |
|---|---|
| **Executory Contracts and Unexpired Leases** | Executory Contracts and Unexpired Leases shall be assumed as provided for in the Bidding Procedures Order. Those Executory Contracts and Unexpired Leases (i) not addressed by the Sales and (ii) not otherwise rejected, assumed, assumed and assigned, or the subject of a motion filed by the Debtors prior to the Plan Effective Date to assume, assume and assign, or reject such Executory Contracts and Unexpired Leases on which the Bankruptcy Court has not ruled, will be deemed rejected unless expressly assumed under the Plan. |
| | The Debtors and Second Lien Agent will work together in good faith to determine which executory contracts and unexpired leases shall be assumed, assumed and assigned, or rejected in the Chapter 11 Cases. |

| **OTHER MATERIAL PROVISIONS REGARDING THE RESTRUCTURING** | |
|---|---|
| **Indemnification Obligations/D&O Insurance** | Other than as explicitly assumed in connection with the assumption of executory contracts and unexpired leases under the Plan, the Reorganized Debtors shall not assume any indemnification obligations of the Debtors, including pursuant to the by-laws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, or employment contracts of the Debtors for current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable.  The organizational documents of the Reorganized Debtors shall be amended on the Effective Date to provide indemnification, exculpation, and other similar protections only to the Reorganized Debtors' officers and directors for acts on or after the Effective Date.<br><br>On or after the Confirmation Date, the Debtors and Reorganized Debtors shall not terminate or otherwise reduce the coverage under any directors' and officers' insurance policies (including any "tail policy") in effect prior to the Plan Effective Date, and any directors and officers of the Debtors who served in such capacity at any time before or after the Plan Effective Date shall be entitled to the full benefits of any such policy (including any "tail policy") for the full term of such policy regardless of whether such directors and/or officers remain in such positions before or after the Plan Effective Date.  At the Debtors' option, each of the Debtors' directors' and officers' insurance policies will be either: (a) assumed by the Reorganized Debtors (including any tail policies), *provided* that such directors' and officers' insurance policies do not require the Reorganized Debtors to make any post-Effective Date cash expenditures; or (b) retained by the Debtors' estates.  In either case ((a) or (b)), each of the Debtors' directors' and officers' insurance policies (including any "tail policy") shall remain in full force and effect for their entire term and shall not be cancelled. |
| **Key Employee Incentive/Retention Plans** | On the Plan Effective Date, the Debtors shall pay, to KEIP participants, all amounts earned pursuant to the KEIP program to the extent such amounts remain unpaid as of the Plan Effective Date, including any such payments arising out of the transaction contemplated under the Plan, which shall be earned and paid on the Plan Effective Date.  Any amounts payable pursuant to proceeds that would be received after the Effective Date, including pursuant to any purchase price adjustments in connections with the Sales, will be estimated, escrowed, and paid upon payment of such proceeds to the Debtors' estates.<br><br>Except as set forth herein, the KEIP and KERP programs shall terminate effective as of the Plan Effective Date and any clawback rights provided for under the KEIP or the KERP shall be released. |
| **Distribution Trust** | On the Plan Effective Date, a trust (the "**Distribution Trust**") shall be established for purposes of reconciling certain Disputed Claims and Interests and distributing the Distribution Trust Assets (as defined below) for the benefit of the Distribution Trust Beneficiaries (as defined below).<br><br>On the Plan Effective Date, the Debtors shall transfer, or cause to be transferred, the following assets (the "**Distribution Trust Assets**") to the |

## **OTHER MATERIAL PROVISIONS REGARDING THE RESTRUCTURING**

|  | Distribution Trust: |
|--|--|

Distribution Trust:

   (a) $[●] in cash from the Distributable Cash (the "**Distribution Trust Carveout**");[3]

   (b) cash in an amount equal to (i) the total amount of Distributable Cash *less* (ii) (A) cash transferred to the Liquidating Trust (if any) on the Plan Effective Date to fund the Liquidating Trust Expense Reserve, (B) the Distribution Trust Carveout, and (C) cash paid from Distributable Cash on the Plan Effective Date on account of the treatment of Administrative Claims (including through the funding of the Professional Compensation Claims Escrow and the Self-Insured Escrow Account from Distributable Cash on the Plan Effective Date), Priority Tax Claims, and Classes 1 to 4;

   (c) the Distribution Trust's beneficial interests in the net proceeds of the Liquidating Trust, if any; and

   (d) the Distribution Trust's beneficial interests in the Professional Compensation Escrow Account and the Self-Insured Escrow Account to the extent funds remain in the Professional Compensation Escrow Account after payment of all allowed Professional Compensation Claims, or in the Self-Insured Escrow Account after the payment of all Health Insurance Claims, as applicable.

The Distribution Trust shall provide for the distribution of the net cash proceeds of the Distribution Trust Assets in accordance with the following distribution waterfall:

   • *First*, to holders of outstanding Allowed Administrative Claims (other than Professional Compensation Claims), holders of outstanding Allowed Priority Tax Claims, holders of outstanding Allowed Other Secured Claims and holders of outstanding Allowed Other Priority Claims, in each case, to the extent such Claims were Disputed as of the Plan Effective Date and not Reinstated or otherwise assumed by the Reorganized Debtors until such Claims are paid in full (the "**First Priority Distribution Trust Beneficiaries**");

   • *Second*, subject to reserving for any potential distributions to First Priority Distribution Trust Beneficiaries on account of applicable Disputed Claims, to holders of Allowed General Unsecured Claims (the "**Second Priority Distribution Trust Beneficiaries**" and, together with the First Priority Distribution Trust Beneficiaries, the "**Distribution Trust Beneficiaries**").

The other terms and procedures governing the Distribution Trust shall be set forth in the Plan (including the Plan Supplement) and be reasonably acceptable to the Debtors, the Committee, and the Second Lien Agent.

---

[3]  To include estimated amount of contingent/unliquidated Administrative Claims on account of postpetition warranties and any other claims that need to be reserved for in connection with confirmation.

| **OTHER MATERIAL PROVISIONS REGARDING THE RESTRUCTURING** | |
|---|---|
| **Self-Insured Escrow Account** | An escrow account (the "**Self-Insured Escrow Account**") shall be established and funded on the Plan Effective Date in the Self-Insured Escrow Amount for the benefit of holders of Health Insurance Claims. |
| **Releases by the Debtors, Releases by Holders of Claims and Interests, Exculpation, and Injunction** | The Plan shall include customary release, exculpation, and injunction provisions for the benefit of the Debtors, the CSI Parties, the First Lien Agent, the Committee, and their respective related parties, which provisions shall be substantially in the form of the language attached hereto as **Exhibit 2**. |
| **Exemption from SEC Registration** | The issuance of all securities under the Plan will be exempt from SEC registration under section 1145 of the Bankruptcy Code to the fullest extent permissible. |
| **Conditions Precedent to the Plan Effective Date** | The following shall be conditions precedent to the occurrence of the Plan Effective Date (the "**Conditions Precedent to the Plan Effective Date**"):<br><br>(a) the Bankruptcy Court shall have entered the Confirmation Order, which shall:<br><br>    (i) authorize the Debtors to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan;<br><br>    (ii) decree that the provisions in the Confirmation Order and the Plan are nonseverable and mutually dependent;<br><br>    (iii) authorize the Debtors, as applicable/necessary, to: (a) implement the Restructuring Transactions; (b) distribute the New Common Stock pursuant to the exemption from registration under the Securities Act provided by section 1145 of the Bankruptcy Code or other exemption from such registration or pursuant to one or more registration statements; and (c) make all distributions and issuances as required under the Plan, including cash and, as applicable/necessary, the New Common Stock;<br><br>    (iv) authorize the implementation of the Plan in accordance with its terms; and<br><br>    (v) provide that, pursuant to section 1146 of the Bankruptcy Code, the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax to the fullest extent permissible; |

| **OTHER MATERIAL PROVISIONS REGARDING THE RESTRUCTURING** | |
|---|---|
| | (b) the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan; |
| | (c) the final version of each of the Plan and all documents contained in any supplement to the Plan, including the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been Filed in a manner consistent in all material respects with this Plan Term Sheet and in a form reasonably acceptable to the Second Lien Agent; |
| | (d) the Debtors shall have fully funded the Professional Compensation Escrow Account, the Liquidating Trust Expense Reserve, and the Self-Insured Escrow Account; |
| | (e) to the extent invoiced, the payment in cash in full of all Restructuring Expenses; |
| | (f) the sale of Proterra Powered to Volvo Battery Solutions LLC shall have been consummated substantially on the terms described in that certain *Notice of Successful Bidder Regarding Debtors' Powered Assets* [ECF No. 525]; |
| | (g) the sale of Proterra Transit shall have been consummated or the Second Lien Agent shall have approved, with such approval not to be unreasonably withheld, a plan for the wind-down of Proterra Transit; and |
| | (h) the Debtors shall have implemented the Restructuring Transactions and all transactions contemplated in this Plan Term Sheet in a manner consistent with this Plan Term Sheet. |
| **Retention of Jurisdiction** | The Plan will provide for the retention of jurisdiction by the Bankruptcy Court with respect to all usual and customary matters. |
| **Waiver of Conditions Precedent to the Plan Effective Date** | The Debtors, with the prior written consent of the Second Lien Agent (not to be unreasonably withheld or delayed), may waive any one or more of the Conditions Precedent to the Plan Effective Date. |

**Exhibit 1**

**Definitions**

| Term | Definition |
|------|------------|
| **"Agreed Second Lien Obligations"** | As defined in the Final Cash Collateral Order. |
| **"Administrative Claim"** | Any Claim of a kind specified under section 503(b) of the Bankruptcy Code and entitled to priority under sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Plan Effective Date of preserving the Estates and operating Debtors' business; (b) Allowed Professional Compensation Claims; (c) Statutory Fees; (d) 503(b)(9) Claims; (e) Health Insurance Claims; and (f) KEIP Claims. |
| **"Allowed"** | With respect to any Claim or Interest, except as otherwise provided herein:  (a) a Claim or Interest in a liquidated amount as to which no objection has been Filed prior to the applicable claims objection deadline and that is evidenced by a Proof of Claim timely Filed by the applicable Bar Date or that is not required to be evidenced by a Filed Proof of Claim under the Plan, the Bankruptcy Code, or a Final Order; (b) a Claim or Interest that is scheduled by the Debtors as neither disputed, contingent, nor unliquidated, and for which no Proof of Claim has been timely Filed in an unliquidated or a different amount; (c) a Claim or Interest that is upheld or otherwise Allowed (i) pursuant to the Plan (including any Claim or Interest that is upheld or otherwise Allowed pursuant to a settlement executed by the Distribution Trustee in accordance with the Plan), (ii) in any stipulation that is approved by the Bankruptcy Court, (iii) pursuant to any contract, instrument, indenture, or other agreement entered into or assumed in connection herewith, or (iv) by Final Order (including any such Claim to which the Debtors had objected or which the Bankruptcy Court had disallowed prior to such Final Order); *provided* that with respect to a Claim or Interest described in clauses (a) through (c) above, such Claim or Interest shall be considered Allowed only if and to the extent that with respect to such Claim or Interest no objection to the allowance thereof has been or, in the Debtors' or the Distribution Trustee's reasonable good faith judgment, may be interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim or Interest, as applicable, shall have been allowed by a Final Order; *provided*, *further*, that no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes such Debtor.  A Proof of Claim Filed after the Bar Date is not considered Allowed and shall be deemed expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.  Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which |

| Term | Definition |
|---|---|
|  | no Proof of Claim is or has been timely Filed, is not considered Allowed and shall be deemed expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court. "**Allow**," "**Allowing**," and "**Allowance**" shall have correlative meanings. |
| "**Avoidance Actions**" | Any and all claims and Causes of Action which any of the Debtors, the Estates, or any other appropriate party in interest has asserted or may assert under sections 502, 510, 542, 544, 545, or 547 through 553 of the Bankruptcy Code or under similar or related state or federal statutes and common law, including fraudulent transfer laws |
| "**Bankruptcy Code**" | Title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended. |
| "**Bankruptcy Court**" | The United States Bankruptcy Court for the District of Delaware. |
| "**Bankruptcy Rules**" | The Federal Rules of Bankruptcy Procedure. |
| "**Bar Date**" | With respect to any particular Claim, the applicable date set by the Bankruptcy Court as the last day for Filing Proofs of Claim or requesting allowance of Administrative Claims in the Chapter 11 Cases for such Claim, whether pursuant to the Confirmation Order, the Plan, the *Order Establishing Bar Dates for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof* [Docket No. 187] and *Notice of Entry of Bar Date Order Establishing Deadlines for Filing Proofs of Claim (Including for Claims Asserted Under Section 503(b)(9) of the Bankruptcy Code) Against the Debtors* [Docket No. 344], or any other applicable order of the Bankruptcy Court. |
| "**Bidding Procedures Order**" | That certain *Order (A) Approving Bidding Procedures to Govern the Sale of All or Substantially All of the Debtors' Assets Pursuant to Section 363 of the Bankruptcy Code, (B) Approving Procedures Regarding Entry Into One or More Stalking Horse Agreements, (C) Establishing Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases, (D) Approving the Form and Manner of the Notice of Assumption and Assignment of Executory Contracts and Unexpired Leases, (E) Scheduling Auctions for the Sales of the Company Assets and Hearings to Consider Approval of the Sales and Approving the Form and Manner of the Notice Thereof, and (F) Granting Related Relief* [Docket No. 218] entered in the Chapter 11 Cases. |
| "**Business Day**" | Any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York. |
| "**Cash**" | Legal tender of the United States of America or the equivalent thereof. |
| "**Cause of Action**" | Without limitation, any claims, interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, Liens, indemnities, guaranties, and franchises of any kind or character |

| Term | Definition |
|---|---|
| | whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise.  Causes of Action also include:  (a) Avoidance Actions; (b) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law; (c) the right to object to or otherwise contest Claims or Interests; (d) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; and (e) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code. |
| **"Chapter 11 Cases"** | Those certain chapter 11 bankruptcy cases of the Debtors jointly administered under the caption *In re Proterra Inc, et al.*, Case No. 23-11120 (BLS) (Bankr. D. Del. 2023). |
| **"Claim"** | Any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors. |
| **"Class"** | A category of holders of Claims or Interests pursuant to section 1122(a) of the Bankruptcy Code. |
| **"Committee"** | The official committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code by the U.S. Trustee on August 24, 2023, as such committee may be reconstituted, supplemented, or otherwise modified from time to time, including pursuant to the U.S. Trustee's *Amended Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 268]. |
| **"Conditions Precedent to the Plan Effective Date"** | As defined in this Plan Term Sheet. |
| **"Confirmation"** | The Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021. |
| **"Confirmation Date"** | The date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021. |
| **"Confirmation Hearing"** | The hearing(s) before the Bankruptcy Court under section 1128 of the Bankruptcy Code at which the Debtors seek entry of the Confirmation Order. |
| **"Confirmation Order"** | The order of the Bankruptcy Court confirming the Plan under section 1129 of the Bankruptcy Code. |
| **"CSI Parties"** | Collectively, CSI Prodigy Holdco LP, CSI Prodigy CoInvestment LP, and CSI PRTA Co-Investment LP, and the Second Lien Agent. |
| **"Cure Claim"** | A Claim based upon a monetary default, if any, by any Debtor on an Executory Contract or Unexpired Lease at the time such contract or lease is assumed or assumed and assigned by the Debtors pursuant to sections 365 or 1123 of the |

| Term | Definition |
|---|---|
| | Bankruptcy Code. |
| **"Cure Cost Reduction"** | As defined in this Plan Term Sheet. |
| **"Disclosure Statement"** | The related disclosure statement with respect to the Plan, as the same may be amended, supplemented, or modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan, that is prepared and distributed in accordance with the Bankruptcy Code, Bankruptcy Rules, and any other applicable law. |
| **"Disallowed"** | All or that portion, as applicable, of any Claim or Interest which: (a) has been disallowed under the Plan, the Bankruptcy Code, applicable law or by a Final Order; (b) is scheduled by the Debtors as being in an amount of zero dollars ($0.00) or as contingent, disputed, or unliquidated and as to which no Proof of Claim was timely filed or deemed timely filed prior to the applicable Bar Date pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court, including the order approving the Bar Date, or otherwise deemed timely filed under applicable law; or (c) is not scheduled by the Debtors and as to which no Proof of Claim or request for allowance of an Administrative Claim (as applicable) has been timely filed or deemed timely filed prior to the applicable Bar Date pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law. |
| **"Disputed"** | With respect to any Claim or Interest, any Claim or Interest or any portion thereof that is not yet Allowed or Disallowed. |
| **"Distributable Cash"** | If (a) no PSA Termination has occurred prior to the Plan Effective Date, cash on hand of the Debtors as of the Plan Effective Date, including cash proceeds from the Sales, less the Reorganized Proterra Retained Cash; or (b) a PSA Termination has occurred prior to the Plan Effective Date, cash on hand of the Debtors as of the Plan Effective Date, including cash proceeds from the Sales and the Reorganized Proterra Retained Cash. |
| **"Distribution Trust"** | As defined in this Plan Term Sheet. |
| **"Distribution Trust Agreement"** | The agreement, to be included in the Plan Supplement, as it may be amended, effective as of the Plan Effective Date, establishing and setting forth the terms and conditions which shall, in conjunction with the Plan and the Confirmation Order, govern the administration of the Distribution Trust, which agreement shall be in a form reasonably acceptable to the Debtors, the Committee, and the Second Lien Agent. |
| **"Distribution Trust Assets"** | As defined in this Plan Term Sheet. |
| **"Distribution Trust Beneficiaries"** | As defined in this Plan Term Sheet. |

| Term | Definition |
|---|---|
| **"Distribution Trust Carveout"** | As defined in this Plan Term Sheet. |
| **"Distribution Trustee"** | FTI Consulting, Inc. or such other trustee appointed by the Debtors and identified in the Plan Supplement, to serve as the trustee under the Distribution Trust Agreement, or any successor thereto appointed in accordance with the terms of the Plan and the Distribution Trust Agreement, as applicable |
| **"Entity"** | As defined in section 101(15) of the Bankruptcy Code. |
| **"Estate"** | The estate of any Debtor created under sections 301 and 541 of the Bankruptcy Code upon the commencement of the applicable Debtor's Chapter 11 Case. |
| **"Exculpated Parties"** | Collectively, (a) the Debtors, (b) any Statutory Committee and each of its members, and (c) with respect to each of the foregoing Persons in clauses (a) and (b), such Persons' predecessors, successors, assigns, subsidiaries, affiliates, current and former officers and directors, principals, equity holders, members, partners, managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, and such Persons' respective heirs, executors, estates, and nominees, in each case in their capacity as such. |
| **"Existing Equity Interest"** | An Interest in a Debtor existing as of the Petition Date. Notwithstanding the foregoing, Existing Equity Interests do not include Intercompany Interests. |
| **"File", "Filed", or "Filing"** | File, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases. |
| **"Final Cash Collateral Order"** | That certain *Final Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* [Docket No. 422] entered in the Chapter 11 Cases. |
| **"Final Order"** | An order or judgment of the Bankruptcy Court, or court of competent jurisdiction with respect to the subject matter that has not been reversed, stayed, modified, or amended, as entered on the docket in any Chapter 11 Case or the docket of any court of competent jurisdiction, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument, or rehearing has expired and no appeal or petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely Filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing will have been denied, resulted in no stay pending appeal of such order, or has otherwise been dismissed with prejudice; provided that the possibility that a motion under Rule 60 of the Federal Rules of Civil |

| Term | Definition |
|---|---|
|  | Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed with respect to such order will not preclude such order from being a Final Order. |
| **"First Day Declaration"** | That certain *Declaration of Gareth T. Joyce in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 16] filed in these Chapter 11 Cases. |
| **"First Lien Agent"** | As defined in the Final Cash Collateral Order. |
| **"First Lien Claim"** | Any Claim on account of the First Lien Credit Facility. |
| **"First Lien Credit Facility"** | As defined in the Final Cash Collateral Order. |
| **"First Lien Professionals"** | Any lawyers, financial advisors, investment bankers, and/or other professionals retained by the First Lien Agent in connection with these Chapter 11 Cases. |
| **"First Priority Distribution Trust Beneficiaries"** | As defined in this Plan Term Sheet. |
| **"General Unsecured Claim"** | Any Claim, other than an Administrative Claim (including any Professional Compensation Claims), a Priority Tax Claim, an Other Secured Claim, an Other Priority Claim, a First Lien Claim, a Second Lien Convertible Notes Claim, or an Intercompany Claim. |
| **"Governmental Unit"** | As defined in section 101(27) of the Bankruptcy Code. |
| **"Health Insurance Claims"** | Claims arising out of the Debtors' self-insured employee benefits programs. |
| **"Holder"** | Any Entity that holds a Claim or Interest, as applicable. |
| **"Impaired"** | With respect to any Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code. |
| **"Intercompany Claim"** | A Claim held by a Debtor against a Debtor. |
| **"Intercompany Interest"** | An Interest in a Debtor held by a Debtor. |
| **"Interest"** | Any equity security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor. |
| **"KEIP"** | The key employee incentive plan approved under the *Order Approving Debtors' Key Employee Incentive Plan* [Docket No. 347]. |

| Term | Definition |
|---|---|
| **"KEIP Claim"** | Claims arising under the KEIP. |
| **"KERP"** | The key employee retention plan approved under the *Order Approving Debtors' Key Employee Retention Plan and Granting Related Relief* [Docket No. 329]. |
| **"Law"** | Any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court). |
| **"Lien"** | As defined in section 101(37) of the Bankruptcy Code. |
| **"LG Parties"** | Collectively, LG Energy Solution, Ltd and its and its affiliates' predecessors, successors, assigns, subsidiaries, affiliates, current and former officers and directors, principals, equity holders, members, partners, managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, and such Persons' respective heirs, executors, estates, and nominees, in each case in their capacity as such. |
| **"Liquidation Payment Amount Claim"** | As defined in the Final Cash Collateral Order. |
| **"Liquidating Trust"** | As defined in this Plan Term Sheet. |
| **"Liquidating Trust Expense Reserve"** | As defined in this Plan Term Sheet. |
| **"Marketing Process"** | The process for the marketing and sale of all or substantially all of the Debtors' assets, or any combination thereof, pursuant to the Bidding Procedures Order. |
| **"New Common Stock"** | As defined in this Plan Term Sheet. |
| **"OpCo"** | As defined in this Plan Term Sheet. |
| **"Other Priority Claim"** | Any Claim other than an Administrative Claim or a Priority Tax Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code. |
| **"Other Secured Claim"** | Any Secured Claim other than a First Lien Claim or a Second Lien Convertible Notes Claim. |
| **"Person"** | A person as such term is defined in section 101(41) of the Bankruptcy Code. |
| **"Petition Date"** | August 7, 2023. |
| **"Plan"** | The Plan as defined in this Plan Term Sheet, including any and all exhibits, supplements, appendices, and schedules hereto, as may be altered, amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof, including the Plan |

| Term | Definition |
|---|---|
| | Supplement (as altered, amended, supplemented, or otherwise modified from time to time), which are incorporated into the Plan by reference and shall be made part of the Plan as if set forth therein. |
| **"Plan Effective Date"** | The date that is the first Business Day on which (a) all Conditions Precedent to the Plan Effective Date have been satisfied or waived in accordance with the Plan and (b) no stay of the Confirmation Order is in effect. |
| **"Plan Supplement"** | The documents and forms of documents, agreements, schedules, and exhibits to the Plan, which shall include (a) the Distribution Trust Agreement, (b) the Schedule of Retained Causes of Action, (c) the identity of the Distribution Trustee, and (d) the Cash amount to be funded into the Liquidating Trust Expense Reserve on the Plan Effective Date; provided, that through the Plan Effective Date, the Debtors shall have the right to amend, supplement, or otherwise modify the Plan Supplement in accordance with the terms of the Plan. |
| **"Plan Support Agreement"** | As defined in this Plan Term Sheet. |
| **"Prepetition Loan Documents"** | As defined in the Final Cash Collateral Order. |
| **"Priority Tax Claims"** | Any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code. |
| **"Professional"** | A Person or Entity employed in the Chapter 11 Cases pursuant to a Bankruptcy Court order in accordance with sections 327, 328, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the Plan Effective Date, pursuant to sections 327, 328, 329, 330, 363, or 331 of the Bankruptcy Code, excluding any ordinary course professional retained pursuant to a Bankruptcy Court order. |
| **"Professional Compensation Claim"** | A Claim against a Debtor for all professional services rendered and costs incurred on or after the Petition Date by a Professional, including estimates through the Plan Effective Date, in connection with the Chapter 11 Cases. |
| **"Professional Compensation Escrow Account"** | An interest-bearing account to be funded by the Debtors on the Plan Effective Date holding Cash in an amount equal to (a) the amount of accrued and unpaid Professional Compensation Claims that are known as of the Plan Effective Date, plus (b) a reasonable estimate of any unknown accrued and unpaid Professional Compensation Claims as of the Plan Effective Date, which estimate shall be determined by the Debtors pursuant to the Plan and in accordance with this Plan Term Sheet. |
| **"Proof of Claim"** | A proof of claim Filed against any of the Debtors in the Chapter 11 Cases by the applicable Bar Date. |
| **"Proterra Energy"** | As defined in the First Day Declaration. |
| **"Proterra Powered"** | As defined in the First Day Declaration. |

| Term | Definition |
|---|---|
| **"Proterra Transit"** | As defined in the First Day Declaration. |
| **"Proterra Valence"** | As defined in the First Day Declaration. |
| **"Proterra Charging"** | Proterra Energy, excluding Proterra Valence. |
| **"Purchaser"** | As defined in this Plan Term Sheet. |
| **"Qualified Bid"** | As defined in the Bidding Procedures Order. |
| **"Reinstate", "Reinstatement", or "Reinstated"** | With respect to Claims and Interests, that the Claim or Interest shall be rendered unimpaired in accordance with section 1124 of the Bankruptcy Code. |
| **"Released Parties"** | Collectively, the Releasing Parties; provided that, in each case, an Entity shall not be a Released Party if it: (a) elects to opt out of the releases contained in the Plan, (b) files with the Bankruptcy Court an objection to the Plan that is not consensually resolved before Confirmation or supports any such objection or objector, or (c) is an LG Party. |
| **"Releasing Parties"** | Collectively, and in each case in its capacity as such: (a) the Debtors, (b) the First Lien Agent, (c) the Second Lien Agent, (d) any Statutory Committee and each of its members, (e) the holders of all Claims or Interests who vote to accept the Plan, (f) the holders of all Claims or Interests whose vote to accept or reject the Plan is solicited but who do not vote either to accept or to reject the Plan and do not opt out of granting the releases set forth herein, (g) the holders of all Claims or Interests who vote, or are deemed to vote, to reject the Plan but do not opt out of granting the releases set forth herein, (h) the holders of all Claims and Interests who are Unimpaired under the Plan, (i) with respect to each of the foregoing Persons in clauses (a) through (h), each of their affiliates, and (j) with respect to each of the foregoing Persons in clauses (a) through (i), each of their and their affiliates' predecessors, successors, assigns, subsidiaries, affiliates, current and former officers and directors, principals, equity holders, members, partners, managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, and such Persons' respective heirs, executors, estates, and nominees, in each case in their capacity as such; provided that an Entity shall not be a Releasing Party if it files with the Bankruptcy Court an objection to the Plan that is not consensually resolved before Confirmation or supports any such objection or objector. |
| **"Reorganized Debtors"** | Collectively, each Debtor, or any successor or assign thereto, by merger, consolidation, or otherwise, on and after the Plan Effective Date. |
| **"Reorganized Proterra"** | Reorganized TopCo, or any successor or assign, by merger, consolidation, or otherwise, on or after the Plan Effective Date. |
| **"Reorganized Proterra** | Cash on hand of the Debtors as of the Plan Effective Date in an |

| Term | Definition |
|---|---|
| **Retained Cash"** | amount required to satisfy 11 U.S.C. § 1129(a)(11). |
| **"Restructuring Expenses"** | The prepetition and postpetition reasonable and documented fees and expenses of the First Lien Professionals and the Second Lien Professionals. |
| **"Restructuring Transactions"** | Those mergers, amalgamations, consolidations, arrangements, continuances, restructurings, transfers, conversions, dispositions, liquidations, dissolutions, settlements, releases, or other transactions that the Debtors reasonably determine to be necessary to implement the Plan in a manner consistent with the Plan Support Agreement, in each case subject to the consent rights set forth therein, as applicable. |
| **"Restructuring"** | The restructuring of the Debtors, as described in this Plan Term Sheet. |
| **"Retained Cash Reduction"** | As defined in this Plan Term Sheet. |
| **"Sale Documents"** | The definitive documents to effectuate the Sales. |
| **"Sales"** | As defined in this Plan Term Sheet. |
| **"Schedule of Retained Causes of Action"** | A schedule of Causes of Action of the Debtors to be retained under the Plan, which shall be included in the Plan Supplement. |
| **"SEC"** | The Securities and Exchange Commission. |
| **"Second Lien Agent"** | As defined in the Final Cash Collateral Order. |
| **"Second Lien Convertible Notes Claim"** | Any Claim on account of the Second Lien Convertible Notes. |
| **"Second Lien Convertible Notes"** | As defined in the Final Cash Collateral Order. |
| **"Second Lien Professionals"** | Any lawyers, financial advisors, investment bankers, and/or other professionals retained by the Second Lien Agent in connection with these Chapter 11 Cases. |
| **"Second Priority Distribution Trust Beneficiaries"** | As defined in this Plan Term Sheet. |
| **"Secured"** | When referring to a Claim:  (a) secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or, in the case of setoff, pursuant to section 553 of the Bankruptcy Code; or (b) otherwise Allowed pursuant to the Plan or a Final Order of the Bankruptcy Court as a Secured Claim. |
| **"Securities Act"** | The Securities Act of 1933, as amended, 15 U.S.C. §§ 77a–77aa, or any similar federal, state, or local law. |

| Term | Definition |
|------|-----------|
| **"Self-Insured Escrow Account"** | As defined in this Plan Term Sheet. |
| **"Self-Insured Escrow Amount"** | Cash in an amount equal to $[●].[1] |
| **"Statutory Committee"** | Any statutory committee appointed in the Chapter 11 Cases, including the Committee. |
| **"Statutory Fees"** | All fees for which the Debtors are obligated pursuant to 28 U.S.C. § 1930(a)(6), together with interest, if any, pursuant to 31 U.S.C. § 3717 |
| **"Termination Date"** | As defined in this Plan Term Sheet. |
| **"Third-Party Release"** | Such releases by the Releasing Parties as set forth in Section III of the Exhibit 2 to this Plan Term Sheet. |
| **"Transit and Powered 363 Sales"** | As defined in this Plan Term Sheet. |
| **"Unimpaired"** | With respect to a Class of Claims or Interests, a Class of Claims or Interests that is not Impaired. |
| **"United States Trustee"** | The United States Trustee for the District of Delaware. |
| **"Unsecured Claim"** | Any Claim that is not a Secured Claim. |
| **"Wages Order"** | The Bankruptcy Court's *Final Order (I) Authorizing the Debtors to Pay Prepetition Employee Wages and Benefits, and (II) Granting Related Relief* [Docket No. 207]. |

---

[1] To be equal to the amounts required to fund the Debtors' self-insured benefit programs for the policy period during which the Plan Effective Date occurs, *minus* amounts in the Self-Insured Escrow Account established pursuant to the Wages Order.

**Exhibit 2**

**Release, Exculpation, Injunction Provisions**

I. *Release of Liens*

Except as otherwise specifically provided in the Plan, the Confirmation Order, or any other document, instrument, or agreement executed to implement the Plan (including those set forth in the Plan Supplement), on the Plan Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Plan Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, discharged, and compromised, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall revert to the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or filing being required to be made by the Debtors; *provided* that no mortgage, deed of trust, Lien, pledge, or other security interest against any property of the Estates in favor of any Allowed Secured Claim shall be released prior to satisfaction and/or payment of such Allowed Secured Claim in full in accordance with the Plan.  Any holder of such Secured Claim (and the applicable agents for such holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such holder (and the applicable agents for such holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Liens and/or security interests, including the execution, delivery, and filing or recording of such releases. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

In addition, the First Lien Agent and Second Lien Agent shall execute and deliver all documents reasonably requested by the Debtors, the Reorganized Debtors, or any Purchaser, as applicable, to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the Debtors or Reorganized Debtors to file UCC-3 termination statements (to the extent applicable) with respect thereto.

II. *Releases by the Debtors*

Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, as of the Plan Effective Date, each of the Released Parties is unconditionally, irrevocably, generally, individually, and collectively, released, acquitted, and discharged by the Debtors, the Reorganized Debtors, and each of their Estates, including any successors to the Debtors or any Estate's representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, from any and all Causes of Action, including any Avoidance Actions or derivative Causes of Action asserted or assertable by or on behalf of a Debtor, Reorganized Debtor, or any of their Estates, any Causes of Action that any Debtor, Reorganized Debtor, or any of their Estates would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the Holder of any Claim against or Interest in a Debtor or other Entity, whether known or unknown, foreseen or unforeseen, asserted or unasserted, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise that the Debtors, the Reorganized Debtors, or their Estates (whether individually or collectively) ever had, now has, or thereafter can, shall, or may have, based on or relating to, or in any manner arising from, in whole or in part:  (a) the

Debtors, the Debtors' in- or out-of-court restructuring efforts, the Marketing Process, intercompany transactions, the Chapter 11 Cases, the purchase, sale, or rescission of any security of the Debtors, any Sale, the formulation, preparation, dissemination, negotiation, or filing of the Sale Documents, Plan Support Agreement, the Disclosure Statement, or the Plan, including the Plan Supplement; (b) any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Sales, the Plan Support Agreement, the Disclosure Statement, or the Plan, including the Plan Supplement; (c) the business or contractual arrangements between any Debtor and any Released Party, whether before or during the Debtors' restructuring, or the restructuring of Claims and Interests before or during the Chapter 11 Cases; (d) the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is affected by or classified in the Plan; (e) the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of consummation of the Plan, the administration and implementation of the Plan, including any issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement; or (f) any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date arising from or relating to any of the foregoing, including, without limitation, the Prepetition Loan Documents, any Interests, and all matters relating thereto.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above shall not release: (a) to the extent that any Claims or other Causes of Action against the Debtors are not released pursuant to the Plan, are not discharged pursuant to the Plan, or are Disputed, any rights of the Debtors and the Reorganized Debtors to assert any and all counterclaims, crossclaims, offsets, indemnities, claims for contribution, defenses, and similar claims or other Causes of Action in response to such Causes of Action; (b) any commercial Cause of Action arising in the ordinary course of business, such as accounts receivable and accounts payable on account of goods and services being performed; (c) any post- Plan Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any other document, instrument, or agreement executed to implement the Plan (including those set forth in the Plan Supplement); or (e) any obligations of any party or Entity under the Sale Documents.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (a) essential to the Confirmation of the Plan; (b) an exercise of the Debtors' business judgment; (c) in exchange for the good and valuable consideration and substantial contributions provided by the Released Parties; (d) a good faith settlement and compromise of the Causes of Action released by the Debtor Release; (e) in the best interests of the Debtors and all Holders of Claims and Interests; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Debtors, the Reorganized Debtors, and the Estates, including any successors to the Debtors or any Estate's representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, asserting any Cause of Action released pursuant to the Debtor Release.

Each of the Debtors expressly acknowledges that although ordinarily a general release may not extend to Claims or Causes of Action that each Debtor does not know or suspect to exist in its favor, which if known by it may have materially affected its settlement with the party released, they have carefully considered, and taken into account in determining to enter into the above releases described in this Plan, the possible existence of such unknown losses or Claims or Causes of Action.

Without limiting the generality of the foregoing, each Debtor expressly waives and relinquishes any and all rights and benefits such party may have or conferred upon it under any federal, state, or local statute, rule, regulation, or principle of common law or equity that provides that a release does not extend to Claims or Causes of Action that the claimant does not know or suspect to exist in its favor at the time of providing the release or that may in any way limit the effect or scope of the releases with respect to released Claims or Causes of Action that such party did not know or suspect to exist in such party's favor at the time of providing the release, which in each case if known by it may have materially affected its settlement with any Released Party, including, without limitation, California Civil Code § 1542, which provides:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

Each of the Debtors expressly acknowledges that the releases and covenants not to sue contained in the Plan are effective regardless of whether those released matters or released Claims or Causes of Action are presently known or unknown, suspected or unsuspected, or foreseen or unforeseen.

*III. Releases by the Releasing Parties*

As of the Plan Effective Date, each of the Releasing Parties other than the Debtors shall, and shall be deemed to have, expressly, absolutely, unconditionally, irrevocably, generally, individually, and collectively, released, acquitted, and discharged each of the Released Parties from any and all Causes of Action, including any Avoidance Actions or derivative Causes of Action asserted or assertable by or on behalf of a Debtor, Reorganized Debtor, or any of their Estates, and any Causes of Action asserted or assertable by or on behalf of the Holder of any Claim or Interest or other Entity, whether known or unknown, foreseen or unforeseen, asserted or unasserted, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise that the Releasing Parties (whether individually or collectively) ever had, now have, or thereafter can, shall, or may have, based on or relating to, or in any manner arising from, in whole or in part: (a) the Debtors, the Debtors' in- or out-of-court restructuring efforts, the Marketing Process, intercompany transactions, the Chapter 11 Cases, the purchase, sale, or rescission of any security of the Debtors, the formulation, preparation, dissemination, negotiation, or filing of the Sale Documents, the Plan Support Agreement, the Disclosure Statement, or the Plan, including the Plan Supplement; (b) any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Sales, the Plan Support Agreement, the Disclosure Statement, or the Plan, including the Plan Supplement; (c) the business or contractual arrangements between any Debtor and any Releasing Party, whether before or during the Debtors' restructuring, or the restructuring of Claims and Interests before or during the Chapter 11 Cases; (d) the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is affected by or classified in the Plan; (e) the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of consummation of the Plan, the administration and implementation of the Plan, including any issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement; or (f) any other act or omission, transaction, agreement,

event, or other occurrence taking place on or before the Plan Effective Date arising from or relating to any of the foregoing, including, without limitation, the Prepetition Loan Documents, and all matters relating thereto.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above shall not release, prejudice, limit, impact, or otherwise impair:  (a) to the extent that any Causes of Action against any Releasing Party are not released or discharged pursuant to the Plan, any rights of such Releasing Party to assert any and all counterclaims, crossclaims, offsets, indemnities, claims for contribution, defenses, and similar claims in response to such Causes of Action; (b) any rights of the First Lien Agent or Second Lien Agent to (i) payment of fees, expenses, and indemnification obligations as against any money or property distributable to holders of Claims under the First Lien Credit Facility or the Second Lien Convertible Notes, respectively, including any rights to priority of payment and/or to exercise charging liens or (ii) seek compensation and/or reimbursement of fees and expenses in  accordance with the terms of the Plan and Confirmation Order, as applicable; (c) any commercial Cause of Action arising in the ordinary course of business, such as accounts receivable and accounts payable on account of goods and services being performed; (d) any post- Plan Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement executed to implement the Plan (including those set forth in the Plan Supplement); or (f) any obligations of any party or Entity under the Sale Documents.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is:  (a) essential to the Confirmation of the Plan; (b) given in exchange for the good and valuable consideration and substantial contributions provided by the Released Parties; (c) a good faith settlement and compromise of the Causes of Action released by the Third-Party Release; (d) in the best interests of the Debtors and their Estates; (e) fair, equitable, and reasonable; (f) given and made after due notice and opportunity for hearing; (g) consensual; and (h) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release.

Each of the Releasing Parties expressly acknowledges that although ordinarily a general release may not extend to Claims or Causes of Action that the Releasing Party does not know or suspect to exist in its favor, which if known by it may have materially affected its settlement with the party released, they have carefully considered, and taken into account in determining to enter into the above releases described in this Plan, the possible existence of such unknown losses or Claims or Causes of Action. Without limiting the generality of the foregoing, each Releasing Party expressly waives and relinquishes any and all rights and benefits such party may have or conferred upon it under any federal, state, or local statute, rule, regulation, or principle of common law or equity that provides that a release does not extend to Claims or Causes of Action that the claimant does not know or suspect to exist in its favor at the time of providing the release or that may in any way limit the effect or scope of the releases with respect to released Claims or Causes of Action that such party did not know or suspect to exist in such party's favor at the time of providing the release, which in each case if known by it may have materially affected its settlement with any Released Party, including, without limitation, California Civil Code § 1542, which provides:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE

**MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.**

**Each of the Releasing Parties expressly acknowledges that the releases and covenants not to sue contained in the Plan are effective regardless of whether those released matters or released Claims or Causes of Action are presently known or unknown, suspected or unsuspected, or foreseen or unforeseen.**

*IV. Exculpation*

To the fullest extent permitted by applicable law, no Exculpated Party will have or incur any liability to any person or Entity for, and each Exculpated Party is hereby released and exculpated from, any Cause of Action related to any act or omission in connection with, relating to, or arising out of, the Debtors' restructuring efforts, the Chapter 11 Cases, preparation for the Chapter 11 Cases, the filing of the Chapter 11 Cases, formulation, preparation, dissemination, negotiation, filing, or termination of the Sale Documents, the Plan Support Agreement, the Disclosure Statement, or the Plan, including the Plan Supplement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with any of the foregoing, the Sales, the funding of the Plan, the occurrence of the Plan Effective Date, the pursuit of Confirmation, the pursuit of consummation, the administration and implementation of the Plan, the issuance of securities pursuant to the Plan, the issuance of the New Common Stock, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, gross negligence, or willful misconduct, but in all respects such Persons will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The foregoing shall not be deemed to release, affect, or limit any post- Plan Effective Date rights or obligations of the Exculpated Parties under the Plan, any Restructuring Transaction, or any other document, instrument, or agreement executed to implement the Plan (including those set forth in the Plan Supplement).

The Exculpated Parties have, and upon consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of consideration pursuant to, the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

The exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability.

*V. Injunction*

Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold claims or interests that have been released pursuant to the Plan provisions setting forth the releases granted by the Debtors or the Releasing Parties, or discharged pursuant to the Plan, or are subject to exculpation pursuant to the article of the Plan which provides for the exculpation of the

**Exculpated Parties, shall be permanently enjoined, from and after the Plan Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties:  (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (c) creating, perfecting, or enforcing any lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such Entity has, on or before the Plan Effective Date, asserted such setoff right in a document filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.**