## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| PROTERRA INC, *et al.*,[1] | Case No. 23-11120 (BLS) |
| Debtors. | |

### OBJECTION AND MOTION FOR JUDGMENT ON THE PLEADINGS TO PROOF OF CLAIM NO. 1177 FILED BY CSI GP I LLC

The Official Committee of Unsecured Creditors (the "Committee") appointed in the chapter 11 bankruptcy cases (the "Chapter 11 Cases") of the above-captioned debtors and debtors-in-possession (the "Debtors"), by and through its counsel, hereby submits this objection (the "Objection") and motion for judgment on the pleadings with respect to proof of claim number 1177 (the "Proof of Claim") filed by CSI GP I LLC on behalf of itself and CSI Prodigy Holdco LP, CSI Prodigy Co-Investment LP, and CSI PRTA Co-Investment LP (collectively, the "CSI Parties"). In support of the Objection, the Committee respectfully states as follows:

### PRELIMINARY STATEMENT[2]

1.      By the Proof of Claim, the CSI Parties seek payment of a $88.6 million Liquidation Premium, equal to 50% of the principal outstanding under certain convertible promissory notes as of the Petition Date. Without providing any justification for why the Liquidation Premium is due and owing, the CSI Parties assert that the Liquidation Premium "was triggered, or will inevitably be triggered, by no later than the Petition Date." The plain

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Proterra Inc (9565); and Proterra Operating Company, Inc. (8459). The location of the Debtors' service address is: 1815 Rollins Road, Burlingame, California 94010.

[2] Capitalized terms used in the Preliminary Statement but not otherwise defined therein shall have the meaning ascribed to them in the Objection.

language of the Convertible Notes and Note Purchase Agreement, however, reveals that the Liquidation Premium is not, and cannot be, owed under the current circumstances.

2.    The Convertible Notes are, in effect, an equity-linked instrument that provides for the ultimate conversion of debt to equity under conditions that are very favorable to the CSI Parties.  The Liquidation Premium, in turn, is designed to set a minimum return on account of the CSI Parties' conversion rights in the event there is a "Liquidation Event" – defined to include a sale, merger or the commencement of a voluntary or involuntary liquidation, dissolution or winding up of the Debtors – prior to the Maturity Date of the Convertible Notes.

3.    The Liquidation Premium is not, however, triggered upon the filing for relief under the Bankruptcy Code, which is separately defined in the Note Purchase Agreement as an "Insolvency Proceeding" and triggers its own distinct set of remedies, one of which was the acceleration of the Maturity Date of the Convertible Notes to the Petition Date.  As the Liquidation Premium is only owed if it was triggered prior to the Maturity Date, and the CSI Parties have not, and cannot, show that it was triggered prior to the commencement of the Debtors' Chapter 11 Cases, the Liquidation Premium is not owed under the plain terms of the Convertible Notes and Note Purchase Agreement.

4.    The Liquidation Premium is also unenforceable as a matter of applicable state law and federal bankruptcy law, which each independently preclude a premium or penalty that bears no reasonable relation to the anticipated damages under the relevant instrument. The Liquidation Premium, which would pay the CSI Parties 50% of the then-outstanding principal under the Convertible Notes – no matter when it is triggered and without adjustment

or accounting for interest already accrued or paid – plainly bears no relation to the expected damages upon the occurrence of a Liquidation Event and therefore cannot be enforced.

5.    Finally, the Liquidation Premium must be denied to the extent it is designed to collect unmatured interest in contravention of Section 502(b)(2) of the Bankruptcy Code.

6.    To hold that the Liquidation Premium is enforceable upon the filing of a bankrutpcy would, in effect, rewrite the provision into an unenforceable penalty. Such a result is contrary to the plain terms of the Convertible Notes and Note Purchase Agreement and applicable law.  Thus, the Committee's Objection must be sustained and the Claim denied.

## JURISDICTION, VENUE AND BACKGROUND

7.    The United States Bankruptcy Court for the District of Delaware (the "Court") has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.   Pursuant to Federal Rule of Bankruptcy Procedure 7008, the Committee consents to the entry of a final order by the Court in connection with this Objection to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

8.    Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

9.    The statutory bases for the relief requested herein are sections 105(a) and 502(b) of the Bankruptcy Code, Bankruptcy Rule 3007 and Federal Rule of Civil Procedure 12(c).

10.    On August 7, 2023 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court").  No trustee or examiner has been appointed in the Chapter 11 Cases.

11.    Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors continue to operate their businesses and manage their properties as debtors in possession.

-3-

12.     On August 24, 2023, the Committee was appointed by the Office of the United States Trustee (the "U.S. Trustee") pursuant to Section 1102(a)(1) of the Bankruptcy Code [Dkt. 126]. On September 21, 2023, the U.S. Trustee filed a second *Amended Notice of Appointment of Committee of Unsecured Creditors* to add one additional member to the Committee [Dkt. 268]. The Committee is now comprised of five members: (i) Power Electronics USA, Inc.; (ii) Ms. Michele Thorne; (iii) TPI, Inc.; (iv) Sensata Technologies, Inc.; and (v) DWFritz Automation LLC.

13.     On October 16, 2023, the Court entered the *Final Order (I) Authorizing the Debtors' Use of Cash Collateral, (II) Granting Adequate Protection, (III) Modifying the Automatic Stay, and (IV Granting Related Relief* [Dkt. 422] (the "Final Cash Collateral Order"). The Final Cash Collateral Order reserved resolution of the Liquidation Premium dispute and provided the parties with a schedule pursuant to which the CSI Parties could assert, and the Debtors and Committee could object to, any claim for a "Liquidation Premium" under Section 2.2 of the Convertible Notes.

14.     On November 29, 2023, the Court entered the *Order Approving Stipulation Regarding Scheduling With Respect to Litigating the Premium Claim* [Dkt. 665] (the "Scheduling Order") that includes a schedule for litigating the Liquidation Premium claim. Pursuant to the Scheduling Order, all objections to the Liquidation Premium and motions for judgment on the pleadings are due by December 6, 2023.

## FACTUAL BACKGROUND

### A.     The Note Purchase Agreement and Convertible Notes

15.     The Debtors are party to that certain Note Purchase Agreement, dated as of August 4, 2020 (as amended, the "Note Purchase Agreement"), by and among Proterra Operating Company, Inc. (formerly, Proterra Inc.) ("OpCo" or the "Company"), the investors from time to time party thereto (the "Second Lien Convertible Noteholders"), the guarantors from time to time

party thereto, and CSI GP I LLC as collateral agent ("CSI GP I" or the "Second Lien Agent").

Pursuant to the Note Purchase Agreement, the Second Lien Convertible Noteholders purchased

certain convertible promissory notes (the "Convertible Notes") secured by second priority security

interests in substantially all of the assets of OpCo.  A copy of Proterra Inc.'s Form 8-K dated

March 31, 2023, including a copy of the Note and Note Purchase Agreement, is attached hereto as

**Exhibit A**.  The Note Purchase Agreement, all exhibits and schedules thereto, and the other

Financing Documents (as that term is defined in the Note Purchase Agreement) – including the

Convertible Notes – constitute the fully integrated agreement and understanding of the parties

thereto. *See* Note Purchase Agreement, § 10.13.  The CSI Parties collectively own 98% of the

Convertible Notes.

16.    The Convertible Notes bear interest as follows: (i) cash interest at a rate of 5.0%

per annum, and (ii) paid-in-kind interest at a rate of (a) with respect to the period ending March

17, 2023, 4.5% per annum, and (ii) with respect to the period commencing on March 17, 2023,

7.0% per annum (in either case, the "PIK Interest Rate").  *See* Convertible Notes, §§ 2.3, 2.4.

17.    The Convertible Notes convert to equity in three separate scenarios: (i) at the

Second Lien Convertible Noteholder's sole election at any time after March 31, 2024, (ii) at the

Second Lien Convertible Noteholder's election after a "Qualified Financing" when Proterra Inc.

(hereinafter referred to as "Parent") or OpCo sells equity or equity-linked securities in a capital-

raising transaction (including a public offering of the Parent's equity securities), or (iii)

automatically upon the occurrence of a "Mandatory Conversion Trigger Event" where the volume

weighted average price of the Parent's publicly-traded Common Stock exceeds a certain value for

a period of at least 20 consecutive trading days.  *See* Convertible Notes, § 6.

18.     To protect the Second Lien Convertible Noteholders' conversion rights, the Convertible Notes include a provision pursuant to which a liquidation premium (the "Liquidation Premium") – calculated as the better of as-converted-to-equity value or 150% repayment of the Convertible Notes (i.e. a flat 50% premium fee) – is due if, prior to the Convertible Notes' Maturity Date, one of the following occurs: (i) a sale of borrower (by way of a merger or sale of all or substantially all of borrower's assets), (ii) a voluntary liquidation, dissolution or winding up of borrower, if the occurrence of the voluntary action was consented to by the CSI Parties, or (iii) an involuntary liquidation, dissolution or winding up of borrower.  Specifically, Section 2.2 of the Convertible Notes provides the following:

> ***If at any time prior to the Maturity Date***, a Liquidation Event occurs before the payment or conversion of the entire Balance of this Note, then the Company shall pay to the Holder at the Liquidation Event (and before making any payments with respect to any shares of capital stock) the greater of (i) 150% of the Principal Balance [o]f the Note, or (ii) the amount of consideration that the Holder would have received had the Note converted pursuant to Section 6 at the Conversion Price that is most advantageous to the holder (whether or not the applicable conversion right is then exercisable; provided that with respect to any conversion pursuant to Section 6.3, a Qualified Financing will have occurred on or after March [__], 2023 and before the effective date of the Liquidation Event) and such conversion occurred in full immediately prior to such Liquidation Event. The Company shall give the Holder written notice of an anticipated payment pursuant to this Section 2.2 at least ten business days prior to the anticipated Liquidation Event, which notice shall include a reasonably detailed summary of the Liquidation Event and all consideration to be provided to the Parent's stockholders in connection therewith.

*See* Convertible Note § 2.2 (emphasis added).

19.     The Convertible Notes define "Liquidation Event" as

(a) the commencement of a voluntary or involuntary liquidation, dissolution or winding up of the Parent or the Company (provided that in the event of a voluntary liquidation, dissolution or winding up of the Parent or the Company, the Required Holders have consented to the occurrence of such event), or (b) the consummation of a Deemed Liquidation Event.[3]

*See* Convertible Note, § 1.

20.     "Maturity Date" is defined as the "earlier of (a) August 4, 2028, or (b) the time at which the Balance of this Note is due and payable upon an Event of Default . . . " *See* Convertible Note § 1.

21.     "Event of Default" is defined in the Note Purchase Agreement to include the commencement of an "Insolvency Proceeding" which expressly includes the filing for relief under the Bankruptcy Code:

any case or proceeding commenced by or against a Person under any state, federal or foreign law for, or any agreement of such Person to, (a) the entry of an order for relief under the Bankruptcy Code, or any other insolvency, debtor relief or debt adjustment law; (b) the appointment of a receiver, trustee, liquidator, administrator, conservator or other custodian for such Person or any part of its property; or (c) an assignment or trust mortgage for the benefit of creditors

*See* Note Purchase Agreement, § 3.

---

[3] The Note Purchase Agreement defines "Deemed Liquidation Event" as: (a) a merger or consolidation in which (i) the Parent is a constituent party or (ii) a subsidiary of the Parent is a constituent party and the Parent issues shares of its capital stock pursuant to such merger or consolidation, except any such merger or consolidation involving the Parent or a subsidiary thereof in which the shares of capital stock of the Parent outstanding immediately prior to such merger or consolidation continue to represent, or are converted into or exchanged for equity securities that represent, immediately following such merger or consolidation, at least a majority, by voting power, of the equity securities of (1) the surviving or resulting party or (2) if the surviving or resulting party is a wholly owned subsidiary of another party immediately following such merger or consolidation, the parent of such surviving or resulting party; or (b) the sale, lease, transfer, exclusive license or other disposition, in a single transaction or series of related transactions, by the Parent or any subsidiary or subsidiaries of the Parent, of all or substantially all the assets of the Parent and its subsidiaries taken as a whole (or, if substantially all of the assets of the Parent and its subsidiaries taken as a whole are held by one or more subsidiaries, the sale or disposition (whether by consolidation, merger, conversion or otherwise) of such subsidiaries of the Parent), except where such sale, lease, transfer or other disposition is made to the Company or one or more wholly owned subsidiaries of the Company.

22.    Upon the occurrence of an Insolvency Proceeding, the Convertible Notes and Note Purchase Agreement provide that the Obligations under the Convertible Notes are immediately accelerated such that they are due and payable, without presentment, demand, protest or any notice of any kind and the PIK Interest Rate is increased to 9.0% (the "Default Interest Rate"). *See* Convertible Notes, § 2.5, Note Purchase Agreement, § 8.

23.    On the Petition Date, the Debtors filed for relief under Chapter 11 of the Bankruptcy Code and the Maturity Date of the Convertible Notes was automatically accelerated to that date pursuant to the terms of the Note Purchase Agreement.

### B.    The Claim

24.    On November 15, 2023, the CSI Parties filed the Proof of Claim seeking allowance of a claim of not less than $266,670,640.37 on account of all obligations under the Prepetition Second Lien Loan Documents (the "Claim"), including (a) principal and accrued interest, (b) adequate protection claims, (c) out-of-pocket fees and expenses, (d) indemnification obligations, (e) postpetition obligations, and (f) the Liquidation Premium in an amount of not less than $88,585,019.28, equal to 50% of the outstanding principal under the Convertible Notes as of the Petition Date.  The Debtors have stipulated to the validity of no less than $177.2 million (subject to the Committee's Challenge rights[4] as set forth in the Final Cash Collateral Order) owed under the Prepetition Second Lien Loan Documents (as that term is defined in the Proof of Claim).  The subject of this Objection is the $88,585,019.28 Liquidation Premium and the Committee reserves all rights associated with any Challenge it may bring.

25.    The Proof of Claim fails to identify the "Liquidation Event" the CSI Parties contend triggered the Debtors' alleged obligation to pay the Liquidation Premium.  The Proof of Claim

---

[4] The Challenge Period with respect to the Committee has been extended by agreement through to and including December 11, 2023.

merely states that the Liquidation Premium "was triggered, or will inevitably be triggered, by no later than the Petition Date because a Liquidation Event occurred by no later than the Petition Date and remains outstanding." *See* Proof of Claim, p. 10.  The amount alleged in the Proof of Claim "assumes that Section 2.2 of the Second Lien Convertible Note was triggered as of the Petition Date." *Id.* at p. 8, n. 4.  The Proof of Claim further asserts that the Liquidation Premium is due "in lieu of payments of principal and interest." *Id.* at p. 10.

26.     The CSI Parties also assert that the loans under the Prepetition Second Lien Loan Documents continue to bear interest at the applicable rates (including at the default rate) as set forth in Section 2 of each Convertible Note.  *See* Proof of Claim, p. 8.  According to the CSI Parties' Proof of Claim, the outstanding principal on the Convertible Notes as of the Petition Date is $177.2 million and the Convertible Notes bear interest at an annual fixed rate of 12.0%.

## OBJECTION

27.     When asserting a proof of claim against a bankrupt estate, a claimant must allege facts that, if true, would support a finding that the debtor is legally liable to the claimant. *Snyder v. Allegheny Int'l, Inc. (In re Allegheny Int'l, Inc.)*, 954 F.2d 167, 173 (3d Cir. 1992).

28.     While a proof of claim filed in accordance with section 501 of the Bankruptcy Code and the Bankruptcy Rules typically constitutes "prima facie evidence of the validity and amount of the claim," *see* Fed R. Bankr. P. 3001(f), to receive such benefit the proof of claim must "allege facts sufficient to support the claim." *In re Allegheny Int'l Inc.*, 954 F.2d at 173.  The initial burden of proof lies on the claimant.  *In re Devonshire PGA Holdings LLC*, 548 B.R. 689, 697 (Bankr. D. Del. 2016) (citing *In re Allegheny Int'l Inc.*, 954 F.2d at 173–74).

29.     When an objecting party presents evidence to rebut a claim's *prima facie* validity, the claimant bears the burden of proving the claim's validity by a preponderance of evidence.  *See In re Allegheny Int'l Inc.*, 954 F.2d at 173–74.  The burden of persuasion with respect to the claim

-9-

always rests with the claimant. *In re F-Squared Investment Mgmt., LLC,* 546 B.R. 538, 543 (Bankr. D. Del. 2016); *In re Allegheny Int'l Inc.*, 954 F.2d at 173–74.

30.    Judgment on the pleadings is appropriate where material facts are undisputed and the only disputes concern questions of law. *Stanley Jacobs Prod., Ltd. v. 9472541 Canada Inc. (In re Thane Int'l, Inc.),* 586 B.R. 540, 545 (Bankr. D. Del. 2018) (citations omitted). Under Delaware law, unambiguous contracts are construed as a matter of law. *Strougo* v. *Hollander*, 111 A.3d 590, 594–95 (Del. Ch. 2015) ("The proper interpretation of an unambiguous contract . . . is a question of law that is appropriately resolved on a motion for judgment on the pleadings."). *Lillis v. AT&T Corp.*, 904 A.2d 325, 329–30 (Del. Ch. 2006) ("[J]udgment on the pleadings . . . is a proper framework for enforcing unambiguous contracts because there is no need to resolve material disputes of fact."). As the Committee's Objection may be granted and the Claim denied purely on the basis of contract interpretation – i.e., the terms of the Convertible Notes and the Note Purchase Agreement – the Committee requests that this Court decide the Objection as a matter of law by entering judgment on the pleadings.

31.    Through the Proof of Claim, the CSI Parties assert that the Liquidation Premium is (or may be) due as of the Petition Date.  The Proof of Claim, however, contains no facts or allegations to demonstrate that any obligation to pay the Liquidation Premium has, in fact, been triggered.  Rather, as demonstrated herein, under the unambiguous language of the Convertible Notes and Note Purchase Agreement, the filing of the Debtors' Chapter 11 Cases, and the resulting acceleration of the Maturity Date of the Convertible Notes to the Petition Date, precluded the occurrence of a Liquidation Event prior to the Maturity Date of the Convertible Notes such that the Liquidation Premium is not, and cannot be, owed under the current circumstances.  Thus, the Claim must be disallowed as a matter of law.

**A. The Liquidation Premium is Not Owed as a Matter of Law**

32.      As set forth in the Convertible Notes, there are two conditions precedent to a Liquidation Premium coming due: (i) a Liquidation Event must occur and (ii) that Liquidation Event must occur prior to the Maturity Date of the Convertible Notes.  As set forth herein, neither of those conditions precedent has been satisfied and the Committee's Objection must be granted as a matter of law. *See In re Thane Int'l, Inc.,* 586 B.R. at 545−46; *see also In re Smurfit-Stone Container Corp.,* 444 B.R. 111, 126 (Bankr. D. Del. 2011) (granting objection to claim on basis of unambiguous contract language).

     i.      <u>The Commencement of the Chapter 11 Cases Does Not Constitute a Liquidation Event Under the Express Terms of the Convertible Notes and Note Purchase Agreement</u>

33.      The Proof of Claim is silent on the specific event that allegedly gave rise to the Liquidation Premium.  Rather, the CSI Parties rely on a vague assertion that a Liquidation Event occurred "by no later than the Petition Date." Proof of Claim, p. 10.  Reliance on the filing of the Chapter 11 petitions as the Liquidation Event giving rise to the Liquidation Premium, however, is fatal to the CSI Parties' case.[5]

34.      Under the express terms of the Convertible Notes and Note Purchase Agreement, the mere filing of a Chapter 11 Petition does not constitute a Liquidation Event. "When the contract is clear and unambiguous, [Delaware courts] will give effect to the plain meaning of the contract's terms and provisions." *Osborn ex rel. Osborn v. Kemp,* 991 A.2d 1153, 1159–60 (Del. 2010). "When interpreting a contract, the Court will give priority to the parties' intentions as reflected in the four corners of the agreement." *GMC Cap. Invs. LLC v. Athenian Venture P'rs I, L.P. ("GMC Cap. Invs. LLC")*, 36 A.3d 776, 779 (Del. 2012).

---

[5] The Committee expressly reserves the right to raise further and additional objections to the Proof of Claim to the extent the CSI Parties assert that the Liquidation Premium is triggered by any other event.

16439731/1

35.     The Convertible Notes should be viewed for what they are: instruments that were designed to convert into shares of stock of Proterra, Inc.  The Liquidation Premium, in turn, must be analyzed according to what the provision was designed to do: protect the Second Lien Convertible Noteholders' conversion interests upon a sale, dissolution, liquidation or winding up of the Debtors by providing the Second Lien Convertible Noteholders with benefits akin to senior preferred stock (i.e. better of as-converted to common stock value or a 150% liquidation preference).

36.     This intention is reflected in the terms of the Convertible Notes and Note Purchase Agreement.  As noted above, the commencement of a Chapter 11 case is not identified as a Liquidation Event, which, as previously indicated, is defined to include a voluntary or involuntary liquidation, dissolution or winding up of the Debtors (none of which has occurred to date). *See,* Convertible Notes, § 2.2. The commencement of the Chapter 11 Cases, on the other hand, is expressly included within the definition of "Insolvency Proceeding", a term that is separately and intentionally defined in the Note Purchase Agreement. *See* Note Purchase Agreement, § 3. Notably, an Insolvency Proceeding is also not included in the definition of Liquidation Event, despite its use elsewhere in the Convertible Notes.

37.     Indeed, the Convertible Notes provide that an Insolvency Proceeding bears its own independent consequence that is not the Liquidation Premium.  The occurrence of an Insolvency Proceeding is an Event of Default (and indeed the only Event of Default) that triggers the immediate and automatic acceleration of the Convertible Notes and accrual of Default Interest. *See* Convertible Notes*,* § 2.5; Note Purchase Agreement, § 8.[6]  If the parties to the Convertible Notes found cause to provide this exclusive remedy upon the occurrence of an Insolvency

---

[6] Upon the occurrence of all other Events of Default, the Required Holders *may*, but are not required to, declare all outstanding Obligations to be immediately due and payable. *See* Note Purchase Agreement, § 8.

16439731/1

Proceeding, surely they would have found cause to include Insolvency Proceeding within the definition of Liquidation Event if that was the true intention. *See Golden Rule Fin. Corp. v. S'holder Rep. Servs. LLC,* C.A. No. 2020-0378-PAF, 2021 WL 305741 at *11 (Del. Chan. Jan 29, 2021) ("It is . . . axiomatic that a court may not, in the guise of construing a contract, in effect rewrite it to supply an omission in its provisions." (citations omitted)).

38.      Furthermore, if the term Liquidation Event was construed to include an Insolvency Proceeding, such that 150% of the outstanding principal became immediately due and payable upon an Insolvency Proceeding, Section 8 of the Note Purchase Agreement triggering the immediate acceleration of the Convertible Notes upon the occurrence of an Insolvency Proceeding would be rendered superfluous. *See Osborn,* 991 A.2d at 1159 ("[Delaware courts] will read a contract as a whole and . . . will give each provision and term effect, so as not to render any part of the contract mere surplusage."). Instead, the plain terms of the Convertible Notes make clear that the parties intended that any damages sustained as a result of an Insolvency Proceeding would be remedied through the acceleration of the Convertible Notes such that they would be immediately due and payable and the accrual of the Default Rate of Interest. While the CSI Parties argue that the Liquidation Premium is due "in lieu of principal and interest" as an apparent attempt to disavow their bargained for remedy, the Convertible Notes and Note Purchase Agreement are clear and the CSI Parties may not now unilaterally rewrite their agreement because they desire a larger payout.

39.      As further evidence that the commencement of the Chapter 11 Cases did not, and was not ever intended to, constitute a Liquidation Event, the definition of Liquidation Event provides that any liquidation, dissolution or winding up of the Debtors requires the consent of the Required Holders in order to satisfy the definition. Convertible Notes, § 1.  Indeed, section 7.2 of

the Note Purchase Agreement requires the prior written consent of the Required Holders for any "Fundamental Changes" of the Company, including to liquidate, wind up its affairs or dissolve itself. *See* Note Purchase Agreement, § 7.2(h).  Section 7.2 does not include the commencement of an Insolvency Proceeding as amongst the actions that require the Required Holders' consent. In fact, the Debtors specifically did not seek the consent of the CSI Parties prior to filing the Chapter 11 Cases, nor were they required to under the Convertible Notes or Note Purchase Agreement.

40.    The filing of the Chapter 11 Cases is better understood as a reorganization, which is not included in the definition of a Liquidation Event. *See, e.g., Florida Dept. of Revenue* v. *Piccadily Cafeterias, Inc.*, 554 U.S. 33, 37 n.2 (2008) ("[T]he central purpose of Chapter 11 is to facilitate reorganizations rather than liquidations"); *Anderson Mem'l Hosp. v. W.R. Grace & Co. (In re W.R. Grace & Co.)*, 475 B.R. 34, 147 (D. Del. 2012), *aff'd sub nom. In re WR Grace & Co.*, 729 F.3d 332 (3d Cir. 2013) ("Chapter 11 addresses debtor reorganization, a process that attempts to rehabilitate a business as a going concern rather than to liquidate it.") (citation omitted).  Indeed, less than 48 hours prior to the filing of the Proof of Claim, the Debtors filed a *Notice of (A) Successful Bidder Regarding Debtors' (I) Transit Assets and (II) Energy Assets and (B) Cancellation of the Sale Hearing Solely with Respect to Proterra Energy,* which attaches as Exhibit C thereto an executed Chapter 11 Plan Support Agreement (as amended at Dkt. 565, the "<u>Plan Support Agreement</u>") with the CSI Parties.  Pursuant to the Plan Support Agreement, the parties agreed to implement the sale of the Debtors' Proterra Energy business line to the CSI Parties *through a joint plan of reorganization*.  Not only is a reorganization definitively not a Liquidation Event, if any liquidation, dissolution or winding up had occurred to trigger the Liquidation Premium, there would be nothing for the Debtors to reorganize.  Indeed, the Debtors and the CSI

-14-

Parties are completing the transaction through a plan of reorganization to preserve and obtain the benefit of certain valuable tax attributes that would otherwise be lost in the event of a liquidation or winding down.

41.     The Convertible Notes and Note Purchase Agreement therefore make clear that the commencement of the Debtors' Chapter 11 Cases does not constitute the requisite Liquidation Event to give rise to the Liquidation Premium.  Accordingly, the Claim must be denied.

ii.     <u>To the Extent the Court Finds that a Liquidation Event Occurred, It Did Not Occur Prior to the Maturity Date of the Convertible Notes</u>

42.     To the extent this Court finds that the commencement of the Chapter 11 Cases does constitute a Liquidation Event, the CSI Parties' Claim must still be denied as a matter of law for failure to satisfy the second requirement of Section 2.2 that such Liquidation Event occur prior to the Maturity Date of the Convertible Notes.

43.     The Convertible Notes are clear that a Liquidation Premium will only be due if a Liquidation Event occurs *prior to* the Maturity Date of the Convertible Notes. *See* Notes, § 2.2. Upon the filing of the Chapter 11 Cases, the Maturity Date of the Convertible Notes was immediately and automatically accelerated to the Petition Date. *See* Note Purchase Agreement, § 8. Accordingly, for the Liquidation Premium to be owed, the CSI Parties must demonstrate that the Liquidation Event occurred *prior to* the Petition Date.  The CSI Parties cannot and have not alleged any facts or circumstances giving rise to the Liquidation Premium prior to the Petition Date.

44.     If the commencement of the Debtors' Chapter 11 Cases constitutes a Liquidation Event, the Liquidation Event would, by definition, occur on (as opposed to before) the Maturity Date and the Liquidation Premium would not be owed. *Ultra Petroleum Corp. v. Ad Hoc Committee of Opco Unsecured Creditors (In re Ultra Petroleum Corp.),* 51 F.4th 138, 147 (5th

16439731/1

Cir. 2022) ("[A] make-whole contractually triggered by a bankruptcy petition cannot antedate that same bankruptcy petition."). While it may be true that a liquidation, dissolution or winding up of the Debtors (or the occurrence of a Deemed Liquidation Event) may occur at some point later in the Chapter 11 Cases if the Debtors are unsuccessful in consummating their proposed reorganization, the automatic acceleration of the Maturity Date of the Convertible Notes upon the occurrence of an Insolvency Proceeding ensures that any such "Liquidation Event" would necessarily occur *after* the Maturity Date of the Convertible Notes. Similarly, if the reorganization contemplated by the Plan Support Agreement is construed to constitute a "Deemed Liquidation Event", such Deemed Liquidation Event would also occur subsequent to the Maturity Date such that the Liquidation Premium would still not be owed. As the express language of Section 2.2 requires that a Liquidation Event occur *prior to* the Maturity Date, any hypothetical subsequent Liquidation Event would not trigger the Liquidation Premium.

45.    Courts construing comparable premium provisions pay careful attention to the language contained therein to ensure the intent of the parties is honored. *See, e.g., Wells Fargo Bank v. The Hertz Corp., et al. (In re Hertz Corp.,* 637 B.R. 781, 788 (Bankr. D. Del. 2021); *In re Energy Future Holdings Corp.,* 842 F.3d 247, 255 (3d. Cir. 2016) (construing "redemption" to refer to both pre- and post-maturity repayments such that repayment of notes following acceleration triggered premium); *In re MPM Silicones, L.L.C.,* 874 F.3d 787, 802–03 (2d Cir. 2017) (construing "redemption" to refer only to pre-maturity prepayments of debt, such that payment made following automatic acceleration of debt upon bankruptcy filing did not trigger premium due upon redemption); *U.S. Bank Tr. Nat'l Ass'n v. AMR Corp.*, 730 F.3d 88, 103 (2d Cir. 2013) (prepayment premium not owed where acceleration of loan advanced the maturity date, such that the loan could not be prepaid); *In re 1141 Realty Owner LLC,* 598 B.R. 534, 541 (Bankr.

S.D.N.Y. 2019) (make-whole premium enforceable where loan agreement expressly provided that premium was payable upon any payment after default, not solely upon prepayment). While the caselaw addressing make-whole provisions typically concerns a prepayment of the relevant debt prior to its stated maturity, where timing is decidedly critical, because the parties to the Convertible Notes expressly required that a Liquidation Event occur prior to the Maturity Date, such caselaw is nevertheless instructive.

46.     By way of example, in *In re Hertz Corp.,* the debtors were party to promissory notes that provided for payment of a redemption premium if the notes were redeemed prior to the notes' "maturity." 637 B.R. at 788.  The *Hertz* noteholders filed an adversary proceeding seeking allowance of a claim on the basis of the redemption premium. *Id.* at 783. The *Hertz* debtors moved to dismiss. *Id.* at 784. The *Hertz* Court carefully examined the language of the notes to discern the precise timing that would or would not trigger the redemption premium. *Id.* at 788.  Because the redemption provision required that the notes be redeemed prior to the undefined "maturity" (as opposed to the "Stated Maturity" defined in the Notes), the *Hertz* Court determined that the parties intended for the common meaning of maturity to apply. *Id.* (citations omitted). As the filing of the bankruptcy accelerated the maturity of the Notes, and a redemption did not occur prior to the petition date, the *Hertz* Court concluded that the redemption premium was not owed and granted the debtors' motion to dismiss. *Id.* at 789.  Conversely, the *Hertz* Court denied a motion to dismiss claims based on a redemption premium under a separate series of notes which required redemption prior to a date certain.  *Id.* at 792. Because the noteholders alleged that the notes were redeemed prior to the stated date certain, the *Hertz* Court found the noteholders had stated a plausible claim for relief. *Id.* at 789.

47.     Here, too, the terms of the Convertible Notes and Note Purchase Agreement must be honored to give effect to the parties' bargain.  As no Liquidation Event occurred prior to the Convertible Notes' Maturity Date, the Liquidation Premium is not owed and the Committee's Objection must be granted.

**B.   The Liquidation Premium is Not Enforceable Under Applicable Law**

48.     Even if the Court determines that the Liquidation Premium provision was triggered pursuant to the terms of the Convertible Notes, it must nevertheless be denied as an unreasonable penalty that bears no relation to the anticipated damages associated with the occurrence of a Liquidation Event and/or seeks to collect unmatured interest.

49.     In order to enforce the Liquidation Premium, it must be shown that (i) the Liquidation Premium is triggered under the contract as a matter of state law, and (ii) the Liquidation Premium is allowable under applicable bankruptcy law.  *In re Sch. Specialty, Inc.,* No. 13-10125 (KJC), 2013 WL 1838513, at *2 (Bankr. D. Del. Apr. 22, 2013); *see In re Atrium View, LLC*, 2008 WL 5378293, at *2 (Bankr. M.D. Pa. Dec. 24, 2008). Under both Delaware state law (which governs the Liquidation Premium provision[7]) and the Bankruptcy Code, the Liquidation Premium cannot be enforced.

iii.     <u>The Liquidation Premium is Not Enforceable Under Delaware State Law</u>

50.     Under Delaware law, a contractual damages clause will be enforced if: (i) the damages were uncertain or not capable of accurate calculation at the time of contracting, and (ii) the estimated damages are reasonable or rationally related to any measure of damages a party might sustain. *Unbound Partners LP v. Invoy Holdings Inc.*, 251 A.3d 1016, 1032–33 (Del. Super. Ct.

---

[7] *See* Notes, § 12.4.

2021) (citations omitted); *Del. Bay Surgical Servs., P.A. v. Swier*, 900 A.2d 646, 651 (Del. 2006),

(quoting *Brazen v. Bell Atl. Corp.*, 695 A.2d 43, 48 (Del. 1997)).

51.     Here, the damages were capable of accurate calculation.  Indeed, subsection (ii) of

Section 2.2 provides a formula to calculate the loss to the Second Lien Noteholders for the lost

opportunity to convert the Convertible Notes to equity.  The parties could have likewise included

a formula for the calculation of actual damages (based upon the fixed variables of outstanding

principle, applicable interest, and the stated Maturity Date) in the event the Convertible Notes were

not converted.  *See, e.g., Auctus Fund, LLC v. Sunstock, Inc.,* 405 F. Supp. 3d 218, 234 (D. Mass.

2019) (finding the parties could have ascertained damages at time of negotiation of convertible

promissory notes by adding (i) the principal yet to be paid, (ii) unpaid interest and (iii) interest on

unpaid amounts).  Rather, the parties opted for an arbitrary – and plainly punitive – flat fee.

52.     Furthermore, the 50% Liquidation Premium is not rationally related to any measure

of damage that may occur upon a Liquidation Event.  As explained herein, the Liquidation

Premium is designed to protect the Second Lien Convertible Noteholders conversion interests and

the flat fee ensures the Second Lien Convertible Noteholders at minimum a 50% return on the then

outstanding principal, regardless of the value of the Company's stock.  In that sense, the

Liquidation Premium is more akin to a liquidation preference for senior preferred stock.  The

Liquidation Premium is calculated by applying the same percentage, no matter when the

Liquidation Event occurs, and without adjustment or regard to the amount of regular and/or default

interest the Second Lien Convertible Noteholders already received.  Indeed, because a portion of

the interest on the Convertible Notes is paid in kind, the minimum Liquidation Premium will

actually *increase* the farther into the life of the Convertible Notes the Liquidation Event occurs.  It

therefore cannot be said that the Liquidation Premium bears any relationship to the damages the

16439731/1

Second Lien Noteholders would sustain upon the occurrence of a Liquidation Event and must therefore be denied. *Swier*, 900 A.2d at 651 (stating if the amount fixed is unconscionable or not rationally related, the amount is unreasonable and cannot be sustained).

      iv.      <u>The Liquidation Premium is Not Enforceable Under the Bankruptcy Code</u>

      53.      Bankruptcy Courts construing make-whole provisions are split on whether such obligations are characterized as unmatured interest or liquidated damages. *In re Hertz,* 637 B.R. at 790–91. As set forth herein, regardless of how the Liquidation Premium is characterized, it is subject to disallowance under the applicable provisions of the Bankruptcy Code. While the vast majority of cases address premiums due upon the prepayment of a debt, the rationale and analysis are nevertheless directly applicable to the Liquidation Premium here.

      **a.  The CSI Parties Cannot Recover the Liquidation Premium to the Extent it Seeks to Recover Unmatured Interest**

      54.      Courts that conclude that a make-whole provision constitutes unmatured interest or the economic equivalent thereof conclude that such premiums are "expressly designed to liquidate fixed-rate lenders' damages flowing from debtor default while market interest rates are lower than their contractual rates" and, consequently, are "nothing more than a lender's unmatured interest, rendered in today's dollars." *In re Ultra Petroleum Corp.,* 51 F.4th at 146 (citations omitted); *see also Del. Tr. Co. v. In re Energy Future Intermediate Holding Co. LLC (In re Energy Future Holdings Corp.),* 842 F.3d 247, 251 (3d Cir. 2016) (stating that a make-whole provision is a "contractual substitute for interest lost on [n]otes redeemed before their expected due date."). While certain Courts have concluded that a make-whole is akin to liquidated damages, as Judge Walrath recently observed in *In re Hertz Corp.,* "[c]alling a make-whole a contract right or a liquidated damages provision does not answer the question of whether it is unmatured interest."

637 B.R. at 791 (citation omitted). "In deciding whether a charge is unmatured interest courts look to the economic substance of the transaction to determine what counts as interest." *Id.*

55.    Here, the Liquidation Premium is designed to ensure that the Second Lien Noteholders receive no less than a 50% return on their investment. While such amount appears to bear no reasonable relation to the actual damages incurred by the Second Lien Noteholders, to the extent it does seek to compensate the Second Lien Noteholders for their expected return on the Convertible Notes, such return would be comprised, at least in part, of unmatured interest. Importantly, courts construing section 502(b)(2) in this context consider the economic reality of the proposed premium – not the labels used by the parties – to determine whether the premium constitutes "the economic equivalent of unmatured interest." *In re Hertz Corp.,* 637 B.R. at 791; *In re Ultra Petroleum Corp.,* 51 F.4th at 147 (when analyzing whether a make-whole constitutes the economic equivalent of unmatured interest, "[w]hat matters . . . is the underlying "economic reality" of the thing – not dictionary definitions or formalistic labels."). The Committee therefore objects to the Liquidation Premium to the extent it constitutes – in whole or in part – the economic equivalent of unmatured interest.

   **b.    The Liquidation Premium Constitutes an Unreasonable Fee That Must Be Denied Pursuant to Section 506(b) of the Bankruptcy Code**

56.    Section 506(b) imposes its own reasonableness requirement separate and apart from applicable state law. *The Atrium View, LLC v. E. Sav. Bank, FSB (In re Atrium View, LLC),* No. 1:07–BK–02478MDF, 2008 WL 5378293, at \*2 (Bankr. M.D. Pa. Dec. 24, 2008); *Noonan v. Fremont Fin.* (*In re Lappin Elec. Co., Inc.*), 245 B.R. 326, 329 (Bankr. E.D. Wis. 2000) ("If it were enforceable under state law but nevertheless unreasonable, it would be subject to disallowance under 11 U.S.C. § 506(b).") (citations omitted); *In re Duralite Truck Body & Container Corp.,* 153 B.R. 708, 712 (Bankr. D. Md. 1993) ("[S]tate law is not controlling under

11 U.S.C. § 506(b) . . . .  The inclusion of the reasonableness requirement indicated Congressional intent to impose a federal standard on recovery of contractual fees, costs, and charges.") (citations omitted).

57.     The reasonableness of a premium is determined by how accurately it predicts actual losses. *In re Atrium View, LLC,* 2008 WL 5378293 at *2 (disallowing prepayment premium pursuant to § 506(b) where claimant failed to demonstrate it reasonably predicted actual losses) (citations omitted).  Courts will consider whether the formula employed represents a reasonable estimate of actual or anticipated damages, and not simply a profit-generator for the lender.  *See In re Duralite Truck Body & Container Corp.*, 153 B.R. at 714 ("A prepayment charge formula must effectively estimate actual damages, otherwise, the charges may operate as either a penalty on the debtor or a windfall to a lender, at the expense of other creditors of the bankruptcy estate. Only a prepayment charge formula which reasonably measures actual damages will be respected under § 506(b).").  A premium will be enforced where it "accounts for changes in the Treasury rate, decreases over time, and has no applicable 'minimum charge'." *Anchor Resol. Corp. v. State St. Bank and Trust Co. of Conn. (In re Anchor Resol. Corp.),* 221 B.R. 330, 341 (Bankr. D. Del. 1998).

58.     Importantly, "a flat fee that is the same regardless of how many months interest is lost and that is unrelated to the market interest rate is clearly not based on a forecast of actual damages. *In re Atrium View, LLC,* 2008 WL 5378293 at *3. Similarly, the Liquidation Premium cannot be said to bear any reasonable relation to the actual or anticipated damages where it guarantees the Second Lien Noteholders a minimum fee equal to 50% of the outstanding principal under the Convertible Notes, without adjustment and regardless of when the Liquidation Event occurs.

59.     Furthermore, the 50% premium is well outside the range of what has previously been considered enforceable in this and other jurisdictions under § 506(b) or comparable state law. *See, e.g.*, *Sch. Specialty*, 2013 WL 1838513, at *4 (noting that while enforcing a 37% premium gave the court pause, it was not plainly disproportionate to the possible loss and could be enforced under § 506(b)); *In re Anchor Resol. Corp.,* 221 B.R. at 341 (enforcing 6.9% premium under § 506(b)); *In re Madison 92nd St. Assocs*., *LLC,* 472 B.R. 189, 197 (Bankr. S.D.N.Y. 2012) (enforcing 5% premium under New York law); *In re Vanderveer Ests. Holdings*, *Inc.,* 283 B.R. 122, 133 (Bankr. E.D.N.Y. 2002) (enforcing 10.5% premium under New York law and § 506(b)); *In re Fin. Ctr. Assocs. E. Meadow, L.P.*, 140 B.R. 829, 839 (Bankr. E.D.N.Y. 1992) (enforcing 24.9% premium under New York law and § 506(b)); *Jefferson-Pilot Invs., Inc. v. Cap. First Realty, Inc.*, No. 10 C 7633, 2011 WL 2888608, at *5 (N.D. Ill. July 18, 2011) (enforcing 34% premium under Illinois law); *Double G Arrowhead Orchards Ltd. P'ship*, No. CV11–0004–PHX–DGC, 2011 WL 2912687, at *4 (D. Ariz. July 20, 2011) (enforcing 25% premium under Arizona law). Rather, the Liquidation Premium is akin to those premiums that have been held unenforceable. *Nisselson v. Empyrean Inv. Fund, L.P. (In re MarketXT Holdings Corp.)*, 376 B.R. 390, 417 (Bankr. S.D.N.Y. 2007) (declining to enforce prepayment premium equal to 76% of principal under New York law); *Auctus Fund, LLC v. Sunstock, Inc.,* 405 F. Supp. 3d at 234 (denying enforcement of provision under New York law that required borrower to pay 150% of unpaid principal plus other fees upon default).

60.     Accordingly, the Liquidation Premium constitutes an unreasonable fee and may not be collected pursuant to Section 506(b).

## RESERVATION OF RIGHTS

61.     The Committee expressly reserves all rights, claims, arguments, defenses, and remedies with respect to the Objection to the fullest extent, and to supplement this Objection prior to the Hearing, to seek discovery, and to present argument at the Hearing, if necessary.

## CONCLUSION

62.     For the reasons stated above, the Committee respectfully requests that the Court grant the Committee's Objection as a matter of law and disallow the CSI Parties' Proof of Claim in full.

Dated: December 6, 2023                        Respectfully submitted,

**MORRIS JAMES LLP**

/s/ *Brya M. Keilson*
Eric J. Monzo (DE Bar No. 5214)
Brya M. Keilson (DE Bar No. 4643)
500 Delaware Avenue, Suite 1500
Wilmington, Delaware 19801
Telephone: (302) 888-5848
Facsimile: (302) 571-1750
Email: emonzo@morrisjames.com
            bkeilson@morrisjames.com

-and-

**LOWENSTEIN SANDLER LLP**
Jeffrey L. Cohen, Esq. (admitted *pro hac vice*)
Eric Chafetz, Esq. (admitted *pro hac vice*)
Jordana Renert, Esq. (admitted *pro hac vice*)
1251 Avenue of the Americas
New York, New York 10020
Telephone:     (212) 262-6700
Facsimile:     (212) 262-7402
Email:         jcohen@lowenstein.com
               echafetz@lowenstein.com
               jrenert@lowenstein.com

*Counsel for the Official Committee of Unsecured Creditors*

16439731/1