## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| PROTERRA INC, *et al.*,[1] | ) Case No. 23-11120 (BLS) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

## DEBTORS' OBJECTION AND MOTION FOR
## JUDGMENT ON THE PLEADINGS TO THE PREMIUM CLAIM

The above-captioned debtors and debtors in possession (collectively, the "Debtors")
hereby submit this objection and motion for judgment on the pleadings (this "Objection") for proof
of claim no. 1177 (the "CSI POC") filed by CSI GP I LLC ("CSI," and together with certain
investors for which CSI is the general partner and on behalf of which the Premium Claim was also
filed, the "CSI Parties").  In support of this Objection, the Debtors respectfully state as follows:

### Preliminary Statement[2]

1.       Debtor Proterra Operating Company, Inc. is the primary obligor on a $177.2 million
secured Note Purchase Agreement, the vast majority of which the Debtors plan to satisfy in full in
cash, with the balance satisfied by distributing to the debt owners—the CSI Parties—all of the
Reorganized Debtors' equity, with their consent.  But the CSI Parties seek over $88.5 million ***more***
as a "premium" (the "Premium Claim") to which they are clearly not entitled and which would
come dollar for dollar out of the recoveries of unsecured creditors.  This additional claim—the

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification
number, are as follows: Proterra Inc (9565); and Proterra Operating Company, Inc. (8459).  The location of the
Debtors' service address is: 1815 Rollins Road, Burlingame, California 94010.

[2]    Capitalized terms used but not defined in this Preliminary Statement shall have the meaning ascribed to them in
the remainder of this Objection or, if not defined therein, in the Note Purchase Agreement or the corresponding
Secured Note.

Premium Claim—is unsupported by the governing Note Purchase Agreement, prohibited by law, and should be disallowed.

2.      Under the plain language of the Note Purchase Agreement, the Premium may be triggered only if a "Liquidation Event" occurs "prior to" the "Maturity Date" of the Secured Notes. The CSI Parties are not entitled to this Premium for at least four separate and independent reasons.

3.      *First*, no "Liquidation Event" has occurred, as the commencement of these Chapter 11 Cases is not a "voluntary . . . liquidation," nor does it otherwise meet the definition of a Liquidation Event.  Significantly, the definition of a Liquidation Event does not include Chapter 11 cases.  The Note Purchase Agreement expressly includes chapter 11 cases in a separate definition of "Insolvency Proceedings," but a Liquidation Event is ***not*** defined to include Insolvency Proceedings.  Moreover, the Debtors have now executed a Plan Support Agreement with the CSI Parties for a plan of ***reorganization***.  As there has been no voluntary liquidation, no Liquidation Event has occurred, and there can be no Premium Claim.  The CSI Parties are also apparently unaware of any Liquidation Event, because they did not identify one in their CSI POC.

4.      *Second*, the filing of these voluntary Chapter 11 Cases could not constitute a Liquidation Event because such an event, as defined, only includes actions to which the CSI Parties consented.  But far from consenting to the filing of these Chapter 11 Cases, the CSI Parties have repeatedly made clear that they were not ***even informed*** that the Debtors would commence the cases.

5.      *Third*, no Liquidation Event could have occurred ***prior to*** the Maturity Date.  The commencement of these Chapter 11 Cases automatically and immediately accelerated the Maturity Date, and therefore neither their commencement—nor anything after—could have occurred "prior

to" the Maturity Date and therefore triggered the Premium.  Indeed, the CSI Parties have conceded that the Liquidation Event "was triggered as of the Petition Date," rather than prior to it.

6.      *Finally*, the Premium is, in any event, an unenforceable penalty prohibited by governing Delaware law.  It purports to require payment of a flat, fixed amount of an additional 50% of principal regardless of when triggered.  That arbitrary requirement is not a legitimate liquidated damages clause under Delaware law, both because it bears no reasonable relation to the CSI Parties' probable loss, and because the CSI Parties' damages—loss of future interest payments on the Secured Notes or loss of hypothetical equity value upon conversion—were not uncertain when the parties entered into the Note Purchase Agreement.

7.      For these reasons, and those that follow, the Court should grant this motion for judgment on the pleadings and disallow the Premium Claim entirely.

### Jurisdiction and Venue

8.      This Court has jurisdiction over this Objection pursuant to 28 U.S.C. § 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b), and this Court may enter a final order consistent with Article III of the United States Constitution.  The Debtors further consent to this Court's entry of final orders or judgments on this Objection if it is later determined that, in the absence of the parties' consent, this Court does not have constitutional authority to enter final orders or judgments.

9.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

10.      The bases for the relief requested herein are sections 502(b)(1) and 105(a) of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 3007 and 3012 of the Federal Rules of Bankruptcy Procedure, and applicable rules of the Local Rules for the United States Bankruptcy Court for the District of Delaware.

**Factual Background**

I.    **The Note Purchase Agreement**

11.    The Debtors and the CSI Parties entered into the Note Purchase Agreement, attaching a corresponding Secured Convertible Promissory Note (each, a "Secured Note"), on August 4, 2020 (both documents, as amended from time to time, the "Note Purchase Agreement" or "NPA").  The Note Purchase Agreement governs approximately $177,200,000[3] in principal of the Secured Notes.  The Note Purchase Agreement provides for a fixed cash interest rate of 5.0% per annum and payment-in-kind ("PIK") interest at two different fixed rates on the Secured Notes.  Secured Note §§ 2.3; 2.4.  The CSI Parties hold substantially all of the Secured Notes.

12.    The Premium Claim is based on Section 2.2 of the Secured Note, which states that the CSI Parties are entitled to a premium, in certain circumstances, upon a "Liquidation Event."  Specifically, Section 2.2 provides that if "at any time prior to the Maturity Date, a Liquidation Event occurs before the payment or conversion of the entire Balance of this Note" "the greater of (i) 150% of the Principal Balance of the Note, or (ii) the amount of consideration that the Holder would have received had the Note converted pursuant to Section 6 at the Conversion Price that is most advantageous to the Holder," shall be due and payable.  The Premium Claim is governed by Delaware law.  Secured Note § 12.4 ("Section[] 2.2 . . . of this Note and any definitions which pertain to such sections of this Note and all claims relating to those Sections shall be governed by the laws of the state of Delaware.").

13.    Entitlement to the Premium therefore requires, (a) a Liquidation Event, that (b) occurred ***prior to*** the Maturity Date.  If these conditions are met, the noteholders are entitled to

---

[3]    This is the approximate amount of principal of the Secured Notes owed as of the Petition Date.

*at least* a payment of 150% of the balance of the Note—*i.e.*, full repayment of the Note, including

any accrued PIK interest, *and* a 50% premium (such 50% premium, the "Premium").

      14.    The Note Purchase Agreement defines a Liquidation Event:

> "*Liquidation Event*" means (a) the commencement of a voluntary or involuntary
> liquidation, dissolution or winding up of the Parent or the Company (provided that
> in the event of a voluntary liquidation, dissolution or winding up of the Parent or
> the Company, the Required Holders (as defined in the [Note] Purchase Agreement)
> have consented to the occurrence of such event), or (b) the consummation of a
> Deemed Liquidation Event.

Secured Note § 1.  A Liquidation Event therefore includes the "commencement of a voluntary . . .

liquidation . . . of the [Debtors]," provided that the "Required Holders . . . have consented to the

occurrence of such event."  The definition of a Liquidation Event does not refer to a chapter 11

filing.

      15.    As discussed above, for the Premium to be payable, the Liquidation Event must

occur *prior to* the Maturity Date.  The Maturity Date is "the earlier of (a) August 4, 2028, or (b) the

time at which the Balance of this Note is due and payable upon an Event of Default . . ."  Secured

Note § 1.  A bankruptcy filing is an Event of Default automatically and immediately triggering the

Maturity Date.  Specifically, an Event of Default occurs, among other situations, if "(j) [a]n

Insolvency Proceeding is commenced by the Company or any other Obligor . . ."  NPA § 1.  An

"Insolvency Proceeding," in turn, means "any case or proceeding commenced by or against a

Person under any state, federal or foreign law for . . . (a) the entry of an order for relief under the

Bankruptcy Code, or any other insolvency, debtor relief or debt adjustment law . . ."  *Id.*

      16.    Importantly, an Event of Default triggered by a bankruptcy filing *automatically*

accelerates the debt, with no further action from any noteholder (or any other party).  Specifically,

"upon the occurrence of any Event of Default described in clause (j) of the definition thereof"—

the clause making the filing of an Insolvency Proceeding an Event of Default—"*immediately and*

***without notice, all outstanding Obligations shall automatically become immediately due and
payable***, without presentment, demand, protest or any other notice of any kind, all of which are
hereby expressly waived . . ."  NPA § 8 (emphasis added).  In contrast, for all Events of Default
"other than an Event of Default described in clause (j) of the definition thereof," the Required
Holders can issue a written notice to accelerate the debt, but acceleration is not automatic.
NPA § 8.

17.    In sum, under the Note Purchase Agreement, (a) the commencement of a
bankruptcy case is an Insolvency Proceeding automatically and immediately accelerating the
Maturity Date and (b) a "voluntary liquidation" must occur ***prior to*** the Maturity Date—meaning
prior to the commencement of a bankruptcy case—to trigger the Premium.

## II.    The Debtors' Bankruptcy Filings

18.    The Debtors filed petitions for relief under chapter 11 of the Bankruptcy Code on
August 7, 2023 (the "<u>Petition Date</u>"), thereby commencing the above-captioned cases (these
"<u>Chapter 11 Cases</u>").  The Debtors commenced these cases ***without*** discussing them with the CSI
Parties. *See Reservation of Rights and Limited Objection of the CSI Parties to the Debtors' Motion
for Entry of Interim and Final Orders (I) Authorizing the Debtors to Use Cash Collateral,
(II) Granting Adequate Protection (III) Modifying the Automatic Stay, and (IV) Granting Related
Relief* at ¶ 1 [Docket No. 51] (the "<u>CSI Parties' Reservation of Rights</u>") ("The Debtors have taken
the near-unprecedented step of ***filing these chapter 11 cases without informing their secured
creditor, CSI***, . . ."); Tr. of Aug. 10, 2023 Hr'g., 26:20–23 [Docket No. 76] (counsel to the CSI

Parties noting that "this case was commenced, ***without notice to us, and really our client had no idea***") (emphases added).

19.     The Debtors commenced these Chapter 11 Cases in part to pursue a value-maximizing post-petition marketing and sale or reorganization process (the "Marketing Process"). *See Declaration of Gareth T. Joyce in Support of Chapter 11 Petitions and First Day Pleadings* at ¶ 66 [Docket No. 16] (the "First Day Declaration").  On August 8, 2023, the Debtors filed a motion outlining certain Bidding Procedures[4] pursuant to which they would conduct the Marketing Process.  Under the Bidding Procedures, the Debtors planned to solicit one or more bids for the Debtors' assets and to explore other strategic transactions.  *See* Bidding Procedures Motion ¶ 7 ("In addition to one or more Asset Sales, the Debtors are likewise soliciting any other type of strategic transaction involving the Debtors and/or the Company Assets, including, without limitation, proposals for the raising of debt or equity financing pursuant to a chapter 11 plan of reorganization . . .").

20.     Pursuant to that Marketing Process, the CSI Parties are the successful bidders for the Debtors' Proterra Energy business line per the *Notice of (A) Successful Bidder Regarding Debtors' (I) Transit Assets and (II) Energy Assets and (B) Cancellation of the Sale Hearing Solely with Respect to Proterra Energy* [Docket No. 529] (the "Transit/Energy Successful Bid Notice").

---

[4]     The "Bidding Procedures" are the procedures set forth in the *Debtors' Motion for entry of: (i) an Order (a) Approving Bidding Procedures to Govern the Sale of all or Substantially all of the Debtors' Assets Pursuant to Section 363 of the Bankruptcy Code, (b) Approving Procedures Regarding Entry Into One or More Stalking Horse Agreements, (c) Establishing Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases, (d) Approving the Form and Manner of the Notice of Assumption and Assignment of Executory Contracts and Unexpired Leases, (e) Scheduling Auctions for the Sales of the Company Assets and Hearings to Consider Approval of the Sales and Approving the Form and Manner of the Notice Thereof, (f) Approving Certain Wind-Down Procedures, and (g) Granting Related Relief; and (ii) an order (a) Authorizing and Approving the Debtors' Entry Into One or More Asset Purchase Agreements, (b) Authorizing the Sale of All or Substantially All of the Debtors' Assets Free and Clear of Liens, (c) Approving the Assumption and Assignment of the Assumed Executory Contracts and Unexpired Leases, and (d) Granting Related Relief* [Docket No. 36] (the "Bidding Procedures Motion").

21.     The Debtors have also executed a Chapter 11 Plan Support Agreement (the "Plan Support Agreement") with the CSI Parties.  *See* Transit/Energy Successful Bid Notice, Exhibit C. Pursuant to the Plan Support Agreement, the Debtors agreed to seek to implement the CSI Parties' pursuit of Proterra Energy through a joint plan of reorganization.  As part of that reorganization, the CSI Parties would receive, on account of their claims, 100% of the Reorganized Debtors' equity with the remainder of their claims being satisfied in cash or otherwise consensually reduced. *See* Ex. A, Plan Support Agreement.  This outcome, under which the CSI Parties recover in full in cash on the vast majority of their claims, was carefully negotiated, produced by the Debtors' competitive Marketing Process, and freely and voluntarily agreed to by the CSI Parties.

## III.    The Premium Claim

22.     On November 15, 2023, CSI filed the CSI POC.  The CSI POC asserts a secured claim in the "aggregate principal and accrued interest amount of not less than $266,670,640.37," including the Premium Claim in the amount of $88,585,019.28.   The CSI POC asserts an interest rate of 12% as of the Petition Date.

23.     In support of the CSI POC, CSI filed the *Addendum in Support of Proof of Master Proof of Claim of CSI GP I LLC on Behalf of the Prepetition Second Lien Secured Parties* attached thereto (the "Addendum").  Notably, the Addendum provides no explanation for why CSI believes it is entitled to the Premium Claim.  Instead, CSI simply restates the language of the Note Purchase Agreement, and contends, without specifically identifying the triggering event, that "the [Premium] *was triggered, or will inevitably be triggered, by no later than the Petition Date* because a Liquidation Event occurred by no later than the Petition Date and remains outstanding." Addendum ¶ 16(e) (emphasis added).  The Petition Date of course was over three months ago, and

the fact that CSI itself still could not identify the triggering event for the Premium—or even

whether such an event had taken place yet at all—speaks volumes about its claim.

24.    On November 29, 2023, this Court entered the *Order Approving Stipulation*

*Regarding Scheduling with Respect to Litigating the Premium Claim* [Docket No. 665] (the

"Scheduling Order").  The Scheduling Order contemplates that initial briefing, including this

Objection, may be decided by this Court under the standard set forth in Federal Rule of Civil

Procedure 12(c) for judgment on the pleadings.  *See* Scheduling Order ¶¶ 3–6.

## Objection

25.    Section 502(a) of the Bankruptcy Code provides, in pertinent part: "[a] claim or

interest, proof of which is filed under section 501 of [the Bankruptcy Code], is deemed allowed,

unless a party in interest . . . objects." 11 U.S.C. § 502(a).  Section 502(b)(1) states a court "shall

allow such claim in such amount, ***except to the extent that—such claim is unenforceable against***

***the debtor*** and the property of the debtor ***under any agreement or applicable law*** . . . ." 11 U.S.C.

§ 502(b)(1) (emphases added).

26.    Where a contract is unambiguous as here, a court may properly decide the dispute

on the pleadings.  *Menna* v. *Weidhaas*, 2023 WL 4851547, at *6–7 (Del. Ch. July 28, 2023)

("[J]udgment on the pleadings . . . is a proper framework for enforcing unambiguous contracts

because there is no need to resolve material disputes of fact." (quoting *Lillis* v. *AT&T Corp.*, 904

A.2d 325, 329 (Del. Ch. 2006))); *Strougo* v. *Hollander*, 111 A.3d 590, 594–95 (Del. Ch. 2015)

("The proper interpretation of an unambiguous contract . . . is a question of law that is

appropriately resolved on a motion for judgment on the pleadings.").  Accordingly, and as provided

for by the Scheduling Order, this Court should determine that the CSI Parties are not entitled to

the Premium Claim based on the unambiguous language of the Note Purchase Agreement, and thus disallow the Premium Claim as a matter of law.

**I.    The CSI Parties Are Not Entitled to the Premium under the Note Purchase Agreement.**

27.    The CSI Parties are not entitled to the Premium as a matter of law for at least three reasons.  *First*, a chapter 11 filing is not a "Liquidation Event," and thus no Liquidation Event occurred.  *Second*, the commencement of these Chapter 11 Cases also could not constitute a Liquidation Event because such an event only includes actions to which the CSI Parties consented, and they did not consent to these cases.  *Third*, any alleged Liquidation Event did not occur "prior to" the Maturity Date, as required to trigger the Premium, because the Maturity Date occurred immediately when these cases were filed.  Each of these reasons independently warrants disallowance of the Premium Claim in its entirety.  *See* 11 U.S.C. § 502(b)(1) (court shall disallow claims that are not enforceable under applicable state law).

**A.  The Premium Is Not Triggered Because a Liquidation Event Does Not Include a Chapter 11 Filing.**

28.    A "Liquidation Event" is necessary (but not sufficient) to trigger the Premium. Secured Note § 2.2.  No such event has occurred because the commencement of these Chapter 11 Cases is not a "voluntary . . . liquidation," as is required for a Liquidation Event.

29.    *First*, the definition of "Liquidation Event" nowhere includes a chapter 11 filing. Secured Note § 1.  Significantly, the agreement uses a ***different defined term*** to capture bankruptcy filings—"Insolvency Proceeding."  *See* NPA § 3 (an Insolvency Proceeding means "any case or proceeding commenced by or against a Person under any state, federal or foreign law for, . . . (a) the entry of an order for relief under the Bankruptcy Code. . .").  The definition of "Liquidation Event" does ***not*** include the term Insolvency Proceeding.  The decision not to include Insolvency Proceedings as Liquidation Events, where the parties could have easily done so, clearly

demonstrates that they did not intend Liquidation Events to include bankruptcy filings.  *See, e.g.*, *In re Hertz*, 637 B.R. 781, 788 (Bankr. D. Del. 2021) (concluding that "the undefined term 'maturity' in section 6(a) must refer to the common meaning of maturity" and not the maturity date in the defined term "Stated Maturity," since the parties chose not to use the defined term). Indeed, a court should be cautious "about implying contractual terms when the contract could easily have been drafted to expressly provide for such terms, limitations, or conditions." *Murfey* v. *WHC Ventures, LLC*, 236 A.3d 337, 357 (Del. 2020) (finding that plain words of contract governed and not "unwritten, implied conditions" that could have been included but were not); *see also In re Ore Cargo, Inc.*, 544 F.2d 80, 82 (2d Cir.1976) (where sophisticated drafter omits a term the court is precluded from implying it from "the general language of the agreement").  Here, where the omitted term was a definition ***in the same agreement***—and indeed, that defined term was used ***three paragraphs later*** in section 2.5—this principle applies with even greater force. Secured Note § 2.5 ("Notwithstanding anything to the contrary herein, automatically during an Insolvency Proceeding with respect to the Company . . . the PIK Interest Rate shall increase to 9.0% per annum.").

30.    *Second*, a chapter 11 case is not a "voluntary liquidation" because the purpose of chapter 11 is reorganization.  *See Florida Dep't of Revenue* v. *Piccadily Cafeterias, Inc.*, 554 U.S. 33, 37 n.2 (2008) ("the central purpose of Chapter 11 is to facilitate reorganizations rather than liquidations," even though Chapter 11 also contemplates liquidations); *In re W.R. Grace & Co.*, 475 B.R. 34, 147 (D. Del. 2012) ("Chapter 11 addresses debtor reorganization, a process that attempts to rehabilitate a business as a going concern rather than to liquidate it."), *aff'd sub nom. In re WR Grace & Co.*, 729 F.3d 332 (3d Cir. 2013).  Indeed, chapter 11 of the Bankruptcy Code is titled "Reorganization," whereas, of course, chapter 7 is titled "Liquidation."

31.     *Third*, the Debtors are currently pursuing a chapter 11 plan of reorganization.  They have executed a Plan Support Agreement with the CSI Parties, a central tenet of which is that the Debtors will **reorganize**.  *See supra* ¶ 3.  Thus, the Debtors had not "commence[d]" a "liquidation" as of the filing of these Chapter 11 Cases (or ever).

32.     As the commencement of these Chapter 11 Cases was not a "voluntary liquidation," no Liquidation Event—a contractual pre-condition to the Premium—has occurred.

### B.    That the CSI Parties Did Not Consent to These Chapter 11 Cases Also Precludes Considering the Bankruptcy Filing a "Liquidation Event."

33.     In addition, commencement of these Chapter 11 Cases could not constitute a Liquidation Event because such an event occurs only if the "Required Holders" (as defined) have consented to it.  Secured Note § 1 (a "Liquidation Event" means "(a) the commencement of a voluntary . . . liquidation . . . of the Parent or the Company (**provided that in the event of a voluntary liquidation . . . of the Parent or the Company, the Required Holders (as defined in the Purchase Agreement) have consented to the occurrence of such event**)") (emphasis added).  The CSI Parties did not consent to the filing of these Chapter 11 Cases.  As they have repeatedly made clear, they were not even informed that the Debtors would file.  *See, e.g.*, *CSI Parties Reservation of Rights* ("The Debtors have . . . **fil[ed] these chapter 11 cases without informing their secured creditor, CSI**, . . .").  That *no* holders—let alone the "Required Holders"—consented to these Chapter 11 Cases is an additional reason that no "Liquidation Event" occurred, and therefore, that the CSI Parties are not contractually entitled to the Premium.

### C.    No "Liquidation Event" Occurred "Prior To" the Maturity Date (*i.e.*, the Petition Date).

34.     Moreover, a Liquidation Event only triggers the Premium if it occurs "***prior to***" the Maturity Date.  Secured Note ¶ 2.2.  To the extent that the CSI Parties wrongly argue there was any Liquidation Event, it did not occur "prior to" the Maturity Date, meaning that the Premium

was not triggered.  The CSI Parties concede as much, stating that an alleged Liquidation Event "***was triggered as of the Petition Date***" (***i.e., the Maturity Date***), ***not*** prior to it.  Addendum ¶ 16(a) n.4 (emphasis added).

35.    The "Maturity Date" occurred immediately when the Debtors filed these Chapter 11 Cases—an "Insolvency Proceeding" automatically triggered an Event of Default, and therefore, the Maturity Date.  *Supra* ¶ 17 (a bankruptcy filing is an "Insolvency Proceeding"—an automatic Event of Default accelerating the Maturity Date to present).  Thus, the entire balance of the Secured Notes became due and payable.  *See, e.g.*, *In re Solutia Inc.*, 379 B.R. 473, 484 (Bankr. S.D.N.Y. 2007) (finding filing of bankruptcy petition automatically accelerated debt, noting "[u]pon acceleration the entire debt becomes due and owing.  ***Acceleration moves the maturity date from the original maturity date to the acceleration date and that date becomes the new maturity date***.") (emphasis added); *see also Black's Law Dictionary* (11th ed. 2019) (acceleration is defined as "the advancing of a loan agreement's maturity date so that payment of the entire debt is due immediately").

36.    These types of automatic acceleration provisions are routinely enforced.  *See, e.g.*, *In re AMR Corp.*, 485 B.R. 279, 292 (Bankr. S.D.N.Y.) ("The language here expresses the parties' clear intention that acceleration is automatic in the event of a bankruptcy filing . . . Indeed, numerous courts have applied such automatic acceleration clauses"), *aff'd*, 730 F.3d 88 (2d Cir. 2013).  The CSI Parties certainly have not suggested that acceleration would not be enforced.

37.    The plain language of the Note Purchase Agreement requires a Liquidation Event "prior to" the Maturity Date to trigger the Premium.  Secured Note § 2.2.  Because the Maturity Date occurred immediately upon the filing of these Chapter 11 Cases, no alleged Liquidation Event could have occurred ***prior to*** this date.  *See, e.g.*, *JFE Steel Corp.* v. *ICI Ams., Inc.*, 797 F. Supp.

2d 452, 469 (D. Del. 2011) ("If the language of the contract is unambiguous, the [c]ourt interprets the contract based on the plain meaning of the language contained on the face of the document."). Indeed, even the CSI Parties state that the Liquidation Event occurred "as of" the Petition Date, **not** "prior to" it. *See supra* ¶ 5. That statement is fatal to their Premium Claim.

38.     Moreover, this situation is similar to a "prepayment premium"—*i.e.*, a premium for payments made before a maturity date—which courts have held cannot apply after a bankruptcy filing already accelerated the maturity date.  For example, in *In re AMR Corp.*, the Second Circuit held that noteholders were not entitled to a prepayment premium where notes had automatically accelerated upon a bankruptcy filing, because "[p]repayment can only occur *prior* to the maturity date." 730 F.3d 88, 103 (2d Cir. 2013) (citations omitted).  Indeed, the law is "well established" that "once a debt is accelerated, lenders may not collect a prepayment or make-whole fee (absent provision to the contrary in the [loan document])." *Wilmington Sav. Fund Soc'y, FSB* v. *Cash Am. Int'l, Inc.*, 2016 WL 5092594, at *6 (S.D.N.Y. Sept. 19, 2016); *see also In re Energy Future Holdings Corp.*, 842 F.3d 247, 259 (3d Cir. 2016) ("[P]repayments cannot occur when payment is now due by acceleration of the debt's maturity. If parties want to mandate a 'prepayment' premium following acceleration, they must clearly state it in their agreement."); *In re Solutia Inc.*, 379 B.R. 473 at 488 ("[b]ecause the [notes] were automatically accelerated" upon the bankruptcy filing, "any payment at this time would not be a prepayment.").

39.     The Premium presents the same—if not even stronger—timing considerations as a prepayment premium.  Just like a prepayment, a Liquidation Event must occur prior to the Maturity Date.  As such, once the debt automatically accelerated and the Maturity Date occurred upon the filing of these Chapter 11 Cases, "it [was] no longer possible" to have a Liquidation Event "prior to" the Maturity Date.  *See In re Energy Future Holdings*, 842 F.3d at 260.  Of course, this is

precisely the result the parties bargained for—no doubt in part because accelerating the debt after a bankruptcy filing by notice would violate the automatic stay.  The CSI Parties cannot now disavow that bargain—at the expense of the Debtors' unsecured creditors—simply because they would like to recover more.

40.    The CSI Parties also cannot argue that they were entitled to elect whether to accelerate the debt.  Under the plain language of the Note Purchase Agreement, the acceleration is "immediate[] and without notice," and causes all outstanding obligations to "automatically become immediately due and payable."   NPA § 8.   Where contractual language is clear that debt automatically accelerates, a creditor cannot elect not to accelerate.  *In re AMR Corp.*, 485 B.R. at 292 (rejecting argument that acceleration must be "chosen by the lender" where parties' clear intention was that acceleration is automatic upon a bankruptcy filing); *see also In re Energy Future Holdings*, 842 F.3d at 258 ("[T]he consequences of acceleration of the debt depend on the language chosen by the parties in the pertinent loan agreement." (quoting *NML Capital* v. *Republic of Argentina*, 952 N.E.2d 482, 42 (N.Y. 2011))).  Moreover, any purported waiver of any Event of Default would have violated the automatic bankruptcy stay.  *See In re AMR Corp.*, 485 B.R. at 294 (rejecting argument that lenders can rescind an event of default caused by bankruptcy filing because "[a]ny deceleration of these notes, however, is barred by the automatic stay imposed by the filing of this bankruptcy").

41.    That the Maturity Date occurred immediately when these Chapter 11 Cases were filed—meaning that no Liquidation Event could have occurred prior to the Maturity Date—is also fatal to the Premium Claim.

II.    **The Premium Is an Unenforceable Penalty under Delaware Law.**

42.    Even beyond being precluded by the clear and unambiguous terms of the Note Purchase Agreement, the Premium—which requires a ***minimum*** payment of 150% of the principal balance of the Secured Notes—is also an unenforceable penalty under governing Delaware law.

43.    Whether a provision is an unenforceable penalty or an enforceable liquidated damages clause is a legal question, which can appropriately be determined as a matter of law.  *See, e.g.*, *S.H. Deliveries, Inc. TriState Courier & Carriage, Inc.*, 1997 WL 817883, at *3 (Del. Super. Ct. May 21, 1997) ("The majority view among jurisdictions is that the question of whether a stipulated sum is for liquidated damages or a penalty is a question of law[.]"); *Universal Atl. Sys., Inc.* v. *Bos. Mkt. Corp.*, 2022 WL 13829825, at *13 (E.D. Pa. Oct. 21, 2022) ("As a matter of law, the liquidated [damages] provision, on its face, constitutes an unenforceable penalty."); *In re MarketXT Holdings Corp.*, 376 B.R. 390, 416 (Bankr. S.D.N.Y. 2007) ("The enforceability of a liquidated damages clause is a matter of law for the Court.").

44.    Contractual damages provisions that are penalties are unenforceable as a matter of Delaware law.  *Delaware Bay*, 900 A.2d at 650 ("The distinction between a penalty and a liquidated damages clause is significant—if a provision is considered a penalty, it is void as against public policy and recovery is limited to actual damages." (quoting *S.H. Deliveries, Inc.*, 1997 WL 817883, at *2)).  "[A] court has a duty to examine a . . . penalty as a liquidated damages clause and to determine whether it is reasonable or unenforceable as a penalty."  *In re MarketXT Holdings Corp.*, 376 B.R. at 416.

45.    A provision is enforceable as a liquidated damages clause under Delaware law only if (1) "the amount agreed upon is reasonable" and (2) "the damages are uncertain."  *Delaware Bay*, 900 A.2d at 651 (citing *Lee Builders, Inc.* v. *Wells*, 103 A.2d 918, 919 (1954)).  Both of these two

essential requirements must be met for a "liquidated damages" provision to be enforceable; neither is met here.

46.     *First*, the Premium is not reasonable because its amount is excessive.  The Premium requires a payment of ***at least*** 50% (*i.e.*, according to the CSI Parties, over $88.5 million) of the principal balance of the Note—over and above the full repayment of that principal balance.  The 50% quantum of the Premium is similar to those that courts have determined unenforceable as penalties.  *See In re MarketXT Holdings Corp.*, 376 B.R. at 416–17 (prepayment provision requiring payment of 76% of principal was an unenforceable penalty); *Auctus Fund, LLC* v. *Sunstock, Inc.*, 405 F. Supp. 3d 218, 234 (D. Mass. 2019) (provision which required the borrower to pay 150% of unpaid principal plus other fixed fees upon default was unenforceable penalty).

47.     The Premium is also not reasonable because it is an arbitrary, fixed-fee payment, which does not vary based on any relevant factors.  Courts are more likely to find damages are reasonable when they are assessed according to a formula which permit the holders "to receive [their] bargained for yield."  *See In re Vanderveer Ests. Holdings, Inc.*, 283 B.R. 122, 130 (Bankr. E.D.N.Y. 2002); *see also In re Fin. Ctr. Assocs. of E. Meadow, L.P.*, 140 B.R. 829, 837 (Bankr. E.D.N.Y. 1992) (finding provision enforceable in part because "the contract provides for a formula to be used in computing the charge, not for a fixed sum").  For example, where a premium incorporates a discount rate or similar metric designed to give a party the present value of anticipated income streams, it is more likely to be rationally related to the probable loss.  *In re Sch. Specialty, Inc.*, 2013 WL 1838513, at *4 (Bankr. D. Del. Apr. 22, 2013) ("[P]repayment consideration calculated on the basis of U.S. Treasury bond interest rates supports the conclusion that a prepayment premium is not plainly disproportionate to a lender's potential losses.").

48.    Notably, clause (ii) of section 2.2 of the Secured Note provides that the CSI Parties would receive, upon a Liquidation Event, the amount they would receive in certain conversion scenarios.   However, clause (i) provides an additional floor of the amount payable upon a Liquidation Event—50% of the balance of the Note—that is expressly **not** based on any anticipated recoveries, and reflects no discount or market-based rate adjustments.  The very purpose of clause (i) is to provide a minimum (and completely arbitrary) amount payable that is greater than that which would be owing in certain equity conversion scenarios.  Moreover, that the same Premium could be triggered **at any point** while the Secured Notes are outstanding—whether the day after the Secured Notes were entered into, or the day before they were anticipated to be repaid—also illustrates that the provision is arbitrary and unreasonable.  *See In re MarketXT Holdings Corp.*, 376 B.R. at 416–17 ("Defendants cannot justify a penalty that in effect charged the Debtor 76% of the principal amount of its own money if it repaid the putative loan **after one day**.") (emphasis added); *see also S.H. Deliveries, Inc.*, 1997 WL 817883, at *2 ("If the damages are easily ascertainable or the amount fixed is excessive, that is, not a reasonable estimate of damages, the provision is void.").

49.    *Second*, the actual amount of probable loss was not uncertain when the parties entered into the Note Purchase Agreement.  This case is like *Auctus Fund, LLC*, where a court held that a provision in a convertible notes agreement requiring payment of 150% of principal and interest upon an event of default was an unenforceable penalty.  405 F. Supp. 3d at 225.  The court reasoned that the parties could have ascertained the note holder's damages when the convertible note instrument was negotiated, simply by adding the unpaid principal and interest.  *Id.* at 233–34. As such, because the actual amount of damages was not difficult to estimate, the court found that the damages provision was an unenforceable penalty.  *Id.*

50.     The probable loss to the CSI Parties if a Liquidation Event occurred prior to the Maturity Date was similarly simple to calculate when the parties entered into the Note Purchase Agreement.  The Note Purchase Agreement has a principal amount, fixed interest rates, and a stated maturity date.  *See supra* ¶ 11 .  Thus, damages could have simply been calculated based on the unpaid balance of the Note together with the outstanding interest.  *See LG Cap. Funding, LLC* v. *5Barz Int'l, Inc.*, 307 F. Supp. 3d 84, 102 (E.D.N.Y. 2018) ("daily" penalties for failing to deliver converted shares unenforceable because "plaintiff's actual damages are a function of conversion price, the market price for defendant's shares at the time of defendant's breach when it failed to deliver the shares, and the number of shares converted, all of which can easily be determined"); *Union Cap. LLC* v. *Vape Holdings Inc.*, 2017 WL 1406278, at *7 (S.D.N.Y. Mar. 31, 2017) (concluding "that the measure of expectation damages was readily ascertainable from the face of the Contracts").  And to the extent that the Premium was designed to compensate for the loss of the CSI Parties' potential equity value upon conversion, the parties ***already had*** a formula in clause (ii) of section 2.2 to determine this—the amount that the CSI Parties would receive on conversion—again supporting that damages were not difficult to estimate when the parties signed the Note Purchase Agreement.  *See Auctus Fund, LLC*, 405 F. Supp. 3d at 233–34 (finding damages susceptible of estimation where "amount is part of the [notes'] method of calculating damages, to which [the parties] agreed").  But clause (i)—which provides an arbitrary alternative floor for damages—is necessarily untethered to the value received on hypothetical equity conversion, or any legitimate damages calculation, and is an unenforceable penalty.

51.     Both because the Premium is unreasonable—in terms of the excessive amount and also the arbitrary methodology—and because damages could have easily been determined, the Premium is an unenforceable penalty under Delaware law.

**Reservation of Rights**

52.    This Objection is limited to the grounds stated herein. Accordingly, it is without prejudice to the rights of the Debtors to object to any claim on any ground whatsoever. The Debtors expressly reserve all further substantive or procedural objections to the Premium Claim and any other claim. The Debtors further reserve their right to amend or supplement the Objection as additional information is discovered.

53.    Nothing contained herein or any actions taken pursuant to such relief is intended or should be construed as: (i) an admission as to the validity of any prepetition claim against the Debtors' estate; (ii) a waiver of the Debtors' rights to dispute any prepetition claim on any grounds; (iii) a promise or requirement that any prepetition claim should be paid; (iv) an implication or admission that any particular claim is of a type specified or defined in this Objection or any order granting the relief requested by the Objection; (v) a request or authorization to assume any prepetition agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; or (vi) a waiver of the Debtors' rights under the Bankruptcy Code or any other applicable law.

*[Remainder of page intentionally left blank]*

**WHEREFORE**, for the reasons set forth above, the Debtors respectfully request that the Court grant this motion for judgment on the pleadings disallowing the Premium Claim in its entirety.

Dated:  December 6, 2023
        Wilmington, Delaware

Respectfully submitted,

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ Andrew L. Magaziner*
Pauline K. Morgan (No. 3650)
Andrew L. Magaziner (No. 5426)
Shella Borovinskaya (No. 6758)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email:  pmorgan@ycst.com
        amagaziner@ycst.com
        sborovinskaya@ycst.com

- and –

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Paul M. Basta (admitted *pro hac vice*)
Andrew J. Ehrlich (admitted *pro hac vice*)
William A. Clareman (admitted *pro hac vice*)
Robert A. Britton (admitted *pro hac vice*)
Paul Paterson (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Tel:    (212) 373-3000
Fax:    (212) 757-3990
Email: pbasta@paulweiss.com
        wclareman@paulweiss.com
        rbritton@paulweiss.com
        ppaterson@paulweiss.com

*Counsel to the Debtors and Debtors in Possession*