**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PROTERRA INC, *et al.*,[1] | ) | Case No. 23-11120 (BLS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Ref. Docket Nos. 36, 218, 278, 529 & 818** |
| | ) | |

## NOTICE OF FILING OF FURTHER REVISED PROPOSED SALE ORDER

**PLEASE TAKE NOTICE** that on August 8, 2023, the above-captioned debtors and debtors in possession (together, the "Debtors"), filed the *Debtors' Motion for Entry of: (I) an Order (A) Approving Bidding Procedures to Govern the Sale of All or Substantially All of the Debtors' Assets Pursuant to Section 363 of the Bankruptcy Code, (B) Approving Procedures Regarding Entry Into One or More Stalking Horse Agreements, (C) Establishing Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases, (D) Approving the Form and Manner of the Notice of Assumption and Assignment of Executory Contracts and Unexpired Leases, (E) Scheduling Auctions for the Sales of the Company Assets and Hearings to Consider Approval of the Sales and Approving the Form and Manner of the Notice Thereof, (F) Approving Certain Wind- Down Procedures, and (G) Granting Related Relief; and (II) an Order (A) Authorizing and Approving the Debtors' Entry Into One or More Asset Purchase Agreements, (B) Authorizing the Sale of All or Substantially All of the Debtors' Assets Free and Clear of Liens, (C) Approving the Assumption and Assignment of the Assumed Executory Contracts and Unexpired Leases, and (D) Granting Related Relief* [D.I. 36] (the "Motion") with the United States Bankruptcy Court for the District of Delaware (the "Court").

**PLEASE TAKE FURTHER NOTICE** that on September 7, 2023, the Court entered the *Order (A) Approving Bidding Procedures to Govern the Sale of All or Substantially All of the Debtors' Assets Pursuant to Section 363 of the Bankruptcy Code, (B) Approving Procedures Regarding Entry Into One or More Stalking Horse Agreements, (C) Establishing Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases, (D) Approving the Form and Manner of the Notice of Assumption and Assignment of Executory Contracts and Unexpired Leases, (E) Scheduling Auctions for the Sales of the Company Assets and Hearings to Consider Approval of the Sales and Hearings to Consider Approval of the Sales and Approving the Form and Manner of the Notice Thereof, and (F) Granting Related Relief* [D.I. 218] (the "Bidding Procedures Order").[2]

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Proterra Inc (9565); and Proterra Operating Company, Inc. (8459). The location of the Debtors' service address is: 1815 Rollins Road, Burlingame, California 94010.

[2]   Capitalized terms used but not otherwise defined herein shall have the meaning given to them in the Motion or Bidding Procedures Order, as applicable.

**PLEASE TAKE FURTHER NOTICE** that on September 25, 2023, the Debtors filed the *Notice of Filing of Proposed Sale Order* [D.I. 278].

**PLEASE TAKE FURTHER NOTICE** that on November 13, 2023, the Debtors filed the *Notice of (A) Successful Bidder Regarding Debtors' (I) Transit Assets and (II) Energy Assets and (II) Cancellation of the Sale Hearing Solely With Respect to Proterra Energy* [D.I. 529] (the "Notice of Successful Bidder") in accordance with the Bidding Procedures Order, thereby announcing Phoenix Motor, Inc. as the Successful Bidder for the Company Assets for Proterra Transit and the Battery Lease Assets (as defined in the Notice of Successful Bidder).

**PLEASE TAKE FURTHER NOTICE** that, on January 4, 2024, the Debtors filed the *Notice of Revised Proposed Sale Order* [D.I. 818] (the "Revised Proposed Sale Order").

**PLEASE TAKE FURTHER NOTICE** that the Debtors have since made certain revisions to the Revised Proposed Sale Order. Attached hereto as **Exhibit A** is a further Revised Proposed Sale Order (the "Further Revised Proposed Sale Order") approving the sale of the Battery Lease Assets and the Company Assets related to Proterra Transit to Phoenix Motor, Inc. For the convenience of the Court and all interested parties, a blackline reflecting the changes made to the Revised Proposed Sale Order is attached hereto as **Exhibit B**.

**PLEASE TAKE FURTHER NOTICE** that the Debtors intend to present the Further Revised Proposed Sale Order at the hearing scheduled for January 8, 2024 at 11:00 a.m. (ET) (the "Sale Hearing"). The Debtors reserve all rights to modify the Further Revised Proposed Sale Order at or prior to the Sale Hearing.

**PLEASE TAKE FURTHER NOTICE** that the Sale Hearing (or any portion hereof) may be adjourned by the Debtors, in consultation with the Consultation Parties, from time to time without further notice other than by announcement in open court or through the filing of a notice or other document on the Court's docket.

*[Remainder of Page Intentionally Left Blank]*

Dated:  January 7, 2024
        Wilmington, Delaware

Respectfully submitted,

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

/s/ Shella Borovinskaya
Pauline K. Morgan (No. 3650)
Andrew L. Magaziner (No. 5426)
Shella Borovinskaya (No. 6758)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email:  pmorgan@ycst.com
        amagaziner@ycst.com
        sborovinskaya@ycst.com

- and -

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Paul M. Basta (admitted *pro hac vice*)
Robert A. Britton (admitted *pro hac vice*)
Michael J. Colarossi (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Tel:    (212) 373-3000
Fax:    (212) 757-3990
Email:  pbasta@paulweiss.com
        rbritton@paulweiss.com
        mcolarossi@paulweiss.com

*Counsel to the Debtors and Debtors in Possession*

30999412.2

## **EXHIBIT A**

**Further Revised Proposed Sale Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| PROTERRA INC, *et al.*,[1] | ) Case No. 23-11120 (BLS) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) **Re: Docket Nos. 36, 218, and 529** |
| | ) |

**ORDER (A) AUTHORIZING
AND APPROVING THE DEBTORS' ENTRY
INTO THE ASSET PURCHASE AGREEMENTS,
(B) AUTHORIZING THE SALE OF THE DEBTORS'
TRANSIT AND BATTERY LEASE ASSETS FREE
AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS, AND
ENCUMBRANCES, (C) APPROVING THE ASSUMPTION
AND ASSIGNMENT OF THE ASSUMED EXECUTORY CONTRACTS
AND UNEXPIRED LEASES, AND (D) GRANTING RELATED RELIEF**

Upon consideration of the motion [Docket No. 36] (the "Motion")[2] of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") for the entry of an order (this "Order") (a) authorizing and approving the Debtors' entry into that certain (i) *Asset Purchase Agreement* by and among the Debtors and Phoenix Motor, Inc., as buyer ("Buyer"), dated as of November 13, 2023, attached hereto as **Exhibit A** (as it may be amended in accordance with its terms, the "Transit APA") for certain assets of Proterra Transit excluding the Battery Leases (defined below) (the "Transit Assets") and (ii) *Asset Purchase Agreement* by and among the Debtors and Buyer [Docket No. 529, Exhibit A], dated as of November 13, 2023, attached hereto as **Exhibit B** (as it may be amended in accordance with its terms, the "Battery Lease APA" and,

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Proterra Inc (9565); and Proterra Operating Company, Inc. (8459). The location of the Debtors' service address is: 1815 Rollins Road, Burlingame, California 94010.

[2]    Capitalized terms used but not otherwise defined herein are to be given the meanings ascribed to them in the Motion.

together with the Transit APA, the "APAs") for certain battery lease assets of the Debtors (the "Battery Leases"), (b) authorizing the sales (the "Sales") of certain of the Debtors' assets set forth in the APAs (the "Assets") pursuant to the APAs, free and clear of all liens, claims, interests, and encumbrances, (c) approving the Debtors' assumption and assignment of the assumed executory contracts and unexpired leases to the Qualified Bidder with the highest or otherwise best Bid (as defined in the Bidding Procedures) at the Auction (the "Successful Bidder"), and (d) granting related relief; and this Court having entered the *Order (A) Approving Bidding Procedures to Govern the Sale of All Or Substantially All of the Debtors' Assets Pursuant to Section 363 of the Bankruptcy Code, (B) Approving Procedures Regarding Entry Into One or More Stalking Horse Agreements, (C) Establishing Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases, (D) Approving the Form and Manner of the Notice of Assumption and Assignment of Executory Contracts and Unexpired Leases, (E) Scheduling Auctions for the Sales of the Company Assets and Hearings to Consider Approval of the Sales and Approving the Form and Manner of the Notice Thereof, and (F) Granting Related Relief* [Docket No. 218] (the "Bidding Procedures Order") on September 7, 2023; and the Debtors having determined (after consultation with the Consultation Parties (as defined in the Bidding Procedures Order) and in accordance with the Bidding Procedures) that the highest or otherwise best offer for the Assets was made by the Buyer pursuant to the APAs; and this Court having conducted a hearing on January 8, 2024 (the "Sale Hearing"), at which time all parties in interest were offered an opportunity to be heard with respect to the Sales and to consider the approval of the Sales pursuant to the terms and conditions of the APAs, and this Court having considered: (i) the Motion and any objections thereto; (ii) the Sales; (iii) the arguments of counsel made at the Sale Hearing, and evidence adduced, related thereto; and (iv) the record of the Sale Hearing held before this Court;

and all parties in interest having been heard, or having had the opportunity to be heard, regarding

the approval of the APAs, the Sales, and the other transactions contemplated by the APAs; and it

appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates,

their creditors, and other parties in interest; and upon the Sale Declaration; and upon the declaration

of John Kimm in support of the Sales [Docket No. 810] (the "Kimm Declaration"); and the

declaration of Mark Hastings in support of the Sales [Docket No. 823] (the "Hastings

Declaration"); and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334(b) and the Amended Standing Order; and this Court having found that this is a core

proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that it may enter a final

order consistent with Article III of the United States Constitution; and this Court having found that

venue of these proceedings and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408

and 1409; and this Court having found that the relief requested in the Motion is in the best interests

of the Debtors' estates, their creditors, and other parties in interest; and this Court having found

that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were

appropriate under the circumstances and that no other notice need be provided; and this Court

having determined that the legal and factual bases set forth in the Motion and at the Sale Hearing

establish just cause for the relief granted herein; and upon all of the proceedings had before this

Court; and after due deliberation and sufficient cause appearing therefor:

**IT IS HEREBY FOUND AND DETERMINED THAT**:[3]

## Statutory Predicates; Final Order

A.       The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to these chapter 11 cases pursuant to Bankruptcy Rule 9014.

B.       This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334(b), and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012.  This is a core proceeding under 28 U.S.C. § 157(b) and this Court may enter a final order consistent with Article III of the United States Constitution.  Venue of these chapter 11 cases and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C.       The statutory bases for the relief requested in the Motion are sections 105, 363, 365, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 6006 and Local Rules 2002-1 and 6004-1.

D.       This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h), 6006(d), and 7062, and to the extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, this Court expressly finds that there is no just reason for delay in the implementation of this Order and expressly directs entry of this Order as set forth herein which shall not be subject to any stay with regard to the transactions contemplated by this Order.

---

[3]     To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

**Notice**

E.      This Court previously entered the Bidding Procedures Order approving, among other things, the Bidding Procedures and the Assumption and Assignment Procedures.

F.      As evidenced by the Sale Notice, affidavits or certificates of service and publication previously filed with this Court including Docket Nos. 83, 243, 254, 258, 316, 326, 352, 468, 502, 562, 566, 567, 568, 630, 631, and 703, and demonstrated by the evidence presented at, and based on the representations of counsel at the Sale Hearing, due, proper, timely, adequate, and sufficient notice of the Motion, the Sale Hearing, the Auction, the Sales, the proposed form of this Order, and the Assumption and Assignment Procedures has been provided in accordance with sections 102(1), 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007, and 9014 and in compliance with the Bidding Procedures Order, to each party entitled to such notice, including, as applicable: (a) all entities known to have expressed a *bona fide* interest in a transaction with respect to the Debtors' assets (the "Company Assets") or any Business Line; (b) all entities known to have asserted any lien, claim, or encumbrance in or upon any assets comprising the Company Assets; (c) all federal, state, and local environmental, regulatory, or taxing authorities or recording offices which have a reasonably known interest in the relief requested by this Motion; (d) known counterparties to any unexpired leases or executory contracts that could potentially be assumed and assigned to a Successful Bidder; (e) all known creditors of the Debtors; (f) the Office of the United States Trustee for the District of Delaware; (g) all taxing authorities having jurisdiction over any of the Company Assets, including the Internal Revenue Service; (h) the Securities and Exchange Commission; (i) the Office of the United States Attorney for the District of Delaware; (j) counsel to the Official Committee of Unsecured Creditors appointed on August 24, 2023, and subsequently reconstituted on September 21, 2023 (the

"Committee"); and (k) all Persons and Entities (both as defined in the Bankruptcy Code) that have filed a request for service of filings in these chapter 11 cases pursuant to Bankruptcy Rule 2002. With respect to Persons or Entities whose identities are not reasonably ascertained by the Debtors, publication of the Sale Notice in *The New York Times* on September 11, 2023, as evidenced by the affidavit of publication filed by the Debtors at Docket No. 243 in these chapter 11 cases, was, and is deemed, sufficient and reasonably calculated under the circumstances to reach such Persons or Entities. The notices described above, in the Motion, and in the Bidding Procedures Order were good, sufficient, and appropriate under the circumstances, and reasonably calculated to reach and apprise all known and unknown holders of liens, claims, and encumbrances or affected contract counterparties, and no other or further notice of the Motion, the Auction, the Sales, the Sale Hearing, the potential assumption and assignment of the contracts and leases to the Successful Bidder is, or shall be, required.

G. The Sale Notice provided all interested parties with timely and proper notice of the Sales, Bid Deadline (as defined in the Bidding Procedures), Auction, and Sale Hearing. Further, a reasonable opportunity to object to and to be heard regarding the relief granted by this Order has been afforded to parties entitled to notice pursuant to Bankruptcy Rule 6004(a).

H. In accordance with the Bidding Procedures Order, and as evidenced by the affidavits or declarations of service and publication previously filed with this Court [Docket Nos. 352, 502, 562, and 703], the Debtors filed and have served the (i) *Notice of (I) Potential Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and (II) Proposed Cure Amounts* [Docket No. 279] (the "Original Cure Notice") on September 25, 2023, (ii) *First Amended Notice of (I) Potential Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and (II) Proposed Cure Amounts* [Docket No. 472], (the "First

Amended Cure Notice") on October 25, 2023, (iii) *Second Amended Notice of (I) Potential Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and (II) Proposed Cure Amounts* [Docket No. 528] (the "Second Amended Cure Notice") on November 10, 2023, and (iv) *Third Amended Notice of (I) Potential Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and (II) Proposed Cure Amounts* [Docket No. 643] (the "Third Amended Cure Notice" and, together with the Original Cure Notice, the First Amended Cure Notice, and the Second Amended Cure Notice, the "Cure Notices") on November 27, 2023 regarding the potential assumption and assignment of certain Contracts and of the amount necessary to cure any defaults pursuant to section 365(b) of the Bankruptcy Code (all such amounts in connection with any Contract, the "Cure Amounts") upon the Non-Debtor Counterparties to the Contracts.  The service and provision of the Cure Notices was good, sufficient, and appropriate under the circumstances and no further notice need be given in respect of assumption and assignment of certain contracts and leases designated for assumption and assignment to the Buyer pursuant to the APAs (each an "Assumed Contract" and collectively, the "Assumed Contracts"),[4] including with respect to adequate assurance of future performance or establishing a Cure Amount for the respective Assumed Contracts.  All Non-Debtor Counterparties to each Assumed Contract set forth in the Cure Notices have had an adequate opportunity to object to assumption and assignment of the applicable Assumed Contract and the Cure Amount set forth in the Cure Notices (including objections related to the adequate assurance of future performance and objections based on whether applicable law excuses the Non-Debtor Counterparty from accepting performance by, or rendering performance to, the Buyer for purposes of section 365(c)(1) of the Bankruptcy Code).

---

[4]    Each of the Assumed Contracts is listed on either **Exhibit C** (the schedule of Non-Contested Assumed Contracts (as defined below)) or **Exhibit D** (the schedule of Delayed Contracts (as defined below)) of this Order.

To the extent that any such party did not timely file a Cure/Assignment Objection by the Cure/Assignment Objection Deadline with respect to a given Assumed Contract or has withdrawn or withdraws its Cure/Assignment Objection (each such party, a "<u>Consenting Counterparty</u>" and each such Assumed Contract, a "<u>Non-Contested Assumed Contract</u>"), (i) such Consenting Counterparty shall be deemed to have consented to the assumption and assignment of each of its Non-Contested Assumed Contracts and (ii) the Cure Amount necessary to "cure" all "defaults", each within the meaning of section 365(b) of the Bankruptcy Code, under each of such Consenting Counterparty's Non-Contested Assumed Contracts shall be deemed to be the applicable amount set forth in the Cure Notices.  Attached hereto as **<u>Exhibit C</u>** is a schedule of the Non-Contested Assumed Contracts.

      I.      The Bidding Procedures established October 26, 2023 at 4:00 p.m. (ET) as the Bid Deadline for the submission of bids by Potential Bidders (as defined in the Bidding Procedures) for the Company Assets related to Proterra Transit, including the Battery Leases and November 13, 2023 at 10:00 a.m. (ET) as the date on which an Auction would take place if at least one Qualified Bid (as defined in the Bidding Procedures) was received with regard to such assets.

      J.      The Debtors received two (2) Qualified Bids for Proterra Transit and two (2) Qualified Bids for the Battery Leases, and the Auction occurred on November 13, 2023.

      K.      On November 13, 2023, the Debtors, in their reasonable business judgment and in consultation with the Consultation Parties, filed a notice designating the Buyer as the Successful Bidder with respect to both the Transit Assets and Battery Leases [Docket No. 529].

      L.      No further or other notice beyond that described in the foregoing <u>Paragraphs E</u> through <u>K</u> is or shall be required in connection with the relief granted in this Order.

**<u>Highest or Otherwise Best Offer and Sound Business Purpose</u>**

M.      The Debtors conducted the sale process in accordance with, and have otherwise complied in all respects with, the Bidding Procedures Order including, but not limited to, consulting with the Consultation Parties when required.  The Assets were adequately marketed by the Debtors and their advisors, and the sale process set forth in the Bidding Procedures Order afforded a full, fair, and reasonable opportunity for any person or entity to make an offer to purchase the Assets.  The Bidding Procedures annexed to the Bidding Procedures Order were non-collusive, proposed and executed in good faith as a result of arm's-length negotiations, and were substantively and procedurally fair to all parties.

N.      The terms contained in the APAs constitute the highest or otherwise best offer for the Assets and provide fair and reasonable consideration to the Debtors for the Assets and the assumption of the Assumed Liabilities (as defined in the APAs), and the consideration provided by the Buyer under the APAs constitutes reasonably equivalent value under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia.  The Debtors' determination, in consultation with their advisors and the Consultation Parties, that the consideration provided by the Buyer under the APAs constitutes the highest or otherwise best offer for the Assets constitutes a valid and sound exercise of the Debtors' business judgment.

O.      Approval of the Motion and the APAs, and the consummation of the Sales contemplated thereby, are in the best interests of the Debtors, their creditors, their estates, and other parties-in-interest.  The Debtors have demonstrated compelling circumstances and good, sufficient, and sound business reasons and justifications for entering into the APAs and the performance of their obligations under the APAs because, among other reasons: (a) the APAs constitute the highest or otherwise best offer for the Assets; (b) the APAs and the consummation

31135047.3

9

of the Sales pursuant to the APAs (the "Closing") present the best opportunity to realize the value

of the Assets; and (c) any other transaction would not have yielded as favorable an economic result.

In addition, the releases set forth in Section 12.16 of the APAs are reasonable and appropriate and

a valid exercise of the Debtors' business judgment, and the consideration provided for in the APAs

constitutes fair and appropriate consideration for such releases.

P.     Entry of this Order approving the APAs and all of the provisions thereof is a

condition precedent to the Buyer's and the Sellers' consummation of the Sales.

Q.     The Buyer is the Successful Bidder for the Assets in accordance with the Bidding

Procedures Order.  The Buyer has complied in all respects with the Bidding Procedures Order and

any other applicable order of this Court in negotiating and entering into the APAs, and the Sales

and the APAs likewise comply with the Bidding Procedures Order and any other applicable order

of this Court.

R.     The Auction was properly conducted by the Debtors on November 13, 2023 in

accordance with the Bidding Procedures Order and in a manner designed to result in the highest

or otherwise best offer for the Assets.  At the Auction, the Debtors determined in an exercise of

their business judgment (after consultation with the Consultation Parties and in accordance with

the Bidding Procedures) to enter into the APAs.

### Sale and Transfer Free and Clear of Interests or Claims

S.     The conditions of section 363(f) of the Bankruptcy Code have been satisfied and,

upon entry of this Order, other than Assumed Liabilities, including Cure Amounts, and Permitted

Encumbrances (as defined in the APAs), or as otherwise provided in the APAs, the Debtors may

transfer all of their right, title, and interest to the Assets free and clear of (i) any and all liens

(including, without limitation, any and all "liens" as that term is defined in Bankruptcy Code

31135047.3

section 101(37)), encumbrances, claims, mortgages, restrictions, hypothecations, charges, instruments, collective bargaining agreements, leases or subleases, licenses, options, deeds of trust, security interests, other interests, conditional sale or other title retention agreements, pledges, other liens (including mechanic's, materialman's, possessory and other consensual and non-consensual liens and statutory liens), judgments, demands, easements, servitudes, rights-of-way, encroachments, restrictive covenants, restrictions on transferability or other similar restrictions, rights of first refusal, offsets, contracts,  rights of recovery, rights of use or possession, and charges of any kind or nature, if any, including any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership, (ii) all claims (including, without limitation, any and all "claims" as that term is defined in Bankruptcy Code section 101(5)), including all rights or causes of action (whether in law or equity), proceedings, warranties and warranty obligations, guarantees, indemnities, rights of recovery, setoff, obligations, demands, restrictions, or liabilities relating to any act or omission of the Debtors or any other person prior to the Closing, claims for reimbursement, contribution, indemnity, exoneration, products liability, labor liabilities, Employees Retirement Income Security Act of 1974 liabilities, liabilities related to the Worker Adjustment and Retraining Notification Act of 1988, alter-ego, environmental, or tax, decrees of any court or foreign or domestic governmental entity, consent rights, options, contract rights, covenants, indentures, loan agreements, and interests of any kind or nature whatsoever (known or unknown, matured or unmatured, accrued, or contingent, and regardless of whether currently exercisable), whether arising prior to or subsequent to the commencement of the above-captioned cases, and whether imposed by agreement, understanding, law, equity, or otherwise, and (iii) all debts, liabilities, obligations, contractual rights and claims, labor, employment and pension claims, and debts arising in any way in connection with any agreements, acts, or failures to act, including

any pension liabilities, retiree medical benefit liabilities, liabilities arising under or related to the Internal Revenue Code, of the Debtors or any of the Debtors' predecessors or affiliates, claims, in each case, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, whether arising prior to or subsequent to the commencement of these chapter 11 cases, including Excluded Liabilities, and whether imposed by agreement, understanding, law, equity or otherwise, including claims otherwise arising under doctrines of successor liability (including, for the avoidance of doubt, any claims arising under the Consolidated Omnibus Budget Reconciliation Act of 1985)  ((i), (ii), and (iii) collectively, the "Interests or Claims").  The Buyer would not have entered into the APAs if the transfer of the Assets were not free and clear of all Interests or Claims except as set forth in the APAs and this Order, or if in the future the Buyer would or could be liable for any such Interests or Claims.

T.      Upon entry of this Order, the Debtors are authorized to transfer all of their right, title and interest in and to the Assets free and clear of all Interests or Claims (except as otherwise assumed in the APAs, including Permitted Encumbrances, or set forth herein) because one or more of the provisions set forth in section 363(f)(1)–(5) of the Bankruptcy Code has been satisfied, including that, except as otherwise expressly provided in the APAs or this Order, such Interests or Claims shall attach to the proceeds of the Sales in the order of their priority, with the same validity, force, and effect which they now have against the Assets, subject to any claims and defenses the Debtors may possess with respect to such Interests or Claims.  Each entity with an Interest or Claim (other than an Assumed Liability or a Permitted Encumbrance or as set forth in the APAs or herein) that is attached to the Assets to be transferred on the Closing Date (as defined in the

APAs):  (i) has, subject to the terms and conditions of this Order, consented to the Sales or is deemed to have consented to the Sales; (ii) could be compelled in a legal or equitable proceeding to accept money satisfaction of such encumbrance; or (iii) otherwise falls within the provisions of section 363(f) of the Bankruptcy Code.  Those holders of Interests or Claims against the Assets who did not object or who withdrew their objections to approval of the APAs or the Motion are deemed to have consented to the transactions contemplated thereby pursuant to section 363(f)(2) of the Bankruptcy Code.  For the avoidance of doubt, nothing in this Order establishes any rights or interests in the Assets (other than the Debtors' rights and interests in such Assets and the Buyer's rights and interests in the Assets from and after the Closing), and nothing herein shall be construed to govern or affect the distributions of the cash proceeds from the Sales of the Assets.

U.      Notwithstanding anything else herein to the contrary, the Buyer acknowledges that it will be required to comply with the National Traffic and Motor Vehicle Safety Act, as applicable to the business of the Buyer after the Closing, and with environmental laws applicable to the Assets after the Closing.

**Assumption and Assignment of the Assumed Contracts**

V.      The Assumption and Assignment Procedures set forth in the Bidding Procedures Order, as supplemented by this Order, are adequate, sufficient, and appropriate under the circumstances.

W.      The assumption and assignment of the Assumed Contracts pursuant to the Assumption and Assignment Procedures, as supplemented by this Order, is in the best interests of the Debtors and their estates and represents the reasonable exercise of the Debtors' sound business judgment.  The Assumed Contracts being assigned to the Buyer are an integral part of the Assets being purchased by the Buyer, and, accordingly, such assumption and assignment of the Assumed

Contracts and the liabilities associated therewith are reasonable and enhance the value of the Debtors' estates.

X.      The Debtors have met all requirements of section 365(b) of the Bankruptcy Code for the Debtors' assumption and assignment to the Buyer, and the Buyer's assumption, on the terms set forth in this Order and the APAs, of each of the Assumed Contracts upon the occurrence of the Closing Date (or, with respect to each Delayed Contract (as defined below), the applicable Delayed Contract Assignment Date).  The Debtors will have (i) cured or provided adequate assurance of cure of any default existing prior to the Closing (or, with respect to each Delayed Contract, the applicable Delayed Contract Assignment Date) under each Assumed Contract, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code and (ii) provided compensation or adequate assurance of compensation to any counterparty to an Assumed Contract for actual pecuniary loss to such entity resulting from any default prior to the Closing (or, with respect to each Delayed Contract, the applicable Delayed Contract Assignment Date) under each Assumed Contract, within the meaning of section 365(b)(1)(B) of the Bankruptcy Code.  The proposed Cure Amounts set forth on the Cure Notices or any other cure amount reached by agreement after any Cure/Assignment Objection are deemed the amounts necessary to "cure" all "defaults," each within the meaning of Bankruptcy Code section 365(b), under the Assumed Contracts.  The assignment of each of the Assumed Contracts is free and clear of all Interests or Claims (other than Assumed Liabilities and Permitted Encumbrances and as set forth in the APAs or herein).  No section of any of the Assumed Contracts that would prohibit, restrict, or condition, whether directly or indirectly, the use, assumption, or assignment of any of the Assumed Contracts in connection with the Sales shall have any force or effect, except as expressly permitted in the APAs and this Order.

31135047.3

14

Y.      Subject to the occurrence of the Closing Date (or, with respect to each Delayed Contract, the applicable Delayed Contract Assignment Date), the Buyer, to the extent necessary, has demonstrated adequate assurance of future performance under the relevant Assumed Contracts within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code.   The Buyer's promise to perform the obligations under the Assumed Contracts arising after the Closing (or, with respect to each Delayed Contract, the applicable Delayed Contract Assignment Date) shall constitute adequate assurance of its future performance of and under the Assumed Contracts, within the meaning of Bankruptcy Code sections 365(b)(1) and 365(f)(2).   Upon the Closing (or, with respect to each Delayed Contract, the applicable Delayed Contract Assignment Date), pursuant to section 365(f) of the Bankruptcy Code, the Assumed Contracts to be assumed and assigned under the APAs shall be assigned and transferred to, and remain in full force and effect for the benefit of, the Buyer notwithstanding any provision in such contracts or other restrictions prohibiting their assignment or transfer.

Z.      No defaults exist in the Debtors' performance under the Assumed Contracts as of the date of this Order other than the failure to pay amounts equal to the Cure Amounts or defaults that are not required to be cured as contemplated in section 365(b)(1)(A) of the Bankruptcy Code. The filed objections of all counterparties to the Assumed Contracts that were heard at the Sale Hearing (to the extent not withdrawn or otherwise resolved by agreement), were considered by this Court, and are overruled on the merits with prejudice.  This Court finds that, with respect to all such Assumed Contracts, the payment of the proposed Cure Amounts in accordance with the terms of the APAs is appropriate and is deemed to fully satisfy the Debtors' obligations under section 365(b) of the Bankruptcy Code.  Accordingly, all of the requirements of section 365(b) of the Bankruptcy Code have been satisfied for the assumption and the assignment by the Debtors to

31135047.3

the Buyer of each of the Assumed Contracts upon the Closing (or, with respect to each Delayed

Contract, the applicable Delayed Contract Assignment Date).  To the extent any Assumed Contract

is not an executory contract within the meaning of section 365 of the Bankruptcy Code, it shall be

transferred to the Buyer in accordance with the terms of this Order that are applicable to the Assets.

AA.    Except as expressly assumed by the Buyer under the APAs or required by law, the

assignment to the Buyer of the Assumed Contracts will not subject the Buyer to any liability

whatsoever which may become due or owing under the Assumed Contracts prior to the Closing

(other than Cure Amounts) and the Buyer shall not be subject to any liability whatsoever for any

Contract that is not an Assumed Contract except to the extent such liability is an Assumed

Liability.

### Good Faith Finding

BB.    The Buyer is not an "insider" or "affiliate" of any of the Debtors as those terms are

defined in section 101 of the Bankruptcy Code.

CC.    The APAs were negotiated, proposed, and entered into by the Debtors and the

Buyer without collusion or fraud, in good faith, and from arm's-length bargaining positions.

DD.    The APAs and the transactions contemplated thereby cannot be avoided under

section 363(n) of the Bankruptcy Code. The Debtors and the Buyer and Buyer's agents,

representatives and affiliates have not engaged in any conduct that would cause or permit the APAs

or the consummation of the transactions contemplated thereby to be avoided, or costs or damages

to be imposed, under section 363(n) of the Bankruptcy Code.  The Debtors and their professionals

marketed the Assets and conducted the marketing and sale process in substantial compliance with

the Bidding Procedures Order.

31135047.3

EE.    Upon the Closing of the transactions contemplated by the APAs, the Buyer shall be deemed to be a good-faith purchaser under section 363(m) of the Bankruptcy Code and, as such, shall be entitled to all of the protections afforded thereby, including because:  (a) the Buyer recognized that the Debtors were free to deal with any other party interested in purchasing the Assets; (b) the Buyer in no way induced or caused the chapter 11 filing by the Debtors; (c) the Buyer has not violated section 363(n) of the Bankruptcy Code by any action or inaction; (d) no common identity of directors, officers, or controlling stakeholders exists between the Buyer and any of the Debtors; (e) the Buyer agreed to subject its bid to the competitive bid procedures set forth in the Bidding Procedures Order; (f) all payments to be made by the Buyer and other agreements or arrangements entered into by the Buyer in connection with the Sales have been disclosed; and (g) as set forth in the Hastings Declaration, the Buyer has not acted in a collusive manner with any person.

### No Fraudulent Transfer or Successor Liability

FF.    The aggregate consideration from the Buyer for the Assets as set forth in the APAs: (a) as such consideration relates to the Assets, constitutes fair consideration and fair value under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, and other similar laws of the United States; and (b) as such consideration relates to the Assets, constitutes reasonably equivalent value and fair consideration (as those terms are defined in the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, and section 548 of the Bankruptcy Code, as applicable).

GG.    Neither the Debtors nor Buyer entered into or has agreed to enter into the APAs with any fraudulent or otherwise improper purpose, including, without limitation, the purpose of hindering, delaying, or defrauding any creditors of the Debtors.

31135047.3

17

HH.    The transfer of the Assets and the assumption of the Assumed Liabilities by the Buyer, except as otherwise set forth in the APAs, does not, and will not, subject the Buyer to any liability whatsoever, with respect to the operation of the Debtors' business prior to the Closing or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, in any theory of law or equity including, without limitation, any laws affecting antitrust, successor, transferee, or vicarious liability.  Pursuant to the APAs, the Buyer is not purchasing all of the Debtors' assets in that the Buyer is not purchasing any of the Excluded Assets (as defined in the APAs) or assuming the Excluded Liabilities (as defined in the APAs), and the Buyer is not holding itself out to the public as a continuation of the Debtors.  Neither the Buyer nor any of its affiliates are a mere continuation of or successor to the Debtors or their estates in any respect.  The APAs do not amount to a consolidation, merger, or *de facto* merger of the Buyer and the Debtors, and there is no continuity of enterprise between the Debtors and the Buyer.  The Buyer would not have entered into the APAs if the transfer of the Assets was not made free and clear of any successor liability whatsoever to the Buyer.  None of the transactions contemplated by the APAs, including, without limitation, the assumption and assignment of the Assumed Contracts, is being undertaken for the purpose of escaping liability for any of the Debtors' debts or hindering, delaying, or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession, or the District of Columbia.  The Debtors are not entering into the transactions contemplated by the APAs fraudulently for the purpose of statutory and common law fraudulent conveyance and fraudulent transfer claims or similar claims.

**<u>Validity of Transfer and Authorizations</u>**

II. The Assets constitute property of the Debtors' estates and title thereto is vested in the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code.  The Debtors have all right, title, and interest in the Assets required to transfer and convey such Assets to the Buyer.  Subject to entry of this Order, the Debtors have full corporate power and authority to execute and deliver the APAs, and all other documents contemplated thereby, and have all corporate authority necessary to consummate the transactions contemplated by the APAs.  No consents or approvals, other than those expressly provided for in the APAs, are required for the Debtors to consummate the transactions contemplated by the APAs.

JJ. The appointment of a consumer privacy ombudsman pursuant to section 363(b)(1) or section 332 of the Bankruptcy Code is not required with respect to the relief requested in the Motion.

**<u>No *Sub Rosa* Plan</u>**

KK. The Sales neither impermissibly restructure the rights of the Debtors' creditors nor impermissibly dictate the terms of a plan of reorganization or liquidation of the Debtors.  This Order does not dictate or direct the distribution of the cash proceeds of the Sales of the Assets.  This Order, the APAs, and the transactions contemplated therein do not constitute a *sub rosa* plan.

**<u>Best Interest of Creditors</u>**

LL. Given all of the circumstances of these chapter 11 cases and the adequacy and fair value of the consideration provided by the Buyer under the APAs, the Sales constitute a reasonable and sound exercise of the Debtors' business judgment, are in the best interests of the Debtors, their bankruptcy estates, their creditors, and all other parties in interest in these chapter 11 cases, and should be approved.

31135047.3

19

MM.    The consummation of each Sale is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m), 365(b), and 365(f), and all of the applicable requirements of such sections have been complied with in respect of each Sale.

NN.    Time is of the essence in consummating the transactions contemplated by the APAs.  Cause has been shown as to why this Order should not be subject to any stay provided by Bankruptcy Rule 6004(h).

**IT IS HEREBY ORDERED THAT:**

1.    Except as otherwise set forth herein, any and all objections (whether made formally or informally) to, reservations of rights regarding, and other responses to the Motion or the relief requested therein, the APAs, all other ancillary agreements, the Sales, the entry of this Order, or the relief granted herein, including without limitation, any objections to Cure Amounts or relating to the cure of any defaults under any of the Assumed Contracts or to assumption and assignment of any of the Assumed Contracts to the Buyer by the Debtors, that have not been withdrawn, waived, adjourned, settled, or otherwise resolved, including without limitation, any and all reservations of rights included in such objections or otherwise, are hereby overruled and denied on the merits with prejudice.  Those parties who did not timely object to the Motion or the entry of this Order in accordance with the Bidding Procedures Order, or who withdrew their objections thereto, are deemed to have consented to the relief granted herein for all purposes, including without limitation, pursuant to section 363(f)(2) of the Bankruptcy Code.

2.    Notice of the Motion, the Auction, the Sale Hearing, and the Sales was fair, appropriate, and equitable under the circumstances, and complied in all respects with the Bidding

Procedures Order, section 102(1) of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 6006, and the Local Rules.

3.     The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law.

## Approval of the APAs

4.     The APAs, including all other ancillary documents, and all of the terms and conditions thereof, and the Sales contemplated thereby, are hereby approved in all respects.

5.     Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, the Debtors, acting by and through their agents, representatives, and professionals, are authorized to perform their obligations under and comply with the terms of the APAs, pursuant to and in accordance with the terms and conditions of the APAs and this Order.

6.     The Debtors, as well as their affiliates, officers, employees, and agents, are authorized to execute and deliver, and empowered to perform under, consummate, and implement the APAs, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the APAs, and to take all further actions and execute such other documents as may be necessary or appropriate to the performance of the obligations contemplated by the APAs, including, without limitation, making any federal, state, or local regulatory filings necessary or advisable in connection with such transfer, without further order of this Court.

7.     This Order and the APAs shall be binding in all respects upon, and shall inure to the benefit of, the Debtors, the Debtors' bankruptcy estates, their affiliates, all creditors, all holders of equity interests in the Debtors, all holders of any Interests or Claims (whether known or unknown) against the Debtors, any holders of Interests or Claims against or on all or any portion

of the Assets, all counterparties to any executory contract or unexpired lease of the Debtors, Buyer and all agents, representatives, affiliates, and permitted successors and assigns of the Buyer, and any trustees, examiners, or other fiduciary under any section of the Bankruptcy Code, if any, subsequently appointed in these chapter 11 cases or upon a conversion of these chapter 11 cases to chapter 7 under the Bankruptcy Code or other plan fiduciaries, plan administrators, liquidating trustees, or other estate representatives appointed or elected in the Debtors' cases. The terms and provisions of the APAs and this Order will inure to the benefit of the Debtors, their bankruptcy estates, and their creditors, the Buyer and all agents, representatives, affiliates, and permitted successors and assigns of the Buyer, and any other affected third parties, including all persons asserting any Interests or Claims in the Assets to be sold to the Buyer pursuant to the APAs, notwithstanding any subsequent appointment of any trustee(s), party, entity, or other fiduciary under any section of any chapter of the Bankruptcy Code, as to which trustee(s), party, entity, or other fiduciary such terms and provisions likewise will be binding.

8.      The releases set forth in Section 12.16 of the APAs are hereby incorporated herein by reference and are approved in all respects. Effective as of the Closing Date, such releases shall be valid, binding, and enforceable.

## Sale and Transfer of Assets

9.      Pursuant to sections 105(a), 363(b), 363(f), 365(b), and 365(f) of the Bankruptcy Code, upon the Closing and pursuant to and except as otherwise set forth in the APAs, the Assets will be transferred to the Buyer free and clear of all Interests or Claims (other than Assumed Liabilities and Permitted Encumbrances) that accrued, arose, or existed prior to the Closing, including, without limitation, the Prepetition Liens and Adequate Protection Liens (each, as defined in the final order approving the use of the Debtors' cash collateral [Docket No. 422] (the

"Cash Collateral Order")), of any person, including, without limitation, all such Interests or Claims specifically enumerated in this Order, whether arising by agreement, by statute, or otherwise and whether occurring or arising before, on, or after the Petition Date, whether known or unknown, occurring, or arising prior to such transfer, with all such Interests or Claims to attach to the cash proceeds of the Sales subject to the terms and conditions set forth in the Cash Collateral Order, in the order of their relative priority and with the same validity, force, and effect the holder of such Interest or Claim had against the Assets prior to the Closing (including, for the avoidance of doubt, as set forth in the Cash Collateral Order), subject to any claims and defenses that the Debtors and their bankruptcy estates may possess with respect thereto. For the avoidance of doubt, nothing in this Order establishes any rights or interests in the Assets (other than the Debtors' rights and interests in such Assets and the Buyer's rights and interests in the Assets from and after the Closing), and nothing herein shall be construed to govern or affect the distributions of the cash proceeds from the Sales of the Assets; *provided*, *however*, that such proceeds shall be utilized as provided in the Cash Collateral Order and the Prepetition First Lien Documents and Prepetition Second Lien Documents (each as defined in the Cash Collateral Order).

10.     On the Closing Date, this Order will be construed and will constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of all of the Assets or a bill of sale transferring good and marketable title in such Assets to the Buyer free and clear of all Claims and Interests pursuant to the terms and conditions set forth in this Order and the APAs. For the avoidance of doubt, the Excluded Assets set forth in the APAs are not included in the Assets and the Buyer will not take title to such Excluded Assets.

11.     Subject to the terms and conditions of this Order, the transfer of Assets to the Buyer pursuant to the APAs and the consummation of the Sales and any related actions contemplated

31135047.3

thereby do not require any consents other than as specifically provided for in this Order and the APAs, constitute a legal, valid, and effective transfer of the Assets, and will vest the Buyer with all of the Debtors' right, title, and interest in and to the Assets as set forth in this Order and the APAs, as applicable, free and clear of all Interests or Claims of any kind or nature whatsoever (except as otherwise assumed in the APAs, including Permitted Encumbrances).

12.     Except to the extent included in the Assumed Liabilities, Cure Amounts, or Permitted Encumbrances or to enforce the APAs, upon the Closing, all Entities or Persons are permanently and forever prohibited, barred, estopped, and enjoined from asserting against the Buyer, and its permitted successors, designees, and assigns, or property, or the Assets conveyed in accordance with the APAs, any Interest or Claim of any kind or nature whatsoever arising prior to Closing, including, without limitation, under any theory of successor or transferee liability, *de facto* merger, or continuity liability, whether known or unknown as of the Closing, now existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated, or unliquidated.

13.     Nothing in this Order or the APAs releases, nullifies, precludes, or enjoins the enforcement of any police or regulatory liability to a governmental unit that any entity would be subject to as the post-sale owner or operator of property after the date of entry of this Order.

14.     To the extent provided by section 525 of the Bankruptcy Code, no governmental unit as defined in 11 U.S.C. § 101(27) may deny, revoke, suspend, or refuse to renew any permit, license, or similar grant relating to the operation of the Assets sold, transferred, or conveyed to the Buyer on account of the filing or pendency of these chapter 11 cases or the consummation of the transactions contemplated by the APAs and this Order.

31135047.3

**Good Faith of the Buyer**

15.     Upon the Closing of the transactions contemplated by the APAs, the Buyer shall be deemed to be a good-faith purchaser under section 363(m) of the Bankruptcy Code and, as such, shall be entitled to all of the protections afforded thereby, including because: (a) the Buyer recognized that the Debtors were free to deal with any other party interested in purchasing the Assets; (b) the Buyer in no way induced or caused the chapter 11 filing by the Debtors; (c) the Buyer has not violated section 363(n) of the Bankruptcy Code by any action or inaction; (d) no common identity of directors, officers, or controlling stakeholders exists between the Buyer and any of the Debtors; (e) the Buyer agreed to subject its bid to the competitive bid procedures set forth in the Bidding Procedures Order; (f) all payments to be made by the Buyer and other agreements or arrangements entered into by the Buyer in connection with the Sales have been disclosed; and (g) as set forth in the Hastings Declaration, the Buyer has not acted in a collusive manner with any person. The reversal or modification on appeal of the authorization provided herein to consummate the Sales shall accordingly not affect the validity of the Sales (including the assumption and assignment of the Assumed Contracts), unless such authorization and consummation of the Sales are duly and properly stayed pending such appeal.

16.     As set forth in the Kimm Declaration and the Hastings Declaration, none of the Debtors, the Buyer, nor any affiliate of either the Debtors or Buyer have engaged in any collusion with other bidders or other parties or have taken any other action or inaction that would cause or permit the Sales to be avoided or costs or damages to be imposed under section 363(n) of the Bankruptcy Code or otherwise. The consideration provided by the Buyer for the Assets under the APAs is fair and reasonable and is not less than the value of such Assets, and the Sales may not be avoided under section 363(n) of the Bankruptcy Code.

31135047.3

17.     The Buyer is not an "insider" of any of the Debtors as that term is defined in section 101(31) of the Bankruptcy Code.

### Assumption and Assignment of the Contracts

18.     Pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, and subject to and conditioned upon the occurrence of the Closing Date (or, with respect to each Delayed Contract, the applicable Delayed Contract Assignment Date), the Debtors' assumption and assignment to the Buyer, and the Buyer's assumption, on the terms set forth in this Order and the APAs, of the Assumed Contracts, is hereby approved in its entirety, and the requirements of section 365 of the Bankruptcy Code with respect thereto are hereby deemed satisfied.

19.     The Debtors are hereby authorized, in accordance with sections 105(a), 363, and 365 of the Bankruptcy Code, to assume and assign to the Buyer, effective upon the Closing Date (or, with respect to each Delayed Contract, the applicable Delayed Contract Assignment Date), the Assumed Contracts free and clear of all Interests or Claims of any kind or nature whatsoever (except as otherwise assumed in the APAs, including Permitted Encumbrances) and execute and deliver to the Buyer such documents or other instruments as may be necessary to assign and transfer the Assumed Contracts to the Buyer.

20.     Upon the Closing (or, with respect to each Delayed Contract, the applicable Delayed Contract Assignment Date), in accordance with sections 363 and 365 of the Bankruptcy Code, the Buyer will be fully and irrevocably vested in all right, title, and interest of each Assumed Contract.

21.     Upon the Closing (or, with respect to each Delayed Contract, the applicable Delayed Contract Assignment Date), the Assumed Contracts will be transferred and assigned to, and remain in full force and effect for the benefit of, the Buyer in accordance with their respective

terms pursuant to the APAs, notwithstanding any provision in any such Assumed Contract (including those of the type described in sections 365(b)(2), (e)(1), and (f) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer.

22.    Pursuant to sections 365(b)(1)(A) and (B) of the Bankruptcy Code, upon the Closing (or, with respect to each Delayed Contract, the applicable Delayed Contract Assignment Date), the Buyer will pay to the respective counterparty the Cure Amounts relating to any Assumed Contract.

23.    The payment of the applicable Cure Amounts (if any), or any other cure amount reached by agreement by a Non-Debtor Counterparty after any Cure/Assignment Objection, will effect a cure of all defaults and all other obligations or liabilities under any Assumed Contract existing, occurring, arising, or accruing prior to the date that such executory contracts or unexpired leases are assumed and compensate for any actual pecuniary loss to such Non-Debtor Counterparty resulting from such default.

24.    Upon the Closing (or, with respect to each Delayed Contract, the applicable Delayed Contract Assignment Date), the Buyer will assume the Assumed Contracts, and, pursuant to section 365(f) of the Bankruptcy Code, the assignment by the Debtors of such Assumed Contracts will not be a default thereunder.  After the payment of the relevant Cure Amounts in accordance with the APAs, neither the Debtors and their estates nor the Buyer will have any further liabilities to the Non-Debtor Counterparties to the Assumed Contracts with respect to such Assumed Contracts, other than Buyer's obligations under the Assumed Contracts that accrue or become due and payable on or after the date that such Assumed Contracts are assumed and assigned to Buyer (except for certain obligations as set forth in the APAs).

31135047.3

25.     Except as (i) otherwise agreed in writing between the Debtors and the Non-Debtor Counterparties to the Assumed Contracts, (ii) timely objected to by a Non-Debtor Counterparty, which objection has not been (a) resolved by agreement of the Debtors and the Non-Debtor Counterparty or (b) determined by Court order, (iii) stated on the record of the Sale Hearing, (iv) set forth in this Order, (v) determined by Court order, or (vi) set forth on Appendix A to any subsequent Cure Notices (collectively, the "Subsequent Cure Notices"), the Cure Amounts for the Assumed Contracts are hereby fixed at the amounts set forth on Appendix C to the Third Amended Cure Notice [Docket No. 643] and the Non-Debtor Counterparties to such Assumed Contracts are forever bound by such Cure Amounts and, upon payment of such Cure Amounts, are hereby enjoined from taking any action against the Debtors and their bankruptcy estates, the Buyer and all agents, representatives, affiliates, and permitted successors and assigns of the Buyer, or the Assets with respect to any claim for cure under any Assumed Contract; *provided, however*, that unless a Non-Debtor Counterparty timely files a Cure/Assignment Objection by the Cure/Assignment Objection Deadline applicable to the Assumed Contracts that are listed on any Subsequent Cure Notices, this paragraph 25 shall also apply to such Non-Debtor Counterparties with respect to the Cure Amounts for the Assumed Contracts set forth on Appendix A to any Subsequent Cure Notices.

26.     Notwithstanding anything herein to the contrary, each Assumed Contract set forth on **Exhibit D** of this Order (each, a "Delayed Contract" and each Non-Debtor Counterparty to such Delayed Contracts, a "Non-Consenting Counterparty") is subject to a Cure/Assignment Objection that, to the extent it objects to whether the Debtors and Buyer have provided adequate assurance of the Buyer's future performance of such Delayed Contract, remains outstanding and is not resolved by this Order (each such outstanding objection, an "Outstanding Cure/Assignment

31135047.3

28

Objection"). Notwithstanding anything herein or in the APAs to the contrary, each Delayed Contract shall not be assumed and assigned by the Debtors pursuant to the Order until the date (the "Delayed Contract Assignment Date") that is the later of (a) the Closing Date and (b) the earlier of (i) the date on which the applicable Non-Consenting Counterparty consents to the Debtors' assumption and assignment to the Buyer of such Delayed Contract and (ii) such other date approved by further order of this Court; *provided* that the Debtors shall have no obligation to assume and assign to the Buyer any Delayed Contract to the extent the Delayed Contract Assignment Date has not occurred by February 16, 2024 (the "Delayed Contract Outside Date"). To the extent any of the Non-Consenting Counterparty's Outstanding Cure/Assignment Objections are not resolved consensually, the Debtors may schedule a hearing on shortened notice for this Court to adjudicate such Outstanding Cure/Assignment Objections and the Debtors' request for approval to assume and assign the related Delayed Contracts to the Buyer.

27.    Nothing herein or in the APAs shall prohibit or otherwise prejudice the Debtors from seeking to reject any Delayed Contract, whether prior to, on, or after the Delayed Contract Outside Date, if such Delayed Contract has not been assumed and assigned to the Buyer and the Debtors, in consultation with the Committee, determine that rejecting the Delayed Contract is in the best interests of the Debtors' estates; *provided* that the Debtors shall use reasonable efforts to provide the Buyer with five (5) days' notice prior to seeking to reject any Delayed Contract.

28.    The Buyer shall promptly pay (or reimburse the Debtors if paid by the Debtors) any administrative expense priority claims arising under any Delayed Contract during the period commencing on the Closing Date and ending on the date that is the earlier of (a) the applicable Delayed Contract Assignment Date, (b) the Delayed Contract Outside Date, and (c) the date on which the Debtors reject such Delayed Contract.

29.    Nothing in this Order, the APAs, or any document, agreement, or instrument contemplated by any of the foregoing shall:  (i) be construed to authorize or permit (a) the assumption and/or assignment of any surety bond issued by (x) Philadelphia Indemnity Insurance Company, (y) Atlantic Specialty Insurance Company, or (z) Lexon Insurance Company (collectively, the "Sureties" and, each individually, a "Surety") on behalf of the Debtors (collectively, the "Surety Bonds" and, each individually, a "Surety Bond"), (b) the assumption and/or assignment of any indemnity agreements executed by one or more of the Debtors pursuant to which the Surety Bonds were issued (the "Indemnity Agreements" and, each individually, an "Indemnity Agreement"), or (c) obligate a Surety to replace any Surety Bond and/or issue any new surety bond on behalf of a Buyer; or (ii) be deemed to provide a Surety's consent to the involuntary substitution of any principal under any Surety Bond and/or any Indemnity Agreement, including, for the avoidance of doubt, that the Buyer shall not be a substitute principal under any Surety Bond or any Indemnity Agreement absent a Surety's consent thereto or further order of the Court.   The Debtors and the Buyer reserve the right to add as an Assumed Contract any Indemnity Agreement, Surety Bond, or similar instrument (collectively, the "Surety Agreements"), and the inclusion of any of the Surety Agreements as an Assumed Contract shall not prejudice (I) the rights of the Sureties to object or respond to such proposed assumption and/or assignment of any Surety Agreement issued by the Surety, including, without limitation, the right to object to an involuntary substitution of principal under any Surety Bond or (II) the rights of the Debtors or any other party-in-interest's right to challenge any of the foregoing actions (or lack thereof).

30.    Additionally, nothing in this Order, the APAs, or any other document, agreement, or instrument contemplated by any of the foregoing shall be deemed to alter, limit, modify, release, waive, or prejudice any rights, remedies, and/or defenses that the Sureties have or may have under

applicable bankruptcy and non-bankruptcy laws, under any of their respective Surety Agreements, or related agreements, or any letters of credit, or other Surety collateral relating thereto.

31.     The Debtors shall not sell, transfer or assign any (i) letters of credit (the "Pre-Petition Letters of Credit") issued or supported by Bank of America, N.A. ("Bank of America"), or (ii) any cash collateral or back-up letters of credit that collateralize or backstop the Pre-Petition Letters of Credit, without Bank of America's express written consent.

32.     Notwithstanding anything to the contrary in this Order or the APAs, no contract between the Debtors and Oracle America, Inc. ("Oracle") will be assumed and/or assigned without (i) Oracle's prior written consent; (ii) the cure of any defaults under such contract; (iii) the provision to Oracle of satisfactory adequate assurance of future performance by the assignee; and (iv) execution by the Debtors or its successor and the assignee of mutually agreeable assignment documentation in a final form to be negotiated after entry of this Order.  In addition, no provision of this Order or any Transition Services Agreement (as defined in the APAs) shall authorize: (x) the transfer of any Oracle license agreement to any third party; or (y) use of any Oracle license agreement that is inconsistent with the relevant license grant including, but not limited to, exceeding the number of authorized users, shared use, or license splitting, absent Oracle's express prior written consent.

33.     Notwithstanding any other terms or provisions of this Order or the APAs, the Buyer agrees that, (i) promptly upon the Closing, Buyer will remediate all defaults under that certain Lease Agreement with Smith Development Company, Inc. ("Smith"), dated as of March 3, 2018 (the "Lease Agreement"), including, but not limited to, Buyer's maintenance and repair obligations pursuant to section 9(b) of the Lease Agreement (and will agree that the roof and gutter repairs will be completed by November 1, 2024)  and (ii) in satisfaction of its obligation to provide

31135047.3

adequate assurance of future performance, Buyer will deposit with Smith the sum of $630,000 (the "Deposit"), of which Smith will apply the April, May, and June 2024 monthly lease payments of $105,890 per month from this Deposit to satisfy Buyer's payment obligations under the Lease Agreement, with the remaining amounts of the Deposit to be retained by Smith as security for Buyer's obligations under the Lease Agreement and to be returned to the Buyer upon the termination of the Lease Agreement if Buyer is not in default under the Lease Agreement.

34.     Notwithstanding any provision in the Sale Motion, the APAs, this Order, and any implementing sale documents (collectively, the "Sale Documents"), solely with respect to the United States government and State governments, nothing in the Sale Documents shall: (1) authorize the assumption, sale, assignment, or other transfer to the Buyer of any federal (i) grants, (ii) grant funds, (iii) contracts, (iv) property, including but not limited to, intellectual property and patents, (v) leases, (vi) agreements, (vii) certifications, and (viii) applications or other interests of the federal government (collectively, "Federal Interests") without compliance by the Debtors and the Purchaser with all terms of the Federal Interests and with all applicable non-bankruptcy law; (2) be interpreted to set cure amounts or to require the government to novate, approve or otherwise consent to the assumption, sale, assignment or other transfer of any Federal Interests; (3) waive, alter, or otherwise limit the United States' property rights, including but not limited to, inventory, inventions, records, patents, intellectual property, licenses, and data; (4) affect the setoff or recoupment rights or defenses of a governmental unit (as defined in 11 U.S.C. § 101(27)); (5) authorize the assumption, transfer, sale or assignment of any assets subject to the jurisdiction of federal non-bankruptcy recall laws without the assumption by the Buyer of all recall obligations required, but not yet performed by the Debtors at the time of such assumption, transfer, sale or assignment, including recall obligations that arise after the assumption, transfer,

sale or assignment of such assets; (6) authorize the assumption, transfer, sale or assignment of any governmental unit's (a) license, (b) permit, (c) registration, (d) authorization, or (e) approval, or the discontinuation of any obligation thereunder, without compliance with any legal requirements, obligations, and approvals under non-bankruptcy law, that are applicable to such assumption, transfer, sale, assignment, or discontinuation; (7) release, nullify, preclude, or enjoin the enforcement of any police or regulatory liability to a governmental unit that any entity would be subject to as the manufacturer, or the post-sale owner, or operator of property; (8) confer exclusive jurisdiction to the Court except to the extent set forth in 28 U.S.C. § 1334 (as limited by any other provisions of the United States Code); (9) divest any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Order or to adjudicate any defense asserted under this Order, subject to the Debtors' and the Buyer's rights to assert before such tribunal or before this Court that any such laws are not in fact police or regulatory laws or that the matter should be heard by this Court; or (10) expand the scope of 11 U.S.C. § 525.  For the avoidance of doubt and without limiting the foregoing, notwithstanding any provision in the Sale Documents, nothing in the Sale Documents shall affect, alter, or modify any federal statutes (including, but not limited to, Title 49 of the United States Code), regulations, rules, guidelines, standards, policies, and procedures of the Department of Transportation, including but not limited to, the National Highway Traffic Safety Administration.

35.     Nothing in this Order or the APAs shall affect the obligations of Buyer based upon its own conduct as a manufacturer under the National Traffic and Motor Vehicle Safety Act.

36.     Buyer may satisfy the cure claim of Regional Transportation Commission of Washoe County ("RTC of Washoe County") by complying with the terms and provisions of that certain *Electric Vehicle Purchase Agreement* between RTC of Washoe County and Proterra

31135047.3

33

Operating Company, Inc., dated April 27, 2023 (the "VPA"), including honoring the Early Adopter Incentive Offer (as defined in section 301(a) of the VPA) in accordance with the terms of section 301 of the VPA.

37.     Notwithstanding any other provisions of this Order, (i) all warranty claims of the Customers[5] and all other rights to demand performance, whenever arising (the "Customer Claims"), under the contracts between the Customers and the Debtors (the "Customer Contracts") that are assumed by the Debtors and assigned to the Buyer, are not waived, released, or discharged against the Buyer, and the Customers retain their rights to assert the Customer Claims under any assumed Customer Contracts against the Buyer, from and after the effective date of assumption of the Customer Contracts in accordance with section 365 of the Bankruptcy Code and (ii) this Order does not authorize the Debtors to assume and not assign any contracts.

38.     Nothing in the preceding paragraph 37 of this Order is intended to waive, release, discharge, or otherwise impact the Non-Debtor Counterparties' right to assert rejection damages against the Debtors to the extent a Non-Debtor Counterparty Contract is rejected by the Debtors under section 365 of the Bankruptcy Code, including pursuant to any chapter 11 plan.

39.     Notwithstanding anything to the contrary in the APAs, this Order, or any cure notices filed by the Debtors, the rights of (i) Florida Power & Light Company, (ii) the Orlando Utilities Commission, (iii) Meritor, Inc. and its subsidiaries, (iv) Tompkins Consolidated Area Transit, Inc. ("TCAT"), (v) Southeastern Pennsylvania Transportation Authority; (vi) Cigna Health and Life Insurance Company; and (vii) Valeo Thermal Commercial Vehicles North America, Inc. (collectively, the "Objectors") to object to the assumption and assignment to the

---

[5]     The "Customers" means:  (i) the City of Detroit, Michigan; (ii) Capital Metropolitan Transportation Authority ("CapMetro"); (iii) Broward County; (iv) Central Florida Regional Transportation Authority (a/k/a Lynx); (v) City of Tallahassee; (vi) Ontario International Airport Authority; and (vi) Tompkins Consolidated Area Transit, Inc.

Buyer of (a) any contract between the Debtors and the Objectors (other than TCAT) and (b) that certain *Engineer, Procure, Construct (EPC) Agreement* between the Debtors and TCAT (collectively, the "Reserved Contracts"), are preserved, and the Debtors shall not assume or assign to the Buyer any of the Reserved Contracts, absent either (1) the consent of the applicable Objector or (2) further order of this Court; *provided* that the Objectors shall have at least (14) fourteen days' notice of any hearing at which the Debtors may seek to assume and assign any of the Reserved Contracts.

40.     Notwithstanding anything in this Order, from and after the Closing, (i) CapMetro shall retain its rights, if any, to assert claims against the Buyer under the CapMetro Customer Contracts for delays in delivering chargers to CapMetro (the "Liquidated Damages Claims") and (ii) the Buyer shall retain all defenses and counterclaims to the Liquidated Damages Claims.

41.     Any provisions in any Assumed Contracts that prohibit or condition the assignment of such Assumed Contract or allow the party to such Assumed Contract to terminate, recapture, impose any penalty, condition on renewal or extension, or modify any term or condition upon the assignment of such Assumed Contract constitute unenforceable anti-assignment provisions that are void, and of no force and effect.  All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment to the Buyer of the Assumed Contracts have been satisfied.

42.     To the extent a Non-Debtor Counterparty to an Assumed Contract failed to timely object to a Cure Amount in accordance with the Bidding Procedures Order, such Cure Amount shall be deemed to be finally determined and any such Non-Debtor Counterparty shall be prohibited from challenging, objecting to, or denying the validity and finality of the Cure Amount

31135047.3

at any time, and such Cure Amount, when paid, shall be deemed to resolve any defaults, amounts due or overdue, or other breaches with respect to any Assumed Contract to which it relates.

43.     Any party having the right to consent to the assumption or assignment of any Assumed Contract that failed to object to such assumption or assignment is deemed to have waived any objections and consented to such assumption and assignment as required by section 365(c) of the Bankruptcy Code.

44.     Upon the Closing (or, with respect to each Delayed Contract, the applicable Delayed Contract Assignment Date), the Buyer will be deemed to be substituted for the Debtors as a party to the applicable Assumed Contracts and the Debtors and their estates will be relieved, pursuant to section 365(k) of the Bankruptcy Code, from any further liability under the Assumed Contracts.

45.     There shall be no assignment fees, increases, rent-acceleration, or any other fees charged to the Buyer or the Debtors and their bankruptcy estates as a result of the assumption and assignment of the Assumed Contracts.

46.     Pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, all counterparties to the Assumed Contracts are forever barred and permanently enjoined from raising or asserting against the Debtors and their estates or the Buyer any assignment fee, default, breach, claim, pecuniary loss, or condition to assignment, arising under or related to the Assumed Contracts, existing as of the date that such Assumed Contracts are assumed or arising by reason of or in connection with the Closing.

47.     Nothing in this Order or the APAs shall relieve the Buyer of any generally applicable contractor requirements to do business with any governmental unit (as defined in Bankruptcy Code section 101(27)); *provided* that Buyer may comply with such requirements on

31135047.3

or after the Closing (or, with respect to each Delayed Contract, the applicable Delayed Contract Assignment Date).

48.    Except as otherwise set forth in the APAs or herein, including the Assumed Liabilities and Cure Amounts that will be paid as provided in the APAs, neither the Buyer, nor any of its successors or assigns, or any of their respective affiliates shall have any liability for any Claim or Interest that arose or occurred prior to the Closing, or otherwise is assertable against the Debtors or is related to the Assets prior to the Closing.  The Buyer is not and shall not be deemed a "successor" to the Debtors or their estates, have, *de facto* or otherwise, merged with or into the Debtors, or be a mere continuation or substantial continuation of the Debtors or the enterprise of the Debtors under any theory of law or equity as a result of any action taken in connection with the APAs or any of the transactions or documents ancillary thereto or contemplated thereby or in connection with the acquisition of the Assets.

## Additional Provisions

49.    In connection with the Closing, a certified copy of this Order evidencing the release, cancelation, and termination provided herein of any Interest or Claims of record on the Assets may be filed or recorded with the appropriate filing agents, filing officers, administrative agencies or units, governmental departments, secretaries of state, federal, state, and local officials, and all other persons, institutions, agencies, and entities which may require such filings by operation of law, the duties of their office, or contract.

50.    Upon consummation of the Sales, if any Person or Entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens*, or other documents or agreements evidencing Interests or Claims against or in the Assets shall not have delivered to the Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties, termination

31135047.3

statements, instruments of satisfaction, releases of all Interests or Claims that the person or entity

has with respect to the Assets (unless otherwise assumed in the APAs, including Permitted

Encumbrances), or otherwise, then: (i) the Debtors are hereby authorized to execute and file such

statements, instruments, releases, and other documents on behalf of the person or entity with

respect to the Assets; and (ii) the Buyer is hereby authorized to file, register, or otherwise record a

certified copy of this Order, which, once filed, registered or otherwise recorded, will constitute

conclusive evidence of the release of all Interests or Claims in the Assets of any kind or nature

(except as otherwise assumed in the APAs, including Permitted Encumbrances); *provided that*,

notwithstanding anything in this Order or the APAs to the contrary, the provisions of this Order

will be self-executing, and neither the Debtor nor Buyer will be required to execute or file releases,

termination statements, assignments, consents, or other instruments in order to effectuate,

consummate, and implement the provisions of this Order.  For the avoidance of doubt, upon

consummation of each of the respective Sales, the Buyer is authorized to file the applicable

termination statements, lien terminations, or other amendments in any required jurisdiction to

remove and record, notice filings or financing statements recorded to attach, perfect, or otherwise

notice any lien or encumbrance that is extinguished or otherwise released pursuant to this Order

under section 363 of the Bankruptcy Code and the related provisions of the Bankruptcy Code.

Each and every federal, state, and local governmental agency or department is hereby authorized

to accept any and all documents and instruments necessary and appropriate to consummate the

transactions contemplated by the APAs, including, without limitation, recordation of this Order.

This Order shall be binding upon and shall govern the acts of all persons including without

limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages,

recorders of deeds, registrars of deeds, administrative agencies, governmental departments,

secretaries of state, federal, state, and local officials, and all other persons who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of such assets or other property interests.

51.     All entities that are currently, or on the Closing may be, in possession of some or all of the Assets are hereby directed to surrender possession of the Assets to the Buyer on the Closing (or, with respect to each Delayed Contract, the applicable Delayed Contract Assignment Date), unless the Buyer otherwise agrees.

52.     This Order shall be effective as a determination that, upon the Closing, all liabilities of any kind or nature whatsoever existing as to the Assets prior to the Closing (other than the Assumed Liabilities) have been unconditionally released, discharged, and terminated and that the conveyances described herein have been effected as set forth in this Order.

53.     At the Closing, the Buyer shall pay the Debtors in accordance with Section 3.1 of the APAs and the Earnest Deposit shall be credited and applied to the respective Purchase Price (as defined in the APA).

54.     Without further order of the Court, the Escrow Agent is hereby authorized, in accordance with, and as permitted under, the APAs, to release the Earnest Deposit to the Debtors, including:  (a) if the respective APA is terminated in accordance with the terms of such APA, including if the Closing has not occurred by the Outside Closing Date (as defined in the APAs); and (b) upon the Closing.

55.     Except as otherwise provided in this Order and the APAs, all rights of the respective Debtors' estates and its stakeholders with respect to the allocation of consideration received from the Buyer in connection with the Sales are expressly reserved for later determination by this Court

and, to the extent consideration is received by any Debtor that is determined to be allocable to another Debtor, such other Debtor shall have a claim against the recipient Debtor with the status of an expense of administration in the case of the recipient Debtor under Bankruptcy Code section 503(b).  Nothing in this Order or the APAs shall constitute a finding of fact or a conclusion of law in relation to the allocation of the sale proceeds as consideration for each of the Assets.

56.      The APAs and any related agreements, documents, or other instruments may be modified, amended, or supplemented through a written document signed by the parties thereto in accordance with the terms thereof and this Order and in consultation with the Consultation Parties without further order of this Court.  The Debtors are authorized to perform each of their covenants and undertakings as provided in the APAs prior to or after the Closing without further order of this Court.

57.      The APAs shall be of full force and effect, regardless of any Debtors' lack of good standing in any jurisdiction in which such Debtor is formed or authorized to transact business.

58.      To the extent applicable, the automatic stay pursuant to section 362 of the Bankruptcy Code is hereby lifted with respect to the Debtors to the extent necessary, without further order of the Court (a) to allow the Buyer to give the Debtors any notice provided for in the APAs, and (b) to allow the Buyer to take any and all actions permitted by the APAs.

59.      No bulk sales law or any similar law of any state or other jurisdiction shall apply to the Debtors' conveyance of the Assets.

60.      The Debtors and the Buyer will use commercially reasonable efforts to enter into a Transition Services Agreement, which shall be reasonably acceptable to the Committee in form and substance, to the extent necessary to assist in the transition of the Proterra Transit business unit to the Buyer, *provided*, that the Debtors may require such Transition Services Agreement to

provide (i) for payment in advance from the Buyer to the Debtor and (ii) that the Transition Services Agreement terminates upon the Debtors' entry into a transition services agreement with Volvo Battery Solutions LLC.  Pursuant to this Order, access to the Acquired Business Books and Records (as defined in the APAs) shall be made reasonably available post-Closing by the Buyer to the Debtors, the Committee, and any subsequently appointed plan administrator or trustee at reasonable times upon reasonable notice.

61.     Nothing in this Order shall be deemed to waive, release, extinguish, or estop the Debtors or their estates from asserting or otherwise impair or diminish any right (including any right of recoupment), claim, cause of action, defense, offset, or counterclaim in respect of any asset that is not an Asset.

62.     The failure specifically to include or make reference to any particular provisions of the APAs in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that each APA and each document, agreement, or instrument contemplated thereby is authorized and approved in its entirety.

63.     Absent a subsequent order of this Court to the contrary, this Order shall be binding in all respects upon any trustees, examiners, "responsible persons" or other fiduciaries appointed in these chapter 11 cases or upon a conversion to chapter 7 under the Bankruptcy Code.

64.     Notwithstanding any provision in the Bankruptcy Rules to the contrary, this Order shall be effective immediately and enforceable upon its entry.

65.     In the event of any conflict between this Order and the APAs, this Order shall control in all respects.

66.     The requirements set forth in Local Rules 6004-1, 9006-1, and 9013-1 are hereby satisfied or waived.

31135047.3

67.    This Court shall retain exclusive jurisdiction to interpret, implement and enforce the terms and provisions of this Order, the Bidding Procedures Order, and the APAs, including all amendments thereto and any waivers and consents thereunder and each of the other agreements executed in connection therewith, and decide any issues or disputes concerning this Order and the APAs or the rights and duties of the parties hereunder or thereunder, including the interpretation of the terms, conditions, and provisions hereof and thereof, the status, nature and extent of the Assets.

31135047.3

## **Exhibit A**

Transit APA

EXECUTION VERSION

ASSET PURCHASE AGREEMENT

by and among

PROTERRA INC.,

PROTERRA OPERATING COMPANY, INC.

("**Sellers**")

and

PHOENIX MOTOR, INC.

("**Purchaser**")

DATED AS OF:

November 13, 2023

## TABLE OF CONTENTS

Page

ARTICLE I Definitions ..................................................................................................1

    Section 1.1    Certain Definitions ............................................................1

    Section 1.2    Construction of Certain Terms and Phrases ......................18

ARTICLE II Purchase and Sale and Assumption........................................................19

    Section 2.1    Purchase and Sale of Acquired Assets .............................19

    Section 2.2    Excluded Assets ...............................................................19

    Section 2.3    Assumed Liabilities..........................................................20

    Section 2.4    Excluded Liabilities..........................................................20

    Section 2.5    Assignment and Cure Amounts.........................................20

    Section 2.6    Bulk Sales Laws ...............................................................20

ARTICLE III Purchase Price.......................................................................................21

    Section 3.1    Purchase Price; Earnest Deposit.......................................21

    Section 3.2    Withholding of Tax ..........................................................21

    Section 3.3    Allocation of Consideration .............................................22

ARTICLE IV Closing Matters......................................................................................22

    Section 4.1    Closing..............................................................................22

    Section 4.2    Deliveries at Closing ........................................................23

    Section 4.3    Further Assurances and Cooperation ...............................24

ARTICLE V Representations and Warranties.............................................................25

    Section 5.1    Representations and Warranties of Seller .........................25

    Section 5.2    Representations and Warranties of Purchaser ..................36

ARTICLE VI Regulatory Matters ...............................................................................39

    Section 6.1    Regulatory Filings ............................................................39

    Section 6.2    Cooperation: Confidentiality ............................................40

    Section 6.3    Objections or Other Challenges .......................................40

ARTICLE VII Certain Covenants ...............................................................................41

    Section 7.1    Conduct of Business Pending Closing .............................41

    Section 7.2    Efforts to Satisfy Closing Conditions...............................42

    Section 7.3    Assets Incapable of Transfer ...........................................42

    Section 7.4    Discovery of Breach ........................................................43

    Section 7.5    Ability to Supplement Disclosure Schedules ...................43

Section 7.6     Restricted Use of Confidential Information ................................................43
Section 7.7     Review and Inspections ...............................................................................44
Section 7.8     No Use of Sellers Brand ..............................................................................44
Section 7.9     Background License .....................................................................................44
Section 7.10    Support Obligations .....................................................................................46
Section 7.11    Transition Services Agreement ...................................................................46
ARTICLE VIII Employee Matters .............................................................................................46
Section 8.1     Transferred Employees ................................................................................46
Section 8.2     Benefits Matters ...........................................................................................46
Section 8.3     Labor Matters ...............................................................................................47
Section 8.4     Benefits Eligibility ......................................................................................47
Section 8.5     WARN Act ...................................................................................................47
ARTICLE IX Conditions to Closing ..........................................................................................48
Section 9.1     Conditions to the Obligations of Purchaser .................................................48
Section 9.2     Conditions to the Obligations of Sellers .....................................................48
Section 9.3     Conditions Precedent to Obligations of Purchaser and Sellers ...................49
Section 9.4     Frustration of Closing Conditions ...............................................................50
ARTICLE X Termination ............................................................................................................50
Section 10.1    Termination ..................................................................................................50
Section 10.2    Effect of Termination ..................................................................................51
ARTICLE XI Bankruptcy Matters .............................................................................................52
Section 11.1    Bankruptcy Cases ........................................................................................52
Section 11.2    Bankruptcy Court Approvals .......................................................................52
Section 11.3    Further Filings and Assurances ....................................................................53
Section 11.4    Notice of Sale ..............................................................................................53
Section 11.5    Free and Clear ..............................................................................................53
Section 11.6    Transfer Tax Exemption ..............................................................................53
ARTICLE XII Miscellaneous .....................................................................................................53
Section 12.1    Survival ........................................................................................................53
Section 12.2    Governing Law and Jurisdiction ..................................................................54
Section 12.3    Notices .........................................................................................................54
Section 12.4    Amendments and Waivers ...........................................................................55
Section 12.5    Entire Agreement .........................................................................................56
Section 12.6    Headings: Interpretation ..............................................................................56

Section 12.7    No Assignment: Binding Effect ..........................................................56

Section 12.8    Counterparts ..........................................................................................56

Section 12.9    Incorporation by Reference ...................................................................56

Section 12.10   Time of the Essence ...............................................................................56

Section 12.11   Specific Performance .............................................................................57

Section 12.12   No Third Party Beneficiaries..................................................................57

Section 12.13   Expenses .................................................................................................57

Section 12.14   Severability.............................................................................................58

Section 12.15   Public Announcements............................................................................58

Section 12.16   No Liability; Release...............................................................................58

## EXHIBITS

Exhibit A          Assumption Agreement

Exhibit B          General Assignment

Exhibit C          Intellectual Property Assignment Agreement

## SCHEDULES

Schedule 1-A       Excluded Claims

Schedule 1-B       Transferred Permits

Schedule 1-C       Transferred Intellectual Property

Schedule 1-E       Tangible Personal Property

Schedule 1-F       Transferred Real Property

Schedule 1-G       Additional Employees

Schedule 1-H       Transferred Contracts

Schedule 1-I       Certain Excluded Assets

Schedule 1-J       Excluded Tangible Personal Property

Schedule 3.3       Allocation Principles

Schedule 7.10      Support Obligations

Seller Disclosure Schedules

Purchaser Disclosure Schedules

<center>**ASSET PURCHASE AGREEMENT**</center>

This ASSET PURCHASE AGREEMENT (collectively with the Exhibits and Schedules referred to herein, this "**Agreement**") is made as of the 11th day of November, 2023 (the "**Execution Date**"), by and among PROTERRA INC, a Delaware corporation ("**Holdco**"), PROTERRA OPERATING COMPANY, INC., a Delaware corporation ("**Opco**" and together with Holdco, "**Sellers**" and each a "**Seller**"), and PHOENIX MOTOR, INC., a Delaware corporation ("**Purchaser**").

WHEREAS, Sellers are engaged in the Business (as defined below);

WHEREAS, on August 7, 2023 (the "**Petition Date**"), Sellers commenced the Bankruptcy Cases (as defined below) and Sellers intend to seek approval of and authorization for a sale and transfer of Sellers' assets used in the conduct of the Business to the individual or entity submitting the highest or otherwise best bid for those assets in a process approved by the Bankruptcy Court (as defined below) (the "**Sale Process**") and to be consummated in accordance with the Bidding Procedures Order (as defined below) and pursuant to the Sale Order (as defined below);

WHEREAS, Purchaser desires to purchase from Sellers the Acquired Assets (as defined below) through the Sale Process (the "**Sale**"), in exchange for the Purchase Price (as defined below) and Purchaser's assumption of the Assumed Liabilities (as defined below), on the terms and subject to the conditions set forth in this Agreement;

WHEREAS, Sellers have determined, in the exercise of their business judgment, that the sale to Purchaser as contemplated herein is the highest or otherwise best bid for the Acquired Assets and therefore it is advisable and in the best interest of their estates and the beneficiaries of the estates to enter into this Agreement, which has been approved by Sellers' applicable governing bodies; and

WHEREAS, Sellers and Purchaser each acknowledge and agree that the transactions contemplated by this Agreement are subject to the Bankruptcy Court's approval of this Agreement.

NOW, THEREFORE, in consideration of the premises and of the respective representations, warranties, covenants, agreements, and conditions contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, Sellers and Purchaser each agree as follows:

<center>ARTICLE I</center>

<center>Definitions</center>

Section 1.1    <u>Certain Definitions</u>. Capitalized terms used in this Agreement but not otherwise defined in this Agreement shall have the meanings ascribed to such terms in the Bidding Procedures Order (as defined below)  as in effect at the date hereof or as such terms may be modified with the approval of the Sellers. In this Agreement and any Exhibit or Schedule hereto, the following capitalized terms have the following respective meanings:

"**Accounts Receivable**" means, with respect to each Seller, all accounts receivable, notes receivable, purchase orders, negotiable instruments, completed work or services that have not been billed, chattel paper, notes and other rights to payment, including those consisting of all accounts receivable in respect of services rendered or products sold to customers by such Seller, any other miscellaneous accounts receivable of such Seller, and any claim, remedy or other right of such Seller related to any of the foregoing, together with all unpaid financing charges accrued thereon and any payments with respect thereto.

"**Acquired Assets**" means:

(a)     all of the properties, rights, title, interests and other tangible and intangible assets that each Seller owns or possesses (other than the Excluded Assets) (wherever located and whether or not required to be reflected on a balance sheet) and that are primarily used or held for use by such Seller in connection with the conduct of the Acquired Business as the same shall exist on the Closing Date, including:

(i)     the Transferred Real Property;

(ii)     the Acquired Tangible Personal Property;

(iii)     all intangible assets of such Seller that are not Intellectual Property, including goodwill and going-concern value;

(iv)     subject to Section 7.3, the Transferred Contracts and such Seller's rights thereunder;

(v)     all Accounts Receivable and all other rights of any Seller to receive or recoup, whether by offset or netting against production from the Acquired Assets and the proceeds thereof or otherwise, amounts owed by Persons other than Sellers and their Affiliates with respect to the Acquired Assets, in each case to the extent accruing from and after the Effective Time;

(vi)     all rights of such Seller in any documents, drawings, diagrams, data, logs and records, operating, maintenance and safety manuals, plans, sales order files, purchase order files, test specifications and validation procedures, present vendor, client, customer and supplier lists, pricing information, sales and promotional literature and paper work and business files of such Seller and other books and records, in each case, primarily used or held for use in connection with the conduct of the Acquired Business, including all of the foregoing data and electronic information related to the Acquired Assets or the Acquired Business stored or archived in any server, computer, laptop, network, system or other electronic data base, but excluding the Excluded Books and Records (collectively, to the extent in the possession or control of such Seller or its Affiliates, the "**Acquired Business Books and Records**"), provided that such Seller may, at its election, provide to Purchaser either originals or copies (whether in hard or electronic form) of such Acquired Business Books and Records and shall be entitled to retain, as applicable, copies or such originals, provided, further, that the

2

foregoing shall exclude all Intellectual Property rights therein, which are the subject of clause (b);

(vii)    all claims and counterclaims of such Seller against any other Person, except for such claims and counterclaims set forth on Schedule 1-A and except for Avoidance Actions;

(viii)    to the extent their transfer is permitted under applicable Laws and/or by the applicable Governmental or Regulatory Authority and subject to Section 7.3, all Permits held by such Seller relating to the Acquired Assets or the Acquired Business listed on Schedule 1-B (the "**Transferred Permits**");

(ix)    all unexpired warranties, indemnitees and guarantees in favor of such Seller made or given by manufacturers, contractors, consultants, vendors, suppliers and other third parties to the extent arising from any Acquired Asset or Assumed Liability;

(x)    all claims, deposits, refunds, rebates and prepaid items of such Seller paid prior to the Closing except (i) those primarily related to or arising from the Excluded Assets or Excluded Liabilities and (ii) those designated as Excluded Assets;

(xi)    all supplies or construction materials owned by such Seller to the extent primarily related to the Acquired Business;

(xii)    all rights of such Seller to collect damages from any Person (other than such Seller or an Affiliate of such Seller) for past, present or future misappropriation, infringement, or other violation of Purchased Intellectual Property; and

(b)    the Purchased Intellectual Property, including the Intellectual Property set forth in Schedule 1-C;

"**Acquired Business**" means the Proterra Transit Business Unit.

"**Acquired Business Books and Records**" has the meaning set forth in the definition of Acquired Assets.

"**Acquired Business Employees**" means Employees who are primarily engaged in the Acquired Business.

"**Acquired Business Material Adverse Effect**" means any event, change, development or effect that, individually or in the aggregate, has had or would reasonably be expected to have a material adverse effect on the Acquired Business, the Acquired Assets or the Condition of the Acquired Business, taken as a whole; provided, however, that none of the following shall be deemed to constitute, and none of the following shall be taken into account in determining whether there has been, an Acquired Business Material Adverse Effect: (a) any change, event, development or effect (whether short-term or long-term) arising from or relating to (1) any general industry

3

change in the industries in which Sellers and the Acquired Business operate, (2) national or international political or social conditions, including the engagement in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the United States or foreign country, or any of their respective territories, possessions or diplomatic or consular offices or upon any military installation, equipment or personnel of the United States, (3) any epidemic, pandemic, or disease outbreak (including COVID-19) or any law, regulation, statute, directive, pronouncement or guideline issued by a Governmental or Regulatory Authority, the Centers for Disease Control and Prevention, the World Health Organization or industry group providing for business closures, "sheltering-in-place", curfews or other restrictions that relate to, or arise out of, an epidemic, pandemic or disease outbreak or any change in such law, regulation, statute, directive, pronouncement or guideline or interpretation thereof, or any worsening of such conditions, (4) any general change in financial, banking or securities markets (including any disruption thereof and any decline in the price of any security or any market index), (5) any change in GAAP, regulatory accounting principles or industry standards, or (6) changes in laws, rules, regulations, orders or other binding directives issued by any Governmental or Regulatory Authority, (b) the taking of (or omitting to take) any action by any Seller at the written request of Purchaser or that is expressly required by this Agreement, (c) any matters that arise from any actions or omissions of Purchaser or its Affiliates (including any breach by Purchaser of this Agreement), (d) any change resulting or arising from the identity of, or any facts or circumstances relating to, Purchaser or its Affiliates, (e) any failure to meet a forecast (whether internal or published) of revenue, earnings, cash flow or other data for any period or any change in such a forecast, (f) any change in or effect on the Acquired Business that, if curable, is cured by Sellers before the earlier of (1) the Closing Date and (2) the date on which this Agreement is terminated pursuant to Article X below, (g) any change in the financial condition or results of operation of Purchaser or its Affiliates, including its ability to access capital and equity markets and changes due to a change in the credit rating of Purchaser or its Affiliates, (h) the announcement, commencement, pendency or consummation of the Bankruptcy Cases, this Agreement or the transactions contemplated hereby, (i) any new or announced renewable fuel or oil provider entrants, including their effect on pricing, (j) any earthquakes, fires, hurricanes, tornados or other natural disasters or effects of weather and other acts of God, (k) any casualty loss or event of condemnation; (l) any seasonality of the Acquired Business as anticipated to be conducted, (m) any change resulting or arising from product recalls announced or commenced prior to the Execution Date or (n) any change in the market price or trading volume of any securities or Indebtedness of a Seller; provided, further, that, for the avoidance of doubt, an Acquired Business Material Adverse Effect shall be measured only against past performance of the Acquired Business and not against any forward-looking statements, financial projections or forecasts of the Acquired Business.

"**Acquired Tangible Personal Property**" means all Tangible Personal Property other than the Excluded Tangible Personal Property.

"**Action**" means any claim, demand, action, cause of action, suit, arbitration, audit, investigation or proceeding.

"**Affiliate**" means, as to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with that Person. For purposes of this definition, "**control**" (including, with correlative meanings, the terms

4

"**controlled by**" and "**under common control with**"), as used with respect to any Person or group of Persons, means possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of the Person, whether through the ownership of voting securities or by contract.

"**Agreement**" has the meaning set forth in the preamble.

"**Allocation Principles**" has the meaning set forth in Section 3.3.

"**Alternative Transaction**" means a sale, assignment, transfer or other disposition of all or substantially all of the Acquired Assets to any Person (or group of Persons), other than to Purchaser or an Affiliate of Purchaser.

"**Antitrust Law**" means the Sherman Act, the Clayton Act, the HSR Act, the Federal Trade Commission Act, and all other Laws or Orders that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or lessening of competition through merger or acquisition.

"**Assumed Liabilities**" means all liabilities and obligations of each Seller relating to, arising under or in connection with (i) the Transferred Contracts, including Cure Amounts, (ii) the Acquired Assets and the Acquired Business, with respect to all Liabilities other than Environmental Liabilities, for periods on and after the Closing Date, (iii) the Acquired Assets and the Acquired Business, with respect to Environmental Liabilities, at any time, except to the extent that such Environmental Liability is a claim subject to discharge in the Bankruptcy Cases, (iv) any Product Liability Claim arising from the sale after the Petition Date of products manufactured by the Acquired Business, (v) any Warranty Liability Claim, (vi) ordinary course trade payables of the Acquired Business that remain unpaid on or after the Closing Date (regardless of when accrued), (vii) all Liabilities of Sellers related to (x) COBRA continuation coverage for Transferred Employees and their applicable dependents arising after the Closing Date, and (y) the Employee Severance Liabilities, and (viii) any Taxes that Purchaser bears under Section 3.3 and Section 12.13.

"**Assumption Agreement**" means the Assumption Agreement in the form attached hereto as Exhibit A.

"**Auction**" has the meaning set forth in the Bidding Procedures.

"**Avoidance Action**" means any claim, right or cause of action of a Seller arising under chapter 5 of the Bankruptcy Code and any analogous state or federal statutes and common Law relating to the Sellers, the Acquired Assets, the Transferred Contracts or the Assumed Liabilities.

"**Backup Bidder**" has the meaning set forth in the Bidding Procedures.

"**Bankruptcy Cases**" has the meaning set forth in Section 11.1.

"**Bankruptcy Code**" means Title 11 of the United States Code.

"**Bankruptcy Court**" has the meaning set forth in Section 11.1.

5

"**Benefit Plan**" means (i) any "employee benefit plan" as defined in Section 3(3) of the ERISA (whether or not subject to ERISA) and (ii) any other pension, retirement, profit-sharing, savings, bonus, incentive, commission, stock option or other equity or equity-based, deferred compensation, severance, retention, employment, benefit, excess benefit, incentive, equity interest, equity bonus, equity purchase, restricted equity, equity ownership, equity appreciation, phantom equity, savings and thrift, cafeteria, reimbursement, health savings, flexible spending, compensation, welfare, sick leave, vacation, medical, dental, hospitalization, vision, disability, accidental death and dismemberment, life insurance, death benefit, post-retirement, transaction bonus, periodic bonus, termination, fringe benefit, perquisite or change of control plan, program, policy, agreement, contract or arrangement that (x) is sponsored, maintained or contributed to by Sellers, or for which Sellers have any obligation to sponsor, maintain or contribute to, or for which Sellers have any direct or indirect liability, whether contingent or otherwise and (y) under which any current or former officer, director, employee, consultant (or their respective beneficiaries) of Sellers has any present or future right to benefits, except for any Multiemployer Plan.

"**Bidding Procedures**" means the procedures governing the Auction and the Sale Process, as approved by the Bankruptcy Court pursuant to the Bidding Procedures Order and attached as Exhibit 1 to the Bidding Procedures Order, and as may be amended from time to time in accordance with their terms.

"**Bidding Procedures Order**" means the order entered by the Bankruptcy Court on September 7, 2023 [ECF No. 218], approving the Bidding Procedures.

"**Business**" means the business of the Proterra Energy Business Unit, the Proterra Powered Business Unit, the Proterra Transit Business Unit and the Proterra Valence Business Unit.

"**Business Day**" means a day (other than a Saturday, Sunday or national holiday) on which commercial banks in the State of New York and the State of California are open for the transaction of commercial banking business.

"**Clayton Act**" means Title 15 of the United States Code §§ 12-27 and Title 29 of the United States Code §§ 52-53, as amended.

"**Closing**" means the consummation of the transactions contemplated in this Agreement.

"**Closing Date**" has the meaning set forth in Section 4.1.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Condition of the Acquired Business**" means the condition of the business, operations, properties, Acquired Assets, financial condition and results of operations of the Acquired Business.

"**Confidential Information**" has the meaning set forth in the Confidentiality Agreement.

"**Confidentiality Agreement**" means that certain Confidentiality Agreement dated as of August 10, 2023 by and between Purchaser and Holdco.

"**Contract**" means any written or oral contract, agreement or instrument, including, supply contracts, purchase orders, sale orders, bids, understandings or commitments, customer agreements, licenses, mortgages, subcontracts, indentures, leases of personal property, deeds of trust, notes or guarantees, pledges, liens, or conditional sales agreements to which the Person referred to is a party or by which any of its assets may be bound.

"**Cure Amounts**" has the meaning set forth in <u>Section 2.5(b)</u>.

"**Deposit Escrow Account**" means the escrow account established pursuant to the Deposit Escrow Agreement.

"**Deposit Escrow Agreement**" means that certain escrow agreement, dated as of the date hereof, executed by and among Purchaser, Holdco and the Escrow Agent.

"**Deposit Escrow Funds**" mean, at any time of determination, the Earnest Deposit deposited in the Deposit Escrow Account, together with any interest earned thereon.

"**Disclosure Update**" has the meaning set forth in <u>Section 7.5</u>.

"**Earnest Deposit**" has the meaning set forth in <u>Section 3.1(b)</u>.

"**Effective Time**" means 12:01 a.m. Eastern Time, on the Closing Date.

"**Employee Severance Liabilities**" means any and all severance, termination indemnity or similar benefits and Liabilities incurred by Sellers or any of their Affiliates with respect to any Acquired Business Employee who does not become a Transferred Employee.

"**Employees**" means the employees of Sellers on the Execution Date, as well as any additional persons who become employees of Sellers during the period from the Execution Date through and including the Closing Date.

"**Environmental Laws**" means all federal, state and local Laws, code, binding and enforceable guidelines, policy or rule of common law or judicial or administrative interpretation thereof relating to pollution, public health and safety (as it relates to exposure to Hazardous Materials) or protection of the environment, including the Comprehensive Environmental Response, Compensation and Liability Act, the Resource Conservation and Recovery Act, the Clean Air Act, the Clean Water Act, and any state or local counterparts or equivalents, as such requirements have been enacted and are in effect on or prior to the Closing Date.

"**Environmental Liabilities**" means all Liabilities relating to Seller's ownership and/or operation of the Acquired Business and/or the Acquired Assets and consisting of or relating to:

> (i)     any Hazardous Materials, environmental matters or conditions (including on-site or off-site contamination and regulation of chemical substances or products);

> (ii)    fines, penalties, judgments, awards, settlements, legal or administrative proceedings, damages, losses, claims, demands and investigative,

7

remedial, or inspection costs and expenses arising under Environmental Laws or relating to Hazardous Materials;

(iii)    financial responsibility under Environmental Laws for cleanup costs or corrective action, including any investigation, cleanup, removal, containment, or other remediation or response actions required by applicable Environmental Laws and for any natural resource damages; or

(iv)    any other compliance, corrective, investigative or remedial measures required under Environmental Laws.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

"**ERISA Affiliate**" means any Person that would be considered a single employer with Sellers under Sections 414(b), (c), (m) or (o) of the Code.

"**Escrow Agent**" means Citibank, N.A.

"**Excluded Assets**" means all assets, rights, claims or properties owned by either Seller that are not Acquired Assets, including:

(i)    all cash, rights in bank accounts, certificates of deposit, bank deposits, cash equivalents, professional fee retainers, the cash surrender value of any life insurance policies, investment securities and checks or other payments received by such Seller (including received in lock boxes) prior to the Effective Time;

(ii)    the Purchase Price and the Deposit Escrow Funds;

(iii)    any Benefit Plan and any assets, trust agreements, insurance policies, administrative service agreements and other contracts, files and records in respect thereof;

(iv)    any prepayments and good faith and other bid deposits submitted by any third party under the terms of the Bidding Procedures Order;

(v)    all Accounts Receivable and all other rights of any Seller to receive or recoup, whether by offset or netting against production from the Acquired Assets and the proceeds thereof or otherwise, amounts owed by Persons other than Sellers and their Affiliates with respect to the Acquired Assets, in each case to the extent accruing prior to the Effective Time;

(vi)    any deposits, escrows, surety bonds or other financial assurances and any cash or cash equivalents securing any surety bonds or financial assurances, in each case, to the extent arising under the Excluded Assets or Excluded Liabilities;

8

(vii)   all trade credits or refunds of costs or expenses borne by any Seller, in each case, attributable to the Acquired Assets and attributable to any period of time prior to the Effective Time;

(viii)   all Excluded Tangible Personal Property;

(ix)   any rights to Tax refunds, rebates, abatements, deposits, prepayments, attributes or credits and current and deferred Tax assets (other than with respect to Taxes allocated to Purchaser in Section 12.13);

(x)   all claims and counterclaims of such Seller against any other Person that are set forth on Schedule 1-A;

(xi)   such Seller's rights under this Agreement and the Related Agreements;

(xii)   the Sellers Brand;

(xiii)   all Intellectual Property that is not Purchased Intellectual Property;

(xiv)   all Contracts that are not Transferred Contracts;

(xv)   all Real Property Leases that are not Transferred Real Property Leases;

(xvi)   all Permits that are not Transferred Permits;

(xvii)   the Excluded Books and Records;

(xviii)   the Avoidance Actions and any other claims, interests, rights, rebates, abatements, remedies, recoveries, goodwill, customer and referral relationships, other intangible property and all privileges, set-offs and benefits of Sellers, and all claims, demands, indemnification rights or causes of action, available to any of the Sellers or their estates against third parties to the extent related to the Excluded Assets or the Excluded Liabilities (including any claim to collect any Accounts Receivable accruing prior to the Effective Time);

(xix)   all of such Seller's insurance policies, including director and officer insurance policies, and related contracts and all rights thereunder (including, the right to make claims thereunder and to the proceeds thereof);

(xx)   all debts, demands, causes of action or other rights or claims of such Seller against any Affiliates of such Seller including any intercompany receivables due from any such Affiliate of such Seller;

(xxi)   any "Acquired Assets" pursuant to that certain Asset Purchase Agreement, dated as of November 9, 2023, by and among the Sellers and Volvo Battery Solutions LLC and Mack Trucks, Inc.;

(xxii)   all shares of capital stock or other equity interest in or issued by any Seller or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interest in or issued by any Seller, and any shares of capital stock or other equity interest in or issued by any other entity in which any Seller holds an equity interest, or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interest in or issued by any other entity in which any Seller holds an equity interest; and

(xxiii)   those assets of the type identified on Schedule 1-I hereto.

"**Excluded Books and Records**" means (i) all books and records relating to employee benefit matters, (ii) all books and records relating to employees, (iii) all minute books of a Seller, (iv) all income Tax Returns and income Tax records, (v) all books and records prepared in anticipation of or in connection with or otherwise related to the negotiation, execution or performance by Sellers under this Agreement or any Related Agreement; (vi) all books and records that Sellers are required by Law to retain, (vii) all books and records that are subject to attorney-client privilege or other work product privilege and (viii) any other books and records to the extent relating to the Excluded Assets or Excluded Liabilities.

"**Excluded Liabilities**" means all Liabilities of each Seller that are not Assumed Liabilities, including:

(i)   all Liabilities of such Seller or any Affiliate of such Seller in respect of any Indebtedness, other than the Support Obligations addressed in Section 7.10 or as set forth in any Transferred Contract;

(ii)   all Liabilities of such Seller or any Affiliate of such Seller for (a) income Taxes (whether or not then due), arising in connection with the consummation of the transactions contemplated by this Agreement or (b) the unpaid pre-Closing Taxes of any other Person under section 1.1502-6 of the Treasury Regulations (or any similar provision of state, local or foreign law) or as a transferee, successor, by Contract, by Law or otherwise;

(iii)   all Liabilities for Taxes with respect to the Acquired Assets, the Acquired Business or any of its facilities (except for Taxes allocated to Purchaser pursuant to Section 12.13) for all taxable periods, or portions thereof, ending at or prior to the Effective Time or that are otherwise allocated to Seller in Section 12.13;

(iv)   all Liabilities arising from any litigation, arbitration or any proceeding with any Governmental or Regulatory Authority involving such Seller, the Acquired Business, any Affiliate of such Seller or any of the Acquired Assets, in each case, with respect to matters that occurred prior to the Effective Time;

(v)   all Liabilities of such Seller to any Affiliate of such Seller or any current or former shareholder, director or officer of such Seller or any Affiliate of such Seller, including, any Liability arising out of or related to any loan, or any accrued interest related thereto, from any Affiliate of such Seller or any member, director or officer of such Seller or any Affiliate to such Seller;

(vi)   all Liabilities to the extent arising out of any Excluded Asset, including any Liabilities arising under any contract that is not a Transferred Contract;

(vii)   all Liabilities of such Seller or any of its Affiliates arising out of any Benefit Plan or any assets attributable to or related to any such Benefit Plan;

(viii)   such Seller's costs and expenses incurred in connection with this Agreement and the transactions contemplated by this Agreement; and

(ix)   all Environmental Liabilities arising out of Excluded Assets.

"**Excluded Tangible Personal Property**" means all Tangible Personal Property listed on Schedule 1-J.

"**Execution Date**" has the meaning set forth in the preamble.

"**Federal Trade Commission Act**" means the Federal Trade Commission Act (15 U.S.C. § 41 *et seq.*), as amended, and the rules and regulations promulgated thereunder.

"**GAAP**" means United States generally accepted accounting principles, consistently applied.

"**General Assignment**" means the General Assignment substantially in the form attached hereto as Exhibit B.

"**Governmental or Regulatory Authority**" means any court, tribunal, public or private arbitrator, authority, agency, commission, official or other instrumentality of the United States, or any country, state, county, city or other political subdivision, including any self-regulatory organization or similar governmental or quasi-governmental entity or body having jurisdiction.

"**Hazardous Materials**" means any substance or material that has been listed, defined or regulated or otherwise classified by any Environmental Law as a "hazardous substance," "hazardous material," "hazardous waste," "toxic substance," "pollutant," "contaminant," or any other similar term intended to define, list, or classify a substance by reason of such substance's ignitability, corrosivity, reactivity, carcinogenicity, reproductive toxicity, "EP toxicity" or adverse effect on human health or the environment, including, substances that are radioactive, toxic, hazardous or otherwise a pollutant, contaminant or waste, including PCBs, asbestos, petroleum products, petroleum derived substances or any fraction thereof, and urea-formaldehyde.

"**HSR Act**" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (15 U.S.C. §§ 15c-15h, 18a), as amended.

"**Improvements**" means the buildings, improvements and structures now existing on the Transferred Real Property.

"**Indebtedness**" means, as to any Person, without duplication, (a) all Liabilities of such Person for borrowed money or in respect of loans or advances (including, reimbursement and all

other obligations with respect to surety bonds, guarantees, letters of credit, banker's acceptances, corporate credit card or business credit lines, indemnities, performance letters, comfort letters and other arrangements similar to the foregoing, in each case only to the extent drawn); (b) all Liabilities of such Person under or pursuant to any arrangement to pay the deferred purchase price of property or services or the acquisition of any business; (c) all Liabilities of such Person under or pursuant to any interest rate and currency swaps, caps, collars, interest rate cap agreements, interest rate swap agreements, foreign currency exchange agreements and similar financial hedging devices and agreements, in each case, to the extent out of the money; (d) all Liabilities created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of such Person or lender under such agreement in the event of default are limited to repossession or sale of such property), other than inventory or other property purchased by such Person in the Ordinary Course of Business; (e) all obligations or liabilities of such Person under or pursuant to leases which are required to be, in accordance with GAAP, recorded as capital leases; (f) all Liabilities secured by any Lien (excluding Permitted Encumbrances) on any property or asset owned by that Person, regardless of whether the indebtedness secured thereby shall have been assumed by that Person or is non-recourse to the credit of that Person; (g) all Liabilities of such Person for off balance sheet financing of such Person (other than operating leases); (h) all Liabilities of such Person evidenced by bonds, debentures, notes or other similar securities or instruments (other than performance, surety and appeal bonds arising in the Ordinary Course of Business in respect of which such Person's liability remains contingent); (i) all Liabilities of such Person for any direct or indirect guarantees made by such Person of any Indebtedness of any other Person described in clauses (a) through (h); and (j) any accrued but unpaid interest, unpaid prepayment or redemption penalties, premiums or payments and unpaid fees and expenses, in each case, that are actually payable in connection with retirement, payment or prepayment of any of the foregoing Liabilities.

"**Independent Accountant**" means an impartial nationally recognized firm of independent certified public accountants to be mutually agreed to by Purchaser and Sellers and not engaged by either Sellers, on the one hand, or Purchaser, on the other hand, or any of their respective Affiliates in the last twelve (12) months.

"**Intellectual Property**" means all intellectual property rights, whether registered or unregistered, as they exist anywhere in the world, including all patents, trademarks and service marks, trade names, logos, URLs and Internet domain names, copyrights, Software, industrial designs, inventions, proprietary know-how, confidential business information and trade secrets.

"**Intellectual Property Assignment Agreement**" means the Intellectual Property Assignment Agreement substantially in the form attached hereto as Exhibit C.

"**Interest**" means Liens, encumbrances, pledges, mortgages, deeds of trust, security interests, leases, charges, fines or penalties related to governmental violations, options, rights of first refusal, easements, servitudes, proxies, voting trusts or agreements, transfer restrictions under any agreement, and any other rights, claims or demands of any kind whatsoever of other Persons, in each case, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, mature or unmatured, material or non-material, disputed or undisputed.

"**Knowledge**" means, with respect to Sellers, the actual knowledge of Gareth T. Joyce, David Black and Jeffrey Mitchell.

"**Laws**" means all laws, statutes, rules, regulations and ordinances in any jurisdiction or any state, county, country, city or other political subdivision or of any Governmental or Regulatory Authority, including, the Bankruptcy Code, ERISA, Environmental Laws, public health and OSHA and anti-kickback statutes.

"**Liability**" or "**Liabilities**" means any or all obligations (whether to make payments, to give notices or to perform or not perform any action), commitments, contingencies and other liabilities of a Person (whether known or unknown, asserted or not asserted, whether absolute, accrued, contingent, fixed or otherwise, determined or determinable, liquidated or unliquidated, and whether due or to become due).

"**Licensable**" means, with respect to any Intellectual Property right, that a Person has the power and authority to grant a license (or sublicense, as the case may be) to such Intellectual Property right without any of the following: (a) the consent of any third party; (b) impairing such Person's existing rights in respect of such Intellectual Property right (it being understood that the grant of any license hereunder, in and of itself, shall not be construed as an impairment of any of such Person's rights); (c) imposing any additional obligations on such Person or impairing any of such Person's other existing rights under any preexisting agreement relating to such Intellectual Property right; and/or (d) the payment of royalties or other consideration by such Person to any third party under any preexisting agreement relating to such Intellectual Property right. For the avoidance of doubt, in no event shall any Intellectual Property right be "Licensable" if any of the foregoing conditions in clauses (a)-(d) apply.

"**Lien**" means any mortgage, pledge, security interest, hypothecation, assignment, encumbrance, lease, lien (including consensual liens, judicial liens or statutory liens), option, right of use and other rights and claims of other Persons, any conditional sale contract, title retention contract, or other encumbrance of any kind, including easements, conditions, reservations and restrictions.

"**Material Contracts**" has the meaning set forth in Section 5.1(j)(i).

"**Multiemployer Plan**" means a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA covering any of the Employees or pursuant to which any of Sellers or their ERISA Affiliates have or could reasonably be expected to have any Liability.

"**New Matter**" has the meaning set forth in Section 7.5.

"**Order**" means and includes any writ, judgment, decree, injunction, award or other order of any Governmental or Regulatory Authority, including the Bankruptcy Court.

"**Ordinary Course of Business**" means an action taken by a Person if: (a) such action is in the ordinary course of business and consistent with the past practices of such Person including with respect to quantity and frequency; or (b) such action is similar in nature and magnitude to actions customarily taken in the ordinary course of normal day-to-day operations of other Persons

13

that are in the same line of business as such Person; subject, however, to those actions necessary and incident, or otherwise relating, to the Bankruptcy Cases.

"**Organizational Document**" means (a) the articles or certificate of incorporation and the bylaws of a corporation; (b) operating agreement, limited liability company agreement, or similar document governing a limited liability company; (c) any charter or similar document adopted or filed in connection with the creation, formation, or organization of a Person; and (d) any amendment to any of the foregoing.

"**OSHA**" means the Occupational Safety and Health Act of 1970, 29 U.S.C. §651, et seq.

"**Outside Closing Date**" means the date that is five (5) Business Days following the entry of the Sale Order by the Bankruptcy Court.

"**Permits**" means all licenses, permits, certificates, orders, authorizations, approvals, registrations, franchises and similar consents granted or issued by any Governmental or Regulatory Authority.

"**Permitted Encumbrances**" means (a) Liens for current Taxes not yet delinquent as of the Closing Date or being contested in good faith by appropriate proceedings; (b) Liens for impositions, assessments, fees, rents or other charges levied or assessed or imposed by a Governmental or Regulatory Authority not yet delinquent as of the Closing Date or being contested in good faith by appropriate proceedings; (c) statutory Liens (including materialmen's, warehousemen's, mechanic's, repairmen's, landlord's and other similar Liens) arising in the Ordinary Course of Business securing payments that are inchoate, unrecorded and not yet delinquent as of the Closing Date or being contested in good faith by appropriate proceedings; (d) easements, rights-of-way (including utility rights-of-way), servitudes, covenants, agreements, licenses, conditions and restrictions and other encumbrances, burdens and defects, imperfections or irregularities of title, and other matters of record as of the Execution Date, affecting all or any portion of the Transferred Real Property which do not materially interfere with Purchaser's proposed use of the Transferred Real Property or the operation of the Acquired Business or that are reflected in any title report, title commitment, title policy, or survey made available to Purchaser; (e) Liens existing as a result of or expressly permitted pursuant to any leases, easements, licenses, rights of way, or other instruments granting a Seller's interest in and to the Transferred Real Property, other than, in each case, Liens created due to a breach of such instrument; (f) Liens created by, through or under Purchaser or its successors or assigns; (g) building and zoning laws, rules and decisions affecting any of the Transferred Real Property; (h) with respect to any Transferred Real Property, any Lien to which the fee or any superior interest is subject; and (i) non-exclusive licenses of Intellectual Property rights.

"**Person**" means any natural person, corporation, general partnership, limited partnership, limited liability partnership, limited liability company, proprietorship, other business organization, trust, government, Governmental or Regulatory Authority, or any other entity whatsoever.

"**Petition Date**" has the meaning set forth in the recitals.

"**Prior Events**" has the meaning set forth in Section 12.16(b).

14

"**Product Liability Claim**" means any Action or Liability arising out of or otherwise relating to in any way or in respect of any claim for personal injury, wrongful death or property damage resulting from exposure to, or any product recall, defective material claim or any other similar claim or cause of action (including with respect to improper performance, malfunctioning, improper design or manufacture or other defect), whether such claim or cause of action is known or unknown or asserted or unasserted, with respect to, any product sold, supplied, marketed, stored, delivered, distributed or transported by the Acquired Business.

"**Proterra Energy Business Unit**" means the business unit of Sellers that provides, installs, and services turnkey fleet-scale, high-power charging solutions and software services, *provided* that the Proterra Valence Business Unit shall be excluded from the definition of Proterra Energy Business Unit.

"**Proterra Other Business Units**" means the Proterra Energy Business Unit, the Proterra Powered Business Unit and the Proterra Valence Business Unit.

"**Proterra Powered Business Unit**" means the business unit of Sellers that designs and manufactures proprietary battery systems and electrification solutions for global commercial vehicle original equipment manufacturer customers.

"**Proterra Transit Business Unit**" means the business unit of Sellers that designs, develops and sells electric transit buses as an original equipment manufacturer for North American public transit agencies, airports, universities and other commercial transit fleets.

"**Proterra Valence Business Unit**" means the business sub-unit of Sellers, currently situated within the Proterra Energy Business Unit, that is a cloud-based data platform that can provide customers performance information about their commercial transit fleets.

"**Purchase Price**" has the meaning set forth in Section 3.1(a).

"**Purchased Intellectual Property**" means (a) all Intellectual Property owned and used by Sellers primarily in the conduct of the Acquired Business (including, for the avoidance of doubt, such primarily used Intellectual Property Rights in Acquired Business Books and Records) and (b) to the extent not included in (a), all patents, patent applications and software set forth in Schedule 1-C.

"**Purchaser**" has the meaning set forth in the preamble.

"**Purchaser Disclosure Schedules**" means the disclosure schedules of Purchaser as attached hereto, and as they may be updated or otherwise modified hereafter in compliance with this Agreement.

"**Purchaser Plan**" has the meaning set forth in Section 8.4.

"**Purchaser Released Claims**" has the meaning set forth in Section 12.16(b).

"**Purchaser Required Approvals**" means the consents and approvals set forth on Section 5.2(d) of the Purchaser Disclosure Schedules.

15

"**Real Property Leases**" means all of Sellers' right, title and interest in all leases, subleases, licenses or other occupancy agreements, including all amendments, renewals and other agreements with respect thereto, pursuant to which a Seller holds a leasehold or subleasehold interest in, or is granted a license or other right to use, any real property.

"**Reasonable Efforts**" means the commercially reasonable efforts that a reasonable Person wanting to achieve the result in question would take under similar circumstances to achieve that result as expeditiously as possible.

"**Related Agreements**" means all agreements, certificates, instruments or other documents required to be executed and/or delivered pursuant to or in connection with, this Agreement by any Person, including, the Assumption Agreement, the General Assignment and the Intellectual Property Assignment Agreement.

"**Representative**" means, with respect to any Person, its directors, officers, employees, agents, advisors or other representatives.

"**Sale**" has the meaning set forth in the recitals.

"**Sale Hearing**" means the hearing before the Bankruptcy Court to consider entry of the Sale Order.

"**Sale Order**" means an Order of the Bankruptcy Court approving consummation of the Sale and the other transactions contemplated hereby, as may be altered, amended, modified, or supplemented from time to time.

"**Sale Process**" has the meaning set forth in the recitals.

"**Seller**" has the meaning set forth in the preamble.

"**Sellers**" has the meaning set forth in the preamble.

"**Seller Disclosure Schedules**" means the disclosure schedules of Sellers attached hereto, and as they may be updated or otherwise modified hereafter in compliance with Section 7.5 of this Agreement, and which, for the avoidance of doubt, exclude Schedule 1-A through 1-J, Schedule 3.3 and Schedule 7.10.

"**Seller Fundamental Representations**" means, collectively, the representations and warranties in the first sentence of Section 5.1(a) (Organization and Existence), Section 5.1(b) (Authority and Approval), Section 5.1(c)(i) (No Conflict — Seller's Organizational Documents) and Section 5.1(o) (Brokers).

"**Seller Group**" has the meaning set forth in Section 12.16(b).

"**Sellers Brand**" means the trademarks "PROTERRA," "PROTERRA POWERED," "PROTERRA TRANSIT," "PROTERRA ENERGY" and any trademark confusingly similar thereto and derivatives thereof.

16

"**Sherman Act**" means title 15 of the United States Code §§ 1-7, as amended.

"**Software**" means computer software, including, source code, object code, disks, documentation, operating manuals, related systems data, source programs, record layouts, program libraries, and any other documentation in those application areas that may pertain to any data processing system or operation.

"**Successful Bidder**" has the meaning set forth in the Bidding Procedures.

"**Support Obligations**" has the meaning set forth in Section 7.10.

"**Tangible Personal Property**" means the fixed assets, equipment, equipment spare parts, machinery, fixtures, tools, furniture and furnishings, consumables, inventory (including works in progress and finished goods), parts, computers, supplies, motor vehicles, cranes, forklifts, supplies and other tangible personal property owned by a Seller and used or held for use primarily in connection with the Acquired Business and the Acquired Assets, including the tangible personal property listed on Schedule 1-E.

"**Tax Returns**" means all returns, declarations, reports, statements, schedules, notices, forms or other documents or information filed or required to be filed in respect of the determination, assessment, collection or payment of any Tax or in connection with the administration, implementation or enforcement of any legal requirement relating to any Tax, and the term "**Tax Return**" means any one of the foregoing Tax Returns.

"**Taxes**" means all taxes, charges, fees, levies or other like assessments, including U.S. federal, state, local, foreign, and other net income, gross income, gross receipts, social security, estimated, sales, use, ad valorem, franchise, profits, net worth, alternative or add-on minimum, capital gains, license, withholding, payroll, employment, unemployment, social security, excise, property, transfer, and any and all other taxes, assessments, fees or other governmental charges, whether computed on a separate, consolidated unitary, combined or any other basis together with any interest and any penalties, additions to tax, estimated taxes or additional amounts with respect thereto, and including any liability for Taxes as a result of being a member of a consolidated, combined, unitary or affiliated group, and the term "Tax" means any one of the foregoing Taxes.

"**Transfer Taxes**" means all stamp, documentary, registration, value-added, transfer, sales, use, bulk sales, reporting, recording, filing and other similar fees, Taxes and charges arising out of or in connection with the transfer of the Acquired Assets effected pursuant to this Agreement.

"**Transferred Contracts**" means each of the Contracts identified and/or described in the Schedule of Transferred Contracts set forth in Schedule 1-H, which schedule shall be in form and substance reasonably acceptable to Purchaser.

"**Transferred Employees**" has the meaning set forth in Section 8.1.

"**Transferred Permits**" has the meaning set forth in the definition of Acquired Assets.

"**Transferred Real Property**" means all of Sellers' right, title and interest in any real property leased, subleased or licensed by Sellers as lessees, sublessees or licensees, pursuant to

the Transferred Real Property Leases, and including all of Sellers' right, title and interest in any Improvements located on such real property.

"**Transferred Real Property Leases**" means the Real Property Leases pursuant to which Sellers lease, sublease, license or otherwise occupy any real property that is primarily used in the conduct of the Acquired Business, and, for the avoidance of doubt, shall include those Real Property Leases set forth on Schedule 1-H.

"**Transition Services Agreement**" means the transition services agreement(s) between Purchaser or an Affiliate of Purchaser and the Sellers or the respective purchasers of any Proterra Other Business Unit, as applicable, pursuant to which Sellers or the respective purchaser of any Proterra Other Business Unit shall use commercially reasonable efforts to provide certain transition services related to the operation of the Acquired Business, each of which shall be in form and substance reasonably satisfactory to Purchaser and Sellers and/or the respective purchasers of any Proterra Other Business Unit, as applicable..

"**Treasury Regulations**" means the regulations (including all proposed and temporary regulations) promulgated by the U.S. Department of the Treasury under the Code, as such regulations may be amended from time to time.

"**WARN Act**" means the Worker Adjustment and Retraining Notification Act.

"**Warranty Liability Claim**" means any Action or Liability arising out of or otherwise relating to in any way or in respect of any product recall or representation, warranty, agreement or guaranty made by a Seller, including any warranty claim, guaranty claim, refund, return, rebate, property damage, defective material claim and/or any other similar claim (including with respect to improper performance, malfunctioning, improper design or manufacture or other defect), or any other similar claim or cause of action, whether such claim or cause of action is known or unknown or asserted or unasserted, with respect to, any product sold, supplied, marketed, stored, delivered, distributed or transported by the Acquired Business.

Section 1.2    Construction of Certain Terms and Phrases.

(a)    Unless the context of this Agreement otherwise requires, (i) words of any gender include each other gender; (ii) words using the singular or plural number also include the plural or singular number, respectively; (iii) the terms "hereof," "herein," "hereby" and derivative or similar words refer to this entire Agreement; (iv) the terms "Article," "Section," or "clause" refer to the specified Article, Section, or clause of this Agreement; (v) the word "including" (and, with correlative meaning, the word "include") means including, without limiting the generality of any description preceding that word; and (vi) the words "shall" and "will" are used interchangeably and have the same meaning. Any reference to a Law shall include any amendment thereof or any successor thereto and any rules and regulations promulgated thereunder, unless the context otherwise requires. Any reference in this Agreement to any contract, license, agreement or order means such contract, license, agreement or order as amended, supplemented or modified from time to time in accordance with the terms thereof. Currency amounts referenced in this Agreement are in U.S. Dollars.

18

(b)      Any representation or warranty contained herein as to the enforceability of a Contract (including this Agreement and any Related Agreement) will be subject to the effect of any bankruptcy, insolvency, reorganization, moratorium or other similar law affecting the enforcement of creditors' rights generally and to general equitable principles (regardless of whether such enforceability is considered in a proceeding in equity or at law).

(c)      This Agreement is being entered into by and among competent and sophisticated parties who are experienced in business matters and represented by counsel and other advisors, and have been reviewed by the parties and their counsel and other advisors. Therefore, any ambiguous language in this Agreement will not be construed against any particular party as the drafter of the language.

(d)      Whenever this Agreement refers to a number of days, such number shall refer to calendar days unless Business Days are specified. Whenever any action must be taken hereunder on or by a day that is not a Business Day, then such action may be validly taken on or by the next day that is a Business Day.

(e)      The phrases "provided", "delivered", or "made available", when used herein, mean that the information or materials referred to have been (i) posted to the on-line "virtual data room" established under project name "Project Wren" on Intralinks to which Purchaser and its counsel have continuous access at least two (2) days prior to the Execution Date or (ii) delivered directly to Purchaser or its Representatives by or on behalf of Sellers at least two (2) days prior to the Execution Date.

<div align="center">ARTICLE II</div>

<div align="center">Purchase and Sale and Assumption</div>

Section 2.1      Purchase and Sale of Acquired Assets. Upon the terms and subject to the conditions of this Agreement and the Sale Order, at the Closing, each Seller will sell, transfer, convey, assign, deliver and set over to Purchaser, and Purchaser will purchase and accept, all of the right, title, benefit and interest of such Seller in, to and under the Acquired Assets, free and clear of all Liens and Interests (other than Permitted Encumbrances and Assumed Liabilities), pursuant to Sections 363(f) and 1123(b)(4) of the Bankruptcy Code. Other than the Permitted Encumbrances and Assumed Liabilities, all mortgages or other Liens on the Acquired Assets securing Indebtedness shall attach to the net proceeds of the Sale pursuant to Sections 363(f) and 1123(b)(4) of the Bankruptcy Code so that the Acquired Assets will be sold free and clear of such Liens and other Interests. At the Closing, the sale, transfer, conveyance, assignment and delivery of the Acquired Assets will be effected pursuant to the General Assignment, the Intellectual Property Assignment Agreement, the Sale Order and other instruments of transfer described in Section 4.2(a).

Section 2.2      Excluded Assets. Notwithstanding anything to the contrary contained herein, the Acquired Assets do not include, and in no event will Purchaser acquire any right, title, benefit or interest in, to or under, any of the Excluded Assets.

<div align="center">19</div>

Section 2.3    <u>Assumed Liabilities</u>. Upon the terms and subject to the conditions of this Agreement, at the Closing, Purchaser will assume and agree to pay, perform and discharge or hold Sellers harmless from all of the Assumed Liabilities. The assumption of the Assumed Liabilities by Purchaser will be effected pursuant to the Assumption Agreement and the Sale Order.

Section 2.4    <u>Excluded Liabilities</u>. Notwithstanding anything to the contrary contained herein, the Assumed Liabilities will not include, and in no event will Purchaser assume, be required to pay, perform, discharge or hold Sellers harmless from any Excluded Liabilities.

Section 2.5    <u>Assignment and Cure Amounts</u>.

(a)    Subject to the terms and conditions of this Agreement and the entry of the Sale Order, at the Closing and pursuant to Section 365 of the Bankruptcy Code, each Seller shall assume and assign to Purchaser, and Purchaser shall take assignment from such Seller of, the Transferred Contracts. Purchaser shall be responsible for Cure Amounts and for satisfying the requirements of "adequate assurance of future performance" as required by section 365 of the Bankruptcy Code and shall cooperate fully with each Seller in seeking such approval from the Bankruptcy Court, including Purchaser providing the necessary evidence required in connection with the Sale Hearing, as applicable, to approve this Agreement and the transactions contemplated herein.

(b)    The cure amounts (collectively, the "**Cure Amounts**"), if any, necessary to cure all defaults as required by section 365 of the Bankruptcy Code, if any, and to pay all actual or pecuniary losses, if any, that have resulted from any defaults on the part of a Seller under the Transferred Contracts as required by section 365 of the Bankruptcy Code shall be paid by Purchaser at the Closing or as soon as reasonably practicable thereafter (except as otherwise agreed to by the other party to the Transferred Contracts) and such Seller shall have no Liability for any such Cure Amounts. As part of the Sale Process, Sellers may file with the Bankruptcy Court the Schedule of Transferred Contracts, which shall be in form and substance reasonably acceptable to Purchaser, setting forth the Transferred Contracts and the respective Cure Amounts as to each Transferred Contract. Purchaser shall have the right to request that Sellers add or remove any Contract identified in the Schedule of Transferred Contracts at any time on or prior to the Sale Hearing (or such later date as may be permitted under the Bidding Procedures Order or the Sale Order, as applicable). Upon such request, Sellers shall provide Purchaser with the amount, in Sellers' sole discretion, by which the Purchase Price shall be adjusted based on such addition or removal and Purchaser shall have the election to have such Contract added or removed. If Purchaser so elects, Sellers may cause an applicable modified Schedule of Transferred Contracts to be filed with the Bankruptcy Court consistent with the Bidding Procedures Order or the Sale Order, as applicable, and the Purchase Price shall be updated to reflect such adjustment.

Section 2.6    <u>Bulk Sales Laws</u>. The parties hereto hereby waive compliance by Sellers with the requirements and provisions of any "bulk-transfer" or similar Laws of any jurisdiction that may otherwise be applicable with respect to the sale and transfer of any or all of the Acquired Assets to Purchaser, and Purchaser hereby waives all claims against Sellers to the extent related to non-compliance therewith.

ARTICLE III

Purchase Price

Section 3.1    Purchase Price; Earnest Deposit

(a)⸝    Subject to entry of the Sale Order, the purchase price for the Acquired Assets will be, in addition to the Assumed Liabilities and the Cure Amounts (which shall be paid by Purchaser to the applicable counterparty on or about the Closing Date), a cash amount equal to THREE MILLION FIVE HUNDRED THOUSAND DOLLARS ($3,500,000.00) (such cash amount, the "**Cash Component Price**" and together with the Assumed Liabilities and the Cure Amounts, the "**Purchase Price**").

(b)    Purchaser or one of its Affiliates has made an earnest deposit by wire transfer of immediately available funds into the Deposit Escrow Account equal to ten percent (10%) of the  Cash Component Price  of the Purchase Price (the "**Earnest Deposit**") in accordance with the Bidding Procedures Order. The Deposit Escrow Funds while remaining in the Deposit Escrow Account, shall not be subject to any lien, attachment, trustee process, or any other judicial process of any creditor of any Seller, Purchaser or their respective Affiliates, and the Deposit Escrow Agreement shall provide that the Deposit Escrow Funds shall be released in accordance with the provisions of this Agreement and Bidding Procedures Order. All interest earned on the Earnest Deposit in the Deposit Escrow Account shall be distributed by the Escrow Agent (i) following the Closing, to Purchaser, or (ii) if the Agreement is terminated prior to the Closing, to Sellers or Purchaser, as applicable, in accordance with Section 10.2. Any portion of the Deposit Escrow Funds released to Purchaser in accordance with the terms of this Agreement and the Bidding Procedures Order shall not be subject to any lien, attachment, trustee process or any other judicial process of any creditor of any Seller. At the Closing, (i) the Earnest Deposit shall be credited against the Purchase Price and distributed by the Escrow Agent to Sellers; and (ii) Purchaser will pay to Sellers by wire transfer of immediately available funds to an account specified in writing by Sellers an amount equal to the Purchase Price minus the Earnest Deposit.

Section 3.2    Withholding of Tax. Purchaser shall be entitled to deduct and withhold any amounts Purchaser is required to deduct and withhold under any applicable Tax Law in connection with payments to be made by Purchaser pursuant to the terms of this Agreement; provided, that, if Purchaser believes that any such deduction or withholding of Tax (other than any deduction or withholding as a result of the failure to provide a W-9 for Sellers in compliance with Section 4.2(a)(v)) is required with respect to any payment under this Agreement, then Purchaser shall give written notice to Sellers describing the basis for such withholding in reasonable detail at least five (5) Business Days prior to making such payment and Purchaser shall provide Sellers with a reasonable opportunity to provide any applicable certificate, form or documentation that would reduce or eliminate the requirement to deduct and withhold Tax with respect to such payment, and Purchaser shall otherwise cooperate with Sellers and take such steps as Sellers may reasonably request to reduce or eliminate such withholding obligation to the extent permitted by

21

applicable Law. Such withheld amounts will be treated for all purposes of this Agreement as having been paid to Sellers by Purchaser to the extent such amounts have been timely paid to the appropriate Tax authority.

Section 3.3    Allocation of Consideration. The Purchase Price, the Assumed Liabilities, and any other items required to be treated as consideration for U.S. federal income Tax purposes will be allocated among the Acquired Assets for all Tax purposes in accordance with section 1060 of the Code and the Treasury Regulations promulgated thereunder in a manner consistent with the principles set forth on Schedule 3.3 (the "**Allocation Principles**"). Within five (5) days of the Closing Date, Purchaser shall provide to Sellers a draft allocation in a manner consistent with the Allocation Principles for Sellers' review and comment. If Sellers do not provide Purchaser written objections to the draft allocation within five (5) days of receipt, the draft allocation shall be deemed to be agreed upon by the parties. If Sellers propose changes to the draft allocation within such five (5)-day period, Sellers and Purchaser shall negotiate in good faith to amend any aspects of the allocation in dispute; provided, however, that if Sellers and Purchaser are unable to resolve any dispute with respect to the allocation within five (5) days after the date Purchaser received notice of Sellers' objection, such dispute shall be resolved by the Independent Accountant. The findings of the Independent Accountant shall be final, binding and conclusive on Sellers and Purchaser. The fees and expenses of the Independent Accountant shall be borne equally by Sellers and Purchaser. Purchaser and Sellers shall (a) complete and file IRS Form 8594 with their respective U.S. Federal income Tax Returns consistent with such allocation for the taxable year in which the Closing occurs, and (b) not take any position (and cause their respective Affiliates to not take any position) on any Tax Return, before any Governmental or Regulatory Authority charged with the imposition, assessment or collection of Taxes, or in any judicial proceeding, that is in any manner inconsistent with the terms of such allocation, as finally determined; provided, however, that (i) no party hereto shall be unreasonably impeded in its ability and discretion to negotiate, compromise and/or settle any Tax audit, claim or similar proceedings in connection with such allocation and (ii) the allocation shall not be binding upon Sellers for purposes of any plan filed in connection with the Bankruptcy Cases and shall not, and shall not be interpreted to, have any effect on any distributions to Sellers' creditors or equityholders. Notwithstanding any other provision of this Agreement, the terms and provisions of this Section 3.3 shall survive the Closing without limitation.

<div align="center">ARTICLE IV</div>

<div align="center">Closing Matters</div>

Section 4.1    Closing. Upon the terms and subject to the conditions of this Agreement, the Closing will take place beginning at 10:00 a.m. (local time) remotely by electronic transmissions or, in the event that the parties deem an in-person Closing necessary, at the offices of Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019-6064, on the second Business Day after the satisfaction (or waiver by the party for whose benefit such conditions exist) of all conditions described in Article IX that are required to be satisfied prior to the Closing (other than actions to be taken or items to be delivered at Closing as set forth herein, but subject to the satisfaction or waiver of such conditions), or at such other time, date, and place as the parties may mutually agree in writing (the "**Closing Date**"). All

<div align="center">22</div>

documents delivered and all transactions consummated at the Closing will be deemed for all purposes to have been delivered and consummated effective as of the Effective Time.

Section 4.2    Deliveries at Closing.

(a)    Deliveries of Seller. At the Closing, each Seller will deliver or cause to be delivered to Purchaser the following, as applicable:

(i)    duly executed counterparts by the applicable Seller of the General Assignment, Assumption Agreement, Intellectual Property Assignment Agreement and other Related Agreements to which a Seller is a party;

(ii)    the Acquired Business Books and Records;

(iii)    any physical Acquired Assets within the control or possession of Seller or its Affiliates (which will be either delivered to the Transferred Real Property or otherwise made available to Purchaser, in either case, as reasonably specified by Purchaser);

(iv)    all certificates of title or origin (or similar documents), duly endorsed with respect to any material vehicles or other equipment included in the Acquired Assets for which a certificate of title or origin is required to transfer title;

(v)    a W-9 for such Seller;

(vi)    a joint written instruction to the Escrow Agent instructing the release of the Earnest Deposit to Sellers; and

(vii)    all other instruments of conveyance and transfer executed by the applicable Seller, in form and substance reasonably acceptable to Purchaser, as may be necessary to convey the Acquired Assets to Purchaser free and clear of all Liens, Liabilities (other than Assumed Liabilities) and other Interests (except Permitted Encumbrances), provided, however, that the Sale Order shall be the only required document to evidence the conveyance and transfer free and clear of such Liens, Liabilities and other Interests.

(b)    Deliveries by Purchaser. At the Closing, Purchaser shall pay all Cure Amounts to the applicable counterparties and will deliver or cause to be delivered to Sellers the following:

(i)    an amount equal to (i) the Cash Component Price minus (ii) the Earnest Deposit, as provided in Section 3.1(b);

(ii)    a joint written instruction to the Escrow Agent instructing the release of the Earnest Deposit to Sellers;

(iii)    duly executed counterparts of the Assumption Agreement and other Related Agreements;

23

(iv)    a certificate of good standing of Purchaser from the Delaware Secretary of State as to Purchaser, that will be dated not more than ten (10) days prior to the Closing Date;

(v)    a certificate of an officer of Purchaser certifying that its Organizational Documents, as certified and as delivered at the Closing, have not been amended or rescinded since the date of such certification and remain in full force and effect at the Closing Date;

(vi)    copies of resolutions of the governing body of Purchaser authorizing the execution, delivery and performance of this Agreement and the Related Agreements;

(vii)    all required Transfer Tax stamps and transfer forms (if any), unless under applicable Law such Transfer Tax stamps or duly stamped transfer forms are only available post-Closing (in which case such Transfer Tax stamps or duly stamped transfer forms shall be delivered to Sellers promptly and in any event no later than five (5) Business Days after receipt thereof by Purchaser); and

(viii)    such other duly executed documents, instruments and certificates as may be required to be delivered by Purchaser pursuant to the terms of this Agreement, all in form reasonably satisfactory to Sellers.

Section 4.3    Further Assurances and Cooperation.

(a)    Further Assurances. Subject to the terms and conditions of this Agreement, from time to time after the Closing through the date on which the Bankruptcy Cases are closed, at a party's reasonable request and without further consideration, and solely at Purchaser's cost and expense, the other party will execute and deliver such other instruments of sale, transfer, conveyance, assignment and confirmation, and assumption, and provide such materials and information and take such other actions as the other party may reasonably deem necessary or desirable in order to more effectively transfer, convey and assign to Purchaser all of the Acquired Assets and/or in order to more effectively effect the assumption by Purchaser of the Assumed Liabilities and Purchaser's operation of the Acquired Business.

(b)    Access to Information and Books and Records. During the period from the Execution Date to the Closing Date, Sellers shall provide Purchaser with (x) reasonable access, during normal business hours and upon reasonable prior written notice, to the Acquired Business Employees and (y) information, including employee records and Benefit Plan data, reasonably requested by Purchaser, except as otherwise prohibited by applicable Laws. For a period of twelve (12) months following the Closing (or until the earlier liquidation or dissolution of Sellers), Purchaser and Sellers will afford each other, and their respective Representatives, during normal business hours and upon reasonable prior notice, reasonable access to, in the case of Sellers, the Excluded Books and Records and, in the case of Purchaser, the Acquired Business Books and Records in its possession with respect to periods through the Closing and the right to make copies and extracts

24

therefrom to the extent that such access may be reasonably required by the requesting party in connection with (i) the preparation of Tax Returns, (ii) any Tax audit, Tax protest, or other proceeding relating to Taxes, (iii) the making of any election related to Taxes, (iv) compliance with the requirements of any Governmental or Regulatory Authority, (v) Sellers' conduct or administration of the Bankruptcy Cases including, their participation in any contested matter or adversary proceeding in or relating to the Bankruptcy Cases, (vi) monitoring or enforcing rights or obligations of each Seller under this Agreement or (vii) any actual or threatened third party action or proceeding. Neither Purchaser nor Sellers may, for a period of seven (7) years after the Effective Time, destroy or otherwise dispose of any such books, records and other data unless such party will first offer in writing to surrender copies of such books, records and other such data to the other party and such other party has not agreed in writing to take possession thereof during the ten (10) day period after such offer is made, provided Sellers' motion to close or dismiss the Bankruptcy Cases shall be deemed to constitute notice to Purchaser of Sellers' intention to destroy all books, records and data in connection with the Acquired Business and its offer to surrender such books, records and data to Purchaser.

(c)    If, in order to properly prepare its Tax Returns or other documents or reports required to be filed with any Governmental or Regulatory Authority, it is necessary that either Purchaser or Sellers be furnished with additional information, documents or records relating to the Acquired Business, the Acquired Assets or the Assumed Liabilities not referred to in Section 4.3(b), and such information, documents or records are in the possession or control of the other party, such other party will use its Reasonable Efforts to furnish or make available such information, documents or records (or copies thereof) at the recipient's reasonable request and at recipient's cost and expense. Notwithstanding the foregoing, this Section 4.3 shall not require any Seller to permit any access to, or to disclose (i) any information that, in the reasonable, good faith judgment (after consultation with counsel, which may be in-house counsel) of Sellers, is reasonably likely to result in any violation of any legal requirement or any Contract to which a Seller is a party or cause any privilege (including attorney-client privilege) or work product protection that a Seller would be entitled to assert to be waived or (ii) if any Seller, on the one hand, and Purchaser, on the other hand, are adverse parties in a litigation, any information that is reasonably pertinent thereto.

## ARTICLE V

### Representations and Warranties

Section 5.1    Representations and Warranties of Seller. Except as set forth in (a) the Seller Disclosure Schedules or (b) any forms, reports, schedules, statements or other documents filed by a Seller and available on the Securities and Exchange Commission's Electronic Data Gathering Analysis and Retrieval System (excluding statements in any "Risk Factors" sections and any disclosure of risks included in any "forward-looking statements" disclaimer to the extent that such statement or disclosure is cautionary, predictive or forward-looking in nature), each Seller makes the following representations and warranties to Purchaser as set forth in this Section 5.1. The Seller Disclosure Schedules will be arranged in paragraphs corresponding to the lettered and numbered Paragraphs contained in this Agreement (as to which Purchaser acknowledges and agrees that any

25

matter disclosed pursuant to a section, subsection, paragraph or subparagraph of the Seller Disclosure Schedules shall be deemed disclosed for all other purposes of the Seller Disclosure Schedules as and to the extent the content or context of such disclosure makes it reasonably apparent, if read in the context of such other section, subsection, paragraph or subparagraph of the Seller Disclosure Schedules, that such disclosure is applicable to such other section, subsection, paragraph or subparagraph of the Seller Disclosure Schedules):

(a) <u>Organization and Existence</u>. Such Seller is a corporation duly incorporated, validly existing, and in good standing under the laws of the State of Delaware, with full power and authority to own, lease, and operate the Acquired Business and the applicable Acquired Assets and to carry on the Acquired Business as and where such assets are now owned or leased and the Acquired Business is now conducted, subject to the Bankruptcy Cases. The states in which such Seller is required by law to be qualified to do business as a foreign company are set forth on <u>Section 5.1(a)</u> of the Seller Disclosure Schedules, and such Seller is qualified to do business as a foreign company in each such state.

(b) <u>Authority and Approval</u>. Such Seller has the power to enter into this Agreement and each of the Related Agreements to which it is a party, subject to entry of the Sale Order by the Bankruptcy Court, and to perform its obligations hereunder and thereunder. The execution, delivery and performance by such Seller of this Agreement and the Related Agreements to which it is to be a party, and the consummation by such Seller of the transactions contemplated herein and therein, have been duly authorized by all required corporate action on the part of such Seller. This Agreement has been duly executed and delivered by such Seller, and when executed and delivered by such Seller, the Related Agreements to which it is a party will have been duly executed and delivered by such Seller, subject to the Bankruptcy Cases. This Agreement is, and each of the Related Agreements to which such Seller is a party when executed and delivered by such Seller, subject to entry of the Sale Order by the Bankruptcy Court, will be, the valid and binding obligations of such Seller, enforceable against such Seller, in accordance with their respective terms, except as may be limited by the Bankruptcy Cases.

(c) <u>No Conflict</u>. The execution and delivery by such Seller of this Agreement and each of the Related Agreements to which it is to be a party, and such Seller's compliance with the terms and conditions hereof and thereof, and the consummation by such Seller of the transactions contemplated hereby and thereby, do not and will not (i) conflict with, or require the consent of any Person that has not been obtained under such Seller's Organizational Documents, (ii) subject to entry of the Sale Order and obtaining the authorizations referred to in <u>Section 5.1(d)</u> of the Seller Disclosure Schedules and excluding any Antitrust Law, violate or breach in any material respect any provision of, or require any consent, authorization, or approval under, any Law or Order applicable to such Seller, the Acquired Business, the Acquired Assets or the Assumed Liabilities, (iii) subject to entry of the Sale Order, and except as set forth in <u>Section 5.1(c)</u> of the Seller Disclosure Schedules, violate, conflict with, result in a breach of, constitute a default under (whether with or without notice or the lapse of time or both), accelerate or permit the acceleration of the performance required by, or require any consent, authorization, or approval under, any Transferred Contract or other Material Contract, or Transferred Permit material to the Acquired Business to which such Seller is a party or by which such Seller is bound or to

which any of its assets or properties are subject, except to the extent excused or stayed by the Bankruptcy Cases or (iv) result in the creation of any Lien upon the Acquired Assets other than Permitted Encumbrances and Liens created by Purchaser; provided, however, that no representation or warranty is made in the foregoing clauses (ii) through (iv) with respect to matters that would not reasonably be expected, individually or in the aggregate, to have an Acquired Business Material Adverse Effect.

(d)    Governmental Approvals and Filing. Except (i) as set forth in Section 9.3(b) or as disclosed in Section 5.1(d) of the Seller Disclosure Schedules, (ii) with respect to any Antitrust Law, and (iii) the entry of the Sale Order, no consent, authorization, approval or action of, filing with, notice to, or exemption from any Governmental or Regulatory Authority on the part of such Seller is required in connection with the execution, delivery and performance of this Agreement or any Related Agreements to which such Seller is to be a party or the consummation of the transactions contemplated hereby or thereby, except where the failure to obtain any such consent, approval or action, to make any such filing, to give any such notice or obtain any such exemption would not reasonably be expected to (x) have a material adverse effect on such Seller or (y) materially adversely affect the validity or enforceability against such Seller of this Agreement or such Related Agreements or materially adversely affect the ability of such Seller to consummate the transactions contemplated by this Agreement.

(e)    Legal Proceedings. Section 5.1(e) of the Seller Disclosure Schedules contains a complete and accurate description (including the case caption and case number where available) of each material Action to which such Seller is currently or in the last year had been a party. Except as disclosed in Section 5.1(e) of the Seller Disclosure Schedules or on the Bankruptcy Cases docket, there is no: (i) pending or, to Seller's Knowledge, written threatened Action or Order of any Governmental or Regulatory Authority, in each case relating to such Seller, the Acquired Business, the Transferred Real Property or any of the Acquired Assets, in each case that would reasonably be expected (x) to have an Acquired Business Material Adverse Effect or (y) to adversely affect the validity or enforceability of this Agreement or any of the Related Agreements against such Seller or adversely affect the ability of such Seller to consummate the transactions contemplated by this Agreement; or (ii) Orders outstanding against such Seller that would adversely affect the ability of such Seller to consummate the transactions contemplated by this Agreement or that are otherwise related to such Seller, the Acquired Business, the Transferred Real Property, or the Acquired Assets.

(f)    Compliance with Laws and Orders. Except as set forth in Section 5.1(f) of the Seller Disclosure Schedules, there is no unresolved material violation of or default under any Law or Order applicable to such Seller, the Acquired Business, the Acquired Assets, or the Transferred Real Property, or the Assumed Liabilities, in each case, other than as a result of the Bankruptcy Cases or stayed by the Bankruptcy Court. Such Seller is in compliance in all material respects with all applicable Laws regulating such Seller, the Acquired Business, the Acquired Assets, or the Transferred Real Property.

27

(g)     Employee Matters and Employee Benefit Plans.

(i)     Each Benefit Plan has been maintained, administered and funded in all material respects, in accordance with its terms and all provisions of applicable Laws (including ERISA and the Code). Except as set forth on Section 5.1(g)(i) of the Seller Disclosure Schedules, none of Sellers or their ERISA Affiliates have, within the past six (6) years, incurred, and no event has occurred and no condition or circumstance exists that could result, directly or indirectly, in, any unsatisfied Liability (including, any indirect, contingent or secondary Liability) of any Seller under Title IV of ERISA or Section 412 or 430 of the Code or Section 302 or 303 of ERISA.

(ii)    Each of the Benefit Plans that is intended to qualify under Section 401 of the Code has received a favorable opinion or determination letter from the Internal Revenue Service that such Benefit Plan is so qualified, and, to the Knowledge of Sellers, nothing has occurred with respect to the operation of any such Benefit Plan which could reasonably be expected to result in the revocation of such favorable opinion or determination.

(iii)   Sellers have timely paid all contributions due to date that are required under Benefit Plans, and there are no pending or unresolved claims under any Benefit Plans for outstanding or owed contributions, arrears, delinquencies, or for compliance with any payroll audit or investigation concerning the Acquired Business Employees.

(iv)    Section 5.1(g)(iv) of the Seller Disclosure Schedules is a complete and accurate anonymized list of all Acquired Business Employees, including base salary/base wage, commissions, bonus or incentive opportunities, title or position, date of hire, work location, exempt or non-exempt status, and full-time or part-time status (except where the provision of such information has been excluded due to appliable privacy Laws).

(v)     (A) With respect to the Acquired Business Employees, Sellers are in compliance in all material respects with all applicable Laws relating to labor and employment, including all legal requirements relating to discrimination, equal employment opportunities, disability, labor relations, wages and hours, Fair Labor Standards Act, payment of wages, occupational safety, and family and medical leave and (B) there are no pending, or to the Knowledge of Sellers, threatened, lawsuits, grievances, unfair labor practice charges, arbitrations, charges, investigations, hearings, actions, claims, or proceedings (including any administrative investigations, charges, claims, actions, or proceedings), against Sellers brought by or on behalf of any Acquired Business Employee alleging violation of any labor or employment legal requirements, breach of any express or implied contract of employment, wrongful termination of employment, or any other discriminatory, wrongful, or tortious conduct in connection with the employment relationship.

(vi)   Except as set forth in Section 5.1(g)(vi) of the Seller Disclosure Schedules, such Seller is not a party to or bound by a collective bargaining agreement or similar agreement with a union or other labor organization covering any of the Acquired Business Employees, and none of the Acquired Business Employees is represented by a union or other certified bargaining agent with respect to their services to Sellers or the Acquired Business. With respect to the Acquired Business, there is not any, and in the last three (3) years has been no, strike, slowdown, picketing or work stoppage.

(h)   Title. Except as set forth in Section 5.1(h) of the Seller Disclosure Schedules, Sellers have good and marketable title to, or a valid leasehold interest in and right to use, all Acquired Assets, in each case, free and clear of all Liens other than Permitted Encumbrances, Liens relating to any Assumed Liabilities or Liens that will be released at the Closing Date.

(i)   Intellectual Property. Section 5.1(i) of the Seller Disclosure Schedules contains a complete and accurate list of all material patents, registered trademarks and trademark applications, registered copyrights and applications for copyright registrations and domain names included in the Purchased Intellectual Property. Except as would not have an Acquired Business Material Adverse Effect or as set forth in Section 5.1(i) of the Seller Disclosure Schedules:

(i)   No Action is pending and, to Sellers' Knowledge, no claims are threatened in writing by any Person against Sellers (1) alleging the use by Sellers of any of the Purchased Intellectual Property infringes or misappropriates the Intellectual Property of any third party; (2) claiming infringement upon or misappropriation of any Intellectual Property rights of third parties as a result of the operation by Sellers of the Acquired Business as presently conducted; or (3) challenging the ownership or validity of any of the Purchased Intellectual Property (other than non-final office actions and similar correspondence involving the United States Patent and Trademark Office or any equivalent foreign Governmental or Regulatory Authority);

(ii)   There are no orders, judgments, holdings, consents, decrees, settlements or rulings with respect to Intellectual Property to which Sellers, or any of the Purchased Intellectual Property, is bound (excluding, for the avoidance of doubt, ordinary course determinations by the United States Patent and Trademark Office or any equivalent foreign Governmental or Regulatory Authority).

(iii)   Such Seller is the owner of the Purchased Intellectual Property, and has the right to use, free and clear of all Liens, other than Permitted Encumbrances, the Purchased Intellectual Property;

(iv)   To Sellers' Knowledge, the operation of the Acquired Business as currently conducted by Sellers, and the possession or use of the Purchased Intellectual Property by Sellers, do not infringe, misappropriate or otherwise violate any Intellectual Property right of any other Person. To Sellers' Knowledge, none of

the Purchased Intellectual Property is being infringed, misappropriated or otherwise violated by any Person; and

(v)    Sellers have used Reasonable Efforts to protect the confidentiality of any trade secret included in the Purchased Intellectual Property.

(j)    Material Contracts.

(i)    Except for (x) Contracts subject to ordinary course confidentiality restrictions that have not been waived despite such Seller's commercially reasonable efforts to have such restrictions waived to permit disclosure to Purchaser, (y) Contracts with legal, financial, or other advisors and consultants in connection with the Bankruptcy Case or any other transactions contemplated hereby, and (z) any agreement entered into with any of such Seller's secured lenders, Section 5.1(j)(i) of the Seller Disclosure Schedules contains a complete and accurate list as of the date hereof of all of the following Transferred Contracts to which such Seller is a party ("**Material Contracts**"):

(A)    all Contracts involving commitments to others to make capital expenditures or purchases or sales in excess of $5,000,000;

(B)    any Contract creating a shareholders' agreement, strategic alliance, partnership, joint venture agreement, development, joint development or similar arrangement that is material to the Acquired Business;

(C)    any Contract that relates to the settlement of any legal proceeding in the last two (2) years;

(D)    any written employment, consulting, contractor, confidentiality, non-competition, severance or termination agreements as to employees, individual consultants or other individual service providers, in each case, material to the Acquired Business;

(E)    any collective bargaining agreements;

(F)    any Contract that is an operations, maintenance or staffing services or other agreement with a provider of contract labor;

(G)    all Contracts relating to any direct or indirect Indebtedness (other than any agreement with such Seller's secured lenders) (including, without limitation, loan agreements, lease purchase arrangements, guarantees, agreements to purchase goods or services or to supply funds or other undertakings on which others rely in extending credit), or any conditional sales contracts, chattel mortgages, equipment lease agreements and other security arrangements with respect to personal property, in each case, with a principal or secured amount in excess of $5,000,000;

(H)    all Contracts between Holdco and Opco;

(I)     all swap agreements, securities contracts, commodities contracts, option agreements, repurchase agreements, futures contracts, forward contracts, master netting agreements, in each instance, as such term is defined or otherwise referenced in the Bankruptcy Code, or other hedging agreement or derivative agreement used in the conduct of the Acquired Business;

(J)     all Contracts that in any way could limit the freedom of Purchaser to engage in any line of business or to compete with any Person in any area or territory;

(K)     all (1) Contracts pursuant to which Sellers grant to a third party a license or right to use any material Purchased Intellectual Property (other than non-exclusive licenses of Intellectual Property) and (2) Contracts pursuant to which Sellers obtain a license or right to use any material Intellectual Property (other than licenses for "off-the-shelf" Software or other Software generally commercially available on standard terms and conditions, or non-exclusive licenses of Intellectual Property);

(L)     all Contracts (whether exclusive or otherwise) with any sales agent, representative, franchisee, dealer, distributor;

(M)     all Contracts that require the payment of royalties;

(N)     all Contracts with any Governmental or Regulatory Authority;

(O)     all Contracts involving a sharing of profits, losses, costs or liabilities;

(P)     all customer Contracts of the Acquired Business;

(Q)     all supplier Contracts of the Acquired Business, including material purchase orders and sales orders for which, as of the date hereof, a supplier remains obligated to provide goods or services or such Seller remains obligated to pay for goods or services, and excluding all other purchase orders and sales orders;

(R)     all Contracts containing written warranties or guaranties extended by such Seller, other than warranties or guaranties extended by such Seller to a customer pursuant to a Contract disclosed pursuant to any of the other items of this Section 5.1(j)(i); and

(S)     all other Contracts not of the type covered by any of the other items of this Section 5.1(j)(i) involving money or property having an obligation, or relating to payments by or to such Seller, in excess of $1,000,000 per month or $5,000,000 in the aggregate in the last twelve (12) consecutive months.

(ii)     True, correct and complete copies of the Material Contracts (including any amendments, supplements, restatements or modifications thereto) listed in Section 5.1(j)(i) of the Seller Disclosure Schedules have been made

available to Purchaser. Subject to entry of the Sale Order and payment of all Cure Amounts, each Material Contract that is a Transferred Contract is in full force and effect, is fully assignable without the consent of any Person, except as set forth on Section 5.1(j)(ii) of the Seller Disclosure Schedules, and is valid, binding and enforceable in accordance with its terms as to such Seller and, to Seller's Knowledge, the other parties to the Material Contract. Other than the payment of Cure Amounts, such Seller has performed and is performing all obligations required to be performed by it under the Material Contracts that are Transferred Contracts. Except as set forth in Section 5.1(j)(ii) of the Seller Disclosure Schedules, no material default or material breach of a Material Contract that is a Transferred Contract exists (or, solely as a result of the Bankruptcy Cases or the consummation of the transactions contemplated hereby, will exist) on the part of such Seller or, to Seller's Knowledge, on the part of any other Person under any such Material Contracts, and no condition or event has occurred that, after notice or lapse of time, or both, would constitute a material default or material breach of such Material Contracts that are Transferred Contracts. No party to a Material Contract that is a Transferred Contract has notified such Seller in writing that such party intends to cancel or otherwise terminate such Material Contract, or to Seller's Knowledge, taken any action or threatened to take any action with respect of an amount paid to such Seller pursuant to such Material Contract or a reduction in fees due to such Seller pursuant to such Material Contract.

(k)    Permits. To Sellers' Knowledge, Sellers own or possess all Permits necessary and material to the Condition of the Acquired Business or the ownership, operation and use of the Acquired Assets. Section 5.1(k) of the Seller Disclosure Schedules identifies all material Permits possessed by Sellers that are necessary to the conduct of the Acquired Business by the Sellers or the ownership or operation of the Acquired Assets by the Sellers as conducted on the Execution Date. Except as disclosed in Section 5.1(k) of the Seller Disclosure Schedules or as a result of the Bankruptcy Cases, (i) all such Permits possessed by Sellers are in full force and effect; (ii) Sellers are in compliance in all material respects with the terms and conditions of such Permits; and (iii) Sellers have not received written notice of violation or proposed revocation or termination of any such Permit from any issuing Person or Governmental or Regulatory Authority, which remains unresolved.

(l)    Insurance. Sellers maintain material insurance covering the Acquired Business and the Acquired Assets in amounts (and subject to deductibles and self-insurance amounts) that, to Seller's Knowledge, are consistent with local industry practice and which Sellers have reasonably determined to be adequate for the Acquired Business, and which (including the name of the carrier thereunder, the amounts, limits or deductibles thereunder, and the expiration date thereof) is listed on Section 5.1(l) of the Seller Disclosure Schedules.

(m)    Certain Environmental Matters. Except as (i) related solely to the Excluded Assets, (ii) would not reasonably be expected to have an Acquired Business Material Adverse Effect or (iii) disclosed in Section 5.1(m) of the Seller Disclosure Schedules:

32

(i)     To Sellers' Knowledge, Sellers hold, and are in compliance in all material respects with, all Permits required to conduct the Acquired Business as currently being conducted under any Environmental Laws.

(ii)     To Sellers' Knowledge, such Seller, the Acquired Business and the Transferred Real Property are in compliance, in all material respects, with all Environmental Laws and, during the one (1) year preceding the Execution Date, such Seller has not received written notice from any Person alleging that such Seller, the Acquired Business or the Transferred Real Property, is in material violation of any applicable Environmental Law, which violation or liability is unresolved.

(iii)     During the one (1) year preceding the date of this Agreement, such Seller has not received any written request for information or any written notice that it is a potentially responsible party under any Environmental Laws with regard to the Acquired Business and the operation of the Transferred Real Property or any off-site location for which any liability is currently being asserted, and to Sellers' Knowledge it is not such a potentially responsible party under any Environmental Law.

(iv)     Such Seller is not subject to any outstanding Order relating to compliance with any Environmental Law or to investigation or cleanup of Hazardous Materials.

(v)     To Sellers' Knowledge, no Hazardous Materials are present in, on or under the Transferred Real Property, except those used by such Seller in the ordinary operation of the Acquired Business and in strict compliance with Environmental Laws.

(vi)     During the one (1) year preceding the Execution Date, such Seller has not transported, stored, used, manufactured, disposed of or released Hazardous Materials in material violation of Environmental Laws.

(n)     Transferred Real Property. Except as set forth in Section 5.1(n) of the Seller Disclosure Schedules:

(i)     Schedule 1-F contains a true, correct and complete list of such Seller's Transferred Real Property. Such Seller has made available to Purchaser true correct and complete copies of the Transferred Real Property Leases with respect thereto.

(ii)     Such Seller has a good and valid leasehold, subleasehold, license, or other right in and to such Seller's Transferred Real Property, free and clear, as of the Closing Date, of Liens and other Interests, except for Permitted Encumbrances. Subject to entry of the Sale Order and payment of all Cure Amounts, each of the Transferred Real Property Leases with respect thereto is in full force and effect, and neither such Seller, nor to the Knowledge of Sellers, any other party thereto, is in material default thereunder, nor has any condition or event occurred that, after

33

notice or lapse of time, or both, would constitute a material default thereunder by such Seller or, to the Knowledge of Sellers, any other party thereto, other than as a result of the Bankruptcy Cases.

(iii)    Other than the rights of fee (or other superior interest) owners, there are no subtenants or other parties in possession of any of such Seller's Transferred Real Property.

(iv)    To the Knowledge of Sellers, there are no pending or threatened proceedings or actions to condemn or take by power of eminent domain, all or any of such Seller's Transferred Real Property.

(o)    Brokers. Except as set forth in Section 5.1(o) of the Seller Disclosure Schedules, no broker, finder or investment banker is entitled to any brokerage commission, finder's fee or similar payment in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of Sellers.

(p)    Taxes. Except as otherwise set forth in Section 5.1(p) of the Seller Disclosure Schedules:

(i)    All material Tax Returns required to be filed with respect to the Acquired Assets have been timely filed and all such Tax Returns are true, accurate and complete in all material respects to the extent that failure to file such a Tax Return, or the failure of any such Tax Return to be true, accurate and complete, could reasonably be expected to give rise to a Lien on any Acquired Asset following the Closing.

(ii)    All material Taxes with respect to the Acquired Assets that are due and payable have been duly and timely paid to the extent that failure to pay such Taxes could reasonably be expected to give rise to a Lien on any Acquired Asset following the Closing.

(iii)    There is no claim, audit, action, suit, investigation or other proceeding pending or threatened in writing against, or with respect to, a material amount of Taxes relating to the Acquired Assets to the extent that the outcome of such proceeding could reasonably be expected to give rise to a Lien on any Acquired Asset following the Closing.

(q)    Credit Support Obligations. Section 5.1(q) of the Seller Disclosure Schedules sets forth a true and complete list of each guaranty, letter of credit, performance or surety bond or similar credit support arrangement provided by such Seller or any of its Affiliates to any other Person with respect to related to the Acquired Business or any Transferred Contract.

(r)    No Material Adverse Change. Except as described in Section 5.1(r) of the Seller Disclosure Schedules, except as a result of the Bankruptcy Cases, since the Petition Date until the Execution Date:

34

(i)    There has not occurred any event or condition that, individually or in the aggregate, has had or is reasonably expected to have an Acquired Business Material Adverse Effect;

(ii)    Such Seller has not, except in the Ordinary Course of Business, sold, leased, transferred, or assigned any of the material properties, rights or other assets of such Seller that would, but for such transaction, be an Acquired Asset;

(iii)    Such Seller has not cancelled, compromised, waived or released any right or claim (or series of related rights and claims) related to the Acquired Assets except in the Ordinary Course of Business or pursuant to an Order of the Bankruptcy Court;

(iv)    Such Seller has not made any change to any accounting method or any change to any material methods of reporting income, deductions or other items for Tax purposes; and

(v)    Such Seller has not made any agreement to do any of the foregoing.

(s)    <u>Inter-Company Transactions</u>. A true, correct and complete list and description of all Contracts (including any amendments, supplements, restatements or modifications thereto) between Sellers relating to the Acquired Assets, Assumed Liabilities or the Acquired Business, is set forth in <u>Section 5.1(s)</u> of the Seller Disclosure Schedules, and true, correct and complete copies of such Contracts have been made available to Purchaser.

(t)    <u>Relations With Competitors; Amounts Owed Related Parties</u>. Except as set forth on <u>Section 5.1(t)</u> of the Seller Disclosure Schedules, to Seller's Knowledge, such Seller does not own, directly or indirectly, any interest in (excepting not more than five percent (5%) stock holdings for investment purposes in securities of publicly held and traded companies) nor is it an officer, director, employee or consultant of, any Person that is a competitor, lessor, lessee, customer or supplier of the Acquired Business, other than Affiliates of such Seller.

(u)    <u>Warranties Exclusive</u>. EXCEPT AS EXPRESSLY SET FORTH IN THIS SECTION 5.1 (AS MODIFIED BY THE SELLER DISCLOSURE SCHEDULES), SUCH SELLER MAKES NO REPRESENTATION OR WARRANTY, STATUTORY, EXPRESS OR IMPLIED, WRITTEN OR ORAL, AT LAW OR IN EQUITY, IN RESPECT OF ANY OF ITS ASSETS (INCLUDING THE ACQUIRED ASSETS), LIABILITIES (INCLUDING THE ASSUMED LIABILITIES), THE BUSINESS OR THE ACQUIRED BUSINESS, INCLUDING, WITH RESPECT TO MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, OR NON-INFRINGEMENT, AND ANY SUCH OTHER REPRESENTATIONS OR WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED AND NONE SHALL BE IMPLIED AT LAW OR IN EQUITY. NEITHER SUCH SELLER NOR ANY OTHER PERSON, DIRECTLY OR INDIRECTLY, HAS MADE OR IS MAKING, ANY REPRESENTATION OR WARRANTY, WHETHER WRITTEN OR ORAL,

REGARDING THE PRO-FORMA FINANCIAL INFORMATION, FINANCIAL PROJECTIONS OR OTHER FORWARD-LOOKING STATEMENTS OF SUCH SELLER, THE BUSINESS OR THE ACQUIRED BUSINESS.

Section 5.2    Representations and Warranties of Purchaser. Except as set forth in the Purchaser Disclosure Schedules, Purchaser makes the following representations and warranties to Sellers as set forth in this Section 5.2. The Purchaser Disclosure Schedules will be arranged in paragraphs corresponding to the lettered and numbered paragraphs contained in this Section 5.2 (as to which each Seller acknowledges and agrees that any matter disclosed pursuant to a section, subsection, paragraph or subparagraph of the Purchaser Disclosure Schedules shall be deemed disclosed for all other purposes of the Purchaser Disclosure Schedules as and to the extent the content or context of such disclosure makes it reasonably apparent, if read in the context of such other section, subsection, paragraph or subparagraph of the Purchaser Disclosure Schedules, that such disclosure is applicable to such other section, subsection, paragraph or subparagraph of the Purchaser Disclosure Schedules):

(a)    Organization and Existence. Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, with full power and authority to own, lease and operate its business and properties and to carry on its business as and where such properties and assets are now owned or leased and such business is now conducted.

(b)    Authority and Approval. Purchaser has the power to enter into this Agreement and each of the Related Agreements to which it is to be a party and to perform its obligations hereunder and thereunder. The execution, delivery and performance by Purchaser of this Agreement and the Related Agreements to which it is to be a party, and the consummation by Purchaser of the transactions contemplated herein and therein, have been duly authorized by all required action on the part of Purchaser. This Agreement has been duly executed and delivered by Purchaser and, when executed and delivered by Purchaser, the Related Agreements to which Purchaser is to be a party will have been duly executed and delivered by Purchaser. This Agreement is, and each of the Related Agreements to which Purchaser is to be a party when executed and delivered by Purchaser, will be, the valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with their respective terms, except as may be limited by the Bankruptcy Cases.

(c)    No Conflict. The execution and delivery by Purchaser of this Agreement and each of the Related Agreements to which it is to be a party, and Purchaser's compliance with the terms and conditions hereof and thereof, and the consummation by Purchaser of the transactions contemplated hereby and thereby, do not and will not (i) conflict with any of, or require any consent of any Person that has not been obtained under, Purchaser's Organizational Documents, (ii) subject to entry of the Sale Order and obtaining the authorizations referred to in Section 5.2(d) of the Purchaser Disclosure Schedules, violate or breach in any material respect any provision of, or require any consent, authorization, or approval under, any Law or any Order applicable to Purchaser, (iii) result in a violation or breach of any provision of any Law or Order applicable to Purchaser, (iv) violate, conflict with, result in a breach of, constitute a default under (whether with or without notice or the lapse of time or both), accelerate or permit the acceleration of the performance

36

required by, or require any consent, authorization, or approval under, any material Contract to which Purchaser is a party or by which it is bound or to which any of its assets or property is subject or (v) result in the creation of any Lien upon the assets or property of Purchaser, except in each case as would not reasonably be expected to have a material adverse effect on Purchaser or materially adversely affect the validity or enforceability of this Agreement against Purchaser or materially adversely affect the ability of Purchaser to consummate the transactions contemplated by this Agreement.

(d)     Governmental Approvals and Filing. Except as disclosed in Section 5.2(d) of the Purchaser Disclosure Schedules, no consent, authorization, approval or action of, filing with, notice to, or exemption from any Governmental or Regulatory Authority on the part of Purchaser is required in connection with the execution, delivery and performance of this Agreement or any Related Agreements to which Purchaser is to be a party or the consummation of the transactions contemplated hereby or thereby, except where the failure to obtain any such consent, approval or action, to make any such filing, to give any such notice or obtain any such exemption would not be reasonably expected to (i) have a material adverse effect on Purchaser or (ii) materially adversely affect the validity or enforceability against Purchaser of this Agreement or such Related Agreements or materially adversely affect the ability of Purchaser to consummate the transactions contemplated by this Agreement.

(e)     Legal Proceedings.

(i)     Purchaser has received no written notice that there are any lawsuits or arbitrations pending or threatened against Purchaser as would reasonably be expected (x) to have a material adverse effect on Purchaser, (y) to materially adversely affect the validity or enforceability of this Agreement or any of the Related Agreements against Purchaser or materially adversely affect the ability of Purchaser to consummate the transactions contemplated by this Agreement, or (z) result in the issuance of an Order restraining, enjoining or otherwise prohibiting or making illegal the consummation of the transactions contemplated by this Agreement; and

(ii)     Purchaser has received no written notice that there are any Orders outstanding against Purchaser that would be reasonably expected to have a material adverse effect on Purchaser or materially adversely affect the ability of Purchaser to consummate the transactions contemplated by this Agreement.

(f)     Brokers. No broker, finder or investment banker is entitled to any brokerage commission, finder's fee or similar payment in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of Purchaser.

(g)     Financial Resources. Purchaser has, and will have available at the Closing, funds sufficient to pay in full the Purchase Price, the Cure Amounts and the fees and expenses related to the transactions contemplated by this Agreement in cash. Purchaser knows of no circumstance or condition that could be reasonably expected to prevent the availability at Closing of such funds. Purchaser acknowledges and agrees that

notwithstanding anything to the contrary contained herein, its obligation to consummate the transactions contemplated hereby is not subject to Purchaser or any of its Affiliates obtaining any financing.

(h)     Sophistication. Purchaser is as of the Execution Date, and shall be as of the Closing Date, an "accredited investor" within the meaning of Rule 501(a) under the Securities Act of 1933 (as amended). Purchaser understands and is able to bear any economic risks associated with the transactions contemplated by this Agreement.

(i)     Investment Entirely for Own Account. Purchaser is acquiring the Acquired Assets for investment for Purchaser's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and Purchaser has no present intention of selling, granting any participation in, or otherwise distributing the same. Purchaser does not presently have any Contract with any Person to sell, transfer or grant participations to such Person or to any third Person, with respect to any of the Acquired Assets or any debt or equity security or interest in any Seller.

(j)     No Conflicting Contracts. Except as set forth in Section 5.2(j) of the Purchaser Disclosure Schedules, neither Purchaser nor any of its Affiliates is a party to any Contract involving the operation, management or ownership of a business similar to any portion of the Acquired Business that would reasonably be expected to cause a delay in any Governmental or Regulatory Authority's granting of any required or necessary approval or authorization in connection with the transactions contemplated hereby, and neither Purchaser nor any of its Affiliates has any plans, or engaged in any discussions, to enter into any such Contract prior to the Closing Date.

(k)     Opportunity for Independent Investigation; No Other Representations. Prior to its execution of this Agreement, Purchaser has conducted to its satisfaction an independent investigation and verification of the current condition and affairs of the Acquired Business and the Acquired Assets, including the condition, the cash flow and the prospects of the Acquired Assets and Assumed Liabilities. In making its decision to execute this Agreement and to purchase the Acquired Assets and assume the Assumed Liabilities, Purchaser has relied and will rely solely upon the results of such independent investigation and verification and the terms and conditions of this Agreement. Purchaser acknowledges and agrees that: (a) it has had the opportunity to visit the Acquired Business and to visit with Sellers and meet with its Representatives to discuss the Acquired Assets and Assumed Liabilities, and their condition, cash flows and prospects, (b) all materials and information requested by Purchaser have been provided to Purchaser to Purchaser's satisfaction and Purchaser is fully familiar with all such materials (including such documents and information found in the electronic data room and the Confidential Information) and information, including all terms and conditions, obligations and liabilities pursuant to, and arising under, all Material Contracts and (c) except as expressly set forth in Section 5.1, neither Sellers nor any Affiliate thereof makes any representation or warranty, express or implied, written or oral, as to the Acquired Business, the Acquired Assets or the Assumed Liabilities or any other matter. Purchaser acknowledges that the Acquired Assets are being transferred on an "AS IS, WHERE IS" basis.

(l)     Disclaimer Regarding Projections. Purchaser may be in possession of certain projections and other forecasts regarding the Acquired Business, Acquired Assets and the Assumed Liabilities and any expansions or other development opportunities relating thereto or otherwise, including projected financial statements, cash flow items and other data, and certain business plan information of the Acquired Business, Acquired Assets and the Assumed Liabilities and any expansions or other development opportunities relating thereto or otherwise. Purchaser acknowledges that there are substantial uncertainties inherent in attempting to make such projections and other forecasts and plans, and that Purchaser is familiar with such uncertainties. Accordingly, Purchaser acknowledges that neither Sellers nor any of their Affiliates, Representatives, agents or advisors has made any representation or warranty, express or implied, written or oral, with respect to such projections and other forecasts and plans.

ARTICLE VI

Regulatory Matters

Purchaser hereby covenants and agrees with Sellers, and each Seller hereby covenants and agrees with Purchaser, in each case, as follows:

Section 6.1     Regulatory Filings. Subject to the terms and conditions of this Agreement, each party shall use Reasonable Efforts to (a) take, or cause to be taken, all actions and to do, or cause to be done, all things necessary under applicable Laws to consummate the transactions contemplated by this Agreement; (b) if required or requested, file such applications and documents as may be required with any Governmental or Regulatory Authority, if any, with consent or approval rights as to or over the transfer of the Acquired Assets to Purchaser; (c) if required, file a Notification and Report Form pursuant to the HSR Act with respect to the transactions contemplated hereby within five (5) Business Days after Purchaser is selected as the Successful Bidder, if applicable, pursuant to the Bidding Procedures Order; (d) supply as promptly as practicable any additional information and documentary material that may be requested or required by any Governmental or Regulatory Authority having rights of consent or approval over or regarding the transfer of the Acquired Assets to Purchaser, including pursuant to any Antitrust Law, including the HSR Act, and (e) if applicable, cause the expiration or termination of the applicable waiting periods under the HSR Act, any other Antitrust Law or any other state, federal or local law, regulation or designation as soon as practicable. In furtherance of and without limiting the generality of the foregoing, the parties hereto will use their respective Reasonable Efforts to (i) prepare, as soon as is practicable following the execution of this Agreement, all necessary filings in connection with the transactions contemplated by this Agreement that may be required to be filed by such party with any other relevant Governmental or Regulatory Authority, (ii) submit such filings as soon as practicable, but in no event later than five (5) Business Days after Purchaser is selected as the Successful Bidder, if applicable, pursuant to the Bidding Procedures Order, (iii) assure that all such filings are in material compliance with the requirements of applicable regulatory Laws, (iv) make available to the other parties such information as the other parties may reasonably request in order to complete the filings or to respond to information requests by any relevant Governmental or Regulatory Authority, (v) take all actions necessary to cause all conditions set forth in Article IX to be satisfied as soon as practicable and (vi) execute and deliver any additional instruments reasonably requested and necessary to fully carry out the purposes of

39

this Agreement. Except as set forth in <u>Section 12.13</u>, each party hereto shall bear its own fees, costs and all other expenses associated with any filings or consents with or from any third party in connection with or otherwise related to the transactions contemplated hereby.

Section 6.2     <u>Cooperation: Confidentiality</u>. In connection with the efforts referenced in <u>Section 6.1</u> to obtain all requisite approvals and authorizations for the transactions contemplated by this Agreement, including, if applicable, under the HSR Act, any other Antitrust Law or any state or local law or regulation, or of any other relevant Governmental or Regulatory Authority, each party hereto shall use Reasonable Efforts to (a) cooperate with the other parties in connection with any filing or submission and in connection with any investigation or other inquiry, including any proceeding initiated by a private party; (b) keep the other parties informed in all material respects of any material communication received by such party from, or given by such party to, any Governmental or Regulatory Authority and of any material communication received or given in connection with any proceeding by a private party, in each case, regarding any of the transactions contemplated hereby and (c) permit the other parties to review any material communication given to it by, and, to the extent reasonably practicable, consult with the other parties in advance of any meeting or conference with, any Governmental or Regulatory Authority, including in connection with any proceeding by a private party. The foregoing obligations in this <u>Section 6.2</u> shall be subject to the Confidentiality Agreement and any attorney-client, work product or other privilege, and each party hereto shall coordinate and cooperate fully with the other parties hereto in exchanging such information and providing such assistance as such other parties may reasonably request in connection with the foregoing and in seeking early termination of any applicable waiting periods under Antitrust Law. No party hereto will take any action with the intent of delaying, impairing or impeding the receipt of any required authorizations, consents, Orders or approvals.

Section 6.3     <u>Objections or Other Challenges</u>. If (a) any objections are asserted with respect to the transactions contemplated hereby under any Antitrust Law or if any suit is instituted by any Governmental or Regulatory Authority or any private party challenging any of the transactions contemplated hereby as violating any Law, including any Antitrust Law, or (b) the filing made pursuant to <u>Section 6.1</u> is reasonably likely to be rejected or conditioned by any Governmental or Regulatory Authority, each party hereto shall use Reasonable Efforts to resolve such objections or challenge such Governmental or Regulatory Authority or private party may have to such transactions, including to vacate, lift, reverse or overturn any Order, whether temporary, preliminary or permanent, so as to permit consummation of the transactions contemplated by this Agreement. In furtherance of the foregoing, Purchaser shall undertake promptly any and all actions required to complete lawfully the transactions contemplated by this Agreement prior to the Outside Closing Date, including by (i) responding to and complying with, as promptly as reasonably practicable, any request for information or documentary material regarding the transactions from any relevant Governmental or Regulatory Authority (including responding to any "second request" for additional information or documentary material under the HSR Act as promptly as reasonably practicable), (ii) causing the prompt expiration or termination (including requesting early termination and/or approvals thereof) of any applicable waiting period and clearance or approval by any relevant Governmental or Regulatory Authority, including defense against, and the resolution of, any objections or challenges, in court or otherwise, by any relevant Governmental or Regulatory Authority preventing consummation of the transactions and (iii) making any necessary post-Closing filings or proffering and consenting to a governmental

order providing for the sale or other disposition, or the holding separate, of particular Acquired Assets, categories of Acquired Assets or lines of business, of either Acquired Assets or lines of business of the Acquired Business or of any other assets or lines of business of Purchaser or any of its Affiliates in order to mitigate or otherwise remedy any requirements of, or concerns of, any Governmental or Regulatory Authority, or proffering and consenting to any other restriction, prohibition or limitation on any of its assets, the Acquired Business, Purchaser or any of Purchaser's Affiliates, in order to mitigate or remedy such requirements or concerns, in each case conditioned on consummation of the transactions contemplated hereby. The entry by any Governmental or Regulatory Authority in any legal proceeding of a governmental order permitting the consummation of the transactions contemplated hereby but which is subject to certain conditions or requires Purchaser or any of its Affiliates to take any action, including any restructuring of the Acquired Assets, the Acquired Business or lines of business of Purchaser or any of its Affiliates or any changes to the existing business of Purchaser or any of its Affiliates, shall not be deemed a failure to satisfy the conditions specified in <u>Article IX</u>. Purchaser further agrees that neither it nor any of its Affiliates shall, prior to Closing, acquire, market, operate or control, nor enter into any other Contract to acquire, market, operate or control, any business similar to any portion of the Acquired Business if the proposed acquisition or ability to market, operate or control such business could reasonably be expected to increase the market power attributable to Purchaser and/or its Affiliates in a manner materially adverse to approval of the transactions contemplated by this Agreement or that would reasonably be expected to prevent or otherwise materially interfere with, or materially delay the consummation of the transactions contemplated by, this Agreement.

<div align="center">ARTICLE VII</div>

<div align="center">Certain Covenants</div>

Section 7.1    <u>Conduct of Business Pending Closing</u>. Except (1) those matters set forth in <u>Section 7.1</u> of the Seller Disclosure Schedules, (2) as otherwise expressly contemplated by this Agreement, (3) as required by applicable Law or any Governmental or Regulatory Authority, (4) with the written consent of Purchaser (which consent will not be unreasonably withheld, conditioned or delayed) or (5) for any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code, during the period from the Execution Date to the Closing Date, each Seller will:

　　　　(a)　　　(i) use its Reasonable Efforts, consistent with current practice, to preserve its business organization, (ii) use its Reasonable Efforts to maintain the Tangible Personal Property in good working condition and repair and (iii) use its Reasonable Efforts to comply with all Laws applicable to the conduct of the Acquired Business or the ownership and use of the Acquired Assets, in each case, except as would not reasonably be expected to have an Acquired Business Material Adverse Effect;

　　　　(b)　　　not sell, assign, transfer, convey, license or dispose of (including by waiver or release) any of the material Acquired Assets other than in the Ordinary Course of Business;

<div align="center">41</div>

(c)     not cancel, terminate, fail to renew or amend, modify or change, in any material respect, any material Transferred Permit, in each case, other than in the Ordinary Course of Business;

(d)     not amend, supplement or modify in any material respect, terminate (other than with cause) or waive any material term under, exercise any material option under or give any material consent with respect to any material Transferred Contract, in each case, other than in the Ordinary Course of Business;

(e)     not institute, settle or consent to any material litigation, arbitration or other proceeding (whether at law or in equity) or Order that would (i) become an Assumed Liability or (ii) have a material and adverse effect on Purchaser's ownership, use or operation of, or the value of, the Acquired Assets, or Purchaser's conduct of the Acquired Business, after the Closing;

(f)     not (i) increase the base salary, base wage rate or cash incentive opportunities of any of the Acquired Business Employees, or (ii) enter into any collective bargaining agreement or other Contract, agreement or understanding with any labor union or similar representative of any of the Acquired Business Employees, in each case, except to the extent determined to be reasonably necessary by any Seller to prevent an Acquired Business Material Adverse Effect;

(g)     not take any of the actions described in Section 5.1(r)(ii) through 5.1(r)(v); and

(h)     not agree in writing to take any of the actions described above in clauses (a) through (g) of this Section 7.1.

Section 7.2     Efforts to Satisfy Closing Conditions.    Each party to this Agreement will use their good-faith, reasonable best efforts to take, or cause to be taken, all actions necessary, proper or advisable to (a) satisfy all of the conditions set forth in Article IX; (b) comply promptly with all legal requirements that may be imposed on such party with respect to the transactions contemplated by this Agreement and, subject to the conditions set forth in Article IX, to consummate the transactions contemplated by this Agreement; and (c) make any required filing with or notification to, and obtain (and to cooperate with the other party to obtain) any consent, authorization, order or approval of, or any exemption by, any Governmental or Regulatory Authority and any other third party that is required to be made or obtained by it in connection with the transactions contemplated by this Agreement, including the Purchaser Required Approvals.

Section 7.3     Assets Incapable of Transfer. To the extent that any Transferred Contract or Transferred Permit is not assignable or transferable without the consent of another Person and such consent requirement is not made unenforceable by the Bankruptcy Code, this Agreement will not constitute an assignment or transfer thereof, an attempted assignment or transfer thereof, or an agreement to effect such an assignment or transfer, if such assignment or transfer, attempted assignment or transfer, or agreement would constitute a breach thereof. Sellers, upon the reasonable request by Purchaser, will use their Reasonable Efforts to obtain the consent of such other Person to the assignment or transfer of any such Transferred Contract and/or Transferred

Permit to Purchaser in all cases in which (a) such consent is or may be required for such assignment or transfer and (b) such consent requirement is not made unenforceable by the Bankruptcy Code. Purchaser will, without additional cost or expense to Purchaser, cooperate with Sellers in their efforts to obtain such consents. For purposes of clarification, Reasonable Efforts by Sellers will in no event require the payment of any money or permit, without the prior written consent of Purchaser, the amendment or modification of any material term or provision of any Transferred Contract or Transferred Permit, but Reasonable Efforts shall include appropriate filings by Sellers in the Bankruptcy Court seeking a determination that the Bankruptcy Code renders unenforceable the consent requirement in question. Notwithstanding the foregoing, failure to obtain any such consent will not give rise to Purchaser's ability not to consummate the transactions contemplated by this Agreement. Without limiting the generality of the foregoing, the beneficial interest in and to the Transferred Contracts or Transferred Permits, to the fullest extent permitted by the relevant Transferred Contract or Transferred Permit and applicable Law, will pass to Purchaser.

Section 7.4    Discovery of Breach. Sellers shall promptly notify Purchaser if, prior to the Closing, Sellers conclude or discover that any of Sellers' representations and warranties contained in this Agreement is not accurate in any material respect such that the conditions set forth in Article IX are incapable of being satisfied, which notice will summarize the reason for such conclusion. Purchaser shall immediately notify Sellers if, prior to the Closing, Purchaser concludes or discovers that any of Purchaser's representations and warranties contained in this Agreement is not accurate in any material respect such that the conditions set forth in Article IX are incapable of being satisfied, which notice will summarize the reason for such conclusion.

Section 7.5    Ability to Supplement Disclosure Schedules. Sellers may, prior to Closing, from time to time, but in no event later than five (5) Business Days prior to the Closing, supplement or amend the Seller Disclosure Schedules with respect to any event, circumstance or matter (each a "**New Matter**"), that is required to be set forth or described in such Seller Disclosure Schedules (a "**Disclosure Update**") to make such Seller Disclosure Schedules true and correct as of the Closing Date. Any such Disclosure Update will not cure any breach or inaccuracy of any representation or warranty made in this Agreement for any purpose or diminish the rights or remedies of Purchaser with respect thereto, nor shall any such notification affect any conditions to the obligations of the parties hereunder.

Section 7.6    Restricted Use of Confidential Information. Purchaser acknowledges and agrees that all information furnished to it in connection with this Agreement, the Related Agreements or the transactions contemplated hereby or thereby (i) is subject to the Confidentiality Agreement, the terms of which are incorporated herein by reference, and (ii) subject to Section 2 of the Confidentiality Agreement, constitutes Confidential Information. Notwithstanding anything to the contrary contained in the Confidentiality Agreement (including any expiration or termination thereof in accordance with its terms), the parties hereto agree that (A) during the period from the Execution Date to the Closing Date, Purchaser shall hold all Confidential Information in accordance with the obligations set forth in the Confidentiality Agreement (as if Purchaser were the Receiving Party thereunder) and (B) from and after the Closing Date, for a period of five (5) years, (x) Purchaser shall hold all Confidential Information, to the extent relating to any Excluded Assets, Excluded Liabilities or Employees (other than Transferred Employees), in accordance with the confidentiality and non-use obligations set forth in the Confidentiality Agreement (as if Purchaser were the Receiving Party thereunder) and (y) Sellers shall hold all Confidential

43

Information, to the extent relating to any Acquired Assets, Assumed Liabilities or Transferred Employees, in accordance with the confidentiality and non-use obligations set forth in the Confidentiality Agreement (as if Sellers were the Receiving Party thereunder). If this Agreement is terminated for any reason prior to the Closing, the Confidentiality Agreement shall continue in full force and effect in accordance with its terms.

Section 7.7    Review and Inspections. Subject to Section 4.3, during the period from the Execution Date to the Closing Date, upon reasonable advance written notice, Sellers will provide Purchaser and its Representatives and designees with reasonable access to Seller's books, records, systems, system master data and transactional data and facilities and reasonably make appropriate accountants, attorneys and advisors available during normal business hours in order to permit Purchaser to complete its review of Sellers for purposes of facilitating the transfer to Purchaser of the Acquired Assets, and will reasonably promptly comply with any reasonable requests relating thereto made by or on behalf of Purchaser. The parties will use Reasonable Efforts to share information protected from disclosure under the attorney-client privilege, work product doctrine, joint defense privilege or any other privilege pursuant to this Section 7.7 in a manner so as to preserve the applicable privilege. Any party may share information with any other party on an "outside counsel only" basis. Nothing in this Agreement shall obligate the parties to share any information covered by the attorney client privilege, work product doctrine or other similar privilege. Sellers acknowledge that Purchaser's review includes an assessment of and preparation for the efficient and orderly transition of the Acquired Business to Purchaser, at and after and subject to the Closing. Without limiting the generality of the foregoing, at any time on or before the Closing Date, upon reasonable advance written notice, Purchaser, its Representatives and designees, shall be granted reasonable access during normal business hours by Sellers to inspect the Transferred Real Property and Seller's records relating thereto (including interviews with Sellers and any Representatives of Sellers) to evaluate the Transferred Real Property for Hazardous Materials and compliance with Environmental Laws. Purchaser shall be entitled to obtain and evaluate all environmental reports and studies related to the Transferred Real Property that are in Sellers' possession, necessary or advisable in Purchaser's sole discretion. Notwithstanding any of the foregoing provisions of this Section 7.7, Purchaser shall not have the right to conduct invasive environmental investigation of any kind on the Acquired Assets, or conduct any structural evaluation or invasive environmental investigation of any kind, including in the form of soil and groundwater sampling, nor be entitled to any environmental reports or other similar information related to Excluded Assets.

Section 7.8    No Use of Sellers Brand. Purchaser shall, within sixty (60) days after the Closing Date, (a) cease use of the Sellers Brand and (b) change signage and stationery and otherwise discontinue public use of the Sellers Brand. As promptly as reasonably practicable after the Closing Date, Purchaser and its Affiliates shall file applications to amend or terminate any certificate of incorporation, certificate of assumed name or d/b/a filings so as to eliminate its right to use the Sellers Brand.

Section 7.9    Background License.

(a)    Effective as of the Closing, each Seller hereby grants to Purchaser and its Affiliates, or alternatively shall procure for Purchaser and its Affiliates from purchasers of the Proterra Other Business Units or assets of any Seller, a worldwide, fully paid-up,

royalty-free, irrevocable, non-terminable, perpetual, sublicensable (including through multiple tiers), non-exclusive license under and to all patents and patent applications (excluding trademarks, websites and domain names) Licensable by a Seller or any of its Affiliates that is not an Acquired Asset and that is used or held for use in or necessary for the operation and maintenance of the Acquired Business as conducted at any time prior to the Closing (including to make, have made, use, sell, offer to sell, and import any product or service, to reproduce, make derivative works of, distribute, display and perform any work, and to use such Intellectual Property) solely in connection with the Acquired Business as conducted as of Closing; provided, for the avoidance of doubt, in no event shall Purchaser or any sublicensee, transferee or assignee of the license granted pursuant to this Section 7.9(a) be used to compete with the Proterra Powered Business Unit as conducted prior to Closing. Purchaser or its Affiliates may assign and otherwise transfer such license, in whole or in part, following written notice to Volvo Battery Solutions LLC (8003 Piedmont Triad Parkway, Greensboro, North Carolina 27409, Attention: Gregory Higgins, Rikard Bentelius and Fredrik Brunell and an additional copy to Greenberg Traurig, LLP, 1000 Louisiana Street, Suite 1700 Houston, Texas 77002 Attention: Shari L. Heyen and David R. Eastlake)or its assignee, (a) to any lender or other financing source as collateral security following the Closing, (b) to an Affiliate or (c) in connection with any assignment, sale, merger, or other transfer of all or any part of the Acquired Business or a product or service line of the Acquired Business or any of its Affiliates (regardless of the form of transaction or series of transactions). All use of such licensed Intellectual Property by or under authority of Purchaser or its Affiliates (or their successors and assigns) from and after the Closing shall be on an "AS IS, WHERE IS" basis, with all faults and all express and implied representations and warranties disclaimed, and at their sole risk.

(b)     Effective as of the Closing, Purchaser hereby grants to the Sellers and purchasers of the Proterra Other Business Units or assets of any Seller and their Affiliates (or on request shall provide a standalone license agreement directly to purchasers of the Proterra Other Business Units or assets of any Seller and their Affiliates granting) a worldwide, fully paid-up, royalty-free, irrevocable, non-terminable, perpetual, sublicensable (including through multiple tiers), non-exclusive license under and to all Purchased Intellectual Property (excluding trademarks, websites and domain names) that is used or held for use in or necessary for the operation and maintenance of the Proterra Other Business Units (and/or any assets acquired in connection therewith) as conducted at any time prior to the Closing (including to make, have made, use, sell, offer to sell, and import any product or service, to reproduce, make derivative works of, distribute, display and perform any work, and to use such Intellectual Property) solely in connection with (x) (i) the Proterra Other Business Units as conducted at any time prior to Closing and (ii) the design, manufacture, marketing, promotion, sale, distribution, maintenance, repair or servicing of battery systems, electric drivetrains or electrification solutions for commercial vehicles, marine applications (boats/vessels), construction equipment, stationary battery energy storage systems, and, in the case of each of clauses (i) and (ii), any natural extensions thereof, and (y) the provision of transition services to the Proterra Other Business Units. Sellers and purchasers of the Proterra Other Business Units or their Affiliates may assign and otherwise transfer such license, in whole or in part, (a) to any lender or other financing source as collateral security following the Closing, (b) to an Affiliate or (c) in connection with any assignment, sale, merger, or other transfer of all or

45

any part of a Proterra Other Business Unit or a product or service line of a Proterra Other Business Unit or any of its Affiliates (regardless of the form of transaction or series of transactions). All use of such licensed Intellectual Property by or under authority of Sellers and purchasers of the Proterra Other Business Units or their Affiliates (or their successors and assigns) from and after the Closing shall be on an "AS IS, WHERE IS" basis, with all faults and all express and implied representations and warranties disclaimed, and at their sole risk.

Section 7.10   <u>Support Obligations</u>. Purchaser shall replace, effective as of Closing, the credit support obligations (including the letters of credit) provided by Sellers or any of their Affiliates with respect to the Acquired Business, the Acquired Assets or the operation thereof, as listed on <u>Schedule 7.10</u>, as the same may be updated from time to time to include additional credit support provided by Sellers or any of their Affiliates with respect to the Acquired Business, the Acquired Assets or the operation thereof at any time on or after the date hereof and prior to Closing in accordance with the terms and conditions set forth herein (collectively, the "**Support Obligations**"). In furtherance of the foregoing, Purchaser shall obtain, prior to the Closing, substitute credit support arrangements in replacement for the Support Obligations, which substitute credit support arrangements shall be in form and substance reasonably satisfactory to Sellers.

Section 7.11   <u>Transition Services Agreement</u>. From the date hereof until Closing (or the earlier termination of this Agreement pursuant to <u>Article X</u>), Purchaser shall use commercially reasonable efforts to enter into a Transition Services Agreement.

<div align="center">

ARTICLE VIII

Employee Matters

</div>

Section 8.1   <u>Transferred Employees</u>. At least ten (10) Business Days prior to, and contingent on the occurrence of the Closing, Purchaser shall extend an offer of employment to those Acquired Business Employees to whom Purchaser has determined to offer employment, with such employment to take effect under the terms stated herein as of the Closing Date. Each such Acquired Business Employee who accepts an offer of employment from Purchaser and commences employment with Purchaser or an applicable Affiliate of Purchaser shall be referred to herein as a "**Transferred Employee**". Purchaser shall provide Sellers with information that Sellers reasonably request to verify that such offers of employment are in compliance with this <u>Article VIII</u>.

Section 8.2   <u>Benefits Matters</u>. With respect to each Transferred Employee who is not covered by a collective bargaining agreement, for a period of at least twelve (12) months following the Closing Date, Purchaser shall provide each Transferred Employee with a position that is comparable to such Transferred Employee's position immediately prior to the Closing and shall maintain: (a) base salary or base wage rate at least equal to such Transferred Employee's base salary and base wage rate as in effect immediately prior to the Closing, (b) cash incentive opportunities for such Transferred Employee that are no less favorable than those in effect for such Transferred Employee immediately prior to the Closing and (c) retirement, health and welfare

<div align="center">46</div>

benefits that are no less favorable than those provided to similarly situated employees of Purchaser or an applicable Affiliate.

Section 8.3    Labor Matters. Purchaser agrees that, as of and following the Closing Date, Purchaser shall recognize any union or other labor representatives of the Transferred Employees. Without limiting the generality of this Section 8.3 or Purchaser's obligations under this Agreement, (a) with respect to each Transferred Employee covered by a collective bargaining agreement, Purchaser shall comply with the terms of the applicable collective bargaining agreement and (b) Purchaser and Sellers shall, and shall cause their respective Affiliates to, cooperate to take all steps, on a timely basis, as are required under applicable Laws or any collective bargaining agreement to notify, consult with, or negotiate the effect, impact, terms or timing of the transactions contemplated by this Agreement with the unions, works councils or other labor representatives of the Transferred Employees or a Governmental or Regulatory Authority to the extent required by applicable Law or any collective bargaining agreement.

Section 8.4    Benefits Eligibility. As of and after the Closing, Purchaser shall provide each Transferred Employee with service credit for purposes of eligibility, vesting and level of benefits (but not for purposes of benefit accrual under any defined benefit pension plan) under any employee benefit plan, policy or arrangement sponsored by Purchaser or any of its Affiliates (each, a "**Purchaser Plan**") for such Transferred Employee's service prior to the Closing with Sellers or any of their respective Affiliates (and their respective predecessors), to the same extent that such service was recognized immediately prior to the Closing under a comparable Benefit Plan; provided, that such service shall not be credited to the extent such credit would result in any duplication of compensation or benefits.  Without limiting the foregoing, (i) each Transferred Employee (and spouse and dependents thereof) will not be subject to any limitations as to pre-existing conditions, actively-at-work requirements, exclusions or waiting periods under any Purchaser Plan that is a health or welfare plan for any limitations for which such employee would have been entitled to coverage under a comparable Benefit Plan in which such Transferred Employee (or spouse or dependent thereof) was eligible to participate immediately prior to the Closing Date and (ii) Purchaser shall cause each Transferred Employee (and spouse and dependents thereof) to be given full credit under each such Purchaser Plan for any co-payments, deductibles, out-of-pocket expenses and lifetime maximums paid or satisfied, as applicable, during the relevant plan year up to and including the Closing Date.

Section 8.5    WARN Act. With respect to Transferred Employees, Purchaser will have responsibility under the WARN Act relating to any act or omission of Purchaser after the Closing Date. With respect to the Employees, Sellers will have full responsibility under the WARN Act relating to any act or omission of Sellers prior to and on the Closing Date. Sellers shall be responsible for all other WARN Act Liabilities relating to the periods prior to and on the Closing Date, including any such Liabilities that result from any Acquired Business Employees' separation of employment from Sellers and/or Acquired Business Employees not becoming Transferred Employees pursuant to this Article VIII. Unless otherwise agreed to by Sellers and Purchaser, Sellers agree to issue, no later than sixty (60) days prior to the Closing Date, all applicable WARN Act notices, in a form acceptable to Purchaser, to the Acquired Business Employees and all other parties required to receive notice under the WARN Acts.

ARTICLE IX

Conditions to Closing

Section 9.1    Conditions to the Obligations of Purchaser. The obligation of Purchaser to effect the Closing is subject to the satisfaction (or waiver by Purchaser) on the Closing Date of the following conditions:

(a)    Representations and Warranties. (i) Each of the Seller Fundamental Representations shall be true and correct in all material respects, in each case as of the Execution Date and as of the Closing as if made as of the Closing, except for such representations and warranties which are as of a specific date, which shall be true and correct in all material respects as of such date, and (ii) each of the representations and warranties of Sellers contained herein (other than the Seller Fundamental Representations) shall be true and correct in all respects (without giving effect to any limitation as to materiality or Acquired Business Material Adverse Effect), in each case as of the Execution Date and as of the Closing as if made as of the Closing, except for (x) changes permitted or contemplated hereby; (y) representations and warranties which are as of a specific date, which shall be true and correct as of such date, subject to the immediately following clause (z); or (z) where the failure to be so true and correct would not in the aggregate have an Acquired Business Material Adverse Effect or have a material adverse effect on the ability of Sellers to consummate the transactions contemplated hereby. Purchaser will have received a certificate from Sellers signed on behalf of each Seller by a duly authorized officer thereof with respect to the foregoing.

(b)    Covenants. The covenants and agreements of Sellers to be performed on or prior to the Closing will have been duly performed in all material respects. Purchaser will have received a certificate from Sellers signed on behalf of each Seller by a duly authorized officer thereof with respect to the foregoing.

(c)    Related Agreements. Each Seller will have duly executed and delivered to Purchaser the Related Agreements  to which such Seller is to be a party.

(d)    Seller's Deliveries. Sellers will have delivered or caused to be delivered to Purchaser the items listed in Section 4.2(a) in form and substance as required herein.

(e)    Acquired Business Material Adverse Effect. Since the Execution Date, there shall not have occurred or been discovered any developments, circumstances or occurrences with regard to any of the Acquired Assets or the Acquired Business, that, individually or in the aggregate, has had an Acquired Business Material Adverse Effect.

Section 9.2    Conditions to the Obligations of Sellers. The obligation of Sellers to effect the Closing is subject to the satisfaction (or waiver by Sellers) on the Closing Date of the following conditions:

(a)    Representations and Warranties. Each of the representations and warranties of Purchaser contained herein shall be true and correct in all material respects, in each case as of the Execution Date and as of the Closing as if made as of the Closing, except for such

48

representations and warranties which are as of a specific date, which shall be true and correct in all material respects as of such date. Sellers will have received a certificate from Purchaser signed on behalf of Purchaser by a duly authorized officer thereof with respect to the foregoing.

(b)    Covenants. The covenants and agreements of Purchaser to be performed on or prior to the Closing will have been duly performed in all material respects. Sellers will have received a certificate from Purchaser signed on behalf of Purchaser by a duly authorized officer thereof with respect to the foregoing.

(c)    Receipt of Purchase Price. Sellers will have received from Purchaser an amount equal to (i) the Purchase Price minus (ii) the Earnest Deposit, as provided and in accordance with Section 3.1(b) of the Agreement. Sellers will have also received the Earnest Deposit from the Escrow Agent. Sellers shall have received evidence of the payment of the Cure Amounts.

(d)    Related Agreements. Purchaser will have duly executed and delivered to Sellers each of the Related Agreements to which Purchaser is a party.

(e)    Purchaser's Deliveries. Purchaser will have delivered or caused to be delivered to Sellers the items listed in Section 4.2(b).

Section 9.3    Conditions Precedent to Obligations of Purchaser and Sellers. The respective obligations of the parties to effect the Closing are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser and Sellers in whole or in part to the extent permitted by applicable Law):

(a)    there shall not be in effect any Order by a Governmental or Regulatory Authority (i) declaring this Agreement or any Related Agreement invalid or unenforceable in any respect or (ii) restraining, enjoining or otherwise prohibiting or making illegal the Closing, in each case, that is not stayed by the commencement of the Bankruptcy Cases or any Order of the Bankruptcy Court;

(b)    the Sale Order, together with any other Order of the Bankruptcy Court required to consummate the transactions contemplated hereby, shall have been entered by the Bankruptcy Court and each such Order (i) is not subject to any stay, and (ii) has not been vacated, reversed, or modified in a material matter with respect to Purchaser's rights or protections thereunder without Purchaser's prior written consent;

(c)    subject to the provisions of Section 7.3, the Sale Order shall approve and authorize the assumption and assignment of the Transferred Contracts and the Transferred Contracts shall have been actually assumed and assigned to Purchaser, subject to the payment of applicable Cure Amounts by Purchaser;

(d)    any applicable waiting period (and any extensions thereof) under the HSR Act shall have expired or been terminated;

(e)     all Purchaser Required Approvals shall have been obtained and shall be in full force and effect; and

(f)     all conditions to the closing of the Sale under the Sale Order other than the Closing, shall have occurred or been waived pursuant to the terms of the Sale Order.

Section 9.4   <u>Frustration of Closing Conditions</u>. Purchaser may not rely on the failure of any condition set forth in this <u>Article IX</u> to be satisfied if such failure was caused by Purchaser's failure to comply with the terms of this Agreement. Sellers may not rely on the failure of any condition set forth in this <u>Article IX</u> to be satisfied if such failure was caused by any Seller's failure to comply with the terms of this Agreement.

<div align="center">ARTICLE X</div>

<div align="center"><u>Termination</u></div>

Section 10.1   <u>Termination</u>. Subject to <u>Section 10.2</u>, this Agreement may be terminated at any time prior to the Closing Date:

(a)     by written agreement of Sellers and Purchaser;

(b)     by the Sellers by written notice to the Purchaser, if the Closing has not occurred on or prior to the Outside Closing Date (unless, in each case, the failure to consummate the Closing by such date is due to the failure of a Seller to have fulfilled any of its obligations under this Agreement);

(c)     by either Purchaser, on the one hand, or Sellers, on the other hand, by written notice to the other, in the event that any Governmental or Regulatory Authority has issued a final, non-appealable Order or ruling or taken any other final, non-appealable action, or any applicable Law has been entered, adopted, enacted or promulgated, in each case permanently restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement that is not stayed by the commencement of the Bankruptcy Cases or any order of the Bankruptcy Court;

(d)     by Sellers, by written notice to Purchaser, (i) in the event that, other than through the failure of a Seller to comply with its obligations under this Agreement, one or more of the conditions to Sellers' obligation to effect the Closing is or becomes impossible to satisfy at any time after the Execution Date and Sellers have not waived such condition(s) or (ii) if neither Seller is in material breach of any terms of this Agreement, upon a material breach of a representation, warranty, or covenant on the part of Purchaser set forth in this Agreement such that a condition set forth in <u>Section 9.2</u> or <u>Section 9.3</u> would not reasonably be expected to be satisfied as of the time of such termination, and such breach is not capable of being cured or has not been cured within 30 days after Purchaser receives written notice thereof from Sellers;

(e)     by Purchaser, by written notice to Sellers, (i) in the event that, other than through the failure of Purchaser to comply with its obligations under this Agreement, one or more of the conditions to Purchaser's obligation to effect the Closing is or becomes

<div align="center">50</div>

impossible to satisfy at any time after the Execution Date and Purchaser has not waived such condition(s) or (ii) if Purchaser is not in material breach of any terms of this Agreement, upon a material breach of a representation, warranty, or covenant on the part of a Seller set forth in this Agreement such that a condition set forth in Section 9.1 or Section 9.3 would not reasonably be expected to be satisfied as of the time of such termination, and such breach is not capable of being cured or has not been cured within 30 days after Seller receives written notice thereof from Purchaser;

(f)     by Purchaser, by written notice to Sellers, if the Sale Order entered by the Bankruptcy Court has been (A) vacated or reversed or (B) modified in a manner that is adverse to Purchaser in any material respect without Purchaser's prior written consent;

(g)     by either Purchaser, on the one hand, or Sellers, on the other hand, by written notice to the other, if (i) Purchaser is not the Successful Bidder or Backup Bidder at the Auction, (ii) prior to Closing, the Bankruptcy Court enters an order dismissing or converting the Bankruptcy Cases to a case under Chapter 7 of the Bankruptcy Code or (iii) the Bankruptcy Court enters an Order denying approval of the Sale Order or represents at a Sale Hearing (as defined in the Bidding Procedures Order) or other hearing that the Bankruptcy Court will not approve entry of the Sale Order;

(h)     by Purchaser, by written notice to Sellers, if, Sellers withdraw the request for authority to sell the Acquired Assets and assume and assign the Transferred Contracts; or

(i)     by Purchaser, by written notice to Sellers, if Sellers (i) move to voluntarily dismiss the Bankruptcy Cases or (ii) move for conversion of the Bankruptcy Cases to a case under chapter 7 of the Bankruptcy Code, in each case, unless the effectiveness thereof is to occur after the Closing.

Section 10.2    Effect of Termination. In the event of the termination of this Agreement in accordance with Section 10.1, this Agreement will thereafter become void and have no effect, and no party hereto will have any liability to the other party hereto or their respective Affiliates, directors, officers or employees, except for the obligations of the parties hereto contained in this Section 10.2, in Article XII and in Section 7.6; provided, however, that (a) if this Agreement is validly terminated by Purchaser prior to Closing pursuant to Section 10.1(e)(ii), Escrow Agent shall, within two (2) Business Days following the termination of this Agreement and without the requirement of any approval by the Bankruptcy Court, distribute the Deposit Escrow Funds to Purchaser and such distribution to Purchaser shall be Purchaser's sole and exclusive remedy as a result of such termination, and (b) if this Agreement is validly terminated by Sellers or Purchaser prior to Closing for any reason other than by Purchaser pursuant to Section 10.1(e)(ii), Escrow Agent shall, within two (2) Business Days following the termination of this Agreement and without the requirement of any approval by the Bankruptcy Court, distribute the Deposit Escrow Funds to Sellers and Sellers shall be entitled to retain the Deposit Escrow Funds.

ARTICLE XI

Bankruptcy Matters

Section 11.1    Bankruptcy Cases. On the Petition Date, Sellers filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code, which cases are jointly administered under Case No. 23-11120 (BLS) (the "**Bankruptcy Cases**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") as of the Execution Date.

Section 11.2    Bankruptcy Court Approvals

(a)    Sellers and Purchaser acknowledge that this Agreement is subject to approval by the Bankruptcy Court by entry of the Sale Order.

(b)    If Purchaser is selected as the Successful Bidder or Backup Bidder pursuant to the Bidding Procedures Order, a list of the Transferred Contracts shall be attached to the Sale Order.

(c)    If the Sale Order or any other Orders of the Bankruptcy Court relating to the transactions contemplated by this Agreement shall be appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or re-argument shall be filed with respect to the Sale Order or other such Order), subject to rights otherwise arising from this Agreement, including each party's respective right to terminate this Agreement pursuant to Section 10.1, Sellers and Purchaser shall use their Reasonable Efforts to oppose such appeal, petition or motion and obtain an expedited resolution of any such appeal, petition or motion.

(d)    Purchaser and Sellers agree that from and after the date that the Auction is declared closed by Sellers, Sellers will not, directly or indirectly, and will not permit any of their respective Affiliates or Representatives (or Representatives of any of their respective Affiliates) to initiate contact with, or solicit or knowingly encourage submission of any inquiries, proposals or offers by, any Person with respect to an Alternative Transaction or otherwise facilitate any effort or attempt to make a proposal or offer to Sellers or any of their respective Affiliates or Representatives (or Representatives of any of their respective Affiliates) with respect to an Alternative Transaction. For the avoidance of doubt, Sellers will not, and will not permit any of their respective Affiliates or Representatives (or Representatives of any of their respective Affiliates) to, pursue or agree to any Alternative Transaction other than as expressly permitted by and in accordance with the Bidding Procedures Order; provided, that Sellers shall have the responsibility and obligation to respond to any inquiries or offers to purchase all or any part of the Acquired Assets and perform any and all other acts related thereto that are required under the Bankruptcy Code, fiduciary obligations, or other applicable law, including, supplying information relating to the Acquired Assets to prospective purchasers, notwithstanding any provisions of Section 7.6 hereof to the contrary.

52

Section 11.3    <u>Further Filings and Assurances</u>.

(a)    Purchaser agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Purchaser, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under the Transferred Contracts and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code.

(b)    In the event the entry of the Sale Order shall be appealed, each party shall use its respective Reasonable Efforts to defend against such appeal, provided however, that nothing herein shall alter, amend or modify the conditions to Closing set forth in <u>Section 9.3(b)</u> hereof.

Section 11.4    <u>Notice of Sale.</u> Notice of the sale of Acquired Assets contemplated in this Agreement shall be served in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Local Rules of the Bankruptcy Court and the Bidding Procedures Order.

Section 11.5    <u>Free and Clear</u>. The transfer of the Acquired Assets shall vest Purchaser with all right, title, and interest of Sellers in the Acquired Assets free and clear of any and all Liens, Liabilities and other Interests (other than Permitted Encumbrances and Assumed Liabilities) pursuant to Sections 363(f) and/or 1123(b)(4) of the Bankruptcy Code, whether arising by statute or otherwise and whether arising before or after the commencement of the Bankruptcy Cases, whether known or unknown, including Interests of or asserted by any of the creditors, vendors, employees, suppliers, or lessors of Sellers or any other third party; <u>provided</u>, that any and all such Liens, Liabilities and other Interests shall attach to the net proceeds of the Purchase Price, with the same priority, validity, force, and effect as they now have against the Acquired Assets. Purchaser shall not be liable for any liability for any Lien, Liability or other Interest, other than the Assumed Liabilities and Permitted Encumbrances.

Section 11.6    <u>Transfer Tax Exemption</u>. The transactions contemplated herein shall be exempt from Transfer Tax to the fullest extent available in accordance with Section 1146 of the Bankruptcy Code.

<div align="center"><u>ARTICLE XII</u></div>

<div align="center"><u>Miscellaneous</u></div>

Section 12.1    <u>Survival</u>. All covenants and agreements contained herein which by their terms are to be performed in whole or in part, or which prohibit actions, subsequent to the Closing shall, solely to the extent such covenants and agreements are to be performed, or prohibit actions, subsequent to the Closing, survive the Closing in accordance with their terms until fully performed or satisfied. All other covenants and agreements contained herein, and all representations and warranties contained herein or in any certificated deliveries hereunder, in each case shall not

<div align="center">53</div>

survive the Closing and shall thereupon terminate and be of no further force or effect, including any actions for damages in respect of any breach or inaccuracy thereof.

Section 12.2    Governing Law and Jurisdiction. Except to the extent governed by the Bankruptcy Code, this Agreement will be governed by and be construed in accordance with the Laws of the State of Delaware, without regard however to the conflicts of laws principles thereof. Without limiting any party's right to appeal any Order of the Bankruptcy Court, (a) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes that may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, including, but not limited to, the assumption and assignment of the Transferred Contracts and (b) any and all legal proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereto hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations pursuant to Section 12.3 hereto. To the extent not prohibited by applicable Law or Bankruptcy Court rule, each party hereby waives and agrees not to assert, by way of motion, as a defense or otherwise in any such proceeding, any claim (i) that it is not subject to the jurisdiction of the Bankruptcy Court, (ii) that the proceeding is brought in an inconvenient forum, (iii) that it is immune from any legal process with respect to itself or its property, (iv) that the venue of the proceeding is improper or (v) that this Agreement or the subject matter hereof or thereof may not be enforced in or by such court. Each of the parties hereto hereby (a) irrevocably submits with regard to any such legal proceeding to the exclusive personal jurisdiction of the Bankruptcy Court in the event any dispute arises out of this Agreement or any transaction contemplated hereby, including, but not limited to, the assumption and assignment of the Transferred Contracts, (b) agrees that it shall not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from the Bankruptcy Court or that such action is brought in an inconvenient forum and (c) agrees that it shall not bring any action relating to this Agreement or any transaction contemplated hereby in any court other than the Bankruptcy Court; provided, that, a party may commence any action or proceeding in a court other than the Bankruptcy Court solely for the purpose of enforcing an order or judgment issued by the Bankruptcy Court. The parties waive personal service of any and all process on each of them and consent that all such service of process shall be made in the manner, to the party and at the address set forth in Section 12.3 of this Agreement, and service so made shall be complete as stated in such Section 12.3. EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY.

Section 12.3    Notices. All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by e-mail (so long as no "bounceback" or similar "undeliverable" message is received by the sender thereof) if successfully transmitted prior to 5:00 pm (Eastern Time) on any Business Day, and on the next Business Day if successfully transmitted after such time or on a non-Business Day or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 12.3):

(1)     If to Sellers, to:

> Proterra Inc
> 1815 Rollins Road
> Burlingame, California 94010
> Attention:     Jeff Mitchell
>                Proterra Legal Department
> Email:         jmitchell@proterra.com; Legal@proterra.com

and an additional copy (which will not constitute notice to Sellers) to:

> Paul, Weiss, Rifkind, Wharton & Garrison LLP
> 1285 Avenue of the Americas
> New York, New York 10019-6064
> Attention:     Paul M. Basta
>                Robert A. Britton
>                Austin S. Pollet
>                Michael J. Colarossi
> Email:         pbasta@paulweiss.com
>                rbritton@paulweiss.com
>                apollet@paulweiss.com
>                mcolarossi@paulweiss.com

(2)     If to Purchaser to:

> Phoenix Motor, Inc.
> 1500 LAKEVIEW LOOP
> ANAHEIM, CA 92807
> Attn: Mark Hastings
> Telephone: 916-622-5531
> Email: MarkH@phoenixmotorcars.com

Section 12.4     Amendments and Waivers.

(a)     This Agreement may be amended, superseded, canceled, renewed, or extended, and the terms hereof may be waived, only by a written instrument signed by the parties hereto or, in the case of a waiver, by the party against whom the waiver is to be effective. Neither the failure nor any delay by any party in exercising any right, power or privilege under this Agreement will operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power or privilege will preclude any other or further exercise of such right, power or privilege or the exercise of any other right, power or privilege. To the maximum extent permitted by applicable Law (i) no claim or right arising out of this Agreement can be discharged by one party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other party, (ii) no waiver that may be given by a party will be applicable except in the specific instance

for which it is given, and (iii) no notice to or demand on one party will be deemed to be a waiver of any obligation of such party or of the right of the party giving such notice or demand to take further action without notice or demand as provided in this Agreement.

(b)    A failure or omission of any party to insist, in any instance, upon strict performance by another party of any term or provision of this Agreement or to exercise any of its rights hereunder will not be deemed a modification of any term or provision hereof or a waiver or relinquishment of the future performance of any such term or provision by such party, nor will such failure or omission constitute a waiver of the right of such party to insist upon future performance by another party of any such term or provision or any other term or provision of this Agreement.

Section 12.5    Entire Agreement. This Agreement, together with the Seller Disclosure Schedules, the Purchaser Disclosure Schedules, all Exhibits and Schedules hereto and the documents, agreements, certificates and instruments referred to herein and therein, including the Related Agreements, Confidentiality Agreement and related Orders, including the Sale Order, constitutes the entire agreement between the parties hereto and with respect to the subject matter hereof and supersedes all prior representations, warranties, agreements, and understandings, oral or written, with respect to such matters and other than any written agreement of the parties that expressly provides that it is not superseded by this Agreement.

Section 12.6    Headings: Interpretation. The headings in this Agreement are intended solely for convenience of reference and will be given no effect in the construction or interpretation of this Agreement. Unless the context otherwise requires, the singular includes the plural, and the plural includes the singular.

Section 12.7    No Assignment: Binding Effect. This Agreement is not assignable by any party without the prior written consent of the other party. Notwithstanding the foregoing, Purchaser may, without the prior written consent of Sellers, assign this Agreement or all or any portion of Purchaser's rights, interests and obligations hereunder to any of its Affiliates upon notice given to Sellers at least three (3) Business Days prior to the Closing, provided however, that in no event will such an assignment release Purchaser from its obligations hereunder. This Agreement will be binding upon and will inure to the benefit of the parties hereto and their respective successors and permitted assigns.

Section 12.8    Counterparts. This Agreement may be executed in any number of counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument. Any electronic signature, including via portable document format (pdf) or DocuSign, attached hereto will be deemed to be an original and will have the same force and effect as an original signature.

Section 12.9    Incorporation by Reference. The Seller Disclosure Schedules, the Purchaser Disclosure Schedules and other Schedules and Exhibits and the documents referenced therein constitute integral parts of this Agreement and are hereby incorporated by reference herein.

Section 12.10    Time of the Essence. With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

Section 12.11 <u>Specific Performance</u>. Each party hereby acknowledges and agrees that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed by a party in accordance with their specific terms or were otherwise breached by a party. Notwithstanding anything to the contrary herein, if any party violates or refuses to perform any covenant or agreement made by such party herein, without limiting or waiving in any respect any rights or remedies of a party under this Agreement now or hereafter existing at law, in equity or by statute, the non-breaching party or parties shall, in addition to any other remedy to which a party is entitled at law or in equity, be entitled to specific performance of such covenant or agreement or seek any other equitable relief, in each case without the proof of actual damages. Each party agrees to waive any requirement for the security or posting of any bond in connection with any such equitable remedy, and agrees that it will not oppose the granting of an injunction, specific performance or other equitable relief on the basis that (a) the other party has an adequate remedy at law, or (b) an award of specific performance is not an appropriate remedy for any reason at law or equity.

Section 12.12 <u>No Third Party Beneficiaries</u>.

(a)     Except as provided in <u>Section 12.16</u>, the terms and provisions of this Agreement are intended solely for the benefit of the parties hereto and their respective successors and permitted assigns, and it is not the intention of the parties hereto to confer third party beneficiary rights upon any other Person.

(b)     For the avoidance of doubt, all provisions contained in this Agreement with respect to employee benefit plans or compensation of any Employees are included for the sole benefit of the respective parties hereto, and nothing contained herein (i) shall confer upon any former, current or future employee of Sellers or Purchaser or any legal representative or beneficiary thereof any rights or remedies, including any right to employment or continued employment, of any nature, for any specified period, (ii) shall cause the employment status of any former, present or future employee to be other than terminable at will, (iii) shall confer any third party beneficiary rights upon any Employee or any dependent or beneficiary thereof or any heirs or assigns thereof or (iv) shall constitute an amendment of any Benefit Plan or other employee compensation or benefit plan, program, policy or arrangement of Sellers, Purchaser or any of their respective Affiliates.

Section 12.13 <u>Expenses</u>. Whether or not the transactions contemplated hereby are consummated, each party hereto will pay its own costs and expenses incurred in connection with the negotiation, execution and closing of this Agreement and the Related Agreements and the transactions contemplated hereby and thereby provided. In the event of termination of this Agreement, the obligation of each party to pay its own expenses will be subject to any rights of such party arising from a breach of this Agreement by another party. Notwithstanding the foregoing, (a) Sellers agree to pay all costs of releasing existing Liens and other Interests and recording the releases, (b) Purchaser agrees to pay any filing fees in connection with the filings made pursuant to the HSR Act and any other federal, state or local Governmental or Regulatory Authority in accordance with <u>Section 6.1</u> and (c) Purchaser will pay the cost of all document recordation costs and all Transfer Taxes not determined to be exempt in accordance with Section 1146 of the Bankruptcy Code arising by reason of the transactions contemplated by this

Agreement to the extent the transactions contemplated herein are determined not to be exempt from such costs.

Section 12.14 <u>Severability</u>. If any term or other provision of this Agreement is illegal, invalid or unenforceable under any Law or as a matter of public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated by this Agreement is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision contained herein is, to any extent, invalid or unenforceable in any respect under the Laws governing this Agreement, the parties to this Agreement shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated by this Agreement be consummated as originally contemplated to the greatest extent possible.

Section 12.15 <u>Public Announcements</u>. Prior to the Closing, unless otherwise required by applicable Law, the Bankruptcy Court, the Bidding Procedures or Bidding Procedures Order or by obligations of Purchaser or Sellers or their respective Affiliates pursuant to any listing agreement with or rules of any securities exchange, Purchaser, on the one hand, and Sellers, on the other hand, shall consult with each other before issuing any press release or otherwise making any public statement with respect to this Agreement or the transactions contemplated hereby and shall not issue any such release or make any such statement without the prior written consent of the other (such consent not to be unreasonably withheld, conditioned or delayed). From and after the Closing, the parties hereto may make public statements with respect to this Agreement or the transactions contemplated hereby so long as such announcements do not disclose the specific terms or conditions of this Agreement, except where such terms and conditions have already been disclosed as required by Law or by obligations of Purchaser or Sellers or their respective Affiliates pursuant to any listing agreement with or rules of any securities exchange or the Bankruptcy Court; <u>provided</u>, that the issuing party shall use its Reasonable Efforts to consult with the other party with respect to the text thereof to the extent practicable.

Section 12.16 <u>No Liability; Release</u>.

(a)     (i) No past, present or future director, officer, manager, employee, incorporator, member, partner or equityholder or other Affiliates of (A) any Seller (other than such Seller in its capacity as such), or (B) Purchaser (other than any obligations hereunder or assumed herein), and (ii) none of the lenders or agents under any Indebtedness of a Seller , in any case, shall have any Liability for any obligations or liabilities of Sellers or Purchaser, as applicable, under this Agreement or any agreement, document or instrument entered into in connection herewith of or for any claim based on, in respect of, or by reason of, the transactions contemplated hereby and thereby. Any claim or cause of action based upon, arising out of, or related to this Agreement or any agreement, document or instrument contemplated hereby may only be brought against Persons that are expressly named as parties hereto or thereto, and then only with respect to the specific obligations set forth herein or therein. Other than the parties hereto, no other party shall have any Liability or obligation for any of the representations, warranties, covenants, agreements, obligations or liabilities of any party under this Agreement or the agreements, documents or instruments contemplated hereby or of or for any legal proceeding based on, in respect

of, or by reason of, the transactions contemplated hereby or thereby (including the breach, termination or failure to consummate such transactions), in each case whether based on contract, tort, fraud, strict liability, other Law or otherwise and whether by piercing the corporate veil, by a claim by or on behalf of a party hereto or another Person or otherwise.

(b)     Effective upon the Closing Date, Purchaser acknowledges that it has no claim, counterclaim, setoff, recoupment, action or cause of action of any kind or nature whatsoever against any of the individuals or entities within the Seller Group, that directly or indirectly arises out of, is based upon, or is in any manner connected with any Prior Event (including, for the avoidance of doubt, any Avoidance Actions) (collectively, the "**Purchaser Released Claims**"); and, should any Purchaser Released Claims nonetheless exist, Purchaser hereby (i) releases and discharges each member of the Seller Group from any liability whatsoever on such Purchaser Released Claims that directly or indirectly arises out of, is based upon, or is in any manner connected with a Prior Event, and (ii) releases, remises, waives and discharges all such Purchaser Released Claims against the Seller Group. For purposes of this <u>Section 12.16(b)</u>, "**Seller Group**" means (1) each Seller, (2) the lenders and agents under the Indebtedness of any Seller, (3) the Statutory Committee of Unsecured Creditors of the Sellers in their Bankruptcy Cases, and any members thereof at any time, in each case, solely in their capacity as such, and (4) with respect to those parties in the foregoing (1)–(3) of this sentence, any of their respective agents, attorneys, financial advisors, legal representatives, consultants, legal advisors, Affiliates, directors, managers, officers, control persons (as defined in Section 15 of the Securities Act of 1933 (as amended) or Section 20 of the Securities Exchange Act of 1934 (as amended), shareholders, partners, estates, members, employees and successors and assigns, in each case, solely in their capacity as such, and "**Prior Event**" means any transaction, event, circumstances, action, failure to act or occurrence of any sort or type, including any approval or acceptance given or denied, whether known or unknown, which occurred, existed, was taken or begun prior to the consummation of the transactions contemplated hereunder; <u>provided</u>, that for the avoidance of doubt, "Prior Event" shall include any transaction, event, circumstances, action, failure to act or occurrence of any sort or type which occurred, existed, was taken or begun in accordance with, pursuant to or by virtue of: (A) any terms of this Agreement, (B) the transactions referred to herein, (C) the Bankruptcy Cases or the events leading to the commencement thereof, or (D) any oral or written agreement relating to the foregoing (A) to (C) of this sentence.

(c)     Without limiting in any way the scope of the release contained in subparagraph (a) or (b) of this <u>Section 12.16</u> and effective upon the Closing Date, Purchaser, to the fullest extent allowed under applicable Law, hereby waives and relinquishes all statutory and common law protections purporting to limit the scope or effect of a general release, whether due to lack of knowledge of any claim or otherwise, including, waiving and relinquishing the terms of any Law which provides that a release may not apply to material unknown claims. Purchaser hereby further affirms its intent to waive and relinquish such unknown claims and to waive and relinquish any statutory or common law protection available in any applicable jurisdiction with respect thereto including, without limitation, California Civil Code § 1542, which provides:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

(d)     Notwithstanding anything set forth herein to the contrary, the releases set forth in this Section 12.16 do not extend to (i) any obligations that are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the willful misconduct, actual and intentional fraud or gross negligence of such Person or (ii) any obligations of the parties under this Agreement.

*[Signature Page to Follow]*

60

IN WITNESS WHEREOF, the parties, intending legally to be bound, have caused this Agreement to be duly executed as of the day and year first herein above written.

**SELLERS:**

PROTERRA INC

By:_____
Name: _GARETH JOYCE_
Title: _CEO & PRESIDENT_

PROTERRA OPERATING COMPANY, INC.

By:_____
Name: _GARETH JOYCE_
Title: _CEO & PRESIDENT_.

**PURCHASER:**

PHOENIX MOTOR INC.

By: _____

Name: JAMES MARK HASTINGS

Title: SENIOR VICE PRESIDENT

**FIRST AMENDMENT
TO
ASSET PURCHASE AGREEMENT**

This First Amendment to Asset Purchase Agreement (this "**Amendment**") is made and entered into as of December 1, 2023, by and among PROTERRA INC, a Delaware corporation ("**Holdco**"), PROTERRA OPERATING COMPANY, INC., a Delaware corporation (together with Holdco, "**Sellers**" and each a "**Seller**"), and PHOENIX MOTOR INC., a Delaware corporation ("**Purchaser**"). Each of the parties named above may be referred to herein as a "**Party**" and collectively as the "**Parties**."

**WHEREAS**, the Parties entered into that certain Asset Purchase Agreement, dated as of November 13, 2023 (the "**Purchase Agreement**");

**WHEREAS**, Section 12.4 of the Purchase Agreement provides that the Purchase Agreement may be amended, superseded, canceled, renewed, or extended by a written instrument signed by the parties to the Purchase Agreement; and

**WHEREAS**, each of the Parties desires to amend the Purchase Agreement on the terms and conditions set forth in this Amendment.

**NOW, THEREFORE**, in consideration of the foregoing and the respective covenants and agreements set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

1.      Capitalized Terms. Capitalized terms used but not otherwise defined herein shall have the meanings assigned thereto in the Purchase Agreement.

2.      Agreements and Amendments to the Purchase Agreement.

(i)      Each of subsections (iv), (v) and (vi) of the definition of "Assumed Liabilities" is hereby deleted in its entirety and replaced with the following corresponding subsection:

"(iv) any Product Liability Claim related to products sold by the Acquired Business after the Closing Date (regardless of when manufactured),

(v)   any Warranty Liability Claim, excluding any such claim or Liability asserted by Southeastern Pennsylvania Transportation Authority,

(vi)   [Reserved],"

(ii)    The definition of "Excluded Liabilities" is hereby amended by adding the following language to the end of the definition:

"(x)    all Liabilities of each Seller with respect to any Product Liability Claim or similar claim with respect to any products sold or any service performed by any Seller prior to the Closing Date;

(xi)    any Liability asserted by Southeastern Pennsylvania Transportation Authority; and

(xii)   all Liabilities under any Contracts or Real Property Leases that are not assigned to Purchaser."

(iii)   The definition of "Outside Closing Date" is hereby deleted in its entirety and replaced with the following:

""**Outside Closing Date** means December 22, 2023."

(iv)    In Section 1.1 of the Purchase Agreement, the following definition is hereby added immediately following the definition of "Representative":

""**Revised Hearing Date** means December 12, 2023."

(v)     The second sentence of Section 2.5(a) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Purchaser shall be responsible for Cure Amounts and for satisfying the requirements of "adequate assurance of future performance" as required by section 365 of the Bankruptcy Code (which shall include a post-Closing financing commitment of no less than $20,000,000) and shall cooperate fully with each Seller in seeking such approval from the Bankruptcy Court, including Purchaser providing the necessary evidence required in connection with the Sale Hearing by no later than December 8, 2023, as applicable, to approve this Agreement and the transactions contemplated herein."

(vi)    The third and fourth sentences of Section 2.5(b) of the Purchase Agreement are hereby deleted in their entirety and replaced with the following:

"Purchaser shall have the right to request that Sellers add or remove any Contract identified in the Schedule of Transferred Contracts at any time on or prior to the Revised Hearing Date.  Purchaser acknowledges and agrees that it may not be possible for certain Transferred Contracts to be assumed and assigned to Purchaser."

(vii)    The first sentence of Section 3.1(b) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Purchaser or one of its Affiliates has made an earnest deposit by wire transfer of immediately available funds into the Deposit Escrow Account equal to ten percent (10%) of the Cash Component Price of the Purchase Price (the "**Initial Earnest Deposit**") in accordance with the Bidding Procedures Order and shall increase the Initial Earnest Deposit by an additional ten percent (10%) of the Cash Component Price of the Purchase Price (the "**Increased Deposit Amount**" and, together with the Initial Earnest Deposit, the "**Earnest Deposit**") on or prior to December 5, 2023."

(viii)    Section 7.12 of the Purchase Agreement is hereby added to the Purchase Agreement with the  following:

Section 7.12 <u>Successor Liability.</u> Purchaser shall have no liability or responsibility for any Liability or other obligation of Sellers arising under, related to or in connection with the Acquired Assets and the Acquired Business other than as expressly set forth in this Agreement. Without limiting the effect of the foregoing, the transfer of the Acquired Assets will not subject Purchaser to any Liability or other obligation in connection with claims against Sellers or the Acquired Assets, including, claims for successor or vicarious liability, by reason of such transfer under the laws of the United States, any state, territory or possession thereof applicable to such transactions. Purchaser shall not be deemed, as a result of the consummation of the transactions contemplated by this Agreement and the Related Agreements, to be a successor of any Seller, have, de facto or otherwise, merged with or into Sellers, be a mere continuation or substantial continuation of Sellers or the enterprise of Sellers or be responsible for any Liability or other obligation of Sellers or for payment of any benefit accruing to Sellers, except as expressly set forth in this Agreement.

(ix)    Section 10.1(b) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"by Sellers by written notice to the Purchaser, if (i) the Closing has not occurred on or prior to the Outside Closing Date (unless the failure to consummate the Closing by such date is due to the failure of a Seller to have fulfilled any of its obligations under this Agreement), (ii) the Increased Deposit Amount has not been transferred into the Deposit Escrow Account on or prior to December 5, 2023, or (iii) Purchaser has not, on or prior to December 8, 2023, (A) provided adequate assurance of future performance (which shall include a post-Closing financing commitment of no less than $20,000,000) or (B) filed an adequate assurance and good faith declaration on the jointly administered docket of the Sellers' Bankruptcy Cases."

3

(x)　　Section 10.2 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"In the event of the termination of this Agreement in accordance with Section 10.1, this Agreement will thereafter become void and have no effect, and no party hereto will have any liability to the other party hereto or their respective Affiliates, directors, officers or employees, except for the obligations of the parties hereto contained in this Section 10.2, in Article XII and in Section 7.6; provided, however, that (a) if this Agreement is validly terminated by Purchaser prior to Closing pursuant to Section 10.1 (e)(ii), Escrow Agent shall, within two (2) Business Days following the termination of this Agreement and without the requirement of any approval by the Bankruptcy Court, distribute the Deposit Escrow Funds to Purchaser and such distribution to Purchaser shall be Purchaser's sole and exclusive remedy as a result of such termination, and (b) if this Agreement is validly terminated by Sellers or Purchaser prior to Closing for any reason other than by Purchaser pursuant to Section 10.1(e)(ii), then, without the requirement of any approval by the Bankruptcy Court, (i) Escrow Agent shall, within two (2) Business Days following the termination of this Agreement, distribute the Deposit Escrow Funds to Sellers and Sellers shall be entitled to retain the Deposit Escrow Funds, and (ii) Purchaser shall, within two (2) Business Days following the termination of this Agreement, pay, to the extent not deposited into the Deposit Escrow Account prior to such termination, the Increased Deposit Amount, by wire transfer of immediately available funds to an account designated by Sellers."

(xi)　　Section 11.3(a) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Purchaser agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Purchaser (which shall include a post-Closing financing commitment of no less than $20,000,000), including furnishing affidavits or other documents or information for filing by no later than December 8, 2023 with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under the Transferred Contracts and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code."

(xii)　　The second sentence of Schedule 1-I of the Purchase Agreement is hereby deleted in its entirety and replaced with the following :

"Any amounts (i) invoiced at any time to and/or payments received from or on behalf of Broward County Transit, (ii) invoiced prior to the Closing to and/or payments received prior to the Closing from British Columbia Transit and (iii) invoiced at any time to and/or payments received from or

4

on behalf of Capital Metropolitan Transportation Authority to the extent relating to buses 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, in each case, less any out-of-pocket fees and expenses actually and directly incurred by Purchaser in connection with the final preparation and delivery of buses to such customers. Following the Closing, Purchaser shall complete, deliver and invoice buses to Broward County Transit and Capital Metropolitan Transportation Authority in accordance with Sellers' historical practices and shall use Reasonable Efforts to collect amounts underlying such invoices."

(xiii)    Schedule 7.10 of the Purchase Agreement is hereby deleted in its entirety and replaced with the new Schedule 7.10 attached hereto as <u>Annex A</u>.

3.    <u>Effectiveness; Continuing Effect; Miscellaneous</u>. This Amendment shall take effect as of the date of execution of this Amendment. Except as amended by this Amendment, the Purchase Agreement shall be and remain unmodified and in full force and effect in accordance with its terms, and each and every one of its provisions, as amended by this Amendment, are hereby adopted, ratified, and affirmed, and further it is understood and agreed that this Amendment does not limit or alter any rights or remedies of the Parties under any document, agreement or instrument other than the Purchase Agreement, except to the extent that the provisions hereof expressly address the matters set forth therein. Upon execution of this Amendment, this Amendment and the Purchase Agreement shall constitute one agreement. Any references to the "Agreement" in the Purchase Agreement or to the words hereof, hereunder or words of similar affect in the Purchase Agreement shall mean the Purchase Agreement as amended by this Amendment, although this change shall not alter the dates as of which any provision of the Agreement speaks, except as expressly provided herein. For example, phrases such as "the date hereof" and "the date of this Agreement" shall continue to refer to November 13, 2023, the date that the Purchase Agreement was executed, except as expressly provided herein. The provisions of Article XII of the Purchase Agreement shall apply to this Amendment *mutatis mutandis*.

[*Signature Pages to Follow*]

IN WITNESS WHEREOF, the Parties, intending to be legally bound, have caused this Amendment to be duly executed as of the day and year first herein above written.

**SELLERS:**

PROTERRA INC

By: _____
Name: Gareth Joyce
Title: President, Proterra Inc.


PROTERRA OPERATING COMPANY, INC.

By: _____
Name: Gareth Joyce
Title: President, Proterra Inc.

**PURCHASER:**

PHOENIX MOTOR INC.

By: _____

Name: JAMES MARK HASTINGS

Title: SENIOR VICE PRESIDENT, CORPORATE DEVELOPMENT + STRATEGY

**ANNEX A**
**Schedule 7.10**

*[See attached.]*

## Schedule 7.10

## Support Obligations

## Standby Letters of Credit

| Issuing Entity | Beneficiary | Document Number | Amount (in USD) | Expiration Date | Ever-green? | Stand Alone or ABL | Issuing Bank | Category | Description |
|---|---|---|---|---|---|---|---|---|---|
| Opco | Steelcase Financial Services Inc. | 68180451 | 741,685.00 | 5/19/2024 | Y | ABL | Bank of America, N.A. | Lease | Greer Furniture Lease |

## Surety Bonds

| Bond Number | Issuing Carrier | Principal | Obligee | Type of Bond | Expiration Date | Bond Amount | Bond Premium |
|---|---|---|---|---|---|---|---|
| PB02182000037 | Philadelphia Indemnity Insurance Company | Holdco | Chicago Transit Authority | Miscellaneous Contracts | 6/29/2024 | 15,619,205.00 | 312,384.00 |
| 800018815 | Atlantic Specialty Insurance Company | Opco | City and County of San Francisco | Electrical – Public | 1/16/2024 | 2,465,696.01 | 49,314.00 |
| PB01989700035 | Philadelphia Indemnity Insurance Company | Holdco | State of California | License & Permit | 5/31/2024 | 50,000.00 | 1,000.00 |
| 22C0023NM | Lexon Insurance Company | Opco | Department of HomeLand Security | Customs – Continuous – All Other * | 12/19/2023 | 600,000.00 | 2,700.00 |
| PB00438200020 | Philadelphia Indemnity Insurance Company | Holdco | Santa Clara Valley Transportation Authority | Supply Maintenance – Public | 8/23/2023 | 440,393.49 | 1,982.00 |
| PB02182000052 | Philadelphia Indemnity Insurance Company | Holdco | Sacramento Regional Transit District | All Other Miscellaneous Contracts – NOC – Public | 10/18/2023 | 890,403.35 | 40,068.00 |
| PB01989700045 | Philadelphia Indemnity Insurance Company | Holdco | Transportation District Commission of Hampton Roads | Miscellaneous Contracts * | 7/2/2023 | 506,637.60 | 25,332.00 |
| 962-019-625 | Intact Insurance Company | Holdco | Canada Border Services Agency | Customs – Continuous – All Other * | 3/1/2023 | 270,307.00 | - |
| PB00438200024 | Philadelphia Indemnity Insurance Company | Opco | Metropolitan Washington Airports Authority | Lien and Payment Bonds – Given at or near Commence-ment of Project | 12/31/2023 | 780,755.00 | 27,326.00 |

*Execution Version*

## SECOND AMENDMENT
## TO
## ASSET PURCHASE AGREEMENT

This Second Amendment to Asset Purchase Agreement (this "**Amendment**") is made and entered into as of December 15, 2023, by and among PROTERRA INC, a Delaware corporation ("**Holdco**"), PROTERRA OPERATING COMPANY, INC., a Delaware corporation (together with Holdco, "**Sellers**" and each a "**Seller**"), and PHOENIX MOTOR INC., a Delaware corporation ("**Purchaser**"). Each of the parties named above may be referred to herein as a "**Party**" and collectively as the "**Parties**."

**WHEREAS**, the Parties entered into that certain Asset Purchase Agreement, dated as of November 13, 2023, as amended by that certain First Amendment to Asset Purchase Agreement, dated as of December 1, 2023 (the "**Purchase Agreement**");

**WHEREAS**, Section 12.4 of the Purchase Agreement provides that the Purchase Agreement may be amended, superseded, canceled, renewed, or extended by a written instrument signed by the parties to the Purchase Agreement; and

**WHEREAS**, each of the Parties desires to amend the Purchase Agreement on the terms and conditions set forth in this Amendment.

**NOW, THEREFORE**, in consideration of the foregoing and the respective covenants and agreements set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

1.    Capitalized Terms. Capitalized terms used but not otherwise defined herein shall have the meanings assigned thereto in the Purchase Agreement.

2.    Agreements and Amendments to the Purchase Agreement.

(i)    The definition of "Outside Closing Date" is hereby deleted in its entirety and replaced with the following:

""**Outside Closing Date**" means January 10, 2024."

(ii)    In Section 1.1 of the Purchase Agreement, the following definition is hereby added immediately following the definition of "Representative":

""**Revised Hearing Date**" means January 5, 2024."

(iii)    The second sentence of Section 2.5(a) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Purchaser shall be responsible for Cure Amounts and for satisfying the requirements of "adequate assurance of future performance" as required by

section 365 of the Bankruptcy Code (which shall include a fully committed and legally enforceable financing of no less than $20,000,000 that shall be fully available at the Closing or a full pledged performance guaranty from a creditworthy entity that is acceptable to Sellers) and shall cooperate fully with each Seller in seeking such approval from the Bankruptcy Court, including Purchaser providing the necessary evidence required in connection with the Sale Hearing by no later than 5:00 p.m. Eastern Time on December 22, 2023, as applicable, to approve this Agreement and the transactions contemplated herein."

(iv)    The first sentence of Section 3.1(b) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Purchaser or one of its Affiliates (i) has made an earnest deposit by wire transfer of immediately available funds into the Deposit Escrow Account equal to ten percent (10%) of the Cash Component Price of the Purchase Price (the "**Initial Earnest Deposit**") in accordance with the Bidding Procedures Order, (ii) has increased the Initial Earnest Deposit by transferring an additional ten percent (10%) of the Cash Component Price of the Purchase Price (the "**First Deposit Increase**") on December 11, 2023 and (iii) shall increase the Initial Earnest Deposit by transferring an additional ten percent (10%) of the Cash Component Price of the Purchase Price (the "**Second Deposit Increase**" and, together with the Initial Earnest Deposit and the First Deposit Increase, the "**Earnest Deposit**") on or prior to 5:00 p.m. Eastern Time on December 22, 2023."

(v)    The opening phrase of Section 7.1 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Except (1) those matters set forth in <u>Section 7.1</u> of the Seller Disclosure Schedules, (2) as otherwise expressly contemplated by this Agreement, (3) as required by applicable Law or any Governmental or Regulatory Authority, (4) with the written consent of Purchaser (which consent will not be unreasonably withheld, conditioned or delayed), or (5) for any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code or those actions or omissions necessary and incident, or otherwise relating, to the Bankruptcy Cases or the wind-down of the operations or business of a Seller, during the period from the Execution Date to the Closing Date, each Seller will:"

(vi)    Section 10.1(b) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"by Sellers by written notice to the Purchaser, if (i) the Closing has not occurred on or prior to the Outside Closing Date (unless the failure to consummate the Closing by such date is due to the failure of a Seller to have fulfilled any of its obligations under this Agreement), (ii) the Second

2

Deposit Increase has not been transferred into the Deposit Escrow Account on or prior to 5:00 p.m. Eastern Time on December 22, 2023, or (iii) Purchaser has not, on or prior to 5:00 p.m. Eastern Time on December 22, 2023, (A) provided adequate assurance of future performance (which shall include a fully committed and legally enforceable financing of no less than $20,000,000 that shall be fully available at the Closing or a full pledged performance guaranty from a creditworthy entity that is acceptable to Sellers) or (B) filed an adequate assurance and good faith declaration on the jointly administered docket of the Sellers' Bankruptcy Cases that is acceptable to Sellers;"

(vii)   Section 11.2(d) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"[Reserved.]"

(viii)   Section 11.3(a) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Purchaser agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Purchaser (which shall include a fully committed and legally enforceable financing of no less than $20,000,000 that shall be fully available at the Closing or a full pledged performance guaranty from a creditworthy entity that is acceptable to Sellers), including furnishing affidavits or other documents or information for filing by no later than 5:00 p.m. Eastern Time on December 22, 2023 with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under the Transferred Contracts and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code."

3.   <u>Separation; Transition Services</u>.   Purchaser acknowledges and agrees that, notwithstanding anything to the contrary set forth in the Purchase Agreement, unless and until Purchaser has, on or prior to 5:00 p.m. Eastern Time on December 22, 2023 (i) provided adequate assurance of future performance (which shall include a fully committed and legally enforceable financing of no less than $20,000,000 that shall be fully available at the Closing or a full pledged performance guaranty from a creditworthy entity that is acceptable to Sellers) and (ii) filed an adequate assurance and good faith declaration on the jointly administered docket of the Sellers' Bankruptcy Cases that is acceptable to Sellers, Sellers shall have no obligation to (a) discuss or otherwise engage with Purchaser on (x) the separation of the Proterra Transit Business Unit or any of the Acquired Assets from the Proterra Other Business Units or (y) post-Closing transition services, the Transition Services Agreement or any matters related thereto, or (b) permit Purchaser to conduct site visits or otherwise accept or accommodate Purchaser at any facility or office of Sellers.

4.    <u>Miami Dade County Transit Buses</u>.    Purchaser acknowledges and agrees that, notwithstanding anything to the contrary set forth in the Purchase Agreement, Sellers may sell, assign or transfer, to one or more third parties, the six electric transit buses that were intended for delivery to Miami-Dade County, Transportation and Public Works, on terms acceptable to Sellers so long as the consummation of the sale for such six transit buses takes place on or before the Closing Date.    Purchaser shall have no warranty or product liability obligations related to or for such 6 transit buses that are delivered before the Closing Date

5.    <u>Effectiveness; Continuing Effect; Miscellaneous</u>. This Amendment shall take effect as of the date of execution of this Amendment and so long as the letter agreement, dated as of the date hereof, by and among the Parties has been executed and delivered by Purchaser, including the Joint Release Instruction attached as Annex I thereto. Except as amended by this Amendment, the Purchase Agreement shall be and remain unmodified and in full force and effect in accordance with its terms, and each and every one of its provisions, as amended by this Amendment, are hereby adopted, ratified, and affirmed, and further it is understood and agreed that this Amendment does not limit or alter any rights or remedies of the Parties under any document, agreement or instrument other than the Purchase Agreement, except to the extent that the provisions hereof expressly address the matters set forth therein. Upon execution of this Amendment, this Amendment and the Purchase Agreement shall constitute one agreement. Any references to the "Agreement" in the Purchase Agreement or to the words hereof, hereunder or words of similar affect in the Purchase Agreement shall mean the Purchase Agreement as amended by this Amendment, although this change shall not alter the dates as of which any provision of the Agreement speaks, except as expressly provided herein. For example, phrases such as "the date hereof" and "the date of this Agreement" shall continue to refer to November 13, 2023, the date that the Purchase Agreement was executed, except as expressly provided herein. The provisions of Article XII of the Purchase Agreement shall apply to this Amendment *mutatis mutandis*.

**[***Signature Pages to Follow***]**

4

IN WITNESS WHEREOF, the Parties, intending to be legally bound, have caused this Amendment to be duly executed as of the day and year first herein above written.

**SELLERS:**

PROTERRA INC

By: _____
Name: Gareth Joyce
Title:   President


PROTERRA   OPERATING   COMPANY, INC.

By: _____
Name: Gareth Joyce
Title:   President

[Signature Page to Second Amendment to Asset Purchase Agreement]

**PURCHASER:**

PHOENIX MOTOR INC.

By: _____

Name: XIAOFENG PENG

Title: CEO

## **Exhibit B**

Battery Lease APA

EXECUTION VERSION

ASSET PURCHASE AGREEMENT

by and among

PROTERRA INC,

PROTERRA OPERATING COMPANY, INC.

(“**Sellers**”)

and

PHOENIX MOTOR, INC.

(“**Purchaser**”)

DATED AS OF NOVEMBER 13, 2023

# TABLE OF CONTENTS

Page

ARTICLE I Definitions .................................................................................................. 1

    Section 1.1    Certain Definitions ................................................................. 1

    Section 1.2    Construction of Certain Terms and Phrases ....................... 14

ARTICLE II Purchase and Sale and Assumption ...................................................... 15

    Section 2.1    Purchase and Sale of Acquired Assets ............................... 15

    Section 2.2    Excluded Assets .................................................................... 16

    Section 2.3    Assumed Liabilities ............................................................. 16

    Section 2.4    Excluded Liabilities ............................................................. 16

    Section 2.5    Assignment and Cure Amounts ......................................... 16

    Section 2.6    Bulk Sales Laws ................................................................... 17

ARTICLE III Purchase Price ....................................................................................... 17

    Section 3.1    Purchase Price; Earnest Deposit ........................................ 17

    Section 3.2    Withholding of Tax .............................................................. 18

    Section 3.3    Allocation of Consideration ................................................ 18

ARTICLE IV Closing Matters ...................................................................................... 19

    Section 4.1    Closing .................................................................................. 19

    Section 4.2    Deliveries at Closing ........................................................... 19

    Section 4.3    Further Assurances and Cooperation ................................ 20

ARTICLE V Representations and Warranties ........................................................... 21

    Section 5.1    Representations and Warranties of Seller ......................... 21

    Section 5.2    Representations and Warranties of Purchaser .................. 25

ARTICLE VI Regulatory Matters ............................................................................... 29

    Section 6.1    Regulatory Filings ............................................................... 29

    Section 6.2    Objections or Other Challenges .......................................... 29

ARTICLE VII Certain Covenants ............................................................................... 30

    Section 7.1    Conduct of Business Pending Closing ............................... 30

    Section 7.2    Efforts to Satisfy Closing Conditions ................................ 30

    Section 7.3    Assets Incapable of Transfer .............................................. 31

    Section 7.4    Discovery of Breach ............................................................. 31

    Section 7.5    Restricted Use of Confidential Information ...................... 32

    Section 7.6    Review and Inspections ....................................................... 32

Section 7.7    No Use of Sellers Brand ........................................................................ 32

Section 7.8    Background License ............................................................................... 32

ARTICLE VIII Intentionally Omitted. ...................................................................... 33

ARTICLE IX Conditions to Closing ......................................................................... 33

Section 9.1    Conditions to the Obligations of Purchaser ........................................ 33

Section 9.2    Conditions to the Obligations of Sellers .............................................. 34

Section 9.3    Conditions Precedent to Obligations of Purchaser and Sellers ........... 35

Section 9.4    Frustration of Closing Conditions ....................................................... 35

ARTICLE X Termination ........................................................................................... 35

Section 10.1    Termination ......................................................................................... 35

Section 10.2    Effect of Termination ......................................................................... 37

ARTICLE XI Bankruptcy Matters ............................................................................. 37

Section 11.1    Bankruptcy Cases ............................................................................... 37

Section 11.2    Bankruptcy Court Approvals .............................................................. 37

Section 11.3    Further Filings and Assurances .......................................................... 38

Section 11.4    Notice of Sale ..................................................................................... 38

Section 11.5    Free and Clear .................................................................................... 38

Section 11.6    Transfer Tax Exemption ..................................................................... 39

ARTICLE XII Miscellaneous ..................................................................................... 39

Section 12.1    Survival ............................................................................................... 39

Section 12.2    Governing Law and Jurisdiction ......................................................... 39

Section 12.3    Notices ................................................................................................ 40

Section 12.4    Amendments and Waivers .................................................................. 41

Section 12.5    Entire Agreement ............................................................................... 41

Section 12.6    Headings: Interpretation ..................................................................... 42

Section 12.7    No Assignment: Binding Effect .......................................................... 42

Section 12.8    Counterparts ........................................................................................ 42

Section 12.9    Incorporation by Reference ................................................................ 42

Section 12.10   Time of the Essence ........................................................................... 42

Section 12.11   Specific Performance .......................................................................... 42

Section 12.12   No Third Party Beneficiaries .............................................................. 42

Section 12.13   Expenses .............................................................................................. 43

Section 12.14   Severability .......................................................................................... 43

Section 12.15   Public Announcements ........................................................................ 43

Section 12.16   No Liability; Release. ....................................................................................... 44

## EXHIBITS

| | |
|---|---|
| Exhibit A | Assumption Agreement |
| Exhibit B | General Assignment |

## SCHEDULES

| | |
|---|---|
| Schedule 3.3 | Allocation Principles |

Seller Disclosure Schedules

Purchaser Disclosure Schedules

EXECUTION VERSION

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (collectively with the Exhibits and Schedules referred to herein, this "**Agreement**") is made as of the 13th day of November, 2023 (the "**Execution Date**"), by and among PROTERRA INC, a Delaware corporation ("**Holdco**"), PROTERRA OPERATING COMPANY, INC., a Delaware corporation ("**Opco**" and together with Holdco, "**Sellers**" and each a "**Seller**"), and PHOENIX MOTOR, INC., a Delaware corporation ("**Purchaser**").

WHEREAS, Sellers are engaged in the Business (as defined below);

WHEREAS, on August 7, 2023 (the "**Petition Date**"), Sellers commenced the Bankruptcy Cases (as defined below) and Sellers intend to seek approval of and authorization for a sale and transfer of Sellers' assets used in the conduct of the Business to the individual or entity submitting the highest or otherwise best bid for those assets in a process approved by the Bankruptcy Court (as defined below) (the "**Sale Process**") and to be consummated in accordance with the Bidding Procedures Order (as defined below) and pursuant to the Sale Order (as defined below);

WHEREAS, Purchaser desires to purchase from Sellers the Acquired Assets (as defined below) through the Sale Process (the "**Sale**"), in exchange for the Purchase Price (as defined below) and Purchaser's assumption of the Assumed Liabilities (as defined below), on the terms and subject to the conditions set forth in this Agreement;

WHEREAS, Sellers have determined, in the exercise of their business judgment, that the sale to Purchaser as contemplated herein is, in light of the facts and circumstances, the highest or otherwise best bid for the Acquired Assets and therefore it is advisable and in the best interest of their estates and the beneficiaries of the estates to enter into this Agreement, which has been approved by Sellers' applicable governing bodies; and

WHEREAS, Sellers and Purchaser each acknowledge and agree that the transactions contemplated by this Agreement are subject to the Bankruptcy Court's approval of this Agreement.

NOW, THEREFORE, in consideration of the premises and of the respective representations, warranties, covenants, agreements, and conditions contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, Sellers and Purchaser each agree as follows:

## ARTICLE I

### Definitions

Section 1.1    Certain Definitions. Capitalized terms used in this Agreement but not otherwise defined in this Agreement shall have the meanings ascribed to such terms in the Bidding Procedures Order (as defined below) as in effect at the date hereof or as such terms may

be modified with the approval of the Sellers. In this Agreement and any Exhibit or Schedule hereto, the following capitalized terms have the following respective meanings:

"**Accounts Receivable**" means all accounts receivable, notes receivable, purchase orders, negotiable instruments, completed work or services that have not been billed, chattel paper, notes and other rights to payment with respect to the Transferred Contracts.

"**Acquired Assets**" means:

(a)     subject to Section 7.3, the Transferred Contracts and each Seller's rights thereunder (in the case of the Battery Lease Agreements, in its capacity as "Lessor" thereunder);

(b)     all of the battery packs that each Seller owns that are leased by such Seller, in its capacity as "Lessor", pursuant to the Transferred Contracts that are Battery Lease Agreements (the "**Tangible Assets**");

(c)     all Accounts Receivable and all other rights of any Seller to receive or recoup, whether by offset or netting against production from the Acquired Assets and the proceeds thereof or otherwise, amounts owed by Persons other than Sellers and their Affiliates with respect to the Transferred Contracts, in each case to the extent arising from and after the Closing Date;

(d)     all claims and counterclaims, known or unknown, of such Seller (in the case of the Battery Lease Agreements, in its capacity as "Lessor") under the Transferred Contracts, against any other Person arising under the Transferred Contracts; and

(e)     all unexpired warranties, indemnitees and guarantees in favor of such Seller made or given by manufacturers, contractors, subcontractors, consultants, vendors, suppliers and other third parties to the extent arising from or related to any Acquired Asset or Assumed Liability.

"**Action**" means any claim, demand, action, cause of action, suit, arbitration, audit, investigation or proceeding.

"**Affiliate**" means, as to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with that Person. For purposes of this definition, "**control**" (including, with correlative meanings, the terms "**controlled by**" and "**under common control with**"), as used with respect to any Person or group of Persons, means possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of the Person, whether through the ownership of voting securities or by contract.

"**Agreement**" has the meaning set forth in the preamble.

"**Allocation Principles**" has the meaning set forth in Section 3.3.

"**Alternative Transaction**" means a sale, assignment, transfer or other disposition of all or substantially all of the Acquired Assets to any Person (or group of Persons), other than to Purchaser or an Affiliate of Purchaser.

"**Antitrust Law**" means the Sherman Act, the Clayton Act, the HSR Act, the Federal Trade Commission Act, and all other Laws or Orders that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or lessening of competition through merger or acquisition.

"**Assumed Liabilities**" means those liabilities and obligations to the extent arising out of or relating to the Transferred Contracts, including Cure Amounts, or any of the other Acquired Assets.

"**Assumption Agreement**" means the Assumption Agreement in the form attached hereto as Exhibit A.

"**Auction**" has the meaning set forth in the Bidding Procedures.

"**Avoidance Action**" means any claim, right or cause of action of a Seller arising under chapter 5 of the Bankruptcy Code and any analogous state or federal statutes and common Law relating to the Sellers, the Acquired Assets, the Transferred Contracts or the Assumed Liabilities.

"**Backup Bidder**" has the meaning set forth in the Bidding Procedures.

"**Bankruptcy Cases**" has the meaning set forth in Section 11.1.

"**Bankruptcy Code**" means Title 11 of the United States Code.

"**Bankruptcy Court**" has the meaning set forth in Section 11.1.

"**Battery Lease Agreements**" means all of the battery lease Transferred Contracts to which the Sellers are party, as the case may be, as "Lessor" thereunder, set forth under the heading "Battery Lease Agreements" on Section 5.1(h)(i) of the Seller Disclosure Schedules.

"**Benefit Plan**" means (i) any "employee benefit plan" as defined in Section 3(3) of the ERISA (whether or not subject to ERISA) and (ii) any other pension, retirement, profit-sharing, savings, bonus, incentive, commission, stock option or other equity or equity-based, deferred compensation, severance, retention, employment, benefit, excess benefit, incentive, equity interest, equity bonus, equity purchase, restricted equity, equity ownership, equity appreciation, phantom equity, savings and thrift, cafeteria, reimbursement, health savings, flexible spending, compensation, welfare, sick leave, vacation, medical, dental, hospitalization, vision, disability, accidental death and dismemberment, life insurance, death benefit, post-retirement, transaction bonus, periodic bonus, termination, fringe benefit, perquisite or change of control plan, program, policy, agreement, contract or arrangement that (x) is sponsored, maintained or contributed to by Sellers, or for which Sellers have any obligation to sponsor, maintain or contribute to, or for which Sellers have any direct or indirect liability, whether contingent or otherwise and (y) under which any current or former officer, director, employee, consultant (or their respective beneficiaries) of Sellers has any present or future right to benefits.

3

"**Bidding Procedures**" means the procedures governing the Auction and the Sale Process, as approved by the Bankruptcy Court pursuant to the Bidding Procedures Order and attached as Exhibit 1 to the Bidding Procedures Order, and as may be amended from time to time in accordance with their terms.

"**Bidding Procedures Order**" means the order entered by the Bankruptcy Court on September 7, 2023 (Docket No. 218), approving the Bidding Procedures.

"**Business**" means the business of the Proterra Energy Business Unit, the Proterra Powered Business Unit, the Proterra Transit Business Unit and the Proterra Valence Business Unit.

"**Business Units**" means the Proterra Transit Business Unit, Proterra Energy Business Unit, the Proterra Powered Business Unit and the Proterra Valence Business Unit.

"**Business Day**" means a day (other than a Saturday, Sunday or national holiday) on which commercial banks in the State of New York and the State of California are open for the transaction of commercial banking business.

"**Cash Component Price**" has the meaning set forth in Section 3.1(a).

"**Clayton Act**" means Title 15 of the United States Code §§ 12-27 and Title 29 of the United States Code §§ 52-53, as amended.

"**Closing**" means the consummation of the transactions contemplated in this Agreement.

"**Closing Date**" has the meaning set forth in Section 4.1.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Confidential Information**" has the meaning set forth in the Confidentiality Agreement.

"**Confidentiality Agreement**" means that certain Confidentiality Agreement dated as of August 10, 2023 by and between Purchaser and Holdco.

"**Contract**" means any written or oral contract, agreement or instrument, including, supply contracts, purchase orders, sale orders, bids, understandings or commitments, customer agreements, licenses, mortgages, subcontracts, indentures, leases of personal property, deeds of trust, notes or guarantees, pledges, liens, or conditional sales agreements to which the Person referred to is a party or by which any of its assets may be bound.

"**Cure Amounts**" has the meaning set forth in Section 2.5(b).

"**Deposit Escrow Account**" means the escrow account established pursuant to the Deposit Escrow Agreement.

"**Deposit Escrow Agreement**" means that certain escrow agreement, dated as of the date hereof, executed by and among Purchaser, Holdco and the Escrow Agent.

"**Deposit Escrow Funds**" mean, at any time of determination, the Earnest Deposit deposited in the Deposit Escrow Account, together with any interest earned thereon.

"**Effective Time**" means 12:01 a.m. Eastern Time, on the Closing Date.

"**Environmental Laws**" means all federal, state and local Laws, code, binding and enforceable guidelines, policy or rule of common law or judicial or administrative interpretation thereof relating to pollution, public health and safety (as it relates to exposure to Hazardous Materials) or protection of the environment, including the Comprehensive Environmental Response, Compensation and Liability Act, the Resource Conservation and Recovery Act, the Clean Air Act, the Clean Water Act, and any state or local counterparts or equivalents, as such requirements have been enacted and are in effect on or prior to the Closing Date.

"**Environmental Liabilities**" means all Liabilities relating to Seller's ownership and/or operation of the Business and/or the Acquired Assets and consisting of or relating to:

> (i)     any Hazardous Materials, environmental matters or conditions (including on-site or off-site contamination and regulation of chemical substances or products);

> (ii)    fines, penalties, judgments, awards, settlements, legal or administrative proceedings, damages, losses, claims, demands and investigative, remedial, or inspection costs and expenses arising under Environmental Laws or relating to Hazardous Materials;

> (iii)   financial responsibility under Environmental Laws for cleanup costs or corrective action, including any investigation, cleanup, removal, containment, or other remediation or response actions required by applicable Environmental Laws and for any natural resource damages; or

> (iv)    any other compliance, corrective, investigative or remedial measures required under Environmental Laws.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

"**Escrow Agent**" means Citibank, N.A.

"**Excluded Assets**" means all assets, rights, claims or properties owned by either Seller that are not Acquired Assets, including:

> (i)     all cash, rights in bank accounts, certificates of deposit, bank deposits, cash equivalents, professional fee retainers, the cash surrender value of any life insurance policies, investment securities and checks or other payments received by such Seller (including received in lock boxes) prior to the Effective Time;

> (ii)    the Purchase Price and the Deposit Escrow Funds;

(iii)    any Benefit Plan and any assets, trust agreements, insurance policies, administrative service agreements and other contracts, files and records in respect thereof;

(iv)    any prepayments and good faith and other bid deposits submitted by any third party under the terms of the Bidding Procedures Order;

(v)    all Accounts Receivable and all other rights of any Seller to receive or recoup, whether by offset or netting against production from the Acquired Assets and the proceeds thereof or otherwise, amounts owed by Persons other than Sellers and their Affiliates with respect to the Acquired Assets, in each case to the extent accruing prior to the Effective Time;

(vi)    any deposits, escrows, surety bonds or other financial assurances and any cash or cash equivalents securing any surety bonds or financial assurances, in each case, to the extent arising under the Excluded Assets or Excluded Liabilities;

(vii)    all trade credits or refunds of costs or expenses borne by any Seller, in each case, attributable to the Acquired Assets and attributable to any period of time prior to the Effective Time;

(viii)    any rights to Tax refunds, rebates, abatements, deposits, prepayments, attributes or credits and current and deferred Tax assets (other than with respect to Taxes allocated to Purchaser in Section 12.13);

(ix)    such Seller's rights under this Agreement and the Related Agreements;

(x)    the Sellers Brand;

(xi)    all Intellectual Property;

(xii)    all Contracts that are not Transferred Contracts;

(xiii)    all Real Property Leases;

(xiv)    all Permits;

(xv)    the Excluded Books and Records;

(xvi)    the Avoidance Actions and any other claims, interests, rights, rebates, abatements, remedies, recoveries, goodwill, customer and referral relationships, other intangible property and all privileges, set-offs and benefits of Sellers, and all claims, demands, indemnification rights or causes of action, available to any of the Sellers or their estates against third parties to the extent related to the Excluded Assets or the Excluded Liabilities (including any claim to collect any Accounts Receivable accruing prior to the Effective Time);

(xvii)  all of such Seller's insurance policies, including director and officer insurance policies, and related contracts and all rights thereunder (including, the right to make claims thereunder and to the proceeds thereof);

(xviii)  all debts, demands, causes of action or other rights or claims of such Seller against any Affiliates of such Seller including any intercompany receivables due from any such Affiliate of such Seller; and

(xix)  all shares of capital stock or other equity interest in or issued by any Seller or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interest in or issued by any Seller, and any shares of capital stock or other equity interest in or issued by any other entity in which any Seller holds an equity interest, or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interest in or issued by any other entity in which any Seller holds an equity interest.

"**Excluded Books and Records**" means (i) all books and records relating to employee benefit matters, (ii) all books and records relating to employees, (iii) all minute books of a Seller, (iv) all income Tax Returns and income Tax records, (v) all books and records prepared in anticipation of or in connection with or otherwise related to the negotiation, execution or performance by Sellers under this Agreement or any Related Agreement; (vi) all books and records that Sellers are required by Law to retain, (vii) all books and records that are subject to attorney-client privilege or other work product privilege and (viii) any other books and records to the extent relating to the Excluded Assets or Excluded Liabilities.

"**Excluded Liabilities**" means all Liabilities of each Seller that are not Assumed Liabilities, including:

(i)  all Liabilities of such Seller or any Affiliate of such Seller in respect of any Indebtedness;

(ii)  all Liabilities of such Seller or any Affiliate of such Seller for (a) income Taxes (whether or not then due), arising in connection with the consummation of the transactions contemplated by this Agreement or (b) the unpaid pre-Closing Taxes of any other Person under section 1.1502-6 of the Treasury Regulations (or any similar provision of state, local or foreign law) or as a transferee, successor, by Contract, by Law or otherwise;

(iii)  all Liabilities for Taxes with respect to the Acquired Assets, the Business or any of its facilities (except for Taxes allocated to Purchaser pursuant to Section 12.13) for all taxable periods, or portions thereof, ending at or prior to the Effective Time or that are otherwise allocated to Seller in Section 12.13;

(iv)  all Liabilities arising from any litigation, arbitration or any proceeding with any Governmental or Regulatory Authority involving such Seller, the Business, any Affiliate of such Seller or any of the Acquired Assets, in each case, with respect to matters that occurred prior to the Effective Time;

(v)      all Liabilities of such Seller to any Affiliate of such Seller or any current or former shareholder, director or officer of such Seller or any Affiliate of such Seller, including, any Liability arising out of or related to any loan, or any accrued interest related thereto, from any Affiliate of such Seller or any member, director or officer of such Seller or any Affiliate to such Seller;

(vi)      all Liabilities to the extent arising out of any Excluded Asset, including any Liabilities arising under any contract that is not a Transferred Contract;

(vii)      all Liabilities of such Seller or any of its Affiliates arising out of any Benefit Plan or any assets attributable to or related to any such Benefit Plan;

(viii)      such Seller's costs and expenses incurred in connection with this Agreement and the transactions contemplated by this Agreement; and

(ix)      all Environmental Liabilities arising out of Excluded Assets.

"**Execution Date**" has the meaning set forth in the preamble.

"**Federal Trade Commission Act**" means the Federal Trade Commission Act (15 U.S.C. § 41 *et seq.*), as amended, and the rules and regulations promulgated thereunder.

"**GAAP**" means United States generally accepted accounting principles, consistently applied.

"**General Assignment**" means the General Assignment substantially in the form attached hereto as Exhibit B.

"**Governmental or Regulatory Authority**" means any court, tribunal, public or private arbitrator, authority, agency, commission, official or other instrumentality of the United States, or any country, state, county, city or other political subdivision, including any self-regulatory organization or similar governmental or quasi-governmental entity or body having jurisdiction.

"**Hazardous Materials**" means any substance or material that has been listed, defined or regulated or otherwise classified by any Environmental Law as a "hazardous substance," "hazardous material," "hazardous waste," "toxic substance," "pollutant," "contaminant," or any other similar term intended to define, list, or classify a substance by reason of such substance's ignitability, corrosivity, reactivity, carcinogenicity, reproductive toxicity, "EP toxicity" or adverse effect on human health or the environment, including, substances that are radioactive, toxic, hazardous or otherwise a pollutant, contaminant or waste, including PCBs, asbestos, petroleum products, petroleum derived substances or any fraction thereof, and urea-formaldehyde.

"**HSR Act**" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (15 U.S.C. §§ 15c-15h, 18a), as amended.

"**Indebtedness**" means, as to any Person, without duplication, (a) all Liabilities of such Person for borrowed money or in respect of loans or advances (including, reimbursement and all other obligations with respect to surety bonds, guarantees, letters of credit, banker's acceptances, corporate credit card or business credit lines, indemnities, performance letters, comfort letters and other arrangements similar to the foregoing, in each case only to the extent drawn); (b) all Liabilities of such Person under or pursuant to any arrangement to pay the deferred purchase price of property or services or the acquisition of any business; (c) all Liabilities of such Person under or pursuant to any interest rate and currency swaps, caps, collars, interest rate cap agreements, interest rate swap agreements, foreign currency exchange agreements and similar financial hedging devices and agreements, in each case, to the extent out of the money; (d) all Liabilities created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of such Person or lender under such agreement in the event of default are limited to repossession or sale of such property), other than inventory or other property purchased by such Person in the Ordinary Course of Business; (e) all obligations or liabilities of such Person under or pursuant to leases which are required to be, in accordance with GAAP, recorded as capital leases; (f) all Liabilities secured by any Lien (excluding Permitted Encumbrances) on any property or asset owned by that Person, regardless of whether the indebtedness secured thereby shall have been assumed by that Person or is non-recourse to the credit of that Person; (g) all Liabilities of such Person for off balance sheet financing of such Person (other than operating leases); (h) all Liabilities of such Person evidenced by bonds, debentures, notes or other similar securities or instruments (other than performance, surety and appeal bonds arising in the Ordinary Course of Business in respect of which such Person's liability remains contingent); (i) all Liabilities of such Person for any direct or indirect guarantees made by such Person of any Indebtedness of any other Person described in clauses (a) through (h); and (j) any accrued but unpaid interest, unpaid prepayment or redemption penalties, premiums or payments and unpaid fees and expenses, in each case, that are actually payable in connection with retirement, payment or prepayment of any of the foregoing Liabilities.

"**Independent Accountant**" means an impartial nationally recognized firm of independent certified public accountants to be mutually agreed to in good faith by Purchaser and Sellers and not engaged by either Sellers, on the one hand, or Purchaser, on the other hand, or any of their respective Affiliates in the last twelve (12) months.

"**Intellectual Property**" means all intellectual property rights, whether registered or unregistered, as they exist anywhere in the world, including all patents, trademarks and service marks, trade names, logos, URLs and Internet domain names, copyrights, Software, industrial designs, inventions, proprietary know-how, confidential business information and trade secrets.

"**Interest**" means Liens, encumbrances, pledges, mortgages, deeds of trust, security interests, leases, charges, fines or penalties related to governmental violations, options, rights of first refusal, easements, servitudes, proxies, voting trusts or agreements, transfer restrictions under any agreement, and any other rights, claims or demands of any kind whatsoever of other Persons, in each case, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, mature or unmatured, material or non-material, disputed or undisputed.

"**Knowledge**" means, with respect to Sellers, the actual knowledge of Gareth T. Joyce.

"**Laws**" means all laws, statutes, rules, regulations and ordinances in any jurisdiction or any state, county, country, city or other political subdivision or of any Governmental or Regulatory Authority, including, the Bankruptcy Code, ERISA, Environmental Laws, public health and OSHA and anti-kickback statutes.

"**Liability**" or "**Liabilities**" means any or all obligations (whether to make payments, to give notices or to perform or not perform any action), commitments, contingencies and other liabilities of a Person (whether known or unknown, asserted or not asserted, whether absolute, accrued, contingent, fixed or otherwise, determined or determinable, liquidated or unliquidated, and whether due or to become due).

"**Licensable**" means, with respect to any Intellectual Property right, that a Person has the power and authority to grant a license (or sublicense, as the case may be) to such Intellectual Property right without any of the following: (a) the consent of any third party; (b) impairing such Person's existing rights in respect of such Intellectual Property right (it being understood that the grant of any license hereunder, in and of itself, shall not be construed as an impairment of any of such Person's rights); (c) imposing any additional obligations on such Person or impairing any of such Person's other existing rights under any preexisting agreement relating to such Intellectual Property right; and/or (d) the payment of royalties or other consideration by such Person to any third party under any preexisting agreement relating to such Intellectual Property right. For the avoidance of doubt, in no event shall any Intellectual Property right be "Licensable" if any of the foregoing conditions in clauses (a)-(d) apply.

"**Lien**" means any mortgage, pledge, security interest, hypothecation, assignment, encumbrance, lease, lien (including consensual liens, judicial liens or statutory liens), option, right of use and other rights and claims of other Persons, any conditional sale contract, title retention contract, or other encumbrance of any kind, including easements, conditions, reservations and restrictions.

"**Material Adverse Effect**" means any event, change, development or effect that, individually or in the aggregate, has had or would reasonably be expected to have a material adverse effect on the Acquired Assets, taken as a whole; provided, however, that none of the following shall be deemed to constitute, and none of the following shall be taken into account in determining whether there has been, a Material Adverse Effect: (a) any change, event, development or effect (whether short-term or long-term) arising from or relating to (1) any general industry change in the industries in which Sellers and the Proterra Transit Business Unit operate, (2) national or international political or social conditions, including the engagement in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the United States or foreign country, or any of their respective territories, possessions or diplomatic or consular offices or upon any military installation, equipment or personnel of the United States, (3) any epidemic, pandemic, or disease outbreak (including COVID-19) or any law, regulation, statute, directive, pronouncement or guideline issued by a Governmental or Regulatory Authority, the Centers for Disease Control and Prevention, the World Health Organization or industry group providing for business closures, "sheltering-in-place", curfews or other restrictions that relate to, or arise out of, an

epidemic, pandemic or disease outbreak or any change in such law, regulation, statute, directive, pronouncement or guideline or interpretation thereof, or any worsening of such conditions, (4) any general change in financial, banking or securities markets (including any disruption thereof and any decline in the price of any security or any market index), (5) any change in GAAP, regulatory accounting principles or industry standards, or (6) changes in laws, rules, regulations, orders or other binding directives issued by any Governmental or Regulatory Authority, (b) the taking of (or omitting to take) any action by any Seller at the written request of Purchaser or that is expressly required by this Agreement, (c) any matters that arise from any actions or omissions of Purchaser or its Affiliates (including any breach by Purchaser of this Agreement), (d) any change resulting or arising from the identity of, or any facts or circumstances relating to, Purchaser or its Affiliates, (e) any failure to meet a forecast (whether internal or published) of revenue, earnings, cash flow or other data for any period or any change in such a forecast, (f) any change in or effect on the Acquired Assets that, if curable, is cured by Sellers before the earlier of (1) the Closing Date and (2) the date on which this Agreement is terminated pursuant to <u>Article X</u> below, (g) any change in the financial condition or results of operation of Purchaser or its Affiliates, including its ability to access capital and equity markets and changes due to a change in the credit rating of Purchaser or its Affiliates, (h) the announcement, commencement, pendency or consummation of the Bankruptcy Cases, this Agreement or the transactions contemplated hereby, (i) any new or announced renewable fuel or oil provider entrants, including their effect on pricing, (j) any earthquakes, fires, hurricanes, tornados or other natural disasters or effects of weather and other acts of God, (k) any casualty loss or event of condemnation; (l) any seasonality of the Acquired Assets or the Proterra Transit Business Unit as anticipated to be conducted, (m) any change resulting or arising from product recalls announced or commenced prior to the Execution Date or (n) any change in the market price or trading volume of any securities or Indebtedness of a Seller; <u>provided</u>, <u>further</u>, that, for the avoidance of doubt, a Material Adverse Effect shall be measured only against past performance of the Proterra Transit Business Unit and not against any forward-looking statements, financial projections or forecasts of Sellers with respect to the Proterra Transit Business Unit.

"**Order**" means and includes any writ, judgment, decree, injunction, award or other order of any Governmental or Regulatory Authority, including the Bankruptcy Court.

"**Ordinary Course of Business**" means an action taken by a Person if: (a) such action is in the ordinary course of business and consistent with the past practices of such Person including with respect to quantity and frequency; or (b) such action is similar in nature and magnitude to actions customarily taken in the ordinary course of normal day-to-day operations of other Persons that are in the same line of business as such Person; subject, however, to those actions necessary and incident, or otherwise relating, to the Bankruptcy Cases.

"**Organizational Document**" means (a) the articles or certificate of incorporation and the bylaws of a corporation; (b) operating agreement, limited liability company agreement, or similar document governing a limited liability company; (c) any charter or similar document adopted or filed in connection with the creation, formation, or organization of a Person; and (d) any amendment to any of the foregoing.

"**OSHA**" means the Occupational Safety and Health Act of 1970, 29 U.S.C. §651, et seq.

"**Outside Closing Date**" means the date that is five (5) Business Days following the entry of the Sale Order by the Bankruptcy Court.

"**Permits**" means all licenses, permits, certificates, orders, authorizations, approvals, registrations, franchises and similar consents granted or issued by any Governmental or Regulatory Authority.

"**Permitted Encumbrances**" means (a) Liens for current Taxes not yet delinquent as of the Closing Date or being contested in good faith by appropriate proceedings; (b) Liens for impositions, assessments, fees, rents or other charges levied or assessed or imposed by a Governmental or Regulatory Authority not yet delinquent as of the Closing Date or being contested in good faith by appropriate proceedings; (c) statutory Liens (including materialmen's, warehousemen's, mechanic's, repairmen's, landlord's and other similar Liens) arising in the Ordinary Course of Business securing payments that are inchoate, unrecorded and not yet delinquent as of the Closing Date or being contested in good faith by appropriate proceedings; (d) Liens created by, through or under Purchaser or its successors or assigns and (e) non-exclusive licenses of Intellectual Property rights.

"**Person**" means any natural person, corporation, general partnership, limited partnership, limited liability partnership, limited liability company, proprietorship, other business organization, trust, government, Governmental or Regulatory Authority, or any other entity whatsoever.

"**Petition Date**" has the meaning set forth in the recitals.

"**Proterra Energy Business Unit**" means the business unit of Sellers that provides, installs, and services turnkey fleet-scale, high-power charging solutions and software services, *provided* that the Proterra Valence Business Unit shall be excluded from the definition of Proterra Energy Business Unit.

"**Proterra Powered Business Unit**" means the business unit of Sellers that designs and manufactures proprietary battery systems and electrification solutions for global commercial vehicle original equipment manufacturer customers.

"**Proterra Transit Business Unit**" means the business unit of Sellers that designs, develops and sells electric transit buses as an original equipment manufacturer for North American public transit agencies, airports, universities and other commercial transit fleets.

"**Proterra Valence Business Unit**" means the business sub-unit of Sellers, currently situated within the Proterra Energy Business Unit, that is a cloud-based data platform that can provide customers performance information about their commercial transit fleets.

"**Purchase Price**" has the meaning set forth in Section 3.1(a).

"**Purchaser**" has the meaning set forth in the preamble.

"**Purchaser Disclosure Schedules**" means the disclosure schedules of Purchaser as attached hereto, and as they may be updated or otherwise modified hereafter in compliance with this Agreement.

"**Purchaser Released Claims**" has the meaning set forth in Section 12.16(b).

"**Purchaser Required Approvals**" means the consents and approvals set forth on Section 5.2(d) of the Purchaser Disclosure Schedules.

"**Real Property Leases**" means all of Sellers' right, title and interest in all leases, subleases, licenses or other occupancy agreements, including all amendments, renewals and other agreements with respect thereto, pursuant to which a Seller holds a leasehold or subleasehold interest in, or is granted a license or other right to use, any real property.

"**Reasonable Efforts**" means the commercially reasonable efforts that a reasonable Person wanting to achieve the result in question would take under similar circumstances to achieve that result as expeditiously as possible.

"**Related Agreements**" means all agreements, certificates, instruments or other documents required to be executed and/or delivered pursuant to or in connection with, this Agreement by any Person, including, the Assumption Agreement and the General Assignment.

"**Representative**" means, with respect to any Person, its directors, officers, employees, agents, advisors or other representatives.

"**Sale**" has the meaning set forth in the recitals.

"**Sale Hearing**" means the hearing before the Bankruptcy Court to consider entry of the Sale Order.

"**Sale Order**" means an Order of the Bankruptcy Court (i) approving the Agreement, (ii) approving the consummation of the Sale and the other transactions contemplated hereby, (iii) finding that Purchaser is purchasing the Acquired Assets in good faith within the meaning of Section 363(m) of the Bankruptcy Code, and (iv) approving the sale of the Acquired Assets free and clear of all Liens, Liabilities and other Interests (other than Permitted Encumbrances and Assumed Liabilities).

"**Sale Process**" has the meaning set forth in the recitals.

"**Seller Disclosure Schedules**" means the disclosure schedules of Sellers attached hereto which, for the avoidance of doubt, excludes Schedule 3.3.

"**Seller Fundamental Representations**" means, collectively, the representations and warranties in the first sentence of Section 5.1(a) (Organization and Existence), Section 5.1(b) (Authority and Approval), Section 5.1(c)(i) (No Conflict — Seller's Organizational Documents) and Section 5.1(i) (Brokers).

"**Seller Group**" has the meaning set forth in Section 12.16(b).

"**Sellers**" has the meaning set forth in the preamble.

"**Sellers Brand**" means the trademarks "PROTERRA," "PROTERRA POWERED," "PROTERRA TRANSIT," "PROTERRA ENERGY" and any trademark confusingly similar thereto and derivatives thereof.

"**Sherman Act**" means title 15 of the United States Code §§ 1-7, as amended.

"**Software**" means computer software, including, source code, object code, disks, documentation, operating manuals, related systems data, source programs, record layouts, program libraries, and any other documentation in those application areas that may pertain to any data processing system or operation.

"**Successful Bidder**" has the meaning set forth in the Bidding Procedures.

"**Tax Returns**" means all returns, declarations, reports, statements, schedules, notices, forms or other documents or information filed or required to be filed in respect of the determination, assessment, collection or payment of any Tax or in connection with the administration, implementation or enforcement of any legal requirement relating to any Tax, and the term "**Tax Return**" means any one of the foregoing Tax Returns.

"**Taxes**" means all taxes, charges, fees, levies or other like assessments, including U.S. federal, state, local, foreign, and other net income, gross income, gross receipts, social security, estimated, sales, use, ad valorem, franchise, profits, net worth, alternative or add-on minimum, capital gains, license, withholding, payroll, employment, unemployment, social security, excise, property, transfer, and any and all other taxes, assessments, fees or other governmental charges, whether computed on a separate, consolidated unitary, combined or any other basis together with any interest and any penalties, additions to tax, estimated taxes or additional amounts with respect thereto, and including any liability for Taxes as a result of being a member of a consolidated, combined, unitary or affiliated group, and the term "Tax" means any one of the foregoing Taxes.

"**Transfer Taxes**" means all stamp, documentary, registration, value-added, transfer, sales, use, bulk sales, reporting, recording, filing and other similar fees, Taxes and charges arising out of or in connection with the transfer of the Acquired Assets effected pursuant to this Agreement.

"**Transferred Contracts**" means all of the Contracts to which the Sellers are party set forth on Section 5.1(h)(i) of the Seller Disclosure Schedules.

"**Treasury Regulations**" means the regulations (including all proposed and temporary regulations) promulgated by the U.S. Department of the Treasury under the Code, as such regulations may be amended from time to time.

Section 1.2    Construction of Certain Terms and Phrases.

(a)    Unless the context of this Agreement otherwise requires, (i) words of any gender include each other gender; (ii) words using the singular or plural number also

14

include the plural or singular number, respectively; (iii) the terms "hereof," "herein," "hereby" and derivative or similar words refer to this entire Agreement; (iv) the terms "Article," "Section," or "clause" refer to the specified Article, Section, or clause of this Agreement; (v) the word "including" (and, with correlative meaning, the word "include") means including, without limiting the generality of any description preceding that word; and (vi) the words "shall" and "will" are used interchangeably and have the same meaning. Any reference to a Law shall include any amendment thereof or any successor thereto and any rules and regulations promulgated thereunder, unless the context otherwise requires. Any reference in this Agreement to any contract, license, agreement or order means such contract, license, agreement or order as amended, supplemented or modified from time to time in accordance with the terms thereof. Currency amounts referenced in this Agreement are in U.S. Dollars.

(b)    Any representation or warranty contained herein as to the enforceability of a Contract (including this Agreement and any Related Agreement) will be subject to the effect of any bankruptcy, insolvency, reorganization, moratorium or other similar law affecting the enforcement of creditors' rights generally and to general equitable principles (regardless of whether such enforceability is considered in a proceeding in equity or at law).

(c)    This Agreement is being entered into by and among competent and sophisticated parties who are experienced in business matters and represented by counsel and other advisors, and have been reviewed by the parties and their counsel and other advisors. Therefore, any ambiguous language in this Agreement will not be construed against any particular party as the drafter of the language.

(d)    Whenever this Agreement refers to a number of days, such number shall refer to calendar days unless Business Days are specified. Whenever any action must be taken hereunder on or by a day that is not a Business Day, then such action may be validly taken on or by the next day that is a Business Day.

(e)    The phrases "provided", "delivered", or "made available", when used herein, mean that the information or materials referred to have been (i) posted to the on-line "virtual data room" established under project name "Project Wren" on Intralinks to which Purchaser and its counsel have continuous access at least two (2) days prior to the Execution Date or (ii) delivered directly to Purchaser or its Representatives by or on behalf of Sellers at least two (2) days prior to the Execution Date.

ARTICLE II

Purchase and Sale and Assumption

Section 2.1    Purchase and Sale of Acquired Assets. Upon the terms and subject to the conditions of this Agreement and the Sale Order, at the Closing, each Seller will sell, transfer, convey, assign, deliver and set over to Purchaser, and Purchaser will purchase and accept, all of the right, title, benefit and interest of such Seller in, to and under the Acquired Assets, free and clear of all Liens and Interests (other than Permitted Encumbrances and Assumed Liabilities),

pursuant to Sections 363(f) and 1123(b)(4) of the Bankruptcy Code. Other than the Permitted Encumbrances and Assumed Liabilities, all mortgages or other Liens on the Acquired Assets securing Indebtedness shall attach to the net proceeds of the Sale pursuant to Sections 363(f) and 1123(b)(4) of the Bankruptcy Code so that the Acquired Assets will be sold free and clear of such Liens and other Interests. At the Closing, the sale, transfer, conveyance, assignment and delivery of the Acquired Assets will be effected pursuant to the General Assignment, the Sale Order and other instruments of transfer described in Section 4.2(a).

Section 2.2    Excluded Assets. Notwithstanding anything to the contrary contained herein, the Acquired Assets do not include, and in no event will Purchaser acquire any right, title, benefit or interest in, to or under, any of the Excluded Assets.

Section 2.3    Assumed Liabilities. Upon the terms and subject to the conditions of this Agreement, at the Closing, Purchaser will assume and agree to pay, perform and discharge or hold Sellers harmless from all of the Assumed Liabilities. The assumption of the Assumed Liabilities by Purchaser will be effected pursuant to the Assumption Agreement and the Sale Order.

Section 2.4    Excluded Liabilities. Notwithstanding anything to the contrary contained herein, the Assumed Liabilities will not include, and in no event will Purchaser assume, be required to pay, perform, discharge and hold Sellers harmless from any Excluded Liabilities.

Section 2.5    Assignment and Cure Amounts.

(a)    Subject to the terms and conditions of this Agreement and the entry of the Sale Order, at the Closing and pursuant to Section 365 of the Bankruptcy Code, each Seller shall assume and assign to Purchaser, and Purchaser shall take assignment from such Seller of, the Transferred Contracts. Purchaser shall be responsible for Cure Amounts and for satisfying the requirements of "adequate assurance of future performance" as required by section 365 of the Bankruptcy Code and shall cooperate fully with each Seller in seeking such approval from the Bankruptcy Court, including Purchaser providing the necessary evidence required in connection with the Sale Hearing, as applicable, to approve this Agreement and the transactions contemplated herein.

(b)    The cure amounts (collectively, the "**Cure Amounts**"), if any, necessary to cure all defaults, if any, and to pay all actual or pecuniary losses, if any, that have resulted from any defaults on the part of a Seller under the Transferred Contracts shall be paid by Purchaser at the Closing or as soon as reasonably practicable thereafter (except as otherwise agreed to by the other party to the Transferred Contracts) and such Seller shall have no Liability for any such Cure Amounts. As part of the Sale Process, Sellers shall file with the Bankruptcy Court the Schedule of Transferred Contracts, which shall be in form and substance reasonably acceptable to Purchaser, setting forth the Transferred Contracts and the respective Cure Amounts as to each Transferred Contract. Purchaser shall have the right to request that Sellers add or remove any Contract identified in the Schedule of Transferred Contracts at any time on or prior to the Sale Hearing (or such later date as may be permitted under the Bidding Procedures Order or the Sale Order, as applicable). Upon such request, Sellers shall provide Purchaser with the amount, in

16

Sellers' sole discretion, by which the Purchase Price shall be adjusted based on such addition or removal and Purchaser shall have the election to have such Contract added or removed. If Purchaser so elects, Sellers shall cause an applicable modified Schedule of Transferred Contracts to be filed with the Bankruptcy Court consistent with the Bidding Procedures Order or the Sale Order, as applicable (which, for the avoidance of doubt, shall be subject to, in the case of the addition of a Contract to the Schedule of Transferred Contracts, the ability of the other party to such Contract to object to such addition), and the Purchase Price shall be updated to reflect such adjustment.

Section 2.6    Bulk Sales Laws. The parties hereto hereby waive compliance by Sellers with the requirements and provisions of any "bulk-transfer" or similar Laws of any jurisdiction that may otherwise be applicable with respect to the sale and transfer of any or all of the Acquired Assets to Purchaser, and Purchaser hereby waives all claims against Sellers to the extent related to non-compliance therewith.

ARTICLE III

Purchase Price

Section 3.1    Purchase Price; Earnest Deposit.

(a)    The purchase price for the Acquired Assets will be, in addition to the Assumed Liabilities and the Cure Amounts (which shall be paid by Purchaser to the applicable counterparty on or about the Closing Date), a cash amount equal to $6,500,000.00 (such cash amount, the "**Cash Component Price**" and, together with the Assumed Liabilities and the Cure Amounts, the "**Purchase Price**").

(b)    Purchaser or one of its Affiliates has made an earnest deposit by wire transfer of immediately available funds into the Deposit Escrow Account equal to ten percent (10%) of the cash amount of the Purchase Price (the "**Earnest Deposit**") in accordance with the Bidding Procedures Order. The Deposit Escrow Funds while remaining in the Deposit Escrow Account, shall not be subject to any lien, attachment, trustee process, or any other judicial process of any creditor of any Seller, Purchaser or their respective Affiliates, and the Deposit Escrow Agreement shall provide that the Deposit Escrow Funds shall be released in accordance with the provisions of this Agreement and Bidding Procedures Order. All interest earned on the Earnest Deposit in the Deposit Escrow Account shall be distributed by the Escrow Agent (i) following the Closing, to Purchaser, or (ii) if the Agreement is terminated prior to the Closing, to Sellers or Purchaser, as applicable, in accordance with Section 10.2. Any portion of the Deposit Escrow Funds released to Purchaser in accordance with the terms of this Agreement and the Bidding Procedures Order shall not be subject to any lien, attachment, trustee process or any other judicial process of any creditor of any Seller. At the Closing, (i) the Earnest Deposit shall be credited against the Purchase Price and distributed by the Escrow Agent to Sellers; and (ii) Purchaser will pay to Sellers by wire transfer of immediately available funds to an account specified in writing by Sellers an amount equal to the Purchase Price minus the Earnest Deposit.

Section 3.2    Withholding of Tax. Purchaser shall be entitled to deduct and withhold any amounts Purchaser reasonably believes that it is required to deduct and withhold under any applicable Tax Law in connection with payments to be made by Purchaser pursuant to the terms of this Agreement; provided, that, if Purchaser believes that any such deduction or withholding of Tax (other than any deduction or withholding as a result of the failure to provide a W-9 for Sellers in compliance with Section 4.2(a)(v)) is required with respect to any payment under this Agreement, then Purchaser shall give written notice to Sellers describing the basis for such withholding in reasonable detail at least five (5) Business Days prior to making such payment and Purchaser shall provide Sellers with a reasonable opportunity to provide any applicable certificate, form or documentation that would reduce or eliminate the requirement to deduct and withhold Tax with respect to such payment, and Purchaser shall otherwise cooperate with Sellers and take such steps as Sellers may reasonably request to reduce or eliminate such withholding obligation to the extent permitted by applicable Law. Such withheld amounts will be treated for all purposes of this Agreement as having been paid to Sellers by Purchaser to the extent such amounts have been timely paid to the appropriate Tax authority.

Section 3.3    Allocation of Consideration. The Purchase Price, the Assumed Liabilities, and any other items required to be treated as consideration for U.S. federal income Tax purposes will be allocated among the Acquired Assets for all Tax purposes in accordance with section 1060 of the Code and the Treasury Regulations promulgated thereunder in a manner consistent with the principles set forth on Schedule 3.3 (the "**Allocation Principles**"). Within five (5) days of the Closing Date, Purchaser shall provide to Sellers a draft allocation in a manner consistent with the Allocation Principles for Sellers' review and comment. If Sellers do not provide Purchaser a written objection to the draft allocation within five (5) days of receipt, the draft allocation shall be deemed to be agreed upon by the parties. If Sellers propose changes to the draft allocation within such five (5)-day period, Sellers and Purchaser shall negotiate in good faith to amend any aspects of the allocation in dispute; provided, however, that if Sellers and Purchaser are unable to resolve any dispute with respect to the allocation within five (5) days after the date Purchaser received notice of Sellers' objection, such dispute shall be resolved by the Independent Accountant. The findings of the Independent Accountant shall be final, binding and conclusive on Sellers and Purchaser. The fees and expenses of the Independent Accountant shall be borne by Purchaser, on the one hand, and Sellers, on the other hand, in inverse proportion as they may prevail on the matters resolved by the Independent Accountant, which proportionate allocation shall be calculated on an aggregate basis based on the relative dollar values of the amounts in dispute and which proportionate allocation shall be conclusively determined by the Independent Accountant. Purchaser and Sellers shall (a) complete and file IRS Form 8594 with their respective U.S. Federal income Tax Returns consistent with such allocation for the taxable year in which the Closing occurs, and (b) not take any position (and cause their respective Affiliates to not take any position) on any Tax Return, before any Governmental or Regulatory Authority charged with the imposition, assessment or collection of Taxes, or in any judicial proceeding, that is in any manner inconsistent with the terms of such allocation, as finally determined; provided, however, that (i) no party hereto shall be unreasonably impeded in its ability and discretion to negotiate, compromise and/or settle any Tax audit, claim or similar proceedings in connection with such allocation and (ii) the allocation shall not be binding upon Sellers for purposes of any plan filed in connection with the Bankruptcy Cases and shall not, and shall not be interpreted to, have any effect on any distributions to

18

Sellers' creditors or equityholders. Notwithstanding any other provision of this Agreement, the terms and provisions of this Section 3.3 shall survive the Closing without limitation.

<div align="center">ARTICLE IV</div>

<div align="center">Closing Matters</div>

Section 4.1    Closing. Upon the terms and subject to the conditions of this Agreement, the Closing will take place beginning at 10:00 a.m. (local time) remotely by electronic transmissions or, in the event that the parties deem an in-person Closing necessary, at the offices of Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019-6064, on the second Business Day after the satisfaction (or waiver by the party for whose benefit such conditions exist) of all conditions described in Article IX that are required to be satisfied prior to the Closing (other than actions to be taken or items to be delivered at Closing as set forth herein, but subject to the satisfaction or waiver of such conditions), or at such other time, date, and place as the parties may mutually agree in writing (the "**Closing Date**"). All documents delivered and all transactions consummated at the Closing will be deemed for all purposes to have been delivered and consummated effective as of the Effective Time.

Section 4.2    Deliveries at Closing.

(a)    Deliveries of Seller. At the Closing, each Seller will deliver or cause to be delivered to Purchaser the following, as applicable:

(i)    the General Assignment, substantially in the form attached hereto as Exhibit B, duly executed by each Seller;

(ii)  . the Assumption Agreement, substantially in the form attached hereto as Exhibit A, duly executed by each Seller;

(iii)    any physical Acquired Assets within the control or possession of Seller or its Affiliates (which will be made available to Purchaser and delivered to a location as reasonably specified by Purchaser);

(iv)    all certificates of title or origin (or similar documents), duly endorsed with respect to any material vehicles or other equipment included in the Acquired Assets for which a certificate of title or origin is required to transfer title;

(v)    a W-9 for such Seller;

(vi)    a joint written instruction to the Escrow Agent instructing the release of the Earnest Deposit to Sellers; and

(vii)    all other instruments of conveyance and transfer executed by the applicable Seller, in form and substance reasonably acceptable to Purchaser, as may be necessary to convey the Acquired Assets to Purchaser free and clear of all

Liens, Liabilities (other than Assumed Liabilities) and other Interests (except Permitted Encumbrances), provided, however, that the Sale Order shall be the only required document to evidence the conveyance and transfer free and clear of such Liens, Liabilities and other Interests.

(b)     Deliveries by Purchaser. At the Closing, Purchaser shall pay all Cure Amounts to the applicable counterparties and will deliver or cause to be delivered to Sellers the following:

(i)     an amount equal to (i) the Cash Component Price minus (ii) the Earnest Deposit, as provided in Section 3.1(b), by wire transfer of immediately available funds to the accounts specified by the Sellers;

(ii)     a joint written instruction to the Escrow Agent instructing the release of the Earnest Deposit to Sellers;

(iii)     the Assumption Agreement, substantially in the form attached hereto as Exhibit A, duly executed by Purchaser;

(iv)     a certificate of good standing of Purchaser from the Delaware Secretary of State as to Purchaser, that will be dated not more than ten (10) days prior to the Closing Date;

(v)     copies of resolutions of the governing body of Purchaser authorizing the execution, delivery and performance of this Agreement and the Related Agreements; and

(vi)     all required Transfer Tax stamps and transfer forms (if any), unless under applicable Law such Transfer Tax stamps or duly stamped transfer forms are only available post-Closing (in which case such Transfer Tax stamps or duly stamped transfer forms shall be delivered to Sellers promptly and in any event no later than five (5) Business Days after receipt thereof by Purchaser).

Section 4.3     Further Assurances and Cooperation.

(a)     Further Assurances. Subject to the terms and conditions of this Agreement, from time to time after the Closing through the date on which the Bankruptcy Cases are closed, at a party's reasonable request and without further consideration, and solely at the cost and expense of the requesting party, the other party will execute and deliver such other instruments of sale, transfer, conveyance, assignment and confirmation, and assumption, and provide such materials and information and take such other actions as the other party may reasonably deem necessary or desirable in order to more effectively transfer, convey and assign to Purchaser all of the Acquired Assets and/or in order to more effectively effect the assumption by Purchaser of the Assumed Liabilities.

(b)     Access to Information and Books and Records. During the period from the Execution Date to the Closing Date, Sellers shall provide Purchaser with reasonable

access, during normal business hours and upon reasonable notice, to information reasonably requested by Purchaser and solely to the extent related to the Acquired Assets and Assumed Liabilities, except as otherwise prohibited by applicable Laws. For a period of twelve (12) months following the Closing (or until the earlier liquidation or dissolution of Sellers), Sellers will afford Purchaser, and its Representatives, during normal business hours and upon reasonable prior notice, reasonable access to the Excluded Books and Records and the right to make copies and extracts therefrom to the extent that such access may be reasonably required by Purchaser in connection with (i) the preparation of Tax Returns, (ii) any Tax audit, Tax protest, or other proceeding relating to Taxes, (iii) the making of any election related to Taxes, (iv) compliance with the requirements of any Governmental or Regulatory Authority, or (v) any actual or threatened third party action or proceeding. Neither Seller may, for a period of seven (7) years after the Effective Time, destroy or otherwise dispose of any such books, records and other data unless such party will first offer in writing to surrender copies of such books, records and other such data to Purchaser and Purchaser has not agreed in writing to take possession thereof during the ten (10) day period after such offer is made, provided Sellers' motion to close or dismiss the Bankruptcy Cases shall be deemed to constitute notice to Purchaser of Sellers' intention to destroy all books, records and data in connection with the Acquired Assets and its offer to surrender such books, records and data to Purchaser.

(c)     If, in order to properly prepare its Tax Returns or other documents or reports required to be filed with any Governmental or Regulatory Authority, it is necessary that either Purchaser or Sellers be furnished with additional information, documents or records relating to the Acquired Assets or the Assumed Liabilities not referred to in Section 4.3(b), and such information, documents or records are in the possession or control of the other party, such other party will use its Reasonable Efforts to furnish or make available such information, documents or records (or copies thereof) at the recipient's reasonable request and at recipient's cost and expense. Notwithstanding the foregoing, this Section 4.3 shall not require any Seller to permit any access to, or to disclose (i) any information that, in the reasonable, good faith judgment (after consultation with counsel, which may be in-house counsel) of Sellers, is reasonably likely to result in any violation of any legal requirement or any Contract to which a Seller is a party or cause any privilege (including attorney-client privilege) or work product protection that a Seller would be entitled to assert to be waived or (ii) if any Seller, on the one hand, and Purchaser, on the other hand, are adverse parties in a litigation, any information that is reasonably pertinent thereto.

## ARTICLE V

### Representations and Warranties

Section 5.1   Representations and Warranties of Seller. Except as set forth in (a) the Seller Disclosure Schedules or (b) any forms, reports, schedules, statements or other documents filed by a Seller and available on the Securities and Exchange Commission's Electronic Data Gathering Analysis and Retrieval System (excluding statements in any "Risk Factors" sections and any disclosure of risks included in any "forward-looking statements" disclaimer to the extent that such statement or disclosure is cautionary, predictive or forward-looking in nature), each

Seller represents and warrants to Purchaser as set forth in this <u>Section 5.1</u>. The Seller Disclosure Schedules will be arranged in paragraphs corresponding to the lettered and numbered Paragraphs contained in this Agreement (as to which Purchaser acknowledges and agrees that any matter disclosed pursuant to a section, subsection, paragraph or subparagraph of the Seller Disclosure Schedules shall be deemed to modify the respective representations and warranties in this <u>Section 5.1</u>, in each case, solely to the extent that it is reasonably apparent on the face of the disclosure that the disclosure in one section of the Seller Disclosure Schedules is applicable to such other section of the Seller Disclosure Schedules):

(a)     <u>Organization and Existence</u>. Such Seller is a corporation duly incorporated, validly existing, and in good standing under the laws of the State of Delaware, with full power and authority to own, lease, and operate the Acquired Assets, as applicable, and to carry on its business as and where such assets are now owned or leased and its business is now conducted, subject to the Bankruptcy Cases. The states in which such Seller is required by law to be qualified to do business as a foreign company are set forth on <u>Section 5.1(a)</u> of the Seller Disclosure Schedules, and such Seller is qualified to do business as a foreign company in each such state.

(b)     <u>Authority and Approval</u>. Such Seller has the power to enter into this Agreement and each of the Related Agreements to which it is a party, subject to entry of the Sale Order by the Bankruptcy Court, and to perform its obligations hereunder and thereunder. The execution, delivery and performance by such Seller of this Agreement and the Related Agreements to which it is to be a party, and the consummation by such Seller of the transactions contemplated herein and therein, have been duly authorized by all required corporate action on the part of such Seller. This Agreement has been duly executed and delivered by such Seller, and when executed and delivered by such Seller, the Related Agreements to which it is a party will have been duly executed and delivered by such Seller, subject to the Bankruptcy Cases. This Agreement is, and each of the Related Agreements to which such Seller is a party when executed and delivered by such Seller, subject to entry of the Sale Order by the Bankruptcy Court, will be, the valid and binding obligations of such Seller, enforceable against such Seller, in accordance with their respective terms, except as may be limited by the Bankruptcy Cases.

(c)     <u>No Conflict</u>. The execution and delivery by such Seller of this Agreement and each of the Related Agreements to which it is to be a party, and such Seller's compliance with the terms and conditions hereof and thereof, and the consummation by such Seller of the transactions contemplated hereby and thereby, do not and will not (i) conflict with, or require the consent of any Person that has not been obtained under such Seller's Organizational Documents, (ii) subject to entry of the Sale Order, obtaining the authorizations referred to in <u>Section 5.1(d)</u> of the Seller Disclosure Schedules and excluding any Antitrust Law, violate or breach in any material respect any provision of, or require any consent, authorization, or approval under, any Law or Order applicable to such Seller, the Acquired Assets or the Assumed Liabilities, (iii) subject to entry of the Sale Order, and except as set forth in <u>Section 5.1(c)</u> of the Seller Disclosure Schedules, violate, conflict with, result in a breach of, constitute a default under (whether with or without notice or the lapse of time or both), accelerate or permit the acceleration of the performance required by, or require any consent, authorization, or approval under, any

Transferred Contract to which such Seller is a party or by which such Seller is bound or to which any of its assets or properties are subject, except to the extent excused or stayed by the Bankruptcy Cases or (iv) result in the creation of any Lien upon the Acquired Assets other than Permitted Encumbrances and Liens created by Purchaser; provided, however, that no representation or warranty is made in the foregoing clauses (ii) through (iv) with respect to matters that would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect.

(d)    Governmental Approvals and Filing. Except (i) as set forth in Section 9.3(b) or as disclosed in Section 5.1(d) of the Seller Disclosure Schedules, (ii) with respect to any Antitrust Law, and (iii) the entry of the Sale Order, no consent, authorization, approval or action of, filing with, notice to, or exemption from any Governmental or Regulatory Authority on the part of such Seller is required in connection with the execution, delivery and performance of this Agreement or any Related Agreements to which such Seller is to be a party or the consummation of the transactions contemplated hereby or thereby, except where the failure to obtain any such consent, approval or action, to make any such filing, to give any such notice or obtain any such exemption would not be reasonably expected to (x) have a material adverse effect on such Seller or (y) materially adversely affect the validity or enforceability against such Seller of this Agreement or such Related Agreements or materially adversely affect the ability of such Seller to consummate the transactions contemplated by this Agreement.

(e)    Legal Proceedings. Section 5.1(e) of the Seller Disclosure Schedules contains a complete and accurate description (including the case caption and case number where available) of each material Action to which such Seller is currently or in the last year had been a party arising out of or in relation to the Acquired Assets. Except as disclosed in Section 5.1(e) of the Seller Disclosure Schedules or on the Bankruptcy Case docket, there is no: (i) pending or, to Seller's Knowledge, written threatened Action or Order of any Governmental or Regulatory Authority, in each case relating to such Seller or any of the Acquired Assets, in each case that would reasonably be expected (x) to have a Material Adverse Effect or (y) to adversely affect the validity or enforceability of this Agreement or any of the Related Agreements against such Seller or adversely affect the ability of such Seller to consummate the transactions contemplated by this Agreement; or (ii) Orders outstanding against such Seller that would adversely affect the ability of such Seller to consummate the transactions contemplated by this Agreement or that are otherwise related to such Seller or the Acquired Assets.

(f)    Compliance with Laws and Orders. Except as set forth in Section 5.1(f) of the Seller Disclosure Schedules, there is no unresolved material violation of or default under any Law or Order applicable to the Acquired Assets or the Assumed Liabilities, in each case, other than as a result of the Bankruptcy Cases or stayed by the Bankruptcy Court. Such Seller is in compliance in all material respects with all applicable Laws related to the Acquired Assets or the Assumed Liabilities.

(g)    Title. Except as set forth in Section 5.1(g) of the Seller Disclosure Schedules, Sellers have good and marketable title to, or a valid leasehold interest in and right to use, all Acquired Assets, in each case, free and clear of all Liens other than

Permitted Encumbrances, Liens relating to any Assumed Liabilities, or Liens that will be released at the Closing Date.

(h)     Contracts.

(i)     Section 5.1(h)(i) of the Seller Disclosure Schedules sets forth a true, correct and complete list of the Transferred Contracts.

(ii)     True, correct and complete copies of Transferred Contracts (including any amendments, supplements, restatements or modifications thereto) have been made available to Purchaser. Pursuant to entry of the Sale Order and payment of all Cure Amounts, each Transferred Contract is in full force and effect, is fully assignable without the consent of any Person, except as set forth on Section 5.1(h)(ii) of the Seller Disclosure Schedules, and is valid, binding and enforceable in accordance with its terms as to such Seller and, to Seller's Knowledge, the other parties thereto. Other than the payment of Cure Amounts, such Seller has performed and is performing all obligations required to be performed by it under the Transferred Contracts. Except as set forth in Section 5.1(h)(ii) of the Seller Disclosure Schedules, no material default or material breach of a Transferred Contract exists on the part of such Seller or, to Seller's Knowledge, on the part of any other Person under any such Transferred Contract, and no condition or event has occurred that, after notice or lapse of time, or both, would constitute a material default or material breach of such Transferred Contracts. No party to a Transferred Contract has notified such Seller in writing that such party intends to cancel or otherwise terminate such Transferred Contract, or, to Seller's Knowledge, has taken any action or threatened to take any action with respect of an amount paid or payable to such Seller pursuant to such Transferred Contract.

(i)     Brokers. Except as set forth in Section 5.1(i) of the Seller Disclosure Schedules, no broker, finder or investment banker is entitled to any brokerage commission, finder's fee or similar payment in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of Sellers.

(j)     Taxes. Except as otherwise set forth in Section 5.1(j) of the Seller Disclosure Schedules:

(i)     All material Tax Returns required to be filed with respect to the Acquired Assets have been timely filed and all such Tax Returns are true, accurate and complete in all material respects to the extent that failure to file such a Tax Return, or the failure of any such Tax Return to be true, accurate and complete, could reasonably be expected to give rise to a Lien on any Acquired Asset following the Closing.

(ii)     All material Taxes with respect to the Acquired Assets that are due and payable have been duly and timely paid to the extent that failure to pay such

Taxes could reasonably be expected to give rise to a Lien on any Acquired Asset following the Closing.

(iii)    There is no claim, audit, action, suit, investigation or other proceeding pending or threatened in writing against, or with respect to, a material amount of Taxes relating to the Acquired Assets to the extent that the outcome of such proceeding could reasonably be expected to give rise to a Lien on any Acquired Asset following the Closing.

(k)    No Material Adverse Change. Except as described in Section 5.1(k) of the Seller Disclosure Schedules, except as a result of the Bankruptcy Cases, since the Petition Date until the Execution Date:

(i)    There has not occurred any event or condition that, individually or in the aggregate, has had or is reasonably expected to have a Material Adverse Effect;

(ii)    Such Seller has not cancelled, compromised, waived or released any right or claim (or series of related rights and claims) related to the Acquired Assets except in the Ordinary Course of Business or pursuant to an Order of the Bankruptcy Court; and

(iii)    Such Seller has not made any agreement to do any of the foregoing.

(l)    Warranties Exclusive. EXCEPT AS EXPRESSLY SET FORTH IN THIS SECTION 5.1, SUCH SELLER MAKES NO REPRESENTATION OR WARRANTY, STATUTORY, EXPRESS OR IMPLIED, WRITTEN OR ORAL, AT LAW OR IN EQUITY, IN RESPECT OF ANY OF ITS ASSETS (INCLUDING THE ACQUIRED ASSETS), LIABILITIES (INCLUDING THE ASSUMED LIABILITIES), OR THE BUSINESS, INCLUDING, WITH RESPECT TO MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, OR NON-INFRINGEMENT, AND ANY SUCH OTHER REPRESENTATIONS OR WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED AND NONE SHALL BE IMPLIED AT LAW OR IN EQUITY. NEITHER SUCH SELLER NOR ANY OTHER PERSON, DIRECTLY OR INDIRECTLY, HAS MADE OR IS MAKING, ANY REPRESENTATION OR WARRANTY, WHETHER WRITTEN OR ORAL, REGARDING THE PRO-FORMA FINANCIAL INFORMATION, FINANCIAL PROJECTIONS OR OTHER FORWARD-LOOKING STATEMENTS OF SUCH SELLER OR THE BUSINESS.

Section 5.2    Representations and Warranties of Purchaser. Except as set forth in the Purchaser Disclosure Schedules, Purchaser makes the following representations and warranties to Sellers as set forth in this Section 5.2. The Purchaser Disclosure Schedules will be arranged in paragraphs corresponding to the lettered and numbered paragraphs contained in this Section 5.2 (as to which each Seller acknowledges and agrees that any matter disclosed pursuant to a section, subsection, paragraph or subparagraph of the Purchaser Disclosure Schedules shall be deemed disclosed for all other purposes of the Purchaser Disclosure Schedules as and to the extent the

content or context of such disclosure makes it reasonably apparent, if read in the context of such other section, subsection, paragraph or subparagraph of the Purchaser Disclosure Schedules, that such disclosure is applicable to such other section, subsection, paragraph or subparagraph of the Purchaser Disclosure Schedules):

(a)    Organization and Existence. Purchaser is a corporation duly incorporated, validly existing, and in good standing under the laws of the State of Delaware, with full power and authority to own, lease and operate its business and properties and to carry on its business as and where such properties and assets are now owned or leased and such business is now conducted.

(b)    Authority and Approval. Purchaser has the power to enter into this Agreement and each of the Related Agreements to which it is to be a party and to perform its obligations hereunder and thereunder. The execution, delivery and performance by Purchaser of this Agreement and the Related Agreements to which it is to be a party, and the consummation by Purchaser of the transactions contemplated herein and therein, have been duly authorized by all required action on the part of Purchaser. This Agreement has been duly executed and delivered by Purchaser and, when executed and delivered by Purchaser, the Related Agreements to which Purchaser is to be a party will have been duly executed and delivered by Purchaser. This Agreement is, and each of the Related Agreements to which Purchaser is to be a party when executed and delivered by Purchaser, will be, the valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with their respective terms, except as may be limited by the Bankruptcy Cases.

(c)    No Conflict. The execution and delivery by Purchaser of this Agreement and each of the Related Agreements to which it is to be a party, and Purchaser's compliance with the terms and conditions hereof and thereof, and the consummation by Purchaser of the transactions contemplated hereby and thereby, do not and will not (i) conflict with any of, or require any consent of any Person that has not been obtained under, Purchaser's Organizational Documents, (ii) subject to entry of the Sale Order and obtaining the authorizations referred to in Section 5.2(d) of the Purchaser Disclosure Schedules, violate or breach in any material respect any provision of, or require any consent, authorization, or approval under, any Law or any Order applicable to Purchaser, (iii) result in a violation or breach of any provision of any Law or Order applicable to Purchaser, (iv) violate, conflict with, result in a breach of, constitute a default under (whether with or without notice or the lapse of time or both), accelerate or permit the acceleration of the performance required by, or require any consent, authorization, or approval under, any Transferred Contract or any other Contract to which Purchaser is a party or by which it is bound or to which any of its assets or property is subject or (v) result in the creation of any Lien upon the assets or property of Purchaser, except in each case as would not reasonably be expected to have a material adverse effect on Purchaser or materially adversely affect the validity or enforceability of this Agreement against Purchaser or materially adversely affect the ability of Purchaser to consummate the transactions contemplated by this Agreement.

(d)    Governmental Approvals and Filing. Except as disclosed in Section 5.2(d) of the Purchaser Disclosure Schedules, no consent, authorization, approval or action of, filing with, notice to, or exemption from any Governmental or Regulatory Authority on the part of Purchaser is required in connection with the execution, delivery and performance of this Agreement or any Related Agreements to which Purchaser is to be a party or the consummation of the transactions contemplated hereby or thereby, except where the failure to obtain any such consent, approval or action, to make any such filing, to give any such notice or obtain any such exemption would not be reasonably expected to (i) have a material adverse effect on Purchaser or (ii) materially adversely affect the validity or enforceability against Purchaser of this Agreement or such Related Agreements or materially adversely affect the ability of Purchaser to consummate the transactions contemplated by this Agreement.

(e)    Legal Proceedings.

(i)    Purchaser has received no written notice that there are any lawsuits or arbitrations pending or threatened against Purchaser as would reasonably be expected (x) to have a material adverse effect on Purchaser, (y) to materially adversely affect the validity or enforceability of this Agreement or any of the Related Agreements against Purchaser or materially adversely affect the ability of Purchaser to consummate the transactions contemplated by this Agreement, or (z) result in the issuance of an Order restraining, enjoining or otherwise prohibiting or making illegal the consummation of the transactions contemplated by this Agreement; and

(ii)    Purchaser has received no written notice that there are any Orders outstanding against Purchaser that would be reasonably expected to have a material adverse effect on Purchaser or materially adversely affect the ability of Purchaser to consummate the transactions contemplated by this Agreement.

(f)    Brokers. No broker, finder or investment banker is entitled to any brokerage commission, finder's fee or similar payment in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of Purchaser.

(g)    Financial Resources. Purchaser has, and will have available at the Closing, funds sufficient to pay in full the Purchase Price, the Cure Amounts and the fees and expenses related to the transactions contemplated by this Agreement in cash. Purchaser knows of no circumstance or condition that could be reasonably expected to prevent the availability at Closing of such funds. Purchaser acknowledges and agrees that notwithstanding anything to the contrary contained herein, its obligation to consummate the transactions contemplated hereby is not subject to Purchaser or any of its Affiliates obtaining any financing.

(h)    No Conflicting Contracts. Except as set forth in Section 5.2(h) of the Purchaser Disclosure Schedules, neither Purchaser nor any of its Affiliates is a party to any Contract involving the operation, management or ownership of a business similar to

any portion of the Proterra Transit Business Unit that would reasonably be expected to cause a delay in any Governmental or Regulatory Authority's granting of any required or necessary approval or authorization in connection with the transactions contemplated hereby, and neither Purchaser nor any of its Affiliates has any plans, or engaged in any discussions, to enter into any such Contract prior to the Closing Date.

(i)     Qualification.  There exist no facts or circumstances that would cause, or be reasonably expected to cause, Purchaser and/or its Affiliates not to qualify as "good faith" purchasers under Section 363(m) of the Bankruptcy Code.

(j)     Opportunity for Independent Investigation; No Other Representations. Prior to its execution of this Agreement, Purchaser has conducted to its satisfaction an independent investigation and verification of the current condition and affairs of the Acquired Assets, including the condition, the cash flow and the prospects of the Acquired Assets and Assumed Liabilities. In making its decision to execute this Agreement and to purchase the Acquired Assets and assume the Assumed Liabilities, Purchaser has relied and will rely solely upon the results of such independent investigation and verification and the terms and conditions of this Agreement. Purchaser acknowledges and agrees that: (a) it has had the opportunity to visit with Sellers and meet with its Representatives to discuss the Acquired Assets and Assumed Liabilities, and their condition, cash flows and prospects, (b) all materials and information requested by Purchaser have been provided to Purchaser to Purchaser's satisfaction and Purchaser is fully familiar with all such materials (including such documents and information found in the electronic data room and the Confidential Information) and information, including all terms and conditions, obligations and liabilities pursuant to, and arising under, all Transferred Contracts and (c) except as expressly set forth in Section 5.1, neither Sellers nor any Affiliate thereof makes any representation or warranty, express or implied, written or oral, as to the Acquired Assets or the Assumed Liabilities or any other matter. Purchaser acknowledges that the Acquired Assets are being transferred on an "AS IS, WHERE IS" basis.

(k)     Disclaimer Regarding Projections.  Purchaser may be in possession of certain projections and other forecasts regarding the Acquired Assets and the Assumed Liabilities and any expansions or other development opportunities relating thereto or otherwise, including projected financial statements, cash flow items and other data, and certain business plan information of the Acquired Assets and the Assumed Liabilities and any expansions or other development opportunities relating thereto or otherwise. Purchaser acknowledges that there are substantial uncertainties inherent in attempting to make such projections and other forecasts and plans, and that Purchaser is familiar with such uncertainties. Accordingly, Purchaser acknowledges that neither Sellers nor any of their Affiliates, Representatives, agents or advisors has made any representation or warranty, express or implied, written or oral, with respect to such projections and other forecasts and plans.

ARTICLE VI

Regulatory Matters

Purchaser hereby covenants and agrees with Sellers, and each Seller hereby covenants and agrees with Purchaser, in each case, as follows:

Section 6.1    Regulatory Filings. Subject to the terms and conditions of this Agreement, each party shall use Reasonable Efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary under applicable Laws to consummate the transactions contemplated by this Agreement.

Section 6.2    Objections or Other Challenges. If (a) any objections are asserted with respect to the transactions contemplated hereby under any Law or if any suit is instituted by any Governmental or Regulatory Authority or any private party challenging any of the transactions contemplated hereby as violating any Law, or (b) any filing made pursuant to Section 6.1 is reasonably likely to be rejected or conditioned by any Governmental or Regulatory Authority, each party hereto shall use Reasonable Efforts to resolve such objections or challenge such Governmental or Regulatory Authority or private party may have to such transactions, including to vacate, lift, reverse or overturn any Order, whether temporary, preliminary or permanent, so as to permit consummation of the transactions contemplated by this Agreement. In furtherance of the foregoing, Purchaser shall undertake promptly any and all actions required to complete lawfully the transactions contemplated by this Agreement prior to the Outside Closing Date, including by (i) responding to and complying with, as promptly as reasonably practicable, any request for information or documentary material regarding the transactions from any relevant Governmental or Regulatory Authority (including responding to any "second request" for additional information or documentary material under applicable Law as promptly as reasonably practicable), (ii) causing the prompt expiration or termination (including requesting early termination and/or approvals thereof) of any applicable waiting period and clearance or approval by any relevant Governmental or Regulatory Authority, including defense against, and the resolution of, any objections or challenges, in court or otherwise, by any relevant Governmental or Regulatory Authority preventing consummation of the transactions and (iii) making any necessary post-Closing filings or proffering and consenting to a governmental order providing for the sale or other disposition, or the holding separate, of particular Acquired Assets, categories of Acquired Assets or lines of business, of the Acquired Assets or of any other assets or lines of business of Purchaser or any of its Affiliates in order to mitigate or otherwise remedy any requirements of, or concerns of, any Governmental or Regulatory Authority, or proffering and consenting to any other restriction, prohibition or limitation on any of its assets, the Acquired Assets, Purchaser or any of Purchaser's Affiliates, in order to mitigate or remedy such requirements or concerns, in each case conditioned on consummation of the transactions contemplated hereby. The entry by any Governmental or Regulatory Authority in any legal proceeding of a governmental order permitting the consummation of the transactions contemplated hereby but which is subject to certain conditions or requires Purchaser or any of its Affiliates to take any action, including any restructuring of the Acquired Assets or lines of business of Purchaser or any of its Affiliates or any changes to the existing business of Purchaser or any of its Affiliates, shall not be deemed a failure to satisfy the conditions specified in Article IX. Purchaser further agrees that neither it nor any of its Affiliates shall, prior to Closing,

acquire, market, operate or control, nor enter into any other Contract to acquire, market, operate or control, any business similar to any portion of the Proterra Transit Business Unit if the proposed acquisition or ability to market, operate or control such business could reasonably be expected to increase the market power attributable to Purchaser and/or its Affiliates in a manner materially adverse to approval of the transactions contemplated by this Agreement or that would reasonably be expected to prevent or otherwise materially interfere with, or materially delay the consummation of the transactions contemplated by, this Agreement.

## ARTICLE VII

### Certain Covenants

Section 7.1    Conduct of Business Pending Closing. Except (1) those matters set forth in Section 7.1 of the Seller Disclosure Schedules, (2) as otherwise expressly contemplated by this Agreement, (3) as required by applicable Law or any Governmental or Regulatory Authority, or (4) with the written consent of Purchaser (which consent will not be unreasonably withheld, conditioned or delayed), during the period from the Execution Date to the Closing Date, each Seller will:

(a)    use its Reasonable Efforts to comply with all Laws applicable to the conduct of the Proterra Transit Business Unit to the extent relating to the Acquired Assets or the ownership and use of the Acquired Assets, in each case, except as would not reasonably be expected to have a Material Adverse Effect;

(b)    not sell, assign, transfer, convey, license or dispose of (including by waiver or release) any of the Transferred Contracts or, other than in the Ordinary Course of Business, other material Acquired Assets;

(c)    not cancel, terminate, fail to renew or amend, modify or change, in any material respect, any material Permit, in each case, to the extent required to perform its material obligations under the Transferred Contracts;

(d)    not amend, supplement or modify in any material respect, terminate (other than with cause) or waive any material term under, exercise any material option under or give any material consent with respect to any material Transferred Contract, in each case, other than in the Ordinary Course of Business;

(e)    not institute, settle or consent to any material litigation, arbitration or other proceeding (whether at law or in equity) or Order arising out of or related to the Acquired Assets that would (i) become an Assumed Liability or (ii) have a material and adverse effect on Purchaser's ownership, use or operation of, or the value of, the Acquired Assets after the Closing; and

(f)    not agree in writing to take any of the actions described above in clauses (a) through (e) of this Section 7.1.

Section 7.2    Efforts to Satisfy Closing Conditions. Each party to this Agreement will use their good-faith, reasonable best efforts to take, or cause to be taken, all actions necessary,

proper or advisable to (a) satisfy all of the conditions set forth in <u>Article IX</u>; (b) comply promptly with all legal requirements that may be imposed on such party with respect to the transactions contemplated by this Agreement and, subject to the conditions set forth in <u>Article IX</u>, to consummate the transactions contemplated by this Agreement; and (c) make any required filing with or notification to, and obtain (and to cooperate with the other party to obtain) any consent, authorization, order or approval of, or any exemption by, any Governmental or Regulatory Authority and any other third party that is required to be made or obtained by it in connection with the transactions contemplated by this Agreement, including the Purchaser Required Approvals.

Section 7.3    <u>Assets Incapable of Transfer</u>. To the extent that any Transferred Contract is not assignable or transferable without the consent of another Person and such consent requirement is not made unenforceable by the Bankruptcy Code, this Agreement will not constitute an assignment or transfer thereof, an attempted assignment or transfer thereof, or an agreement to effect such an assignment or transfer, if such assignment or transfer, attempted assignment or transfer, or agreement would constitute a breach thereof. Sellers will, prior to the Closing, use their Reasonable Efforts to obtain the consent of such other Person to the assignment or transfer of any such Transferred Contract to Purchaser in all cases in which (a) such consent is or may be required for such assignment or transfer and (b) such consent requirement is not made unenforceable by the Bankruptcy Code. Purchaser will, without additional cost or expense to Purchaser, cooperate with Sellers in their efforts to obtain such consents. If any such consent is not obtained prior to the Closing, Sellers shall use their Reasonable Efforts to cooperate with Purchaser in reasonable and lawful arrangements, to the extent reasonably practicable, designed to provide for Purchaser the benefits thereunder, including (a) adherence to reasonable procedures established by Purchaser for the immediate transfer to Purchaser of any payments or other funds received by Purchaser thereunder from the other party to the Transferred Contract for services performed by Purchaser after the Closing and (b) enforcement for the benefit of Purchaser of any and all rights of Sellers thereunder against the other party or parties thereto arising out of the breach or cancellation thereof by such other party or parties or otherwise. For purposes of clarification, Reasonable Efforts by Sellers will in no event require the payment of any money or permit, without the prior written consent of Purchaser, the amendment or modification of any material term or provision of any Transferred Contract, but Reasonable Efforts shall include appropriate filings by Sellers in the Bankruptcy Court seeking a determination that the Bankruptcy Code renders unenforceable the consent requirement in question. Notwithstanding the foregoing, failure to obtain any such consent will not give rise to Purchaser's ability not to consummate the transactions contemplated by this Agreement. Without limiting the generality of the foregoing, the beneficial interest in and to the Transferred Contracts, to the fullest extent permitted by the relevant Transferred Contract and applicable Law, will pass to Purchaser.

Section 7.4    <u>Discovery of Breach</u>. Sellers shall promptly notify Purchaser if, prior to the Closing, Sellers conclude or discover that any of Sellers' representations and warranties contained in this Agreement is not accurate in any material respect such that the conditions set forth in <u>Article IX</u> are incapable of being satisfied, which notice will summarize the reason for such conclusion. Purchaser shall promptly notify Sellers if, prior to the Closing, Purchaser concludes or discovers that any of Purchaser's representations and warranties contained in this

Agreement is not accurate in any material respect such that the conditions set forth in <u>Article IX</u> are incapable of being satisfied, which notice will summarize the reason for such conclusion.

Section 7.5    <u>Restricted Use of Confidential Information</u>. Purchaser acknowledges and agrees that all information furnished to it in connection with this Agreement, the Related Agreements or the transactions contemplated hereby or thereby (i) is subject to the Confidentiality Agreement, the terms of which are incorporated herein by reference, and (ii) subject to Section 2 of the Confidentiality Agreement, constitutes Confidential Information. Notwithstanding anything to the contrary contained in the Confidentiality Agreement (including any expiration or termination thereof in accordance with its terms), the parties hereto agree that (A) during the period from the Execution Date to the Closing Date, Purchaser shall hold all Confidential Information in accordance with the obligations set forth in the Confidentiality Agreement (as if Purchaser were the Receiving Party thereunder) and (B) from and after the Closing Date, for a period of five (5) years, (x) Purchaser shall hold all Confidential Information, to the extent relating to any Excluded Assets or Excluded Liabilities in accordance with the confidentiality and non-use obligations set forth in the Confidentiality Agreement (as if Purchaser were the Receiving Party thereunder) and (y) Sellers shall hold all Confidential Information, to the extent relating to any Acquired Assets or Assumed Liabilities in accordance with the confidentiality and non-use obligations set forth in the Confidentiality Agreement (as if Sellers were the Receiving Party thereunder). If this Agreement is terminated for any reason prior to the Closing, the Confidentiality Agreement shall continue in full force and effect in accordance with its terms.

Section 7.6    <u>Review and Inspections</u>. Subject to <u>Section 4.3</u>, during the period from the Execution Date to the Closing Date, upon reasonable advance written notice, Sellers will provide Purchaser and its Representatives and designees with reasonable access to Seller's books, records, systems, system master data and transactional data and facilities and reasonably make appropriate accountants, attorneys and advisors available during normal business hours in order to permit Purchaser to complete its review of Sellers for purposes of facilitating the transfer to Purchaser of the Acquired Assets, and will reasonably promptly comply with any reasonable requests relating thereto made by or on behalf of Purchaser. The parties will use Reasonable Efforts to share information protected from disclosure under the attorney-client privilege, work product doctrine, joint defense privilege or any other privilege pursuant to this <u>Section 7.6</u> in a manner so as to preserve the applicable privilege. Any party may share information with any other party on an "outside counsel only" basis. Nothing in this Agreement shall obligate the parties to share any information covered by the attorney client privilege, work product doctrine or other similar privilege. Sellers acknowledge that Purchaser's review includes an assessment of and preparation for the efficient and orderly transition of the Acquired Assets to Purchaser, at and after and subject to the Closing.

Section 7.7    <u>No Use of Sellers Brand</u>. Purchaser shall, within sixty (60) days after the Closing Date, (a) cease use of the Sellers Brand and (b) change signage and stationery and otherwise discontinue public use of the Sellers Brand.

Section 7.8    <u>Background License</u>. Effective as of the Closing, each Seller hereby grants to Purchaser and its Affiliates, or alternatively shall procure for Purchaser and its Affiliates from purchasers of the Business Units or assets of any Seller, a worldwide, fully paid-up, royalty-free,

irrevocable, non-terminable, perpetual, sublicensable (including through multiple tiers), non-exclusive license under and to all Intellectual Property (excluding trademarks, websites and domain names) Licensable by a Seller or any of its Affiliates that is not an Acquired Asset and that is necessary for Purchaser and its Affiliates to perform their obligations under the Transferred Contracts as such contracts exist as of Closing, in each case solely in connection with the performance of Purchaser's and its Affiliates' obligations under the Transferred Contracts; provided, for the avoidance of doubt, in no event shall Purchaser or any sublicensee, transferee or assignee of the license granted pursuant to this <u>Section 7.8</u> be used to compete with the Proterra Powered Business Unit as conducted prior to Closing. Purchaser or its Affiliates may assign and otherwise transfer such license, in whole or in part, following written notice to Volvo Battery Solutions LLC (8003 Piedmont Triad Parkway, Greensboro, North Carolina 27409, Attention: Gregory Higgins, Rikard Bentelius and Fredrik Brunell and an additional copy to Greenberg Traurig, LLP, 1000 Louisiana Street, Suite 1700 Houston, Texas 77002 Attention: Shari L. Heyen and David R. Eastlake) or its assignee, (a) to any lender or other financing source as collateral security following the Closing, (b) to an Affiliate or (c) in connection with any assignment, sale, merger, or other transfer of all or any part of the Acquired Business or a product or service line of the Acquired Business or any of its Affiliates (regardless of the form of transaction or series of transactions). All use of such licensed Intellectual Property by or under authority of Purchaser or its Affiliates (or their successors and assigns) from and after the Closing shall be on an "AS IS, WHERE IS" basis, with all faults and all express and implied representations and warranties disclaimed, and at their sole risk.

<center>ARTICLE VIII</center>

<center>Intentionally Omitted.</center>

<center>ARTICLE IX</center>

<center>Conditions to Closing</center>

Section 9.1    <u>Conditions to the Obligations of Purchaser</u>. The obligation of Purchaser to effect the Closing is subject to the satisfaction (or waiver by Purchaser) on the Closing Date of the following conditions:

(a)    <u>Representations and Warranties</u>. (i) Each of the Seller Fundamental Representations shall be true and correct in all material respects, in each case as of the Execution Date and as of the Closing as if made as of the Closing, except for such representations and warranties which are as of a specific date, which shall be true and correct in all material respects as of such date, and (ii) each of the representations and warranties of Sellers contained herein (other than the Seller Fundamental Representations) shall be true and correct in all respects (without giving effect to any limitation as to materiality or Material Adverse Effect), in each case as of the Execution Date and as of the Closing as if made as of the Closing, except for (x) changes permitted or contemplated hereby; (y) representations and warranties which are as of a specific date, which shall be true and correct as of such date, subject to the immediately following clause (z); or (z) where the failure to be so true and correct would not in the aggregate have a Material Adverse Effect or have a material adverse effect on the ability of Sellers

<center>33</center>

to consummate the transactions contemplated hereby. Purchaser will have received a certificate from Sellers signed on behalf of each Seller by a duly authorized officer thereof with respect to the foregoing.

(b)     Covenants. The covenants and agreements of Sellers to be performed on or prior to the Closing will have been duly performed in all material respects. Purchaser will have received a certificate from Sellers signed on behalf of each Seller by a duly authorized officer thereof with respect to the foregoing.

(c)     Related Agreements. Each Seller will have duly executed and delivered to Purchaser the Related Agreements to which such Seller is to be a party.

(d)     Seller's Deliveries. Sellers will have delivered or caused to be delivered to Purchaser the items listed in Section 4.2(a) in form and substance as required herein.

(e)     Material Adverse Effect. Since the Execution Date, there shall not have occurred or been discovered any developments, circumstances or occurrences with regard to any of the Acquired Assets or the Assumed Liabilities, that, individually or in the aggregate, has had a Material Adverse Effect.

Section 9.2     Conditions to the Obligations of Sellers. The obligation of Sellers to effect the Closing is subject to the satisfaction (or waiver by Sellers) on the Closing Date of the following conditions:

(a)     Representations and Warranties. Each of the representations and warranties of Purchaser contained herein shall be true and correct in all material respects, in each case as of the Execution Date and as of the Closing as if made as of the Closing, except for such representations and warranties which are as of a specific date, which shall be true and correct in all material respects as of such date. Sellers will have received a certificate from Purchaser signed on behalf of Purchaser by a duly authorized officer thereof with respect to the foregoing.

(b)     Covenants. The covenants and agreements of Purchaser to be performed on or prior to the Closing will have been duly performed in all material respects. Sellers will have received a certificate from Purchaser signed on behalf of Purchaser by a duly authorized officer thereof with respect to the foregoing.

(c)     Receipt of Purchase Price. Sellers will have received from Purchaser an amount equal to (i) the Purchase Price minus (ii) the Earnest Deposit, as provided and in accordance with Section 3.1(b) of the Agreement. Sellers will have also received the Earnest Deposit from the Escrow Agent. Sellers shall have received evidence of the payment of the Cure Amounts.

(d)     Related Agreements. Purchaser will have duly executed and delivered to Sellers each of the Related Agreements to which Purchaser is a party.

(e)    Purchaser's Deliveries. Purchaser will have delivered or caused to be delivered to Sellers, to the extent not already set forth in Section 9.3(d), the items listed in Section 4.2(b).

Section 9.3    Conditions Precedent to Obligations of Purchaser and Sellers. The respective obligations of the parties to effect the Closing are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser and Sellers in whole or in part to the extent permitted by applicable Law):

(a)    there shall not be in effect any Order by a Governmental or Regulatory Authority (i) declaring this Agreement or any Related Agreement invalid or unenforceable in any respect or (ii) restraining, enjoining or otherwise prohibiting or making illegal the Closing, in each case, that is not stayed by the commencement of the Bankruptcy Cases or any Order of the Bankruptcy Court;

(b)    the Sale Order, together with any other Order of the Bankruptcy Court required to consummate the transactions contemplated hereby, shall have been entered by the Bankruptcy Court and each such Order (i) is not subject to any stay, and (ii) has not been vacated, reversed, or modified in a material matter with respect to Purchaser's rights or protections thereunder without Purchaser's prior written consent;

(c)    subject to the provisions of Section 7.3, the Sale Order shall approve and authorize the assumption and assignment of the Transferred Contracts and the Transferred Contracts shall have been actually assumed and assigned to Purchaser, subject to the payment of applicable Cure Amounts by Purchaser;

(d)    all Purchaser Required Approvals shall have been obtained and shall be in full force and effect; and

(e)    all conditions to the closing of the Sale under the Sale Order other than the Closing, shall have occurred or been waived pursuant to the terms of the Sale Order.

Section 9.4    Frustration of Closing Conditions. Purchaser may not rely on the failure of any condition set forth in this Article IX to be satisfied if such failure was caused by Purchaser's failure to comply with the terms of this Agreement. Sellers may not rely on the failure of any condition set forth in this Article IX to be satisfied if such failure was caused by any Seller's failure to comply with the terms of this Agreement.

<div align="center">ARTICLE X</div>

<div align="center">Termination</div>

Section 10.1    Termination. Subject to Section 10.2, this Agreement may be terminated at any time prior to the Closing Date:

(a)    by written agreement executed by each of Sellers and Purchaser;

<div align="center">35</div>

(b)    by Sellers by written notice to Purchaser, if the Closing has not occurred on or prior to the Outside Closing Date (unless, in each case, the failure to consummate the Closing by such date is due to the failure of a Seller to have fulfilled any of its obligations under this Agreement);

(c)    by either Purchaser, on the one hand, or Sellers, on the other hand, by written notice to the other, in the event that any Governmental or Regulatory Authority has issued a final, non-appealable Order or ruling or taken any other final, non-appealable action, or any applicable Law has been entered, adopted, enacted or promulgated, in each case permanently restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement that is not stayed by the commencement of the Bankruptcy Cases or any order of the Bankruptcy Court;

(d)    by Sellers, by written notice to Purchaser, (i) in the event that, other than through the failure of a Seller to comply with its obligations under this Agreement, one or more of the conditions to Sellers' obligation to effect the Closing is or becomes impossible to satisfy at any time after the Execution Date and Sellers have not waived such condition(s) or (ii) if neither Seller is in material breach of any terms of this Agreement, upon a material breach of a representation, warranty, or covenant on the part of Purchaser set forth in this Agreement such that a condition set forth in Section 9.2 or Section 9.3 would not reasonably be expected to be satisfied as of the time of such termination, and such breach is not capable of being cured or has not been cured within 30 days after Purchaser receives written notice thereof from Sellers;

(e)    by Purchaser, by written notice to Sellers, (i) in the event that, other than through the failure of Purchaser to comply with its obligations under this Agreement, one or more of the conditions to Purchaser's obligation to effect the Closing is or becomes impossible to satisfy at any time after the Execution Date and Purchaser has not waived such condition(s) or (ii) if Purchaser is not in material breach of any terms of this Agreement, upon a material breach of a representation, warranty, or covenant on the part of a Seller set forth in this Agreement such that a condition set forth in Section 9.1 or Section 9.3 would not reasonably be expected to be satisfied as of the time of such termination, and such breach is not capable of being cured or has not been cured within 30 days after Seller receives written notice thereof from Purchaser;

(f)    by Purchaser, by written notice to Sellers, if the Sale Order entered by the Bankruptcy Court has been (A) vacated or reversed or (B) modified in a manner that is adverse to Purchaser in any material respect without Purchaser's prior written consent;

(g)    by either Purchaser, on the one hand, or Sellers, on the other hand, by written notice to the other, if (i) Purchaser is not the Successful Bidder or Backup Bidder at the Auction, (ii) prior to Closing, the Bankruptcy Court enters an order dismissing or converting the Bankruptcy Cases to a case under Chapter 7 of the Bankruptcy Code or (iii) the Bankruptcy Court enters an Order denying approval of the Sale Order or represents at a Sale Hearing (as defined in the Bidding Procedures Order) or other hearing that the Bankruptcy Court will not approve entry of the Sale Order;

36

(h)     by Purchaser, by written notice to Sellers, if, Sellers withdraw the request for authority to sell the Acquired Assets and assume and assign the Transferred Contracts; or

(i)     by Purchaser, by written notice to Sellers, if Sellers (i) move to voluntarily dismiss the Bankruptcy Cases or (ii) move for conversion of the Bankruptcy Cases to a case under chapter 7 of the Bankruptcy Code, in each case, unless the effectiveness thereof is to occur after the Closing.

Section 10.2    Effect of Termination. In the event of the termination of this Agreement in accordance with Section 10.1, this Agreement will thereafter become void and have no effect, and no party hereto will have any liability to the other party hereto or their respective Affiliates, directors, officers or employees, except for the obligations of the parties hereto contained in this Section 10.2, in Article XII and in Section 7.5; provided, however, that (a) if this Agreement is validly terminated by Purchaser prior to Closing pursuant to Section 10.1(e)(ii), Escrow Agent shall, within two (2) Business Days following the termination of this Agreement and without the requirement of any approval by the Bankruptcy Court, distribute the Deposit Escrow Funds to Purchaser and such distribution to Purchaser shall be Purchaser's sole and exclusive remedy as a result of such termination, and (b) if this Agreement is validly terminated by Sellers or Purchaser prior to Closing for any reason other than by Purchaser pursuant to Section 10.1(e)(ii), Escrow Agent shall, within two (2) Business Days following the termination of this Agreement and without the requirement of any approval by the Bankruptcy Court, distribute the Deposit Escrow Funds to Sellers and Sellers shall be entitled to retain the Deposit Escrow Funds.

ARTICLE XI

Bankruptcy Matters

Section 11.1    Bankruptcy Cases. On the Petition Date, Sellers filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code, which cases are jointly administered under Case No. 23-11120 (BLS) (the "**Bankruptcy Cases**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") as of the Execution Date.

Section 11.2    Bankruptcy Court Approvals.

(a)     Sellers and Purchaser acknowledge that this Agreement is subject to approval by the Bankruptcy Court by entry of the Sale Order.

(b)     If Purchaser is selected as the Successful Bidder or Backup Bidder pursuant to the Bidding Procedures Order, a list of the Transferred Contracts shall be attached to the Sale Order.

(c)     If the Sale Order or any other Orders of the Bankruptcy Court relating to the transactions contemplated by this Agreement shall be appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or re-argument shall be filed with respect to the Sale Order or other such Order), subject to rights otherwise arising from this Agreement, including each party's respective right to terminate this Agreement pursuant to

37

Section 10.1, Sellers and Purchaser shall use their Reasonable Efforts to oppose such appeal, petition or motion and obtain an expedited resolution of any such appeal, petition or motion.

(d)     Purchaser and Sellers agree that from and after the date that the Auction is declared closed by Sellers, Sellers will not, directly or indirectly, and will not permit any of their respective Affiliates or Representatives (or Representatives of any of their respective Affiliates) to initiate contact with, or solicit or knowingly encourage submission of any inquiries, proposals or offers by, any Person with respect to an Alternative Transaction or otherwise facilitate any effort or attempt to make a proposal or offer to Sellers or any of their respective Affiliates or Representatives (or Representatives of any of their respective Affiliates) with respect to an Alternative Transaction. For the avoidance of doubt, Sellers will not, and will not permit any of their respective Affiliates or Representatives (or Representatives of any of their respective Affiliates) to, pursue or agree to any Alternative Transaction other than as expressly permitted by and in accordance with the Bidding Procedures Order; provided, that Sellers shall have the responsibility and obligation to respond to any inquiries or offers to purchase all or any part of the Acquired Assets and perform any and all other acts related thereto that are required under the Bankruptcy Code, fiduciary obligations, or other applicable law, including, supplying information relating to the Acquired Assets to prospective purchasers, notwithstanding any provisions of Section 7.5 hereof to the contrary.

Section 11.3    Further Filings and Assurances.

(a)     Purchaser agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Purchaser, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under the Transferred Contracts and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code. Without limiting the foregoing, Sellers and Purchaser shall each use Reasonable Efforts to cooperate to obtain a Sale Order finding that Purchaser is purchasing the Acquired Assets in good faith within the meaning of Section 363(m) of the Bankruptcy Code.

(b)     In the event the entry of the Sale Order shall be appealed, each party shall use its respective Reasonable Efforts to defend against such appeal, provided however, that nothing herein shall alter, amend or modify the conditions to Closing set forth in Section 9.3(b) hereof.

Section 11.4    Notice of Sale. Notice of the sale of Acquired Assets contemplated in this Agreement shall be served in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Local Rules of the Bankruptcy Court and the Bidding Procedures Order.

Section 11.5    Free and Clear. The transfer of the Acquired Assets shall vest Purchaser with all right, title, and interest of Sellers in the Acquired Assets free and clear of any and all

Liens, Liabilities and other Interests (other than Permitted Encumbrances and Assumed Liabilities) pursuant to Sections 363(f) and/or 1123(b)(4) of the Bankruptcy Code, whether arising by statute or otherwise and whether arising before or after the commencement of the Bankruptcy Cases, whether known or unknown, including Interests of or asserted by any of the creditors, vendors, employees, suppliers, or lessors of Sellers or any other third party; provided, that any and all such Liens, Liabilities and other Interests shall attach to the net proceeds of the Purchase Price, with the same priority, validity, force, and effect as they now have against the Acquired Assets. Purchaser shall not be liable for any liability for any Lien, Liability or other Interest, other than the Assumed Liabilities and Permitted Encumbrances.

Section 11.6   Transfer Tax Exemption. The transactions contemplated herein shall be exempt from Transfer Tax to the fullest extent available in accordance with Section 1146 of the Bankruptcy Code.

ARTICLE XII

Miscellaneous

Section 12.1   Survival. All covenants and agreements contained herein which by their terms are to be performed in whole or in part, or which prohibit actions, subsequent to the Closing shall, solely to the extent such covenants and agreements are to be performed, or prohibit actions, subsequent to the Closing, survive the Closing in accordance with their terms until fully performed or satisfied. All other covenants and agreements contained herein, and all representations and warranties contained herein or in any certificated deliveries hereunder, in each case shall not survive the Closing and shall thereupon terminate and be of no further force or effect, including any actions for damages in respect of any breach or inaccuracy thereof.

Section 12.2   Governing Law and Jurisdiction. Except to the extent governed by the Bankruptcy Code, this Agreement will be governed by and be construed in accordance with the Laws of the State of Delaware, without regard however to the conflicts of laws principles thereof. Without limiting any party's right to appeal any Order of the Bankruptcy Court, (a) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes that may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, including, but not limited to, the assumption and assignment of the Transferred Contracts and (b) any and all legal proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereto hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations pursuant to Section 12.3 hereto. To the extent not prohibited by applicable Law or Bankruptcy Court rule, each party hereby waives and agrees not to assert, by way of motion, as a defense or otherwise in any such proceeding, any claim (i) that it is not subject to the jurisdiction of the Bankruptcy Court, (ii) that the proceeding is brought in an inconvenient forum, (iii) that it is immune from any legal process with respect to itself or its property, (iv) that the venue of the proceeding is improper or (v) that this Agreement or the subject matter hereof or thereof may not be enforced in or by such court. Each of the parties hereto hereby (a) irrevocably submits with regard to any such legal proceeding to the exclusive personal jurisdiction of the Bankruptcy Court in the event any dispute arises out of this Agreement or any transaction contemplated hereby, including, but

not limited to, the assumption and assignment of the Transferred Contracts, (b) agrees that it shall not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from the Bankruptcy Court or that such action is brought in an inconvenient forum and (c) agrees that it shall not bring any action relating to this Agreement or any transaction contemplated hereby in any court other than the Bankruptcy Court; provided, that, a party may commence any action or proceeding in a court other than the Bankruptcy Court solely for the purpose of enforcing an order or judgment issued by the Bankruptcy Court. The parties waive personal service of any and all process on each of them and consent that all such service of process shall be made in the manner, to the party and at the address set forth in Section 12.3 of this Agreement, and service so made shall be complete as stated in such Section 12.3. EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY.

Section 12.3    Notices. All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by e-mail (so long as no "bounceback" or similar "undeliverable" message is received by the sender thereof) if successfully transmitted prior to 5:00 pm (Eastern Time) on any Business Day, and on the next Business Day if successfully transmitted after such time or on a non-Business Day or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 12.3):

(1)    If to Sellers, to:

Proterra Inc
1815 Rollins Road
Burlingame, California 94010
Attention:    Jeff Mitchell
              Proterra Legal Department
Email:        jmitchell@proterra.com
              legal@proterra.com

and an additional copy (which will not constitute notice to Sellers) to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064
Attention:    Paul M. Basta
              Robert A. Britton
              Austin S. Pollet
              Michael J. Colarossi
Email:        pbasta@paulweiss.com
              rbritton@paulweiss.com
              apollet@paulweiss.com

mcolarossi@paulweiss.com

(2)    If to Purchaser to:

Phoenix Motor, Inc.
1500 LAKEVIEW LOOP
ANAHEIM, CA 92807
Attn: Mark Hastings
Telephone: 916-622-5531
Email: MarkH@phoenixmotorcars.com

Section 12.4    Amendments and Waivers.

(a)    This Agreement may be amended, superseded, canceled, renewed, or extended, and the terms hereof may be waived, only by a written instrument signed by the parties hereto or, in the case of a waiver, by the party against whom the waiver is to be effective. Neither the failure nor any delay by any party in exercising any right, power or privilege under this Agreement will operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power or privilege will preclude any other or further exercise of such right, power or privilege or the exercise of any other right, power or privilege. To the maximum extent permitted by applicable Law (i) no claim or right arising out of this Agreement can be discharged by one party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other party, (ii) no waiver that may be given by a party will be applicable except in the specific instance for which it is given, and (iii) no notice to or demand on one party will be deemed to be a waiver of any obligation of such party or of the right of the party giving such notice or demand to take further action without notice or demand as provided in this Agreement.

(b)    A failure or omission of any party to insist, in any instance, upon strict performance by another party of any term or provision of this Agreement or to exercise any of its rights hereunder will not be deemed a modification of any term or provision hereof or a waiver or relinquishment of the future performance of any such term or provision by such party, nor will such failure or omission constitute a waiver of the right of such party to insist upon future performance by another party of any such term or provision or any other term or provision of this Agreement.

Section 12.5    Entire Agreement. This Agreement, together with the Seller Disclosure Schedules, the Purchaser Disclosure Schedules, all Exhibits and Schedules hereto and the documents, agreements, certificates and instruments referred to herein and therein, including the Related Agreements, Confidentiality Agreement and related Orders, including the Sale Order, constitutes the entire agreement between the parties hereto and with respect to the subject matter hereof and supersedes all prior representations, warranties, agreements, and understandings, oral or written, with respect to such matters and other than any written agreement of the parties that expressly provides that it is not superseded by this Agreement.

Section 12.6   Headings: Interpretation. The headings in this Agreement are intended solely for convenience of reference and will be given no effect in the construction or interpretation of this Agreement. Unless the context otherwise requires, the singular includes the plural, and the plural includes the singular.

Section 12.7   No Assignment: Binding Effect. This Agreement is not assignable by any party without the prior written consent of the other party. Notwithstanding the foregoing, Purchaser may, without the prior written consent of Sellers, assign this Agreement or all or any portion of Purchaser's rights, interests and obligations hereunder to any of its Affiliates upon notice given to Sellers at least three (3) Business Days prior to the Closing, provided however, that in no event will such an assignment release Purchaser from its obligations hereunder. This Agreement will be binding upon and will inure to the benefit of the parties hereto and their respective successors and permitted assigns.

Section 12.8   Counterparts. This Agreement may be executed in any number of counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument. Any electronic signature, including via portable document format (pdf) or DocuSign, attached hereto will be deemed to be an original and will have the same force and effect as an original signature.

Section 12.9   Incorporation by Reference. The Seller Disclosure Schedules, the Purchaser Disclosure Schedules and other Schedules and Exhibits and the documents referenced therein constitute integral parts of this Agreement and are hereby incorporated by reference herein.

Section 12.10   Time of the Essence. With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

Section 12.11   Specific Performance. Each party hereby acknowledges and agrees that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed by a party in accordance with their specific terms or were otherwise breached by a party. Notwithstanding anything to the contrary herein, if any party violates or refuses to perform any covenant or agreement made by such party herein, without limiting or waiving in any respect any rights or remedies of a party under this Agreement now or hereafter existing at law, in equity or by statute, the non-breaching party or parties shall, in addition to any other remedy to which a party is entitled at law or in equity, be entitled to specific performance of such covenant or agreement or seek any other equitable relief, in each case without the proof of actual damages. Each party agrees to waive any requirement for the security or posting of any bond in connection with any such equitable remedy, and agrees that it will not oppose the granting of an injunction, specific performance or other equitable relief on the basis that (a) the other party has an adequate remedy at law, or (b) an award of specific performance is not an appropriate remedy for any reason at law or equity.

Section 12.12   No Third Party Beneficiaries.

(a)      Except as provided in Section 12.16, the terms and provisions of this Agreement are intended solely for the benefit of the parties hereto and their respective

42

successors and permitted assigns, and it is not the intention of the parties hereto to confer third party beneficiary rights upon any other Person.

(b)      For the avoidance of doubt, all provisions contained in this Agreement with respect to employee benefit plans or compensation of any employees of a Seller are included for the sole benefit of the respective parties hereto, and nothing contained herein (i) shall confer upon any former, current or future employee of Sellers or Purchaser or any legal representative or beneficiary thereof any rights or remedies, including any right to employment or continued employment, of any nature, for any specified period, (ii) shall cause the employment status of any former, present or future employee to be other than terminable at will, (iii) shall confer any third party beneficiary rights upon any such employee or any dependent or beneficiary thereof or any heirs or assigns thereof or (iv) shall constitute an amendment of any Benefit Plan or other employee compensation or benefit plan, program, policy or arrangement of Sellers, Purchaser or any of their respective Affiliates.

Section 12.13 Expenses. Whether or not the transactions contemplated hereby are consummated, each party hereto will pay its own costs and expenses incurred in connection with the negotiation, execution and closing of this Agreement and the Related Agreements and the transactions contemplated hereby and thereby provided. In the event of termination of this Agreement, the obligation of each party to pay its own expenses will be subject to any rights of such party arising from a breach of this Agreement by another party. Notwithstanding the foregoing, (a) Sellers agree to pay all costs of releasing existing Liens and other Interests and recording the releases, (b) Purchaser agrees to pay any filing fees in connection with the filings made pursuant to the HSR Act and any other federal, state or local Governmental or Regulatory Authority in accordance with Section 6.1 and (c) Purchaser will pay the cost of all document recordation costs and all Transfer Taxes not determined to be exempt in accordance with Section 1146 of the Bankruptcy Code arising by reason of the transactions contemplated by this Agreement to the extent the transactions contemplated herein are determined not to be exempt from such costs.

Section 12.14 Severability. If any term or other provision of this Agreement is illegal, invalid or unenforceable under any Law or as a matter of public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated by this Agreement is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision contained herein is, to any extent, invalid or unenforceable in any respect under the Laws governing this Agreement, the parties to this Agreement shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated by this Agreement be consummated as originally contemplated to the greatest extent possible.

Section 12.15 Public Announcements. Prior to the Closing, unless otherwise required by applicable Law, the Bankruptcy Court, the Bidding Procedures or Bidding Procedures Order or by obligations of Purchaser or Sellers or their respective Affiliates pursuant to any listing agreement with or rules of any securities exchange, Purchaser, on the one hand, and Sellers, on the other hand, shall consult with each other before issuing any press release or otherwise

making any public statement with respect to this Agreement or the transactions contemplated hereby and shall not issue any such release or make any such statement without the prior written consent of the other (such consent not to be unreasonably withheld, conditioned or delayed). From and after the Closing, the parties hereto may make public statements with respect to this Agreement or the transactions contemplated hereby so long as such announcements do not disclose the specific terms or conditions of this Agreement, except where such terms and conditions have already been disclosed as required by Law or by obligations of Purchaser or Sellers or their respective Affiliates pursuant to any listing agreement with or rules of any securities exchange or the Bankruptcy Court; provided, that the issuing party shall use its Reasonable Efforts to consult with the other party with respect to the text thereof to the extent practicable.

Section 12.16  No Liability; Release.

(a)      (i) No past, present or future director, officer, manager, employee, incorporator, member, partner or equityholder or other Affiliates of (A) any Seller (other than such Seller in its capacity as such), or (B) Purchaser (other than any obligations hereunder or assumed herein), and (ii) none of the lenders or agents under any Indebtedness of a Seller, in any case, shall have any Liability for any obligations or liabilities of Sellers or Purchaser, as applicable, under this Agreement or any agreement, document or instrument entered into in connection herewith of or for any claim based on, in respect of, or by reason of, the transactions contemplated hereby and thereby. Any claim or cause of action based upon, arising out of, or related to this Agreement or any agreement, document or instrument contemplated hereby may only be brought against Persons that are expressly named as parties hereto or thereto, and then only with respect to the specific obligations set forth herein or therein. Other than the parties hereto, no other party shall have any Liability or obligation for any of the representations, warranties, covenants, agreements, obligations or liabilities of any party under this Agreement or the agreements, documents or instruments contemplated hereby or of or for any legal proceeding based on, in respect of, or by reason of, the transactions contemplated hereby or thereby (including the breach, termination or failure to consummate such transactions), in each case whether based on contract, tort, fraud, strict liability, other Law or otherwise and whether by piercing the corporate veil, by a claim by or on behalf of a party hereto or another Person or otherwise.

(b)      Effective upon the Closing Date, Purchaser acknowledges that it has no claim, counterclaim, setoff, recoupment, action or cause of action of any kind or nature whatsoever against any of the individuals or entities within the Seller Group, that directly or indirectly arises out of, is based upon, or is in any manner connected with any Prior Event (including, for the avoidance of doubt, any Avoidance Actions) (collectively, the "**Purchaser Released Claims**"); and, should any Purchaser Released Claims nonetheless exist, Purchaser hereby (i) releases and discharges each member of the Seller Group from any liability whatsoever on such Purchaser Released Claims that directly or indirectly arises out of, is based upon, or is in any manner connected with a Prior Event, and (ii) releases, remises, waives and discharges all such Purchaser Released Claims against the Seller Group. For purposes of this Section 12.16(b), "**Seller Group**" means (1) each Seller, (2) the lenders and agents under the Indebtedness of any Seller, (3) the Statutory

44

Committee of Unsecured Creditors of the Sellers in their Bankruptcy Cases, and any members thereof at any time, in each case, solely in their capacity as such, and (4) with respect to those parties in the foregoing (1)–(3) of this sentence, any of their respective agents, attorneys, financial advisors, legal representatives, consultants, legal advisors, Affiliates, directors, managers, officers, control persons (as defined in Section 15 of the Securities Act of 1933 (as amended) or Section 20 of the Securities Exchange Act of 1934 (as amended)), shareholders, partners, estates, members, employees and successors and assigns, in each case, solely in their capacity as such, and "**Prior Event**" means any transaction, event, circumstances, action, failure to act or occurrence of any sort or type, including any approval or acceptance given or denied, whether known or unknown, which occurred, existed, was taken or begun prior to the consummation of the transactions contemplated hereunder; provided, that for the avoidance of doubt, "Prior Event" shall include any transaction, event, circumstances, action, failure to act or occurrence of any sort or type which occurred, existed, was taken or begun in accordance with, pursuant to or by virtue of: (A) any terms of this Agreement, (B) the transactions referred to herein, (C) the Bankruptcy Cases or the events leading to the commencement thereof, or (D) any oral or written agreement relating to the foregoing (A) to (C) of this sentence.

(c)     Without limiting in any way the scope of the release contained in subparagraph (a) or (b) of this Section 12.16 and effective upon the Closing Date, Purchaser, to the fullest extent allowed under applicable Law, hereby waives and relinquishes all statutory and common law protections purporting to limit the scope or effect of a general release, whether due to lack of knowledge of any claim or otherwise, including, waiving and relinquishing the terms of any Law which provides that a release may not apply to material unknown claims. Purchaser hereby further affirms its intent to waive and relinquish such unknown claims and to waive and relinquish any statutory or common law protection available in any applicable jurisdiction with respect thereto including, without limitation, California Civil Code § 1542, which provides:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

(d)     Notwithstanding anything set forth herein to the contrary, the releases set forth in this Section 12.16 do not extend to (i) any obligations that are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the willful misconduct, actual and intentional fraud or gross negligence of such Person or (ii) any obligations of the parties under this Agreement.

*[Signature Pages to Follow]*

45

IN WITNESS WHEREOF, the parties, intending legally to be bound, have caused this Agreement to be duly executed as of the day and year first herein above written.

**SELLERS:**

PROTERRA INC

By: _____
Name: GARETH JOYCE
Title: CEO & PRESIDENT

PROTERRA OPERATING COMPANY, INC.

By: _____
Name: GARETH JOYCE
Title: CEO & PRESIDENT.

[Signature Page to Asset Purchase Agreement]

**PURCHASER:**

PHOENIX MOTOR, INC.

By: _____
Name: JAMES MARK HASTINGS
Title: SENIOR VICE PRESIDENT

[Signature Page to Asset Purchase Agreement]

*EXECUTION VERSION*

**FIRST AMENDMENT**
**TO**
**ASSET PURCHASE AGREEMENT**

This First Amendment to Asset Purchase Agreement (this "**Amendment**") is made and entered into as of December 1, 2023, by and among PROTERRA INC, a Delaware corporation ("**Holdco**"), PROTERRA OPERATING COMPANY, INC., a Delaware corporation (together with Holdco, "**Sellers**" and each a "**Seller**"), and PHOENIX MOTOR INC., a Delaware corporation ("**Purchaser**"). Each of the parties named above may be referred to herein as a "**Party**" and collectively as the "**Parties**."

**WHEREAS**, the Parties entered into that certain Asset Purchase Agreement, dated as of November 13, 2023 (the "**Purchase Agreement**");

**WHEREAS**, Section 12.4 of the Purchase Agreement provides that the Purchase Agreement may be amended, superseded, canceled, renewed, or extended by a written instrument signed by the parties to the Purchase Agreement; and

**WHEREAS**, each of the Parties desires to amend the Purchase Agreement on the terms and conditions set forth in this Amendment.

**NOW, THEREFORE**, in consideration of the foregoing and the respective covenants and agreements set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

1.    <u>Capitalized Terms</u>. Capitalized terms used but not otherwise defined herein shall have the meanings assigned thereto in the Purchase Agreement.

2.    <u>Agreements and Amendments to the Purchase Agreement</u>.

(i)    The definition of "Outside Closing Date" is hereby deleted in its entirety and replaced with the following:

""**Outside Closing Date**" means December 22, 2023."

(ii)    In Section 1.1 of the Purchase Agreement, the following definition is hereby added immediately following the definition of "Representative":

""**Revised Hearing Date**" means December 12, 2023."

(iii)    The second sentence of Section 2.5(a) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Purchaser shall be responsible for Cure Amounts and for satisfying the requirements of "adequate assurance of future performance" as required by section 365 of the Bankruptcy Code (which shall include a post-Closing

financing commitment of no less than $20,000,000) and shall cooperate fully with each Seller in seeking such approval from the Bankruptcy Court, including Purchaser providing the necessary evidence required in connection with the Sale Hearing by no later than December 8, 2023, as applicable, to approve this Agreement and the transactions contemplated herein."

(iv)      The third sentence of Section 2.5(b) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Purchaser shall have the right to request that Sellers add or remove any Contract identified in the Schedule of Transferred Contracts at any time on or prior to the Revised Hearing Date."

(v)      The first sentence of Section 3.1(b) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Purchaser or one of its Affiliates has made an earnest deposit by wire transfer of immediately available funds into the Deposit Escrow Account equal to ten percent (10%) of the cash amount of the Purchase Price (the "**Initial Earnest Deposit**") in accordance with the Bidding Procedures Order and shall increase the Initial Earnest Deposit by an additional ten percent (10%) of the cash amount of the Purchase Price (the "**Increased Deposit Amount**" and, together with the Initial Earnest Deposit, the "**Earnest Deposit**") on or prior to December 5, 2023."

(vi)      Section 7.8 of the Purchase Agreement is hereby added to the Purchase Agreement with the  following:

Section 7.8 <u>Successor Liability.</u> Purchaser shall have no liability or responsibility for any Liability or other obligation of Sellers arising under, related to or in connection with the Acquired Assets other than as expressly set forth in this Agreement. Without limiting the effect of the foregoing, the transfer of the Acquired Assets will not subject Purchaser to any Liability or other obligation in connection with claims against Sellers or the Acquired Assets, including, claims for successor or vicarious liability, by reason of such transfer under the laws of the United States, any state, territory or possession thereof applicable to such transactions. Purchaser shall not be deemed, as a result of the consummation of the transactions contemplated by this Agreement and the Related Agreements, to be a successor of any Seller, have, de facto or otherwise, merged with or into Sellers, be a mere continuation or substantial continuation of Sellers or the enterprise of Sellers or be responsible for any Liability or other obligation of Sellers or for payment of any benefit accruing to Sellers, except as expressly set forth in this Agreement.

2

(vii)    Section 10.1(b) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"by Sellers by written notice to Purchaser, if (i) the Closing has not occurred on or prior to the Outside Closing Date (unless the failure to consummate the Closing by such date is due to the failure of a Seller to have fulfilled any of its obligations under this Agreement), (ii) the Increased Deposit Amount has not been transferred into the Deposit Escrow Account on or prior to December 5, 2023, or (iii) Purchaser has not, on or prior to December 8, 2023, (A) provided adequate assurance of future performance (which shall include a post-Closing financing commitment of no less than $20,000,000) or (B) filed an adequate assurance and good faith declaration on the jointly administered docket of the Sellers' Bankruptcy Cases;"

(viii)    Section 10.2 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"In the event of the termination of this Agreement in accordance with Section 10.1, this Agreement will thereafter become void and have no effect, and no party hereto will have any liability to the other party hereto or their respective Affiliates, directors, officers or employees, except for the obligations of the parties hereto contained in this Section 10.2, in Article XII and in Section 7.5; provided, however, that (a) if this Agreement is validly terminated by Purchaser prior to Closing pursuant to Section 10.1(e)(ii), Escrow Agent shall, within two (2) Business Days following the termination of this Agreement and without the requirement of any approval by the Bankruptcy Court, distribute the Deposit Escrow Funds to Purchaser and such distribution to Purchaser shall be Purchaser's sole and exclusive remedy as a result of such termination, and (b) if this Agreement is validly terminated by Sellers or Purchaser prior to Closing for any reason other than by Purchaser pursuant to Section 10.1(e)(ii), then, without the requirement of any approval by the Bankruptcy Court, (i) Escrow Agent shall, within two (2) Business Days following the termination of this Agreement, distribute the Deposit Escrow Funds to Sellers and Sellers shall be entitled to retain the Deposit Escrow Funds, and (ii) Purchaser shall, within two (2) Business Days following the termination of this Agreement, pay, to the extent not deposited into the Deposit Escrow Account prior to such termination, the Increased Deposit Amount, by wire transfer of immediately available funds to an account designated by Sellers."

(ix)    Section 11.3(a) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Purchaser agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Purchaser (which

shall include a post-Closing financing commitment of no less than $20,000,000), including furnishing affidavits or other documents or information for filing by no later than December 8, 2023 with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under the Transferred Contracts and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code. Without limiting the foregoing, Sellers and Purchaser shall each use Reasonable Efforts to cooperate to obtain a Sale Order finding that Purchaser is purchasing the Acquired Assets in good faith within the meaning of Section 363(m) of the Bankruptcy Code."

3.      <u>Effectiveness; Continuing Effect; Miscellaneous</u>. This Amendment shall take effect as of the date of execution of this Amendment. Except as amended by this Amendment, the Purchase Agreement shall be and remain unmodified and in full force and effect in accordance with its terms, and each and every one of its provisions, as amended by this Amendment, are hereby adopted, ratified, and affirmed, and further it is understood and agreed that this Amendment does not limit or alter any rights or remedies of the Parties under any document, agreement or instrument other than the Purchase Agreement, except to the extent that the provisions hereof expressly address the matters set forth therein. Upon execution of this Amendment, this Amendment and the Purchase Agreement shall constitute one agreement. Any references to the "Agreement" in the Purchase Agreement or to the words hereof, hereunder or words of similar affect in the Purchase Agreement shall mean the Purchase Agreement as amended by this Amendment, although this change shall not alter the dates as of which any provision of the Agreement speaks, except as expressly provided herein. For example, phrases such as "the date hereof" and "the date of this Agreement" shall continue to refer to November 13, 2023, the date that the Purchase Agreement was executed, except as expressly provided herein. The provisions of Article XII of the Purchase Agreement shall apply to this Amendment *mutatis mutandis*.

[*Signature Pages to Follow*]

4

IN WITNESS WHEREOF, the Parties, intending to be legally bound, have caused this Amendment to be duly executed as of the day and year first herein above written.

**SELLERS:**

PROTERRA INC

By: _____
Name: Gareth Joyce
Title: President, Proterra Inc.

PROTERRA    OPERATING    COMPANY, INC.

By: _____
Name: Gareth Joyce
Title: President, Proterra Inc.

**PURCHASER:**

PHOENIX MOTOR INC.

By: _____

Name: JAMES MARK HASTINGS

Title: SENIOR VICE PRESIDENT, CORPORATE DEVELOPMENT & STRATEGY

*Execution Version*

<div align="center">

**SECOND AMENDMENT**
**TO**
**ASSET PURCHASE AGREEMENT**

</div>

This Second Amendment to Asset Purchase Agreement (this "**Amendment**") is made and entered into as of December 15, 2023, by and among PROTERRA INC, a Delaware corporation ("**Holdco**"), PROTERRA OPERATING COMPANY, INC., a Delaware corporation (together with Holdco, "**Sellers**" and each a "**Seller**"), and PHOENIX MOTOR INC., a Delaware corporation ("**Purchaser**"). Each of the parties named above may be referred to herein as a "**Party**" and collectively as the "**Parties**."

**WHEREAS**, the Parties entered into that certain Asset Purchase Agreement, dated as of November 13, 2023, as amended by that certain First Amendment to Asset Purchase Agreement, dated as of December 1, 2023 (the "**Purchase Agreement**");

**WHEREAS**, Section 12.4 of the Purchase Agreement provides that the Purchase Agreement may be amended, superseded, canceled, renewed, or extended by a written instrument signed by the parties to the Purchase Agreement; and

**WHEREAS**, each of the Parties desires to amend the Purchase Agreement on the terms and conditions set forth in this Amendment.

**NOW, THEREFORE**, in consideration of the foregoing and the respective covenants and agreements set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

1.    <u>Capitalized Terms</u>. Capitalized terms used but not otherwise defined herein shall have the meanings assigned thereto in the Purchase Agreement.

2.    <u>Agreements and Amendments to the Purchase Agreement</u>.

(i)    The definition of "Outside Closing Date" is hereby deleted in its entirety and replaced with the following:

""**Outside Closing Date**" means January 10, 2024."

(ii)    In Section 1.1 of the Purchase Agreement, the following definition is hereby added immediately following the definition of "Representative":

""**Revised Hearing Date**" means January 5, 2024."

(iii)    The second sentence of Section 2.5(a) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Purchaser shall be responsible for Cure Amounts and for satisfying the requirements of "adequate assurance of future performance" as required by

section 365 of the Bankruptcy Code (which shall include a fully committed and legally enforceable financing of no less than $20,000,000 that shall be fully available at the Closing or a full pledged performance guaranty from a creditworthy entity that is acceptable to Sellers) and shall cooperate fully with each Seller in seeking such approval from the Bankruptcy Court, including Purchaser providing the necessary evidence required in connection with the Sale Hearing by no later than 5:00 p.m. Eastern Time on December 22, 2023, as applicable, to approve this Agreement and the transactions contemplated herein."

(iv)    The first sentence of Section 3.1(b) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Purchaser or one of its Affiliates (i) has made an earnest deposit by wire transfer of immediately available funds into the Deposit Escrow Account equal to ten percent (10%) of the Cash Component Price of the Purchase Price (the "Initial Earnest Deposit") in accordance with the Bidding Procedures Order, (ii) has increased the Initial Earnest Deposit by transferring an additional ten percent (10%) of the Cash Component Price of the Purchase Price (the "First Deposit Increase") on December 11, 2023 and (iii) shall increase the Initial Earnest Deposit by transferring an additional ten percent (10%) of the Cash Component Price of the Purchase Price (the "Second Deposit Increase" and, together with the Initial Earnest Deposit and the First Deposit Increase, the "Earnest Deposit") on or prior to 5:00 p.m. Eastern Time on December 22, 2023."

(v)    The opening phrase of Section 7.1 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Except (1) those matters set forth in Section 7.1 of the Seller Disclosure Schedules, (2) as otherwise expressly contemplated by this Agreement, (3) as required by applicable Law or any Governmental or Regulatory Authority, (4) with the written consent of Purchaser (which consent will not be unreasonably withheld, conditioned or delayed), or (5) for any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code or those actions or omissions necessary and incident, or otherwise relating, to the Bankruptcy Cases or the wind-down of the operations or business of a Seller, during the period from the Execution Date to the Closing Date, each Seller will:"

(vi)    Section 10.1(b) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"by Sellers by written notice to the Purchaser, if (i) the Closing has not occurred on or prior to the Outside Closing Date (unless the failure to consummate the Closing by such date is due to the failure of a Seller to have fulfilled any of its obligations under this Agreement), (ii) the Second

2

Deposit Increase has not been transferred into the Deposit Escrow Account on or prior to 5:00 p.m. Eastern Time on December 22, 2023, or (iii) Purchaser has not, on or prior to 5:00 p.m. Eastern Time on December 22, 2023, (A) provided adequate assurance of future performance (which shall include a fully committed and legally enforceable financing of no less than $20,000,000 that shall be fully available at the Closing or a full pledged performance guaranty from a creditworthy entity that is acceptable to Sellers) or (B) filed an adequate assurance and good faith declaration on the jointly administered docket of the Sellers' Bankruptcy Cases that is acceptable to Sellers;"

(vii)   Section 11.2(d) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"[Reserved.]"

(viii)   Section 11.3(a) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Purchaser agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Purchaser (which shall include a fully committed and legally enforceable financing of no less than $20,000,000 that shall be fully available at the Closing or a full pledged performance guaranty from a creditworthy entity that is acceptable to Sellers), including furnishing affidavits or other documents or information for filing by no later than 5:00 p.m. Eastern Time on December 22, 2023 with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under the Transferred Contracts and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code. Without limiting the foregoing, Sellers and Purchaser shall each use Reasonable Efforts to cooperate to obtain a Sale Order finding that Purchaser is purchasing the Acquired Assets in good faith within the meaning of Section 363(m) of the Bankruptcy Code."

3.   Effectiveness; Continuing Effect; Miscellaneous. This Amendment shall take effect as of the date of execution of this Amendment and so long as the letter agreement, dated as of the date hereof, by and among the Parties has been executed and delivered by Purchaser, including the Joint Release Instruction attached as Annex I thereto. Except as amended by this Amendment, the Purchase Agreement shall be and remain unmodified and in full force and effect in accordance with its terms, and each and every one of its provisions, as amended by this Amendment, are hereby adopted, ratified, and affirmed, and further it is understood and agreed that this Amendment does not limit or alter any rights or remedies of the Parties under any document, agreement or instrument other than the Purchase Agreement, except to the extent that the provisions hereof expressly address the matters set forth therein. Upon execution of this Amendment, this Amendment and the Purchase Agreement shall constitute one agreement. Any references to the

3

"Agreement" in the Purchase Agreement or to the words hereof, hereunder or words of similar affect in the Purchase Agreement shall mean the Purchase Agreement as amended by this Amendment, although this change shall not alter the dates as of which any provision of the Agreement speaks, except as expressly provided herein. For example, phrases such as "the date hereof" and "the date of this Agreement" shall continue to refer to November 13, 2023, the date that the Purchase Agreement was executed, except as expressly provided herein. The provisions of Article XII of the Purchase Agreement shall apply to this Amendment *mutatis mutandis*.

**[*Signature Pages to Follow*]**

4

IN WITNESS WHEREOF, the Parties, intending to be legally bound, have caused this Amendment to be duly executed as of the day and year first herein above written.

**SELLERS:**

PROTERRA INC

By: _____
Name: Gareth Joyce
Title:   President

PROTERRA    OPERATING    COMPANY, INC.

By: _____
Name: Gareth Joyce
Title:   President

**PURCHASER:**

PHOENIX MOTOR INC.

By:_____

Name:    XIAOFENG  PENG

Title:    CEO

**Exhibit C**

Schedule of Non-Contested Assumed Contracts

Proterra Inc, et al.

| # | Master Contract # | Customer / Counterparty | Contract Title | Effective Date (Start) | Contract Category | Cure Schedule Index # |
|---|---|---|---|---|---|---|
| 1 | N/A | 301 W Companies LLC, Brickell 13 Chicago LLC | Amendment No 1 to Equipment Lease Agreement | 7/20/2023 | Customers | 9 |
| 2 | N/A | 3Degrees Group, Inc. | LCFS Credit Registration and Sale Agreement | 12/20/2019 | Suppliers | 3 |
| 3 | LCFS Credit REgistration & Sale Agreement 12/20/2019 | 3Degrees Group, Inc. | First Amendment to the LCFS Credit Registration and Sale Agreement | 9/29/2022 | Suppliers | 2 |
| 4 | N/A | 601 W Companies LLC | Equipment Lease Agreement | 12/1/2021 | Customers | 8 |
| 5 | N/A | ABC Bus, Inc. | Brokerage Agreement | 10/3/2023 | Suppliers | N/A |
| 6 | PRO-19-001 | Alabama A&M University | Purchase and Sale of Two (2) 40' BE Buses and Two (2) Associated Charging Stations | 5/7/2019 | Customers | 54 |
| 7 | PRO-19-001 / AMD 1 | Alabama A&M University | Amendment No. 1 to Original Contract [Add (2) 40'  and (4) 35' Buses] | 11/5/2020 | Customers | 53 |
| 8 | PRO-19-001 / AMD 2 | Alabama A&M University | Amendment No. 2 to Original Contract Additional Chargers | 5/3/2021 | Customers | 52 |
| 9 | PRO-19-001 / CO1 | Alabama A&M University | Change Order No 1 (CR-01) - Change to Pneumatic Operating Doors | 3/15/2021 | Customers | 57 |
| 10 | N/A | Amerex Corporation | Open PO (SRG826276) | 11/13/2023 | Suppliers | 102 |
| 11 | N/A | American Cable Company | Open PO (GVL826608) | 12/7/2023 | Suppliers | N/A |
| 12 | N/A | American Seating Company | Open PO (SRG825402) | 10/5/2023 | Suppliers | 3694 |
| 13 | N/A | American Seating Company | Open PO (SRG825402) | 10/5/2023 | Suppliers | 3694 |
| 14 | N/A | American Seating Company | Open PO (SRG826137) | 11/6/2023 | Suppliers | 3694 |
| 15 | N/A | AON Center (SL PRU LLC_Jones Lang LaSalle Americas) - 601 W Companies LLC and Brickel 13 Chicago LLC - (Equipment Location: Prudential Plaza 130 E. Randolph Street, Chicago IL 60601) | Equipment Lease Agreement (601 W Companies LLC & Brickel 13 Chicago LLC) - 1M9TH16J7GS816114; 1M9TH16J7GS816115; 1M9TH16J7GS816116; 1M9TH16J7GS816117; 1M9TH16J7GS816118 | 12/1/2021 | Customers | 128 |
| 16 | N/A | ArrowHawk Industries | Open PO (826602) | 12/7/2023 | Suppliers | N/A |
| 17 | 2021-27 | Arvin, City of | LCFS Credit Registration and Sale Agreement | 9/28/2021 | Customers | 170 |
| 18 | P2018-01 / 2019-12 | Arvin, City of | Purchase and Sale of Three (3) 35 Foot Battery Electric Buses and three (3) Associated Charging Stations | 5/14/2019 | Customers | 520 |
| 19 | P2018-01 / 2019-12 / AMD-1 | Arvin, City of | Amendment No. 1 to Bus and Charging Station Purchase Agreement - Section 3.B.1.a-b deleted | 9/5/2019 | Customers | 519 |
| 20 | PA-2021-001-AVON | Avon, Town of | Purchase and Sale of Two (2) 35-Foot Battery electric Buses and Three (3) Associated Charging Stations | 6/29/2021 | Customers | 3602 |
| 21 | PA-2021-001-AVON / AMD-1 | Avon, Town of | Amendment No 1 to Purchase Agreement Section 3 Payment | 11/30/2022 | Customers | 3601 |
| 22 | PA-2021-001-BSOOB / CO-002 | Biddeford Saco Old Orchard Beach | Change Order CO-002 - Procurement of two (2) 35'ZX5+ BEB | 12/21/2022 | Customers | 270 |
| 23 | PA-2021-001-BSOOB | Biddeford Saco Old Orchard Beach Transit | Purchase and Sale of Two (2) 35 Foot Battery Electric Buses and Two (2) Associated Charging Stations | 8/20/2021 | Customers | 272 |
| 24 | PA-2021-001-BSOOB / CO-001 | Biddeford Saco Old Orchard Beach Transit | Change Order CO-001 - Inflationary Bus Price Increase | 3/10/2022 | Customers | 271 |
| 25 | Exhibit to PA-2021-001-BSOOB | Biddeford Saco Old Orchard Beach Transit | Construction Agreement | 8/20/2021 | Customers | 273 |
| 26 | N/A | Bill Thomas, RTC Executive Director | Supplemental Mass Transit and Transportation Related Vehicles (GA SWC 99999-001-SPD0000138-0007) | 10/26/2022 | Customers | 274 |
| 27 | PA 02/24/21 | Bloomington-Normal Public Transit System (B-NPTS) - Connect Transit | Purchase and Sale of Four, 35 Foot Battery Electric Buses and 2, 125kW Associated Charging Stations | 2/25/2021 | Customers | 316 |
| 28 | PA 02/24/21 / CR-0001 | Bloomington-Normal Public Transit System (B-NPTS) - Connect Transit | Change Order Form - Change No. CR-0001  - Removal of 125kW PCS, Procurement of 1.5MW Depot DC Charging Solution (PE), Installation Costs. | 7/16/2021 | Customers | 741 |
| 29 | PA 02/24/21 / CR-0002 | Bloomington-Normal Public Transit System (B-NPTS) - Connect Transit | Change Order Form - Change No. CR-0002  - (8) 40' ZX5 Max BEB, | 9/23/2021 | Customers | 740 |
| 30 | PA 02/24/21 / CR-0003 | Bloomington-Normal Public Transit System (B-NPTS) - Connect Transit | Change Order Form - Change No. CR-0003  - (8) 40' ZX5 Max BEB | 3/18/2022 | Customers | 743 |
| 31 | PA 02/24/21 / CR-0004 | Bloomington-Normal Public Transit System (B-NPTS) - Connect Transit | Change Order Form - Change No. CR-0003  -  Procurement of Installation for eight (8) Dispensers | 3/18/2022 | Customers | 746 |
| 32 | PA 02/24/21 / CR-0005 | Bloomington-Normal Public Transit System (B-NPTS) - Connect Transit | Purchase and Sale of Four, 35 Foot Battery Electric Buses and 2, 125kW Associated Charging Stations | 4/29/2022 | Customers | 317 |
| 33 | PA 02/24/21 / CR-0009 | Bloomington-Normal Public Transit System (B-NPTS) - Connect Transit | Change Order CO-0006 - Procurement of five (5) 40' ZX5 Max Battery Electric Buses | 11/28/2022 | Customers | 745 |

| # | Master Contract # | Customer / Counterparty | Contract Title | Effective Date (Start) | Contract Category | Cure Schedule Index # |
|---|---|---|---|---|---|---|
| 34 | N/A | Bossard Inc. | Open PO (GVL826593) | 12/6/2023 | Suppliers | 329 |
| 35 | N/A | Bossard Inc. | Open PO (GVL826593) | 12/6/2023 | Suppliers | 329 |
| 36 | Bowman Trailer Leasing | Bowman Trailer Leasing | Standard Purchase Order 754938 dated March 20, 2020 | Unknown | Lease Agreements | 343 |
| 37 | P2018-06-Breckenridge | Breckenridge, Town of | Purchase and Sale of Two (2) 35 Foot Battery electric Buses and Two (2) Associated Charging Stations | 5/6/2019 | Customers | 3554 |
| 38 | N/A | Breckenridge, Town of | Purchase and Sale of Three (3) 35 Foot Heavy Duty, Low Floor Battery Electric Buses and Three (3) Charging Systems | 2/18/2022 | Customers | 3555 |
| 39 | N/A | Bucher Hydraulics AG | Open PO (825079) | 9/15/2023 | Suppliers | 361 |
| 40 | N/A | Bucher Hydraulics AG | Open PO (SRG826323) | 11/14/2023 | Suppliers | 361 |
| 41 | N/A | Bung King | Open PO (SRG825510) | 10/9/2023 | Suppliers | N/A |
| 42 | N/A | Canadian Construction Documents Committee | Design-Build Stipulated Price Contract 2013 | 5/13/2022 | Customers | 393 |
| 43 | N/A | Capital Metropolitan Transportation Authority | Contract No. 200417, as modified | Unknown | Customers | 404 |
| 44 | N/A | Capital Metropolitan Transportation Authority | Contract No. 200744, as modified | Unknown | Customers | 402 |
| 45 | N/A | Capital Metropolitan Transportation Authority | Contract No. 500013, as modified | Unknown | Customers | 401 |
| 46 | N/A | Capital Metropolitan Transportation Authority | Storage and Maintenance Agreement | Unknown | Customers | 403 |
| 47 | N/A | Capital Metropolitan Transportation Authority | Purchase Order No. 404463 | Unknown | Customers | N/A |
| 48 | N/A | Capital Metropolitan Transportation Authority | Purchase Order No. 600022 | Unknown | Customers | N/A |
| 49 | N/A | Carolina Water Specialities, LLC dba Culligan of the Piedmont, Easley, SC | Rental Agreement   Quantity 17 - Culligan Ascent - Model 100 | 9/16/2022 | Suppliers | 422 |
| 50 | 19-PRO007 | Charleston Area Regional Transportation Authority | Purchase & Sales of (3) 40' BE Buses & (3) Charging Stations | 10/9/2019 | Customers | 431 |
| 51 | 19-PRO008 | Charleston Area Regional Transportation Authority | Purchase and Sale of (3) 40' BE Buses & (3) Charging Stations | 11/1/2019 | Customers | 430 |
| 52 | 19-PRO008 / AMD-1 | Charleston Area Regional Transportation Authority | Amendment No 001 Contract No 19-PROT008 - amend the Section 3 payment information to include the battery purchase for all three (3) buses. | 2/16/2021 | Customers | 465 |
| 53 | PO131342 | Charleston Area Regional Transportation Authority | Engineer, Procure, Construct (EPC) Agreement | 5/17/2022 | Customers | 464 |
| 54 | PO 10/07/2021 / CO-1 Rev 2 | Charleston Area Regional Transportation Authority | Change Order Form Request - 1 Rev 2 - Provide (1) Future Charging Stalls | 7/13/2022 | Customers | 432 |
| 55 | PO101278 / CO-1 | Charleston Area Regional Transportation Authority | Change Order Request Form - Change No. 1 Installation Costs | 5/16/2022 | Customers | 464 |
| 56 | PO101278 / CO-1 | Charleston Area Regional Transportation Authority | Change Order Form Change No. CO-1 - Full Install of LED Stop Requested Sign | 2/15/2021 | Customers | 435 |
| 57 | PO101278 / CO-2 | Charleston Area Regional Transportation Authority | Change Order Form Change No. CO-2 - Electric Door | 2/15/2021 | Customers | 434 |
| 58 | PO101278 / CO-3 | Charleston Area Regional Transportation Authority | Change Order Form Change No CO-3 - Bike Rack Change | 6/8/2021 | Customers | 433 |
| 59 | PO 101278 | Charleston Area Regional Transportation Authority | Letter re: Notice to Proceed with Purchase Order (PO 101278) | 3/2/2022 | Customers | 463 |
| 60 | MSA 02/13/19 / WA-CARTA 01 / CO-1 | Charleston Area Regional Transportation Authority_EV Infrastructure_CARTA | Change Order Request Form - Change No. 1 | 10/7/2021 | Customers | 474 |
| 61 | PA 10/07/2021 / CO-2 | Charleston Area Regional Transportation Authority_EV Infrastructure_CARTA | Change Order Request Form - Change No. 2 - Additional cost to supply and install a temporary power solution | 8/15/2022 | Customers | N/A |
| 62 | C17FT101878289 | Chicago Transit Authority | Contract for Design, Build, Manufacture and Delivery of Buses and Charging Systems - Up to (45) Low Floor 40' Buses (13) En-Route Charging Stations | 5/30/2018 | Customers | 492 |
| 63 | N/A | Chicago Transit Authority | Change Order CO-2022-01 - Bulletin 31 | 10/18/2022 | Customers | 490 |
| 64 | C17FT101878289 / CO-1 | Chicago Transit Authority | Contract Change Order No. 01 - Description of Changes 1-9 | 10/5/2019 | Customers | 492 |
| 65 | C17FT101878289 / CO-2 | Chicago Transit Authority | Contract Change Order No. 02 - ComEd Electrical Utility Scope Coordination, Chicago/Austin Curb & Pavement Restoration etc. | 9/16/2020 | Customers | 492 |
| 66 | C17FT101878289 / CO-3 | Chicago Transit Authority | Contract Change Order No. 03 | 1/20/2021 | Customers | 492 |
| 67 | C17FT101878289 / CO-4 | Chicago Transit Authority | Contract Change Order No. 04 | 10/21/2021 | Customers | 492 |
| 68 | C17FT101878289 / CO-5 | Chicago Transit Authority | Contract Change Order No. 05 | 11/15/2022 | Customers | 492 |
| 69 | C17FT101878289 / CO-6 | Chicago Transit Authority | Contract Change Order No. 06 | 6/2/2023 | Customers | 486 |
| 70 | C17FT101878289 | Chicago Transit Authority | Letter re Pilot Buses Conditional Acceptance (C17FT101878289) | 11/22/2019 | Customers | 492 |
| 71 | C17FT101878289 | Chicago Transit Authority | Letter re Proterra Pilot Buses Conditional Acceptance (C17FT101878289) | 11/22/2019 | Customers | 492 |
| 72 | C17FT101878289 | Chicago Transit Authority | Allowance Expenditure Authorization (C17FT101878289) | 5/12/2020 | Customers | 488 |
| 73 | N/A | Chicago Transit Authority | Proceed Order No: 006 | 8/6/2020 | Customers | 492 |
| 74 | N/A | Chicago Transit Authority | Proceed Order No: 021 | 8/20/2020 | Customers | 492 |

| # | Master Contract # | Customer / Counterparty | Contract Title | Effective Date (Start) | Contract Category | Cure Schedule Index # |
|---|---|---|---|---|---|---|
| 75 | C17FT101878289 | Chicago Transit Authority | Proceed Order No: 005 (Contract No. C17FT101878289) | 4/29/2020 | Customers | 492 |
| 76 | C17FT101878289 | Chicago Transit Authority | Proceed Order No: 014 (Contract No. C17FT101878289) | 10/25/2019 | Customers | 492 |
| 77 | C17FT101878289 | Chicago Transit Authority | Proceed Order No: 003 (Contract No. C17FT101878289) | 7/9/2019 | Customers | 492 |
| 78 | C17FT101878289 | Chicago Transit Authority | Proceed Order No: 002 (Contract No. C17FT101878289) | 5/11/2019 | Customers | 492 |
| 79 | C17FT101878289 | Chicago Transit Authority | Cover Letter Package 1: RFP No. C17FT101878289 (RFP NO. C17FT101878289) | 3/19/2018 | Customers | 489 |
| 80 | C17FT101878289 | Chicago Transit Authority | C17FT101878289 Change Order No. 5 – 50 kW Helix Mobile Charger | 12/12/2022 | Customers | 492 |
| 81 | C17FT101878289 | Chicago Transit Authority | Contract Change Order (Contract No. C17FT101878289) | 10/4/2021 | Customers | 492 |
| 82 | C17FT101878289 | Chicago Transit Authority | Proceed Order No: 015 (Contract No. C17FT101878289) | 9/4/2020 | Customers | 492 |
| 83 | N/A | Chicago Transit Authority | Contract for Electric Bus En-Route Rapid Charger Stations (No. 1) | 3/10/2020 | Customers | 491 |
| 84 | C17FT101878289 | Chicago Transit Authority | Letter re: Contract No. C17FT101878289 - Chicago/Austin Site Utility (Contract  No. C17FT101878289) | 10/24/2019 | Customers | 492 |
| 85 | N/A | Chicago Transit Authority_Documoto - Content Publishing (on Behalf of Chicago Transit Authority) | Statement of Work - Proterra Content Publishing (on behalf of Chicago Transit Authority) | 8/18/2022 | Customers | 493 |
| 86 | N/A | Chicago Transit Authority_Documoto - Content Publishing (on Behalf of Chicago Transit Authority) | Statement of Work - Proterra Content Publishing (on behalf of Chicago Transit Authority) | 7/24/2023 | Customers | 494 |
| 87 | C17FT101878289 | Chicago Transit Authority_M.A. Mortenson Company | Agreement for Design-Build Services | 7/19/2018 | Customers | 495 |
| 88 | CO No 011 | Chicago Transit Authority_M.A. Mortenson Company | Contract Change Order No. 011 | 4/7/2021 | Customers | 492 |
| 89 | Service Location 0216 | Cintas | Facility Services Rental Agreement | 5/12/2022 | Suppliers | 503 |
| 90 | Q-02940061 | Citrix Systems | Citrix Subscription Quote for Customer: Proterra, Inc | 11/21/2023 | IT Suppliers | N/A |
| 91 | N/A | City of Albuquerque | Purchase Order | 12/12/2022 | Customers | 513 |
| 92 | N/A | City of Albuquerque | Purchase Order | 6/24/2021 | Customers | 514 |
| 93 | N/A | City of Albuquerque | Purchase Order | 6/24/2021 | Customers | 514 |
| 94 | PA-2020-001-Boulder | City Of Boulder | Proterra Form Sale Contract (Contract NO:.PA-2020-001-Boulder) | 11/4/2020 | Customers | 534 |
| 95 | PO:. 20010230 | City of Charlotte Ap | Purchase Order (PO:. 20010230) | 11/14/2019 | Customers | 536 |
| 96 | PO #18085 | City of Clemson Clemson Area Transit | Purchase Order (PO #18085) | 9/8/2017 | Customers | 537 |
| 97 | CB 19259 | City of Everett | Purchase Order (PO No. CB 19259) | 3/3/2020 | Customers | 566 |
| 98 | 8102022 | City of Guadalupe | Purchase Order (8102022) | 8/10/2022 | Customers | 590 |
| 99 | N/A | City of Rock Hill | Notice to Proceed | 7/2/2021 | Customers | 618 |
| 100 | 9011071 | City of Roseville | Purchase Order (No. 9011071) | 5/25/2022 | Customers | 621 |
| 101 | 9011071 | City of Roseville | Purchase Order (9011071) | 5/25/2022 | Customers | 622 |
| 102 | 63759 | City of Santa Maria California | Purchase Order (63759) | 12/8/2022 | Customers | 634 |
| 103 | P02771 | City of Visalia - Transit Division | Notice to Proceed - Purchase of Four Transit Buses and Chargers (Purchase Order No. P02771) | 11/9/2020 | Customers | 673 |
| 104 | N/A | Clemson Area Transit | Acceptance of Buse 1807, the Charger and PCS Chargers #7, and 8 | 1/2/2019 | Customers | 688 |
| 105 | N/A | Clemson Area Transit | Acceptance of Buses 1901, and 1802 and PCS Chargers # 4, and 5 | 12/21/2018 | Customers | 689 |
| 106 | N/A | Clemson Area Transit | Letter re: Notice to Proceed | 9/7/2017 | Customers | 690 |
| 107 | PO# 000069863A | Colorado Springs | Purchase Order (PO# 000069863A) | 12/31/2021 | Customers | 706 |
| 108 | N/A | Conduent State & Local Solutions, Inc. | Open PO (GVL826344) | 11/15/2023 | Suppliers | 724 |
| 109 | N/A | Connecticut Green Bank | Assignment and Assumption Agreement - 60 kW charger (00120C2DF692CD01) and 125 kW charger (001200C2DF6B14401) Greenville South Carolina Production Facility | 6/18/2020 | Customers | 747 |
| 110 | PA81408930 | County of Sacramento | Purchase Order (PA81408930) | 7/5/2022 | Customers | 769 |
| 111 | N/A | Crown Credit Company | Crown Equipment Lease No. 40565262 | Unknown | Lease Agreements | 785 |
| 112 | N/A | Crown Credit Company | Crown Equipment Lease No. 40639607 | Unknown | Lease Agreements | 786 |
| 113 | N/A | Crown Credit Company | Crown Equipment Lease No. 40708992 | Unknown | Lease Agreements | 787 |
| 114 | N/A | Crown Credit Company | Master Lease Agreement dated January 14, 2020 | Unknown | Lease Agreements | 788 |
| 115 | N/A | Crown Equipment Corporation | Planned Maintenance Service Agreement - CA | Unknown | Suppliers | 784 |
| 116 | N/A | Crown Equipment Corporation | Planned Maintenance Service Agreement - Greenville | Unknown | Suppliers | 789 |
| 117 | N/A | Crown Equipment Corporation | Standard Purchase Order (Purchase Order: 749544) | Unknown | Suppliers | 790 |
| 118 | N/A | Cullen Western Star Trucks LTD. | Open PO (824890) | 8/31/2023 | Suppliers | N/A |
| 119 | N/A | Current Trucking, Electric Vehicle Sales | Certified Pre-Owned Bus Purchase Agreement | 9/14/2023 | Customers | 796 |
| 120 | S-2058303 / C-2058308-01 | Dallas Area Rapid Transit | Award/Contract Form, Schedule, Exhibits and Supporting Attachments | 6/11/2021 | Customers | 981 |
| 121 | S-2058303 / C-2058308-01 - MOD-1 | Dallas Area Rapid Transit | Contract Modification No 1 - Increase the Contract amount to extend the performance period. | 7/12/2021 | Customers | 975 |

| # | Master Contract # | Customer / Counterparty | Contract Title | Effective Date (Start) | Contract Category | Cure Schedule Index # |
|---|---|---|---|---|---|---|
| 122 | S-2058303 / C-2058308-01 - MOD-2 | Dallas Area Rapid Transit | Contract Modification No 2 - adjusts deliver, period of performance adds milestone payments.  There are LD but minimal and we'll beat the POP | 7/20/2021 | Customers | 981 |
| 123 | S-2058303 / C-2058308-01 - MOD-3 | Dallas Area Rapid Transit | Contract Modification No 3 - Update the delivery and acceptance information provided under Special Provisions (Exhibit D) | 3/22/2022 | Customers | 981 |
| 124 | S-2058303 / C-2058308-01 - MOD-4 | Dallas Area Rapid Transit | Contract Modification No 4 - Modification to update the "Final Acceptance" Provision stated under Exhibit D of Contact. Remove and replace Exhibit D with the revised attachment. | 8/29/2022 | Customers | 981 |
| 125 | C-2058309-01 / Mod 5 | Dallas Area Rapid Transit | Contract Modification No 5 - Materials/Equipment | 1/7/2023 | Customers | 981 |
| 126 | S-2021268 LoNo / C-2021268-01 LoNo | Dallas Area Rapid Transit | Award/Contract Form (With Exhibits A-G, I-L, U-X) | 3/11/2016 | Customers | 971 |
| 127 | C-2021268-02 / Mod. 1 | Dallas Area Rapid Transit | Contract Modification No. 1 - Revise Delivery Schedule Dates, Milestones, Pilot Bus Approval | 8/9/2016 | Customers | 971 |
| 128 | C-2021268-02 / Mod. 2 | Dallas Area Rapid Transit | Contract Modification No. 2 - Provision 4 Requesting APC winning provision be installed on all (7) Buses | 7/26/2016 | Customers | 972 |
| 129 | C-2021268-02 / Mod. 3 | Dallas Area Rapid Transit | Contract Modification No. 3 - Seating Capacity Revised from 28 to 27 | 9/28/2016 | Customers | 971 |
| 130 | C-2021268-02 / Mod. 4 | Dallas Area Rapid Transit | Contract Modification No. 4 - Ratify Change Request #5 & #6 "Dimensions" "Interior Panels and Finishes" | 11/15/2016 | Customers | 971 |
| 131 | C-2021268-01 / Mod. 5 | Dallas Area Rapid Transit | Contract Modification No. 5 - Ratify Change Order #1 and Change Request #8 dated | 1/30/2020 | Customers | 971 |
| 132 | C-2021268-01 / Mod. 6 | Dallas Area Rapid Transit | Contract Modification No. 6 - (1) Additional Shop Charger | 9/29/2017 | Customers | 971 |
| 133 | C-2021268-01 / Mod. 7 | Dallas Area Rapid Transit | Contract Modification No. 7 - Incorporate all Material, Labor & Costs Re CO #2, #9, CO#14, CO#15, CO#16, CO#17, CO#21 | 10/10/2018 | Customers | 971 |
| 134 | C-2021268-01 / Mod. 8 | Dallas Area Rapid Transit | Contract Modification No. 8 - Extended Warranty, Change Request #18, Change Request #20 | 2/12/2020 | Customers | 971 |
| 135 | C-2021268-01 / Change #20 | Dallas Area Rapid Transit | Specification/Exhibit Change Request Form - DART Change Request #20 - Swap Out three (3) existing plug-in Chargers (2 Tritium Units and 1 ChargePoint Unit), three (3) Proterra PCS 60kW Charging Systems | 3/19/2019 | Customers | 971 |
| 136 | C-2021268-01 | Dallas Area Rapid Transit Authority | Contract Modification (C-2021268-01) | 11/4/2016 | Customers | 973 |
| 137 | C-2021268-01 | Dallas Area Rapid Transit Authority | Amendment 1 Dated December 24, 2016 (Solicitation No. S-2021268 LONO Electric Buses; Contract No. C-2021268-01 LONO Electric Buses) | 12/24/2015 | Customers | 974 |
| 138 | C-1058308-01 | Dallas Area Rapid Transit Authority | Award / Contract Form (Solicitation No. S-2058303 / Contract No. C-1058308-01) | 1/5/2016 | Customers | 977 |
| 139 | C-2021268-01 | Dallas Area Rapid Transit Authority | Letter re Request for Quote - Trapeze APC System C-202126801 | 6/3/2016 | Customers | 978 |
| 140 | N/A | Dallas Area Rapid Transit Authority | Letter in Response to DART Letter Dated 6/3/16 | 6/27/2016 | Customers | 979 |
| 141 | 1261 | Dallas Area Rapid Transit Authority | Quote (Quote No. 1261) | 1/24/2018 | Customers | 980 |
| 142 | 20-001 | DART - Delaware Transit Corporation | Letter re Notice to Proceed for Contract #22-001 (Contract No 20-001) | 8/12/2022 | Customers | 983 |
| 143 | 20-001 | DART - Delaware Transit Corporation | Letter re Contract #20-001 Amendment/Change Order (Contract No 20-001) | 10/2/2019 | Customers | 984 |
| 144 | C-2021268-01 | DART - Delaware Transit Corporation | Specifications/Exhibit Change Request Form (C-2021268-01) | 3/19/2019 | Customers | 990 |
| 145 | De Lage Landen Financial Services, Inc. printers | De Lage Landen Financial Services, Inc.-Lessor, Office 1 (Officia Imaging, Inc.) – maintenance | Equipment Lease Agreement dated October 1, 2018 | Unknown | Lease Agreements | 1000 |
| 146 | 17-044 | Delaware Transit Corporation | Purchase & Sale of (6) 35' Catalyst & (3) Overhead Fast-Charging Stations & (6) Plug-In Chargers | 8/25/2017 | Customers | 1049 |
| 147 | 17-044 | Delaware Transit Corporation | Replacement Pages - Purchase & Sale of (6) 35' Catalyst & (2) Overhead Fast-Charging Stations & (6) Plug-In Chargers | 8/25/2017 | Customers | 1049 |
| 148 | 17-044 | Delaware Transit Corporation | Change Order 1 - Correction to Original K to represent the (2) Overhead Chargers (Total 3) | 6/18/2018 | Customers | 1049 |
| 149 | 17-044 | Delaware Transit Corporation | Change Order 2 - Fuel Focus Addition & ITS Cabinet Bus Bar Addition | 1/3/2020 | Customers | 1049 |
| 150 | 17-044 | Delaware Transit Corporation | Memorandum of Agreement - Exchange six (6) thirty-five foot (35') Proterra E2 Battery Electric Buses (35' E2 BEBs) previously purchased by DTC for six (6) new forty foot (40') Proterra ZX5+ BEBs (35' ZX5+ BEBs) | 9/30/2021 | Customers | 1049 |
| 151 | 20-001 | Delaware Transit Corporation | Purchase & Sale of (8) 35' & (2) 40' Catalyst Buses, (2) Overhead Inverted-pantograph Fast-Charging Stations, (10) Plug-in Chargers | 8/27/2019 | Customers | 1045 |
| 152 | 20-001 / AMD1 | Delaware Transit Corporation | Amendment No 1 to Original K to include the Charging Station Infrastructure Price | 9/20/2019 | Customers | 1035 |
| 153 | 20-001 / AMD2 | Delaware Transit Corporation | Amendment No 2 Contract No 20-001 between Proterra Inc and Delaware Transit Corporation - Charging Station Infrastructure Installation | 2/11/2021 | Customers | 1037 |
| 154 | 20-001 / AMD 1 - CO-1 | Delaware Transit Corporation | Change Order No 1 - Install Rebar Dowels | 1/31/2020 | Customers | 1040 |
| 155 | 20-001 / CO-2 | Delaware Transit Corporation | Change Order 2 Changing from Customer supplied leased tires to Michelin X InCity Energy Z LR L-315/80R22.5. (2) 40' E2 Buses | 6/4/2020 | Customers | 1039 |
| 156 | 20-001 / CO-3 | Delaware Transit Corporation | Change Order 3 - Remove (1) OH Inverted-Pantograph, Add (3) PE NBD180 Charging; Remove (2) Plug-In Charging Stations, Add (3) PE NBD180 Charging Cabinets | 2/11/2021 | Customers | 1038 |
| 157 | 22-001 / AMD-1 | Delaware Transit Corporation | Amendment No 1 to Purchase Order and Agreement #22-001 | 10/17/2022 | Customers | 1033 |

| # | Master Contract # | Customer / Counterparty | Contract Title | Effective Date (Start) | Contract Category | Cure Schedule Index # |
|---|---|---|---|---|---|---|
| 158 | 22-001 | Delaware Transit Corporation | Purchase Order and Agreement #22-001 | 7/22/2022 | Customers | 1034 |
| 159 | 22-025 | Delaware Transit Corporation | Purchase Agreement #22-025 | 7/29/2022 | Customers | 1032 |
| 160 | 22-025 / AMD-1 | Delaware Transit Corporation | Amendment No. 1 to Purchase Agreement #22-025 | 10/17/2022 | Customers | 1030 |
| 161 | Q-002471 | Delaware Transit Corporation | Quotation (Q-002471) | 6/8/2023 | Customers | 1026 |
| 162 | Q-00270 | Delaware Transit Corporation | Quotation (Q-00270) | 6/9/2023 | Customers | 1027 |
| 163 | Q-00243 | Delaware Transit Corporation | Quotation (Q-00243) | 6/8/2023 | Customers | 1028 |
| 164 | 22-025 | Delaware Transit Corporation | Letter re: Notice to Proceed for Contract #22-025 (Contract #22-025) | 8/26/2022 | Customers | 1031 |
| 165 | 22-001 | Delaware Transit Corporation | AMD 1 - Contract No. 22-001 b/w PTRA and DTC (PO No. 22-001) | 9/27/2022 | Customers | 1033 |
| 166 | 20-001 / CO -1 | Delaware Transit Corporation _Mid_Atlantic Electrical Services Inc | Change Order No 1 | 1/31/2020 | Customers | 1040 |
| 167 | N/A | Dellinger Enterprises, LTD | Open PO (GVL825577) | 10/11/2023 | Suppliers | N/A |
| 168 | N/A | Dellinger Enterprises, LTD | Open PO (GVL826194) | 11/9/2023 | Suppliers | N/A |
| 169 | N/A | Dellinger Enterprises, LTD | Open PO (GVL826232) | 11/10/2023 | Suppliers | N/A |
| 170 | N/A | Dellinger Enterprises, LTD | Open PO (GVL826356) | 11/15/2023 | Suppliers | N/A |
| 171 | N/A | Dellinger Enterprises, LTD | Open PO (GVL826413) | 11/21/2023 | Suppliers | N/A |
| 172 | N/A | Dellinger Enterprises, LTD | Open PO (GVL826452) | 11/28/2023 | Suppliers | N/A |
| 173 | N/A | Dellinger Enterprises, LTD | Open PO (GVL826453) | 11/28/2023 | Suppliers | N/A |
| 174 | N/A | Dellinger Enterprises, LTD | Open PO (GVL826456) | 12/5/2023 | Suppliers | N/A |
| 175 | N/A | Department of Administrative Services | Contract Affidavit | 12/10/2012 | Customers | 1078 |
| 176 | 1-19-23-17C / AMD-2 | Department of General Services, California State Schedule | Standard Agreement - Amendment 2 - Exercise option to extend the Agreement for up to one additional year. | 12/16/2019 | Customers | 1081 |
| 177 | 1-19-23-17C | Department of Revenue State of Washington | Standard Agreement - Amendment (1-19-23-17C) | 5/18/2021 | Customers | 1090 |
| 178 | 1-19-23-17C | Department of Revenue State of Washington | Standard Agreement-Amendment (Agreement No. 1-19-23-17C) | 7/8/2022 | Customers | 1091 |
| 179 | N/A | Department of Revenue State of Washington | Contract Agreement | 7/24/2015 | Customers | 1092 |
| 180 | 99999-001-SPD0000138-0007 | Department of Revenue State of Washington | Contract Amendment (99999-001-SPD0000138-0007) | 9/19/2018 | Customers | 1093 |
| 181 | N/A | Department of Revenue State of Washington | Statewide Standard Contract Form for the State of Georgia (Solicitation No. 99999-001-SPD0000152; Contract No. 99999-001-SPD0000138-0007) | 6/26/2020 | Customers | 1094 |
| 182 | EB17-1 | King County Department of Transportation Transit Division | King County Department of Transportation Transit Division Contract (EB17-1) | 12/8/2017 | Customers | 1096 |
| 183 | PA-2021-001-DDOT | Detroit Department of Transportation | Purchase and Sale of Four 40 Foot Battery Electric Buses and Associated Charging Stations | 9/29/2021 | Customers | 1103 |
| 184 | Contract PA 6003774 | Detroit Department of Transportation | Contract Purchase Agreement 6003774 | 9/29/2021 | Customers | 1104 |
| 185 | N/A | Detroit Department of Transportation | Quote for Construction and Temporary Equipment Installation | 3/1/2022 | Customers | 1102 |
| 186 | N/A | Digabit, Inc DBA Documoto | Open PO (826045) | 11/1/2023 | Suppliers | N/A |
| 187 | Task Order/Contract No. DCKA-2020-C-0039 | District of Columbia, Department of Transportation | Task Order DCKA-2020-C-0039-1 - DC Circulator Battery Electric Bus (BEB) Procurement Task Order Attachment 1, Attachment 2 | 6/22/2021 | Customers | 1130 |
| 188 | Contract No. 09214 / DCKA-2020-C-0039 | District of Columbia, Department of Transportation | Amendment to Solicitation / Modification of Contract | 8/2/2023 | Customers | 1129 |
| 189 | Task Order DCKA-2020-C-0039 | District of Columbia, Department of Transportation | Change of Name Agreement | 6/12/2023 | Customers | 1128 |
| 190 | Contract No. 09214 - RQ952734 / PO565845 | District of Columbia, Department of Transportation | Task Order 01B - PO565845 (14 - 40' Heavy Duty Buses) PO 565845-KAO/TDD/DC Circulator | 7/25/2017 | Customers | 1131 |
| 191 | DCKA-2017-Z-0001 / RQ952734 / PO565845 / M01 | District of Columbia, Department of Transportation | M01 Amendment of Solicitation / Modification of Contract Unforeseen Work, Site Conditions, Environmental Study | 8/6/2018 | Customers | 1127 |
| 192 | DCKA-2017-Z-0001 | District of Columbia, Department of Transportation | Settlement Agreement and Release Payment from DDOT to Proterra | 1/30/2020 | Customers | 3516 |
| 193 | PO619749-KAO/TDD/KAO/TDD/DC | District of Columbia, District Department of Transportation | Electronic Invoicing Purchase Order (Order No. PO619749-KAO/TDD/KAO/TDD/DC) | 1/14/2020 | Customers | 1132 |
| 194 | PA-2021-001-DUKE | Duke University | Purchase and Sale of Two (2) 40-Foot Battery Electric Buses and Two (2) Associated Charging Stations | 4/1/2021 | Customers | 1170 |
| 195 | PA-2021-001-DUKE / CO-1 | Duke University | Change Order Request Form - Change No 1 - replace 75kw Charging Station and single-cable dispenser with 90kW Charging Station | 8/5/2021 | Customers | 1169 |
| 196 | PA-2022-002-DUKE | Duke University | Purchase Agreement | 7/27/2022 | Customers | 1168 |
| 197 | PA-2022-002-DUKE / CO-0001 | Duke University | Change Order - Change No . CO-0001 - Addition of two more buses to DUKE3 build | 1/23/2023 | Customers | 1167 |
| 198 | PA-2022-002-DUKE / CO-0002 | Duke University | Change Order - Change No . CO-0002 - Additional of two more buses to DUKE3 build | 3/28/2023 | Customers | 1166 |

| # | Master Contract # | Customer / Counterparty | Contract Title | Effective Date (Start) | Contract Category | Cure Schedule Index # |
|---|---|---|---|---|---|---|
| 199 | N/A | Duke University | Section 1-4 of Contract Between Proterra Inc and Duke University | 12/11/2020 | Customers | 1164 |
| 200 | N/A | Duke University | Letter re Proterra Bus Delivery Documentation | 11/9/2021 | Customers | 1165 |
| 201 | P2020-01-ECO Transit | Eagle County Transit | Purchase & Sale of Three (3) 40 Foot Battery Electric Buses and Three (3) Associated Charging Stations | 4/14/2020 | Customers | 1185 |
| 202 | N/A | Eaton Truck Components SP | Open PO (SRG825427) | 10/6/2023 | Suppliers | 1195 |
| 203 | N/A | Eaton Truck Components SP | Open PO (SRG825534) | 10/10/2023 | Suppliers | 1195 |
| 204 | N/A | Eaton Truck Components SP | Open PO (SRG826332) | 11/14/2023 | Suppliers | 1195 |
| 205 | N/A | Exelon Business Services , LLC | Sale of two 40 Foot Battery Electric Buses | 12/15/2017 | Customers | 1277 |
| 206 | N/A | Exelon Business Services Company, LLC | GENERAL TERMS AND CONDITIONS FOR SERVICES AND MATERIALS | 12/15/2017 | Customers | 1278 |
| 207 | Parking License Agreement | Fairforest of Greenville, LLC | Parking License Agreement dated August 3, 2022 | Unknown | Lease Agreements | 1288 |
| 208 | SC Offsite storage (2299 Ridge Road Greenville, SC 29607) | Fresh Water System, Inc | Sublease Agreement dated July 1, 2022 | Unknown | Lease Agreements | 1369 |
| 209 | 96"Forks | G&W Equipment, Inc | P.O. Number 809104 | Unknown | Lease Agreements | 1376 |
| 210 | Solicitation No 47QMCA21R0013 / AMD-0001 | General Services Administration, U.S. | Amendment of Solicitation/Modification of Contract  - Amendment #0001 - RFP Documentation | 9/10/2021 | Customers | 3744 |
| 211 | Solicitation No 47QMCA21R0013 / AMD-0002 | General Services Administration, U.S. | Amendment of Solicitation/Modification of Contract  - Amendment #0002 - RFP Documentation | 9/14/2021 | Customers | 3743 |
| 212 | Solicitation No 47QMCA21R0013 / AMD-0003 | General Services Administration, U.S. | Amendment of Solicitation/Modification of Contract  - Amendment #0003 - RFP Documentation | 10/13/2021 | Customers | 3739 |
| 213 | Solicitation No 47QMCA21R0013 / AMD-0004 | General Services Administration, U.S. | Amendment of Solicitation/Modification of Contract  - Amendment #0004 - RFP Documentation | 10/19/2021 | Customers | 3738 |
| 214 | Solicitation No 47QMCA21R0013 / AMD-0005 | General Services Administration, U.S. | Amendment of Solicitation/Modification of Contract  - Amendment #0005 - RFP Documentation | 11/9/2021 | Customers | 3737 |
| 215 | Solicitation No 47QMCA21R0013 / Contract No 47QMCA22D000Z | General Services Administration, U.S. | Solicitation/Contract/Order for Commercial Items - Indefinite Delivery, Indefinite Quantity Contract (IDIQ) | 12/9/2021 | Customers | 3665 |
| 216 | Solicitation No 47QMCA21R0013 / Contract No 47QMCA22D000Z - Attachment F | General Services Administration, U.S. | Attachment F to Solicitation/Contract/Order for Commercial Items - Indefinite Delivery, Indefinite Quantity Contract (IDIQ) - Supporting email from JC in Box file | 12/9/2021 | Customers | 3745 |
| 217 | Solicitation No 47QMCA21R0013 / Contract No 47QMCA22D000Z (GS-30F-MA021) / AMD-1 | General Services Administration, U.S. | Amendment of Solicitation/Modification of Contract - FAR 52.212-4(c) - Contract Terms and Conditions - Commercial Items - Changes (Oct 2018) | 12/21/2021 | Customers | 3746 |
| 218 | Solicitation No 47QMCA21R0013 / Modification PS-0004 | General Services Administration, U.S. | Amendment of Solicitation/Modification of Contract  - Amendment #0004 | 10/19/2021 | Customers | 3741 |
| 219 | 99999-SPD0000212-0004 | Georgia Department of Administrative Services - Georgia State | Statewide Standard Contract Form | 7/1/2023 | Customers | 1391 |
| 220 | eRFP  99999-001-SPD00001521 | Georgia Department of Administrative Services - Georgia State | Statewide Contract Exhibit A Public Mass Transit & Transportation Product Categories | 7/1/2018 | Customers | 3414 |
| 221 | N/A | GlyphWorks | N/A | Unknown | IT Suppliers | N/A |
| 222 | 19-017 | GoTriangle | Contract No. 19-017 Two (2) Electric Buses (Contract No. 19-017) | 6/19/2019 | Customers | 1458 |
| 223 | N/A | GoTriangle | Exhibit E - Conditional Waiver and Release on Final Payment | 2/1/2020 | Customers | 1459 |
| 224 | N/A | Grainger | Open PO (824803) | 8/25/2023 | Suppliers | N/A |
| 225 | N/A | Grainger | Open PO (825723) | 10/18/2023 | Suppliers | N/A |

| # | Master Contract # | Customer / Counterparty | Contract Title | Effective Date (Start) | Contract Category | Cure Schedule Index # |
|---|---|---|---|---|---|---|
| 226 | N/A | Grainger | Open PO (825725) | 10/18/2023 | Suppliers | N/A |
| 227 | N/A | Grainger | Open PO (826072) | 11/2/2023 | Suppliers | N/A |
| 228 | N/A | Grainger | Open PO (SRG826116) | 11/6/2023 | Suppliers | N/A |
| 229 | N/A | Grainger | Open PO (826168) | 11/8/2023 | Suppliers | N/A |
| 230 | N/A | Grainger | Open PO (GVL826754) | 12/18/2023 | Suppliers | N/A |
| 231 | PA 10/18/2019 | Greater Bridgeport Transit Authority | Purchase & Sale of Up to Five (5) 40' BE Buses & Up to Five (5) Associated Charging Stations | 10/18/2019 | Customers | 1548 |
| 232 | PA 10/18/2019 / Option to Exercise | Greater Bridgeport Transit Authority | Option Exercise Agreement (3) 40' ZX5 MAX | 12/22/2021 | Customers | 1550 |
| 233 | PA 10/18/2019 / AMD-1 | Greater Bridgeport Transit Authority | Amendment No 1 to the Option Exercise Agreement Re: Agreement Between Greater Bridgeport Transit Authority and  POCI - Section 2 Exercise Price (a) Exercise Price and Exhibit A and Section 3 Bus Configuration | 12/5/2022 | Customers | 1549 |
| 234 | PA 10/18/2019 / AMD-2 | Greater Bridgeport Transit Authority | Option Exercise Agreement No 2 - Chargers Re: Agreement Between Greater Bridgeport Transit Authority and  POCI - Option to purchase two (2) additional Charging Stations. | Unknown | Customers | N/A |
| 235 | PA 01/12/2021 | Greater Peoria Mass Transit District | Purchase & Sales of (3) 35' BE Buses and (3) 125kW Associated Charging Stations | 1/12/2021 | Customers | 1556 |
| 236 | PA 01/12/2021 / CR-001 | Greater Peoria Mass Transit District | Change Order Form - Change No. CR-0001 | 7/26/2021 | Customers | 1559 |
| 237 | PA 01/12/2021 / CR-002 | Greater Peoria Mass Transit District | Change Order Form - Change No. CR-0002 | 8/30/2021 | Customers | 1558 |
| 238 | CO-1 | Greater Peoria Mass Transit District_Facet Engineering | Change Order No 1 - Revision 0, Invoice Summary INV 1376 | 8/24/2021 | Customers | 1557 |
| 239 | PA-2021-001-GPORT | Greater Portland Transit District | Purchase and Sale of Two (2) 35 Foot Battery Electric Buses and Two (2) Associated Charging Stations | 8/17/2021 | Customers | 1564 |
| 240 | PA-2021-001-GPORT / AMD-1 | Greater Portland Transit District | Amendment No. 001 to Purchase Agreement | 5/12/2022 | Customers | 1563 |
| 241 | Exhibit to PA-2021-001-GPORT | Greater Portland Transit District | Construction Agreement | 8/18/2021 | Customers | 1562 |
| 242 | N/A | Green Mountain Transit Authority | Original Contract Price - Two (2) 40' Electric Buses | 9/25/2019 | Customers | 1568 |
| 243 | GMT.CO 17 / CO 1 | Green Mountain Transit Authority | GMT Change Order 17 - Project Change Order No. 1 to Original Contract - Upgrade Infotainment to Luminator InfoTransit with Voice Annunciator | 2/25/2019 | Customers | 1567 |
| 244 | N/A | Green Mountain Transit Authority | GMT Change Order Number 1, Project Change Order No. 2 to Original Contract | 1/10/2022 | Customers | 1566 |
| 245 | N/A | Greenville Transit Authority dba Greenlink | Purchase Agreement between Greenville Transit Authority dba Greenlink and Proterra Operating Company, Inc. | 12/12/2022 | Customers | 1584 |
| 246 | N/A | Greenville Transit Authority dba Greenlink | Agreement to Purchase Chargers for Electric Vehicles ; Exhibit C Federal Transit Administration (FTA) Terms | 12/12/2022 | Customers | 1585 |
| 247 | AGMT 12/12/22 | Greenville Transit Authority dba Greenlink | Amendment No 1 to the Agreement to Purchase chargers for Electric Vehicles - Amend the Exhibit A Statement of Work | 12/27/2022 | Customers | 1584 |
| 248 | CO-1 | Greenville Transit Authority dba Greenlink | Change Order No. 1 | 4/21/2023 | Customers | 1582 |
| 249 | N/A | Griffiths Corporation | Open PO (SRG825457) | 10/9/2023 | Suppliers | N/A |
| 250 | N/A | Grote Industries, LLC | Open PO (SRG825459) | 10/9/2023 | Suppliers | N/A |
| 251 | GS-30F-026BA | GSA/FAS/QVOCFA | Amendment of Solicitation/Modification of Contract (GS-30F-026BA) | 4/18/2014 | Customers | 1600 |
| 252 | PA-01/14/2021 | Harvard College_President and Fellows of Harvard College, acting by and through its Transportation Services Department | Purchase and Sale of Four 35 Foot Battery Electric Buses and Two Associated Charging Stations | 1/14/2021 | Customers | 1632 |
| 253 | PA-01/14/2021 /AMD-1 | Harvard College_President and Fellows of Harvard College, acting by and through its Transportation Services Department | Amendment No 1 to Contract Agreement | 10/8/2021 | Customers | 2790 |
| 254 | BT01-21 | Houston Galveston Area Council (HGAC Buy) | Cooperative Agreement - Proterra Inc - Public Services - ID 6156 - General Provisions; Special Provisions 20-001626; Attachment A; | 1/1/2021 | Customers | 1672 |
| 255 | BT01-21 | Houston Galveston Area Council (HGAC Buy) | Amendment to Cooperative Agreement - Proterra Inc - Public Services - ID 6156 - General Provisions; Special Provisions 20-001626; Attachment A; | Unknown | Customers | 1672 |
| 256 | GV 3 order pickers | HYG Financial Services, Inc. | Lease | Unknown | Lease Agreements | 1684 |
| 257 | N/A | INIT Innovations In Transportation Inc. | Open PO (GVL826633) | 12/11/2023 | Suppliers | N/A |
| 258 | A21-148 | Iowa City Transit (ICT) | City of Iowa Vendor Contract (A21-148) | 4/7/2021 | Customers | 1765 |
| 259 | PA-2021-001-ICT | Iowa, City of - City Transportation Services Department | Purchase and Sales of a quantity of four (4) 40 Foot Battery Electric Buses and four (4) Associated Charging Stations | 3/31/2021 | Customers | 593 |
| 260 | ITIC building and pad | ITIC | Sublease Agreement dated January 1, 2021 | Unknown | Lease Agreements | 1749 |

| # | Master Contract # | Customer / Counterparty | Contract Title | Effective Date (Start) | Contract Category | Cure Schedule Index # |
|---|---|---|---|---|---|---|
| 261 | ITIC Durability Test Track | ITIC | Durability Track Addendum to Master Services Agreement dated September 14, 2020 | Unknown | Lease Agreements | 1750 |
| 262 | Main track elements and the Roadway | ITIC (Master Service Agreement) | Master Services Agreement dated January 1, 2021 | Unknown | Lease Agreements | 1751 |
| 263 | N/A | J.J. Kane Exchange, LLC, J.J. Kane Associates Inc. dba J.J. Kane Auctioneers | Seller Agreement | 10/6/2023 | Suppliers | N/A |
| 264 | 117622652 | Johnson Controls Security Solutions LLC | Commercial Sales Agreement | 06/28/2022 | IT Suppliers | 1805 |
| 265 | 20-185 | Juneau, City and Borough of | Purchase and Sale of (1) 40 Foot Battery Electric Bus | 2/26/2020 | Customers | 511 |
| 266 | 20-185 / AMD1 | Juneau, City and Borough of | Amendment No 1 to Contract 20-185 Purchase and Sale of One 40 Foot Battery Electric Bus - Section (A)(2) - Payment; Section 4-Options | 7/23/2020 | Customers | 510 |
| 267 | N/A | Kamin Industries Inc | Purchase Agreement four (4) 40-Foot Proterra Catalyst E2 Battery Electric Buses and one (1) 35-Foot Proterra Catalyst E2 Battery Electric Bus. VINs: 1M9TH16J7HS816194, 1M9TH16J0HS816196, 1M9TH16J2HS816197, 1M9TH16J4HS816198, 1M9TH16J6HS816199 | 5/18/2022 | Customers | 1834 |
| 268 | N/A | Kamin Industries Inc | Purchase Agreement five (5) 40-Foot Proterra Catalyst E2 Battery Electric Buses VINs: 1M9TH16J1HL816135, 1M9TH16J2JS816240, 1M9TH16J6JL816283 and Two (2) 35-Foot E2 (440kWh) 1M9TG16J4HS816142 and 1M9TG16J5JS816347. | 5/27/2022 | Customers | 1833 |
| 269 | N/A | Kamin Industries Inc_Electric Vehicles Sales, Inc. a division of Kamin Motor Group, Inc. | Certified Pre-Owned Bus Purchase Agreement - Four (4) 40-Foot Proterra Catalyst E2 | 12/20/2022 | Customers | 1835 |
| 270 | N/A | King County Metro | Change Order #5 - Construct BEB Five-Bus Charging Station | 9/13/2018 | Customers | 1856 |
| 271 | EB11-2 | King County Metro | Change Order #1 - Order 1 Additional 40 Foot Battery Bus (EB11-2) | 12/2/2015 | Customers | 1856 |
| 272 | EB11-2 | King County Metro | Manufacture and Delivery of 40FT Heavy Duty Buses (EB 11-2) | 8/1/2014 | Customers | 1856 |
| 273 | EB11-2 | King County Metro | Notice to Proceed (EB 11-2) | 8/1/2014 | Customers | 1856 |
| 274 | N/A | Kongsberg Power Products Systems I, LLC | Open PO (SRG825532) | 10/10/2023 | Suppliers | N/A |
| 275 | WI-2019-007-00 | La Crosse, City of  (Municipal Transit Utility) | Purchase and Sale of Two (2) 35- Foot Battery Electric Buses and Two (2) Associated 150kW Charging Stations | 2/26/2021 | Customers | 597 |
| 276 | N/A | La Crosse, City of  (Municipal Transit Utility) | Contractor Agreement | 8/30/2021 | Customers | 1913 |
| 277 | N/A | Lawrence, City of | Purchase Agreement between City of Lawrence and Proterra Operating Company, Inc. | 6/27/2023 | Customers | 600 |
| 278 | N/A | Lock-Ridge Tool Co., Inc. | Open PO (SRG825544) | 10/10/2023 | Suppliers | N/A |
| 279 | N/A | Lock-Ridge Tool Co., Inc. | Open PO (GVL826237) | 11/10/2023 | Suppliers | N/A |
| 280 | N/A | Lock-Ridge Tool Co., Inc. | Open PO (GVL826298) | 11/14/2023 | Suppliers | N/A |
| 281 | N/A | Lock-Ridge Tool Co., Inc. | Open PO (GVL825598) | 10/11/2023 | Suppliers | N/A |
| 282 | P2018-04-Citibus | Lubbock, City of | Purchase and Sale of Two (2) 40 Foot Battery Electric Buses and Two (2) Associated Charging Stations | 4/4/2019 | Customers | 2056 |
| 283 | N/A | Luminator Technology Group Global, LLC dba Luminator Technology Group | Open PO (GVL824762) | 8/23/2023 | Suppliers | 2066 |
| 284 | N/A | Luminator Technology Group Global, LLC dba Luminator Technology Group | Open PO (GVL824922) | 9/5/2023 | Suppliers | 2066 |
| 285 | N/A | Luminator Technology Group Global, LLC dba Luminator Technology Group | Open PO (SRG825151) | 9/20/2023 | Suppliers | 2066 |
| 286 | N/A | Luminator Technology Group Global, LLC dba Luminator Technology Group | Open PO (SRG825517) | 10/9/2023 | Suppliers | 2066 |
| 287 | N/A | Luminator Technology Group Global, LLC dba Luminator Technology Group | Open PO (GVL825527) | 10/10/2023 | Suppliers | 2066 |
| 288 | N/A | Luminator Technology Group Global, LLC dba Luminator Technology Group | Open PO (GVL825589) | 10/11/2023 | Suppliers | 2066 |
| 289 | N/A | Luminator Technology Group Global, LLC dba Luminator Technology Group | Open PO (GVL825637) | 10/12/2023 | Suppliers | 2066 |
| 290 | N/A | Luminator Technology Group Global, LLC dba Luminator Technology Group | Open PO (GVL826165) | 11/8/2023 | Suppliers | 2066 |
| 291 | N/A | Luminator Technology Group Global, LLC dba Luminator Technology Group | Open PO (GVL826303) | 11/14/2023 | Suppliers | 2066 |
| 292 | N/A | Luminator Technology Group Global, LLC dba Luminator Technology Group | Open PO (GVL826495) | 11/29/2023 | Suppliers | 2066 |
| 293 | 18146019 | M. A. Mortenson Company | Change Order #11 Project CTA EV Bus Charging Station (18146019) | 2/4/2021 | Customers | 2074 |
| 294 | N/A | Mender | N/A | Unknown | IT Suppliers | N/A |
| 295 | N/A | Meritor, Inc | Open PO (SRG824594) | 8/15/2023 | Suppliers | N/A |

| # | Master Contract # | Customer / Counterparty | Contract Title | Effective Date (Start) | Contract Category | Cure Schedule Index # |
|---|---|---|---|---|---|---|
| 296 | N/A | Meritor, Inc | Open PO (SRG824595) | 8/15/2023 | Suppliers | N/A |
| 297 | N/A | Meritor, Inc | Open PO (SRG825656) | 10/13/2023 | Suppliers | N/A |
| 298 | PA-2020-001-MTTA | Metropolitan Tulsa Transit Authority | Purchase and Sale of Four 40 Foot Battery Electric Buses and Two Associated Charging Stations | 10/22/2020 | Customers | 2130 |
| 299 | RFP-21-27713 / PO-22-10672 | Metropolitan Washington Airports Authority | Solicitation Offer and Award; Proposal Deviations - Commercial | 12/21/2021 | Customers | 2132 |
| 300 | RFP-21-27713 / PO-22-10672 | Metropolitan Washington Airports Authority | Contract Award No. PO-22-10672 entitled Battery Electric Transit Buses | 3/17/2022 | Customers | 2133 |
| 301 | PO-22-10672 | Metropolitan Washington Airports Authority | Purchase Order (Purchase Order No. PO-22-10672) | 3/15/2022 | Customers | 2131 |
| 302 | N/A | Missoula Urban Transportation District | Letter Re: Notice to Proceed | 11/28/2018 | Customers | 2196 |
| 303 | MUTD 12.14.2018 | Missoula Urban Transportation District (Mountain Line) | Purchase and Sale of (6) 35' Battery Electric Buses, (7) Depot Charging Stations, and Associated Technical Assistance | 12/14/2018 | Customers | 2197 |
| 304 | Agmt.04/19/2021 | Montana, Associated Student of University of Montana | Purchase and Sale of Three (3) 35 Foot Battery Electric Buses and One (1) 125 kW Multi-Dispenser PCS Charging Station | 4/19/2021 | Customers | 3718 |
| 305 | Agmt.04/19/2021 / AMD #1 | Montana, Associated Student of University of Montana | Amendment #1 to Contract UOFMT.142112208 | 6/28/2022 | Customers | 3716 |
| 306 | N/A | MWS Auto Services Inc. d/b/a Marietta Wrecker Service | Liability Release Agreement | 5/4/2022 | Customers Suppliers | 2255 |
| 307 | N/A | Napa Valley Transportation Authority | Purchase Order (Purchase Order #: 21-2002) | 2/17/2021 | Customers | 2270 |
| 308 | PO 21-2002 / AMD-1 | Napa Valley Transportation Planning Agency (NCTPA) | Amendment No 1 to Purchase Order No 21-2002 - (2) Model ZX5 Max, Electric Bus, 40' 40 PAX; (2) HVIP (Pending Approval); (2) Warranty | 6/4/2021 | Customers | 2274 |
| 309 | PO 21-2002 / AMD-2 | Napa Valley Transportation Planning Agency (NCTPA) | Amendment No 2 to Purchase Order No 21-2002 - Calculation Error (EV-Charger Tax Exclusion & Bus-Wrap Unit Charge) | 2/7/2022 | Customers | 2273 |
| 310 | PO 21-2002 / AMD-3 | Napa Valley Transportation Planning Agency (NCTPA) | Amendment No 3 to Purchase Order No 21-2002 - Additional Charges to meet additional installation requirements | 3/14/2022 | Customers | 2272 |
| 311 | PO 21-2002 / AMD-4 | Napa Valley Transportation Planning Agency (NCTPA) | Amendment No 4 to Purchase Order No 21-2002 - Section 6, Corrections to Exhibit A | 7/7/2022 | Customers | 2271 |
| 312 | N/A | New York City Transit Authority_Black & Veatch Corporation | Amendment No 1 to Confidentiality Agreement - Section 3 extended through 06/05/2025 | 6/5/2020 | Customers | 2300 |
| 313 | N/A | New York City Transit Authority_Black & Veatch Corporation | Confidentiality Agreement | 6/3/2015 | Customers | 2300 |
| 314 | N/A | Ningbo Wego Machinery Co.,Ltd | Open PO (GVL826605) | 12/7/2023 | Suppliers | 2326 |
| 315 | GS-30F-026BA | NFS, IMR-Santa Fe Mabo | Amendment of solicitation/modification of contract (GS-30F-026BA) | 9/12/2018 | Customers | 2605 |
| 316 | N/A | Oasis Sales | VeSys (Capital Essentials) | Unknown | Suppliers | N/A |
| 317 | N/A | ODP Business Solutions, LLC | Open PO (826525) | 12/1/2023 | Suppliers | N/A |
| 318 | N/A | One Albuquerque Transit | Letter re: Acceptance & Warranty Start Dates for Buses 4 & 5 | 5/13/2022 | Customers | 2625 |
| 319 | PO-2021-000842 | Ontario International Airport Authority | Purchase Order PO-2021-000842 (with POT&Cs attached) - (8) ZEB 40 ZX5 | 4/26/2021 | Customers | 2626 |
| 320 | PO-2021-000842 / CO-1 | Ontario International Airport Authority | Change Order Request Form - Change No. 1 - Charger Dispenser Configuration Change Line 6 and Change Qty of Tires and Wheels | 3/9/2022 | Customers | 2627 |
| 321 | PO 233263 B | PACE Transit, the Suburban Bus Division of the RTA | PACE Additional Terms and Conditions to Purchase Order No. 233263 B | 3/17/2022 | Customers | 2694 |
| 322 | PO 233263 B | PACE Transit, the Suburban Bus Division of the RTA | Purchase Order No. 233263 B | 3/17/2022 | Customers | 2695 |
| 323 | Contract No. 233263 / CO-1 | PACE Transit, the Suburban Bus Division of the RTA | Change Order No 1. with Options Tracker | 5/23/2022 | Customers | 2693 |
| 324 | Contract No. 233263 / CO-2 | PACE Transit, the Suburban Bus Division of the RTA | Change Order No 2 | 7/20/2022 | Customers | 2692 |
| 325 | Contract No. 233263 / CO-3 | PACE Transit, the Suburban Bus Division of the RTA | Change Order No 3 | 9/23/2022 | Customers | 2691 |
| 326 | Contract No. 233263 / CO-4 | PACE Transit, the Suburban Bus Division of the RTA | Change Order No 4 | 10/7/2022 | Customers | 2690 |
| 327 | Contract No. 233263 / CO-5 | PACE Transit, the Suburban Bus Division of the RTA | Change Order No 5 | 5/4/2023 | Customers | 2689 |
| 328 | Contract No. 233263 / CO-6 | PACE Transit, the Suburban Bus Division of the RTA | Change Order No 6 | 5/22/2023 | Customers | 2688 |
| 329 | PSA 2018 | Park City Municipal Corporation | Park City Municipal Corporation Contract Contractor/Service Provider/Professional Services Agreement | 11/16/2018 | Customers | 2709 |
| 330 | N/A | Park City Municipal Corporation | Battery Services Agreement | 6/30/2017 | Battery Lease Agreement | 2711 |
| 331 | N/A | Park City Municipal Corporation | Battery Lease Agreement | 11/19/2018 | Battery Lease Agreement | 2713 |

| # | Master Contract # | Customer / Counterparty | Contract Title | Effective Date (Start) | Contract Category | Cure Schedule Index # |
|---|---|---|---|---|---|---|
| 332 | N/A | Parker Hannifin Corporation | Open PO (SRG825474) | 10/9/2023 | Suppliers | N/A |
| 333 | N/A | Parker Hannifin Corporation | Open PO (GVL825647) | 10/12/2023 | Suppliers | N/A |
| 334 | RFP 21-980369 | Pinellas Suncoast Transit Authority | Agreement for Electric Transit Buses with Charging and Associated Equipment | 10/27/2021 | Customers | 2755 |
| 335 | RFP 21-980369 / MODIFICATION 1 - C-22-MT-004 | Pinellas Suncoast Transit Authority | Contract Modification No. 1 | 11/23/2021 | Customers | 2756 |
| 336 | P20-4091 | Pioneer Valley Transit Authority | Purchase Order (P20-4091) | 2/5/2020 | Customers | 2757 |
| 337 | P2018-07-Port Arthur | Port Arthur Transit | Purchase and Sale of Six (6) 35 Foot Battery Electric Buses (E2 44kWh 800V) and Three (3) Associated Charging Stations | 12/23/2019 | Customers | 2771 |
| 338 | PA 2020-002-PAT | Port Arthur Transit | Contract for Purchase and Sale of Four (4) 35 Foot Battery Electric Buses (E2 440kWh 800V) and Two (2) Associated Charging Stations | 8/4/2020 | Customers | 2770 |
| 339 | N/A | Port Authority of NY &NJ (The) | Purchase Order #45000068446, as amended by subsequent change orders | Unknown | Customers | 3539 |
| 340 | PO 69204 | Port Authority of NY &NJ (The)_NEBR | Purchase Order  69204 - Proterra Extended Warranty Parts | 2/5/2021 | Customers | 2772 |
| 341 | N/A | President and Fellows of Harvard College | Notice to Proceed - Contract of Purchase | 3/22/2021 | Customers | 2791 |
| 342 | PO:. 4100013018 | Prince Georges County MD | Purchase Order (PO:. 4100013018) | 9/27/2022 | Customers | 2799 |
| 343 | 4100009149 | Prince Georges County MD | Purchase Order (PO:. 4100009149) | 1/18/2022 | Customers | 2800 |
| 344 | PO:. 4100007098 | Prince Georges County MD | Purchase Order (PO:. 4100007098) | 4/5/2021 | Customers | 2801 |
| 345 | PA-2021-001-PGC | Prince George's County_Department of Public Works and Transportation | Purchase and Sales of Four 35-Foot Battery Electric Buses and four 125 kW Associated Charging Stations | 3/24/2021 | Customers | 2796 |
| 346 | PA-2021-001-RACINE | Racine, City of - Belle Urban System (Ryde) | Purchase and Sale of (9) 35 Foot Battery Electric Buses and (1) 1200kW DC Charging System and 10 Dispensers | 6/21/2021 | Customers | 2831 |
| 347 | xRef. PA-2021-001-RACINE | Racine, City of - Belle Urban System (Ryde) | Contractor Agreement - Infrastructure Project | 6/21/2021 | Customers | 602 |
| 348 | xRef. PA-2021-001-RACINE | Racine, City of - Belle Urban System (Ryde) | Form of Battery Lease Agreement dated June 21, 2021 | 6/21/2021 | Battery Lease Agreement | 603 |
| 349 | N/A | Racine, City of - Belle Urban System (Ryde) | Form of Battery Lease Agreement | 3/10/2022 | Battery Lease Agreement | 603 |
| 350 | Exhibit D | Racine, City of - Belle Urban System (Ryde) | Exhibit D - Commencement Certificate dated December 28, 2021 | 12/23/2021 | Battery Lease Agreement | 604 |
| 351 | xRef: IFB 554-IFB22-2003 | Raleigh-Durham Airport Authority | Purchase Agreement between Raleigh-Durham Airport Authority and Proterra Operating Company, Inc.; IFB | 7/13/2023 | Customers | 2836 |
| 352 | PO 70642 | Raleigh-Durham Airport Authority | Amendment No 1 to Purchase Order No 70642 to install (3) 60 kW Plug-In Chargers, purchase spare parts for (4) buses, charging infrastructure to include additional conduit | 4/11/2019 | Customers | 2837 |
| 353 | PO 70642 | Raleigh-Durham Airport Authority | Purchase Order No 70642 | 6/4/2018 | Customers | 2837 |
| 354 | N/A | RATP Dev USA, Inc. | Vendor Agreement | 4/1/2023 | Customers | 2842 |
| 355 | N/A | RDU Legal | Purchase Agreement b/w Raleigh-Durham Airport Authority & PTRA | 7/13/2023 | Customers | 2856 |
| 356 | Idealease Tractor | Regional Idealease of Rochester, LLC | Vehicle Lease and Service Agreement dated March 27, 2013 | Unknown | Lease Agreements | 2867 |
| 357 | 19-017 | Research Triangle Regional Public Transportation Authority | Purchase and Sale of Two (2) 40 Foot Battery Electric Buses and Two (2) Associated Charging Stations (Options) | 6/19/2019 | Customers | 2890 |
| 358 | 19-017 | Research Triangle Regional Public Transportation Authority | Amendment  No 1 to Contract No 19-017 | 10/16/2019 | Customers | 2890 |
| 359 | 19-017 | Research Triangle Regional Public Transportation Authority | Amendment  No 2 to Contract No 19-017 | 3/5/2020 | Customers | 2890 |
| 360 | N/A | Research Triangle Regional Public Transportation Authority | Purchase and Sale of Two 40FT BEBs and Two Charging Stations | 5/28/2019 | Customers | 2890 |
| 361 | PA-2021-001-RIVIAN | Rivian Automotive LLC | Purchase Agreement | 12/17/2021 | Customers | 2903 |
| 362 | N/A | Robert's Tours and Transportation Inc dba RH Sales & Services | Franchise Agreement | 4/24/2019 | Customers | 2909 |
| 363 | PA-2022-001-RRM | Rock Region Metro | Purchase Agreement | 2/28/2022 | Customers | 2926 |
| 364 | N/A | Rock Region Metro | Agreement to Purchase Chargers for Electric Buses | 3/10/2022 | Customers | 2930 |
| 365 | N/A | Rock Region Metro | Engineer, Procure, Construct (EPC) Agreement | 4/25/2022 | Customers | 2927 |
| 366 | PA-2022-001-RRM | Rock Region Metro | Change Order CO-01 - Updated Spare tire/Wheel Service Strategy | 4/26/2022 | Customers | 2930 |
| 367 | AMGT 03/10/22 / AMD-1 | Rock Region Metro | Amendment No. 1 to Agreement to Purchase Chargers for Electric Buses | 6/17/2022 | Customers | 2930 |
| 368 | N/A | Rock Region Metro | Cancellation of April 25, 2022 EPC Agreement | 6/28/2022 | Customers | 2928 |
| 369 | PA-2022-001-RRM / CO-02 | Rock Region Metro | Change Order CO-02 - Base Bus Price | 1/12/2023 | Customers | 2930 |
| 370 | N/A | Rock Region Metro | Charging Infrastructure Design / Build Agreement | 5/23/2022 | Customers | 2929 |

| # | Master Contract # | Customer / Counterparty | Contract Title | Effective Date (Start) | Contract Category | Cure Schedule Index # |
|---|---|---|---|---|---|---|
| 371 | PA-2021-001-ROCKHILL | Rockhill, City of | Purchase and Sale of (3) 35 Foot Battery Electric Buses and 2 Associated Charging Stations Attachment 1 - Option Tracker and Customer Templates, Attachment 2 Warranty Provisions | 6/24/2021 | Customers | 617 |
| 372 | PA-2021-001-ROCKHILL / CO-001 | Rockhill, City of | Change Order Form - Change No. CR-001 - Capture the cost of relocating the provisioning of the radio handset. | 9/29/2021 | Customers | 620 |
| 373 | PA-2021-001-ROCKHILL / CR-002 | Rockhill, City of | Change Order Form CR-002 - 3-Year Extension to the configurable Package Warranty | 12/8/2021 | Customers | 619 |
| 374 | DP 26644 | Rockhill, City of | Contract Addendum 1 | 8/1/2023 | Customers | 616 |
| 375 | PO-DP26644 / CO-1 | Rockhill, City of | Contract Change Order No. 1 - Project: On-Route Overhead Charger Installation at Parking Deck B | 12/6/2022 | Customers | 2913 |
| 376 | PRO.26083 | Rockhill, City of_Core States Grou | Client Contract Amendment #2 - Dispenser Relocation Phase 0050 | 12/14/2022 | Customers | 2931 |
| 377 | PO#211137 O2 | San Diego International Airport | Change Order Form (PO#211137 O2) | 4/15/2020 | Customers | 3033 |
| 378 | No. 0000238474 | San Francisco City County | Purchase Order (Purchase Order No. 0000238474) | 10/16/2018 | Customers | 3036 |
| 379 | No. 0000238474 | San Francisco City County | Purchase Order (Purchase Order No. 0000238474) | 10/16/2018 | Customers | 3036 |
| 380 | 381716 | San Francisco City County | Purchase Order (381716) | 12/9/2019 | Customers | 3037 |
| 381 | SFMTA-2020-19 | San Francisco Municipal Transportation Agency - City and County of San Francisco Municipal Transportation Agency One South Van Ness Avenue 7th Floor, San Francisco, California 94103 | Agreement - Contract No SFMTA-2020-19 | 11/18/2019 | Customers | 512 |
| 382 | P122555 | San Joaquin Regional Transit District | Purchase Order (P122555) | 10/22/2018 | Customers | 3042 |
| 383 | P122487 | San Joaquin Regional Transit District | Purchase Order (P122487) | 10/2/2018 | Customers | 3043 |
| 384 | PO609570 | San Luis Obispo, City of | Purchase Order 609570 | 6/11/2021 | Customers | 628 |
| 385 | PA-2021-001-SLO | San Luis Obispo, City of | Purchase and Sale of One (1) 35' Foot Battery Electric Buses | 4/12/2022 | Customers | 630 |
| 386 | PA-2021-001-SLO | San Luis Obispo, City of | Purchase and Sale of  One (1) 35' Foot Battery Electric Buses | 4/12/2022 | Customers | N/A |
| 387 | N/A | San Patricio Group, Inc., dba Aransas Autoplex | State of Texas Dealer of Record Agreement | 1/27/2020 | Customers | 3057 |
| 388 | N/A | Santa Clara Valley Transportation Authority_Praxis Technology Escrow | Beneficiary Master Escrow Agreement | 7/3/2018 | Customers | 3062 |
| 389 | 23-0064 L | Santa Cruz Metro | Purchase Order (23-0064 L) | 9/23/2022 | Customers | 3067 |
| 390 | 22-9118 L | Santa Cruz Metro | Purchase Order (22-9118 L Revision 1) | 4/13/2022 | Customers | 3068 |
| 391 | 22-9118 L | Santa Cruz Metro | Purchase Order (22-9118 L) | 3/23/2022 | Customers | 3069 |
| 392 | 17-20 | Santa Cruz Metropolitan Transit District | Purchase and Delivery of 40-Foot Battery Electric Buses and Associated Charging Systems effective | | Customers | 3077 |
| 393 | 17-20 | Santa Cruz Metropolitan Transit District | SCMTD First Amendment to Contract No 17-20 For Purchase and Delivery of Four 40-Foot Battery Electric Buses and Associated Charging Systems | 10/29/2019 | Customers | 3076 |
| 394 | 17-20 | Santa Cruz Metropolitan Transit District | SCMTD Second Amendment to Contract No 17-20 For Purchase and Delivery of Four 40-Foot Battery Electric Buses and Associated Charging Systems | 2/24/2020 | Customers | 3074 |
| 395 | 17-20 | Santa Cruz Metropolitan Transit District | Notice of Force Majeure Event | 4/3/2020 | Customers | 3070 |
| 396 | 17-20 / Order No. 19-4006G *Revision 1 | Santa Cruz Metropolitan Transit District | Contract Blanket Order No. 19-4006G Revision 1 - (1) 40' Electric Zero Emission Bus Catalyst E2 Max with Duo Power Drivetrain (1) HVIP Voucher | 4/11/2019 | Customers | 3071 |
| 397 | 17-20 / Order No. 19-4006G *Revision 3 | Santa Cruz Metropolitan Transit District | Contract Blanket Order No. 19-4006G Revision 3 - Base Bus Price Plus Extended Warranty, Diagnostic Tool Kit, on-site technical support, depot charger, HVP Voucher (1st Amendment to Contract) | 10/25/2019 | Customers | 3071 |
| 398 | 17-20 / Order No. 19-4006G *Revision 5 | Santa Cruz Metropolitan Transit District | Contract Blanket Order No. 19-4006G Revision 5 - Bus Total, Diagnostic Tool Kit, Depo Charger, ADA Equipment, Extended Warranty, On Site Technical Support, HVIP Voucher (2nd Amendment to Contract) | 2/24/2020 | Customers | 3071 |
| 399 | 17-20 / Order No. 19-4008G *Revision 1 | Santa Cruz Metropolitan Transit District | Contract Blanket Order No. 19-4008G  Revision 1 - (1) 40' Electric Zero Emission Bus Catalyst E2 Max with Duo Power Drivetrain (1) HVIP Voucher | 4/11/2019 | Customers | 3072 |
| 400 | 17-20 / Order No. 19-4008G *Revision 2 | Santa Cruz Metropolitan Transit District | Contract Blanket Order No. 19-4008G Revision 2 - (1) 40' Electric Zero Emission Bus Catalyst E2 Max with Duo Power Drivetrain (1) HVIP Voucher | 6/19/2019 | Customers | 3072 |
| 401 | 17-20 / Order No. 19-4008G *Revision 3 | Santa Cruz Metropolitan Transit District | Contract Blanket Order No. 19-4008G Revision 3 - (1) 40' Electric Zero Emission Bus Catalyst E2 Max with Duo Power Drivetrain (1) HVIP Voucher | 8/7/2019 | Customers | 3072 |
| 402 | 17-20 / Order No. 19-4008G *Revision 4 | Santa Cruz Metropolitan Transit District | Contract Blanket Order No. 19-4008G Revision 4 - Base Bus Price Plus Extended Warranty, Diagnostic Tool Kit, on-site technical support, depot charger, HVP Voucher (1st Amendment to Contract) | 10/25/2019 | Customers | 3072 |
| 403 | 17-20 / Order No. 19-4008G *Revision 6 | Santa Cruz Metropolitan Transit District | Contract Blanket Order No. 19-4008G Revision 6 - Bus Total, Diagnostic Tool Kit, Depo Charger, ADA Equipment, Extended Warranty, On Site Technical Support, HVIP Voucher (2nd Amendment to Contract) | 2/24/2020 | Customers | 3072 |

| # | Master Contract # | Customer / Counterparty | Contract Title | Effective Date (Start) | Contract Category | Cure Schedule Index # |
|---|---|---|---|---|---|---|
| 404 | 17-20 / Order No. 19-4009G *Revision 1 | Santa Cruz Metropolitan Transit District | Contract Blanket Order No. 19-4009G  Revision 1 - (2) 40' Electric Zero Emission Bus Catalyst E2 Max with Duo Power Drivetrain (1) HVIP Voucher | 4/11/2019 | Customers | N/A |
| 405 | 17-20 / Order No. 19-4009G * Revision 2 | Santa Cruz Metropolitan Transit District | Contract Blanket Order No. 19-4009G Revision 2 - (2) 40' Electric Zero Emission Bus Catalyst E2 Max with Duo Power Drivetrain (1) HVIP Voucher | 8/14/2019 | Customers | N/A |
| 406 | 17-20 / Order No. 19-4009G * Revision 3 | Santa Cruz Metropolitan Transit District | Contract Blanket Order No. 19-4009G Revision 3 - (2) Base Bus Price Plus Extended Warranty, Diagnostic Tool Kit, on-site technical support, depot charger, HVP Voucher (1st Amendment to Contract) | 10/25/2019 | Customers | N/A |
| 407 | 17-20 / Order No. 19-4009G * Revision 5 | Santa Cruz Metropolitan Transit District | Contract Blanket Order No. 19-4009G Revision 5 - Bus Total, Diagnostic Tool Kit, Depo Charger, ADA Equipment, Extended Warranty, On Site Technical Support, HVIP Voucher (2nd Amendment to Contract) | 2/24/2020 | Customers | N/A |
| 408 | 17-20 / AMD-3 | Santa Cruz Metropolitan Transit District | Third Amendment to Contract No. 17-20 for Purchase and Delivery of 40-Foot Battery Electric Business and Associated Charging Systems | 11/18/2022 | Customers | 3070 |
| 409 | 17-20 | Santa Cruz Metropolitan Transit District | Contract No. 17-20 Exhibit D Cover Sheet | 10/14/2019 | Customers | 3073 |
| 410 | PA-2021-001-SMAT | Santa Maria Area Transit | Purchase and Sale of Two (2) Foot Battery Electric Buses | 8/19/2021 | Customers | 3079 |
| 411 | N/A | Santa Maria Area Transit | Additional Terms and Conditions | 5/31/2023 | Customers | 3080 |
| 412 | PO 57614 | Santa Maria, City of | Purchase Order 57614 - Buses, Charging Infrastructure, Spare Parts | 11/30/2020 | Customers | 635 |
| 413 | N/A | Santa Maria, City of | Bus and Charger Options Configurator | 12/20/2020 | Customers | 636 |
| 414 | N/A | SC Dept of Motor Vehicle | Open PO (824897) | 8/31/2023 | Suppliers | N/A |
| 415 | N/A | SCTAC Board of Directors | Open PO (826451) | 11/28/2023 | Suppliers | N/A |
| 416 | 1000016672 | SFMTA Municipal Transportation Agency | Purchasing Request Form (1000016672) | 7/28/2020 | Customers | 3130 |
| 417 | 1000016672 | SFMTA Transit Division | Memorandum - Request for Certification | 7/27/2020 | Customers | 3131 |
| 418 | N/A | Shore Auto Rubber Exports Pvt Ltd | Open PO (GVL824709) | 8/22/2023 | Suppliers | N/A |
| 419 | N/A | Shore Auto Rubber Exports Pvt Ltd | Open PO (GVL826307) | 11/14/2023 | Suppliers | N/A |
| 420 | N/A | Siemens Industry Software Inc. | Open PO (825124) | 9/19/2023 | Suppliers | 3142 |
| 421 | N/A | Silicon Forest Electronics | Open PO (SRG826158) | 11/8/2023 | Suppliers | N/A |
| 422 | PA-2021-001-SMAT | SMAT | Purchase and Sale of Two (2) 35 Foot Battery Electric Buses (PA-2021-001-SMAT) | 7/12/2021 | Customers | 3278 |
| 423 | Greenville facility | Smith Development Company, Inc. | Lease Agreement dated April 1, 2018 | Unknown | Lease Agreements | 3280 |
| 424 | N/A | Sonny Merryman | Proterra Dealer Agreement | 10/22/2021 | Customers | 3293 |
| 425 | N/A | Spika Design & Manufacturing, Inc. | Reseller Agreement | 8/18/2022 | Customers | 3395 |
| 426 | 99999-001-SPD0000152 | State Purchasing Division, Georgia | RFX Addendum #1 | 12/28/2023 | Customers | 3419 |
| 427 | N/A | Steven Engineering | Open PO (GVL826465) | 11/28/2023 | Suppliers | N/A |
| 428 | SMART Control No. 21-3293 / PA-2021-001-SMART / Req #21-3352 | Suburban Mobility Authority for Regional Transportation | Purchase and Sale of Four 40 Foot Battery Electric Buses and Associated Charging Stations | 5/24/2021 | Customers | 3433 |
| 429 | N/A | Suburban Mobility Authority for Regional Transportation | Exhibit D Commencement Certificate VIN: 7JZTH127J8MS000485; 7JZTH12J1MS000487; 7JZTH12J3MS000488 | 6/28/2022 | Customers | 3433 |
| 430 | Req #21-3293 | Suburban Mobility Authority for Regional Transportation | Notice to Proceed - Purchase of 4 Electric Buses, 1 diagnostic tool, and 4 Plug-in Chargers with Warranty and 2 years extended warranty | 5/24/2021 | Customers | 3433 |
| 431 | PA-2021-001-SMART / SMART Control No. 21-3293 | Suburban Mobility Authority for Regional Transportation | Letter to SMART - Correction to Attachment 1 of Purchase and Sale of Four 40 Foot Battery Electric Buses and Associated Charging Stations agreement | 6/16/2021 | Customers | 3433 |
| 432 | P2019-01-Summit County | Summit County (Summit Stage) | Purchase and Sales of Three (3) 40 Foot Battery Electric Buses and Three (3) Depot Charging Stations | 10/24/2019 | Customers | 3434 |
| 433 | P2021-01-Summit County | Summit County (Summit Stage) | Purchase and Sale of One (1) 40-Foot Battery-Electric Bus and One (1)  Charging Station | 10/25/2021 | Customers | 3435 |
| 434 | N/A | Summit Racing | Open PO (DEVGVL825433) | 10/6/2023 | Suppliers | N/A |
| 435 | N/A | Superior Interior Systems | Open PO (GVL826244) | 11/10/2023 | Suppliers | 3436 |
| 436 | RFP-20-001-HWYS | Sustainability Partners | Master Goods and Services Agreement #47 - Project Addendum: Design and Engineering Services Rider, Procurement Services Rider, Installation Services Rider, Construction Services Rider, General Services Rider, Appendix A (General Terms and Conditions), Appendix B | 3/29/2021 | Customers | 3438 |
| 437 | RFP-20-001-HWYS | Sustainability Partners | Construction Services Rider to MGSA #47 to Master Goods and Services Agreement #47- Attachment 1, Attachment 2, Attachment 3 | 3/29/2021 | Customers | 3441 |
| 438 | RFP-20-001-HWYS | Sustainability Partners | Design and Engineering Services Rider to MGSA #47 to Master Goods and Services Agreement #47 - Attachment 1 | 3/29/2021 | Customers | 3442 |
| 439 | RFP-20-001-HWYS | Sustainability Partners | General Services Rider to MGSA #47 to Master Goods and Services Agreement #47 - Attachment 1 | 3/29/2021 | Customers | 3440 |

| # | Master Contract # | Customer / Counterparty | Contract Title | Effective Date (Start) | Contract Category | Cure Schedule Index # |
|---|---|---|---|---|---|---|
| 440 | RFP-20-001-HWYS | Sustainability Partners | Installation Service Rider to MGSA #47 to Master Goods and Services Agreement #47 - Attachment 1 | 3/29/2021 | Customers | 3439 |
| 441 | RFP-20-001-HWYS | Sustainability Partners | Procurement Services Rider to MGSA #47 to Master Goods and Services Agreement #47 - Attachment 1 | 3/29/2021 | Customers | 3437 |
| 442 | N/A | Swamp Fox Software and Analytics | Master Services Agreement dated November 19, 2021 | 11/19/2021 | IT Suppliers | 3453 |
| 443 | N/A | Swamp Fox Software and Analytics | Statement of Work | 11/19/2021 | IT Suppliers | 3452 |
| 444 | MSA 11/19/2021 | Swamp Fox Software and Analytics | Change Order No. 1 to the SCOPE OF WORK - Sales Configurator Application | 3/3/2023 | IT Suppliers | 3451 |
| 445 | PA2020-001-TTD | Tahoe Transportation District | Purchase and Sale of Three (3) 35 Foot Battery Electric Buses, Two (2) Depot Charging Stations and Two 92) Overhead Charging Stations | 1/7/2021 | Customers | 3467 |
| 446 | PA2020-001-TTD / AMD-1 | Tahoe Transportation District | Amendment No 1 to Contract No PA2020-001-TTD | 9/14/2021 | Customers | 3466 |
| 447 | PA2020-001-TTD / AMD-2 | Tahoe Transportation District | Amendment No 2 to Contract No PA2020-001-TTD - Install (1) 60kW Chargers at District's Corp. Yard in Lieu of Being installed at LTCC | 9/27/2021 | Customers | 3465 |
| 448 | PA2020-001-TTD / AMD-3 | Tahoe Transportation District | Amendment No. 3 to Contract No. PA2020-001-TTD - Purchase and Sale of Three (3) 35 Foot Battery Electric Buses, Two (2) Depot Charging Stations and Two (2) Overhead Charging Stations - Sec. 3 Payment A. | 11/10/2022 | Customers | 3464 |
| 449 | P-2509 | TARC | Deviation Mod (Deviation Mod No. 001) | Unknown | Customers | 3472 |
| 450 | N/A | Testco Incorporated | Open PO (SRG825498) | 10/9/2023 | Suppliers | 3510 |
| 451 | N/A | Testco Incorporated | Open PO (SRG826133) | 11/6/2023 | Suppliers | 3510 |
| 452 | PA-2022-001-UCI | The Regents of the Univeristy of California | Purchase Agreement | 3/17/2023 | Customers | 3542 |
| 453 | N/A | Therma-Tech Engineering (A.R. Lintern Division) | Letter Agreement - Service Parts & Support dated March 3, 2021 - Therma-Tech shall manufacture and supply Service Components related to the Products for a period of 12 years from the Effective ("Support Period") | 3/2/2021 | Suppliers | 3562 |
| 454 | N/A | Tompkins Consolidated Area Transit, Inc. | Agreement for Bus and Bus-Related Parts and Services | 2/29/2020 | Customers | 3587 |
| 455 | N/A | Topeka Metropolitan Transit Authority | Purchase Agreement | 10/3/2022 | Customers | 3589 |
| 456 | PA-2021-001-AVON | Town of Avon | Letter re Notice to Proceed with Contract #PA-2021-001-AVON (Contract No. PA-2021-001-AVON) | 8/11/2021 | Customers | 3603 |
| 457 | N/A | Town of Breckenridge | PRICING DETAILS FOR "TOWN OF BRECKENRIDGE" | 8/21/2019 | Customers | 3608 |
| 458 | N/A | Town of Breckenridge Transit | Sales Order - Bus Configuration | Unknown | Customers | 3612 |
| 459 | N/A | Transit and Mobility Manager City of Racine | Purchase Agreement | 4/24/2023 | Customers | 3616 |
| 460 | N/A | Transit and Mobility Manager City of Racine | Purchase Agreement | 4/28/2023 | Customers | 3617 |
| 461 | N/A | Transtech Innovations | Open PO (SRG825560) | 10/10/2023 | Suppliers | N/A |
| 462 | JTB-06.22.18.1 | Travel Plaza, LLC (JTB Hawaii) | Purchase and Sale of Three (3) 40 Foot Battery Electric Buses, and Two (2) Associated Charging Stations, and Extended Warranty | 7/10/2018 | Customers | 3633 |
| 463 | Contract NO: JTB-06.22.18-1 | Travel Plaza, LLC. | Purchase and Sale of Buses, Charging Stations, and Warranty (Contract NO:.JTB-06.22.18-1) | 7/9/2018 | Customers | 3634 |
| 464 | Contract No. 19-017 | Triangle Regional Public Transportation Authority | GO Triangle Amendment 1 (Contract NO:.19-017) | 10/3/2019 | Customers | 3635 |
| 465 | N/A | Truck World Repair, LLC | Open PO (824828) | 8/28/2023 | Suppliers | 3651 |
| 466 | N/A | Truck World Repair, LLC | Open PO (824976) | 9/7/2023 | Suppliers | 3651 |
| 467 | N/A | Truck World Repair, LLC | Open PO (825314) | 10/2/2023 | Suppliers | 3651 |
| 468 | N/A | Truck World Repair, LLC | Open PO (GVL825622) | 10/12/2023 | Suppliers | 3651 |
| 469 | N/A | Truck World Repair, LLC | Open PO (825792) | 10/23/2023 | Suppliers | 3651 |
| 470 | N/A | Truck World Repair, LLC | Open PO (GVL825975) | 10/30/2023 | Suppliers | 3651 |
| 471 | N/A | Truck World Repair, LLC | Open PO (826589) | 12/6/2023 | Suppliers | 3651 |
| 472 | N/A | Truck World Repair, LLC | Open PO (826601) | 12/7/2023 | Suppliers | 3651 |
| 473 | N/A | Truck World Repair, LLC | Open PO (826669) | 12/13/2023 | Suppliers | 3651 |
| 474 | N/A | TWC Services, Inc | Open PO (825906) | 10/27/2023 | Suppliers | N/A |
| 475 | Contract No.: 47QMCA22D000Z | U.S. General Services Administration Federal Acquisition Services | GSA's Appreciation of Interest No. 47QMCA21R0013 (Contract No.: 47QMCA22D000Z) | 8/31/2021 | Customers | 3666 |
| 476 | GS-30F-026BA | U.S. General Services Administration Medium | Amendment of Solicitation/Modification of Contract (GS-30F-026BA/ MC072) | 4/18/2017 | Customers | 3667 |
| 477 | PO 343748 | University of California, Irvine | University of California, Irvine Purchase Order 03/29/22 | 3/29/2022 | Customers | 3711 |
| 478 | PA-2022-001-UCI | University of California, Irvine | Purchase Agreement | 3/17/2023 | Customers | 3712 |
| 479 | PO/Reference No.: E1198055 | University of Georgia | Purchase Order (PO/Reference No.: E1198055) | 2/5/2021 | Customers | 3713 |
| 480 | N/A | University of Montana | Purchase and Sale of Three Buses and One Charging Station | Unknown | Customers | 3717 |
| 481 | N/A | University of Montana | Notice to Proceed - Overhead Charging Station Contract | 5/23/2016 | Customers | 3720 |

| # | Master Contract # | Customer / Counterparty | Contract Title | Effective Date (Start) | Contract Category | Cure Schedule Index # |
|---|---|---|---|---|---|---|
| 482 | N/A | University of Montana | Letter re: Notice to Proceed | 5/14/2021 | Customers | 3721 |
| 483 | ITN#18-03-MH, Electric Buses for PATS | University of South Florida | University of Florida Product Purchase Agreement for Buses and Chargers | 3/13/2020 | Customers | 3722 |
| 484 | MSGA 2020-09-15 | Valley Regional Transit | Master Goods and Services Agreement / Exhibit A Commonwealth of Virginia Division of Purchases and Supply Standard Contract / Exhibit B Pricing and Warranty | 9/15/2020 | Customers | 3769 |
| 485 | MSGA 2021-05-25 | Valley Regional Transit | Master Goods and Services Agreement - (4) Four 35' Catalyst E2 | 5/10/2021 | Customers | 3768 |
| 486 | PO No. 30020402-000 | Valley Regional Transit | Purchase Order No. 30020402-000; Project No. 23227-020-000) | 9/23/2020 | Customers | 3767 |
| 487 | N/A | Valley Regional Transit | Form of battery lease agreement | 11/29/2021 | Customers | 3770 |
| 488 | N/A | Valley Regional Transit | Form of Battery Lease Agreement - Lease High Voltage (HV) Battery Packs | 6/24/2021 | Customers | 3771 |
| 489 | License Account Reference No 480001283 | Vector North America Inc. | Enterprise Licensing Agreement | 2/3/2023 | IT Suppliers | 3817 |
| 490 | N/A | Vector North America Inc. | Open PO (824905) | 9/1/2023 | Suppliers | 3817 |
| 491 | PO No. 191127 | Via Mobility Services | Purchase Order (PO No. 191127) | 11/27/2019 | Customers | 3829 |
| 492 | N/A | Via Mobility Services | Notice to Proceed (NTP) | 11/30/2020 | Customers | 3832 |
| 493 | PO No. 1285 | Via Mobility Services | Purchase Order (PO No. 1285) | 12/15/2020 | Customers | 3834 |
| 494 | PO No. 1284 | Via Mobility Services | Purchase Order (PO No. 1284) | 12/15/2020 | Customers | 3835 |
| 495 | PA-2020-001-VIA MOBILITY | VIA Mobility Services & City of Boulder | Contract No. PA-2020-001-VIA MOBILITY - Via Mobility Services and Proterra Inc - Purchase and Sale of Two (2) 35-Foot Battery Electric Buses | 7/28/2020 | Customers | 3830 |
| 496 | PA-2020-001-BOULDER | VIA Mobility Services & City of Boulder | Purchase and Sale of One (1) 35 Foot Battery Electric Bus | 11/20/2020 | Customers | 3836 |
| 497 | 20-047 | VIA Procurement Office | VIA Addendum No. 8 (Contract No:. 20-047) | 5/18/2020 | Customers | 3837 |
| 498 | 20-047 | VIA Procurement Office | VIA Addendum No. 7 (Contract No: 20-047) | 4/29/2020 | Customers | 3838 |
| 499 | 20-047 | VIA Procurement Office | VIA Addendum No. 6 (Contract No: 20-047) | 4/8/2020 | Customers | 3839 |
| 500 | 20-047 | VIA Procurement Office | VIA Addendum No. 5 (Contract No: 20-047) | 4/3/2020 | Customers | 3840 |
| 501 | 20-047 | VIA Procurement Office | VIA Addendum No. 4 (Contract No: 20-047) | 3/27/2020 | Customers | 3841 |
| 502 | 20-047 | VIA Procurement Office | VIA Addendum No. 3 (Contract No: 20-047) | 2/20/2020 | Customers | 3842 |
| 503 | N/A | Vintage Parts | Vintage Parts, Inc. Parts Purchase Agreement | Unknown | Suppliers | 3858 |
| 504 | N/A | Vintage Parts, Inc. | Open PO (GVL825788) | 10/20/2023 | Suppliers | 3858 |
| 505 | IFB 6447 / CTR010082 / eVA Vendor No. SUP096329 | Virginia, The Commonwealth of | Notice of Award - To Furnish: Vehicle: Low Floor Transit Buses, Commuter Coach Buses, and Trolleys Heavy Duty, 12 Year (29 ft. – 60 ft. sizes) | 1/11/2023 | Customers | 3860 |
| 506 | E194-81688 MA6465 | Virginia, The Commonwealth of | Contract E194-81688 MA6465 | 7/1/2019 | Customers | 3861 |
| 507 | E194-81688 MA6465 / MOD-1 | Virginia, The Commonwealth of | Modification #1 to Contract - Bus Price Increase | 7/1/2020 | Customers | 712 |
| 508 | E194-81688 MA6465 / MOD-2 | Virginia, The Commonwealth of | Modification #2 to Contract Number E194-81688 | 2/18/2021 | Customers | 711 |
| 509 | PA-2020-002-VIS | Visalia, City of | Purchase and Sale of Four (4) 35 - Foot Battery Electric Buses and Four (4) Associated Charging Stations | 10/9/2020 | Customers | 674 |
| 510 | PO2771 | Visalia, City of | Change Order Committee Form | 2/16/2021 | Customers | N/A |
| 511 | N/A | Wanxiang Sterling Stetson Owner LLC | Amendment No 1 to Equipment Lease Agreement | 7/17/2023 | Customers | 3905 |
| 512 | N/A | Wanxiang Sterling Stetson Owner LLC - Equipment Location: Prudential Plaza 130 E. Randolph Street, Chicago IL 60601) | Equipment Lease Agreement - 1M9TH16J6GS816119; 1M9TH16J2GS816120; 1M9TH16J2GS816121; 1M9TH16J6GS816122; 1M9TH16J9GS816123 | 12/1/2021 | Customers | 3906 |
| 513 | Contract No. 06719-01 / AMD-1 | Washington, Department of Enterprise Services (WA-DES) | First Amendment to Contract No. 06719-01 Transit Buses | Unknown | Customers | 3915 |
| 514 | Contract No. 06719-01 / AMD-2 | Washington, Department of Enterprise Services (WA-DES) | Second Amendment to Contract No. 06719-01 Transit Buses | 4/1/2023 | Customers | 3914 |
| 515 | Contract No. 06719-01 / AMD-3 | Washington, Department of Enterprise Services (WA-DES) | Third Amendment to Contract No. 06719-01 Transit Buses | 5/5/2023 | Customers | 3913 |
| 516 | Master Contract: 06719-01 | Washington, Department of Enterprise Services (WA-DES)_WA State Transit Bus Cooperative | State Cooperative Purchasing Schedule - Master Contract No. 06719-01 Transit Buses: Heavy Duty 35 FT Electric, 40 FT Electric Categories | Unknown | Customers | 3915 |
| 517 | N/A | Wilson Composites, LLC | Open PO (SRG826098) | 11/3/2023 | Suppliers | N/A |
| 518 | Contract No. 210680 | Wilsonville, City of | Goods and Services Contract (SMART Electric Bus Purchase Project) - (1) Bus (1) Charger | 3/23/2021 | Customers | 677 |
| 519 | N/A | Wilsonville, City of | Goods and Services Contract for Proterra Catalyst Battery Electric Buses and Depot Charging Stations | 11/19/2018 | Customers | 678 |

| # | Master Contract # | Customer / Counterparty | Contract Title | Effective Date (Start) | Contract Category | Cure Schedule Index # |
|---|---|---|---|---|---|---|
| 520 | N/A | Wilsonville, City of | City of Wilsonville First Amendment to Goods and Services Contract | 2/28/2019 | Customers | 679 |
| 521 | N/A | Wilsonville, City of | Agreement for Professional Services | 7/6/2021 | Customers | 3942 |
| 522 | N/A | Wisesorbent Technology LLC | Open PO (SRG826099) | 11/3/2023 | Suppliers | 3945 |
| 523 | N/A | XT-Shenzhen Zhenrong Era Supply Chain Management Co. Ltd | Open PO (826258) | 11/13/2023 | Suppliers | N/A |
| 524 | PO-7428760 | Yale University | Purchase Order (PO-7428760) | 3/13/2020 | Customers | 3968 |
| 525 | 1-19-23-17C | Zero-Emisison Transit Buses (incorrect: should be State of California) | Statewide Contract (1-19-23-17C) | 9/26/2022 | Customers | 3978 |

**Exhibit D**

Schedule of Delayed Contracts

All contracts with the following Non-Debtor Counterparties:

1. BC Transit
2. Broward County Transit
3. Central Florida Regional Transportation Authority (Lynx)
4. City of Santa Rosa, California
5. City of Tallahassee
6. City of Sonoma
7. The Town of Jackson, Wyoming and Southern Teton Area Rapid Transit (START)

**<u>EXHIBIT B</u>**

**Blackline**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| PROTERRA INC, *et al.*,[1] | ) Case No. 23-11120 (BLS) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) **Re:  Docket Nos. 36, 218, and 529** |
| | ) |

## ORDER (A) AUTHORIZING
## AND APPROVING THE DEBTORS' ENTRY
## INTO THE ASSET PURCHASE AGREEMENTS,
## (B) AUTHORIZING THE SALE OF THE DEBTORS'
## TRANSIT AND BATTERY LEASE ASSETS FREE
## AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS, AND
## ENCUMBRANCES, (C) APPROVING THE ASSUMPTION
## AND ASSIGNMENT OF THE ASSUMED EXECUTORY CONTRACTS
## AND UNEXPIRED LEASES, AND (D) GRANTING RELATED RELIEF

Upon consideration of the motion [Docket No. 36] (the "Motion")[2] of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") for the entry of an order (this "Order") (a) authorizing and approving the Debtors' entry into that certain (i) *Asset Purchase Agreement* by and among the Debtors and Phoenix Motor, Inc., as buyer ("Buyer"), dated as of November 13, 2023, attached hereto as **Exhibit A** (as it may be amended in accordance with its terms, the "Transit APA") for certain assets of Proterra Transit excluding the Battery Leases (defined below) (the "Transit Assets") and (ii) *Asset Purchase Agreement* by and among the Debtors and Buyer [Docket No. 529, Exhibit A], dated as of November 13, 2023, attached hereto as **Exhibit B** (as it may be amended in accordance with its terms, the "Battery

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Proterra Inc (9565); and Proterra Operating Company, Inc. (8459). The location of the Debtors' service address is: 1815 Rollins Road, Burlingame, California 94010.

[2]    Capitalized terms used but not otherwise defined herein are to be given the meanings ascribed to them in the Motion.



Lease APA" and, together with the Transit APA, the "APAs") for certain battery lease assets of the Debtors (the "Battery Leases"), (b) authorizing the sales (the "Sales") of certain of the Debtors' assets set forth in the APAs (the "Assets") pursuant to the APAs, free and clear of all liens, claims, interests, and encumbrances, (c) approving the Debtors' assumption and assignment of the assumed executory contracts and unexpired leases to the Qualified Bidder with the highest or otherwise best Bid (as defined in the Bidding Procedures) at the Auction (the "Successful Bidder"), and (d) granting related relief; and this Court having entered the *Order (A) Approving Bidding Procedures to Govern the Sale of All Or Substantially All of the Debtors' Assets Pursuant to Section 363 of the Bankruptcy Code, (B) Approving Procedures Regarding Entry Into One or More Stalking Horse Agreements, (C) Establishing Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases, (D) Approving the Form and Manner of the Notice of Assumption and Assignment of Executory Contracts and Unexpired Leases, (E) Scheduling Auctions for the Sales of the Company Assets and Hearings to Consider Approval of the Sales and Approving the Form and Manner of the Notice Thereof, and (F) Granting Related Relief* [Docket No. 218] (the "Bidding Procedures Order") on September 7, 2023; and the Debtors having determined (after consultation with the Consultation Parties (as defined in the Bidding Procedures Order) and in accordance with the Bidding Procedures) that the highest or otherwise best offer for the Assets was made by the Buyer pursuant to the APAs; and this Court having conducted a hearing on January 8, 2024 (the "Sale Hearing"), at which time all parties in interest were offered an opportunity to be heard with respect to the Sales and to consider the approval of the Sales pursuant to the terms and conditions of the APAs, and this Court having considered: (i) the Motion and any objections thereto; (ii) the Sales; (iii) the arguments of counsel made at the Sale Hearing, and evidence adduced, related thereto; and (iv)



the record of the Sale Hearing held before this Court; and all parties in interest having been heard, or having had the opportunity to be heard, regarding the approval of the APAs, the Sales, and the other transactions contemplated by the APAs; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and other parties in interest; and upon the Sale Declaration; and upon the declaration of John Kimm in support of the Sales [Docket No. ▲810] (the "Kimm ~~Declaration") and the declaration of Richard Feldman in support of the Sales [Docket No. ▲] (the "Feldman~~ Declaration"); and the declaration of Mark Hastings in support of the Sales [Docket No. ▲823] (the "Hastings Declaration"); and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334(b) and the Amended Standing Order; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that it may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of these proceedings and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and that no other notice need be provided; and this Court having determined that the legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor:



**IT IS HEREBY FOUND AND DETERMINED THAT**:[3]

## Statutory Predicates; Final Order

A.      The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to these chapter 11 cases pursuant to Bankruptcy Rule 9014.

B.      This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334(b), and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012.  This is a core proceeding under 28 U.S.C. § 157(b) and this Court may enter a final order consistent with Article III of the United States Constitution.  Venue of these chapter 11 cases and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C.      The statutory bases for the relief requested in the Motion are sections 105, 363, 365, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 6006 and Local Rules 2002-1 and 6004-1.

D.      This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h), 6006(d), and 7062, and to the extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, this Court expressly finds that there is no just reason for delay in the implementation of this Order and expressly directs entry of this Order as set forth herein which shall not be subject to any stay with regard to the transactions contemplated by this Order.

---

[3]     To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.



## Notice

E.     This Court previously entered the Bidding Procedures Order approving, among other things, the Bidding Procedures and the Assumption and Assignment Procedures.

F.     As evidenced by the Sale Notice, affidavits or certificates of service and publication previously filed with this Court including Docket Nos. 83, 243, 254, 258, 316, 326, 352, 468, 502, 562, 566, 567, 568, 630, 631, and 703, and demonstrated by the evidence presented at, and based on the representations of counsel at the Sale Hearing, due, proper, timely, adequate, and sufficient notice of the Motion, the Sale Hearing, the Auction, the Sales, the proposed form of this Order, and the Assumption and Assignment Procedures has been provided in accordance with sections 102(1), 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007, and 9014 and in compliance with the Bidding Procedures Order, to each party entitled to such notice, including, as applicable: (a) all entities known to have expressed a *bona fide* interest in a transaction with respect to the Debtors' assets (the "Company Assets") or any Business Line; (b) all entities known to have asserted any lien, claim, or encumbrance in or upon any assets comprising the Company Assets; (c) all federal, state, and local environmental, regulatory, or taxing authorities or recording offices which have a reasonably known interest in the relief requested by this Motion; (d) known counterparties to any unexpired leases or executory contracts that could potentially be assumed and assigned to a Successful Bidder; (e) all known creditors of the Debtors; (f) the Office of the United States Trustee for the District of Delaware; (g) all taxing authorities having jurisdiction over any of the Company Assets, including the Internal Revenue Service; (h) the Securities and Exchange Commission; (i) the Office of the United States Attorney for the District of Delaware; (j) counsel to the Official Committee of Unsecured Creditors appointed on August 24, 2023, and subsequently



reconstituted on September 21, 2023 (the "Committee"); and (k) all Persons and Entities (both as defined in the Bankruptcy Code) that have filed a request for service of filings in these chapter 11 cases pursuant to Bankruptcy Rule 2002.  With respect to Persons or Entities whose identities are not reasonably ascertained by the Debtors, publication of the Sale Notice in *The New York Times* on September 11, 2023, as evidenced by the affidavit of publication filed by the Debtors at Docket No. 243 in these chapter 11 cases, was, and is deemed, sufficient and reasonably calculated under the circumstances to reach such Persons or Entities.  The notices described above, in the Motion, and in the Bidding Procedures Order were good, sufficient, and appropriate under the circumstances, and reasonably calculated to reach and apprise all known and unknown holders of liens, claims, and encumbrances or affected contract counterparties, and no other or further notice of the Motion, the Auction, the Sales, the Sale Hearing, the potential assumption and assignment of the contracts and leases to the Successful Bidder is, or shall be, required.

G.    The Sale Notice provided all interested parties with timely and proper notice of the Sales, Bid Deadline (as defined in the Bidding Procedures), Auction, and Sale Hearing. Further, a reasonable opportunity to object to and to be heard regarding the relief granted by this Order has been afforded to parties entitled to notice pursuant to Bankruptcy Rule 6004(a).

H.    In accordance with the Bidding Procedures Order, and as evidenced by the affidavits or declarations of service and publication previously filed with this Court [Docket Nos. 352, 502, 562, and 703], the Debtors filed and have served the (i) *Notice of (I) Potential Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and (II) Proposed Cure Amounts* [Docket No. 279] (the "Original Cure Notice") on September 25, 2023, (ii) *First Amended Notice of (I) Potential Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and (II) Proposed Cure Amounts* [Docket No. 472], (the "First



6

Amended Cure Notice") on October 25, 2023, (iii) *Second Amended Notice of (I) Potential Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and (II) Proposed Cure Amounts* [Docket No. 528] (the "Second Amended Cure Notice") on November 10, 2023, and (iv) *Third Amended Notice of (I) Potential Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and (II) Proposed Cure Amounts* [Docket No. 643] (the "Third Amended Cure Notice" and, together with the Original Cure Notice, the First Amended Cure Notice, and the Second Amended Cure Notice, the "Cure Notices") on November 27, 2023 regarding the potential assumption and assignment of certain Contracts and of the amount necessary to cure any defaults pursuant to section 365(b) of the Bankruptcy Code (all such amounts in connection with any Contract, the "Cure Amounts") upon the Non-Debtor Counterparties to the Contracts.  The service and provision of the Cure Notices was good, sufficient, and appropriate under the circumstances and no further notice need be given in respect of assumption and assignment of certain contracts and leases designated for assumption and assignment to the Buyer pursuant to the APAs (each an "Assumed Contract" and collectively, the "Assumed Contracts"),[4] including with respect to adequate assurance of future performance or establishing a Cure Amount for the respective Assumed Contracts.  All Non-Debtor Counterparties to each Assumed Contract set forth in the Cure Notices have had an adequate opportunity to object to assumption and assignment of the applicable Assumed Contract and the Cure Amount set forth in the Cure Notices (including objections related to the adequate assurance of future performance and objections based on whether applicable law excuses the Non-Debtor Counterparty from accepting performance by, or rendering performance to, the

---

[4]    Each of the Assumed Contracts is listed on either **Exhibit C** (the schedule of Non-Contested Assumed Contracts (as defined below)) or **Exhibit D** (the schedule of Delayed Contracts (as defined below)) of this Order.



Buyer for purposes of section 365(c)(1) of the Bankruptcy Code).  To the extent that any such party did not timely file a Cure/Assignment Objection by the Cure/Assignment Objection Deadline with respect to a given Assumed Contract or has withdrawn or withdraws its Cure/Assignment Objection (each such party, a "<u>Consenting Counterparty</u>" and each such Assumed Contract, a "<u>Non-Contested Assumed Contract</u>"), (i) such Consenting Counterparty shall be deemed to have consented to the assumption and assignment of each of its Non-Contested Assumed Contracts and (ii) the Cure Amount necessary to "cure" all "defaults", each within the meaning of section 365(b) of the Bankruptcy Code, under each of such Consenting Counterparty's Non-Contested Assumed Contracts shall be deemed to be the applicable amount set forth in the Cure Notices.  Attached hereto as **<u>Exhibit C</u>** is a schedule of the Non-Contested Assumed Contracts.

I.      The Bidding Procedures established October 26, 2023 at 4:00 p.m. (ET) as the Bid Deadline for the submission of bids by Potential Bidders (as defined in the Bidding Procedures) for the Company Assets related to Proterra Transit, including the Battery Leases and November 13, 2023 at 10:00 a.m. (ET) as the date on which an Auction would take place if at least one Qualified Bid (as defined in the Bidding Procedures) was received with regard to such assets.

J.      The Debtors received two (2) Qualified Bids for Proterra Transit and two (2) Qualified Bids for the Battery Leases, and the Auction occurred on November 13, 2023.

K.      On November 13, 2023, the Debtors, in their reasonable business judgment and in consultation with the Consultation Parties, filed a notice designating the Buyer as the Successful Bidder with respect to both the Transit Assets and Battery Leases [Docket No. 529].



L.    No further or other notice beyond that described in the foregoing Paragraphs E through K is or shall be required in connection with the relief granted in this Order.

**Highest or Otherwise Best Offer and Sound Business Purpose**

M.    The Debtors conducted the sale process in accordance with, and have otherwise complied in all respects with, the Bidding Procedures Order including, but not limited to, consulting with the Consultation Parties when required.  The Assets were adequately marketed by the Debtors and their advisors, and the sale process set forth in the Bidding Procedures Order afforded a full, fair, and reasonable opportunity for any person or entity to make an offer to purchase the Assets.  The Bidding Procedures annexed to the Bidding Procedures Order were non-collusive, proposed and executed in good faith as a result of arm's-length negotiations, and were substantively and procedurally fair to all parties.

N.    The terms contained in the APAs constitute the highest or otherwise best offer for the Assets and provide fair and reasonable consideration to the Debtors for the Assets and the assumption of the Assumed Liabilities (as defined in the APAs), and the consideration provided by the Buyer under the APAs constitutes reasonably equivalent value under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia.  The Debtors' determination, in consultation with their advisors and the Consultation Parties, that the consideration provided by the Buyer under the APAs constitutes the highest or otherwise best offer for the Assets constitutes a valid and sound exercise of the Debtors' business judgment.

O.    Approval of the Motion and the APAs, and the consummation of the Sales contemplated thereby, are in the best interests of the Debtors, their creditors, their estates, and other parties-in-interest.  The Debtors have demonstrated compelling circumstances and good,



sufficient, and sound business reasons and justifications for entering into the APAs and the performance of their obligations under the APAs because, among other reasons: (a) the APAs constitute the highest or otherwise best offer for the Assets; (b) the APAs and the consummation of the Sales pursuant to the APAs (the "Closing") present the best opportunity to realize the value of the Assets; and (c) any other transaction would not have yielded as favorable an economic result.  In addition, the releases set forth in Section 12.16 of the APAs are reasonable and appropriate and a valid exercise of the Debtors' business judgment, and the consideration provided for in the APAs constitutes fair and appropriate consideration for such releases.

P.      Entry of this Order approving the APAs and all of the provisions thereof is a condition precedent to the Buyer's and the Sellers' consummation of the Sales.

Q.      The Buyer is the Successful Bidder for the Assets in accordance with the Bidding Procedures Order.  The Buyer has complied in all respects with the Bidding Procedures Order and any other applicable order of this Court in negotiating and entering into the APAs, and the Sales and the APAs likewise comply with the Bidding Procedures Order and any other applicable order of this Court.

R.      The Auction was properly conducted by the Debtors on November 13, 2023 in accordance with the Bidding Procedures Order and in a manner designed to result in the highest or otherwise best offer for the Assets.  At the Auction, the Debtors determined in an exercise of their business judgment (after consultation with the Consultation Parties and in accordance with the Bidding Procedures) to enter into the APAs.



**Sale and Transfer Free and Clear of Interests or Claims**



S.      The conditions of section 363(f) of the Bankruptcy Code have been satisfied and, upon entry of this Order, other than Assumed Liabilities, including Cure Amounts, and Permitted Encumbrances (as defined in the APAs), or as otherwise provided in the APAs, the Debtors may transfer all of their right, title, and interest to the Assets free and clear of (i) any and all liens (including, without limitation, any and all "liens" as that term is defined in Bankruptcy Code section 101(37)), encumbrances, claims, mortgages, restrictions, hypothecations, charges, instruments, collective bargaining agreements, leases or subleases, licenses, options, deeds of trust, security interests, other interests, conditional sale or other title retention agreements, pledges, other liens (including mechanic's, materialman's, possessory and other consensual and non-consensual liens and statutory liens), judgments, demands, easements, servitudes, rights-of-way, encroachments, restrictive covenants, restrictions on transferability or other similar restrictions, rights of first refusal, offsets, contracts,  rights of recovery, rights of use or possession, and charges of any kind or nature, if any, including any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership, (ii) all claims (including, without limitation, any and all "claims" as that term is defined in Bankruptcy Code section 101(5)), including all rights or causes of action (whether in law or equity), proceedings, warranties and warranty obligations, guarantees, indemnities, rights of recovery, setoff, obligations, demands, restrictions, or liabilities relating to any act or omission of the Debtors or any other person prior to the Closing, claims for reimbursement, contribution, indemnity, exoneration, products liability, labor liabilities, Employees Retirement Income Security Act of 1974 liabilities, liabilities related to the Worker Adjustment and Retraining Notification Act of 1988, alter-ego, environmental, or tax, decrees of any court or foreign or domestic governmental entity, consent rights, options, contract rights, covenants, indentures, loan agreements, and



12

interests of any kind or nature whatsoever (known or unknown, matured or unmatured, accrued, or contingent, and regardless of whether currently exercisable), whether arising prior to or subsequent to the commencement of the above-captioned cases, and whether imposed by agreement, understanding, law, equity, or otherwise, and (iii) all debts, liabilities, obligations, contractual rights and claims, labor, employment and pension claims, and debts arising in any way in connection with any agreements, acts, or failures to act, including any pension liabilities, retiree medical benefit liabilities, liabilities arising under or related to the Internal Revenue Code, of the Debtors or any of the Debtors' predecessors or affiliates, claims, in each case, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, whether arising prior to or subsequent to the commencement of these chapter 11 cases, including Excluded Liabilities, and whether imposed by agreement, understanding, law, equity or otherwise, including claims otherwise arising under doctrines of successor liability (including, for the avoidance of doubt, any claims arising under the Consolidated Omnibus Budget Reconciliation Act of 1985)  ((i), (ii), and (iii) collectively, the "Interests or Claims").  The Buyer would not have entered into the APAs if the transfer of the Assets were not free and clear of all Interests or Claims except as set forth in the APAs and this Order, or if in the future the Buyer would or could be liable for any such Interests or Claims.

T.      Upon entry of this Order, the Debtors are authorized to transfer all of their right, title and interest in and to the Assets free and clear of all Interests or Claims (except as otherwise assumed in the APAs, including Permitted Encumbrances, or set forth herein) because one or more of the provisions set forth in section 363(f)(1)–(5) of the Bankruptcy Code has been



satisfied, including that, except as otherwise expressly provided in the APAs or this Order, such Interests or Claims shall attach to the proceeds of the Sales in the order of their priority, with the same validity, force, and effect which they now have against the Assets, subject to any claims and defenses the Debtors may possess with respect to such Interests or Claims.  Each entity with an Interest or Claim (other than an Assumed Liability or a Permitted Encumbrance or as set forth in the APAs or herein) that is attached to the Assets to be transferred on the Closing Date (as defined in the APAs):  (i) has, subject to the terms and conditions of this Order, consented to the Sales or is deemed to have consented to the Sales; (ii) could be compelled in a legal or equitable proceeding to accept money satisfaction of such encumbrance; or (iii) otherwise falls within the provisions of section 363(f) of the Bankruptcy Code.  Those holders of Interests or Claims against the Assets who did not object or who withdrew their objections to approval of the APAs or the Motion are deemed to have consented to the transactions contemplated thereby pursuant to section 363(f)(2) of the Bankruptcy Code.  For the avoidance of doubt, nothing in this Order establishes any rights or interests in the Assets (other than the Debtors' rights and interests in such Assets and the Buyer's rights and interests in the Assets from and after the Closing), and nothing herein shall be construed to govern or affect the distributions of the cash proceeds from the Sales of the Assets.

U.      Notwithstanding anything else herein to the contrary, the Buyer acknowledges that it will be required to comply with the National Traffic and Motor Vehicle Safety Act, as applicable to the business of the Buyer after the Closing, and with environmental laws applicable to the Assets after the Closing.



**<u>Assumption and Assignment of the Assumed Contracts</u>**

V.      The Assumption and Assignment Procedures set forth in the Bidding Procedures Order, as supplemented by this Order, are adequate, sufficient, and appropriate under the circumstances.

W.      The assumption and assignment of the Assumed Contracts pursuant to the Assumption and Assignment Procedures, as supplemented by this Order, is in the best interests of the Debtors and their estates and represents the reasonable exercise of the Debtors' sound business judgment.  The Assumed Contracts being assigned to the Buyer are an integral part of the Assets being purchased by the Buyer, and, accordingly, such assumption and assignment of the Assumed Contracts and the liabilities associated therewith are reasonable and enhance the value of the Debtors' estates.

X.      The Debtors have met all requirements of section 365(b) of the Bankruptcy Code for the Debtors' assumption and assignment to the Buyer, and the Buyer's assumption, on the terms set forth in this Order and the APAs, of each of the Assumed Contracts upon the occurrence of the Closing Date (or, with respect to each Delayed Contract (as defined below), the applicable Delayed Contract Assignment Date).  The Debtors will have (i) cured or provided adequate assurance of cure of any default existing prior to the Closing (or, with respect to each Delayed Contract, the applicable Delayed Contract Assignment Date) under each Assumed Contract, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code and (ii) provided compensation or adequate assurance of compensation to any counterparty to an Assumed Contract for actual pecuniary loss to such entity resulting from any default prior to the Closing (or, with respect to each Delayed Contract, the applicable Delayed Contract Assignment Date) under each Assumed Contract, within the meaning of section 365(b)(1)(B) of the Bankruptcy



Code.  The proposed Cure Amounts set forth on the Cure Notices or any other cure amount reached by agreement after any Cure/Assignment Objection are deemed the amounts necessary to "cure" all "defaults," each within the meaning of Bankruptcy Code section 365(b), under the Assumed Contracts.  The assignment of each of the Assumed Contracts is free and clear of all Interests or Claims (other than Assumed Liabilities and Permitted Encumbrances and as set forth in the APAs or herein).  No section of any of the Assumed Contracts that would prohibit, restrict, or condition, whether directly or indirectly, the use, assumption, or assignment of any of the Assumed Contracts in connection with the Sales shall have any force or effect, except as expressly permitted in the APAs and this Order.

Y.      Subject to the occurrence of the Closing Date (or, with respect to each Delayed Contract, the applicable Delayed Contract Assignment Date), the Buyer, to the extent necessary, has demonstrated adequate assurance of future performance under the relevant Assumed Contracts within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code. The Buyer's promise to perform the obligations under the Assumed Contracts arising after the Closing (or, with respect to each Delayed Contract, the applicable Delayed Contract Assignment Date) shall constitute adequate assurance of its future performance of and under the Assumed Contracts, within the meaning of Bankruptcy Code sections 365(b)(1) and 365(f)(2).  Upon the Closing (or, with respect to each Delayed Contract, the applicable Delayed Contract Assignment Date), pursuant to section 365(f) of the Bankruptcy Code, the Assumed Contracts to be assumed and assigned under the APAs shall be assigned and transferred to, and remain in full force and effect for the benefit of, the Buyer notwithstanding any provision in such contracts or other restrictions prohibiting their assignment or transfer.



Z.      No defaults exist in the Debtors' performance under the Assumed Contracts as of the date of this Order other than the failure to pay amounts equal to the Cure Amounts or defaults that are not required to be cured as contemplated in section 365(b)(1)(A) of the Bankruptcy Code.  The filed objections of all counterparties to the Assumed Contracts that were heard at the Sale Hearing (to the extent not withdrawn or otherwise resolved by agreement), were considered by this Court, and are overruled on the merits with prejudice.  This Court finds that, with respect to all such Assumed Contracts, the payment of the proposed Cure Amounts in accordance with the terms of the APAs is appropriate and is deemed to fully satisfy the Debtors' obligations under section 365(b) of the Bankruptcy Code.  Accordingly, all of the requirements of section 365(b) of the Bankruptcy Code have been satisfied for the assumption and the assignment by the Debtors to the Buyer of each of the Assumed Contracts upon the Closing (or, with respect to each Delayed Contract, the applicable Delayed Contract Assignment Date).  To the extent any Assumed Contract is not an executory contract within the meaning of section 365 of the Bankruptcy Code, it shall be transferred to the Buyer in accordance with the terms of this Order that are applicable to the Assets.

AA.     Except as expressly assumed by the Buyer under the APAs or required by law, the assignment to the Buyer of the Assumed Contracts will not subject the Buyer to any liability whatsoever which may become due or owing under the Assumed Contracts prior to the Closing (other than Cure Amounts) and the Buyer shall not be subject to any liability whatsoever for any Contract that is not an Assumed Contract except to the extent such liability is an Assumed Liability.



**Good Faith Finding**

BB.    The Buyer is not an "insider" or "affiliate" of any of the Debtors as those terms are defined in section 101 of the Bankruptcy Code.

CC.    The APAs were negotiated, proposed, and entered into by the Debtors and the Buyer without collusion or fraud, in good faith, and from arm's-length bargaining positions.

DD.    The APAs and the transactions contemplated thereby cannot be avoided under section 363(n) of the Bankruptcy Code. The Debtors and the Buyer and Buyer's agents, representatives and affiliates have not engaged in any conduct that would cause or permit the APAs or the consummation of the transactions contemplated thereby to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code.  The Debtors and their professionals marketed the Assets and conducted the marketing and sale process in substantial compliance with the Bidding Procedures Order.

EE.    Upon the Closing of the transactions contemplated by the APAs, the Buyer shall be deemed to be a good-faith purchaser under section 363(m) of the Bankruptcy Code and, as such, shall be entitled to all of the protections afforded thereby, including because:  (a) the Buyer recognized that the Debtors were free to deal with any other party interested in purchasing the Assets; (b) the Buyer in no way induced or caused the chapter 11 filing by the Debtors; (c) the Buyer has not violated section 363(n) of the Bankruptcy Code by any action or inaction; (d) no common identity of directors, officers, or controlling stakeholders exists between the Buyer and any of the Debtors; (e) the Buyer agreed to subject its bid to the competitive bid procedures set forth in the Bidding Procedures Order; (f) all payments to be made by the Buyer and other agreements or arrangements entered into by the Buyer in connection with the Sales have been



disclosed; and (g) as set forth in the Hastings Declaration, the Buyer has not acted in a collusive manner with any person.

### No Fraudulent Transfer or Successor Liability

FF.    The aggregate consideration from the Buyer for the Assets as set forth in the APAs: (a) as such consideration relates to the Assets, constitutes fair consideration and fair value under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, and other similar laws of the United States; and (b) as such consideration relates to the Assets, constitutes reasonably equivalent value and fair consideration (as those terms are defined in the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, and section 548 of the Bankruptcy Code, as applicable).

GG.    Neither the Debtors nor Buyer entered into or has agreed to enter into the APAs with any fraudulent or otherwise improper purpose, including, without limitation, the purpose of hindering, delaying, or defrauding any creditors of the Debtors.

HH.    The transfer of the Assets and the assumption of the Assumed Liabilities by the Buyer, except as otherwise set forth in the APAs, does not, and will not, subject the Buyer to any liability whatsoever, with respect to the operation of the Debtors' business prior to the Closing or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, in any theory of law or equity including, without limitation, any laws affecting antitrust, successor, transferee, or vicarious liability.  Pursuant to the APAs, the Buyer is not purchasing all of the Debtors' assets in that the Buyer is not purchasing any of the Excluded Assets (as defined in the APAs) or assuming the Excluded Liabilities (as defined in the APAs), and the Buyer is not holding itself out to the public as a continuation of the Debtors.  Neither the Buyer nor any of its



affiliates are a mere continuation of or successor to the Debtors or their estates in any respect. The APAs do not amount to a consolidation, merger, or *de facto* merger of the Buyer and the Debtors, and there is no continuity of enterprise between the Debtors and the Buyer.  The Buyer would not have entered into the APAs if the transfer of the Assets was not made free and clear of any successor liability whatsoever to the Buyer.  None of the transactions contemplated by the APAs, including, without limitation, the assumption and assignment of the Assumed Contracts, is being undertaken for the purpose of escaping liability for any of the Debtors' debts or hindering, delaying, or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession, or the District of Columbia.  The Debtors are not entering into the transactions contemplated by the APAs fraudulently for the purpose of statutory and common law fraudulent conveyance and fraudulent transfer claims or similar claims.

### Validity of Transfer and Authorizations

II.    The Assets constitute property of the Debtors' estates and title thereto is vested in the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code.  The Debtors have all right, title, and interest in the Assets required to transfer and convey such Assets to the Buyer.  Subject to entry of this Order, the Debtors have full corporate power and authority to execute and deliver the APAs, and all other documents contemplated thereby, and have all corporate authority necessary to consummate the transactions contemplated by the APAs.  No consents or approvals, other than those expressly provided for in the APAs, are required for the Debtors to consummate the transactions contemplated by the APAs.

JJ.    The appointment of a consumer privacy ombudsman pursuant to section 363(b)(1) or section 332 of the Bankruptcy Code is not required with respect to the relief requested in the Motion.



### No *Sub Rosa* Plan

KK.    The Sales neither impermissibly restructure the rights of the Debtors' creditors nor impermissibly dictate the terms of a plan of reorganization or liquidation of the Debtors. This Order does not dictate or direct the distribution of the cash proceeds of the Sales of the Assets.  This Order, the APAs, and the transactions contemplated therein do not constitute a *sub rosa* plan.

### Best Interest of Creditors

LL.    Given all of the circumstances of these chapter 11 cases and the adequacy and fair value of the consideration provided by the Buyer under the APAs, the Sales constitute a reasonable and sound exercise of the Debtors' business judgment, are in the best interests of the Debtors, their bankruptcy estates, their creditors, and all other parties in interest in these chapter 11 cases, and should be approved.

MM.    The consummation of each Sale is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m), 365(b), and 365(f), and all of the applicable requirements of such sections have been complied with in respect of each Sale.

NN.    Time is of the essence in consummating the transactions contemplated by the APAs.  Cause has been shown as to why this Order should not be subject to any stay provided by Bankruptcy Rule 6004(h).

**IT IS HEREBY ORDERED THAT:**

1.    Except as otherwise set forth herein, any and all objections (whether made formally or informally) to, reservations of rights regarding, and other responses to the Motion or the relief requested therein, the APAs, all other ancillary agreements, the Sales, the entry of this


31135047.1
31135047.3

Order, or the relief granted herein, including without limitation, any objections to Cure Amounts or relating to the cure of any defaults under any of the Assumed Contracts or to assumption and assignment of any of the Assumed Contracts to the Buyer by the Debtors, that have not been withdrawn, waived, adjourned, settled, or otherwise resolved, including without limitation, any and all reservations of rights included in such objections or otherwise, are hereby overruled and denied on the merits with prejudice. Those parties who did not timely object to the Motion or the entry of this Order in accordance with the Bidding Procedures Order, or who withdrew their objections thereto, are deemed to have consented to the relief granted herein for all purposes, including without limitation, pursuant to section 363(f)(2) of the Bankruptcy Code.

2.      Notice of the Motion, the Auction, the Sale Hearing, and the Sales was fair, appropriate, and equitable under the circumstances, and complied in all respects with the Bidding Procedures Order, section 102(1) of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 6006, and the Local Rules.

3.      The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law.

<u>**Approval of the APAs**</u>

4.      The APAs, including all other ancillary documents, and all of the terms and conditions thereof, and the Sales contemplated thereby, are hereby approved in all respects.

5.      Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, the Debtors, acting by and through their agents, representatives, and professionals, are authorized to perform their obligations under and comply with the terms of the APAs, pursuant to and in accordance with the terms and conditions of the APAs and this Order.



6.      The Debtors, as well as their affiliates, officers, employees, and agents, are authorized to execute and deliver, and empowered to perform under, consummate, and implement the APAs, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the APAs, and to take all further actions and execute such other documents as may be necessary or appropriate to the performance of the obligations contemplated by the APAs, including, without limitation, making any federal, state, or local regulatory filings necessary or advisable in connection with such transfer, without further order of this Court.

7.      This Order and the APAs shall be binding in all respects upon, and shall inure to the benefit of, the Debtors, the Debtors' bankruptcy estates, their affiliates, all creditors, all holders of equity interests in the Debtors, all holders of any Interests or Claims (whether known or unknown) against the Debtors, any holders of Interests or Claims against or on all or any portion of the Assets, all counterparties to any executory contract or unexpired lease of the Debtors, Buyer and all agents, representatives, affiliates, and permitted successors and assigns of the Buyer, and any trustees, examiners, or other fiduciary under any section of the Bankruptcy Code, if any, subsequently appointed in these chapter 11 cases or upon a conversion of these chapter 11 cases to chapter 7 under the Bankruptcy Code or other plan fiduciaries, plan administrators, liquidating trustees, or other estate representatives appointed or elected in the Debtors' cases.  The terms and provisions of the APAs and this Order will inure to the benefit of the Debtors, their bankruptcy estates, and their creditors, the Buyer and all agents, representatives, affiliates, and permitted successors and assigns of the Buyer, and any other affected third parties, including all persons asserting any Interests or Claims in the Assets to be sold to the Buyer pursuant to the APAs, notwithstanding any subsequent appointment of any



trustee(s), party, entity, or other fiduciary under any section of any chapter of the Bankruptcy Code, as to which trustee(s), party, entity, or other fiduciary such terms and provisions likewise will be binding.

8.      The releases set forth in Section 12.16 of the APAs are hereby incorporated herein by reference and are approved in all respects.  Effective as of the Closing Date, such releases shall be valid, binding, and enforceable.

<u>**Sale and Transfer of Assets**</u>

9.      Pursuant to sections 105(a), 363(b), 363(f), 365(b), and 365(f) of the Bankruptcy Code, upon the Closing and pursuant to and except as otherwise set forth in the APAs, the Assets will be transferred to the Buyer free and clear of all Interests or Claims (other than Assumed Liabilities and Permitted Encumbrances) that accrued, arose, or existed prior to the Closing, including, without limitation, the Prepetition Liens and Adequate Protection Liens (each, as defined in the final order approving the use of the Debtors' cash collateral [Docket No. 422] (the "<u>Cash Collateral Order</u>")), of any person, including, without limitation, all such Interests or Claims specifically enumerated in this Order, whether arising by agreement, by statute, or otherwise and whether occurring or arising before, on, or after the Petition Date, whether known or unknown, occurring, or arising prior to such transfer, with all such Interests or Claims to attach to the cash proceeds of the Sales subject to the terms and conditions set forth in the Cash Collateral Order, in the order of their relative priority and with the same validity, force, and effect the holder of such Interest or Claim had against the Assets prior to the Closing (including, for the avoidance of doubt, as set forth in the Cash Collateral Order), subject to any claims and defenses that the Debtors and their bankruptcy estates may possess with respect thereto.  For the avoidance of doubt, nothing in this Order establishes any rights or interests in the Assets (other



than the Debtors' rights and interests in such Assets and the Buyer's rights and interests in the Assets from and after the Closing), and nothing herein shall be construed to govern or affect the distributions of the cash proceeds from the Sales of the Assets; *provided*, *however*, that such proceeds shall be utilized as provided in the Cash Collateral Order and the Prepetition First Lien Documents and Prepetition Second Lien Documents (each as defined in the Cash Collateral Order).

10.     On the Closing Date, this Order will be construed and will constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of all of the Assets or a bill of sale transferring good and marketable title in such Assets to the Buyer free and clear of all Claims and Interests pursuant to the terms and conditions set forth in this Order and the APAs. For the avoidance of doubt, the Excluded Assets set forth in the APAs are not included in the Assets and the Buyer will not take title to such Excluded Assets.

11.     Subject to the terms and conditions of this Order, the transfer of Assets to the Buyer pursuant to the APAs and the consummation of the Sales and any related actions contemplated thereby do not require any consents other than as specifically provided for in this Order and the APAs, constitute a legal, valid, and effective transfer of the Assets, and will vest the Buyer with all of the Debtors' right, title, and interest in and to the Assets as set forth in this Order and the APAs, as applicable, free and clear of all Interests or Claims of any kind or nature whatsoever (except as otherwise assumed in the APAs, including Permitted Encumbrances).

12.     Except to the extent included in the Assumed Liabilities, Cure Amounts, or Permitted Encumbrances or to enforce the APAs, upon the Closing, all Entities or Persons are permanently and forever prohibited, barred, estopped, and enjoined from asserting against the Buyer, and its permitted successors, designees, and assigns, or property, or the Assets conveyed



in accordance with the APAs, any Interest or Claim of any kind or nature whatsoever arising prior to Closing, including, without limitation, under any theory of successor or transferee liability, *de facto* merger, or continuity liability, whether known or unknown as of the Closing, now existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated, or unliquidated.

13. Nothing in this Order or the APAs releases, nullifies, precludes, or enjoins the enforcement of any police or regulatory liability to a governmental unit that any entity would be subject to as the post-sale owner or operator of property after the date of entry of this Order.

14. To the extent provided by section 525 of the Bankruptcy Code, no governmental unit as defined in 11 U.S.C. § 101(27) may deny, revoke, suspend, or refuse to renew any permit, license, or similar grant relating to the operation of the Assets sold, transferred, or conveyed to the Buyer on account of the filing or pendency of these chapter 11 cases or the consummation of the transactions contemplated by the APAs and this Order.

**Good Faith of the Buyer**

15. Upon the Closing of the transactions contemplated by the APAs, the Buyer shall be deemed to be a good-faith purchaser under section 363(m) of the Bankruptcy Code and, as such, shall be entitled to all of the protections afforded thereby, including because: (a) the Buyer recognized that the Debtors were free to deal with any other party interested in purchasing the Assets; (b) the Buyer in no way induced or caused the chapter 11 filing by the Debtors; (c) the Buyer has not violated section 363(n) of the Bankruptcy Code by any action or inaction; (d) no common identity of directors, officers, or controlling stakeholders exists between the Buyer and any of the Debtors; (e) the Buyer agreed to subject its bid to the competitive bid procedures set forth in the Bidding Procedures Order; (f) all payments to be made by the Buyer and other

agreements or arrangements entered into by the Buyer in connection with the Sales have been disclosed; and (g) as set forth in the Hastings Declaration, the Buyer has not acted in a collusive manner with any person.  The reversal or modification on appeal of the authorization provided herein to consummate the Sales shall accordingly not affect the validity of the Sales (including the assumption and assignment of the Assumed Contracts), unless such authorization and consummation of the Sales are duly and properly stayed pending such appeal.

16.     As set forth in the Kimm Declaration and the Hastings Declaration, none of the Debtors, the Buyer, nor any affiliate of either the Debtors or Buyer have engaged in any collusion with other bidders or other parties or have taken any other action or inaction that would cause or permit the Sales to be avoided or costs or damages to be imposed under section 363(n) of the Bankruptcy Code or otherwise.  The consideration provided by the Buyer for the Assets under the APAs is fair and reasonable and is not less than the value of such Assets, and the Sales may not be avoided under section 363(n) of the Bankruptcy Code.

17.     The Buyer is not an "insider" of any of the Debtors as that term is defined in section 101(31) of the Bankruptcy Code.

<u>**Assumption and Assignment of the Contracts**</u>

18.     Pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, and subject to and conditioned upon the occurrence of the Closing Date (or, with respect to each Delayed Contract, the applicable Delayed Contract Assignment Date), the Debtors' assumption and assignment to the Buyer, and the Buyer's assumption, on the terms set forth in this Order and the APAs, of the Assumed Contracts, is hereby approved in its entirety, and the requirements of section 365 of the Bankruptcy Code with respect thereto are hereby deemed satisfied.



19.    The Debtors are hereby authorized, in accordance with sections 105(a), 363, and 365 of the Bankruptcy Code, to assume and assign to the Buyer, effective upon the Closing Date (or, with respect to each Delayed Contract, the applicable Delayed Contract Assignment Date), the Assumed Contracts free and clear of all Interests or Claims of any kind or nature whatsoever (except as otherwise assumed in the APAs, including Permitted Encumbrances) and execute and deliver to the Buyer such documents or other instruments as may be necessary to assign and transfer the Assumed Contracts to the Buyer.

20.    Upon the Closing (or, with respect to each Delayed Contract, the applicable Delayed Contract Assignment Date), in accordance with sections 363 and 365 of the Bankruptcy Code, the Buyer will be fully and irrevocably vested in all right, title, and interest of each Assumed Contract.

21.    Upon the Closing (or, with respect to each Delayed Contract, the applicable Delayed Contract Assignment Date), the Assumed Contracts will be transferred and assigned to, and remain in full force and effect for the benefit of, the Buyer in accordance with their respective terms pursuant to the APAs, notwithstanding any provision in any such Assumed Contract (including those of the type described in sections 365(b)(2), (e)(1), and (f) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer.

22.    Pursuant to sections 365(b)(1)(A) and (B) of the Bankruptcy Code, upon the Closing (or, with respect to each Delayed Contract, the applicable Delayed Contract Assignment Date), the Buyer will pay to the respective counterparty the Cure Amounts relating to any Assumed Contract.

23.    The payment of the applicable Cure Amounts (if any), or any other cure amount reached by agreement by a Non-Debtor Counterparty after any Cure/Assignment Objection, will


31135047.1
31135047.3

28

effect a cure of all defaults and all other obligations or liabilities under any Assumed Contract existing, occurring, arising, or accruing prior to the date that such executory contracts or unexpired leases are assumed and compensate for any actual pecuniary loss to such Non-Debtor Counterparty resulting from such default.

24.     Upon the Closing (or, with respect to each Delayed Contract, the applicable Delayed Contract Assignment Date), the Buyer will assume the Assumed Contracts, and, pursuant to section 365(f) of the Bankruptcy Code, the assignment by the Debtors of such Assumed Contracts will not be a default thereunder.  After the payment of the relevant Cure Amounts in accordance with the APAs, neither the Debtors and their estates nor the Buyer will have any further liabilities to the Non-Debtor Counterparties to the Assumed Contracts with respect to such Assumed Contracts, other than Buyer's obligations under the Assumed Contracts that accrue or become due and payable on or after the date that such Assumed Contracts are assumed and assigned to Buyer (except for certain obligations as set forth in the APAs).

25.     Except as (i) otherwise agreed in writing between the Debtors and the Non-Debtor Counterparties to the Assumed Contracts, (ii) timely objected to by a Non-Debtor Counterparty, which objection has not been (a) resolved by agreement of the Debtors and the Non-Debtor Counterparty or (b) determined by Court order, (iii) stated on the record of the Sale Hearing, (iv) set forth in this Order, (v) determined by Court order, or (vi) set forth on Appendix A to any subsequent Cure Notices (collectively, the "Subsequent Cure Notices"), the Cure Amounts for the Assumed Contracts are hereby fixed at the amounts set forth on Appendix C to the Third Amended Cure Notice [Docket No. 643] and the Non-Debtor Counterparties to such Assumed Contracts are forever bound by such Cure Amounts and, upon payment of such Cure Amounts, are hereby enjoined from taking any action against the Debtors and their bankruptcy estates, the



Buyer and all agents, representatives, affiliates, and permitted successors and assigns of the Buyer, or the Assets with respect to any claim for cure under any Assumed Contract; *provided*, *however*, that unless a Non-Debtor Counterparty timely files a Cure/Assignment Objection by the Cure/Assignment Objection Deadline applicable to the Assumed Contracts that are listed on any Subsequent Cure Notices, this paragraph 25 shall also apply to such Non-Debtor Counterparties with respect to the Cure Amounts for the Assumed Contracts set forth on Appendix A to any Subsequent Cure Notices.

26.     Notwithstanding anything herein to the contrary, each Assumed Contract set forth on **Exhibit D** of this Order (each, a "<u>Delayed Contract</u>" and each Non-Debtor Counterparty to such Delayed Contracts, a "<u>Non-Consenting Counterparty</u>") is subject to a Cure/Assignment Objection that, to the extent it objects to whether the Debtors and Buyer have provided adequate assurance of the Buyer's future performance of such Delayed Contract, remains outstanding and is not resolved by this Order (each such outstanding objection, an "<u>Outstanding Cure/Assignment Objection</u>").  Notwithstanding anything herein or in the APAs to the contrary, each Delayed Contract shall not be assumed and assigned by the Debtors pursuant to the Order until the date (the "<u>Delayed Contract Assignment Date</u>") that is the later of (a) the Closing Date and (b) the earlier of (i) the date on which the applicable Non-Consenting Counterparty consents to the Debtors' assumption and assignment to the Buyer of such Delayed Contract and (ii) such other date approved by further order of this Court; *provided* that the Debtors shall have no obligation to assume and assign to the Buyer any Delayed Contract to the extent the Delayed Contract Assignment Date has not occurred by February 16, 2024 (the "<u>Delayed Contract Outside Date</u>").  To the extent any of the Non-Consenting Counterparty's Outstanding Cure/Assignment Objections are not resolved consensually, the Debtors may schedule a hearing



on shortened notice for this Court to adjudicate such Outstanding Cure/Assignment Objections and the Debtors' request for approval to assume and assign the related Delayed Contracts to the Buyer.

27.     Nothing herein or in the APAs shall prohibit or otherwise prejudice the Debtors from seeking to reject any Delayed Contract, whether prior to, on, or after the Delayed Contract Outside Date, if such Delayed Contract has not been assumed and assigned to the Buyer and the Debtors, in consultation with the Committee, determine that rejecting the Delayed Contract is in the best interests of the Debtors' estates; *provided* that the Debtors shall use reasonable efforts to provide the Buyer with five (5) days' notice prior to seeking to reject any Delayed Contract.

28.     The Buyer shall promptly pay (or reimburse the Debtors if paid by the Debtors) any administrative expense priority claims arising under any Delayed Contract during the period commencing on the Closing Date and ending on the date that is the earlier of (a) the applicable Delayed Contract Assignment Date, (b) the Delayed Contract Outside Date, and (c) the date on which the Debtors reject such Delayed Contract.

29.     Nothing in this Order, the APAs, or any document, agreement, or instrument contemplated by any of the foregoing shall:  (i) be construed to authorize or permit (a) the assumption and/or assignment of any surety bond issued by (x) Philadelphia Indemnity Insurance Company, (y) Atlantic Specialty Insurance Company, or (z) Lexon Insurance Company (collectively, the "Sureties" and, each individually, a "Surety") on behalf of the Debtors (collectively, the "Surety Bonds" and, each individually, a "Surety Bond"), (b) the assumption and/or assignment of any indemnity agreements executed by one or more of the Debtors pursuant to which the Surety Bonds were issued (the "Indemnity Agreements" and, each individually, an "Indemnity Agreement"), or (c) obligate a Surety to replace any Surety Bond and/or issue any



new surety bond on behalf of a Buyer; or (ii) be deemed to provide a Surety's consent to the involuntary substitution of any principal under any Surety Bond and/or any Indemnity Agreement, including, for the avoidance of doubt, that the Buyer shall not be a substitute principal under any Surety Bond or any Indemnity Agreement absent a Surety's consent thereto or further order of the Court.   The Debtors and the Buyer reserve the right to add as an Assumed Contract any Indemnity Agreement, Surety Bond, or similar instrument (collectively, the "Surety Agreements"), and the inclusion of any of the Surety Agreements as an Assumed Contract shall not prejudice (I) the rights of the Sureties to object or respond to such proposed assumption and/or assignment of any Surety Agreement issued by the Surety, including, without limitation, the right to object to an involuntary substitution of principal under any Surety Bond or (II) the rights of the Debtors or any other party-in-interest's right to challenge any of the foregoing actions (or lack thereof).

30.    Additionally, nothing in this Order, the APAs, or any other document, agreement, or instrument contemplated by any of the foregoing shall be deemed to alter, limit, modify, release, waive, or prejudice any rights, remedies, and/or defenses that the Sureties have or may have under applicable bankruptcy and non-bankruptcy laws, under any of their respective Surety Agreements, or related agreements, or any letters of credit, or other Surety collateral relating thereto.

31.    The Debtors shall not sell, transfer or assign any (i) letters of credit (the "Pre-Petition Letters of Credit") issued or supported by Bank of America, N.A. ("Bank of America"), or (ii) any cash collateral or back-up letters of credit that collateralize or backstop the Pre-Petition Letters of Credit, without Bank of America's express written consent.



32.     Notwithstanding anything to the contrary in this Order or the APAs, no contract between the Debtors and Oracle America, Inc. ("<u>Oracle</u>") will be assumed and/or assigned without (i) Oracle's prior written consent; (ii) the cure of any defaults under such contract; (iii) the provision to Oracle of satisfactory adequate assurance of future performance by the assignee; and (iv) execution by the Debtors or its successor and the assignee of mutually agreeable assignment documentation in a final form to be negotiated after entry of this Order.  In addition, no provision of this Order or any Transition Services Agreement (as defined in the APAs) shall authorize: (x) the transfer of any Oracle license agreement to any third party; or (y) use of any Oracle license agreement that is inconsistent with the relevant license grant including, but not limited to, exceeding the number of authorized users, shared use, or license splitting, absent Oracle's express prior written consent.

33.     Notwithstanding any other terms or provisions of this Order or the APAs, the Buyer agrees that, (i) promptly upon the Closing, Buyer will remediate all defaults under that certain Lease Agreement with Smith Development Company, Inc. ("<u>Smith</u>"), dated as of March 3, 2018 (the "<u>Lease Agreement</u>"), including, but not limited to, Buyer's maintenance and repair obligations pursuant to section 9(b) of the Lease Agreement (and will agree that the roof and gutter repairs will be completed by November 1, 2024)  and (ii) in satisfaction of its obligation to provide adequate assurance of future performance, Buyer will deposit with Smith the sum of $630,000 (the "<u>Deposit</u>"), of which Smith will apply the April, May, and June 2024 monthly lease payments of $105,890 per month from this Deposit to satisfy Buyer's payment obligations under the Lease Agreement, with the remaining amounts of the Deposit to be retained by Smith as security for Buyer's obligations under the Lease Agreement and to be returned to the Buyer



upon the termination of the Lease Agreement if Buyer is not in default under the Lease Agreement.

34.     Notwithstanding any provision in the Sale Motion, the APAs, this Order, and any implementing sale documents (collectively, the "Sale Documents"), solely with respect to the United States government and State governments, nothing in the Sale Documents shall: (1) authorize the assumption, sale, assignment, or other transfer to the Buyer of any federal (i) grants, (ii) grant funds, (iii) contracts, (iv) property, including but not limited to, intellectual property and patents, (v) leases, (vi) agreements, (vii) certifications, and (viii) applications or other interests of the federal government (collectively, "Federal Interests") without compliance by the Debtors and the Purchaser with all terms of the Federal Interests and with all applicable non-bankruptcy law; (2) be interpreted to set cure amounts or to require the government to novate, approve or otherwise consent to the assumption, sale, assignment or other transfer of any Federal Interests; (3) waive, alter, or otherwise limit the United States' property rights, including but not limited to, inventory, inventions, records, patents, intellectual property, licenses, and data; (4) affect the setoff or recoupment rights or defenses of a governmental unit (as defined in 11 U.S.C. § 101(27)); (5) authorize the assumption, transfer, sale or assignment of any assets subject to the jurisdiction of federal non-bankruptcy recall laws without the assumption by the Buyer of all recall obligations required, but not yet performed by the Debtors at the time of such assumption, transfer, sale or assignment, including recall obligations that arise after the assumption, transfer, sale or assignment of such assets; (6) authorize the assumption, transfer, sale or assignment of any governmental unit's (a) license, (b) permit, (c) registration, (d) authorization, or (e) approval, or the discontinuation of any obligation thereunder, without compliance with any legal requirements, obligations, and approvals under non-bankruptcy law,



34

that are applicable to such assumption, transfer, sale, assignment, or discontinuation; (7) release, nullify, preclude, or enjoin the enforcement of any police or regulatory liability to a governmental unit that any entity would be subject to as the manufacturer, or the post-sale owner, or operator of property; (8) confer exclusive jurisdiction to the Court except to the extent set forth in 28 U.S.C. § 1334 (as limited by any other provisions of the United States Code); (9) divest any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Order or to adjudicate any defense asserted under this Order, subject to the Debtors' and the Buyer's rights to assert before such tribunal or before this Court that any such laws are not in fact police or regulatory laws or that the matter should be heard by this Court; or (10) expand the scope of 11 U.S.C. § 525. For the avoidance of doubt and without limiting the foregoing, notwithstanding any provision in the Sale Documents, nothing in the Sale Documents shall affect, alter, or modify any federal statutes (including, but not limited to, Title 49 of the United States Code), regulations, rules, guidelines, standards, policies, and procedures of the Department of Transportation, including but not limited to, the National Highway Traffic Safety Administration.

35.     Nothing in this Order or the APAs shall affect the obligations of Buyer based upon its own conduct as a manufacturer under the National Traffic and Motor Vehicle Safety Act.

36.     Buyer may satisfy the cure claim of Regional Transportation Commission of Washoe County ("RTC of Washoe County") by complying with the terms and provisions of that certain *Electric Vehicle Purchase Agreement* between RTC of Washoe County and Proterra Operating Company, Inc., dated April 27, 2023 (the "VPA"), including honoring the Early



Adopter Incentive Offer (as defined in section 301(a) of the VPA) in accordance with the terms of section 301 of the VPA.

37.     Notwithstanding any other provisions of this Order, (i) all warranty claims of the Customers[5] and all other rights to demand performance, whenever arising (the "<u>Customer Claims</u>"), under the contracts between the Customers and the Debtors (the "<u>Customer Contracts</u>") that are assumed by the Debtors and assigned to the Buyer, are not waived, released, or discharged against the Buyer, and the Customers retain their rights to assert the Customer Claims under any assumed Customer Contracts against the Buyer, from and after the effective date of assumption of the Customer Contracts in accordance with section 365 of the Bankruptcy Code and (ii) this Order does not authorize the Debtors to assume and not assign any contracts.

38.     Nothing in the preceding paragraph 37 of this Order is intended to waive, release, discharge, or otherwise impact the Non-Debtor Counterparties' right to assert rejection damages against the Debtors to the extent a Non-Debtor Counterparty Contract is rejected by the Debtors under section 365 of the Bankruptcy Code, including pursuant to any chapter 11 plan.

39.     Notwithstanding anything to the contrary in the APAs, this Order, or any cure notices filed by the Debtors, the rights of (i) Florida Power & Light Company, (ii) the Orlando Utilities Commission, (iii) Meritor, Inc. and its subsidiaries, (iv) Tompkins Consolidated Area Transit, Inc. ("<u>TCAT</u>"), (v) Southeastern Pennsylvania Transportation Authority; (vi) Cigna Health and Life Insurance Company; and (vii) Valeo Thermal Commercial Vehicles North America, Inc. (collectively, the "<u>Objectors</u>") to object to the assumption and assignment to the Buyer of (a) any contract between the Debtors and the Objectors (other than TCAT) and (b) that

---

[5]     The "<u>Customers</u>" means:  (i) the City of Detroit, Michigan; (ii) Capital Metropolitan Transportation Authority ("<u>CapMetro</u>"); (iii) Broward County; (iv) Central Florida Regional Transportation Authority (a/k/a Lynx); (v) City of Tallahassee; <u>(vi) Ontario International Airport Authority;</u> and (vi) Tompkins Consolidated Area Transit, Inc.



certain *Engineer, Procure, Construct (EPC) Agreement* between the Debtors and TCAT (collectively, the "Reserved Contracts"), are preserved, and the Debtors shall not assume or assign to the Buyer any of the Reserved Contracts, absent either (1) the consent of the applicable Objector or (2) further order of this Court; *provided* that the Objectors shall have at least (14) fourteen days' notice of any hearing at which the Debtors may seek to assume and assign any of the Reserved Contracts.

40.    Notwithstanding anything in this Order, from and after the Closing, (i) CapMetro shall retain its rights, if any, to assert claims against the Buyer under the CapMetro Customer Contracts for delays in delivering chargers to CapMetro (the "Liquidated Damages Claims") and (ii) the Buyer shall retain all defenses and counterclaims to the Liquidated Damages Claims.

41.    Any provisions in any Assumed Contracts that prohibit or condition the assignment of such Assumed Contract or allow the party to such Assumed Contract to terminate, recapture, impose any penalty, condition on renewal or extension, or modify any term or condition upon the assignment of such Assumed Contract constitute unenforceable anti-assignment provisions that are void, and of no force and effect.  All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment to the Buyer of the Assumed Contracts have been satisfied.

42.    To the extent a Non-Debtor Counterparty to an Assumed Contract failed to timely object to a Cure Amount in accordance with the Bidding Procedures Order, such Cure Amount shall be deemed to be finally determined and any such Non-Debtor Counterparty shall be prohibited from challenging, objecting to, or denying the validity and finality of the Cure Amount at any time, and such Cure Amount, when paid, shall be deemed to resolve any defaults,



amounts due or overdue, or other breaches with respect to any Assumed Contract to which it relates.

43.     Any party having the right to consent to the assumption or assignment of any Assumed Contract that failed to object to such assumption or assignment is deemed to have waived any objections and consented to such assumption and assignment as required by section 365(c) of the Bankruptcy Code.

44.     Upon the Closing (or, with respect to each Delayed Contract, the applicable Delayed Contract Assignment Date), the Buyer will be deemed to be substituted for the Debtors as a party to the applicable Assumed Contracts and the Debtors and their estates will be relieved, pursuant to section 365(k) of the Bankruptcy Code, from any further liability under the Assumed Contracts.

45.     There shall be no assignment fees, increases, rent-acceleration, or any other fees charged to the Buyer or the Debtors and their bankruptcy estates as a result of the assumption and assignment of the Assumed Contracts.

46.     Pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, all counterparties to the Assumed Contracts are forever barred and permanently enjoined from raising or asserting against the Debtors and their estates or the Buyer any assignment fee, default, breach, claim, pecuniary loss, or condition to assignment, arising under or related to the Assumed Contracts, existing as of the date that such Assumed Contracts are assumed or arising by reason of or in connection with the Closing.

47.     Nothing in this Order or the APAs shall relieve the Buyer of any generally applicable contractor requirements to do business with any governmental unit (as defined in Bankruptcy Code section 101(27)); *provided* that Buyer may comply with such requirements on



or after the Closing (or, with respect to each Delayed Contract, the applicable Delayed Contract Assignment Date).

48.     Except as otherwise set forth in the APAs or herein, including the Assumed Liabilities and Cure Amounts that will be paid as provided in the APAs, neither the Buyer, nor any of its successors or assigns, or any of their respective affiliates shall have any liability for any Claim or Interest that arose or occurred prior to the Closing, or otherwise is assertable against the Debtors or is related to the Assets prior to the Closing.  The Buyer is not and shall not be deemed a "successor" to the Debtors or their estates, have, *de facto* or otherwise, merged with or into the Debtors, or be a mere continuation or substantial continuation of the Debtors or the enterprise of the Debtors under any theory of law or equity as a result of any action taken in connection with the APAs or any of the transactions or documents ancillary thereto or contemplated thereby or in connection with the acquisition of the Assets.

## Additional Provisions

49.     In connection with the Closing, a certified copy of this Order evidencing the release, cancelation, and termination provided herein of any Interest or Claims of record on the Assets may be filed or recorded with the appropriate filing agents, filing officers, administrative agencies or units, governmental departments, secretaries of state, federal, state, and local officials, and all other persons, institutions, agencies, and entities which may require such filings by operation of law, the duties of their office, or contract.

50.     Upon consummation of the Sales, if any Person or Entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens*, or other documents or agreements evidencing Interests or Claims against or in the Assets shall not have delivered to the Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties,



termination statements, instruments of satisfaction, releases of all Interests or Claims that the person or entity has with respect to the Assets (unless otherwise assumed in the APAs, including Permitted Encumbrances), or otherwise, then: (i) the Debtors are hereby authorized to execute and file such statements, instruments, releases, and other documents on behalf of the person or entity with respect to the Assets; and (ii) the Buyer is hereby authorized to file, register, or otherwise record a certified copy of this Order, which, once filed, registered or otherwise recorded, will constitute conclusive evidence of the release of all Interests or Claims in the Assets of any kind or nature (except as otherwise assumed in the APAs, including Permitted Encumbrances); *provided that*, notwithstanding anything in this Order or the APAs to the contrary, the provisions of this Order will be self-executing, and neither the Debtor nor Buyer will be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate, and implement the provisions of this Order.  For the avoidance of doubt, upon consummation of each of the respective Sales, the Buyer is authorized to file the applicable termination statements, lien terminations, or other amendments in any required jurisdiction to remove and record, notice filings or financing statements recorded to attach, perfect, or otherwise notice any lien or encumbrance that is extinguished or otherwise released pursuant to this Order under section 363 of the Bankruptcy Code and the related provisions of the Bankruptcy Code.  Each and every federal, state, and local governmental agency or department is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the APAs, including, without limitation, recordation of this Order.  This Order shall be binding upon and shall govern the acts of all persons including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of



deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of such assets or other property interests.

51.    All entities that are currently, or on the Closing may be, in possession of some or all of the Assets are hereby directed to surrender possession of the Assets to the Buyer on the Closing (or, with respect to each Delayed Contract, the applicable Delayed Contract Assignment Date), unless the Buyer otherwise agrees.

52.    This Order shall be effective as a determination that, upon the Closing, all liabilities of any kind or nature whatsoever existing as to the Assets prior to the Closing (other than the Assumed Liabilities) have been unconditionally released, discharged, and terminated and that the conveyances described herein have been effected as set forth in this Order.

53.    At the Closing, the Buyer shall pay the Debtors in accordance with Section 3.1 of the APAs and the Earnest Deposit shall be credited and applied to the respective Purchase Price (as defined in the APA).

54.    Without further order of the Court, the Escrow Agent is hereby authorized, in accordance with, and as permitted under, the APAs, to release the Earnest Deposit to the Debtors, including:  (a) if the respective APA is terminated in accordance with the terms of such APA, including if the Closing has not occurred by the Outside Closing Date (as defined in the APAs); and (b) upon the Closing.

55.    Except as otherwise provided in this Order and the APAs, all rights of the respective Debtors' estates and its stakeholders with respect to the allocation of consideration


31135047.1
31135047.3

received from the Buyer in connection with the Sales are expressly reserved for later determination by this Court and, to the extent consideration is received by any Debtor that is determined to be allocable to another Debtor, such other Debtor shall have a claim against the recipient Debtor with the status of an expense of administration in the case of the recipient Debtor under Bankruptcy Code section 503(b).  Nothing in this Order or the APAs shall constitute a finding of fact or a conclusion of law in relation to the allocation of the sale proceeds as consideration for each of the Assets.

56.     The APAs and any related agreements, documents, or other instruments may be modified, amended, or supplemented through a written document signed by the parties thereto in accordance with the terms thereof and this Order and in consultation with the Consultation Parties without further order of this Court.  The Debtors are authorized to perform each of their covenants and undertakings as provided in the APAs prior to or after the Closing without further order of this Court.

57.     The APAs shall be of full force and effect, regardless of any Debtors' lack of good standing in any jurisdiction in which such Debtor is formed or authorized to transact business.

58.     To the extent applicable, the automatic stay pursuant to section 362 of the Bankruptcy Code is hereby lifted with respect to the Debtors to the extent necessary, without further order of the Court (a) to allow the Buyer to give the Debtors any notice provided for in the APAs, and (b) to allow the Buyer to take any and all actions permitted by the APAs.

59.     No bulk sales law or any similar law of any state or other jurisdiction shall apply to the Debtors' conveyance of the Assets.



60.    The Debtors and the Buyer will use commercially reasonable efforts to enter into a Transition Services Agreement, which shall be reasonably acceptable to the Committee in form and substance, to the extent necessary to assist in the transition of the Proterra Transit business unit to the Buyer, *provided*, that the Debtors may require such Transition Services Agreement to provide (i) for payment in advance from the Buyer to the Debtor and (ii) that the Transition Services Agreement terminates upon the Debtors' entry into a transition services agreement with Volvo Battery Solutions LLC.  Pursuant to this Order, access to the Acquired Business Books and Records (as defined in the APAs) shall be made reasonably available post-Closing by the Buyer to the Debtors, the Committee, and any subsequently appointed plan administrator or trustee at reasonable times upon reasonable notice.

61.    Nothing in this Order shall be deemed to waive, release, extinguish, or estop the Debtors or their estates from asserting or otherwise impair or diminish any right (including any right of recoupment), claim, cause of action, defense, offset, or counterclaim in respect of any asset that is not an Asset.

62.    The failure specifically to include or make reference to any particular provisions of the APAs in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that each APA and each document, agreement, or instrument contemplated thereby is authorized and approved in its entirety.

63.    Absent a subsequent order of this Court to the contrary, this Order shall be binding in all respects upon any trustees, examiners, "responsible persons" or other fiduciaries appointed in these chapter 11 cases or upon a conversion to chapter 7 under the Bankruptcy Code.



64.     Notwithstanding any provision in the Bankruptcy Rules to the contrary, this Order shall be effective immediately and enforceable upon its entry.

65.     In the event of any conflict between this Order and the APAs, this Order shall control in all respects.

66.     The requirements set forth in Local Rules 6004-1, 9006-1, and 9013-1 are hereby satisfied or waived.

67.     This Court shall retain exclusive jurisdiction to interpret, implement and enforce the terms and provisions of this Order, the Bidding Procedures Order, and the APAs, including all amendments thereto and any waivers and consents thereunder and each of the other agreements executed in connection therewith, and decide any issues or disputes concerning this Order and the APAs or the rights and duties of the parties hereunder or thereunder, including the interpretation of the terms, conditions, and provisions hereof and thereof, the status, nature and extent of the Assets.



## **Exhibit A**

Transit APA

*[Intentionally Omitted]*



## **Exhibit B**

Battery Lease APA

*[Intentionally Omitted]*



**<u>Exhibit C</u>**

Schedule of Non-Contested Assumed Contracts

*[Intentionally Omitted]*

**Exhibit D**

Schedule of Delayed Contracts

| Outstanding Cure/Assignment Objection | Delayed Contract(s) | Non-Debtor Counterpart(ies) |
|---|---|---|
| ECF No. [____] | | |
| ECF No. [____] | | |
| ECF No. [____] | | |

All contracts with the following Non-Debtor Counterparties:

1. BC Transit
2. Broward County Transit
3. Central Florida Regional Transportation Authority (Lynx)
4. City of Santa Rosa, California
5. City of Tallahassee
6. City of Sonoma
7. The Town of Jackson, Wyoming and Southern Teton Area Rapid Transit (START)