```
 1                    UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF DELAWARE
 2

 3   IN RE:                      .  Chapter 11
                                 .  Case No. 23-11120 (BLS)
 4   PROTERRA, INC., et al.,     .
                                 .  (Jointly Administered)
 5                               .
                                 .  Courtroom No. 1
 6                               .  824 Market Street
               Debtors.         .  Wilmington, Delaware 19801
 7                               .
                                 .  Tuesday, January 23, 2024
 8   . . . . . . . . . . . . . .  11:04 p.m.

 9                        TRANSCRIPT OF HEARING
              BEFORE THE HONORABLE BRENDAN L. SHANNON
10                  UNITED STATES BANKRUPTCY JUDGE

11   APPEARANCES:

12   For the Debtors:           Michael J. Colarossi, Esquire
                                PAUL, WEISS, RIFKIND, WHARTON
13                                & GARRISON, LLP
                                1285 Avenue of the Americas
14                              New York, New York 10019

15   For the U.S. Trustee:      Linda J. Casey, Esquire
                                UNITED STATES DEPARTMENT OF JUSTICE
16                              OFFICE OF THE UNITED STATES TRUSTEE
                                J. Caleb Boggs Federal Building
17                              844 King Street
                                Suite 2207, Lockbox 35
18                              Wilmington, Delaware 19801

19   (APPEARANCES CONTINUED)

20   Audio Operator:            Dana L. Moore, ECRO

21   Transcription Company:     Reliable
                                The Nemours Building
22                              1007 N. Orange Street, Suite 110
                                Wilmington, Delaware 19801
23                              Telephone: (302)654-8080
                                Email:  gmatthews@reliable-co.com
24
     Proceedings recorded by electronic sound recording,
25   transcript produced by transcription service.
```

1    <u>APPEARANCES (CONTINUED)</u>:

2    For Cyress Jam,
     individually and on
3    behalf of the
     securities litigation
4    class:                    Michael J. Joyce, Esquire
                               THE LAW OFFICES OF JOYCE, LLC
5                              1225 King Street
                               Suite 800
6                              Wilmington, Delaware 19801

7                              -and-

8                              Adam M. Apton, Esquire
                               LEVI & KORSINSKY, LLP
9                              33 Whitehall Street
                               17th Floor
10                             New York, New York 10004

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                    INDEX

2    MOTIONS:                                              PAGE

3    Agenda
     Item 2:    Debtors' Motion for Entry of an Order (A)      5
4               Approving the Adequacy of the Disclosure
                Statement; (B) Approving the Solicitation and
5               Notice Procedures With Respect to Confirmation
                of the Debtors' Joint Chapter 11 Plan of
6               Reorganization; (C) Approving the Forms of
                Ballots and Notices in Connection Therewith;
7               (D) Scheduling Certain Dates With Respect
                Thereto; and (E) Granting Related Relief [D.I.
8               793, 1/2/24]

9
                Court's Ruling:                              24
10

11   Transcriptionist's Certificate                         31

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Proceedings commenced at 11:04 a.m.)

2              THE CLERK:  All rise.

3              THE COURT:  Please be seated.

4              Good morning, are you ready to proceed?

5              MR. COLAROSSI:  Yes, Your Honor.

6              Michael Colarossi, Paul Weiss, on behalf of the

7   debtors.

8              So if it's all right, I'd like to start with some

9   general updates --

10             THE COURT:  Sure.

11             MR. COLAROSSI:  -- on the developments in the

12  cases?

13             So the debtors have made substantial progress in

14  these Chapter 11 cases in cooperation with the second lien

15  lenders, UCC, and other stakeholders.  The sale of Proterra

16  Transit closed On January 11th, 2024, as we noticed on the

17  docket, and the parties continue to work towards closing the

18  sale of Proterra Powered, which is anticipated to close on

19  February 1st.

20             THE COURT:  Very good.

21             MR. COLAROSSI:  The outside date to the sale of

22  the battery leases to Phoenix is today.  We have also been

23  negotiating an APA with the backup bidder and if there's any

24  issues with closing the battery lease sale to Phoenix, we may

25  file a motion to seek Your Honor's approval to consummate

1  that backup bid on shortened notice.

2           THE COURT:  Okay.  I'll be here.

3           MR. COLAROSSI:  Great, Your Honor.

4           And then, finally, as Your Honor knows, a global

5  settlement was reached with the second lien lenders and the

6  UCC, as reflected in the amended and restated PSA we filed

7  and embodied in the plan.

8           THE COURT:  I saw it.

9           MR. COLAROSSI:  All right.  With that, Your Honor,

10  I'll cover a couple of updates with respect to the disclosure

11  statement motion itself.

12           THE COURT:  That'd be great.

13           MR. COLAROSSI:  So as I'm sure Your Honor saw, we

14  filed amended versions of the plan and disclosure statement,

15  as well as a proposed disclosure statement order,

16  incorporating certain comments received from the objecting

17  parties.  Among other changes highlighted in the redlines we

18  filed on the dockets, we added language highlighting the

19  plan's third-party release provisions and related definitions

20  and opt-out procedures, the various notices to be sent to

21  non-voting classes.

22           We added information on the debtors' post-petition

23  marketing process, the amended and restated PSA, and

24  liquidation payment settlement to notices to be sent to

25  registered shareholders and beneficial owners of shares.

1         We also revised the plan's definitions -- release

2    provisions to include releases to exclude -- excuse me, Your

3    Honor -- exclude the releases of claims for actual fraud,

4    gross negligence, and willful misconduct.

5         We also revised the definition of releasing party

6    and released party to ex accumulate Mr. Jam in his individual

7    capacity, in light of his desire to opt out of the releases

8    as set forth in his objection, and we added to the

9    definitions of releasing party and released party, or we

10   added those definitions to the body of the disclosure

11   statement, as well as a notice highlighting that the

12   identities of all released parties will not be known prior to

13   the opt-out deadline, given that our releases are mutual.

14            THE COURT:  Okay.

15            MR. COLAROSSI:  And then, finally, Your Honor, we

16   incorporated certain commentary provided by counsel to Mr.

17   Jam regarding the Security class action and the releases into

18   the body of the disclosure statement.

19            THE COURT:  Okay.

20            MR. COLAROSSI:  So, with respect to the disclosure

21   statement, Your Honor, five objections were filed.  The

22   debtors worked cooperatively with each of the objecting

23   parties in an effort to consensually resolve their concerns

24   and narrow the scope of any issues that need to be decided by

25   Your Honor.

1           I'm pleased to report that we were able to fully

2   resolve three of the objections on a consensual basis,

3   including through changes reflected in the amended plan and

4   disclosure statement that I've discussed.

5           THE COURT:  Which of the objections have been

6   resolved?

7           MR. COLAROSSI:  The objection -- all of the

8   objections, other than Mr. Jam's and the U.S. Trustee's

9   objection, so that includes SEPTA's objection and the two

10  surety bond providers, Philadelphia and (indiscernible).

11          THE COURT:  Okay.

12          MR. COLAROSSI:  Your Honor, to resolve SEPTA's

13  objection, we've confirmed to SEPTA that the debtors intend

14  to reject these contracts and we've agreed to read into the

15  record, a statement regarding the inclusion of SEPTA's

16  asserted claim amount into the recovery analyses set forth in

17  the disclosure statement.  It's all right with Your Honor,

18  I'll do that now?

19          THE COURT:  Okay.

20          MR. COLAROSSI:  The debtors included the

21  approximate amount of SEPTA's filed proof of claim,

22  approximately $23 million in the high end of the estimated

23  range of general unsecured claims used for the recovery

24  analyses set forth in the disclosure statement.  The high end

25  of that estimated range is approximately $260 million, which

1  reflects an estimate encompassing the gross amount of filed

2  claims, excluding any prospective claims not yet filed, such

3  as rejection damages claims.

4          These figures were estimates at the time of the

5  analysis and are subject to material change.  The debtors

6  reserve any and all rights to dispute SEPTA's and any other

7  party's proof of claim amount.

8          THE COURT:  Very good.

9          MR. COLAROSSI:  All right.  So turning to the

10  remaining two objections, those of the U.S. Trustee and

11  Mr. Jam, while I understand that our amended filings

12  partially resolved those objections and I went through the

13  key changes, there remains certain unresolved points, which

14  we addressed in our reply.  Since filing the reply, we've

15  continued to work cooperatively with the objecting parties

16  and we've reached agreement on two other changes that help to

17  resolve additional points with the U.S. Trustee.

18          To address the U.S. Trustee's objection that the

19  shareholder notices contain confusing legalese, we've agreed

20  to add simple, straightforward -- a simple, straightforward

21  statement to the beginning of certain of the notices being

22  sent to the various stakeholders, stating, in simple terms,

23  that the recipient of the notice will be deemed to grant the

24  third-party releases if they do not opt out or object to the

25  plan as equitable.

1          Second, to resolve the U.S. Trustee concern

2   regarding the definition of releasing party, including

3   certain categories of related persons, we've agreed to revise

4   the definition to provide for the main categories of

5   releasing parties set forth in the definition are only

6   granting releases on behalf of their related persons, to the

7   extent they have the ability to do so under applicable law.

8          THE COURT:  All right.  I understand.

9          MR. COLAROSSI:  Thank you, Your Honor.

10          And if those changes are acceptable to Your Honor,

11   we'll reflect them in a revised proposed order and the

12   solicitation versions of the plan and disclosure statement.

13          THE COURT:  Very good.

14          MR. COLAROSSI:  So, with that, I'll move on to our

15   case in chief on the disclosure statements.

16          THE COURT:  Okay.

17          MR. COLAROSSI:  As Your Honor knows, to solicit

18   votes on the plan, Section 1125 of the Bankruptcy Code

19   requires the disclosure statement contain adequate

20   information for hypothetical investors in the voting classes

21   to make an informed decision with respect to the plan.  The

22   disclosure statement contains extensive information about the

23   debtors' background, capital structure, and business

24   operations, key events leading to the Chapter 11 cases, key

25   terms of the plan and estimated recoveries, analysis of

1   recoveries in a hypothetical Chapter 7 liquidation, certain

2   risk factors, securities disclosures, and potential tax

3   consequences related to the plan, and recommendations from

4   the debtors and the UCC that voting classes should vote to

5   accept the plan.

6          In addition, as I so noted earlier, the latest

7   amended disclosure statement included additional information

8   to address concerns raised by the objecting parties,

9   including to incorporate commentary provided by Mr. Jam's

10  counsel.

11         We respectfully submit that the disclosure

12  statement, therefore, satisfies Section 1125's adequate

13  information requirement and the disclosure statement motion

14  should, therefore, be approved.

15         With respect to the remaining disclosure statement

16  objections, the U.S. Trustee and Mr. Jam assert various

17  arguments, contending that the disclosure statement motion

18  should not be approved unless the third-party release

19  provisions are severed from the plan at least respect to

20  shareholders.  I'll note that neither of these objecting

21  parties are releasing parties under the plan and also that

22  their arguments fail for several reasons.  First and

23  foremost, they are premature in that, by asserting issues

24  that are properly reserved for confirmation.

25         Courts have consistently held that challenges to a

1  plan itself, including its release provisions, should

2  generally be addressed at the confirmation hearing after

3  voting creditors have been informed about the proposed plan,

4  a vote has been undertaken and there's an opportunity to

5  develop a full, factual record.

6          While there is a limited exception for disclosure

7  statements describing patently unconfirmable plans, that

8  exception does not apply where the plan can be confirmed on

9  development of the factual record.  Here, the plan is

10 consistent with substantial precedent from this and other

11 districts and it's certainly confirmable, thus, the remaining

12 objection's arguments regarding the validity of the third-

13 party releases need not be decided until the confirmation

14 hearing, at which time the debtors will demonstrate that the

15 releases are consensual and should be approved.

16          THE COURT:  Okay.

17          MR. COLAROSSI:  Second, Your Honor, the plan

18 contains an intentionally drafted opt-out structure whereby

19 all nondebtor holders of claims or interests under the plan

20 will have the opportunity to demonstrate their consent by

21 electing not to opt out of the third-party releases,

22 especially, in light of the changes that we've agreed to with

23 the U.S. Trustee, the applicable notices clearly inform

24 shareholders in other provisions of the notice that they will

25 be granting the releases unless they submit an opt-out form

1 | or object to the plan.

2 |       The plan's approach is consistent with substantial

3 | case law in this and other districts, holding that consent

4 | can be deemed from the failure to opt out of releases, and

5 | it's also consistent with Federal Rule of Civil Procedure 23,

6 | which relies upon an opt-out mechanism to deem consent from

7 | putative class action members in certain circumstances, which

8 | I assume is what Mr. Jam and the Securities class action is

9 | going to seek to utilize to certify a class.

10 |       THE COURT:  Okay.  I understand.

11 |       MR. COLAROSSI:  Third, as the debtors will

12 | demonstrate at the confirmation hearing, the debtors'

13 | shareholders are active and interested in these Chapter 11

14 | cases.  The debtors and their professionals have received

15 | numerous informal requests and questions throughout the

16 | course of these Chapter 11 cases from an active shareholder

17 | base.  Various shareholders have filed a number of letters on

18 | the docket, which I am sure Your Honor is aware.

19 |       THE COURT:  I have seen the letters.

20 |       MR. COLAROSSI:  And the formation of an official

21 | equity committee has been requested not once, but twice in

22 | these cases.  Moreover, according to Mr. Jam, the

23 | shareholders have alleged valuable Securities law claims

24 | against the debtors and certain of their current and former

25 | Ds and Os.  This, if true, should mean that the shareholders

1  is are interested and paying attention.

2          THE COURT:  Okay.

3          MR. COLAROSSI:  Two other points I'd like to note,

4  Your Honor.  First, Mr. Jam lacks authority to bind putative

5  class members.  The putative class has not been certified.

6  Nothing gives Mr. Jam authority to nonconsensually bind

7  putative class members to opting out of the release,

8  especially prior to class certification.

9          And, second, Mr. Jam lacks standing.  In light of

10  his decision to opt out of the third-party releases, the

11  debtors have revised the plan's definition of released and

12  releasing parties to exclude Mr. Jam and, thus, consistent

13  with case law in this district, he lacks standing to object

14  to the third-party releases.

15          With that, I'm happy to answer any questions;

16  otherwise, I'll cede the podium.

17          THE COURT:  No, I think I'd like to hear from the

18  United States Trustee first.

19          Ms. Casey, good morning.  It's good to see you.

20          MS. CASEY:  Good morning, Your Honor.  It's good

21  to see you.  For the record, Linda Casey, on behalf of the

22  United States Trustee.

23          Your Honor, there's a lot and I'm going to try to

24  be somewhat organized, but there is a lot.  I'm going to

25  start with the prematurity issue.  Our office has quite a bit

1   of objections to the third-party releases and they are

2   reserved for confirmation.  We raised the objections that we

3   thought were appropriate for the disclosure statement

4   hearing.

5           There are more than just the fact that the

6   shareholders and the class of creditors who has claims based

7   on their equities, so there are two different classes, have

8   to opt out.  There is the -- first, there's multiple opt-

9   outs.  They need to opt out in their status as a holder of a

10  claim and then they need to opt out as an equity holder.  I

11  understand that that may only apply to one creditor, but it

12  still is there.

13          Second, there is a process by which the nominees

14  have to solicit the opt-outs from the beneficial holders and

15  that certainly would not be necessary as a cost and an

16  expense on those parties if this opt-out structure is not

17  appropriate.

18          And, finally, it does increase the costs to the

19  estate to opt out if it's not appropriate.  So, with do think

20  that it's not premature; there are reasons to have it heard

21  today.

22          THE COURT:  Okay.

23          MS. CASEY:  The fact that there are some equity

24  holders who are active and interested in the proceedings does

25  not mean that all equity holders have received actual notice

1  and understand this, and so I don't think that's there.  So

2  it comes down to the opt-outs.

3           But before I go into those, I'd like to raise a

4  couple of issues that are easier and then we'll get to the

5  opt-outs.  There is an issue that was raised by the U.S.

6  Trustee as to who is giving the releases and if the parties

7  can understand who is giving the releases.  The debtors have

8  revised the disclosure statement to say that you can't know

9  who's giving the releases until after the release opt-out

10  deadline is, so at least that is disclosed.  Whether we have

11  a confirmation objection regarding that, we still reserve

12  that for confirmation.

13           THE COURT:  Of course.

14           MS. CASEY:  There's another issue regarding -- and

15  it's resolved with an asterisk -- who has given the releases.

16  So we have requested that there be some way for parties to

17  know have I been released or have I not been released from

18  certain parties.  So we've requested that there be a list of

19  the parties who have opted out filed.  And the debtors have

20  revised the order to say that we will do so, if practicable.

21  There's a whole bunch of issues:  PII; there's equity holders

22  who have somehow opted out of the nominees to being publicly

23  disclosed, et cetera.  And so there's going to be a lot of

24  discussion about how we -- if Your Honor allows this opt-out

25  process --

1           THE COURT:  I don't think I've seen this request

2    before.  I think I appreciate the principle that's behind it,

3    but that would be my initial reaction is, usually,

4    shareholders sit behind nominee walls, so the name holder,

5    you know, interfaces with the world for the shareholders, but

6    it is, I think, an important question and one that I don't

7    think it's come up in any case have I've had, but, you know,

8    it would obviously be a complicated issue to determine,

9    subsequently, who had and who had not given a release if,

10   years later you had to go start digging through, you know,

11   the claims agent for the specific ballots, et cetera, if

12   there were litigation in another forum.

13          So the point would be that the claims agent or the

14   balloting agent would prepare a list that would identify each

15   of the parties that have opted out so that that known

16   universe would be available to the Court and, obviously, to

17   the parties that are expecting or giving releases in order to

18   ensure familiarity.

19          I get the PII concern.  Is this something that

20   could be addressed by a sort of careful sealing structure?

21          MS. CASEY:  It could be and we have -- so, just to

22   step back before I answer that question, this goes towards

23   all classes, including unclassified claims; it's not just the

24   equity holders.  Because everybody is either a releasing

25   party or a released party.

1        But as to the issue of the sealing, that's what we

2   discussed previously and that's what we're sort of punting.

3   There's language in the order that says that they will do it

4   if practicable and then we're going to talk about what it

5   means to actually do it.

6        Hopefully, it's easy as to the creditors in other

7   classes or the unclassified creditors and that maybe the

8   difficulty is just as to the equity holders, but we will

9   discuss that between now and confirmation and come up with,

10  you know, my client is concerned of PII and those issues as

11  well, so we don't want to just be rash and say, Hey, file a

12  list of everybody.

13        THE COURT:  Sure.  No, I appreciate that.

14        MS. CASEY:  So then we get to the issue of the

15  need to opt out.  And here, you know, we have two fully --

16  well, anybody who's fully impaired, who are not receiving any

17  consideration at all.  They're not receiving any payment

18  distribution from the estate.  They're not receiving any

19  benefit of any contribution provided by any of the released

20  parties and many of the released parties have provided no

21  consideration at all whatsoever.  There's no monetary

22  contribution to the plan from most of the released parties.

23        So you have a fully impaired class of creditors

24  who is being required to opt out of a release.  This idea of,

25  Well, wait, Federal Rule of Civil Procedure 23, that's a

1  class of creditors, who, if they're successful, are going to

2  share in a pot of money.

3         This is a fully impaired class who's receiving no

4  distribution, has not received consideration for the release.

5  This Court, in Indianapolis Downs specifically noted that the

6  release structure did not apply to any party that is deemed

7  to reject.

8         And our issue here, obviously, the United States

9  Trustee generally does not like the opt-out procedures and we

10 have argued that many times that the opt out is not actual

11 notice.  And, here, one subclass of the equity holders are

12 previous equity holders who have claims against the officers

13 and directors, but have sold their equity interests --

14         THE COURT:  Sold their stock.

15         MS. CASEY:  -- but may have that claim against the

16 debtors, as well, for the same bad acts that are only

17 entitled to constructive notice because their identity is not

18 known to the debtors and they're going to be giving these

19 releases because they fall within the definition of the

20 creditors.  They have only been getting constructive notice

21 and they didn't actually opt out and they're not getting for

22 that.

23         But even the parties who cabinet actual notice, to

24 require them to opt out of a release where they're not

25 getting consideration is simple not equitable and it's not

1    consistent with the law.  A contract under non-bankruptcy law

2    that doesn't have consideration is not enforceable.

3            Under bankruptcy law, releases are required to

4    have consideration.  Here, you have no consideration flowing

5    for these creditors and yet, they have to take some form of

6    action to say, Hey, I don't like the fact that there's no

7    consideration flowing to me.  And what you're basically

8    having is the Bankruptcy Court forcing on parties a release

9    that doesn't have consideration that would not be enforceable

10   otherwise, other than their having the Bankruptcy Court

11   order.

12           And having them to be required to opt out is just

13   simply inequitable.  Judge Dorsey has addressed this issue

14   and he also came to the conclusion that requiring equity

15   holders to opt out when they're fully impaired or any fully

16   impaired creditor to opt out is just simply not equitable.

17           And then here you have the additional issue of the

18   time period.  Yes, it's the time period that's allowed by the

19   rules for the notice of a confirmation hearing, but then it's

20   further truncated by the notice is going to go to the

21   nominee.  The nominee is going to have to figure out how to

22   notify parties.  The equity holders are going to have to

23   respond.  The nominee is going to have to create the list.

24   The nominee is then going to have to prepare the list and

25   file the list.  So you're truncating that time even further

1  and you're also putting the burden, not only do we have the

2  burden of the equity holders getting the notice,

3  understanding the notice, properly opting out, but then

4  relying upon their nominee to accurately reflect who it was

5  that has opted out, all for a class that is receiving no

6  consideration.

7          And the debtors may very well come up and say,

8  Well, these are mutual releases, but there's certainly no

9  evidence that the mutual releases are themselves

10 consideration because it is unlikely that any of the

11 releasing parties have claims against the equity holders and

12 there certainly is no evidence today and it's unlikely that

13 there could be a factual record that there are claims against

14 these equity holders that somehow the mutuality of the

15 releases is the consideration.

16         And so, you know, it is a different argument that

17 the U.S. Trustee telephonically makes about opt-outs.  It's

18 specifically to fully impaired creditors.  It's the fact that

19 they're not receiving consideration.  It's the fact that the

20 beneficiaries of the releases have not provided any monetary

21 contributions.  And it's inequitable and improper, and not

22 consistent with the law, to have parties provide releases to

23 nondebtors where there has been no consideration provided.

24         THE COURT:  Okay.

25         MS. CASEY:  If Your Honor has any further

1  questions?

2          THE COURT:  No, I don't think I do.  Thank you.

3          Can I hear from the Jam Plaintiffs, Mr. Joyce?

4          MR. JOYCE:  Good morning, Your Honor.

5          THE COURT:  Good morning.

6          MR. JOYCE:  Mike Joyce on behalf of Cyress Jam as

7  the lead Plaintiff of the Securities class.

8          Your Honor, with me in court today is Adam Apton,

9  my co-counsel.  He, if it's okay with the Court, will address

10  our objection and he is admitted *pro hac*.

11          THE COURT:  Very good.

12          MR. JOYCE:  Thank you, Your Honor.

13          THE COURT:  Counsel?

14          MR. APTON:  Judge, Adam Apton of Levi & Korsinsky.

15  Thank you for allowing me to appear before Your Honor today.

16          I think that the U.S. Trustee's Office did a very

17  good job explaining why these releases are problematic, thank

18  you, but I'm not going to belabor that point.  I want to

19  discuss the disclosure statement issue and what I would

20  submit is the lack of disclosure being sent my clients.  Not

21  just Mr. Jam, but the entire class of Proterra shareholders

22  that he represents in the District Court in the Northern

23  District of California.

24          These are people who invested in Proterra over a

25  period of two years.  They lost everything.  This is real

1  money, real lives.  I want to make that clear for the Court,

2  because this isn't -- and there's a lot riding on the

3  validity of these releases and the notice that my client and

4  other shareholders will receive about being forced to waive

5  these claims or release these claims for no consideration.

6        We have to assume today that these releases are

7  going to be upheld.  I don't agree that they should be, but

8  for the purposes of today --

9        THE COURT:  For purposes of today -- those issues

10 are reserved -- but you're right, I mean, the Court looks at

11 it understanding the proposition, because the disclosure

12 statement objection is predicated upon the idea that the

13 releases become effective.  I get it.

14        MR. APTON:  Precisely.

15        So without proper disclosure, by the time of the

16 confirmation hearing, that train will have already left the

17 station.  So we need to do everything we can to make sure the

18 disclosure is as fulsome and as informative as it possibly

19 can be under the standards.

20        And so I have a future issues with the disclosure

21 statement.  One, debtors' counsel was kind enough to include

22 some commentary from me, my co-counsel, my client about the

23 description of the claims at issue, the Securities class-

24 action claims.  That commentary is buried within the

25 disclosure statement.  It is not being sent to beneficial

1  owners; i.e., my class members.  It's not contained in the

2  opt-out ballot.  There's no cover letter accompanying these

3  ballots to beneficial holders, as there is from the Committee

4  of Unsecured Creditors going to other class members or other

5  classes of holders, I suppose.

6          Frankly, there's no assurance that beneficial

7  holders will even receive notice or the opt-out ballot by the

8  February 27th deadline.  As the U.S. Trustee's Office made

9  clear, there a process -- it's a complicated process --

10  whereby the nominee, E*TRADE, let's have it, will receive

11  a --

12          THE COURT:  Or DTC or somebody.

13          MR. APTON:  Well, precisely, Your Honor.

14          And so, they, then, have to turn around and make

15  sure that beneficial shareholders receive the notice.  The

16  beneficial shareholders then have to examine the notice and

17  hopefully get it back to E*TRADE in time for E*TRADE to turn

18  around to send it to the debtor, all within a period of,

19  what, 30 days?

20          I routinely, in my practice, deal with

21  administrative processes, notice processes.  You cannot do a

22  claims process in less than 110 days.  That is, by practice,

23  pretty much the minimum amount of time you need as a

24  shareholder representative to get the complete circle.

25          More importantly, the opt-out ballots and the

1  notices that these beneficial shareholders will receive, it

2  does not describe what it is they are giving up, the

3  Securities class-action claims.  These are their only ability

4  to recover anything under this bankruptcy plan and there's no

5  description of it.

6          Yes, there is a reference in the disclosure -- in

7  the notice that they could obtain additional information by

8  going to this website or calling this toll-free number.

9          That's not sufficient.  These people need to be

10 told, at this point in time, that if they do not opt out,

11 they're going to lose their only chance at any recovery from

12 the fraud and gross negligence that occurred by Proterra and

13 its directors and officers between August 2021 and August

14 2023.  That's, provisionally, our class period at this point

15 in time.

16          Your Honor, without in additional information,

17 these shareholders, like I said, will not have a fair shot at

18 protecting these claims.  They'll be left with nothing.

19          THE COURT:  Very good.

20          MR. APTON:  Thank you, Your Honor.

21          THE COURT:  Sure.

22          Does anyone else wish to be heard?

23      (No verbal response)

24          THE COURT:  Okay.  Here's what we're going to do.

25          I'm not prepared to prove an opt-out structure

1  here and I'll give you my reasons.  First, as Ms. Casey

2  noted, and as counsel noted, I have opined on this issue and

3  I have stuck largely with the prospect that an opt-out is, in

4  fact, an appropriate tool available in connection with plan

5  confirmation and release provisions, but the circumstances

6  that are presented before me with pending litigation,

7  admittedly, not a certified class, but a host of

8  communications to the Court from shareholders expressing

9  concerns and the prospect that there is no meaningful -- or,

10 I'm sorry, not meaningful -- there is no distribution

11 expected to these individuals raises a concern about whether

12 or not an opt-out is appropriate.

13         In its most blunt terms, in Indianapolis Downs, I

14 found that stakeholders, I believe it was creditors, were

15 required to opt out of a release structure.  And to boil it

16 down, it was, you need to open your mail and you need to act.

17 I don't think that is a controversial proposition.  I

18 recognizes and fully respect that a number of my colleagues

19 here feel differently about that proposition as a threshold

20 matter.

21         But as Ms. Casey, I think, in particular, noted,

22 these are materially different circumstances than I faced in

23 Indianapolis Downs and in other cases.  And in a situation

24 where there is no anticipated, or there is no provided for

25 distribution to these individuals, I've not been presented

1  with the argument about whether there's a failure of

2  consideration, but it resonates.

3           But, regardless, to the extent that someone is not

4  receiving any distribution under a plan, the fact that they

5  would have to take an affirmative action in order to avoid

6  giving a release, I think, is a step further than I am

7  comfortable with.  I would direct that the plan and the

8  materials be modified so that parties, and particularly

9  equity securities holders, would be providing, and the folks

10 whose claims follow from their ownership of stock at some

11 time, be afforded the opportunity to opt in to the releases

12 and I expect that the parties will be able to manage that

13 process of revising the forms and the papers.

14          Again, I don't want to beat a dead horse here.

15 There are, I think, two approaches that we have taken, my

16 colleagues and I, in this court.  I believe that opt out is

17 appropriate, consistent with applicable law and consistent

18 with the way that things are administered in a bankruptcy

19 proceeding.  Failure to act in a thousand different contexts

20 in a bankruptcy proceeding constitutes consent to the relief

21 that's being sought.

22          In this situation, obviously, we deal with

23 releases.  I don't know if you've noticed, but it's kind of a

24 hot topic right now and we may be advised from the Supreme

25 Court about the appropriateness and the scope of those.

1  That's an issue that's not in front of me today.

2        I have a question of asking shareholders to opt

3  out of a release in a plan that provides them nothing.  I am

4  cognizant of the concerns, particularly that counsel

5  expressed about the mechanics of communicating with the

6  shareholders and getting them to do that and go through that

7  exercise.  I make no comment on that.  I have dealt with it

8  on many occasions.

9        As a general proposition, my experience has been

10  that shareholders are able to engage and participate, but I'm

11  certainly aware from my time here and my time is practice

12  that communicating with shareholders of a public company is a

13  complicated and challenging exercise; nevertheless, the case

14  itself needs to move forward.  But in this instance, I'm not

15  prepared to approve and authorize an opt-out structure

16  because I don't think that the facts and circumstances

17  support it.

18        That is not a change or deviation from the way

19  that I have approached these questions; again, generally, I

20  have held consistent from Indianapolis Downs and later that

21  an opt-out structure is and can be utilized.  I know the

22  United States Trustee has consistently opposed that, and I

23  respect that, and, again, Mr. Harrington may afford -- having

24  gone all Hollywood on us --

25        (Laughter)

1          THE COURT:  -- Mr. Harrington may ultimately lead

2   to further for the courts about this particularly fraught

3   question.  But for purposes of today, I'm satisfied that the

4   mechanics of the solicitation process should be revised to

5   require and structure an opt-in for the releases and we will

6   go from there.

7          As to the balance of the issues, I have had the

8   opportunity to review the redlines that were submitted.  I

9   very much appreciate getting them.  They appear to largely

10  resolve the issues that have been raised.  I'm not going to

11  require further disclosure by, as requested by either the

12  United States Trustee or the objectors.  I think that the

13  opt-in structure is responsive to those concerns and

14  considerations.

15          I'm satisfied with the revisions that have been

16  made and that they're appropriate.  I expect that

17  Mr. Colarossi and I have may have some points that we need to

18  walk through right now, but otherwise, other than that, I'm

19  satisfied that the disclosure statement certainly contains

20  information adequate to permit a hypothetical stakeholder to

21  make an informed decision to vote for or against the plan.

22  But in terms of the mechanics of the release, you have my

23  ruling.

24          Mr. Colarossi?

25          MR. COLAROSSI:  Thank you, Your Honor.

1            We'll work cooperatively with the other PSA

2   parties regarding incorporating Your Honor's comments and

3   decision today.

4            Just as a point of clarification, with respect to

5   the change to opt in, to confirm, you want the -- that

6   applies specifically to "deem to reject" classes and our

7   current structure works for the other classes?

8            THE COURT:  Yes.

9            MR. COLAROSSI:  Thank you.

10           THE COURT:  Okay.  All right.

11           So I will look for a form of order and the

12  attachments that will reflect all of that.

13           If it goes off the rails or if there's some

14  intractable issue, I don't want letters or anything else; I

15  would ask that you get me on the phone.  I'm familiar with

16  the bid and the ask.  I certainly understand the issues, but

17  I mean, I would deal with it by phone, because I would rather

18  keep this process moving if you have issues with respect to

19  the forms that you're going to be wordsmithing, okay?

20           MR. COLAROSSI:  Absolutely.  And we'll get right

21  on it.

22           THE COURT:  All right.  Anything else this

23  morning?

24           MR. COLAROSSI:  No, Your Honor.

25           THE COURT:  All right.  I appreciate everyone's

1  time.

2           And with that, we're adjourned.  I'll look for the

3  order under certification.

4           Stand in recess.

5       (Proceedings concluded at 11:39 a.m.)

1                              CERTIFICATION

2              I certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of my

5    knowledge and ability.

6

7    /s/ William J. Garling                    January 29, 2024

8    William J. Garling, CET-543

9    Certified Court Transcriptionist

10   For Reliable