IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PROTERRA INC, *et al.*,[1] | ) | Case No. 23-11120 (BLS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |

**PHILADELPHIA INDEMNITY INSURANCE COMPANY'S *CORRECTED*
LIMITED OBJECTION AND RESERVATION OF RIGHTS TO THE
FOURTH AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION FOR
PROTERRA INC. AND ITS DEBTOR AFFILIATE**

**COMES NOW** Philadelphia Indemnity Insurance Company ("Philadelphia"), by and through the undersigned counsel, and hereby submits this *Philadelphia Indemnity Insurance Company's Limited Objection and Reservation of Rights to the Fourth Amended Joint Chapter 11 Plan of Reorganization for Proterra Inc and Its Debtor Affiliate* (the "Limited Objection"). In support of this Limited Objection, Philadelphia respectfully states as follows:

**PRELIMINARY STATEMENT**

1.     Philadelphia asserts that certain language as outlined below should be included in any order confirming the Plan to specify and preserve Philadelphia's and other sureties' rights with respect to the Plan and other related documents. Specifically, the Plan as written likely violates sections 365 and 1129(a)(1) of the Bankruptcy Code because it could be construed to impair Philadelphia's rights and obligations with respect to the Bonds, the Indemnity Agreement, and Collateral (all as defined below). Philadelphia seeks to clarify the Plan's treatment of any Bonded Contract (as defined below) assumed, assumed and assigned, or rejected or to be assumed, assumed

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Proterra Inc (9565); and Proterra Operating Company, Inc. (8459). The location of the Debtors' service address is: 1815 Rollins Road, Burlingame, California 94010.

1

and assigned, or rejected and how such relates to Philadelphia's rights and obligations regarding the Bonds, Indemnity Agreement, and Collateral.

2. Moreover, the Plan and its process of assumption is, at least as they relate to Philadelphia and the Debtors' other sureties, fundamentally flawed because the Debtors propose to potentially assume certain Bonded Contracts while rejecting others. The assumption of Bonded Contracts requires continuation of Bonds for the Debtors, which in turn requires adequate protection in the form of indemnity and collateral for those Bonds.

3. The Plan must provide a mechanism that assures the continued effectiveness of the Bonds for the Bonded Contracts the Debtors are assuming, which requires either the execution of new indemnity agreements and providing collateral for the Bonds to be continued, each in form and substance acceptable to Philadelphia, or the assumption/reaffirmation of the existing Indemnity Agreement and treatment the Philadelphia's claims against the Debtors thereunder as unimpaired. For those Bonds relating to Bonded Contracts subject to assumption and assignment to a third-party purchaser, the Plan should not preclude, whether by injunction, release, or otherwise, Philadelphia from asserting rights and remedies with respect to the Bonds that are no longer in place for the purchasers pursuant to the Phoenix Sale Order.

4. For those Bonded Contracts that the Debtors reject, Philadelphia will have claims against the Debtor under the Indemnity Agreement executed for all Bonds, including the Bonds relating to assumed Bonded Contracts. Philadelphia also has collateral to secure all obligations under the Indemnity Agreement. In short, to assume/reaffirm the existing Indemnity Agreement, the Debtors would have to cure all defaults under it, which would include Philadelphia's recovery against its Collateral for indemnity claims that Philadelphia would have under the Indemnity Agreement relating to the Bonds for the rejected Bonded Contracts.

5.      If the Debtors do not intend to continue the Bonds in place, or do not need Philadelphia's Bonds going forward, then the Debtors may simply reject the underlying Bonded Contracts in total, but Philadelphia's rights in its Collateral for claims under the Bonds should not be impaired, and again, nor should Philadelphia's rights under the Phoenix Sale Orders be modified by the Plan.

### PHILADELPHIA'S BONDS, INDEMNITY AGREEMENT, AND COLLATERAL

6.      Prior to these chapter 11 cases, Philadelphia issued various surety bonds (the "Bonds", and each a "Bond"), as provided in **Exhibit 1**,[2] in the aggregate penal amount of not less than $32,343,956.34 on behalf of the above-referenced Debtors to assure the performance and payments of the Debtors' obligations owed to the various obligees under the Bonds with respect to certain contracts, permits, and/or licenses (collectively, the "Bonded Contracts").

7.      In consideration of Philadelphia issuing the Bonds on behalf of the Debtors, Debtor Proterra Inc. ("Proterra") executed that certain *General Indemnity Agreement Commercial Surety* dated September 30, 2016 (the "Indemnity Agreement"), on behalf of itself and any subsidiary or affiliate, including Debtor Proterra Operating Company, Inc. (the "Indemnitors"), and agreed, among other things, to indemnify and hold harmless Philadelphia from and against any Loss (as defined in the Indemnity Agreement) related to **any and all** Bonds and/or the Indemnity Agreement.  A redacted copy of the Indemnity Agreement is attached as **Exhibit 2**.

8.      Along with the contractual indemnity and other contractual rights and remedies provided under the Indemnity Agreement, Philadelphia has certain rights and remedies against both Debtors as named principals under the respective Bonds, especially indemnity, exoneration, and the right of equitable subrogation under common law, which includes, but is not limited to,

---

[2] Exhibit A contains the Bonds identified by Philadelphia to the best of its knowledge, as currently in force.  The list of Bonds provided is not intended to be exhaustive and may not include all active Bonds.

3

the right to assert a subrogor's claim for setoff or recoupment.

9. Moreover, as security for the Bonds issued on behalf of the Debtors, the Debtors provided Philadelphia with (a) $12,433,804.00 in cash held in a deposit account controlled by Philadelphia, (b) an irrevocable letter of credit issued by Bank of America, N.A. in the amount of $2,610,221.00 (the "BoA ILOC"), and (c) an irrevocable letter of credit issued by First-Citizens Bank & Trust Company (Successor by Purchase to the Federal Deposit Insurance Corporation as Receiver for Silicon Valley Bridge Bank, N.A. (as Successor to Silicon Valley Bank)) in the amount of $131,470.00 (the "FCB ILOC", and items a, b, and c, collectively with the rights and remedies discussed above and any and all proceeds of the foregoing, the "Collateral").

## SALE TREATMENT OF EXECUTORY CONTRACTS

10. On January 9, 2024, this Court approved two asset purchase agreements by and among the Debtors as sellers and Phoenix Motor, Inc. ("Phoenix") as purchaser (the "Transit APA", the "Battery APA", and collectively, the "Phoenix APAs") through entry of the *Order (A) Authorizing and Approving the Debtors' Entry into the Asset Purchase Agreements (B) Authorizing the Sale of the Debtors' Transit and Battery Lease Assets Free and Clear of All Liens, Claims, Interests, and Encumbrances, (C) Approving the Assumption and Assignment of the Assumed Executory Contracts and Unexpired Leases, and (D) Granting Related Relief* [Doc. No. 833] (the "Phoenix Sale Order").[3]

11. Philadelphia, along with other sureties, negotiated the following surety specific language for inclusion in the Phoenix Sale Order:

> 29. Nothing in this Order, the APAs, or any document, agreement, or instrument contemplated by any of the foregoing shall: (i) be construed to authorize

---

[3] Other sales have taken place in these cases. To Philadelphia's knowledge, these other sales do not involve any Bonded Contracts, the Bonds, the Indemnity Agreement, or the Collateral. However, to the extent that any of these other sales do implicate any Bonded Contracts, the Bonds, the Indemnity Agreement, or the Collateral, Philadelphia objects, *mutatis mutandis*, for the same reasons provided herein.

4

or permit (a) the assumption and/or assignment of any surety bond issued by (x) Philadelphia Indemnity Insurance Company, (y) Atlantic Specialty Insurance Company, or (z) Lexon Insurance Company (collectively, the "Sureties" and, each individually, a "Surety") on behalf of the Debtors (collectively, the "Surety Bonds" and, each individually, a "Surety Bond"), (b) the assumption and/or assignment of any indemnity agreements executed by one or more of the Debtors pursuant to which the Surety Bonds were issued (the "Indemnity Agreements" and, each individually, an "Indemnity Agreement"), or (c) obligate a Surety to replace any Surety Bond and/or issue any new surety bond on behalf of a Buyer; or (ii) be deemed to provide a Surety's consent to the involuntary substitution of any principal under any Surety Bond and/or any Indemnity Agreement, including, for the avoidance of doubt, that the Buyer shall not be a substitute principal under any Surety Bond or any Indemnity Agreement absent a Surety's consent thereto or further order of the Court. The Debtors and the Buyer reserve the right to add as an Assumed Contract any Indemnity Agreement, Surety Bond, or similar instrument (collectively, the "Surety Agreements"), and the inclusion of any of the Surety Agreements as an Assumed Contract shall not prejudice (I) the rights of the Sureties to object or respond to such proposed assumption and/or assignment of any Surety Agreement issued by the Surety, including, without limitation, the right to object to an involuntary substitution of principal under any Surety Bond or (II) the rights of the Debtors or any other party-in-interest's right to challenge any of the foregoing actions (or lack thereof).

30. Additionally, nothing in this Order, the APAs, or any other document, agreement, or instrument contemplated by any of the foregoing shall be deemed to alter, limit, modify, release, waive, or prejudice any rights, remedies, and/or defenses that the Sureties have or may have under applicable bankruptcy and non-bankruptcy laws, under any of their respective Surety Agreements, or related agreements, or any letters of credit, or other Surety collateral relating thereto.

12. Exhibit C to the Phoenix Sale Order provided the schedule of contracts being assumed and assigned to Phoenix as part of the Phoenix APAs not subject to any assignment or cure objection (the "<u>Non-Contested Assumed Contracts</u>"), and Exhibit D provided the schedule of potentially assumed and assigned contracts subject to either an assignment or cure objection (the "<u>Delayed Contracts</u>"), with an outside date of February 16, 2024, for either (a) the various parties to resolve the applicable assignment or cure objection and assume and assign the relevant contract to Phoenix or (b) the Debtors to reject (the "<u>Delayed Contracts Rejection Date</u>").

5

13. On January 11, 2024, the Debtors filed, in relevant part, a revised schedule of the Non-Contested Assumed Contracts related to the Transit APA [Doc. No. 848 Exhibit C-1] and a revised schedule of the Delayed Contracts[4] [Doc. No. 848 Exhibit D]. More specifically, the revised schedule of Non-Contested Assumed Contracts includes contracts related to the following obligees under the Bonds that likely constitute Bonded Contracts:

- Biddeford Saco Old Orchard Beach, lines 22-25,
- City of Visalia, lines 74, 469-470,
- Delaware Transit Authority, lines 113-115, 117-134,
- Rock Region Metro, lines 326-333,
- County of Sacramento, line 81, and
- Santa Clara Valley Transportation Authority, line 351.

The revised schedule of Non-Contested Assumed Contracts does not include any associated Bonds or the Indemnity Agreement.

14. The revised schedule of Delayed Contracts includes contracts related to the following obligees under the Bonds that likely constitute Bonded Contracts:

- BC Transit, line 1,
- Chicago Transit Authority, line 7, and
- Metropolitan Washington Airports Authority, line 8.

15. Further, on February 20, 2024, the Debtors filed the *Debtors' Thirty-First Omnibus Motion for Entry of an Order (I) Authorizing the Debtors to Reject Certain Executory Contracts, and (III)* [sic] *Granting Related Relief* (the "Thirty-First Rejection Motion"), which, in part, seeks (a) an extension to the Delayed Contracts Rejection Date to March 5, 2024, and (b) authority to reject any Delayed Contracts not assumed and assigned to Phoenix by March 5, 2024. More specifically, the Thirty-First Rejection Motion lists the following Delayed Contracts related to the following obligees under the Bonds that likely constitute Bonded Contracts:

- BC Transit, lines 1-18,

---

[4] It is not immediately clear from the filings which of the Phoenix APAs the Delayed Contracts are related to.

6

- Chicago Transit Authority, lines 19-45,
- Metropolitan Washington Airports Authority, lines 46-48, and
- Miami Dade County, lines 49-52.

The Thirty-First Rejection Motion does not list any associated Bonds or the Indemnity Agreement.

## PLAN TREATMENT OF EXECUTORY CONTRACTS

16. On February 8, 2024, the Debtors filed the *Fourth Amended Joint Chapter 11 Plan of Reorganization for Proterra Inc and Its Debtor Affiliate* [Doc. No. 1039 Exhibit A] (the "Plan"), and on February 16, 2024, the Debtors filed a supplement to the Plan consisting, in part, of a Schedule of Assumed Executory Contracts and Unexpired Leases [Doc. No. 1076-3 Exhibit C] and a Schedule of Retained Causes of Action [Doc. No. 1076-2 Exhibit B].

17. The Schedule of Assumed Executory Contracts and Unexpired Leases provides those contracts to be assumed by the reorganized Debtors or transferred to the Distribution Trust (as defined in the Plan), as the case may be, and includes contracts related to the following obligees under the Bonds that may constitute Bonded Contracts: a contract with AES Engineering Ltd associated with BC Transit, a contract with Biddeford Saco Old Orchard Beach Transit, and a contract with Decker Electric, Inc._Biddeford Saco Old Orchard Beach Transit [Doc. No. 1076-3 at 4-5]. The Schedule of Assumed Executory Contracts and Unexpired Leases does not include any Bonds or the Indemnity Agreement.

18. The Schedule of Retained Causes of Action, in part, provides "all Causes of Action against any creditor . . . or other Entity based upon, in whole or in part, any and all postings of a security deposit, adequate assurance payment, or any other type of deposit, prepayment, or collateral owed by such creditor . . . or other entity" that the Debtors intend to preserve for the Reorganized Debtors and/or the Distribution Trust, as the case may be [Doc. No. 1076-2 at 4].

More specifically, the Schedule of Retained Causes of Action includes the following relevant line items:

- Cash Proceeds of letter of credit associated with BC Transit,
- Cash Proceeds of the BoA ILOC,
- Cash Proceeds of FCB ILOC,
- Bond No. PB01989700046 (Spokane Transit Authority),
- Bond No. PB01989700045 (Transportation District of Commission of Hampton Roads),
- Bond No. PB02182000050 (Delaware Transit Authority),
- Bond No. PB00438200005 (Board of County Commissions of Miami-Dade County),
- Bond No. PB00438200020 (Santa Clara Valley Transportation Authority),
- Bond No. PB00438200024 (Metropolitan Washington Airports Authority),
- Bond No. PB00438200013 (City of Visalia),
- Bond No. PB02182000047 (State of California, Contractors License Board),
- Bond No. PB01989700035 (State of California),
- Bond No. PB00438200017 (State of Oregon),
- Bond No. PB00438200008 (State of Washington, Contractors Board),
- Bond No. PB02182000037 (Chicago Transit Authority),
- Bond No. PB00438200019 (State of California, Contractors License Board),
- Bond No. PB02182000051 (Southeastern Pennsylvania Transportation Authority),
- Bond No. PB02182000042 (State of California, Contractor's License Board),
- Bond No. PB02182000052 (Sacramento Regional Transit District).

19. The Plan itself does not mention Philadelphia, the Bonds, the Indemnity Agreement, or the Collateral. However, Article V.A. of the Plan addresses treatment of executory contracts and unexpired leases. That section provides:

> As of the Effective Date, except as provided herein, the Debtors shall be deemed to have rejected all Executory Contracts and Unexpired Leases, except for any Executory Contract or Unexpired Lease which (a) is a D&O Policy or an Insurance Contract, (b) has been identified on the Schedule of Assumed Executory Contracts and Unexpired Leases, if any (which shall be included in the Plan Supplement), (c) has been otherwise rejected, assumed, or assumed and assigned, including in connection with any Sale, or designated for assumption or assumption and assignment pursuant to the terms of any Sale Order, or (d) is the subject of a motion filed by the Debtors prior to the Effective Date to assume, assume and assign, or reject such Executory Contract or Unexpired Lease on which the Bankruptcy Court has not ruled and is still pending.
>
> The Confirmation Order shall constitute an order of the Bankruptcy Court approving (a) the foregoing rejections and (b) the assumption of the Executory Contracts and Unexpired Leases listed on the Schedule of Assumed Executory

> Contracts and Unexpired Leases, each pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date. Each Executory Contract and Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order, and not assigned to a third party on or prior to the Effective Date, shall be (a) assumed by the Debtors, in the event that a Reorganization occurs, or (b) transferred to the Distribution Trust and be deemed a Distribution Trust Asset, in the event that a Plan Support Agreement Termination has occurred. To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the counterparty thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. Notwithstanding anything to the contrary in the Plan, the Debtors reserve the right to alter, amend, modify, or supplement the Assumed Executory Contract and Unexpired Lease List prior to the Confirmation Date on no less than seven days' notice to any counterparty to an Executory Contract or Unexpired Lease affected thereby.

[Doc. No. 1039 at 63-64]. Article V.C. goes on to provide that the "Effective Date Notice shall indicate that all Executory Contracts that do not fall into categories (a), (b), or (c) as set forth in <u>Article V.A.</u> hereof are deemed rejected as of the Effective Date" [Doc. No. 1039 at 64].

20. Article V.D. in turn states, in part:

> The Debtors or Reorganized Debtors, as applicable, reserve the right to reject any Executory Contract or Unexpired Lease in their discretion, subject to the consent rights set forth in the Plan Support Agreement, including in connection with the resolution of any cure disputes. Notwithstanding anything to the contrary herein, if at any time the Bankruptcy Court determines that the Allowed Cure Claim with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the applicable Cure Notice or Plan Cure Notice, the Debtors or Reorganized Debtors, as applicable, will have the right, at such time, to remove such Executory Contract or Unexpired Lease from the Schedule of Assumed Executory Contracts and Unexpired Leases, in which case such Executory Contract or Unexpired Lease shall be deemed rejected as the Effective Date.

> Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims against any Debtor or defaults, whether monetary or nonmonetary, including defaults of provisions restricting a change in control or any bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date that the Debtors or Reorganized Debtors assume such Executory Contract or Unexpired Lease[.]

9

[Doc. No. 1039 at 65].

21. In sum, regarding executory contracts, Article V of the Plan:

- rejects all executory contracts not otherwise provided for,
- allows the Debtors to modify which executory contracts will be assumed or assumed and assigned as part of the Plan up to seven days prior to the Confirmation Date (as defined in the Plan),
- allows the Debtors to assume, assume and assign, or reject certain executory contracts, including, ostensibly, the Delayed Contracts, post-confirmation,
- modifies any assumed executory contract to effectively remove any change-in-control provisions, and
- provides for a full release and satisfaction of (a) any Claims against the Debtors and (b) any defaults, including those related to any change-in-control provision, arising under any assumed executory contract.

## **PLAN TREATMENT AND SECURED CLAIM**

22. Articles III.B. and III.C. create nine different voting classes, with classes 1 and 5 relevant here.

23. Class 1 consists of all Other Secured Claims, and the Plan proposes to either (a) pay holders of Allowed Other Secured Claims "in full in Cash payment in full in Cash, on the later of the Effective Date and the date that is ten Business Days after the date on which such Other Secured Claim becomes an Allowed Other Secured Claim or, in each case, as soon as reasonably practicable thereafter, and, if such payment is not made on the Effective Date, from the Distribution Trust," (b) reinstate the holders Allowed Other Secured Claim; (c) return the collateral securing the holder's Allowed Other Secured Claim; or (d) treat the Allowed Other Secured Claim to render it unimpaired [Doc. No. 1039 at 33-34]. Holders of Other Secured Claims in Class 1 are unimpaired and therefore presumed to have accepted the Plan [Doc. No. 1039 at 33-34]. Class 5 consists of all General Unsecured Claims and is impaired and entitled to vote to accept or reject the Plan [Doc. No. 1039 at 36-37]. To the extent of available funds, holders of General Unsecured Claims will be paid a *pro rata* share from the Distribution Trust [Doc. No. 1039 at 36-37].

24.     Given the Collateral, Philadelphia appears to be a holder of an Other Secured Claim in Class 1 to the extent the Collateral satisfies its claim against the Debtors and a holder of a General Unsecured Claim in Class 5 to the extent the Collateral does not so satisfy its claim.

## **PLAN RELEASE, EXCULPATION, AND INJUNCTIONS**

25.     Article I.A.134. of the Plan defines "Releasing Parties" as, in relevant part, (i) the Debtors, (ii) holders of Claims or Interests that (a) accepted the Plan, (b) neither accepted nor rejected the Plan and did not opt-out of any Plan release, (c) rejected the Plan and did not opt-out of any Plan release, (d) are deemed to have rejected the Plan but opt-in to any Plan release, and (e) are Unimpaired under the Plan (as defined therein), (iii) all Affiliates of those listed in (i) and (ii) to the extent those listed in (i) and (ii) had authority to so bind the Affiliate, and (iv) all predecessors, successors, assigns, subsidiaries, affiliates, current and former officers and directors, principals, equity holders, members, partners, managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, other professionals, and the heirs, executors, estates, and nominees of the foregoing of those listed in (i), (ii), and (iii) to the extent those listed in (i), (ii), and (iii) had authority to so bind the person [Doc. No. 1039 at 22]. Article I.A.134. excludes any entity that files or supports a Plan objection that is not consensually resolved prior to confirmation [Doc. No. 1039 at 22].

26.     Article I.A.133. of the Plan in turn defines "Released Parties" as the Releasing Parties collectively [Doc. No. 1039 at 22].

27.     Article IX of the Plan then provides (a) broad-sweeping releases from the Debtors to the Released Parties (Article IX.B.) and from the Releasing Parties except for the Debtors to the Released Parties (Article IX.C.), (b) a similarly broad exculpation provision (Article IX.D), (c) an

11

injunction effective in the event that a "Reorganization occurs" (Article IX.E.), (d) an injunction effective in the event that a "Plan Support Agreement Termination occurs," (e) a provision governing parties rights to setoff, and (h) a release with respect to Liens or other security interests against property of the Debtors' estates (Article IX.H.) [Doc. No. 1039 at 75-84] (items a-h, collectively, the "Plan Releases and Injunctions").

28. To be clear, Philadelphia does not consent and opts-out of the Plan Releases and Injunctions and therefore objects to being included as a Releasing Party or Released Party

## PHILADELPHIA'S LIMITED OBJECTION

29. Philadelphia's Limited Objection can be placed into three separate categories: objections, as each relates to the Bonded Contracts, Bonds, Indemnity Agreement, and/or Collateral, with respect to (a) rejected executory contracts, (b) assumed and assigned or potentially assumed and assigned executory contracts related to the Transit APA, and (c) executory contracts to be assumed as part of the Plan by the Debtors, Reorganized Debtors, and/or the Distribution Trust, as the case may be. Each category of objection will be taken in turn below.

## LIMITED OBJECTION: REJECTED EXECUTORY CONTRACTS

30. As discussed above, the Debtors' Plan rejects any executory contract not otherwise assumed or assumed and assigned as part of the Plan or some other transaction, which may include certain of the Bonded Contracts and/or the Bonds.

31. Rejection of any Bonded Contract is likely to trigger claims against the applicable Bond by the obligee, or some other Bond beneficiary, which in turn would trigger a claim by Philadelphia against the Debtors under the Indemnity Agreement. In which case, Philadelphia would seek recovery against **its** Collateral to reimburse itself for any loss associated with such claims.

32. Accordingly, it is imperative that nothing impair Philadelphia's rights and interests in and to **its** Collateral, and Philadelphia seeks clarity with respect to its status as a holder of an Other Secured Claim and its ability to recover against **its** Collateral in relation to the Plan Releases and Injunctions.

**LIMITED OBJECTION: ASSUMED AND ASSIGNED EXECUTORY CONTRACTS**

33. As discussed above, certain Bonded Contracts appear to have already been assumed and assigned to Phoenix in relation to the Transit APA, and it remains unclear to Philadelphia whether Phoenix has provided the required replacement bonds. It additionally remains unclear whether certain other Bonded Contracts will be so assumed and assigned or rejected. As noted above, none of the associated Bonds may be assumed, assumed and assigned, or rejected. The Bonds must either be replaced by a purchaser and released or treated as assumed/reaffirmed with Philadelphia's consent on terms acceptable to Philadelphia (which include, without limitation, the assumption/reaffirmation of the Indemnity Agreement and/or execution of a new indemnity agreement).

34. Assumption and assignment of the Delayed Contracts remains a moving target, potentially even post confirmation, and as provided in paragraph 29 of the Phoenix Sale Order:

> The Debtors and the Buyer reserve the right to add as an Assumed Contract any Indemnity Agreement, Surety Bond, or similar instrument (collectively, the "Surety Agreements"), and the inclusion of any of the Surety Agreements as an Assumed Contract shall not prejudice (I) the rights of the Sureties to object or respond to such proposed assumption and/or assignment of any Surety Agreement issued by the Surety, including, without limitation, the right to object to an involuntary substitution of principal under any Surety Bond or (II) the rights of the Debtors or any other party in-interest's right to challenge any of the foregoing actions (or lack thereof).

35. Thus, it is not clear to Philadelphia how the Debtors intend to treat the Bonds when certain of the Bonded Contracts may be assumed, certain of the Bonded Contracts may be have been assumed and assigned, and still others may be rejected. The Debtors' process for assumption

13

and rejection simply ignores the nature of Philadelphia's Bonds and the Indemnity Agreement, and it creates uncertainty to such a degree that it is impractical and raises questions of feasibility relative to the Plan.

36. Philadelphia reiterates that none of the Bonds may be assumed and assigned to Phoenix without Philadelphia's consent,[5] for which it is not currently willing to provide, and providing adequate assurance of future performance to Philadelphia under the Bonds in the form of either an assumption/reaffirmation of the existing Indemnity Agreement or the execution of a new indemnity agreement, otherwise the assumption and assignment to Phoenix impairs Philadelphia's claim and violates sections 365 and 1129(a)(1) of the Bankruptcy Code.

---

[5] First, the Debtors cannot assume and assign the Bonds because they do not constitute property of the estate. *See O'Malley Lumber Co. v. Lockard (In re Lockard)*, 884 F.2d 1171, 1178 (9th Cir. 1989); *Ohio v. Mansfield Tire and Rubber Co. (In re Mansfield Tire and Rubber Co.)*, 660 F.2d 1108, 1115 (6th Cir. 1981); *Globe Constr. Co. v. Okla. City Hous. Auth.*, 571 F.2d 1140, 1143 (10th Cir. 1978), *cert. denied*, 439 U.S. 835 (1978); *In re Buna Painting & Drywall Co.*, 503 F.2d 618, 619 (9th cir. 1974); *McLean Trucking Co. v. Dep't of Indus. Relations (In re McLean Trucking Co.)*, 74 B.R. 820, 826 (Bankr. W.D.N.C. 1987); *Moran v. Johns-Manville Sales Corp.*, 28 B.R. 376, 378 (N.D. Ohio 1983); *Fintel v. Oregon (In re Fintel)*, 10 B.R. 50, 51 (Bankr. D. Or. 1981). Second, even if the Bonds are property of the estate, they are executory contracts that constitute non-assumable/non-assignable financial accommodations. *See* 11 U.S.C. § 365(c)(2) (debtors "may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if such contract is a contract to . . . extend . . . financial accommodations, to or for the benefit of the debtor"); *In re United Airlines*, 368 F.3d 720, 723-24 (7th Cir. 2004) ("Although the Bankruptcy Code does not define 'financial accommodation,' it is common ground among the parties that a guaranty or other form of suretyship fits the bill."); *In re Thomas B. Hamilton Co., Inc.*, 969 F.2d 1013, 1018-19 (11th Cir. 1992) (finding guaranty and surety contracts constitute financial accommodations); *In re Edwards Mobile Home Sales, Inc.*, 119 B.R. 857, 858-59 (Bankr. M.D. Fla. 1990) (finding that obligations to pay another's debts constitute financial accommodations); *Wegner Farms Co. v. Merchants Bonding Co. (In re Wegner Farms Co.)*, 49 B.R. 440, 444 (Bankr. N.D. Iowa 1985) (finding surety bonds constitute non-assumable financial accommodations); *In re Adana Mortg. Bankers, Inc.*, 12 B.R. 977, 987 (Bankr. N.D. Ga. 1980) (finding guaranty agreements constitute non-assumable financial accommodations). Third, the Bonds only assure payment and/or performance of the named principal thereunder for which Philadelphia conducted underwriting, due diligence, and risk assessment of prior to issuing any surety credit. Forcing Philadelphia to assure a different party's payment and/or performance materially alters the risks under the Bonds without Philadelphia's consent or ability to conduct underwriting, due diligence, and risk assessment. It is a pillar of surety law that such constitutes an involuntary substitution of principal that discharges Philadelphia's obligations under the Bonds. Thus, even if the Debtors were to attempt assumption and assignment, such would be ineffective because Philadelphia would be discharged and owe no obligations to Phoenix under to the Bonds. *See In re Liquidation of Union Indem. Ins. Co.*, 749 N.Y.S.2d 250, 251 (N.Y. App. Div. 2002); *Nat'l Fuel Gas Distribution Corp. v. Hartford Fire Ins. Co.*, 815 N.Y.S.2d 495 (Sup. Ct. 2005), *aff'd as modified*, 814 N.Y.S.2d 436 (2006); RESTATEMENT (THIRD) OF SURETYSHIP & GUARANTY § 37 (1996); SURETY ASPECTS OF BANKRUPTCY LAW AND PRACTICE 147-48 (Chad L. Schexnayder & Michael E. Collins eds., 2021).

37. Additionally, because Philadelphia has neither consented to the assumption and assignment of any Bonds to Phoenix and the underlying Bonded Contracts may have already, or may be, assumed and assigned to Phoenix, Philadelphia's obligations under the Bonds have been discharged and the obligees under the Bonds now are party to, or will be party to, unbonded contracts with Phoenix. However, the broad, wide-sweeping Plan Releases and Injunctions set forth in Article IX could be construed as preventing Philadelphia from exercising its rights and remedies with respect to Phoenix and the applicable Bond obligees/Bonded Contract counterparties, all of which are non-Debtors. Pursuant to the surety provisions in the Phoenix Sale Order discussed above, the Plan should not preclude Philadelphia from asserting its rights and remedies, including, without limitation, the right to send notices to the requisite parties, informing them of Philadelphia's discharged obligations under the Bonds. Accordingly, Philadelphia seeks further clarity regarding the scope of the Plan Releases and Injunctions as such relate to Philadelphia, the Bonds, the Indemnity Agreement, and the Collateral.

38. For the avoidance of doubt and to ensure an equitable outcome, Philadelphia requests the language discussed below be incorporated into any order confirming the Plan.

### **LIMITED OBJECTION: EXECUTORY CONTRACTS ASSUMED IN THE PLAN**

39. The Plan purports to assume certain executory contracts that potentially constitute Bonded Contracts but does not address the associated Bonds required by the Bonded Contracts.

40. Similar to the above, Philadelphia will not consent to assumption of the associated Bonds without the Debtors providing adequate assurance of future performance, including, without limitation, unimpaired treatment of Philadelphia's existing Collateral, the posting of additional collateral, and/or either an assumption/reaffirmation of the existing Indemnity Agreement or the execution a new indemnity agreement, which in either case, the Debtors/Reorganized Debtors

15

obligations under the agreement will involve taking liability for Philadelphia's losses related to all of the Bonds issued on behalf of the Debtors, not just the Bond or Bonds that the Debtors wish to assume, because the existing Indemnity Agreement and indemnity agreements more generally apply to all issued Bonds, past, present, and future, and must be assumed/reaffirmed, if at all, *cum onere*. For instance, those Bonded Contracts rejected by the Debtors will trigger claims on the Bonds, which in turn triggers Philadelphia's claim against the Debtors under the Indemnity Agreement. In order to assume a Bond associated with a Bonded Contract that the Debtors also plan to assume, the Debtors must assume/reaffirm the Indemnity Agreement, which would include liability for Philadelphia's indemnity claim against the Debtors related to the rejected Bonded Contracts and liability for Philadelphia's claim against the Debtors related to the assumed Bonded Contract.

41. To the extent that any executory contract provided on the Schedule of Assumed Executory Contracts and Unexpired Leases is a Bonded Contract, and the Debtors do not propose to provide replacement bonding or the adequate assurance discussed above, the Plan as written impairs Philadelphia's claim and violates sections 365 and 1129(a)(1) of the Bankruptcy Code.

## LIMITED OBJECTION: PROPOSED CONFIRMATION LANGUAGE

42. Philadelphia remains willing and will continue to work with the Debtors and other parties to resolve the issues discussed above and is hopeful that a consensual resolution may be obtained.

43. To that end, similar to the agreed surety language in the Phoenix Sale Order, Philadelphia proposes the addition of the following language in the Plan or any order confirming the Plan, as the case may be:

Definitions

1. "*Surety*" or "*Sureties*" means, individually or collectively, (a) Philadelphia Indemnity Insurance Company, (b) Atlantic Specialty Insurance Company and affiliated entities, including without limitation, Intact Insurance Company, and (c) Lexon Insurance Company, in each case, as surety in their role as an issuer of Surety Bonds and/or party to a Surety Indemnity Agreement.

2. "*Surety Bonds*" means any surety bond and/or related instruments issued by the Surety on behalf of the Debtors in connection with the Debtors' business operations.

3. "*Surety Collateral*" means any and all letters of credit issued in favor of the Sureties or cash collateral held by the Sureties in connection with the Surety Bonds.

4. "*Surety Indemnity Agreements*" means the surety payment and indemnity agreements entered into between the Sureties and the Debtors in connection with the Surety Bonds.

<u>Surety Bonds</u>

Notwithstanding the foregoing, or anything in the Plan, Plan Supplement, or Confirmation Order:

1. Each Surety's rights and remedies set forth in the Surety Indemnity Agreements and law and each of the Surety's rights, interests and claims in, to, and/or against the Surety Collateral shall survive the Effective Date and shall, except as set forth in subsections (2) and (3), below, be unaffected by the Plan, the Plan Supplement, or the Confirmation Order. For the avoidance of doubt, none of the Debtors, Reorganized Debtors, Wind-Down Debtor, Plan Sponsor, or Distribution Trustee shall have any obligation to replenish any Surety Collateral drawn upon by the Surety, nor shall the Sureties have any obligation to continue to provide any Surety Bonds to or on behalf of the Debtors, the Reorganized Debtors, the Wind-Down Debtor, the Plan Sponsor or Distribution Trustee, or otherwise, except on terms acceptable to such Surety in its discretion, which terms shall include, without limitation, the execution by such parties of an indemnity agreement in form and substance satisfactory to such Surety in its discretion, and delivering to such Surety collateral and related agreements in form and substance satisfactory to such Surety in its discretion. After the Effective Date, and provided that all obligations of any Surety in connection with the Surety Bonds and the Surety Indemnity Agreements have been satisfied such that such Surety is Unimpaired, all Proofs of Claim filed by such Surety shall be deemed withdrawn and shall be expunged from the Claims Register.

2. Upon the release of each Surety from all Surety Bonds and the satisfaction of all obligations of the Debtors and/or any other indemnitors under the Surety Indemnity Agreements, as determined by each Surety, with respect to the Surety Collateral, including in the event that any Purchaser has obtained surety bonds to replace any Surety Bonds issued in connection with any Transferred Contract or Transferred Real Property Lease (each as defined in the Purchase Agreements), after each Surety has reimbursed itself from any loss under the Surety Indemnity Agreement the Surety shall deliver the remaining Surety Collateral to the Distribution Trust or the Reorganized Debtors, as applicable, in accordance with this Plan.

3. To the extent that (i) the Debtors or Reorganized Debtors, as applicable, have obtained or obtain surety bonds to replace any Surety Bonds issued in connection with any Executory Contracts and Unexpired Leases that are included on the Schedule of Executory Contracts and Unexpired Leases and the Surety is released under such Surety Bonds, as determined by each Surety, to the extent the value of Surety's Surety Collateral exceeds the sum of (i) then aggregate penal limits of the Surety Bonds that have not been released and replaced, and (ii) any unreimbursed obligations under such Surety's Indemnity Agreement and Surety Bonds (the "Excess Surety Collateral"), such Surety shall work with the Debtors or Reorganized Debtors, as applicable, to release some or all of such Excess Collateral as determined by such Surety in its discretion, and after each Surety has reimbursed itself from any loss and/or unreimbursed obligations under the Surety Indemnity Agreement to the Distribution Trust or the Reorganized Debtors, as applicable, in accordance with this Plan.

4. Notwithstanding any provision to the contrary, nothing in the Confirmation Order, this Plan, the Plan Supplement or any other documents included in or related thereto, including, without limitation, the discharge, injunction, or release provisions under Article IX of the Plan, shall be deemed to (i) prevent or limit any Surety from exercising any of its rights with respect to the Surety Collateral relating to the Surety Bonds, the Surety Indemnity Agreements, the Transit Sale Order, or the Powered Sale Order, or related agreements, control agreements, trust agreements, deposit accounts, letters of credit, or applicable law, including the common law of suretyship, and/or (ii) alter, limit, expand, enjoin, modify, prejudice, waive, or release any rights or claims of any Surety against any non-debtor, including, without limitation, any claims under the Surety Indemnity Agreement and/or Surety Bonds. For the avoidance of doubt, the Third-Party Release shall not apply to the Sureties, and the Sureties are not Released Parties or Releasing Parties under this Plan.

5. Nothing in the Confirmation Order, this Plan, the Plan Supplement, or any other documents included in or related thereto, shall alter, modify, or limit any of the terms or provisions of paragraphs 28–29 of Docket No. 663 (i.e., the Powered Sale Order) or paragraphs 29–30 of Docket No. 833 (i.e., the Transit Sale Order), nor shall anything in the Confirmation Order, the Plan, the Plan Supplement, or any other documents included in or related thereto enjoin or preclude a Surety from exercising any rights relative to any Surety Bonds relating to any assets, contracts, and/or agreements acquired by a purchaser under the Powered Sale Order and/or the Transit Sale Order.

6. To the extent of any inconsistency or conflict between the terms of this Article V.F and elsewhere in the Plan or Plan Supplement, this Article V.F shall govern.  To the extent of any inconsistency between the terms of this Article V.F and the Sale Orders, the Sale Orders shall govern.

7. Nothing in the Confirmation Order, this Plan, the Plan Supplement, or any other documents included in or related thereto, shall authorize or permit the substitution of any principal under any Surety Bond, without such Surety's consent and the execution and delivery to such Surety of any and all documents and any collateral as such Surety requires in its discretion, to continue any such Surety Bond in place for the Debtors, the Reorganized Debtors, the Plan Sponsor, Wind-Down Debtor, or Distribution Trustee.

8. For the avoidance of doubt, all Surety Collateral shall remain in place to secure all payment and performance obligations under the Surety Bonds and the Indemnity Agreements regardless of when any such obligations arose or arises.

## **JOINDER**

44. In filing this Objection, Philadelphia joins, adopts and relies upon arguments and objections asserted by Lexon Insurance Company and Atlantic Specialty Insurance Company, to the extent they do not otherwise conflict with the objections stated herein.

## RESERVATION OF RIGHTS

45.     Philadelphia reserves any and all liens, interests, rights, claims, remedies, defenses, and the like it may assert (a) with respect to the Bonds, the Indemnity Agreement, and/or the Collateral or (b) under any applicable bankruptcy or non-bankruptcy law, whether asserted in Philadelphia's personal capacity or in its capacity as equitable subrogee, and Philadelphia additionally reserves the right to amend and/or supplement this Limited Objection.

**WHEREFORE**, Philadelphia requests this Court deny confirmation of the Plan and grant such other and further relief the Court deems just and proper.

Respectfully submitted,

**MCELROY, DEUTSCH, MULVANEY & CARPENTER, LLP**

Dated: February 28, 2024

*/s/ Gaston P. Loomis*
Gaston P. Loomis (#4812)
300 Delaware Avenue, Suite 1014
Wilmington, Delaware 19801
Telephone: (302) 300-4510
Facsimile: (302) 654-4031
E-mail: gloomis@mdmc-law.com

-and-

Scott C. Williams (admitted *pro hac vice*)
S. Marc Buchman (admitted *pro hac vice*)
**MANIER & HEROD, P.C.**
1201 Demonbreun Street, Suite 900
Nashville, Tennessee 37203
Telephone: (615) 244-0030
Facsimile: (615) 242-4203
E-mail: swilliams@manierherod.com
        mbuchman@manierherod.com

*Attorneys for Philadelphia Indemnity Insurance Company*