**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| PROTERRA INC, *et al.*,[1] | ) Case No. 23-11120 (BLS) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**DEBTORS' MEMORANDUM OF LAW IN SUPPORT OF**
**CONFIRMATION OF THE FOURTH AMENDED JOINT CHAPTER 11 PLAN**
**OF REORGANIZATION FOR PROTERRA INC AND ITS DEBTOR AFFILIATE**

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Proterra Inc (9565); and Proterra Operating Company, Inc. (8459).  The location of the Debtors' service address is: 500 Pennsylvania Avenue PO Box 2205 Greer, South Carolina 29652.

# **TABLE OF CONTENTS**

<div align="right">

**Page**

</div>

TABLE OF AUTHORITIES ................................................................................................. iv

PRELIMINARY STATEMENT .......................................................................................... 1

BACKGROUND ................................................................................................................... 3

I.      OVERVIEW ............................................................................................................. 3

II.      EVENTS LEADING TO THE CHAPTER 11 FILING .................................... 4

III.      THE CHAPTER 11 CASES ................................................................................. 7

     A.      The Marketing Process ................................................................................ 7

     B.      The Plan Support Agreement and Chapter 11 Plan ............................. 9

IV.      SOLICITATION AND VOTING PROCESS .................................................... 14

     A.      Plan Solicitation ........................................................................................ 14

     B.      Voting Results ............................................................................................ 14

ARGUMENT ........................................................................................................................ 15

V.      THE PLAN SATISFIES EACH REQUIREMENT FOR CONFIRMATION ................. 16

     A.      The Plan Complies with the Applicable Provisions of the Bankruptcy Code as Required by Section 1129(a)(1) of the Bankruptcy Code ...................... 16

           1.      The Plan Satisfies the Classification Requirements of Section 1122(a) of the Bankruptcy Code .................................... 16

           2.      The Plan Satisfies the Mandatory Requirements of Section 1123 of the Bankruptcy Code .......................................... 18

     B.      The Plan Satisfies Section 1129(a)(2) of the Bankruptcy Code ......................... 21

           1.      The Debtors Complied with the Disclosure and Solicitation Requirements of Section 1125 ...................................... 21

           2.      The Debtors Only Solicited Parties Entitled to Vote Under Section 1126 of the Bankruptcy Code .................................... 23

     C.      The Plan Has Been Proposed in Good Faith and Not by Any Means Forbidden by Law in Compliance with Section 1129(a)(3) of the Bankruptcy Code ........................................................................................ 24

     D.      The Plan Provides for Court Approval of Certain Administrative Payments in Compliance with Section 1129(a)(4) of the Bankruptcy Code ...................... 26

     E.      The Debtors Complied with the Governance Disclosure Requirement in Compliance with Section 1129(a)(5) of the Bankruptcy Code ...................... 27

     F.      The Plan Does Not Require Governmental Approval of Rate Changes and Therefore Complies with Section 1129(a)(6) of the Bankruptcy Code ............... 28

G. The Plan is in the Best Interests of Creditors and Holders of Interests in Accordance with Section 1129(a)(7) of the Bankruptcy Code ............................ 28

H. At Least One Impaired Class of Claims Has Accepted the Plan as Required by Section 1129(a)(8) of the Bankruptcy Code ................................... 30

I. The Plan Treats Administrative and Priority Tax Claims in Accordance with Section 1129(a)(9) of the Bankruptcy Code .................................... 31

J. The Plan Was Accepted by at Least One Impaired Class as Required by Section 1129(a)(10) of the Bankruptcy Code ........................................ 32

K. The Plan is Feasible Within the Meaning of Section 1129(a)(11) of the Bankruptcy Code ............................................................................ 32

L. The Plan Complies with Section 1129(a)(12) of the Bankruptcy Code .............. 35

M. Sections 1129(a)(13)–(16) of the Bankruptcy Code Are Inapplicable to the Debtors .......................................................................................... 36

N. The Plan Satisfies the "Cram Down" Requirements Under Section 1129(b) of the Bankruptcy Code for Non-Accepting Classes ............................................ 37

  1. The Plan Does Not Discriminate Unfairly ................................................. 37

  2. The Plan is Fair and Equitable ................................................. 39

O. The Plan is the Only Plan for Purposes of Section 1129(c) of the Bankruptcy Code ........................................................................... 40

P. The Plan's Principal Purpose is Not Avoidance of Taxes or Section 5 of the Securities Act as Prohibited by Section 1129(d) of the Bankruptcy Code ................................................................................................ 40

Q. Section 1129(e) of the Bankruptcy Code Does Not Apply to the Plan ............... 40

VI. THE DISCRETIONARY CONTENTS OF THE PLAN ARE APPROPRIATE AND SHOULD BE APPROVED ................................................................... 40

A. The Plan Satisfies the Discretionary Provisions of Section 1123(b) of the Bankruptcy Code ............................................................................ 40

B. The Plan's Cure Process is Appropriate under Section 1123(d) of the Bankruptcy Code ............................................................................ 42

C. The Plan's Release, Exculpation, and Injunction Provisions Are Reasonable, in the Best Interests of the Debtors' Estates, and Comply with the Bankruptcy Code .......................................................................... 42

  1. The Debtor Release Is Appropriate and Should Be Approved ................. 43

  2. The Third-Party Release Is Consensual and Should Be Approved .......... 48

  3. The Exculpation Should Be Approved .................................................... 51

  4. The Injunction Is Narrowly Tailored and Should Be Approved ............... 53

D. The Plan's Other Settlements Are Reasonable and Should Be Approved ........... 53

VII.    THE PROPOSED MODIFICATIONS TO THE PLAN ARE APPROPRIATE ............. 56

VIII.   THE OBJECTIONS SHOULD BE OVERRULED ........................................................ 58

IX.     GOOD CAUSE EXISTS TO WAIVE THE STAY OF THE CONFIRMATION
        ORDER .............................................................................................................................. 59

CONCLUSION ...................................................................................................................................... 60

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*In re 203 N. LaSalle St. Ltd. P'ship.*,
190 B.R. 567 (Bankr. N.D. Ill. 1995) .....................................................................37

*In re Adelphia Commc'ns Corp.*,
368 B.R. (Bankr. S.D.N.Y. 2007) ............................................................................28

*In re Aleris Int'l, Inc.*,
No. 09-10478 (BLS), 2010 WL 3492664 (Bankr. D. Del. May 13, 2010).........26, 33

*In re Ambanc La Mesa Ltd. P'ship*,
115 F.3d 650 (9th Cir. 1997) ...................................................................................38

*In re Armstrong World Indus., Inc.*,
348 B.R. 111 (D. Del. 2006)...............................................................................15, 38

*B.D. Int'l Discount Corp.* v. *Chase Manhattan Bank, N.A.* (*In re B.D. Int'l Disc. Corp.*),
701 F.2d 1071 (2d Cir. 1983).....................................................................................24

*Bank of Am. Nat'l Trust and Sav. Ass'n* v. *203 N. LaSalle St. P'ship*,
526 U.S. 434 (1999).....................................................................................28, 28, 39

*NLRB* v. *Bildisco & Bildisco*,
465 U.S. 513 (1984).....................................................................................................24

*In re Bowles*,
48 B.R. 502 (Bankr. E.D. Va. 1985) .........................................................................37

*In re Burns & Roe Enters., Inc.*,
No. 08-4191 (GEB), 2009 WL 438694 (D.N.J. Feb. 23, 2009) ...............................57

*In re Conseco, Inc.*,
301 B.R. 525 (Bankr. N.D. Ill. 2003) .......................................................................50

*In re Coram Healthcare Corp.*,
315 B.R. 321 (Bankr. D. Del. 2004) ....................................................................43, 47

*In re Exaeris, Inc.*,
380 B.R. 741 (Bankr. D. Del. 2008) ....................................................................43, 54

*In re Exide Techs.*,
303 B.R. 48 (Bankr. D. Del. 2003) ......................................................................44, 50

*In re Genco Shipping & Trading Ltd.*,
   513 B.R. 233 (Bankr. S.D.N.Y. 2014) ..................................................................49

*In re Glob. Ocean Carriers Ltd.*,
   251 B.R. 31 (Bankr. D. Del. 2000) .......................................................................39

*In re Glob. Safety Textiles Holdings LLC*,
   No. 09-12234 (KG), 2009 WL 6825278 (Bankr. D. Del. Nov. 30, 2009) .............57

*In re Great Bay Hotel & Casino, Inc.*,
   251 B.R. 213 (Bankr. D.N.J. 2000) .....................................................................37

*In re Indianapolis Downs, LLC*,
   486 B.R. 286 ........................................................................................32, 33, 44, 49

*In re ION Media Networks, Inc.*,
   419 B.R. 585 (Bankr. S.D.N.Y. 2009) ................................................................39

*In re Jersey City Med. Ctr.*,
   817 F.2d 1055 (3d Cir. 1987) ..............................................................................16

*John Hancock Mut. Life Ins. Co.* v. *Route 37 Bus. Park Assocs.*,
   987 F.2d 154 (3d Cir. 1993) ................................................................................16

*In re Johns-Manville Corp.*,
   68 B.R. ................................................................................................................38

*In re Lapworth*,
   No. 97-34529 (DWS), 1998 WL 767456 (Bankr. E.D. Pa. Nov. 2, 1998) ...........20

*In re Madison Hotel Assocs.*,
   749 F.2d 410 (7th Cir. 1984) ..............................................................................24

*In re Mallinckrodt PLC*,
   639 B.R. 837 (Bankr. D. Del. 2022) ...................................................................25

*In re Maremont Corp.*,
   601 B.R. 1 (Bankr. D. Del. 2019) .......................................................................60

*Momentum Mfg. Corp.* v. *Emp. Creditors Comm. (In re Momentum Mfg. Corp.)*,
   25 F.3d 1132 (2d Cir. 1994) ...............................................................................21

*In re NII Holdings, Inc.*,
   288 B.R. 356 (Bankr. D. Del. 2002) ...................................................................23

*In re Nortel Networks, Inc.*,
   522 B.R. 491 (Bankr. D. Del. 2014) ...................................................................54

*In re Nutritional Sourcing Corp.*,
    398 B.R. 816 (Bankr. D. Del. 2008) ...................................................................15

*In re Nuverra Env't Sols., Inc.*,
    590 B.R. 75 (D. Del. 2018) ...............................................................................17

*In re PES Holdings, LLC*,
    No. 18-10122 (KG) (Bankr. D. Del. Apr. 2, 2018) ...............................................49

*Pizza of Hawaii, Inc.* v. *Shakey's, Inc. (In re Pizza of Haw., Inc.)*,
    761 F.2d 1374 (9th Cir. 1985) .........................................................................33

*Platinum Cap., Inc.* v. *Sylmar Plaza, L.P. (In re Sylmar Plaza, L.P.)*,
    314 F.3d 1070 (9th Cir. 2002) .........................................................................24

*In re Prussia Assocs.*,
    322 B.R. 572 (Bankr. E.D. Pa. 2005) ...............................................................33

*In re PWS Holding Corp.*,
    228 F.3d 224 (3d Cir. 2000)........................................................................20, 51

*In re S&W Enter.*,
    37 B.R. 153 (Bankr. N.D. Ill. 1984) ..................................................................15

*In re Spansion, Inc.*,
    426 B.R. 114 (Bankr. D. Del. 2010) ............................................................43, 49

*In re Tonopah Solar Energy, LLC*,
    Case No. 20-11844 (KBO), 2022 WL 982558 (D. Del. March 31, 2022) ..............32

*In re W.R. Grace & Co.*,
    475 B.R. 34 (D. Del. 2012)........................................................................33, 46

*In re Wash. Mut., Inc.*,
442 B.R. 314 (Bankr. D. Del. 2011) ................................................................. *passim*

*In re Woodbridge Grp. of Companies, LLC*,
    592 B.R. 761 (Bankr. D. Del. 2018) ..................................................................53

*In re World Health Alts., Inc.*,
    344 B.R. 291 (Bankr. D. Del. 2006) ..................................................................43

*In re Worldcom, Inc.*,
    No. 02-13533 (AJG), 2003 WL 23861928 (Bankr. S.D.N.Y. Oct. 31, 2003) ........20

*In re Zenith Elecs. Corp.*,
    241 B.R. 92 (Bankr. D. Del. 1999) ...................................................................49

**STATUTES**

11 U.S.C. § 1123(a) ..........................................................................................................18, 19, 20

11 U.S.C. § 1123(b) ...............................................................................................................22, 41

11 U.S.C. 1126(c) ........................................................................................................................24

11 U.S.C. § 1126(f) ...............................................................................................................23, 30

11 U.S.C. § 1126(g) .....................................................................................................................23

11 U.S.C. § 1129(a) .....................................................................................................................31

11 U.S.C. § 1129(b) .........................................................................................................37, 39, 40

**OTHER AUTHORITIES**

Fed. R. Bankr. P. 3017 .................................................................................................................23

Fed. R. Bankr. P. 3018 .................................................................................................................23

Fed. R. Bankr. P. 3019 ...........................................................................................................57, 58

Fed. R. Bankr. P. 3020 ...........................................................................................................60, 61

Fed. R. Bankr. P. 6004 .................................................................................................................61

Fed. R. Bankr. P. 6006 .................................................................................................................61

Fed. R. Bankr. P. 9019 .........................................................................................................42, 44, 54

H.R. Rep. No. 95-595 (1977)...................................................................................................16, 21

S. Rep. No. 95-989 (1978) ........................................................................................................16, 21

Proterra Inc and Proterra Operating Company, Inc. (together, the "Debtors"), the debtors and debtors in possession in the above-captioned cases (the "Chapter 11 Cases"), respectfully submit this memorandum of law (this "Memorandum") in support of confirmation of the *Fourth Amended Joint Chapter 11 Plan of Reorganization for Proterra Inc and Its Debtor Affiliate* [Docket No. 1039] (as modified, amended, or supplemented from time to time in accordance with its terms, the "Plan")[2] and in reply to various objections raised in connection therewith. The Debtors refer the Court to the Plan, the Disclosure Statement, the Disclosure Statement Order, the Plan Supplement, the Confirmation Declarations,[3] any other declarations that may be proffered or submitted in connection with the hearing on the confirmation of the Plan (the "Confirmation Hearing"), as well as the record of the Chapter 11 Cases for an overview of the Debtors' business and other relevant facts that may bear on the confirmation of the Plan (each capitalized term, as applicable, is defined below). In support of confirmation of the Plan, the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT

1.  In an exercise of their fiduciary duties, the Debtors commenced these Chapter 11 Cases without notifying their secured lenders of the impending bankruptcy filing, thereby positioning the Debtors to challenge any Liquidation Payment Amount Claim asserted

---

[2]    Capitalized terms used and not otherwise defined herein have the meanings set forth in the Plan.

[3]    Certain facts and circumstances supporting the confirmation of the Plan are set forth in, among other things, the *Declaration of Justin D. Pugh in Support of Confirmation of the Fourth Amended Joint Chapter 11 Plan of Reorganization for Proterra Inc and Its Debtor Affiliate* (the "Pugh Declaration"), the *Declaration of John Kimm in Support of Confirmation of the Fourth Amended Joint Chapter 11 Plan of Reorganization for Proterra Inc and Its Debtor Affiliate* (the "Kimm Declaration"), the *Declaration of Jill Frizzley in Support of Confirmation of the Fourth Amended Joint Chapter 11 Plan of Reorganization for Proterra Inc and Its Debtor Affiliate* (the "Frizzley Declaration"), and the *Declaration of James Lee of Kurtzman Carson Consultants LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Fourth Amended Joint Chapter 11 Plan of Reorganization for Proterra Inc and Its Debtor Affiliate* (the "Voting Declaration" and together with the Pugh Declaration, the Kimm Declaration, and the Voting Declaration, the "Confirmation Declarations"), each filed contemporaneously herewith and incorporated herein by reference.

against their estates by holders of Second Lien Convertible Notes.  Over the course of these Chapter 11 Cases, the Debtors have negotiated with the Plan Sponsor (which now holds 100% of the Second Lien Convertible Notes), the official committee of unsecured creditors appointed in these Chapter 11 Cases (the "Committee"), and other key stakeholders to achieve, for the benefit of the Debtors' estates and stakeholders, among other things:  (a) consensual use of cash collateral on the terms set forth in the Final Cash Collateral Order; (b) key employee retention and incentive plans to preserve and maximize the value of the Debtors' business lines; (c) the consummation of value-maximizing sales of the Debtors' Proterra Powered business line, Proterra Transit business line, and certain related battery leases, respectively; and (d) the Plan Support Agreement, documenting the Plan Sponsor's and the Committee's respective support for the Plan.

2.     Now, the Debtors seek to confirm the Plan.  The Plan reflects extensive arm's-length negotiations among the Debtors, the Plan Sponsor, the Committee, and other key stakeholders over the course of several months, incorporates a settlement of the Plan Sponsor's asserted Liquidation Payment Amount Claim, and provides a clear path for maximizing the value of the Debtors' remaining assets for the benefit of the Debtors' estates, providing a full recovery for holders of Other Secured Claims, Other Priority Claims, First Lien Claims, and Second Lien Convertible Notes Claims, and providing a meaningful recovery for holders of Allowed General Unsecured Claims that is significantly greater than their potential recovery in a liquidation.

3.     As set forth on **Exhibit A**, following good faith and arm's-length negotiations with various parties which filed formal objections and provided informal comments to the Debtors' advisors, the Debtors have resolved, or expect to resolve, all objections other than objections from four shareholders who filed letters on the docket (collectively,

the "Shareholder Objections").[4]  The Shareholder Objections contend that the Court should not approve the Plan because holders of Interests in TopCo allegedly deserve to receive a distribution from the Debtors' estates.  The Shareholder Objections rely on outdated prepetition financial reporting, are inconsistent with the results of the Debtors' robust Court-approved marketing and auction process, and fail to recognize the substantial amount of Claims against the Debtors' estates, which have priority over the Interests in question.

4.  For the reasons set forth herein and in the Confirmation Declarations, the Plan satisfies the requirements for confirmation set forth in section 1129 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as may be amended from time to time, the "Bankruptcy Code") and accordingly should be confirmed.  A proposed order confirming the Plan (the "Proposed Confirmation Order") will be filed contemporaneously herewith, and, as applicable, incorporates various resolutions reached with certain responding or objecting parties.

## BACKGROUND[5]

## I.   OVERVIEW

5.  As of the Petition Date (as defined below), the Debtors operated three business lines (each, a "Business Line" and collectively, the "Business Lines") that addressed critical components of commercial and industrial vehicle electrification.  First, the Debtors designed and manufactured proprietary battery systems and electrification solutions for commercial vehicle original equipment manufacturer ("OEM") customers as part of the Debtors' powered-products Business Line ("Proterra Powered").  Second, the Debtors' energy Business Line ("Proterra Energy") provided turnkey fleet-scale, high-power charging solutions and software

---

[4]   *See* Docket Nos. 1007, 1047, 1048, and 1091.

[5]   The pertinent facts are set forth in the Disclosure Statement, the Plan, and the testimony and declarations that will be adduced and submitted at or in connection with the Confirmation hearing.  Such facts are incorporated herein as if fully set forth herein.

3

services.  Third, the Debtors operated their transit Business Line ("Proterra Transit"), which designed, developed, and sold electric transit buses as an OEM for North American public transit agencies, airports, universities, and other commercial transit fleets.

## II.    EVENTS LEADING TO THE CHAPTER 11 FILING

6.    Prior to commencing these Chapter 11 Cases, the Debtors determined that Proterra Powered and Proterra Energy required additional capital to continue to innovate, grow, and reach their full potential in a highly competitive industry.  The Debtors believed there was substantial incremental value to unlock through the continued growth of Proterra Powered and Proterra Energy and continued to invest in those Business Lines to preserve and maximize value for all stakeholders.  However, the Debtors' ability to do so came under substantial pressure because of constraints posed by Proterra Transit and the Debtors' then-existing corporate structure and limitations on additional borrowing.

7.    While Proterra Transit was the Debtors' original flagship Business Line that helped position the Debtors' other Business Lines to start and grow, it demanded a large amount of working capital.  For example, in order to build the highly customized buses their customers demanded, the Debtors had to maintain extensive and often unique inventories, which when combined with labor-intensive manufacturing, required a large amount of working capital. Moreover, Proterra Transit had to contend with long-term contracts that had become economically unfavorable over time prior to the Petition Date, putting significant strain on the Debtors' liquidity.

8.    The capital-intensive business and burdensome contracts of Proterra Transit along with the growth capital needs of Proterra Powered and Proterra Energy weighed on the Debtors' liquidity.  In March 2023, the Debtors filed their annual report on Form 10-K pursuant to Section 13(a) of the Exchange Act (the "2022 10-K").  Prior to the publication of the 2022 10-K, the Debtors and the Plan Sponsor, as the holders of the vast majority of the Second Lien

Convertible Notes, were in negotiations to address a potential financial covenant default. However, the Debtors and Plan Sponsor were unable to reach an agreement in time prior to the filing of the 2022 10-K, and thus the 2022 10-K noted that the Debtors' independent registered public accounting firm's audit report included an explanatory paragraph expressing substantial doubt about the Debtors' ability to continue as a going concern ("Going Concern Paragraph"). Following the filing of the 2022 10-K with the Going-Concern Paragraph, the Debtors' public equity price fell.

9.      The Debtors continued to negotiate with the Plan Sponsor following the filing of the 2022 10-K, and the Debtors entered into an amendment to the Note Purchase Agreement[6] on March 31, 2023 (the "March 2023 Amendment") to address their breach of the Note Purchase Agreement's Minimum Liquidity Covenant.[7]  The March 2023 Amendment changed the interest expense and also curtailed the Debtors' ability to issue common stock and altered, among other things, mandatory and optional conversion rights, minimum liquidity requirements, and certain other covenants.

10.      In 2023, the Debtors sought to address their liquidity constraints by, among other things, raising additional capital and engaging in certain cost-cutting measures.  The Debtors engaged a leading investment bank ("Investment Bank") in February 2023 as a financial advisor to explore raising incremental financing either from new investors or the Company's existing creditors.  The Debtors also engaged Moelis & Company ("Moelis") in April 2023 to assist in their efforts to raise additional capital and to market Proterra Transit.  Investment Bank and Moelis

---

[6]   "Note Purchase Agreement" means that certain Note Purchase Agreement, dated as of August 4, 2020, by and among Legacy Proterra, the investors from time to time party thereto.

[7]   The Note Purchase Agreement requires the Debtors to maintain liquidity at quarter end of not less than the greater of (a) $75.0 million and (b) four times of Cash Burn (as defined therein) for the three-month period then ended (the "Minimum Liquidity Covenant").

collectively communicated with 25 potential counterparties during the capital raise process. In addition, during the prepetition marketing process, Moelis communicated with 26 potential investors and the Debtors executed 15 NDAs. None of the potential investors ultimately submitted an executable bid to acquire Proterra Transit or provide incremental capital during this prepetition process.

11.     The Debtors faced two structural impediments to raising new capital. First, the Debtors received feedback that while investors were interested in investing into or lending against the Proterra Powered Business Line, these investors were not inclined to move forward given the financial overhang of Proterra Transit. Second, the Second Lien Convertible Notes[8] essentially precluded the raising of additional secured debt, which limited the potential financing structures to equity investments.

12.     The Debtors examined options to scale back or separate Proterra Transit from the other Business Lines. However, running Proterra Transit at a diminished scale without renegotiating contracts would not have materially solved the working capital or cost structure issues of the Business Line. Operating at a diminished scale could have also led to production complications. Winding down the Business Line would have crystalized material liability for breach of contract, among other issues. Therefore, the Debtors were unable to raise additional capital or otherwise address the structural impediments posed by Proterra Transit prior to the commencement of these Chapter 11 Cases.

---

[8]     The "Second Lien Convertible Notes" means those convertible notes issued by the Debtors pursuant to the Note Purchase Agreement.

### III.    THE CHAPTER 11 CASES

13.    On August 7, 2023 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  The Debtors continue to manage and operate their business as debtors in possession under sections 1107 and 1108 of the Bankruptcy Code.  On August 24, 2023, the U.S. Trustee appointed the Committee pursuant to section 1102(a) of the Bankruptcy Code [Docket No. 121].  No other statutory committee, trustee, or examiner has been appointed in these Chapter 11 Cases.

14.    On August 10, 2023 (the "First Day Hearing"), the Court held a hearing to consider first day pleadings filed by the Debtors on an interim basis.  At the First Day Hearing, the Debtors obtained consensual use of "cash collateral" as such term is defined in section 363 of the Bankruptcy Code ("Cash Collateral") on a temporary interim basis for two weeks (the "Interim Period").  The use of cash collateral ensured that the Debtors could operate postpetition in the ordinary course.  Following consensual extensions of the Interim Period, the Court entered the final order approving the Debtors' use of Cash Collateral (the "Final Cash Collateral Order") [Docket No. 422] on October 16, 2023.  The Final Cash Collateral Order authorized the Debtors to use Cash Collateral through April 1, 2024, subject to certain events of default.

#### A.    The Marketing Process

15.    The Debtors filed their Chapter 11 Cases with one overarching goal—to utilize the tools provided to them under the Bankruptcy Code to maximize value for their stakeholders.  Accordingly, at the outset of these Chapter 11 Cases, the Debtors sought and obtained Court approval of the Bidding Procedures to govern their postpetition marketing and sale process (the "Marketing Process").

16.    On November 9, 2023 and November 13, 2023, the Debtors conducted the auctions for the Debtors' Business Lines (each, an "Auction" and together, the "Auctions").  At

7

the conclusion of the Track B Auction (as defined in the Bidding Procedures Order), the Debtors selected Volvo Battery Solutions LLC ("Volvo") as the successful bidder. [Docket No. 525]. On November 29, 2023, the Court entered that certain *Order (A) Authorizing and Approving the Debtors' Entry into the Asset Purchase Agreement, (B) Authorizing the Sale of the Debtors' Powered Assets Free and Clear of All Liens, Claims, Interests, and Encumbrances, (C) Approving the Assumption and Assignment of the Assumed Executory Contracts and Unexpired Leases, and (D) Granting Related Relief* (the "Powered Sale Order") [Docket No. 664]. Thereby authorizing the Debtors to close the transaction contemplated by the Purchase Agreement. On February 1, 2024, the Debtors closed the sale of Proterra Powered to Volvo (the "Powered Sale"). [Docket No. 968]. At the conclusion of the Track A Auction (as defined in the Bidding Procedures Order), the Debtors selected (a) Phoenix Motor, Inc. (Phoenix") as the successful bidder with respect to (i) certain battery lease assets (the "Battery Leases") and (ii) Proterra Transit (the "Transit Sale, and collectively with the Powered Sale, the "Sales") and (b) the Plan Sponsor[9] as the successful bidder with respect to Proterra Energy. [Docket No. 529] (the "Transit Notice"). On January 9, 2024, the Court entered that certain *Order (A) Authorizing and Approving the Debtors' Entry into the Asset Purchase Agreements, (B) Authorizing the Sale of the Debtors' Transit and Battery Lease Assets Free and Clear of all Liens, Claims, Interests, and Encumbrances, (C) Approving the Assumption and Assignment of the Assumed Executory Contracts and Unexpired leases, and (D) Granting Related Relief* (the "Transit Sale Order"), thereby authorizing the Debtors to close the transactions contemplated by the Purchase Agreements [Docket No. 883] and sell Proterra Transit and the Battery Leases to Phoenix. On

---

[9]  Anthelion I Prodigy Holdco LP (as successor agent to CSI GP I LLC), Anthelion I Prodigy Holdco LP (f/k/a CSI I Prodigy Holdco LP), Anthelion Prodigy Co-Investment LP (f/k/a CSI Prodigy Co-Investment LP), and Anthelion PRTA Co-Investment LP (f/k/a CSI PRTA Co-Investment LP) (collectively, the "Plan Sponsor").

January 11, 2024, the Debtors closed the sale of Proterra Transit to Phoenix and amended the Purchase Agreement regarding the Battery Leases.  *See* Docket No. 879.  On February 7, 2024, the Debtors closed the sale of the Battery Leases to Phoenix.  *See* Docket No. 1010.

**B.**     **The Plan Support Agreement and Chapter 11 Plan**

17.     As part of the diligence and negotiations leading to the Auctions, the Debtors and the Plan Sponsor engaged in negotiations regarding the Plan Sponsor's potential interest in any of the Debtors' Business Lines.  The Plan Sponsor identified an interest in Proterra Energy, and the parties began negotiating a chapter 11 plan support agreement (as amended, supplemented, or otherwise modified from time to time, the "Plan Support Agreement").  At the Track A Auction, the Debtors selected the Plan Sponsor as the winning bidder for Proterra Energy and entered into the Plan Support Agreement, which was attached to the Transit Notice.  The Plan Support Agreement provided for, *inter alia*, the Debtors and the Plan Sponsor to support the restructuring transactions contemplated by the plan term sheet attached to the Plan Support Agreement, which included a credit bid by CSI Fund I GP LLC as collateral agent for the Second Lien Convertible Notes (the "Second Lien Agent") of $10 million in exchange for 100% of the equity in the Reorganized Debtors.[10]  The Plan Support Agreement did not resolve the Plan Sponsor's alleged Liquidation Payment Claim (as defined below).

18.     As set forth in the Final Cash Collateral Order, the Second Lien Agent reserved its right to assert a claim on account of the Liquidation Payment (the "Liquidation Payment Claim").  The Second Lien Agent was required to file its master proof of claim in the Chapter 11 Cases, which could include the Liquidation Payment Claim, by no later than November

---

[10]    "Reorganized Debtors" means, if a Reorganization occurs, collectively, each Debtor, or any successor or assign thereto, by merger, consolidation, or otherwise, on and after the Effective Date.

15, 2023.  The Debtors' deadline to reply to the Second Lien Agent's assertion of a Liquidation

Payment Claim was December 6, 2023.

19.    On November 15, 2023, the Second Lien Agent filed a proof of claim

asserting a secured claim under the Prepetition Second Lien Loan Documents in the aggregate

principal and accrued interest amount of not less than $266,670,640.37 (the "Asserted Principal

and Prepetition Interest Amount").  *See* Proof of Claim No. 1177 (the "Second Lien Agent Proof

of Claim").  In addition to the Asserted Principal and Prepetition Interest Amount, the Second Lien

Agent asserted claims arising out of, if any, the Second Lien Agent's adequate protection claims

under the Final Cash Collateral Order, claims arising out of the alleged Debtors' obligations to

reimburse the Second Lien Agent's fees and expenses with respect to their advisors, and alleged

indemnification agreements.  The Second Lien Agent included an alleged Liquidation Payment

Claim of $88,585,019.28 in the Second Lien Agent Proof of Claim.

20.    On November 29, 2023, the Court entered the *Order Approving Stipulation*

*Regarding Scheduling with Respect to Litigating the Premium Claim* [Docket No. 665]

(the "Stipulation").  In accordance with the schedule set forth in the Stipulation, the Debtors and

the Committee filed objections and motions for judgment on the pleadings with respect to the

Second Lien Agent's Proof of Claim asserting a Liquidation Payment Claim on December 6, 2023

[Docket Nos. 689, 690].

21.    The Debtors, Second Lien Agent, and Committee continued to engage in

thorough, arm's-length negotiations regarding the Liquidation Payment Claim and other related

topics.  Ultimately, the negotiations were successful, and on January 2, 2024, the Debtors, Plan

Sponsor, and the Committee entered into an amended Plan Support Agreement.  *See Notice of*

*Filing of Amended and Restated Plan Support Agreement* [Docket No. 794].  The amended Plan

Support Agreement incorporated a comprehensive settlement, including with respect to the Liquidation Payment Claim and the Committee's challenges to the Second Lien Agent's liens (the "<u>Liquidation Payment Settlement</u>").  The Liquidation Payment Settlement, as embodied in the Plan, provides that the Allowed amount of the Second Lien Convertible Notes Claims shall include the Settled Amounts—*i.e.*, (a) $3.0 million; *plus* (b) postpetition interest on the Agreed Second Lien Obligations at the default rate set forth in the Second Lien Convertible Notes Purchase Agreement; *less* (c) postpetition interest on the Agreed Second Lien Obligations at the non-default rate set forth in the Second Lien Convertible Notes Purchase Agreement.  Furthermore, the Debtors' estates will fund $10.0 million or such other amount as is agreed by the Debtors, Second Lien Agent, and the Committee into the Distribution Trust Expense Reserve.

22.     The Liquidation Payment Settlement resolved any potential objection to the Plan by the Committee, and the Committee executed the Plan Support Agreement and agreed to support the Plan in accordance therewith.  In doing so, the Debtors, the vast majority of the Holders of their funded debt, and the Committee agreed to support the Plan and the Restructuring Transactions (as defined in the Plan) contained therein, providing a clear path to a value-maximizing reorganization for the benefit of the Debtors' estates and stakeholders.  Therefore, the signing of the amended Plan Support Agreement represented an important milestone in these Chapter 11 Cases.

23.     Also on January 2, 2024, the Debtors filed the *First Amended Disclosure Statement for Joint Chapter 11 Plan of Reorganization for Proterra Inc and Its Debtor Affiliate* [Docket No. 796] (as amended, supplemented, or otherwise modified from time to time, the "<u>Disclosure Statement</u>") and *First Amended Joint Chapter 11 Plan of Reorganization for Proterra Inc and Its Debtor Affiliate* [Docket No. 795] (as amended, supplemented, or otherwise

modified from time to time, the "Plan").[11]   On January 25, 2024, the Court entered an order

approving a revised Disclosure Statement (the "Disclosure Statement Order").   Shortly before

entry of the Disclosure Statement Order, the Debtors filed solicitation versions of the Plan

[Docket No. 943] and the Disclosure Statement [Docket No. 944].  These versions were distributed

with the Solicitation Packages (as defined below) on or about January 30, 2024.  *See Certificate*

*of Service* [Docket No. 1049] (the "Solicitation Affidavit") at ¶¶ 10–11; Voting Decl. at ¶ 9.

24.     The Plan provides for, among other things, the following treatment of

certain Allowed Claims against, and Interests in, the Debtors:[12]

- *First Lien Claims*:  First Lien Claims will be paid in full in cash;

- *Second Lien Convertible Notes Claims*:  if a Reorganization Occurs,
  each Holder of a Second Lien Convertible Notes Claim shall receive
  (a) on account, and in satisfaction, of such Holder's *pro rata* portion of
  $10 million of the Allowed Second Lien Convertible Notes Claims, its
  *pro rata* allocation of all of the equity of Reorganized Proterra; (b) such
  Holder's Allowed Second Lien Convertible Notes Claim shall be
  reduced *pro rata* by the (i) Reorganized Proterra Retained Cash and
  (ii) the Cure Cost Reduction; if a Plan Support Agreement Termination
  Distribution Occurs, each Holder of a Second Lien Convertible Notes
  Claims shall receive cash in an amount equal to their Allowed Second
  Lien Convertible Notes Claims;

- *General Unsecured Claims*:  each Holder of an Allowed General
  Unsecured Claim shall receive its pro rata share of the Second Priority
  Distribution Trust Beneficiaries' interests in the Distribution Trust;

- *Interests in TopCo*:  Interests in TopCo shall receive no recovery or
  distribution on account of such Interests; and

---

[11]   The Plan and Disclosure Statement were subsequently amended.  *See* Docket Nos. 888, 889, 921, 922, 945, 946,
and 1039.

[12]   The narrative contained herein is for descriptive purposes only and is qualified in all respects by the terms and
conditions set forth in the Plan.   The terms "Allowed," "Claims," "Cure Cost Reduction," "Distribution Trust
Beneficiaries," "Distribution Trust," "Holder," "Interests," "Reorganized Proterra Retained Cash," "Second
Priority Distribution Trust Beneficiaries," "Section 510(b) Claims," and "TopCo" have the meaning ascribed to
them in the Plan.

- ***Section 510(b) Claims***:  Section 510(b) Claims, if any, shall be canceled and released without any distribution on account of such Section 510(b) Claims.

25.    On February 8, 2024, the Debtors filed an amended version of the Plan [Docket No. 1039] and Plan Support Agreement [Docket No. 1040].  On February 16, 2024, the Debtors filed the *Plan Supplement for the Joint Chapter 11 Plan of Reorganization for Proterra Inc and its Debtor Affiliate* [Docket No. 1076] (as amended, supplemented, or otherwise modified from time to time, the "Plan Supplement").[13]   The Plan Supplement includes the following exhibits:    (a) Distribution Trust Agreement, (b) Schedule of Retained Causes of Action, (c) Schedule of Assumed Executory Contracts, (d) organizational documents for the Reorganized Debtors, (e) Restructuring Transactions Memorandum, (f) Financial Projections, and (g) Volvo Transition Services Agreement.

26.    The Debtors anticipate filing a further amended Plan that will reflect changes to address certain objections and informal comments received by the Debtors, including, among other things:    (a) limitations to the definition of "Exculpated Parties" and "Releasing Parties" and the limitation of Exculpation to acts and omissions occurring after the Petition Date; (b) language preserving the ability of the Distribution Trustee and U.S. Trustee to object to the reasonableness of the Restructuring Expenses of a First Lien Professional or Second Lien Professional (as defined in the Plan); and (c) clarifications regarding the payment of statutory fees.

---

[13]    On February 27, 2024, the Debtors filed the *Notice of Filing Amended Exhibits B, C, and E of the Plan Supplement for the Fourth Amended Joint Chapter 11 Plan of Reorganization for Proterra Inc and Its Debtor Affiliate* [Docket No. 1128], which included revised versions of the Schedule of Causes of Action, Assumption Schedule, and Restructuring Transactions Memorandum (each as defined in the Plan Supplement).

## IV.     SOLICITATION AND VOTING PROCESS

### A.     Plan Solicitation

27.     The Disclosure Statement Order:  (a) established solicitation and voting procedures with respect to the Plan (the "Solicitation and Voting Procedures"); (b) established notice and objection procedures with respect to the Plan; (c) established February 27, 2024, as the deadline for Holders of Claims entitled to vote on the Plan to submit ballots, opt-out forms, and opt-in forms, as applicable (the "Voting Deadline"); (d) established February 27, 2024, as the date by which to file objections to confirmation of the Plan (the "Plan Objection Deadline"); and (e) scheduled the commencement of the Confirmation Hearing for March 5, 2024 at 10:00 a.m. (prevailing Eastern Time).

28.     The Debtors were not required to solicit votes from Holders of Claims in Class 1 (Other Secured Claims), Class 2 (Other Priority Claims), Class 3 (First Lien Claims), Class 6 (Intercompany Claims), Class 7 (Interests in OpCo), Class 8 (Interests in TopCo), and Class 9 (Section 510(b) Claims) (such Classes, collectively, the "Non-Voting Classes") because the Non-Voting Classes are either unimpaired under the Plan and deemed to accept the Plan, or receive no distributions under the Plan and accordingly, are deemed to reject the Plan.  Instead, in accordance with the Disclosure Statement Order, the Debtors' claims and solicitation agent, Kurtzman Carson Consultants LLC ("KCC" or the "Solicitation Agent"), distributed Notices of Non-Voting Status to Holders of Unimpaired Claims Conclusively Presumed to Accept the Plan and Notice of Non-Voting Status to Holders of Impaired Interests Deemed to Reject the Plan, as applicable.  Solicitation Aff. at ¶¶15–16.

### B.     Voting Results

29.     In accordance with the Disclosure Statement Order, on or about January 30, 2024, the Solicitation Agent distributed copies of the Solicitation and Voting Procedures, the

applicable ballot with voting instructions (the "Ballot"), the Solicitation Package Cover Letter (as defined in the Disclosure Statement Order) and UCC Letter (as defined in the Disclosure Statement Order), Disclosure Statement, and exhibits thereto, including the Plan, the Disclosure Statement Order, and the Confirmation Hearing Notice (as defined in the Disclosure Statement Order) (the "Solicitation Package") to Holders of (a) Second Lien Convertible Notes Claims in Class 4 and (b) General Unsecured Claims in Class 5 (collectively, the "Voting Classes"). Solicitation Aff. at ¶¶11–12.  The Debtors published notice of the Confirmation Hearing and the Voting Deadline and Objection Deadline in the *New York Times* on January 29, 2024. *See Affidavit of Publication* [Docket No. 1050] (the "Publication Affidavit").

30.     All valid Ballots cast by Holders entitled to vote in the Voting Classes and received by the Solicitation Agent on or before the Voting Deadline were tabulated pursuant to the Solicitation Procedures.  Voting Decl. at ¶ 12. Class 4 and Class 5 voted to accept the Plan. *Id.* at Ex. A.  Because the Plan meets the requirements of section 1129(b) of the Bankruptcy Code, as further described below, the Debtors respectfully submit that the Court should confirm the Plan notwithstanding the Classes that were deemed to reject the Plan.

31.     The Solicitation Agent was also designated to tabulate which Holders of Claims and Interests elected not to grant the Third-Party Releases, either by submitting an Opt-In Form or by checking the appropriate box on their Ballot, as applicable.

## ARGUMENT

32.     The remainder of this Memorandum is divided into two parts.  *First*, the Debtors demonstrate that the Plan satisfies each applicable requirement of the Bankruptcy Code for purposes of Plan confirmation.  *Second,* Debtors demonstrate why any unresolved objections should be overruled.

<div align="center">

**Part One**

</div>

**V.    THE PLAN SATISFIES EACH REQUIREMENT FOR CONFIRMATION**

**A.    The Plan Complies with the Applicable Provisions of the Bankruptcy Code as Required by Section 1129(a)(1) of the Bankruptcy Code**

33.    To obtain confirmation of the Plan, the Debtors must demonstrate that the Plan satisfies the applicable provisions of section 1129 of the Bankruptcy Code by a preponderance of the evidence. *See In re Armstrong World Indus., Inc.*, 348 B.R. 111, 120 (D. Del. 2006) ("[T]he debtor's standard of proof that the requirements of § 1129 are satisfied is preponderance of the evidence."). The principal goal of this provision is to ensure compliance with the sections of the Bankruptcy Code governing classification of claims and interests and the contents of a plan of reorganization.[14] Through filings with the Court, including the Confirmation Declarations, and any evidence that may be adduced at the Confirmation Hearing, the Debtors will demonstrate that the Plan complies with all relevant sections of the Bankruptcy Code, the Bankruptcy Rules, and applicable non-bankruptcy law. In particular, the Plan fully complies with the requirements of sections 1122 and 1123 of the Bankruptcy Code. Each such requirement is addressed individually below. As a result, the Plan should be confirmed.

**1.    The Plan Satisfies the Classification Requirements of Section 1122(a) of the Bankruptcy Code**

34.    The Plan's classification of Claims and Interests complies with section 1122(a) of the Bankruptcy Code, which provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests

---

[14]    *See* S. Rep. No. 95-989, 95th Cong., 2d Sess. 126 (1978); H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 412 (1977); *see also In re Nutritional Sourcing Corp.*, 398 B.R. 816, 824 (Bankr. D. Del. 2008) (same); *In re S&W Enter.*, 37 B.R. 153, 158 (Bankr. N.D. Ill. 1984) ("An examination of the Legislative History of [section 1129(a)(1)] reveals that although its scope is certainly broad, the provisions it was most directly aimed at were [s]ections 1122 and 1123.").

of such class." 11 U.S.C. § 1122(a). Because claims need only be "substantially" similar to be placed in the same class, plan proponents have broad discretion in determining the classification of claims and interests. *See John Hancock Mut. Life Ins. Co.* v. *Route 37 Bus. Park Assocs.*, 987 F.2d 154, 159 (3d Cir. 1993) (As long as each class represents a voting interest that is "sufficiently distinct and weighty to merit a separate voice in the decision whether the proposed reorganization should proceed," the classification is proper.); *In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1060–61 (3d Cir. 1987) (recognizing that separate classes of claims must be reasonable and allowing a plan proponent to group similar claims in different classes). Courts have identified several grounds justifying the separate classification of claims, including: (a) where members of a class possess different legal rights; and (b) where sound business reasons support separate classification. *John Hancock*, 987 F.2d at 159. Additionally, section 1122(b) of the Bankruptcy Code expressly permits separate classification of certain claims for purposes of administrative convenience. 11 U.S.C. § 1122(b). Here, the Plan appropriately classifies Claims and Interests as follows:

| Class | Claim / Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | First Lien Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 4 | Second Lien Convertible Notes | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Intercompany Claims | Unimpaired/ Impaired | Not Entitled to Vote (Presumed to Accept / Deemed to Reject) |
| 7 | Interests in OpCo | Unimpaired/ Impaired | Not Entitled to Vote (Presumed to Accept / Deemed to Reject) |
| 8 | Interests in TopCo | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 9 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

35. The Plan's classification scheme satisfies the requirements of section 1122. The Plan provides for separate classification of Claims against and Interests in the Debtors based

upon differences in the nature and legal rights arising from such Claims and Interests. Accordingly, the Debtors can establish a reasonable basis for the classification scheme under the Plan. *See In re Nuverra Env't Sols., Inc.*, 590 B.R. 75, 96 (D. Del. 2018) ("In determining whether the separate classification of substantially similar claims is permissible[,] '[i]t is a well-recognized principle that the classification of claims or interests must be reasonable.'") (quoting *W.R. Grace & Co.*, 475 B.R. 34, 110 (D. Del. 2012)).  The Plan complies with section 1122 of the Bankruptcy Code.

**2.    The Plan Satisfies the Mandatory Requirements of Section 1123 of the Bankruptcy Code**

36.    Section 1123 of the Bankruptcy Code sets forth both mandatory and optional provisions that a chapter 11 plan must and may include.  As set forth below, the Plan satisfies each of section 1123's seven applicable mandatory requirements related to the specification of claims treatment and classification, the equal treatment of claims within classes, and the mechanics of implementing a plan.

37.    ***Proper Classification***.  The first requirement of section 1123(a) is that the plan specify the classification of claims and interests. 11 U.S.C. § 1123(a)(1).  Articles III.B and III.C of the Plan set forth these specifications in detail.  Thus, the Plan satisfies section 1123(a)(1) of the Bankruptcy Code.

38.    ***Specified Unimpaired and Impaired Classes***.  The second and third requirements of section 1123(a) are that the plan specify (a) the status (*i.e.*, impaired or unimpaired) of such claims and interests and (b) the precise nature of their treatment under the plan.  11 U.S.C. §§ 1123(a)(2), (a)(3).  Articles III.B and III.C of the Plan also sets forth these specifications in detail.  Thus, the Plan satisfies sections 1123(a)(2) and 1123(a)(3) of the Bankruptcy Code.

18

39. ***No Disparate Treatment***. The fourth requirement of section 1123(a) is that a plan must "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment." 11 U.S.C. § 1123(a)(4). The Plan satisfies this requirement because Holders of Allowed Claims or Interests in each Class will receive the same rights and treatment as other Holders of Allowed Claims or Interests within such Holders' respective Class, unless a Holder of an Allowed Claim agrees to less favorable treatment. *See* Plan Art. III.C. Accordingly, the Plan satisfies section 1123(a)(4) of the Bankruptcy Code.

40. ***Adequate Means for Implementation***. The fifth requirement of section 1123(a) is that a plan must provide adequate means for its implementation. *See* 11 U.S.C. § 1123(a)(5). The Plan, together with the documents and forms of agreement included in the Plan Supplement, provides a detailed blueprint for the transactions contemplated thereby.

41. Article IV of the Plan, in particular, sets forth the means for implementation of the Plan, which include, among other things: (a) consummation of the Restructuring Transactions, including as set forth in the Restructuring Transactions Memorandum; (b)(i) if a Plan Support Agreement Termination has not occurred, consummation the Reorganization or (ii) if a Plan Support Agreement Termination has occurred, consummation of the Plan Support Agreement Termination Distribution; (c) creation of the Distribution Trust and transfer of the Distribution Trusts Assets thereto; (d) adoption of the New Organizational Documents; (e) expiration of the current members of the boards of directors of each Debtor and the appointment of the New Board; and (f) preservation of the Debtors' Retained Causes of Action.

42.     The terms governing the execution of these transactions are also set forth in greater detail in the applicable definitive documents or forms of agreements included in the Plan Supplement.  Thus, the Plan satisfies section 1123(a)(5) of the Bankruptcy Code.

43.     ***Non-Voting Equity Securities***.  The sixth requirement of section 1123(a) is that a plan must contemplate a provision in the reorganized debtor's corporate charter, if the debtor is a corporation, which prohibits the issuance of non-voting equity securities or, with respect to preferred stock, adequate provisions for the election of directors upon an event of default.  *See* 11 U.S.C.§ 1123(a)(6).  The Plan provides that the New Organizational Documents will prohibit the issuance of non-voting securities to the extent prohibited by section 1123(a)(6) of the Bankruptcy Code.  Plan Art. IV.N.4.  Thus, the Plan satisfies section 1123(a)(6) of the Bankruptcy Code.

44.     ***Selection of Officers and Directors***.  Finally, section 1123(a)(7) requires that a plan "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan."  11 U.S.C. § 1123(a)(7).  Article IV.N.5 of the Plan provides that the term of the current members of the boards of managers shall expire, and the New Board shall be appointed in accordance with the respective New Organizational Documents; the Plan also provides that the Distribution Trustee shall be deemed to be the sole officer, member, shareholder, and manager of the Wind Down Debtors, if any.  In accordance with Article IV.N.5 of the Plan, the Debtors disclosed the identities and affiliations of the individuals proposed to serve as directors of the Reorganized Debtors and the identity of any insiders that will be employed or retained by the Reorganized Debtors, as well as the nature of any compensation for such insiders in the Plan Supplement.  *See* Plan Supplement, Ex. D-5.  The officers of the Reorganized Debtors have been disclosed in an amended Plan Supplement.  The selection process and composition of the New

Board and the officers of the Reorganized Debtors thus complies with applicable state law, the Bankruptcy Code, the interests of creditors and equity security holders, and public policy.

45.     Accordingly, the Debtors respectfully submit that the Plan satisfies section 1123(a) of the Bankruptcy Code.

**B.      The Plan Satisfies Section 1129(a)(2) of the Bankruptcy Code**

46.     Section 1129(a)(2) of the Bankruptcy Code requires that the plan proponent to comply with the applicable provisions of the Bankruptcy Code.  11 U.S.C. § 1129(a)(2).  Case law and legislative history indicate this section principally reflects the disclosure and solicitation requirements of section 1125 of the Bankruptcy Code, which prohibits solicitation of plan votes without a court-approved disclosure statement.  *See In re PWS Holding Corp.*, 228 F.3d 224, 248 (3d Cir. 2000); *In re Lapworth*, No. 97-34529 (DWS), 1998 WL 767456, at *3 (Bankr. E.D. Pa. Nov. 2, 1998) ("The legislative history of § 1129(a)(2) specifically identifies compliance with the disclosure requirements of § 1125 as a requirement of § 1129(a)(2).") (citations omitted).[15]

**1.      The Debtors Complied with the Disclosure and Solicitation Requirements of Section 1125**

47.     Section 1125 of the Bankruptcy Code prohibits the solicitation of acceptances or rejections of a plan of reorganization "unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information." 11 U.S.C. § 1125(b).  Section 1125 ensures that parties in interest are fully informed regarding a debtor's condition so that they may make an informed decision whether to approve or

---

[15]     *See also In re Worldcom, Inc.*, No. 02-13533 (AJG), 2003 WL 23861928, at *49 (Bankr. S.D.N.Y. Oct. 31, 2003) (stating that section 1129(a)(2) requires plan proponents to comply with applicable provisions of the Bankruptcy Code, including "disclosure and solicitation requirements under sections 1125 and 1126 of the Bankruptcy Code") (citations omitted); S. Rep. No. 989, 95th Cong., 2d Sess., at 126 (1978); H.R. Rep. No. 595, 95th Cong., 1st Sess., at 412 (1977).

reject the plan.[16]  *See Momentum Mfg. Corp.* v. *Emp. Creditors Comm. (In re Momentum Mfg. Corp.)*, 25 F.3d 1132, 1136 (2d Cir. 1994) (noting that section 1125 of the Bankruptcy Code obliges a debtor to engage in full and fair disclosure that would enable a hypothetical reasonable investor to make an informed judgment about the plan).

48.    On January 25, 2024, the Court approved the Disclosure Statement as containing "adequate information" within the meaning of section 1125(b) of the Bankruptcy Code when it entered the Disclosure Statement Order.  The Solicitation Agent solicited votes on the Plan consistent with the Court-approved Solicitation and Voting Procedures.  *See generally* Solicitation Aff.  Finally, the Debtors did not solicit acceptances of the Plan from any Holder of a Claim or Interest prior to entry of the Disclosure Statement Order, thus complying with section 1125(b) of the Bankruptcy Code.  *See* Voting Decl. at ¶ 9.

49.    By distributing the Disclosure Statement and soliciting acceptances of the Plan through their Solicitation Agent in accordance with the Disclosure Statement Order, the Debtors have complied with sections 1125 and 1126 of the Bankruptcy Code, as well as Bankruptcy Rules 3017 and 3018.  Solicitation of votes in accordance with the Court-approved Solicitation and Voting Procedures also complied with Local Rule 3017-1 with respect to the hearing on the Disclosure Statement, voting procedures, and service of the Disclosure Statement.

50.    Accordingly, the Debtors complied with the solicitation requirements of section 1125 of the Bankruptcy Code and the Disclosure Statement Order.

---

[16]   *See Momentum Mfg. Corp.* v. *Emp. Creditors Comm. (In re Momentum Mfg. Corp.)*, 25 F.3d 1132, 1136 (2d Cir. 1994) (noting that section 1125 of the Bankruptcy Code obliges a debtor to engage in full and fair disclosure that would enable a hypothetical reasonable investor to make an informed judgment about the plan).

**2.    The Debtors Only Solicited Parties Entitled to Vote Under Section 1126 of the Bankruptcy Code**

51.    Section 1126 of the Bankruptcy Code provides that only holders of claims and equity interests allowed under section 502 of the Bankruptcy Code in impaired classes that will receive or retain property under a plan on account of such claims or equity interests may vote to accept or reject a plan.  11 U.S.C. § 1126.  As noted above, the Debtors did not solicit votes on the Plan from the following Classes:

| Unimpaired Claims (Presumed to Accept) | | | |
|---|---|---|---|
| **Class** | **Claim/Interest** | **Status** | **Voting Rights** |
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | First Lien Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Impaired Claims (Deemed to Reject) | | | |
| **Class** | **Claim/Interest** | **Status** | **Voting Rights** |
| 6 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| 7 | Interests in OpCo | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| 8 | Interests in TopCo | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 9 | Section 510(b) Claim | Impaired | Not Entitled to Vote (Deemed to Reject) |

52.    Holders of Claims in the Unimpaired Classes are presumed to accept the Plan and Holders of Claims and Interests in the Deemed Rejecting Classes are deemed to reject the Plan and, therefore, were not entitled to vote on the Plan.  *See* 11 U.S.C. § 1126(f), (g).  Thus, the Debtors solicited votes only from Holders of Claims in the Voting Classes (Classes 4 and 5) because each of these Classes is Impaired and entitled to receive a distribution under the Plan.  *See* Plan, Art. III.C, Solicitation Aff.  The Voting Declaration, summarized above, reflects the results

of the voting process in accordance with section 1126 of the Bankruptcy Code.[17]  As set forth in

the Voting Declaration, Class 4 and Class 5 voted to accept the Plan.  *See* Voting Decl. at Ex. A.

53.     Based on the foregoing, the Debtors submit that the Plan satisfies the

requirements of section 1129(a)(2) of the Bankruptcy Code.

**C.     The Plan Has Been Proposed in Good Faith and Not by Any Means Forbidden by Law in Compliance with Section 1129(a)(3) of the Bankruptcy Code**

54.     Section 1129(a)(3) of the Bankruptcy Code requires that a chapter 11 plan

be "proposed in good faith and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3).

Where the plan proponent proposes the plan with the legitimate and honest purpose to reorganize

and has a reasonable hope of success, the plan proponent satisfies the good faith requirement of

section 1129(a)(3) of the Bankruptcy Code.  *See In re NII Holdings, Inc.*, 288 B.R. 356, 362

(Bankr. D. Del. 2002) (concluding that 1129(a)(3) is satisfied when "the Plan has been proposed

with the legitimate purpose of reorganizing the business affairs of each of the Debtors and

maximizing the returns available to creditors of the Debtors.").  Thus, "good faith" should be

evaluated in light of the totality of the circumstances surrounding the development of the plan.

*See Platinum Cap., Inc.* v. *Sylmar Plaza, L.P. (In re Sylmar Plaza, L.P.)*, 314 F.3d 1070, 1074

(9th Cir. 2002); *see also In re Madison Hotel Assocs.*, 749 F.2d 410, 425 (7th Cir. 1984) (stating

that to determine compliance with section 1129(a)(3), the court examines the plan "in light of the

totality of the circumstances surrounding confection of the plan") (internal quotation marks and

citations omitted).  The fundamental purpose of chapter 11 is to enable a distressed business to

---

[17]   "A class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated under subsection (e) of [section 1126], that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors, other than any entity designated under subsection (e) of [section 1126], that have accepted or rejected such plan."  11 U.S.C. 1126(c).  No Class of Interests was entitled to vote on the Plan.  *See* Plan, Art. III.C.  Therefore, the Debtors need not comply with section 1126(d) of the Bankruptcy Code.

reorganize its affairs to prevent the adverse economic effects associated with disposing of assets at liquidation value.  *See NLRB* v. *Bildisco & Bildisco*, 465 U.S. 513, 528 (1984); *B.D. Int'l Discount Corp.* v. *Chase Manhattan Bank, N.A.* (*In re B.D. Int'l Disc. Corp.*), 701 F.2d 1071, 1075 n.8 (2d Cir. 1983) (stating that "the two major purposes of bankruptcy [are] achieving equality among creditors and giving the debtor a fresh start").

55.     Here, the Debtors have proposed the Plan in good faith and solely for the legitimate and beneficial purpose of maximizing recoveries for creditors and positioning the Reorganized Debtors for success.  Pugh Decl. at ¶ 15.  Prior to the commencement of these Chapter 11 Cases, the Debtors faced constrained liquidity and an inability to invest in their Proterra Powered and Proterra Energy Business Lines.   Through the Marketing Process and the Restructuring Transactions embodied in the Plan, the Chapter 11 Cases facilitated the sale or reorganization of all three of the Debtors' Business Lines through a competitive and robust Marketing Process.  The Plan will allow the Reorganized Debtors to exit bankruptcy with no funded debt, positioning the Reorganized Debtors' business for success post-emergence.  The Debtors conducted the Marketing Process and negotiated, developed, and proposed the Plan in good faith and with input from the Committee and other stakeholders, including the Plan Sponsor.  Moreover, the Marketing Process provided for a true market test to ensure that the Chapter 11 Cases would maximize value for creditors under the Court's supervision.

56.     Therefore, the Plan represents the culmination of months of good faith, arm's-length negotiations among the Debtors and their key stakeholders.  Pugh Decl. at ¶ 15.  The Debtors' management team and advisors acted in good faith and in the best interests of the Debtors' estates in evaluating and negotiating the Bidding Procedures, Purchase Agreements, Plan, and Restructuring Transactions contemplated in connection with the finalization and execution of the

necessary documents for the Plan.  *Id.*  Throughout that process, the Debtors and their officers and directors have sought to forge consensus among stakeholders wherever possible.  *Id.*  The Plan was accepted by both Voting Classes.  Voting Decl. at Ex. A.  The voting results demonstrate the Plan's inherent fairness and good faith efforts to achieve the objectives of chapter 11.  Furthermore, the Plan is "not by any means forbidden by law," and indeed, is in full compliance with the Bankruptcy Code and applicable nonbankruptcy law.

57.     Accordingly, the Plan is the result of arm's-length negotiations following the robust, Court-approved Marketing Process, and it provides for the Reorganized Debtors to emerge as a going-concern and is feasible.  Therefore, the Plan and the Debtors' conduct satisfy section 1129(a)(3) of the Bankruptcy Code.  *See In re Mallinckrodt PLC*, 639 B.R. 837, 886 (Bankr. D. Del. 2022) (holding the plan satisfied section 1129(a)(3) of the Bankruptcy Code because, among other reasons, it recapitalized the business, the debtors demonstrated they were fair in dealing with creditors, and there was no allegations of misconduct).

**D.     The Plan Provides for Court Approval of Certain Administrative Payments in Compliance with Section 1129(a)(4) of the Bankruptcy Code**

58.     Section 1129(a)(4) of the Bankruptcy Code requires that certain professional fees and expenses paid by the plan proponent, by the debtor, or by a person issuing securities or acquiring property under the plan be subject to approval of the Court as reasonable. *See* 11 U.S.C. § 1129(a)(4); *see also In re Aleris Int'l, Inc.*, No. 09-10478 (BLS), 2010 WL 3492664, at *23 (Bankr. D. Del. May 13, 2010) (discussing requirements under section 1129(a)(4) for plan confirmation, including review of fees by the Court for reasonableness).

59.     Here, all payments made or to be made by the Debtors for services or for costs or expenses in connection with these Chapter 11 Cases prior to the Effective Date, including all Professional Compensation Claims (as defined in the Plan), were approved by, or are subject

to approval of, the Court.  Plan, Art. II.B.2.  Article II.B.2 of the Plan provides that final requests for payment of Professional Compensation Claims for services rendered and reimbursement of expenses incurred through and including the Effective Date must be filed no later than 30 days after the Effective Date for determination of the Allowed amounts of such fees by the Court in accordance with the order(s) relating to or allowing any such Professional Compensation Claim. *Id.*

60.    Accordingly, the Plan fully complies with the requirements of section 1129(a)(4) of the Bankruptcy Code.

**E.    The Debtors Complied with the Governance Disclosure Requirement in Compliance with Section 1129(a)(5) of the Bankruptcy Code**

61.    Section 1129(a)(5) of the Bankruptcy Code requires that the plan proponent disclose the identity and affiliations of the proposed officers and directors of the reorganized debtors; that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy; and, to the extent that there are any insiders that will be retained or employed by the debtors, that there be disclosure of the identity and nature of any compensation of any such insiders.  11 U.S.C. § 1129(a)(5).

62.    Here, as part of the Plan Supplement, the Debtors disclosed the identities and affiliations of the individuals proposed to serve as directors of the Reorganized Debtors and the identity of any insiders that will be employed or retained by the Reorganized Debtors, as well as the nature of any compensation for such insiders.  *See* Plan Supplement, Ex. D-5.  The officers of the Reorganized Debtors have been identified in an amended Plan Supplement.  *Id.*

63.    Accordingly, the Plan satisfies section 1129(a)(5) of the Bankruptcy Code.

**F.     The Plan Does Not Require Governmental Approval of Rate Changes and Therefore Complies with Section 1129(a)(6) of the Bankruptcy Code**

64.     Section 1129(a)(6) of the Bankruptcy Code permits confirmation only if any regulatory commission that will have jurisdiction over the debtor after confirmation has approved any rate change provided for in the plan.  11 U.S.C. § 1129(a)(6).  The Plan does not provide for any rate changes.  Therefore, section 1129(a)(6) of the Bankruptcy Code is inapplicable to the Plan.

**G.     The Plan is in the Best Interests of Creditors and Holders of Interests in Accordance with Section 1129(a)(7) of the Bankruptcy Code**

65.     Section 1129(a)(7) of the Bankruptcy Code—the "best interests of creditors" test—requires that, with respect to each impaired class of claims or interests, either: (a) each holder of a claim or interest of such class has accepted the plan; or (b) each holder will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtors liquidated under chapter 7 of the Bankruptcy Code.  11 U.S.C. § 1129(a)(7).  This test applies if a class of claims or interests entitled to vote does not vote unanimously to accept a plan, even if the class as a whole votes to accept the plan.  *See Bank of Am. Nat'l Trust and Sav. Ass'n* v. *203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 n.13 (1999) ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan.").  The best interests test is satisfied where the estimated recoveries under a proposed plan for a debtor's stakeholders that reject that plan are greater than or equal to the recoveries such stakeholders would receive in a hypothetical chapter 7 liquidation.  *In re Adelphia Commc'ns Corp.*, 368 B.R., 140, 252 (Bankr. S.D.N.Y. 2007) ("In determining whether the best interests standard is met, the court must measure what is to be received by rejecting creditors in the impaired classes under the plan against what would be received by them in the event of liquidation under chapter 7.").  Because the best

Case 23-11120-BLS    Doc 1147    Filed 03/01/24    Page 37 of 78

interests test by its terms does not apply to unimpaired Classes under the Plan, it is not relevant for Class 1 (Other Secured Claims), Class 2 (Other Priority Claims), and Class 3 (First Lien Claims).

66.     The "best interests test" requires a determination of what the holders of Allowed Claims and Allowed Interests in each impaired class would receive in a hypothetical liquidation of the Debtors' assets and properties in the context of a liquidation under chapter 7 of the Bankruptcy Code.  To determine if the Plan is in the best interests of Holders of Allowed Claims and Interests in each Impaired Class, the value of the distributions from the proceeds of the hypothetical liquidation of the Debtors' assets and properties is compared with the value offered to such classes of Claims and Interests under the Plan.  Pugh Decl. at ¶¶ 22–25.  Exhibit B of the Disclosure Statement contained the liquidation analysis that the Debtors' financial advisor, FTI Consulting, Inc. ("FTI"), along with other advisors, performed in connection with the Plan (the "Liquidation Analysis").  As described more fully in the Pugh Declaration, the Debtors carefully completed the Liquidation Analysis after extensive due diligence.  Pugh Decl. at ¶ 22.  Subject to the assumptions and qualifications contained therein, the Liquidation Analysis establishes that all Holders of Claims and Interests in Impaired Classes will receive or retain property under the Plan valued, as of the Effective Date, in an amount greater than or equal to the value of what they would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code, as illustrated in the following table:

| Class | Claim/Interest | Estimated Plan Recovery | Estimated Chapter 7 Liquidation Recovery |
|---|---|---|---|
| 4 | Second Lien Convertible Notes Claims | 100% | 100% |
| 5 | General Unsecured Claims | 15.7-24.8% | 7.5-12.1% |
| 6 | Intercompany Claims | N/A | N/A |
| 7 | Interests in OpCo | N/A | N/A |

| Class | Claim/Interest | Estimated Plan Recovery | Estimated Chapter 7 Liquidation Recovery |
|-------|----------------|-------------------------|-------------------------------------------|
| 8 | Interests in TopCo | 0% | 0% |
| 9 | Section 510(b) Claims | 0% | 0% |

Pugh Decl. at ¶ 25.

67.     As demonstrated by the Liquidation Analysis, if the Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code, creditors would receive no more than their respective Plan recoveries.  Pugh Decl. at ¶ 26.  Additionally, all of the Holders of Claims entitled to vote on the Plan received the Liquidation Analysis, together with the Disclosure Statement, and were provided appropriate time to consider the contents thereof.

68.     Accordingly, the Debtors submit that the Plan fully complies with and satisfies the "best interest test" and all other requirements of section 1129(a)(7) of the Bankruptcy Code.

**H.     At Least One Impaired Class of Claims Has Accepted the Plan as Required by Section 1129(a)(8) of the Bankruptcy Code**

69.     Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests either accept a plan or not be impaired by a plan. 11 U.S.C. § 1129(a)(8).  A class of claims or interests that is not impaired under a plan is "conclusively presumed" to have accepted the plan and need not be further examined under section 1129(a)(8) of the Bankruptcy Code.  *See* 11 U.S.C. § 1126(f).  As set forth above, Classes 4 and Class 5 have voted to accept the Plan.  Specifically, 100% of Holders entitled to vote in Class 4 who voted on the Plan voted to accept the Plan.  Voting Decl., Ex. A.  84% in number and 68% in amount of Class 5 who voted on the Plan voted to accept the Plan, so it is an accepting class under section 1126(c) of the Bankruptcy Code, and Classes 8 and 9 are deemed to reject the Plan under section 1126(g) of the

Bankruptcy Code because Holders of Claims and Interests in such Classes are not entitled to receive or retain any property under the Plan.  Holders in Classes 6 and 7 are either Unimpaired and deemed to accept the Plan, or Impaired and deemed to reject the Plan.  Therefore, section 1129(a)(8) of the Bankruptcy Code has not been satisfied with respect to these Classes.  However, the Plan is nevertheless confirmable because, as discussed below, it satisfies section 1129(b) of the Bankruptcy Code with respect to these rejecting classes.

I.   **The Plan Treats Administrative and Priority Tax Claims in Accordance with Section 1129(a)(9) of the Bankruptcy Code**

70.   Section 1129(a)(9) of the Bankruptcy Code requires that certain priority claims be paid in full on the effective date of a plan and that holders of certain other priority claims receive deferred cash payments, unless such holders agree to different treatment for such claim. 11 U.S.C. § 1129(a)(9).  In particular, pursuant to section 1129(a)(9)(A) of the Bankruptcy Code, holders of claims of a kind specified in section 507(a)(2) of the Bankruptcy Code (*i.e.*, administrative claims allowed under section 503(b) of the Bankruptcy Code) must receive on the effective date cash equal to the allowed amount of such claims.  11 U.S.C. § 1129(a)(9)(A). Section 1129(a)(9)(B) of the Bankruptcy Code requires that each holder of a claim of a kind specified in section 507(a)(1) or (4) through (7) of the Bankruptcy Code—generally domestic support obligations, wage, employee benefit, and deposit claims entitled to priority—must receive deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim (if such class has accepted the plan) or cash of a value equal to the allowed amount of such claim on the effective date of the plan (if such class has not accepted the plan). 11 U.S.C. § 1129(a)(9)(B)(i), (ii).  Finally, section 1129(a)(9)(C) of the Bankruptcy Code provides that the holder of a claim of a kind specified in section 507(a)(8) of the Bankruptcy Code (*i.e.*, priority tax claims) must receive cash payments over a period not to exceed five years from the petition date,

the present value of which equals the allowed amount of the claim.  11 U.S.C. § 1129(a)(9)(C)(i), (ii).

71.     The Plan satisfies section 1129(a)(9) of the Bankruptcy Code.

- *First*, the Plan satisfies section 1129(a)(9)(A) of the Bankruptcy Code because Article II.A provides that each Holder of an Allowed Administrative Expense Claim will receive payment in full on the Effective Date.

- *Second*, the Plan satisfies section 1129(a)(9)(B) of the Bankruptcy Code because no Holders of the types of Claims specified by section 1129(a)(9)(B) are Impaired under the Plan and such Claims have been paid in the ordinary course.

- *Third,* the Plan satisfies section 1129(a)(9)(C) of the Bankruptcy Code because Article II.C specifically provides that the Holders of Allowed Priority Tax Claims will be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

72.     Accordingly, the Debtors submit that the Plan satisfies all of the requirements of section 1129(a)(9) of the Bankruptcy Code.

**J.     The Plan Was Accepted by at Least One Impaired Class as Required by Section 1129(a)(10) of the Bankruptcy Code**

73.     Section 1129(a)(10) of the Bankruptcy Code requires the affirmative acceptance of the Plan by at least one Class of impaired Claims, "determined without including any acceptance of the plan by any insider."  11 U.S.C. § 1129(a)(10).  Class 4 (Second Lien Convertible Notes Claims) and Class 5 (General Unsecured Claims) are Impaired and have accepted the Plan, without including the acceptance of the Plan by any insiders in such Classes. Voting Decl., Ex. A.  Accordingly, the Plan satisfies section 1129(a)(10) of the Bankruptcy Code.

**K.     The Plan is Feasible Within the Meaning of Section 1129(a)(11) of the Bankruptcy Code**

74.     Section 1129(a)(11) of the Bankruptcy Code requires that the bankruptcy court find a plan is feasible as a condition precedent to confirmation.  Specifically, the bankruptcy

court must determine that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is provided for in the plan. *See* 11 U.S.C. § 1129(a)(11).

75.      A debtor does not have to guarantee the success of a plan to demonstrate its feasibility under section 1129(b)(11) of the Bankruptcy Code. *See In re Tonopah Solar Energy, LLC*, Case No. 20-11844 (KBO), 2022 WL 982558 (D. Del. March 31, 2022) ("[T]he feasibility standard is whether the plan offers a reasonable assurance of success. Success need not be guaranteed.") (quoting *Kane* v. *Johns-Manville Corp (In re Johns-Manville Corp.)*, 843 F.2d 636, 649 (2d Cir. 1988)); *In re Indianapolis Downs, LLC*, 486 B.R. 286, 298 ("§ 1129(a)(11) does not require a guarantee of the plan's success; rather the proper standard is whether the plan offers a 'reasonable assurance' of success.").[18] Instead, courts will find that a plan is feasible if a debtor demonstrates a reasonable assurance that consummation of the plan will not likely be followed by a further need for financial reorganization. *In re Indianapolis Downs*, 486 B.R. at 298. "The purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation." *Pizza of Hawaii, Inc.* v. *Shakey's, Inc. (In re Pizza of Haw., Inc.)*, 761 F.2d 1374, 1382 (9th Cir. 1985) (citations omitted).

76.      Courts consider a number of factors when assessing feasibility of a plan, including:

---

[18]   *See also In re W.R. Grace & Co.*, 475 B.R. 34, 115 (D. Del. 2012) (finding that a court "need not require a guarantee of success, but rather only must find that the plan presents a workable scheme of organization and operation from which there may be reasonable expectation of success"); *In re Prussia Assocs.*, 322 B.R. 572, 584 (Bankr. E.D. Pa. 2005) (observing that "[t]he Code does not require the debtor to prove that success is inevitable, and a relatively low threshold of proof will satisfy § 1129(a)(11) so long as adequate evidence supports a finding of feasibility") (internal quotation marks omitted).

- the adequacy of the capital structure;

- the earning power of the business;

- the economic conditions;

- the ability of management; and

- any other related matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.[19]

77.     The Plan satisfies the feasibility requirements of section 1129(a)(11) of the Bankruptcy Code by providing for a clear path to emergence from these Chapter 11 Cases and the Debtors' ability to satisfy all of their obligations under the Plan.  The Debtors, together with their creditor constituents—which include the future owners of the Reorganized Debtors—have thoroughly analyzed the Debtors' ability to meet their obligations under the Plan and submit that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.  Pugh Decl., at ¶ 32.  Notably, if no Plan Support Agreement Termination has occurred, the Reorganized Debtors will be funded with the Reorganized Proterra Retained Cash in an amount equal to Second Lien Convertible Notes Claims *less* the Equity Distribution Reduction, Cure Cost Reduction, and Proterra Energy Transition Cost Reduction.  Therefore, the Reorganized Debtors will be funded with approximately $181.5 million of cash on the Effective Date.  Pugh Decl., at ¶ 31.  Moreover, the Reorganized Debtors will have no funded debt on the Effective Date.

78.     The Financial Projections (as defined below) further demonstrate that the Plan is feasible.  As set forth in the Pugh Declaration, to ensure their ability to fulfill their go-forward obligations under the Plan, the Debtors, with the assistance of their advisors, prepared projections of the Reorganized Debtors' financial performance for fiscal years 2024 through 2026

---

[19]     *See, e.g.*, *In re Aleris Int'l*, 2010 WL 3492664, at *28.

(the "Financial Projections").  *See* Plan Supplement, Ex. F.  As discussed in greater detail in the Pugh Declaration, the Debtors submit that the Financial Projections demonstrate the Reorganized Debtors' ability to continue operating in the ordinary course post-emergence.  The Financial Projections demonstrate that the Reorganized Debtors are expected to realize positive unlevered free cash flow in fiscal year 2026.  This expectation, coupled with the large amount of cash expected to be retained by the Reorganized Debtors, shows that confirmation of the Plan is unlikely to be followed by liquidation or the need for further reorganization.

79.    Moreover, the Plan is the product of extensive negotiations and discussions among the Debtors and their key stakeholders.  Pugh Decl., at ¶ 30.  The Debtors' stakeholders extensively reviewed the Debtors' Financial Projections, which ultimately resulted in the terms incorporated into the Plan.  Indeed, the Holders of Second Lien Convertible Notes Claims have agreed to forgo a payment in cash in exchange for funding the Reorganized Proterra Retained Cash Amount, thereby evidencing their conviction that the Plan is feasible.  *Id.*  Furthermore, not a single Objection challenges the Debtors' Financial Projections or the business plan that supports the Plan.

80.    Accordingly, the Plan satisfies the feasibility requirements of section 1129(a)(11) of the Bankruptcy Code.

**L.    The Plan Complies with Section 1129(a)(12) of the Bankruptcy Code**

81.    Section 1129(a)(12) of the Bankruptcy Code requires the payment of "[a]ll fees payable under section 1930 of title 28, as determined by the court at the hearing on confirmation of the plan[.]"  11 U.S.C. § 1129(a)(12).  Section 507 of the Bankruptcy Code provides that "any fees and charges assessed against the estate under [section 1930] of title 28" are afforded priority as administrative expenses. 11 U.S.C. § 507(a)(2).  Article II.D of the Plan provides that on the Effective Date, the Debtors shall pay, in full in cash, any fees due and owing

to the U.S. Trustee at the time of Confirmation.  Thereafter, the Distribution Trustee (as defined in the Plan) or any Disbursing Agent (as defined in the Plan) appointed by the Distribution Trustee, shall pay all U.S. Trustee fees due and owing under section 1930 of the Judicial Code in the ordinary course until the earlier of (a) the entry of a final decree closing the applicable Reorganized Debtor's Chapter 11 Case, or (b) the Court enters an order converting or dismissing the applicable Reorganized Debtor's Chapter 11 Case.  Finally, the Plan provides that any deadline for filing Administrative Expense Claims (as defined in the Plan) or Accrued Professional Compensation Claims (as defined in the Plan) shall not apply to U.S. Trustee fees.

82.     The Plan, therefore, complies with section 1129(a)(12) of the Bankruptcy Code.

**M.     Sections 1129(a)(13)–(16) of the Bankruptcy Code Are Inapplicable to the Debtors**

83.     Section 1129(a)(13) of the Bankruptcy Code applies only where debtors provide retiree benefits as defined by section 1114(a) of the Bankruptcy Code.  The Debtors do not provide such retiree benefits.  Therefore, section 1129(a)(13) of the Bankruptcy Code is inapplicable.

84.     Sections 1129(a)(14) and (15) of the Bankruptcy Code apply only to debtors that are individuals.  The Debtors are not individuals.  Therefore, sections 1129(a)(14) and (15) of the Bankruptcy Code are inapplicable.

85.     Section 1129(a)(16) of the Bankruptcy Code applies only to debtors that are non-profit entities or trusts.  The Debtors are not non-profit entities or trusts.  Therefore, section 1129(a)(16) of the Bankruptcy Code is inapplicable.

**N.     The Plan Satisfies the "Cram Down" Requirements Under Section 1129(b) of the Bankruptcy Code for Non-Accepting Classes**

86.     Section 1129(b) of the Bankruptcy Code provides a mechanism (known as "cram down") for confirmation of a chapter 11 plan in circumstances where the plan is not accepted by all impaired classes of claims.  11 U.S.C. § 1129(b)(1).   Under section 1129(b)(1), the bankruptcy court may "cram down" a plan over the dissenting vote of an impaired class or classes of claims or interests as long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to such dissenting class or classes.  *Id*.

87.     Claims and Interests in Class 8 (Interests in TopCo) and Class 9 (Section 510(b) Claims) are Impaired under the Plan, and the Holders of such Claims and Interests have been deemed to reject the Plan.  Claims and Interests in Class 6 (Intercompany Claims) and Class 7 (Interests in OpCo) may be Impaired under the Plan and deemed to reject the Plan (Classes 6, 7, 8, 9, collectively, the "Rejecting Classes").  The Debtors respectfully submit that the Plan may nonetheless be confirmed over the rejection by such Classes pursuant to section 1129(b) of the Bankruptcy Code, because the Plan does not discriminate unfairly and is fair and equitable with respect to all non-accepting Impaired Classes.

**1.     The Plan Does Not Discriminate Unfairly**

88.     The Plan does not discriminate unfairly with respect to the Rejecting Classes.  Although the Bankruptcy Code does not provide a standard for determining when "unfair discrimination" exists, courts typically examine the facts and circumstances of the particular case to make the determination.  *See In re 203 N. LaSalle St. Ltd. P'ship.*, 190 B.R. 567, 585 (Bankr. N.D. Ill. 1995), *rev'd on other grounds, Bank of Am.*, 526 U.S. 434 (1999) (noting "the lack of any clear standard for determining the fairness of a discrimination in the treatment of classes under a Chapter 11 plan" and that "the limits of fairness in this context have not been established"); *see*

*also In re Bowles*, 48 B.R. 502, 507 (Bankr. E.D. Va. 1985) ("[W]hether or not a particular plan

does so [unfairly] discriminate is to be determined on a case-by-case basis . . ."). Generally, courts

have held that a plan unfairly discriminates in violation of section 1129(b) only if similarly situated

claims receive materially different treatment without a reasonable basis for the disparate treatment.

*See In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 228 (Bankr. D.N.J. 2000) (noting that

one of the "[t]he hallmarks of the various tests" is "whether there is a reasonable basis for the

discrimination . . ."). A plan does not unfairly discriminate where it provides different treatment

to two or more classes that are comprised of dissimilar claims or interests. *See, e.g.*, *In re Ambanc*

*La Mesa Ltd. P'ship*, 115 F.3d 650, 657 (9th Cir. 1997); *In re Johns-Manville Corp.*, 68 B.R. at

636. Likewise, there is no unfair discrimination if, taking into account the particular facts and

circumstances of the case, there is a reasonable basis for the disparate treatment. *See In re*

*Armstrong World Indus., Inc.*, 348 B.R. 111, 121 (D. Del. 2006) ("The hallmarks of the various

tests have been whether there is a reasonable basis for the discrimination[.]") (quoting *In the Matter*

*of Lernout & Hauspie Speech Prods., N.V.*, 301 B.R. 651, 660 (Bankr. D. Del. 2003)).

89.     Here, the Plan's treatment of the Rejecting Classes is proper because all

similarly situated Holders of Claims and Interests will receive substantially similar treatment, and

the Plan's classification scheme rests on a legally acceptable rationale that treats each Rejecting

Class based on its particular facts and circumstances under these Chapter 11 Cases. For example,

all Holders of Interests in TopCo (Class 8) will have their Interest cancelled without distribution

or compensation; and all Holders of Section 510(b) Claims (Class 9) shall be canceled and released

without any distribution on account of such Section 510(B) Claims. Accordingly, the Plan does

not discriminate unfairly with respect to the Rejecting Classes and satisfies the requirements of

section 1129(b).

## 2.    The Plan is Fair and Equitable

90.    For a plan to be "fair and equitable" with respect to an impaired class of unsecured claims or interests that rejects a plan (or is deemed to reject a plan), the plan must follow the "absolute priority" rule and satisfy the requirements of section 1129(b)(2). *See* 11 U.S.C. § 1129(b)(2)(B)(ii); 11 U.S.C. § 1129(b)(2)(C)(ii); *see also 203 N. LaSalle*, 526 U.S. at 441–42 ("As to a dissenting class of impaired unsecured creditors, such a plan may be found to be 'fair and equitable' only if the allowed value of the claim is to be paid in full, § 1129(b)(2)(B)(i), or, in the alternative, if 'the holder of any claim or interest that is junior to the claims of such [impaired unsecured] class will not receive or retain under the plan on account of such junior claim or interest any property,' § 1129(b)(2)(B)(ii). That latter condition is the core of what is known as the 'absolute priority rule.'").  Generally, this requires that an impaired rejecting class of claims or interests either be paid in full or that a class junior to the impaired rejecting class not receive any distribution under a plan on account of its junior claim or interest. *See 203 N. LaSalle*, 526 U.S. at 459.

91.    The Plan is fair and equitable with respect to Class 8 (Interests in TopCo), and Class 9 (Section 510(b) Claims).  While these Classes are not paid in full, no Classes junior to these Classes will receive a recovery under the Plan.[20]  Accordingly, the Plan is "fair and equitable" with respect to all Rejecting Classes and satisfies section 1129(b) of the Bankruptcy Code.

---

[20]    To the extent Classes 6 (Intercompany Claims) and 7 (Interests in OpCo) receive a recovery, such treatment is not "on account of" such Intercompany Claims or Intercompany Interests within the meaning of section 1129(b)(2)(B)(ii) of the Bankruptcy Code.  Rather, it is simply to maintain the Debtors' prepetition organizational structure for the administrative benefit of the Reorganized Debtors and has no economic substance.  Courts have recognized that such technical preservations for the purpose of corporate formalities do not violate the absolute priority rule, and the unimpairment of such Claims and Interests, if any, affects neither the economic substance of the Plan, nor any recoveries to the Debtors' creditors. *See In re Glob. Ocean Carriers Ltd.*, 251 B.R. 31, 47–48 (Bankr. D. Del. 2000) (holding that "the retention of the corporate structure among the Debtors will not adversely affect any creditors" and does not violate absolute priority rule); *In re ION Media Networks, Inc.*, 419 B.R. 585, 661 (Bankr. S.D.N.Y. 2009) ("This technical preservation of equity is a means to preserve the corporate

O.      **The Plan is the Only Plan for Purposes of Section 1129(c) of the Bankruptcy Code**

92.     Section 1129(c) of the Bankruptcy Code provides that a bankruptcy court may confirm only one plan.  11 U.S.C. § 1129(c).  Because the Plan is the only plan before the Court, section 1129(c) is satisfied.

P.      **The Plan's Principal Purpose is Not Avoidance of Taxes or Section 5 of the Securities Act as Prohibited by Section 1129(d) of the Bankruptcy Code**

93.     Section 1129(d) of the Bankruptcy Code states that "the court may not confirm a plan if the principal purpose of the plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933."  11 U.S.C. § 1129(d).  The purpose of the Plan is not to avoid taxes or the application of section 5 of the Securities Act of 1933.  Pugh Decl. at ¶ 42.  Article II.A of the Plan contemplates the payment of all Allowed Priority Tax Claims.  Accordingly, the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.

Q.      **Section 1129(e) of the Bankruptcy Code Does Not Apply to the Plan**

94.     The provisions of section 1129(e) of the Bankruptcy Code apply only to a "small business case" as defined therein.  11 U.S.C. § 1129(e).  These Chapter 11 Cases are not "small business cases."  Accordingly, section 1129(e) of the Bankruptcy Code does not apply to the Plan.

## VI.    THE DISCRETIONARY CONTENTS OF THE PLAN ARE APPROPRIATE AND SHOULD BE APPROVED

A.      **The Plan Satisfies the Discretionary Provisions of Section 1123(b) of the Bankruptcy Code**

95.     Section 1123(b) of the Bankruptcy Code allows a plan to include a variety of non-mandatory provisions.  Among other things, section 1123(b) of the Bankruptcy Code

---

structure that does not have any economic substance and that does not enable any junior creditor or interest holder to retain or recover any value under the Plan.").

provides that a plan may: (a) impair or leave unimpaired any class of claims or interests; (b) provide for the assumption or rejection of executory contracts and unexpired leases; (c) provide for the settlement or adjustment of any claim or interest belonging to the debtor or the estates; and (d) include any other appropriate provision not inconsistent with the applicable provisions of chapter 11. *See* 11 U.S.C. § 1123(b)(1)–(3), (6).  Each of the Plan's permissive provisions comport with these requirements:[21]

- as permitted under section 1123(b)(1) of the Bankruptcy Code, Article III classifies and describes the treatment for Claims and Interests under the Plan, and identifies which Claims and Interests are impaired or unimpaired;

- as permitted under section 1123(b)(2) of the Bankruptcy Code, Article V provides for the rejection of executory contracts and unexpired leases, except for any executory contract or unexpired lease which is (a) a D&O Policy or an Insurance Contract, (b) has been identified on the Schedule of Assumed Executory Contracts and Unexpired Leases, (c) has been otherwise rejected, assumed, or assumed and assigned, or (d) is the subject of a motion filed by the Debtors prior to the Effective Date to assume, assume and assign, or reject such executory contract or unexpired lease on which the Court has not ruled.  The Debtors filed their Schedule of Assumed Contracts with the Plan Supplement.  *See* Plan Supplement at Ex. C;

- pursuant to section 1123(b)(3)(A) of the Bankruptcy Code, the Plan (a) is premised on the Liquidation Payment Settlement by and among the Debtors, the Plan Sponsor, and the Committee, and (b) provides that, unless waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Court order, the Debtors' Causes of Action will be reserved and assigned to Reorganized Proterra or the Distribution Trust as set forth on the Schedule of Retained Causes of Action.  As discussed below, the Liquidation Payment Settlement satisfies the standard for approval under Bankruptcy Rule 9019; and

- as permitted by section 1123(b)(5) of the Bankruptcy Code, Article III modifies the rights of Holders of Claims as set forth therein.

---

[21]   Section 1123(b)(4), which authorizes the sale of substantially all of a debtor's property pursuant to a plan, is inapplicable here.

**B.      The Plan's Cure Process is Appropriate under Section 1123(d) of the Bankruptcy Code**

96.      Section 1123(d) of the Bankruptcy Code provides that amounts necessary to cure defaults under executory contracts proposed to be assumed shall be "determined in accordance with the underlying agreement and applicable nonbankruptcy law." 11 U.S.C. § 1123(d).   Article V.D of the Plan provides for the satisfaction of Cure Claims associated with each Executory Contract or Unexpired Lease to be assumed in accordance with section 365(b)(1) of the Bankruptcy Code.   *See* 11 U.S.C. § 365(b)(1).   Specifically, the Debtors or the Reorganized Debtors, as applicable, shall pay Cure Claims, if any, as indicated on the Cure Notices distributed to the counterparties of assumed Executory Contracts and Unexpired Leases, on the later of the Effective Date, the date of resolution of any dispute regarding the assumption or assumption and assignment of the Executory Contract or Unexpired Lease, or as soon as reasonably practicable thereafter.   *See* Plan Art. V.D.[22]   Any disputed Cure Claims will be determined in accordance with the procedures set forth in Article V.D of the Plan and applicable law.  As such, the Plan provides that the Debtors will cure, or provide adequate assurance that the Debtors will promptly cure, defaults with respect to assumed Executory Contracts or Unexpired Leases in compliance with section 365(b)(1) of the Bankruptcy Code, and therefore complies with section 1123(d) of the Bankruptcy Code.

**C.      The Plan's Release, Exculpation, and Injunction Provisions Are Reasonable, in the Best Interests of the Debtors' Estates, and Comply with the Bankruptcy Code**

97.      Among other discretionary provisions, the Plan contains certain Debtor and consensual third-party releases, exculpation, and injunction provisions.  These provisions are the

---

[22]      The form of the notice of assumption (or assumption and assignment) of any Executory Contract and Unexpired Leases (and any corresponding cure claims) was approved in the Disclosure Statement Order at paragraph III.F.23 and Exhibit 6 thereto.

product of extensive good faith, arm's-length negotiations, were an essential element of the negotiations between the Debtors and their key constituencies in obtaining their support for the Plan Support Agreement and the Plan, are an integral part of the Debtors' overall restructuring efforts, facilitate the Debtors' exit from chapter 11 by providing necessary finality, and are consistent with applicable precedent in this District.

98.     Indeed, the Debtors' Investigation Committee—which conducted a thorough independent Investigation of potential estate claims and causes of action against Insiders (as defined below)—believes that the Debtor releases and third-party releases are reasonable and appropriate.  Frizzley Decl., ¶¶ 20, 23.  As discussed in the Frizzley Declaration, the Investigation Committee was vested with the full and exclusive power and authority of the Board to (a) oversee an independent investigation (the "Investigation") of any potential claims and causes of action of the Debtors that may exist against any of the Debtors' directors, officers, managers, members, equity holders, principals, employees, and any other individual that is an insider (the "Insiders") of the Debtors and (b) determine what action should be taken, if any.

### 1.     The Debtor Release Is Appropriate and Should Be Approved

99.     Section 1123(b) of the Bankruptcy Code provides that a chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."  *See In re Coram Healthcare Corp.*, 315 B.R. 321, 334–35 (Bankr. D. Del. 2004) (holding that standards for approval of settlement under section 1123 of the Bankruptcy Code are generally the same as those under Bankruptcy Rule 9019).  Generally, courts in the Third Circuit approve a settlement by the debtors if the settlement "exceed[s] the lowest point in the range of reasonableness."  *See, e.g.*, *In re Exaeris, Inc.*, 380 B.R. 741, 746–47 (Bankr. D. Del. 2008) (internal citation omitted); *In re World Health Alts., Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006) (stating that settlement must be within reasonable range of litigation possibilities).  Furthermore,

a debtor may release claims under section 1123(b)(3)(A) of the Bankruptcy Code "if the release is a valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate." *In re Spansion, Inc.*, 426 B.R. 114, 143 (Bankr. D. Del. 2010); *see also In re Wash. Mut., Inc.*, 442 B.R. 314, 327 (Bankr. D. Del. 2011) ("In making its evaluation [whether to approve a settlement], the court must determine whether 'the compromise is fair, reasonable, and in the best interest of the estate.'") (internal citation omitted).

100.    In addition to analyzing debtor releases under the business judgment standard, some courts within the Third Circuit assess the propriety of a "debtor release" in light of five "*Zenith* factors" in the context of a chapter 11 plan:[23]

- whether there is an identity of interest between the debtor and the third party;

- whether the third party has made a substantial contribution to the debtor's reorganization;

- whether the release is essential to the debtor's reorganization;

- whether a substantial majority of creditors support the release; and

- whether the plan provides for payment of all or substantially all of the claims in the class or classes affected by the release.

No one factor is dispositive, nor is a plan proponent required to establish each factor for the release to be approved. *Wash. Mut.*, 442 B.R. at 346 ("These factors are neither exclusive nor conjunctive requirements, but simply provide guidance in the [c]ourt's determination of fairness."); *In re Exide Techs.*, 303 B.R. 48, 72 (Bankr. D. Del. 2003) (finding that *Zenith* factors are not exclusive or conjunctive requirements).

---

[23]    *See, e.g.*, *In re Indianapolis Downs, LLC*, 486 B.R. 286, 303 (Bankr. D. Del. 2013) (citing *In re Zenith Elecs. Corp.*, 241 B.R. 92 (Bankr. D. Del. 1999)).

101.    Article IX.B of the Plan provides for certain releases by the Debtors (the "Debtor Release"), as of the Effective Date, of, among other things, certain claims, rights, and causes of action that the Debtors, Reorganized Debtors, and Wind Down Debtors, as applicable, may have against the Released Parties.  The Debtors have satisfied the business judgment standard in granting the Debtor Release under the Plan because it is fair, reasonable, and in the best interests of the Debtors' estates.

102.    Notably, the Debtor Release was negotiated in connection with the Plan Support Agreement, is a vital component of the Plan, and constitutes a sound exercise of the Debtors' business judgment.  Critically, without the Debtor Release, the Debtors would not have secured support from the Plan Sponsor, the Committee, and other Released Parties for the Plan, including the terms of the Liquidation Payment Settlement.  Frizzley Decl. ¶ 19.  In addition to the significant benefits provided by the Plan, the Debtors will receive as consideration for the Debtor Release mutual releases of potential claims and causes of action from the Releasing Parties.

103.    In analyzing the Debtor Release, it is important to recognize that the Debtor Release reflects the review and assessment of potential claims by the Investigation Committee. The Investigation Committee is comprised of independent director Jill Frizzley.  As discussed in the Frizzley Declaration, the Investigation Committee was vested with the full and exclusive power and authority of the Board to conduct the Investigation.  To carry out its mandate and discharge its responsibilities, the Investigation Committee retained Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Investigation Committee Counsel") as counsel.  Frizzley Decl., ¶ 6.  FTI also provided investigative support in the Investigation.  *Id.*  In regular consultation with the Investigation Committee, Investigation Committee Counsel performed an independent factual examination and a review and analysis of applicable federal and state law.  For example,

Investigation Committee Counsel collected emails from nine document custodians in senior leadership, accounting, and finance functions at the Company. Investigation Committee Counsel reviewed approximately 11,500 of these emails and attachments (totaling approximately 135,000 pages). *Id.* at ¶7. Investigation Committee Counsel also collected and reviewed minutes from meetings of the Board and the Audit Committee of the Board and further reviewed key transaction documents, the Company's publicly filed documents, publications in financial media, as well as other relevant data sources. *Id.* Finally, Investigation Committee Counsel interviewed eight current or former officers, directors, and employees of the Company. *Id.* At the conclusion of the Investigation, the Investigation Committee did not identify any plausible or colorable Potential Causes of Action that, if pursued by the Debtors, is likely to provide value to the Debtors' estates. *Id.* at ¶ 12.

104.    Additionally, to the extent the *Zenith* factors apply to the Debtor Release,[24] these factors support the proposed Debtor Release here. ***First***, there is an identity of interest between the Debtors and many of the parties to be released. The Released Parties generally include stakeholders and proponents that are and have been critical participants in the Plan process, sharing a common goal in seeing the Marketing Process and Plan succeed. Like the Debtors, these parties seek to confirm the Plan and have the Debtors complete the transactions contemplated thereunder.

105.    ***Second***, as set forth in the Frizzley Declaration, the Released Parties subject to the Investigation provided integral support to the Debtors throughout these Chapter 11 Cases. For example, the Plan Sponsor and Committee (together, the "<u>Consenting Stakeholders</u>") have made numerous contributions during the pendency of the Chapter 11 Cases to facilitate the

---

[24]    *See In re W.R. Grace & Co.*, 475 B.R. 34, 107 n.69 (D. Del. 2012) ("Moreover, since *Zenith* was decided, other courts have noted its weaknesses . . . stating that the holding of *Zenith* is 'neither conclusive nor . . . [is it] a list of conjunctive requirements,' but rather is merely 'helpful in weighing the equities of the particular case after a fact-specific review.'") (internal citations omitted).

administration of these cases as well as support confirmation of the Plan. Among other things, the Consenting Stakeholders are parties to the Plan Support Agreement whereby they agreed to, among other obligations, (a) support the consummation and implementation of restructuring transactions contemplated by the Plan; and (b) support, and not object to, delay or impede confirmation or consummation of the Plan, including in the case of the Plan Sponsor, voting in favor of the Plan, and in the case of the Committee, recommending that all Holders of General Unsecured Claims vote in favor of the Plan. In addition, the Consenting Stakeholders agreed to, as applicable, provide mutual consensual releases to the non-Debtor Released Parties. The Consenting Stakeholders and First Lien Agent also, as applicable, either (a) consented to the Debtors' use of cash collateral, or (b) were supportive of the relief contained in the Final Cash Collateral Order. Frizzley Decl., at ¶ 18. Moreover, the Consenting Stakeholders have reached an agreement with respect to the terms of a settlement, embodied in the Plan, regarding the Second Lien Agent's claim for a liquidation event premium under the Note Purchase Agreement. *Id.*

106.  ***Third***, the Debtor Release is essential to the Plan itself. Absent the Debtor Release, it is highly unlikely that the Released Parties would have entered into the Plan Support Agreement and agreed to support the Plan and the Restructuring Transactions contemplated by the Plan. Frizzley Decl., at ¶ 19. In short, the evidence demonstrates that the Debtors would not have been able to build the level of consensus with respect to the Plan and the transactions contemplated thereby, without the Debtor Release.

107.  Importantly, the Debtor Release is the product of arm's-length negotiations between the Debtors and their key stakeholders. Frizzley Decl., at ¶ 19. The Debtors do not release any entity other than a Released Party from any Claims or Causes of Action expressly set forth and preserved by the Plan, and expressly exclude Claims or Causes of Action that are found

to be the result of actual fraud, willful misconduct, or gross negligence.  In light of the foregoing, the Debtors believe that the record of these Chapter 11 Cases fully supports the essential nature of these releases.

108.    **Fourth**, as evidence by the Voting Declaration, 100% of the Holders of Second Lien Convertible Notes Claims and over 84% in number and 68% in amount of Holders of General Unsecured Claims voted to accept the Plan.  As such, a majority of creditors support and/or otherwise do not object to the Debtor Release.

109.    **Fifth**, while the Plan does not provide "full" recoveries to Holders of General Unsecured Claims, it does provide consideration to Holders of General Unsecured Claims in the form of a *pro rata* share of the Second Priority Distribution Trust Beneficiaries' interests in the Distribution Trust, which pursuant to the Disclosure Statement, would provide Holders of General Unsecured Claims with an estimated recovery of between 15.7% and 24.8% of their Claims.  Therefore, the Holders of General Unsecured Claims share in the meaningful recovery in all of the assets of the Debtors' estates after paying the Administrative Expense Claims, Other Secured Claims, Other Priority Claims, First Lien Claims, and Second Lien Convertible Notes Claims (each as defined in the Plan).

110.    For these reasons, the Debtors submit that the Debtor Release is justified, in the best interests of creditors, constitutes an integral part of the Plan, and satisfies the factors considered by courts in determining whether a debtor release is proper.

### 2.    The Third-Party Release Is Consensual and Should Be Approved

111.    Article IX.C of the Plan describes certain releases granted by the Releasing Parties (the "Third-Party Release").  The Plan provides for an appropriately tailored Third-Party Release that applies only to parties that have been provided notice of and consented to the Third-Party Release and, therefore, should be approved.  Generally, a chapter 11 plan may provide

for a consensual release of claims by third parties.  Courts in this jurisdiction routinely approve

such release provisions if, as here, they are consensual.[25]  The determination as to whether a

third-party release is consensual ultimately relies on the particular circumstances at issue in a

particular case.  *In re Indianapolis Downs, LLC*, 486 B.R. 286, 305 (Bankr. D. Del. 2013).  Nor is

affirmative consent to a third party release (as opposed to opting out of that release) required for

such release to be "consensual."  *See id.*; *In re Spansion, Inc.*, 426 B.R. 114, 144 (Bankr. D. Del.

2010).  Similarly, a third-party release is consensual against non-debtor parties where the releasing

parties have the opportunity to opt out of the release, but fail to do so.  *See Indianapolis Downs*,

486 B.R. at 306; *In re Genco Shipping & Trading Ltd.*, 513 B.R. 233, 270 (Bankr. S.D.N.Y. 2014).

112.    Here, the third-party release is fully consensual under applicable authority

in this District.  In soliciting votes on the Plan, the Debtors sent ballots to all Holders of Impaired

Claims (as approved by the Court) entitled to vote, and the ballots stated conspicuously in bolded,

capitalized typeface that certain releases were contained in the Plan and provided instructions for

opting out of such releases.  *See* Disclosure Statement Order, Exs. 3-A, 3-B.  In addition, for the

Holders of Claims and Interests in Impaired, Non-Voting Classes, the respective notices included

a Court-approved opt-in form, clearly providing instructions to Holders with respect to opting in

to the Third Party Release.  *See* Disclosure Statement Order, Exc. 4-B, 5-A, 5-B, 5-C.  The Plan

and the Disclosure Statement provide appropriate and specific disclosure with respect to the

entities, Claims, and Causes of Action that are subject to the Third-Party Release.  Additionally,

---

[25]    *See Wash. Mut.*, 442 B.R. at 352 (observing that consensual third-party releases are permissible); *In re Zenith Elecs. Corp.*, 241 B.R. 92, 111 (Bankr. D. Del. 1999) (approving non-debtor releases for creditors that voted in favor of the plan); *see also Pace Indus., LLC*, No. 20-10927 (MFW), 2020 WL 5015839, at *8 (Bankr. D. Del. May 29, 2020) [Docket No. 215] (approving plan releases and finding them consensual where creditors were required to file objections to the releases to opt out); *In re PES Holdings, LLC*, No. 18-10122 (KG) (Bankr. D. Del. Apr. 2, 2018) [Docket No. 357] (approving third-party release as consensual given notice and consideration provided to releasing parties).

the release provisions of the Plan were conspicuous, emphasized with boldface type in the Plan, the Disclosure Statement, the Ballots, and the applicable notices.[26]  The Debtors provided actual notice to all known parties in interest, including all known Holders of Claims and Interests and all entities listed on the Debtors' creditor matrix, as well as published notice in national and local publications for the benefit of unknown parties in interest.  *See* Solicitation Affidavit and Publication Affidavit.  Therefore, all affected parties have received sufficient notice of the Third-Party Release and have had appropriate time to raise any objections or, where applicable, to opt in or opt out.[27]

113.    The Third-Party Release was an integral negotiated term of the Plan Support Agreement and Plan.  The Third-Party Release facilitated the participation of critical parties in interest in both the Plan process and the chapter 11 process more generally, including the Marketing Process.  The Third-Party Release was crucial to incentivizing parties in interest to support the Plan Support Agreement and Plan by providing critical concessions and cooperation, and to prevent costly and time-consuming litigation regarding various parties' respective rights and interests.  The Third-Party Release is designed to provide finality for the Debtors, the Reorganized Debtors, and the Released Parties.  As such, the Third-Party Release appropriately offers certain protections to parties who participated in the Debtors' restructuring.  Without the Third-Party Release, it is highly unlikely that the Debtors' key stakeholders would have been willing support the Restructuring Transactions contemplated by the Plan Support Agreement and

---

[26]    *See* Plan, Art. IX; Disclosure Statement, Introduction, Arts. V; Disclosure Statement Order, Exs. 3-A, 3-B, 4-B, 5-A, 5-B, 5-C.

[27]    *See In re Exide Techs.*, 303 B.R. 48, 74 (Bankr. D. Del. 2003) (holding that the court was not required to scrutinize a release of claims by third parties where the release binds only creditors who voted to accept the plan); *see also In re Conseco, Inc.*, 301 B.R. 525, 528 (Bankr. N.D. Ill. 2003) ("The [third-party] release now binds only those creditors who agreed to be bound, either by voting for the Plan or by choosing not to opt out of the release. Therefore, the [third-party] release is purely consensual . . .").

Plan, or otherwise have supported the Marketing Process and confirmation of the Plan, and enable the Debtors to conduct value-maximizing Sales and emerge from chapter 11 as the Reorganized Debtors.  Frizzley Decl. ¶ 18.

114.    Moreover, the circumstances of these Chapter 11 Cases warrant the Third-Party Release because it is critical to the success of the Plan and the Debtors' restructuring. As discussed above, the Released Parties provided valuable consideration that enabled the Debtors to propose and implement the Plan and proceed to confirmation efficiently, and each of the Released Parties assisted the Debtors during the reorganization process.  As such, each of the Released Parties is an appropriate recipient of the Third-Party Release.

115.    Accordingly, the Debtors submit that the consensual Third-Party Release is appropriately tailored under the circumstances of these Chapter 11 Cases, is justified by the record of these Chapter 11 Cases, is consistent with the accepted practices within the Third Circuit, and should be approved.

### 3.    The Exculpation Should Be Approved

116.    Courts within the Third Circuit have held exculpation provisions to be appropriate where limited to estate fiduciaries and to conduct not constituting gross negligence or willful misconduct.  *See, e.g.*, *Wash. Mut.*, 442 B.R. at 350–51 (holding that exculpation must be limited to estate fiduciaries and conduct not constituting gross negligence or willful misconduct). Unlike third-party releases, exculpation provisions do not affect the liability of third parties *per se*, but rather set a standard of care of gross negligence or willful misconduct in future litigation by a non-releasing party against an "Exculpated Party" for acts arising out of the Debtors' restructuring. *See In re PWS Holding Corp.*, 228 F.3d 224, 245 (3d Cir. 2000) (finding that an exculpation provision "is apparently a commonplace provision in Chapter 11 plans, [and] does not affect the liability of these parties, but rather states the standard of liability under the Code").

117.   Article IX.D of the Plan provides for the exculpation of the Exculpated Parties[28] (the "Exculpation").   The Debtors submit that the Exculpation is fair and appropriate under both applicable law and the facts and circumstances of these Chapter 11 Cases.   The Exculpated Parties are limited to: (a) the Debtors; (b) Committee and each of its members, solely in their capacity as such, (c) the Debtors' officers and directors who served in such capacity during the Chapter 11 Cases and (d) estate-retained professionals.   Additionally, the scope of the Exculpation does not protect the Exculpated Parties from liability resulting from actual fraud, willful misconduct, or gross negligence.

118.   The Debtors believe that the Exculpation is necessary and appropriate to protect parties who have made substantial contributions to the Debtors' reorganization from future collateral attacks related to actions taken in good faith in connection with the Debtors' restructuring.   The Exculpated Parties played a critical role in formulating, negotiating, soliciting, and implementing, as applicable, the Plan, the Disclosure Statement, the Marketing Process, and related documents in furtherance of the Debtors' restructuring and these Chapter 11 Cases.   The Exculpated Parties have participated in good faith throughout these Chapter 11 Cases, including *inter alia*, with respect to Marketing Process and formulating, negotiating, and implementing the Debtors' Plan Support Agreement and Plan.   Furthermore, the Exculpation has been tailored to address certain comments received from the U.S. Trustee, and it is the Debtors understanding that the U.S. Trustee does not object to the Exculpation as formulated in the Plan following these arm's-length negotiations.

---

[28]   "Exculpated Parties" means, collectively, (a) the Debtors; (b) any Statutory Committee and each of its members, solely in their capacity as such; (c) the Debtors' officers and directors who served in such capacity during the Bankruptcy Cases; and (d) estate-retained professionals.

119.     Accordingly, the Debtors respectfully submit that the Exculpation provides reasonable and appropriate protections and should be approved.

### 4.     The Injunction Is Narrowly Tailored and Should Be Approved

120.     Article IX.E of the Plan provides for an injunction (the "Injunction") that is necessary to implement the Plan's release, discharge, and exculpation provisions.  The Injunction generally provides that all entities are permanently enjoined from commencing or maintaining any action against the Debtors, the Reorganized Debtors, the Released Parties, or the Exculpated Parties on account of or in connection with or with respect to any Claims or Interests released, discharged, or exculpated pursuant to the Plan.  The Plan's release and exculpation provisions, each of which were material components of the comprehensive restructuring agreed to among the parties to the Plan Support Agreement and embodied in the Plan, would be substantially weakened without the Injunction provision.  Thus, the injunction provision is a key provision of the Plan because enforces the release, discharge, and exculpation provisions that are centrally important to the Plan and is thereby necessary to implement the Plan's terms.  As such, to the extent that the Court finds that the exculpation and release provisions are appropriate, it should likewise find that the Injunction provision is appropriate.  In addition, the Injunction provision is narrowly tailored to meet its purpose.  Accordingly, the Injunction provision should be approved.

### D.     The Plan's Other Settlements Are Reasonable and Should Be Approved

121.     Plan's other settlements are appropriate and should be approved. "Compromises are generally favored in bankruptcy." *In re Wash. Mut., Inc.*, 442 B.R. 314, 327 (Bankr. D. Del. 2011).  "A bankruptcy court may approve settlements under Bankruptcy Rule 9019 or as part of a debtor's plan.  The standards for approving settlements under Rule 9019 or as part of a plan are the same." *In re Woodbridge Grp. of Companies, LLC*, 592 B.R. 761, 772 (Bankr. D. Del. 2018).  Courts typically consider four factors when evaluating a proposed settlement:

(a) the probability of success in litigation; (b) the likely difficulties in collection; (c) the complexity

of the litigation involved, and the expense, inconvenience and delay necessarily attending it, and

(d) the paramount interest of the creditors. *Id.* "The law is clear that the threshold for approving

a settlement is not high. All that is required is that the settlement exceed 'the lowest point in the

range of reasonableness.'" *In re Exaeris, Inc.*, 380 B.R. 741, 746 (Bankr. D. Del. 2008) (quoting

*In re Coram Healthcare Corp.*, 351 B.R. 321, 330 (Bankr. D. Del. 2004)).

122.    The plan proponent bears the burden of persuading the court that a

settlement falls within the range of reasonableness. *See In re Wash. Mut.*, 442 B.R. at 328.

However, in determining whether a settlement is appropriate and should be approved, a bankruptcy

court "should not have a 'mini-trial' on the merits, but rather should canvass the issues and see

whether the settlement falls below the lowest point in the range of reasonableness." *In re Nortel*

*Networks, Inc.*, 522 B.R. 491, 510 (Bankr. D. Del. 2014) (quoting *In re W.R. Grace & Co.*, 475

B.R. 34, 77–78 (D. Del. 2012)). Here, the Plan settlements and compromises, including the

Liquidation Payment Settlement, are the result of good-faith, arm's-length negotiations among the

parties, and readily satisfy the "lowest point in the range of reasonableness" required for the

approval of the settlements.

123.    As set forth in the Plan Support Agreement and embodied in the Plan, the

Debtors, Plan Sponsor, and Committee resolved the Plan Sponsor's Liquidation Payment Claim

and any potential Challenges (as defined in the Final Cash Collateral Order), which would have

otherwise been brought by the Committee, including any Challenge with respect to the scope and

validity of the Second Lien Agent's liens, through the Liquidation Payment Settlement. The

Liquidation Payment Settlement, as embodied in the Plan, includes that the Allowed amount of

the Second Lien Convertible Notes Claims shall include the Settled Amounts—*i.e.*, (a) $3.0

54

million; *plus* (b) postpetition interest on the Agreed Second Lien Obligations at the default rate set forth in the Second Lien Convertible Notes Purchase Agreement; *less* (c) postpetition interest on the Agreed Second Lien Obligations at the non-default rate set forth in the Second Lien Convertible Notes Purchase Agreement.  Furthermore, the Debtors' estates will fund $10.0 million or such other amount as is agreed by the Debtors, Second Lien Agent, and the Committee into the Distribution Trust Expense Reserve.  The Liquidation Payment Settlement resolved any potential objection to the Plan by the Committee, and the Committee executed the Plan Support Agreement and agreed to support the Plan in accordance therewith.  The Liquidation Payment Settlement and the Plan provides for, among other things:

- a clear path to the present Plan and the Reorganized Debtors' exit from chapter 11 with no funded debt, providing the Reorganized Debtors with stability to run their business on a go-forward basis;

- comprehensive restructuring transactions following the Marketing Process, which provides recoveries to Holders of General Unsecured Claims (estimated to be between 15.7% and 24.8%) and allows the Reorganized Debtors to emerge quickly from these Chapter 11 Cases;

- significantly improved recoveries to Holders of General Unsecured Claims (Class 5) as compared to their potential recovery in a liquidation; and

- have the support of the Debtors, the Committee, and the Plan Sponsor.

124.    Furthermore, the Liquidation Payment Settlement and the corresponding Plan settlements and compromises enabled the Debtors to build critical support for the Plan and restructuring transactions and resolved potential disputes with the Committee and Plan Sponsor, which will prevent the needless expense to the Debtors' estates of additional litigation in connection with Confirmation.  The Plan's settlements and comprises embody a number of resolutions reached by the Debtors and their stakeholders, including the following:

- the First Lien Agent and Second Lien Agent permitted the Debtors' use of Cash Collateral, which provided the critical stability to run the

Marketing Process, leading to the value-maximizing Sales. Without the consensual use of Cash Collateral, the Debtors would not have been able to operate during the Marketing Process or would have needed to raise debtor-in-possession financing at potentially a greater cost;

- the Plan Sponsor and Committee have supported the transactions contemplated by the Plan Support Agreement, and the Plan Sponsor agreed to settle its Liquidation Payment Claim and to fund the Reorganized Debtors with a significant portion of their Allowed Second Lien Convertible Notes Claim. This significant cash position of the Reorganized Debtors helps position the Reorganized Debtors for long-term success;

- the Plan Sponsor agreed to support and vote in favor of the Plan, guaranteeing an impaired accepting class of Claims under the Plan, which allows the Court to confirm the Plan; and

- the Committee agreed to support the Plan, thus avoiding potential costly litigation regarding potential challenges to the Second Lien Agent's collateral and Confirmation. The Committee's support further paved the way toward a consensual, value-maximizing Plan confirmation process.

125.    The Debtors, Plan Sponsor, and Committee are all represented by experienced and competent counsel and advisors who vigorously negotiated these settlements and compromises, as applicable, and agree that approval of the Plan is a significantly better outcome than the alternatives. Accordingly, the Plan's settlements and compromises collectively represent a reasonable resolution of the issues raised in these Chapter 11 Cases, result in a Plan that is fair and equitable and in the best interest of the Debtors' estates —and surely above the lowest point in the range of reasonableness—and should therefore be approved by the Court.

## VII.    THE PROPOSED MODIFICATIONS TO THE PLAN ARE APPROPRIATE

126.    Section 1127(a) of the Bankruptcy Code provides that a plan proponent may modify its plan at any time before confirmation as long as such modified plan meets the requirements of sections 1122 and 1123 of the Bankruptcy Code. Further, when the proponent of a plan files the plan with modifications with the court, the plan as modified becomes the plan.

Bankruptcy Rule 3019 provides that modifications after a plan has been accepted will be deemed accepted by all creditors and equity holders who have previously accepted the plan if the court finds that the proposed modifications do not adversely change the treatment of the claim of any creditor or the interest of any equity security holder.  Courts interpreting Bankruptcy Rule 3019 have consistently held that a proposed modification to a previously accepted plan will be deemed accepted where the proposed modification is not material or does not adversely affect the way creditors and stakeholders are treated. *See, e.g.*, *In re Glob. Safety Textiles Holdings LLC*, No. 09-12234 (KG), 2009 WL 6825278, at *4 (Bankr. D. Del. Nov. 30, 2009) (finding that nonmaterial modifications to plan do not require additional disclosure or resolicitation); *In re Burns & Roe Enters., Inc.*, No. 08-4191 (GEB), 2009 WL 438694, at *23 (D.N.J. Feb. 23, 2009) (confirming plan as modified without additional solicitation or disclosure because modifications did "not adversely affect creditors").

127.    The Debtors filed amended versions of the Plan on February 8, 2024 to incorporate certain modifications (collectively, the "Modifications") supported by the Plan Sponsor, the Committee, and other parties in interest.  The initial Modifications address, among other things, contracts entered into by the Debtors prior to the Effective Date to prepare for the Reorganized Debtors' operation of Proterra Energy as a standalone business (the "Proterra Energy Transition Contracts") and the costs incurred by the Debtors to prepare for the Reorganized Debtors' operation of Proterra Energy as a standalone business (the "Proterra Energy Transition Costs").  The Modifications included a reduction to the Second Lien Convertible Notes Claims by the aggregate amount of Proterra Energy Transition Costs (the "Proterra Energy Transition Cost Reduction").  In the event that the Debtors and Plan Sponsor are unable to agree on the amount of

the Proterra Energy Transition Cost Reduction, the Court shall determine such amount after notice and a hearing.

128.    The Debtors anticipate additional Modifications to be made in amended Plan, including changes to the Plan to address certain objections and informal comments received by the Debtors, including, among other things:  (a) limitations to the definition of "Exculpated Parties" and "Releasing Parties" and the limitation of Exculpation to acts and omissions occurring after the Petition Date; (b) language preserving the ability of the Distribution Trustee and U.S. Trustee to object to the reasonableness of the Restructuring Expenses of a First Lien Professional or Second Lien Professional (as defined in the Plan); and (c) clarifications regarding the payment of statutory fees.

129.    The Modifications do not adversely affect the treatment of creditors and stakeholders who voted to accept the Plan prior to the filing thereof.   Additionally, the modifications were negotiated and consented to by the Plan Sponsor and Committee.  Accordingly, the Debtors submit that no additional solicitation or disclosure is required on account of the Modifications, and that such Modifications should be deemed accepted by all creditors that previously voted to accept the Plan.

## **Section Two**

## VIII.   **THE OBJECTIONS SHOULD BE OVERRULED**

130.    The Debtors received 13 objections to the Plan, including the four Shareholder Objections,   four   objections   from   surety   providers   to   the   Debtors (the "Surety Objections")[29], four objections from Proterra Transit customer counterparties (the "Transit   Counterparty   Objections"),   and   the   objection   from   the   U.S.   Trustee

---

[29]    *See* Docket Nos. 1117, 1119, 1126, and 1133.

(the "U.S. Trustee Objection").[30]  The Debtors have worked diligently and in good faith to attempt to resolve each of these objections.  As set forth on **Exhibit A**, the Debtors have resolved, or expect to resolve, all of the objections to the Plan, including the U.S. Trustee Objection, except for the Shareholder Objections.  Regarding the Shareholder Objections, having demonstrated that the Plan satisfies the statutory confirmation requirements above and as further described in Exhibit A, the Shareholder Objections should be rejected and overruled.

## IX.   GOOD CAUSE EXISTS TO WAIVE THE STAY OF THE CONFIRMATION ORDER

131.   Bankruptcy Rule 3020(e) provides that "[a]n order confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 3020(e).  Bankruptcy Rules 6004(h) and 6006(d) provide similar stays to orders authorizing the use, sale, or lease of property (other than cash collateral) and orders authorizing a debtor to assign an executory contract or unexpired lease under section 365(f) of the Bankruptcy Code.  Each rule also permits modification of the imposed stay upon court order.

132.   The Debtors submit that good cause exists for waiving and eliminating any stay of the proposed Confirmation Order pursuant to Bankruptcy Rules 3020, 6004, and 6006 so that the proposed Confirmation Order will be effective immediately upon its entry.  *See, e.g.*, *In re Maremont Corp.*, 601 B.R. 1, 116 (Bankr. D. Del. 2019) (waiving stay of enforcement including pursuant to Bankruptcy Rule 3020(e)).  The restructuring contemplated by the Plan was vigorously negotiated among sophisticated parties and is partially premised on the Reorganized Debtors emerging from the Chapter 11 Cases on the Effective Date.  Pugh Decl. ¶ 63.  That restructuring contemplates a series of corporate steps that must be completed on the Effective Date, including,

---

[30]   *See* Docket Nos. 1101, 1118, 1122, and 1123.

among other things, the issuance of the New Common Stock.  Additionally, under the Plan Support Agreement, the Plan must go effective by March 14, 2024.  *Id.*  Given that time is of the essence, immediate effectiveness of the Confirmation Order would facilitate the Debtors' efforts to take the steps necessary to consummate the Plan by the Effective Date.

133.    Finally, as set forth above, given the Debtors' extensive efforts to provide each of the solicited parties, as well as their other stakeholders, a full measure of adequate notice, staying the Confirmation Order will not serve any due process-related ends.  Accordingly, the Debtors request a waiver of any stay imposed by the Bankruptcy Rules so that the proposed Confirmation Order may be effective immediately upon its entry.

## CONCLUSION

WHEREFORE, the Plan complies with all of the requirements of section 1129 of the Bankruptcy Code, and the Debtors respectfully request that the Court enter the Confirmation Order, overrule the remaining Objections, and confirm the Plan.

Dated: March 1, 2024
      Wilmington, Delaware

Respectfully submitted,

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ Andrew L. Magaziner*
Pauline K. Morgan (No. 3650)
Andrew L. Magaziner (No. 5426)
Shella Borovinskaya (No. 6758)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email:  pmorgan@ycst.com
       amagaziner@ycst.com
       sborovinskaya@ycst.com

- and -

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Paul M. Basta (admitted *pro hac vice*)
Robert A. Britton (admitted *pro hac vice*)
Michael J. Colarossi (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Tel:    (212) 373-3000
Fax:    (212) 757-3990
     Email:  pbasta@paulweiss.com
        rbritton@paulweiss.com
        mcolarossi@paulweiss.com

*Counsel to the Debtors and Debtors in Possession*

61

**<u>Exhibit A</u>**

**Response Chart**

| Objecting Party | Status | Proposed Language / Objection | Response to Objection |
|---|---|---|---|
| Martin Perko<br><br>[Docket No. 1007] | Unresolved | Location: N/A<br>• Mr. Perko wrote to the Court to request the Court reject the Plan.<br>• Mr. Perko maintains that the treatment of Interests in TopCo is not fair. | • As set forth in the Memorandum, the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code because it does not unfairly discriminate and is fair and equitable with respect to Holders of Interests in TopCo. |
| Richard Woller<br><br>[Docket No. 1047] | Unresolved | Location: N/A<br>• Mr. Woller wrote to the Court arguing, among other things, that he was unsure why the Plan cannot provide recovery to the Holders of Interests in TopCo. | • As set forth in the Memorandum, the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code because it does not unfairly discriminate and is fair and equitable with respect to Holders of Interests in TopCo. |
| Eric Oben<br><br>[Docket No. 1048] | Unresolved | Location: N/A<br>• Mr. Oben objected to the Plan because Holders of Interests in TopCo would not receive a recovery. | • As set forth in the Memorandum, the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code because it does not unfairly discriminate and is fair and equitable with respect to Holders of Interests in TopCo. |
| A. Khan<br><br>[Docket No. 1091] | Unresolved | Location: N/A<br>• A. Khan argued that counsel to the Debtors, Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul, Weiss") and the Plan Sponsor had "a cozy relationships . . . which has resulted in repeated illegal filings by Proterra for the benefit of [the Plan Sponsor] to the detriment of all other parties in this bankruptcy."<br>• A. Khan described two prior relationships. First, when a Metra SpA ("Metra"), a portfolio company of KPS Capital Partners, LP ("KPS"), purchased Extruded | • As set forth in the Memorandum, the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code because it does not unfairly discriminate and is fair and equitable with respect to Holders of Interests in TopCo.<br>• The allegation of an improper relationship between Paul, Weiss and the Plan Sponsor is unsupported by facts. Regarding the Metra acquisition, Paul, Weiss and the Plan Sponsor were both advisors to Metra and KPS. Therefore, the Plan Sponsor was not Paul, Weiss's client. Regarding the ecoATM investment, Paul, Weiss represented |

Objections[1]

---

[1]    Capitalized terms used but not defined herein have the meanings ascribed to them in the respective Objection.

| Objecting Party | Status | Proposed Language / Objection | Response to Objection |
|---|---|---|---|
| | | Aluminum Corp ("EAC"), Paul, Weiss served as legal counsel to EAC and the Plan Sponsor served as debt capital markets advisor to EAC. Second, Paul, Weiss acted as legal advisor to ecoATM, LLC ("ecoATM") when the Plan Sponsor invested $200mm into ecoATM.<br>• A. Khan argued this relationship has led Paul, Weiss as counsel to the Debtors to attempt to "give illegally an [$]88M premium to [the Plan Sponsor]."<br>• A. Khan further argued that there should be a "proper distribution" made to Holders of Interests in TopCo, which he states "[s]ome have estimated" to be between $0.20 to $0.80 per share. | ecoATM, which was opposite the Plan Sponsor in the transaction. Like with the Metra acquisition, the Plan Sponsor was not Paul, Weiss's client in the ecoATM transaction. As disclosed in the *Debtors' Application for an Order Authorizing the Retention and Employment of Paul, Weiss, Rifkind, Wharton & Garrison LLP as Co-Counsel for the Debtors and Debtors in Possession as of the Petition Date* [Docket No. 98] and supporting declarations [Docket Nos. 98-3, 203], Paul, Weiss represents TD Bank, a former affiliate of the Plan Sponsor, and that Paul, Weiss's representation of TD Bank constituted approximately 0.01% of the Firm's aggregate fee receipts over the 12 months prior to the Petition Date. No party objected to the Debtors' retention of Paul, Weiss, which the Court approved on September 6, 2023 through its *Order Authorizing the Retention and Employment of Paul, Weiss, Rifkind, Wharton & Garrison LLP as Co-Counsel for the Debtors and Debtors in Possession as of the Petition Date* [Docket No. 208].<br>• Additionally, A. Khan's description of the events in these Chapter 11 Cases is incorrect. In an exercise of their fiduciary duties, the Debtors commenced these Chapter 11 Cases without notifying their secured lenders of the |

| Objections[1] | | | |
|---|---|---|---|
| **Objecting Party** | **Status** | **Proposed Language / Objection** | **Response to Objection** |
| | | | impending bankruptcy filing, thereby positioning the Debtors to challenge any Liquidation Payment Amount Claim asserted against their estates by holders of Second Lien Convertible Notes. When the Second Lien Agent filed its proof of claim, which included the Liquidation Premium Claim, the Debtors filed the *Debtors' Objection and Motion for Judgment on the Pleadings to the Premium Claim* [Docket No. 690] to challenge it. The record of these Chapter 11 Cases therefore does not support that the Debtors or Paul, Weiss attempted to "give illegally an [$]88M premium to [the Plan Sponsor]." |
| Southeastern Pennsylvania Transportation Authority ("SEPTA") [Docket No. 1101] | The Debtors anticipate resolving this objection prior to the Confirmation Hearing. | Location: Paragraphs 23–32<br>• The Plan cannot release, enjoin, or exculpate Philadelphia Indemnity Insurance Company (the "Surety") from SEPTA's claims against the Surety in a state court action brought by SEPTA against the Surety and the Debtors. | • The Plan does not affect SEPTA's state court action against the Surety.<br>• The Plan does not provide for a third-party release unless the releasing party consents thereto. SEPTA opted out of providing any third-party release.<br>• Furthermore, SEPTA is permitted to maintain its action against the Surety (but not the Debtors). Article IX.E of the Plan prohibits parties holding Claims discharged under the Plan (including claims discharged under Article IX.E of the Plan) only from asserting such claims against "Debtors, the Reorganized Debtors, the Wind Down Debtors, the Exculpated Parties, or the |

| Objecting Party | Status | Proposed Language / Objection | Response to Objection |
|---|---|---|---|
| | | | Released Parties or the Distribution Trust". As neither the Surety nor any bonds issued by the Surety are any of the foregoing categories, SEPTA's claims against the Surety in the state court action are unaffected by the Plan, which does not release, enjoin, nor exculpate the Surety from such claims.<br>• The Debtors have proposed language to be added to the Confirmation Order to resolve the objection. |
| | The Debtors anticipate resolving this objection prior to the Confirmation Hearing. | Location: Paragraphs 33–37<br>• SEPTA's rights of setoff and recoupment cannot be impaired or limited by the Plan. | • The Debtors have proposed language to be added to the Confirmation Order to resolve the objection. |
| Lexon Insurance Company ("Lexon")<br><br>[Docket No. 1117] | The Debtors anticipate resolving this objection prior to the Confirmation Hearing. | Location: Paragraphs 22–39<br>• Lexon seeks clarity with respect to the treatment of the Lexon Bonds and Lexon Collateral under the Plan.<br>• Lexon asserts the third-party release and injunction provisions are overly broad and impermissible.<br>• Lexon asserts that the Lexon Collateral may not be assumed or assumed and assigned without Lexon's consent. | • The Plan does not affect Lexon's rights, if any, to collateral posted by the Debtors in connection with surety bonds issued by Lexon.<br>• All General Unsecured Claims of Lexon against the Debtors (i.e., those claims, if any, remaining after Lexon applies the collateral posted by the Debtors to satisfy their obligations, if any, to Lexon) are discharged under the Plan pursuant to section 1141(d) of the Bankruptcy Code and are treated pursuant |

The heading row of the table reads: **Objections[1]**

| Objecting Party | Status | Proposed Language / Objection | Response to Objection |
|---|---|---|---|
| | | | to the Plan. Lexon is not entitled to indemnification from the Debtors with respect to any claims that are General Unsecured Claims, as any such obligation is discharged.<br>• The Plan does not provide for a third-party release unless the releasing party consents thereto. Lexon opted out of providing any third-party release.<br>• The Plan does not propose to assume or assume and assign any of the surety bonds issued by Lexon or the related collateral.<br>• The Debtors have proposed language to be added to the Confirmation Order to resolve the objection. |
| GS Operating, LLC d/b/a Gexpro Services ("Gexpro") [Docket No. 1118] | Resolved | Location: Paragraph 17<br>• Gexpro objects to the Plan to the extent its asserted administrative expenses claims are not paid in full as of the Effective Date of the Plan. | • The objection is resolved. |
| Atlantic Specialty Insurance Company and Intact Insurance Company | The Debtors anticipate resolving this objection prior to the | Location: Paragraphs 21–28<br>• Atlantic asserts that the Plan should be modified to expressly preserve all of Atlantic's rights under applicable law, including rights to setoff, recoupment and subrogation.<br>• Atlantic seeks clarity with respect to the treatment of the Atlantic Bonds, Atlantic | • In accordance with Article IX.E of the Plan, Atlantic's assertion of a right to setoff or recoupment preserves such right, which will be unimpaired by the Plan and Confirmation Order.<br>• The Plan does not affect Atlantic's rights, if any, to collateral posted by the Debtors in |

The table header spanning all columns reads: **Objections[1]**

| Objecting Party | Status | Proposed Language / Objection | Response to Objection |
|---|---|---|---|
| (collectively, "Atlantic") [Docket No. 1119] | Confirmation Hearing. | Collateral, and Atlantic Contracts under the Plan, including whether any such contracts are proposed to be assumed by the Reorganized Debtors. | connection with surety bonds issued by Atlantic.<br>• The Plan does not propose to assume or assume and assign any of the surety bonds issued by Atlantic or the related collateral.<br>• The Debtors have proposed language to be added to the Confirmation Order to resolve the objection. |
| Miami-Dade County<br><br>[Docket No. 1122] | The Debtors anticipate resolving this objection prior to the Confirmation Hearing. | Location: Page 1<br>• Miami-Dade County objects to confirmation of the Plan to the extent it requires rejection of Miami-Dade County's executory contracts (the "County Contracts") prior to April 5, 2024. | • The Debtors have determined, in their reasonable business judgment, to reject the County Contracts, which relate to Proterra Transit and thus are not beneficial to the Reorganized Debtors. Miami-Dade County does not challenge this determination and thus, their limited objection should be overruled.<br>• The Debtors have proposed language to be added to the Confirmation Order to resolve the objection. |
| City of Madison, Wisconsin ("Madison")<br><br>[Docket No. 1123] | The Debtors anticipate resolving this objection prior to the Confirmation Hearing. | Location: Paragraphs 2–6<br>• Madison was a contract counterparty of the Debtors, under which the Debtors agreed to provide, among other things, electric transit buses.<br>• Madison maintains that it has claims for repairs that accrued prepetition and postpetition. Madison has been unable to ascertain the costs of these repairs.<br>• Madison requested clarification on the status and cost of repairs due. | • Madison had three contracts rejected pursuant the *Fourteenth Omnibus Order (I) Authorizing the Debtors to Reject Certain Executory Contracts, and (II) Granting Related Relief* [Docket No. 1014] (the "Rejection Order"). Madison was served notice of such Rejection Order as set forth in Docket No. 1080. In accordance with the *Order Establishing Bar Dates for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof* [Docket No. 187], |

| Objections[1] | | | |
|---|---|---|---|
| Objecting Party | Status | Proposed Language / Objection | Response to Objection |
| | | | Madison may file a proof of claim for any rejection damages within 30 days following the Rejection Order, which was entered February 7, 2024.<br>• Any Allowed rejection damages claim will be paid pursuant to the terms of the Plan. Accordingly, Madison is at most a Holder of General Unsecured Claims. Madison does not raise any arguments that the Plan does not satisfy the requirements for confirmation set forth in section 1129 of the Bankruptcy Code, and its objection should be overruled.<br>• The Debtors are working with counsel to Madison to resolve their objection prior to the Confirmation Hearing. |
| Philadelphia Indemnity Insurance Company ("Philadelphia")<br><br>[Docket No. 1132] | The Debtors anticipate resolving this objection prior to the Confirmation Hearing. | Location: Paragraphs 29–43<br>• Philadelphia seeks clarity with respect to its status as a holder of an Other Secured Claim and its ability to recover against its Collateral in relation to the Plan Releases and Injunctions.<br>• Philadelphia asserts that none of the bonds it has may be assumed or assumed and assigned without Philadelphia's consent.<br>• Philadelphia asserts that, too the extent that any executory contract provided on the Schedule of Assumed Executory Contracts and Unexpired Leases is a bonded contract, and the Debtors do not propose to provide replacement bonding or the adequate | • The Plan does not affect Philadelphia's rights, if any, to collateral posted by the Debtors in connection with surety bonds issued by Philadelphia.<br>• The Plan does not provide for a third-party release unless the releasing party consents thereto. Philadelphia opted out of providing any third-party release.<br>• The Plan does not propose to assume or assume and assign any of the surety bonds issued by Philadelphia or the related collateral.<br>• The Debtors have proposed language to be added to the Confirmation Order to resolve the objection. |

| Objecting Party | Status | Proposed Language / Objection | Response to Objection |
|---|---|---|---|
| | | assurance discussed above, the Plan as written impairs Philadelphia's claim and violates sections 365 and 1129(a)(1) of the Bankruptcy Code. | |