UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

|  |  |
|---|---|
| IN RE: | . Chapter 11 |
|  | . |
|  | . Case No. 23-11120(BLS) |
| PROTERRA, INC., et al, | . |
|  | . |
|  | . 824 Market Street |
|  | . Wilmington, Delaware 19801 |
| Debtors. | . |
| . . . . . . . . . . . . . . | . Tuesday, March 5, 2024 |

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE BRENDAN L. SHANNON
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtors:                Andrew L. Magaziner, Esq.
                                Sheila Borovinskaya, Esq.
                                YOUNG, CONAWAY, STARGATT
                                 & TAYLOR, LLP
                                Rodney Square
                                1000 North King Street
                                Wilmington, Delaware 19801

                                Robert A. Britton, Esq.
                                Michael A. Colarossi, Esq.
                                Paul A. Paterson, Esq.
                                Zachary W. Singer, Esq.
                                Tyler Zellinger, Esq.
                                PAUL, WEISS, RIFKIND, WHARTON
                                 & GARRISON, LLP
                                1285 Avenue of the Americas
                                New York, New York 10019

(Appearances Continued)


Audio Operator:                 Electronically Recorded
                                by Dana L. Moore, ECRO

Transcription Company:          Reliable
                                1007 N. Orange Street
                                Wilmington, Delaware 19801
                                (302)654-8080
                                Email:  gmatthews@reliable-co.com


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES:

For the U.S. Trustee:          Timothy J. Fox, Jr., Esq.
                               OFFICE OF THE U.S. TRUSTEE
                               844 King Street, Suite 2207
                               Wilmington, Delaware 19801

For the Official Committee
of Unsecured Creditors:        Eric J. Monzo, Esq.
                               MORRIS JAMES, LLP
                               500 Delaware Avenue, Suite 1500
                               Wilmington, Delaware 19801

                               Jordana L. Renert, Esq.
                               Erica G. Mannix, Esq.
                               LOWENSTEIN SANDLER, LLP
                               1251 Avenue of the Americas
                               New York, New York 10020

For IVECO S.p.A. and EVCO:
GmbH:                          G. David Dean, Esq.
                               COLE SCHOTZ, PC
                               500 Delaware Avenue, Suite 1410
                               Wilmington, Delaware 19801

For Nikola Corporation:        M. Blake Cleary, Esq.
                               POTTER, ANDERSON & CORROON, LLP
                               1313 North Market Street
                               6th Floor
                               Wilmington, Delaware 19801

                               Joshua D. Morse, Esq.
                               PILLSBURY WINTHROP SHAW
                                PITTMAN, LLP
                               Four Embarcadero Center
                               22nd Floor
                               San Francisco, California 94111

For Southeastern
Pennsylvania Transit
Authority:                     Lawrence J. Kotler, Esq.
                               DUANE MORRIS, LLP
                               1201 North Market St, Suite 501
                               Wilmington, Delaware 19801

(Appearances Continued)

```
APPEARANCES:  (Continued)


For Atlantic Specialty
Insurance Company and
Intact Insurance Company:    Bradley P. Lehman, Esq.
                             GELLERT, SCALI, BUSENKELL
                              & BROWN, LLC
                             1201 North Orange Street
                             Suite 300
                             Wilmington, Delaware 19801


For Ventura Systems, Inc.:   Ricardo Palacio, Esq.
                             ASHBY & GEDDES, PA
                             500 Delaware Ave, Suite 8
                             Wilmington, Delaware 19801


For Second Lien Agent,
Anthelion Prodigy
Co-Investment LP (f/k/a
CSI Prodigy Co-Investment
LP), Anthelion I Prodigy
Holdco LP (f/k/a CSI I
Prodigy Holdco LP), and
Anthelion PRTA
Co-Investment LP (f/k/a
CSI PRTA Co-Investment LP):  Peter J. Keane, Esq.
                             PACHULSKI, STANG, ZIEHL
                              & JONES, LLP
                             919 North Market Street
                             17th Floor
                             Wilmington, Delaware 19899

                             Dennis M. Twomey, Esq.
                             Jackson T. Garvey, Esq.
                             SIDLEY AUSTIN, LLP
                             One South Dearborn
                             Chicago, Illinois 60603


For Smith Development and
the City of Edmonton:        Daniel N. Brogan, Esq.
                             BENESCH, FRIEDLANDER, COPLAN
                              & ARONOFF, LLP
                             1313 North Market Street
                             Suite 1201
                             Wilmington, Delaware 19801



(Appearances Continued)
```

APPEARANCES:  (Continued)

For Cigna Health and Life
Insurance Company:                 Jeffrey C. Wisler, Esq.
                                   CONNOLLY GALLAGHER, LLP
                                   1201 North Market Street
                                   20th Floor
                                   Wilmington, Delaware 19801


APPEARANCES VIA ZOOM:  (On the Record)

Also Appearing:                    Martin Perko, *Pro Se*

INDEX

                                                                PAGE

FOURTH AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION          6
FOR PROTERRA, INC. AND ITS DEBTOR AFFILIATE
        Presentment/Argument by Mr. Colarossi                  11
        Argument Re:  Perko Objection                          16
        Court Decision Re:  Shareholder Objections             28
        Comments by Ms. Mannix                                 30
        Comments by Mr. Fox                                    32
        Comments by Mr. Garvey                                 32
        Review of Revised Confirmation Order                   34
        Court Decision                                         37


DEBTORS' THIRTIETH OMNIBUS MOTION FOR ENTRY OF AN ORDER         40
(I) AUTHORIZING THE DEBTORS TO REJECT CERTAIN EXECUTORY
CONTRACTS AND (II) GRANTING RELATED RELIEF




EXHIBIT                                                       EVID.

Lee Declaration                                                 9
Pugh Declaration                                                9
Frizzley Declaration                                           10
Kimm Declaration                                               11

1          (Proceedings commence at 10:03 a.m.)

2          (Call to order of the Court)

3              THE COURT:  Please be seated.  Ready to proceed?

4     Good morning.

5              MR. COLAROSSI:  Good morning, Your Honor.  Michael

6     Colarossi, Paul Weiss, on behalf of the debtors.

7              THE COURT:  Good to see you.

8              MR. COLAROSSI:  Good to see you.

9              So, Your Honor, this day has been a long time

10    coming.  First off, I'd like to thank Your Honor and the

11    staff of this Court, the debtors' management team, the

12    committee and plan advisor, and the respective -- plan

13    sponsor -- excuse me -- and their respective advisors.

14              THE COURT:  It is Oscar season, I guess.

15         (Laughter)

16              MR. COLAROSSI:  The U.S. Trustee's Office and all

17    other stakeholders and their respective advisors, who have

18    worked collaboratively with us to help make this day a

19    reality.

20              During these Chapter 11 cases, the debtors

21    conducted a robust, multi-track marketing process pursuant to

22    this Court's bidding procedures order, resulting in value-

23    maximizing bids for all three of the debtors' business lines.

24    With the Court's approval, the debtors have already

25    consummated the sale of Proterra Power to Volvo and the sale

1    of Proterra Transit and certain related battery leases to

2    Phoenix.  These sales realized meaningful returns benefitting

3    the debtors' estates and preserved hundreds of jobs.

4          Now the debtors seek to maximize the value of the

5    remaining business line, Proterra Energy, through

6    confirmation of their Chapter 11 plan.

7          The plan not only incorporates the highest and best

8    bid fo Proterra Energy, submitted as part of the court-

9    approved bidding process, it also embodies a settlement of

10   the plan sponsor's liquidation premium claim, it preserves

11   jobs, and it facilitates distributions to unsecured

12   creditors.

13         The plan enjoys substantial stakeholder support and

14   reflects months of good faith, arm's length negotiations

15   amongst the debtors, the committee, the plan sponsors, and

16   other parties-in-interest.

17         We are also happy to report that we have

18   consensually resolved almost all objections to confirmation

19   of the plan, with the only exceptions being the four

20   objections filed by certain individual shareholders.

21         THE COURT:  Has the Miami objection, Miami Dade

22   Taxing Authority objection, been resolved?

23         MR. COLAROSSI:  It has been resolved through

24   language reflected in the confirmation order that we filed

25   this morning.

1          THE COURT:  Very good.

2          MR. COLAROSSI:  Unless the Court has any other

3    questions, I will proceed by first introducing the debtors'

4    declarations into evidence.

5          Second, I'll turn to satisfaction of the various

6    requirements for confirmation of the plan.

7          Third, I'll respond specifically to the shareholder

8    objections.

9          And fourth, I'll turn to the changes reflected in

10   the revised proposed confirmation order we filed this

11   morning.

12         THE COURT:  Mr. Colarossi, could you do me a favor?

13   I believe Ms. Borovinskaya gave me a copy of the redline of

14   the plan and I left it on my desk.  I have every confidence

15   there's another copy floating around in all those boxes.

16         MR. COLAROSSI:  There certainly is and we can get

17   you one, Your Honor.

18         THE COURT:  Great.  Thank you.  Sorry about that.

19         You may proceed.

20         MR. COLAROSSI:  All right.  So turning to the

21   declarations, I'd like to move four declarations into

22   evidence.  All of the declarants are present in the courtroom

23   and available for cross-examination.

24         THE COURT:  Why don't we start with the balloting

25   certification.

1    MR. COLAROSSI:  All right.  That's the declaration

2    of James Lee of KCC.  I'd like to move that into evidence.

3        THE COURT:  I would ask if there are any objections

4    to the admission of Mr. Lee's declaration as part of the

5    debtors' case-in-chief for purposes of plan confirmation.

6        (No verbal response)

7        THE COURT:  Very well.  Mr. Lee's declaration is

8    admitted.

9        (Lee Declaration received in evidence)

10       THE COURT:  Is there any party that intends or

11   expects to cross-examine Mr. Lee regarding the contents of

12   his declaration?

13       (No verbal response)

14       THE COURT:  Very well.  Mr. Lee's declaration is

15   admitted without contradiction.

16       MR. COLAROSSI:  Next, I'd like to move for the

17   declaration of Justin Pugh, the debtors' Chief Transformation

18   Officer, in support of confirmation into evidence.

19       THE COURT:  All right.  Are there any objections to

20   Mr. Pugh's declaration, again, as part of the debtors' case-

21   in-chief for purposes of plan confirmation?

22       (No verbal response)

23       THE COURT:  Very well.  Mr. Pugh's declaration is

24   admitted.

25       (Pugh Declaration received in evidence)

1          THE COURT:  Is there any party that intends or

2     expects to cross-examine Mr. Pugh regarding the contents of

3     his declaration?

4          (No verbal response)

5          THE COURT:  Again, Mr. Pugh's declaration is

6     admitted and his testimony is admitted without contradiction.

7          You may proceed.

8          MR. COLAROSSI:  Thank you, Your Honor.

9          Next, I'll move the declaration of Jill Frizzley,

10    the independent director on the debtors' investigation

11    committee, in support of plan confirmation.

12         THE COURT:  All right.  Are there any objections to

13    Ms. Frizzley's declaration, again, as part of the debtors'

14    case-in-chief, for purposes of confirmation?

15         (No verbal response)

16         THE COURT:  Very well.  Ms. Frizzley's declaration

17    is admitted.

18         (Frizzley Declaration received in evidence)

19         THE COURT:  Is there any party that intends or

20    expects to cross-examine Ms. Frizzley regarding the contents

21    of her declaration?

22         (No verbal response)

23         THE COURT:  Ms. Frizzley's declaration is admitted

24    without contradiction.

25         Mr. Colarossi, I think you've got one more.

1          MR. COLAROSSI:  That's right, Your Honor.  Finally,

2     I'll move the declaration of John Kimm of Moelis, the

3     debtors' investment banker, in support of plan confirmation.

4          THE COURT:  All right.  Are there any objection to

5     the admission of Mr. Kimm's declaration, again, in support of

6     plan confirmation?

7          (No verbal response)

8          THE COURT:  Very well.  Mr. Kimm's declaration is

9     admitted.

10          (Kimm Declaration received in evidence)

11          THE COURT:  Is there any party that intends or

12     expects to cross-examine Mr. Kimm regarding the contents of

13     his declaration?

14          (No verbal response)

15          THE COURT:  Very well.  Mr. Kimm's declaration is

16     admitted without contradiction.

17          You may proceed.

18          MR. COLAROSSI:  Thank you, Your Honor.

19          So turning to the confirmation requirements.  To

20     begin, as evidenced by the lead declaration regarding the

21     voting results, the plan was accepted by both voting classes,

22     100 percent in amount and number of claims voting in Class 4,

23     the second lien convertible notes claims voted to accept the

24     plan; and over 84 percent in number and 69 percent of claims

25     in Class 5, that's general unsecured claims, voted to accept

1    the plan.

2              These voting results demonstrate the strong

3    creditor support for the plan and they satisfy the

4    confirmation requirement of an impaired consenting class.

5    They also mirror the support of the plan from the plan

6    sponsor, which now holds 100 percent of the second lien

7    notes, and the committee.

8              This substantial stakeholder support aligns with

9    the fact that the plan not only satisfies the best interests

10   test by providing all stakeholders with a recovery no worse

11   than in a Chapter 7 liquidation, but it also maximizes the

12   value of the debtors' remaining assets for the benefit of

13   their estates.

14             Furthermore, as evidenced by the Pugh declaration,

15   the plan is feasible and unlikely to be followed by

16   subsequent Chapter 11 cases; and, thus, all counterparties to

17   contracts and leases assumed pursuant to the plan have

18   adequate assurance of future performance.

19             Finally, with respect to deemed-to-reject classes

20   receiving no recovery under the plan, the plan satisfies the

21   requirements for cram-down pursuant to Section 1129(b).

22             The plan does not discriminate unfairly.  All

23   similarly situated holders of claims and interests are

24   appropriately classified together and will receive the same

25   treatment.

1          The plan is also fair and equitable.  It provides

2    no distribution to any junior class of claims or interests in

3    accordance with the absolute priority rule.

4          Your Honor, as set forth in our papers, the plan

5    also satisfies the remaining confirmation requirements of

6    1129(a), the mandatory provisions of 1123(a), and the

7    permissive provisions of Section 1123(b).  In general, those

8    provisions are not contested today, so I don't intend to walk

9    through each and every one of them, but I'm happy to answer

10   any questions you might have.

11         THE COURT:  I've done that to people every once in

12   awhile, but I'm not going to do it to you today.

13      (Laughter)

14         THE COURT:  You may proceed.

15         I do note -- and I don't disagree -- the debtors'

16   declarations certainly cover the elements of plan

17   confirmation.

18         I would also note -- and we'll deal with it later -

19   - the debtor, just a few days ago, filed a comprehensive

20   memorandum that is not evidence, obviously, but certainly

21   goes to the record before the Court that demonstrates

22   compliance with the requirements of the Code.

23         You may proceed, Mr. Colarossi.

24         MR. COLAROSSI:  Thank you, Your Honor.

25         So, with that, I'll turn to the shareholder

1    objections, which consist of four letters filed on the docket

2    from individuals identifying themselves as "shareholders."

3    And to be clear, by "shareholder," I mean a holder of an

4    equity interest in Proterra, Inc.

5         At their core, the four objections argue that the

6    plan is unfair or should be rejected because it does not

7    provide a shareholder recovery.  While the debtors certainly

8    sympathize with the shareholders and wish they had sufficient

9    assets to pay all creditors in full and provide a recovery to

10   them, that is just not the case in these Chapter 11 cases.

11        As evidenced by the Pugh and Kimm declarations, the

12   debtors are not solvent, and the estimated recovery to

13   holders of general unsecured claims under the plan is

14   approximately 16 percent to 25 percent.

15        That meaningful recovery is the result of the

16   debtors' extensive efforts to maximize the value of their

17   assets for the benefit of their estates through both an

18   extensive court-approved marketing and bidding process that

19   was open to any and all potential bidders and the

20   consummation of the highest and best bids submitted in that

21   process.  The debtors spoke to over 245 potential bidders and

22   they -- we were absolutely focused on maximizing the value of

23   the debtors' assets for the benefit of their estates.  The

24   market test embodied in the results of that bidding process

25   reflect that the value of the debtors' assets -- they reflect

1   that -- the value of the debtors' assets, not the historical

2   book values of the debtors' assets cited in certain of the

3   shareholder objections.

4          Furthermore, as previously noted, the plan

5   satisfies Section 1129(b)'s cram-down requirements; and,

6   thus, the plan can be confirmed without shareholders voting

7   to accept the plan.

8          We, therefore, respectfully request that the

9   shareholder objections be overruled and that Your Honor

10  confirm the plan.

11         THE COURT:  All right.  I do note, as reflected in

12  the agenda, as well as on the docket, that there are four

13  separate submissions from parties that identify themselves or

14  appear to be shareholders of the debtor.  And I have heard

15  the debtors' response.  And I note, also, that the debtor

16  also addressed these issues in the debtors' memorandum

17  submitted.

18         I would ask -- we'll go through each of the

19  objectors who are identified as parties filing objections in

20  Tabs B, C, D, and E of the agenda filed with the Court today.

21  And I'll start with Mr. Perko, whose objection appears at

22  Docket Number 1007, dated February 6, 2020.

23         Is Mr. Perko present in the courtroom or is anyone

24  here today on his behalf, either live or virtually?

25         MR. PERKO:  Yes.  Hello, Your Honor, I am live.

1          THE COURT:  Good morning, sir.  And welcome.

2          I trust you were able to hear Mr. Colarossi's

3    comments.

4          THE COURT:  Good morning, sir, and welcome.  I

5    trust you were able to hear Mr. Colarossi's comments, and I

6    do appreciate getting your correspondence.  I would be happy

7    to hear from you this morning.

8          MR. PERKO:  No.  Thank you, Your Honor.

9          With regards to the letter that I provided, I -- I

10   hear what counsel has said with regards to historic value

11   that are reported on the financial statements.  And with me,

12   and my background being a CPA, I am quite familiar with GAAP

13   and as -- as they're required to present the financial

14   statements based upon historical.  But at the same time, as

15   well, they need to be presented at recoverable values

16   throughout -- throughout the periods in which it's reported.

17         But that being said, the issue that I've had and

18   which I've addressed in my letter is that both the equity

19   position of the company before based upon historical value,

20   predominantly due to the cash balances that were available,

21   along with the receivables, as well, the equity value in the

22   company, we're still positive before and after -- after

23   Chapter 11 was declared.

24         Now the last statements that were provided were the

25   -- were the January statements.  And on those, it did show

1  that there was an impairment with regards to the sale of the

2  transit business.

3          The issue that I have as a shareholder, as I -- and

4  as well with the opt-in and the opt-out provision that was

5  provided earlier on, I still have no visibility as to the end

6  results of the Volvo sale of the -- of the battery business,

7  which closed on, conveniently, in my opinion, on February

8  1st, while the transit business, although it was part of

9  Track A, was conducted after Track B.  As a result, the Volvo

10 business, then being computed on February 1st, I've got no

11 sight as a shareholder in order to determine what the end

12 value of that operation is.

13         And just based upon my history owning the company -

14 - again, I'm a shareholder before Chapter 11, and I did

15 acquire additional shares after Chapter 11, again, based upon

16 my analysis and seeing that -- the positive equity position -

17 - I have no over -- I have no visibility as to what the

18 value, what the market value is of the Volvo operation.

19         I do know that the end sale is going to result in a

20 cash injection of two hundred and twenty, 230 million

21 additional dollars to the company.  And as of the last

22 statement, there was about $90 million in cash, and as well

23 as I consider a collectible, about $50 million worth of

24 receivables, which would have been needed to provided and

25 allowanced for if it was not deemed collectible.

1      Again, I've got no -- as to if there's any

2  impairment which would drive down the equity position even

3  further, based upon the Volvo, and again, based -- based upon

4  my experience and -- or -- with the company and knowledge of

5  the company, that company itself was the growing arm of the

6  business and -- or comparatively, again, to the transit

7  business.  So, that being said, I wouldn't expect an

8  impairment comparable to the transit business.

9      So, again, for the opt-in/opt-out provision,

10  without that information, I was not given enough in order to

11  determine on that -- on that standpoint.  I decided to opt

12  out accordingly.

13      And even today, with -- with our needing the -- the

14  financial statements from February, which would include the

15  Volvo business, has not been included after that.

16      You know, on the statement as to the stakeholders

17  being represented, me, as a shareholder, I just -- you know,

18  I haven't received any consideration for the -- for the

19  amounts that I've invested into the company before or, again,

20  with TopCo or the BottomCo, if we'll call that.  And I've got

21  an equity interest in the TopCo, which has an equity interest

22  in the -- in the BottomCo, which then results in the

23  consolidation.

24      So, again, looking at the company itself, I looked

25  at a company that -- that was -- had cash and -- and

1　　receivables, current assets that were available in excess of

2　　the amounts of the obligation that -- that were on the books

3　　before and -- and even during the process, again, with the

4　　expectation of the Volvo business being closed.

5　　　　　　So that, along with -- I -- you know, getting back

6　　to my comments, as well, about the equity committee that was

7　　-- that was twice denied, you know, I -- I have an issue to

8　　consider that, you know, some of the existing shareholders,

9　　which represented management and such, you know, the same

10　　management that were involved in this process that were, as

11　　well, be getting their K-I-Ps, and as well if there's

12　　management that's going to be carried over into the new

13　　entity, as well.

14　　　　　　Those -- those management will likely be made whole

15　　with new compensation packages in this -- in this new

16　　operation.  You know, me, as a shareholder, I -- I would, at

17　　minimum, expect, and what I was expecting at least, to get

18　　shares in -- in the new operation, given that I had, again,

19　　equity interests before in a -- in a company that, again, had

20　　-- had strong cash balances.

21　　　　　　You know, the debt up -- you know, the debt itself

22　　by the lender, specifically Cowen, and the potential penalty

23　　with regards to early -- the Chapter 11, and then as well as

24　　the going concern, that -- that was issued in the statements,

25　　you know, with those -- with those situation, I -- I just

1     don't -- again, I -- I have a hard time reconciling as to

2     myself, as a shareholder, that I'm not getting any

3     consideration going forward based upon a company where its

4     debt did not exceed the -- the assets on the business.

5              And again, if we're going to get into an argument

6     about market value and such, I've looked at, even -- even

7     today, even after -- even after the January statement, after

8     the impairment that was included because of the transit

9     business, to which I even expected that transit business to

10    have the most amount of issues, given the contingent

11    liabilities with regards to warranty repairs and who knows

12    what other liabilities that may exist with regards to those

13    operations.  You know, that business I would have expected to

14    be more complex, if that one was more -- closed, again,

15    before the Volvo business, which brought in $230 million,

16    which closed on February 1st, which then will be disclosed on

17    the -- on the February 29th month-end statements.  And you

18    know, here, today, we -- we've got -- you know, me, as a

19    shareholder, I -- I've got no sight as to what the -- what

20    the results for that.

21             So, Your Honor, thank you for the opportunity.

22    With all that being said, I -- again, I reiterate what --

23    what I said earlier on in my letters, that I just -- I have a

24    hard time reconciling as to, again, the company that had the

25    cash balance, that had the asset balance, that had the equity

1    balance.

2              And furthermore, the loss carryforward amounts, you

3    know, I've -- I've never been -- they're not included in the

4    financial statements, but there is a market value with

5    regards to that, you know, upwards of a hundred, $150 million

6    cash, based upon 20 percent -- 21 percent corporate tax rate.

7    So that, itself, is not reflected anywhere that then can be

8    used on the new entity going forward to be applied, again,

9    hopefully, to -- to profits that are generated from it.

10             So, you know, there -- there are elements, yes. You

11   know, the -- the financial statements, the balance sheets

12   specifically reported it at the balance sheet.  And I'm going

13   to ignore the fact that the management had a responsibility,

14   historically, in order to impair and write down assets that

15   weren't -- weren't allowed to be sold.  But they carried on

16   historically, until they started the auction process.

17             We know that transit suffered, you know, a sixty-

18   million-dollar in excess of an impairment loss.  But again,

19   my expectation is Volvo would have -- the Volvo sale and the

20   battery business would have resulted in -- in something more.

21   And then the entity itself is going to be carried on.  And

22   again, I, myself, expected, again fair consideration, fair

23   compensation for the investment that had in the company

24   beforehand.  So thank you for your time, Your Honor --

25             THE COURT:  No --

1    MR. PERKO:  -- and I appreciate it very much.

2    THE COURT:  Thank you, Mr. Perko.

3    Before I ask Mr. Colarossi to respond to your

4  comments, I think it would make the most sense for the Court

5  to hear from the other folks, to the extent that they wish to

6  be heard, so that Mr. Colarossi and the debtor could respond

7  to each of the collective comments.

8    The next objection that's identified on the agenda

9  is a submission from Mr. Richard Woller, which appears at

10  Docket Number 1047.  Is Mr. Woller present in the courtroom

11  or is anyone today, either virtually or live, representing

12  Mr. Woller?

13    (No verbal response)

14    THE COURT:  Very well.  Hearing no response.

15    I would ask -- the next submission is from Eric

16  Oben, which appears at Docket Number 1048.  And I would ask

17  if Mr. Oben is present in the courtroom or if anything -- if

18  he or anyone is participating virtually at today's hearing.

19    (No verbal response)

20    THE COURT:  Hearing no response.

21    The final submission comes from A. Khan, which

22  appears at Docket Number 1091.  And I would ask if Mr. Khan

23  is present in the courtroom or is anyone here today on behalf

24  of Mr. Khan.

25    (No verbal response)

1          THE COURT:  Very well.  Hearing on response.

2          I would ask Mr. Colarossi.  You certainly had an

3    opportunity to hear Mr. Perko's comments.  Obviously, a

4    number of them are anticipated in the debtors' submissions,

5    but I would like your response.

6          MR. COLAROSSI:  Of course, Your Honor.  There's a

7    few points I'd like to emphasize.

8          First, the -- with respect to the sales of Proterra

9    Transit and Proterra Powered, those sales were already

10   approved by orders of this Court and have been consummated.

11   The fact that those sales have closed is reflected in notices

12   filed on the docket of these Chapter 11 cases.  The purchase

13   price is similarly -- for those sales is similarly reflected

14   on the docket.  There are a number of filings, including the

15   APAs, notices.  And the cash result of those sales is

16   reflected in the Pugh declaration in cash -- I mean expected

17   cash amount upon emergence reflected therein.

18         I think another point that is missing from and

19   obviously relevant to the analysis of whether the debtors are

20   solvent is the analysis of the amount of claims asserted

21   against the debtors.  The Pugh declaration includes an

22   estimate of that amount of claims.  And in order to, I mean,

23   make the assessment of whether the debtors are solvent, you,

24   of course, have to think about what are the amount of claims

25   here because the debtors are in bankruptcy.  They're

1  rejecting a number of contracts.  I think we're on the

2  thirty-third or thirty second omnibus rejection motion.

3  There will be rejection damages claims asserted against these

4  estates, which, I mean, would have to be paid in full prior

5  to getting a recovery to shareholders under the plan.

6         Finally, I'd just like to point that the value, as

7  noted previously, is reflected in the market test that the

8  debtors did, pursuant to a court-approved bidding process.

9  It is also established by the uncontroverted evidence that we

10  submitted in the record today from the debtors' investment

11  banker.  And with that --

12         THE COURT:  Okay.

13         MR. COLAROSSI:  -- I'll close.

14         THE COURT:  Mr. Perko, I would give you an

15  opportunity to briefly respond.

16         MR. PERKO:  Your -- thank you, Your Honor.

17         Again, I think, with the -- the issue -- the

18  primary issue that I have with -- with the deal is that it

19  appears that this -- that the cash funds and -- are being

20  used now for a brand -- a new entity, so cash funds, myself

21  as a shareholder, that I -- that I previously had ownership

22  in, are -- that's -- are then now being transferred over to a

23  brand-new entity, where myself, as a shareholder, I receive

24  no consideration in order for that to happen.  I've had no

25  opportunity to vote on the process.

1          Again, in my letter, I addressed, after the Chapter

2     11 was filed, I, as a shareholder, had no opportunity to vote

3     on the management board and individuals that were involved in

4     the process going forward, as well.  I mean, as a

5     shareholder, I didn't get the opportunity for a shareholder

6     meeting to -- to even look at the management and to discuss

7     them specifically, you know, how -- how they were operating,

8     the company.

9          But with -- but again, with that being said, you

10    know, the issue I have is that the cash balance that was --

11    existed before, the cash balance that incurred as a result of

12    the sales, that cash, before entering the process of the

13    sale, is then being used in order to fund a new operation

14    going forward.

15         And I -- I understand that there are obligations,

16    as well, that need to be paid to the existing individuals.

17    But -- but again, for myself, as a shareholder, I would

18    respect to receive consideration for my shares in order for

19    the entity to go on.  I -- I don't see how, if this is

20    allowed for an entity that -- that has, again, the cash

21    balance available to them beforehand, in order to exhaust the

22    -- the debt -- and again, there was that eighty-million-

23    dollar trigger, as well, in the -- in the Cowen, in order --

24    in the Cowen agreement that -- that would have capitalized

25    the company and created an issue for the company.  Again, the

1  management -- I would have expected the management turn, as

2  well, in order to negotiate that.  But again, that -- that's

3  historical.  From that standpoint, I feel management should

4  have had an -- talked to Cowen, in order to negotiate that --

5  that debt, but yet, they -- they went to -- as I noted in my

6  letter, Cowen even commented in -- in your court that -- that

7  they took the unprecedented step in order to declare Chapter

8  11 without speaking to them beforehand.

9         So, with that, that happening, again, the financial

10  position of the company, and the obligations -- yes, the

11  obligations that they had going forward, all these -- all

12  these numbers were provided into the court document.  But

13  wasn't -- what wasn't provided, again, what is the net result

14  of the battery business being sold to Volvo.  Is it a

15  profitable endeavor?  Was there a gain as a result of that

16  sale or not?

17         And -- and for me, again, getting back to the opt-

18  in and opt-out, I don't have that information.  I don't have

19  the final financial information.  I know what the cash sale

20  was.  But again, what -- what are the amounts that are going

21  to result in a potential loss, and there were expected again,

22  especially with the K-A-I-Ps and (indiscernible) if managing

23  is going to receive them, resulting in a -- in a massive loss

24  on the transit business, and then, in turn, resulting in a

25  loss in Volvo, I'd -- I mean, I'd question that from that

1    perspective.

2           But regardless, you know, I -- it just -- me, as a

3    shareholder, I haven't been -- or I don't have complete

4    information, again, with regards to the vote that happened

5    earlier on.  We don't have complete information today, as --

6    as we have this proceeding.  And those financial statements

7    aren't expected to be out, again, in -- not for a couple of

8    weeks.

9           So, again, thanks for your time, Your Honor.  For

10   me, the -- just the obligations -- the equity, the cash that

11   was available to the company before Chapter 11, after the

12   sale, so the transit and the battery business, are now being

13   used in order to fund the business going forward.  And me, as

14   a shareholder, I -- I have a difficult time accepting that a

15   business is going to be carried forward with the cash that I

16   had invested in beforehand.  That cash is then going to be

17   used going forward and I've got not consideration as a result

18   of it.  I got no new equity interest in that business going

19   forward.  And I, effectively, have not been able to vote in

20   that process or, again, with the -- with the shareholder

21   example.  So that -- that is my response, Your Honor, and

22   thank you again for your time.

23           THE COURT:  Thank you, Mr. Perko.  Again, I

24   appreciate your submission, as well as your comments to the

25   Court.

1       Based upon the record before, though, I will

2  overrule your and the other objections.  And I will address

3  the objections on the merits, notwithstanding three of them

4  were not formally presented at today's hearing.  It is my

5  practice, generally, to consider these sorts of submissions

6  on the record, so that the Court is not simply defaulting

7  parties that don't necessarily make the trip or otherwise

8  appear in the proceeding.

9       What I have are submissions, objections to plan

10  confirmation by shareholders of the company.  And I start by

11  echoing Mr. Colarossi's comments and an observation I've made

12  many times:  I'm certainly sympathetic to the consequences of

13  a bankruptcy proceeding and a Chapter 11 case where the

14  corporation is not able to make or afford a distribution to

15  equity security holders who have invested in the company,

16  provided their value in hopes and expectation of getting a

17  meaningful return.

18       But the Bankruptcy Code is structured in a priority

19  scheme that provides only for a distribution to equity after

20  all claims senior to them, which include, essentially, all

21  claims, are paid in full and, if appropriate, with interest.

22  And I'm satisfied that the record here does not demonstrate

23  that there is, indeed, value to make it through the creditor

24  body for a distribution, meaningful or otherwise, to holders

25  of equity.

1          And again, we are at the confirmation hearing,

2   where the Court has already approved and considered, both a

3   sale process and the results of that sale process that

4   brought in consideration.  The math on the results of the

5   sale, as well as the expectation with respect to claims

6   administration in this case, are reflected in Mr. Pugh's

7   declaration, as well as in the debtors' memorandum, and

8   identify that there is no prospect for a distribution to

9   equity here.  And I wish, as I would in many cases, that the

10  sale results had been different and had brought in a

11  sufficient return to provide for that opportunity for that

12  distribution, but those are not the circumstances that are

13  before me today.

14          So, based upon the record before me, again, I

15  appreciate the engagement by the shareholders and I certainly

16  would prefer a different result, but the record before me is

17  undisputed and it requires that the objections be overruled.

18          Mr. Colarossi, you may proceed.

19          MR. COLAROSSI:  Thank you, Your Honor.

20          That concludes my presentation with respect to

21  confirmation.

22          I can go over and -- as reflected in the amended

23  plan filed on the docket at Docket Number 1154, with the

24  support of the PSA parties, we made certain modifications to

25  the plan to resolve certain informal parties and objections

1     of parties-in-interest, and we also filed an amended proposed

2     confirmation order this morning reflecting certain

3     incremental changes to resolve remaining objections.

4            THE COURT:  I think, before we turn to that page-

5     turn, particularly as to the confirmation order -- I

6     appreciate getting it right in advance, but I think it would

7     make sense for us to do at least a substantive page-turn on

8     as we went.  You can skip all of the nonmaterial stuff.

9            Before we do that, though, I think I would like to

10    hear from other parties with respect to any issues, concerns,

11    or support for the debtors' plan, and then we can deal with

12    the technicalities.  I just want to confirm that anyone that

13    wishes to be heard has an opportunity to do so.

14           And I'll start with the committee.  Ms. Renert,

15    welcome.

16       (Participants confer)

17           THE COURT:  Counsel?

18           MS. MANNIX:  Good morning, Your Honor.  Erica

19    Mannix of --

20           THE COURT:  Welcome.

21           MS. MANNIX:  -- Lowenstein Sandler on behalf of the

22    Official Committee of Unsecured Creditors.  With me today is

23    Eric Monzo from Morris James and next to him is my colleague

24    Jordana Renert from Lowenstein Sandler, as well.

25           The committee fully support confirmation of the

1    plan today.  Importantly, the plan implements the global

2    settlement among the committee, the debtors, and the second

3    lien agent.  That, among other things, resolved the

4    liquidation premium and reducing that amount of the asserted

5    claim from over $88 million to a limited amount of $3

6    million.  This significant reduction in the claim paved the

7    way to ensure recoveries to general unsecured creditors.

8         The committee is party to that certain plan support

9    agreement and submitted a letter in connection with

10   solicitation of the plan, recommending that general unsecured

11   creditors vote in favor of the plan.  Ultimately, the general

12   unsecured creditors have voted in favor of the plan, as

13   reflected by the James Lee declaration.

14        The committee was closely involved throughout the

15   Chapter 11 cases, including the sales and marketing processes

16   and formation of the plan.  And from the committee's

17   perspective, the plan is fair and represents the best outcome

18   for the general unsecured creditors.

19        While the committee is here today on a consensual

20   basis, I am more than happy to answer any questions Your

21   Honor may have for me.

22        THE COURT:  I do not have any questions, Ms.

23   Mannix.  I appreciate the report from the committee.

24        Mr. Fox?  Good morning, sir.  Welcome.  It's good

25   to --

1          MR. FOX:  Good morning.

2          THE COURT:  -- to see you.

3          MR. FOX:  Good morning, Your Honor.  And may it

4     please the Court, Tim Fox on behalf of the United States

5     Trustee.

6          I'm pinch hitting for my colleague Ms. Casey, who

7     has another confirmation hearing pending at the same time.

8     But I understand from Ms. Casey that the U.S. Trustee's filed

9     objection has been resolved based on amendments to the plan

10    to address the issues identified in our objection.  And at

11    this time, the U.S. Trustee does not object to the proposed

12    confirmation of the debtors' plan.

13         THE COURT:  Very good.  As always, I appreciate

14    your and your colleagues' engagement with the debtor to raise

15    your issues and then, in this instance, to have successfully

16    resolved them, so thank you for that.

17         MR. FOX:  Thank you, Your Honor.

18         THE COURT:  Great.

19         Can I hear from the second lien agent?  Mr. Garvey.

20    Welcome back.  Good to see you.

21         MR. GARVEY:  Good morning, Judge.  Good to see you,

22    as well.  For the record, Jackson Garvey of Sidley Austin,

23    LLP on behalf of the second lien agent and lenders.  That's

24    the Anthelion parties, formerly known as the Cowen parties.

25         So, Judge, as the plan sponsor, we're excited to be

1  here at confirmation and supportive of confirmation of the

2  plan and of the version of the confirmation order and plan,

3  revised plan, that has been filed by the debtors over the

4  last couple of days.

5          As Judge -- as Your Honor knows, these cases

6  started out on a bit of a rocky footing, from our

7  perspective.  We've gotten to a place -- I'd like to thank

8  the other parties involved, including the debtors, the

9  committee, the U.S. Trustee's Office, and their respective

10  professionals for helping us get there.  But we're excited to

11  take over the energy business and to grow it going forward.

12          Just one point to address from this morning that

13  came up.  I just watch to clarify that the cash that's being

14  left on the balance sheet in the reorganized entity is on

15  account of a dollar-for-dollar reduction in my clients'

16  claim, so it's cash neutral to all other parties.

17          THE COURT:  I understand.  Thank you, Mr. Garvey.

18          MR. GARVEY:  Thank you, Judge.

19          THE COURT:  All right.  I would ask if there are

20  any other parties that wish to be heard in connection with

21  the debtors' request for confirmation of the plan.

22      (No verbal response)

23          THE COURT:  All right.  Mr. Colarossi, shall we

24  take a look at the confirmation order.

25          MR. COLAROSSI:  Happy to, Your Honor.

1          What I handed up to you before was actually --

2          THE COURT:  The plan.

3          MR. COLAROSSI:  -- of the plan.  I can -- if I may

4     approach, I'll give you the confirmation order.

5          THE COURT:  That would be great.  Thanks.

6          And I don't think we need to do the page-turn on

7     the plan.  I've had an opportunity to review that, and I

8     assume the parties have, as well.  We'll focus our attention

9     on the order unless other parties wish to be heard.

10          MR. COLAROSSI:  Thank you, Your Honor.

11          So what I handed you is a changed pages only to

12     help guide the review.

13          THE COURT:  Right.

14          MR. COLAROSSI:  The first page is just kind of

15     feeding in the defined term on the fee examiner order.

16          On the next page, we have, in Paragraph 130, we

17     added language clarifying that any allowed claim of the fee

18     examiner may be paid from the professional --

19          THE COURT:  That's all fine.

20          MR. COLAROSSI:  -- fee escrow.

21          Turning a few pages -- I'm sorry, that just -- the

22     paragraph number changes got picked up in the --

23          THE COURT:  Sure.

24          MR. COLAROSSI:  -- CPO.

25          But on -- the next substantive page is paragraph --

1          THE COURT:  Page 72.

2          MR. COLAROSSI:  72, Paragraph 141.  This reflects

3     language requested by the U.S. Trustee's Office regarding --

4          THE COURT:  This is --

5          MR. COLAROSSI:  -- the reorganized --

6          THE COURT:  -- the U.S. Trustee's vig?

7          MR. COLAROSSI:  Yes.

8       (Laughter)

9          THE COURT:  Okay.

10          MR. COLAROSSI:  Vig and the reorganized debtors'

11     signing of post-confirmation reports.

12          THE COURT:  They got to cover the payments on the

13     departmental Lamborghini.

14       (Laughter)

15          THE COURT:  They love when I make that joke.

16       (Laughter)

17          MR. COLAROSSI:  So turning to Paragraph 143, that's

18     Page 74.  This is just language clarifying the mechanics for

19     payments under the debtors' health insurance policies with

20     Cigna.

21          THE COURT:  Okay.

22          MR. COLAROSSI:  Turning to Paragraph 144 and 145,

23     this reflects --

24          THE COURT:  The surety bonds issues.

25          MR. COLAROSSI:  Yes, surety bonds issues regarding

1    -- I mean preservations of rights, including with respect to

2    surety bond collateral.

3         THE COURT:  Can you give me just a minute to read

4    through --

5         MR. COLAROSSI:  Of course.

6         THE COURT:  -- Paragraph 145?

7      (Pause in proceedings)

8         THE COURT:  Okay.  I understand those changes.

9         MR. COLAROSSI:  Thank you, Your Honor.

10        Turning to Paragraph 151.

11        THE COURT:  Okay.

12        MR. COLAROSSI:  I have to get there myself.  151,

13   that's Page 80.  This is clarifying language requested by

14   Iveco regarding its opt-out of the plan's releases.

15        THE COURT:  Okay.

16        MR. COLAROSSI:  Paragraph 152.

17        THE COURT:  This is the Miami Dade resolution.

18        MR. COLAROSSI:  This is the Miami Dade resolution.

19   It, I mean, addresses the rejection of its contracts with the

20   debtors on a consensual basis.

21        THE COURT:  So we just pushed out the effective

22   date to the date that they had requested in their objection?

23        MR. COLAROSSI:  Exactly.

24        THE COURT:  I got it.  Okay.

25        MR. COLAROSSI:  And that covers it, Your Honor.

1          THE COURT:  All right.  Okay.  I would ask if

2     anyone else wishes to be heard with respect to the debtors'

3     request for an order approving and authorizing confirmation

4     of their plan.

5          (No verbal response)

6          THE COURT:  Hearing no response.

7          I will enter an order confirming the plan.

8          I note, as Mr. Colarossi has walked the Court

9     through, that there are recent changes.  So I will expect

10    that that form of order will be finalized and uploaded

11    promptly.

12         But in approving the confirmation, I note that the

13    Court has considered the four -- on the merits, the four

14    extant objections submitted by shareholders, and the Court

15    has ruled on that and overruled those objections.

16         So that brings us then to the record for plan

17    confirmation.

18         I note that the Court entered a disclosure

19    statement order back in January, appearing at Docket Number

20    951.  The record developed to today reflects scrupulous

21    compliance with the requirements set forth in the court and

22    the Court's order and the solicitation procedures and time

23    line as set forth, again, in that order.

24         I start with Mr. Lee's declaration and the

25    balloting certification that has been admitted into evidence

1    and is not controverted.  That balloting certification

2    clearly demonstrates that the debtor as met the balloting and

3    creditor suffrage requirements for plan confirmation.

4         I note, frankly, overwhelming creditor support, 100

5    percent of Class 4 and 84 percent of Class 5, certainly

6    satisfying the requirements under the Bankruptcy Code Section

7    1125 and 1126, for purposes of plan confirmation.  So the

8    debtor has met that requirement.

9         Also, in our colloquy earlier with Mr. Colarossi,

10   the Court observed that the debtors' declarations of Ms.

11   Frizzley and Mr. Pugh, as well as the debtors' memorandum,

12   lay out in excruciating detail the compliance with Sections

13   1129 and 1123, to the extent applicable, and how those

14   elements have been satisfied by purposes of either the

15   debtors' plan or the debtors' confirmation order.

16        And again, in the absence of objection, I will not

17   burden the record with extensive findings in connection

18   therewith, but simply demonstrate that the record shows the

19   debtors have carried, in fact, their burden on each of those

20   elements.

21        And finally, the Court has admitted the declaration

22   of Mr. Kimm, which reflects the marketing and sale process

23   and the results of that process, leading to, effectively, the

24   consideration that is the predicate and basis of the plan

25   that the Court is being asked to confirm today.

1        And in the absence, as I said, of objection, I'm

2    not going to make detailed findings.  I'm simply prepared to

3    find that the debtors have carried their burden under

4    Bankruptcy Code Section 1129 and 1123, for purposes of

5    confirmation of their plan.

6        I'm not certain.  Has the debtor requested a waiver

7    of the Rule 6004 stay?  I will not -- I had that in my notes

8    somewhere, but I can't recall.

9        MR. COLAROSSI:  We have, Your Honor.  And we would

10   -- I mean, we'd like to go effective as soon as possible.

11   The -- we've been negotiating with the PSA parties to have

12   the plan supplement docs in a position to be executed as soon

13   as possible.  And as, I mean, reflected on the docket, the

14   PSA has a milestone for the effective date of the 14th.

15        THE COURT:  Okay.  I am going to grant the debtors'

16   request for a waiver of the Rule 6004 stay that would

17   otherwise require a fourteen-day stay prior to going

18   effective with the plan.  I'm satisfied that the record

19   before me, as noted, demonstrates that cause, in fact,

20   exists.  And it is often the Court's strong preference that a

21   debtor move forward promptly and go effective as promptly as

22   circumstances permit, in order to give effect to the terms of

23   the plan.

24        So I would be prepared to enter an order that

25   confirms the plan, provides for the provisions and

1    protections that have been identified in the redline that

2    we've walked through, and would also authorize the debtor to

3    go effective on that transaction at its earliest opportunity.

4            With that, the plan is confirmed.  And I would ask

5    if there are any questions.  All right.

6            MR. COLAROSSI:  None from the debtor.  Thank you.

7            THE COURT:  Mr. Colarossi, do we have anything else

8    today?

9            MR. COLAROSSI:  The only remaining items on the

10   agenda are the three rejection motions.

11           THE COURT:  Right.

12           MR. COLAROSSI:  The third omnibus rejection motion,

13   thirtieth and thirty-first.  We have consensually resolved

14   all of the objections to those motions and we plan to file

15   certificates of counsel reflecting the resolutions of those

16   objections shortly after this hearing.  Happy to discuss

17   those or go over them in detail, if you'd like.

18           THE COURT:  Why don't we discuss them -- if they're

19   resolved, why don't we discuss them generally?  But I think

20   that counsel is approaching and is interested in being heard

21   in connection with the claim -- with the lease rejection

22   motions.

23       (Participants confer)

24           MR. COLAROSSI:  Sure.  So happy to present --

25   provide a bit more detail on the thirtieth.

1          THE COURT:  I think that sounds fine.

2          MR. COLAROSSI:  Okay.  So that's Agenda Number 4.

3          The debtors received formal objections and informal

4     comments from Atlantic, Nikola, and Navistar.

5          With respect to Atlantic and Navistar, those

6     contracts are being removed from the schedule, and so they

7     are addressed through the withdrawal of the motion with

8     respect to those contracts.

9          THE COURT:  Okay.

10          MR. COLAROSSI:  With respect to Nikola, we have

11     agreed on language regarding the resolution of disputes

12     between the debtors and, in the future, their successor-in-

13     interest the distribution trust under the plan, with respect

14     to the -- any claims between the debtors and Nikola, and also

15     with respect to a letter of credit posted by Nikola under the

16     -- Nikola's contract with the debtors.

17          THE COURT:  Right.  I saw the references to the

18     letter of credit.

19          Counsel?

20          MR. MORSE:  Thank you, Your Honor.

21          THE COURT:  Good morning and welcome.

22          MR. MORSE:  Good morning.

23          Do you mind if I hand up the redline?

24          MR. COLAROSSI:  Sure.

25          MR. MORSE:  Okay.  Good morning, Your Honor.

1   Joshua Morse from Pillsbury Winthrop Shaw Pittman on behalf

2   of Nikola --

3               THE COURT:  Welcome.

4               MR. MORSE:  -- Corporation.

5               And just to sort of level-set, this dispute is over

6   a fifteen-million-dollar letter of credit.

7               THE COURT:  I saw.

8               MR. MORSE:  And we have resolved the issue.

9               Do you mind if I approach and just --

10              THE COURT:  Of course.

11              MR. MORSE:  -- hand up a redline?

12              THE COURT:  Sure.  Thank you.

13              MR. MORSE:  You're welcome.  And I believe we will

14   be submitting under certificate of counsel a revised order,

15   just to sort of walk you through it.

16              And I do want to thank debtors' counsel for working

17   with us and indulging us to resolve our limited objection.

18   And I understand that other counsel have been working behind

19   the scenes to help us resolve this issue.

20              And to -- just directing your attention to the

21   redline before you, under 5(a), the parties have consented to

22   the termination of the contract as of March 6th.

23              Paragraphs 5(b) through (e), there's going to be an

24   exchange of letters, sort of outlining the dispute and

25   attempting to reach a consensual resolution.

1          All of those letters, under Paragraph 5(g), and any

2    discussions are --

3          THE COURT:  408.

4          MR. MORSE:  -- of course, protected 408.

5          And then, to the extent that there isn't the

6    ability to reach resolution, then the other side, under

7    Paragraph 5(f), is going to come into court.  So we may be

8    back in front of you; hopefully, we won't be.

9          THE COURT:  I got my fingers crossed.

10         (Laughter)

11         THE COURT:  I --

12         MR. MORSE:  It's as --

13         THE COURT:  No, I --

14         MR. MORSE:  -- simple as that.

15         THE COURT:  Yeah, I'm just busting your chops.

16         MR. MORSE:  Of course.

17         THE COURT:  That sounds fine with me.

18         I see, again, what you've laid out is a pretty

19   streamlined process for the parties to exchange their

20   positions and then try to settle the matter.  And in my

21   experience, having the opportunity to return promptly to the

22   Court is one of the things that will often focus parties'

23   attention and lead, hopefully, to a business resolution.  So

24   I'm happy to be on the kind of receiving end of this, and I

25   would be advised by the parties as it plays out.  And you can

1   expect that the Court would accommodate with respect to

2   scheduling and whatever else you might need in the absence of

3   a resolution. But again, my hopes go for a resolution.

4         MR. MORSE:  Yes.  Thank you so much, Your Honor.

5         THE COURT:  Sure.  Thank you, Counsel.

6         MR. MORSE:  Appreciate it.

7         MR. COLAROSSI:  And I mean, I should say all of

8   these changes have the support of the plan sponsor and the --

9         THE COURT:  Right.

10        MR. COLAROSSI:  -- and the committee.

11        THE COURT:  Okay.

12        MR. COLAROSSI:  Unless there's any questions --

13        THE COURT:  No questions.

14        MR. COLAROSSI:  -- I think that would conclude that

15   presentation.

16        THE COURT:  Very good.

17        I would ask if anyone else wishes to be heard.

18     (No verbal response)

19        THE COURT:  All right.  I appreciate your time this

20   morning.  Again, my congratulations to the parties on the

21   plan confirmation process of a substantial and complex

22   matter.  With that, we are adjourned.  I will look for the

23   form of order.  Thank you, Counsel.

24        UNIDENTIFIED:  Thank you, Your Honor.

25     (Proceedings concluded at 10:49 a.m.)

1

## CERTIFICATION

2           I certify that the foregoing is a correct

3     transcript from the electronic sound recording of the

4     proceedings in the above-entitled matter to the best of my

5     knowledge and ability.

6

7

8

9

10    _____        March 7, 2024

11    Coleen Rand, AAERT Cert. No. 341

12    Certified Court Transcriptionist

13    For Reliable

14

15

16

17

18

19

20

21

22

23

24

25